**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN FULTON, | ) | Case No. 20-cv-3118 |
| | ) | |
| *Plaintiff,* | ) | Hon. Joan H. Lefkow |
| | ) | District Judge |
| *v.* | ) | |
| | ) | Hon. Maria Valdez |
| ROBERT BARTIK, *et al.* | ) | Magistrate Judge |
| | ) | |
| *Defendants.* | ) | JURY TRIAL DEMANDED |

| | | |
|---|---|---|
| ANTHONY MITCHELL, | ) | Case No. 20-cv-3119 |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | [Consolidated with *Fulton v. Bartik* |
| *v.* | ) | for pre-trial purposes] |
| | ) | |
| ROBERT BARTIK, *et al.* | ) | |
| | ) | |
| *Defendants.* | ) | JURY TRIAL DEMANDED |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO THE CITY
DEFENDANTS' MOTION TO DISMISS**

Andrea D. Lyon
LYON LAW
53 W. Jackson Blvd., Ste. 1650
Chicago, IL 60604
T: 312-877-5543
F: 312-663-3707
andrea@andrealyon.com

Arthur Loevy
Jon Loevy
Russell Ainsworth
Julia Rickert
Sam Heppell
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
julia@loevy.com

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ..................................................................................................2

ARGUMENT ..........................................................................................................................8

I.     THIS COURT SHOULD DISREGARD DEFENDANTS' REFERENCES TO DISPUTED FACTS IN RESOLVING THEIR MOTION ................................................8

II.     PLAINTIFF'S ALLEGATIONS SATISFY RULE 8.........................................................9

III.    PLAINTIFFS' FEDERAL CLAIMS SHOULD PROCEED ...........................................14

    A.     Plaintiffs' Due Process Claims Are Legally Sound and Sufficiently Pleaded.......14

    B.     Plaintiffs' Fourth Amendment Claims Are Timely ................................................18

    C.     Plaintiffs Have Pleaded Violations of the Thirteenth Amendment ......................20

    D.     Plaintiffs' "Failure to Intervene" Allegations Are Sufficient ...............................21

    E.     Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Section 1983 Conspiracy Claims, and the Intracorporate Conspiracy Doctrine Is Inapplicable.........................................................................................................23

    F.     The City Provides No Basis for Dismissing Plaintiffs' *Monell* Claims.................28

IV.    PLAINTIFFS' STATE LAW CLAIMS SHOULD PROCEED .......................................28

    A.     *Res Judicata* Does Not Bar Plaintiffs' State Law Claims.....................................28

    B.     Plaintiffs' Malicious Prosecution Claims Are Sufficiently Pleaded.....................30

    C.     Plaintiffs' IIED Claims Are Timely.......................................................................32

    D.     Plaintiffs' State Civil Conspiracy Claims Should Not Be Dismissed as Duplicative.......................................................................................................34

V.     PLAINTIFFS' DERIVATIVE CLAIMS SHOULD PROCEED .....................................35

CONCLUSION......................................................................................................................35

## TABLE OF AUTHORITIES

*Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994)..........................................35

*Andersen v. City of Chicago*, No. 16-cv-1963, 2019 WL 6327226
    (N.D. Ill. Nov. 26, 2019)............................................................33

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015)..........................................25

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................10

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017)....................................15, 16

*Awalt v. Marketti*, 75 F. Supp. 3d 777 (N.D. Ill. 2014) ................................... 28

*Baker v. City of Chicago*, No. 16-CV-08940, 2020 WL 5110377 (N.D. Ill. Aug. 31, 2020) .......33

*Barnett v. Stern*, 909 F.2d 973 (7th Cir. 1990) ............................................. 29

*Batchelor v. City of Chicago*, 2020 WL 509034 (N.D. Ill. Jan. 31, 2020) ....................33

*Bausch v. Stryker Corp.*, 630 F.3d 546 (7th Cir. 2010) ....................................35

*BBL, Inc. v. City of Angola*, 809 F.3d 317 (7th Cir. 2015) ................................ 17

*Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984) ............................... 26

*Bergholz v. John Marshall Law Sch.*, No. 18 C 3, 2018 WL 5622052
    (N.D. Ill. Oct. 30, 2018) ....................................................21

*Brady v. Maryland*, 373 U.S. 83 (1963) ....................................................16, 17

*Bridewell v. Eberle*, 730 F.3d 672 (7th Cir. 2013) ....................................... 33

*Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009)..............................................10

*Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4694685 (N.D. Ill. Sept. 26, 2019)............33

*Brzowski v. Sigler*, No. 17 C 9339, 2020 WL 3489484 (N.D. Ill. June 26, 2020) ...................... 30

*Burks v. Raemisch*, 555 F.3d 592 (7th Cir. 2009)...................................... 10

*Carter v. Dolan*, 2009 WL 1809917 (N.D.Ill. June 25, 2009)......................................... 12

*Chatman v. City of Chicago*, 2015 WL 1090965 (N.D. Ill. Mar. 10, 2015)............................... 13

## TABLE OF AUTHORITIES – cont.

*Collins v. Village of Palatine, Ill.*, 875 F.3d 839 (7th Cir. 2017) .................................. 32

*Culp v. Flores*, 454 F. Supp. 3d 764 (N.D. Ill. 2020) .................................................19

*Dobbey v. Jeffreys*, 417 F. Supp. 3d 1103 (N.D. Ill. 2019) .......................................... 27

*Draper v. Rhay*, 315 F.2d 193 (9th Cir. 1963)............................................................21

*Ennenga v. Starns*, 677 F.3d 766 (7th Cir. 2012) .........................................................8

*Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764 (N.D. Ill. 2011) ..............................9

*Fulton v. Zalatoris*, No. 07 C 5569, 2008 WL 697349 (N.D. Ill. Mar. 12, 2008).........................29

*Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003).....................................................16, 17

*General Elec. Captial Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir. 1997)...............8

*Gibbs v. Village of Flossmoor*, 2014 WL 1396184 (N.D. Ill. Apr. 10, 2014) ............................. 33

*Global Relief v. New York Times. Co.*, 2002 WL 31045394 (N.D. Ill. 2002) ...........................8, 9

*Haliw v. City of S. Elgin*, No. 19 C 01515, 2020 WL 1304697
  (N.D. Ill. Mar. 18, 2020)................................................................. 23, 25, 26, 27

*Hartman v. Bd. of Trustees of Comm. Coll. Dist. No. 508*, 4 F.3d 465 (7th Cir. 1993) ...............27

*Heck v. Humphrey,* 512 U.S. 477 (1994)............................................................... passim

*Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344 (7th Cir. 1995)................................8

*Hill v. City of Chicago*, Nos. 19 C 6080, 2020 WL 509031 (N.D. Ill. Jan. 31, 2020)..................33

*Hill v. Cook County*, 2020 WL 2836773 (N.D. Ill. May 31, 2020).................................19

*Hudson v. City of Chicago*, 889 N.E.2d 210 (Ill. 2008) ........................................... 29, 30

*Hutchinson v. Spink*, 126 F.3d 895 (7th Cir. 1997) .....................................................20

*Jacobs v. City of Chicago*, 215 F.3d 758 (7th Cir. 2000) ................................................9

*Johnson v. Rogers*, 944 F.3d 966 (7th Cir. 2019)...................................................... 30

*Johnson v. Village of Maywood*, 2012 WL 5862756 (N.D. Ill. Nov. 19, 2012)..........................11

## TABLE OF AUTHORITIES – cont.

*Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) ...............................................26, 31

*KFC Corp. v. Iron Horse of Metairie Rd., LLC*, No. 18 C 5294, 2020 WL 3892989
    (N.D. Ill. July 10, 2020)...............................................................................................17, 18

*Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3142757 (N.D. Ill. July 25, 2017).................28

*Kuri v. City of Chicago*, 2014 WL 114283 (N.D. Ill. Jan. 10, 2014)............................................ 11

*Leira v. City of Chicago*, 2014 WL 3921359 (N.D. Ill. Aug. 5, 2014)..........................................12

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) ................................................................19

*Lewis v. Downey*, 581 F.3d 467 (7th Cir. 2009) ...........................................................................21

*Manuel v. Joliet*, 903 F.3d 667 (7th Cir. 2018)........................................................................18, 19

*McDonough v. Smith*, 139 S. Ct. 2149 (2019) ................................................................19, 20, 33

*Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691 (N.D. Ill. 2017) ............. 34

*Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).............27

*Piercy v. Whiteside Cty.*, No. 14 CV 7398, 2016 WL 1719802 (N.D. Ill. Apr. 29, 2016) .......... 22

*Pursley v. City of Rockford*, 2019 WL 4918139 (N.D. Ill. Oct. 4, 2019) .................................... 11

*Quinones v. Szorc*, 771 F.2d 289 (7th Cir. 1985) ................................................................... 13, 24

*Rich v. Baldwin*, 479 N.E.2d 361 (Ill. App. 1985).......................................................................32

*Richman v. Sheahan*, 512 F.3d 876 (7th Cir. 2008)...................................................................... 12

*Rivera v. Lake Co.*, 974 F. Supp. 2d 1179 (N.D. Ill. 2013) .................................................... 12, 13

*Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816 (7th Cir. 2009)..................................... 13

*Sanchez v. City of Chicago*, 700 F.3d 919 (7th Cir. 2012) .......................................................... 22

*Sanchez v. Vill. of Wheeling*, 447 F. Supp. 3d 693 (N.D. Ill. 2020) ...........................................15

*Sanders v. City of Chicago Heights*, 2014 WL 5801181 (N.D. Ill. Nov. 7, 2014).......................11

*Sanders v. St. Joseph County*, 806 F. App'x 481 (7th Cir. 2020)................................................. 19

