# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHN FULTON,                      )
                                             )
        Plaintiff,              )
                                             )
      v.                          )   Case No. 20 C 3118
                                             )
ROBERT BARTIK, et al.,            )   Judge Joan H. Lefkow
                                             )
        Defendants.             )

---

ANTHONY MITCHELL,                 )
                                             )
        Plaintiff,              )
                                             )
      v.                          )   Case No. 20 C 3119
                                             )
ROBERT BARTIK, et al.,            )   Judge Joan H. Lefkow
                                             )
        Defendants.             )

## OPINION AND ORDER

In these related actions, plaintiffs John Fulton and Anthony Mitchell filed substantively identical complaints against the same defendants, alleging constitutional violations brought under 42 U.S.C. § 1983 and state law claims.[1] Defendants Robert Bartik, John Zalatoris, James Breen, Edward Winstead, Joseph Struck, Michael Kennedy, Michael Schmitz, Brian Skora, Detective Aguirre, Leonard Rolston, Stephen Franco, Robert Girardi, and the City of Chicago (City Defendants), and McRay Judge, Jacob Rubinstein, Andrew Varga, Eugene Shepherd, and Cook County (County Defendants) moved to dismiss the complaints under Federal Rule of Civil

---

[1] This court has jurisdiction under 28 U.S.C. §§ 1331 and 1367. Venue lies under 28 U.S.C. § 1391(b).

Procedure 12(b)(6). (Dkts. 55, 70.)[2] For the reasons below, defendants' motions to dismiss are granted in part and denied in part.

## BACKGROUND

Plaintiffs' actions are based on events surrounding the investigation of Christopher Collazo's murder, and their arrests and prosecutions for that murder.[3]

### I. The initial investigation of Collazo's murder

On March 10, 2003, around 3:00 a.m., Sid Taylor called 911 to report an alley fire. (Dkt. 1 at 5, ¶¶18, 20.) Officers arrived at the fire to find Collazo's partially burned remains, his wrists and ankles bound with duct tape, mouth covered with duct tape, and blood on and around the body. (*Id.* ¶19.)

That day, "Police Officer Defendants" — Bartik, Zalatoris, Breen, Rolston, Winstead, Struck, Girardi, Cervenka, Kennedy, Schmitz, Skora, Franco, Aguirre, and other unknown law enforcement — interviewed Taylor and Marcus Marinelli, who were both in the same street gang. (*Id.* ¶¶20, 24.) Taylor told officers that from his house he saw a fire and two men near it; he did not know either man's race. (*Id.* ¶21.)

Marinelli, who was Collazo's friend and the last person known to see him alive, told officers that he last saw Collazo at 9:00 p.m. on March 9, 2003. (*Id.* ¶¶23, 25.) He also told them that about one month earlier he and Collazo had robbed a black teenager who was trying to buy a

---

[2] The corresponding docket numbers for documents in 20 C 3118 and 20 C 3119 are the same. The complaints and motions to dismiss are nearly identical, except for the name of the plaintiff, so citations to the docket should be interpreted to encompass both dockets. This decision also cites to the page number of the entire document, not the number at the bottom of the page.

[3] The following facts come from the well-pleaded factual allegations in the complaint. *See infra* Legal Standard.

gun from them. (*Id.* ¶25.) That teenager (who was Fulton) was referred to Collazo by a mutual

friend of theirs, Johnitta Griffin, a 17-year-old girl. (*Id.* ¶25.)

Police Officer Defendants interviewed Griffin. (*Id.* at 6, ¶26.) She told them that she was

a friend of Collazo's but knew nothing of his murder. (*Id.* ¶27.) She also told the officers that she

had referred Fulton, who also was her friend, to Collazo to buy a gun, but Collazo and Marinelli

robbed Fulton instead of selling him a gun. (*Id.* ¶27.) Griffin denied knowing of a connection

between the robbery and Collazo's murder. (*Id.* ¶28.)

Police Officer Defendants gathered information on Collazo's murder that had no

connection to Fulton, including a license plate number. (*Id.* ¶29.) This information was

exculpatory for Fulton and Mitchell, but officers withheld it from anyone outside of the Chicago

Police Department. (*Id.* ¶29.) At some point, Schmitz and Skora fabricated a police report,

stating that Taylor had identified the two men near the alley fire as black. (*Id.* ¶30.)

Defendants chose to frame Fulton and Mitchell, and their friend Antonio Shaw, for

Collazo's murder. (*Id.* ¶31.) Police Officer Defendants re-interviewed Griffin, during which they

coerced her into falsely implicating Fulton in Collazo's murder with a false narrative that they

had concocted and fed to her. (*Id.* at 6–7, ¶¶32, 35.) In her false statement, Griffin stated that she

had talked with Fulton on the phone multiple times on and around March 9, 2003, and he had

demanded that she facilitate revenge on Collazo for the gun sale robbery. (*Id.* at 6, ¶32.)

Police Officer Defendants then arranged for and conspired with Rubinstein, an assistant

state's attorney, to record Griffin's false statement and falsely document that it was the result of

legitimate interrogation tactics. (*Id.* at 7, ¶33.) Rubinstein did so because he knew that probable

cause for charging Fulton and Mitchell with Collazo's murder did not exist. (*Id.*) Alternatively,

Police Officer Defendants concealed the fabricated statement from Rubinstein, and fellow assistant state's attorneys Judge and Varga (Prosecutor Defendants). (*Id.* ¶34.)

## II.     Fulton's arrest and false confession

On March 18, based on Griffin's false statements, defendants arrested Fulton. (*Id.* ¶36.) He was an 18-year-old high school senior, living with his fiancée Yolanda Henderson and their child. (*Id.* ¶38.)

Defendants questioned Fulton at the police station. (*Id.* ¶39.) Fulton explained to them that Griffin had connected him with Collazo in late January or early February so that he could buy a gun for personal protection. (*Id.* at 8, ¶39.) He further explained that he, Mitchell, and Shaw met with Collazo and Marinelli, but Collazo and Marinelli robbed him at gunpoint. (*Id.* ¶39.) Fulton told defendants that neither he nor Mitchell saw Collazo again, and he denied seeking revenge or knowing anything of Collazo's death. (*Id.* ¶¶40, 41.) He also told them that on March 9 he was with Henderson at the University of Chicago Hospital emergency room or was otherwise at their apartment until he left for school the following morning. (*Id.* ¶41.)

Defendants insisted that Fulton adopt the same fabricated story that they had coerced Griffin into telling. (*Id.* ¶42.) They used false promises of leniency, threats, and physical violence over a long detention in harsh conditions to coerce him into falsely confessing to Collazo's murder and implicating Mitchell and Shaw. (*Id.* at 8–9, ¶¶43, 44, 49.) Fulton falsely confessed that he, Mitchell, and Shaw beat Collazo and placed him in the trunk of his car. (*Id.* at 10, ¶50.) Defendants also fabricated an additional false confession from Fulton, obtained by Bartik, a police officer and polygrapher, that Fulton had spontaneously confessed to Collazo's murder before a polygraph exam. (*Id.* ¶¶51, 52.)

Police Officer Defendants arranged for and conspired with Judge and Rubinstein to coerce Fulton's false confession and statements implicating Mitchell and Shaw, and document

4

that it was the result of legitimate interrogation tactics. (*Id.* ¶46.) Judge and Rubinstein conspired with Police Officer Defendants because they were aware that there was no probable cause to charge Fulton with Collazo's murder. (*Id.* ¶47.) Alternatively, Police Officer Defendants concealed their coercive interrogation tactics and fabrication of Fulton's statements from Prosecutor Defendants. (*Id.* ¶48.)

