**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN FULTON, | ) | |
| | ) | |
| Plaintiff, | ) | 20-cv-3118 |
| | ) | |
| v. | ) | Judge Lefkow |
| | ) | |
| ROBERT BARTIK, et al., | ) | Jury Trial Demanded |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ANTHONY MITCHELL, | ) | |
| | ) | 20-cv-3119 |
| Plaintiff, | ) | |
| | ) | Judge Lefkow |
| v. | ) | |
| | ) | Jury Trial Demanded |
| ROBERT BARTIK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**INDIVIDUAL CITY DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR PARTIAL MOTION FOR SUMMARY JUDGMENT**

Defendants Robert Bartik, John Zalatoris, James Breen, Edward Winstead, Joseph Struck, Michael Kennedy, Matthew Schmitz, Brian Skora, Joseph Aguirre, Leonard Rolston, Stephen Franko, and Robert Girardi ("Individual City Defendants"), by and through their undersigned counsel, hereby submit the following memorandum of law in support of their partial motion for summary judgment.

Dated: June 16, 2023

Respectfully submitted,

/s/ Natalie Y. Adeeyo
Shneur Nathan (snathan@nklawllp.com)
Avi Kamionski (akamionski@nklawllp.com)
Natalie Adeeyo (nadeeyo@nklawllp.com)
Breana Brill (bbrill@nklawllp.com)

Special Asst. Corporation Counsel
Nathan & Kamionski LLP
33 West Monroe, Suite 1830
Chicago, IL 60603
(312) 957-6639

# <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................................1

STATEMENT OF UNDISPUTED FACTS ..........................................................................................5

LEGAL STANDARD .........................................................................................................................13

ARGUMENT ......................................................................................................................................14

    I.    SUMMARY JUDGMENT FOR DEFENDANTS CERVENKA, KENNEDY, SKORA, AGUIRRE, AND FRANKO IS PROPER AS THERE IS NO EVIDENCE THAT THEY WERE PERSONALLY INVOLVED IN ANY ALLEGED CONSTITUTIONAL VIOLATION ........................................14

        A.   *Defendant Richard Cervenka ("Sgt. Cervenka")* ...............................................................15
        B.   *Defendant Michael Kennedy ("Sgt. Kennedy")*.................................................................16
        C.   *Defendant Brian Skora ("Officer Skora")*.......................................................................16
        D.   *Defendant Joseph Aguirre ("Detective Aguirre")*............................................................17
        E.   *Defendant Stephen Franko ("Youth Investigator Franko")* ...............................................17

    II.   PLAINTIFFS' BRADY CLAIMS IN COUNT IV FAIL BECAUSE THERE ARE NO MATERIAL FACTS TO SUPPORT THAT ANY EVIDENCE WAS DELIBERATELY WITHHELD OR DESTROYED ......................................................................................................................18

        A.   *Plaintiffs Cannot Establish That Individual City Defendants Intentionally Or Recklessly Withheld Evidence of a Back Door Camera and Key Fob at Fulton's Apartment.* ..................................20
        B.   *There Is No Evidence That Individual City Defendants Withheld Any Evidence Regarding a License Plate Number* ................................................................................................................24
        C.   *Plaintiffs' Argument That Individual City Defendants Withheld the Circumstances Surrounding the Interviews of Shaw, Griffin, Fulton, and Mitchell Fails as a Matter of Law* ...........................25

    III.  ARGUABLE PROBABLE CAUSE DEFEATS PLAINTIFFS' DEPRIVATION OF LIBERTY CLAIMS IN COUNT III AGAINST ALL INDIVIDUAL CITY DEFENDANTS .....................................28

    IV.  PLAINTIFFS CANNOT PRESENT EVIDENCE SUFFICIENT TO SUSTAIN THEIR STATE LAW MALICIOUS PROSECUTION CLAIM IN COUNT IV .........................................................35

        A.   *Probable cause exists to defeat this claim.* ......................................................................35
        B.   *Alternatively, the State law Malicious Prosecution Claim fails because the nolle prosequi of Plaintiffs' charges is not indicative of innocence.* ...............................................................36

    V.   SUMMARY JUDGMENT SHOULD BE GRANTED FOR DEFENDANTS BARTIK, WINSTEAD, ROLSTON, AND SCHMITZ ON PLAINTIFFS' COERCED CONFESSION CLAIMS IN COUNT I..38

        A.   *Plaintiff Mitchell's confession* ......................................................................................39
        B.   *Plaintiff Fulton's confession* .........................................................................................40

    VI.  COUNT II SHOULD BE DISMISSED AGAINST ALL INDIVIDUAL CITY DEFENDANTS AS THERE IS NO EVIDENCE TO SUGGEST THE KNOWING FABRICATION OF ANY WITNESS STATEMENTS ....................................................................................................................41

        A.   *Nothing in the Record Suggests that Individual City Defendants Knowingly Fabricated Johnnitta "Precious" Griffin's Statements of March 11 and March 14, 2003* ....................................42
        B.   *Antonio Shaw's Confession Was Never Used Against Plaintiffs at Trial and Therefore Cannot Serve as the Basis for a Fabrication Claim.* .............................................................................45
        C.   *Fulton's Fabrication Claim Based on Mitchell's Confession and Mitchell's Fabrication Claim Based on Fulton's Confession Also Fail.* ...................................................................................46

    VII. THERE IS NO EVIDENCE THAT DEFENDANTS BARTIK, WINSTEAD, CERVENKA, KENNEDY, SCHMITZ, SKORA, FRANKO, AND AGUIRRE FAILED TO INTERVENE .................50

**VIII. PLAINTIFFS CANNOT ESTABLISH THAT INDIVIDUAL CITY DEFENDANTS CONSPIRED TO VIOLATE PLAINTIFFS' CONSTITUTIONAL OR STATE LAW RIGHTS** ..................................51

**IX. THERE IS NO EVIDENCE TO SUPPORT PLAINTIFFS' INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIMS** ..........................................................................................53

**CONCLUSION** .........................................................................................................................................55

# TABLE OF AUTHORITIES

CASES

48 F.4th 816, 834-35 (7th Cir. 2022) ---------------------------------------------------------------------- 50
*Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714–15 (7th Cir 2013) ------------------------------------ 30
*Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000) ----------------------------------- 52
*Andersen v. Vill. of Glenview*, No. 17-CV-05761, 2018 WL 6192171, at *15 (N.D. Ill. 2018), aff'd, 821 F. App'x 625
    (7th Cir. 2020)----------------------------------------------------------------------------------------- 36
*Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) -------------------------------------- 47
*Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987)----------------------------------------------- 33, 34
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)------------------------------------------ 13, 14
*Arizona v. Fulminate*, 499 U.S. 279, 288 (1991)-------------------------------------------------------- 39
*Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011) ---------------------------------------------------- 33, 34
*Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009)-------------------------------------------------------- 50
*Backes v. Village of Peoria Heights, Illinois*, 662 F.3d 866, 870 (7th Cir. 2011) ----------------------- 15
*Baker v. McCollan*, 443 U.S. 137, 146 (1979)----------------------------------------------------------- 24
*Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 74, 451 Ill.Dec. 310, 183 N.E.3d 767, 782 (Ill. 2021) ----------------------- 35
*Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015) -------------------------------------- 19, 52, 53
*Brady v. Maryland*, 373 U.S. 83 (1963) --------------------------------------------------------------- 18
*Bridgeforth v. City of Glenwood*, No. 18 C 7150,  2020 WL 1922907, at *7 (N.D. Ill. Apr. 21, 2020)------------- 21, 26
*Brown v. City of Chicago*, No. 18 C 7064, 2022 WL 4602714, at *27 (N.D. Ill. Sept. 30, 2022) -------------- 28, 46, 47
*Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994) ------------------------------------------- 44
*Cairel v. Alderden*, 821 F.3d 823, 836 (7th Cir. 2016) ----------------------------------------------- 54
*Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019)---------------------------------------------------- 29
*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) --------------------------------------------------- 13
*Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001)--------------------------------------- 15
*Chavez v. Martinez*, 538 U.S. 760, 700 (2003) --------------------------------------------------------- 39
*Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 59------------------------------------------------------- 53
*Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017)--------------------------------------------- 39
*Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019)----------------------------- 30, 32, 42, 46
*Delapaz v. Richardson*, 634 F.3d 895, 901 (7th Cir. 2011) --------------------------------------------- 45
*DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989) ----------------------- 50
*Doe v. Calumet City*, 641 N.E.2d 498, 507 (1994) ----------------------------------------------------- 54
*Ewell v. Toney*, 853 F.3d 911, 917-18 (7th Cir. 2017)----------------------------------------------------- 52
*Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) --------------------------------------- 38, 42, 45, 46
*Foodcomm Intern. v. Barry*, 463 F. Supp. 2d 818, 830 (N.D. Ill. 2006) -------------------------------- 52
*Franklin v. Askew*, No. 19-CV-04375, 2022 WL 17093358, at *4 (N.D. Ill. Nov. 21, 2022)------------------------- 29
*Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022) ---------------------------------------------- 30
*Gauger v. Hendle*, 954 N.E.2d 307, 329 (Ill. App. Ct. 2011)--------------------------------------------- 35
*Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) --------------------------------------------- 15, 16
*Gerstein v. Pugh*, 420 U.S. 103, 121 (1975) ----------------------------------------------------------- 31
*Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) ----------------------------------------- 50
*Glessner v. Rybaski*, No. 09 CV 7917, 2013 WL 389006, at *4 (N.D. Ill. 2013) ---------------------------- 36, 37
*Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *7 (N.D. Ill. Mar. 29, 2022) ----------------------- 39
*Green v. City of Chicago*, No. 11 C 7067, 2015 WL 2194174 at *4 (N.D. Ill. 2015)---------------------------- 33
*Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) ------------------------------------------- 15
*Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ----------------------------------------------- 50
*Harris v. Kuba*, 486 F.3d 1010, 1016–17 (7th Cir. 2007) ---------------------------------------------- 20
*Hernandez v. Sheahan*, 455 F.3d 772, 775 (7th Cir. 2006)-------------------------------------------- 32
*Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *3 (N.D. Ill. 2009)---------------------------- 23, 44

*Holloway v. City of Milwaukee*, 43 F.4th 760, 768 (7th Cir. 2022) -------------------- 19

*Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) ------------------------------------ 54

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999) ------------------ 13

*Hunter v. Bryant*, 502 U.S. 224, 229 (1991) ---------------------------------------------- 35

*Hyung Seok Koh v. Graf*, 3007 F. Supp. 3d 827, 849 (N.D.Ill. 2018) ------------- 30, 31, 38

*Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) ------------------------------------ 13

*Jones v. York*, 34 F.4th 550, 559 (7th Cir. 2022) ---------------------------------------- 19

*Kaley v. United States*, 571 U.S. 320, 134 S.Ct. 1090, 1103 (2014) -------------------- 29

*Kaley v. United States*, 571 U.S. 320, 328 (2014) -------------------------------------- 36

*Leaf v. Shelnutt*, 400 F.3d 1070, 1079 (7th Cir. 2005) ------------------------------- 33, 34

*Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019) -------------------------- 30, 45

*Logan v. Caterpillar*, 246 F.3d 912, 926 (7th Cir. 2001) --------------------------- 33, 36, 37

*Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) --------------- 34

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ----------- 13

*Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) --------------------------------- 14

*Mitchell v. Doherty*, 37 F.4th 1277, 1283 (7th Cir. 2022) ------------------------------ 29

*Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978) ------------ 50

*Moran v. Calumet*, 54 F.4th 483, 492 (7th Cir. 2022) ------------------------------------ 19

*Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) ------------------------- 29

*Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003) --------------------------- 14

*Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) ------------------- 42, 45, 46

*Petty v. City of Chicago*, No. 07 C 7013, 2012 WL 1965416, at *3 (N.D. Ill. May 31, 2012)------------------------ 21, 47

*Phillip v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881, at *22 (N.D. Ill. Mar. 13, 2018) ------------------- 24

*Porter v. City of Chicago*, 912 N.E.2d 1262, 1273 (Ill. App. Ct. 2009) -------------------- 35

*Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015) -------------------------------- 28

*Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 63 (Ill. 2016) ------------------------ 53

*Sidney v. Alejo*, No. 16 C 2041, 2018 WL 3659352, at *8 (N.D. Ill. Aug. 2, 2018) -------- 54

*Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006)----------------- 20, 26, 33

*Taylor v. City of Chicago*, No. 14 C 737, 2019 WL 4597383, at *11 (N.D. Ill. Sept. 23, 2019)----------------------- 24

*Thompson v. Clark*, 142 S. Ct. 1332, 1337-38, 1341, n.2 (2022) ------------------------ 29

*Thurman v. Village of Hazel Crest*, 579 F. Supp. 2d 1019, 1029 (N.D. Ill. 2008) -------- 52

*Totten v. Benedictine Univ.*, No. 20 C 6107, 2021 WL 3290926, at *11 (N.D. Ill. Aug. 2, 2021)------------------- 53

*United States v. Bullock*, 632 F.3d 1004, 1022 (7th Cir. 2011) ------------------------ 31

*United States v. King*, 910 F.3d 320, 327 (7th Cir. 2018) ------------------------------ 19

*United States v. Lee*, 399 F.3d 864, 865 (7th Cir. 2005) -------------------------------- 21

*United States v. Price*, 418 F.3d 771, 785 (7th Cir. 2005) ------------------------------ 22

*United States v. Sanchez*, 251 F.3d 598, 603 (7th Cir. 2001) --------------------------- 22

*United States v. Schreiber*, 866 F.3d 776, 781 (7th Cir. 2017) ------------------------- 36

*United States v. Warren*, 454 F.3d 752, 759 (7th Cir.2006)----------------------------- 22

*United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) ----------------------------- 24

*United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010) -------------------------- 31

*Vance v. Rumsfeld*, 701 F.3d 193, 203–05 (7th Cir. 2012) ------------------------------ 50

*Vaughn v. Chapman*, 662 F. App'x 464, 467 (7th Cir. 2016) --------------------------- 35

*Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015) ------------------------------- 30, 36

*Walden v. City of Chicago*, 755 F.Supp.2d 942, 965 (N.D. Ill. 2010) ------------------ 26

*Wallace v. City of Chicago*, 440 F.3d 421, 429 (7th Cir. 2006) ------------------------ 26

*Wallace v. Kato*, 549 U.S. 384, 389 (2007) ----------------------------------------------- 29

*Washington v. City of Chicago*, No. 20 CV 442, 2022 WL 2905669, at *9 (N.D. Ill. July 22, 2022) ----------------- 32

*Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir.1998)----------------------- 36, 37

*Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012) -------------------- 42, 45, 46

*Wilbon v. Plovanich*, 67 F. Supp. 3d 927, 946 (N.D. Ill. 2014) ------------------------ 50

*Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ---------------------------- 39

*Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021) -------------------------- 30

STATUTES

745 ILCS 10/1-210----------------------------------------------------------------------------------------------------------------- 35

745 ILCS 10/2-202----------------------------------------------------------------------------------------------------------------- 35, 36

Fed. R. Civ. P. 56(c) --------------------------------------------------------------------------------------------------------------- 13

## INTRODUCTION

On March 10, 2003, at approximately 3:00 a.m., the body of Christopher Collazo ("Collazo") was found duct-taped, gagged, beaten, and set on fire in the alley behind 5228 South Peoria Street on the South Side of Chicago. Just weeks before his murder, Plaintiffs John Fulton ("Fulton") and Anthony Mitchell ("Mitchell") (collectively "Plaintiffs"), arranged to purchase a gun from Collazo in Collazo's neighborhood, an interaction that set the stage for Collazo's murder. In mid-February 2003, through the help of his ex-girlfriend Johnnitta "Precious" Griffin ("Griffin"), Fulton arranged to buy a gun from Collazo. However, when Fulton arrived to purchase the gun, Collazo and his friend Marcus Marinelli ("Marinelli") robbed Fulton at gunpoint with a BB gun. Thereafter, Collazo repeatedly called Fulton's house taunting him, calling him names, and threatening to come to his apartment building where Fulton, his fiancé, and his young child lived.

