**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JOHN FULTON, | ) | Case No. 20-cv-3118 |
| | ) | |
| *Plaintiff,* | ) | Hon. Joan H. Lefkow |
| | ) | District Judge |
| *v.* | ) | |
| | ) | Hon. Maria Valdez |
| LEONARD ROLSTON, *et al.* | ) | Magistrate Judge |
| | ) | |
| *Defendants.* | ) | JURY TRIAL DEMANDED |

| | | |
|---|---|---|
| ANTHONY MITCHELL, | ) | Case No. 20-cv-3119 |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | [Consolidated with *Fulton v. Bartik* |
| *v.* | ) | for pre-trial purposes] |
| | ) | |
| LEONARD ROLSTON, *et al.* | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants.* | ) | |

---

**PLAINTIFFS' CONSOLIDATED RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Arthur Loevy
Jon Loevy
Russell Ainsworth
Julia Rickert
Sam Heppell
Alyssa Martinez
LOEVY & LOEVY
311 N. Aberdeen Street
Chicago, IL 60607
T: 312-243-5900
F: 312-243-5902
julia@loevy.com

Andrea D. Lyon
LYON LAW
53 W. Jackson Blvd., Ste. 1650
Chicago, IL 60604
T: 312-877-5543
F: 312-663-3707
andrea@andrealyon.com

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................................ ii

Introduction ............................................................................................................................. 1

Defendants' Local Rule 56.1 Violations ................................................................................ 2

Summary of Facts ................................................................................................................... 4

Argument ................................................................................................................................ 7

   I.   The Police Officer Defendants are not entitled to summary judgment. ............................ 7

     A.   The Police Officer Defendants fabricated evidence used to deprive Plaintiffs of their liberty. ................................................................................................................................ 7

     B.   Plaintiffs' deprivation of liberty claims must proceed to trial against the Police Officer Defendants. ..................................................................................................................... 18

     C.   Plaintiffs' malicious prosecution claims must be tried to a jury. ................................. 26

     D.   Defendants conspired to violate Plaintiffs' rights under state and federal law. ............. 30

     E.   Defendants Bartik, Winstead, and Franko failed to intervene to prevent the violations of Plaintiffs' rights. ............................................................................................................ 34

     F.   Defendants are liable for intentionally inflicting emotional distress on Plaintiffs. ......... 35

   II.   Because Plaintiffs' claims against the Police Officer Defendants survive, Defendant City of Chicago is not entitled to summary judgment. ...................................................................... 36

   III.   The County Defendants are not entitled to summary judgment on the basis of any immunity. ................................................................................................................................ 37

     A.   Defendants Judge and Varga acted as investigators, not prosecutors. ........................... 37

     B.   Defendants Judge and Varga are not entitled to absolute prosecutorial immunity. ....... 39

     C.   None of Plaintiffs' claims arise solely from the courtroom testimony of any Defendant, so the absolute testimonial immunity is inapplicable. ........................................................... 45

     D.   The County Defendants are not entitled to qualified immunity. .................................... 46

     E.   The County Defendants are not entitled to sovereign immunity. ................................... 50

   IV.   Genuine disputes of material fact preclude summary judgment on Plaintiffs' substantive claims against the County Defendants. ....................................................................................... 52

     A.   Plaintiffs' claims against Defendants Judge and Varga must be decided by a jury. ....... 52

     B.   Plaintiffs' claims against Defendant Shepherd must be decided by a jury. ................... 67

   V.   Defendant Cook County is not entitled to summary judgment on indemnification because Plaintiffs' claims against the County Defendants survive. ......................................................... 70

Conclusion .............................................................................................................................. 70

## **TABLE OF AUTHORITIES**

**Cases**

*Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30 (1997) ........................................ 27, 29

*Alexander v. DeAngelo*, 329 F.3d 912 (7th Cir. 2003) ................................................ 54

*Alexander v. United States*, 721 F.3d 418 (7th Cir. 2013) ........................................ 20, 21, 24

*Amundsen v. Chicago Park Dist.*, 218 F.3d 712 (7th Cir. 2000) .................................... 65

*Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) ........................................ 7

*Andrews v. Burge*, 660 F. Supp. 2d 868 (N.D. Ill. 2009) ............................................ 43

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) .......................................... 10

*Barrera v. Young*, 794 F.2d 1264 (7th Cir. 1986) .................................................. 55

*Beaman v. Freesmeyer*, 2021 IL 125617 ......................................................... 21, 26

*Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015) .............................................. 31, 34

*Beck v. Ohio*, 379 U.S. 89 (1964) ............................................................ 19, 20, 24

*Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir. 1984) ........................................ 65

*Betker v. Gomez*, 692 F.3d 854 (7th Cir. 2012) ................................................. 25

*BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986) ................................................. 19

*Bio–Medical Laboratories, Inc. v. Trainor*, 68 Ill.2d 540 (1977) ................................ 51

*Blackburn v. Alabama*, 361 U.S. 199 (1960) .................................................... 53

*Bonds v. Fizer*, 2014 IL App (1st) 123601-U .................................................. 29

*Booker v. Ward*, 94 F.3d 1052 (7th Cir. 1996) ................................................. 19

*Brady v. Maryland,* 373 U.S. 83 (1963) ...................................................... 49

*Branion v. Gramly,* 855 F.2d 1256 (7th Cir. 1988) ............................................. 34

*Brown v. City of Chicago*, 633 F. Supp. 3d 1122 (N.D. Ill. 2022) ............................... 58

*Brunson v. Murray*, 843 F.3d 698 (7th Cir. 2016) ............................................. 43

*Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) ................................................. 40

*Burns v. Reed*, 500 U.S. 478 (1991) ........................................................ 39

*Byrd v. Brishke,* 466 F.2d 6 (7th Cir. 1972) .................................................. 47

*Cairel v. Alderden*, 821 F.3d 823 (7th Cir. 2016) ............................................. 66

*Camm v. Faith*, 937 F.3d 1096 (7th Cir. 2019) ................................................ 9

*Carroccia v. Anderson*, 249 F. Supp. 2d 1016 (N.D. Ill. 2003) .................................. 67

*Chatman v. City of Chicago*, 2015 WL 1090965 (N.D. Ill. Mar. 10, 2015) ........................ 47, 62

*Chavez v. Martinez*, 538 U.S. 760 (2003) ..................................................... 52

*Chelios v. Heavener,* 520 F.3d 678 (7th Cir. 2008) ............................................ 23

*Coleman v. Peoria*, 925 F.3d 336 (7th Cir. 2019) ............................................. 24

*Feldman v. Ho*, 171 F.3d 494 (7th Cir. 1999) ................................................. 51

*Fields v. City of Chicago*, 2014 WL 477394 (N.D. Ill. Feb. 6, 2014) ............................ 28

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ........................................ passim

*Fikes v. Alabama*, 352 U.S. 191 (1957) ...................................................... 55

*Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010) ................................................. 19, 20, 24, 36

*Franks v. Delaware*, 438 U.S. 154 (1978) .................................................... 20, 24

*Fulton v. Bartik*, 547 F. Supp. 3d 799 (N.D. Ill. 2021) ................................... passim

*Gilbert v. Merchant*, 488 F.3d 780 (7th Cir. 2007) ........................................... 53

*Gossmeyer v. McDonald*, 128 F.3d 481 (7th Cir. 1997) ........................................ 51

*Goudy v. Cummings*, 922 F.3d 834 (7th Cir. 2019) ............................................ 9

*Gray v. City of Chicago*, 2022 WL 910601 (N.D. Ill. Mar. 29, 2022) ................................... 47, 58

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir. 2006)................................................... 14

*Halsey v. Pfeiffer*, 750 F.3d 273, 289 (3d Cir. 2014)................................................................ 14

*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979) ....................................................... 31, 64, 66

*Harris v. City of Chicago*, 2015 WL 5445012 (N.D. Ill. Sept. 15, 2015) ............................. 47, 62

*Harris v. City of Chicago*, 2020 WL 7059445 (N.D. Ill. Dec 2, 2020) ................................... 50

*Harris v. City of Chicago*, 330 F.R.D. 508 (N.D. Ill. 2018)..................................................... 42

*Harris v. New York*, 401 U.S. 222 (1971).................................................................................. 17

*Harris v. United States*, 2017 WL 770969 (N.D. Ill. Feb. 28, 2017) ...................................... 28

*Hart v. Mannina*, 798 F.3d 578 (7th Cir. 2015)....................................................................... 19

*Healy v. Vaupel*, 133 Ill. 2d 295 (1990)................................................................................... 51

*Henry v. Ramos*, 1997 WL 610781 (N.D. Ill., Sept. 28, 1997).......................................... 36, 66, 70

*Herhold v. City of Chicago*, 723 F. Supp. 20 (N.D. Ill. 1989)................................................. 34

*Hill v. Coppleson*, 627 F.3d 601 (7th Cir. 2010) ................................................................. 40, 42

*Holder v. Ivanjack*, 39 F. Supp. 2d 965 (N.D. Ill. 1999) ........................................................ 66

*Hope v. Pelzer*, 536 U.S. 730 (2002) ........................................................................................ 48

*Hostrop v. Bd. of Junior College Dist.* No. 515, 523 F.2d 569 (7th Cir. 1975).......................... 64

*Hunt v. Jaglowski*, 926 F.2d 689 (7th Cir. 1991)..................................................................... 43

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) ............................................................. 13, 14, 16, 59

*Jackson v. Curry*, 888 F.3d 259 (7th Cir. 2018) ...................................................................... 52

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) .................................................... passim

*Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013)........................................................................ 14

*Kitchen v. Burge*, 781 F. Supp. 2d 721 (N.D. Ill. 2011) .......................................................... 45

*Koh v. Graf,* 3007 F. Supp. 3d 827 (N.D. Ill. 2018) ................................................................ 24

*Kuri v. City of Chicago*, 2017 WL 4882338 (N.D. Ill Oct. 30, 2017) ...................................... 20

*Kyles v. Whitley*, 514 U.S. 419, 433 (1995).............................................................................. 63

*Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011).................................................................. 20, 24

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) ........................................................... 24

*Lewis v. Mills*, 677 F.3d 324 (7th Cir. 2012) ........................................................................... 39

*Liggins v. City of Chicago*, 2021 WL 2894167 (N.D. Ill. July 9, 2021)................................... 50

*Logan v. Caterpillar, Inc.*, 246 F.3d 912 (7th Cir. 2001) ........................................................ 28

*Lovelace v. Gibson*, 2020 WL 6049901 (C.D. Ill. Oct. 13, 2020) ........................................... 62

*Mack v. City of Chicago*, 2023 WL 4744791 (N.D. Ill. July 25, 2023).................................... 58

*Maxwell v. Indianapolis*, 998 F.2d 431 (7th Cir. 1993)...................................................... 19, 23

*McClure v. Owens Corning Fiberglass Corp.,* 188 Ill. 2d 102 (1999) ..................................... 31

*McComas v. Brickley,* 673 F.3d 722 (7th Cir. 2012) ................................................................ 25

*McCottrell v. White*, 933 F.3d 651 (7th Cir. 2019)................................................................... 46

*McCullough v. Hanley*, 2018 WL 3496093 (N.D. Ill. July 20, 2018) ...................................... 62

*Melongo v. Podlasek*, 2019 WL 1254913 (N.D. Ill. Mar. 19, 2019) ....................................... 39

*Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325 (1960)........................................................ 34

*Moline Tool Co. v. Department of Revenue*, 410 Ill. 35 (1951) ................................................ 51

*Montes v. DiSantis*, 2005 WL 1126556 (N.D.Ill. May 10, 2005)............................................ 30

*Mooney v. Holohan*, 294 U.S. 103 (1935) ................................................................................ 49

*Moore v. City of Chicago*, 2011 WL 1231318 (N.D. Ill. 2011)................................................ 67

*Napue v. Illinois*, 360 U.S. 264 (1959) ..................................................................................... 49

*Nesbitt v. Villanueva*, 2012 WL 14350 (N.D. Ill. Jan. 4, 2012).............................................. 61

*Nichol v. Stass*, 735 N.E.2d 582 (2000) ................................................................. 51

*Olson v. Tyler*, 771 F.2d 277 (7th Cir. 1985) ......................................................... 25

*Orange v. Burge*, 2008 WL 4443280 (N.D. Ill. Sept. 29, 2008) ........................... 44

*Ortiz v. City of Chicago*, 656 F.3d 523 (7th Cir. 2011) ........................................ 12

*Padilla v. City of Chicago*, 932 F. Supp. 2d 907 (N.D. Ill. 2013) ........................ 28

*Parker v. Side by Side, Inc.*, 50 F. Supp. 3d 988 (N.D. Ill. 2014) ........................ 66

*Patrick v. City of Chicago*, 2014 WL 7204501 (N.D. Ill. Dec. 17, 2014) ...... 47, 62

*Patrick v. City of Chicago*, 213 F. Supp. 3d 1033 (N.D. Ill. 2016) ...................... 43

*Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020) .................................... 16

*Patrick v. City of Chicago*, 2018 WL 3438942 (N.D. Ill. July 17, 2018) ............. 14

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) ..................................................... 61

*Proffitt v. Ridgway*, 279 F.3d 503 (7th Cir. 2002) ............................................... 64

*Pyle v. Kansas*, 317 U.S. 213 (1942) ..................................................................... 49

*Resendiz v. City of Chicago*, 2017 WL 11569364 (N.D. Ill. Aug. 10, 2017) .... 47, 62

*Richardson v. City of Indianapolis*, 658 F.2d 494 (7th Cir. 1981) ....................... 65

*Richman v. Sheahan*, 270 F.3d 430 (7th Cir. 2001) ......................................... 50, 51

*Rivera v. Lake County*, 974 F. Supp. 2d 1179 (N.D. Ill. 2013) ....................... 47, 62

*Rosario v. City of Chicago*, 2012 WL 1319806 (N.D. Ill. Apr. 17, 2012) ............ 67

*Sanders v. City of Chicago Heights*, 2016 WL 2866097 (N.D. Ill. May 17, 2016) ..... 65

*Santiago v. Lane*, 894 F.2d 218 (7th Cir. 1990) ................................................... 41

*Saunders v. City of Chicago*, 2014 WL 3535723 (N.D. Ill. July 11, 2014) ...... 15, 62

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ....................................... 53, 54, 57

*Schwing v. Miles*, 367 Ill. 436 (1937) ..................................................................... 51

*Senn Park Nursing Center v. Miller*, 104 Ill.2d 169 (1984) .................................. 51

*Serrano v. Guevara*, 2020 WL 3000284 (N.D. Ill. June 4, 2020) ......................... 44

*Smith v. Burge*, 2016 WL 6948387 (N.D. Ill. Nov. 28, 2016) .......................... 47, 62

*Smith v. Burge*, 222 F. Supp. 3d 669 (N.D. Ill. 2016) .............................. 39, 40, 65

*Smith v. Duckworth*, 856 F.2d 909 (7th Cir. 1988) .............................................. 54

*Sornberger v. Knoxville*, 434 F.3d 1006 (7th Cir. 2006) .................................. 19, 55

*Sprosty v. Buchler*, 79 F.3d 635 (7th Cir. 1996) ................................................... 54

*Starks v. City of Waukegan*, 946 F. Supp. 2d 780 (N.D. Ill. 2013) ....................... 35

*Swick v. Liautaud*, 169 Ill. 2d 504 (1996) ............................................................. 27

*Taylor v. City of Chicago*, 2019 WL 4597383 (N.D. Ill. Sept. 23, 2019) ............. 14

*Taylor v. Riojas*, 141 S. Ct. 52 (2020) ................................................................... 48

*Treece v. City of Naperville*, 1998 WL 142391 (N.D. Ill. Mar. 25, 1998) ............ 30

*Tully v. Del Re*, 2002 WL 31175983 (N.D. Ill. Oct. 1, 2002) ................................ 65

*United States v. Bagley,* 473 U.S. 667 (1985) ........................................................ 49

*United States v. Bullock*, 632 F.3d 1004 (7th Cir. 2011) ....................................... 24

*United States v. Caliendo*, 910 F.2d 429 (7th Cir. 1990) ...................................... 64

*United States v. Gillaum*, 372 F.3d 848 (7th Cir. 2004) ....................................... 53

*United States v. Huerta*, 239 F.3d 865 (7th Cir. 2001) ......................................... 53

*United States v. Mancillas*, 580 F.2d 1301 (7th Cir. 1978) ................................... 64

*United States v. Montgomery*, 555 F.3d 623 (7th Cir. 2009) ................................ 54

*United States v. Nichols*, 847 F.3d 851 (7th Cir. 2007) ........................................ 54

*United States v. Shah*, 2022 WL 17251276 (N.D. Ill. Nov. 28, 2022) .................. 53

*United States v. Vallar*, 635 F.3d 271 (7th Cir. 2011) .......................................... 53

*United States v. Villalpando*, 588 F.3d 1124 (7th Cir. 2009) .................................................. 54, 55

*United States v. Williams*, 627 F.3d 247 (7th Cir. 2010).......................................................... 24, 25

*Van de Kamp v. Goldstein*, 555 U.S. 335 (2009).......................................................................... 40

*Velez v. City of Chicago*, 2023 WL 6388231 (N.D. Ill. Sept. 30, 2023) ..................................... 66

*Viilo v. Eyre*, 547 F.3d 707 (7th Cir. 2008) ................................................................................. 46

*Walder v. United States*, 347 U.S. 62 (1954).............................................................................. 17

*Walker v. White*, 2021 WL 1058096 (N.D. Ill. Mar. 19, 2021) .................................................. 50

*Washington v. Boudreau*, 2022 WL 4599708 (N.D. Ill. Sept. 30, 2022)..................................... 67

*Weidner v. Thieret*, 866 F.2d 958 (7th Cir. 1989)........................................................................ 55

*White Eagle Cooperative Ass'n v. Conner*, 553 F.3d 467 (7th Cir. 2009) ................................. 26

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)........................................... 14, 16, 39, 49

*Williams v. City of Chicago*, 773 F.3d 749 (7th Cir. 2013) ................................................. 19, 21

*Wilson v. Burge*, 2023 WL 2750946 (N.D. Ill. Mar. 31, 2023) ................................................... 43

*Withrow v. Williams*, 507 U.S. 680 (1993)................................................................................... 53

*Xie v. City of Chicago*, 2016 WL 6193981 (N.D. Ill. Oct. 24, 2016) .......................................... 65

*Ziarko v. Soo Line R. Co.*, 161 Ill. 2d 267 (1994)........................................................................ 26

**Rules**

Fed. R. Evid. 804 ........................................................................................................................... 29

## INTRODUCTION

Plaintiffs John Fulton and Anthony Mitchell (collectively "Plaintiffs") were not involved in any way with the March 2003 murder of Christopher Collazo. Although Defendants never had any legitimate evidence to the contrary, they used threats, violence, and false promises of leniency to coerce Plaintiffs into confessing to that crime. Defendants also fabricated additional witness statements and created false reports to implicate Plaintiffs. As a result, Plaintiffs were held and prosecuted for murder without probable cause. They were convicted based on the evidence Defendants manufactured and served 16 years in prison before a court vacated their convictions and the State dropped the charges against them.

