IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN FULTON, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ROBERT BARTIK, et al., )<br>)<br>Defendants. ) | Case No. 20 C 3118<br><br>Judge Joan H. Lefkow |

| | |
|---|---|
| ANTHONY MITCHELL, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ROBERT BARTIK, et al., )<br>)<br>Defendants. ) | Case No. 20 C 3119<br><br>Judge Joan H. Lefkow |

**ORDER**

Plaintiffs John Fulton and Anthony Mitchell move to exclude the opinions and testimony of Dr. Diana Goldstein, a false confessions expert disclosed by "Individual Defendants" who were at the time employed by the Chicago Police Department, pursuant to Fed. R. Evid. 702 and 703. (Dkt. 283.)[1] The motion is granted. The remaining *Daubert* motions are addressed in separate orders.

---

[1] The court has consolidated *Fulton* v. *Bartik, et al.*, No. 20-cv-3118, and *Mitchell* v. *Bartik, et al.*, No. 20-cv-3119. For consistency, the court refers to docket entries and record citations in *Fulton*. The following constitutional claims will proceed to trial: false confession under the Fifth and Fourteenth Amendments (Count I); fabrication of false witness statements under the Fourteenth Amendment (Count II); deprivation of liberty without probable cause under the Fourth and Fourteenth Amendments (Count III); failure to intervene (Count VI); and conspiracy (Count VII). Related state-law claims will also proceed to trial: malicious prosecution (Count IX); intentional infliction of emotional distress (Count X); civil conspiracy (XI); *respondeat superior* against the City of Chicago (Count XII); and indemnification against the City of Chicago (XIII).

1

**STATEMENT**

In related actions, Fulton and Mitchell filed complaints against the Individual Defendants, alleging constitutional violations under 42 U.S.C. § 1983 and Illinois common law. They claim that they were deprived of their constitutional rights and wrongfully imprisoned because Chicago police officers fabricated witness testimony and coerced false confessions, leading to plaintiffs' eventual convictions for the murder of Christopher Collazo. Trial is set to begin February 10, 2025.[2]

**LEGAL STANDARD**

The admission of expert opinion testimony is governed by Federal Rule of Evidence 702 and *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1992). "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed R. Evid. 702.

The district court serves "as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich* v. *Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004). District courts employ a three-part analysis before admitting expert testimony:

> (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue.

*Obrycka* v. *City of Chicago*, 792 F. Supp. 2d 1013, 1018 (N.D. Ill. 2011). The focus of the court's *Daubert* inquiry must be "solely on principles and methodology, not on the conclusions they generate." *Id.* (quoting *Chapman* v. *Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002)).

The Rule 702 inquiry is "a flexible one." *Bielskis* v. *Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (quoting *Daubert*, 509 U.S. at 594). "Determinations on admissibility should not supplant the adversarial process; 'shaky' expert testimony may be admissible, assailable by its opponents through cross-examination." *Gayton* v. *McCoy*, 593 F.3d 610, 616 (7th Cir. 2010).

**ANALYSIS**

Individual Defendants offer the expert opinions and testimony of Dr. Goldstein to rebut the opinions of plaintiffs' false confession expert, Dr. Richard Leo. (*See* Dkt. 279-1, for Dr.

---

[2] The court assumes familiarity with the relevant background facts, which are described fully in the court's summary judgment opinion. (Dkt. 256 at 2–12.)

Leo's Report; *see* Dkt. 283-4 for Dr. Goldstein's Report.) Dr. Goldstein is a licensed and board-certified clinical neuropsychologist and serves as the president, CEO, and director of neuropsychology at Michigan Avenue Neuropsychologists in Chicago, Illinois. She is also the Director of Neuropsychology for the Isaac Ray Forensic Group, LLC. (*See* Dkt. 383-4.)

Plaintiffs move to bar her opinions and testimony in their entirety under Fed. R. Evid. 702 and *Daubert*, arguing that she is not qualified to rebut Dr. Leo's opinions. Further, they contend that Dr. Goldstein's opinions are not premised on a reliable methodology and that her opinions discrediting the body of false confession research "invade[] the province of the Court." (Dkt. 283 at 10.)

### A. Dr. Goldstein's Qualifications

Individual Defendants argue that "Dr. Goldstein's extensive background, experience, and specialized knowledge as a clinical and forensic neuropsychologist" qualify her to rebut Dr. Leo's opinions on the "empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subjects of police interrogation practices, psychological coercion, and false confessions." (Dkt. 337 at 2, 4; Dkt. 337-1 at 11-13.)

