## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN FULTON, | ) | Case No. 20-cv-3118 |
| | ) | |
| Plaintiff, | ) | Hon. Joan H. Lefkow |
| | ) | District Judge |
| v. | ) | |
| | ) | Hon. Maria Valdez |
| ROBERT BARTIK, et al., | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| ANTHONY MITCHELL, | ) | Case No. 20-cv-3119 |
| | ) | |
| Plaintiff, | ) | Hon. Joan H. Lefkow |
| | ) | District Judge |
| v. | ) | |
| | ) | Hon. Maria Valdez |
| ROBERT BARTIK, et al., | ) | Magistrate Judge |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

### DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendants Bartik, Breen, Franko, Girardi, Struck, Winstead, and Zalatoris, by and through their undersigned counsel, move this Court for judgment as a matter of law to Rule 50(a) of the Federal Rules of Civil Procedure, and in support of their motion, state as follows:

### INTRODUCTION

Defendants are entitled to judgment as a matter of law on each of Plaintiffs' claims because no reasonable jury could find in Plaintiffs' favor. Plaintiffs have elicited insufficient evidence for a reasonable jury to find Defendants Bartik, Girardi, Franko, Struck and Winstead were personally involved in any alleged constitutional violation. Furthermore, insufficient evidence exists for a reasonable jury to find in plaintiffs' favor on Count I, because no reasonable jury could find

defendants knowingly fabrication of any witness statements. Finally, no reasonable jury could find in Plaintiffs' favor on their conspiracy claims or on their IIED claims.

## STANDARD

"A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). Rule 50 "allows a district court to enter judgment against a party who has been fully heard on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary bases to find for the party on the issue." Fed.R.Civ.P. 50(a) (motion for judgment as a matter of law); *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012). The standard for granting summary judgment mirrors the standard for judgment as a matter of law, such that the inquiry under each is the same. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)). A Rule 50 motion requires the court to decide a single question: whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence is sufficient to allow a reasonable jury to find in favor of the nonmoving party. *Khan v. Bland*, 630 F.3d 519, 523 (7th Cir. 2010) (quoting *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008)). The court may neither weigh the evidence nor make credibility determinations on a Rule 50 motion. *Passananti*, 689 F.3d at 659 (citing *Waite v. Bd. of Trs. of Ill. Cmty. Coll. Dist. No. 508*, 408 F.3d 339, 343 (7th Cir. 2005)). Inferences that are too speculative and ignore a witness' other testimony do not create a genuine fact issue for a jury to resolve. *See, Swetlik v. Crawford*, 738 F.3d 818, 829 (7th Cir. 2013).

## ARGUMENT

## I.    PLAINTFFS CANNOT ESTABLISH DEFENDANTS GIRARDI, FRANKO, STRUCK, AND WINSTEAD WERE PERSONALLY INVOLVED IN ANY ALLEGED CONSTITUTIONAL VIOLATION.

Defendants Bartik, Franko, Girardi, Struck, and Winstead are entitled to judgment as a matter of law on all counts because Plaintiffs have failed to put forth sufficient evidence of their personal involvement in any of the claims. "[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation.'" *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (quoting *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003)). Thus, it follows that "[a] plaintiff bringing a civil rights action must prove that the defendant personally participated in or caused the unconstitutional actions." *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008).

The evidence shows Defendants Bartik, Franko, Girardi, Struck, and Winstead played no role in Plaintiffs' detention or in any of the allegedly false statements obtained or used in Plaintiffs' prosecution. Because nothing in the trial record established personal involvement of Defendants Bartik, Franko, Girardi, Struck, and Winstead in any alleged constitutional violation, they are entitled to judgment as matter of law on each of Plaintiffs constitutional claims as well as their state law claims.

### a.    Bartik – Counts II, III, VII, X

Mr. Fulton claims Bartik made-up his confession during the polygraph test which Fulton had requested. Bartik testified he had no memory of Fulton confessing to him other than his reports. (TT 1920:9–16; 1921:20–25). Officer Bartik testified on direct examination that he worked as polygraph examiner for CPD in March 2003. (TT 1917:13). On March 18, 2003, he met John Fulton around 9:15 PM when Mr. Fulton was escorted into his office by Detectives Zalatoris and Breen. (TT 1918:19–22). According to Bartik's notes, Fulton left at 10:15pm. (TT 1923:4–8). Bartik recalled discussing the investigation with Detectives Zalatoris and Breen, and testified "I believe that if Mr. Fulton had made any [prior] statements, he wouldn't be in my office." (TT 1919:18–25). Plaintiffs were careful to elicit testimony that Plaintiffs' Exhibit 13, page 1,

Zalatoris' supplemental general progress report, notes Mr. Fulton was at Area 1, not the Polygraph unit at Homan Square, at 9:30 p.m. (TT 1925:10–1926:4).

