## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN FULTON, | ) | |
| | ) | |
| Plaintiff, | ) | 20-cv-3118 |
| | ) | |
| v. | ) | Judge Lefkow |
| | ) | |
| ROBERT BARTIK, et al., | ) | Jury Trial Demanded |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| ANTHONY MITCHELL, | ) | |
| | ) | 20-cv-3119 |
| Plaintiff, | ) | |
| | ) | Judge Lefkow |
| v. | ) | |
| | ) | Jury Trial Demanded |
| ROBERT BARTIK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>DEFENDANTS' MOTION FOR MISTRIAL</u>

*/s/ Natalie Y. Adeeyo*
Special Assistant Corporation Counsel
Shneur Nathan, Avi Kamionski,
Natalie Adeeyo, Breana Brill, & John Cerney
Nathan & Kamionski LLP
206 S. Jefferson Street
Chicago, IL 60661
nadeeyo@nklawllp.com

*/s/ James P. Fieweger*
Special Assistant Corporation Counsel
James P. Fieweger
Michael Best & Friedrich LLP
444 W Lake St Ste 3200,
Chicago, IL 60606
jpfieweger@michaelbest.com

*Attorneys for Individual City Defendants*

*Attorney for City of Chicago*

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

LEGAL STANDARD ........................................................................................................... 2

ARGUMENT ........................................................................................................................ 2

I.    PLAINTIFFS' COUNSEL'S REPEATED VIOLATIONS OF THE COURT'S MOTION IN LIMINE RULINGS. .......................................................................................................... 3

    A. Violation of Court's in limine ruling barring use of the term "kids." ................................. 3

    B. Violation of the Court's in limine ruling barring reference to any violation of the 48-hour rule being "unconstitutional." ........................................................................ 7

    C. Violation of Court's reserved ruling regarding Collazo's gang membership. ................... 8

    D. Violation of Court's order barring testimony regarding Defendant Bartik's history. ........ 8

II.   PLAINTIFFS' COUNSEL'S INFLAMMATORY COMMENTARY IN FROM OF THE JURY. ............... 9

III.  PLAINTIFFS' COUNSEL'S IMPROPER AND ARGUMENTATIVE QUESTIONING DURING WITNESS CROSS EXAMINATIONS. ...................................................................................... 11

IV.  INAPPROPRIATE EMOTIONAL OUTBURSTS FROM PLAINTIFFS AND AT PLAINTIFFS' COUNSEL'S TABLE. ................................................................................................ 14

V.   THE COURT'S INTERVENTION DURING PLAINTIFFS' COUNSEL'S MISBEHAVIOR. ............... 17

VI.  THE CUMULATIVE EFFECT OF PLAINTIFFS' COUNSEL'S MISBEHAVIORS HAS DEPRIVED DEFENDANTS OF A FAIR TRIAL. ............................................................................. 19

CONCLUSION ................................................................................................... 20

## **INTRODUCTION**

For four weeks, this trial has been plagued with attorney misbehavior and continuous disregard for the Court's pre-trial and mid-trial orders. Counsel for Plaintiffs have repeatedly and strategically asked improper questions, demonstrated inappropriate behavior in front of the jury, and violated the Court's *in limine* rulings. In addition to this misbehavior, Plaintiffs' counsel also impugned the character of defense counsel by suggesting that defense counsel would have given a witness consideration for his current pending charges in exchange for his testimony at this trial. Despite the Court's cautionary instructions, Plaintiffs' counsel repeated this conduct throughout the trial.

For example, Plaintiffs' counsel has violated this Court's motion *in limine* rulings by questioning witnesses regarding the "constitutionality" of the 48-hour rule and by incessantly referring to Plaintiffs, Shaw, and Griffin as "kids." To make matters worse, the jury has also now heard emotional outbursts from family members in the gallery, jokes and snide remarks from Plaintiffs' counsel, periodic laughter from Plaintiffs' counsel's table, and a display of embrace between Plaintiff Fulton and a damages witness in front of the jury. The list goes on.

Although the Court has made some efforts to temper Plaintiffs' counsel's inappropriate misbehavior, those efforts were not enough. Respectfully, the Court has sometimes contributed to these issues by providing unclear or inconsistent rulings, occasionally not providing rulings during witness examinations when defense counsel objects, by disparately enforcing rulings, and by the Court's facial gestures and sighs when defense counsel has made objections or asked for sidebars.

Each of these deliberate misbehaviors by Plaintiffs' counsel is inappropriate standing alone; however, when these repeated actions are taken in their totality, it is clear that Defendants have been substantially prejudiced by Plaintiffs' counsel's conduct during this trial. Individual

City Defendants, thus, did not receive a fair trial to which they were entitled. There is no feasible way to cure this prejudice to Individual City Defendants besides granting this motion and declaring a mistrial.

