```
                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
                            EASTERN DIVISION

JOHN FULTON,                       )  Case No. 20 C 3118
                                   )
               Plaintiff,          )
          v.                       )
                                   )
ROBERT BARTIK, et al.,             )
                                   )
               Defendants.         )
-----------------------------     )
ANTHONY MITCHELL,                  )  Case No. 20 C 3119
                                   )
               Plaintiff,          )
          v.                       )
                                   )
ROBERT BARTIK, et al.,             )  Chicago, Illinois
                                   )  February 10, 2025
               Defendants.         )  2:59 p.m.

                            VOLUME 1
             TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
              BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Plaintiffs:       LOEVY & LOEVY
                          BY:  MR. JONATHAN I. LOEVY
                               MR. RUSSELL R. AINSWORTH
                               MS. JULIA T. RICKERT
                               MS. FATIMA LADHA
                               MR. ISAAC GREEN
                          311 N. Aberdeen Street, 3rd Floor
                          Chicago, Illinois  60607

                          LYON & KERR, PLLC
                          BY:  MS. ANDREA D. LYON
                          53 W. Jackson Boulevard, Suite 1650
                          Chicago, Illinois  60604

For Defendant Officers:   NATHAN & KAMIONSKI, LLP
                          BY:  MR. SHNEUR Z. NATHAN
                               MR. AVI T. KAMIONSKI
                               MS. BREANA L. BRILL
                               MR. JOHN M. CERNEY
                               MS. NATALIE ADEEYO
                          206 S. Jefferson Street
                          Chicago, Illinois  60661
```

APPEARANCES  (Continued):

For Defendant City:        MICHAEL BEST & FRIEDRICH, LLP
                           BY:  MR. JAMES P. FIEWEGER
                           444 W. Lake Street, Suite 3200
                           Chicago, Illinois  60606

Court Reporter:            KATHLEEN M. FENNELL, CSR, RMR, FCRR
                           Official Court Reporter
                           219 South Dearborn Street, Room 2328A
                           Chicago, Illinois  60604
                           Telephone:  (312) 435-5569
                           Kathleen_Fennell@ilnd.uscourts.gov

                           *   *   *   *   *

                PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury in:)

(Voir dire and preliminary instructions reported but not transcribed at this time.)

OPENING STATEMENT ON BEHALF OF PLAINTIFFS BY MR. LOEVY

MR. LOEVY:  Thank you, Your Honor.

May it please the Court, counsel.

As the judge said, my name is Jon Loevy, but before I begin I want to thank you.  All of us are busy, we have things going on in our life, and you've undertaken to make this commitment to come here and hear John and Anthony's case, and we are very appreciative.

As Judge Lefkow explained, it's an important part of our citizenship.  It's part of what it means to be a citizen is to participate in the jury system, and it's particularly important in a case like this one, where John and Anthony are alleging that their constitutional rights were violated, where they're alleging basically that that they were framed, and that they served 16 years each in prison for a crime they didn't commit.

When that kind of thing happens, we let the community be the judge of what's justice.  The police department doesn't decide.  The government doesn't decide.  Not even Judge Lefkow gets to decide.  You will, the community.  And it only works if people show up.  So thank you very much for doing it.  I'm Jon Loevy.  You got Russell Ainsworth, Julia Rickert, Fatima Ladha,

Isaac Green, Andrea Lyon, and our clients, John Fulton and Anthony Mitchell.

I'll start with John Fulton. He is married. His wife is here, Dominique. He's got children. He runs his own auto dealership. Since being released from his wrongful conviction, he started an auto dealership. He got the license for it. It's a family business. His wife is the CFO. She runs the money. His son, who was born right before he got wrongfully convicted, is now a senior at Western Illinois. He's going to be a mechanical engineer. John's extremely proud of him.

Also in the auto business his best friend, George Morales, who was his cellmate in prison, and his godson, Miguel also. The five of them run this auto dealership.

You have Anthony Mitchell. Anthony grew up in Chicago. His mother is a postal worker. His father was a construction worker, helped build Harold Washington Library. His sister is a nurse. The most -- he also is a parent.

The most relevant thing about these two guys though, unfortunately for better or for worse, is they are wrongfully convicted people. They spent their late teen years all through their 20s into their 30s in prison for a crime they didn't commit, and they are innocent, ladies and gentlemen.

It turns out that while this crime was being committed on the north side of the city, way up on Foster, he was on videotape deep on the south side of the city, and you can see

and you will see -- if we could have the ELMO please -- you will see that he's on video from 8:00 all the way through midnight as he was at the hospital with his girlfriend and then at home.

So this is a crime that he couldn't have committed because he can account for his whereabouts. Now, his -- I will start the story at the end. His conviction was overturned. John and Anthony's conviction was overturned. They were released from prison, and the state's attorney decided to dismiss the charges, and they are now free.

But that doesn't make them whole. They're here seeking justice. There is a giant hole in both Anthony and John at what they've lost and what's been taken from them, and they want this trial for a chance to prove that their rights were violated and come to court and get justice.

So let's back up. They grew up in Chicago, as I said. I'll start with John. He grew up. His mother actually died during his child birth, and that -- he'll talk about what that meant. He was raised by his grandparents in a house with love. He had a normal childhood, you know, riding bikes, playing video games, went to a Catholic high school, De La Salle. He was on the bowling team. He was dating a girl he liked a lot. He had moved in with her. Her name was Yolanda. You may meet her, too. As we mentioned, he had a child. He was getting ready to take on the world. He's getting ready for prom, for

graduation.

And then all of a sudden on March 18th, 2003, he's getting ready for school, and the Chicago Police Department breaks into his house, arrests him, takes him to the police station and starts telling him he's committed a murder. You're going down for a murder. He has no idea what they're talking about. He didn't murder anybody. He didn't have anything to do with anything.

Next thing you know, 104 hours in custody, four days later, he's being prosecuted, and he's wrongfully convicted. He doesn't walk out for 20 -- for another 16 years.

So what is this murder? A kid named Chris Collazo on the north side. Chris Collazo was the kind of kid who had a lot of enemies. He was involved in crimes. He had a long criminal rap sheet. There were a lot of people --

MR. NATHAN: Objection, motion in limine.

MR. LOEVY: There's no motion barring this, Your Honor.

THE COURT: I don't think so. I don't recall that.

MR. LOEVY: There are a lot of people that might have wanted to kill Chris Collazo, and it's the police department's job to try to figure out who killed Chris Collazo.

He's found with his hands duct taped behind his back. He's found with his feet duct taped together. It's obviously a professional hit. Somebody has gagged his mouth, has beaten

him to death, has suffocated him, put him in an industrial-sized body bag and dumped his body and lit it on fire. I mean, that is a serious crime by somebody who's obviously a professional, not these two kids from the south side.

MR. NATHAN: Objection. Motion in limine again, violation of that.

THE COURT: Which order are you talking about?

MR. NATHAN: May I have a sidebar, Your Honor?

THE COURT: Well, let me just say that what Mr. Loevy is saying is not evidence, and if the evidence comes in that's inconsistent with what he says, you are to rely on the evidence.

MR. LOEVY: Thank you, Your Honor.

THE COURT: And let's try to avoid interruptions.

MR. LOEVY: Thank you, Your Honor.

So the police get this case, and it's a serious crime, and they have to track down suspects and leads, and they talked to the victim's family and they are told that a name La Raza, and we don't know what they did to investigate that name. We know that the police ran the victim's rap sheet. He's got a 14-page rap sheet.

MR. NATHAN: Objection, again.

MR. LOEVY: Your Honor, you've already ruled on this. I'd ask that he not interrupt me.

MR. NATHAN: I'm happy to elaborate.

THE COURT: I'll hear you at a break.

MR. NATHAN: There's been two instances of what I see as something that has to be addressed.

MR. LOEVY: Your Honor, I'd also ask if Mr. Fieweger is giving the opening, that it's one attorney per.

THE COURT: Well, yes. That's true, too.

MR. LOEVY: May I proceed?

THE COURT: Yes.

MR. LOEVY: Thank you.

THE COURT: I'll hear you but at a break because I don't -- this is not evidence, ladies and gentlemen. This is Mr. Loevy's view of the case, and the same will be true for the defense.

MR. LOEVY: If the police officers are going to do their job, there's a lot of suspects to investigate. They solved the crime with the first suspect, the first theory. They talked to the family, and they said who's the last one to see him alive? Well, he was with his friend Marcus Marinelli.

So the police go track down Marcus Marinelli. They arrest him. They put him in the squad car and they take him to the police station. They say, hey, you're in big trouble, man. You're the last one to see him. You're going down for murder. You better cooperate, you better give us a name or you're going down for murder.

Marcus Marinelli says I didn't kill him. He's my friend. You know, when I left him, he was going off to do a drug deal and I didn't want to go, so that's the last I saw him.

Well, you've got to give us the name. You've got to give us the name or you're in trouble. So Marcus Marinelli says, well, about five weeks before he died, back before Valentine's Day, we robbed a couple of black kids from the south side. Maybe they -- we robbed $14 from them. Maybe -- maybe they killed him.

So, again, that's a lead. That's a suspect, right? That doesn't mean you've got to close the case.

So what were they talking about? Before Valentine's Day, four or five weeks before somebody killed Collazo, there was a situation where these two guys met Collazo. John Fulton grew up in a tough neighborhood, in a neighborhood where there were break-ins, in a neighborhood where he had been robbed at gunpoint multiple times in his life, and he decided he wanted to purchase a gun.

He is a licensed firearm owner today. He owns multiple firearms. That's why we asked you during jury selection, you know, how you feel about that subject. He wanted to -- in his house, when he was growing up, his father had a gun to protect his house, his grandfather had a gun to protect his house, his uncle had a gun to protect his house.

He had moved out with his girlfriend. He wanted a gun to protect his house.

So he asked his friend if she knew where he could get one. She introduced him to Chris Collazo. So his path did cross with that kid that somebody executed.

They go, they're going to go meet him five weeks before the murder, four or five weeks, and the kid, Chris Collazo, gets in their car, they smoke a joint, and Chris Collazo obviously says to himself, you know, I think I can rob these kids because Chris --

MR. NATHAN: Objection again, same motion.

MR. LOEVY: I think what he's --

THE COURT: Go ahead. Go ahead.

MR. LOEVY: All right. That John shows up with his friend Anthony, and there's this other 15-year-old, you'll hear from, too, Shaw, and they take John into the house. They're going to sell him a gun, and they put a BB gun to John's head, and they steal his money and then they run away.

So John gets back in the car. He tells his friends what happened, and Collazo calls John and says, wait a minute, you only gave me $14. And John looks in his pockets, and he realizes, wait a minute. I had the $300 in one pocket and my gas money in the other. This guy robbed the wrong pocket. He got $14.

So he sort of taunts the guy, ha-ha, and the guy was

mad. I'm going to get you, I'm going to get you, and John was a little scared because he told John he was going to come after him. But then a day went by and nothing happened, then another day went by, then a week went by, then another week went by, and John stopped thinking about it. Another week went by and another week went by, and it was over.

Now, that is true that this kid had robbed John of $14, and so we are not denying that John was a suspect. The police should have investigated that, just like a hundred other suspects. But what the police did is they decided case closed. Oh, we got a motive. This guy probably wanted to get revenge for that thing that happened 14 -- four weeks earlier. The case is closed.

So they go -- they grab John, and I'll talk about it, and they basically close the case. But there's a whole lot of other people they should have investigated. And, frankly, it never sat well with the victim's family. The victim's family, you'll hear the police talked to the victim's brother Victor, he had another brother, and they had concerns that the police got the wrong guy.

And you'll hear from a state's attorney named Nazarian who says that the family wanted to talk to them about a year later after they had been arrested, and the family was saying the police are not investigating the right witnesses. There may be other witnesses. Why are they so fixated on these two

guys?

The reason the police were so fixated on these two guys is because they got a false confession, and you're going to hear a lot about false confessions, but after four days in custody, 105 hours, the police manage to get John and later others to confess to this crime.

There was no physical evidence, no witnesses, no proof, nothing, and that's why you were asked during voir dire if you could imagine a criminal case with no evidence. There was no evidence. Just this false confession.

We know the confession is false, ladies and gentlemen, because it's false. So if I was to show you the highlights of this confession that they procured from John Fulton, let's go through the important parts.

They get John to say that he was on the phone with the girl who introduced them on March 9th between 3:00 and 7:00 and that they abducted this kid Collazo on the Foster bus, jumping off the Foster bus between 9:30 and 10:30.

Everything about the confession is false. They checked the phone records years later, and you know what? He wasn't on the phone. It's untrue.

They checked the Foster bus schedule and they figure out at trial the Foster bus stopped running at 8:21. What he confessed to is false.

And most importantly, the abduction happening in the

evening hours, he's on videotape on another side of town, and he can prove it.

So he's given a confession that is a false confession. How did they do it? Well, they arrested John. He's 18 years old. They hold him Tuesday, Wednesday, Thursday, Friday. He gets no food. They didn't feed him the entire time he was in there. They put him in one of those tiny interrogation rooms, lock him in there. There's no windows, no light. He can't tell day from night.

After a certain number of hours, he's just completely lost what's even going on. They won't let him sleep. He gets maybe an hour or two at a time, and then they're waking him, and there's nowhere to sleep. There's no beds. He's just completely disoriented.