## TABLE OF AUTHORITIES – cont.

*Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020) ........................................................................19

*Sokolova v. United Airlines, Inc.*, No. 18-CV-02576, 2019 WL 1572555
    (N.D. Ill. Apr. 11, 2019) .....................................................................................................17

*Spalding v. City of Chicago*, 24 F. Supp. 3d 765 (N.D. Ill. 2014) ...............................................27

*Spencer v. Village of Arlington Heights*, 2020 WL 4365640 (N.D. Ill. July 30, 2020) ................19

*Spring v. Schwarz*, 2017 WL 4130504 (N.D. Ill. Sep. 9, 2017) ...................................................11

*Swanson v. Citibank*, N.A., 614 F.3d 400 (7th Cir. 2010) ...........................................................10

*Swick v. Liautaud*, 662 N.E.2d 1238 (Ill. 1996) ...............................................................30, 31, 32

*Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464 (7th Cir. 2020) ...................................8

*Taylor v. City of Chicago,* No. 17-CV-03642, 2018 WL 4075402
    (N.D. Ill. Aug. 27, 2018) ....................................................................................................15

*Thermodyne Food Serv. Prod., Inc. v. McDonald's Corp.*, 940 F. Supp. 1300
    (N.D. Ill. 1996) ...................................................................................................................34

*United States v. Kozminski,* 487 U.S. 931 (1988) ........................................................................20

*Virnich v. Vorwald*, 664 F.3d 206 (7th Cir. 2011) .......................................................................10

*Walker v. Thompson*, 288 F.3d 1005 (7th Cir. 2002) ..................................................................24

*Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006) ...........................................................16

*Washington v. Summerville*, 127 F.3d 552 (7th Cir. 1997) ..........................................................32

*Wilson v. City of Chicago*, 2009 WL 3242300 (N.D. Ill. Oct. 7, 2009) .......................................13

*Zidek v. Analgesic Healthcare, Inc.*, No. 13 C 7742, 2014 WL 2566527
    (N.D. Ill. June 6, 2014) ..................................................................................................17, 18

*Zurbriggen v. Twin Hill Acquisition Co., Inc.*, No. 17 C 05648, 2020 WL 1939390
    (N.D. Ill. Apr. 22, 2020) .....................................................................................................18

## STATUTES AND OTHER AUTHORITIES

735 ILCS 5/2-702(j)............................................................................................8

FED. R. CIV. P. 8(a)......................................................................................... 10

FED. R. CIV. P. 12(d).........................................................................................8

U.S. Const. Amend XIII ...................................................................................21

**INTRODUCTION**

In 2003, friends John Fulton and Anthony Mitchell (collectively, "Plaintiffs") were regular teenagers. They had absolutely no connection to the gruesome, gang-style murder of Christopher Collazo in March of that year. But the police officer defendants in this case ("Defendants") saw Fulton and Mitchell as a way to close a murder case without having to conduct a real investigation. They arrested Fulton and Mitchell without probable cause, based on witness statements that Defendants had concocted themselves and knew to be false. Defendants then violently interrogated both teenagers to extract confessions they also knew to be false. They did the same to Plaintiffs' fifteen-year-old friend, Antonio Shaw. Defendants fabricated other evidence against Fulton and Mitchell as well, and they suppressed crucial exculpatory evidence, causing Fulton and Mitchell to be wrongfully convicted for the Collazo murder.

Plaintiffs each lost more than 16 years of their lives to prison before a state court ordered a new trial based on evidence showing that Fulton's alibi for the night of the murder was solid. This alibi also exonerated Mitchell, whose supposed role in the murder, according to Defendants' fictional stories, was always as Fulton's assistant. Rather than pursuing a new trial they knew they could not win, prosecutors dropped all charges against Plaintiffs.

Plaintiffs now seek to vindicate their constitutional and statutory rights that Defendants violated. Defendants have moved to dismiss Plaintiffs' claims on an array of grounds. See Dkt. 55 (motion), 57 (memorandum in support). But their arguments ignore controlling law and do not grapple with the actual facts of the complaints. Instead, Defendants present the facts as they wish them to be and disregard law that goes against their position. For those reasons, as detailed below, Defendants' motions to dismiss should be denied in their entirety.

## FACTUAL BACKGROUND

In detailed complaints spanning over 200 paragraphs, Plaintiffs lay out how Defendants framed them for a murder they did not commit and how Defendants' actions violated their rights, caused their wrongful convictions, and deprived them of their freedom for more than 16 years. Plaintiffs' allegations are summarized here, with additional details discussed where appropriate in response to Defendants' arguments. Plaintiffs also elaborate on certain factual allegations in this response, as the Seventh Circuit permits. "[I]n opposing a Rule 12(b)(6) motion," a plaintiff "may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (collecting cases).

In the early hours of March 10, 2003, Christopher Collazo's partially burned remains were discovered in an alley. Dkt. 1 ¶¶ 18-19.[1] Later that day, Defendants interviewed Collazo's friend and fellow Maniac Latin Disciple, Marcus Marinelli. *Id.* ¶¶ 22, 24. Marinelli denied knowledge of Collazo's murder but told Defendants that he and Collazo had robbed a Black teenager at gunpoint approximately one month earlier. *Id.* ¶ 25. He explained that a girl named Johnitta Griffin had referred the teenager to Collazo to purchase a gun. *Id.*

Defendants subsequently interviewed 17-year-old Griffin, who explained that she was friends with Collazo but knew nothing about his murder. She confirmed that she had referred Fulton, a friend of hers, to Collazo in order to purchase a gun, which Fulton had wanted for personal protection, and that Collazo and Marinelli had robbed him rather than selling him a gun. *Id.* ¶¶ 26-27. Griffin denied knowing of any connection between that robbery and Collazo's murder a month later. *Id.* ¶¶ 28.

---

[1] Because the complaints in these cases track one another and the docket numbers currently line up in both cases, Plaintiffs cite to a single docket number in this brief, which responds to the motion and memorandum in support that Defendants have filed in both cases.

This information gave Defendants no legitimate reason to suspect Plaintiffs of having any involvement in Collazo's murder. At this point, Defendants could—and should—have pursued additional leads and conducted a legitimate investigation into Collazo's murder, which would have cleared Plaintiffs as suspects. Instead, they opted to close the case quickly by framing three Black teenagers: 18-year-old Fulton, 17-year-old Mitchell, and 15-year-old Antonio Shaw. *Id.* ¶ 31. They began by re-interviewing Griffin. Through threats and intimidation, and by feeding her a false narrative that they had concocted, Defendants coerced Griffin to falsely implicate Fulton in Collazo's murder. *Id.* ¶ 32. In Griffin's false new account, supplied by Defendants, Fulton had demanded that she facilitate revenge on Collazo for the February robbery, and she had talked with Fulton multiple times by phone on and around March 9. *Id.*

Defendants could have sought to confirm the information that they had purportedly extracted from Griffin by, for example, checking phone records. If they had done so, they would have learned that no phone calls took place between Griffin and Fulton around the time of Collazo's murder. *Id.* ¶ 35. But Defendants were not conducting a real investigation.

Instead, based solely on Griffin's coerced, fabricated false statements, Defendants entered Fulton's apartment with their guns drawn in the early hours of March 18, 2003 and arrested him. *Id.* ¶ 36. At the time of Fulton's arrest, he was a high school senior, two months away from graduation, and he had no criminal convictions or gang affiliation. *Id.* ¶¶ 37-38. He was living with his fiancée, Yolanda Henderson, and their infant child. *Id.*

At the police station, Defendants questioned Fulton about his relationship with Christopher Collazo. Plaintiff truthfully explained that Johnitta Griffin had put him in touch with Collazo in late January or early February so that he could purchase a gun from him for personal protection. He told police that he, along with Mitchell and Shaw, had gone to meet Collazo, and

Collazo and a friend had robbed Fulton in a stairwell, taking cash totaling $15. *Id.* ¶ 39. Collazo had not sold Fulton a gun. *Id.* ¶ 39. Fulton never saw Collazo again after that night, and he truthfully denied any involvement in Collazo's murder. *Id.* ¶ 40.

Fulton told Defendants what he had actually done the night of March 9. He had spent it at the University of Chicago Hospital emergency room, starting before 9:00 PM, with Yolanda Henderson, who was suffering from strep throat. Directly after the hospital, he was home at their apartment until he left for school on the morning of March 10, several hours after Collazo's body was found. *Id.* ¶ 41. Defendants refused to accept Fulton's truthful denials. They did not take appropriate steps to investigate his alibi. *Id.* ¶ 42. They just continued interrogating him and accusing him of murdering Collazo. *Id.* ¶ 41.

Fulton refused to confess to something he did not do, but Defendants were unrelenting in their demands and employed illegal tactics to overcome his will over the course of several days. Defendants' coercive interrogation tactics included false promises of leniency, threats, and physical violence, all while holding Fulton incommunicado in harsh conditions of detention over an extended period of time. *Id.* ¶ 44. Eventually, they succeeded in coercing Fulton to confess to Collazo's murder—and to implicate his friends, Mitchell and Shaw. *Id.* ¶ 43. Fulton's resulting statements were entirely and demonstrably false, and any true facts they contained about Collazo's murder were fed to him by Defendants. *Id.* ¶ 45.