## III.    Mitchell's arrest and false confession

Mitchell was arrested on March 19. (*Id.* at 15, ¶60.) He was age 17 at the time. (*Id.* at 14, ¶ 59.) Defendants used abusive tactics to coerce him into falsely confessing to murdering Collazo. (*Id.* at 15, ¶¶60, 61.)

Police Officer Defendants then arranged for and conspired with Rubinstein to fabricate Mitchell's false confession and statements implicating Fulton and Shaw, and then falsely documented that those statements had been the result of legitimate interrogation tactics. (*Id.* at 15–16, ¶¶63, 66.) Rubinstein conspired with Police Officer Defendants because he knew that there was no probable cause to charge Mitchell or Fulton with Collazo's murder, and he was complicit in the officers' plan to frame them for the murder. (*Id.*) Alternatively, Police Officer Defendants concealed their interrogation tactics and fabrication of Mitchell's statements from Prosecutor Defendants. (*Id.* ¶64.)

## IV.    Shaw's arrest and false confession

Police Officer Defendants arrested Shaw, presented him with Fulton's and Mitchell's false confessions, and subjected him to physically and psychologically coercive interrogation techniques. (*Id.* at 16, ¶¶69, 70.) Shaw then falsely confessed to participating in Collazo's murder and falsely implicated Fulton and Mitchell in it. (*Id.* ¶71.)

Police Officer Defendants arranged for and conspired with Varga to fabricate Shaw's false confession and false statements implicating Fulton and Mitchell, and to document those

false statements as having been the product of legitimate interrogation tactics. (*Id.* ¶72.) Alternatively, Police Officer Defendants concealed their coercive tactics and fabrication of Shaw's statement from Prosecutor Defendants. (*Id.* ¶77.)

Shaw was charged with Collazo's murder. (*Id.* ¶75.) Before trial, the trial court judge suppressed Shaw's confession. (*Id.* ¶76.) The prosecutors did not appeal that ruling and dropped the charges against him. (*Id.*) The false confession damaged Shaw's ability to provide exculpatory testimony at Fulton's and Mitchell's trials. (*Id.* at 17, ¶77.)

## V. Evidence conflicting with the fabricated evidence

Evidence, including phone records and video, showed that the fabricated logistics of Fulton and Mitchell's travel from the southside to the northside and the circumstances of their supposed encounter with Collazo were not possible. (*Id.* ¶78.) Phone records and video also provided Fulton with an alibi for the time that he and Mitchell supposedly murdered Collazo. (*Id.* ¶78.) That alibi helped Mitchell as well, whose supposed role was tied to Fulton's. (*Id.* ¶79.)

Defendants falsely claimed that Fulton evaded security cameras at his apartment building by leaving through an unmonitored back door in the middle of the night, committed the murder with Mitchell and Shaw, and then came back through the same door. (*Id.* at 18, ¶81.) Shepherd, an investigator with the Cook County State's Attorney's Office, fabricated evidence and suppressed exculpatory evidence to support this story by taking photos of Fulton's apartment building to make it appear as though there was no camera monitoring the back door where Fulton supposedly left the night of the murder. (*Id.* at 18–19, ¶¶82–83, 86.) But there was a camera there and an electronic fob system that tracked all entries and exits. (*Id.* at 18, ¶¶84, 85.) Shepherd's suppression of the building's security system was part of a pattern of similar misconduct by investigators at the Cook County State's Attorney's Office, which occurred at least one other time in another case. (*Id.* at 19, ¶87.)

**VI.    Plaintiffs were convicted of Collazo's murder, but those convictions were vacated**

Before and during trial, defendants suppressed evidence that would have exculpated Fulton and Mitchell from Collazo's murder. (*Id.* ¶89.) The only evidence presented at trial was defendants' fabricated evidence. (*Id.* at 19–20, ¶¶90–92.) Fulton's and Mitchell's defenses were largely premised on Fulton's alibi (*id.* at 20, ¶94), but the prosecution used Shepherd's fabricated photographic evidence to rebut Fulton's alibi, (*id.* ¶96). Fulton and Mitchell were convicted of murdering Collazo and sentenced to 31 years in prison. (*Id.* ¶97.)

In 2019, Fulton's and Mitchell's convictions were vacated based on new evidence of their innocence and constitutional violations during their trials. (*Id.* at 21, ¶100.) Prosecutors dropped the charges. (*Id.*)

**VII.    The claims**

Plaintiffs complaints raise claims under § 1983 for deprivations of various constitutional rights and claims under Illinois law. The eight § 1983 claims are the following:

- count I, against Police Officer Defendants, Judge, and Rubinstein for violating their right against self-incrimination under the Fifth Amendment to the United States Constitution (*id.* at 30, ¶136), and right to due process and right to a fair trial under the Fourteenth Amendment (*id.* ¶137–38) in connection with the coerced confessions;

- count II, against Police Officer Defendants and Prosecutor Defendants (acting as investigators) for fabricating false witness statements from plaintiffs, Griffin, and Shaw that implicated plaintiffs in Collazo's murder, while also suppressing misconduct and circumstances under which the false statements were obtained in violation of their right to a fair trial and due process under the Fourteenth Amendment (*id.* at 31–32, ¶¶146–47);

- count III, against Police Officer Defendants and Shepherd for using false, manufactured evidence to accuse them of criminal activity, thereby causing plaintiffs' deprivation of liberty and commencement of judicial proceedings against them without probable cause, in violation of the Fourth Amendment (*id.* at 32, ¶153);

- count IV, against Police Officer Defendants and Shepherd for withholding and destroying exculpatory evidence from Prosecutor Defendants and fabricating

false witness statements, in violation of the rights to a fair trial, not to be wrongfully convicted, and to be free from involuntary confinement under the Fourteenth Amendment (*id.* at 33–34, ¶¶160–64);

- count V, against Police Officer Defendants and Shepherd for involuntary servitude in violation of the Thirteenth Amendment (*id.* at 35, ¶¶170–71);

- count VI, against defendants for failing to intervene to stop the other alleged constitutional deprivations (*id.* at 35–36, ¶174);

- count VII, against Police Officer Defendants, Shepherd, and "other conspirators, unknown and unknown," for conspiring to commit the other alleged constitution deprivations (*id.* at 36–37, ¶¶180–81); and

- count VIII, against the City of Chicago under *Monell* v. *N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), for the underlying constitutional deprivations by Police Officer Defendants as the result of widespread practices or customs (*id.* at 37–38, ¶¶186–95).

As for the state law claims, plaintiffs raise five counts:

- count IX, against Police Officer Defendants and Shepherd, along with unknown individuals, for malicious prosecution (*id.* at 39–40, ¶¶197–99);

- count X, against defendants for intentional infliction of emotional distress (IIED) (*id.* at 40–41, ¶203);

- count XI, against Police Officer Defendants, Shepherd, and "other co-conspirators, known and unknown," for civil conspiracy related to the malicious prosecution and IIED claims (*id.* at 41, ¶¶206–08);

- count XII, against the City of Chicago for all torts committed by the Police Officer Defendants that occurred within the scope of their employment under the doctrine of *respondeat superior* (*id.* at 42, ¶212); and

- count XIII, for indemnification under 745 Ill. Comp. Stat. 10/9-102 by City of Chicago for any judgments entered against Police Officer Defendants and Cook County for any judgment against Prosecutor Defendants and Shepherd (*id.* at 42, ¶¶216–18).

## LEGAL STANDARD

City Defendants and County Defendants each moved to dismiss the complaints in their entirety under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief can be granted. (Dkts. 55, 70.) Under Rule 8(a)(2), a complaint need only contain "a short

and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary, but the complaint must provide defendants with fair notice of what the claim is and the grounds on which it rests. *See Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007). The complaint must present enough factual matter that if accepted as true states a plausible claim for relief. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 570. Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). On a motion to dismiss under Rule 12(b)(6), this court accepts as true all well-pleaded facts, not legal conclusions, and draws all reasonable inferences in plaintiffs' favor. *See Dix* v. *Edelman Fin. Servs., LLC*, 978 F.3d 507, 512 (7th Cir. 2020) (per curiam).