Defendant Detectives Leonard Rolston, Edward Winstead, John Zalatoris, James Breen, Robert Girardi, and Joseph Struck were each assigned to investigate aspects of Collazo's murder. Defendant Detectives first learned of the February 2003 robbery through Marinelli. This strong motive evidence provided by Marinelli to detectives was corroborated by Griffin, who also told detectives additional details about her interactions with Fulton, Mitchell, and Collazo in the days leading up to Collazo's death. Griffin provided a handwritten statement to Assistant State's Attorney ("ASA") Jacob Rubinstein in which she revealed that: 1) she set up the gun exchange between Fulton and Collazo; 2) Collazo repeatedly threatened Fulton in the wake of the robbery; 3) Fulton threatened her for the $300 he claims was taken from him by Collazo; and 4) on March 9, 2003, she had called Fulton and told him Collazo's whereabouts. She then provided the same information in her statement to the grand jury.

1

Marinelli's and Griffin's statements were key in establishing probable cause to arrest Plaintiffs Fulton and Mitchell. After their arrests, both Fulton and Mitchell confessed to the murder. Although Plaintiffs now deny having anything to do with Collazo's murder, they admit that it is undisputed that Collazo robbed Fulton a few weeks prior to Collazo's murder. Plaintiffs' corroboration of Marinelli's and Griffin's statements about the February 2003 robbery, coupled with their own inculpatory statements about Collazo's murder, led detectives to arrest Antonio Shaw. Shaw also confessed to his involvement in Collazo's murder. Both Plaintiffs' confessions separately provided key details about how Fulton, Mitchell, and Shaw abducted, beat and eventually murdered Collazo, including burning his body and leaving him in an alley on the South side.

At Plaintiffs' trials, the State relied on the statements given to detectives and the ASAs by Marinelli and Griffin, despite Griffin recanting the portion of her statement related to calling Fulton on March 9, 2003. Fulton also presented an alibi defense that he was at the hospital with his fiancée, Yolanda Henderson, up until 11:54 p.m. on March 9, 2003, and therefore could not have killed Collazo. Mitchell relied entirely on Fulton's alibi and failed to present his own alibi at trial. The State argued that Fulton and Mitchell committed Collazo's murder between the hours of 11:54 p.m., when Fulton was last seen on the front door camera of his apartment building, and 3:00 a.m., when Collazo's burning body was discovered. The State argued that Fulton was never detected on video when he left his apartment to commit Collazo's murder because he snuck out the back door which did not have a video camera. Plaintiffs failed to present any evidence at their criminal trial to prove that a back door camera existed. Both juries found Fulton and Mitchell guilty. Plaintiffs were each sentenced to 31 years total in prison.

Following their convictions, Fulton attempted to establish through a post-conviction petition and a series of filings that the State withheld evidence of the existence of an alleged back door camera at his apartment building. Fulton asserted that this alleged camera could prove he did not sneak out the back door and commit Collazo's murder. Fulton and Mitchell also argued that their confessions were false and coerced, and that Griffin's statement was fabricated. However, the circumstances surrounding their confession, Griffin's partial recantation, and the alleged existence of a back door camera in 2003 was not information new to either Plaintiff at the time of their criminal trials. In fact, Fulton's criminal defense attorney took a transcribed recantation statement from Griffin, cross-examined Griffin at trial regarding her entire statement to detectives, inspected Fulton's building prior to trial, and admitted that he never saw a camera at the back door of Fulton's apartment building. Plaintiffs ultimately were granted an evidentiary hearing on their post-conviction petitions.

On February 19, 2019, Judge Flood of the Circuit Court of Cook County granted Plaintiffs a new trial on the basis that the jury did not hear about whether there was a functioning camera at the back door of Fulton's apartment or that Fulton's resident key fob allegedly registered entries and exits to the building automatically. Judge Flood found that because this evidence was not presented to the jury, Plaintiffs did not receive a fair trial. Notably, the Court made no determination whether the back door camera or key fob issues constituted a *Brady* violation, or whether the Court considered them to be the product of ineffective assistance of counsel. Judge Flood also did not opine regarding the guilt or innocence of Plaintiffs, or whether he believed any detective or officer coerced or fabricated any of the statements. Following Judge Flood's ruling, Plaintiffs sought to obtain certificates of innocence. The State objected, and the Court denied both

certificates of innocence, in large part due to the Court's conviction that Mitchell's videotaped confession that he, Fulton, and Shaw committed the murder was highly credible.

Plaintiffs now assert federal Section 1983 claims against the Individual City Defendants – Defendant Detectives Rolston, Winstead, Zalatoris, Breen, Girardi and Struck, as well as Defendant Detective Joseph Aguirre; Defendant Sergeants Richard Cervenka and Michael Kennedy; Defendant Officers Bartik, Schmitz, and Skora; and Defendant Youth Investigator Stephen Franko for: false confession (Count I); fabrication of false witness statements (Count II); deprivation of liberty without probable cause (Count III); a due process claim based on fabrication and *Brady* (Count IV); involuntary servitude (Count V)[1]; failure to intervene (Count VI); and Section 1983 conspiracy (Count VII). Plaintiffs also assert Illinois state law claims against the Individual City Defendants for malicious prosecution (Count IX), intentional infliction of emotional distress (Count X), and civil conspiracy (Count XI).[2]

Individual City Defendants respectfully request that summary judgment be granted as follows:

1. Defendants Cervenka, Kennedy, Skora, Aguirre and Franko should be dismissed with prejudice, as there is no evidence that they had any personal involvement in any of the constitutional violations alleged by Plaintiffs;

2. Count IV of Plaintiffs' complaint, alleging various *Brady* violations against Individual City Defendants, should be dismissed in its entirety, as the evidence in the record does not sustain Plaintiffs' allegations that any material exculpatory evidence was suppressed;

3. The existence of probable cause, or at the very least, arguable probable cause that would invoke qualified immunity, defeats Plaintiffs' Fourth Amendment pretrial detention claims in Count III;

---

[1] On July 1, 2021, the Court dismissed Plaintiffs' claim of involuntary servitude (Count V) with prejudice. Dkt. No. 106, at p. 33.

[2] Plaintiffs each filed Complaints under separate case numbers. As the complaints are nearly identical, and for ease of reference, all references to "Dkt. No. 1" refers to the complaints filed in both Fulton's and Mitchell's civil lawsuits.

4. Similarly, the existence of probable cause should defeat Plaintiffs' state malicious prosecution claim in Count IX, as well as Plaintiffs' inability to prove that their cases were terminated in a manner indicative of innocence;

5. No evidence exists to sustain coerced confession claims in Count I against Defendants Bartik, Winstead and Schmitz for Mitchell's confession, and against Bartik and Schmitz for Fulton's confession;

6. Count II should be dismissed against all Individual City Defendants as there are no material facts to suggest that they knowingly fabricated any witness statements or other evidence;

7. The failure to intervene claim in Count VI against Defendants Bartik, Winstead, Cervenka, Kennedy, Schmitz, Skora, Franko, And Aguirre should be dismissed;

8. Plaintiffs cannot establish that Individual City Defendants conspired to violate their constitutional or state law rights in Counts VI and XI; and

9. Plaintiffs cannot sustain their intentional infliction of emotional distress claims in Count X with any evidence in the record.

## <u>STATEMENT OF UNDISPUTED FACTS</u>

At approximately 3:00 a.m. on March 10, 2003, Sid Taylor peered out his second-floor window and saw a ball of fire burning in the alley behind 5228 South Peoria Street. (Statement of Uncontested Facts ("SOF") at ¶¶ 5,10). Taylor saw two Black males, one wearing a red jacket and the other wearing a black jacket, standing by the fire. (SOF at ¶ 10). Taylor called 911 and the Chicago Fire Department and Chicago Police Department officers arrived shortly thereafter on scene. (SOF at ¶ 5).

Officers Schmitz and Skora responded to a call of a garbage can on fire. (SOF at ¶ 9). Schmitz proceeded up the alley to the area of the extinguished fire and saw a body partially covered in a plastic garbage bag on a charred box that was gagged and tied up. (SOF at ¶ 6-7, 9).The victim was later identified as Christopher Collazo. (SOF at ¶ 6). Mitra Kalelkar, M.D., of the Cook County Medical Examiner's Office who performed the autopsy of Collazo, determined that the cause of Collazo's death was blunt force trauma coupled with asphyxiation. (SOF at ¶ 8). Schmitz then

canvassed the area for any potential witnesses and came upon Taylor standing in the backyard of his home. Schmitz interviewed Taylor regarding what he saw and notified the detective division for a detective to respond to the scene. (SOF at ¶ 10). Detective Rolston appeared on scene and interviewed Taylor again regarding his observations that early morning. (SOF at ¶¶ 12-13). Detective Winstead also interviewed Taylor later that day. Each time he was interviewed, Taylor gave a similar account of seeing two individuals, one in red and one in black, standing by the fire. (SOF at ¶ 14).

### *Motive Evidence and Initial Witnesses Lead Detectives to Fulton and Mitchell*

On March 10, 2003, Detectives Zalatoris and Breen visited Collazo's home and informed his mother, Madilen Mercado, of Collazo's death. (SOF at ¶ 15). During this visit, Dets. Zalatoris and Breen learned that Collazo was last seen with his friends "Sticks" and "Wood" on March 9, 2003 at approximately 8:00 p.m. (SOF at ¶ 16). Collazo's brother Victor then showed Dets. Zalatoris and Breen where "Wood" lived. (SOF at ¶ 17). Detectives Zalatoris and Breen then spoke to "Wood," whose real name is Michael Rosas and learned that "Sticks's" real name is Marcus Marinelli. (SOF at ¶ 18).

On March 11, 2003, Detectives Winstead and Rolston interviewed Marinelli and learned that Marinelli was with Collazo at Collazo's house up until approximately 9:00 p.m. or 9:30 p.m. (SOF at ¶ 19). Collazo and Marinelli were hanging out in Collazo's basement when Collazo stated that he planned to go to Marisol "Madi" Caldero's house and hang out with "Precious." (SOF at ¶ 20). Marinelli declined to go with Collazo that night and relayed that that was the last time he saw Collazo. (SOF at ¶ 20). Marinelli also told Detectives Winstead and Rolston that Collazo's murder may be revenge for a robbery that happened with "some black guys from the South Side" in February 2003. (SOF at ¶ 20). Marinelli then showed Dets. Winstead and Rolston where the

robbery took place at 7068 W. Diversey. Marinelli also told the detectives where Caldero lived. (SOF at ¶ 21).

Detectives Winstead and Rolston interviewed Caldero who confirmed that Collazo was supposed to come to her home the night of March 9th, but never did. (SOF at ¶¶ 22-23). Caldero told detectives that she learned about the February 2003 robbery through her goddaughter Johnnitta "Precious" Griffin. (SOF at ¶ 23). Caldero also provided detectives with Griffin's home address. (SOF at ¶ 23).

Detective Winstead and Rolston then proceeded to Griffin's home to interview her. Griffin confirmed that she helped set up the gun deal between Collazo and her ex-boyfriend "Lu," whose real name was John, during a three-way call. (SOF at ¶¶ 24-25). Griffin told detectives where "Lu" lived, what kind of car he drove, and that his given name was John. (SOF at ¶ 25). Griffin also told detectives that the last time she spoke with "Lu" was on March 8th, and she claimed she knew nothing about Collazo's murder. (SOF at ¶ 25).

After speaking with Griffin, Dets. Winstead and Rolston visited the area of "Lu's" apartment at 500 East 33rd Street based on the information Griffin provided them. (SOF at ¶ 26). Detectives found near the parking lot of the apartment complex the car Griffin described as belonging to "Lu": a silver Aurora. (SOF at ¶ 26). Detectives ran the license plate number and learned the car was registered to John Fulton. (SOF at ¶ 26). Dets. Winstead and Rolston proceeded into the apartment complex at 500 West 33rd Street, also referred to as Lake Meadows Apartments, and spoke with security who confirmed that Fulton was a resident of the building. (SOF at ¶ 27).

On March 14, 2003, Detectives Rolston, Zalatoris, and Breen picked up Griffin and asked her to accompany them to Area One for a subsequent interview. (SOF at ¶ 29). During this interview, Detectives Zalatoris and Breen asked Griffin what she knew about Collazo's murder.

(SOF at ¶ 30). This time, Griffin revealed that she had talked to Fulton on March 9, 2003. (SOF at ¶ 30). An unknown number called Griffin the afternoon of March 9th, and when she answered the call, the caller hung up. (SOF at ¶ 30). After Griffin used *69 to return the call, she learned that the caller was Fulton. (SOF at ¶ 30). Fulton demanded that she provide him with $300. (SOF at ¶ 30). Fulton also asked her whether she would see Collazo that night. (SOF at ¶ 30). After confirming that she would see Collazo that night at a party on the North Side, Fulton asked Griffin for directions to the location. (SOF at ¶ 30). A few hours later, Fulton called Griffin again asking her if she would see Collazo that night and what route Collazo would take to get to the party. (SOF at ¶ 30). Griffin told Fulton what she thought was the route Collazo would take to get to Caldero's house that night. (SOF at ¶ 30). When Griffin arrived at Caldero's house at approximately 10:00 p.m., Collazo had not arrived. (SOF at ¶ 32). Griffin waited until 2:00 a.m. for Collazo, but he never arrived. Griffin then went to sleep, and the next morning returned home. (SOF at ¶ 32).