The Police Officer Defendants move for partial summary judgment. The flaw in these Defendants' Motion is that they repeatedly provide the Court with their version of the facts and then claim victory. Of course, at summary judgment, the Defendants must construe all disputed facts in Plaintiffs' favor, and accept all inferences drawn therefrom. That standard is fatal to these Defendants' efforts to obtain summary judgment on Plaintiffs' claims for fabrication of evidence; deprivation of liberty; failure to intervene; malicious prosecution; conspiracy, and intentional infliction of emotional distress. Because the Police Officer Defendants are not entitled to summary judgment, the City's derivative motion for summary judgment fails too.

As to the County Defendants, they, too, ignore their role in fabricating and coercing false statements from Mr. Fulton and his former co-defendant, a 15-year-old boy named Antonio Shaw. Because Judge and Varga were acting as investigators, and were complicit in the misconduct that procured the false inculpatory statements from Fulton and Shaw, they are neither immune from liability nor able to win summary judgment on the merits. As for Shepherd, he fabricated false evidence to break Fulton's alibi, depriving both Plaintiffs of a fair trial. The

claims against the County Defendants must proceed to trial so a jury may determine which competing version is correct.[1]

## <u>DEFENDANTS' LOCAL RULE 56.1 VIOLATIONS</u>

This district has seen a troubling trend in wrongful conviction lawsuits. Parties are filing progressively larger over-sized briefs accompanied by an ever-greater number of statements of "undisputed" facts backed by mounds of exhibits. The legal issues are no more complex, but the filings grow exponentially more massive. The problem stems from moving parties including their own competing version of the facts despite obvious factual disputes that would otherwise defeat summary judgment.

As but one glaring example, the Police Officer Defendants assert that Mr. Fulton confessed to Defendant Bartik. Dkt. 203 ¶¶ 78-80.[2] Of course, Defendants have known since long before the filing of this lawsuit that Mr. Fulton vigorously disputes ever inculpating himself to Defendant Bartik. PSOF ¶ 72. The Police Officer Defendants continue this trend throughout their facts, averring that it is undisputed that Griffin implicated Plaintiffs of her own volition, when she has testified since before the criminal trial in 2006 that she was coerced and fed the information by the Defendants. Dkt. 203 at ¶¶ 29-30; PSOF ¶¶ 21-24. And the Police Officer Defendants claim that Mr. Fulton confessed to Defendants Breen and Zalatoris, despite it being obvious through Mr. Fulton's testimony for decades that he alleged the Defendants fed the

---

[1]    Plaintiffs do not oppose the dismissal of Defendants Cervenka, Kennedy, Schmitz, Skora, and Aguirre from this case. Plaintiffs do not oppose the grant of summary judgment to Defendants Bartik, Rolston, and Winstead on Count I. Plaintiffs also do not oppose the grant of summary judgment to Defendant Rolston on Count II. Plaintiffs do not oppose the grant of summary judgment to all Defendants other than Defendant Shepherd on Count IV. Plaintiffs also do not oppose the grant of summary judgment to Defendant Shepherd on Counts VI, VII, and XI.

[2]    For ease of reference Plaintiffs cite to the docket numbers of the filings on the Fulton docket. Corresponding versions of the documents referenced in this motion appear on the Mitchell docket, with a docket number four numbers higher than the cited Fulton docket number.

confession to him. Dkt. 203 at ¶¶ 83-90; PSOF ¶¶ 50-52.[3]

As this Court well knows, unnecessarily inflating the summary judgment record forces the Court to wade through disputed facts to determine which facts are actually at issue and dispositive of the parties' legal disputes. Local Rule 56.1 is intended to achieve the exact opposite result. The parties are supposed to winnow the issues until the Court is left with the undisputed record.

The Court is not powerless in the face of this problem. This Court has the inherent power to manage its docket, and it can vigorously enforce Local Rule 56.1 by denying the Police Officer Defendants' Motion, relying instead on Rule 50 as a device to ensure that all of Plaintiffs' claims are properly supported by evidence at trial. Such an approach is particularly appropriate here, where Defendants only seek partial summary judgment, and concede that a trial is necessary regardless of the outcome of their Motion. Absent meaningful enforcement of Local Rule 56.1, summary judgment filings will continue to grow increasingly voluminous until each motion consumes more resources than a trial. Accordingly, Plaintiffs request that this Court deny the Police Officers Defendants' Motion for Summary Judgment.

---

[3]     When questioned about the inclusion of Fulton's disputed confession to Bartik, defense counsel responded by stating:

> The disputed facts you've identified at paragraphs 78-81 are not facts that will affect the outcome of Plaintiffs' suit. Fulton's confession to Bartik has no effect on Mitchell's case. Additionally, if Fulton contends that his confession to Bartik never occurred, then these facts have no bearing on Fulton's coerced confession claim as explained in our motion.

Ex. 85 (email exchange between the parties). Defense counsel's response provides no justification for including disputed facts in Defendants' statement of undisputed facts and admits that the facts are disputed and thus incapable of winning summary judgment.

## SUMMARY OF FACTS

The events at issue arise from the murder of Christopher Collazo during the night of March 9, 2003. Collazo's body was found burning in an alley at approximately 3 a.m. on March 10. PSOF ¶ 2. Collazo's body had been encased in a plastic bag or bags, and he had been gagged with his own sock. *Id*. ¶ 5.

Police investigators initially focused on Marcus Marinelli, the victim's friend, who had been with him the night of the murder. *Id*. ¶ 10. Police handcuffed Marinelli and took him into custody, telling his mother he had killed his friend. *Id*. ¶ 12. Marinelli disclaimed any knowledge of the murder but told police that he and the victim had robbed Mr. Fulton some weeks earlier. *Id*. ¶ 13. Marinelli directed police to Johnnita Griffin, who had put Marinelli and the victim in touch with John Fulton. *Id*. ¶ 13. When police first interviewed Griffin, she truthfully reported that she had no knowledge about the murder.

Undeterred, Defendants Rolston, Breen, and Zalatoris returned to 17-year-old Griffin's home at 11 p.m. on March 13. *Id*. ¶ 20. Without her consent, they drove her half an hour away to Area 1 and then held her through the night. *Id*. At the station, Defendants Zalatoris and Breen told Griffin that she set Collazo up to be assaulted; they refused to allow her access to an attorney; they threatened her that she would be charged with murder unless she went along with their false story. *Id*. The false story was that on March 9, Griffin had called Mr. Fulton and provided him with information so that Mr. Fulton could assault the victim. *Id*. At 9:45 a.m. the following morning, Griffin finally succumbed to the pressure and repeated the Defendants' false story. *Id*. ¶ 21.

The story was not true—neither Griffin nor Plaintiffs had anything to do with the murder—but Defendant Rolston nonetheless arrested 18-year-old Mr. Fulton at 5:30 a.m. on

March 18. *Id*. ¶ 22. Defendants Zalatoris and Breen then fed Mr. Fulton their false story: that he and 17-year-old Mr. Mitchell and their teenaged friend Shaw used information provided by Griffin to intercept, abduct, and murder Collazo. *Id*. ¶¶ 21-22. To make the confession believable, Defendants Zalatoris and Breen drove Mr. Fulton around the city to familiarize him with various locations, including where on the North side they supposedly beat the victim, and the alley on the south side where Collazo's body was eventually found. *Id*. ¶ 84.

After rehearsing what he was supposed to tell the felony review state's attorney, Mr. Fulton finally falsely confessed for the first time in the presence of Defendant Judge. *Id*. ¶ 52. Mr. Fulton then asked to speak to Defendant Judge alone, and revealed to him that his confession was false, that it had been provided to him by the police, and that he had an alibi for the night of the murder. *Id*. ¶ 53. In fact, Mr. Fulton had been at the hospital with his girlfriend, who was there seeking treatment. *Id*. ¶ 37. Surveillance video from the hospital and Mr. Fulton's apartment documented Mr. Fulton's time at the hospital and his return home with his girlfriend just before midnight. *Id*. ¶¶ 55, 122-26.

Defendant Judge, working in concert with the police, documented Mr. Fulton's false confession, but he did not document or report Fulton's recantation or his alibi. *Id*. ¶ 55. After Mr. Fulton recanted, Defendant Judge watched Defendants Zalatoris and Breen roughly pull Mr. Fulton out of the room and bring him to another room, where these detectives assaulted him. *Id*. ¶ 58.

Thereafter, Defendants Struck and Girardi entered the picture and told Mr. Fulton that he could go home if he convinced the prosecutor that his story about abducting Collazo was real. *Id*. ¶ 50. After being in custody since 5:30 a.m. on March 18, Mr. Fulton finally agreed on March 21 to falsely implicate himself, and he then repeated the Defendants' story to ASA Rubinstein. *Id*.

¶¶ 68-70. To ensure that Mr. Fulton's alibi did not get in the way of charges against Plaintiffs, Defendant Winstead fabricated an account from Yolanda Henderson, Mr. Fulton's girlfriend, that Mr. Fulton dropped her off at their apartment and did not come home with her. *Id*. ¶¶ 131-32. This account was false, spun from whole cloth, but Defendant Winstead documented it in a police report. *Id*. ¶ 132.

Meanwhile, Defendants Zalatoris and Breen arrested Mr. Mitchell with guns drawn. *Id*. ¶ 76. They used physical force against him and coerced him to repeat the same inculpatory story that Mr. Fulton had been forced to adopt. *Id*. ¶ 81.

Not finished, Defendants Zalatoris and Breen also coerced 15-year-old Shaw to implicate Plaintiffs with the same false narrative. *Id*. ¶¶ 91-116. In the presence of Defendant ASA Varga and Defendant Youth Officer Franko, these Defendants fed Shaw facts that he eventually agreed to regurgitate, falsely stating that he and Plaintiffs had abducted the victim, beaten him, and set his body on fire. *Id*. ¶¶ 96-97, 112, 114; Dkt. 224 ¶¶ 162-164.

Despite the interlocking nature of the confessions, the statements contradicted each other and the evidence on a number of key points. PSOF ¶¶ 117-20. The murder weapon supposedly a baseball bat, which is inconsistent with the pathologist's findings of what caused the victim's death. PSOF ¶¶ 5, 119. The confessions differed about when the victim was placed in a human-sized plastic bag, and where the plastic bag originated. *Id*. ¶¶ 117-18. Despite the body being blood-soaked, no blood or other forensic evidence was found in Mr. Fulton's car, which was supposedly used to transport the victim. *Id*. ¶¶ 3, 133-34. And phone records directly contradicted the various accounts. *Id.* ¶ 30

These inconsistencies, along with the objective video evidence supporting Mr. Fulton's alibi, presented a barrier to Plaintiffs' prosecution. Thus, two years later, Defendant Bartik

decided to bolster the case by claiming that Mr. Fulton had also confessed to him. *Id*. ¶ 72. Bartik's story was false (*id*. ¶ 73.), but this fabricated evidence that Mr. Fulton had confessed to yet another person was damning. Additionally, in order to poke a hole in Mr. Fulton's otherwise rock-solid alibi, Defendant Shepherd fabricated the false narrative that there was no security camera covering the back doors of Fulton's apartment building, although his visit to the apartment confirmed the opposite. *Id.* ¶¶ 135-40. Prosecutors latched onto this fabricated evidence with devastating effect in closing arguments, suggesting Mr. Fulton's alibi should be discounted because he could have snuck out the back door of his apartment without being caught on camera. *Id.* ¶ 141.

    As a result of this misconduct, Plaintiffs were convicted of Collazo's murder in 2005 and sentenced to 31 years in prison. Dkt. 203 ¶ 202. After spending more than 16 years behind bars, Plaintiffs were finally set free when their convictions were vacated and charges against them dismissed in 2019. *Id.* ¶¶ 207-08.

## ARGUMENT

**I.    The Police Officer Defendants are not entitled to summary judgment.**

    **A.    The Police Officer Defendants fabricated evidence used to deprive Plaintiffs of their liberty.**

    The Police Officer Defendants claim that Plaintiffs cannot proceed on their fabrication of evidence claims because no evidence establishes that these Defendants knew they were fabricating false evidence. Dkt. 202 at 48-56. Defendants' argument relies entirely on crediting Defendants' version of events, which Plaintiffs dispute. To prevail on these claims, Plaintiffs must show that Defendants: (1) "'created evidence that they knew to be false,'" and, (2) that the evidence was used "'in some way'" to deprive Plaintiff of liberty. *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 80 (7th Cir.

2012); *Petty v. City of Chicago*, 754 F.3d 416, 421-22 (7th Cir. 2014)).The record, taken in the light most favorable to Plaintiffs, establishes that Defendants invented a false story and fed it to Plaintiffs, Shaw, and Griffin. A jury is thus needed to adjudicate Plaintiffs' fabrication claims.

### 1. The Police Officer Defendants are liable for fabricating Griffin's false statements.

Johnitta Griffin was just 17 years old when police officers abducted outside her home at 11 p.m. on March 13, 2003. PSOF ¶¶ 16, 21. Defendants Rolston, Breen, and Zalatoris brought her to the police station, and once there, Breen and Zalatoris coerced her through the night to adopt a fabricated story. *Id*. ¶¶ 22-23. According to that story, Griffin had told Mr. Fulton on March 9 where to find Collazo to assault him, what bus Collazo would be taking, and that he could be intercepted exiting the bus at about 9:30 p.m. *Id*. The story was not true, and it did not come from Griffin, but Griffin felt she had to tell the story because she had been threatened with murder charges and promised that everything would be okay if she went along with what the police wanted. *Id*. Eventually, at 9:45 a.m. on March 14, after being at the station all night, Griffin told the made-up story to a felony review ASA, and falsely implicated Plaintiffs in the murder. *Id*. ¶ 25.

On these facts, Defendants Zalatoris and Breen are liable for fabricating Griffin's statement. The statement did not come from Griffin, so Defendants cannot claim they did not know her statement was false; it was not Griffin's statement to begin with. *Id*. ¶¶ 18-27; Dkt. 202 at 49-50 (claiming that the Defendants did not know Griffin's statement was false). If police make up a story, kidnap a 17-year-old girl, and hold her at the police station all night, threatening to charge her with murder until she agrees to implicate Plaintiffs, they are liable for fabricating evidence.

It is true, as Defendants contend, that simply yelling at a witness and threatening the

witness might not amount to fabrication. Dkt. 202 at 51-52. But that is not what Plaintiffs contend here. Rather, the evidence supports that Defendants fed a false story to a 17 year-old girl while holding her incommunicado until they could convince her to regurgitate that false narrative. It is the concocting of the story (and getting the witness to repeat it) that supports a due process claim for fabricating evidence.[4]

A jury may or may not credit these facts at trial. But at summary judgment, they must be credited, and so there is no possibility that Defendants can prove as a matter of law that they did not fabricate Griffin's statement.

### 2. Once this Court determines evidence has been fabricated, it need not assess every possible theory.

Given that evidence exists from which a jury could find that the Police Officer Defendants fabricated evidence (*see supra* at Arg. I.A.1, regarding their fabrication of Griffin's statements), this Court need not consider every possible item of evidence piecemeal to determine if Plaintiffs' due process claims should advance to trial. *See Goudy v. Cummings*, 922 F.3d 834, 838-44 (7th Cir. 2019) (suppressed or fabricated evidence is assessed cumulatively, not piece-by-piece, and a court need not evaluate every piece of such evidence to decide genuine disputes require a trial); *Camm v. Faith*, 937 F.3d 1096, 1108-09 (7th Cir. 2019). A factual dispute on any of Plaintiffs' due process theories requires a trial. In short, Defendants fall far short of their burden to show summary judgment is warranted on the fair trial claims, and this Court need not parse every theory—particularly those not addressed by Defendants—to deny their motion. This Court can end its analysis here and move Plaintiffs' due process claims to trial.

---

[4]     Defendants suggest that because Griffin was truthful in her March 11 interview (when she did not implicate Plaintiffs), they somehow did not know the false story they fed to Griffin was false. Dkt. 202 at 50. This argument hardly merits a response. Simply because a witness is truthful about non-inculpatory facts does not insulate Defendants from liability for feeding false inculpatory facts to the same witness.

Nonetheless, out of an abundance of caution, Plaintiffs discuss the evidence supporting additional due process theories which they are entitled to present to a jury.

### 3. The Police Officer Defendants are liable for fabricating Plaintiffs' confessions because they cannot demonstrate as a matter of law that they did not know the confessions were false.

The Police Officer Defendants do not contest that, for purposes of summary judgment, sufficient evidence is in the record to support Plaintiffs' claims that their confessions were coerced. And an officer who coerces a confession is indisputably liable for fabricating false evidence, provided that the officer knew the confession was false. *See Avery v. City of Milwaukee*, 847 F.3d 433, 440 (7th Cir. 2017). Thus, to obtain summary judgment on Plaintiffs' fabrication claims relating to the confessions, Defendants must prove as a matter of law that no reasonable fact-finder could determine they knew the confessions were false. Because there is extensive record evidence that Defendants knowingly fed a false story to Plaintiffs, their argument fails.