Under Fed. R. Evid. 702, a witness can be "qualified as an expert by knowledge, skill, experience, training, or education." The question for the court is "not whether an expert is qualified in general, but whether [her] qualifications provide a foundation for [her] to answer the specific question." *Gayton* v. *McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (cleaned up). Specifically, courts first "must look at each of the conclusions [the expert] draws individually to see if he has the adequate education, skill, and training to reach them." *Hall* v. *Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). Courts routinely find that an expert who is qualified to opine on one area may not be equally as qualified to opine on another. *See*, *e.g.*, *Happel* v. *Walmart Stores, Inc.*, 602 F.3d 820 (7th Cir. 2010) (affirming the district court's exclusion of the expert testimony of a board-certified physician, who despite his medical experience, was unfamiliar with the medical literature on the plaintiff's disease and lacked experience treating it); *Higgins v. Koch Dev. Corp.*, 794 F.3d 697 (7th Cir. 2015) (a doctor with experience diagnosing and treating asthma was not qualified to assess its genesis and testify as to causation).

Dr. Goldstein is a licensed and board-certified clinical neuropsychologist who has been practicing for more than 20 years. She earned a master's degree and a Ph.D. from The Chicago Medical School in clinical psychology and completed a post-doctoral fellowship in clinical neuropsychology at the University of Chicago Medical Center. (Dkt. 337 at 5; Dkt 337-4). She has lectured at various medical schools on the subjects of psychiatry and behavioral neuroscience. (Dkt. 337-4 at 6-9.) Currently, Dr. Goldstein is the president, CEO, and director of neuropsychology at Michigan Avenue Neuropsychologists in Chicago, Illinois, where she provides neuropsychological and psychological outpatient evaluations and treatments. (*Id.* at 1-2.) She additionally serves as the Director of Neuropsychology for the Isaac Ray Forensic Group, LLC. In this role, she conducts forensic evaluations and consults in criminal and civil cases including cases that involve custodial confessions. (*Id.*)

Dr. Goldstein offers a number of opinions that collectively critique and question the body of research on false confessions. In her opinion, she summarizes her findings as follows:

> Investigations into the phenomenon of false confessions among suspects in criminal matters are fraught with methodological problems. The empirical work remains in its nascent form, and because its data points are relatively hard to come by, the inferences drawn from this body of work must necessarily remain qualitative in nature, not quantitative; reliable conclusions cannot be drawn at this time." (Dkt. 283-4 at 4).

> [F]alse confession researchers have drawn inferences from studies with small sample sizes" …. "[A]t this time, there are no compelling data … that any of the other identified 'risk factors' do in fact significantly increase confession risk from a statistical standpoint." (*Id*. at 23.)

That Dr. Goldstein is principally a practitioner, is not in itself a reason to disqualify her as an expert. *Trustees of Chicago Painters & Decorators Pension, Health & Welfare* v. *Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 787-88 (7th Cir. 2007) ("[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience."); *Smith* v. *Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("a court should consider a proposed expert's full range of practical experience as well as academic or technical training.") But the knowledge and experience must be in the relevant field.

Dr. Goldstein's research experiences do not appear to be pertinent to the science underlying false confessions. She has not published a peer-reviewed article or book *in any field,* much less on social science research methodology, in more than twenty years. Her active research activities appear to be on unrelated topics of psychiatric and psychological disorders and testing (*Id*. at 6) (ongoing research includes work on "Malingering of Cognitive Impairment and Psychiatric Disorder" and the "Public Safety Pre-Hire Psychological Screening Database"). Generally, an expert's practical experiences can make up for a dearth of academic or research credentials, but Individual Defendants have not demonstrated that Dr. Goldstein has relevant clinical experience. *Contra Taylor* v. *City of Chicago*, No. 14 C 737, 2021 WL 12242781, at *8 (N.D. Ill. Dec. 1, 2021) (ruling that a forensic psychiatrist was qualified to rebut Dr. Leo's opinion because he had "completed substantial field work reviewing the confessions of inmates awaiting trial" in addition to his clinical role); *Brown* v. *City of Chicago*, No. 18 C 7064, 2023 WL 2561728, at *13 (N.D. Ill. Mar. 17, 2023) (qualifying same witness because "[h]e ha[d] interviewed and assessed hundreds of criminal defendants about their choice to confess, has taught and lectured on the assessment of disputed confessions, and has qualified as an expert in courts across the country in cases relating to disputed confessions.").

Individual Defendants distinguish this case from *Harris* v. *Chicago*, No. 14 C 4391, 2017 WL 3142755, at *4 (N.D. Ill. July 25, 2017), where the court excluded the opinions of a former prosecutor, later a federal judge and law professor, who was also disclosed as a rebuttal witness to Dr. Leo. The court explained that the rebuttal expert "ha[d] not trained as a social scientist nor contributed to the study of coercive interrogation and false confessions that would allow him to rebut Dr. Leo's testimony based on the science of social psychology. *Id*. at *4. Individual

4

Defendants are correct that the circumstances are different here, as Dr. Goldstein has a Ph.D. and has formal training and expertise in psychology. As in *Harris*, however, Dr. Goldstein "has never conducted scientific experiments in relation to false confessions" nor has she contributed to the body of false confession research in any other way. 2017 WL 3142755 at *4.