Plaintiffs' Exhibit 51, page 3–4, Bartik's report documenting Fulton's confession, Bartik wrote that John Fulton, "repeated his admission in front of Gang Specialist James Breen and Detective Zalatoris of Area 1 violent crime." Bartik was clear "I wrote down what Mr. Fulton told me on the paper, sir." (TT 1949:20). Plaintiffs make much of the fact that Bartik' confession was not documented in the Police Reports. (TT 1930:16–24.) However, Bartik could not explain why a confession given to him, was not included in another detective's report, other than to note that Zalatoris testified it was an oversight. (TT 1938:15–16). After Mr. Fulton confessed, Bartik exited the polygraph examination room, and I went to the office where Detective Breen and Zalatoris were, and informed them that Mr. Fulton had given additional information and the explained to them what the additional information was. (TT 1963:24–1964:21)

Bartik testified that he had discussed the matter in passing with Breen prior to the first trial and the October 4th, 2005 conversation with Nazarin prior to first trial. (TT 1941:8–16). Bartik testified his report had not been shared with anyone by that point and that it was not dated. (TT 1942:21–1943:6). He testified that it was a summation, not an exact account. (TT 1956:3). He testified concerning that meeting during which he ran into Breen, asked why he had not been subpoenaed, then communicated to ASA Nazarian that he had paperwork on this case and that Mr. Fulton had given him a statement, (TT 1947:10–15). Bartik testified once she was apprised of the information, he provided the paperwork to ASA Nazarian. (TT 1948:5–16). Bartik testified he was not responsible for conducting a follow-up on that statement "I was going to inform the detectives what Mr. Fulton had told me. It is their investigation." (TT 1959:12–15). Importantly, Fulton's statement to Bartik matches the evidence in the record. Nazarian testified that when she learned

4

about Fulton's confession to Bartik the state was able to proceed with the prosecution "without it." Therefore, the statement was immaterial to the investigation. On this limited evidence, no reasonable jury could find Bartik was personally involved in the alleged constitutional violations.

### b. Defendant Stephen Franko - Counts III, VII

No evidence supports Plaintiffs' claims that Defendant Stephen Franko ("Youth Investigator Franko") violated their constitutional rights. In March 2003, Youth Investigator Franko was serving as the youth officer, who by state law had to be present when a relative refuses to come into the station to interview a juvenile. (TT 2333:5–10; 2235:20–23). Because of Shaw's age, 15, Youth Investigator Franko was brought in for Shaw's interview with Detectives Zalatoris and Breen. (TT 1321:1–10). Franko's involvement is limited to his presence during the March 21, 2003, interview with Antonio Shaw when he confessed. *Id.* Zalatoris testified Franko was "safeguarding [Shaw's] rights," (TT 1321:10). Detective Breen disagreed with Counsel's representation "that the youth officer [Franco] did absolutely nothing to protect Shaw's rights that you can remember." (TT 2333:15–2334:9). Breen stated and "I don't specifically recall what Youth Investigator Steve Franko did. We had to have him there required by state law." (TT 2336:4–5). He was not involved in interrogating Shaw. (TT 2350:18-19). Breen noted "Shaw agreed to give a handwritten in front of his uncle, Ronald Smith and a Cook County State's Attorney Vargas and Detective Zalatoris and a Youth Investigator Franko." (TT 2331:12–15). Rubenstein further testified of Franko's role, "[Franko] was there to advise, look after Mr. Shaw. (TT 3140:11). Breen reiterated that Franko was not involved in interrogating Shaw. (TT 2350:16–19).

Shaw gave a statement during this interview; however, his statement was later suppressed and was not used against Plaintiffs at their criminal trials. When ASA Varga took Shaw's handwritten statement, Franko was no longer present because Shaw's uncle, Mr. Smith, had arrived. (TT 3159:18–22). Furthermore, since it was not used against Plaintiffs at their criminal trial, it cannot serve as the

basis of a fabrication claim. *See Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) (holding that a plaintiff must prove that the evidence alleged to be fabricated must be used against him at his criminal trial). Youth Investigator Franko's presence at the interview of Antonio Shaw was his only connection to the investigation. He had no further involvement in the Collazo murder investigation once Shaw's uncle, Ron Smith, arrived at the police station and Youth Investigator Franko's services as a youth officer were no longer needed. Thus, Plaintiffs cannot establish that Franko violated any of their constitutional rights. Consequently, Youth Investigator Franko is entitled to judgment as a matter of law.