## LEGAL STANDARD

A court's power to declare a mistrial is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expedition disposition of cases." *Link v. Wabash R. Co.*, 370 U.S. 626, 630 (1962). Attorney violations and violation of motions *in limine* are grounds for mistrial. *See, e.g.*, *Spicer v. Rossetti*, 150 F.3d 642, 643-44 (7th Cir. 1998); *Joseph v. Brierton*, 739 F.2d 1244, 1247-48 (7th Cir. 1984). A motion for mistrial must meet two basic requirements: the motion must "state with particularity the grounds for seeking the order" (Fed. R. Civ. P. 7(b)(1)(B)), and there must be timely and proper objections. Fed. R. Evid. 103(a). A court may grant a new trial pursuant to Federal Rule of Civil Procedure 59(a) "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). "To obtain a new trial based on attorney misconduct, [the moving party] must show both that the misconduct occurred and that it prejudiced their case." *Christmas v. City of Chicago*, 682 F.3d 632, 642 (7th Cir. 2012) (citing *Whiting v. Westray*, 294 F.3d 943, 944 (7th Cir. 2002)). It is also a violation for counsel to refer to inadmissible evidence during examination of a witness. *Raybestos Products Co. v. Younger*, 54 F.3d 1234, 1239 (7th Cir. 1995).

## ARGUMENT

Over the course of this trial, Plaintiff's counsel has repeatedly committed violations to the benefit of their clients in a blatant attempt to mislead the jury and prejudice the Defendants. The jury has witnessed multiple court order violations, inappropriate commentary, laughter, improper

questioning, and a staged embrace and kiss between Plaintiff Fulton and a witness in an effort to taint this trial to their advantage. These tactics have severely prejudiced Individual City Defendants, and the curative instructions this Court has intermittently provided throughout this trial cannot undue the harm done by Plaintiffs. Defendants moved for a mistrial at the close of opening statements based on violations of several motions *in limine* and the cumulative effect of those violations at the mere start of this trial. (Trial Tr. Vol. , 45:5-21). The Court took Defendants' oral motion for a mistral under advisement. (*id*. at 48:14-15). However, Plaintiffs' opening statement was only a teaser of the many violations and misbehaviors to come. Defendants now move for a mistrial again.

## I.  Plaintiffs' Counsel's Repeated Violations of the Court's Motion in Limine Rulings.

From the start of this trial, Plaintiffs' counsel set out to prejudice the jury against Individual City Defendants by violating this Court's motion *in limine* rulings. Specifically, Plaintiffs violated the Court's ruling as it pertains to Individual City Defendants' motions *in limine* Nos. 12, 32, 45. Each violation will be addressed in turn.

### A.  Violation of Court's in limine ruling barring use of the term "kids."

In their opening statement, Plaintiffs' counsel stated, ". . . I mean, that is a serious crime by somebody who's obviously a professional, not these two kids from the south side." (Trial Tr. Vol. 1, 7:3-5). Individual City Defendants had previously moved to bar Plaintiffs from making any reference to John Fulton, Anthony Mitchell, Antonio Shaw, or Johnnitta Griffin as "children," "kids," "minors," "teenagers" or similar terms. (*See* Dkt. No. 285 at 22). This Court barred Plaintiffs from such terms as "children," "kids," "minors," and "juveniles" because they are unduly prejudicial and irrelevant. (*See* Dkt. No. 400 at 11). The Court specifically noted that such terms would "only serve to 'garner emotional sympathy[.]'" (*Id*.)

3

Despite the Court's unequivocal ruling, Plaintiffs' counsel repeatedly referred to Fulton, Mitchell, Shaw, and Griffin as "kids" and "boys" throughout this trial, in clear violation of the Court's ruling. Indeed, Plaintiff's counsel has referred to Fulton, Mitchell, Shaw and/or Griffin as "kids" over 40 times. (*See* Trial Transcript Vol. 1, 7:3-5, 9:8-9, 10:9-10, 16:22, 21:16-18, 23:17-24, 28:4-5; Trial Transcript Vol. 2, 124:8, 133:9-10, 165:10-11, 211:17, 218:19-22; Trial Transcript Vol. 3, 524:14, 605:23-25, 625:7, 653:18-23,654:4-6, 655:6-8, 748:9-11; Trial Transcript Vol. 5, 1104:17-23, 1121:1-3, 1121:7-10, 1123:2-3, 1175:12-20, 1123:2-3, 1175:12-20, 1186:7-21, 1188:10-11, 1219:12-16, 1221:5-7, 1228:16-18, 1235:10-12, 1262:2-4; Trial Tr. Vol. 6, 1301:14-15, 1310:17-18, 1315:15-16, 1319:23, 1333:11-13, 1333:22-23, 1341:15-18, 1370:9-11, 1413:18-20, 1434:20-23, 1459:15-16, 1480:20-21, 1465:1, 1556:19-21, 1574:21-23).

At the end of his opening statement, Defendants requested a sidebar and moved for a mistrial. The Court remarked to Mr. Loevy, "Well, I – you did violate my order about calling them boys and kids, so bear that in mind. It does not amount to a mistrial, however." (Trial Tr. Vol. 1, at 48:8–16). Mr. Loevy replied, "I apologize, Your Honor. They were boys and kids, but I will not do that again. If I -- you know, I apologize." (*Id.*) The Court took the motion for mistrial under advisement. (*Id.*)

It did not take long for Mr. Loevy to break his promise and again violate the Court's order. During examination of Plaintiff Fulton, he elicited testimony from Fulton about being a kid (Trial Tr. Vol. 2, 120:3–6; 124:8–11; 133:18; 165:2–6; 211:17; 218:19-22; 247:10–11; 262:1–7) and continued using the word "kid" himself (133:9-10; 165:10-11; 333:10 (sidebar)). At one point the Court commented on Mr. Fulton's testimony, "I mean, he said -- he did make himself out to be a real gentleman, you know, and he was a kid…" (Trial Tr. Vol. 3, 429:9–11).