There's a lawyer that the family hired running around town trying to find him, going from police station to police station to police station, where's John Fulton, and the Chicago Police Department says we can't find him. He's not here. Don't know where he is. That lawyer twice went to the police station where John was only to be turned away, told sorry, not here.

Well, he was there, and they were pressuring him, making him promises, and threatening him. The way they did this over and over again was you're going down for murder. I don't know what you're talking about. You're going down for

murder. You're going to get the death penalty unless you cooperate. You've got to cooperate, and then we'll let you out of this terrible, terrible situation.

They feed him the facts. It's called contamination. John didn't know anything about Chris Collazo's death. He wouldn't have been able to tell you that he was duct taped, he wouldn't have been able to tell you he was lit on fire. The police basically fed all the information to John through questioning. They literally took him on a field trip.

They put him in the back of their car at one point, the only time he left the room, and they drove him to where the body was found and they showed it to him. They drove him to where they were claiming he abducted it, because otherwise he couldn't give a confession, so they had to educate him about what he would need to put into this confession.

So they showed him where they supposedly did all these things. They took him to a polygrapher, and they said, hey, you want to take a lie detector? He said sure, bring me a lie detector. I didn't have anything to do with this. He told them a hundred times he's innocent.

They bring him to the polygrapher, Mr. Bartik, and then they say never mind. You don't get a polygraph. He's like why not? He signed the form. Uh, you know, it won't be necessary. They bring him back. They're constantly pressuring him.

And the way you get a false confession is you just increase the pressure and you make it so that the person eventually feels hopeless and they feel disoriented, particularly an 18-year-old.  And when the pressure builds and builds and then you tell him there's a way to release the pressure, all you got to do is cooperate, just be a witness and you can go home.  Just say you saw it, you didn't mean to do it, and then you can go home.

And John Fulton's not going to be able to tell you today why he fell prey to this; why after four days in this police station, he finally gave this confession that we know is false.  He can't explain it, what his 18-year-old self was thinking.  They couldn't do it to him today, I'll tell you that.

But there is someone who can explain it to you, a guy named Dr. Leo.  He is an expert, one of the leaders in his field, the field of false confessions, and he supplies a very important piece of this because you're jurors.  You're saying, well, why would someone confess to something they didn't do?  I wouldn't confess to something I didn't do.  That's what you're thinking.  Dr. Leo is going to explain it happens.  It happens with disturbing frequency.

Here's the basis.  In the United States in the late '90s, there was -- DNA exonerations became a thing.  Some of you maybe are too young to know about it, but DNA started

solving crimes, and they started over -- Dr. Leo is going to explain, they started looking at some cases where someone was guilty, guilty, guilty, and then the DNA proved they didn't do it. Like a rape case and the guy was in prison, and the DNA proved wrong rapist.

And social scientists like Dr. Leo said this is interesting. How did this happen? How did we get a known false confession? And they looked at the data and it turned out that in something like 25 percent of the early DNA exonerations, a few hundred of them, there was a false confession.

So you have DNA exonerations, no question the guy's innocent and was convicted, and in 25 percent of those cases, the innocent guy had said I did it. And that's strange. You know, we know he's innocent. We turn over the card, he's innocent. Why are all these people giving confessions?

So they studied that data, and they came up with some insights into why people falsely confessed. There are two main reasons people falsely confess: One, youth, and, two, unduly long interrogations, and both of those present here. Let's talk about youth.

When you are a kid, and John was 18 years old. He was a -- he's a young adult, he's a high school senior, but he's 18. And in those false confessions I told you about, young people are unduly represented because young people are kind of

knuckleheads. Their brains are not fully developed. They are impulsive. They think short-term. They're easier to trick. They respect authority figures.

So a young person's more thinking like how do I get out of this room? Whereas 40-year-old John Fulton is thinking I'm not going to talk to you anymore. A young person isn't mature enough to make this situation stop.

So in case after case with these false confessions, it was people 18 and younger, just like John and Anthony, 18 and 17.

The other thing about false confessions that they discovered in the data was long interrogations. Dr. Leo is going to tell you most interrogations, police interrogations, are a few hours. Five hours is too long because how many times can you say I didn't do it? You know, John's like I don't know anything about this crime. How do you ask hours' worth of questions about that? He doesn't know anything about the crime. Two hours, three hours, four hours, five hours.

After five hours, the incidence of false confessions shoots up. And by the way, you count not just the questioning time. You count the time that you're isolated in the room. John wasn't in there for five hours. He was in there for 104 hours. He was in there for more time than the Constitution allows.

MR. NATHAN: Objection.

THE COURT: Overruled.

MR. NATHAN: Motion in limine again. This is the third one now.

THE COURT: Go ahead. We'll deal with it later.

MR. LOEVY: Judge Lefkow is going to instruct you on the law, and we expect what the law is going to be instructed is that the police have 48 hours except under extraordinary circumstances to bring you before a judge, and they're really supposed to bring you before a judge as reasonably -- as soon as reasonably practical.

They cannot hold you for 140 hours -- 104 hours and just keep squeezing you until you give in. It's not a thing. It's not how you interrogate people, and you can't do that. And the police knew you can't do it.

Every person has got a breaking point. Eventually people are going to give up. We don't do this in this country. So typical interrogations, five hours or less. Longer than five hours, you start seeing false confessions, and that's what's happened. You're going to get a confession. It's just not going to be true.

Now, when John was in there and he kept telling he's innocent, kept telling he was innocent and it wasn't working, they said, hey, if you just cooperate, you can go home, and, you know, if you don't, you're in big trouble. Eventually John says fine, let's do this. I'll cooperate, and they rehearse.

They go over the confession. He wouldn't have known how to give this confession because he didn't know the kid got bound. He didn't know the kid got lit on fire. He wasn't there.

Police rehearsed the details with him over and over. Then they call in the state's attorney. You're going to hear from the state's attorney as soon as tomorrow or Wednesday. The state's attorney is going to testify I sat in the room with John, and he gave me this confession, and the police were in the room with us. And then when he was done giving me this confession, after about an hour, this confession that turned out to be false, we said to the police, hey -- he said, can you ask the police to leave?

The police leave. And John's going to tell you what happened when he's alone with the state's attorney and the state's attorney is going to tell you what happened. The state's attorney is going to admit that what happened next is John said this isn't true. I didn't do this. This -- right then and there, he's giving a statement. He says it's not true. The police told me I could go home. They're threatening me. It's not true. It's not a true confession. I was at the hospital. Go find the security video. You'll see I wasn't there.

This is the state's attorney who's going to admit that that's what John Fulton told him. Now, the state's attorney wrote it up in his notes, and you know what his notes say? Not

what I just said. His notes say John confessed to murder. He bound him with duct tape. You know, he lit him on fire. He's guilty, guilty, guilty. The state's attorney forgot to write in the notes, oh, by the way, he says it's all false.

He's going to have to explain to you on the stand why when John's telling him it's false, he doesn't write down it's false. He writes down the real -- the fake confession and then he leaves the station and doesn't come back. He's out of the investigation. He says he's off duty. He just disappears. So they're not going to take John's statement when he's saying he's innocent.

So they -- they don't -- they never give John the chance to give the statement that he's innocent. So the state's attorney leaves and says to the police officers, you know, you guys better keep talking to him because he's not saying the story.

So they go back in there and they hit him because they're mad because he just got them in trouble. He just told the state's attorney when they left the room that they made him give a false confession. They slapped him and they kicked him a couple times, not trying to hurt him or, you know, damage him, but definitely trying to send the message that you should not do that.

And then they kept him in there for another 72 hours, and then he finally -- he gives up. You know, he's in there

for 105 hours. It wasn't working to tell them the truth. They won't let him give a statement until he's saying the false thing, so he says fine. If you guys are telling me I can go home, I'll do it right this time, I won't say I'm innocent, I'll do it right, and he's about to do it and then his lawyer finally finds him.

The family had hired this lawyer who was going station to station. The lawyer comes in there, talks to John, John says, look, I'm finally going home, they said I can go home, I just got to tell the story, I'm going home. The lawyer says they're lying to you. You're not going home if you tell that lie, and John does not give the statement. And John did not ever get the chance to give a statement that he was innocent.

Now, he was not the only one they did it to. They did it to four other people. I've already told you about Marinelli. Marinelli was the kid that the police first found and they arrested him, and they said if you cooperate, give us a name, you can go home.

Marinelli cooperated. He told him about having robbed -- Marinelli said I robbed John Fulton with Collazo. I robbed him. They let him go home. Why? Because he cooperated. Never got prosecuted.

Then they go to the next witness, the girl who had introduced John to Collazo because Collazo and John don't know each other. There's a girl in the middle. John had met this

girl Precious Griffin. He met her on a party line. I never heard of it, but apparently back in the early 2000s before they had InstaSnap and Facebook, they would talk on party line.

So John meets this girl. They're talking. They're friends, and he actually has a -- they have a little relationship and they're friends, and she's the one he asks, hey, do you know anybody who might be able to sell me a gun? So she's the one who introduced them.

They go to her and they say -- they find her at 11:00 on a school night, and they arrest her. They put her in the police car, and they say you're in real trouble. We're arresting you. You aided and abetted a homicide. And she's, like, what? He's, like, yeah, you helped John Fulton kill Chris Collazo. She said, no, I didn't. Chris Collazo is my friend. Why would I do that? No, you don't understand. You're in real trouble. You're going down for murder unless you tell us that you helped John Fulton do a revenge killing. It's a revenge killing theory that they're going to go with. And she says not true, not true.

So they -- according to them, she's there voluntarily, but from 11:00 at night, 10:00, 11:00 at night, they keep her up all night without a parent, without a lawyer, all night until the next morning, something like 12 hours later, she finally says, okay, I was on the phone with John. I called him. I told him he's getting off the Foster bus sometime

around 9:30, 10:00.  She gives the false confession, too.  It's all false.  They got her phone records.  Not true.  There is no bus.  The bus wasn't running, and John's on videotape.

So she gives this statement.  They lock her in.  They take her in to the grand jury, that's what they do.  Once they got a witness saying their story, they make them say it under oath.  But the second she gets out of police custody, she says, uh-uh, not true.  I didn't help John murder anybody.  Somebody killed Chris Collazo.  I got no knowledge.  Not true, not true, not true.

And they called her at John's trial.  And they said remember when you signed the statement?  She said they made me sign that statement, but it's not true.  I didn't have anything to do with that murder.  I didn't help John murder him.  John's innocent.  I got nothing to do with it.  It's all made up by the police department.  That's another witness.

Then they go to another witness, the third one is Antonio Shaw.  Antonio Shaw is a 15-year-old kid.  He has a stutter.  He's slow.  He's the kind of kid that would be very vulnerable to police pressure, and John and Anthony knew him.

John and Anthony had been living together.  They were roommates at the time, and there was another kid who would hang around, too, this kid Shaw.  His nickname is Sticks.  I'll call him Sticks.

So Sticks had been present five weeks earlier when

they did that gun deal that went wrong with the deal. So the police grab Sticks, and they put him in there for a long time, and they say, hey, all you got to do is cooperate and you can go home. And the same pressure and the same drill.

Now, the thing about Sticks is his uncle found him. He had an uncle who was going from station to station and for whatever reason, they let the uncle into the police station. So the uncle heard the police telling Sticks all you got to do is cooperate, say these guys did it, and you can go home. Just cooperate, so you can go home.

And Ronald Smith, if we have time, you'll hear from him. He'll say that's what happened. The police are telling him, you're not in trouble, just say it happened. He went home. He did not -- he's not on trial like the two of them.

And that brings you to Anthony Mitchell. Anthony Mitchell was 17 at the time. Anthony is struggling. What they did to him was wrong, and he is to this day still fighting what they did to him. They put him in a room on Wednesday, Thursday, Friday, same thing. Imagine a 17-year-old person that doesn't have any idea what the police are talking about. Didn't kill anybody. Didn't light anybody on fire. Didn't do any of this, and they won't accept that.

How many ways can you tell them I don't know what you're talking about. Listen, you're going down for murder. You know, you better make a deal for yourself. All you got to

do is say it was a witness, just say your friend did it, so much pressure, so much pressure.

Anthony finally succumbs, and they break out the court reporter and they have a statement. So Anthony gives a statement on the court reporter. Now, I'm going to read you the beginning of the statement. I'm not going to read you what they said, I'm going to read you Anthony's words because all Anthony had to do was say yes.

Some state's attorney comes in there and they say, okay, we're going to talk about the murder that happened. They tell him where. Foster and Rockwell. He's never been to Foster and Rockwell in his life. March 9th, okay, you ready to go? Yes.

Now, here's Anthony's words. The state's attorney is telling a story. Here's what he said during this confession: Yes, yes, yes, yes, yes, yes, yes, yes.

So they're saying and then this happened, then this happened. He's saying yes, yes, yes. Next page, yes. Yeah, right. Uh-huh. Yes. Yes. Yes. Yes, sir. Yes, uh-huh. So they're telling this story, oh, you did this, you did that. He just has to say yes. Right, yes, yes, yes, yes, right, yes, yes, right, right. So far he hasn't said anything. The state's attorney is saying, and then you did this, then you did this, all he's got to do is say yes, yes, yes. Keeps going yes, right, right, yes, yes, yes, yes. They're telling the

story. He's confessing. He thinks he's cooperating to go home. You know, he's been there for three days. Uh-huh, yes, sir, yes, yes, uh-huh, yes, right, yes, right. Boy, he's confessed to who knows what at this point. He just keeps saying yes.