Fulton's false confession included that he, Mitchell, and Shaw had severely beaten Collazo on the street and had placed him in the trunk of Fulton's car and kept him there for an extended period of time. *Id.* ¶ 50. Because Defendants knew this story to be false, they chose not to have Fulton's car tested for Collazo's blood or DNA, which would have been an obvious investigative step to take if they believed the story they were peddling, but which instead they

4

knew would undermine the false statements they had concocted. *Id.* Instead, Defendants chose to bolster the fabricated false confessions they had coerced from Fulton by fabricating an additional false confession that he never gave. Defendant Bartik, a police officer and polygrapher, obliged in this regard by writing a report of a confession Fulton supposedly gave directly to him, though no such event ever took place. *Id.* ¶ 51.

Defendants arrested Mitchell near midnight on March 19, 2003, over 48 hours into Fulton's interrogation. *Id.* ¶ 60. Mitchell truthfully denied any involvement in or knowledge of Christopher Collazo's murder, but Defendants, by again employing abusive interrogation tactics, ultimately succeeded in coercing a false confession from him as well. *Id.* Mitchell was just 17-years-old at the time of his arrest. Like Fulton, he had no criminal convictions and no gang affiliation. *Id.* ¶ 59. To obtain Mitchell's false confession, Defendants used the same psychologically coercive and physically violent tactics as they had used—and were still using—on Fulton. *Id.* ¶ 61.

Over the course of a multi-day interrogation, Defendants coerced Mitchell to give multiple versions of their fabricated false statements. Mitchell adopted, recanted and amended the story as Defendants honed the "confession" to fit their developing understanding of the objective evidence. *Id.* ¶ 65. The false confession Defendants obtained from Mitchell largely mirrored the false confession that Defendants had extracted from Fulton. *Id.* ¶ 66. The story Mitchell was forced to provide was that he and Shaw had assisted Fulton, the ostensible leader in Defendants' false narrative, to murder Collazo. Defendants used the same techniques to extract a false confession from 15-year-old Shaw, who was also entirely innocent.[2] *Id.* ¶¶ 67-77.

---

[2] Shaw was never tried because his false confession ultimately was suppressed. Defendants' fabrication of that false statement nevertheless harmed Plaintiffs by undercutting the value of truthful exonerating testimony that Shaw could have provided on behalf of Plaintiffs, corroborating their innocence and revealing the coercive police tactics to which all three teenagers were subjected.

Evidence soon emerged that proved Defendants' fabricated narratives about Collazo's murder were false and that Fulton and Mitchell's original and subsequent denials of involvement in the murder were true. *Id.* ¶¶ 66, 78. This evidence includes, but is not limited to, evidence that the logistics of Fulton and Mitchell's supposed travel from the Southside to the Northside and the circumstances of their supposed encounter with Collazo were physically impossible, and phone records and video evidence which confirmed that Fulton had an ironclad alibi for the time he, purportedly assisted by Mitchell and Shaw, was supposedly murdering Collazo. *Id.* ¶ 78.

As the evidence mounted that Fulton's alibi was true, conclusively demonstrating the falsity of Defendants' fabricated evidence against both Fulton and Mitchell, Defendants concocted a new false story to explain how Fulton and Mitchell could have murdered Collazo even though video footage showed him at the hospital and then directly afterward arriving at his apartment and not leaving the building again until morning when he left for school. *Id.* ¶ 80. In the story Defendants finally settled upon, which was also entirely false, they said that Fulton had managed to evade the security cameras at his apartment building by sneaking out through an unmonitored back door in the middle of the night, committing this heinous murder with Mitchell and Shaw, sneaking back in the same way, and then responsibly leaving for school in the morning. *Id.* ¶ 81.

Defendant Shepherd, an investigator for the Cook County State's Attorney's Office, fabricated evidence to support this new false story. *Id.* ¶ 82. He went to Fulton's apartment building and created photographic evidence which he used to give the false appearance that no camera monitored the back door. *Id.* ¶ 83.

In reality, Fulton's apartment building had no unmonitored door that could be used to leave and return undetected. The building had a back door, but that door was monitored by a

security camera—along with an electronic fob system that tracked all entries to the building—meaning that Fulton could not have left and returned to his apartment building without detection. *Id.* ¶¶ 84-85. Defendant Shepherd suppressed this vital exculpatory evidence, which would have conclusively disproved all of the false evidence supposedly implicating Fulton and Mitchell in the Collazo murder. *Id.* ¶ 86.

Plaintiffs were tried for the Collazo murder in 2006. *Id.* ¶ 88. Before and during Plaintiffs' trial, Defendants suppressed a great deal of evidence in addition to the camera evidence that would have exculpated them from involvement in the Collazo murder. Defendants withheld this exculpatory evidence from the State's Attorney's Office, as well as from Plaintiff. *Id.* ¶ 89. Moreover, all of the inculpatory evidence the prosecution presented at trial was fabricated by Defendants. *Id.* ¶ 90.

Based on this fabricated evidence—including the coerced confessions of Fulton and Mitchell and the coerced statements of Griffin—and the suppressed exculpatory evidence, both Plaintiffs were convicted of Collazo's murder and sentenced to 31 years in prison. *Id.* ¶ 97. Without the Defendants' misconduct, Plaintiffs would never have been charged with, prosecuted for, or convicted of the Collazo murder. *Id.* ¶ 98.

From the time Plaintiffs were falsely charged with murder, they have consistently maintained their innocence. They continued to do so after they were convicted, vigorously pursuing all available avenues of post-conviction relief. *Id.* ¶ 99. Finally, in 2019, Cook County Judge Lawrence Flood vacated both Plaintiffs' convictions, based on new evidence of their innocence and in recognition that constitutional violations had tainted their trials. Prosecutors subsequently dropped all charges against them. *Id.* ¶ 100.

## ARGUMENT

### I.    THIS COURT SHOULD DISREGARD DEFENDANTS' REFERENCES TO DISPUTED FACTS IN RESOLVING THEIR MOTION.

An overarching problem with Defendants' motion is that it relies on disputed facts that are absent from Plaintiffs' complaints and that are not proper subjects for judicial notice. Throughout their brief, Defendants cite to Illinois judicial opinions in Plaintiffs' criminal case and to exhibits they have attached to their motion, and they interpret those sources in their own favor to contest the factual allegations of Plaintiffs' complaint.[3] That approach is not permissible. For purposes of deciding a motion to dismiss, courts accept the facts in the complaint as true and grant the plaintiff all reasonable inferences that can be drawn from those facts. *Taha v. Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020). As a result, the alternative set of facts Defendants put forward in their motion must be disregarded.

Courts are generally limited to the complaint when reviewing a motion to dismiss. *General Elec. Captial Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997); see also *Geinosky*, 675 F.3d at 745 n.1. If materials outside the complaint are considered, the motion must be treated as one under Rule 56. FED. R. CIV. P. 12(d); *Global Relief v. New York Times. Co.*, 2002 WL 31045394, at *4 (N.D. Ill. 2002). There is an exception when courts take judicial notice of matters of public record, but they may do so only when those matters "are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned." *Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012) (citing *General Elec. Capital*, 128 F.3d at 1081). For a fact to be judicially noticed, it must be beyond dispute. *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1354 (7th Cir. 1995). As

---

[3]      For example, Defendants describe a trial court's denial of Plaintiffs' petitions for certificates of innocence, Dkt. 57 at 7, despite that this denial is legally flawed, being appealed, and inadmissible in this case, see 735 ILCS 5/2-702(j).

a result, factual findings made by other courts are generally not subject to judicial notice. *General Elec. Capital*, 128 F.3d at 1082 n.6 ("We agree that courts generally cannot take notice of findings of fact from other proceedings for the truth asserted therein because these findings are disputable and usually are disputed."); *Global Relief*, 2002 WL 31045394, at *4 ("Typically, [judicial] notice of a court order is limited to the purpose of recognizing the judicial act or litigation, but not for the truth of the matters asserted in the document.").

If facts from outside of a complaint are subject to dispute, those facts cannot be used to contradict a complaint or to decide a motion under Rule 12(b)(6). *General Electric Capital*, 128 F.3d at 1076-83; *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 771-72 (N.D. Ill. 2011). The Seventh Circuit has reversed dismissals under Rule 12(b)(6) where contradictory facts from outside of the complaint were considered. *Jacobs v. City of Chicago*, 215 F.3d 758, 765 (7th Cir. 2000).

Because factual questions, such as questions about the origin and reliability of evidence introduced in Fulton and Mitchell's criminal trial, are strenuously contested in this case, they are all beyond judicial notice. As a result, where Defendants rely on their own interpretation of external documents and findings in judicial opinions to contest the facts in Plaintiffs' complaints—for example, when they contradict Fulton and Mitchell's allegations that they are factually innocent of the Collazo murder—those facts should be disregarded.

## II. PLAINTIFFS' ALLEGATIONS SATISFY RULE 8.

Defendants argue that Plaintiffs' federal claims against them should be dismissed because, they contend, Plaintiffs are not permitted to plead that misconduct was undertaken jointly by the group of Defendant police officers who investigated the Collazo murder. Dkt. 57 at 9-13. This "group pleading" argument is mistaken and should be rejected.

9

The Federal Rules permit notice pleading and require only "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). The plaintiff is not required to make "detailed factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, dismissal for failure to state a claim under Rule 12(b)(6) is warranted only if "the allegations in the complaint, however true, could not raise a claim of entitlement to relief." *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011), as amended (Jan. 3, 2012). The Court's role at this stage is not to determine whether Plaintiffs' account will ultimately hold up:

> "Plausibility" . . . does not imply that the district court should decide whose version to believe, or which version is more likely than not. . . . [T]he Court is saying instead that the plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself could these things have happened, not did they happen.

*Swanson v. Citibank*, N.A., 614 F.3d 400, 404 (7th Cir. 2010).