## <u>ANALYSIS</u>

### I.    **Plaintiffs' use of group pleading**

At the outset, City Defendants and County Defendants move to dismiss the complaints in their entirety based on plaintiffs' use of "group pleading," a practice of collectively defining subgroups of defendants. (Dkt. 57 at 11; dkt. 70 at 11.) This practice, they claim, does not meet federal pleading requirements generally and is particularly problematic for § 1983 claims because liability for them rests on personal involvement. (Dkt. 57 at 12; dkt. 70 at 11–12.) Plaintiffs respond that their use of group pleading satisfies the pleading standards because it puts defendants on notice of the alleged misconduct and defendants are alleged to be jointly responsible in those acts. (Dkt. 74 at 17–21; dkt. 84 at 12–17.)

Group pleading, while not ideal, is not categorically impermissible. *See, e.g.*, *Brooks* v. *Ross*, 578 F.3d 574, 582 (7th Cir. 2009) (directing allegations at all defendants provided sufficient notice); *Gray* v. *City of Chi.*, No. 18 C 2624, 2019 WL 3554239, at *5 (N.D. Ill. Aug. 1, 2019) (describing cases in which group allegations deemed sufficient and those in which it

was not). Notice and plausibility remain the benchmarks. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Thus, group pleading is permissible so long as it provides notice to each defendant of the contours of the alleged deprivation and that he or she is alleged to have participated in it. *See Brooks*, 578 F.3d at 581–82.

Here, the group pleading in plaintiffs' complaints pass muster. The factual allegations are not so vague that the individual defendants would not know the contours of the claims and that they are each alleged to have taken part somehow, as identified individually or as part of a group. Reading the complaint "as a whole," the individual defendants have notice "regarding who is responsible for what," especially because "they are accused of acting jointly," *Engel* v. *Buchan*, 710 F.3d 698, 710 (7th Cir. 2013), for either participating directly or indirectly via conspiracy or failing to intervene in particular deprivations. Neither City Defendants nor County Defendants have argued that the sheer number of defendants in each collective group renders the factual allegations implausible.

To be sure, plaintiffs' use of collective groups — Police Officer Defendants, Prosecutor Defendants, defendants — and at times individually named defendants, creates ambiguity as to specific actions of the individual defendants. For example, plaintiffs indiscriminately switch from "Police Officer Defendants," a defined subset of defendants, to "Defendants," as in all of them, when describing discrete episodes. (*E.g.*, dkt. 1 at 5, ¶¶20, 21; *id.* at 6, ¶32; *id.* at 7, ¶39.) As County Defendants point out, this can create nonsensical scenarios, like when "defendants" withheld information from anyone outside of the Chicago Police Department, which is not possible because Prosecutor Defendants do not work in the Chicago Police Department. (Dkt. 70 at 12.) But whatever ambiguity plaintiffs' use of group pleading creates as to any defendant's personal involvement, it can be resolved by the more specific references to the group or

individual defendant alleged to have participated in the violation under each count. Plaintiffs' use of group pleading in this instance is therefore not a reason to dismiss the complaints.

## II.     Claim preclusion for Rubinstein

Rubinstein moves to dismiss the claims against him in counts I, II, VI, and X based on claim preclusion. (Dkt. 70 at 10.) "Claim preclusion prevents parties from relitigating the same claim or cause of action, even if certain issues were not litigated in the prior action. Suits involve the same claim or cause of action if the later suit arises from the same transaction or involves a common nucleus of operative facts." *Brownback* v. *King*, 141 S. Ct. 740, 747 n.3 (2021) (cleaned up). Thus, the filing of a later action is barred if there is an identity of parties or their privies, an identity of causes of action, and a final judgment on the merits in the earlier action. *See Fed. Dep't Stores, Inc.* v. *Moitie*, 452 U.S. 394, 398 (1981).

Here, plaintiffs filed an action against Rubinstein[4] in 2005 for claims arising out of his involvement in the Collazo murder investigation and prosecution, but they voluntarily dismissed him from the case with prejudice. (Dkt. 70 at 10; *see* No. 05-cv-1551, dkt. 73.) Rubinstein contends that the voluntary dismissal with prejudice operated as an adjudication on the merits of a similar action, thereby precluding the filing of this action. (Dkt. 70 at 10.) Plaintiffs respond that their claims against Rubinstein are not precluded because those claims were barred under *Heck* v. *Humphrey*, 512 U.S. 477 (1994), until their convictions were vacated in 2019, and thus they continued to accrue through that time. (Dkt. 84 at 11.)

Under *Heck*, if judgment for a § 1983 plaintiff would necessarily imply the invalidity of his criminal conviction, that claim cannot proceed unless and until the plaintiff can show that the conviction has been invalidated by some official means, such as by a state court. 512 U.S. at 487.

---

[4] In the 2005 action, plaintiffs named "Jake Rubenstein" as a defendant. No party disputes that Jake Rubenstein and Jacob Rubinstein are the same person.

A *Heck*-barred claim accrues until the conviction is invalidated. *Id.* at 489–90. Accordingly, a dismissal under *Heck* is not a judgment on the merits, allowing claims to be refiled once the underlying conviction is invalidated in a plaintiff's favor. *See Johnson* v. *Rogers*, 944 F.3d 966, 968 (7th Cir. 2019).

The earlier claims against Rubinstein were not dismissed under *Heck*. Rather, plaintiffs voluntarily dismissed him with prejudice (dkt. 70-3), which they do not dispute operates as an adjudication on the merits (dkt. 84 at 11). Therefore, that adjudication on the merits bars any claims arising from underlying facts in the 2005 complaint. Plaintiffs submit no authority, nor does there appear to be any, allowing *Heck* to be raised as an exception to claim preclusion. Moreover, the *Heck* defense is waivable, allowing parties to bypass it for the merits of a claim, *see Johnson*, 944 F.3d at 968, and so there is clear incongruity in allowing plaintiffs to raise it here for their benefit to avoid the preclusive effect of their prior voluntary dismissal.

Nevertheless, "[c]laim preclusion generally does not bar claims that are predicated on events that postdate the filing of the initial complaint." *Lucky Brand Dungarees, Inc.* v. *Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1596 (2020). Some of the factual predicate for the claims against Rubinstein may rely on conduct occurring through plaintiffs' 2006 convictions, post-dating the 2005 action. And because claim preclusion is an affirmative defense, it is not always amenable to resolution on a Rule 12(b)(6) motion where, as here, the basis for it is not "disclosed in the complaint," *Muhammad* v. *Oliver*, 547 F.3d 874, 878 (7th Cir. 2008). Yet plaintiffs do not explain what, if anything, happened between the filing of the 2005 action and the 2006 conviction that could support any of their claims against Rubinstein. (Dkt. 88 at 5.)

The claims against Rubinstein in counts I, II, VI, and X are dismissed without prejudice, with leave to replead if plaintiffs can identify facts postdating the 2005 action that support their

claims. Rubinstein did not include the § 1983 conspiracy claim in count VII under this argument, but it follows that the conspiracy claim goes the way of the underlying counts. As explained below, Rubinstein is not the target of the state law conspiracy claim in count XI.