On March 14, 2003, Griffin's statement was memorialized by ASA Rubinstein and was substantially similar to what she told the detectives previously. (SOF at ¶¶ 34-44). On March 14, 2003, Griffin testified under oath before a grand jury; she provided the same account of what happened in February 2003 and on March 9, 2003 to the grand jury as she did to Detectives Zalatoris and Breen and ASA Rubinstein. (SOF at ¶¶ 45-57).

### Fulton and Mitchell Confess to the Murder of Christopher Collazo

On March 18, 2003, Detectives Girardi and Rolston went to Fulton's apartment building at 500 East 33rd Street. (SOF at ¶ 59). Dets. Girardi and Rolston then proceeded up to Fulton's apartment where they arrested him and had him transported to Area One. (SOF at ¶¶ 61-62). Fulton was briefly interviewed by Detective Girardi. (SOF at ¶¶ 63-64). He Mirandized Fulton, obtained from Fulton a signed consent form to search Fulton's apartment and car, and showed Fulton

pictures of Collazo, Marinelli, and Griffin, each of whom Fulton identified. (SOF at ¶ 64-66). Detective Girardi also had Fulton's car transported to Area One and ordered forensic testing be performed on Fulton's car. (SOF at ¶¶ 62, 68). Forensic testing confirmed Shaw's fingerprint underneath the spare tire cover in the trunk of Fulton's car.  (SOF at ¶ 70). A claw hammer, a kitchen knife, and an empty Hennessey bottle, among other items, were found in Fulton's car. (SOF at ¶ 71).

Later in the day on March 18th, Fulton was interviewed by Detectives Zalatoris and Breen. (SOF at ¶ 74). After Fulton was Mirandized, Fulton confirmed his involvement in the February 2003 robbery but denied his involvement in Collazo's murder. (SOF at ¶ 74). Fulton also requested that he take a lie detector test. (SOF at ¶ 75). Dets. Zalatoris and Breen then took Fulton to the polygraph unit where he spoke to Officer Bartik alone. (SOF at ¶ 76). After explaining the process of a polygraph examination, Bartik began his pre-test interview. During the pre-test interview, Fulton admitted to killing Collazo. (SOF at ¶¶ 77-80). Officer Bartik informed Dets. Zalatoris and Breen about Fulton's inculpatory statement, and Fulton and the detectives returned to Area One. No polygraph examination was administered. (SOF at ¶ 81).

Back at Area One, Detectives Zalatoris and Breen read Fulton his *Miranda* rights again and then Fulton confessed to Collazo's murder. (SOF at ¶¶ 83-88). ASA McCray Judge then interviewed Fulton, who provided a statement to him similar to what he previously told Dets. Zalatoris and Breen. (SOF at ¶¶ 91-92). However, at the end of their conversation, Fulton recanted his statement, saying that he had actually been with his fiancé Yolanda Henderson on March 9th because he took her to the hospital. (SOF at ¶¶ 96-97). ASA Judge then asked Fulton about the description he gave him about what he, Mitchell, and Shaw were wearing the night of the murder: a white hoodie, a red hoodie, and a black hoodie. (SOF at ¶¶ 98-99). Fulton admitted to ASA Judge

that no detective forced him to provide that description, but that he made it up. (SOF at ¶¶ 98-99). ASA Judge confronted Fulton with the fact that this supposedly "made-up" detail was corroborated by witness Sid Taylor, who told the police he saw two men, one wearing a red top and one wearing a black top, standing by the fire in the alley behind 5228 S. Peoria on the night of the murder. (SOF at ¶ 99). Fulton replied by stating "that wouldn't be very good for me, would it?" (SOF at ¶ 99). Nonetheless, Fulton asserted that the prior statement he gave was not true and he made it all up. (SOF at ¶ 99). ASA Rubinstein spoke with Fulton the following day, and Fulton stated that he had been with Yolanda the night of the murder. (SOF at ¶¶ 102-105).

On March 19, 2003, Mitchell was arrested and brought to Area One. Dets. Zalatoris and Breen Mirandized and interviewed Mitchell about his involvement in the Collazo murder. (SOF at ¶¶ 130-131). Mitchell confirmed the details of the February 2003 robbery to detectives. (SOF at ¶ 131). However, Mitchell, like Fulton, denied involvement in Collazo's murder. (SOF at ¶ 131). After investigating Fulton's alibi, on March 20, 2003, ASA Rubinstein interviewed Fulton and Mitchell separately. Fulton and Mitchell continued denying their involvement in Collazo's murder. (SOF at ¶¶ 112-113, 136-137).

Then on March 21, 2003, Fulton confessed to ASA Rubinstein that he, Mitchell, and Shaw kidnapped and killed Collazo. (SOF at ¶ 138). That same day, Mitchell confessed to ASA Nicholas D'Angelo that he participated in Collazo's killing. (SOF at ¶¶ 140-143). Unlike Fulton who ultimately declined to videotape his statement, Mitchell provided a videotaped statement admitting his role in Collazo's abduction and murder. (SOF at ¶ 145). Fulton and Mitchell both confessed that, through the help of Griffin, they along with Shaw found Collazo near Foster and Rockwell, ambushed him, beat him up, and placed him in the trunk of Fulton's car. (SOF at ¶¶ 118-122, 148-149). They stuffed a rag in Collazo's mouth and duct-taped his hands, feet, and mouth. (SOF at ¶

118-122, 148-149). They stopped in an alley on the North Side and put Collazo's body in a plastic bag and duct-taped the plastic bag. (SOF at ¶ 118-122, 148-149). They then drove from Lake Shore Drive to I-55 to the Dan Ryan and got off at the Garfield exit on the South Side. (SOF at ¶ 118-122, 148-149). They then found an alley behind 5228 S. Peoria, removed Collazo from the trunk, found a cardboard box, placed Collazo in the box, dumped gasoline on the box from a gas can in Fulton's trunk, and set Collazo on fire. (SOF at ¶ 118-122, 148-149). The gas can was located in Fulton's grandfather's garage, as Fulton stated it would be when he was interviewed by Dets. Zalatoris and Breen. (SOF at ¶ 88).

### Plaintiffs' Prosecutions and Convictions

On March 21, 2003, the Cook County State's Attorney's Office approved charges for first-degree murder against Fulton, Mitchell, and Shaw. (SOF at ¶ 159). On March 22, 2003, the criminal complaint charging Fulton with first-degree murder was filed. (SOF at ¶ 160). Detectives Girardi and Breen signed the criminal complaint. (*Id*.) On March 22, 2003, a probable cause hearing was held in which the Court set no bail for Fulton and Mitchell. (SOF at ¶ 161).

On April 16, 2003, Fulton, Mitchell, and Shaw were indicted by a grand jury for first-degree murder, aggravated kidnapping, and concealment of a homicidal death. (SOF at ¶ 180). On June 25, 2004 and May 21, 2005, Plaintiffs moved to suppress their inculpatory statements, which the trial court denied. (SOF at ¶ 198). In August 2006, the trials of Fulton and Mitchell commenced simultaneously, albeit with separate juries for each defendant. (SOF at ¶ 203). At trial, the State called Marcus Marinelli and Johnnitta Griffin, who each provided the same account of the February 2003 robbery they told to detectives on March 11 and 14, 2003, respectively. (SOF at ¶¶ 204-211). Griffin testified that she did not talk to Fulton on March 9, 2003, and therefore did not provide Fulton with a description of Collazo or Collazo's bus routes on March 9th. (SOF at ¶

11

212). Before Fulton's jury and not Mitchell's jury, ASA Rubinstein testified to Fulton's oral statement confessing to the murder of Collazo that Fulton provided to him on March 21, 2003. (SOF at ¶ 214). Mitchell's videotaped confession taken March 21, 2003 was played in front of his own jury and not Fulton's jury. (SOF at ¶ 215). Each jury found Plaintiffs guilty on all counts in their respective verdicts. (SOF at ¶ 216). The trial court sentenced Plaintiffs to 31 years for first-degree murder, 25 years for aggravated kidnapping, and three years for concealment of a homicidal death, which were to run concurrently. (SOF at ¶ 217).

### *Plaintiffs' Post-Conviction Investigation*

In December 2012, Fulton filed his post-conviction petition, alleging that the State committed *Brady* violations by suppressing the existence of a back door camera at his apartment building as well as the practice of officers coercing and falsifying witness statements. (SOF at ¶ 219). Fulton also asserted an ineffective assistance of counsel claim and a coercion claim against detectives. (SOF at ¶ 219). Mitchell filed his post-conviction petition in November 2013 alleging the exact same claims as Fulton despite having different criminal defense attorneys. (SOF at ¶ 219). After filing a series of supplements, Plaintiffs were granted a hearing on their post-conviction claims. Based on the testimony at the hearing, Judge Flood found that the jury was denied the opportunity to hear about whether a back door camera or key fob existed at Fulton's apartment building in March 2003, and vacated their convictions. (SOF at ¶¶ 220, 222). On May 29, 2019, the State dismissed all charges against Plaintiffs. (SOF at ¶ 223). Plaintiffs subsequently filed petitions seeking certificates of innocence, but their petitions were denied based on the Cook County Circuit Court finding that Mitchell's videotaped statement confessing to Collazo's murder, and implicating Fulton and Shaw, was credible. (SOF at ¶¶ 224-227). That decision is currently on appeal. (SOF at ¶ 228). In denying the certificates of innocence, the trial court found that "in

large part, that rests upon my belief that Mr. Mitchell gave a credible statement" during his videotaped confession – "it appears to me, through his demeanor; his coolness; his – the way he-spoke and the way he was able to fill in certain details, it convinced [me] of the truthfulness of at least what I consider to be very important parts of that statement." (SOF at ¶ 227). This suit followed.

## **LEGAL STANDARD**

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (internal citation omitted); see also Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To determine whether there is a genuine issue of material fact, courts construe the record in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

The non-movant cannot rest on the pleadings alone, but must designate specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine triable issue; he must do more than simply show that there is some metaphysical doubt as to the material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 261 (Brennan, J., dissenting) (1986) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 818 (7th Cir. 1999). Finally, a scintilla of evidence

in support of the non-movant's position is not sufficient to successfully oppose a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## ARGUMENT

The totality of evidence uncovered during the Collazo murder investigation gave Defendant Detectives sufficient probable cause to arrest, detain, and recommend charges for murder against Plaintiffs. Marinelli provided detectives with the motive for Plaintiffs to kill Collazo: he robbed Fulton at gunpoint and repeatedly threatened to kill him. Griffin corroborated Marinelli's statement that Fulton was upset that he was robbed by Collazo. Griffin also set the stage for how Collazo's murder occurred: she assisted Fulton in locating Collazo, which allowed Plaintiffs to go forward with their revenge on Collazo the night of March 10, 2003. And finally, Plaintiffs gave highly detailed, separate accounts of how they murdered Collazo in their confessions – details they later claimed they "made up" to fill in "holes" but which lined up almost perfectly with each other. There is no evidence in this case that any of the Individual City Defendants fabricated these statements by witnesses and Plaintiffs or withheld exculpatory evidence. Instead, the record is replete with evidence that could lead a jury to reasonably find in favor of Individual City Defendants on Plaintiffs' constitutional and state law claims.

I. **SUMMARY JUDGMENT FOR DEFENDANTS CERVENKA, KENNEDY, SKORA, AGUIRRE, AND FRANKO IS PROPER AS THERE IS NO EVIDENCE THAT THEY WERE PERSONALLY INVOLVED IN ANY ALLEGED CONSTITUTIONAL VIOLATION**

"[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (quoting *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003)). Thus, it follows that "[a] plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the

unconstitutional actions." *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008). Plaintiffs cannot point to anything in the record that Defendants Cervenka, Kennedy, Skora, Aguirre, and Franko engaged in any alleged constitutional violation.

### A. Defendant Richard Cervenka ("Sgt. Cervenka")

The undisputed evidence shows that Sgt. Cervenka was the approving supervisor on the General Offense Case RReport ("GOCR") authored by Officer Matthew Schmitz and two Case Supplementary Rreports authored by Detective Leonard Rolston. (SOF at ¶ 194). There is no evidence that Sgt. Cervenka participated in the murder investigation itself, or discussed the investigation with any of the defendant detectives or felony review ASAs. Likewise, Plaintiff has no evidence to prove that he talked to any witnesses or was present for any interviews of witnesses, or that he interacted with Plaintiffs or was present for any statements either Plaintiff gave, or had any involvement in the criminal prosecutions of either Plaintiff. Sgt. Cervenka's approval of the GOCR and two case supplementary reports was an administrative action in his capacity as a supervising sergeant.

In order for a supervisor to be held liable under Section 1983 for the actions of those he supervises, the supervisor must "approve[] of the conduct and the basis for it." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001); *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) ("An official satisfies the personal responsibility requirement of section 1983 ... if the conduct causing the constitutional deprivation occurs at [his] direction or with [his] knowledge and consent.") (internal quotation marks omitted); *see also Backes v. Village of Peoria Heights, Illinois*, 662 F.3d 866, 870 (7th Cir. 2011) ("[S]upervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see…[t]hey must in other words act either knowingly or with deliberate, reckless indifference"). "In short, some

causal connection or affirmative link between the action complained about and the official sued is necessary for §1983 recovery." *Gentry*, 65 F.3d at 561.

In this case, Plaintiffs have not established any causal connection or affirmative link between Sgt. Cervenka and the alleged violations of their constitutional rights. There is no evidence that Sgt. Cervenka "approved" of or knew about any misconduct that Plaintiffs allege occurred during the Collazo murder investigation. As such, Sgt. Cervenka cannot be held liable to Plaintiffs under § 1983 and he is entitled to judgment as a matter of law.

### B. Defendant Michael Kennedy ("Sgt. Kennedy")

Similarly, Sgt. Kennedy was the approving supervisor on the cleared closed report authored by Detective Rolston and two field investigation progress reports authored by Detective Rolston. (SOF at ¶ 195). There is no evidence in the record that Sgt. Kennedy spoke with any of Defendant Detectives about these reports, or that he was involved in the investigation or criminal prosecution of Plaintiffs in any way. Sgt. Kennedy, like Defendant Cervenka, signed these reports as a supervising sergeant as part of his administrative responsibilities of ensuring that the reports are properly prepared and complete. (SOF at ¶ 195). Plaintiffs cannot prove that Kennedy had any personal involvement in any of the constitutional violations alleged in their complaints, and therefore, Defendant Kennedy should be dismissed with prejudice.