The evidence construed in the light most favorable to Plaintiffs shows that Mr. Fulton repeatedly told the detectives that he was innocent. PSOF ¶¶ 40, 42, 60. Mr. Fulton did not confess until he was with Defendant Judge, which occurred shortly before 5 a.m. on March 19. *Id.* ¶ 52. Between the time of Mr. Fulton's arrest and the time he eventually gave in to the police coercion and gave a false confession, the detectives fed him all of the key facts his confession would ultimately contain, driving him around and showing him where the victim supposedly got off the bus and where the victim's body was found. PSOF ¶¶ 45-49. The detectives rehearsed with Mr. Fulton the story he needed to tell Defendant Judge and told Fulton if he told that story he would get to go home. *Id.* ¶ 50. In order to go home, the detectives told him that his story had to match the story Griffin told. *Id.* ¶ 49.

In addition, Defendant Bartik fabricated a confession from Mr. Fulton out of thin air. Dkt.

203 ¶¶ 79-80. This confession was non-existent; Mr. Fulton never made an inculpatory statement to Defendant Bartik. PSOF ¶ 72. Accordingly, Defendant Bartik cannot claim that he had any basis to believe the statement he wrote was true, and he certainly cannot claim he was unaware that Fulton never made a statement to him.

Based on the record which must be taken as true for purposes of summary judgment, the false confession that Mr. Fulton ultimately provided under coercion was concocted by the Defendant Police Officers; it did not come from Mr. Fulton. A fair inference from this record is that the Defendant Police Officers knew the story was false; after all, they invented the story with no basis to believe it was true, and coerced Mr. Fulton to tell the story despite his claimed innocence and alibi. PSOF ¶¶ 36-51. Summary judgment is not available to Defendants on this record.

Similarly, Mr. Mitchell repeatedly told the detectives that he had no involvement in the murder. *Id.* ¶¶ 75, 80. Detectives nonetheless showed him a statement attributed to Mr. Fulton containing facts about the murder. *Id.* ¶ 78. As they had with Mr. Fulton, the Detectives drove Mr. Mitchell around the city, telling him details about the case and trying to get him to repeat the statement they had previously shown him. *Id.* ¶¶ 84-85. The Detectives told Mr. Mitchell that they knew he did not have any involvement in the crime, but that he needed to cooperate in order to go home. *Id.* ¶¶ 86-89. The Detectives told Mr. Mitchell that he could go home if he gave a statement repeating the facts that they showed him in the written statement. *Id.* ¶ 86. The Detectives coached Mr. Mitchell about which facts to include in his confession. *Id.* ¶ 90. The Detectives fed Mr. Mitchell facts, including that Mr. Fulton told him where Collazo would be getting off the bus; where they each sat in the car; that Griffin guided them to Foster and Rockwell over the phone; that Mr. Mitchell, Mr. Fulton, and Shaw all hit the victim; that

Mr. Fulton used an aluminum bat to beat the victim while Mr. Mitchell and Shaw were kicking the victim; that they placed the victim in the trunk of the car and drove to a Citgo gas station; that they planned to set the body on fire, and bought a gas can as part of the plan; and that they eventually set the body on fire at an alley near 52nd and Peoria Street. DSOF ¶148.

In sum, both Plaintiffs repeatedly told the Defendants that they were innocent; Defendants nevertheless fed Plaintiffs a story to tell the prosecutor, rehearsing with and coaching the Plaintiffs in order to make the Plaintiffs' rendition believable. Defendants may contend that they did not know that the story they fed to Plaintiffs was false, but "a jury would not be required to believe this account." *Ortiz v. City of Chicago*, 656 F.3d 523, 532 (7th Cir. 2011). And at summary judgment. Defendants can only prevail if no reasonable juror could find that they knew Plaintiffs' confessions were false.

Defendants point out that, after Plaintiffs agreed to confess, they made up some additional facts that made their way into the confessions. Dkt. 202 at 53-56. Defendants contend that, therefore, the confessions were not fabricated. *Id*. Defendants' argument is a non-starter.

First, any contention that the confessions were not fabricated is precluded by Plaintiffs' testimony that the confessions were false and fed to them by Defendants. At summary judgment, all disputed facts must be resolved in Plaintiffs' favor.

Second, the fact that Plaintiffs added facts to the confessions after Defendants fed them the bones of the story does not in any way detract from the fact that Defendants fabricated the confessions. Defendants' argument simply ignores that they fed Plaintiffs details about the confessions before Plaintiffs ever agreed to provide any details about the crime. Given that the element in dispute is whether Defendants knew that Plaintiffs confessions were false, the operative time period is what Defendants knew when they were concocting the confessions.

Third, Defendants argument fails as a logical matter. As detailed above, the record supports Plaintiffs' contention that Defendants knew that the basics of the confessions were false. Thus, Defendants must also have known that—whatever embellishing details Plaintiffs offered in an effort to comply with Defendants' demands that they tell a convincing story—those details were necessarily false as well. If one knows that it is false that a toddler went on a field trip to the moon yesterday, one also knows that it is false when she earnestly states she ate ice cream there. Later added facts by Plaintiffs to flesh out the story, regardless of how detailed or consistent with the underlying fabricated narrative, do nothing to make it more plausible that Defendants believed that the confessions were true. Especially when, as here, none of Plaintiffs' embellishments were ever corroborated.

### 4. The Police Officer Defendants are liable for fabricating Shaw's and Plaintiffs' statements, regardless of whether the statements were introduced at Plaintiffs' trials.

Defendants claim that Shaw's confession was not used against Plaintiffs at trial and thus it cannot constitute fabricated evidence. Dkt. 202 at 52-53. Defendants make an identical argument concerning the fact that each Plaintiff's confession was not introduced at the other Plaintiff's trial. *Id*. at 53.

The Seventh Circuit has already rejected the argument that evidence needs to be admitted in a proceeding to state a due process fabrication claim. *See Hurt v. Wise*, 880 F.3d 831, 843 (7th Cir. 2018), *partially abrogated on other grounds* by *Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2019). In *Hurt*, the Seventh Circuit recognized that a fabrication claim "can be based on false police reports," and that the due process clause does not require every piece of fabricated evidence be introduced at trial for it to be actionable. 880 F.3d at 844. Instead, if a plaintiff "can show that the fabricated police reports furthered the prosecution, they have done enough." *Id*.

13

Indeed, by recognizing that a fabrication claim can be based upon detention *before* trial, the Seventh Circuit, like others, has long embraced this conclusion. *See id.* ("The Fourteenth Amendment's Due Process Clause is the relevant constitutional source; it forbids the state from depriving a person of liberty (including by pre-trial detention) based on manufactured evidence."); *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("Fields II") ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him."); *Julian v. Hanna*, 732 F.3d 842, 847 (7th Cir. 2013) (fabrications of evidence affect liberty interests both before and after conviction); *Jones v. City of Chicago*, 856 F.2d 985, 993-94 (7th Cir. 1988) (police officers can be liable when they "deliberately supplied misleading information that influenced the decision" of the prosecutor to pursue the case); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 289, 294 n.19 (3d Cir. 2014) (defendant has suffered an injury when fabricated evidence is used to initiate a prosecution or obtain criminal charges); *Gregory v. City of Louisville*, 444 F.3d 725, 741 (6th Cir. 2006) (holding that officer's investigatory notes "were the result of pretrial fabrication efforts by [the officers]," and "comprise[d] part of the documentary record before the prosecution and defense and affected the course of the criminal proceedings independent of any testimony to the notes' contents…. Their very existence, even if not introduced as evidence at trial, affected Plaintiff's criminal prosecution independent of the officers' testimony."); *Patrick v. City of Chicago*, 2018 WL 3438942, at *8 (N.D. Ill. July 17, 2018) (finding "Defendants' contention that the fabricated evidence must be used at trial in order to establish a constitutional violation . . . unpersuasive"). Accordingly, Plaintiffs can prevail on their fabrication claim if the evidence "furthered" their prosecution in some way. *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012); *Taylor v. City of Chicago*, No. 14 C 737, 2019 WL 4597383, at *15 (N.D. Ill. Sept. 23, 2019).

Moreover, courts have specifically held fabricating a co-defendant's confession can form the basis for a fabrication-of-evidence claim. *Saunders v. City of Chicago*, No. 12-CV-09158, 2014 WL 3535723, at *4 (N.D. Ill. July 11, 2014).

Here, crediting Plaintiffs' evidence and drawing inferences in their favor, the Police Officer Defendants fabricated Plaintiffs' and Shaw's confessions, which constituted damning evidence of guilt, though false. The interlocking nature of the (false) confessions made it appear that Plaintiffs' confessions were legitimate, when they were entirely the product of Defendants' coercion and manipulation.

Defendants' position is that it did not violate Mr. Fulton's due process rights for them to fabricate and coerce false inculpatory statement from Mr. Mitchell and from Shaw—and vice versa for Mitchell, with Fulton and Shaw's statements. This is an untenable reading of the due process clause, which guarantees Plaintiffs the right to a fair trial. It is well-established that this fair trial right includes the right to present exculpatory evidence in defense—that is the essence of the *Brady* right, which requires police and prosecutors to make that exculpatory evidence available to you. For Fulton, the testimony of Mitchell and Shaw was exculpatory evidence of the most critical variety—since Fulton's (coerced, false) confession gave a narrative of the crime that included both Mitchell and Shaw, Mitchell and Shaw's testimony at Fulton's trial denying their own involvement in the crime would have been powerful and persuasive evidence of Fulton's innocence. Fulton had a due process right to not have state actors interfere with his ability to present that exculpatory evidence at his trial. But Defendants absolutely interfered with his ability to do so—they rendered Mitchell and Shaw's exculpatory testimony worthless to Fulton by fabricating false confessions for those witnesses too. In light of the fabrication, calling either as a witness would have permitted introduction of their own confessions to impeach their

testimony, which also implicated Fulton—a devastating cross that no competent defense attorney would permit. The same is true for Mitchell's inability to call Fulton and Shaw.

The due process clause unquestionably forbids Defendants from destroying or suppressing exculpatory evidence; by the same token, it forbids them from fabricating false evidence which had the effect of precluding Plaintiffs from calling those exculpatory witnesses at trial. The summary judgment record in this case would permit a reasonable jury to conclude that Defendants fabrication of Shaw's confession and the confession of each co-Plaintiff made the other co-Plaintiff's criminal trial unfair. The fabrication claims on this basis are viable.

Defendants' reliance on *Fields II*, 740 F.3d 1107, and *Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020), is unpersuasive. Dkt. 202 at 53. Those cases simply stand for the non-controversial position that the evidence has to have been used against the plaintiff in some way. *Fields II*, 740 F.3d at 1114 ("For if the evidence hadn't been used against the defendant, he would not have been harmed by it, and without a harm there is, as we noted earlier, no tort."); *Patrick*, 974 F.3d at 834 ("If fabricated evidence is later used at trial to obtain a conviction, the accused may have suffered a violation of his due-process right to a fair trial."). While these cases refer to evidence being admitted against the plaintiff at trial, neither case holds that a plaintiff can only bring a fabrication claim when the fabricated evidence was introduced at trial. The case law set forth in *Hurt* and *Whitlock* unambiguously states that a fabrication of evidence claim is viable when the fabricated evidence is used to deprive the plaintiff of his liberty, regardless of whether it is also introduced against him at trial, which Plaintiffs have demonstrated here. *Hurt*, 880 F.3d at 843; *Whitlock*, 682 F.3d at 582.

As to the argument that "Shaw's statement was suppressed and therefore not available to be used as evidence against Plaintiffs at their criminal trials," Defendants do not support this

contention with a legal basis. While Shaw's statement could not be used against Shaw, it is not at all clear that the statement could not be used to impeach Shaw should he testify at Plaintiffs' trial. In fact, Shaw's suppressed statement could have been used to impeach him had he been prosecuted and taken the stand in his own defense. *Cf. Harris v. New York*, 401 U.S. 222, 225 (1971) (permitting a suppressed statement to be used as impeachment evidence under certain circumstances); *Walder v. United States*, 347 U.S. 62, 65 (1954) ("It is one thing to say that the Government cannot make an affirmative use of evidence unlawfully obtained. It is quite another to say that the defendant can turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths."). Moreover, Shaw's confession occurred before Plaintiffs were charged, and thus it was used to deprive them of their liberty. The suppression ruling necessarily long post-dated that event.

### 5. Defendants Zalatoris, Breen, Struck, and Girardi are each liable for fabricating evidence.

The Police Officer Defendants do not separately argue that they individually lacked knowledge the fabricated statements were false, but such an argument is easily dispatched. Defendants Zalatoris and Breen knowingly fabricated Griffin's inculpatory statements—those statements were fed to her by the Defendants, so they cannot plausibly claim they did not know the statements were false. PSOF ¶¶ 22-24.

Likewise, Defendants Struck and Girardi conspired with the other Defendants to frame Plaintiffs (*see* Arg.I.D., *infra*). They told Mr. Fulton that he needed to tell a story "like it were true" to convince ASA Rubinstein to let him go. PSOF ¶ 64. Theoretically Defendants Struck and Girardi believed the story to be true but were telling Fulton to lie in order to get him to inculpate himself. But that is not what Defendants Struck and Girardi said to Mr. Fulton. They

told him to lie to ASA Rubinstein, and to "stick to the story," in order to go home. *Id*. ¶ 64. Summary judgment is not available on Plaintiffs' fabrication claim against Defendants Zalatoris, Breen, Girardi, or Struck.

### 6. Defendant Winstead is also liable for fabricating evidence casting doubt on Mr. Fulton's alibi.

Finally, Defendant Winstead fabricated a false report that Henderson said Fulton did not come inside with her when she arrived home the night of the murder, and may not have come home at all that night. PSOF ¶¶ 131-32. Henderson maintains that she never made these statements to him, and these statements were demonstrably false. *Id*. ¶ 132.

Defendant Winstead does not argue this statement was not knowingly fabricated, and his implicit admission is appropriate. Based on the summary judgment record, Defendant Winstead concocted an inculpatory statement out of thin air. That false evidence was introduced at trial against both Defendants. *Id*. ¶¶ 15, 131-32. Defendant Winstead's false report that Mr. Fulton did not come home with his alibi witness, Henderson, and may not have been home at all the night of the murder, is another, independently sufficient reason why Plaintiffs' fabrication claims survive and must be decided by a jury.

### B. Plaintiffs' deprivation of liberty claims must proceed to trial against the Police Officer Defendants.

Regarding Plaintiffs' deprivation of liberty claims, the Police Officer Defendants contend that they had probable cause to believe Plaintiffs committed murder, and thus they are not liable and are entitled to qualified immunity. Defendants are wrong. Their reliance on findings of probable cause during the criminal proceedings is misplaced, because it is well established that when fabricated evidence is used to obtain a probable cause finding, police officers cannot use that finding to shield themselves from liability. Because there never was *any* reason to suspect

Plaintiffs of any involvement with Collazo's murder, much less probable cause to do so, Plaintiffs' deprivation of liberty claims must proceed to trial.

### 1. The Police Officer Defendants lacked probable cause.

The Police Officer Defendants focus their attack on Plaintiffs' deprivation of liberty claims on the alleged lack of probable cause. Whether probable cause exists is a quintessential question for the jury. *Williams v. City of Chicago,* 773 F.3d 749, 757 (7th Cir. 2013); *Booker v. Ward*, 94 F.3d 1052, 1057 (7th Cir. 1996); *Maxwell v. Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). The probable cause standard is objective and based on the facts known to the officers. *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). Officers have probable cause when "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). When the facts underlying probable cause are disputed, a jury must decide. *Maxwell*, 998 F.2d at 434; *Williams*, 733 F.3d at 757 (7th Cir. 2013). At summary judgment, this Court should "give the non-moving party the benefit of conflicts in the evidence about what the officers actually knew at the time." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015) (citing *Williams,* 733 F.3d at 756). "The question of probable cause is typically a proper issue if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sornberger v. Knoxville*, 434 F.3d 1006, 1013-14 (7th Cir. 2006) (internal quotation marks omitted).

While officers are allowed "some margin of error" in assessing probable cause, "a police officer evaluating a situation for probable cause must utilize the means at hand to minimize the risk of error." *BeVier v. Hucal,* 806 F.2d 123, 128 (7th Cir. 1986). Thus, where obvious reasons existe to doubt the accuracy of the information reported, and there has been a failure to inform the courts and prosecutors of facts that would negate probable cause, probable cause will not

save a flawed indictment. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Beck*, 379 U.S. at 91; *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013); *Lawson v. Veruchi*, 637 F.3d 699, 704-05 (7th Cir. 2011); *Fox*, 600 F.3d at 833-35 (7th Cir. 2010); *Jones*, 856 F.2d at 995.

It is well-settled that Defendants cannot rely on fabricated evidence and false statements to establish probable cause. *See Alexander*, 721 F.3d at 423 ("Knowingly false statements by the affiant cannot support a finding of probable cause"); *Lawson*, 637 F.3d at 704 (analyzing whether probable cause existed by setting aside purportedly fabricated or manipulated evidence); *Kuri v. City of Chicago*, 2017 WL 4882338, at *7 (N.D. Ill. Oct. 30, 2017) ("Defendants cannot manufacture their own probable cause by fabricating evidence.").

Defendants point to the following facts to support their contention that probable cause existed: 1) Mr. Fulton stated he owned a red hoodie and a black hoodie, and a witness saw people wearing a red shirt and a black shirt running from the scene of the fire; 2) duct tape was found at Mr. Fulton's home; 3) a gas can was found in Mr. Fulton's grandfather's garage; 4) Mr. Fulton, Mr. Mitchell, and Shaw confirmed that they had been robbed by Collazo and that Mr. Fulton was threatened by him; 5) phone records corroborated Mr. Fulton's statements about his conversations with Griffin on March 9 regarding where Collazo could be found; and 6) Mr. Mitchell's confession dovetails with Mr. Fulton's confession. Dkt. 202 at 37-38. Some of these alleged facts are outright false, and the totality of the circumstances, including Mr. Fulton's alibi, cannot provide the Defendants with probable cause to believe that Plaintiffs committed a crime.