Individual Defendants urge the court to analogize the circumstances here to *Chatman* v. *City of Chi.*, No. 14 C 2945, 2018 WL 11426158, at *3 (N.D. Ill. Oct. 30, 2018). In *Chatman*, the court permitted an expert witness to rebut Dr. Leo's opinions. The plaintiff moved to bar testimony because the rebuttal expert was a forensic psychiatric and not a false confessions expert. *Id*. The rebuttal expert had relevant academic research experience as well as "several years of clinical experience evaluating criminal defendants' confessions through his work in the corrections psychiatry unit ... He [also] has taught, lectured, and presented on the study of false confessions." *Id*. Dr. Goldstein has far less relevant experience with false confessions. She has served as an expert on a case related to false confessions at least once in the past, and she has reviewed research and conducted her own literature review as an expert witness. However, she herself has testified that she is not an expert on false confessions or interrogations (Dkt. 337-3 at 98:4-5) and has admitted that she first grew familiar with false confession research while authoring an expert report for another case. (Dkt. 337-3 at 87:16-88:9.)[3]

Based on her relative lack of experience as a researcher, or even as a clinician, the court concludes that Dr. Goldstein lacks the qualifications to serve as a rebuttal witness to Dr. Leo. This conclusion is confirmed by examination of the methods Dr. Goldstein applies and the opinions she reaches, which are addressed below.

### B. Dr. Goldstein's Methods

Plaintiffs contend that Dr. Goldstein's opinions should be excluded because they were "not derived by applying a sound methodology." (Dkt. 283 at 12.) Individual Defendants respond that her methodology reflects one "utilized in her field as a Ph.D. and neuropsychologist, including an analysis of applicable scholarly publications, analysis of the field studies utilized, analysis of sample sizes, and utilization of statistics." (Dkt. 337 at 9.)

Pursuant to Fed. R. Evid. 702, the court must ensure that an expert's testimony is "the product of reliable principles and methods; and … reflects a reliable application of the principles and methods to the facts of the case." The question of reliability requires an assessment of the "validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc.* v. *Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

At her deposition, Dr. Goldstien testified that she was trained in research methodology and statistics as part of her doctoral training. (*See* Dkt. 337-2 at 76-77, 98.) Dr. Goldstein

---

[3] Dr. Goldstein testified that she served as an expert in a case in which she "evaluat[ed] the [false confession] research that forms the foundation for opinions in the matter." (Dkt. 337-3 at 124:4-125:8.) But whether an expert has been previously qualified or testified as an expert "is irrelevant to a determination of whether [s]he has the necessary knowledge, skill, experience, training, or education to qualify [] as an expert under Rule 702." *Demouchette* v. *Dart*, 2012 WL 6568232, at *8 (N.D. Ill. Dec. 14, 2012).

5

maintains that, consistent with her training, she reviewed all of Dr. Leo's publications and conducted additional research on false confessions, a field she admits is "indirectly related" to her own. (Dkt. 337 at 10.) The additional research she conducted appears to the court to be a literature review.

Despite her efforts, Dr. Goldstein's "methodology" does not satisfy the requirements of Fed. R. Evid. 702 or *Daubert*. First, Dr. Goldstein's report is replete with instances in which she concludes that investigations and studies are unreliable, even though they are peer-reviewed publications. She does little to explain how research on false confessions is able to survive the rigors of academic publishing if it is so "fraught with methodological problems." Moreover, courts in this district have repeatedly recognized the validity of false confession research. *See, e.g.*, *United States* v. *Hall*, 974 F. Supp. 1198, 1203 (C.D. Ill. 1997), *aff'd*, 165 F.3d 1095 (7th Cir. 1999); *Andersen* v. *City of Chicago*, No. 16 C 1963, 2020 WL 1848081, at *3 (N.D. Ill. Apr. 13, 2020). And this court also concluded in *Kluppelberg* v. *Burge*, 2016 WL 6821138 at *4 (N.D. Ill. Sept. 16, 2016), "the science of social psychology, and specifically the field involving the use of coercion in interrogations, is sufficiently developed in its methods to constitute a reliable body of specialized knowledge under Rule 702."