Notably, Plaintiffs did not even call detective Franko and elicited no evidence or testimony that he was involved in or aware of that any of the allegedly fabricated confessions, statements, or report were, in fact false or the product of fabrication or coercion (or both), such that he could be directly responsible for; a part of conspiracy; or have intervened to prevent Plaintiffs' criminal convictions. *Accord Heidelberg* v. *Manias*, 1:18-cv-01161-SLD-JEH, 2019 WL 4862069, at \*19 (C.D. Ill. Mar. 26, 2019) (defendant officer who was "aware [plaintiff] was being detained and prosecuted unlawfully and did nothing to prevent it" could be liable for failure to intervene). When asked about the police questioning during his arrest, Shaw testified:

> Well, it was so many, to be honest, playing the good cop/bad cop role. Pretty much they kept trying to get me to tell them about a crime that I didn't commit nor know of. So they kept telling me a narrated story trying to say that Anthony and John implicated me. Then pretty much was trying to tell me the stories, what they supposedly said that I did or what they did.

(TT 2954:1–9). This testimony shows Shaw could not identify who allegedly fed him details of the crime, he speaks only of "the Police" and in particular, there is no mention of Franko in his testimony. He described the tactics used against him as "They kept just trying to, 'No. Tell us something. Tell us something.'… Then, you know, they come in there and want to slam the door like, 'You know what, I've had enough of this. We got enough information from John and Anthony to get you convicted.'" (TT 2954:14–22). When led by his attorney, Shaw noted "they" told him "if you, if you tell us

something, you'll be able to go home." (TT 2955:14–17.) As it relates to Franko, Shaw only testified that there was a youth officer there when he confessed and that he did not understand Franko's role. (TT 2955:22–24.) He claimed that Franko was "Almost like interrogating me too, but taking a statement. Well, at the time he was trying to, but I kept telling him like 'I don't know nothing. I didn't do anything.'" (TT 2956:2–11.) He also claimed Franko got mad and packed up, but was not sure if that happened. *Id.* Shaw clarified, as other evidence supports, that Franko left when Shaw's Uncle Ron Smith appeared. (TT 2956:12–14.) Shaw was clear that his Uncle told him tell the Police. (TT 2957:12–17). When asked what information the Police had given Shaw about the murders before he confessed, his response was overly vague: "Pretty much details allegedly what John and Anthony involvement was and what they said that my participation was." (TT 2957:12–18). When led by his attorney, he claimed that he did not know details like "that the victim was bound and gagged, duct-taped, lit on fire using…gasoline." (TT 2962:18–19).

There is insufficient evidence for a reasonable jury to conclude Shaw's statement was fabricated in light of the facts that (a) Shaw's uncle was present, (b) Shaw could not identify one officer involved in his statement and specifically testified he could not tell who was who, (c) Shaw could not identify any details fed to him without his attorney's prompting. Shaw's testimony (and not the leading questions fed to him by his attorneys) does not point to any improper tactics used in his interrogation. Even taking Shaw's testimony as proof that he was fed details of the murder and coerced into confessing—— a gratuitous leap based on the evidence—Shaw was clear that "I didn't know the difference between prosecutor and youth officer. (TT 2960:3–4). Accordingly, there is no evidence to implicate Detective Franko.

No evidence establishes Franko was involved in "creating evidence"; he did not take Shaw's statement. Nor is there evidence Franko knew Plaintiffs' Shaw's or Griffin's statements were false. There is no evidence that he was involved in improper or coercive tactics like physical abuse, psychological intimidation, or deceptive interrogation tactics to overcome the defendant's free will.

While Shaw was 15, his uncle was present during the questioning demonstrating the voluntary nature of his confession. While Shaw was 15, his uncle was present during the questioning demonstrating the voluntary nature of his confession. A confession from a reasonable person in Shaw's position, that is an individual with his parental guardian and legal youth guardian, is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics. None of the tactics testified to were "shocking to the conscience." *Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016) ("substantive due process guarantees of the Fourteenth Amendment" protect against "'conscience-shocking interrogation tactics'") (quoting *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010)).