The violations continued during McCray Judge's examination. (Trial Tr. Vol. 3, 605:23–25; 625:7; 653:18–23). On the third violation during Judge's examination, Defendants again objected to Mr. Loevy's use of the word, to which he responded, "[t]here's no such motion, your Honor," and the Court replied "[the witness] said something to that effect." (*Id.* at 653:18–24). Without a clear ruling, in his very next question, Mr. Loevy violated the order twice more (*id.* at 654:4-6 ("this kid seemed like not the kind of kid.")) and again shortly thereafter (*id.* at 655:6-8).

The violations continued during examination of Leo direct (Trial Tr. Vol. 4, at 748:9-11) and then during examination of Defendant Zalatoris. (Trial Tr. Vol. 5, 1104:17-23 ("…he met this kid John Fulton…and then says, "You know what, I'm going to rob this kid." Kid's seen his face. This is a kid …"); 1121:7–10 (The kid that Chris Collazo robbed, that's someone you got to investigate…"); 1123:2–3 (". . . I set these two kids up. . ."); 1175:12-20 (… the evidence that convicted the boys…). Defendants again reraised the objection which the Court sustained. (Trial Tr. Vol 5, 1175:16-20.) Upon sustaining the objection, and in the presence of the Jury, Mr. Loevy said "What?", and the Court repeated, "the boys", and Mr. Loevy replied "Oh. 'The boys.' All right." *Id.*

A similar encounter followed when Mr. Loevy asked Zalatoris, "did you say to yourself: You know, this kid's just a kid. He's an adult under the eyes of the law, but he is really a high school teenager. (Trial Tr. Vol. 5, 1186:7–21). Defendants objected and Mr. Loevy asked, "Is this about the language again?" and the Court replied "It is." *Id.* Mr. Loevy attempted to correct himself with "This young adult who was a teenager." *Id.* The Court overruled the objection. Mr. Loevy continued his contemptuous use of the word, at times acknowledging he was doing so. (*Id.* at 1188:10-11 ("You could have had the boys — young men sign that, right?"); 1219:12-16 ("By the way, 15 is not a boy. 15 is a -- I mean, not a young man. 15 is a boy, right?"); 1221:5-7 ("This kid

5

was in here for four days."); 1228:16-18 ("This kid says it's not true."); 1235:10-12 ("Can you think of a good reason why this kid's sweater should have been— sorry, this young adult's sweater wasn't taken?); 1262:2-4 ("This kid confesses"); Trial Tr. Vol. 6, 1301:14-15 ("I think this kid's finally ready"); *id*. at 1310:17-18 (And you then spoke to a boy named Shaw, right? Shaw was a youth, right?).

Mr. Loevy demonstrated his deliberate disregard for the Court's order when asking Zalatoris the question, "was Rolston present when the kid was arrested?" (Trial Tr. Vol. 6, 1315:15-16.) Defendants reraised the objection and Mr. Loevy responded in front of the jury "Oh, the kid -- well, actually, this was a kid…He was a kid." (*Id*. at 1315:18–22). At sidebar Defendants noted their frustration at having to reraise the objection over and over, commented that Mr. Loevy was showboating and flagrantly violating the court's order, and reraised the oral motion for mistrial. (*Id*. at 1316:6–1317:2) The Court denied the motion noting, "That is I think most people on the jury would understand that a teenager can be called a kid. However, I do want you to do better and remember this, okay, Mr. Loevy?" (*Id*. at 1317:3–6). Mr. Loevy did not do any better asking shortly thereafter "Did you think that this kid was in a vulnerable position?" (*Id*. at 1319:23). The Court sustained the objection, but Mr. Loevy mocked the ruling with the following exchange:

> Q: A person 17 and older the law treated as an adult, right?
> A. Yes.
> Q. And a person under 17, the law did not treat as an adult, right?
> A. Juvenile.
> Q. Juvenile.

(Trial Tr. Vol. 6, 1320:5-10). This exchange not only highlighted the use of the term and gave the jury a false impression that Defendants were being difficult, it again directly violated the order prohibiting use of the term "juvenile." (Dkt. No. 400 at 11.) Mr. Loevy continued to blatantly

violate the order, (Trial Tr. Vol. 6, 1333:11-13) ("you had a kid denying it"), often times deliberately drawing attention to the violation (*id*. at 1333:22-23) ("try to find this kid – this– sorry, this young adult?) (*id*. at 1341:15-18) ("maybe this kid didn't have -- sorry -- this teen didn't have access to a relative, right?"). He continued to refer to Shaw as a juvenile (*id*. at 3140:1–5).

Each of these repeated references to terms the Court barred constitutes prejudicial attorney misbehavior by Plaintiffs. Considering the number of times the Court's *in limine* order, it is fair to assume Plaintiffs' counsel's constant use of the terms "kids" and "boys" was intentional. Indeed, Plaintiffs' counsel's repeated use of "young person" demonstrates he was aware of the contours of he Court's ruling. (*See*, *e.g.*, Trial Tr. Vol. 1, 17:4-10). Although Defendants' motion and the Court's order concerned references to Plaintiffs, Shaw, and Griffin, Plaintiffs' counsel consistently referred to Collazo and Marinelli as kids also, demonstrating his intention to toe the line of what the Court permitted. (*See*, *e.g.*, *id*. at 19:3; 21:16). Counsel continued to violate the order throughout his opening. (TT 23:17–24 ("Antonio Shaw is a 15-year-old kid. He has a stutter. He's slow. He's the kind of kid that… there was another kid who would hang around, too, this kid Shaw."); 28:4–5 ("So the boys give a confession …"); 30:22–23 ("He put the wrong thing in the kid's mouth").) This violation alone is grounds for a mistrial.