It keeps going. Yeah, yes, yes, yes. Arms. He finally said a word, arms. That was in response to the question: You had duct taped his arms? And then he said: Arms. Yes, sir, yes, right, and then he said the word south. Because then they said to Anthony: And then you drove south? And Anthony said south. Then we got yes, yes, uh-huh, yes.

Then he says trunk. Guess why he said trunk? Because they said right, you got Chris's body out of the trunk. And he says trunk. Yes, yes, uh-huh, yes, right, uh-huh. Yes, yeah, yes, yes, right, right, yes, yes, right, right, yes, yes, yes, and who's this picture we're showing you? John Fulton.

That's some confession. They told him a story, and all he had to do was say yes. They said you can go home if you cooperate, and he believed them, and they were lying to him. And then when he was done giving that confession, they said tell it back to us, and he did. Basically the story that he just told him that he said yes to, he gave it back to him, but you can see what the score is there. This was not real. They didn't say Anthony, all right, if you killed somebody, tell us what happened. No. They fed it to him right there on the

tape.

None of this ever made sense. You know, they can't get it straight. They don't know where the murder weapon is. They don't know where the jewelry is that was supposedly taken. They got the wrong alley. All their details don't match. It never made sense that they on a school night at -- on Sunday night, they don't even know where Collazo is. They suddenly five weeks later want to go get revenge on the coldest night of the year. It was 3 degrees, negative 11 wind chill. This is the night they just wake up and they're going to get revenge over this 14 dollars? John had school the next morning. John went to school on Monday. We have the school records. He wasn't off lighting somebody on fire.

The other thing that never made sense is where are the missing five hours? If they did this crime, they abducted him at 9:30 to 10:30, the body doesn't get dumped until 3:00 a.m. on the south side.

So where are they? They're just driving around in the car with the body in their trunk? None of this makes sense. But I can actually prove, ladies and gentlemen, that the confession is false, and this is where it goes from not just, well, we made a mistake, to intentional misconduct. This is how you know that he was framed, and the gist is this: There's a whole bunch of stuff in this confession that the police believed was true, and that's the stuff that ended up in their

mouth, all these things the police thought were true, and then they give this confession with what the police thought was true, and then they turned out to be false.

So the boys give a confession that's consistent with what the police thought. They didn't know anything about the crime. And they got the facts wrong.

Let me explain. So we have a chart that you're going to see a lot of this trial. You're not going to be able to read it now. We'll go through it, but basically everything the police thought ends up in the confession, and it ends up false. And for the people watching on the screen, we're not going to go through it, but lots of facts, ends up in the confession, and on further investigation, it all turns out to be false. Let's do the first one.

I already told you the confession has the abduction happens at 9:00 to 10:30. Well, it turns out that John can account for all of his whereabouts during that time. At 8:00, he leaves his apartment. He's on videotape leaving his apartment. His girlfriend Yolanda had strep throat. She had been coughing up blood. So the night of the murder, he takes her to the hospital.

And then they're -- they get to the hospital at 8:30, and they leave the hospital at -- John leaves to go home at 10:30 because he's going to go wait at home. You see at almost 11:00 he enters his apartment a half hour later. By the way,

he did not during this time drive, in a half an hour, drive all the way from the south side, all the way to the north side, kill somebody and get back in half an hour. And the reason you know that is it takes 15 minutes to get to his apartment, and in his apartment, he orders a film, embarrassingly a pornography film, but it saved his life. So he's ordering a film, so you know he's in there.

Then at 11:30, half hour later, he leaves his apartment. It's on the security video. He goes back to the hospital, and then he comes back at 11:53 with Yolanda, and he doesn't leave again until 8:00 the next morning. So when the confession says that, you know, we did it between 9:30 and 10:30, he couldn't have because he's on videotape not doing it.

The police believed it happened then. It ends up in their mouth.

The second thing I've already told you about the Foster bus. The confession that Precious Griffin gives and that these guys give is we abducted him off the Foster and Rockwell bus at the Foster and Rockwell stop.

Here's the bus stop here. Oddly, the crime supposedly happened at a bus stop, where there would be people around. In this confession, Chris gets off a bus and Precious had told them on the phone that he's going to be here.

He gets off the bus. They grab him. They beat him to death. They stuff him in their trunk. Nobody sees it. They

don't even bother to canvass if anybody would have seen it, but it couldn't have happened, ladies and gentlemen.

How do you know it couldn't have happened? Because the last bus ran at 8:21. They forgot to check the bus schedule. So they believed that this happened, him abducting a bus. It couldn't have happened. So this confession that John gave, it couldn't have happened.

The next fact, the mouth was stuffed. The police knew from the scene that somebody had stuffed something in the victim's mouth and duct taped it. There was some cloth or something had been jammed in there.

So they must have said to John Fulton what did you put in the guy's mouth? He's, like, I didn't put anything in his mouth because I wasn't there. And then after 105 hours, he's saying fine, I stuffed something in his mouth. What did you stuff in his mouth? A rag from my car.

The police know something has been stuffed in his mouth, but they didn't know what. When they get to the morgue later, they take the tape off, and they pull out his sock. Somebody had taken off the victim's sock, stuffed it in his mouth, put his shoe back on.

So John gave the wrong confession. He put the wrong thing in the kid's mouse because the cops didn't know what the right thing was. They just knew there was something in his mouth. So they tell John you got to say something's in his

mouth, and they get the wrong thing.

The next thing the police got wrong was it was obvious that this kid had been beaten. I won't show you the photos now. But he was all bloody, and he was messed up. Somebody had beaten him up. And the cops had a theory that he must have got hit with an object, like a pipe or a bat or some kind of bat.

So they're saying to John and Anthony, what did you hit him with? Was it a bat? Was it bat? Fine, it was a bat. So in the confession, they'd beaten him to death with a bat. Turns out the medical examiner later does an autopsy and she says I don't think it was a bat at all. These injuries were not caused by a bat. There's no fractures of the skull. There's no fractures. There's no oblong shape. It wasn't a bat.

So these guys confessed. They gave the wrong confession. They confessed to the wrong crime. And then they shaved the guy's head, and they found these strange marks that the police didn't know about, I'm showing you a close-up here, round, almost looks like a bullet hole.

And the coroner said the way this guy got whacked is with something with a sharp edge. So the police didn't know it at the time because nobody had shaved his head. They had John and Anthony give the wrong confession. They didn't know that the killer had taken something, probably a board with a nail on

it or something, and had -- it didn't go all the way through to their skull. So nobody knew that, so it wasn't in their confession.

Turns out, shave the kid's head, the confession is false. The next thing is the victim was bound and gagged with duct tape. I told you at the scene, you know, there was duct tape. They said, ah-ha. Look what we found in John's apartment. John said you can search my apartment. I got no problem with that. There's duct tape on his windows. He's a duct tape owner, as if many people in Chicago aren't.

Well, years later when they're getting ready to decide whether prosecute him again, they test the duct tape, not the same duct tape. And they also found when they're getting ready to reprosecute, they found a profile of a person on the duct tape like a DNA-type profile that wasn't John and wasn't Anthony. So they got that wrong.

The next fact they got wrong was this -- the crime supposedly happened at 528 South Peoria and that the guys ran. So in their confession, they didn't know the address 5228 Peoria. But that's in their confession. How did they know that? The police took them to 5228 Peoria and showed them. This is where you left the body, right? Okay. As Anthony said, yes, yes, yes. They showed them. Why did they have to show them where they left the body?

The problem was there was a witness who had called in

911 and he allegedly saw two people running from the body. In the confession, it was John, Anthony and Sticks, three people. So the confession, again, did not match the facts, nor did it match -- the guy supposedly said there's a red coat. Nobody's got a red coat. They go search John's house. There's no red coat, and this wasn't like some super mastermind criminal case -- criminal crime that they're accusing him of.

I mean, they're accusing him of driving his own car to the bus stop with his license plates, beating a guy to death in front of all the people at the bus stop, so it's not like he's like trying to cover his tracks in their theory of the case, but they can't find this red coat.

Now, the police knew the victim had been burned. Somebody had poured gasoline. They smelled gasoline at the scene. So they said, John, when you killed him, where did you get the gasoline? John's, like, I don't know, I didn't kill him, and I don't have any gasoline.

Do you have a gas can? Actually, yeah, I have a gas can. I've got a lawnmower. They get John's gas can, and they decide ah-hah, this is the murder weapon. On that drive along, they say, John, was that the gas station where you got the gas? Okay, that's the gas station where I got the gas.

They compared the gas cans. In other words, in the confession, he said he bought a gas can from the gas station. It's not the same gas can.

In other words, they had to write it resembled the gas cans, but there's a lot of gas cans that resemble each other. It was the wrong gas can, so John's confession is falling apart.

Just two more. Stay with me. The victim, as I said, was beaten and bloodied, and in the confession, we beat him with this bat, we messed him up real good, and we stuffed him in John's trunk.

Now, John's trunk, when the police got -- you know, he carries around his bowling balls. This is three bowling balls. And during his direct, I'm going to make him explain why a man needs three bowling balls, but John was on the bowling team. He's got three bowling balls. He's got a toolbox. There's not room for Chris Collazo in that trunk.

But let's say they did stuff Chris Collazo in the trunk. When they arrest John that day, they take his car to the police station, they impound it, and then they search it. There's no blood. There's no DNA. Nothing. If this kid -- and by the way, in the confession they stuffed him in the trunk before they put him in the bag later. Nothing.

They're forensic scientists. They look very carefully. They find hairs. They find fingerprints. They just don't find any trace of the victim. And that's why they're trying to get you jurors that don't believe in physical evidence because there's no physical evidence, and they say

John says, well, the trunk was all bloody, but I washed it out. In the confession, he says I washed off the tire cover. It was all bloody, but I washed it.

Nope. There was a fingerprint on the tire cover. So he couldn't have washed it. It just wasn't the victim's fingerprint. In fact, it was their friend Sticks's fingerprint. Sticks was in the car all the time. Anthony was in the car all the time. They were living together. They'd get groceries. They'd go in the trunk.

If their fingerprints weren't in the trunk, it would be a problem. And there couldn't have been blood on it and washed off because the prints are still there. The hair is still in the trunk. It's just not the victim's hair. It's not the victim's trunk. So they're never going to be able to explain to you where the physical evidence is.

The last one is the phone calls. You know, in Precious Griffin's confession and John's confession, he doesn't know how to find this Collazo guy. He's only met him once in his life, five weeks earlier. How is he going to find him on Sunday night?

So in the confession, he's on the cellphone, and Griffin is saying come to Foster and Rockwell, I'll give you directions, and he's on the drive and they're on the phone. So there should be phone records. So they're getting ready for trial, and the lawyers are starting to say, well, wait a

minute, where are the phone records?

And the state's like, well, we can't find Precious Griffin's phone records. We got John's records. We got Collazo's records. There was some calls back in February before Valentine's Day when they did the gun deal, but we can't find Precious Griffin's phone records.

Well, what do you mean you can't find them? 18 months into the case, they show up. One of the detectives says, oh, they're in my garage. They were in an envelope in my garage. I forgot and they got misplaced. Here they are, and what do you know? When you check the phone records, they don't match. The confession is false. These calls didn't happen. There is no call on March 9th.

So speaking of missing things, and this is where it gets really dirty. Remember the polygrapher, Bob Bartik, remember John tried to take a polygraph. They wouldn't give him a polygraph.

Bartik's in the library or something, and he tells this story, and he's, like, wait a minute, Fulton and Mitchell are on trial? Why didn't I get a subpoena? They confessed to me, too.

And everybody is, like, what? They're, like, yeah. And he pulls out this report, well, once he realized there was a problem, it's undated. You know, Chicago police reports, there's a form. They look like police reports. You know, and

so Mr. Bartik's got this undated handwritten something that he says he found in his -- I don't know where he found it, but nobody had ever seen it before, and he fixes the problem.

The confession changes to match the phone records, and the call goes to March 8th instead of March 9th between Precious and Collazo because they were friends. And he's, like, yeah, John told me that the phone calls were on March 8th. Let's just change the confession. Everybody says, Mr. Bartik, where have you been all these years? He's, like, nobody asked me. You know, John confessed to me. I told the police officers, and the police officers are, like, no. Actually, we didn't know he confessed to the polygrapher. Really, he confessed to you and you didn't tell? And it turns out Mr. Bartik has a little habit of this.

MR. NATHAN: Objection, motion in limine.

MR. LOEVY: Your Honor, this is not barred by the motion in limine. It will not be Mr. Sosnowski's testimony.

MR. NATHAN: Sidebar, Your Honor.

THE COURT: Go ahead and finish, and then we'll deal with these. If there's a need for a correction, I'll make it.

MR. LOEVY: I will, in abundance of caution, raise it with the Court. I don't want to get anything wrong, so I will move forward here.

THE COURT: Okay.