Applying these standards, Defendants' "group pleading" argument must be rejected, as similar arguments have been rejected in other cases. First, to the extent Defendants are asserting that Plaintiffs have failed to allege what particular misconduct each individual Defendant committed, their premise is incorrect. Under Seventh Circuit law, the same allegation explicitly directed at a group of defendants is sufficient to plead personal involvement after *Iqbal*, even if each defendant comprising the group is not named individually in each separate paragraph. *Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009) (finding allegations that all members of a group of defendants engaged in misconduct unobjectionable); *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) (holding that a prisoner's statement that he repeatedly alerted a group of medical personnel to his medical condition and they did nothing in response stated a claim so long as the complaint at some point identified all of the medical personnel involved). Plaintiffs have alleged acts of misconduct by a group of investigating police officers during a single

10

criminal investigation, and each Defendant is jointly responsible for each act of misconduct. Defendants argue that the pleadings do not put them sufficiently on notice of what misconduct they committed, but they do not explain how the allegations fail to provide this notice. Each of the individual Defendants is accused of each of the particular allegations directed against him or her, and each is completely free to admit, deny, or claim lack of knowledge as to every single allegation that Plaintiffs have pleaded, consistent with that particular Defendant's view of the truth.

For that reason, courts in this District consistently have denied motions to dismiss filed in wrongful conviction cases where the defendants assert the same "group pleading" argument advanced here. *See*, *e.g.*, *Pursley v. City of Rockford*, 2019 WL 4918139, at *4 (N.D. Ill. Oct. 4, 2019) (rejecting group pleading argument and noting that a plaintiff is entitled under Rule 8 to direct allegations against a whole group of defendant police officers); *Spring v. Schwarz*, 2017 WL 4130504, at *3 (N.D. Ill. Sep. 9, 2017) ("Group pleading that refers to 'Defendants' collectively is sufficient under Rule 8 when a plaintiff provides enough detail about the nature of the allegations to put each defendant on fair notice of the claims."); *Kuri v. City of Chicago*, 2014 WL 114283, at *7 (N.D. Ill. Jan. 10, 2014) ("Although it relies on 'group pleading,' Kuri's complaint is coherent, and the basis of his claims is easily understood."); *Sanders v. City of Chicago Heights*, 2014 WL 5801181, at *3 (N.D. Ill. Nov. 7, 2014) (rejecting defendants' "group pleading" argument because "[u]nder the circumstances, Plaintiff has alleged sufficient details that present a 'story that holds together'"); *Johnson v. Village of Maywood*, 2012 WL 5862756, at *2 (N.D. Ill. Nov. 19, 2012) ("Plaintiff could have made identical factual allegations in five separate paragraphs, alleging one-by-one that each Defendant witnesses or participated in the attack and failed to come to his aid. Plaintiff could have done so, but he was not required

11

to."); *Rivera v. Lake Co.*, 974 F. Supp. 2d 1179, 1194-95 (N.D. Ill. 2013) ("[A]n allegation directed at multiple defendants can be adequate to plead personal involvement[.]"). This Court should adopt the same approach as was taken in the cases above and hold that Plaintiffs' detailed allegations directed against all Defendants are sufficient to put them on notice of the claims against them.

The cases Defendants rely upon, see Dkt. 57 at 9-11, do not support their argument. For example, in *Brooks v. Ross*, the problem with the complaint was not group pleading but that the "behavior Brooks has alleged that the defendants engaged in is just as consistent with lawful conduct as it is with wrongdoing." 578 F.3d at 581. The court in *Brooks* said explicitly that a plaintiff "adequately pleads personal involvement" by "directing [an] allegation at all of the defendants." *Id.* at 582. Another readily distinguishable case they cite is *Leira v. City of Chicago*, where the complaint was not dismissed in its entirety but was dismissed as to "Unspecified Defendants," and the plaintiff was "granted leave to replead after conducting preliminary discovery." 2014 WL 3921359, at *3 (N.D. Ill. Aug. 5, 2014). Similarly, in *Carter v. Dolan*, the plaintiff had been "given the opportunity to identify the individual conduct of each Defendant officer and failed to do so." 2009 WL 1809917, at *3 (N.D. Ill. June 25, 2009). *Carter* was distinguished on this ground by the court in *Rivera v. Lake County*, which rejected a similar "group pleading" argument in a wrongful conviction case and concluded "it would be unreasonable for this Court to expect more specific allegations until the parties have conducted discovery." 974 F. Supp. 2d at 1199. The same is true here.

Second and independently, the very nature of some torts prevents plaintiffs from ascertaining which of many individual defendants is responsible for a specific act of misconduct. *See Richman v. Sheahan*, 512 F.3d 876, 884-85 (7th Cir. 2008) (noting that defendants may be

jointly and severally liable for injuries even if it remains unclear which of them committed specific acts); *Quinones v. Szorc*, 771 F.2d 289, 291 (7th Cir. 1985) ("The very nature of a conspiracy obscures most, if not all, information about the alleged conspirators' agreement . . . . This is particularly true where, as here, much of the information regarding . . . the formation of the conspiracy [is] in the hands of the defendant."). For example, it remains unclear to Plaintiffs—though not to Defendants, who possess far greater personal knowledge—whether certain Defendants were directly involved in fabricating the false statements that they presented as originating from Johnitta Griffin. Dkt. 1 ¶¶ 31-35. But the fact that Plaintiffs lack personal knowledge about some of Defendants' actions does not mean that there is a pleading defect justifying dismissal. *See, e.g.*, *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009) (noting that where a plaintiff has been injured "as the consequence of the actions of an unknown member of a collective body, identification of the responsible party may be impossible without pretrial discovery" and that this is "not by itself a proper ground for dismissal"); *Chatman v. City of Chicago*, 2015 WL 1090965, at *4 (N.D. Ill. Mar. 10, 2015) ("Plaintiff may require discovery before identifying precisely which individual Defendant committed which alleged actions. Given the details alleged in the two-hundred and seven paragraphs in the complaint, Plaintiffs inability to specifically attribute a particular act to a particular individual Defendant does not doom the case at the pleading stage."); *Rivera*, 974 F. Supp. 2d at 1194-95 ("This Court recognizes that a plaintiff may not be able to attribute misconduct to specific individuals where the plaintiff did not know the identity of the offender at the time of the incident."); *Wilson v. City of Chicago*, 2009 WL 3242300, at *2 (N.D. Ill. Oct. 7, 2009 ("[E]ach Defendant knows what he did or did not do and can admit or deny the fact based on this knowledge. . . . The Defendants, and not [the plaintiff], are in possession of the knowledge of

13

precisely which of them, if any, interrogated, manipulated, threatened, or coerced [individuals] into giving false testimony."). This provides an independent reason for the Court to reject Defendants' "group pleading" argument.[4]

### III.   PLAINTIFFS' FEDERAL CLAIMS SHOULD PROCEED.

#### A.  Plaintiffs' Due Process Claims Are Legally Sound and Sufficiently Pleaded.

Plaintiffs have each brought two counts under the Fourteenth Amendment's Due Process Clause. The first (Count II) is focused on Defendants' fabrication of false witness statements. The second (Count IV) is focused on other evidence Defendants fabricated, suppressed, or conspired with each other and Defendant Shepherd to fabricate or suppress. Naturally, there is overlap between the allegations that make up these counts.

Defendants first argue that Count II should be dismissed because, they contend, Plaintiffs have pleaded simple coercion of witness statements and not fabrication of witness statements. Dkt. 57 at 14-19. With respect to Count IV, Defendants argue that it is duplicative of Count II and that, where Count IV is unique, it fails to state a claim. *Id.* at 22-23. They are mistaken as to both counts.

---

[4]   Defendants specifically single out Plaintiffs' allegations against Defendants Girardi, Aguirre, Franco, Cervenka, and Kennedy, arguing that Plaintiffs fail to allege anything against these individuals other than their identity as police officers or supervisors. Dkt. 57 at 12. But this misperceives Plaintiffs' allegations, which are that Defendants (including these five individuals) committed the alleged misconduct as part of a group. And to the extent Defendants' motion is intended to argue that the lack of additional detail around these five officers' roles in the Collazo investigation somehow renders Plaintiffs' allegations implausible, such contention lacks merit: as discussed above, Plaintiffs' approach of alleging misconduct perpetrated by a defined sub-group of the Defendant officers is entirely proper. In any event, while discovery is required to reveal the full extent of each Defendant's role in the conspiracy to frame Plaintiffs, it cannot be disputed that Girardi, Aguirre, Franco, Cervenka and Kennedy played significant roles in the Collazo investigation. Defendant Franco was a youth officer who assisted with the interrogation of (and extraction of false statements from) Antonio Shaw. Defendants Girardi and Aguirre were assigned as detectives to investigate the Collazo murder. And Defendants Cervenka and Kennedy were supervisors assigned to oversee the Collazo investigation, monitoring and approving the conduct of other officers. Taken as a whole, Plaintiffs' allegations far surpass the low pleadings threshold required to show that these five individuals, along with the other police officer defendants, were part of a conspiracy to frame Plaintiffs for the Collazo murder, accomplished through the means described in detail in Plaintiffs' complaints.

Defendants' contention that their alleged misconduct was mere witness coercion fails to credit Plaintiffs' extensive allegations of fabrication. Plaintiffs have alleged that Defendants coerced witness statements, including from Johnitta Griffin, that they knew to be false and had concocted themselves. Dkt. 1 ¶¶ 31-35. Plaintiffs have also alleged that Defendant Bartik fabricated a report about Fulton confessing to him when no such confession, not even a coerced one, was made to Bartik. *Id.* ¶ 51-52. The fabricated evidence was used against Plaintiffs at trial.