### III. Counts II and IV: due process claims based on the fabrication of evidence and suppressed or destroyed evidence

Counts II and IV are similar. In count II, plaintiffs allege that Police Officer Defendants and Prosecutor Defendants fabricated witness statements from Griffin, Fulton, Mitchell, and Shaw using physical violence and psychological abuse to implicate Fulton and Mitchell in Collazo's murder while also suppressing their own misconduct and the circumstances under which the witness statements were obtained, in violation of their right to a fair trial and due process under the Fourteenth Amendment. (Dkt. 1 at 31–32, ¶¶146–47.) In count IV, plaintiffs allege that Police Officer Defendants and Shepherd withheld evidence from them and Prosecutor Defendants, destroyed exculpatory evidence, and created false evidence by fabricating witness statements, in violation of the right to a fair trial, not to be wrongfully convicted, and right to be free from involuntary confinement under the Fourteenth Amendment. (*Id.* at 33–34, ¶¶160–64.)

Using false evidence to convict a person at trial violates his right to a fair trial under the Due Process Clause of the Fourteenth Amendment. *Patrick* v. *City of Chi.*, 974 F.3d 824, 834–35 (7th Cir. 2020). The "essence" of a fabricated evidence due process claim is that "the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process." *Id.* at 835. Plaintiffs must allege that defendants used fabricated evidence that they knew to be false to deprive them of their liberty. *See Anderson* v. *City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019). Such a claim can be supported by allegations that police fed details to witnesses in order to concoct narratives with detailed incriminating evidence. *See, e.g.*, *Whitlock* v. *Brueggemann*, 682 F.3d 567, 576 (7th Cir.

2012). Relatedly, where the use of fabricated evidence results in a conviction, it "might also violate the accused's right to due process under the rubric of *Brady* v. *Maryland*, 373 U.S. 83 (1963), and *Kyles* v. *Whitley*, 514 U.S. 419 (1995), if government officials suppressed evidence of the fabrication." *Lewis* v. *City of Chi.*, 914 F.3d 472, 480 (7th Cir. 2019) (citing *Avery* v. *City of Milwaukee*, 847 F.3d 433, 443–44 (7th Cir. 2017)).

City Defendants and County Defendants argue that the fabricated evidence due process claims in count II fail as a matter of law because they are premised only on coercion, which is not legally cognizable without allegations of fabrication. (Dkt. 57 at 24-26; dkt. 70 at 16.) City Defendants and County Defendants also argue that the alleged suppression of misconduct surrounding witness statements fails to state a claim on its own because plaintiffs knew of the suppression of misconduct arising from their own statements and Shaw's witness statement was thrown out before trial and not used. (Dkt. 57 at 25–29; dkt. 70 at 18–19.) City Defendants add that the suppression of misconduct surrounding Griffin's statements does not make for a viable claim because, according to the transcripts from their trials, plaintiffs were aware that Griffin's handwritten statements and grand jury testimony were untrue and argued as much to the jury. (Dkt. 57 at 25–29.) City Defendants also argue that count IV should be dismissed for the same reasons and its additional allegation of destruction of evidence lacks supporting facts (dkt. 57 at 32–33), while County Defendants believe that count IV is redundant of count III and should fail for the same reasons (dkt. 70 at 19).

Plaintiffs argue that their allegations go beyond coercion and spell out a fabricated evidence due process claim, pointing to allegations that defendants coerced witness statements that "they knew to be false and had concocted themselves," (dkt. 74 at 22 (citing dkt. 1 ¶¶ 31–

35)), and Bartik fabricated a report that Fulton confessed to the murder before is polygraph exam, (*id.* (citing dkt. 1 at 10, ¶¶51–52)).

Here, plaintiffs have stated plausible fabricated evidence due process claims. Their complaints describe defendants' concocting narratives based on details that they knew to be false (dkt. 1 at 7, ¶35); *id.* at 8–9, ¶¶42–45), and Bartik's fabricating a confession on his own (dkt. 1 at 10, ¶52). Their claims model the one in *Avery*, where two detectives "knew their reports of [the criminal defendant's] confession were false when they wrote them; those reports—and the fake confession—were [foreseeably] used at trial to convict him." 847 F.3d at 440, 443. Creating evidence that defendants know to be false is the "hallmark" of such a claim. *Petty* v. *City of Chi.*, 754 F.3d 416, 423 (7th Cir. 2014).

As for the claims based on the alleged suppression and destruction of evidence, which relies on a factual predicate different from the fabricated evidence due process claim, *see BRC Rubber & Plastics, Inc.* v. *Cont'l Carbon Co.*, 900 F.3d 529, 540 (7th Cir. 2018), the alleged misconduct and suppression during Griffin's second interview and during plaintiffs' interviews (to the extent each plaintiff was deprived of information that undermined the corroborative value of the other's false confession) are at least sufficient to state a claim. Given that there is a dispute over the use and interpretation of Griffin's trial testimony (*see* dkt. 57 at 28–29; dkt. 74 at 23 n.5), the court will not take judicial notice of it as an indisputable fact that plaintiffs were aware that her statements were the product of misconduct.

Finally, count IV will not be dismissed as redundant of count III. Contrary to County Defendants' reading of counts III and IV, although each count is born out of the same factual predicate, they merely present different legal theories for recovery and the underlying facts give rise to plausible claims. Counts II and IV stand.

**IV.    Count III: unlawful pretrial detention claims**

Count III alleges that Police Officer Defendants and Shepherd used false, manufactured evidence to accuse Fulton and Mitchell of criminal activity, thereby causing a deprivation of their liberty and the commencement of criminal proceedings against them without probable cause, in violation of the Fourth Amendment. (Dkt. 1 at 32–33, ¶¶152–55.)

City Defendants seek to dismiss the Fourth Amendment claims based on plaintiffs' unlawful pretrial detention without probable cause as untimely. (Dkt. 57 at 29.) The Fourth Amendment prohibits unreasonable seizures, including arrest and pretrial detention, without probable cause. *See Young* v. *City of Chi.*, 987 F.3d 641, 644 (7th Cir. 2021). Probable cause exists if the facts and circumstances within the arresting officer's knowledge would allow a prudent person to believe that the suspect had committed or was committing an offense. *See Camm* v. *Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019). "[A] judge's probable-cause determination . . . predicated solely on a police officer's false statements" or "fabrications" violates the Fourth Amendment. *Manuel* v. *City of Joliet*, 137 S. Ct. 911, 918, 919 (2017). The statute of limitations for any § 1983 claim in Illinois is two years. *See Savory* v. *Cannon*, 947 F.3d 409, 413 (7th Cir. 2020) (en banc). And under *Manuel* v. *City of Joliet*, 903 F.3d 667, 670 (7th Cir. 2018), an unlawful pretrial detention claim accrues when the detention ends, which, like here, can be upon conviction, *see Lewis*, 914 F.3d at 478. City Defendants argue that the claims that are premised on unlawful pretrial detention — wrongful because the probable cause was based on fabricated evidence — began to accrue once they were convicted in 2006. (Dkt. 57 at 31.) City Defendants also argue that any false arrest claims began to accrue in March 2003, after their arrests, *id.*, although plaintiffs note that they "allege no claim for false arrest" (dkt. 84 at 12.)

Plaintiffs argue that *Manuel*'s accrual rule for this claim has been called into question after *McDonough* v. *Smith*, 139 S. Ct. 2149 (2019), as noted in *Savory* v. *Cannon*, 947 F.3d 409

(7th Cir. 2020). (Dkt. 74 at 26.) Under those decisions, they assert, their unlawful pretrial detention claims under the Fourth Amendment were *Heck*-barred and thus accrued until their convictions were vacated and charges dismissed. *Id.*

The issue here is whether *McDonough* altered *Manuel*'s bright-line accrual rule. In *McDonough*, the Court, evaluating a fabricated evidence due process claim, concluded that based on the nature of that claim, a judgment for the § 1983 plaintiff would have undermined the validity of his underlying conviction, and so it accrued under *Heck* until criminal proceedings against him were terminated in his favor. *See McDonough*, 139 S. Ct. at 2154–55. In *Savory*, the Seventh Circuit followed course, holding the same for plaintiff's fabricated evidence due process claim, but reserving for remand the question of when the Fourth Amendment unlawful pretrial detention claim that also was based on fabricated evidence accrued. 947 F.3d at 416 n.4, 418.