### C. Defendant Brian Skora ("Officer Skora")

Officer Skora likewise cannot be held liable to Plaintiffs for any constitutional violation. Officer Skora was one of the first reporting officers on scene at 5228 S. Peoria. His role was limited to containing the scene of fire. (SOF at ¶ 11). Officer Skora did not interact with Plaintiffs or any witnesses, and he did not take part in drafting any report as part of the Collazo murder investigation. (SOF at ¶ 11). He had no interaction with Sid Taylor and was not present during

16

Officer Schmitz's interview of Mr. Taylor. (SOF at ¶ 11). Officer Skora is entitled to judgment as a matter of law because there is no evidence to demonstrate his personal involvement in the alleged unconstitutional acts claimed by either Plaintiff.

### D. Defendant Joseph Aguirre ("Detective Aguirre")

Detective Aguirre accompanied Detective Winstead on March 10th to the scene of fire to reinterview Sid Taylor. (SOF at ¶ 196) However, Detective Aguirre was not present for the interview of Sid Taylor - Detective Winstead conducted this interview alone. (SOF at ¶ 196). There is no evidence that Defendant Aguirre authored any general progress reports or case reports in the investigation or participated in any way in the criminal prosecution, and nothing to prove that he had any further involvement with the Collazo murder investigation. Without any evidence to support his involvement in Plaintiffs' alleged constitutional violations, summary judgment should be granted in Detective Aguirre's favor.

### E. Defendant Stephen Franko ("Youth Investigator Franko")

Additionally, there is no evidence to support Plaintiffs' allegations that Youth Investigator Franko violated their constitutional rights. In March 2003, Youth Investigator Franko was working as a youth investigator for the Chicago Police Department. (SOF at ¶ 197). Youth Investigator Franko was present during the March 21, 2003 interview of Antonio Shaw, conducted by ASA Andrew Varga and Detective Zalatoris, because Shaw was a juvenile at the time of the interview. (SOF at ¶ 197). Shaw gave a statement during this interview; however, his statement was later suppressed and was not used against Plaintiffs at their criminal trials. (SOF at ¶ 197). Since it was not used against Plaintiffs at trial, it cannot serve as the basis of a fabrication claim. *See Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) (holding that a plaintiff must prove that the evidence alleged to be fabricated must be used against him at his criminal trial). Youth Investigator

Franko's presence at the interview of Antonio Shaw was his only connection to the investigation. He had no further involvement in the Collazo murder investigation once Shaw's uncle, Ron Smith, arrived at the police station and Youth Investigator Franko's services as a youth officer were no longer needed. (SOF at ¶ 197). Thus, Plaintiffs cannot establish that Youth Investigator violated any of their constitutional rights. Consequently, Youth Investigator Franko is entitled to judgment as a matter of law.

In sum, Defendants Cervenka, Kennedy, Skora, Aguirre, and Franko played no role in Plaintiffs' detention or with any of the allegedly false statements obtained or used in Plaintiffs' prosecution, which are the bases for Plaintiffs' claims. Plaintiffs will not be able to offer any evidence to the contrary which would create a dispute of material fact sufficient to preclude summary judgment in their favor. Consequently, Defendants Cervenka, Kennedy, Skora, Aguirre, and Franko are entitled to summary judgment on all claims.

## II.    PLAINTIFFS' BRADY CLAIMS IN COUNT IV FAIL BECAUSE THERE ARE NO MATERIAL FACTS TO SUPPORT THAT ANY EVIDENCE WAS DELIBERATELY WITHHELD OR DESTROYED

Plaintiffs allege violations of their due process rights in Count IV of their complaints regarding Individual City Defendants withholding or destroying certain evidence, invoking *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Plaintiffs allege that the defendants withheld or concealed evidence of the following: 1) the existence of a back door camera at Fulton's apartment; 2) Fulton's key fob which allegedly recorded his entries and exits from the apartment building; 3) an exculpatory license plate number; 4) the allegedly coercive interrogation tactics used during the interviews of Shaw, Griffin, and Plaintiffs themselves; and 5) phone records for Griffin, Caldero, Collazo and Plaintiff Fulton.

"To prevail on a *Brady* suppression claim against a police officer, a plaintiff must prove that '(1) the [nondisclosed] evidence is favorable to him; (2) the evidence was concealed by the officer; and (3) the concealed evidence resulted in prejudice.'" *Moran v. Calumet*, 54 F.4th 483, 492 (7th Cir. 2022) (citing *Jones v. York*, 34 F.4th 550, 559 (7th Cir. 2022) (citations omitted)). "These elements require more than simply proving that exculpatory evidence was not disclosed to the defense." *Id.* A *Brady* violation only exists when suppressed evidence is material, meaning that "there is 'a reasonable probability' that the outcome would have been different if the evidence had been disclosed." *Jones*, 34 F.4th at 559 (quoting *United States v. King*, 910 F.3d 320, 327 (7th Cir. 2018)). In order to attach § 1983 liability to an officer, a plaintiff must demonstrate the officer intentionally, or at a minimum recklessly, failed to turn over the material evidence to the prosecution. *Moran*, 54 F.4th at 493.[3]

Further, "a plaintiff cannot show that a police officer suppressed evidence if the prosecution was aware of it…[a] police officer's *Brady* obligation extends only 'insofar as they must turn over potentially exculpatory evidence ... to the prosecution.'" *Id.* (citing *Holloway v. City of Milwaukee*, 43 F.4th 760, 768 (7th Cir. 2022) (citation omitted)). "Thus, police officers 'discharge their *Brady* duty by turning over exculpatory evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation.'" *Id.* (quoting *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015)(citation omitted)). Once the prosecution has the evidence, "it is the prosecution's—not the officer's—duty to disclose it to the defense." *Moran*, 54 F.4th at 493.

---

[3] The Seventh Circuit has not yet definitively decided whether a plaintiff must prove intentional conduct or whether reckless conduct is sufficient to establish suppression; it is clear that mere negligence will not sustain a § 1983 Brady claim. *See Moran*, 42 F.4th at 493 (assuming without deciding that reckless failure to disclose could satisfy the suppression element). Defendants do not concede that reckless conduct is sufficient.

Finally, because "[t]he Constitution does not require that police testify truthfully," but entitles a defendant only "to a trial that will enable jurors to determine where the truth lies," no *Brady* violation occurs when a police officer withholds information known to the criminal defendant. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006); *see also Harris v. Kuba*, 486 F.3d 1010, 1016–17 (7th Cir. 2007) (finding no *Brady* violation where police officer allegedly lied to prosecutors about facts known to criminal defendant).

### A. Plaintiffs Cannot Establish That Individual City Defendants Intentionally Or Recklessly Withheld Evidence of a Back Door Camera and Key Fob at Fulton's Apartment.

In their post-conviction petitions, Plaintiffs alleged that the State's theory at trial that Fulton left out of the back door of his apartment building to commit Collazo's murder is "patently false" because of evidence that "debunked" this theory: namely, a security camera and a key fob security scanner at the back door that he claims exonerates him.

Plaintiffs each allege that "Fulton's apartment building had no unmonitored door that could be used to leave and return undetected. The building had a back door, but that door was monitored by a security camera. The security camera system–and an electronic fob system which tracked all entries to the building–meant that Fulton could not have left and returned to his apartment building without detection." (Dkt. No. 1, ¶¶ 84-85). Plaintiffs' *Brady* claims regarding the alleged existence of a back door camera and key fob fail for four reasons: (1) there is no evidence that a back door camera existed at Fulton's apartment at Lake Meadows in March 2003; (2) Fulton lived there and was in the best position to know whether a back door camera existed and whether the key fob automatically recorded his entry and exit; (3) there is no evidence that the Defendant Detectives knew of any such evidence; and (4) even if this evidence did exist, Fulton and his criminal defense

attorneys, through the exercise of due diligence, could have easily discovered the evidence the detectives allegedly suppressed.

### i. No evidence that the purported back door camera existed.

"*Brady* 'deals with the concealment of exculpatory evidence <u>unknown</u> to [a criminal] defendant'; the failure to disclose information of which the criminal defendant was aware is not a *Brady* violation." *Bridgeforth v. City of Glenwood*, No. 18 C 7150, 2020 WL 1922907, at *7 (N.D. Ill. Apr. 21, 2020) (quoting *United States v. Lee*, 399 F.3d 864, 865 (7th Cir. 2005) (emphasis added); *see also Petty v. City of Chicago*, No. 07 C 7013, 2012 WL 1965416, at *3 (N.D. Ill. May 31, 2012) ("The government is under no obligation pursuant to *Brady* to disclose exculpatory evidence that the accessed already knows") (citations omitted).

Plaintiffs' *Brady* claims regarding the back door camera fail because there is no evidence there actually was a back door camera. Fulton, who lived at Lake Meadows for months before the murder, testified at deposition that he was aware of a front door camera but not a back door camera. (SOF ¶ 191). In fact, Fulton could not recall if he had <u>ever</u> seen a camera located at the back door at Lake Meadows. (SOF ¶ 191). Further, Fulton's criminal defense attorney, Elliot Zinger, testified at his deposition that during the pendency of Fulton's prosecution, he went to Lake Meadows to specifically see what cameras existed at the apartment building and did <u>not</u> see a camera located at the back door. (SOF ¶ 193). Michael Sanfratello, President of Advanced Wiring Solutions who installed the security system and surveillance cameras at Lake Meadows, confirmed that a back door camera was <u>never</u> installed at Lake Meadows prior to March 10, 2003. (SOF ¶ 190). With these facts in the record, Fulton and Mitchell cannot now assert that the officers withheld this information from them.

These undisputed facts clearly show that no back door camera existed at the time of Collazo's murder, and thus any alleged exculpatory evidence relating to a back door camera did not exist. More importantly, there is no evidence that Individual City Defendants knew about any purported back door camera that recorded entry and exit of the building, much less concealed evidence of a back door camera. The fact that Fulton can neither confirm nor deny the existence of a back door camera further confirms that such a camera did not exist. Notably, Fulton and his counsel knew that there was a front door camera and ensured that the video footage from that camera was recovered and introduced at trial to show him and Yolanda entering and exiting the building prior to the murder. (SOF at ¶ 213). Yet, Plaintiff and his counsel somehow neglected to do so for this back door camera, the only logical conclusion being that the camera did not exist.

Ultimately, the lack of any evidence to prove there was a back door camera at Lake Meadows dooms Plaintiffs' *Brady* claim. *See United States v. Warren*, 454 F.3d 752, 759 (7th Cir.2006) (no *Brady* violation because defendant was "unable to point to any specific evidence, exculpatory or otherwise, withheld by the government"); *United States v. Price*, 418 F.3d 771, 785 (7th Cir. 2005) (*Brady* violation did not occur where no document existed corroborating defendant's claim); *United States v. Sanchez*, 251 F.3d 598, 603 (7th Cir. 2001) (finding that no proof of the existence of a document corroborating the defendant's claim prevents government officials from being held liable under *Brady*).

ii.    **No evidence that Individual City Defendants knew about the electronic key fob or whether it recorded exits and entries to Plaintiff Fulton's building.**

Plaintiffs also allege that a key fob security system existed in March 2003 that would have captured Fulton's entry and exit at the back door of Lake Meadows, and claims that records of the key fob would have proven that Fulton did not leave the apartment that night to murder Collazo. First, Fulton lived at this building and used the key fob daily, so this information could not be

suppressed from him. (SOF ¶ 192). Second, Plaintiffs have no evidence that Individual City Defendants <u>knew</u> a key fob security system existed at the back door of Lake Meadows, let alone that the detectives suppressed key fob records from Plaintiffs. Fulton testified at his deposition that he had a key fob as of March 2003 that he used on a daily basis – proving the information was not suppressed from him. (SOF ¶ 192). Yet, Mr. Zinger, Fulton's defense attorney, testified that he did <u>not</u> know if a key fob existed at the back door. (SOF ¶ 193). Once again, if Fulton was aware of this supposed key fob system that could prove that he did not leave from the back door of Lake Meadows after 11:54 p.m. on March 9th, he could and should have disclosed that to his attorneys.

Plaintiffs had the opportunity to build a defense in the criminal prosecution by subpoenaing records of the alleged key fob system and chose not to do so. *See United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014) (holding that "evidence is not 'suppressed' if the defendant knew of the evidence and could have obtained it through the exercise of reasonable diligence"). There is no proof in the record that the key fob security system records existed, let alone that they would have been exculpatory. Plaintiffs' speculation cannot sustain this claim. More importantly, there is no evidence that Individual City Defendants knew about the key fob system, if it existed. Thus, Plaintiffs' *Brady* allegations relating to the key fob system should fail.

The Court's ruling in *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *3 (N.D. Ill. 2009), on a similar *Brady* issue provides guidance. In *Hill*, the plaintiff alleged officers withheld two exculpatory reports. The plaintiff failed to present any evidence that the officers hid the existence of these reports, and the officers argued that the plaintiff could not prove the existence of these two reports in the first place. (*Id*. at *4). The Court held that the plaintiff's speculation as to the existence of these reports, without concrete proof of their existence and that their contents contain exculpatory information, could not serve as the basis for a *Brady* claim. (*Id*.) Courts in this

23

district have reached similar conclusions. *See Taylor v. City of Chicago*, No. 14 C 737, 2019 WL 4597383, at *11 (N.D. Ill. Sept. 23, 2019) (holding that nothing in the record suggested that a visual check logbook existed to support a *Brady* claim); *Phillip v. City of Chicago*, No. 14 C 9372, 2018 WL 1309881, at *22 (N.D. Ill. Mar. 13, 2018) (finding that the plaintiffs failed to assert a viable *Brady* claim because the plaintiff was aware of his co-defendant's potential alibi).

Relatedly, Plaintiffs cannot predicate a *Brady* claim on an allegation that Defendant Detectives should have investigated whether there was exculpatory key fob evidence but failed to do so. Police officers are under no constitutional obligation to "investigate independently every claim of innocence" or "perform an error-free investigation." *Baker v. McCollan*, 443 U.S. 137, 146 (1979); *see also United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) ("While the Supreme Court in *Brady* held that the government may not properly conceal exculpatory evidence from a defendant, it does not place any burden upon the government to conduct a defendant's investigation or assist in the presentation of the defense's case." *United States v. White*, 970 F.2d 328, 337 (7th Cir. 1992) (internal quotation marks omitted)).[4]

Here, Plaintiffs cannot establish that a back door camera or key fob records containing exculpatory evidence existed or, if they did, that Plaintiffs and their criminal defense counsel could not have reasonably ascertained this information through due diligence. Thus, Plaintiffs have failed to establish the existence of any *Brady* violation regarding either the alleged back door camera or key fob.