To begin, Defendants get their own facts wrong. The witness reported that the people running from the scene were wearing a red jacket and a black jacket, Dkt. 203 ¶ 11, not a red shirt and a black shirt; and not a red hoodie and a black hoodie. More to the point, Mr. Fulton was simply repeating the facts as told to him by the Defendants. Resp. Dkt. 224 ¶ 97. Defendants

cannot rely on their fabrications to establish probable cause. *Alexander*, 721 F.3d at 423. Regardless, even if Mr. Fulton had owned a black jacket and a red jacket (which the evidence does not support), the fact would not move the needle for probable cause, given the ubiquity of red and black jackets in Chicago during early March.

Likewise, the fact that Mr. Fulton owned duct tape or that a gas can was found in his grandfather's garage is meaningless. There is no evidence, for example, that police were able to match Mr. Fulton's particular brand or color of duct tape to the crime scene. And Defendants fail to explain how the fact that Mr. Fulton's relative owned a gas can makes it more likely that Plaintiffs committed murder.

While it is undisputed that there was a rift between Plaintiffs and Collazo, there is no evidence that Plaintiffs took any steps whatsoever to cause harm to Collazo. Evidence of motive, without more, cannot establish probable cause—and even if it could, the idea that Fulton, Mitchell and Shaw chose to commit a horrifyingly brutal murder weeks after Collazo stole $14 from Fulton defies credible belief. *See, e.g.*, *Williams*, 733 F.3d at 756 (7th Cir. 2013) ("mere proximity to suspected criminal activity does not, without more, generate probable cause"); *Beaman v. Freesmeyer*, 2021 IL 125617, ¶¶118-38 (jury must decide absence of probable cause because, although defendants claimed that they reasonably believed that plaintiff was "the only person who had means, motive, and opportunity to commit the crime," many of the facts they relied on were disputed, and, permitted differing inferences that, when construed in plaintiff's favor, supported a lack of probable cause).

Defendants have to reach so far to try to establish probable cause that they misrepresent the evidence. Defendants claim that phone records corroborate Mr. Fulton's false statements that he called Griffin on March 9 and learned about Collazo's whereabouts that evening. Dkt. 202 at

38. That is false. The phone records show zero phone calls between Mr. Fulton and Griffin on March 9, PSOF ¶ 30, and the phone calls on March 8 were all from Griffin to Mr. Fulton (not the other way around) and cumulatively lasted only a couple of minutes. Dkt. 203 ¶174. Defendants cannot rely on phone calls on March 8 to substantiate that Mr. Fulton learned Collazo's whereabouts in a phone call on March 9. The phone records are exculpatory because they constitute objective evidence contradicting the notion that Mr. Fulton learned that Collazo would be taking the Foster bus the evening of March 9, or that Griffin provided directions to Plaintiffs while they drove to the North side to intercept Collazo.

Regarding Mr. Mitchell's confession, as explained above, Plaintiffs' confessions were fabricated by Defendants. The fact that Mr. Mitchell filled in some gaps by stating, for example, the directions they drove to get to the site where the victim was burned (a location fed and shown to him by the police) is hardly inculpatory. Dkt. 203 ¶¶148-49.

Regardless, there were a number of inconsistencies between the confessions that should have alerted the police that the confessions were unreliable. For example, the confessions state that the victim was placed in a human-sized plastic bag either 1) at the scene of the fire; or 2) when they stopped in an alley; or 3) at Foster and Rockwell, where the beating took place. PSOF ¶ 117. The human-sized plastic bag that was placed over the victim came from either 1) purchased at a gas station; or 2) happened to be in Mr. Fulton's trunk; or 3) Mr. Fulton's bowling bag; or 4) had been used to carry dirty laundry. *Id*. ¶ 118. The confessions state that the victim was gagged with a rag from Mr. Fulton's trunk, but the police knew that the victim had been gagged with one of his own socks. *Id*. ¶ 119. The confessions disagree about what kind of baseball bat was used, and the medical examiner says no baseball bat was used at all. *Id.* According to police, Mr. Fulton and Mr. Mitchell identified different alleys as the alley where

22

they stopped before heading to the South side. *Id*. ¶ 120. In sum, Defendants cannot use Plaintiffs' false confessions, that they helped fabricate, to establish probable cause.

Moreover, Defendants completely ignore the fact that they knew Mr. Fulton had an alibi for the time that Plaintiffs were supposedly driving around Chicago accosting Collazo and disposing of his body. Police obtained video evidence from the University of Chicago hospital and, before Plaintiffs were charged, had Henderson walk them through the video and identify Mr. Fulton. *Id*. ¶ 130. While the confessions state that Plaintiffs were driving to the North side of Chicago around 8 p.m. (and then beating Collazo, driving him around the city, and ultimately setting his body on fire), video evidence and hospital logs demonstrated that Mr. Fulton was at the hospital with Henderson. *Id*. ¶¶ 122-24.

In addition, despite the victim being covered in blood, police found no evidence of blood or other forensic evidence in Mr. Fulton's car or anywhere else associated with Plaintiffs. PSOF ¶¶ 3, 133-34. The victim was found wrapped in plastic bag, and Mitchell's and Shaw's confessions stated that the victim was placed in the plastic bag at the second stop, meaning after the victim was supposedly beaten with a baseball bat and placed in the trunk, yet no blood was discovered in the trunk. *Id.* ¶ 53. Moreover, no eyewitness to this purported highly public attack on Foster Avenue ever emerged.

Under the totality of the circumstances, with the facts and all inferences therefrom taken in the light most favorable to Plaintiffs, Defendants cannot claim that they had probable cause as a matter of law. *Chelios v. Heavener,* 520 F.3d 678, 686 (7th Cir. 2008) (If the facts that form the basis of probable cause are disputed, a jury must determine if probable cause exists). *Maxwell*, 998 F.2d at 434 (A court cannot decide the probable cause question "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.").

Defendants halfheartedly contend that they believed they had probable cause because Plaintiffs were indicted by a grand jury and a criminal court determined there was probable cause to detain them. Dkt. 202 at 37. But Defendants ignore the line of cases holding that if police fabricate the evidence used to find that probable cause existed, police cannot rely on the resulting probable cause findings.[5] Those decision-makers were ignorant of Defendants' misconduct, and cannot be used to establish probable cause in this civil proceeding. *See Franks*, 438 U.S. at 155-56; *Beck*, 379 U.S. at 91; *Alexander*, 721 F.3d at 423; *Lawson* 637 F.3d at 704-05; *Fox*, 600 F.3d at 833-35; *Jones*, 856 F.2d at 995; *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019).

Lastly, Defendants suggest that purported motive evidence—Plaintiffs' dislike for Collazo—was sufficient to establish probable cause. Dkt. 202 at 39. No case in the Seventh Circuit—or any other circuit, for that matter—holds that motive evidence alone is sufficient to support a finding of probable cause. In fact, in every case cited by Defendants to support their argument, the court found *more* than just motive evidence to support probable cause. In *Koh v. Graf,* 3007 F. Supp. 3d 827 (N.D. Ill. 2018), "substantial physical" and first-hand witness evidence was used to support the finding of probable cause. *Id.* at 849. In *United States v. Bullock*, 632 F.3d 1004 (7th Cir. 2011), the court concluded there was probable cause to arrest Bullock because they found physical evidence—a marijuana box, lighter, crack cocaine, and scale—in addition to motive evidence. *Id.* at 1023. In *United States v. Williams*, 627 F.3d 247 (7th Cir. 2010), probable cause to search was found because agents intercepted calls and

---

[5]     The Police Officer Defendants' silence on this point is all the more confounding given that they cite *Coleman v. Peoria*, 925 F.3d 336 (7th Cir. 2019), and Coleman states that the presumption of probable cause according to findings during the criminal proceedings "may be rebutted by evidence that law enforcement obtained the indictment through improper or fraudulent means." *Id*. at 351; *see also Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019) ("This presumption is premised on an 'assumption … that there will be a truthful showing' of probable cause." (quoting *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010) (also cited by Defendants at Dkt. 202 at 37).  It would be inappropriate for Defendants to sandbag Plaintiffs by addressing the argument in reply.

observed physical evidence of guilt first-hand. *Id*. at 251. Here, the Police Officer Defendants cannot point to any untainted evidence to corroborate their claim that they had probable cause to suspect Plaintiffs of murder, and there exists plenty of evidence on the other side of the ledger to establish that Plaintiffs were innocent. On this record, Plaintiffs are entitled to a trial on their deprivation of liberty claim.

**2.  The Police Officer Defendants are not entitled to qualified immunity.**

In conclusory fashion, the Police Officer Defendants assert that they should be cloaked with qualified immunity for possessing a "mistaken" belief that probable cause existed. Dkt. 202 at 41-42. Defendants, however, present no argument as to why they may have been mistaken in their belief, and the record belies that assertion.

The appropriate inquiry is whether, at the time of the violation in this case, a "reasonably well-trained police officer would have known that the arrest was illegal." *Betker v. Gomez*, 692 F.3d 854, 864 (7th Cir. 2012) (citing *Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985)). The question, in other words, "turns on whether the arresting officer had 'arguable probable cause.'" *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2012) (citing *Jones v. Clark*, 630 F.3d 677, 684 (7th Cir. 2011)). "Arguable probable cause exists when a reasonable officer could *mistakenly* have believed that he had probable cause to make the arrest." *Id*. (emphasis in original).

Based on the summary judgment record before this Court, Defendants cannot claim they were mistaken. They fabricated Griffin's statement inculpating Plaintiffs; they then used that fraudulent statement to falsely arrest Plaintiffs and coerce them to falsely confess. Under no view of the evidence can Defendants claim to have made a reasonable mistake as a defense. *See Olson v. Tyler*, 771 F.2d 277, 281 (7th Cir. 1985) (officers not entitled to qualified immunity when they fabricated the evidence used to establish probable cause).

**C.** **Plaintiffs' malicious prosecution claims must be tried to a jury.**

To succeed on a claim of malicious prosecution pursuant to Illinois law, a plaintiff must establish five elements: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." *Beaman*, 2021 IL 125617, ¶74. The Police Officer Defendants challenge only two of these elements: whether there was an absence of probable cause and whether the proceedings terminated in favor of the Plaintiff.

**1.** **The police officer defendants cannot establish an absence of probable cause as a matter of law.**

The police officer Defendants argue perfunctorily that probable cause existed for the same reasons they argue probable cause defeats Plaintiffs' deprivation of liberty claims. Dkt. 202 at 42-43. The same arguments against summary judgment on Plaintiffs' deprivation of liberty claims apply here as well, including why the grand jury indictments cannnot establish probable cause in this civil proceeding. *See* Arg. I.B.1, *supra*. Defendants half-heartedly claim that they are entitled to immunity because their actions were not willful and wanton, but they do not support their argument with case citations or facts and, therefore, it is forfeited. *White Eagle Cooperative Ass'n v. Conner,* 553 F.3d 467, 476 n.6 (7th Cir. 2009) (undeveloped arguments unsupported by citations to authority are forfeited). Even if it were not forfeited, Plaintiffs' evidence establishes that Defendants acted with a conscious disregard for Plaintiffs' rights, by fabricating evidence they knew to be false and by causing them to be wrongly prosecuted and convicted nonetheless. *Ziarko v. Soo Line R. Co.*, 161 Ill. 2d 267, 279 (1994) ("'When I use the expression 'willful and wanton conduct' I mean a course of action which [shows actual or deliberate intention to harm or which, if not intentional,] shows an utter indifference to or

conscious disregard for [a person's own safety] [and] [the safety of others].'") (quoting IPI Civil 3d No. 14.01.).

### 2. Plaintiffs' criminal cases concluded in a manner indicative of their innocence.

Defendants also argue that Plaintiffs cannot satisfy the "indicative of innocence" component of the "favorable termination" element of a malicious prosecution claim. Dkt. 202 at 43-45. Despite that the State chose to *nolle prosequi* the criminal charges against Plaintiffs explicitly because of insufficient evidence against them, Dkt. 203 ¶ 209, Defendants insist Plaintiffs' criminal cases did not conclude in a manner indicative of their innocence. They are mistaken.

Although a case's resolution by *nolle prosequi* is not inherently sufficient to satisfy the favorable termination element, a plaintiff need only demonstrate that the reasons for the *nolle prosequi* were "consistent" with their innocence. *Swick v. Liautaud*, 169 Ill. 2d 504, 513 (1996). Though the burden remains on Plaintiff, the test is undeniably stated permissively: a *nolle* suffices *unless* there are reasons to suspect it was unrelated to innocence. *Id*. The purpose of this requirement is to foreclose malicious prosecution claims where the charges were dropped, not because of a dearth of evidence, but instead as part of a deal between the State and the criminal defendant or as an act of mercy. *Id.* The State's reason for dropping the charges against Plaintiffs—that the prosecution would be "unable to meet [its] burden" at a retrial, Dkt. 203 ¶ 209— is exactly the sort of dismissal required to satisfy the favorable termination element. *Id.* at 514 ("[T]he abandonment of the criminal proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution."); *Adams v. Sussman & Hertzberg, Ltd.*, 292 Ill. App. 3d 30, 42 (1997) ("[T]he reason for the dismissal of the criminal action [was] the State's inability to prove its case against the accused. A dismissal on that basis is

a termination in favor of the accused indicative of the accused's innocence.").

Contrary to Defendants' understanding, the favorable termination element does not require the prosecution to have declared the plaintiff innocent. *See, e.g.*, *Harris v. United States*, 2017 WL 770969, at *5 (N.D. Ill. Feb. 28, 2017) (prosecution account of why it dismissed charges contradicted by circumstantial facts, precluding summary judgment); *Padilla v. City of Chicago*, 932 F. Supp. 2d 907, 927-30 (N.D. Ill. 2013) (evidence of the State's inability to carry its burden is indicative of innocence regardless of whether prosecutor personally believed that plaintiff was innocent). The ultimate question whether the circumstances surrounding a *nolle prosequi* raises an inference of dismissal consistent with innocence is a question for the jury.

Acquittals, for example, are "clearly sufficient to show favorable termination" under Illinois law, *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 926 (7th Cir. 2001), despite that prosecutors often continue to believe in defendants' guilt after a jury acquits (and, indeed, must have believed the defendant guilty beyond a reasonable doubt when choosing to present the case to a jury). And in Plaintiffs' case, the concession that it could not meet its burden amounts to a concession that Plaintiffs would be acquitted in any retrial.

Even if the State had not conceded its inability to meet its burden as it did, a rule accepting at face value the CCSAO's declared reasons for abandoning a prosecution would improperly empower the CCSAO to nullify malicious prosecution liability, including for its own prosecutors. *See, e.g.*, *Fields v. City of Chicago*, 2014 WL 477394 (N.D. Ill. Feb. 6, 2014) ("the fact that the State's Attorney's Office does not want Fields to be declared innocent—a determination in which that office has a direct interest, because it could well have an unfavorable impact on the claims against the former prosecutors sued in the present case—does not suffice to eliminate a genuine factual dispute"). At the very least, on this record, the Court cannot

determine that no reasonable juror could find that the dismissal of the charges was consistent with Plaintiffs' innocence.

The State's assertion at the time of the *nolle prosequi* that some witnesses could not be found and that others were causing "difficulty" does not change the analysis. In *Adams*, the State had dropped the charges against the plaintiff because a witness "would not testify against the plaintiff in the criminal action because he had been ordered by his superiors not to do so." 292 Ill. App. 3d at 42. The "State's inability to prove its case against the accused" made the *nolle prosequi* a termination indicative of innocence. *Id.*

This is not a case where a key witness has died before providing sworn testimony or the only living witness is a child, making the prosecution impracticable. *See, e.g.*, *Bonds v. Fizer*, 2014 IL App (1st) 123601-U, ¶ 39. Rather, in this case, the prosecutor's noted "difficulty" with witnesses, Dkt. 203 ¶¶ 222-23, was a direct result of Plaintiffs' innocence. Plaintiffs, Shaw and Griffin would not go along with the false, fabricated story of Plaintiffs' guilt. As to the prosecutor's statement that some witnesses could not be located, *id.,* the only witnesses who implicated Plaintiffs at trial could have been found with a little effort. They consist of Plaintiffs themselves (through their false confessions), Johnitta Griffin (who was impeached with her prior false statement implicating Plaintiffs) and various police and prosecutors who are defendants in this case, all of whom were available to testify in this case, as demonstrated by the fact they have been deposed. And the prior trial testimony of any truly unavailable witness could have been presented at the retrial. *See* Fed. R. Evid. 804(b)(1) (hearsay exceptions for unavailable witnesses).

Although Plaintiffs have definitively established favorable termination, Defendants attempt to muddy the water by pointing to two past judicial decisions that are no longer in force:

the decision on direct appeal affirming Plaintiffs' convictions, and the initial decision denying Plaintiffs' COI petitions. Dkt. 202 at 44-45. Neither decision has any relevance to whether the criminal case against Plaintiffs terminated in manner indicative of innocence. And the convictions affirmed on direct appeal were later vacated and the charges dismissed, Dkt. 224 ¶¶ 207-08, while the erroneous denial of the COI petitions has been vacated and the case remanded for further proceedings, Dkt. 224 ¶¶ 211-12. The relevant decision is that the State dropped the charges against Plaintiffs because it could not meet its burden. The favorable termination element is thus satisfied. *See Treece v. City of Naperville*, 1998 WL 142391, at *6 (N.D. Ill. Mar. 25, 1998) (question of fact as to whether "a reasonable jury could infer that the [ASA's] requested the *nolle prosequi* order because they lacked reasonable grounds to pursue the criminal prosecution"); *Montes v. DiSantis*, 2005 WL 1126556, at *14 (N.D. Ill. May 10, 2005) (indicative of innocence was satisfied where "there is nothing to indicate that the charge against Hector was abandoned due to a settlement agreement, misconduct, mercy, new criminal proceedings, [] impracticabilty").

### D. Defendants conspired to violate Plaintiffs' rights under state and federal law.

Defendants Zalatoris, Breen, Struck, Girardi, Winstead, Rolston, Franko, and Bartik conspired with each other, and others, to violate Plaintiffs' state and federal rights. Dkt. 202 at 59-60. Although Defendants baldly contend that no evidence supports Plaintiffs' conspiracy claims, ample evidence shows these police officers agreed to violate Plaintiffs' rights and took overt steps toward their common goal of wrongfully convicting Plaintiffs.