Second, Dr. Goldstein critiques research findings that she contends Dr. Leo relies on without much support or explanation. For example, when reviewing a peer-reviewed article about false confessions in Iceland, she writes in her report that "the overall rate of false confession among all interrogated participants ages 14 to 24 was 14.7%, a number that, while certainly meaningful, is relatively small, making its application to single cases like Mr. Fulton and Mr. Mitchell's difficult to understand." (*See* Dkt. 337-2 at 21.) Dr. Goldstein does not explain why an almost 15% false confession rate is "meaningful" or "relatively small." It is also unclear what the comparison group is for her conclusion. Further, the report critiques Dr. Leo's extrapolation of these findings to Fulton's and Mitchell's interrogations, even though Dr. Leo does not cite the same study in his report. (*See generally* Dkt. 383-1.) As a second example, plaintiffs argue that Dr. Goldstein fails to explain why it matters that field studies "have failed to separate murder cases from other felony and misdemeanor cases." (*See* 337-2 at 4 ¶ 2.) *See United States* v. *Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (citing *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.")).

Finally, plaintiffs argue that Dr. Goldstein merely "rehash[es] limitations acknowledged by false confession researchers themselves" (Dkt. 283-1 at 14.) Individual Defendants respond that the fact Dr. Goldstein highlights the very study limitations that false confession researchers themselves recognize indicates that "arguably her opinions have already been accepted in the relevant expert community." (Dkt. 337 at 11.) But courts have recognized that study limitations do not themselves mean that false confession research is unreliable. *Andersen*, 2020 WL 1848081, at *3; *see also Kluppelberg*, 2016 WL 6821138, at *4 ("Defendants' specific arguments—that since [the false confession expert] did not include non-coerced confessions in his study he cannot opine on the rate of coerced confessions or that there is a causal link between certain police tactics and false confessions—merely identify limitations of [that expert's] methodology, not that it is unreliable").

### C. Dr. Goldstein's Opinions

Plaintiffs further argue that Dr. Goldstein opines on legal conclusions that usurp the court's responsibility. Generally, the task of evaluating whether an expert's opinions are based upon sufficient foundation and a sound methodology is for the court to undertake at this very stage. *See Chatman*, 2018 WL 11426158, at *3. Individual Defendants argue that Dr. Goldstein's opinions fit squarely within the role of an expert witness.

Dr. Goldstein's opinions question and critique the science of false confession research and the research methodologies utilized in the field. (Dkt. 283-4 at 3.) For example, she opines that research on false confessions is "fraught with methodological problems," "should not be relied upon to assess the reliability of suspect statements," the "empirical work remains in nascent form, and that the "subject samples" are "impure." (*Id*.)

Several courts in this district have prohibited expert testimony that questions the reliability of the science underlying false confession research. *See Chatman*, 2018 WL 11426158, at *3 (citing *Harris*, 2017 WL 3142755 at *5) (finding that opinions "concerning the science upon which [a false-confessions expert] relied" is a legal conclusion for the court to resolve); *Harris*, 2017 WL 3142755, at *5 (barring a rebuttal expert's testimony questioning "the science on which Dr. Leo relies"). In *Brown*, the court barred a rebuttal witness from offering opinions that questioned the "empirical research foundation that informs the understanding of false confessions, specifically … the quality, sufficiency, and reliability of the data Dr. Leo relies on in this field." (*Brown*, 2023 WL 2561728, at *16) (citation omitted). Following Judge Lee's approach in *Chatman*, the court permitted the rebuttal witness to "opine that Dr. Leo's research does not accord with what he has experienced in his own line of work [as a forensic psychologist]—that is, that Dr. Leo's theory does not align with practice. … he may not, however, opine that … [Dr. Leo's] scholarship is 'hogwash'" *Id*. (*citing* Chatman, 2018 WL 11426158 at *4).

Individual Defendants urge this court to rely on *Taylor* where the court found a rebuttal witness was qualified to opine on the "scientific reliability of Dr. Leo's research and opinions." *Taylor*, 2021 WL 12242781, at *8. But the focus of Dr. Goldstein's opinions is different in this case. Here, "Dr. Goldstein's opinion is that the body of social psychology research Dr. Leo relies upon … is underdeveloped and cannot reliably be applied to particular individuals including the individuals in this case." (Dkt. 337 at 4.) Individual Defendants distinguish these circumstances from *Harris* and *Chatman*, where courts barred expert opinions stating that Dr. Leo's findings were "not the product of reliable principles and methods." (Dkt. 337 at 13-14.) But while certain of Dr. Goldstein's opinions (*see, e.g.*, dkt. 283-4 at ¶¶ 10, 12-13) question the "scientific reliability of Dr. Leo's research and opinions," (dkt. 337 at 14), the majority critique the reliability of the underlying research that Dr. Leo relies upon. (*see, e.g.*, dkt. 283-4 at ¶¶ 1-9). The latter fall within the province of the court to resolve. As the court finds that Dr. Goldstein lacks the qualifications to rebut Dr. Leo's opinions and testimony, the fact that certain of her opinions do not usurp the role of the court is moot.

7

**Conclusion**

For the reasons set forth above, the Plaintiffs' motion is granted.

Date: February 7, 2025

_____
U.S. District Judge Joan H. Lefkow