### c.   *Defendant Girardi – Counts I, II, III, VII*

Plaintiffs claim Girardi was present when Fulton was arrested, participated in taking John Fulton's "second confession", and interviewed Mitchell prior to him confessing on video. (TT 3211:8–17). Girardi was there, but Rolston, the lead detective. (TT 3213:7). Girardi was clear that he was assisting Rolston, and he did not know much about the investigation: "Detective Rolston was doing most of the interaction because I didn't really know anything about the case at that point." (TT 3215:22–24; 3217:24–25; 3218:7–25; 3221:9–12). Girardi drafted the arrest report, Plaintiffs' Exhibit 43. (TT 3216:9–12). Girardi was clear when interviewing Fulton "I did not delve into details of the murder because I still did not know the details in any depth." (TT 3226:8–9). Girardi described his intermittent involvement. (TT 3230:2–25). Girardi also attested to his limited involvement with Mitchell, "I don't know what I knew about what Mitchell had asserted. I did not talk to him prior to that conversation with the State's attorney. (TT 3231:2–20). Girardi did not even question Mitchell, Rubenstein did. (TT3234:6–8). Mitchell had confessed before Girardi even spoke with him (TT 3232:6–8).

Plaintiff elicited little other evidence of Girardi's involvement. When asked who interrogated him, Fulton testified that he knew from records it was "Zalatoris and Breen, Girardi, Rolstein." (TT 194:18–240.) In fact, he confirmed that Detective Girardi treated him "very, very well." (TT 460:6–9.) Fulton testified to nothing else regarding Girardi. Girardi was involved in the arrest of Fulton, and did not even physically arrest him. (Dx 6 at 4; TT 1312:6–9.) Mitchell did not testify concerning Girardi.

On this limited evidence, no reasonable jury could find Girardi was personally involved in the alleged constitutional violations. Indeed, on multiple occasions Plaintiff's attorney has offered to dismiss Girardi and Struck, in exchange for some consideration, demonstrating not even Plaintiffs think he is culpable, but rather that he is named as leverage. (*See*, *e.g.*, TT 2474:9–11 "We have offered to dismiss Girardi and Struck from the case, no questions asked. All we need is an agreement that neither side will call them."). Accordingly, no evidence ties Girardi to the alleged fabrications of Fulton's and Mitchell's confessions. Girardi, therefore, is entitled to judgment as a matter of law on all counts.

### d. *Defendant Struck – Counts I, II, III, VII*

Plaintiffs elicited insufficient evidence of Struck's involvement for a reasonable jury to find in their favor. Struck was involved in the investigation. (TT 996:7–12). While he is listed as an arresting detective, and did not physically arrest Fulton. (Dx 6 at 4; TT 1067:20–22; 1275:3–6; 1312:6–9). When asked who interrogated him, Plaintiff testified that Detective Struck was "cool and just told you to tell the truth," (TT 459: 10–12). Regarding Mitchell, Detective Struck was with Nick D'Angelo during the Anthony Mitchell's confession. (TT 853:20–22.) Nazarian asked Struck to get Precious Griffin's phone records. There was no evidence he engaged in knowingly improper coercion.

Struck is involved in two interviews with Fulton, and two interviews and video with Mitchell. No evidence Struck knew the confession was false. He testified he "Did not participate

in the investigative part" and "got involved more towards the end." He testified, "I don't know what they knew" and "I don't even know if I moved" during the video-taped Mitchell confession. There is no evidence he was involved in any of the alleged improper tactics; no evidence of knowingly improper coercion; no evidence he knowingly encouraged any witness to provide false information. Finally, he did not even author any supplementary reports in this case.

On this limited evidence, no reasonable jury could find Struck was personally involved in the alleged constitutional violations. Indeed, on multiple occasions Plaintiff's attorney has offered to dismiss Girardi and Struck, in exchange for some consideration, demonstrating not even Plaintiffs think he is culpable, but rather that he is named as leverage. (*See*, *e.g.*, TT 2474:9–11 "We have offered to dismiss Girardi and Struck from the case, no questions asked. All we need is an agreement that neither side will call them."). Accordingly, no evidence ties Struck to the alleged fabrications of Fulton's and Mitchell's confessions. Struck, therefore, is entitled to judgment as a matter of law on all counts.

### e.     Defendant Winstead – Counts II, III, VII

Edward Winstead testified via his prior deposition. Winstead was assigned to the Collazo investigation on March 10, 2003, during the second watch roll call. (34:6-12). Mr. Collazo's body had been found earlier that morning around two or three in the morning. (34:13-19). In his GPR recording his interview the initial witness Mr. Taylor, Mr. Winstead did not write down the race of the two males. (40:4-8).