### B. Violation of the Court's in limine ruling barring reference to any violation of the 48-hour rule being "unconstitutional."

Particularly egregious is Plaintiffs' counsel's failure to adhere to this Court's ruling to Defense motion *in limine* No. 32, Dkt. 295, in which defense moved to bar Plaintiffs from being able to argue that they should be compensated for being detained longer than 48 hours. The Court granted this motion with the exception that Plaintiffs were allowed to argue that their detentions were unreasonably long and a factor in their confessions. Yet, despite the Court's prior ruling, Plaintiffs' counsel proceeded, in his opening statement, to state that Plaintiff John Fulton "was in

there for more time than the Constitution allows." (Trial Tr. Vol. 1, 17:23-18:3). Even though defense counsel objected immediately, the Court merely stated, "Go ahead. We'll deal with it later" and failed to ever give a curative instruction. (*id*. at 18:4; *see also* 45:17-46:19). The Court did rule the following day that Plaintiffs were barred from referring to the 48-hour issue as a "constitutional" issue (Trial Tr. Vol. 2, 107:1-4); however, Plaintiffs' counsel proceeded to further violate both the original motion *in limine* ruling and the second ruling multiple times throughout the trial. (*See* Trial Tr. Vol. 5, 1209:2-9; Trial Tr. Vol. 8, 2196:7-13; Trial Tr. Vol. 12, 3252:21-3253:23, 3330:14-3331:20; Trial Tr. Vol. 13, 3688:15-17).

### C. Violation of Court's reserved ruling regarding Collazo's gang membership.

Defendants moved *in limine* to bar evidence of any gang references relating to Collazo. (Dkt. No. 309). In its ruling, the Court reserved ruling on this evidence being elicited unless and until "Plaintiffs lay the foundation at trial that Collazo was a member of a gang and the police, based on their experience, would typically consider that fact in investigating a murder[.]" (*See* Dkt. No. 400, at 25). Rather than wait to lay proper foundation, Plaintiffs referenced Collazo's gang affiliation, and called him a "kid" to make things worse, during the cross examination of Defendant Zalatoris, in clear violation of Defendants' motion *in limine* No. 45. (*See* Trial Tr. Vol. 5, 1094:18-23, "Q: And when you were investigating who might have wanted to do this, one of the first things you had to look at was this kid's gang affiliation; right?").

### D. Violation of Court's order barring testimony regarding Defendant Bartik's history.

Lastly, Mr. Loevy referenced Defendant Robert Bartik's history of obtaining pretest confessions, violating two motions *in limine*. First, Individual City Defendants moved *in limine* to bar inadequately disclosed 404(b) witnesses. (*See* Dkt. No. 298). The Court's ruling followed: "The court will bar these witnesses from testifying, as their testimony would be inadmissible

propensity evidence under Fed. R. Evid. 404(b). The motion is granted." (Dkt. No. 400, at 17). Individual City Defendants also sought to bar 404(b) propensity regarding Bartik's past conduct through Plaintiffs' purported polygraph expert Mr. Sosnowski. (*See* Dkt. 280). In its ruling, the Court held that Mr. Sosnowski's testimony "does not require impermissible propensity evidence implicating Bartik's history. In summary, Sosnowski may not testify regarding Bartik's history of obtaining pretest confessions, as it requires an impermissible propensity inference." (Dkt. No. 401, at 4). Thus, the Court excluded evidence of any prior alleged misconduct against Mr. Bartik. Despite this ruling, Plaintiffs' counsel intentionally stated during opening statements, "Actually, we didn't know he confessed to the polygrapher. Really, he confessed to you and you didn't tell? And it turns out Mr. Bartik has a little habit of this." (Trial Tr. Vol. 1, 37:12-14). This was blatantly improper and in violation of the Court's ruling.

## II. Plaintiffs' Counsel's Inflammatory Commentary in From of the Jury.

Counsel has made it impossible for the jury to decide the facts based on admitted evidence by injecting inflammatory commentary amounting to prejudicial testimony from the attorney rather than the witness. No instruction can mitigate the harm caused by the fact that the jury has been presented with multiple off-limits argument and evidence, and has received improper instructions. For example, during Defendant Zalatoris's exchange took place in front of the jury:

> Q: Now let's go back to how it was reported. Was Rolston present when the kid was arrested?
> A. No.
> MR. NATHAN: Objection, motion.
> MR. LOEVY: Oh, the kid -- well, actually, this was a kid.
> MR. NATHAN: Excuse me.
> **MR. LOEVY: He was a kid.**

(Trial Tr. Vol. 6, 1315:15-16). The inappropriate commentary continued throughout Defendant Zalatoris's examination. In the middle of Defendant Zalatoris' examination, Plaintiffs' counsel

accused defense counsel of making up that Defendant Winstead has dementia. The following

exchange occurred in front of the jury:

> Q: And Mr. Winstead unfortunately has dementia apparently; correct?
> A: Oh, I don't know about that.
> Q: Have you talked to him?
> A: Yeah, maybe about three, four months ago.
> Q: Was he fine?
> A: I mean, he was elderly.
> Q: But he's – he can testify in court; right?
> MR. NATHAN: Objection. Calls for speculation. If you have something to argue
> about with Judge Lefkow, I'd ask to do it at a sidebar.
> **MR. LOEVY: Your Honor, it has been told to us by them that he has
> dementia.**
> MR. NATHAN: Excuse me. We can introduce it into evidence if that's necessary.
> MR. LOEVY: Let's just go with Mr. Zalatoris.
> MR. NATHAN: This is something that should be discussed and it's not
> appropriate for this forum.