MR. LOEVY: Mr. Bartik finds this report that nobody's

ever seen before, and now he's claiming he got a confession, and the police are, like, you never told us that. They picked -- they were at the station -- they were at the polygraph thing with John Fulton, and he forgot to mention there was a confession before they took the polygraph test?

None of this, none of this makes sense, and there's another problem. The confession supposedly happened at 10:00 at Homan Square. There's other reports that say the confession happened at Area 1 at 10:00. There's two confessions, same time. None of this makes sense.

Speaking of things that showed up late, you got the phone records in the garage, you got Bartik's report, about 10 years after they've been convicted, a file shows up in the basement of the Chicago Police Department.

Now, this is not a claim in the case. We're not alleging that there's a constitutional violation here. We're alleging this goes to their mind state.

It turns out there was a file in the basement of the police department that nobody gave these guys that had other suspects for the Collazo murder, and you're going to hear that the police are obligated to turn over everything. They can't just hold back stuff.

And there were, of course, plenty of other people who might have wanted to kill Collazo, and they forgot to turn over this file until it was found in a basement 10 years after

they'd been convicted.

You're going to hear a police practices expert. An expert witness sometimes comes to court, the defendants have hired some, the plaintiffs have hired some. They cost money. They get paid for their time, and they give you opinions. And our police practices expert is going to say nothing about this makes sense. Nothing about this is proper. It's all improper. This is not the way you run a police investigation. This is completely contrary to national police standards.

Now, they have a police practices expert who's supposedly going to tell their story. I have a prediction for you. I don't think they're going to call their police practices expert because if they call their police practices expert, he's going to have to defend what happened here, and I don't think he's going to be able to defend what happened here. I think they're just not going to call their police practices expert.

I'm almost done, I'm going to talk a little about the claims and then the damages. The claims in the case are that their constitutional rights were violated, that they got framed. You know, obviously, if they committed this murder, then you should not hear from them. But if they didn't have anything to do with this murder, which is true, then how is it that they managed to give these false confessions that had all the details of the case? And the reason is because those

confessions were fabricated. They were coerced, and we have a Constitution in this country, and this is a violation of their constitutional rights.

You've heard a little bit about the jury instructions. You've heard about the defendants. The defendants are some Chicago police officers. The main ones are Zalatoris and Breen. By the end of the trial, you'll have all the characters down. It's like a TV show. You don't have to memorize them all on the first go here, but Zalatoris and Breen are the main detectives, and Mr. Bartik, the polygrapher, who came up with this confession.

So there were some other police officers who also played roles. What's their defense going to be? I suppose they're going to try to say these guys are guilty. Maybe they're going to change the confession. Maybe they're going to throw out the confession John gave at the time and say, well, maybe he did it a different time or maybe the time was different. There's no reports. There's no paper. They're not going to be able to justify what happened here.

Judge Lefkow has already told you about the jury instructions. Common sense. You do not leave common sense at the door. That's the only instruction I want to emphasize here. You're allowed to apply your life experiences and say is this making sense?

The other instruction is the burden of proof. I want

to talk about the burden of proof briefly. This is not a criminal case. There are no criminal implications for anybody. It's a civil case about justice between the sides. Because it's a civil case, the burden is preponderance of the evidence.

John and Anthony don't have to prove anything beyond a reasonable doubt. They just have to show a preponderance. Some people talk about it as if you put all the evidence supporting the plaintiff, all the evidence supporting the defendants on the scale, which way does it tip? Dead tie, they win because we have the burden of proof. But if it tips a little bit, then we've proved it.

So to use a football analogy in the football season, the ball starts on the 50-yard line. If we push it a little bit into their side of the field, we win. So as you're listening to the evidence, keep in mind that all we have to show you is it's more likely that their rights were violated, nothing beyond a reasonable doubt, more likely. And that's going to be an easy test here. So liability is not going to be challenging.

That brings me to the last thing, which is damages. These men were damaged. They were damaged heavily by what happened. They, at ages 17 and 18, high school senior getting ready to graduate, a 17-year-old got thrust into the Illinois Department of Corrections, the Cook County Jail, put into maximum security. You know, if you commit some crimes, you go

to some divisions.  They are in maximum security, the place with the rapists and the murderers, the worst crimes in Illinois.  If you, you know, light a baby on fire, maximum security.  Whatever, you think of the worst crimes, that's where those people are.

This 17- and 18-year-old have to go in there and fend for themselves.  It's an incredibly violent place.  John says first day he shows up, somebody's getting stabbed.  They have constant violence, constant danger, sexual assaults, danger, violence all around them, and they have to try to find a way to survive.  You're going to hear about the indignities --

MR. NATHAN:  Objection, another motion in limine.

MR. LOEVY:  What is he talking about?

THE COURT:  Just go ahead and wrap up.

MR. LOEVY:  You're going to hear about the indignities of prison, the tiny cells, the strip searches, the inedible food, the hot, the cold, the loss of liberty.  You know, to be in a cell 23 years a day, to grow up essentially in a place where you're in an institution, they had to struggle against it.

And Anthony probably was more close to giving up than John, but John never gave up, and he's got to tell you about his mother.  That's his mother on his shirt.  I asked John to wear a suit and tie.  He wasn't going to do it.  He wants to come before you and say this is me.  They're going to judge me

for what I am. He wears a shirt like that almost every day of the year. It's his auto -- anime auto sales shirt. He wears it every day. That's his mother on it. It's his homage to her legacy. And this is who he is.

But John has tried to survive in there, and he never stopped fighting. He did push post-conviction, and he did go to the jail library and try to defend his case. He hired excellent lawyers, and he was able to overturn his conviction.

But they suffered. He lost his teen years. He lost all of his 20s. They lost most of their 30s. They had their bonds with the outside world frayed.

You know, people in their lives at the beginning were there for them. But they drifted, you know. People have got their own lives, and your friends sort of, like, who's going to invest in somebody that's going to life for a gazillion years? So people sort of drifted away.

And John and Anthony say they figured out who's really there for them, and the circle is pretty small. It's basically the people who work in his car dealership with him. You know, they were tested, and they survived.

Now, they're both parents. Anthony is going to tell you that that's really what saved him. I mean, he is lost. He finds himself crying. He's free, but he is a damaged, damaged guy. He has a four-year-old now since being out. They've been out for five years. It's nobody's fault that it took this long

to get to trial. It's not the defendants' fault. It's not our fault. It's not Judge Lefkow's fault. Sometimes it takes a while for trial. They have been out, but they are struggling.

They're struggling for what's been done to them. They're trying to catch their footing. They're doing the best they can, but there is pain right below the surface. And you don't have to hear me tell it. I'm just a lawyer talking. They're going to be up there. You're going to meet them, and you're going to understand.

You're going to understand that these men have been wronged, have had too much taken from them, and that they are in pain, and that what they want is justice.

So thank you for listening to me, and I hope that we are able to get them justice. Thank you.

THE COURT: All right. How are you feeling? Do you need a break? We've been here quite a while.

A JUROR: I'm okay.

THE COURT: You're all right?

All right. Mr. Fieweger.

MR. FIEWEGER: Thank you, Your Honor.

MR. NATHAN: May we have a sidebar before Mr. Fieweger starts?

THE COURT: Yes. If anyone would like to stand up and stretch, feel free.

(Proceedings heard at sidebar:)

THE COURT: Go ahead.

MR. NATHAN: Your Honor --

THE COURT: Oh, I need my headphones.

All right. I'm ready.

MR. NATHAN: Your Honor, the defendants are moving for a mistrial at this time based on several motions *in limine* and the cumulative effect of those violations.

The plaintiff -- the defendants moved *in limine* to bar evidence of any gang references relating to Collazo. They moved *in limine* to bar the criminal background of Collazo. That's motion *in limine* 34. That ruling was reserved. Mr. Loevy just went right through it.

Defendants' motion *in limine* 12 sought to bar a reference to the plaintiffs as kids. He repeatedly referred to them as kids. He also called them boys. I repeatedly objected. He kept doing it.

Defendants moved *in limine* to bar reference to a constitutional violation. We've talked about that over and over again, and he again violated that motion *in limine* in referencing a violation of the Constitution as to the length of custody.

THE COURT: All right. Where are you on that? Where are my rulings on that? What page?

MR. NATHAN: May I just have one moment, Your Honor?

THE COURT: Yes.

MR. LOEVY: Your Honor, we also could do this at the close of the day possibly.

MR. NATHAN: That's --

THE COURT: We could.

MR. NATHAN: It's ruling *in limine* to Defendants' 32, Docket No. 400 is the ruling, page 20.

MR. LOEVY: No, that's not -- Your Honor, even the title of the motion doesn't have any resemblance to what he's talking about.

THE COURT: All right. I -- I will say with respect -- do you have other issues?

MR. NATHAN: Yes, Your Honor. And we -- the ruling is one thing, the written ruling. We also discussed it at the pretrial conference. We referenced that as being something that should be excluded.

Your Honor, lastly --

THE COURT: That's right. I said plaintiffs may argue their detentions were unreasonably long and a factor in their false confessions.

MR. NATHAN: Lastly and probably most importantly, Mr. Loevy referenced that Mr. Bartik has a history, and that violated two motions *in limine*. That violated a motion *in limine* seeking to bar 404(b) evidence, as well as a part of Your Honor's ruling relating to Mr. Sosnowski, their polygraph expert, which also sought to bar that evidence.

That is from Docket No. 401 is the Court's ruling. Such testimony does not require impermissible propensity evidence implicating Bartik's history. In summary, Sosnowski may not testify regarding Bartik's history of obtaining pretest confessions, as it requires an impermissible propensity inference.

This is extremely prejudicial to the defendants, and the cumulative effect of it certainly is prejudicial. For those reasons, we're seeking a mistrial.

MR. LOEVY: Your Honor --

MR. KAMIONSKI: Hold on, just one more point.

Can I just finish this one point?

THE COURT: One attorney. Tell him what you want to say.

MR. NATHAN: Another just reference to the Court's ruling at Docket No. 401, page 4 of 7, where the Court excluded evidence of any prior alleged misconduct against Mr. Bartik.

MR. LOEVY: All right, Your Honor. What he just read you was Mr. Sosnowski may not testify about it. I didn't talk about Mr. Sosnowski testifying about it.

On the 404(b), you said we could bring up other victims if we laid a -- if we showed they had been disclosed, and you did not bar it. So, you know, I believe that's what the evidence is going to show because we did disclose it.

You know, you barred us from saying Sosnowski is going

to say it's very rare, you know, to have the pretrial -- but that's in the context of the expert. So they never barred -- and, in fact, you said we could bring in other 404(b) witnesses. So this is -- and then -- and this is the one in the abundance of caution I said, all right, I won't go there. So I didn't even want to -- I didn't even do it, so why are we talking about it?

THE COURT: All right. Well, I -- you did violate my order about calling them boys and kids, so bear that in mind. It does not amount to a mistrial, however.

MR. LOEVY: I apologize, Your Honor. They were boys and kids, but I will not do that again. If I -- you know, I apologize.

THE COURT: All right. Well, I'm going to -- I will take your motion under advisement, and we'll go ahead with the defense opening statement.

(Proceedings heard in open court:)

MR. KAMIONSKI: Could I get the computer?

OPENING STATEMENT ON BEHALF OF DEFENDANTS BY MR. FIEWEGER

MR. FIEWEGER: Thank you, Your Honor.

Ladies and gentlemen, as you just heard, on March 10th, 2003, the Chicago Police Department was asked to resolve a gruesome mystery. There was a 911 call at approximately 3:00 in the morning, reporting a fire in the alley behind the 5200 block of South Peoria Street. The

Chicago Fire Department responded. They found a box that was on fire. They extinguished it, and they found inside the box an unidentified and burned corpse. That's all they had to go on to start with, ladies and gentlemen. It was the Chicago Police Department's job to figure out what happened.

That effort started at about 3:30 that morning when the first Chicago officer arrived on scene and started the investigation, and that investigation that lasted over a few weeks is what we're going to be talking about in the coming days. That's what this trial is about, ladies and gentlemen, the investigation conducted by the Chicago Police Department, but not only the Chicago Police Department, ladies and gentlemen, because although Mr. Loevy didn't mention it, there were others involved in this investigation as well.

You're going to hear that members of the Cook County State's Attorney's Office were also involved in this investigation and fully aware of what the Chicago police were doing, participated in that investigation, approved the charges against these individuals, and proceeded with the trial against them.

What you're also going to learn, ladies and gentlemen, is that investigation led to determinations that Mr. Fulton had, in fact, agreed to buy a gun from the victim Chris Collazo, who it turned out was a 19-year-old young man who lived in Elmwood Park, a village on the west side of the City

of Chicago, not the north side of Chicago. He lived on the west side.

Fulton had arranged to buy that gun from him, and they went and they had a meet-up. Mr. Mitchell went with him, and a third person went along as well, Mr. Shaw. And it's undisputed, ladies and gentlemen, that rather than execute a gun transaction, Chris Collazo robbed John Fulton. And this robbery happened just a couple of few weeks before Chris Collazo's murder.

Following the theft, you're going to hear that Chris Collazo and John Fulton went back and forth taunting each other. Mr. Fulton, who was already afraid enough that he felt the need to get a weapon for himself, took these threats from Mr. Collazo seriously. And as Mr. Loevy had told you, there was a person in between who put them together, Precious Griffin. You're going to hear that Mr. Fulton conveyed threats to Mr. Collazo through Ms. Griffin.