Plaintiffs' allegations make out an unmistakable due process fabrication claim. In *Avery v. City of Milwaukee*, 847 F.3d 433, 440 (7th Cir. 2017), defendants who "knew their reports of [plaintiff]'s confession were false when they wrote them" could be liable under due process fabrication theory because "those reports—and the fake confession—were used at trial to convict" plaintiff. *See also Sanchez v. Vill. of Wheeling*, 447 F. Supp. 3d 693, 701 (N.D. Ill. 2020) (fabrication claim sufficiently pleaded where plaintiff alleged "conduct beyond coerciveness"); *Taylor v. City of Chicago,* No. 17-CV-03642, 2018 WL 4075402, at *3 (N.D. Ill. Aug. 27, 2018) (fabrication claim sufficiently pleaded where plaintiff alleged the defendant "fabricated evidence by causing a witness . . . to state falsely" that plaintiff had supplied the gun used in a shooting). The bottom line is that defendants "can't escape liability" for a due process fabrication violation "by shifting the focus to the background facts about the [interrogation] tactics they used," *Avery*, 847 F.3d at 440, but that is what Defendants are trying to do here.

Regarding Plaintiffs' allegations that Defendants suppressed the exculpatory evidence surrounding their fabrication of false witness statements, Defendants contend that due process is not implicated by this suppression because Plaintiffs were aware at the time of their trial that these statements were false. However, while it is true that Plaintiffs, who were of course aware of their own innocence, knew that any evidence of their guilt was necessarily false, that fact

15

certainly did not give Defendants free reign to suppress the exculpatory information where they themselves had created the false evidence. See *Avery*, 847 F.3d at 443-44 ("Avery knew that the informants' statements were false, but he did not know about the pressure tactics and inducements the detectives used to obtain them. . . . In other words, he did not have the evidence that could help him prove that the informants' statements were false.").

Plaintiffs' situation is not analogous to the situation of the plaintiff in *Gauger v. Hendle*, whose suppression claim under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), was concerned only with the truth or falsity of the plaintiffs' own confession, and whose claims "implie[d] that the state has a duty not merely to disclose but also to create truthful exculpatory evidence." 349 F.3d 354, 360 (7th Cir. 2003), overruled on other grounds by *Wallace v. City of Chicago*, 440 F.3d 421 (7th Cir. 2006). Plaintiffs' were not present when Defendants used threats to coerce 17-year-old Johnitta Griffin to adopt the fabricated story Defendants had concocted,[5] putting Plaintiffs' claims squarely on the *Avery* side of the line rather than the *Gauger* side. And even with respect to their own interrogations, Plaintiffs are contending that Defendants, in violation of due process, suppressed evidence of the actions they had taken, and had seen each other take, to obtain these false witness statements—including periods of planning for and debriefing during and after the series of coercive interrogations, of which Plaintiffs had no knowledge, even as to their own

---

[5]     Defendants argue that there can be no *Brady* claim with respect to Johnitta Griffin, pointing to a handpicked section of her trial testimony that they contend fully reveals the exculpatory evidence that Defendants coerced Griffin to make false statements implicating Fulton. Defendants are attempting to support their motion to dismiss with their own interpretation of evidence that is not in the complaint and is not even arguably subject to judicial notice. This attempt is entirely improper when Defendants also deny that their motion should be treated as one under Rule 56. Dkt. 57 at 6 n. 5.  Defendants are wrong about the import of the selected testimony they cite—even taking their own chosen summation of the testimony, trial testimony during which Griffin "testified she did not recall" her prior statements to law enforcement can hardly be argued to suffice as a *Brady*-compliant disclosure to Plaintiffs of the exculpatory evidence of the coercive circumstances in which those statements were fabricated. *Id.* at 18. Regardless, debating the significance of evidence is not permitted at this stage of the case, and the Court should ignore Defendants' attempts to dispute Plaintiffs' allegations, as explained further in Section I, *supra*.

interrogations. A *Brady* claim arising from such a scenario was not addressed in, and is not foreclosed by, *Gauger*.

The full extent of the evidence Defendants suppressed about the interrogations they conducted will not be revealed except through discovery, and the exculpatory value of that evidence can be assessed then. But the opinion in *Gauger*, a summary judgment case, should not be given the broad effect Defendants seek at the pleading stage, and at no stage should it be read so broadly as to mean that police officers never have a *Brady* obligation to provide exculpatory evidence that a criminal defendant has some reason to know exists somewhere.[6] Regardless, these counts contain well-pleaded allegations of unlawful evidence fabrication as well as suppression, and courts do not dismiss alternative legal theories or parts of claims, meaning Defendants' arguments offer no basis for dismissal. See *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims"); see *also, e.g.*, *KFC Corp. v. Iron Horse of Metairie Rd., LLC*, No. 18 C 5294, 2020 WL 3892989, at *3 (N.D. Ill. July 10, 2020); *Sokolova v. United Airlines, Inc.*, No. 18-CV-02576, 2019 WL 1572555, at *3 (N.D. Ill. Apr. 11, 2019); *Zidek v. Analgesic Healthcare, Inc.*, No. 13 C 7742, 2014 WL 2566527 (N.D. Ill. June 6, 2014).

To the extent Count IV overlaps with Count II, Count IV is viable for the same reasons as Count II. And Defendants' further contention that Plaintiffs' fail to state a *Brady* claim simply ignores that they have identified an array of suppressed exculpatory evidence in their complaints, including a clandestine investigative file containing *Brady* material that Defendants withheld from Plaintiffs and prosecutors alike, and evidence regarding the door monitoring systems that

---

[6] For example, if Defendants had videotaped their violent interrogations of Plaintiffs and had not turned over those videos, that would be an obvious *Brady* violation, despite that Plaintiffs are already aware of the circumstances that would be depicted on the video.

Defendants' co-conspirator Defendant Shepherd hid with his misleading photography. Dkt. 1 ¶¶ 29, 82-86, 120.

Defendants complain that Plaintiffs have not provided much detail about their allegations that Defendants destroyed exculpatory evidence. But no such deficit, assuming it exists, can be the basis for dismissing a claim that is supported by other allegations. Again, a "motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc.*, 809 F.3d at 325. "The federal rules allow for dismissal for 'failure to state a claim' but do not provide a basis for striking individual legal theories." *Zidek*, 2014 WL 2566527, at *2. "As long as the plaintiff can, in response to a motion to dismiss, identify some plausible theory that would entitle it to relief on its claim, that claim may move forward and a motion to dismiss other legal theories must be denied." *KFC Corp.*, 2020 WL 3892989, at *3; *see also, e.g., Zurbriggen v. Twin Hill Acquisition Co., Inc.*, No. 17 C 05648, 2020 WL 1939390, at *9 (N.D. Ill. Apr. 22, 2020) ("[I]f there is any identifiable legal theory that supports a given claim, that claim survives, and the Court has no . . . authority . . . to 'dismiss' alternative legal theories presented in support of that claim at this stage of the litigation.").

### B. Plaintiffs' Fourth Amendment Claims Are Timely.

Defendants argue that Plaintiffs did not timely file their Fourth and Fourteenth Amendment claims for the deprivation of their liberty without probable cause, which are set out in Count III of the complaint. Dkt. 57 at 19-22. Defendants argue that the Seventh Circuit's decision on remand in *Manuel v. Joliet*, 903 F.3d 667, 670 (7th Cir. 2018) (*Manuel II*), sets release from custody as the accrual date for this type of claim. But the Seventh Circuit has left it to the district courts to decide in the first instance whether the Supreme Court's recent decision

18

in *McDonough v. Smith*, 139 S. Ct. 2149 (2019), affects the relevant holding of *Manuel II*. See *Savory v. Cannon*, 947 F.3d 409, 412 n.2, 416 n.4 (7th Cir. 2020).

This Court should conclude that the accrual rule described in *Manuel II* does not survive *McDonough*, as was found in *Culp v. Flores*, 454 F. Supp. 3d 764, 769 (N.D. Ill. 2020); *Spencer v. Village of Arlington Heights*, 2020 WL 4365640, at *2 (N.D. Ill. July 30, 2020), and *Hill v. Cook County*, 2020 WL 2836773, at *9-11 (N.D. Ill. May 31, 2020). As with the claim at issue in *Culp*, Plaintiffs' Fourth and Fourteenth Amendment claims in Count III are "premised on the complaint's allegations that he committed no crime," and that there was no basis to accuse him. 454 F. Supp. at 768; see, *e.g.*, Dkt. 1 ¶¶ 1, 6, 10, 79, 197-98. Such claims resemble common-law malicious prosecution claims, which *McDonough* makes clear accrue only with favorable termination of the criminal case. 139 S. Ct. at 2154-55. As the court in *Culp* observed, this understanding of the accrual rule for unlawful deprivation of liberty claims is not only most consistent with *McDonough* and *Savory*, but it is also strongly supported by *Sanders v. St. Joseph County*, 806 F. App'x 481, 484 & n.2 (7th Cir. 2020) ("If, however, a conclusion that Sanders's confinement was unconstitutional would imply the invalidity of an ongoing criminal proceeding or a prior criminal conviction, then *Heck* would continue to bar Sanders's claim after his release and until either those proceedings terminated in his favor or the conviction was vacated.")

Defendants rely upon *Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019), presenting that case as standing for the proposition that a Fourth Amendment claim that would impugn a conviction accrues when the conviction is entered. Dkt. 57 at 20. Such an understanding would turn *Heck* on its head by lifting the *Heck*-bar upon conviction rather than the usual time, when a conviction is vacated. But *Lewis* does no such thing. The plaintiff in that case was never

convicted, and the court stressed that its opinion was dealing "only with a claim of wrongful pretrial detention, not a claim of wrongful conviction." 914 F.3d at 480. What the court actually held in *Lewis* was that the Fourth Amendment claim of the plaintiff in that case was *Heck*-barred under *McDonough* until the plaintiff was released from jail and the charges against him dropped. 914 F.3d at 478. The same is true for Plaintiffs, and their Fourth Amendment claims are therefore timely.