Before the district court in *Savory* issued a decision on remand, the Seventh Circuit issued an unpublished order in *Sanders* v. *St. Joseph County* where it recognized that an unlawful pretrial detention claim "that impl[ies] the invalidity of an ongoing criminal proceeding or a prior criminal conviction" could be *Heck*-barred even "after [plaintiff's] release and until either those proceedings terminated in his favor or the conviction was vacated." 806 F. App'x 481, 484 n.2 (7th Cir. 2020).

Thereafter, the district court in *Savory*, citing *McDonough* and *Sanders*, determined that plaintiff's unlawful pretrial detention claim was *Heck*-barred because the allegation that officers knowingly detained him without probable cause also threatened the integrity of the ensuing criminal prosecution, and thus he could not have brought that claim until proceedings terminated in his favor when he was pardoned. *See Savory* v. *Cannon*, No. 17 C 204, 2021 WL 1209129, at *6 (N.D. Ill. Mar. 31, 2021). The apparent thrust of all this is that courts should look to the

nature of the particular claim at issue in determining whether a win for plaintiff on that claim would be incompatible with his criminal conviction.

Here, a judgment for plaintiffs on the unlawful pretrial detention claim would have undermined the validity of their convictions because both their pretrial detention and convictions were based on the same allegedly fabricated evidence. Therefore, a judgment in plaintiffs' favor on the unlawful pretrial detention claims "directly challenges—and thus necessarily threatens to impugn—the prosecution itself." *McDonough*, 139 S. Ct. at 2159 (citing *Heck*, 512 U.S. at 486–487). "There is no logical way to reconcile th[e] claim[ ] with a valid conviction." *Savory*, 947 F.3d at 417. While City Defendants urge this court to follow *Brown* v. *City of Chicago*, No. 18 C 7064, 2019 WL 4694685, at *3 (N.D. Ill. Oct. 8, 2019), in which the court concluded that *McDonough* did not save a plaintiff's unlawful detention claim, that decision predated *Savory* and *Sanders* and did not have the benefit of their guidance on whether an unlawful pretrial detention claim can operate as a collateral attack on a criminal conviction. City Defendants offer no argument that success on this claim does not run into *Heck*. Instead, they recast the claim as "essentially a false arrest claim" (dkt. 57 at 31 n.6), but that is not correct.[5] Count III stands.

## V.    Count V: involuntary servitude claims

Count V alleges that as a result of Police Officer Defendants' and Shepherd's other constitutional violations, neither plaintiff was duly convicted of a crime, and thus their labor during incarceration constituted involuntary servitude, in violation of the Thirteenth Amendment. (Dkt. 1 at 35, ¶¶170–71.) City Defendants and County Defendants argue that these claims should be dismissed because there is no allegation of forced labor and plaintiffs were "duly convicted"

---

[5] City Defendants also raise for the first time in their reply an alternative argument that if plaintiffs proceed with their Fourteenth Amendment claims, the Fourth Amendment claims must necessarily drop out. (Dkt. 80 at 29.) For purposes of the motions to dismiss, this argument is forfeited. *See TAS Dist. Co.* v. *Cummins Engine Co.*, 491 F.3d 625, 630 (7th Cir. 2007).

of a crime. (Dkt. 57 at 34; dkt. 70 at 20.) Plaintiffs respond that they have in fact alleged forced labor during their incarcerations and argue that they were not "duly convicted" because their convictions violated due process. (Dkt. 74 at 27–28; dkt. 84 at 24.)

The Thirteenth Amendment proscribes "involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted[.]" U.S. Const. amend. XIII, § 1. Thus, the amendment does not apply to persons "duly convicted" of a crime and "the consensus holds that [it] . . . is not implicated 'where a prisoner is incarcerated pursuant to a presumptively valid judgment . . . even though the conviction may be subsequently reversed.'" *Savory*, No. 17 C 204, 2021 WL 1209129, at *7 (quoting *Omasta* v. *Wainwright*, 696 F.2d 1304, 1305 (11th Cir. 1983), and citing *Tourscher* v. *McCullough*, 184 F.3d 236, 240–42 (3d Cir. 1999); *Perrault* v. *State*, 2016 WL 126918, at *3 (W.D. Wis. Jan. 11, 2016), *aff'd sub nom. Perrault* v. *Wis. Dep't of Corr.*, 669 F. App'x 302 (7th Cir. 2016); *Rivera* v. *Carroll*, 2009 WL 2365240, at *9 (S.D.N.Y. Aug. 3, 2009)). Plaintiffs were incarcerated based on presumptively valid convictions at the time that they allege to have been subject to forced labor. Count V is dismissed with prejudice.

## VI. Count VI: failure to intervene claims

In count VI, plaintiffs allege that Police Officer Defendants, Prosecutor Defendants, and Shepherd failed to intervene to stop the underlying constitutional violations, though they had the opportunity to do so. (Dkt. 1 at 35–36, ¶174.) A failure to intervene under § 1983 requires only that plaintiffs allege that the defendants knew that a constitutional violation was committed and had a realistic opportunity to prevent it. *See Gill* v. *City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

City Defendants and County Defendants seek dismissal of the failure to intervene claims for the same reasons as their group pleading argument and arguments for dismissing the

underlying constitutional tort. (Dkt. 57 at 35; dkt. 70 at 25, 27–28.) But those arguments fail for the same reasons that the group pleading is not fatal and the underlying violations survive.

County Defendants also argue that the failure to intervene claims based on their investigations of plaintiffs should be dismissed because they are entitled to qualified immunity. (Dkt. 70 at 25.) They argue that it is not clearly established that prosecutors can be liable for not intervening to stop constitutional deprivations committed by police officers. (*Id.*) In support, they primarily rely on *Patrick* v. *City of Chicago*, 213 F. Supp. 3d 1033, 1054–55 (N.D. Ill. Oct. 4, 2016), a decision granting summary judgment in which the court recognized that there is no clear duty on prosecutors to intervene to stop police misconduct and declined to expand liability in that case. (*Id.* at 27.)

But plaintiffs respond that they have alleged that Prosecutor Defendants were not simply bystanders to Police Officer Defendants' misconduct but instead Judge and Rubinstein fabricated evidence and coerced false confessions on their own, and, by inference, Varga also was involved. (Dkt. 84 at 27.) Plaintiffs also argue that there is no categorical bar to bringing failure to intervene claims when it is alleged that the prosecutor failed to intervene in a police officer's misconduct. (*Id.* at 27–29.) And they argue that since *Whitlock* v. *Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012), courts have declined to dismiss failure to intervene claims where prosecutors are alleged to have acted in an investigative capacity. (*Id.* at 29–31.)

Plaintiffs have plausibly alleged that Prosecutor Defendants were more than passive participants in the investigation, taking on roles as investigators and fabricating evidence and coercing statements, independent of any Police Officer Defendant's participation. (Dkt. 1 at 30, ¶¶136–38; *id.* at 31–32, ¶¶146–47.) Further, *Patrick* does not squarely address the same prosecutor conduct alleged in this case, nor does it stand for the proposition that failure to

intervene claims against prosecutors are categorically foreclosed. Failure to intervene claims can cast a wide participant net. *See Yang* v. *Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). What is alleged sufficiently states that Judge and Rubinstein, acting in an investigatory role, failed to intervene to stop constitutional wrongs. But there is no alleged factual basis, nor basis to reasonably infer, that Varga also had the opportunity to intervene to stop the alleged constitutional wrongs against plaintiffs because his role is limited to Shaw's false confession. Count VI stands as to Judge but is dismissed without prejudice as to Varga with leave to replead if plaintiffs can allege facts showing that he failed to intervene in an underlying constitutional deprivation, despite having a reasonable opportunity to do so. Rubinstein is dismissed without prejudice based on claim preclusion.