## B. There Is No Evidence That Individual City Defendants Withheld Any Evidence Regarding a License Plate Number

---

[4] Plaintiffs' complaints also briefly suggest that Griffin's phone records should have been investigated. (Compl. ¶35). This, too, cannot serve as the predicate for a *Brady* claim. In any event, Griffin's phone records were obtained prior to Plaintiffs' trial and disclosed. (SOF ¶¶ 187-188).

In their Complaints, Plaintiffs make the vague assertion that Individual City Defendants "gathered information relating to the Collazo murder that had no connection to Plaintiff, including a license plate number." (Dkt. No. 1, ¶ 29). Plaintiffs' claim that this mystery license plate number was exculpatory and was intentionally withheld from the Cook County State's Attorney's Office. There is no evidence in the record to support such a claim. It is unclear what Plaintiffs are specifically alleging with regard to a "license plate number," and nothing in the record supports their allegation that <u>any</u> license plate number unconnected to Plaintiff was "gathered." Plaintiffs cannot establish that "a license plate number" was suppressed by Individual City Defendants. There is no evidence to suggest that, had this supposed license plate number been disclosed to Plaintiffs or their counsel, the outcomes of their trials would have been different. Plaintiffs are merely speculating as to the materiality of some license plate number, if it even exists. Consequently, any *Brady* claim premised upon the vague license plate allegation fails.

### C. Plaintiffs' Argument That Individual City Defendants Withheld the Circumstances Surrounding the Interviews of Shaw, Griffin, Fulton, and Mitchell Fails as a Matter of Law

Plaintiffs allege that Individual City Defendants violated their due process rights by concealing the allegedly coercive interrogation tactics used during the interviews of Shaw, Griffin, and Plaintiffs themselves. (Dkt. No. 1, ¶¶ 34, 48, 64, 74). However, Plaintiffs' allegations regarding any purported withholding of the interrogation tactics used to obtain these statements cannot form the basis of a *Brady* due process claim, as Plaintiffs and their criminal defense attorneys were aware of this information well before trial.

#### i.   The Suppression of Plaintiffs' Own Confessions

First, Plaintiffs allege that the Individual City Defendants violated their *Brady* rights because the coercive circumstances surrounding their <u>own</u> confessions were intentionally suppressed by officers. This theory fails, as this information would have been known to Plaintiffs

as soon as their interrogations occurred. *See Sornberger*, 434 F.3d at 1027 (finding that because the plaintiff was familiar with the circumstances of her own interrogation, the officers did not violate *Brady* by failing to disclose what she believed to be coercion); *Wallace v. City of Chicago*, 440 F.3d 421, 429 (7th Cir. 2006) (rejecting the notion that there is "a free-standing due process claim whenever unfair interrogation tactics" are utilized by officers to obtain an incriminating statement); *Walden v. City of Chicago*, 755 F.Supp.2d 942, 965 (N.D. Ill. 2010) (finding that "a coerced confession alone cannot constitute a *Brady* violation, as no 'suppression' occurs because the plaintiff is aware of his own confession"); *Bridgeforth*, 2020 WL 1922907, at *7 (finding that because plaintiff "knew what he said at the interrogation," he could not state a viable *Brady* violation for the officers' failure to disclose these facts). Fulton and Mitchell knew exactly what occurred during their interrogations – they cannot now allege that they were unaware of any coercion that they claim occurred during the interrogations. As such, Plaintiffs' *Brady* claims based on their own confessions do not constitute a *Brady* due process violation.

### ii. The Alleged Suppression of the Circumstances of Griffin's Interview

The alleged suppression of the circumstances surrounding Griffin's interview with detectives does not constitute a cognizable *Brady* claim, as the details of her interview were known to Plaintiffs' criminal defense attorneys prior to trial. Griffin gave a handwritten statement to ASA Rubinstein and was presented by ASA Navarro to the grand jury on March 14, 2003. (SOF ¶¶ 45-56). Plaintiffs' criminal defense attorneys had the information that she had implicated Plaintiffs in the murder of Collazo as early as May 13, 2003. (SOF ¶¶ 181-182). Once Plaintiffs' attorneys became aware that Griffin implicated Plaintiffs in Collazo's murder, their attorneys interviewed Griffin multiple times regarding the circumstances surrounding her statements to police and prosecutors. (SOF ¶¶ 181-183).

26

Fulton's investigator, Edward Bunch, interviewed Griffin on May 13, 2003, and took a second handwritten statement from her regarding the circumstances surrounding her interview with detectives. (SOF ¶¶ 181-182). Griffin told Bunch that, on March 14, 2003, unidentified detectives said she could be charged with murder if she didn't say anything, and so Griffin told those detectives that she knew about the gun transaction and threats back and forth between Collazo and Plaintiffs. (SOF at ¶¶ 181-182). Plaintiffs were therefore put on notice as of May 2003 that the detectives allegedly told Griffin that she'd be charged with murder if she didn't say anything. (SOF ¶¶ 181-182). On March 4, 2004, Fulton's attorney, Elliot Zinger, took a videotaped sworn statement from Griffin where she told Mr. Zinger the circumstances of her conversations with police and prosecutors. (SOF ¶ 183). Prior to this videotaped statement, Griffin also spoke with Mitchell's attorney, Rick Bueke, but Mr. Bueke was not present for the videotaped statement because of a family emergency. (SOF ¶ 183). In fact, Fulton's criminal defense attorney argued at his motion to quash arrest hearing on October 5, 2004 that Griffin's statement was inconsistent and coerced, and explored these inconsistencies and alleged coercion of Griffin extensively at the trial. (SOF ¶ 202). The alleged circumstances surrounding Griffin's March 2003 statement were therefore available to Plaintiffs and cannot support a *Brady* claim.

### iii. The Circumstances of Shaw's Confession Was Disclosed and Was Not Used at Plaintiffs' Trial

Plaintiffs also cannot establish that the circumstances surrounding Shaw's confession were suppressed. Shaw confessed to his involvement in Collazo's murder on March 21, 2003. (SOF ¶¶ 165-171). Shaw moved to suppress his confession and quash his arrest, which was granted on October 31, 2005. (SOF ¶ 172). Shaw, through his criminal defense attorney, made his allegations of coercion in open court before Plaintiffs' criminal defense attorneys during a motion to suppress hearing in August and September 2005. (SOF ¶ 172). Plaintiffs were aware of what Shaw alleged

happened in the interview room with detectives at that hearing, and they cannot now claim that they knew nothing about Shaw's allegedly coerced interrogation by the time of trial. Further, even if this information had not come out at court, Plaintiffs could have easily had their investigator or attorneys interview him regarding details of Shaw's interrogation.

Individual City Defendants could not have withheld information regarding Shaw's interrogation of which Plaintiffs had knowledge. *See Brown v. City of Chicago*, No. 18 C 7064, 2022 WL 4602714, at \*27 (N.D. Ill. Sept. 30, 2022) (holding that the plaintiff's *Brady* claim failed where the plaintiff argued that the failure to disclose coercive interrogation techniques used during a co-defendant's interview violated *Brady*, as Seventh Circuit law makes clear that "'*Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution.'" *Id*. (quoting *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015)). Plaintiffs here cannot claim that detectives failed to disclose their alleged wrongdoing regarding Shaw's interrogation, when they were aware of it as of May 19, 2004, when he testified at his motion to suppress hearing. (SOF ¶ 172). Thus, Plaintiffs' *Brady* claims concerning Shaw's interrogation fail.

Plaintiffs have failed to establish that Individual City Defendants suppressed any evidence or that their criminal defense attorneys could not have discovered the allegedly withheld evidence through due diligence. Thus, summary judgment must be granted in favor of Individual City Defendants on Plaintiffs' *Brady* claims.

## III. ARGUABLE PROBABLE CAUSE DEFEATS PLAINTIFFS' DEPRIVATION OF LIBERTY CLAIMS IN COUNT III AGAINST ALL INDIVIDUAL CITY DEFENDANTS

Plaintiffs each assert a deprivation of liberty claim under Section 1983 in Count III of their complaints alleging that Individual City Defendants "used false evidence that they had

manufactured in order to accuse Plaintiff of criminal activity and cause the initiation, continuation, and perpetuation of judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent." (Dkt. No. 1, ¶ 152).

To succeed on their Fourth Amendment deprivation of liberty/malicious prosecution claims, Plaintiffs must show at a minimum that 1) the criminal proceedings were instituted without any probable cause, 2) that the prosecution resulted in a seizure of Plaintiffs, and 3) that the proceedings terminated in Plaintiffs' favor. *Thompson v. Clark*, 142 S. Ct. 1332, 1337-38, 1341, n.2 (2022).[5] The criminal proceedings are instituted, triggering this claim, when an individual "is bound over by a magistrate or arraigned on charges." *Wallace v. Kato*, 549 U.S. 384, 389 (2007); *see also Mitchell v. Doherty,* 37 F.4th 1277, 1283 (7th Cir. 2022) (legal process is initiated when a judge finds probable cause for a warrantless arrest). Here, a probable cause hearing was held on March 22, 2003 to initiate the criminal proceedings against both Plaintiffs. (SOF at ¶ 161). Probable cause at the time criminal proceedings were instituted is an absolute defense to a Fourth Amendment deprivation of liberty/malicious prosecution claim. *Franklin v. Askew*, No. 19-CV-04375, 2022 WL 17093358, at *4 (N.D. Ill. Nov. 21, 2022) (Tharp, J.) (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)).

Probable cause requires nothing more than a "fair probability" on which "reasonable and prudent" people could act. *Kaley v. United States*, 571 U.S. 320, 134 S.Ct. 1090, 1103 (2014) ("Probable cause ... is not a high bar"). Probable cause exists if the facts and circumstances within the officer's knowledge would allow a prudent person to believe that the suspect had committed an offense. *Camm v. Faith*, 937 F.3d 1096, 1105 (7th Cir. 2019) (citation omitted). Probable cause is assessed objectively, based on the conclusions that the officer reasonably might have drawn

---

[5] Defendants assert that malice is also an element, but that issue is not necessary to decide for purposes of this summary judgment. *Id.* at 1338 n.3.

from information known to him. *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021) (citations omitted). An officer's belief need not be "correct or even more likely true than false, so long as it is reasonable." *Gaddis v. DeMattei*, 30 F.4th 625, 630 (7th Cir. 2022) (citation omitted).

Even if the Court determines that a genuine dispute exists as to whether the Defendant Detectives had probable cause to initiate charges against Plaintiffs for the murder of Collazo, Individual City Defendants had "arguable probable cause" for purposes of applying the qualified immunity doctrine. *See Hyung Seok Koh v. Graf*, 3007 F. Supp. 3d 827, 849 (N.D.Ill. 2018) (citing *Abbott v. Sangamon Cty., Ill*., 705 F.3d 706, 714–15 (7th Cir 2013)). In other words, it would have been reasonable—even if mistaken—for Defendant Detectives to believe that there was probable cause to initiate charges against Plaintiffs based on the information they obtained from the witnesses they had at the time, Marinelli and Griffin. *See id.*

Additionally, in cases where a court has already determined that probable cause exists that finding "is normally entitled to a presumption of validity." *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019). On March 22, 2003, a criminal court ruled there was probable cause to detain Plaintiffs. (SOF at ¶ 161). On April 16, 2003, Plaintiffs were indicted by the grand jury on charges of first-degree murder, aggravated kidnapping, and concealment of a homicidal death for the death of Christopher Collazo. (SOF at ¶ 180). "[S]uch an indictment is *prima facie* evidence of probable cause." *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 351 (7th Cir. 2019) (citing *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015)).

The record demonstrates that ample probable cause existed to institute criminal proceedings on March 22, 2003 against Fulton and Mitchell. Defendant Detectives knew from the sole eyewitness, Sid Taylor, that two people wearing a red shirt and a black shirt were running from the fire, a fact corroborated later by Fulton, who claimed he owned a red hoodie and black

hoodie, in one of his "made up" confession details. (SOF at ¶¶ 10, 98-99). Fulton also corroborated the method of Collazo's murder, including the use of duct tape to bind the victim's hands, feet, and mouth, wrapping the victim in a plastic bag before he was set on fire, and a gas can used to douse the victim – duct tape and a gas can were later found at Fulton's home and his grandfather's home, respectively. (SOF at ¶¶ 121-122). Fulton and Mitchell, and later Shaw, confirmed Marinelli's and Griffin's accounts of the gun deal and robbery, and also the threats and taunts made by Collazo to Fulton after the robbery. (SOF at ¶¶ 102-104, 116, 133, 168). Fulton had given various ASAs and detectives statements detailing his conversations with Griffin on the day prior to the murder about where Collazo could be found the night of March 9th, which were corroborated by phone records that showed Griffin and Fulton had numerous calls that afternoon of March 9th. (SOF at ¶¶ 79, 84, 92, 102, 114, 116-123, 185-188). Most damning, Mitchell gave a fully detailed account of the murder, including many details he later claimed he "made up," which dovetailed with the details Fulton was giving at about the same time to detectives and ASAs. (SOF at ¶¶ 148-153).

Clearly, Defendant Detectives had sufficient information at hand to initiate charges against Fulton, and later Mitchell, particularly in light of almost every witness corroborating the motive evidence – the gun deal gone bad – which led to Collazo's murder. "The inference of the suspect's guilt need not be the most likely scenario, or even more likely true than not, for a reasonable officer to have probable cause . . . ." *Hyung Seok Koh v. Graf*, 3007 F. Supp. 3d 827, 848 (N.D. Ill. 2018) (referencing *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975)). "Probable cause is a holistic, commonsense inquiry, and officers are allowed to draw reasonable inferences based on their experience and judgment." *Id*. at 848-49 (citing *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010); *United States v. Bullock*, 632 F.3d 1004, 1022 (7th Cir. 2011)); *see also Washington v.*

*City of Chicago*, No. 20 CV 442, 2022 WL 2905669, at \*9 (N.D. Ill. July 22, 2022) ("Even when presented with information that may be inaccurate, officers are entitled to act 'and let the courts determine whether to credit a suspect's claim of innocence'" (quoting *Hernandez v. Sheahan*, 455 F.3d 772, 775 (7th Cir. 2006)). The record demonstrates that Defendant Detectives reasonably believed that there was a strong motive for Fulton to have been involved in Collazo's murder following the undisputed story of the gun deal and robbery initially told to them by both Marinelli and Griffin. Although Griffin today denies telling the police that she provided Fulton with Collazo's location just prior to the time Collazo was murdered (SOF ¶¶ 181-184), there was ample probable cause based on the strong and undisputed motive evidence provided by Marinelli and Griffin, and eventually verified by other witnesses including Plaintiffs and Shaw. (SOF at ¶ 20, 30, 102-104, 116, 133, 168).