A conspiracy claim under 42 U.S.C. § 1983 is established by evidence showing two or more individuals agreed to deprive a person of their constitutional rights and then took an overt act in furtherance of that agreement. *Fulton v. Bartik*, 547 F. Supp. 3d 799, 817 (N.D. Ill. 2021),

30

citing *Daugherty* v. *Page*, 906 F.3d 606, 612 (7th Cir. 2018); *see also Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Similarly, a civil conspiracy claim under Illinois law requires that a plaintiff allege facts establishing "'(1) the existence of an agreement between two or more persons (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) that an overt act was performed by one of the parties pursuant to and in furtherance of a common scheme, and (4) an injury caused by the unlawful overt act.'" *Fulton*, 547 F. Supp. 3d at 823, *quoting Lewis* v. *Lead Indus. Ass'n*, 2020 IL 124107, ¶20, 178 N.E.3d 1046 (Ill. 2020). The participants in the conspiracy need not "know all the details of the plan designed to achieve the objective or have the same motives for desiring the intended conspiratorial result." *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979), *rev'd in part on other grounds*, 100 S. Ct. 1987 (1980). All that is required is for each defendant to "understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [their] part to further them." *Jones*, 856 F.2d at 992.

Defendants argue that Plaintiffs have no "direct proof" that Defendants entered into any agreement to violate their rights. Dkt. 202 at 59. But direct evidence of conspiracy is rarely available, and reliance on circumstantial evidence is appropriate and common. *See Beaman*, 776 F.3d at 511 ("Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy . . . ."); *see also McClure v. Owens Corning Fiberglass Corp.,* 188 Ill. 2d 102, 134 (1999) ("A conspiracy is almost never susceptible to direct proof. Usually, it must be established from circumstantial evidence and inferences drawn from evidence, coupled with common-sense knowledge of the behavior of persons in similar circumstances.") (internal quotation marks omitted) (citation omitted). Circumstantial evidence abounds that Defendants conspired to violate Plaintiffs' rights.

The detective defendants—Zalatoris, Breen, Struck, Girardi, Winstead, and Rolston—all worked together at Area 1 on the Collazo murder investigation and communicated with each other about case developments. *E.g.*, PSOF ¶¶ 19-20, 28, 37, 63-64, 67. They also all took overt actions demonstrating their common purpose of framing Plaintiffs for the murder in violation of their rights.

Defendants Rolston, Zalatoris, and Breen intercepted 17-year-old Griffin outside her home at 11:00 pm. Rolston had previously interviewed Griffin, Dkt. 203 ¶ 24, and she had truthfully denied any knowledge of Collazo's murder, PSOF ¶ 18. Rolston then tricked Griffin into getting into the squad car, at which point the detectives sped off to Area 1 without Griffin's consent, in effect "kidnapping" her. PSOF ¶ 20; Dkt. 203 ¶ 28. At Area 1, Zalatoris and Breen terrorized and coerced Griffin all night long with threats of prosecution for a murder about which she knew nothing. PSOF ¶ 22. They fed her a false narrative of Plaintiffs' involvement that would later be disproved by objective evidence. *Id.* ¶¶ 30-31, 122-26. Rolston, who was the "primary detective" assigned to the investigation, spoke to Griffin multiple times about the case. *Id.* ¶ 28. Having kidnapped her the night before, *Id.* ¶ 20; Dkt. 203 ¶ 28, he offered to drive her home after she had provided the fabricated story of Collazo's murder to the Grand Jury, PSOF ¶ 28.

Defendants Zalatoris and Breen also coerced Mr. Fulton to falsely confess to the murder and to adopt the same fabricated revenge narrative they had forced on Griffin. *Id.* ¶¶ 62-63. After Mr. Fulton recanted the false confession, Zalatoris and Breen became violent and demanded that he inculpate himself again. *Id.* ¶ 64.

Defendants Struck and Girardi then stepped in to obtain another false confession from Fulton that conformed to the existing fabricated story. *Id.* 62-63. Struck and Girardi also falsely

promised Mr. Fulton that he would go home if he stuck to the false story while speaking to ASA Rubinstein, telling him that he had to make his story believable in order to go home. *Id.* ¶ 64.

Meanwhile, the conspirators had a problem with their false narrative: Mr. Fulton's alibi. In order to cast doubt on the alibi, Defendant Winstead fabricated a false statement from Fulton's girlfriend Yolanda Henderson that Fulton did not come home with her the night of the murder, and thus was unaccounted for and could have possibly committed the murder. *Id.* ¶ 131.

Defendants Zalatoris and Breen also coerced false confessions from Mr. Mitchell and, joined by Defendant Franko, from Antonio Shaw. *Id.* ¶¶ 90, 95-97. Mitchell's and Shaw's false confession told the same fabricated story as the false statements fed to Fulton and Griffin. *Id.* ¶ 118-19; Dkt. 224 ¶¶ 161-64. Franko, a youth officer who was acquainted with Zalatoris, was ostensibly present to act *in loco parentis* to Shaw. PSOF ¶ 97.  Instead, Franko permitted the detectives to coerce Shaw and feed him their fabricated account of Collazo's murder. *Id.* ¶ 97.

Defendant Bartik was the only conspirator not working out of Area 1. But the evidence shows Bartik also joined the conspiracy and took overt acts in furtherance of it. After discussing the case with Defendant Breen just before trial, Bartik approached the prosecutor, ASA Nazarian, and falsely claimed to have obtained a confession from Fulton years earlier. PSOF ¶ 73. Bartik later sent Nazarian a fabricated report that told the same demonstrably false story of Collazo's murder that had been fed to Plaintiffs, Griffin, and Shaw. Dkt. 224 ¶ 86. Mr. Fulton never made an inculpatory statement to Officer Bartik, PSOF ¶ 72, and so Bartik could not have created this fabricated report without the guidance of his co-conspirators. At the very least, a permissible inference from these facts is that Bartik was acting in concert with his co-conspirators.

The alternate explanation—that these events occurred without a conspiracy—is highly improbable. In that scenario, each of the Defendant police officers worked independently to frame Plaintiffs, coercing coincidentally interlocking statements from Griffin, Mr. Fulton, Mr. Mitchell, and Shaw. Winstead then independently fabricated a statement from Henderson to break Mr. Fulton's alibi, and Bartik later crafted a confession eerily similar to the ones fabricated by Zalatoris, Breen, Struck, and Girardi. Granted, Plaintiffs' evidence is circumstantial, but "oh what circumstances." *Branion v. Gramly,* 855 F.2d 1256 (7th Cir. 1988). *See also Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330 (1960) (circumstantial evidence can be more certain, satisfying, and persuasive than direct evidence).

Viewing all of this evidence in Plaintiffs' favor, a reasonable jury could infer that Defendants conspired to violate Plaintiffs' due process rights and to violate Plaintiffs' rights to be free from forced self-incrimination, detention without probable cause, and malicious prosecution. Where, as here, there is "evidence from which a reasonable jury could infer the existence of a conspiracy," summary judgment should be denied. *See Beaman*, 776 F.3d at 510-511 (citation omitted).

###    E.    Defendants Bartik, Winstead, and Franko failed to intervene to prevent the violations of Plaintiffs' rights.

Defendants argue that Plaintiffs' failure to intervene claims against Bartik, Winstead, and Franko fail "as a matter of law" because such claims were called into question by a concurrence in a Seventh Circuit case. Dkt. 202 at 57. Concurrences, however, do not have the force of law. *See Herhold v. City of Chicago*, 723 F. Supp. 20, 33 (N.D. Ill. 1989) (concurrence "cannot be accepted as the law"). And failure-to-intervene claims remain viable in this circuit. A defendant is liable for failure to intervene under Section 1983 if they "knew that a constitutional violation was committed and had a realistic opportunity to prevent it" but did not. *Fulton*, 547 F. Supp. 3d

at 816, citing *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

According to Defendants, no violations of Plaintiffs' rights occurred, meaning there would have been nothing for Bartik, Winstead, and Franko to intervene in. Dkt. 202 at 58. But Plaintiffs explain in Arg. I.A-C how the evidence demonstrates their rights were violated.

Defendants do not argue that they lacked an opportunity to intervene in the violations of Plaintiffs' constitutional rights, meaning the argument is forfeited. *Starks v. City of Waukegan*, 946 F. Supp. 2d 780, 788 (N.D. Ill. 2013) (declining to consider an argument raised for the first time in reply brief because it is forfeit). In any event, such an argument would fail for the same reason Plaintiffs' conspiracy claims must go forward. Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Bartik, Winstead, and Franko could have prevented Plaintiffs' rights from being violated by alerting others that the evidence against them was fabricated. At any point during Plaintiffs' prosecution, from their arrest in March 2003 to their trial in 2006, these Defendants had the opportunity to intervene, blow the whistle on the misconduct, and prevent Plaintiffs' rights from being violated. As participants in a conspiracy who took active steps to further it, as explained in Arg. I.D, Defendants had ample opportunity to expose the conspiracy and prevent Plaintiffs from being prosecuted with fabricated evidence.

## F. Defendants are liable for intentionally inflicting emotional distress on Plaintiffs.

Defendants argue that they cannot be liable to Plaintiffs for intentional infliction of emotional distress (IIED) because, in their telling, Defendants merely conducted an above-board murder investigation. Dkt. 202 at 61. Defendants thus did nothing "outrageous," they contend, and so no IIED claim can proceed. *Id.*

Although it is true that, to support an IIED claim, a defendant's conduct must be "extreme and outrageous" from the perspective of an average member of the community, *Fox*,

600 F.3d at 842, each Defendant's conduct was exactly that. They coerced false confessions to a brutal murder from Plaintiffs through threats, violence, and false promises, over the course of multiple days. PSOF ¶¶ 32-90. They coerced two other teenagers—Griffin and Shaw—to make false statements against Plaintiffs. *Id.* ¶¶ 20-30, 91-116. They fabricated police reports to build their case and send the teenage Plaintiffs to prison, perhaps for the rest of their lives. *Id.* ¶¶ 15, 131-32. Such reprehensible conduct would be viewed as extreme and outrageous by almost anyone. *See Henry v. Ramos*, 1997 WL 610781, at *2 (N.D. Ill., Sept. 28, 1997) ("An average member in the community would consider it outrageous for police officers to falsely frame, arrest and imprison an innocent citizen."). Moreover, an important factor in deciding whether conduct is "extreme and outrageous" is whether "a defendant abused a position of authority." *Fox*, 600 F.3d at 842, and Defendants abused their authority with abandon. The distress and suffering this abuse caused Plaintiffs was immense and of long duration. Summary judgment should be denied on this claim.

## II. Because Plaintiffs' claims against the Police Officer Defendants survive, Defendant City of Chicago is not entitled to summary judgment.

Defendant City of Chicago argues it is entitled to (1) dismissal of Plaintiffs' *respondeat superior* and indemnification claims, and (2) dismissal of all claims against the Unknown Chicago Police Officers. To the first point, Defendant City is not entitled to summary judgment on either of Plaintiffs' claims against it. The assertion that "[t]o the extent the Individual City Defendants are granted summary judgment pursuant to their motion, there will be no remaining basis to impose vicarious liability against the City on those claims" is incorrect. Dkt. 209, ¶ 7. Even if this Court were to grant summary judgment to the Individual City Defendants—which, for all the reasons stated above, it should not—there would still be active claims against them such that Defendant City could still be found liable, *i.e.*, false confession (Count I) and

conspiracy (Counts VII and XI) against Defendants Zalatoris and Breen. As such, Defendant City is not entitled to summary judgment on either of Plaintiffs' claims—regardless of whether the Individual City Defendants are awarded summary judgment. To the second point, Plaintiffs do not oppose the dismissal of claims against the Unknown Chicago Police Officers.

## III. The County Defendants are not entitled to summary judgment on the basis of any immunity.

The County Defendants argue variously that they are entitled to absolute immunity, Dkt. 199 at 8-11, 12-13, 15-16, qualified immunity, *id.* at 11-12, and sovereign immunity, *id.* at 13-15. None of these immunity arguments warrant judgment in their favor on any of Plaintiffs' claims.

### A. Defendants Judge and Varga acted as investigators, not prosecutors.

Properly construed in Plaintiffs' favor, the summary judgment record reveals that Defendants Judge and Varga conspired with the Defendant Police Officers to railroad Fulton and Mitchell for a crime they did not commit. They played an active role in the police investigation—including personal participation in the coercive interrogations of Fulton and Shaw—and were plainly acting as investigators, not prosecutors.

As felony review ASAs, Varga and Judge's duties placed them in the thick of the police investigation—they would be called upon to visit crime scenes, meet with police detectives to discuss the case, interview and take statements from witnesses and suspects, and actively direct the course of the investigation, including requesting follow-up investigation by police. Dkt. 198, ¶12, Dkt. 226, ¶12. And their actions in this case were no different, standing should-to-shoulder with the Police Officer Defendants and assisting them in their corrupt investigation. After arriving at Area 1, before beginning his work on the case, Judge met with the detectives and reviewed their police reports. Dkt. 198 ¶20. At that point, Mr. Fulton had

not made any inculpatory statement; Fulton's first inculpatory statement was made in Judge's presence. PSOF ¶ 52. Later, Mr. Fulton told Judge that his inculpatory statement was false, that he had an alibi for the time of the crime, and that he only confessed because detectives had threatened him and his family and promised him he could leave if he went along with their story. *Id.* ¶¶ 55-56. But because Judge was in on the conspiracy with the detectives, Judge deliberately failed to document Mr. Fulton's recantation and alibi, did nothing to investigate his serious allegations of police misconduct, and instead sent Fulton back into the hands of the detectives for them to extract another false confession—including standing by while Zalatoris physically grabbed Mr. Fulton, dragged him to another room, and beat him with that goal. *Id.* ¶¶ 58.

Defendant Varga acted similarly in his interactions with detectives and Antonio Shaw. Shaw, who Varga knew was just 15 years old, told Varga during their first interaction that detectives were pressuring Shaw to falsely confess to the Collazo murder. *Id.* ¶¶ 93. Rather than investigating these serious allegations of police misconduct committed against a child, Varga, because he was in on the conspiracy, instead continued to work with detectives to secure a confession. When Varga spoke with Shaw again, and Shaw maintained his innocence and gave an alibi, Varga failed to investigate and failed to meaningfully document the alibi, beyond a tiny notation consisting simply of the word "alibi" in his notes. *Id.* ¶¶ 38, 114-15. After detectives eventually succeeded in coercing Shaw to give a false confession, Shaw told Varga what the officers had done and that they had fed him all of the facts contained in the story—and Varga saw the physical manifestations of Shaw's distress, having pulled out all of his braids—yet Varga deliberately failed to document this account of coercion, instead working to create a written version of this fabricated narrative. *Id.* ¶¶ 115.

### B.   Defendants Judge and Varga are not entitled to absolute prosecutorial immunity.

Defendants Judge and Varga are not entitled to absolute prosecutorial immunity because they were acting in an investigative capacity. "[P]rosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case,' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Burns v. Reed*, 500 U.S. 478, 486 (1991) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430–31 (1998)). However, a prosecutor acting in an investigative capacity is not entitled to absolute immunity. *Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) ("a showing that a prosecutor investigated and fabricated evidence against a target would automatically defeat absolute prosecutorial immunity, even if that target was later brought to trial") (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 276 (1993)); *Whitlock*, 682 F.3d at 579-80. As such, a prosecutor who is involved in a conspiracy to target a criminal suspect is not protected by absolute immunity. *Smith v. Burge*, 222 F. Supp. 3d 669, 694 (N.D. Ill. 2016) (citing *Johnson v. Dossey*, 515 F.3d 778, 783 (7th Cir. 2008)). Further, a prosecutor who fabricates evidence is also not entitled to absolute immunity. *Id*. (citing *Buckley*, 509 U.S. at 274–75). When a determination of a defendant's entitlement to absolute immunity rests on a dispute of fact, summary judgment should be denied. *Melongo v. Podlasek*, 2019 WL 1254913, at *9 (N.D. Ill. Mar. 19, 2019) (citing *Hill v. Coppleson*, 627 F.3d 601, 605–06 (7th Cir. 2010); *Whitlock*, 682 F.3d at 578-79).

When determining whether "particular actions of government officials fit within a common-law tradition of absolute immunity, or only the more general standard of qualified immunity, [courts] have applied a 'functional approach,'" looking to "the nature of the function performed, not the identity of the actor who performed it." *Smith*, 222 F.Supp.3d at

694 (quoting *Buckley*, 509 U.S. at 269); *see also Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) ("immunity may not apply when a prosecutor is not acting as an officer of the court, but is instead engaged in other tasks, say, investigative or administrative tasks."). Typically, a prosecutor's actions will fall within one of two buckets: those of an advocate that are "intimately associated with the judicial phase of the criminal process," and those of an investigator. *Hill v. Coppleson*, 627 F.3d 601, 605 (7th Cir. 2010) (internal quotation marks and citations omitted); *Buckley v. Fitzsimmons*, 509 U.S. 259, 270 (1993). The former enjoys absolute immunity; the latter does not. Defendants Judge and Varga were both functioning as investigators and thus do not have absolute immunity protection.

Defendant Judge was acting in an investigatory capacity. First, Fulton had made no inculpatory statements prior to being interviewed by Defendant Judge. PSOF ¶ 52. *See Hill*, 627 F.3d at 605-06 (holding that "a determination that [Plaintiff] did not confess until his meeting with [the prosecutor] would indicate that [the prosecutor] was likely acting in the role of an investigator searching for more evidence, activities to which only the qualified immunity analysis applies."). Second, Defendant Judge was not acting as a neutral observer of the evidence, as he claimed to be. Defendant Judge said it was his job to take statements, be a neutral open-minded assessor of the evidence, and to confront detectives who mistreated or coerced suspects. Dkt. 199 at ¶13, 17; PSOF ¶ 57. Instead, when Fulton alleged that he had been fed the facts of the case, had an alibi, and was innocent, Defendant Judge buried any mention of these facts. He did not tell his supervisors. PSOF ¶ 59. He did not document the exculpatory statements (although he certainly documented the inculpatory ones). *Id*. Further, he was present when Defendants Zalatoris and Breen roughly grabbed Fulton and manhandled him to another room where the two proceeded to beat 18-year-old Fulton, something

40

Defendant Judge also disclosed to no one. *Id.* ¶ 58.