Mr. Winstead recalled that Marcus Marinelli was a friend of the victim. (53:18-20). During his interview, Mr. Marinelli told Mr. Winstead about the gun robbery that involved John Fulton, including that Mr. Marinelli and Mr. Collazo robbed Mr. Fulton at gunpoint. (54:25-55:11; 56:3-6). Marinelli informed Winsted and Rolston about Johnnitta Griffin.

His next investigative step after his interview with Mr. Marinelli was to locate Precious and Marisol Caldero. (66:13-17). Mr. Marinelli showed Mr. Winstead where Marisol Caldero lived which led to Precious. (69:17-21). Mr. Winstead located Precious, Ms. Griffin, on March 11, 2003, right after his interview with Ms. Caldero. (72:12-17). Ms. Griffin said that she knew both the victim, Collazo, and Fulton, and informed him about the gun robbery.. (73:5-7). Ms. Griffin said that post-gun deal, Mr. Fulton kept calling her. (74:13-16). Ms. Griffin was cooperative when she recounted the gun deal. (76:6-12). She said that she had last spoken to Mr. Fulton on March 8th via phone during which Mr. Fulton blamed Ms. Griffin for the gun robbery and asserted that she owed him $300. (80:16-24). Mr. Winstead authored a GPR recording his interview with Ms. Griffin. (77:4-78:1). Detective Rolston was also present for the interviews conducted on March 11th. (78:2-11).

Ms. Griffin also gave Mr. Fulton's address and a description of Fulton's car to Mr. Winstead and after his interview with Griffin, he drove to the address she gave. (81:19-24). He found a car matching the description of Mr. Fulton's car, ran the plates, and they came back to Mr. Fulton. (81:19-82:3). The next time he spoke with Ms. Griffin was when he drove her to the grand jury around March 15, 2003. (90:7-9; 91:12-16).

Mr. Winstead also interviewed Yolanda Henderson on March 19, 2003. (99:17-24). Mr. Winstead also interviewed Mr. Fulton on March 19th. (101:10-13). He also drafted a GPR recording this interview. (100:21-101:1). Mr. Winstead also investigated Mr. Fulton's claim about taking Ms. Henderson to the emergency department on March 9th. (104:11-14). He reviewed the footage with ASA Rubinstein and subsequently with Ms. Henderson. (105:17-20). Ms. Henderson walked him through the footage. (106:1-21). Mr. Winstead denied ever telling Ms. Griffin that she could be charged with any crime in connection to Collazo's murder and was unaware of any other

detective telling her that. (112:2-10). To Mr. Winstead's recollection, he only interviewed Mr. Fulton, and not Mitchell or Shaw. (122:5-16).

Notably, Plaintiffs did not even call detective Winstead and elicited no evidence or testimony that he was involved in or aware that any of the allegedly fabricated confessions, statements, or reports were, in fact false or the product of fabrication or coercion (or both), such that he could have directly participated in the constitutional violations; be part of the alleged conspiracy; or have intervened to prevent Plaintiffs' criminal convictions. This evidence is insufficient to establish Winsted's personal involvement in the fabrication of Fulton or Mitchell's statements, and he is entitled to judgment as a matter of law on all Counts.

## II.    INSUFFICIENT EVIDENCE EXISTS FOR A REASONABLE JURY TO FIND IN PLAINTIFFS' FAVOR ON COUNT I

Defendants Breen, Girardi, Struck, and Zalatoris are entitled to judgment as a matter of law in their favor on Count I because there is insufficient evidence for a reasonable jury to find for Plaintiffs on their Fifth Amendment claims. Count I asserts two distinct legal theories as grounds for recovery. violations of both procedural and substantive due process. Judgment as a matter of law is proper for Defendants on either theory.

### a.  *Plaintiffs made their Confessions Voluntarily.*

When presented with a procedural due process claim based on coerced confession, a court considers whether "in the totality of the circumstances," the "statements to authorities were voluntary." *United States v. Outland*, 993 F.3d 1017, 1021 (7th Cir. 2021). "A confession will be deemed involuntary" if authorities "obtained the statement through coercive means that overcame the defendant's free will." *Id.* Put another way, "a confession is voluntary if, in the totality of circumstances, it is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the

defendant's free will." *United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015) (quoting *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004)). The court must consider "both the characteristics of the accused and the details of the interrogation[.]" *Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)), and "analyze coercion from the perspective of a reasonable person in the position of the suspect[.]" *Sturdivant*, 796 F.3d at 695 (quoting *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001)). Relevant factors include the interrogated person's "age, education, intelligence level, and mental state; the length of the … detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Huerta*, 239 F.3d at 871. Plaintiff's statements were voluntary. Each signed consent forms for the same. Insufficient evidence exists for a reasonable jury to find in Plaintiffs favor on this portion of of the false-evidence claim.