(Trial Tr. Vol. 6, 1475:15-1476:10). This was clearly an inappropriate and offhand comment for

Mr. Loevy to make in front of the jury, particularly because it concerns the private medical

information of a defendant who, due to his health, has been unable to attend trial.

Mr. Loevy's comments didn't stop there. During Defendant Girardi's examination,

Plaintiffs' counsel stated, "I'm going to show you the March 21st memo of Rubinstein, which

might or might not have been taken – written on March 21st." (Trial Tr. Vol. 12, 3266:17-19).

During ASA Nazarian's testimony while an objection was pending, Mr. Loevy stated, "She's

telling stories." (Trial Tr. Vol. 12, 3469:22-3470:1). On March 5, 2023, during witness Elliot

Zinger's examination, Mr. Loevy who was not the examining attorney made the following

comment in reference to ASA Nazarian's testimony within earshot of the jury: "Well she just kept

talking." A juror laughed at Mr. Loevy's comment.

These repeated violations, if not individually, then in the aggregate, have prejudiced

Defendants irreparably and denied Defendants a fair trial. The court has yet to ameliorate this

prejudice with any instruction to the jury that statements by counsel are not evidence. The cumulative effect on the jury of Plaintiffs' counsel's inflammatory commentary cannot be overstated. Although defense counsel objected to much of this misbehavior, those objections were not always sustained or were sustained after Plaintiffs' counsel's improper remarks reached the ears of the jury and had their intended effect. Counsel's behavior has prejudiced Defendants to the extent necessary to warrant a new trial.

## III.    Plaintiffs' Counsel's Improper and Argumentative Questioning During Witness Cross Examinations.

Plaintiffs' counsel's improper questioning of witnesses also caused significant, incurable prejudice to Individual City Defendants because the questions were argumentative and/or grossly misrepresented the facts in the record. For example, Plaintiffs' counsel's examination of Defendant John Zalatoris is replete with the following improper questions:

- Q: And if we were to look at this statement, this is Plaintiffs' Exhibit 13, it's notes already – the notes are already in evidence. This is basically a script of the crime, right? (Trial Tr. Vol. 6, 1292:16-19);

- Q: You were not confident enough to call the state's attorney in the morning of the 20th, right? (*id*. at 1297:2-3);

- Q: So was it your understanding that Shaw was doing this because he wanted to go to prison forever or because he thought he was going to get a deal? (*id*. at 1348:9-11);

- Q: But if it wouldn't have been improper, how do you remember 20 years later that you didn't? (*id*. at 1371:7-8);

- Q: It never came up in your investigation that, hey, we got this whole theory of the case that they're on the phone and, you know what, the phone records don't show it. Nobody brought that to your attention? It wasn't discussed? (*id*. at 1400:24-1401:2);

- Q: Because that would be weird if they all tracked something that you believed was true and turned out to be false, right? (*id*. at 1408:8-9);

- Q: Well it sure looks like this got added later, doesn't it? (*id*. at 1409:13);

- Q: But you have no – he didn't sign anything, you have no way to prove it, right? (*id*. at 1430:25-1431:1);

- Q: You're just making that up, though; right? (*id*. at 1456:25);

- Q: Isn't it true you claim you didn't ask John Fulton where the murder weapon is because he couldn't tell you where the murder weapon was? (*id*. at 1461:9-11);

- Q: These are not things we're thinking about for the first time ever, are we? (*id*. at 1466:5-6);

- Q: So he's a convenient person to blame, isn't he? (*id*. at 1475:9);

- Q: At the point that you got Precious's statement, it really was a point of no return for you, wasn't it, sir? (*id*. at 1491:3-4);

- Q: Are you sure you wouldn't have been in trouble? (*id*. at 1493:6);

- Sir, in eliciting that testimony, you're asking, are you not, a jury to have mercy on your – when they decide the punitive damages against you? That's why you are talking about your money, right?" (*id*. at 1553:17-20)

- Q: So that really struck fear in her heart, that John's lawyer was going to come sue her? (*id*. at 1560:21-22);

- Q: The innocence part wasn't part. You were the guilt part? (*id*. at 1567:24);

- Q: In other words, if you really had proof that he said "I can tell you about the alley. It's got a blue car." And you drove to the alley, although you picked the alley, I guess, and you said, "Is this it?" And he said, "That's it." (*id*. at 1571:3-6);

- Q: By the way, your memory seems a little selective, would you agree? (*id*. at 1573:20-21)

Over a day and a half of questioning, the jury had to listen to Plaintiffs' counsel give a closing statement at Zalatoris. It was blatantly improper for Plaintiffs' counsel to argue their theory of the case under the guise of cross-examination.