Mr. Loevy would have you believe that oh, by the time Mr. Collazo was brutally murdered, it was water under the bridge. Ladies and gentlemen, there was taunting going right up until March 9th. There was clearly bad blood between Mr. Fulton and Mr. Collazo for good reason. He had robbed the man, and he had threatened him.

As a result of the efforts of the Chicago Police Department, Mr. Fulton and Mr. Mitchell and Mr. Shaw all

confessed to their involvement in this crime, and they didn't confess once. They confessed multiple times. And you'll hear, there's variations in their confessions over time, and you're going to hear that's not unusual or unheard of.

Mr. Fulton and Mr. Mitchell proceeded to trial before a jury in 2006, and they were convicted of this crime. And ladies and gentlemen, what you're going to hear throughout this trial and much of what Mr. Loevy just told you was all known in 2006 at the time of the criminal trial.

In the years that followed, Mr. Fulton and Mr. Mitchell recanted their stories, as did other witnesses, and they pursued post-conviction relief. They pursued appeals, and as Mr. Loevy mentioned, they managed to get their convictions overturned. But what you're going to hear is that overturning was not based -- there's never been a finding of any misconduct by the Chicago Police Department, by these officers, or anybody else. Their convictions were overturned based on procedural irregularities that had nothing to do with the Chicago police.

MR. LOEVY: That's inaccurate.

MR. FIEWEGER: 20 years later, Mr. Fulton and Mr. Mitchell are going to ask you to award them enormous sums of money. They're going to ask you to second-guess what the Chicago Police Department and the Cook County State's Attorney's Office did to investigate these crimes, and they're

going to ask you to award them quite literally millions of dollars.

But, ladies and gentlemen, keep in mind, keep an open mind. Listen to what the evidence says. Listen to what was said at one time as opposed to another and what the Chicago police did because ladies and gentlemen, if you follow, if you use your common sense, if you keep an open mind, you're going to determine that the Chicago Police Department conducted a legitimate and valid investigation in this case.

Now, ladies and gentlemen, again, as with Mr. Loevy, I'd like to thank you for your time, your attention, your being here today. I echo his comments. Your role is critical. It's extremely important, and the thing that you bring to that role that makes your role so important is your common sense.

You don't check your common sense at the door when you come into this jury box. Your common sense is a critical part of what you can do for us in the coming days.

And as Judge Lefkow will tell you, I ask you, keep an open mind. Listen to all of the evidence. Mr. Loevy had his opportunity to go first. Then we have our opportunity to go. You don't need to reach a conclusion when Mr. Loevy is done. In fact, you shouldn't. You need to listen to everything. Put it all in context and listen to all of it.

Only at the end when you've heard all of the evidence are you going to be in a position that you'll even be able to

make a determination as to whether or not these gentlemen deserve what they're asking from you.

As we said before, my name is Jim Fieweger. I'm here representing the officers. With me is Shneur Nathan, Avi Kamionski, John Cerney, Breana Brill, and Natalie Adeeyo. It's our privilege and honor, ladies and gentlemen, to represent the representatives of the Chicago Police Department who are on trial before you. And those individuals include Sergeant Robert Bartik, Detective John Zalatoris, Detective James Breen.

MR. BREEN: Good afternoon.

MR. FIEWEGER: And Detective Robert Girardi. You'll hear there are two additional individuals, who as Judge Lefkow indicated, they're not here today. They couldn't be here due to health and other commitments, but as Judge Lefkow indicated to you, there's no -- you shouldn't hold that against them or reach any improper assertions about them as a result of that. And those include Detective Edward Winstead and Sergeant Stephen Franko.

You're also going to hear a little bit about an eighth individual, a Detective Lenny Rolston. He was the first detective at the scene. Unfortunately, Mr. Rolston is deceased, and we're not going to hear from him during the trial.

Now, as I mentioned to you previously, this is an investigation about something that happened 20 years ago.

Plaintiffs would have you believe that this investigation was a sham and was all designed to frame them and put them away for extended periods of time. They have a number of legal theories about why they -- their rights have been violated and why they should recover, and Judge Lefkow is going to tell you about that at the end of the trial.

But essentially, ladies and gentlemen, what they're asking you to do is to believe that the Chicago Police Department intentionally conspired to frame them, to stick a murder on them for no reason, and that not only that, but that the Cook County State's Attorney's Office was fully complicit in that conspiracy.

So let's talk a little bit about the investigation itself of what happened. Mr. Loevy would have you believe that there was no investigation. It was just they jumped to the first thing. But that's not true.

As you can see on the slide, they took steps, and what the police do when they investigate a crime is they start with a kernel of information. They find a piece of data, and they take that, and they try to take it to the next step. Sometimes you can, sometimes you can't.

But here they did. So what we started with, ladies and gentlemen, was the gruesome scene where there's a burned carton with an unidentified corpse in it. There's no identification on the body, no way of identifying him. Nobody

knows who's in that box.

So on March 10th, the afternoon of March 10th, the first day of the investigation, Detectives Breen and Zalatoris go to the medical examiner's office and they ask them to take the fingerprints of the victim. And using those fingerprints, they identified him as Chris Collazo, as we mentioned, a young man who happened to live in Elmwood Park.

So now knowing who the victim is, Detectives Breen and Zalatoris faced the extremely unenviable task of going and talking to the victim's mother. So you're going to hear they went and spoke with her. They had the hard job of telling her that her son was dead and tried to find out any information they can about Chris Collazo, his whereabouts the night before, something that might help them in their investigation.

And what they learn from Ms. -- Mr. Collazo's mother is that he had spent the night before with a couple of friends, and she identifies them by nicknames and Mr. Collazo's brother is able to tell them, well, one of them lives at this address.

So they take that information, like they're supposed to do, and they build upon it, and they go from Mr. Collazo's mother to find one of the people who was with Mr. Collazo the night before. It's a man named Mr. Rosas.

They go and they talk to Rosas, and they find that the other person who was with Chris Collazo the night before was Mr. Marinelli, Marcus Marinelli.

They also learn, in speaking to Mr. Rosas, that Mr. Rosas had talked to Chris Collazo at 1:00 in the morning by phone the night before. So at 1:00 in the morning, Chris Collazo is alive.

So the next stage, ladies and gentlemen -- so, again, they take the information, they build upon it. They try to take the next step. The next step here is Detectives Rolston and Winstead, who are two additional detectives who were working on the case. They went and interviewed Mr. Marinelli.

Now, Mr. Loevy would have you think that going and talking to these people is somehow an affront, somehow something that the police shouldn't be doing. They're doing exactly what their job is. He's saying, oh, they went and came and arrested him. They went and they picked him up, and they wanted to do questioning because that's what the police have to do.

They have to go find the witnesses. They have to talk to them. So simply picking somebody up and taking them for questioning, there's nothing wrong with that.

So in interviewing Mr. Marinelli, they learned that he and Rosas again had been with Collazo the night before, and they also learned that Marinelli had conducted the robbery of Mr. Fulton along with Collazo.

According to Marinelli, Precious had put Mr. Fulton in touch with Collazo for the purpose of purchasing a gun, and

Collazo and Marinelli agreed to concoct a scheme to rather than sell the gun to Mr. Fulton, they would rob him.

So keep in mind, ladies and gentlemen, this is the first time anybody comes up or anybody hears the name John Fulton or Anthony Mitchell. It's not the police who are coming up with this. It's the witnesses who are involved and who knew what was happening.

Mr. Loevy said what are the police supposed to be doing? They're supposed to be looking for people with motives. Mr. Marinelli just gave them somebody with a motive. So according to Mr. Marinelli, they had arranged to have a meeting with Mr. Fulton on -- somewhere on Diversey. And Mr. Fulton and Mr. Mitchell and a third person, Mr. Shaw, drove to this meeting with Mr. Collazo where they're supposed to purchase the gun, but unbeknownst to them, Mr. Marinelli was hiding in the vestibule of a building nearby.

Mr. Collazo gets in the car. He talks with -- he talks with Mr. Mitchell, with Mr. Fulton, with Mr. Shaw for a little while. They agree on doing the gun transaction. They go into this vestibule, and Mr. -- only Mr. Fulton. Mr. Collazo says we can only take in the person who's doing the deal because we can't have too many people in my buddy's mom's house.

So they go into the vestibule, and rather than purchase the gun, Marinelli and Collazo knock Mr. Fulton down,

hold a gun to his head, and steal his money. They flee the scene. Mr. Fulton returns to the car, and they leave the scene.

On his way back, Mr. Collazo calls Mr. Fulton and is taunting him, and he's yelling at him because he didn't manage to rob the $300 that he was supposed to get for the gun. He robbed him of a lesser amount. But it takes almost no time at all for Mr. Collazo to be reaching out to Mr. Fulton and taunting him.

And these calls and these taunts continue in the following days and weeks, and you'll hear during one of these calls, Mr. Collazo tells Mr. Fulton he knows where he lives. He knows his address. He knows his apartment number. He knows the building code for getting in. Mr. Fulton is understandably threatened by Mr. Collazo.

So after talking to Mr. Marinelli, the police officers take him through the neighborhood to try to get a sense of where things happened, how it fits together, who's where, and during this, they learn of another person, Marisol Caldero. They show her where Marisol Caldero is. She's friends with Mr. Collazo, and it turns out she's also friends with Precious, and she's the conduit that gets the police officers to Precious.

Precious obviously is an important person here because she puts them together. From Ms. Caldero, they learn that

Precious's name is Johnitta Griffin and where she lives.

So, again, following up on the information that they've collected as part of the investigation, they moved from Michael Rosas to Mr. Marinelli to Ms. Caldero and now to Ms. Griffin, to Precious. They go and they interview Precious, and she agrees that she tells them that she met Mr. Fulton sometime before on a party line, that they were friendly, that they'd previously been in a dating relationship.

She told them where Mr. Fulton lived, an address in the South Shore neighborhood, and described his car, which she said was a newer model gray Oldsmobile Aurora with distinctive rims. So to follow up on the information that they received, the detectives went to check out the location, and they see at the location the type of car that was described by Precious.

They check with the security people inside the building, and they confirm that Mr. Fulton in fact does live at the address that Precious had given him. So they're following up on the information that they're learning during the investigation. They're confirming the information from third parties.

The next day on March 14th, the detectives return to Ms. Griffin's house, and they picked her up and took her to Area 1 where they interviewed her. They asked her additional details about what happened on March 9th, and they learned that Ms. Griffin had spoken by phone to Mr. Fulton.

Now, you're going to hear that Mr. Fulton's phone records or Ms. Griffin's phone records don't show that those two phones called each other on March 9th. But what you are going to hear, too, is that Precious had used a pay phone to call Mr. Collazo that evening, because remember back in 2003, pay phones actually existed.

You're also going to see that there are calls to and from Mr. Fulton's telephone from unidentified or unspecified telephone numbers. You're also going to learn that Mr. Fulton's phone had a Nextel push-to-talk feature on it.

But aside from what they don't show, if you take a look at the slide, these are excerpts from the phone records for Ms. Griffin, Mr. Collazo and Mr. Fulton on March 8th, the day before. And what you'll see is there are approximately 10 or so calls in that left-hand -- in that left-hand box highlighted in yellow between Precious and Mr. Fulton, and you'll also see that there's one highlighted in green between Precious and Mr. Collazo's home.

And you'll notice that that call between Precious and Mr. Collazo is only about ten minutes after the call between Mr. Fulton and Precious.

On March 9th, Fulton asked if he could see -- asked Griffin if she would see Collazo that evening, and Griffin said that she would at Caldero's house. They had planned to meet at Caldero's house later that evening, where there was going to be

a party and Mr. Collazo had planned to be there.

She told them that Mr. Collazo would likely take a CTA bus to get there. Now, you heard Mr. Loevy tell you about the CTA bus schedule that shows that it wasn't running, but you're going to hear evidence, ladies and gentlemen, about other buses that were running at that time and buses that were convenient to take from Elmwood Park to the location where he was going to get off and go to Ms. Caldero's house.

You're also going to hear that Mr. Fulton, during his conversations, told Precious, "Make sure you know your boy got it coming." These are among the threats that Mr. Fulton conveyed through Precious to Mr. Collazo.

Precious went to Ms. Caldero's house that night as they had planned, but Mr. Collazo never arrived. After speaking to the detectives, Precious met with an assistant state's attorney named Mr. Rubinstein. Now, you heard a lot from Mr. Loevy about all the stuff that the police did. You never heard about Mr. Rubinstein from him. That's because Mr. Rubinstein was a member of the Cook County States's Attorney's Office, and he's a member of what's called the Felony Review Unit.

And the Felony Review Unit participates in investigative stages, so when somebody makes a statement or somebody makes a confession, the practice is to call in members of the Felony Review Unit to follow that up with an interview.

Here, Mr. Rubinstein came in, and he followed up the interview that Precious had given to the police to see if he could confirm or deny or see what she had to say to Mr. Rubinstein.

Again, she had explained that she had set Fulton up with Mitchell -- she had set up Fulton and Mitchell with Mr. Collazo so they could buy a gun, and she explained that the gun deal had went bad because Collazo had robbed Fulton, and she also explained that since then, Fulton had been telling her she needed to repay him $300 in order to make up for the robbery that he had suffered.