### C. Plaintiffs Have Pleaded Violations of the Thirteenth Amendment.

Plaintiffs' Thirteenth Amendment claims should not be dismissed. The Supreme Court in *United States v. Kozminski* concluded that the Thirteenth Amendment outlaws involuntarily servitude, defined as a condition where "the victim had no available choice but to work or be subject to legal sanction." 487 U.S. 931, 942-43 (1988). And the Seventh Circuit *Hutchinson v. Spink*, 126 F.3d 895, 901 (7th Cir. 1997), acknowledged that this provision of the Thirteenth Amendment can be enforced under § 1983.

Defendants argue that Plaintiffs have not alleged involuntary servitude, Dkt. 57 at 23-24, but in fact Plaintiffs have alleged that they were subjected to involuntary servitude while they were wrongfully imprisoned, Dkt. 1 ¶ 171. *Kozminski* limited the definition of "involuntary servitude" to physical or legal coercion, 587 U.S at 944, which Defendants stress. But that limitation is not inconsistent with Plaintiffs' allegations. Moreover, the Supreme Court specified in *Kozminski* that it was interpreting the words "involuntary servitude" as they were understood by Congress in 1948, when the criminal statute at issue in that case was adopted. *Id.* at 945-46. The door was left open to a more expansive reading outside the context of a criminal statute. *Id.* at 944.

Defendants also contend that, because the Thirteenth Amendment expressly permits involuntary servitude "as a punishment for crime whereof the party shall have been *duly convicted*," U.S. Const. Amend XIII (emphasis added), they are not liable for Plaintiffs' involuntary servitude prior to the vacatur of their convictions. Dkt. 57 at 24. Plaintiffs, however, are claiming that they were convicted in violation of due process, meaning they were never duly convicted. And, unlike the cases that hold that the Thirteenth Amendment is not violated if servitude is imposed during the pendency of a criminal appeal, when the conviction is assumed to be valid absent further relief, *e.g.*, *Draper v. Rhay*, 315 F.2d 193, 197 (9th Cir. 1963), Plaintiffs' convictions have been vacated, and the whole premise of Plaintiffs' due process claims is that Defendants' creation of false evidence and suppression of exculpatory evidence was the reason for their convictions. Their allegations are enough at this stage to plausibly plead a Thirteenth Amendment theory.[7]

### D. Plaintiffs' "Failure to Intervene" Allegations Are Sufficient.

Relying on their previous arguments about "group pleading," Defendants contend that Plaintiffs' claims that Defendants failed to intervene to prevent violations of their rights should be dismissed. Dkt. 57 at 25. The elements of a failure to intervene claim are that an officer "(1) had reason to know that a fellow officer was using excessive force or committing a constitutional violation, and (2) had a realistic opportunity to intervene to prevent the act from occurring." *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009)

---

[7] In any event, as is true of many of Defendants' other arguments for dismissal, their arguments about the Thirteenth Amendment can have no substantial effect on the scope of discovery and so need not be resolved at this stage. *See Bergholz v. John Marshall Law Sch.*, No. 18 C 3, 2018 WL 5622052, at *4 (N.D. Ill. Oct. 30, 2018) ("Resolving this legal question will not change the scope of discovery . . . so this aspect of [the motion to dismiss] is denied without prejudice to renewal at summary judgment or prior to trial.")

The problems with Defendants' "group pleading" argument with regard to failure to intervene are the same problems this argument has with regard to Plaintiffs' claims for the underlying constitutional violations. See Section II., *supra*. Their position disregards that Plaintiffs are accusing each and every one of them of failing to intervene and also ignores the reality that Plaintiffs cannot know before discovery precisely which individual Defendant personally committed each and every act of misconduct against them. Each Defendant could not personally deliver each blow or each threat during the abusive interrogations Plaintiffs endured, but Plaintiffs know that while any one of the Defendants was actively abusing or framing them, the others stood by and did nothing to stop the misconduct. And there is no question that the same officers can be held liable both for directly violating a plaintiff's constitutional rights and for failing to intervene during the same encounter. See *Sanchez v. City of Chicago*, 700 F.3d 919, 926 (7th Cir. 2012) ("[I]t is possible to hold a named defendant liable for his failure to intervene vis-à-vis the excessive force employed by another officer, even if the plaintiff cannot identify the officer(s) who used excessive force on him."). Additionally, Plaintiffs have alleged a broad conspiracy to frame them, and each Defendant had ample opportunity over the course of months and years to step in and stop the various constitutional violations that this conspiracy entailed, yet they all failed to do so.

Resolving whether particular Defendants had a realistic opportunity to intervene at a specific time to stop the violation of Plaintiffs' rights may require discovery. But Plaintiffs' failure to intervene claims are plausibly pleaded and should proceed. See *Piercy v. Whiteside Cty.*, No. 14 CV 7398, 2016 WL 1719802, at *7 (N.D. Ill. Apr. 29, 2016) (explaining that a "more developed factual record might defeat" a failure to intervene claim based on allegations

closely tied to the underlying violation but that the allegations were sufficient at the pleading stage).

**E. Defendants Are Not Entitled to Qualified Immunity on Plaintiffs' Section 1983 Conspiracy Claims, and the Intracorporate Conspiracy Doctrine Is Inapplicable.**

Defendants obliquely reference qualified immunity with respect to Plaintiffs' conspiracy claims under Section 1983. Dkt. 57 at 26-28. They point to a recent decision by another court in this District that held qualified immunity barred such a claim because the Seventh Circuit has not decided whether the "intracorporate conspiracy doctrine" applies to Section 1983 conspiracy claims brought against employees of the same governmental entity. Dkt. 57 at 26 (citing *Haliw v. City of S. Elgin*, No. 19 C 01515, 2020 WL 1304697, at *9 (N.D. Ill. Mar. 18, 2020)). The intracorporate conspiracy doctrine, which was developed in the context of antitrust law, is premised on the idea that two employees of the same corporation cannot conspire with one another when acting within the scope of their employment because the employees are part of the same legal entity. *Haliw*, 2020 WL 1304697, at *9. Defendants ask for the same outcome here as in *Haliw*, presumably meaning they intend to assert qualified immunity.

This argument, based solely on the purported uncertainty surrounding the intracorporate conspiracy doctrine's applicability to Section 1983 claims, should be rejected for multiple reasons. First, Plaintiffs have not alleged a purely intracorporate conspiracy; Plaintiffs have alleged that Defendants also conspired with an employee of Cook County, meaning the conspiracy extended beyond the Chicago Police Department and the intracorporate conspiracy doctrine is not even theoretically applicable. Dkt. 1 at ¶ 160. Second, the qualified immunity analysis in the *Haliw* decision ignored controlling Seventh Circuit precedent and should not be followed by this Court. And, on the merits, applying the intracorporate conspiracy doctrine to claims brought under Section 1983, which (as Defendants emphasize elsewhere) require personal

involvement and treat each defendant as a separate legal entity, would conflict with the very premise of that doctrine and thus make no sense. Finally, even if the intracorporate conspiracy doctrine could theoretically apply to a Section 1983 claim, the claims in this case are of a type that is excluded from the doctrine's operation.

Defendants contend that Plaintiffs' naming of a Cook County investigator as a co-conspirator should be ignored entirely because, they argue, the allegations about the investigator are not specific enough. They cite no authority for simply reading these allegations out of the complaint and reimagining the scope of the alleged conspiracy, which is what they are asking this Court to do. Regardless, Plaintiffs have sufficiently alleged that Defendants conspired with a Cook County investigator to frame them. The complaints describe the purpose of the conspiracy—to frame Plaintiffs and violate their rights—and allege at length how this investigator, Defendant Shepherd, fabricated inculpatory photographic evidence to further the conspiracy. Dkt. 1 ¶¶ 80-86, 94-98, 180-184. Such allegations are more than sufficient. "[I]t is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with." *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002). See also *Geinosky*, 675 F.3d at 749 ("While the complaint makes only rather conclusory direct allegations of conspiracy, the complaint also alleges a pattern of harassment by several officers over a period of months. It is a challenge to imagine a scenario in which that harassment would not have been the product of a conspiracy."); *Quinones*, 771 F.2d at 291 ("The very nature of a conspiracy obscures most, if not all, information about the alleged conspirators' agreement . . .").

Even assuming for the sake of argument that Plaintiffs were alleging a purely intracorporate conspiracy, Defendants' attempted invocation of qualified immunity must be

rejected. *Haliw*, their only support, concluded that officer defendants were entitled to qualified immunity on a Section 1983 conspiracy claim because "[l]iability is not clearly established for conspiracies amongst police officers of a single municipality because the law is unsettled on whether the intracorporate conspiracy doctrine applies to § 1983 claims." 2020 WL 1304697, at *4. But the *Haliw* qualified immunity analysis ignored clear direction from the Seventh Circuit that qualified immunity is concerned with whether *conduct* constitutes a constitutional violation and not with whether liability for that act or that actor has been established. The question in a qualified immunity analysis "is not whether issues concerning the availability of a remedy are settled. The qualified immunity defense focuses instead on whether the official defendant's conduct violated a clearly established constitutional right." *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015).