## VII. Count VII: federal conspiracy claims

Count VII alleges that Police Officer Defendants and Shepherd, with "other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff[s] for a crime [they] did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means," while "agree[ing] among themselves to protect one another from liability for" doing so. (Dkt. 1 at 36, ¶180.) And "[i]n furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity." (*Id.* at 37, ¶181.) Plaintiffs also allege that Judge, Rubinstein, and Varga "arranged for and conspired with" Police Officer Defendants to fabricate evidence and suppress misconduct; to that end, Rubenstein was involved in manufacturing false statements from Shaw, Fulton, and Mitchell, Judge was involved in Fulton's false statement, and Varga was involved in Shaw's. (*Id.* at 7, ¶33 (Rubinstein in connection with Shaw); *id.* at 9, ¶46 (Judge and Rubinstein in connection with Fulton); *id.* at 15, ¶63 (Rubinstein in connection with Mitchell); *id.* at 16, ¶72 (Varga in connection with Shaw)).

A § 1983 conspiracy claim requires allegations that the defendants reached an agreement to deprive the plaintiff of his constitutional rights and that a member of the conspiracy took an overt act to deprive him of those rights. *See Daugherty* v. *Page*, 906 F.3d 606, 612 (7th Cir. 2018). As with the failure to intervene claims, conspiracy is not an independent basis for liability. It requires that the plaintiff show an underlying constitutional violation and demonstrate that the defendants agreed to cause the constitutional harm. *See Smith* v. *Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). A plaintiff must set forth allegations with the specific defendants, the approximate time period of the conspiracy, and the general purpose of the conspiracy. *See Loubser* v. *Thacker*, 440 F.3d 439, 443 (7th Cir. 2006). A plaintiff is not required to plead a "precise causal connection" between the actions of the defendants and the alleged violations, but instead only a "tenable theory or basis of suit." *Pratt* v. *Tarr*, 464 F.3d 730, 732–33 (7th Cir. 2006). At the same time, the plaintiff must allege that "a particular defendant joined the conspiracy and knew of its scope." *Bank of Am., N.A.* v. *Knight*, 725 F.3d 815, 818 (7th Cir. 2013).

To begin, City Defendants move to dismiss this claim on qualified immunity grounds. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *See Kisela* v. *Hughes*, 138 S. Ct. 1148, 1152 (2018). City Defendants argue that they are entitled to qualified immunity "to the extent Plaintiffs' claims are premised on an alleged conspiracy amongst the Police Officer Defendants" based on the intra-corporate conspiracy doctrine. (Dkt. 57 at 37.) The intra-corporate conspiracy doctrine, derived from corporate and antitrust settings, bars conspiracy claims against managers of a corporation jointly pursuing its lawful business purpose based on the actions of employees of the same corporate entity if they are acting within the scope

of their employment. *See Travis* v. *Gary Cmty. Mental Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990). City Defendants point to a recent district court decision in *Haliw* v. *City of S. Elgin*, 19 C 01515, 2020 WL 1304697 (N.D. Ill. Mar. 18, 2020), that determined that the defendant police officers were entitled to qualified immunity on a § 1983 conspiracy claim because the applicability of this doctrine to such claims was, and remains, not clearly established.

The intra-corporate doctrine and its questionable applicability here is no reason to dismiss plaintiffs' § 1983 conspiracy claims because plaintiffs at least alleged an inter-entity conspiracy among Police Officer Defendants and Shepherd, a Cook County State's Attorney's Office investigator. Thus, at this stage, there is no need to decide whether this potential theory of non-liability or qualified immunity could bar an alternate factual scenario based on a portion of this claim. *See BBL, Inc.* v. *City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015). Further, there are recognized exceptions to the intra-corporate conspiracy doctrine that plausibly apply here, such as where employees of the same governmental entity are acting outside of the scope of that entity's interests, which is the case when law enforcement subverts the law, or where the conspiracy is part of a broader unlawful pattern of conduct by the entity's employees, as alleged in the *Monell* claims. *See Weston* v. *City of Chi.*, No. 20 C 6189, 2021 WL 2156459, at *10 (N.D. Ill. May 27, 2021).

Next, City Defendants and County Defendants argue that the complaint lacks the factual basis needed to allege a conspiracy between Police Officer Defendants and Shepherd. (Dkt. 57 at 38; dkt. 70 at 16.) Their general objections about specificity are not well taken. The requirements for pleading a conspiracy are not as precise as defendants contend, such as requiring dates. *Cf. Pratt*, 464 F.3d at 732–33. Plaintiffs' allegations for conspiracy liability against Police Officer

Defendants and Shepherd for framing plaintiffs with fabricated evidence and suppressing exculpatory evidence (*see* dkt. 1 at 36–37, ¶¶180–82) clear the bar.

Last, County Defendants argue that there is no plausible conspiracy theory of liability alleged against Judge, Rubinstein, and Varga because plaintiffs do not allege an agreement between them or Police Officer Defendants to deprive plaintiffs of their constitutional rights. (Dkt. 70 at 14–15.) And for Varga, they argue that his alleged involvement with Shaw's confession cannot be the basis of a conspiracy claim because Shaw's confession was not used at plaintiffs' trials and thus did not deprive plaintiffs of any constitutional rights. (*Id.* at 16.)

Plaintiffs respond by highlighting the nature and scope of the alleged conspiracy and Judge's, Rubinstein's, and Varga's roles in it: Rubinstein conspired with Police Officer Defendants to fabricate a false statement from Griffin; Rubinstein and Judge worked with Police Officer Defendants to use and hide improper interrogation tactics to fabricate a false confession from plaintiffs; and Varga did the same in connection with Shaw's false confession. (Dkt. 84 at 17–18.)

Plaintiffs conspiracy claims are not a model of clarity. *See also infra* section IX.D. (state civil conspiracy claims). Their specific mention of Shepherd and "other co-conspirators, known and unknown," agreeing to commit a deprivation with no specific mention under count VII of Judge, Rubinstein, and Varga by name, coupled with the inclusion of several specific factual allegations elsewhere that the three prosecutors "arranged for and conspired with" Police Officer Defendants creates uncertainty as to whether plaintiffs intended to bring conspiracy claims against Judge, Rubinstein, and Varga and the precise scope of that conspiracy.

But plaintiffs' imprecise drafting is not fatal at this stage. Saved by favorable inferences and general incorporation of all allegations under each count, the court will assume that "other

co-conspirators" includes Judge and Varga because there are references elsewhere to their participation in a conspiracy. For reasons explained in section II of this decision, however, Rubinstein is dismissed without prejudice based on claim preclusion. With that, plaintiffs provide a tenable basis for this claim against Judge, who is alleged to have agreed with Police Officer Defendants to frame plaintiffs for murder with false evidence and then suppress their misconduct. (Dkt. 1 at 7, ¶33; *id.* at 9, ¶46; *id.* at 15, ¶63.) As to Varga, however, his only role is related to Shaw's false confession, which has no connection to any underlying constitutional deprivation against plaintiffs. Plaintiffs respond that "Varga played a role in the conspiracy which in fact harmed [them]" (dkt. 84 at 18) but do not specify the underlying constitutional deprivation against them based on Shaw's allegedly false statements. Therefore, the conspiracy claims against Varga are dismissed without prejudice, with leave to replead if plaintiffs can allege that Varga took part in a conspiracy beyond the alleged involvement in Shaw's confession. The conspiracy claims against Judge, Police Officer Defendants, and Shepherd survive.