At the criminal trial and at her deposition, Griffin recanted that she told detectives about any conversations with Fulton in the days prior to the murder regarding Collazo's expected location on March 10, 2003.[6] (SOF ¶ 184, 212). Even if the portion of Griffin's statements to detectives about these phone conversations with Fulton is disregarded for purposes of summary judgment, there is still very strong undisputed motive evidence in this case . The undisputed facts establish that Defendant Detectives knew that Fulton was robbed at gunpoint by Collazo. (SOF at

---

[6] *See Coleman*, 925 F.3d at 351 ("Police officers are constantly faced with reluctant witnesses and recanted confessions…[y]et they are not required 'to use the rules for summary judgment and draw inferences in favor of the suspects'" (quoting *Bridewell v. Eberle*, 730 F.3d 672, 676 (7th Cir. 2013)); *Askew v. City of Chicago*, 440 F.3d 894, 896 (7th Cir. 2006) ("[P]olice often encounter competing and inconsistent stories…[o]ne person makes an accusation; another denies it; police on the scene must yet lack the tools to determine immediately where the truth lies…[t]he Constitution permits them to initiate the criminal process and leave the sifting of competing claims and inferences to detectives, prosecutors, judges, and juries in the criminal prosecution"); *see also Spiegel v. Cortese*, 196 F.3d 717, 724 (7th Cir. 1999) ("Many putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established.").

¶ 20, 30, 102-104, 116, 133, 168). Although Collazo only made off with approximately $14 or $15, Fulton testified that Collazo repeatedly called, taunted Fulton and threatened to kill him thereafter. (SOF at ¶¶ 20, 102). "A dispute concerning some facts relevant to determining the existence of probable cause does not preclude a finding of probable cause, so long as the finding survives after adopting the plaintiff's version of disputed facts supported by the record...[e]ven if disputed facts are necessary to the determination of probable cause, the court may still find the existence of probable cause as long as the plaintiff's version of the facts is adopted." *Green v. City of Chicago*, No. 11 C 7067, 2015 WL 2194174 at *4 (N.D. Ill. 2015) (citation omitted); *Logan v. Caterpillar*, 246 F.3d 912, 926 (7th Cir. 2001) ("A disagreement about the relevant facts ... does not preclude a finding of probable cause so long as the finding survives after adopting the plaintiff's version of the disputed facts for which there is some support in the record") (citation omitted). Based on the totality of what was known to Defendant Detectives from March 10, 2003 up to March 22, 2003, the undisputed evidence in the record establishes that probable cause existed for detectives to initiate charges against Plaintiffs. Thus, summary judgment should be granted in favor of Individual City Defendants on Plaintiffs' deprivation of liberty claims.

Alternatively, the Individual City Defendants are entitled to qualified immunity. "Government officials performing discretionary functions enjoy qualified immunity from suit to the extent that their conduct 'could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Sornberger*, 434 F.3d at 1013 (quoting *Anderson v. Creighton*, 483 U.S. 635, 638–39 (1987) (citing *Leaf v. Shelnutt*, 400 F.3d 1070, 1079 (7th Cir. 2005)). In essence, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011).

To determine whether police officer defendants are entitled to qualified immunity, courts follow a two-step analysis: (1) whether the plaintiff has asserted the violation of a federal constitutional right; and, if such a violation did occur, (2) whether the right was so clearly established at the time of the alleged violation that a reasonable officer would know that his actions were unconstitutional. *Id*. (citing *Saucier v. Katz*, 533 U.S. 194, 200-202 (2001); *Anderson*, 483 U.S. at 640; *Leaf*, 400 F.3d at 1080). Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Plaintiffs seek to hold Individual City Defendants liable for their reliance on Griffin's statement implicating Plaintiffs. As established above, the defendant detectives reasonably believed that under the totality of the evidence they had at the time, they had probable cause to detain Plaintiffs and seek felony charges for the murder of Collazo. Specifically, Marinelli's motive evidence stemming from the February 2003 robbery, that was corroborated by Griffin and then Plaintiffs, and the corroboration between Plaintiffs' details given to detectives and ASAs of the murder and the physical evidence of the method of Collazo's murder, provided Individual City Defendants with probable cause to initiate charges against Plaintiffs for Collazo's murder.

In the event that Individual City Defendants were mistaken in believing that the evidence they had at the time of Plaintiffs' detention was sufficient for probable cause, their belief that probable cause existed based upon the totality of the evidence was reasonable under the circumstances. *See Anderson*, 483 U.S. at 641 (finding "that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and ... in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable"); *see also Hunter v. Bryant*, 502 U.S. 224, 229

(1991) (holding that officers are protected by qualified immunity where they possessed trustworthy, but ultimately incorrect, evidence that a suspect planned to assassinate the President).

Therefore, Individual City Defendants are, at a minimum, entitled to qualified immunity for Plaintiffs' federal deprivation of liberty claims in Count III, and those claims should be dismissed.

## IV. PLAINTIFFS CANNOT PRESENT EVIDENCE SUFFICIENT TO SUSTAIN THEIR STATE LAW MALICIOUS PROSECUTION CLAIM IN COUNT IV

Plaintiffs also each assert a state law malicious prosecution claim in Count IX. (Dkt. No. 1, ¶ 197). To recover under Illinois law, malicious prosecution requires proof of five elements: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding: (4) the presence of malice; and (5) damages resulting to the plaintiff." *Beaman v. Freesmeyer*, 2021 IL 125617, ¶ 74, 451 Ill.Dec. 310, 183 N.E.3d 767, 782 (Ill. 2021) (internal quotation marks omitted). Commencement of legal process begins when the criminal complaint is subscribed. *Vaughn v. Chapman*, 662 F. App'x 464, 467 (7th Cir. 2016) (citing *Gauger v. Hendle*, 954 N.E.2d 307, 329 (Ill. App. Ct. 2011) and *Porter v. City of Chicago*, 912 N.E.2d 1262, 1273 (Ill. App. Ct. 2009)). In addition, under Illinois law, police officers performing discretionary functions, such as criminal investigations, enjoy immunity from suit unless their actions are deemed "willful and wanton." 745 ILCS 10/2-202. In this context, "willful and wanton conduct" is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210.

### A. Probable cause exists to defeat this claim.

As it does for Plaintiffs' constitutional deprivation of liberty claims in Count III, probable cause also forms a complete defense to an Illinois state law claim for malicious prosecution. See *Wade v. Collier*, 783 F.3d 1081, 1085 (7th Cir. 2015) (citing *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001)). As argued above, probable cause existed to initiate criminal proceedings against Plaintiffs based upon the totality of the evidence in the investigation that Individual City Defendants amassed at the time. Additionally, "[a] grand jury indictment conclusively establishes the existence of probable cause as to the charged crimes." *Andersen v. Vill. of Glenview*, No. 17-CV-05761, 2018 WL 6192171, at *15 (N.D. Ill. 2018), aff'd, 821 F. App'x 625 (7th Cir. 2020) (citing to *Kaley v. United States*, 571 U.S. 320, 328 (2014); *United States v. Schreiber*, 866 F.3d 776, 781 (7th Cir. 2017)). Therefore, Plaintiffs cannot meet the third element, "absence of probable cause," of their malicious prosecution claim in Count IV. Similarly, because there was at least arguable probable cause for Plaintiffs' prosecutions, the Individual City Defendants are entitled to immunity from the malicious prosecution claim because their conduct was not willful and wanton. See 745 ILCS 10/2-202.

**B. Alternatively, the State law Malicious Prosecution Claim fails because the *nolle prosequi* of Plaintiffs' charges is not indicative of innocence.**

Plaintiffs' state law malicious prosecution claim also fails because they cannot prove that their respective prosecutions were terminated in a manner indicative of innocence. The decision to *nolle prosequi* is not a final disposition of a criminal case but rather is a procedure that restores the matter to its pre-charging state. *Glessner v. Rybaski*, No. 09 CV 7917, 2013 WL 389006, at *4 (N.D. Ill. 2013) (Lefkow, J.) (citing *Washington v. Summerville*, 127 F.3d 552, 557 (7th Cir.1998)). In the context of a malicious prosecution claim brought under Illinois law, a decision to terminate criminal proceedings via *nolle prosequi* constitutes a termination in the plaintiff's favor unless the charges are dropped for reasons that are not indicative of innocence. *Id*. (citing *Logan v.*

36

*Caterpillar*, 246 F.3d 912, 925 (7th Cir. 2001)). The plaintiff has the burden of showing that the prosecutor decided to *nolle prosequi* the case for reasons consistent with the plaintiff's innocence. *Id*. A decision to *nolle prosequi*, standing alone without other reasons to show why charges were dropped, is not indicative of innocence. *Id*.; *see Washington*, 127 F.3d at 558.

Here, Plaintiffs' petitions for post-conviction relief were granted by Judge Flood, who granted Plaintiffs a new trial. Thereafter, the State appeared at a hearing on May 29, 2019, where the prosecutor stated that upon review of the case "…based on the age of the case and the status of our witnesses, some we were unable to locate, others we are having difficulty with, but at this time, based on those factors, we are unable to meet our burden of proof…at this time our motion as to both defendants is *nolle prose*[*qui*]." (SOF ¶¶ 222-223). The State never mentioned terminating the proceedings because Plaintiffs were innocent of Collazo's murder. Subsequently, when Plaintiffs presented their separate petitions for certificates of innocence ("COI"), the State filed objections to Plaintiff Fulton's one-sentence basis for the COI petition, and stated the fact "…that the People entered into the record that they were unable to re-try Petitioner based on the age of the case and the problems they had with securing of witnesses necessary for retrial was in no way a concession to Petitioner's innocence." (SOF ¶ 225)(emphasis added). The State noted in their objections to Plaintiff Mitchell's COI petition that the appellate court "already thoroughly reviewed the strength of the evidence that was introduced in the case against him and found that Mitchell was indeed proved guilty beyond a reasonable doubt." (SOF ¶ 226)(emphasis added).

Furthermore, Judge Martin ultimately denied Plaintiffs' COI petitions, finding that Plaintiffs did not sustain their burden to show that they were innocent of the offenses charged. (SOF ¶ 227). The Court went on to say that "in large part, that rests upon my belief that Mr. Mitchell gave a credible statement" during his videotaped confession – "it appears to me, through

his demeanor; his coolness; his – the way he- spoke and the way he was able to fill in certain details, it convinced [me] of the truthfulness of at least what I consider to be very important parts of that statement." (SOF ¶ 227). With regard to Griffin, the Court "considered her statements as well, and the conversations she had with both Mr. Mitchell and Mr. Fulton at various times." (SOF ¶ 227). Taking into account "Mr. Mitchell's statement, the statements by Ms. Griffin, …as well as the events leading up to this horrific crime – and that is, more specifically, Mr. Fulton's desire to arrange the purchase of a firearm…[c]onsidering all of these things together, I just remain unconvinced that the Petitioners are able to sustain their burden." (SOF ¶ 227).

Plaintiffs cannot sustain their burden on this crucial element of malicious prosecution here as well. Therefore, summary judgment should be granted on Count IV of Plaintiffs' complaint.

## V. SUMMARY JUDGMENT SHOULD BE GRANTED FOR DEFENDANTS BARTIK, WINSTEAD, ROLSTON, AND SCHMITZ ON PLAINTIFFS' COERCED CONFESSION CLAIMS IN COUNT I

The Seventh Circuit has drawn a distinction between coerced testimony (which might be true, even if coerced) and false or fabricated testimony, "which is known to be untrue by the witness and whoever cajoled or coerced the witness to give it." *Hyung Seok Koh v. Graf*, 3007 F.Supp.3d 827, 857-58 (N.D.Ill. 2018) (citing *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014)). In Count I of their Complaints, Plaintiffs each allege that Individual City Defendants used physical and psychological coercion which forced them to falsely implicate themselves in the murder of Christopher Collazo. (Dkt. No. ¶136). However, there is no evidence to support those allegations against Defendants Bartik and Schmitz with regard to either of Plaintiffs' confessions, and similarly, no evidence that Defendant Winstead had any interaction with Mitchell when he was arrested, brought to the station, and ultimately confessed.[7]

---

[7] There is equally no evidence that Defendants Cervenka, Kennedy, Skora, Aguirre, and Franko coerced the inculpatory statements of Plaintiffs, as none of them were involved in Plaintiffs' confessions. However, because

"To bring a successful claim of coerced confession, a plaintiff must show that he 'has been compelled to be a witness against himself in a criminal case.'" *Gray v. City of Chicago*, No. 18 C 2624, 2022 WL 910601, at *7 (N.D. Ill. Mar. 29, 2022) (citing *Chavez v. Martinez*, 538 U.S. 760, 770 (2003)). Put simply, a plaintiff must show "(1) that he was coerced into confessing, and (2) that the confession was used against him in his criminal trial…[t]his analysis considers the totality of the circumstances and asks whether [the plaintiff's] 'will was overborne in such a way as to render his confession the product of coercion.'" *Gray*, 2022 WL 910601, at *7 (quoting *Arizona v. Fulminate*, 499 U.S. 279, 288 (1991)). In order to prove this claim, the plaintiff must demonstrate a causal connection between <u>each</u> defendant and the alleged misconduct. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017); *see also Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("An individual cannot be held liable in a §1983 action unless he caused or participated in an alleged constitutional deprivation...[a] causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary").

### A. Plaintiff Mitchell's confession

First, it is undisputed that Defendants Bartik, Winstead, Schmitz, and Rolston had no personal involvement in Mitchell's confession. After Mitchell was arrested on March 19, 2003, the record establishes that his interactions were limited to Defendants Zalatoris, Breen, Rolston and ASA Rubinstein. (SOF ¶¶ 130-149).Defendants Bartik, Winstead, Schmitz, and Rolston never took part in any of Mitchell's interviews, and they were not present at the interviews wherein he confessed. (SOF ¶130-149).