Certainly, one view of the evidence is that Defendant Judge was simply negligent in his duties, and simply neglected to fulfill his duties as a prosecutor. But a plausible inference from these facts (and the only permissible one given the procedural posture of the Rule 56 Motion) is that Defendant Judge was acting as an investigator. When the confession he obtained was undermined by Fulton's recantation, he pretended the recantation had not occurred and left Fulton to be manhandled by the detectives, presumably hoping rough treatment would spur Fulton back to inculpating himself.[6]

Based on the record, we cannot determine conclusively what Defendant Judge's intent was at the time. We are left with a set of facts from which competing inferences can be drawn. When intent is the issue to be decided, summary judgment can rarely be granted. *Santiago v. Lane,* 894 F.2d 218, 224 (7th Cir. 1990). And when competing inferences arise, this Court is bound to draw those inferences in Plaintiffs' favor. Defendant Judge is entitled to present a defense at trial, but he cannot obtain summary judgment on this record. Defendant Judge interrogated Mr. Fulton (during which he made his first confession); chose to discredit his alibi; did not pass his alibi on to his supervisors or the detectives working the case; and did not address or document the coercion of the officers or Fulton's alibi. PSOF ¶¶ 52, 55-56, 58-59. These are all investigatory acts aimed at fabricating a case against Mr. Fulton. Thus, Defendant Judge is not entitled to absolute prosecutorial immunity.

---

[6]     County Defendants argue that Defendant Judge's "only involvement was interviewing John Fulton after he had already been arrested, interrogated by detectives, and had made an inculpatory statement to detectives Breen and Zalatoris" and that it is "undisputed that [Defendant Judge] reported Fulton's statement, recantation, and alibi to the police and his colleagues." Both statements are blatantly incorrect.

Defendant Varga was also clearly acting in an investigatory capacity. First, as with Mr. Fulton and Defendant Judge, Shaw did not make any inculpatory statements until speaking with Defendant Varga, which indicates Defendant Varga was acting in the role of an investigator. *See Hill*, 627 F.3d at 605-06. As such, County Defendants' citation to *Harris v. City of Chicago*, 330 F.R.D. 508, 516 (N.D. Ill. 2018) (finding an ASA entitled to prosecutorial immunity when taking statements from a suspect after being told by police he had confessed) is irrelevant. Second, Shaw told Defendant Varga many times, through several interviews that spanned the course of hours, that he was innocent. PSOF ¶¶ 93, 95-96, 103. Shaw also made clear that Defendant Zalatoris was trying to coerce him into giving a false confession. *Id.* ¶¶ 108, 114. Defendant Varga claimed not to believe him and continued to interrogate him until he changed his story. PSOF ¶¶ 93, 95-96, 103. When Shaw would deny his involvement, Defendant Varga would leave and knowingly subject 15-year-old Shaw, who had been detained and questioned for nearly 19 hours before they first spoke, to more coercive tactics by Defendant Zalatoris. *Id.* ¶¶ 93-94, 103, 105, 107-08. Defendant Varga additionally wrote out Shaw's entire handwritten fabricated statement that Detective Zalatoris came up with and then had Shaw and his uncle sign each page. *Id.* ¶ 115. Defendant Varga took that fabricated statement and advised Deputy Supervisor Bob Heilengotter to charge all three teenagers with murder.[7] *Id.* ¶ 13. Like Defendant Judge, Varga buried any mention of the exculpatory statements made to him by Shaw, including Shaw's innocence and the detectives' role in fabricating his confession. *Id.* ¶ 115. These acts serve an investigatory function and thus, Defendant Varga is not entitled to absolute prosecutorial immunity as a matter of law.

---

[7]     Defendant Judge was not a part of Fulton and Mitchell's criminal trial prosecution team.

County Defendants' reliance on *Hunt v. Jaglowski*, 926 F.2d 689 (7th Cir. 1991) is misplaced. In *Hunt*, the police had already completed their investigation before contacting the prosecutor, who was not alleged to have participated in manufacturing false evidence, to have witnessed any misconduct, or to have engaged in any coercion himself. 926 F.2d 689, 691-93 (7th Cir. 1991) (plaintiff's sole contention that prosecutor participated in police coercion rejected as lacking in evidentiary support). Unlike prosecutors to whom the Seventh Circuit has granted absolute immunity, Judge and Varga's work did not begin "after the police investigation had ended," *Brunson v. Murray*, 843 F.3d 698, 705 (7th Cir. 2016); it was part and parcel of the investigation. Nor is this case akin to *Andrews*, which did not involve any allegations of investigative conduct or fabrication of evidence on the part of the prosecutors sued. *Andrews v. Burge*, 660 F. Supp. 2d 868, 875-79 (N.D. Ill. 2009).

The facts of this case more closely align with *Patrick v. City of Chicago*, 213 F. Supp. 3d, 1033 (N.D. Ill. 2016).[8] In *Patrick*, the court distinguished *Hunt* by noting the key difference that in *Patrick* the prosecutor helped the officer obtain the coerced confession. That evidence was enough to suggest that the prosecutor was acting in an investigatory and not prosecutorial function and thus was not entitled to absolute immunity. *See Wilson v. Burge*, 2023 WL 2750946, at *22 (N.D. Ill. Mar. 31, 2023) (citing *Patrick*, 213 F. Supp. 3d at.1045–46) That is the case here.

In this case, both Defendant Judge and Defendant Varga assisted in obtaining the coerced confession. Neither Fulton nor Shaw had made any inculpatory statement prior to the arrival of Defendants Judge and Varga, respectively. PSOF ¶¶ 52, 93. Defendant Judge intentionally documented a confession that he knew was fabricated, did not document Fulton's

---

[8] While more aligned with *Patrick* than *Hunt*, there are still critical differences between this case and *Patrick* that will be discussed *infra*.

alibi, did not document or report to his supervisors how Fulton had been treated by the detectives, did not report seeing Fulton be roughly handled by the detectives, and then left Fulton at the mercy of the Police Officer Defendants to continue their coercive tactics.

Defendant Varga was also deeply involved in the interrogation process and in obtaining Shaw's coerced confession. He interrogated Shaw three separate times where Shaw denied involvement. *Id.* ¶¶ 93, 103, 105. It was not until the fourth interrogation where Shaw, after being threatened and made false promises for hours, gave the false confession fed to him by Defendant Zalatoris. *Id.* ¶¶ 107, 110-11. Shaw made clear to Defendant Varga that the statement was coached and coerced. *Id.* ¶¶ 93, 103, 114. He had also made clear to Varga earlier in the night that Defendant Zalatoris was coaching him to tell a fake story he did not want to tell. *Id.* ¶ 93. Under Plaintiffs' view of the evidence, Defendant Varga knowingly and intentionally participated in the interrogating that night, and then fabricated a handwritten statement—thus helping the officers obtain a coerced confession. Varga was "personally involved in [Plaintiffs'] ongoing interrogation[s]" and "actively assisted in gathering the evidence that would later form the basis of the charges against [Plaintiffs]." *Orange v. Burge*, 2008 WL 4443280, at *10 (N.D. Ill. Sept. 29, 2008) (prosecutor was not entitled to absolute immunity where "he was personally involved in" the plaintiff's "ongoing interrogation" and "coached plaintiff regarding the false confession"); *Serrano v. Guevara*, 2020 WL 3000284, at *23 (N.D. Ill. June 4, 2020) (denying absolute immunity because a jury could reasonably infer that the prosecutor was "participating in the creation of new evidence to assist the detectives . . . in bringing a new case" and "not just testing [the witness's] credibility"). Varga's job title as a felony review prosecutor is irrelevant to the germane inquiry, which is whether his actions consisted of police-type investigative work.

*See Fields II*, 740 F.3d at 1114. As such, even under a *Hunt* framework, Defendants Judge and Varga are not entitled to absolute prosecutorial immunity.

As Defendants Judge and Varga are not entitled to absolute prosecutorial immunity on their federal claims, they are also not entitled to immunity on their state law claims. "Illinois and federal doctrines of prosecutorial immunity are coterminous," therefore, a prosecutor who is not entitled to prosecutorial immunity under federal law will also not be entitled to immunity with respect to state law claims. *Kitchen v. Burge*, 781 F. Supp. 2d 721, 737 (N.D. Ill. 2011). Therefore, Defendants Judge and Varga are not entitled to absolute immunity on any of the claims against them.

### C. None of Plaintiffs' claims arise solely from the courtroom testimony of any Defendant, so the absolute testimonial immunity is inapplicable.

County Defendants are not entitled to absolute testimonial immunity because none of Plaintiffs' claims arise solely from the testimony of any County Defendant during Plaintiffs' criminal court proceedings. The claims against Defendant Judge stem from his participation in coercing a confession out of Fulton, fabricating evidence, conspiring to violate Plaintiffs' constitutional rights, failing to intervene, and intentional infliction of emotional distress. The claims against Defendant Varga stem from his participation in coercing and fabricating a confession out of Shaw, which eliminated his viability as a star defense witness, and intentional infliction of emotional distress. The claims against Shepherd arise from him knowing there was a camera facing the rear door at Lake Meadows yet intentionally crafting a false narrative, prior to getting on the witness stand, that there was no such camera, in order to break Mr. Fulton's alibi. Each of these claims are discussed more fully *infra*; however, none of them arise solely from County Defendants' courtroom testimony. As such, the absolute testimonial immunity is inapplicable.

### D. The County Defendants are not entitled to qualified immunity.

County Defendants' argument for qualified immunity is unclear and undeveloped. Dkt. 199 at 11-12. County Defendants provide little to no discussion of the clarity of any applicable law, virtually no factual analysis, and no explanation of even which prong of qualified immunity County Defendants contest. *Id.* A generic and perfunctory mention of the background law on qualified immunity is insufficient to raise the defense; County Defendants' argument has been forfeited. *McCottrell v. White*, 933 F.3d 651, 670 n.12 (7th Cir. 2019).

Though it is unclear, County Defendants appear to only raise qualified immunity for Defendant Judge relating to the failure to intervene claim. County Defendants make no specific argument raising qualified immunity for any claim against Defendant Varga beyond broadly claiming he is protected by the immunity. Dkt. 199 at 12. County Defendants do not explicitly raise any qualified immunity argument for Defendant Shepherd beyond vaguely claiming that he is an investigator for the State's Attorney's Office and that he did nothing wrong. Dkt. 199 at 12.

A prosecutor or investigator is only entitled to qualified immunity if his or her "actions (1) did not violate clearly established statutory or constitutional rights, (2) of which a reasonable person would have known." *Viilo v. Eyre*, 547 F.3d 707, 709 (7th Cir. 2008). First, as established *infra,* Plaintiffs have established that County Defendants violated their rights by coercing their confessions, fabricating statements implicating Plaintiffs in a murder they did not commit, and coercing Plaintiffs' co-defendant to also give a coerced false statement—in violation of their right to due process. County Defendants' qualified immunity arguments primarily rest on the claim they did nothing wrong and are thus entitled to qualified immunity. Because these facts are disputed, the County Defendants cannot obtain summary judgment as to the first prong.

Regarding the second prong, the challenge that County Defendants bring—which is only raised in the context of Defendant Judge's failure to intervene claim—fails. Qualified immunity does not permit a prosecutor to stand by and fail to intervene as his cohorts in an investigation trample over a suspect's constitutional rights. As far back as *Byrd v. Brishke*, the Seventh Circuit stated that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his person in his presence or otherwise within his knowledge." 466 F.2d 6, 11 (7th Cir. 1972).[9] Given that Defendant Judge was acting in a policelike investigatory manner, a reasonable official in his position would have known that a failure to intervene claim applies to him as much as it does to any police officer. *See Saunders v. City of Chicago*, 2013 WL 6009933, at \*10 (N.D. Ill. Nov. 13, 2013) (allowing failure to intervene claim to go forward against a prosecutor for his conduct in 1995); *Lovelace v. Gibson*, No. 17-CV-1201, 2020 WL 6049901, at \*31 (C.D. Ill. Oct. 13, 2020), *rev'd and remanded on other grounds*, 21 F.4th 481 (7th Cir. 2021) (denying prosecutor's summary judgment motion on failure to intervene because prosecutors are "intimately aware of the ethical code of conduct for prosecutors and an individual's constitutional rights."). As the Seventh Circuit explained in *Whitlock*, a "prosecutor who is acting in an investigatory capacity" is "held to the same standard of liability as a police officer" and is not "subject to rules that are any different." 682 F.3d at 580, 583; *see also Fields II*, 740 F.3d at 1114 (holding that a prosecutor is not entitled to absolute immunity or qualified immunity for fabricating evidence prior to trial). This very

---

[9]      Following these principles, numerous courts in this district have denied qualified immunity to prosecutors and allowed failure to intervene claims against them to proceed. *See e.g., Gray v. City of Chicago*, 2022 WL 910601, at \*16 (N.D. Ill. Mar. 29, 2022); *Resendiz v. City of Chicago*, 2017 WL 11569364, at \*2 (N.D. Ill. Aug. 10, 2017); *Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1191 (N.D. Ill. 2013); *Chatman v. City of Chicago*, 2015 WL 1090965, at \*10 (N.D. Ill. Mar. 10, 2015); *Smith v. Burge*, 2016 WL 6948387, at \*10 (N.D. Ill. Nov. 28, 2016); *Harris v. City of Chicago*, 2015 WL 5445012, at \*4 (N.D. Ill. Sept. 15, 2015); *Patrick v. City of Chicago*, 2014 WL 7204501, at \*10 (N.D. Ill. Dec. 17, 2014).

Court, in response to Defendants' raising of qualified immunity in their motion to dismiss, noted that "failure to intervene claims can cast a wide participant net" and that failure to intervene against prosecutors are not categorically foreclosed, especially when they are acting in such an investigatory manner.[10]

Additionally, a plaintiff need not show that case law clearly establishes the constitutional violation at issue where the violation is obvious. *Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002) ("officials can still be on notice that their conduct violates established law even in novel factual circumstances"); *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) (denying qualified immunity to defendant who housed plaintiff in abjectly unsanitary conditions, despite lack of on-point case that doing so was unconstitutional). It is obvious that a prosecutor who participates in a coercive interrogation, in which officers are fabricating evidence, feeding facts to suspects, and falsely promising that they will be released if they confess, has a constitutional duty to intervene and stop the interrogation. It is not credible for Defendant Judge to argue that a felony review ASA in 2003 would be unaware of an obligation to step-in and prevent constitutional violations by police from tainting a criminal investigation and ultimately a criminal prosecution.

The record abounds with evidence that County Defendants knew Plaintiffs' confessions were false, stood alongside police officers who were playing an active role in fabricating and coercing this false evidence, and could have prevented these violations had they acted. PSOF ¶¶ 50-59, 93-96, 103-05, 111-15. Whether Defendant Judge failed to intervene during to prevent constitutional violations committed by the police is therefore a question that must be left to the jury, rather than decided prematurely based on a meritless invocation of qualified immunity.

---

[10]    *Fulton*, 547 F. Supp. 3d at 816-17 (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

48

Defendant Shepherd's invocation of qualified immunity fails for similar reasons. He asserts that his "only involvement in this case was to investigate the Lake Meadows Apartments for security cameras, and then testify about what he found" with there being "no evidence in this case indicating that Defendant Shepherd did anything else." Dkt. 199 at 12. Accepting those facts, Shepherd argues he did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id*. However, Plaintiffs' version of the facts with regard to Shepherd is very different, *see infra*. Arg. IV.B.1. Accepting Plaintiffs' version, Defendant Shepherd knowingly and intentionally violated Plaintiffs' constitutional rights. It is not a novel area of law that one cannot fabricate evidence. *See Fields II*, 740 F.3d at 1114 (holding that a prosecutor is not entitled to absolute immunity or qualified immunity for fabricating evidence prior to trial). This question must go to a jury.

Lastly, though County Defendants do not raise any other iteration of a qualified immunity defense for Plaintiffs' other claims, they are not entitled to qualified immunity on any other count. At the time of the 2003 investigation in this case, it had long been clearly established that a prosecutor who engages in the deliberate manufacture of false evidence violates the constitution and is not entitled to qualified immunity. *See Whitlock*, 682 F.3d at 585; *see also Fields II,* 740 F.3d at 1114 ("it was established law by 1985 . . . that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process."); *Mooney v. Holohan*, 294 U.S. 103, 110, 112-23 (1935); *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Brady v. Maryland,* 373 U.S. 83 (1963); *United States v. Bagley,* 473 U.S. 667 (1985); *Jones*, 856 F.2d 985. Whether Defendant Judge is held liable directly or on a conspiratorial basis is immaterial, as "what must be clearly established is limited to the underlying constitutional right that the Defendants conspired to violate." *See, e.g.,*

*Liggins v. City of Chicago*, 2021 WL 2894167, at *6 (N.D. Ill. July 9, 2021); *Walker v. White*, 2021 WL 1058096, at *16 (N.D. Ill. Mar. 19, 2021); *Harris v. City of Chicago*, 2020 WL 7059445, at *5 (N.D. Ill. Dec 2, 2020). In other words, if Defendant Judge had fair notice that he could not deliberately manufacture false evidence, as he did pursuant to *Whitlock*, he also had fair notice that he could not enter a conspiratorial agreement to achieve the same end. More generally, Defendant Judge was on notice that he could not conspire to deprive Plaintiffs of their constitutional rights. *See Jones*, 856 F.2d at 992. As such, no County Defendant is entitled to qualified immunity.

### E. The County Defendants are not entitled to sovereign immunity.

County Defendants are not entitled to sovereign immunity on the state law claims because, under one view of the facts, County Defendants were arguably acting beyond the scope of their authority in violation of the law. An agent's conduct will only be attributed to the state for purposes of sovereign immunity if: "(1) [there are] no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) . . . the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State." *Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001) (quoting *Healy v. Vaupel*, 133 Ill.2d 295, 309 (1990)). County Defendants incorrectly claim that the relevant legal question for whether County Defendants are entitled to sovereign immunity is whether the acts of ASA Judge, ASA Varga, and Defendant Shepherd arose out of a breach of duty that was imposed on them by virtue of their state employment, or whether they are charged with a breach of duty independent of their state employment. That is not the case.