### b. *There is no evidence of improper tactics employed by Defendants*

When a claim alleges a substantive due process violation, the core inquiry is whether the alleged interrogation tactic "shocks the conscience." *Cairel v. Alderden*, 821 F.3d 823, 833 (7th Cir. 2016) ("substantive due process guarantees of the Fourteenth Amendment" protect against "'conscience-shocking interrogation tactics'") (quoting *Fox v. Hayes*, 600 F.3d 819, 841 (7th Cir. 2010)). "Determining what constitutes such behavior can be difficult; the ultimate question is 'whether the conduct is too close to the rack and the screw.'" *Id.* (cleaned up). Lies, threats, and insults do not shock the conscience. *Cairel*, 821 F.3d at 833. What is most likely to rise to the conscience-shocking level is conduct intended to injure in some way unjustifiable by any government interest. *Chavez v. Martinez*, 538 U.S. 760, 775 (2003).

A confession is voluntary if, in the totality of the circumstances, it is the product of rational intellect and free will, and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics which have overcome a person's free will and ability to make a rational choice. There is inadequate evidence of knowingly improper coercion for a reasonable jury to find in Plaintiffs favor. There is no credible evidence of physical abuse as shown by Zinger's testimony that he had an opportunity to visit Fulton. There is insufficient credible evidence of improper intimidation. Any evidence of intimidation like threats of going to jail are inherent in an arrest and therefore not "improper." Intimidation must rise beyond that level. Furthermore, there is no credible evidence of deceptive tactics other than what Plaintiffs and Shaw have parroted from their attorney's mouth.

Plaintiffs evidence of their characteristics does not lend them support. The jury heard repeatedly Plaintiffs were "kids", in violation of the Court's order *in limine* on the issue. Plaintiff testified they were fed details of the investigation, but could not identify any specific details. Moreover, evidence shows they were properly mirandized and advised of their rights to an attorney. Taken together, this evidence is insufficient for a reasonable jury to determine Plaintiff's will was overcome or that they were unable to make a rational choice. Accordingly, Defendants are entitled to judgment as a matter of law on Count I.

## III. NO REASONABLE JURY COULD FIND DEFENDANTS KNOWINGLY FABRICATED ANY WITNESS STATEMENTS

Plaintiffs claim that Defendants Bartik, Breen, Girardi, Struck, Winstead, and Zalatoris violated their Fourteenth Amendment constitutional right to due process by knowingly fabricating the statements of Plaintiffs, Johnnitta Griffin, and Yolanda Henderson which were used against them at their criminal trials, resulting in unfair criminal trials, and causing them to be wrongfully convicted and incarcerated. (Count II). There is insufficient evidence for a reasonable jury to

conclude that any of the officers "knowingly fabricated any witness statement" or "knowingly encouraged any witness to provide false information." Accordingly, Defendants are entitled to judgment as a matter of law on Count II.

To state a due process violation based on fabricated evidence, the evidence was knowingly fabricated; the detectives knew it was false; the fabricated confession or witness was introduced against the plaintiff at his criminal trial; the statement was material; and he damaged as a result. *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). A plaintiff must show that the fabricated evidence was used against him at his criminal trial. *Id.* The jury must find that "evidence was used to deprive Plaintiff of his liberty *in some way*" was "incomplete in that it failed to explain that [the plaintiff] had the burden to prove that the fabricated evidence was used against him *at his criminal trial* and was material." *Id.* (emphases added). When a plaintiff brings a fabricated evidence claim under the Fifth and Fourteenth Amendments, *Patrick* requires that the evidence to have been used at trial. *Accord Brown* v. *City of Chi.*, 633 F. Supp. 3d 1122, 1156 n.35 (N.D. Ill. 2022).

Plaintiffs claim Defendants knowingly fabricated (1) Griffin's statement, (2) Fulton's confession, (3) Mitchell's confession, and (4) Henderson's statement. There is insufficient evidence that the statement by Johnnitta Griffin was fabricated or that that Defendants knew statements were false. The same is true of Henderson's statement, who testified here that she testified truthfully at the criminal trial and that she said she was with John that night. (955:21–956:2). This is a witness who testified that Fulton was manipulative. Additionally, no evidence establishes that any detective knew any of the confessions or statements.