Plaintiffs' counsel also confronted Defendant Zalatoris with the transcript of Plaintiff Mitchell's videotaped statement, questioning Zalatoris about the types of questions Mitchell was asked by Assistant State's Attorney Nick D'Angelo. Zalatoris was not present when the statement was taken nor did he create the document he was being questioned about. (Trial Tr. Vol. 6, 1301-1309). Plaintiffs' counsel even went so far as to ask Zalatoris, "And then at the end of the confession, all Anthony had to do was tell the state's attorney back the same story that he had said yes to, yes, yes, yes, right?" (*Id*. at 1308:16-18). Yet, this line of questioning was permitted.

12

Plaintiffs didn't stop there. Plaintiffs' counsel's conjectural cross examination tactics continued with each Defendant, even independent third-party witnesses. For example, during the examination of Assistant State's Attorney Nancy Nazarian, Plaintiffs' counsel asked the following inappropriate questions:

- Q: The reason you are having trouble here is because the whole theory of the case was revenge, revenge, revenge, correct? (Trial Tr. Vol. 12, 3426:24-25);

- Q: You argued in closing they got taunted and made him mad. They got robbed by somebody they didn't even know. They lost their money. They were angry. They wanted revenge. That's what this case was always about, and that's only what it was always about. That was your theory, right? (*id*. at 3434:34-3435:3);

- Q: But you would have preferred if he saw three people running than two, right? (*id*. at 3441:2-3);

- Q: Yeah. All we have is a receipt. What are you even talking about? […] Well, what is she even talking about I guess is my question?" (*id*. at 3455:21-3456:1);

- Q: No. You guys tried to make it look like she was flip-flopping. But she told you: I was with John. He was at the hospital with me. I'm not lying. I'm not making it up. And she was right, wasn't she? (*id*. 3465: 8-11);

- Q: So the defense is done. You're done. And you came up with a brand-new never-before-seen version of John's confession, right? (*id*. 3466: 16-18);

- Q: Because like I can't prove I didn't sneak out. There is no security camera on my back door. Does that mean I'm guilty of murder? (*id*. at 3469:7-9);

- Q: So you theory of the case was after midnight they drove to the north side and just hoped Chris Collazo would get off a bus at midnight? (*id*. at 3473:18-20);

Plaintiffs' counsel even went so far as to ask ASA Nazarian if there was evidence that she didn't kill Christopher Collazo. (Trial Tr. Vol. 12, 3475:12 ("Q: There is no evidence you didn't kill Collazo either, right?"). There is no instance in which any attorney, let alone Mr. Loevy who is an experienced trial attorney, thought that question was permissible.

The prejudice is clear and quite deliberate. Plaintiffs' counsel used these improper questions to undermine the credibility of any witness who was not directly aligned with Plaintiffs. Whether it was during the cross examination of Defendants or when third party witnesses were unnecessarily treated adversely, Plaintiffs' improper and argumentative questions served the

13

purpose Plaintiffs intended to serve: to taint the juror's minds with accusations based on Plaintiffs' theory of the case. Defense counsel objected to each of Plaintiffs' counsel's prejudicial questions. However, these repeated objections each day during a four-week trial likely wore on the jury and made it appear as though defense counsel was trying to hide something from the jury, a reality Plaintiffs' counsel knew when he asked these types of questions.

Ultimately, Plaintiffs' counsel's questioning of these witnesses with sarcasm, one-liners, and colorful mischaracterizations of their prior testimony or the facts in the record was done with one purpose in mind: to have a lasting impact on the jury. The Court has sustained objections to this deliberate behavior, and yet counsel persisted. Despite the clearly injurious effect of this behavior, the Court has not provided any curative instructions regarding counsel's plainly unwarranted mischief. Because of the damage caused by Plaintiffs' counsel's behavior, and the lack of any curative instructions to address these repeated violations, a mistrial is warranted. *See Collins v. Lochard*, No. 14-1915, 2015 WL 4127039, at *2 (7th Cir. July 9, 2015) (curative instructions often "suffice to cure any risk of prejudice").

## IV. Inappropriate Emotional Outbursts from Plaintiffs and at Plaintiffs' Counsel's Table.

The jury has witnessed multiple inappropriate and extremely prejudicial emotional outbursts from Plaintiffs' side during this trial. One example of improper and prejudicial emotional outbursts occurred during Plaintiffs' cross examination of Defendant James Breen. Plaintiffs' counsel asked Breen the following question and he gave the following answer:

Q: And you have no regret or remorse for the years that they spent in prison?

A: Not at all.

(Trial Tr. Vol. 9, 2418:17-19). Right after Officer Breen responded to Plaintiffs' counsel's question, Plaintiff John Fulton's wife, who was sitting in the gallery right by all the jurors, shouted loud enough for the court reporter to hear:

> UNKNOWN SPEAKER: Wow.

(Trial Tr. Vol. 9, 2418:20). Directly after this inappropriate and prejudicial outburst occurred, defense counsel brought it to the Court's attention:

> MR. NATHAN: Your Honor … at the end of this examination, there's a person in the gallery who audibly said "Wow" and – in response to Mr. Loevy's questions about, would you have done anything differently, do you have remorse, those types of questions. And it was loud. She just said, "Wow." And she should be told that she should not be doing that, and it would be my preference if she wouldn't be in the courtroom.
>
> MR. LOEVY: I agree. Mr. Nathan is correct. That shouldn't have happened. I heard it too.