She also explained that she told Fulton that Collazo would be taking the CTA bus to get to Marisol Caldero's house, which is at about the 2600 block of West Foster.

During the second half of March, 2003, Precious, Marinelli, Caldero and Rosas, individuals who had all been interviewed by the Chicago Police Department, all testified before the grand jury, and they gave statements to the grand jury consistent with the statements they had provided the Chicago Police Department.

Now, despite telling her account to multiple detectives, as well as multiple assistant state's attorneys, not long after she testified in the grand jury, Precious tried to recant her statement, and you're going to hear all about it. You're going to hear her statement before, and you're going to

hear about her statement after. But I ask you listen to what she's recanting, ladies and gentlemen.

She's not denying that she set up the gun deal. She's not denying that there was the robbery. She's not denying that she was in touch with Mr. Fulton and Mr. Mitchell. She's not denying that she had been threatened afterwards. She's saying I did not put them together on March 9th. That's what she's recanting, ladies and gentlemen. She's recanting -- again, this is where your common sense comes into play.

What's she recanting? She's recanting the aspect of her statement that implicates herself in the crime, and she's recanting the aspect of her statement that implicates her former boyfriend, a person she's friendly with, Mr. Fulton, from the crime. This is where your common sense comes into play, ladies and gentlemen. Why do people do stuff like that?

Now, at about 5:30 on March 18th, 5:30 in the morning on March 18th, the detectives went and they picked up Mr. Fulton at his house. Now, Mr. Loevy says they broke into their house. No, they went and they arrested him because they had had reason to pick him up.

At various times, various detectives questioned Mr. Fulton at Area 1, and his -- he relayed the story about the gun robbery -- the gun sale gone bad, turned into a robbery, and he initially denied involvement in any murder of Chris Collazo.

These interviews took place during the day on the 18th. Again, he was picked up at about 5:30. There were times when he was interviewed for a while. He was left alone for a while. He was interviewed for a while. He was left alone for a while.

This wasn't some sort of nonstop interrogation from 5:30 in the morning until midnight. What you're going to hear from the detectives is they went and they got information from him. They left, they conducted additional investigation. Sometimes they were following up on the information that Mr. Fulton had provided them to see if they could confirm or deny it. It's what they're supposed to do during investigation.

So at about 6:00 that night, Detectives Breen and Zalatoris were interviewing Mr. Fulton again. Sometime during that conversation, Mr. Fulton said, yeah, I want to take a lie detector test. So Detectives Breen and Zalatoris made arrangements to take him to the polygraph unit, which was located at a physically different location than Area 1 where the investigation was being run.

When they arrived at the polygraph unit, Mr. Fulton signed a consent form, indicating that he was voluntarily participating in this process, and before -- you're going to hear, ladies and gentlemen, that before the polygraph test can be conducted, the examiner is supposed to ask questions of the subject. They're supposed to take what's called a pretest

opening - defendants

65

interview, and the idea is to get a feeling for how the subject responds to questions, to get some information that could be used during the examination so that they can form their questions in a way that the test can be meaningful.

You're going to hear from Mr. Bartik or Sergeant Bartik that during this interview, Mr. Fulton confessed to him that he, in fact, was involved in the murder of Mr. Collazo. This is the first time that he's made this representation, and it's not after hundreds of hours of interrogation, ladies and gentlemen. He was picked up at 5:30 in the morning, and he made this statement to Sergeant Bartik at about 9:00 or so at night.

Sergeant Bartik will tell you that because Mr. Fulton was offering new information about the investigation, he informed Detectives Breen and Zalatoris and that they should stop the -- they should not proceed with the examination because the subject was now providing new information about the investigation, and the detectives should interview him rather than conduct the polygraph examination.

So the polygraph examination was called off. Sergeant Bartik will testify to you that he typed up a report, summarizing the statement that Mr. Fulton had given to him, and he put it in the files at the polygraph unit.

Now, Detectives Breen and Zalatoris didn't work at the polygraph unit. They worked at Area 1. So there was a --

there's a disconnect here. The report, Sergeant Bartik's report goes into the polygraph unit files, and nobody asks for it. So it never makes it over to Area 1.

When they get back from the polygraph unit to Area 1, Detectives Breen and Zalatoris interview Mr. Fulton as they had planned to do because that's why they called off the polygraph examination. And you're going to hear as a result of this interview, Detectives Breen and Zalatoris were able to prepare an eight-page, single-spaced set of handwritten notes documenting Mr. Fulton's confession to his participation in Chris Collazo's murder.

Focused on the confession, the detectives failed to document their trip to the polygraph unit, but we know they went because Mr. Fulton signed a consent form there.

So as you're going to hear, there's some inconsistencies in reports that exist and where they are, but the simple fact that a report didn't make it from the polygraph unit to Area 1 doesn't mean that there's any sort of misconduct here, ladies and gentlemen. Bad recordkeeping is not a violation of anybody's constitutional rights.

And while Sergeant Bartik's report may not have made it to Area 1, you will hear that it absolutely did make it to the Cook County State's Attorney's Office because the prosecutor who handled the case, Nancy Nazarian, will tell you that Bartik himself made sure she received a copy, and she

shared a copy of Bartik's report with Mr. Fulton and Mr. Mitchell's lawyers during the criminal proceedings. They had every opportunity to challenge that report prior to their trial and, in fact, they did.

After returning to Area 1, ladies and gentlemen, again, Mr. Fulton spoke with Detectives Breen and Zalatoris. They interviewed him for about an hour and a half, and he confessed to his involvement in Collazo's murder.

Now, as you're going to hear, the procedure is when a suspect confesses to a murder or confesses to any crime, the procedure is to call somebody from the State's Attorney's Office, the Felony Review Unit, to come in and interview that individual as well. So Detectives Breen and Zalatoris called the felony review office, and an assistant state's attorney named McRay Judge came to Area 1 to talk to Mr. Fulton.

Mr. Fulton's account that he gave to McRay Judge was similar to what he told to Detectives Breen and Zalatoris. He told him how Collazo had robbed him and that Fulton, Milton and Shaw had located Colazzo, beat him, put him in a trunk, and later burned him.

At the end of the interview with McRay Judge, Fulton recanted his story. He said, you know what? I didn't do that. I wasn't with them that night. I went to the hospital. I was at the hospital with my girlfriend. And those are the pictures that Mr. Loevy showed you. I was at the hospital that night.

Couldn't have happened.

So what those pictures show that, in fact, he was at the hospital. He went there. He waited for a while. He came home. About 11:00, he went back and picked up his girlfriend, and they were back home about 11:30 or so.

Having recanted his story, Assistant State's Attorney Judge asked Mr. Fulton about some of the details that had been included in the statement that he had given Mr. Judge, details about the color of the jacket or tops that the individuals who were seen near the fire were wearing. He had told Assistant State's Attorney Judge that he, Mr. Mitchell and Mr. Shaw were wearing red, black and white hoodies.

What you're also going to hear, ladies and gentlemen, is the person who called 911 on March 9th said that he saw two individuals near the fire who were wearing a red jacket and a black jacket. These are consistent with details that Mr. Fulton had provided about the offense.

When Mr. Judge asked Mr. Fulton, well, why are you able to provide these details that are consistent with what the 911 caller says, Mr. Fulton responds to him, well, that wouldn't be good for me, would it?

Now, you heard Mr. Loevy make an allegation about how sometime this night, Mr. Fulton was slapped around by Zalatoris and Breen.

Avi, could you put the picture up?

Now, you're going to hear, obviously the detectives are going to deny this, and you're going to have an opportunity to consider who's telling the truth, but these are the pictures of Mr. Fulton and Mr. Mitchell that were taken after their interviews, so at the close of the investigation. There's no indication of any sort of physical injury or any indication that any of them had been struck or hit in any way.

In fact, there's no corroborating evidence beyond Mr. Fulton's own self-serving statement that he was ever struck.

So, again, having learned some more information from Mr. Fulton that he had recanted this story, that he now says he had gone to the hospital with his girlfriend, what did the detectives do? What did the police department do?

They followed up on it. They went to the -- they went to the hospital. They got the very pictures, the video that Mr. Loevy was showing you. They're the ones who went and found the information that, in fact, indicated that by 11:30 at night, Mr. Fulton had returned to his house. He had been tied up by about 9:30 until about 11:30.

But what you're also going to hear, ladies and gentlemen, is there is no evidence showing where Mr. Fulton was between 11:30 and about 8:00 the next morning when he leaves his building from the front door and there's a video camera showing it. There's no evidence at all about showing him come

in, come out, go anywhere. But what you're also going to learn about is at the back door of this building, there's no video camera. At the back door of this building, it's possible to get in and out of that building without using a fob and not making any indication as to whether or not you left.

So the detectives investigated all of this. They found it all out. They turned it over to the State's Attorney's Office, and the State's Attorney's Office considered all of that, and we're still good to go. We think that this is a legitimate case.

Now, ladies and gentlemen, you're going to hear that at their criminal trial, the prosecutors proceeded on a theory and presented evidence showing that Mr. Fulton could have left his building at 12:00 at night, gone, participated in the murder, and returned by 3:00 in the morning. It's all consistent with the video evidence.

Now, Mr. Fulton and Mr. Mitchell may try to argue that there was a back door camera back in 2003, but don't fall for this, ladies and gentlemen, because that was an issue that was presented and hashed out at the criminal trial back in 2006, back in the time when there was a better opportunity to actually find out what existed at that time.

Now, after Mr. Fulton had confessed to both the detectives and to the assistant state's attorney, at about 11:30 at night on March 19th, the police picked up

Mr. Mitchell. In an initial interview, he denied that he had participated in the murder, but he also confirmed his participation in the robbery and the gun deal gone bad.

Now, at about 6:00 on March 20th that evening, about a day and a half after he'd been picked up, less than a day after he'd been picked up. He'd been picked up at 11:30 on March 19th. At about 6:00 on March 20th, he's interviewed by Zalatoris and Breen again, and for about two hours. And during this interview, he makes admissions about his involvement in Mr. Collazo's murder.

After the interview, Breen and Zalatoris have Mitchell -- take Mitchell for a ride in a car, and they show him the route -- he shows them the route that they followed on March 9th.

Now, Mitchell also confessed to Assistant State's Attorney Nick D'Angelo who's another individual from the felony review office. He personally interviewed Mr. Mitchell, and at about 2:00 on March 21st, a third individual, another state's attorney, Mr. D'Angelo also interviewed Mr. Mitchell and took a statement from him, and that was the statement that Mr. Loevy read some of you -- read some of the portions of it to you.

And during -- what you're going to hear is the standard procedure that the state's attorneys are supposed to follow when they conduct these interviews is during the first half, the first portion, they're supposed to ask the subject

information that they know.  Information that's been developed from the investigation to that point, and they're supposed to see whether or not the subject confirms or denies.

And then what they do is they move on into the interview, and they ask kind of more open-ended, more broad-ranging questions, give -- to give the witness an interview -- give the witness an opportunity to provide additional information.

Now, Mr. Loevy read to you from the first half of that interview.  Now, this is what I'm talking about, keep an open mind.  Listen to all of the evidence because if you look at the back half of the interview, here's just randomly, page 23, talking about the night of the murder:

"Q.  Where did you guys eventually drive to?

"A.  We drove to Lake Shore Drive down on Lake Shore talking to her.  She said, all right, don't get off nowhere, stay on Lake Shore Drive until you get to Foster Street.  Then you gonna get off.

"Okay.  You took -- did she tell you where to take Foster to?

"Yeah, she told us to take Foster to Rockwell.

"Okay.  Did you do that?

"Not exactly.

"Okay.  What happened?

"We made the -- we made the wrong turn.  We made a

right instead of a left, and it wasn't any -- we couldn't go that far, so we had to make a U-turn."

Mr. Loevy would have you believe that the police fed this about making a wrong turn and a U-turn. These are details that Mr. Mitchell provided of his own accord during his interview with the assistant state's attorney, during his recorded interview with the assistant state's attorney. That's why we have a transcript of exactly what he said.

Now, also on March 24th, we heard a little bit about Antonio Shaw. Remember, he was the third person who was in the car during the gun deal gone bad.

He was picked up around 4:00 in the afternoon, and Mr. Shaw was at the time a juvenile. So under the rules, he was entitled to have a responsible adult with him. At the time that he was picked up, he was at his aunt's house. The police asked the aunt if she would come to the station with them and serve as the responsible adult. She refused. She said I've got work to do. I can't do it.

So what did they do? They reached out, they tried to find Mr. Shaw's cousin, Cindy Brooks. They couldn't find her. She wasn't available. So what did they do? They called in a youth officer, Mr. Franko, who's one of the defendants here, and Mr. Franko was called in to serve as the youth officer to provide the procedural protection for youths who are subject to interrogation. That was Mr. Franko's role in this.

So during the interview with Detectives Zalatoris and Breen with Youth Officer Franko available, Mr. Shaw told them that, in fact, he was present with Mitchell at the gun deal where Fulton and Collazo were robbed, where Fulton was robbed by Collazo, and he told the officers that Fulton drove to the north side with Mitchell and Shaw, and they beat, murdered and burned Mr. Collazo.