In *Armstrong*, the defendants had asserted qualified immunity based on ambiguity in the law over whether a due process claim for destruction of exculpatory evidence is cognizable when the plaintiff was not ultimately convicted. *Id.* In rejecting the defendants' position, the Seventh Circuit observed that their argument was "built on a basic misunderstanding about qualified immunity." *Id.* The Supreme Court "has repeatedly described the defense of qualified immunity[] in terms of whether the defendant official's 'actions' or 'conduct' violated clearly established law, not in terms of whether a defendant should have realized he would be held civilly liable for his actions or conduct." *Id.*

Defendants' qualified immunity argument runs afoul of *Anderson* because it is premised entirely on uncertainty over whether the intracorporate conspiracy doctrine shields defendants from individual liability for Section 1983 conspiracy claims. Defendants do not and cannot contend that any uncertainty exists over whether a conspiracy to deprive a person of their

25

constitutional rights violates clearly established law. In fact, the Seventh Circuit has recognized such claims routinely, even against conspirators who are all part of the same law enforcement entity. See, *e.g.*, *Geinosky*, 675 F.3d at 749 (reinstating conspiracy claim against "several members of the same police unit [who] allegedly acted in the same inexplicable way against a plaintiff on many different occasions"); *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) (conspiracy among supervisory officers within the Chicago Police Department); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1253-61 (7th Cir. 1984) (upholding punitive damages for conspiracy among members of the Milwaukee Police Department). In any event, law enforcement officers know that conspiring to deprive a person of their constitutional rights is illegal. Defendants' assertion of qualified immunity under these circumstances should be unequivocally rejected.

Qualified immunity aside, applying the intracorporate conspiracy doctrine to Section 1983 conspiracy claims would be improper. As Defendants acknowledge in their discussion of *Haliw*, "the rationale of the doctrine may not apply to Section 1983 conspiracy claims because the acts of a municipality's employees are not attributable to the governmental employer." Dkt. 57 at 26. *Haliw* makes that point persuasively:

> The intracorporate conspiracy defense makes sense in the corporate and antitrust settings because whatever a business's employees do (within the scope of employment) is deemed to be the act of the business via vicarious liability. In sharp contrast, there is no *respondeat superior* theory of liability against municipalities for § 1983 claims. That is, the acts of a municipality's employees are *not* attributable to the governmental employer in § 1983 cases … So there really is more than one legal entity when individual officers are sued under a § 1983 conspiracy theory: each individual officer is solely responsible for the officer's own conduct.

2020 WL 1304697, at *4 (citations omitted). In other words, the Supreme Court's holding in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978), that the actions of municipal employees generally are not attributable to their employer is diametrically in opposition to the premise of the intracorporate conspiracy doctrine, which is that employees' actions within the scope of their employment generally *are* attributable to their employer. Defendants do not argue against the solid reasoning on this point in *Haliw*.[8]

Finally, even courts that have not categorically rejected the application of the intracorporate conspiracy doctrine to Section 1983 claims have recognized that it does not apply to claims like Plaintiffs', which allege a broad conspiracy within an organization. In *Dobbey v. Jeffreys*, 417 F. Supp. 3d 1103 (N.D. Ill. 2019), the plaintiffs alleged that a group of prison guards conspired to violate their First Amendment rights by canceling a debate class. The court concluded that the intracorporate conspiracy doctrine would not apply even if it theoretically applied to Section 1983 claims because the doctrine does not "apply to conspiracies that are 'part of some broader discriminatory pattern,' or to conspiracies that 'permeate the ranks of the organization's employees.'" *Id.* at 1112 (quoting *Hartman v. Bd. of Trustees of Comm. Coll. Dist. No. 508*, 4 F.3d 465, 470-71 (7th Cir. 1993)). Rather, the doctrine applies to "routine, collaborative business decisions." *Id.* (citation omitted). When a "complaint alleges a widespread pattern of retaliation by multiple defendants throughout CPD's ranks," the intracorporate conspiracy doctrine cannot apply. *Spalding v. City of Chicago*, 24 F. Supp. 3d 765, 779 (N.D. Ill. 2014). Plaintiffs' complaints fall in this category.

---

[8] By not disputing these good reasons for not applying the intracorporate conspiracy doctrine to Section 1983 claims, Defendants seem to concede them. Should Defendants decide to make new arguments in their reply brief about the applicability of the intracorporate conspiracy doctrine, the Court should treat those arguments as forfeited or should decline to consider them without first granting Plaintiff an opportunity to respond.

**F. The City Provides No Basis for Dismissing Plaintiffs' *Monell* Claims.**

Defendant City of Chicago argues that Plaintiffs' policy or practice claims under *Monell* should be dismissed for the same reasons the individual Defendants give for the dismissal of other claims. Dkt. 57 at 13-14. But Plaintiffs' claims against the individual Defendants should not be dismissed, as explained throughout this brief. Moreover, *Monell* claims can stand alone under some circumstances. See, *e.g.*, *Awalt v. Marketti*, 75 F. Supp. 3d 777, 782 (N.D. Ill. 2014) ("The Court finds these scenarios reasonable enough such that the possibility of *Monell* liability will not be foreclosed if the jury finds there is no individual liability."). Defendants' brief does not make clear whether they intend to advance the argument that a finding of individual liability is necessary to establish *Monell* liability, and most of their argument is appropriately stated in terms of the need to establish an underlying constitutional violation. To the extent that Defendants do intend to make that argument, it is so underdeveloped that it should be deemed waived. *Kluppelberg v. Burge*, No. 13 C 03963, 2017 WL 3142757, at *5 (N.D. Ill. July 25, 2017) ("Defendants do not support this cursory argument with pertinent authority. The court therefore considers the argument waived.")

**IV. PLAINTIFFS' STATE LAW CLAIMS SHOULD PROCEED.**

**A. *Res Judicata* Does Not Bar Plaintiffs' State Law Claims.**

Defendants argue that Plaintiffs' state law claims for malicious prosecution, intentional infliction of emotional distress, and conspiracy are barred by *res judicata* under the "Hudson doctrine." Dkt. 57 at 30-31. In *Hudson v. City of Chicago*, the Illinois Supreme Court held that "if there is an adjudication on the merits of one claim in a case, this determination will have *res judicata* effect on the filing of any other claims that could have been raised and determined in the first case," even if these other claims actually had been in the original case and had been

voluntarily dismissed by the plaintiff. *Hudson v. City of Chicago*, 889 N.E.2d 210, 220 (Ill. 2008). *Hudson* did not ditch the standard elements of *res judicata*, which remain (1) "a final judgment on the merits rendered by a court of competent jurisdiction," (2) "an identity of cause of action," and (3) the same parties or their privies in both cases. *Id.* at 213. Defendants point to two previous federal lawsuits Plaintiffs filed and voluntarily dismissed and argue that the second is *res judicata* in this case with respect to Plaintiffs' state law claims.

Fulton and Mitchell filed their first lawsuit concerning their framing for the Collazo murder in 2005, while they were still awaiting trial. As Defendants recount, they voluntarily dismissed an individual defendant from that case, and then later voluntarily dismissed the entire case. They filed suit again in 2007 after they had been convicted of Collazo's murder, and the court ruled that all but one of their claims was barred by the delayed accrual rule of *Heck v. Humphrey,* 512 U.S. 477 (1994). *Fulton v. Zalatoris*, No. 07 C 5569, 2008 WL 697349, at *3-*4 (N.D. Ill. Mar. 12, 2008). Under *Heck*, claims necessarily impugning a conviction will not accrue until the conviction has been set aside. 512 U.S. at 487. The judge then stayed the sole claim that he had concluded was not *Heck*-barred—a state law false arrest claim—explaining that allowing it to proceed would interfere with Plaintiffs' pending criminal appeal. Plaintiffs later opted to dismiss what remained of their now-stayed case voluntarily.

Defendants argue that, "[u]nder *Hudson*, the voluntary dismissal in Fulton/Mitchell II operated as an adjudication on the merits for purposes of *res judicata*" with respect to Plaintiffs' state law claims. Dkt. 57 at 32. But federal preclusion rules, not state rules, are what determine the preclusive effect of federal judgments like the one from "Fulton/Mitchell II." See *Barnett v. Stern*, 909 F.2d 973, 977 (7th Cir. 1990) ("The district court correctly concluded that, because the prior action was brought in federal court, federal rules of *res judicata* apply."). The decision

in the *Hudson* case is therefore inapplicable, and Defendants have made no argument grounded in federal preclusion rules, which do not encompass the *Hudson* doctrine.

Regardless, *Hudson* would not bar the claims in this case even if it were appropriate to apply Illinois claim preclusion law. The holding of *Hudson* hinged on the trial court's dismissal of some claims on the merits before the plaintiff voluntarily dismissed the remaining claims and then later refiled. *Hudson*, 889 N.E.2d at 214. For Plaintiffs, however, there was no "adjudication on the merits of one claim," as there was in *Hudson*. *Id.* at 20. The dismissal of *Heck*-barred claims does not constitute a dismissal on the merits. See *Johnson v. Rogers*, 944 F.3d 966, 968 (7th Cir. 2019) ("A suit barred by the doctrine of *Heck* is premature and must be dismissed without prejudice, because *Heck* holds that the claim does not accrue until the conviction has been set aside."); *Brzowski v. Sigler*, No. 17 C 9339, 2020 WL 3489484, at *4 (N.D. Ill. June 26, 2020) ("A dismissal based on *Heck* is not a judgment on the merits."). Defendants' *res judicata* argument should be rejected.