## VIII.    Count VIII: *Monell* claims

City Defendants next argue that the *Monell* claims should be dismissed to the extent the underlying federal claims against them in their individual capacities are dismissed. (Dkt. 57 at 23.) Plaintiffs respond that the *Monell* claims should stand for the same reason that their claims against individual defendants stand. (Dkt. 74 at 35.) And they contend that the *Monell* claims can survive even if there is no individual liability "under some circumstances." *Id*. (citing *Awalt* v. *Marketti*, 75 F. Supp. 3d 777 (N.D. Ill. 2014)).

*Monell* liability cannot survive without an underlying constitutional violation by an individual defendant. *See City of Los Angeles* v. *Heller*, 475 U.S. 796, 799 (1986). The *Awalt* decision that plaintiffs cite involved a motion to bifurcate trial on individual defendant liability

and "Entity Defendants" that were corporations or governmental bodies, and the court noted there that plaintiff had "described a number of scenarios in which one or more of the Entity Defendants could be found liable even absent a finding of individual liability." *Awalt*, 75 F. Supp. 3d at 782. Plaintiffs have not provided the court with a similar scenario, nor is one apparent. The *Monell* claims survive to the extent that the underlying federal claims survive.

## IX.    Counts IX–XI: state law claims for malicious prosecution, IIED, and civil conspiracy

### A.    Claim preclusion as to all three state law claims

City Defendants move to dismiss the state-law claims for malicious prosecution, IIED, and civil conspiracy, contained in counts IX through XI, respectively, under claim preclusion. (Dkt. 57 at 30.) In 2005, plaintiffs filed an action in federal court — "*Fulton/Mitchell I*," No. 05 C 01551 — alleging various claims against Zalatoris, Breen, Struck, Girardi, Winstead, and Rubinstein based on their involvement in the Collazo murder investigation and prosecution. (Dkt. 57 at 40–41.) In October 2006, plaintiffs voluntarily dismissed their claims against Rubinstein with prejudice and then six days later voluntarily dismissed the entire action. *Id*. In October 2007, plaintiffs refiled their case — "*Fulton/Mitchell II*," No. 07-cv-05569. *Id*. There, the court dismissed without prejudice claims for coercive interrogation, conspiracy, and deprivation of their right to a fair trial under *Heck*, but not the false arrest claims. *Id*. In February 2012, plaintiffs moved to voluntarily dismiss their remaining claims without prejudice, citing Rule 41(b) (allowing defendants, not plaintiffs, to move for involuntary dismissals that operate as adjudications on the merits), which the court granted (*see* No. 07 C 05569, dkts. 94, 96).

City Defendants submit that under *Hudson* v. *City of Chicago*, 889 N.E.2d 210 (Ill. 2008), the state law claims here are precluded. In *Hudson*, the Illinois Supreme Court held that "if there is an adjudication on the merits of one claim in a case, this determination will have

26

[preclusive] effect on the filing of any other claims that could have been raised and determined in the first case." 889 N.E.2d at 220. Applying *Hudson*, City Defendants contend that the voluntary dismissal of Rubinstein in *Fulton/Mitchell II* operated as an adjudication on the merits for purposes of claim preclusion, barring the state law claims here. (Dkt. 57 at 42.) In their reply, however, City Defendants state that the dismissal with prejudice of Rubinstein in *Fulton/Mitchell I* operated as an adjudication on the merits. (Dkt. 80 at 39.)

Whatever the precise operation of *Hudson* may be, plaintiffs are correct (dkt. 74 at 36) that federal preclusion rules, not state ones, govern here. *See Ross ex rel. Ross* v. *Bd. of Educ. of Twp. High Sch. Dist. 211*, 486 F.3d 279, 283 (7th Cir. 2007) ("The federal law of claim preclusion applies here because the earlier judgment was rendered by a federal court.") (citations omitted); *see also H.A.L. NY Holdings, LLC* v. *Guinan*, 958 F.3d 627, 632 (7th Cir. 2020) (citing *Semtek Int'l Inc.* v. *Lockheed Martin Corp.*, 531 U.S. 497, 507–08 (2001)) ("general rule is that the [prelusive] effect of a federal judgment is a matter of federal common law"); *cf. Chi. Title Land Tr. Co.* v. *Potash Corp. of Saskatchewan Sales*, 664 F.3d 1075, 1079 (7th Cir. 2011) (if "prior adjudication was in Illinois state court, we apply Illinois [claim preclusion] principles"). Thus, *Hudson* is inapplicable and there is no need to further address City Defendants' argument.

**B.      Count IX: malicious prosecution claims**

In count IX, plaintiffs allege that Police Officer Defendants and Shepherd, along with unknown individuals, accused plaintiffs of criminal activity and influenced the initiation and continuation of judicial proceedings against them without probable cause and with awareness that plaintiffs were innocent. (Dkt. 1 at 40, ¶¶197–98.) They further allege that the judicial proceedings against them were terminated in their favor when prosecutors dismissed all charges against them. (*Id.* ¶199.)

A malicious prosecution claim under Illinois law requires that a plaintiff show that (1) the defendant commenced an original judicial proceeding, (2) the proceeding was terminated in the plaintiff's favor, (3) the absence of probable cause, (4) malice, and (5) damages. *See Swick* v. *Liautaud*, 662 N.E.2d 1238, 1234 (Ill. 1996). Liability extends to any person, including police officers, if the person played a "significant role" in causing the prosecution. *Beaman* v. *Freesmeyer*, 131 N.E.3d 488, 498 (Ill. 2019).

City Defendants argue that plaintiffs' malicious prosecution claims should be dismissed because there are no allegations that any City Defendant "commenced or continued the criminal proceeding against" either of them (dkt. 57 at 43–44), and both City Defendants and County Defendants (namely, Shepherd under this count) argue that the dismissal of charges by *nolle prosequi* are not indicative of plaintiffs' innocence (dkt. 57 at 44–45; dkt. 70 at 28–31). Plaintiffs respond that liability for police officers can rest on their supplying misleading information to prosecutors and that their factual allegations of innocence, at this stage, are sufficient to show a favorable termination. (Dkt. 74 at 38–39; dkt. 84 at 32–34.)

Plaintiffs have pleaded a viable claim for malicious prosecution against City Defendants and Shepherd. As for the "commenced proceedings" requirement, police officers (or investigators) can be liable for the commencement of judicial proceedings where they "deliberately supplied misleading information that influenced the [prosecutor's or grand jury's] decision[s]," *Jones* v. *City of Chi.*, 856 F.2d 985, 994 (7th Cir. 1988), which is what plaintiffs have alleged with regard to fabricated evidence and suppressed evidence (*e.g.*, dkt. 1 at 9, ¶48; *id.* at 18, ¶83; *id.* at 19, ¶ 86).

Regarding the favorable-termination requirement, although a *nolle prosequi* order[6] alone is insufficient to satisfy this requirement, *see Lund* v. *City of Rockford*, 956 F.3d 938, 949 (7th Cir. 2020), there are additional circumstances alleged here that, if true, could show that the dismissal of their criminal proceedings was indicative of their innocence (dkt. 1 at 21), *e.g.*, *Cult Awareness Network* v. *Church of Scientology Int'l*, 685 N.E.2d 1347, 1351 (Ill. 1997).