Moreover, there is no evidence that Defendant Schmitz had any involvement in the Collazo murder investigation past the early morning hours of March 10, 2003, when he canvassed the scene

---

this argument was addressed in the section above, to avoid redundancy, the arguments will not be addressed again here.

and interviewed witness Sid Taylor. (SOF ¶¶ 9-10, 12). Therefore, Defendants Bartik, Winstead, Rolston, and Schmitz should be dismissed from this matter for any claims of coercing Mitchell's confession.

### B. Plaintiff Fulton's confession

Plaintiff Fulton alleges that he never confessed to Defendant Bartik when he went down to the polygraph unit to take a polygraph examination on March 18, 2003. Fulton testified at his deposition that he was taken to the polygraph unit by Detectives Zalatoris and Breen, and he had a conversation with Defendant Bartik. (SOF ¶ 82). During this conversation, Bartik introduced himself, told Fulton that a polygraph examination was a voluntary process, and explained to Fulton that he had to sign a form before the test could be administered. (SOF ¶ 77). Fulton then claims that Zalatoris, Breen, and Bartik stepped out of the room for approximately five minutes, then came back into the room, and Zalatoris or Breen said "it's not going to hold up in court, let's go." (SOF ¶ 82). Fulton testified that nothing else was discussed with Bartik, and he completely denied confessing to Bartik. (SOF ¶ 82). Fulton denies that Bartik coerced a confession – Fulton instead is adamant he never confessed to Bartik. On that basis alone, Fulton cannot sustain a coerced confession claim against Defendant Bartik.

Fulton also never alleges that Defendant Rolston forced him to make an inculpatory statement. During Fulton's interviews with Defendants Rolston and Girardi on March 18, 2003, Defendant Rolston did not discuss with Fulton his involvement in Collazo's murder, and therefore could not have coerced his confession. (SOF ¶¶ 64-65). Rather, Defendants Rolston and Girardi obtained a signed consent to search form from Fulton, explained to him that he was arrested for Collazo's murder, showed him a series of photographs of individuals whom he identified, and

asked him about his whereabouts on March 9th. (SOF ¶¶ 64-65). Nevertheless, there is no evidence in the record that Rolston was involved with, much less coerced, Fulton's eventual confession.

Next, Defendant Winstead was not involved in the interviews where Fulton confessed to his involvement in the Collazo murder. The first time Winstead took part in an interview with Fulton was on March 19, 2003 at approximately 4:00 p.m., the day after Fulton initially confessed to the murder of Collazo. (SOF ¶¶ 102-107). During this interview, Fulton provided his alibi that he was at the hospital with his fiancé Yolanda Henderson on March 9th. (SOF ¶¶ 102-107). After this interview, Defendant Winstead then interviewed Henderson to confirm Fulton's alibi for March 9th. (SOF ¶¶ 108-109). On March 20, 2003, Defendant Winstead was present when ASA Rubinstein re-interviewed Fulton, and Fulton presented the same alibi story. (SOF ¶¶ 112-113). There is simply no evidence that demonstrates that Defendant Winstead coerced Fulton to confess to the Collazo murder.

Ultimately, Plaintiffs cannot present any evidence that Defendants Bartik, Winstead, Rolston, or Schmitz coerced Mitchell's confession, and have no evidence to support the coerced confession claim against Bartik and Schmitz for Fulton's confession. Thus, Plaintiffs' coerced confession claims against these Defendants cannot withstand summary judgment.

## VI.    COUNT II SHOULD BE DISMISSED AGAINST ALL INDIVIDUAL CITY DEFENDANTS AS THERE IS NO EVIDENCE TO SUGGEST THE KNOWING FABRICATION OF ANY WITNESS STATEMENTS

In Count II, Plaintiffs both assert a "fabrication of false witness statements" claim, alleging that Individual City Defendants "used physical violence and psychological abuse" to procure false statements from Johnnitta Griffin, Antonio Shaw, Plaintiff Fulton, and Plaintiff Mitchell. (Dkt. No. 1, ¶147). Plaintiffs assert that detectives knew the information they obtained from each of

these witnesses to be false, and so the detectives suppressed "their own misconduct and the circumstances in which these witness statements were obtained." (Id., ¶146).

To establish a fabrication of evidence due process claim, a plaintiff must prove: (1) the defendant knowingly fabricated evidence against the plaintiff; (2) the evidence was used against the plaintiff at his criminal trial; (3) the evidence was material; and (4) the plaintiff was damaged as a result. *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). Plaintiffs have to clear a "high bar" to succeed on such a claim. *Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019). Plaintiffs must establish not only that a statement was false, but also that the Individual City Defendants "manufactured" it. *Id*. at 344 (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012)). That requires proof that Individual City Defendants caused these witnesses to give statements that the defendants <u>knew</u> were false. *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) (officers fabricate evidence when they tell "witnesses what to say knowing that what the [officer is] telling them [is] false"). "Evidence that merely impeaches aspects of [a witness's] statement or suggests [the officer] had reason to doubt [the witness's] veracity is insufficient." *Coleman*, 925 F.3d at 345.

Plaintiffs cannot present any evidence to show that Individual City Defendants knowingly fabricated any witness statement, knowingly encouraged any witness to provide false information, and/or that these alleged fabricated statements were used against Plaintiffs at their criminal trials. Each instance of alleged fabrication is addressed in turn.

### A. Nothing in the Record Suggests that Individual City Defendants Knowingly Fabricated Johnnitta "Precious" Griffin's Statements of March 11 and March 14, 2003

Even if the Court assumes the truth of Griffin's deposition testimony that she was pressured by police to give a statement against Plaintiffs, there is no evidence that any defendant knew that

such a statement was false. Griffin has never wavered about her participation in the gun deal between Collazo and Fulton – the very event that caused Collazo and Fulton to meet in the first place. Griffin told the detectives that she set up the gun deal between Collazo and Fulton that occurred around Valentine's Day in 2003, a truth which she has maintained every time she was asked about it. Griffin even testified at trial that everything she told Detective Winstead on March 11, 2003 was truthful. (SOF ¶ 206).

During that same March 11th interview, Griffin also told ASA Rubinstein about the threatening calls from Fulton's supposed brother "Dwight," a detail she testified about at both the grand jury and at Plaintiffs' criminal trials. (SOF ¶¶ 38, 51, 206). The only additional information Griffin provided to Dets. Winstead and Rolston on March 11th were details about Fulton – specifically, his address, car, and physical description, all of which were true and Griffin has never refuted. (SOF ¶¶ 24-25). Plaintiffs now claim that Griffin "denied knowing of any connection between [the February 2003] robbery and Collazo's murder" during her March 11th interview with detectives. Clearly, the evidence in the record, especially through Griffin's own subsequent testimony, demonstrates there was no fabrication of her March 11, 2003 statement to detectives.

Griffin next spoke to Detectives Zalatoris and Breen on March 14, 2003. Griffin told the detectives the same story regarding the February gun deal, but also provided more details about her communications with Fulton in the days prior to Collazo's murder. Griffin told detectives on March 14th that she spoke with Fulton on the phone on March 9th. (SOF ¶¶ 30-31). During this telephone conversation, Fulton asked her about his $300 and whether Griffin would be with Collazo that night. (SOF ¶ 30). Griffin told Fulton that she'd meet Collazo at approximately 10:20 p.m. that night. (SOF ¶ 30). Griffin also gave Fulton her route of travel that night, what she believed would be Collazo's route of travel, as well as Caldero's address. (SOF ¶ 30). Griffin told detectives

she then received a second call from Fulton that night confirming the time when Collazo would head to Caldero's home. (SOF ¶ 31). Griffin told detectives she went to Caldero's home and Collazo never showed. (SOF ¶ 32). Griffin recounted the same story of what happened on March 9, 2003, involving her, Fulton and Collazo to ASA Rubinstein, ASA Sandra Navarro, and the grand jury. (SOF ¶¶ 36-55). Griffin never told ASA Rubinstein or ASA Navarro that any detective threatened her or promised her anything in exchange for her testimony. (SOF ¶¶ 35, 57).

Plaintiffs assert that Griffin was threatened to provide this March 14th statement. However, Griffin's claims during her trial testimony of improper interrogation tactics do not amount to fabrication because there was no way for Defendant Detectives to know it was false. Specifically, Griffin testified that during her March 14, 2003 interview, she spoke with detectives for approximately 30 minutes. (SOF ¶ 58). During this interview, she claimed a detective told her she was lying when she said she knew nothing about Collazo's murder and that he knew that she had helped somebody kidnap Chris and kill him, and that a different detective then showed her pictures of Collazo's body and yelled at her, threatening to charge her with murder. (SOF ¶ 58). Griffin also testified that she gave the handwritten statement to ASA Rubinstein because a detective told her to "keep the story the same way and I'll be okay." (SOF ¶ 58).

Even if the Court found these allegations against the detectives credible, these "facts" are not enough to support a fabrication claim. Yelling at a witness and threatening to charge that witness with murder does not amount to fabrication and does not bear on whether Plaintiffs themselves can present a fabrication claim with regard to Griffin's treatment. *See Buckley v. Fitzsimmons*, 20 F.3d 789, 794 (7th Cir. 1994) ("[c]oercing witnesses to speak … is a genuine constitutional wrong, but the persons aggrieved [are the witnesses] rather than [the arrestee.]"; *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994, at *5 (N.D. Ill. 2009) ("obtaining a statement

with coercive tactics that inculpated the arrestee may have violated the witness's rights, but it did not violate the arrestee's due process rights."); *see also Whitlock*, 682 F.3d at 584 ("[c]oercively interrogating witnesses, paying witnesses for testimony, and witness-shopping may be deplorable, and these tactics may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial"). As Griffin herself is a witness, and not a plaintiff, Plaintiffs' must show fabrication – not coercion – to sustain a § 1983 claim against the Individual City Defendants.

There is simply no evidence other than Plaintiffs' speculation and unsupported innuendo that any detective <u>knew</u> that the facts Griffin provided to them during her March 11th and March 14th interviews were false. *See Delapaz v. Richardson*, 634 F.3d 895, 901 (7th Cir. 2011) ("conjecture alone cannot defeat a summary judgment motion"). Therefore, there is no evidence to sustain Plaintiffs' fabrication claims based on Griffin's statement, and these claims should be dismissed.

**B.  Antonio Shaw's Confession Was Never Used Against Plaintiffs at Trial and Therefore Cannot Serve as the Basis for a Fabrication Claim.**

Plaintiffs claim that Individual City Defendants fabricated co-defendant Shaw's handwritten statement implicating himself, Fulton, and Mitchell in Collazo's murder. In order for Plaintiffs to bring a successful fabrication claim in Count IV, they must prove that the fabricated evidence was used against them at their criminal trials and caused their convictions. *See Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) ("if the evidence hadn't been used against the defendant, he would not have been harmed by it, and without a harm there is, as we noted earlier, no tort"); *see also Patrick v. City of Chicago*, 974 F.3d 824, 834 ("If fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due-process right to a fair trial" (citing *Lewis v. City of Chicago*, 914 F.3d 472, 479 (7th Cir. 2019)).

In this case, Shaw's statement was suppressed and therefore not available to be used as evidence against Plaintiffs at their criminal trials. Shaw did not testify at either of Plaintiffs' criminal trials. Shaw's statement was not introduced by the State against either Plaintiff at trial. (SOF ¶¶ 173-174). As such, Plaintiffs' fabrication claim in so far as it is predicated upon Shaw's confession fails as a matter of law, as it was never used as evidence at Plaintiffs' criminal trial and did not cause Plaintiffs' convictions.

### C. Fulton's Fabrication Claim Based on Mitchell's Confession and Mitchell's Fabrication Claim Based on Fulton's Confession Also Fail.

Count IV also alleges that each of Plaintiffs' confessions were fabricated by detectives. These claims must also be dismissed for the same reason Shaw's statement can't support a fabrication claim: Fulton's confession was not used against Mitchell at Mitchell's criminal trial and Mitchell's statement was not used against Fulton at Fulton's criminal trial. (SOF ¶¶ 214-215). Neither of the confessions were ever admitted into evidence at the other's criminal trial, and thus had no impact upon their eventual convictions. Plaintiffs' separate fabrication claims based on the other plaintiff's allegedly inculpatory statements therefore fail. *See Fields*, 740 F.3d at 1114; *Patrick*, 974 F.3d at 834.

### D. Plaintiffs Cannot Prove that Individual City Defendants Knowingly Fabricated Their Own Confessions

To succeed on the fabrication claims as related to their own confessions, Plaintiffs must show "that each [defendant officer] personally participated in manufacturing the handwritten confession, meaning they deliberately and knowingly created the false evidence." *Brown v. City of Chicago*, No. 18 C 7064, 2022 WL 4602714, at *22 (N.D. Ill. Sept. 30, 2022) (citing *Coleman*, 925 F.3d at 344; *Whitlock*, 682 F.3d at 580). A plaintiff must prove that each defendant officer "created evidence that they knew with certainty to be false." *Anderson v. City of Rockford*, 932

F.3d 494, 510 (7th Cir. 2019) (quoting *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014) (internal quotation marks omitted)). Assuming Plaintiffs' confessions are false for purposes of summary judgment only, there is no evidence in the record that Individual City Defendants knowingly manufactured their false confessions.

First, there is no evidence in the record, other than pure speculation, that any detective knowingly invented a false narrative for Fulton to say. Nowhere during the recording of Mitchell's videotaped statement do Detectives Girardi or Struck, or any other Individual City Defendant for that matter, tell Mitchell what to say. (SOF ¶¶ 149-152).There is also no evidence that any of the detectives suggested to ASA Rubinstein or ASA D'Angelo what information should be contained in either of Plaintiffs' confessions. (SOF ¶¶ 149-152).Without concrete evidence that any of the Individual City Defendants <u>knowingly</u> participated in the alleged fabrication of Plaintiffs' confessions, Plaintiffs' claims cannot survive summary judgment. *See Brown*, 2022 WL 4602714, at *22 (holding that defendant officer could not be liable for creating the plaintiff's confession where the officer did not write the confession, did not tell the Assistant State's Attorney what to write in the confession, and the plaintiff speculates that the officers were the source of the information).