50

This Court does not even have to reach the question of duty because sovereign immunity does not apply if the state's agent acts in violation of statutory or constitutional law in excess of his or her authority. *See Healy v. Vaupel*, 133 Ill. 2d 295, 308 (1990) ("Sovereign immunity affords no protection, however, when it is alleged that the State's agent acted in violation of statutory or constitutional law or in excess of his authority, and in those instances an action may be brought in circuit court."); *Gossmeyer v. McDonald*, 128 F.3d 481, 487 (7th Cir. 1997); *Richman*, 270 F.3d at 441-42; *Nichol v. Stass*, 735 N.E.2d 582, 586 (2000); *Feldman v. Ho*, 171 F.3d 494, 498 (7th Cir. 1999) ("Illinois follows the federal practice by making an exception for situations in which the public employee did not act within the scope of his employment or violated the Constitution."); *Senn Park Nursing Center v. Miller*, 104 Ill.2d 169, 188-89 (1984); *Bio–Medical Laboratories, Inc. v. Trainor*, 68 Ill.2d 540, 548 (1977); *Moline Tool Co. v. Department of Revenue*, 410 Ill. 35, 37 (1951); *Schwing v. Miles*, 367 Ill. 436, 441-42 (1937). Defendant Judge acted in violation of statutory and constitutional law in excess of his authority when he conspired and participated in coercing Fulton's testimony, fabricated evidence, failed to intervene, and intentionally inflicted emotional distress. PSOF ¶¶ 50-59. Defendant Varga acted in violation of statutory and constitutional law in excess of his authority when he fabricated evidence and intentionally inflicted emotional distress. *Id.* ¶¶ 93-96, 103-05, 111-15. Defendant Shepherd acted in violation of statutory and constitutional law in excess of his authority when he deprived Plaintiffs of liberty, violated Plaintiffs' Due Process rights, continued the baseless prosecution of Plaintiffs, and intentionally inflicted emotional distress. *Id.* ¶¶ 134-42. As such, County Defendants cannot establish as a matter of law that they are entitled to sovereign immunity for the state law claims, and the fact disputes must go to a jury.

**IV.    Genuine disputes of material fact preclude summary judgment on Plaintiffs' substantive claims against the County Defendants.**

The County Defendants advance various arguments in favor of summary judgment, but each relies on taking disputes of fact and available inferences in their favor, which is improper. Properly construed, the summary judgment record supports Plaintiffs' claims.

**A.    Plaintiffs' claims against Defendants Judge and Varga must be decided by a jury.**

County Defendants paint a sanitized picture of the record, one untainted by their misconduct. As detailed below, County Defendants rely on recitations of "we did nothing wrong" as justification for being entitled to summary judgment on all counts. Plaintiffs introduce many contradicting material facts such that, with all favorable inferences being made in their favor, each of Plaintiffs' claims against the County Defendants should go to a jury.

**1.    Defendant Judge is liable for his involvement in coercing and fabricating Fulton's confession.**

County Defendants argue that Defendant Judge is not liable for his role in coercing Fulton's confession; however, they provide the incorrect framework for this Court to even analyze that question. To bring a successful Fifth Amendment claim, a plaintiff must show (1) that his confession was involuntary and coerced, and (2) that his confession was used against him in a criminal case.[11] *Chavez v. Martinez*, 538 U.S. 760, 770-71 (2003). To determine whether the confession is voluntary, it has long been established that courts must "examine[] the totality of circumstances to determine whether a confession had been 'made freely, voluntarily and without compulsion or inducement of any sort'"—if not, it was an involuntary statement obtained in

---

[11]    For Fulton to show that his confession was used against him in a criminal case, he must show that his confession was either used at his criminal trial, *see Chavez*, 538 U.S. at 770-71, or at a pre-trial hearing, *see Jackson v. Curry*, 888 F.3d 259, 265 (7th Cir. 2018). None of the parties dispute that his confession was used at his criminal trial. As such, this section will focus on the involuntary and coercive nature of the confession.

violation of the Fifth Amendment. *Withrow v. Williams*, 507 U.S. 680, 689 (1993); *see also Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) (the voluntariness inquiry "must be broad" and "based upon consideration of the totality of the circumstances"); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (voluntariness does not turn "on the presence or absence of a single controlling criterion"). The Seventh Circuit has repeatedly reaffirmed this totality standard, holding that for "a confession [to be] voluntary" it must, "in the totality of circumstances, [be] the 'product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004) (quoting *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001)); *see also United States v. Vallar*, 635 F.3d 271, 282 (7th Cir. 2011). That "totality" includes "both the characteristics of the accused and the details of the interrogation." *Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) (quoting *Schneckloth*, 412 U.S. at 226). The use of police coercion to extract an involuntary statement is a violation of due process under the Fourteenth Amendment. *See, e.g., Schneckloth*, 412 U.S. at 223-26; *United States v. Stadfeld*, 689 F.3d 705, 709–10 (7th Cir. 2012). *United States v. Shah*, 2022 WL 17251276, at *4 (N.D. Ill. Nov. 28, 2022).

The Seventh Circuit has further held that courts must "analyze coercion from the perspective of a reasonable person in the position of the suspect," and should "consider the following factors: the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Shah*, 2022 WL 17251276, at *4 (citing *United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015)); *see also United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001); *Schneckloth*, 412

U.S. at 226 ("factors taken into account" in assessing the totality of circumstances "include[] the youth of the accused"); *Smith v. Duckworth*, 856 F.2d 909, 912 (7th Cir. 1988) (holding that evaluating an interrogation for coercion requires consideration of the education, age and intelligence of the accused, and what the accused has been told about his constitutional rights before providing statements).

In this case, many facts—when taken in light most favorable to Plaintiff—support a showing that Fulton's confession was coerced. First, Fulton was only 18 years old, and still in high school, when he was first arrested and brought in for questioning. PSOF ¶¶ 32, 129. Second, he was arrested at 5:30 a.m. and then continuously interrogated, coached, and threatened by detectives. PSOF ¶¶ 35-71. Third, for nearly 24 hours, he was not given any food. PSOF ¶ 70. He was not allowed to sleep. PSOF ¶ 71.

Fourth, Police Officer Defendants falsely promised Fulton that he would be able to go home after he gave a fabricated confession. PSOF ¶ 67. False promises of leniency are routinely condemned as impermissible interrogation tactics. *See United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009) ("[A] false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him[,]" and "generally . . . is a forbidden tactic[.]") (citing *United States v. Baldwin*, 60 F.3d 363, 365 (7th Cir. 1995)); *see also United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009); *United States v. Nichols*, 847 F.3d 851, 857 (7th Cir. 2007); *Alexander v. DeAngelo*, 329 F.3d 912, 918 (7th Cir. 2003); *Sprosty v. Buchler*, 79 F.3d 635, 646 (7th Cir. 1996).

Fifth, Police Officer Defendants lied about having incriminating evidence against Fulton, including a matching car description, a witness who described seeing two Black males near Collazo's body, an uninterested witness pointing the finger at him (Marninelli), and a voluntary

statement from Johnnitta Griffin's implicating Fulton. PSOF ¶¶ 7-8, 10-15, 38. Lying about evidence is another factor, in the totality of the circumstances, that can render a confession involuntary. *See Sornberger*, 434 F.3d at 1011-1012, 1023-1027 (reversing dismissal of coerced confession claim at summary judgment where police lied about other witnesses implicating the suspect, made false promises of leniency, and threatened dire consequences if the suspect did not confess). The same is true for feeding a suspect facts about the crime to shape the confession, which the Police Officer Defendants actively did. *E.g., Fikes v. Alabama*, 352 U.S. 191, 195 (1957).

Sixth, Officer Defendants threatened Fulton that he would lose his family if he did not confess, which adds to the coercive nature of the confession. By threatening his family and making false promises of leniency, Fulton was influenced to view making a false confession as being more beneficial than staying on the truth. Conduct that "influences a rational person who is innocent to view a false confession as more beneficial than being honest is necessarily coercive, because of the way it realigns a suspect's incentives during interrogation." *Villalpando*, 588 F.3d at 1128. Such conduct "prevent[s] a suspect from making a rational choice by distorting the alternatives among which the person under interrogation is being asked to choose." *Id.* (quoting *Sprosty*, 79 F.3d at 646). *See also Barrera v. Young*, 794 F.2d 1264, 1267 (7th Cir. 1986) ("The 'voluntariness' of a confession depends not only on whether it was a result of free choice but also on whether the interrogator's techniques 'are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means.'"); *Weidner v. Thieret*, 866 F.2d 958, 963-64 (7th Cir. 1989) ("Interrogation becomes constitutionally objectionable" when the totality of the circumstances "prevent the person being questioned from making a rational choice." . . . "Misrepresentations can do this, by distorting the alternatives

among which the person under interrogation is being asked to choose; so can threats that prevent a person from thinking clearly, or that (much like misrepresentations) exaggerate the consequences of one of the alternatives—not confessing.").

Against this backdrop is where Defendant Judge arrives at Area 1. For one to two hours, Defendant Judge converses with Defendants Zalatoris and Breen, reviews documents, and catches up on the circumstances of Officer Defendants' treatment of Fulton. Dkt. 198, ¶20. Taking all inferences in Plaintiffs' favor, it is reasonable that Defendants Zalatoris and Breen caught Defendant Judge up to speed on their coercive interrogation tactics prior to his arrival. As such, going into his interrogation of Fulton, Defendant Judge was aware of Fulton's age, level of schooling, length of his detention, threatening nature of the interrogations, false promises of leniency, intense coaching of a fabricated story, and the use of physical punishment—including deprivation of food, water, and sleep.

Rather than take any steps whatsoever to address the coercive nature of Fulton's interrogation, Defendant Judge added to the coercion to elicit a coerced confession from Fulton. Defendant Judge first interrogated Fulton again with both detectives present. PSOF ¶¶ 50-52. During this interrogation, he considered the inculpatory statements Fulton made but completely discounted the exculpatory ones or facts that did not line up with the physical evidence. *Id.* ¶¶ 5, 30-31, 119, 122-26. Fulton had to ask Defendant Judge if they could speak alone. *Id.* ¶ 54. When Fulton confessed to Defendant Judge that the story he had given was fabricated by the detectives, Defendant Judge chose to ignore him and bury that alibi, along with potential exculpatory evidence. *Id.* ¶¶ 55-59. He did not document the alibi anywhere, in any format. *Id.* ¶ 57. He did not notify his supervisors that Fulton had made a full recantation, nor did he tell his supervisors about the coercive nature of the forced confession. PSOF ¶ 59. He did not take a formal

statement from Fulton because, making all inferences in Plaintiffs' favor, he did not want to document anything from Fulton until the officers had more time to extract a cleaner, coerced confession. He was present when the detectives came back in and roughly grabbed Fulton by the shirt and forced him into another room where they proceeded to beat him but did not document this treatment. PSOF ¶ 58. He left Fulton to the mercy of the detectives without taking any further action, despite both being aware of—and actively contributing to—the coercive environment that was being exerted upon Fulton to falsely confess. PSOF ¶ 58.

Whether, in the totality of circumstances, Defendant Judge's conduct rose to the level of overcoming Plaintiff's free will and rendering his statements involuntary, is at the very least a question of causation. Which acts forced Mr. Fulton to involuntarily confess? Was it the act of having his recantation be ignored by a prosecutor, being physically grabbed in front of that prosecutor while Defendant Judge remained silent? Did those acts lead Mr. Fulton to later conclude his situation was hopeless, and that confessing to a murder he did not commit was indeed the only way to go home? Judge's culpability is a vigorously disputed factual issue that will ultimately require a jury to resolve. *See Schneckloth*, 412 U.S. at 248-49 ("Voluntariness is a question of fact to be determined from all the circumstances.").

### 2. Defendants Judge and Varga are liable for fabricating Fulton and Shaw's confessions, regardless of whether the statements were used at Plaintiffs' trial.

Defendants argue that Defendant Judge is entitled to dismissal on Plaintiffs' fabrication cause of action because Judge "didn't fabricate anything at all." Dkt. 199 at 19. Defendants then make various forms of the same argument with respect to Defendant Varga: that Varga is entitled to summary judgment on Plaintiffs' fabrication claim because he did nothing wrong and because Shaw's confession was not introduced at Plaintiffs' criminal trial. Dkt. 199 at 19-23. Each of County Defendants' piecemeal arguments fail to justify granting summary judgment. There is a

plethora of disputes of fact as to each separate theory of dismissal, and therefore, Plaintiffs' fabrication claim—and all the theories and counterarguments subsumed within it—should proceed to trial.

County Defendants assert that an evidence-fabrication claim has four elements: (1) the defendant knowingly fabricated evidence against the plaintiff, (2) the evidence was used at his criminal trial, (3) the evidence was material, and (4) the plaintiff was damaged as a result. *Mack v. City of Chicago*, 2023 WL 4744791, at *14 (N.D. Ill. July 25, 2023). Defendants do not contest the third or fourth elements, but they argue that Plaintiff cannot establish the first or second. Of note, at summary judgment, a plaintiff "need not have a smoking gun or an admission to prove knowledge." *Gray v. City of Chicago*, 2022 WL 910601, at *10 (N.D. Ill. Mar. 29, 2022). Rather, he must "offer sufficient evidence from which a reasonable jury could find that the Individual Defendants knew the evidence they were eliciting was false." *Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1156-57 (N.D. Ill. 2022). Plaintiffs, taking all inferences in their favor, have shown factual disputes under the umbrella of these elements such that a reasonable jury could find in their favor.

As to the first element, taking facts in the light most favorable to Plaintiffs, there is ample evidence of Defendants' knowing fabrication. Fulton made it very clear to Defendant Judge that Defendant Zalatoris had coached him on the entire story and had threatened him into giving a false confession. PSOF ¶¶ 55-56. He also told him about the false promises of leniency. *Id.* ¶ 56. Plaintiffs have supplied enough facts that a jury could infer Judge chose not to take a formal statement because Fulton was still in the process of being coached and was not yet clean enough to get a full documented confession. Plaintiffs also raise enough disputes of fact such that a jury could find Defendant Varga also knew that 15-year-old Shaw's statement was false. Defendant

Varga interrogated Shaw three separate times after he had been held at Area 1 all day. *Id.* ¶¶ 93, 103, 105. Shaw truthfully maintained his innocence for as long as he could, despite heavy coaching, threats, and false promises of leniency from Defendant Zalatoris. *Id.* ¶¶ 93-94, 103, 105, 107-08. Defendant Varga told Shaw he did not believe his denials and continued to come back to see if his story had changed. *Id.* Shaw told Defendant Varga that Defendant Zalatoris was pressuring him into giving a fabricated story and lying. *Id.* ¶ 93, 114. After nearly 24 hours of interrogation, and under emotional distress, Shaw eventually caved and gave a false narrative of his involvement.

As to the second element, the Seventh Circuit has already rejected the argument that evidence needs to be admitted in a proceeding to state a due process fabrication claim. *See Hurt*, 880 F.3d at 843, *partially abrogated on other grounds by Lewis*, 914 F.3d at 475. Plaintiffs adopt their argument on this point set forth in Arg.I.A.4, *supra*.

County Defendants next fallaciously argue that because Shaw's handwritten statement is not 100 percent made up, that it does not qualify as a fabricated statement. Dkt. 199 at 21. Immediately after the quoted language County Defendants cite from *Fields II* ("testimony that is made up; it is invariably false") the court goes on to say that "[f]alse testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it." 740 F.3d at 1110. Nowhere does *Fields II* stand for the proposition that if a single fact is true in a suspect's statement, then the entire statement is *per se* not fabricated. Such a line in the sand would destroy the essence of fabrication jurisprudence.

In this case, Defendant Varga fabricated Shaw's statement and merely had Shaw and his uncle sign the bottom of each page or where Varga noted there was a clear error. PSOF ¶ 115. Defendant Varga authored and directed the statement, knowing the entire story was fabricated.

PSOF ¶ 114. The only piece included that was true was the gun deal robbery for $15 that Marinelli and Collazo committed against Fulton. However, County Defendants cite that kernel of truth as being the ultimate evidence that transforms fabricated evidence into a perfect and truthful retelling of the facts of a case. Rather, the gun deal robbery was included in the statement for two reasons: (1) because it was the only true connection Plaintiffs ever had to Collazo (first given by Marinelli, then Griffin, then Fulton, then Mitchell, and *then* Shaw); and (2) because it was the only "evidence" of motive Defendants had. The detectives and County Defendants were using that sole piece of information as both the motivation behind the murder and as an easy way to close out the case—with no regard for what actually happened or for finding who actually murdered Collazo. At the very least, Plaintiffs have asserted enough disputes of fact that, when taken in a light most friendly to them, confirm that the fabrication claim should be heard by a jury.

Last, County Defendants make a murky argument claiming that because *Fields II* gives slightly different definitions to the terms "coercion," "fabrication," and "false," somehow Plaintiffs' fabrication cause of action is undermined. Dkt. 199 at 21-22. *See Fields II*, 740 F.3d at 1110 ("Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it"). In this case, Plaintiffs made clear arguments that Defendants Judge and Varga, respectively, fabricated Fulton's and Shaw's statements. The statements are false. The statements also happened to be extracted in a coercive setting that Defendants Judge and Varga actively contributed to and failed to intervene in. The *Fields II* court's lesson in semantics does not establish any grounds for granting summary judgment on

behalf of County Defendants when there is an abundance of disputes of material facts surrounding County Defendants' coercive tactics and fabrication of evidence.[12]

County Defendants' arguments surrounding Plaintiffs' fabrication claim ignore ample evidence. County Defendants are free at trial to argue that their version of the facts is true, but such an approach at summary judgment is improper. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (courts "may not make credibility determinations, weigh the evidence or decide which inferences to draw from the facts" at summary judgment); *Nesbitt v. Villanueva*, 2012 WL 14350, at *4 (N.D. Ill. Jan. 4, 2012) (same).