Plaintiff's story is that Breen and Zalatoris drove them around, threatened them, fed them the details of the crime, and ultimately coerced confessions from Plaintiffs. No evidence any of

15

the other defendants knowingly fabricated anything or knew that these statements were false. At best, Bartik provided false corroborating evidence, however that evidence was immaterial, because Nazarian testified that the State was going forward without that evidence. Additionally, Plaintiffs have not established each statement was material at their criminal trial. Given the extent of the evidence against Plaintiffs, no reasonable jury could determine that there is a reasonable likelihood that the result in the criminal proceeding would have been different if these statements had not been used. Accordingly, Defendants are entitled to judgment as a matter of law on Count II.

## IV. NO REASONABLE JURY COULD FIND IN PLAINTIFFS FAVOR ON THEIR CONSPIRACY CLAIMS.

Plaintiffs claim that Defendants Bartik, Breen, Franko, Girardi, Struck, Winstead, and Zalatoris conspired among themselves to coerce their confessions and to fabricate evidence and to violate their constitutional rights. (Count VII). No reasonable jury could find in Plaintiffs' favor on this Count because they have not established constitutional violations, and even if they had there is insufficient evidence to sustain a conspiracy claim. Defendants seek judgment as a matter of law on the conspiracy count as there is insufficient evidence of (1) an underlying constitutional violations or torts, (2) a "meeting of the minds" to violate Plaintiffs' rights, and (3) any overt acts demonstrative of a conspiracy to coerce their confessions. While evidence of a conspiracy need not be "direct," there is also insufficient circumstantial evidence to prove up the conspiracy claims. *Beaman* v. *Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015) ("Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative.").

To succeed on a federal conspiracy claim (Count VII), a plaintiff must show that (1) "individuals reached an agreement to deprive him of his constitutional rights" and (2) "overt acts in furtherance [of that agreement] actually deprived him of those rights." *Daugherty* v. *Page*, 906

F.3d 606, 612 (7th Cir. 2018). A plaintiff must show that each "particular defendant joined the conspiracy and knew of its scope." *Bank of Am., N.A.* v. *Knight*, 725 F.3d 815, 818 (7th Cir. 2013). A defendant "need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are." *Jones* v. *City of Chi.*, 856 F.2d 985, 992 (7th Cir. 1988). Rather, it suffices for a defendant to "understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do [his] part to further them." *Id.*

No reasonable jury could conclude all of these defendants (and the various other police officers, state investigators, ASAs, etc.) were acting together to commit an unlawful act. While Zalatoris and Breen could be said to have been working together to feed facts to both Fulton and Mitchell and to coerce false confessions from them, there is no evidence any other Detective knowingly became involved in that scheme. This is especially true of Bartik, as the State was going to go forward without him. Thus, the alleged Barik fabrication came well after the State was going forward with the prosecution. Moreover, doing your job is not an unlawful act; and the testimony is clear that that is what the Detectives were doing. By extension, no reasonable jury could conclude there was an agreement to accomplish an unlawful purpose, or to accomplish a lawful purpose by unlawful means. Setting aside the constitutional 48-hour violation, for which Plaintiffs have already been compensated, Defendants actions were lawful and within the scope of their employment. No evidence of an agreement between anyone let alone that that each particular defendant joined the conspiracy and knew of its scope. Plaintiffs will ask the jury to infer an agreement in an investigation involving dozens of detectives and countless others. Even assuming that inference, Plaintiffs nonetheless have produced insufficient evidence that any defendant understood the general objectives of the scheme, accepted them, and agreed, either explicitly or implicitly, to do his part to further them.

No reasonable jury could conclude anyone involved in the investigation after Zalatoris and Breen knowingly became a member of the agreement with the intention to carry it out. By extension no reasonable jury could find those Defendants committed an overt action in furtherance of the conspiracy; that is, he must take positive steps to accomplish their goal. The story is Zalatoris and Breen did this. Testimony has been extensive that they were part of an overall investigation so other than Zal and Breen there is no evidence of foreseeability. There is no evidence of positive steps taken by the other detectives to further their actions.

Finally, as described above, Plaintiffs have put forth insufficient evidence that their constitutional rights were violated. Plaintiffs' conspiracy claims are derivative of his other constitutional claims. *See Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). To the extent this Court grants judgment in favor of Defendants on those claims, Defendants are also entitled to judgment on the conspiracy claims as there is no underlying constitutional violation and because insufficient evidence exists for a reasonable jury to find in Plaintiff's favor.