(Trial Tr. Vol. 9, 2419:1-12). The Court never admonished Plaintiff Fulton's wife for her inappropriate outburst, and did not give a curative instruction directly after the incident to the jury. It was beyond prejudicial for this loud comment to be made from the gallery, by Plaintiff's own wife, in front of the jury.

Another inappropriate incident occurred before the jury just two days later. Plaintiffs called Jerome Greenlaw, Plaintiff Fulton's uncle, to testify as a damages witness on February 27, 2025. After defense counsel concluded their cross-examination, the Court released him from the stand in front of the jury. As recorded in the transcript, after Mr. Greenlaw stepped off the witness stand, Plaintiff Fulton stood up and the two hugged and kissed directly in front of the jury box. (Trial Tr. Vol. 11, 3194:16 ("Witness hugs Mr. Fulton.")). This "show" was not only inappropriate, but it was incredibly prejudicial. Right after the incident occurred, defense counsel brought it to the Court's attention:

MR. NATHAN: Your Honor, I do want to say that it was completely inappropriate what just happened after the witness got off of the stand. He came over to Mr. Fulton and gave him a hug and kissed him right in front of the jury box. It's –

THE COURT: It wasn't ideal.

MR. LOEVY: No.

MR. NATHAN: It's beyond not ideal, Your Honor. It's – this is after a history in this case where we've had an outburst from the bench from Mr. Fulton's wife, saying "Wow" during a – the conclusion of Mr. Breen's testimony. We've had laughing at Plaintiffs' table, outbursts from Counsel, as well as Plaintiffs. And now this is at a minimum a third instance on a third day. And we're renewing our motion for a mistrial.

(Trial Tr. Vol. 11, 3195:1-14). However, by this point, the jury had already been dismissed and the Court never gave any sort of curative instruction. (*See id*. at 3194:17-22).

Mr. Loevy also made an inappropriate and baseless accusation against defense counsel that the attorneys for Defendants were going to offer Mr. Marinelli consideration for his current pending criminal charges in exchange for his testimony in this trial. Specifically, on March 4, 2025, during the direct examination of witness Marcus Marinelli, Mr. Loevy asked Mr. Marinelli, "Sir, before you testified this afternoon, you made a request if you could speak privately to the attorneys for the police officers; correct?" (Trial Transcript Dated 03-04-25 at 3801-3802). Mr. Marinelli answered, "No, yeah, for the City, for City of Chicago, yes." (*Id*. at 3802). Mr. Loevy asked again, "How about, the first one is, you said you wouldn't testify until you got that private meeting?" Mr. Marinelli answered, "Correct." (*Id*.) Mr. Loevy also asked, "And you – what is it – when you wanted to talk to the attorneys for the police officers, were you trying to say, "Hey, maybe I can get some consideration for what I got going on right now"? (*Id*. at 3803). Mr. Loevy made this suggestion to the jury without any foundation or good faith basis to lodge such an accusation against defense counsel.

16

Mr. Loevy has made continuous argumentative questions in an effort to showboat to the jury which has been unfairly prejudicial to Defendants. This misbehavior has resulted in extensive prejudice to Defendants.

## V.    The Court's Intervention During Plaintiffs' Counsel's Misbehavior.

Counsel has made it impossible for the jury to decide the facts based on admitted evidence by injecting inflammatory commentary and improper questioning amounting to prejudicial testimony from the attorney rather than the witness. However, respectfully, the Court has not intervened to the extent needed to eliminate any harm.

Precautionary measures can mitigate any harm caused by counsel's statement and obviated the need for a mistrial. *See United States v. Lawrence*, 788 F.3d 234, 244 (7th Cir. 2015) ("Curative instructions . . . have long been accepted in this circuit as a reasonable use of a district court's discretion to avoid a mistrial."). However, Plaintiffs' counsel has not been admonished in front of the jury to cured the harm emanating from counsel's comments. *See Durant v. Surety Homes Corp.*, 582 F.2d 1081, 1089 (7th Cir. 1978) (any prejudice caused by improper cross-examination question was eliminated by court's prompt admonishment of counsel and instruction for jury to disregard question). The Court has instructed the jury that Plaintiffs' counsel's commentary is not evidence. Due to the lack of prompt intervention through instructions or admonishment in the deliberately prejudicial behavior,  a mistrial should be declared.

This Court has also provided inconsistent rulings with regarding the Individual City Defendants' motion *in limine* No. 32 regarding the 48-hour rule. Individual City Defendants moved to bar Plaintiffs from arguing that Plaintiffs should be compensated for being detained longer than 48 hours without a probable cause hearing. (*See* Dkt. No. 295). The Court granted Defendants' motion. (*See* Dkt. 400 at 20). At the pretrial conference, Plaintiffs sought to admit as

an exhibit the Supreme Court's decision in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) which, in summary, sets forth the 48-hour rule. (*See* Transcript of Pretrial Conference Dated January 29, 2025, at 60). The Court ruled at the pretrial conference that the length of Plaintiffs' custody is relevant. (*Id*. at 66). However, the Court explained that "[t]he issue of whether you call it unconstitutional to the witness, I think, is – you know, maybe you shouldn't do that." (*Id*. at 66). The Court held that this issue would be best resolved through a jury instruction. (*Id*. at 64-68). Therefore, per this Court's finding, Plaintiffs were barred from arguing or presenting any testimony or evidence that Plaintiffs' custody for more than 48 hours was "unconstitutional" or a "constitutional violation."