So Mr. Shaw, like Mr. Mitchell and Mr. Fulton, admitted his participation in the killing of Mr. Collazo.

On March 22nd, Mr. Shaw was -- gave a separate statement to another assistant state's attorney, Andrew Varga, also from the Felony Review Unit, but before he gave his formal statement, Mr. Shaw's uncle came to the police department, and the interview was stopped consistent with standards and consistent with procedures.

Before the interview was stopped, however, Mr. Shaw did give a 14-page statement to Assistant State's Attorney Varga in which he describes his participation in the murder. Again, a statement's consistent with the statements given by Mr. Fulton and Mr. Mitchell.

Now, as we said, the Cook County State's Attorney's Office played a significant role in this case. They had assistant state's attorneys at the police department following up on what the police had learned, conducting their own independent interviews to confirm whether or not the

information that they were provided could be reasonable and reliable.

You're going to hear that Assistant State's Attorney Jake Rubinstein took a formal statement from Precious Griffin on March 14th. You're going to hear that McRay Judge took a statement from Mr. Fulton and made sure that Mr. Fulton's alibi was assessed and excluded from further proceedings.

You're going to hear that Assistant State's Attorney Rubinstein personally interviewed Mr. Fulton and took an oral confession from him. You're going to hear that Assistant State's Attorney Rubinstein took an oral confession from Mr. Mitchell, as did Assistant State's Attorney Nick D'Angelo.

Assistant State's Attorney D'Angelo also took a detailed videotaped statement from Mr. Mitchell. A fourth prosecutor, Assistant State's Attorney Andrew Varga, interviewed Mr. Shaw and took the 14-page statement from him.

These are all individuals from outside the Chicago Police Department who followed up on the information provided them, took statements from these individuals, and were part of the office that confirmed to go forward and prosecute this case. They independently evaluated the evidence and made their own charging decision about whether or not to proceed with the case.

The case was presented to a grand jury. Again, Rosas, Marinelli, and Griffin each testified before it, and the grand

jury returned an indictment against both Mr. Fulton and Mr. Mitchell. You're going to hear during their criminal case Mr. Fulton and Mr. Mitchell were both represented by competent attorneys.

During the criminal proceedings, their defense lawyers argued it took too long for the police to get these confessions from our witness -- from our clients. They argued about the phone calls are inconsistent, the phone records don't show what's -- what the statements say they do. They argued about there wasn't much physical evidence, and they argued about the bus schedule.

Again, ladies and gentlemen, virtually none of what we're going to hear about is new. This was all presented at the criminal case. The case proceeded to a trial before a jury, and they convicted both Mr. Fulton and Mr. Mitchell of Mr. Collazo's murder.

Now, over the years, ladies and gentlemen, they have challenged these convictions, and they've recanted their testimony, as have other witnesses. And you're going to hear that the -- their convictions were reversed, but, again, not for any basis of misconduct by the Chicago Police Department, by the State's Attorney's Office, by anyone. They were overturned for procedural irregularities.

Now, you're going to get an opportunity to hear from all of these people, ladies and gentlemen. You're going to

hear from the witnesses from the Chicago Police Department. You're going to get a chance to assess their credibility. You're going to get a chance to assess whether or not they reacted competently.

And make no mistake, just as Mr. Fulton and Mr. Mitchell take this case very seriously, as they should, so do these gentlemen from the Chicago Police Department who stand before you being accused of gross misconduct. And give them an opportunity, listen to them. Give them an opportunity. Hear what they say because they're going to tell you, ladies and gentlemen, they conducted a good investigation in this case. They did what they were supposed to do. They followed the law, they followed the information, they followed the evidence to reach a conclusion.

But not only from -- you're not only going to hear from members of the police department, you're going to hear from Jake Rubinstein. Mr. Rubinstein is currently a partner in a prominent law firm, and he's going to tell you how both Mr. Mitchell and Mr. Fulton confessed to him.

You're going to hear from McRay Judge, who is also a partner in a prominent law firm, and he's going to tell you about the confessions he heard.

You're going to hear from Nick D'Angelo, and he's going to tell you about how Mr. Mitchell confessed to him.

You're going to hear from ASA Andy Varga. He's going

to tell you how Mr. Shaw confessed to him, and how he personally approved the charges in this case. And what you're going to hear from all of these lawyers, all of these people who have professional reputations is that each of them stand by the decisions they made and the statements that they took from these individuals.

And you're also going to hear from the Assistant State's Attorney Nancy Nazarian who actually tried the case. She's going to tell you she's aware of many of the points that Mr. Loevy just made, and despite that, she did not consider those -- that information sufficient to drop the case.

And you're going to hear, ladies and gentlemen, prosecutors have an ethical obligation. They are not supposed to proceed with cases if they don't think that they can prove charges beyond a reasonable doubt, and you're going to hear from Ms. Nazarian she knew all about most of what Mr. Loevy just told you, and she still thought that the case could proceed to trial.

Ladies and gentlemen, the plaintiffs have been litigating these claims for 20 years. They made these -- they made these allegations about the false confessions, about the beating, about flipping Precious, about being unfair, they made it at the criminal trial, they made it in motions to suppress before their criminal trial, they made it in post-conviction petitions, and not once has a judge or jury determined that

these individuals are innocent despite what Mr. Loevy says.

At the close of the evidence, ladies and gentlemen, Judge Lefkow is going to explain to you the law and how to apply it. That's her job. And as she said, your job is to consider everything that you hear from everybody.

And, again, keep an open mind. Hear all of it. Don't find somebody that you find sympathetic and say, okay, I'm going to lock in on that. That's not your job. Your job is to listen to everything, and I believe that if you listen to everything here, you're going to find that the Chicago Police Department was faced with a gruesome and awful task on March 10th, and they undertook that task as best they could, and they conducted a valid and a just investigation.

Thanks.

THE COURT: Thank you, Mr. Fieweger.

All right. We're going to recess for the day. We'll start -- we'll start evidence at 9:30 in the morning. I would like you all to be on time, and that means allowing a little extra time to get here because, as you know, traffic can be difficult or things happen. If for any reason something very unexpected happens, please be in touch with who, my courtroom deputy? Do they have your info?

THE CLERK: Yes.

THE COURT: Okay. You can call her and let her know just so we'll know.

And there will be coffee for you and maybe some snacks in the jury room, so that will be available.

As I indicated earlier, you must not talk about the case with anyone at home or anybody else you might see, and with that, I think we're finished unless there's -- okay. Mr. Loevy?

MR. LOEVY:  I was going to stand for the jury.

THE COURT:  Pardon me?

MR. LOEVY:  I was just getting ready to stand for the jury.  I thought we were done.  We're done.  I got nothing.

(Laughter.)

THE COURT:  All right then, you're excused.

THE CLERK:  All rise.

(Jury out at 4:52 p.m.)

THE COURT:  All right.  Let's talk about a couple things before you go.  Who's going to be your first witness?

MR. LOEVY:  Our first witness is John Fulton, and McRay Judge was going to be a backup.

So we're going to go John and McRay Judge, and we're told McRay Judge is available on Wednesday, but we're told he's available Tuesday, Wednesday.  After that, he can't.  So he needs to go on Wednesday.  I can't imagine we're not going to finish the direct and the cross of John, but we are going to lock him in on Wednesday if they're doing a ten-hour cross-examination.  Remember in the pretrial conference,

they're, like, wait a minute. We have to schedule people. So we're saying McRay is going on Wednesday, so you see it's like Tuesday, we're going to have plaintiffs going to testify, and then he's going to get crossed, and then all day Wednesday. And so we have to tell McRay something, and I've told him he could be here on Wednesday.

If that means it's 3:00 and they still haven't finished a two-day cross-examination, then McRay can't testify, so I would like permission, he's a professional, to tell him he could testify on Wednesday afternoon. And if Mr. Nathan is on his 8th hour of cross-examination, then it will have to break because Fulton will still be here, and we can lock in McRay because I was told McRay can't come back.

THE COURT: So how much time do you think McRay will take?

MR. LOEVY: I think from our side, we have an hour.

THE COURT: An hour.

MR. NATHAN: And I think we'll probably be around the same.

For Wednesday, not Tuesday.

THE COURT: Yeah, okay. So that means at least by 3:00 in the afternoon, he has to be on.

MR. LOEVY: Yes. And I haven't talked to Mr. Nathan, but it's hard to cross Mr. Fulton for that long.

MR. NATHAN: I think Mr. Loevy is saying that he's

committing to finishing the direct with four hours or less.

MR. LOEVY: I think that's realistic.

THE COURT: Okay. Do we need this on the record?

MR. LOEVY: Well, we have something we want to put on the record.

THE COURT: Okay.

MR. LOEVY: I'll wait my turn.

THE COURT: So first is Mr. Fulton, and you think that will take --

MR. LOEVY: Then I think we'll get to Mr. Judge. What we wanted to apprise the Court is there's one video deposition, Griffin, which is going to be our fit in, that will be our first one. I don't know if would be Wednesday or Thursday or Friday or next week, but if you guys are doing it in order, that's the one we need the rulings on, Griffin, so we can cue up the video.

THE COURT: Okay. These are the objections to the -- yeah, all right. I was going to ask you when you would need those, so --

MR. LOEVY: That would be first, although everything is going -- already we're on slow track here because I hoped we would have a witness going. Nobody's fault, but I'm worried. You know, this is going to be long. We've got long crosses. We wanted Dr. Leo to testify this week. In fact, we had hoped he was going to be here Wednesday.

Is he set for Wednesday?  We're going to have to talk to him because when we planned the trial, we'll start Fulton on Monday, finish him on Tuesday, Leo on Wednesday.  Everybody's doing the best we can.

MR. NATHAN:  Right, but this is what I moved *in limine* on because I don't want my cross-examination to be broken up by Mr. Judge because he's a professional, Mr. Leo because he's a professional.  These are people who they scheduled.

MR. LOEVY:  So what should we do?

THE COURT:  What do you propose?

MR. NATHAN:  Why Mr. Leo was scheduled -- I understand with Mr. Judge, he's a neutral, and they're saying -- I accept their representation that these are the dates of his availability.

Mr. Leo is a witness who they retained, and they're scheduling him on Wednesday when they had complete control over when they were going to call Mr. Fulton and when to anticipate the cross-examination.  They asked me about how long my cross was going to be.  I said probably six or seven hours.

And, nevertheless, they scheduled Mr. Leo apparently for Wednesday.  This is the first I'm hearing of that.  That wasn't a good idea, and I just don't want to be --

MR. LOEVY:  You didn't say six or seven hours, and we did schedule Leo for Wednesday.  I hate to just quibble, but isn't that a reasonable estimate?  We'll do John Fulton, then

we'll do Judge, and then on Wednesday we'll do Leo.

MR. AINSWORTH: Three witnesses in three days.

MR. LOEVY: We weren't trying to, like, to conspire on his cross-examination

THE COURT: I mean, that's a long time to have a witness, you know, on the stand, four hours of cross, is that what he said?

MR. LOEVY: He just said seven.

MR. NATHAN: I said six.

THE COURT: Sorry?

MR. NATHAN: I'll need six.

MR. LOEVY: See how it goes, Your Honor.

THE COURT: Okay. Well, we'll accommodate Mr. Judge, I guess his name is, and then, I mean, I can't --

MR. LOEVY: There's nothing for you to rule on.

THE COURT: There's no way I can really predict what's going to happen.

MR. LOEVY: Let's see what happens at the end of tomorrow. You're going to reach out to Leo. It looks like at a minimum, he's going to have to come back on Thursday. It's just going slow. We're all going to deal with it. I'm sorry you're subjected to this.

THE COURT: We have all this on the record, which -- let's go to more substantive matters then.

MR. LOEVY: I have a couple, Your Honor. Based on

opening, the defense counsel said multiple times, and we're probably going to follow up this in writing, but they're making their defense, why would the Cook County State's Attorney's Office be complicit? He literally said they're alleging the Cook County State's Attorney's complicit in wrongful convictions.

He said the Cook County State's Office thinks this is a legitimate case. These are people with professional reputations. So the implication to the jury is we didn't do anything wrong. The Cook County State's Attorney Office wouldn't do this. Well, we know of dozens and dozens and dozens of wrongful convictions that the Cook County State's Attorney's Office was involved in.

So they should be the one staying away from why would Cook County State's Attorneys in a million years do this, because that is going to open the door -- actually, they do. They can't have it both ways. They can't say ladies and gentlemen, you know this is proper because the Cook County State's Attorney's Office was part of it. That's opening the door to it, and maybe the door hasn't yet been opened, but we think that they're on notice that if they keep or in any way say to any witness, well, if a state's attorney was part of it, it couldn't have been corrupt, and that opens the door to actually the State's Attorney's Office was super corrupt.

MR. NATHAN: Mr. Fieweger referenced ASA Judge and ASA

Rubinstein as being members of the bar and being partners at law firms. That doesn't open the door to the entire Cook County State's Attorney's Office in every case that's ever existed there.

MR. LOEVY: He said a hundred times --

THE COURT: Well, I get -- I noticed that, you know, but it does sort of give an imprimatur, oh, these are attorneys who are partners in a law firm. They wouldn't do anything bad, you know. But sort of like with Mr. Loevy, this is opening statement rather than the evidence, so I think you should probably stay away from that in order to avoid having some opening the doors, Mr. Loevy says, to rebuttal on that issue.