### B. Plaintiffs' Malicious Prosecution Claims Are Sufficiently Pleaded.

Liability for malicious prosecution in Illinois requires the commencement or continuation of a criminal proceeding with malice but without probable cause and the termination of the proceeding in the plaintiffs' favor, meaning the case ended in a manner "indicative of innocence." *Swick v. Liautaud*, 662 N.E.2d 1238, 1243 (Ill. 1996). Defendants argue that Plaintiffs' allegations are deficient with respect to the "commencement or continuation" element because, they say, Plaintiffs' allegations do not explain how Defendants were responsible for the charges brought against them. Dkt. 57 at 33-34. They also contend that Plaintiffs have not sufficiently pleaded that their criminal cases terminated in their favor.

30

On the "commencement" element, Defendants have ignored the clear import of Plaintiffs'
allegations. Plaintiffs each allege that Defendants "accused Plaintiff of criminal activity and
exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff
without any probable cause for doing so and in spite of the fact that they knew Plaintiff was
innocent," and Plaintiffs have described at length how Defendants' accusations and fabricated
evidence, including false police reports, caused them to be prosecuted. See, *e.g.*, Dkt. 1 ¶¶ 32,
36, 49-52, 67, 91, 96, 167, 197. And it has long been established that a prosecutor's decision to
prosecute does not immunize police officers from malicious prosecution claims. *Jones v. City of
Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's
decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of
these decisions will shield a police officer who deliberately supplied misleading information that
influenced the decision.")

With respect to the "favorable termination" element, Defendants rely on Plaintiffs'
burden to prove *at trial* that the charges against them were dropped in a manner indicative of
innocence in order to argue now that Plaintiffs' pleadings are deficient, citing *Swick*, 662 N.E.2d
at 1243. But *Swick*—a case about claims that went to trial—does not address what plaintiffs must
plead to state a malicious prosecution claim, and certainly the case is silent on what federal
notice pleading requires.

Moreover, even at trial, *Swick* merely requires that the "circumstances surrounding the
abandonment of the criminal proceedings must compel an inference that there existed a lack of
reasonable grounds to pursue the criminal prosecution." *Id.* Neither an acknowledgement of
innocence from the state nor a finding of innocence by a court or jury is required for a criminal
proceeding to be indicative of innocence. Acquittal after trial, for example—which is not a

finding of innocence and certainly not a concession of innocence by the state—qualifies as favorable termination indicative of innocence for malicious prosecution purposes. See *Rich v. Baldwin*, 479 N.E.2d 361, 362 (Ill. App. 1985). And when the state opts not even to try a defendant but instead ends the case with a *nolle prosequi*, a plaintiff need only "establish[] that the *nolle prosequi* was entered for reasons consistent with his innocence" to meet the favorable termination element, as the Seventh Circuit has explained when applying *Swick. Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir. 1997).

The scenario Plaintiffs allege in their complaints—a *nolle prosequi* was entered in both of their cases after the emergence of additional alibi evidence had resulted in the grant of a new trial—is consistent with innocence and supports the inference that no reasonable grounds existed to pursue a prosecution. To elaborate further, an assistant state's attorney conceded when dropping the charges against Plaintiffs that the state would not be able to meet its burden at trial. In short, Plaintiffs' allegations are enough at this stage, and the question whether Plaintiffs will ultimately meet their burden at trial is not before the Court.

### C. Plaintiffs' IIED Claims Are Timely.

Defendants argue that Plaintiffs' claims for intentional infliction of emotional distress are time-barred because they were not filed within one year of Defendants' appalling behavior that forms the basis of these claims. Dkt. 57 at 35-36. Normally, a statute of limitations defense should not be considered on a motion to dismiss. *Collins v. Village of Palatine, Ill.*, 875 F.3d 839, 842 (7th Cir. 2017) (explaining that dismissal under 12(b)(6) on timeliness grounds is appropriate only "if the complaint contains everything necessary to establish that the claim is untimely"). Regardless, Plaintiffs' IIED claims, because they are inextricably tied up with

Plaintiffs' wrongful convictions, did not accrue under *Heck* until the charges against Plaintiffs were dropped. These claims are therefore timely.

There is a division of authority in this District over when IIED claims accrue, and the line of cases that applies *Heck* to delay the accrual of those claims under the sort of circumstances present here is more persuasive. Defendants rely upon *Batchelor v. City of Chicago*, 2020 WL 509034 (N.D. Ill. Jan. 31, 2020) and *Gibbs v. Village of Flossmoor*, 2014 WL 1396184 (N.D. Ill. Apr. 10, 2014) for their position, see Dkt. 57 at 36, but those cases in turn rely on *Bridewell v. Eberle*, 730 F.3d 672, 678 (7th Cir. 2013), a case that never analyzed whether an IIED claim can be *Heck*-barred but merely considered whether IIED can be seen as an ongoing violation. The more persuasive line of cases in this district has "concluded that when an IIED claim is based on the same misconduct that procured the plaintiff's conviction, the statute of limitations does not begin to run until the wrongful conviction has been overturned." *Baker v. City of Chicago*, No. 16-CV-08940, 2020 WL 5110377, at *9 (N.D. Ill. Aug. 31, 2020) (citing as examples *Hill v. City of Chicago*, Nos. 19 C 6080, 2020 WL 509031, at *5 (N.D. Ill. Jan. 31, 2020); *Andersen v. City of Chicago*, No. 16-cv-1963, 2019 WL 6327226, at *6 (N.D. Ill. Nov. 26, 2019); and *Brown v. City of Chicago*, No. 18 C 7064, 2019 WL 4694685, at *6 (N.D. Ill. Sept. 26, 2019)). This conclusion makes sense because the finality, federalism, and comity concerns highlighted by the Supreme Court in *Heck*, 512 U.S. at 484, and recently reiterated in *McDonough v. Smith*, 139 S. Ct. 2149, 2159 (2019), counsel against permitting an IIED claim to go forward if it would necessarily impugn an extant conviction. Plaintiffs' IIED claims, which are premised on the same misconduct that caused their wrongful convictions, necessarily impugn those convictions and so did not accrue until those convictions were set aside. Defendants' statute of limitations argument for dismissing them should be rejected.

### D. Plaintiffs' State Civil Conspiracy Claims Should Not Be Dismissed as Duplicative.

The only argument Defendants make with respect to Illinois civil conspiracy that does not merely incorporate an argument they make elsewhere in their brief is their argument that Plaintiffs' conspiracy claims are duplicative of the torts underlying that conspiracy, and thus not cognizable under Illinois law. Dkt. 57 at 29.

Illinois law, it is true, does not recognize civil conspiracy claims that do not expand the scope of liability. In other words, if a conspiracy claim implicates precisely the same people and conduct as the underlying claim, the conspiracy claim serves no purpose and should not proceed. *Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 725 (N.D. Ill. 2017) ("Plaintiff fails to allege new facts not already alleged in the underlying tort claims nor seeks to extend liability to additional defendants."). On the other hand, conspiracy claims that do expand the scope of liability are cognizable. See, e.g., *Thermodyne Food Serv. Prod., Inc. v. McDonald's Corp.*, 940 F. Supp. 1300, 1310 (N.D. Ill. 1996) (declining to grant summary judgment on a civil conspiracy claim "[b]ecause count VIII adds Liebermann, it is not completely identical to count V.")

Defendants argue that this limitation applies to Plaintiffs' state law civil conspiracy claims. Dkt. 57 at 28. Their argument, however, ignores that Plaintiffs have alleged that Defendants conspired with Defendant Shepherd to frame Plaintiffs but have not alleged that Defendant Shepherd directly participated in the interrogations or that Defendants directly helped Shepherd create the misleading photos, meaning Plaintiffs' conspiracy claims put Defendants and Shepherd on the hook for each other's misconduct. Moreover, as Plaintiffs explained above in Section II, they cannot know before discovery whether certain Defendants actively participated in every action that violated their rights; some Defendants may ultimately be liable

for particular violations as conspirators. "The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994). Because it is impossible for Plaintiffs' to know at this stage of the case which category each conspirator falls into for every act of misconduct, dismissing Plaintiffs' conspiracy claims for failing to expand the scope of liability would be premature, even putting aside that Defendant Shepherd is implicated along with Defendants. In short, Defendants once again have raised an argument that may be suited for a summary judgment motion but is not appropriate for a motion to dismiss.

## V.    PLAINTIFFS' DERIVATIVE CLAIMS SHOULD PROCEED.

Finally, Defendants assert that Plaintiffs' *respondeat superior* and indemnification claims should be dismissed, arguing that they should not survive if all claims against individual Defendants are dismissed. Dkt. 57 at 36. But the claims against the individual Defendants should not be dismissed for the reasons given above, and so the Court should reject this argument for dismissal of derivative claims.

## CONCLUSION

For the reasons given above, Plaintiffs request that Defendants' motions to dismiss be denied in their entirety.[9]

DATED: October 28, 2020                                RESPECTFULLY SUBMITTED,

                                                                                BY:    /s/ Julia Rickert
                                                                                        *One of Plaintiffs' Attorneys*

---

[9] If the Court were to disagree with Plaintiffs, their complaints should be dismissed without prejudice and with leave to replead. *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010).

Arthur Loevy
Jon Loevy
Russell Ainsworth
Julia Rickert
Sam Heppell
LOEVY & LOEVY
311 N. Aberdeen Street
Chicago, IL 60607
T: 312-243-5900
F: 312-243-5902
julia@loevy.com

Andrea D. Lyon
LYON LAW
53 W. Jackson Blvd., Ste. 1650
Chicago, IL 60604
T: 312-877-5543
F: 312-663-3707
andrea@andrealyon.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 28, 2020, I filed the foregoing document using the

Court's CM/ECF system, which effected service on all counsel of record.

/s/ Julia Rickert
*One of Plaintiffs' Attorneys*

36