City Defendants and Shepherd also ask this court to take judicial notice of evidence of prior court proceedings to overcome the favorable-termination allegations. They cite transcripts from the state court's ruling on vacating plaintiffs' convictions, in which the court stated that it drew no conclusion as to plaintiffs' guilt or innocence. (Dkt. 57 at 45; dkt. 70 at 29.) The consequences of that court's statement are certainly subject to "reasonable dispute," *Ennenga* v. *Starns*, 677 F.3d 766, 774 (7th Cir. 2012), and thus not a proper judicially noticeable fact that dooms plaintiffs' malicious prosecution claims. And the same is true for the transcript that Shepherd cites of the state court's denial of plaintiffs' request for certificates of innocence. (Dkt. 70 at 30–31.) That transcript shows that the state court found that plaintiffs failed to meet their burden to show "actual innocence" for purposes of obtaining certificates of innocence (dkt. 70 at 31 (citing dkt. 70-7 at 5–7)), a finding that does preclude a fact finder in this proceeding from finding that plaintiffs' criminal proceedings were terminated in a manner that was indicative of their innocence.

Therefore, plaintiffs have alleged plausible claims for malicious prosecution against City Defendants and Shepherd. Count IX stands.

---

[6] This court takes judicial notice that the criminal charges against plaintiffs were dismissed by *nolle prosequi* order. (Dkt. 57-3 at 6–7.)

### C.     Count X: IIED claims

In count X, plaintiffs alleged that the actions of Police Officer Defendants, Prosecutor Defendants, and Shepherd "were extreme and outrageous," rooted in an abuse of power and done with intent to cause, or in reckless disregard of the probability that their conduct would cause, severe emotional distress. (Dkt. 1 at 40–41, ¶203); *see Bianchi* v. *McQueen*, 58 N.E.3d 680, 700 (Ill. App. Ct. 2016) (IIED claim can be based on a malicious prosecution claim).

City Defendants and County Defendants argue that the IIED claims are barred by the one-year statute of limitations under the Illinois Local Governmental & Governmental Employees Tort Immunity Act, 745 Ill. Comp. Stat. 10/8-101. (Dkt. 70 at 32.) City Defendants contend that the IIED claims began to accrue at the time that plaintiffs were charged because the claims were intertwined with the malicious prosecution claim. (Dkt. 57 at 45–46.) But County Defendants contend that the IIED claims accrue from the date of plaintiffs' arrests. (Dkt. 70 at 32.) Under either theory, though, the clock would have started in 2003. Plaintiffs respond that their IIED claims did not accrue under *Heck*. (Dkt. 74 at 39–40; dkt. 84 at 35–36.)

*Heck*'s bar on § 1983 damages claims applies to state law claims as well. *See Starks* v. *City of Waukegan*, 946 F. Supp. 2d 780, 803 (N.D. Ill. 2013) (recognizing that Illinois adopted *Heck* for state law claims in *Lieberman* v. *Liberty Healthcare Corp.*, 948 N.E.2d 1100 (Ill. App. 2011)). Under *Bridewell* v. *Eberle*, a case relied on by City Defendants and County Defendants, IIED claims based on a plaintiff's arrest and prosecution accrue on the date of arrest. 730 F.3d 672, 678 (7th Cir. 2013). But in *Parish* v. *City of Elkhart*, the Seventh Circuit determined that an IIED claim that was based on all of the actions leading to the wrongful conviction — including fabricating evidence and destroying or suppressing evidence — was *Heck*-barred because prevailing on the IIED claim would have necessarily implied the invalidity of the conviction. 614 F.3d 677, 684 (7th Cir. 2010).

Here, like *Parish*, the alleged course of conduct forming the basis of the IIED claims went from arrest through prosecution and was perfected in plaintiffs' convictions. If judgment were entered for plaintiffs on the IIED claims, that would have undermined the validity of their convictions. *Bridewell* does not compel a different result because there, in contrast to here, "[n]one of the plaintiffs contended that the[ir] interrogations had been coercive or otherwise improper" and no convictions were obtained; indeed, *Heck* was not addressed in that decision. *Bridewell*, 730 F.3d at 675.

Thus, the IIED claims accrued under *Heck*. The complaints do not state the exact date that the convictions were vacated or charges dropped (dkt. 1 at 21, ¶100), but no defendant argued that the claims were untimely even if they accrued under *Heck*. Count X stands.

### D.    Count XI: civil conspiracy claims

In count XI, plaintiffs allege that Police Officer Defendants, Shepherd, and "other co-conspirators, known and unknown," acted in concert to reach an agreement among themselves to frame plaintiffs for crimes they did not commit and conspired by concerted action to maliciously prosecute them and intentionally inflict emotional distress. (Dkt. 1 at 41, ¶¶206–08.)

A civil conspiracy claim under Illinois law requires that a plaintiff allege facts establishing "(1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the unlawful overt act." *Lewis* v. *Lead Indus. Ass'n*, – N.E.3d – , 2020 IL 124107, ¶20 (Ill. 2020).

City Defendants and County Defendants present three arguments for dismissal. The first two — that the underlying causes of action are not cognizable and the conspiracy allegations are too conclusory (dkt. 57 at 39–40; dkt. 70 at 21–23) — are rejected for reasons already discussed,

*see supra* section VII (federal conspiracy claims); section IX.B. & C. (malicious prosecution and IIED claims).

The third argument is that the conspiracy claims are duplicative of the malicious prosecution and IIED claims and thus not separately actionable. (Dkt. 57 at 39–40; dkt. 70 at 23.) Plaintiffs respond that their conspiracy claims are not duplicative because they have alleged that Police Officer Defendants[7] conspired with Shepherd to frame them but not that Shepherd participated in Police Officer Defendants' interrogations, nor have they alleged that Police Officer Defendants helped Shepherd create misleading photos, and so the conspiracy claims tie Police Officer Defendants to Shepherd's misconduct and vice versa. (Dkt. 74 at 41; dkt. 84 at 25–26.) To the extent that the conspiracy claims expand the scope of liability for Police Officer Defendants' and Shepherd's misconduct, they survive dismissal.

## X. Derivative claims in counts XII and XIII

In count XII, plaintiffs alleged that the City of Chicago is liable for all torts committed by the Police Officer Defendants that occurred within the scope of their employment. (Dkt. 1 at ¶212.) In count XIII, plaintiffs alleged that under state law, the City of Chicago is liable for any judgments entered against Police Officer Defendants, and Cook County is liable for any judgments against Prosecutor Defendants and Shepherd. (Dkt. 1 at 42–43, ¶¶216–18.) But City Defendants and County Defendants offer no reason to dismiss the derivative claims that are premised on the underlying claims, independent of what happens to the underlying claims. (Dkt. 57 at 46; dkt. 32 at 32.) These claims remain in the case.

---

[7] In response to City Defendants' motion to dismiss, plaintiffs reference "Defendants," but not specifically Police Officer Defendants. (Dkt. 74 at 41–42.) But in response to County Defendants' motion, plaintiffs use "Police Officer Defendants," not Defendants. (Dkt. 84 at 41.) Unlike the federal conspiracy claim, this court takes plaintiffs' failure to mention Judge, Rubinstein, or Varga in its defense of the claims as an indication that those prosecutors are not alleged to be part of a conspiracy to maliciously prosecute plaintiffs.

## <u>CONCLUSION AND ORDER</u>

City Defendants' and County Defendants' motions to dismiss are granted in part and denied in part. All involuntary servitude claims in count V are dismissed with prejudice. All claims against Rubinstein are dismissed without prejudice. The failure to intervene claim in count VI and conspiracy claim in count VII against Varga are dismissed without prejudice. Plaintiffs have 21 days to replead those claims that were dismissed without prejudice, if they choose to do so. A scheduling conference is scheduled for July 27, 2021, at 11:00 a.m.

Date: July 1, 2021

_____
U.S. District Judge Joan H. Lefkow