Additionally, Plaintiffs both admitted that they were the source of the details contained in their confessions in response to questioning. In other words, the police did not feed them details for them to repeat. For example, Mitchell claims that he made up the following details about his involvement in Collazo's murder (SOF ¶ 152):

- how many blocks they drove;
- that Shaw put $2 or $3 of gas in the gas can;
- Shaw set the gas can on his lap to prevent it from leaking so the car wouldn't smell like gas;
- they stopped in an alley and saw a big brown garage;
- there were two old beetle looking cars there in the alley;

- they parked the car on a slant a little bit so that it wouldn't look like a scene;
- Fulton grabbed the plastic bag;
- Fulton told him and Shaw to tilt Collazo's body so they wouldn't have to take Collazo completely out of the trunk to put the bag on him;
- Mitchell taped Collazo's arms;
- Fulton taped Collazo's feet;
- Shaw put a towel in Collazo's mouth and wrapped some tape around his face;
- they put tape at the bottom of the plastic bag so when they took Collazo out he wouldn't just fall out;
- they got on I-55 and got off on Indiana and went all around traffic[8];
- they got off on 55th and Garfield Park;
- they made a right on Garfield, 55th, and took that to Halsted;
- they took another right on Halsted and took that to about 51st street;
- they put the box flat, slid Collazo in the box so they wouldn't have to pick him up, and dropped Collazo in there;
- they titled the box a little so the gas can go downwards into it and when it caught fire it should be able to spread;
- Shaw got the box;
- Shaw went to the car and got the gas can out the back of the car;
- Mitchell walked back up and said don't light that with a lighter or "you gonna set your shit on fire";
- Shaw said they need matches or they're just going to leave Collazo there;
- Mitchell said there might be some matches in the car and looked in the glove compartment and found some matches there; and
- They said that if any one of them got caught, just get caught, and that they're not going to trick or tell on one another.

Many of these factual details provided by Mitchell to police and prosecutors are corroborated by Fulton's confession and the evidence recovered, including that: Mitchell and Shaw used duct tape to bind Collazo's hands, feet, and mouth; they placed a plastic bag over Collazo; they used a gas can to ignite Collazo's body; a rag was placed in Collazo's mouth; they drove from Lake Shore Drive to I-55 to the Dan Ryan and then exited at Garfield; they taped the bag around Collazo's legs; Shaw went and got a cardboard box; and Shaw went and got the gas can out of the

---

[8] At Mitchell's deposition, after he admitted that he "made up" the detail of his confession that he, Fulton, and Shaw got on I-55 and got off on Indiana, Mitchell testified that he thinks he "would have had to come up with that [detail] on his own because there's not another way for you to go." (SOF at ¶ 153). The fact that Mitchell said there's no other way for you to go from Lake Shore Drive back to the south side aside from the route he stated, coupled with his admission that he provided this detail on his own, indicates his familiarity with the route and the likelihood that his confession was not fabricated.

trunk of Fulton's car. (SOF at ¶ 118-122). The likelihood of Mitchell inventing these details out of thin air – where these are the same details Fulton already provided to detectives when he spoke to them two days before Mitchell confessed – is next to impossible. If anything, Mitchell's similarities confirm that Fulton's confession could not have been made up. The details of the condition of Collazo's binding and confinement also line up with the evidence at the scene. (SOF at ¶¶ 7-8, 121, 134). Moreover, both Fulton and Mitchell confirmed at their depositions that many of the details they gave about the February 2003 robbery during their confessions were true. (SOF at ¶¶ 92, 150). The bottom line, therefore, is that Individual City Defendants had no reason to believe that the information Fulton or Mitchell provided was false.

During his videotaped confession, Mitchell was not crying, did not stumble over his answers, and often did not pause to think about his answers to ASA D'Angelo's questions. (SOF at ¶ 149). Conversely, Mitchell spoke clearly and confidently throughout his statement, despite alleging that he was being physically and psychologically tortured by detectives, starved, denied access to the bathroom, and ultimately being spoon-fed the numerous details of the confession. (SOF at ¶ 149). In fact, the Honorable Leroy K. Martin, Jr. of the Circuit Court of Cook County, in his denial of Plaintiffs' certificates of innocence, found Mitchell's videotaped confession to be credible because of "his demeanor; his coolness; [...] the way he spoke and the way he was able to fill in certain details[.]" (SOF at ¶ 227).

Ultimately, there is no evidence that Individual City Defendants knowingly fabricated Plaintiffs' confessions when Plaintiffs have each admitted they made up the details contained in their confessions. Even if Plaintiffs claim that they were subjected to intense interrogation, such tactics alone do not amount to a fabrication claim under the law. Thus, summary judgment on Plaintiffs' fabrication claims based on their own confessions must be granted.

## VII. THERE IS NO EVIDENCE THAT DEFENDANTS BARTIK, WINSTEAD, CERVENKA, KENNEDY, SCHMITZ, SKORA, FRANKO, AND AGUIRRE FAILED TO INTERVENE

To succeed on their failure to intervene claims, Plaintiffs must prove that each Individual City Defendant (1) "had reason to know … that any constitutional violation ha[d] been committed by a law enforcement official"; and (2) "had a realistic opportunity to intervene to prevent the harm from occurring." *Wilbon v. Plovanich*, 67 F. Supp. 3d 927, 946 (N.D. Ill. 2014); *see Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). Therefore, Plaintiffs' failure to intervene claim depends on proof of an underlying constitutional violation. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

However, Judge Easterbrook recently questioned the validity of a Section 1983 "failure to intervene" claim in his concurrence opinion in *Mwangangi v. Nielsen*, where he noted that "failure to intervene" sounds more like vicarious liability, and "the Supreme Court held many times that Section 1983 supports only direct, and not vicarious, liability." 48 F.4th 816, 834-35 (7th Cir. 2022) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009); *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978)). Judge Easterbrook stated that *DeShaney v. Winnebago County Department of Social Service*s, 489 U.S. 189 (1989) holds "that our Constitution establishes negative liberties – the right to be free of official misconduct – rather than positive rights to have public employees protect private interests." *Id*. at 834. Any federal claim for "failure to intervene" brought by Plaintiffs against the Individual City Defendants should be considered more in the realm of "forbidden vicarious liability," which § 1983 cannot be used to pursue. *Id*. (citing *Vance v. Rumsfeld*, 701 F.3d 193, 203–05 (7th Cir. 2012)). Therefore, Plaintiffs' "failure to intervene" claims under § 1983 should fail as a matter of law.

Further, even if a failure to intervene claim were viable, Plaintiffs have no evidence that Defendants Bartik, Winstead, Cervenka, Kennedy, Schmitz, Skora, Franko, or Aguirre directly violated their constitutional rights. Probable cause supported charges against Plaintiffs. Similarly, Plaintiffs cannot establish that any evidence was withheld by Individual City Defendants that they were not aware of or through reasonable due diligence could have learned about.

Additionally, Plaintiffs admitted that the details in their confessions were made up by themselves, and therefore, Individual City Defendants could not have knowingly manufactured their statements. Because Plaintiffs cannot establish that Defendants Bartik, Winstead, Cervenka, Kennedy, Schmitz, Skora, Franko, and Aguirre violated their constitutional rights, these Defendants are entitled to summary judgment on Plaintiffs' failure to intervene claims. Additionally, Defendants Bartik, Winstead, Cervenka, Kennedy, Schmitz, Skora and Aguirre were not present for the interviews of Griffin, Shaw, Fulton, or Mitchell during which Plaintiffs claim their rights were violated. Thus, these Defendants would have no opportunity to intervene in the alleged violations that occurred in the interview rooms.

Furthermore, as there is no evidence that any Individual City Defendant fabricated any witness statement, detained Plaintiffs without probable cause, or withheld exculpatory evidence, Plaintiffs' failure to intervene claims with regard to Plaintiffs' fabrication, deprivation of liberty, and due process claims (Counts II, III, and IV) cannot survive.

## VIII. PLAINTIFFS CANNOT ESTABLISH THAT INDIVIDUAL CITY DEFENDANTS CONSPIRED TO VIOLATE PLAINTIFFS' CONSTITUTIONAL OR STATE LAW RIGHTS

Plaintiffs each allege that Individual City Defendants, alongside Defendant Shepherd, "reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose by unlawful means." (Dkt. No.

1, ¶ 180). To establish liability for conspiracy under § 1983, Plaintiffs "must show that (1) the individuals reached an agreement to deprive [Plaintiffs] of [their] constitutional rights, and (2) overt acts in furtherance actually deprived [Plaintiffs] of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (citation omitted). To sustain a claim that the defendants conspired to deny a plaintiff's constitutional rights, the plaintiff must allege that the defendants "directed themselves toward an unconstitutional action by virtue of a mutual understanding[,]" and support such allegations with facts suggesting a "'meeting of the minds.'" *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000); *see Thurman v. Village of Hazel Crest*, 579 F. Supp. 2d 1019, 1029 (N.D. Ill. 2008) ("A conspiracy claim cannot survive summary judgment based on vague conclusory allegations that include no overt acts reasonably related to promoting the conspiracy."); *Ewell v. Toney*, 853 F.3d 911, 917-18 (7th Cir. 2017) (Although claims for "alleged conspiracies between state actors are possible under section 1983," they typically "add nothing but needless complexity.").

Under Illinois law, a civil conspiracy is defined as: "'(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act.'" *Foodcomm Intern. v. Barry*, 463 F. Supp. 2d 818, 830 (N.D. Ill. 2006) (citation omitted)).

Here, Plaintiffs vaguely argue that Individual City Defendants conspired to violate their constitutional rights. However, there is no direct proof within the record that establishes that Individual City Defendants had a "meeting of the minds" to violate Plaintiffs' rights. There is no evidence to support Plaintiffs' claims that Individual City Defendants detained them without probable cause, fabricated any evidence, or withheld any exculpatory evidence, and therefore

52

Plaintiffs' conspiracy claims based on these underlying constitutional claims also fail. *See Coghlan v. Beck*, 2013 IL App (1st) 120891, ¶ 59 ("[C]onspiracy is not an independent tort: the conspiracy claim fails if the independent cause of action underlying the conspiracy allegation fails").

Additionally, Plaintiffs cannot point to any overt acts by Individual City Defendants that demonstrate a conspiracy to coerce Plaintiffs' confessions. Plaintiffs should not be allowed to rely on speculation, unsupported inferences, or self-serving assumptions to support their conspiracy claims. *See Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015) (finding that plaintiffs cannot rely on speculation to establish a conspiracy). Without specific facts to support Plaintiffs' allegations that Individual City Defendants conspired to frame them for Collazo's murder, their conspiracy claims must be dismissed.

## IX.   THERE IS NO EVIDENCE TO SUPPORT PLAINTIFFS' INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIMS

Plaintiffs each assert that "[t]he actions, omissions, and conduct of the Police Officer Defendants, the Prosecutor Defendants, and Defendant Shepherd as set forth above were extreme and outrageous [… and] rooted in an abuse of power and authority and were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiffs[.]" (Dkt. No. 1, ¶ 203).

To succeed on an intentional infliction of emotional distress ("IIED") claim under Illinois law against the Individual City Defendants, Plaintiffs must show that (1) Defendants' conduct was "truly extreme and outrageous"; (2) Defendants "intended the conduct [to] inflict severe emotional distress or kn[e]w that there [wa]s at least a high probability that [the] conduct w[ould] cause severe emotional distress"; and (3) the "conduct in fact caused severe emotional distress." *Totten v. Benedictine Univ.*, No. 20 C 6107, 2021 WL 3290926, at *11 (N.D. Ill. Aug. 2, 2021) (citing *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 63 (Ill. 2016)). "Extreme and outrageous"

conduct does not include "'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities…[i]nstead, the conduct must go beyond all bounds of decency and be considered intolerable in a civilized community." *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citation omitted); see also *Sidney v. Alejo*, No. 16 C 2041, 2018 WL 3659352, at \*8 (N.D. Ill. Aug. 2, 2018) ("Physical injury is not required to establish severe emotional distress, nor is the need to seek medical treatment…[b]ut mere annoyance, frustration, stress, embarrassment, humiliation, nervousness, and the like are insufficient." (citing *Honaker* at 495-96)).

In making this determination, courts consider "whether the defendant reasonably believed that his objective was legitimate; greater latitude is given to a defendant pursuing a reasonable objective even if that pursuit results in some amount of distress for a plaintiff." *Honaker*, 256 F.3d at 491 (citation omitted). "Police officers, for example, are entitled to perform their law enforcement responsibilities assertively." *Cairel v. Alderden*, 821 F.3d 823, 836 (7th Cir. 2016) (citing *Honaker*, 256 F.3d at 491).

The evidence in the record is insufficient to prove that any Individual City Defendants engaged in the level of outrageous conduct that would sustain an IIED claim. The detectives in this case were investigating a gruesome murder for which they obtained probable cause to initiate murder charges against Plaintiffs based on totality of the evidence at hand. Plaintiffs have uncovered no evidence that any detective fabricated evidence or withheld exculpatory evidence that led to Plaintiffs' prosecutions. Both Plaintiffs ultimately confessed to the murder of Collazo out of fear that the other one was securing a deal, not due to any coercion on the part of detectives. No action by any of the Individual City Defendants would cause an average member of society to exclaim, "Outrageous!" upon hearing about the conduct. *Doe v. Calumet City*, 641 N.E.2d 498, 507 (1994) (citations omitted). Thus, Plaintiffs' IIED claims must be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants Robert Bartik, John Zalatoris, James Breen, Edward Winstead, Joseph Struck, Michael Kennedy, Matthew Schmitz, Brian Skora, Joseph Aguirre, Leonard Rolston, and Robert Girardi respectfully request that this Honorable Court grant their partial motion for summary judgment, grant the specific relief requested earlier in this memorandum, and grant any additional relief that this Court deems appropriate.

Dated: June 16, 2023                      Respectfully submitted,

                                          */s/ Natalie Y. Adeeyo*
                                          Special Assistant Corporation Counsel
                                          Shneur Nathan, Avi Kamionski,
                                          Natalie Adeeyo & Breana Brill
                                          Nathan & Kamionski LLP
                                          33 West Monroe, Suite 1830
                                          Chicago, IL 60603
                                          (312) 957-6639

                                          *Attorneys for Individual City Defendants*

## CERTIFICATE OF SERVICE

I, Natalie Adeeyo, hereby certify that I have caused true and correct copies of the above and foregoing motion to be served on all counsel of record via the Court's CM/ECF system, which sent electronic notification of the filing on the same day to all counsel of record.

*/s/ Natalie Y. Adeeyo*

Shneur Nathan, Avi Kamionski,
Natalie Adeeyo & Breana Brill
Special Assistants Corporation Counsel
Nathan & Kamionski LLP
33 West Monroe, Suite 1830
Chicago, IL 60603
(312) 957-6639
*Attorneys for Individual City Defendants*