### 3.    Defendant Judge is liable for failing to intervene.

County Defendants incorrectly argue that they are entitled to summary judgment on Plaintiffs' failure to intervene cause of action against Defendant Judge. As this Court has established, "failure to intervene under § 1983 requires only that plaintiffs allege that the defendants knew that a constitutional violation was committed and had a realistic opportunity to prevent it." *Fulton*, 547 F. Supp. 3d at 816.

To the first prong, Plaintiffs have supplied enough facts that, when taken in a light most favorable to them, establish that Defendant Judge knew the constitutional violations had been committed. First, Defendant Judge had met with Detectives Zalatoris and Breen for up to two hours before meeting with Fulton. PSOF ¶ 50. During that time, the detectives brought him up to speed. He would have learned that Fulton had been there for nearly 24 hours. Taking inferences in Plaintiffs' favor, the detectives could have also told him about the investigation and their

---

[12]    County Defendants also raise the argument that since Shaw had an adult present for, or one who consented to, his interrogations, Defendant Varga is entitled to summary judgment on Plaintiffs' fabrication claim. First, this is not a proper ground for requesting summary judgment. Further, Shaw's uncle testified that Shaw decided to give a fabricated statement after being promised he would be released and allowed to go live with family in Mississippi. PSOF ¶ 102. Neither person's presence lends any support to the attestation that Shaw was not coerced and that his statement was not fabricated.

coercive tactics against Fulton thus far. Second, Fulton told Defendant Judge about how the officers were treating him, including that he was threatened and extended false promises of leniency. *Id.* ¶¶ 55-56. Third, Defendant Judge was present when Defendant Zalatoris roughly grabbed Fulton and took him to another room where he proceeded to beat him. *Id.* ¶ 58. As a prosecutor, Defendant Judge would have known that these were constitutional violations. As this issue turns on a question of fact, it is proper for it to go to a jury.

To the second prong, a reasonable jury could find that Defendant Judge had a realistic opportunity to prevent the constitutional violations. Post-*Whitlock*, courts in this District have allowed failure to intervene claims to proceed against prosecutors where, as here, "it is alleged that they were involved in the investigation and had knowledge of the constitutional violation and, thus, would have had a realistic opportunity to prevent an officer from violating plaintiff's rights."[13] *McCullough v. Hanley*, 2018 WL 3496093, at *16 (N.D. Ill. July 20, 2018); *see also Resendiz*, 2017 WL 11569364, at *2 (a prosecutor who acts as an investigator and allegedly fabricates evidence against a defendant during the investigation stage could be held liable for failure to intervene under Section 1983); *Lovelace v. Gibson*, 2020 WL 6049901, at *31 (C.D. Ill. Oct. 13, 2020) (denying prosecutor's summary judgment motion on failure to intervene). Here, Defendant Judge was acting as an investigator and knew about the constitutional violations occurring.[14] He also participated in fabricating evidence against Plaintiffs. He had many realistic

---

[13]    *See e.g., Rivera*, 974 F. Supp. 2d at 1191 (declining to dismiss claim where prosecutor's liability for failure to intervene was plausible given that he participated in the investigation); *Chatman*, 2015 WL 1090965, at *10  (same); *Smith v. Burge*, 2016 WL 6948387, at *10 (same); *Harris*, 2015 WL 5445012, at *4 (same); *Patrick*, 2014 WL 7204501, at *10, *reconsidered in part on other grounds Patrick v. City of Chicago*, 103 F. Supp. 3d 907 (N.D. Ill. 2015) (same); *Saunders*, 2013 WL 6009933, at *10, *reconsidered in part on other grounds in Saunders v. City of Chicago*, 146 F. Supp. 3d 957 (N.D. Ill. 2015) (same).
[14] *See supra,* Arg. III.A, for a discussion of how Defendant Judge was acting as an investigator.

opportunities to intervene, both while at Area 1 and after. Because this issue also turns on issues of material fact, it must go to a jury.

County Defendants also argue, in a footnote, that failure to intervene should be dropped from Plaintiff Mitchell's lawsuit; however, Defendant Judge's failure to intervene also actively tainted the case against Mitchell. *See Kyles v. Whitley*, 514 U.S. 419, 433, 460-61 (1995) (highlighting that materiality of evidence is a cumulative inquiry which "'must be evaluated in the context of the entire record.'") (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)).

When Defendant Judge failed to intervene to stop the coercion and fabrication of evidence against Fulton, that conduct extended to Mitchell because it tainted the entire investigation and evidence gathering process. Defendant Judge knew that officers had coerced Fulton to implicate Mitchell and Shaw. He knew that Fulton's confession, including the portions involving Mitchell and Shaw, was false because Fulton told him. PSOF ¶¶ 55-56. He also chose not to take a formal statement from Mitchell, despite supposedly only being given a confession. PSOF ¶¶ 77-90. Taking inferences in favor of Plaintiffs, Defendant Judge knew that similar tactics would be used on Mitchell to elicit the same fabricated confession as Fulton. The confessions of both were very interwoven in the narrative that Defendants created such that when Defendant Judge failed to intervene on behalf of Fulton, he also subjected Mitchell to the same constitutional violations—despite having the opportunity to intervene while it was happening to Fulton or at any point after the fact. Being a prosecutor and felony review supervisor, Defendant Judge was in a unique position to be able to bring the truth to light, and he chose not to. The coerced and false statement he both allowed to happen and actively participated in inculpated Fulton which then paved the way for ASA DeAngelo to elicit a fabricated and coerced statement from Mitchell and for ASA Varga to do the same with Shaw.

### 4. Plaintiffs' conspiracy claims against Defendant Judge must be decided by a jury.

County Defendants make no argument seeking summary judgment of Plaintiffs' conspiracy cause of action against Defendant Judge.[15] Regardless, out of an abundance of caution, Plaintiffs will assert why County Defendants are not entitled to summary judgment on this claim.

Defendant Judge is liable for conspiring to violate Plaintiffs' constitutional rights. To prove a section 1983 conspiracy, Plaintiffs must point to evidence from which a jury could infer an agreement among two or more people acting in concert to commit an unlawful act, or a lawful act by unlawful means. *Hampton*, 600 F.2d 600, *rev'd in part*, 446 U.S. 754. However, conspirators "need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones*, 856 F.2d at 992. Conspirators are liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy." *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002).

A co-conspirator need not have directly caused a constitutional violation himself. *See United States v. Caliendo*, 910 F.2d 429, 438 (7th Cir. 1990) (mere presence or a single act can be grounds for liability if the act was "intended to advance the ends of the conspiracy") (internal citation omitted); *United States v. Mancillas*, 580 F.2d 1301, 1308 (7th Cir. 1978); *Hostrop v. Bd. of Junior College Dist*. No. 515, 523 F.2d 569, 576 (7th Cir. 1975) (citing W. Prosser, The Law of Torts § 46 at 293 (4th ed. 1971)). All that is necessary is that the co-conspirator agree—

---

[15] The conspiracy cause of action was recognized by this Court in its opinion and order on the motion to dismiss. Dkt. 106 at 25. It is also recognized by County Defendants in their memorandum of law in support of their motion for summary judgment. Dkt. 199 at 7. As such, the issue is forfeited.

explicitly or tacitly—to the objective of the conspiracy and take some overt step in furtherance of that objective. *Jones*, 856 F.2d at 993; *Sanders v. City of Chicago Heights*, 2016 WL 2866097, at *11 (N.D. Ill. May 17, 2016).

The overt step need not be illegal. *See Smith*, 222 F. Supp. 3d at 697. Further, "an express agreement among the conspirators is not necessary; the participants must simply share the same general conspiratorial objective." *Xie v. City of Chicago*, 2016 WL 6193981, at *10 (N.D. Ill. Oct. 24, 2016) (citing *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013)). "[I]f the agreement is not overt, 'the alleged acts must be sufficient to raise the inference of mutual understanding' (i.e., the acts performed by the members of a conspiracy 'are unlikely to have been undertaken without an agreement')." *Amundsen v. Chicago Park Dist*., 218 F.3d 712, 718 (7th Cir. 2000) (quoting *Kunik v. Racine Cty., Wisconsin*, 946 F.2d 1574, 1580-81 (7th Cir. 1991)). This is because the "law does not demand proof that each conspirator knew the exact limits of the illegal plan or the identity of all participants therein," but requires only "that there be a single plan, the essential nature and general scope of which is known to each person who is to be held responsible for its consequences." *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981) (citation and internal quotation marks omitted). "Conspiracies are by their nature carried out in secret, and thus direct proof of agreement is rare." *Tully v. Del Re*, 2002 WL 31175983, at *7 (N.D. Ill. Oct. 1, 2002) (citing *United States v. Sasson*, 62 F.3d 874, 886 (7th Cir. 1995)). Thus, "circumstantial evidence may provide adequate proof of conspiracy." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1256 (7th Cir. 1984).

Here, the overarching plan was to frame Plaintiffs for Collazo's murder, and Defendant Judge both understood that and took overt steps in furtherance of that conspiracy. He conspired with Defendants Zalatoris and Breen for up to two hours before first talking with Fulton. PSOF

¶ 50. He then interrogated Fulton with both detectives present. PSOF ¶¶ 51-52. When Fulton got him alone to tell him the truth, Judge buried that truth. He then witnessed Fulton being physically harmed by Defendant Zalatoris and taken somewhere else where he would be repeatedly punched in the head and kicked in the side, which he also buried. PSOF ¶ 58.

As such, Plaintiffs' conspiracy claim must go to the jury. At summary judgment, when inferences are taken in the nonmovant's favor, "[t]he question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds." *Hampton*, 600 F.2d at 621. Applying this law, the jury must resolve Plaintiffs' conspiracy claims.

### 5. Plaintiffs' IIED claims against the County Defendants must be decided by a jury.

County Defendants incorrectly claim that their misconduct does not rise to the level of fulfilling the requirements for intentional infliction of emotional distress. Dkt. 199 at 33-34. For conduct to be extreme and outrageous it must go "beyond all bounds of decency and be considered intolerable in a civilized community." *Velez v. City of Chicago*, 2023 WL 6388231, at *13 (N.D. Ill. Sept. 30, 2023) (citing *Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010)). "Courts analyze whether conduct is extreme and outrageous based on an objective standard taking into consideration the totality of the circumstances" and do not "look at each of the acts separately." *Parker v. Side by Side, Inc.*, 50 F. Supp. 3d 988, 1023 (N.D. Ill. 2014) (citing *Duffy v. Orlan Brook Condo. Owners' Ass'n*, 981 N.E.2d 1069, 1079 (Ill. App. Ct. 2012)); *Holder v. Ivanjack*, 39 F. Supp. 2d 965, 970 (N.D. Ill. 1999). Courts also examine the "degree of power or authority the defendant holds over the plaintiff." *Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016). *See Henry*, 1997 WL 610781, at *2 ("An average member in the community would consider it

66

outrageous for police officers to falsely frame, arrest and imprison an innocent citizen."); *Moore v. City of Chicago*, 2011 WL 1231318, at *4 (N.D. Ill. 2011).

Further, if County Defendants "fabricated false or misleading evidence of [plaintiff's] guilt or concealed exculpatory evidence from prosecutors, that behavior is sufficiently outrageous to support a claim for emotional distress." *Carroccia v. Anderson*, 249 F. Supp. 2d 1016, 1028 (N.D. Ill. 2003); *see also Washington v. Boudreau*, 2022 WL 4599708, at *25 (N.D. Ill. Sept. 30, 2022); *Rosario v. City of Chicago*, 2012 WL 1319806, at *11 (N.D. Ill. Apr. 17, 2012) ("Allegations that a state official fabricated false or misleading evidence of guilt ... would be sufficiently 'outrageous' to support an IIED claim."). That is exactly what both Defendants Judge and Varga did. Drawing inferences in Plaintiffs' favor, a jury could conclude that Defendant Judge's and Defendant Varga's acts were "extreme and outrageous." Both prosecutors acted in an investigatory capacity where they fabricated evidence and concealed exculpatory evidence: Defendant Judge buried Fulton's alibi and Defendant Varga buried Shaw's alibi. PSOF ¶¶ 55, 59, 103-04. Both buried the mistreatment of Fulton and Shaw at the hands of the Police Officer Defendants. *Id.* ¶ 115. Defendant Judge buried the fact that 18-year-old Fulton was roughly treated. *Id.* ¶ 58. Defendant Varga buried that 15-year-old Shaw was coerced and railroaded to the point of tears and tearing out his braids in anxiety. *Id.* ¶¶ 109, 111. Both held positions of authority over Fulton and Shaw, and as a result of their actions, Plaintiffs spent over 16 years incarcerated for a murder they had nothing to do with. Due to the disputes of fact, Plaintiffs' intentional infliction of emotional distress claim should go to the jury.

**B. Plaintiffs' claims against Defendant Shepherd must be decided by a jury.**

**1. Defendant Shepherd's involvement in the case.**

Defendant Shepherd was an investigator with the State's Attorney's Office who testified

in the State's rebuttal case at Plaintiffs' criminal trials. Dkt. 198, ¶¶85, 88; PSOF ¶ 140. Early in the morning on the day of his testimony, Shepherd visited Mr. Fulton's apartment building at the request of the trial prosecutors to investigate whether the front and rear doors of the apartment building had security cameras. PSOF ¶ 138. Fulton's apartment building *did* have security cameras at the back doors, but Shepherd fabricated a false narrative that there were no cameras covering the back doors, and he testified to this false narrative at trial. *Id.* ¶ 140. The prosecution seized on this false narrative in their closing arguments, arguing that Mr. Fulton's (otherwise ironclad) alibi could be disregarded because he could have snuck out the back door of his apartment building, beyond the view of the security cameras, to murder Collazo. *Id.* ¶¶ 141-42.

### 2. Defendant Shepherd is liable for violating Plaintiffs' constitutional rights as a result of his fabricated backdoor camera evidence.

Shepherd advances various arguments for why he is entitled to summary judgment on Plaintiffs' deprivation of liberty, due process, malicious prosecution, and intentional infliction of emotional distress claims, but all of his arguments require accepting a version of the facts which Plaintiffs dispute, so none can be accepted at the summary judgment stage. On the deprivation of liberty claim and fabrication claims, he argues he did not fabricate evidence because he did not see surveillance cameras at the back area of the building. Dkt. 199 at 24, 26-27. But this is a disputed fact, and a reasonable jury could conclude that Shepherd *did* see a camera at the back door and fabricated a false narrative to the contrary. *See* PSOF ¶¶138-140. Moreover, while Shepherd is correct that he is absolutely immune for his testimony on the witness stand, Dkt. 199 at 24, he is *not* immune from his pre-testimonial acts of evidence fabrication, which he later testifies to at trial. And a reasonable jury could infer from the record in this case that Shepherd's false narrative about the lack of a backdoor security camera was concocted before he hit the witness stand—after all, the only reason he was called to testify

was that the prosecutors knew he would testify about the absence of a backdoor camera, which means he shared his fabricated narrative with them out of court before the proceedings began that day. If he had told prosecutors the truth—that there was a backdoor camera—his testimony would have strengthened Fulton's alibi and prosecutors never would have called him to the stand. So, he must have shared his fabricated false narrative with them before testifying. Finally, he asserts his backdoor camera testimony was not the proximate cause of harm to Plaintiffs because he did not know how that testimony would affect the trial. But again, this requires accepting that Shepherd knew nothing about Fulton's alibi, which is disputed. *See* Dkt. 226, ¶88.

As for malicious prosecution, in addition to contesting the facts about the truthfulness of his narrative that there was no backdoor camera, Shepherd argues that Plaintiffs cannot establish that his conduct served to continue the criminal proceedings against them, or that he acted with malice. Dkt. 199 at 32. But both of these are fact questions which must be resolved by the jury. Mr. Fulton had an ironclad alibi, which was only pierced due to Shepherd's false testimony which allowed prosecutors to argue that Fulton could have snuck out the back door to murder Collazo. PSOF ¶¶40-41, 122-130, 140-141. A reasonable jury could conclude that Shepherd's fabricated 'no camera' narrative was critical to the prosecution continuing its criminal case against Plaintiffs, ultimately resulted in their wrongful conviction. And a reasonable jury could certainly infer that Shepherd acted with malice when he fabricated a false story to knowingly help break Fulton's alibi. *Id.* ¶¶138-140; Dkt. 226, ¶88.

Finally, as for IIED, Shepherd argues in conclusory fashion that his "behavior was not extreme and outrageous." Dkt. 199 at 34. But a reasonable jury could conclude that deliberately falsifying evidence to break Mr. Fulton's alibi, in order to help frame Plaintiffs for

murder, is "extreme and outrageous." *See Henry*, 1997 WL 610781, at *2. Shepherd's argument fails.

**V.      Defendant Cook County is not entitled to summary judgment on indemnification because Plaintiffs' claims against the County Defendants survive.**

Defendant Cook County argues it is entitled to summary judgment on Plaintiffs' indemnification claim. However, for the reasons laid out above, Cook County is not entitled to summary judgment because there are genuine disputes of material fact as to Plaintiffs' claims against County Defendants such that those claims must go to a jury. As those claims survive, so too does Plaintiffs' indemnification claim against Defendant Cook County.

<u>CONCLUSION</u>

For the foregoing reasons, with the exception of the claims identified above for which Plaintiffs do not contest dismissal, *see supra* at 2, n.1, Defendants' motions for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

BY:      /s/ Julia Rickert
         *One of Plaintiffs' Attorneys*

Arthur Loevy                     Andrea D. Lyon
Jon Loevy                        LYON LAW
Russell Ainsworth                53 W. Jackson Blvd., Ste. 1650
Julia Rickert                    Chicago, IL 60604
Sam Heppell                      T: 312-877-5543
Alyssa Martinez                  F: 312-663-3707
LOEVY & LOEVY                    andrea@andrealyon.com
311 N. Aberdeen Street
Chicago, IL 60607
T: 312-243-5900
F: 312-243-5902
julia@loevy.com

## CERTIFICATE OF SERVICE

    I hereby certify that on October 10, 2023, I filed the foregoing document using the

Court's CM/ECF system, which effected service on all counsel of record.

/s/ Julia Rickert
*One of Plaintiffs' Attorney*s