## V.     NO REASONABLE JURY COULD FIND IN PLAINTIFFS FAVOR ON THEIR IIED CLAIMS.

Plaintiffs claim that Defendants Bartik, Breen, and Zalatoris intentionally inflicted emotional distress on Plaintiffs in violation of Illinois law. (Count IX). Each Defendant is entitled to judgment as a matter of law in their favor because Plaintiffs have not elicited sufficient evidence that a reasonable jury could find in their favor on that count.

To succeed on a claim for intentional infliction of emotional distress, a plaintiff must establish: "(1) that the defendant's conduct was extreme and outrageous; (2) that the defendant knew that there was a high probability that his conduct would cause severe emotional distress; and (3) that the conduct in fact caused severe emotional distress." *Kolegas* v. *Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992). The tort imposes liability only for conduct "calculated to cause severe emotional distress to a

person of ordinary sensibilities." *Honaker* v. *Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (quoting *Knierim* v. *Izzo*, 174 N.E.2d 157, 164 (Ill. 1961)). The tort does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Id.*

Under the Illinois Tort Immunity Act, "a public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, unless he acts maliciously and without probable cause." 745 ILCS 10/2-208. Plaintiff testified that about the emotional distress because of their respective arrests, prosecutions, and incarcerations. The nature of their IIED claims, therefore, is based on his emotional distress from being prosecuted, making the claim derivative to his malicious prosecution claim. *See*, *e.g.*, *Bolden v. Pesavento*, No. 17-CV-417, 2024 WL 1243004, at *29 (N.D. Ill. Mar. 23, 2024) (Plaintiffs' intentional infliction of emotional distress claim rises or falls with the malicious prosecution claim.) The malicious prosecution claims fails because probable cause existed, and therefore, by extension, their IIED claim also fails because the defendants are entitled to immunity under the Illinois Tort Immunity Act. *See Messino v. City of Elmhurst*, 2021 WL 4318082, at *6 (N.D. Ill. Sept. 23, 2021) (stating the existence of probable cause sufficient to invoke immunity).

Furthermore, the alleged fabrication of evidence is not sufficiently extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community. Plaintiffs have not introduced evidence that their criminal prosecutions were terminated favorably; *i.e.*, terminated in a manner indicative of innocence, which shows their prosecutions were just because there is little evidence regarding the circumstances surrounding the abandonment of the criminal proceedings so no reasonable jury could infer that there existed a lack of reasonable grounds to pursue the criminal prosecution. None of Defendants conduct in this case was sufficiently outrageous to sustain Plaintiffs' claims of intentional infliction of emotional distress. Plaintiffs failed to elicit evidence of malicious intent, suggesting the motive behind the alleged fabrication was profession a promotion. Thus, there is

insufficient evidence of an intent to inflict emotional distress on the Plaintiffs. Whatever emotional distress suffered is not so severe that no reasonable person could be expected to endure it; prison is prison and society expects the guilty to endure it. At best, Plaintiffs have put forth evidence sufficient for a jury to consider whether Zalatoris and Breen coerced and fabricated plaintiffs' false confessions. However, as detailed above, there is insufficient evidence of outrageous conduct. Accordingly, Defendants are entitled to judgment as a matter of law on this count.

WHEREFORE, Defendants respectfully request this Court grant judgment in their favor as a matter of law on all counts as to Defendants.

Dated: March 6, 2025                       Respectfully submitted,

                                           /s/ John Cerney
                                           Special Assistant Corporation Counsel
                                           Shneur Nathan, Avi Kamionski,
                                           Natalie Adeeyo, Breana Brill, & John Cerney
                                           Nathan & Kamionski LLP
                                           206 S. Jefferson Street
                                           Chicago, IL 60661
                                           (312) 612-1072

                                           Attorneys for Individual City Defendants

                                           /s/ James P. Fieweger
                                           Special Assistant Corporation Counsel
                                           James P. Fieweger
                                           Michael Best & Friedrich LLP
                                           444 W Lake St Ste 3200,
                                           Chicago, IL 60606
                                           jpfieweger@michaelbest.com

                                           Attorney for City of Chicago

**<u>CERTIFICATE OF SERVICE</u>**

I, John Cerney, hereby certify that I have caused true and correct copies of the above and foregoing motion to be served on all counsel of record via electronic mail, on March 6, 2025.

*/s/John Cerney*