However, during opening statements, Plaintiffs' counsel stated, "After five hours, the incidence of false confessions shoots up. And by the way, you count not just the questioning time. You count the time that you're isolated in the room. John wasn't in there for five hours. He was in there for 104 hours. He was in there for more time than the Constitution allows." (Trial Tr. Vol. 1, 17:19-24).

After opening statements, the Court addressed this issue regarding the 48-hour rule. Defense counsel reminded the Court that it barred Plaintiffs from arguing that the length of Fulton's and Mitchell's custody beyond 48 hours without a probable cause hearing was a constitutional violation. (Trial Tr. Vol. 1, 92:3-95:21). However, the Court found that "there's a need for Plaintiffs to be able to talk about the detention being beyond what the rule is." (*Id*.) The following morning, after Defendants' filed a motion to enforce the Court's ruling on the 48-hour rule, the Court told the parties, ""I think it is confusing to the jury to talk about that detention beyond the 48 hours as unconstitutional, so I want to stay away from that. But there are, you know, the officers had a standard that they were to apply, and you can inquire into that." (Trial Tr. Vol.

18

2, 107:2-4). However, during that same discussion, the Court stated that if the Individual City Defendants "admit" the violation occurred, "then we're done"; however, if the detectives "deny it," then they could be "confronted with this other evidence that there's a rule, there's a constitutional law, there's something." (*Id*. at 108:13-21). After further discussion, the Court stated that Plaintiffs' counsel "can't argue that this was independently a constitutional violation when he's arguing his case to the jury." (*Id*. at 109:13-16).

In addition, when defense counsel has made objections or asked for sidebars during this trial, the Court has made some gestures of disapproval. Defense counsel respectfully brought this issue to the Court's attention and proposed a curative instruction. (*See* Trial Tr. Vol. 12, 3207:9-3208:2). The Court acknowledged defense counsel's concern: "Well, I think it's fair enough because I have shown some irritation about that." (*Id*. at 3208:7-8). To much of Defendants' appreciation, the Court read to the jury a curative instruction on this issue.

While the Court has made some efforts to reel in Plaintiffs' counsel's conduct and to be mindful of its own, respectfully, the Court's efforts have not been enough to overcome the prejudice caused by Plaintiffs' counsel's actions or to immunize the jury from the improper behaviors displayed by Plaintiffs. This additional factor weights in favor of declaring a mistrial.

## VI.     The Cumulative Effect of Plaintiffs' Counsel's Misbehaviors Has Deprived Defendants of a Fair Trial.

The cumulative effect of Plaintiffs' violations of the Court's evidentiary rulings along with their conduct at trial deprived Defendants of a fair trial. To prevail on their cumulative effect argument, Defendants must show: "(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered [their] trial fundamentally unfair." *United States v. Powell*, 652 F.3d 702, 706 (7th Cir.2011) (citing *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir.2000)). "In conducting this analysis, we examin[e] ... the entire record,

paying particular attention to the nature and number of alleged errors committed; their interrelationship, if any, and their combined effect; how the trial court dealt with the errors, including the efficacy of any remedial measures; and the strength of the prosecution's case." *Id*.

Each violation and misbehavior committed by Plaintiffs' counsel has damaged the integrity of this trial, and their cumulative impact on the jury was severely prejudicial to Defendants. From the incessant violations of the Court's *in limine* rulings regarding the terms "kids" and "boys," to Mr. Loevy's inappropriate questioning during cross examinations and commentary during objections, to the emotional outbursts from Plaintiffs' table and team throughout this trial, there is no question that multiple errors were committed by Plaintiffs' counsel during this trial. The many objections Defendants had to lodge in an effort to maintain the integrity of this trial only highlighted Plaintiffs' counsel efforts to taint the jury. When looking at any one of these misbehaviors in a vacuum, one could chock such conduct the adversarial process. However, when considering each of these multiple errors cumulatively in the context of the entire trial, it is clear Plaintiffs' actions deprived Defendants of a fair trial to which Defendants were entitled.

## CONCLUSION

Individual City Defendants are not entitled to a perfect trial, they are entitled to a fair one. Plaintiffs' counsel's grossly inappropriate conduct deprived Individual City Defendants of a fair trial. As such, Individual City Defendants respectfully request the Court declare a mistrial, and for any other relief this Court deems just and proper.

Dated: March 6, 2025                    Respectfully submitted,

/s/ Natalie Y. Adeeyo                    /s/ James P. Fieweger
Special Assistant Corporation Counsel    Special Assistant Corporation Counsel
Shneur Nathan, Avi Kamionski,            James P. Fieweger
Natalie Adeeyo, Breana Brill, & John Cerney    Michael Best & Friedrich LLP

Nathan & Kamionski LLP
206 S. Jefferson Street
Chicago, IL 60661
nadeeyo@nklawllp.com

444 W Lake St Ste 3200,
Chicago, IL 60606
jpfieweger@michaelbest.com

*Attorneys for Individual City Defendants*

*Attorney for City of Chicago*

21

### CERTIFICATE OF SERVICE

I, Natalie Adeeyo, hereby certify that I have caused true and correct copies of the above and foregoing motion to be served on all counsel of record via electronic mail, on March 6, 2025.

*/s/ Natalie Y. Adeeyo*