MR. LOEVY: We have another issue, Your Honor.

Mr. Fieweger said, you know, motions to suppress, PC petitions, no judge has agreed that they had been abused by the Chicago Police Department. That's unfair and improper argument. On the post-conviction, for example, they never reached the issue of innocence. They decided it on the ineffective assistance. So it's at best a misleading argument, because they just implied that a judge on the post-conviction rejected allegations that the police did anything wrong, and I think frankly did it on purpose.

We are going to -- instead of just arguing and whining, I'm going to get the transcript and put it before Your Honor, but I think that the reason the convictions were

overturned is probably going to become part of the trial. They have just implied a procedural irregularity, and it was -- it was overturned on basically a *Brady* violation. That's not a procedural irregularity.

MR. NATHAN: That --

MR. LOEVY: We're all going to have to argue about what that means, but they made it sound like it was a technicality, but it was evidence related to the video cameras and the way they just opened it up in opening, I think we want to think about it and propose something to Your Honor.

THE COURT: Yeah, I really hope we don't have to get into, you know, satellite litigation of what happened in the habeas case.

MR. NATHAN: Your Honor, Mr. Loevy in opening statement repeatedly said that the plaintiffs in this case were wrongfully convicted. He repeatedly said that. And Your Honor's ruling as to motion *in limine* No. 43 at Docket No. 400, stated that --

THE COURT: I just have the numbers.

MR. NATHAN: -- may be told that convictions were vacated because of procedural error, not a determination of innocence.

THE COURT: Right.

MR. NATHAN: That's what -- that's what Mr. Fieweger was saying. We stuck with the Court's ruling, and Mr. Loevy

complaining about the Court's ruling is -- maybe that's a motion to reconsider, but it's nothing that we did wrong.

MR. LOEVY: They have it half right. Just call it procedural, but they said the judges rejected allegations of police misconduct. The judges rejected, heard this evidence and didn't find any of that. It wasn't -- that wasn't fair. They could have --

THE COURT: Well, they didn't say it quite that way.

MR. LOEVY: They said the judges heard it --

THE COURT: But this can be the --

MR. LOEVY: There is another one, Your Honor.

THE COURT: -- implicit, yeah.

MR. LOEVY: You did say don't -- specifically said don't say what the suppression rulings were, and I assume that's an accident. I'll give them the benefit of the doubt.

MR. NATHAN: He didn't say suppression.

MR. LOEVY: Yes, he did,.

THE COURT: Yes, he did.

MR. LOEVY: He shouldn't have. We accept the apology, but he wasn't supposed to do that.

THE COURT: What's --

(Counsel conferring.)

MR. LOEVY: He said motions to suppress, that's what he said.

MR. FIEWEGER: I'll see what the transcript said. I'm

not staying I didn't say that.

THE COURT: He did refer to motions to suppress.

MR. LOEVY: I take it that was an accident, accidents happen, but that wasn't supposed to be part of it. But now the door is, like, wide open. We're going to think about it and propose to you how to proceed and look at the transcripts.

THE COURT: Okay. Well, if you would give me a summary of your objections on both sides and why you think -- I'm not going to declare a mistrial at this point, but I would like to make sure everybody knows what they can and can't bring in, so if you would let me know that as soon as possible, or I guess I can get the transcript, so --

MR. LOEVY: We will make a proposal, Your Honor, on the safest way to proceed.

THE COURT: There was one thing I wanted to ask. What was it that you said, Mr. Loevy, or someone remind me about Mr. Bartik.

MR. LOEVY: Oh. It was that they filed a motion to bar Sosnowski's testimony. Sosnowski wanted to say I'm a polygrapher, and in the world, I'm familiar that there's no such thing as pretest confessions. That's when you relax the guy. I want to be able to give expert testimony that there's no such thing. They moved to bar that, and you agreed with them.

Then I started saying what we're going to

cross-examine Bartik with is isn't it true in 150 exams or whatever, you've said 80 people confessed, that you are really good at getting confession. That's not barred by the ruling, and it's not even arguably misconduct. It's just showing that -- I mean, Your Honor, if Sosnowski is going to say I've done 30,000 of these and nobody virtually has ever pretrial confessed during a pretrial interview. That's the non-confrontational part. You sit them in the chair and they say I confess. He says 30,000 times, nobody's ever done that.

Mr. Bartik, well, you claim like 80 people have confessed to you. It's not misconduct. He's not claiming it's misconduct. He's saying, yeah, 80 people legitimately confessed to me, so it's not covered by any other ruling. And you said you were going to reserve on whether we could call 404(b) witnesses on this point.

So when he objected, since you said reserve on the 404(b), I said I'll just wait to be totally safe, but it is not barred by anything that exists nor should it be barred. It's relevant. It's relevant that this guy believes he's really good at getting pretrial confession or pre-polygraph confessions.

MR. NATHAN: Mr. Loevy is seeking to argue propensity. That's what was barred by the Court.

THE COURT: Well, I don't know that that would be propensity if he is doing it on cross and he's relying on

actual facts.

MR. NATHAN: He's saying that because he obtained confessions in other cases, he did it here?

MR. LOEVY: What I am saying is -- I'll try to think of an analogy, but, like, Mr. Sosnowski says 30,000 times, nobody's ever confessed to me. Mr. Bartik, I'm not accusing him of misconduct, but if in half of his cases, he sits the guy down in the chair, and the guy says, yes, I'd like to confess before we even start, that's evidence that's relevant at a trial because it's not misconduct. Fine. Mr. Bartik, maybe all 80 of those people confessed to you.

THE COURT: Yeah, I hear you.

MR. NATHAN: That's classic propensity. It should not be coming in.

THE COURT: Well, it is only if it means something negative, right?

MR. NATHAN: Well, he wouldn't be putting it in if he was trying to argue about --

THE COURT: Obviously.

MR. NATHAN: -- I submit to the Court.

THE COURT: But I -- it isn't exactly a prior bad act. It could be a prior good.

MR. LOEVY: He's a very good --

THE COURT: That's for the jury to decide, whereas, if, you know, it was like Mr. Bartik beat up 8 out of 10 of the

witnesses, you know, that might be a bad act certainly.

MR. LOEVY: He's just good at what he does.

THE COURT: Okay. Now there's this issue about referring to the constitutional right to be brought before a judge in 20, 48 hours.

MR. LOEVY: What we recollect from the pretrial conference was that you said you weren't going to let us put in the Riverside County case and that we were going to propose an instruction, which we have, so that you would tell what the law is if you decide to give it.

It is relevant to the claims in this case that the law is you have to bring someone to a judge within 48 hours absent extraordinary circumstances, and, in fact, you're supposed to bring them to a judge as soon as reasonably practical. They brought John to a judge in 104 hours. That's relevant because what they did here deviates from what they have been trained to do, what they know is true, what the Constitution says. That's relevant, and that is one of the factors in the confession -- false confession thing, so how is that inadmissible or bar-able?

THE COURT: Well, they're saying that you're not claiming that as part of your -- as an independent claim. Isn't that what I'm hearing?

MR. NATHAN: Your Honor, both Mr. Mitchell and Mr. Fulton each were part of a class action settlement to fund

litigation. They were compensated for any technical violation, constitutional violation that occurred. That is not disputed.

THE COURT: But the plaintiff is not arguing that --

MR. NATHAN: I -- Your Honor, this is what we argued before at the pretrial conference and Your Honor ruled that because there was a settlement relating to the constitutional violation, and we would have to go into this whole minitrial about what happened in the class action, what the policy was and how it was -- the officers were acting perhaps pursuant to an improper policy that was subject to a settlement, a class action settlement, that had many components that involved Mr. Loevy's law firm against the City, we're trying to stay away from that.

In order to do that, they were going to be allowed to introduce the length of custody. That was fair game. Your Honor excluded that simple fact of saying that it's a constitutional violation. That's extremely prejudicial to the defendants who are being accused of constitutional violations.

MR. LOEVY: Why is it unfairly prejudicial if they committed a constitutional violation? I mean, that's what we're on trial for.

THE COURT: Well, it seems to me that the deviation from what they were supposed to do is relevant. Now, you're saying they were compensated for that already?

MR. NATHAN: Yes. That's undisputed.

MR. LOEVY: Your Honor, what they were compensated for was, oh, I didn't get a bed and I wasn't fed so I get a thousand dollars for not getting a bed and fed because they were part of a class action. There was no waiver of claims, and, by the way, Anthony wasn't in the class, but it's not -- the argument in the motion *in limine*, you can go back to it, what's the number?

MR. AINSWORTH: 32.

MR. LOEVY: It's 32. What they moved to bar was seeking damages for the inconvenience of being placed in a room. That's not what we're seeking here, so it's a totally different issue.

Now, where Mr. Nathan went after that, he's, like, well, we can't bring up the class action and that they had a bad policy. I don't know why not. What they said at the pretrial conference was we'd have to tell the jury that the cops were acting pursuant to the City's policy by holding them too long. Okay. Then tell the jury that that's your defense, that the City had a policy that was a bad policy. But, you know, let's not lose sight of the ball here. They were held too long in a false confession case.

THE COURT: Right.

MR. LOEVY: If they want to say that we thought we had good faith to hold them too long, then explain it. Then we're going to say, well, the City admitted that you didn't have good

faith.

MR. NATHAN: That is not a claim they're making in this case, the technical violation of the 48-hour rule. That was subject to a class action settlement. If they were making that claim, we would have won summary judgment on that claim.

THE COURT: Well, I -- I can't -- this happened, right? Tell the jury what happened. This is argument that it was unconstitutional, which we all know it would have been, right? So he's not claiming damages for that, and what are we talking about, a thousand dollars?

MR. LOEVY: Something like that.

MR. NATHAN: They're making up a number, Mr. Loevy. There is a number, whatever the number was was approved by Judge Gettleman in a different courtroom in this building, and it was inherent in a class action settlement, anybody who's part of the class settled it.

THE COURT: I know -- I hear you, but I don't think that overcomes the need for the plaintiffs to be able to talk about the detention being beyond what the rule is.

MR. LOEVY: Yeah, it's a false confession, fabricated confession case.

THE COURT: Okay. What else do we have?

MR. LOEVY: Nothing from the plaintiffs at this time, Your Honor.

MR. NATHAN: I did want to go back to the ruling on

the 404(b) issue.  The Court's -- the language from the Court's opinion from the Sosnowski opinion, Docket No. 401, individual defendants also take issue with Sosnowski's opinion regarding Bartik's --

THE COURT:  Hold on, hold on.  What number is it?

MR. NATHAN:  401.

THE COURT:  I mean --

MR. NATHAN:  It's the *Daubert* ruling on Sosnowski.

THE COURT:  Oh, *Daubert* motion, all right.  401. Okay.  What page are you on?

MR. NATHAN:  Page 4.

THE COURT:  Okay.

MR. NATHAN:  Under (b) there, Bartik's history of preinterview confessions.  Individual defendants take issue with Sosnowski's opinion regarding Bartik's "history" of obtaining admissions and confessions of major crimes during a short amount of time spent in the pretest interview.

Your Honor continues about reviewing these 148 cases and then 80 cases and then concludes in this opinion, that that's out, that it's 404(b) evidence.

MR. LOEVY:  It says Sosnowski's barred from testifying about it, and we're not trying to bring in expert testimony.

MR. NATHAN:  The basis for the Court's ruling is that it's propensity evidence.

MR. LOEVY:  Your Honor, I think since this is  --

THE COURT: Hold on, just hold on. Let me read this.

(Pause.)

THE COURT: Well, I did say it was propensity evidence.

MR. LOEVY: You also said, Your Honor, that Sosnowski may testify to his frequency of obtaining pre-polygraph confessions, having personally conducted 30,000, and that's only relevant except to compare it to Sosnowski's.

THE COURT: Right.

MR. LOEVY: This is essentially a new motion. We'd like the opportunity to present something to you in writing. We're not talking about whether Sosnowski can testify about it. Let's talk about whether we can bring it up vis-a-vis Bartik. We'd like to brief that.

THE COURT: All right. That would be helpful, too. And on this issue that was raised this morning -- where did I write this down -- oh, Mr. Loevy's motion that was given -- handed to me, and you were going to respond to that, so --

MR. KAMIONSKI: We're drafting something.

THE COURT: -- you are drafting something. I'll get that tomorrow?

MR. KAMIONSKI: Hope so.

THE COURT: Okay. All right. Escaped my mind exactly what the issue was, but you know what I'm talking about.

MR. LOEVY: It was the Fifth Amendment.

THE COURT: Oh, the Fifth Amendment, right, right, okay.

And it would be helpful if you know some judge in this court or elsewhere who's admitted this evidence under these circumstances.

MR. NATHAN: Okay.

THE COURT: All right. Anything else?

MR. LOEVY: Not from the plaintiff.

MR. NATHAN: Not from the defendants.

THE COURT: Okay. Then we're all finished for today.

MR. LOEVY: Thank you.

THE COURT: Have a good evening.

(Adjourned at 5:16 p.m., until February 11, 2025 at 9:30 a.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen M. Fennell*          *February 11, 2025*
Kathleen M. Fennell                Date
Official Court Reporter