IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
                         EASTERN DIVISION

JOHN FULTON,                        )  Case No. 20 C 3118
                                    )
                Plaintiff,          )
          v.                        )
                                    )
ROBERT BARTIK, et al.,              )
                                    )
                Defendants.         )
----------------------------       )
ANTHONY MITCHELL,                   )  Case No. 20 C 3119
                                    )
                Plaintiff,          )
          v.                        )
                                    )
ROBERT BARTIK, et al.,              )  Chicago, Illinois
                                    )  February 11, 2025
                Defendants.         )  9:22 a.m.

                            VOLUME 2
               TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
                BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Plaintiffs:        LOEVY & LOEVY
                           BY:  MR. JONATHAN I. LOEVY
                                MR. RUSSELL R. AINSWORTH
                                MS. JULIA T. RICKERT
                                MS. FATIMA LADHA
                                MR. ISAAC GREEN
                           311 N. Aberdeen Street, 3rd Floor
                           Chicago, Illinois  60607

                           LYON & KERR, PLLC
                           BY:  MS. ANDREA D. LYON
                           53 W. Jackson Boulevard, Suite 1650
                           Chicago, Illinois  60604

For Defendant Officers:    NATHAN & KAMIONSKI, LLP
                           BY:  MR. SHNEUR Z. NATHAN
                                MR. AVI T. KAMIONSKI
                                MS. BREANA L. BRILL
                                MR. JOHN M. CERNEY
                                MS. NATALIE ADEEYO
                           206 S. Jefferson Street
                           Chicago, Illinois  60661

100

APPEARANCES  (Continued):

For Defendant City:        MICHAEL BEST & FRIEDRICH, LLP
                           BY:  MR. JAMES P. FIEWEGER
                           444 W. Lake Street, Suite 3200
                           Chicago, Illinois  60606

Court Reporter:        KATHLEEN M. FENNELL, CSR, RMR, FCRR
                       Official Court Reporter
                       219 South Dearborn Street, Room 2328A
                       Chicago, Illinois  60604
                       Telephone:  (312) 435-5569
                       Kathleen_Fennell@ilnd.uscourts.gov

                    *   *   *   *   *

              PROCEEDINGS REPORTED BY STENOTYPE
    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE CLERK: 20 C 3118, Fulton v. Bartik, 20 C 3119, Mitchell v. Bartik.

THE COURT: Good morning everyone.

MR. LOEVY: Good morning, Your Honor. Same appearances for the plaintiff.

THE COURT: Yes.

MR. NATHAN: Good morning, Your Honor. Same appearances for the defendants.

THE COURT: Okay. Good. We can set that aside.

I just wanted to chat with you a little bit about some of the issues of yesterday. I still don't have any response to the motion to bar reference to the invocation of the Fifth Amendment.

MR. NATHAN: We will -- one moment.

We'll have that filed this morning.

THE COURT: Okay.

MR. NATHAN: Apologize.

THE COURT: Mr. Loevy's position on the motion for setoff of the County settlement?

MR. LOEVY: We do not have an update, Your Honor. The question for the Court is if we need to resolve it, you know, as we go.

THE COURT: We don't.

MR. LOEVY: All right. So we'd just as soon then file

something, if that's okay.

THE COURT: All right. You have other fish to fry.

MR. LOEVY: Thank you.

THE COURT: All right. So I'll keep that in reserve.

Then there's the issue about the cross-examination of Officer Bartik about his confessions.

MR. LOEVY: Yeah, we want to file something, you know, in advance of him -- I don't think it's going to become-- it's not an issue today and probably not an issue tomorrow.

THE COURT: Okay.

MR. LOEVY: So we were going to file something on that.

THE COURT: All right.

The reference to Collazo's involvement in gang activity, murdered by a rival gang --

MR. LOEVY: Yeah, Your Honor --

THE COURT: -- I reserved for foundation, so.

MR. LOEVY: I, you know, they're trying to make this trial that we're not allowed to talk about any suspects except the plaintiff, which is ridiculous from the plaintiffs' perspective. We expect the very first question for the police officer when we start talking about what did you do was, well, you considered who might kill this guy. He was in a gang, there was rival gangs. You -- as a police officer, you don't ignore that information.

We thought it was, you know, pretty precautionary to say, well, plaintiff, you've got to wait to see if he admits those things. Of course, he's going to admit those things.

THE COURT: Right, okay. So I think --

MR. NATHAN: Your Honor --

THE COURT: So I think --

MR. NATHAN: Your Honor, may I respond?

THE COURT: Yeah, I just don't want to argue all this, wait till it comes up. But, yes, go ahead, respond.

MR. NATHAN: The gang -- the reference to gangs does not have an evidentiary tie. Yes, Mr. Collazo was mentioned as a possible gang member, but there's no evidence that there was a bona fide suspect that was -- that was not investigated.

There's always going to be a Rule 403 balancing consideration here. There are maybe some tiny bit of probative evidentiary value here, substantially outweighed by the danger of unfair prejudice based on rank speculation that we're going to be going on -- off on rabbit trails about gangs that no one -- no one has investigated, so --

THE COURT: The transcript said something, I know we had the rough transcript, was it La Raza? Was that --

MR. LOEVY: Yeah, the detectives' notes mentioned a rival gang, La Raza. There's no dispute Collazo was in a gang.

And contrary to what he just said, there's no Rule 403 prejudice associated with that. So they say, hey, we didn't

look at the other gangs, that's very relevant if they chose not to. The notes reference that.

THE COURT: That's enough. I'll just hold on to that one.

I -- there's a motion whether the defense opened the door to post-conviction proceedings, and I really want to avoid that, but I am concerned that Mr. Fieweger said no judge has ever said that these men were innocent. You know, they -- it implies, strongly implies that they were faced with that question.

MR. NATHAN: The --

THE COURT: Apparently, they weren't.

MR. NATHAN: I apologize. I didn't mean to speak over Your Honor.

Mr. Loevy said during his opening statement that these men were wrongfully convicted. He said that repeatedly. He argued that they were innocent, and the aspect of Mr. Fieweger's argument saying that there was never a finding of innocence is true and consistent with Your Honor's rulings.

The -- the -- he did mention the word "suppression," which was excluded, and that he said was in error. It came out. I saw it one time in the transcript. Maybe it's twice, but I don't -- it had no context, and I think it was a mistake. I don't think it opened the door to anything. It shouldn't have been done. He apologized for it yesterday. Without any

context, I don't think the jury even understands what that means.

MR. LOEVY: Your Honor --

THE COURT: Twice it says, you know, no judge has determined that these men are innocent, so I -- you know, unless the judges were faced with this question, it doesn't seem to be fair to say that.

MR. NATHAN: But it's unfair for the plaintiff to say they were wrongfully convicted without us being able to rebut anything.

MR. LOEVY: That's the allegation in the case.

THE COURT: That's the case.

MR. NATHAN: They were arguing that they were wrongfully convicted. That means that -- that's implying there's a determination, and it's fair to rebut that by saying there is no determination of that.

MR. LOEVY: Do we have to say we were rightfully convicted? I mean, we're here to say we were wrongfully convicted.

THE COURT: A jury convicted them of these crimes or this crime, so --

MR. NATHAN: And the conviction was vacated. That's -- that's fair game. But to say that they're wrongfully convicted, that's a conclusion that implies that there was a finding of that.

THE COURT: Yeah, it doesn't strike me as being outside the bounds of their theory of the case.

MR. LOEVY: We have a proposed instruction, Your Honor.

THE COURT: Okay.

MR. LOEVY: We're working on -- I've edited it a bit. What I wanted to do was get the references in the opening that targeted to this. It doesn't have to come up today, this instruction, but we would like to propose an instruction that we think cures it for your consideration.

THE COURT: Okay.

MR. LOEVY: And then you'll decide what you want to give or what you don't from our perspective.

THE COURT: All right. Then we have this issue about being -- their being detained for more than 48 hours. And, you know, I went back to my rulings to sort of think it through, and I -- one of them seems inconsistent in the sense that I say I'm excluding these 404(b) witnesses, and then I say that they can call three of them, so let's just, like, leave that open as --

MR. NATHAN: We're blending two different issues. One's an issue of 48-hour rule --

THE COURT: Right.

MR. NATHAN: -- and then 404(b) is a separate issue that they were going to brief on.

THE COURT: But they were the same witnesses. Nonetheless -- pass that -- I think it is confusing to the jury to talk about that detention beyond the 48 hours as unconstitutional, so I want you to stay away from that.

But there are, you know, the officers had a standard that they were to apply, and you can inquire into that.

MR. LOEVY: May I address that?

THE COURT: And then -- sorry?

MR. LOEVY: Your Honor, can I address that, please?

THE COURT: Okay.

MR. LOEVY: Thank you. And by the way, Mr. Fulton is a few minutes away is my understanding. How many minutes?

MR. AINSWORTH: One.

MR. LOEVY: One minute away. So I'm going to talk here.

THE COURT: You've got two minutes left.

MR. LOEVY: Two minutes. Thank you.

We had this issue in a previous trial with Judge Jenkins, the last trial I did, where the plaintiff wanted to say you didn't give him access to a lawyer or a phone call, and we wanted to say that's against the law. And Judge Jenkins said I don't want you to say against the law, against the Constitution. You just got to say it's improper. You can't do that.

The relevant fact is you did something you can't do.

Like, they can't say, well, we held him up for 105 hours, well -- and they can't get up there and say we're allowed to do that. You can't say we didn't give him the *Miranda* rights, we're allowed to do that.

So what I think Your Honor should direct everybody to do is say you can't hold them for more than reasonably practical, 48 hours maximum, you can't do that. If they don't dispute that you can't do that, then we just leave it at that.

THE COURT: Right.

MR. LOEVY: If they try to get up here and say, yes, we can, we don't have to give him *Miranda*. Then we might have to get into why you can't do that.

THE COURT: That was my thinking as well. They can be asked and if they admit it, then we're done. If they deny it, then --

MR. NATHAN: They can be asked what, Your Honor?

THE COURT: -- cross-examined on -- on --

MR. NATHAN: I'm unclear --

THE COURT: Confronted with this other evidence that there's a rule, there's a constitutional law, there's something.

MR. NATHAN: What is it Your Honor is saying that Mr. Loevy or plaintiffs are allowed to ask about?

THE COURT: They can ask them if it is -- if holding someone for more than 48 hours is --

MR. LOEVY:  Can't do that.

MR. NATHAN:  Is what?

THE COURT:  You can do that, right.

MR. NATHAN:  So that --

THE COURT:  You have to take them before a judge within 48 hours.

MR. NATHAN:  And that is -- that's the same thing as arguing or inquiring about whether there was a violation, a constitutional violation.  And let me just -- we filed something so the record I think is very clear, there has been no complaint -- there's no allegation in the complaint about this.  We had no opportunity --

THE COURT:  I know, I know that.  That's why I'm saying he can't argue that this was independently a constitutional violation when he's arguing his case to the jury.  It's --

MR. NATHAN:  But saying something that they did something --

THE COURT:  It's part of the story.  There's no way you can do without --

MR. NATHAN:  What we're proposing, Your Honor, is that he be allowed to inquire as to the time that they were in custody.  You tell them the arrest was at such and such a time, you continued to hold them, and he can establish the hundred hours, that's -- the time is fine.  And that -- he's going to

have an expert, Dr. Leo, that's going to talk about how the duration of time in custody was coercive. That is -- that is sufficient without being unfairly prejudicial to us.

THE COURT: Okay. Then whether Bartik can be cross-examined about his record of getting confessions, and my answer to that is yes because it's not 404(b) testimony. It's just -- it goes to his -- it's not necessarily a bad act. I mean, I think we all would think it would be, but the jury may not.

MR. NATHAN: Well, Your Honor, they're going to put forth an expert that's going to say that that's a bad act, and that's why it is 404(b) evidence.

THE COURT: So we have to -- okay. I don't want to argue with you. You know, those are my thoughts on the -- on these evidentiary issues.

Can we see -- I know we were missing one juror.

MR. NATHAN: Your Honor --

THE COURT: Amanda, can we -- are they all here?

THE CLERK: I'll check.

MR. NATHAN: Your Honor, as to that 404(b) issue, I'm just trying to clarify where we stand on it. It sounds like the plaintiff was going to file something relating to that issue, and we would like an opportunity to respond before they inquire anything about that with Bartik.

THE COURT: All right. Yeah. Okay. That sounds

good.

MR. LOEVY: The courtroom is podium-less, it appears, Your Honor.

THE COURT: Pardon me?

MR. LOEVY: There's no podium in the courtroom. I think we forgot one.

THE COURT: Oh.

MR. LOEVY: We'll use this table here?

THE COURT: Was there one here yesterday?

MR. LOEVY: I don't think there was. It might have been too crowded.

I guess, you know, Mr. Nathan might be right. It might get really crowded here with it. Maybe we'll just use the ELMO table.

THE COURT: Yeah. I have a hard time getting a line to these gentlemen over here. Good morning.

Well, when Amanda gets back, we'll ask her. This can be off the record.

(Off the record.)

MR. NATHAN: Your Honor, relating to -- I don't know your timing. If you want to get started, I'll sit down.

THE COURT: I do, but is the jury here?

THE CLERK: Yes.

MR. NATHAN: I'll sit down.

THE COURT: Is your witness here?

MR. LOEVY: I will make -- I'm going to go get him.

THE CLERK: All rise.

(Jury in at 9:36 a.m.)

MR. LOEVY: Your Honor, may we address the Court?

THE CLERK: You may be seated.

THE COURT: Please be seated. Good morning.

(Proceedings heard at sidebar:)

MR. LOEVY: I am embarrassed to report that our client is still on his way up. I've never been in this situation. I don't have a witness to call. I could dance or tell a story.

THE COURT: Okay. Is he in line?

MR. LOEVY: We were told at 9:23 that his thing said 6 minutes to get dropped off. He should be here. They're downstairs. I mean, I guess maybe best to ask the jury to step back out. I apologize.

THE COURT: Can you call down there and say send him up?

THE CLERK: Yes.

(Proceedings heard in open court:)

THE COURT: Good morning, ladies and gentlemen.

THE JURY: Good morning.

THE COURT: I hope you had a good rest last night. We had -- we have, as often happens in cases on trial, we have a glitch, and I'm going to have to excuse you -- actually, maybe not. Hold on just a minute.

I think our problem is solved.

Go ahead, Mr. Loevy.

MR. LOEVY: All right. May I have one moment, Your Honor?

All right. We're ready, Your Honor. Plaintiff will call John Fulton.

THE COURT: Good morning. Raise your right hand and be sworn.

(Witness sworn.)

THE COURT: Please be seated.

THE WITNESS: Good morning, Your Honor.

THE COURT: Good morning.

JOHN JONATHAN FULTON, PLAINTIFF HEREIN, DULY SWORN,

DIRECT EXAMINATION

BY MR. LOEVY:

Q. Good morning. If you'd state your name for the record. State your name for the record.

A. Given name, John Jonathan. Last name, family name, Fulton.

Q. Are you married?

A. Yes.

Q. How long have you been married?

A. Since 2020 of August.

Q. And how long was that after your release?

A. Probably about April, May, June, July -- like a year and five months.

Fulton - direct

114

Q.   All right.  Where did you spend 16 years of your life, starting at age 18?

A.   In the Illinois Department of Corrections.

Q.   And what did you spend it in prison for?

A.   First degree murder, aggravated kidnapping, and a concealment of a homicide.

Q.   Did you have anything whatsoever to do with that crime?

A.   No, sir.

Q.   What year were you released?

A.   2019.

Q.   All right.  And you said you met your wife, what is her name?

A.   Dominique Davis.

Q.   And she's here in court?

A.   That beautiful queen right there.

Q.   And do you have children with her?

A.   Absolutely.

Q.   And did she have children from a prior relationship?

A.   Absolutely.

Q.   Are you guys a family now?

A.   Absolutely.

Q.   Tell me about the child that you and she have together.

A.   Well, we share her children and my children, so I consider her children my children, but we biologically share one child. He's two years old.  His name is Jo'han Adolphus Devontae

Fulton.

Q. And do you have a child from your prior relationship?

A. Yes, sir.

Q. What is his name?

A. Cam'ron Mikail Fulton.

Q. And what does Cam'ron do?

A. He's a senior at Illinois Western University.

Q. And what's he studying?

A. Engineering.

Q. What do you do for a living, sir?

A. Well, I am an owner of two businesses. The first business is Anna Mae Auto Sales. It's a used car dealership out in Monee, Illinois. I also am the owner and administrator of John Fulton, which is also a property management company that I named after myself.

Q. All right. Let's talk first about the auto dealership. You said it's called Anna Mae Auto?

A. Yes, sir.

Q. Why do you call it that?

A. My mother died five days after I was born. I never got a chance to meet her, and so I felt as though it was only right, since she sacrificed her life for me, for me to dedicate my life to keeping a legacy for her. She was only 31 years old. I was her only child.

Q. What was her name?

A.   Anna Mae Greenlaw.

Q.   And your shirt there, is that an Anna Mae dealership shirt?

A.   Yes, sir.

Q.   How many days a year do you wear such a shirt?

A.   I wear it every day until my wife tell me I can't.

Q.   All right.  How did you get a dealership license?

A.   Well, I went through the training program at the Secretary of State office.

Q.   And how is -- who is in charge of Anna Mae Auto dealers?

A.   I am the administrator, but everybody that works for the company are co-CEOs.

Q.   And does your co-plaintiff Anthony Mitchell fit into the business, too?

A.   Not currently now, no.

Q.   Was there a time he worked there, too?

A.   Yes.

Q.   All right.  Who works there with you besides --

A.   Well, it's me.  My wife is the Chief Financial Officer.  My son -- everybody that works there are their own independent contractors, so everybody is their own boss.

        But like I said, my wife is the CFO.  My son, he's a -- a porter as well as an engineer for the company.  My best friend, George Morales who is present, he is also a porter as well as an engineer as well as co-CEO as well.

Q.   You said he's present in court right now?

Fulton - direct

117

A.   Yes, sir.

Q.   How did you meet George Morales?

A.   While incarcerated.

Q.   Was he someone you were a cellmate with?

A.   Yes.

Q.   All right.  Is there anybody else who works there, anybody?
Your godson?

A.   Yes.  My godson, Miguel Russell, which is also my son
Cam'ron's best friend.

Q.   All right.  How long has Anna Mae Auto been in business?

A.   Since January of 2020.

Q.   Have you grown the business?

A.   Yes, sir.

Q.   How have you done that?

A.   Well, we started -- the business isn't banked by -- we
aren't backed by a business, by a bank, so we personally use
our own personal funds to buy the cars from the auctions and
everything.  And so that's how we started in January of 2020.

It wasn't until the past year that we landed a
partnership with Mariner Finance, as well as NextGear Capital,
and now they both lend us a line of credit in the amount of
$100,000 to be able to purchase vehicles, as well as get those
vehicles fixed, so we can offer good quality vehicles to the
public.

Q.   And do you -- when -- you do some work on the cars to fix

them up before you sell them?

A. Absolutely. We fix everything that's humanly possible that's within the budget. If it's not within the budget, we'll prefer to send the car back to the auction than sell it to a customer on the street.

Q. Is customer service an important part of your business?

A. Absolutely.

Q. Can you explain?

A. Well, I named the business after my mother, and so I never got a chance to meet my mother, and so there's honor in her name, and I have to make sure that everybody that comes in contact with Anna Mae knows her story so they know the quality of the relationship that we're trying to build.

Q. Do you make good relationships with the customers?

A. Absolutely.

Q. Was there setbacks in the business over time?

A. Yes, yes.

Q. What was a time period where it was tough?

A. Well, initially when we very first started, I didn't have a dealer license, and so I started working for another dealership previously. That dealership name was DDNS Automotive Group. That individual had a dealer's license, so the agreement that we had was and that every month I would give him $400 a month to be able to rent the license, and I was going to be responsible for all the cars that I purchased, I had to pay

for. I also had to pay for getting them fixed up and as well as if I wanted to hire on staff, I had to pay them as well.

Q. And then there came a point in time, to fast-forward, where you decided to do your own business?

A. Yes.

Q. And did you guys make it through COVID okay?

A. COVID was hard. Before COVID, I had two full-time mechanics that I was paying $300 a day. We had over 33 cars. This was during the time where Mitchell was a part of the business.

And then COVID hit. So when COVID hit, a lot of people obviously stopped buying cars, money dried up, and now we got all these cars and can't move them.

So ultimately I ended up having to lay off both the mechanics. One of the mechanics was Mitchell's father. I end up having to let him go. Then ultimately Mitchell and his younger brother as well.

Q. All right. And you've gotten the business onto stronger footing now?

A. Yes, thanks to my wife and family.

Q. All right. Last back up, sir. Tell the jury where you grew up.

A. I grew up on the south side of Chicago.

Q. What neighborhood?

A. South Shore neighborhood.

Fulton - direct

120

Q.   Tell the jury a little bit about the neighborhood as you were growing up.

A.   As a kid, you really don't know danger in the neighborhood. You just -- you're a kid, so you want to go out, you ride your bike, you have snowball fights. You do -- you do the typical stuff, kid stuff.

But also in the neighborhood there were robberies that took place. If you left your bike outside overnight, it could be gone the next day. My grandfather had his car broken into. They stole his radio out the car. We done have our garage broken into a few different times, lawnmower stolen.

It's -- it's -- it's the norm, you don't think it's unnormal because it happens in the neighborhood, right.

Q.   It was a tough neighborhood, too?

A.   Yeah. I mean, there were definitely gangs in the neighborhood. My grandmother made sure that I didn't go to really none of the schools in the neighborhood. So she sent me outside the neighborhood to try to avoid me having to join gangs and violence and stuff like that.

Q.   Let's talk about your grandmother. Who raised you?

A.   Sylvia Lee Greenlaw.

Q.   And who is she?

A.   She's my grandmother.

Q.   And who -- how did it come to be that you were raised by your grandparents?

A.   Well, my mom died five days after I was born due to child birth complications, and so my mother was my grandmother's favorite child, so obviously my grandmother wasn't going to allow anybody to raise her favorite child's child.  I was the only thing left of my mother.

And so she was -- she got married in her 40s, and so I was raised by her and my grandfather.

Q.   And did they do a good job of raising you, your grandparents?

A.   I didn't feel like I was missing anything growing up other than the obvious I want my actual mom, right, but my grandmother made me feel loved.  I didn't want for anything.  I knew my grandmother was having a hard time with raising me as far as emotionally raising a child that looks like her daughter, right?  And so grieving and crying was something that was -- it was a norm.

Q.   Okay.  How about your father?  Was he --

A.   My father was in the picture.  I used to go over to his house on the weekends.  He worked for People's Gas.  And, yeah, he wasn't -- he wasn't an emotional guy, but he was a -- I guess you could say a guy's guy.

You know, he didn't come to my basketball games or bowling tournaments or nothing like that, but if I called him, I could go over to his house on the weekends.  If I needed to talk to him, I can get in touch with him, but, you know, the

lovey-dovey dad, that was more my grandfather.

Q.   And what did your grandparents do for a living?

A.   My grandmother was a lab technician, as well as she was the person that would wash up the dead bodies before they went to the morgue.

     And my grandfather, he did a couple tours in the service, and then when he got out, he worked for Romano Brothers, which is a liquor company.

Q.   You mentioned that you had gone to a few schools outside the neighborhood.  Where did you end up in high school?

A.   High school, I ended up going to De La Salle Institute.

Q.   And what kind of school was De La Salle?

A.   It was an all-boy school.  It was located on -- still is located on 35th and Michigan.  I started there my freshman year.  I went there all four years.  I was two months away from graduating when I was wrongfully arrested for this crime.

Q.   All right.  Were you -- what kinds of things did you do for hobbies and fun?

A.   Well, I worked on cars.  I'm really like a car junkie, so I like really the electronics of it, so radio, sound system, alarms, rims.

     I bowl.  You said back then or now?

Q.   No, you're on the right track.  You're bowling?

A.   Bowling.

Q.   Tell the jury about your hobby for bowling.

A.   I started bowling when I was eight years old.  Some grammar school friends of mine were in the league, and they invited me to come join, you know, come watch them bowl, and bowling seemed like something that, you know, I could perfect better than basketball, right?  Bowling had more of a promise for me. Basketball was like what's the chances of you really making it to the NBA, right?

     But if you practice, practice, practice on bowling, then your individual skill will ultimately end up being a good thing for the whole team, right, because if your individual skills are great, then where the deficiencies of other players are, you can help.

Q.   And did you get good at it?

A.   Yeah, I was good.

Q.   All right.  And I promised during opening I'd explain why you carried three bowling balls in your trunk in your bowling bag.

A.   So --

Q.   Briefly though.

A.   Different -- I carry four now, but different -- different lane services require different type of balls.  So you usually have oily lanes, dry lanes, and then have you a mixture of both.

     And so usually they have some balls that are called, like, polyurethane balls that are good for dry services.

They're more of straight down and more of an impact on the back end.  And then you have other balls that are more for oily surfaces, right?  I'm left-handed, so --

Q.  So you carry them in your trunk?

A.  Yeah.

Q.  All right.  What other sports did you play briefly?

A.  I played basketball.  I ran track.  Flag football.

Q.  Who were the kids you hung out with?

A.  Kids really that I went to school with, a couple of kids from the neighborhood, guys that was on the bowling team, girls that was on the bowling team, the usual.

Q.  Did you also do a little martial arts?

A.  Yes.  My grandmother enrolled me in martial arts when I was I think about eight or nine years old.  It was one of those that she wanted me always to be able to defend myself.  You know, with me not having my mother, she felt like it was her job to make sure I had everything I needed living in a life without my mom.

Q.  All right.  And how long did you stay with that?

A.  I stayed with martial arts from eight or nine until probably about 16, 17.

Q.  Were you working at the time before you were arrested?

A.  No.

Q.  Not immediately before, but had you had jobs growing up?

A.  Yes.  I worked at the -- my grandfather got me a job in 8th

grade working at the sound shop. He went and got a radio installed in his car, and he knew that I was doing similar type of stuff at home with stuff, and so he asked the owner of the business if it was possible if his grandson could come in and sweep up and probably learn a few things.

And so the guy didn't have a problem with it. So I used to go after school in 8th grade on the days that I didn't have either basketball or track practice, and go help out. And it turned into a hobby of mine and --

Q. You said it was called the sound shop?

A. Yeah. So it was called First Security Plus. It was located on 79th and King Drive.

Q. And what kind of skills did you learn there?

A. Wiring, how to read system diagrams, basic system diagrams, how to install radios, amplifiers, subwoofers, rims, stuff like that.

Q. Did you make a little business about installing sounds?

A. Yes.

Q. Tell the jury about that.

A. So that would be time -- so the business was a first come/first serve business, or you could call by appointment, but usually it was first come/first served. So a lot of people would come to the business and wouldn't be able to get serviced the same day, and so those people would get turned away and would have to come back the next day.

And so for me, it would be like, okay, well, listen, if it was something that I could do, hey, look, this weekend if you want to, we can make appointments, and I would do it out of my grandparents' garage. You could drop your car off at my house, and I'll call you when it's ready.

Q. Would you carry tools in your car for that?

A. Yes.

Q. All right. What about other jobs growing up?

A. I worked at Nordstrom's for a little while. I worked at Co-Op Grocery Store. My first job when I was 15, I worked at Sears, Sears and Roebucks.

Q. What was your job there?

A. I worked in Brand Central, which was the electronics department where they sell TVs. I was like a salesperson in the electronics department.

And then from there, I ended up going to Co-Op Grocery Store, which is located in Hyde Park. I worked there for a little while and then my supervisor there ended up getting another job position at another grocery store by the name of Market in the Park, and he wanted to take his team from Co-Op to Market in the Park, so I went with him as well as other members.

Q. What work did you do at the grocery store?

A. I was a cashier, stock guy. I counted the money in the safe to make sure that the money was there before we locked up

at night, locked the store up at night when he wasn't there.

Q. Did you spend time talking to girls when you were a teenager?

A. Yeah, absolutely.

Q. How would you meet girls?

A. Roller skating rink, bowling, basketball -- I mean, just about everywhere.

Q. All right. When you were young, did you have some relationships before you were arrested?

A. Yes.

Q. Who was the first serious one?

A. Well, in grammar school, I dated a girl by the name of Kiyanna Satterfield.

Q. And when you say grammar school, about what grades?

A. This was 7th and 8th grade.

Q. And who was she?

A. She was a girl that went to our school. She was also my basketball coach's daughter.

Q. And who was the basketball coach?

A. Clifton Satterfield.

Q. And has he remained a figure in your life including after your release?

A. Yes. He's -- he ultimately became my godfather.

Q. So tell the jury about how you formed this relationship with your basketball coach.

Fulton - direct

128

A.   Well, when I started going to St. Thomas, he was the PE teacher.  And, of course, as the school year starts, they pass out memos for join basketball, track and field if you want to join these events.  And with him being the coach, obviously he's the person that you're going to meet, and I took a liking to him.

He liked kids.  He was very easy to talk to, and so he was not only the PE teacher but he was also the basketball coach, the track and field coach, the flag football coach, and so, you know, with me being a part of each one of those teams, then I have an intertwined relationship with him.

Q.   And you -- you met his daughter?

A.   Yes.  The rest of his family as well, yeah.

Q.   And would you go on dates with his daughter, too?

A.   Yes.  We would go out.  He would come and pick me up on the weekends at times.  He would sometimes take me home from school, drop me off at home because it was on his way home.  You know, he introduced me as his godson to people.

Q.   When did you stop dating Kiyanna Satterfield?

A.   Going into my freshman year of high school.

Q.   All right.  At this point in your life, say fast-forward, you're getting ready to graduate high school, what was your plan for the future?

A.   Well, I liked cars, so I wanted to go to Universal Technical Institute and become ASE-certified mechanic.

Q.   ASC certified did you say?

A.   Yeah.  ASE-certified mechanic.

Q.   What is that?

A.   So it's just certification to be a technician dealing with cars, so that means you know all the parts of the vehicle as well as how they work, how they operate, how they interchange with one another.

Q.   Did you view this as a career path?

A.   Yes.

Q.   Can you explain?

A.   Well, I had seen the commercial on TV where, you know, they advertise you can enroll in UTI.  If you graduate, you can take the -- if you are interested, you could take the ASE certification.  If you pass, they'll give you job placement. The job placement starts with a career of 200,000.  So when you see that and you like cars, it's, like, yeah, that's where I want to go.

Q.   Did you actually take steps to enroll?

A.   Yes.  I had paid -- I had paid for seating and placement, but unfortunately due to me being wrongfully arrested for this case, I wasn't able to go.

Q.   All right.  How about Yolanda Henderson, who is she?

A.   She's my first son's mother.

Q.   All right.  When did you meet Yolanda?

A.   I met Yolanda between 2001 and 2002, somewhere between

there.

Q. Back when you were in high school?

A. Yes.

Q. And how did you meet her?

A. She was working at KFC, and I ended up coming through the KFC drive-through with my auntie, and, yeah.

Q. All right. What did you like about Yolanda as you got to know her?

A. As I got to know her?

Q. Yes.

A. She had -- you know, she's a good-hearted person. She cares about people. She reminded me a lot of myself.

Q. Is she a serious person?

A. Yes.

Q. What was her aspirations for the future?

A. At the time, she wanted to be a five star chef. She wanted to work in a restaurant and ultimately have her own restaurant.

Q. How long did you date her?

A. We dated from 2001, 2002 when we met all the way up until I want to say, like, 2005.

Q. How old were you when Cam'ron was born?

A. I was 18.

Q. And were you thinking about children at that time or not thinking about children?

A. Not really.

Fulton - direct

131

Q.   All right.  Were you happy though that you had a son?

A.   Absolutely.

Q.   Did you like being a parent?

A.   Yes.

Q.   What did you like about being a parent?

A.   First off, they smell good, the babies smell good, but also it was the fact of the matter that, you know, it was a -- it was a baby that looked like you, and it's -- I can't explain it.  It's rough to explain, but it's a part of you that you're seeing, right, and you want to do everything for it, like --

Q.   Did you move out of your grandparents' house when you and Yolanda had the baby?

A.   Yes.

Q.   Where did you go move?

A.   I moved in Lake Meadows, which is located on 33rd and King Drive.

Q.   What's Lake Meadows?

A.   It's an apartment building complex, a high-rise building. Some of them are 22 stories high or higher.

Q.   When did you move in, and how long did you live there?

A.   I believe -- I believe it was November 30th of 2002, and I lived there all the way up until I was arrested there in 2003, wrongfully.

Q.   And did Yolanda move in?

A.   Yes.

Fulton - direct

132

Q.   All right.   Did the relationship stay smooth between you and Yolanda the whole time?

A.   No.   We ended up having some disagreements, so it was -- it wasn't always great, but we got along because we lived together.

Q.   All right.

A.   And then at one point in time, we had had a big argument about something, and I had asked her to leave.   So she ended up moving back with her parents, and then that lasted for like a couple weeks, and then the reality of the house, no baby, it's like, oh, okay, what we argue about is not that serious.   Okay, come back.

Q.   So you guys -- she moved back in?

A.   Yeah, she moved back in, and, you know, when she first -- when we first moved in together, you know, we weren't together, but I wanted to raise our child together.

        And so when she ended up moving back in, that's when I took our relationship serious, and we got back together, and, yeah.

Q.   All right.   Were there other people who lived in the apartment sometimes?

A.   Yes.

Q.   Who were they?

A.   Anthony Mitchell and Antonio Shaw.

Q.   And how old were you when you met Anthony Mitchell?

A.   16 or 17.

Q.   And he has a nickname?

A.   Yes, Riff.

Q.   How -- and how many years were you and Riff tight?

A.   All the way up until a little bit before I got wrongfully arrested for this crime.

Q.   All right.  Did you get real tight with Riff?

A.   Yes.

Q.   How about this other kid, Stick?

A.   Yes.

Q.   Were you older than Stick?

A.   Yes.

Q.   How did you meet Stick?

A.   I met him through Riff.

Q.   What was Stick like?

A.   He was -- he was a good guy.  He was a little slow.  He stuttered, and I didn't like the fact of how, you know, you would see other kids that would make fun of him because he was like that.  I just didn't like the way they treated him sometimes.

Q.   All right.  I want to now shift the conversation to this person named Chris Collazo.  How many times in your life did you meet Chris Collazo?

A.   Once.

Q.   All right.  Back then, had you ever been robbed before?

A.   Yes.

Q.   In your life, have you been robbed at gunpoint?

A.   Yes.

Q.   And you mentioned that sometimes -- well, were there break-ins in your car or house?

A.   In my home, yes.

Q.   Are you a legal firearms owner today?

A.   Yes.

Q.   Do you have a license for that?

A.   Yes.

Q.   How did you get a license for it?

A.   I took the 16-hour training course that's provided by Illinois State Police.

Q.   Do you take gun safety seriously?

A.   Yes.

Q.   Where do you keep your firearms?

A.   They all are in safes, fireproof safes.

Q.   And where are those?

A.   Located in our home.

Q.   Why do you have a gun in your home?

A.   To protect my person and my family.

Q.   And was that something that was true of other parent figures in your life back then?

A.   Yes.  My grandfather had a firearm in the house for a while.  My uncle has had firearms in the house.  My godfather

has a firearm in the house to protect the home. My dad. It's a -- it's a norm to have a firearm to protect the house.

Q. All right. Back then, did you know where to buy a gun?

A. I didn't know where, no, not exactly where, but you know, I would ask people that I knew that were off the streets, you know, if they knew something and then somebody, you know, would say yes or either no.

Q. And who is Froggy?

A. Froggy is a guy that I had met through a friend of mine named Darnell.

Q. All right. Did you -- who did you reach out to to try to buy a gun?

A. Precious.

Q. Who is Precious?

A. Precious is a girl that I had met on the party line.

Q. What's a party line?

A. A party line was like a chat group back in the '90s, in the early 2000s. It was -- it had many different phone numbers, but it was a -- like almost a central link location where you can call and talk to many different people from either that was here in Illinois or from out of state, and you guys could all talk together. It was like -- it was like Facebook before Facebook, just on phone calls.

Q. And did you and Precious become friends?

A. Yes.

Q.   Did you actually have a romantic relationship with her?

A.   Yes.

Q.   Can you characterize it or describe it?

A.   We had sex once, and, you know, we were friends.  She would come over to the house.  We would sit, watch movies, me, her and Riff and Stick, and that's it, talk on the phone and stuff like that.

Q.   Was there a period of time where you and Yolanda were not exclusive boyfriend and girlfriend?

A.   Yes.

Q.   Was she dating other people, too?

A.   I believe so.

Q.   All right.  When Precious, you asked Precious where you could get a gun, what did she tell you?

A.   She didn't know, but she'll make some phone calls and she'll let me know.

Q.   And then what happened?

A.   She called me back, and she had a guy named Peanut on the phone.

Q.   And then what happened?

A.   Peanut told me that he had guns for sale and that he would charge me 200 -- I mean, 280 to $300 for them.

Q.   All right.  What happened next?  Tell the story.

A.   Well, the original deal was we was supposed to originally meet at Precious's house, and the gun deal was supposed to

Fulton - direct

137

happen at Precious's house.

And so we made it all the way to Precious's house.  I called Precious, and Precious called him because during our conversation on the phone, he wouldn't give me his phone number.  He said the reason why he didn't give out his phone number is because he had did it once before in the past, and things didn't go right.

So if I wanted to get in contact with him, call Precious, and Precious will call him and they would call me back.

So I made it to Precious's home.  I called Precious to tell her I was outside, and then she called me back with him on the phone, and then she said she didn't want us to do the deal at her house.

Q.  Let me break in and get the time frame on this.  Do you know, from reviewing the records and the transcripts and the testimony, approximately when this was?

A.  Sometime around two weeks before Valentine's Day, somewhere around there.

Q.  So it was before Valentine's Day 2003?

A.  Yes.

Q.  All right.  And we're going to talk about the crime that you were investigated for.  That's four or five weeks later, right?

A.  I believe so, yes.

Q. All right. So shooting back to before Valentine's Day, did you go meet up with Chris Collazo?

A. Yes.

Q. And then what happened?

A. Well, I got -- we got in front of the house that he identified as being his. We called Precious and told Precious to tell him that we was outside. And then he called back and said he was on his way out. We was literally parked in front of the house.

And then probably like a block ahead, we seen somebody walking, walking up the street. And so he walked to the car, and he says that the friend of his that has the guns for sale isn't home, and so he asked us did we smoke weed. We said yes. He said, well, let me get into the car. We can smoke and just hang out and get chill until my friend get home.

Q. So did you hang out with Chris Collazo in the car for a minute?

A. Yes.

Q. And talked to him?

A. Yes.

Q. Did he make any effort to hide his identity or anything like that?

A. He didn't identify his name as Christopher Collazo. He identified himself as Peanut.

Q. All right. After you guys finished that, what happened

next?

A.   He made a phone call to somebody that lived in the building to see if they were there yet and they didn't answer, and so he got out the car and he actually went into the building.

Q.   What did you do?

A.   I was sitting in the car at the time.  And then he came back out, and when he came back out, he said, all right, let's go.

        So we all -- me, Mitchell and Shaw were all in the car, and so we all got ready to get out the car.  And then that's when he was, like, well, only the person that's purchasing the gun can come in because I guess the guy's mom didn't want, you know, strangers and stuff, a lot of people in the house.  And so that's when I went in.  I followed Peanut inside the building.

Q.   And then what happened?

A.   We walked inside the corridor building and when we got inside, he was walking in front of me.  It was pitch black in the back, but there was a light on at the top of the stairs. It didn't look unnormal.  I had been inside corridor buildings where it was like that before.

        But when we walked in, the door didn't close behind us, right?  And so by the time we got to the stairs, he was like, well, wait a minute, let me go and close the door because the tenants be tripping about the door being open.

So he turned to go towards the door, and then he told me go ahead and go upstairs and just knock on the door.

So I took two steps and then it dawned on me, like, wait a minute, I'm getting ready to go knock on some stranger's door.  No, wait.

So I stopped and I waited for him to close the door and come back because I was going to wait for him to go back up, and I was going to go behind him.

Q.  Then did something happen?

A.  Yes.  Once he closed the door and turned back this way, out the pitch black somebody stepped out with all black on with a gun in their hand.

Q.  And what did that person do?

A.  They told -- person told me this is a robbery.  Get down on your knees.

Q.  And do you now know the person who robbed you?

A.  Yes.

Q.  What's his name?

A.  Marcus Marinelli.

Q.  And what did you do when Marinelli said get down on your knees?

A.  I came down the stairs, and I got down on my knees and I put my hands up.

Q.  All right.  Did you know that Marinelli was actually having a BB gun?  Did you know either way?

A.   No.

Q.   What did it look like to you?

A.   It looked like a real gun to me.

Q.   All right.  So, what, did he rob you?

A.   Yes.

Q.   What did you lose?

A.   $15.  14, $15.

Q.   And I guess maybe I jumped ahead in the story, but what did you do when he said give me your money?

A.   I reached for my first pocket.  I'm left-handed, so I actually reached for the very first pocket.

Q.   Gave him the money?

A.   Yes.

Q.   And they ran away or what --

A.   That's when Collazo told me don't come out for ten minutes.  If you come out of here before ten minutes, we're going to kill you.

Q.   And what did you do?

A.   I waited ten minutes alone.

Q.   What did you do?

A.   I came out, I ran to the car, and I told Riff and Stick that I had just got robbed.

Q.   All right.  And then what did you guys do?

A.   We proceeded back home.

Q.   All right.  What did you figure out on the way?

A.   Well, on the way home, we was passing by a Burger King, which we had passed by on the way there, and Riff had asked, said, hey, man, you want something to eat?  Let's stop at Burger King, because he was driving.  And I'm, like, all right, fine.  So he pulls in Burger King, and as he pulls in Burger King drive-through, I noticed that Burger King has icons on there that says Mastercard, credit card, and Visa.

So the first thing I do is I reach, because I had on jogging pants.  The jogging pants I have on have four pockets, two pockets at the bottom, two pockets at the top.  So I reached for my wallet in my bottom pocket, and when I pulled the wallet out, I felt that it was something else in there.

And so when I reached in there, I realized it was a bulk of money in there, but I didn't know where the money had came from.  So I counted it, and it came out to 280 or $300.

Q.   What did you figure out?

A.   Come to figure out this was the gun money.

So now when I reached in my left pocket, I realized that the guy that robbed me, he didn't get the gun money, he got the $15 that I had in my pocket because this was the money that -- this was the money for the gas that we was going to put in the car to go back home.

Q.   Did he apparently figure it out, too?

A.   Yes.

Q.   What happened then?

A.   While sitting in the drive-through, once I realized I had my wallet, I told Riff, hey, look, order whatever you all want.

And then I got a phone call, anonymous phone call.  I answered it, and it was Peanut telling me don't tell, don't tell Precious what had happened.  So I'm, like, all right, fine, and I hung up.

And then he called back a little while later and asked me to come back because he know I got more money than that.

Q.   All right.  Was he -- you heard in opening taunting.  Was there taunting going on?

A.   Not -- not initially, no.  But it was, when he first called me, he had told me don't tell Precious because he knew where I live at and everything, right?  And so it was like, okay, but I had called her anyway to tell her what had happened.

Q.   Was there any laughing going on?

A.   He was, yes.

Q.   All right.  And did you laugh back at him?

A.   Yeah, once I realized that he didn't get the gun money, yeah.

Q.   Tell us what you mean.

A.   Well, it was like, ah-ha, that's what you get for trying to rob me.

Q.   All right.  And did he -- did he want you to give him the rest of the money?

A.   He actually asked -- he called and asked me to come back.

Q. All right. Were you going to do that?

A. No.

Q. All right. Did he call you again?

A. Yes. He kept calling.

Q. Tell us about that.

A. And then I guess Precious had told him that I had called her and told her about the robbery, and so that's when he called me and told me that he knew I stayed 500 East 33rd, Apartment 1608. He told me that he knew that I had security around the building, that basically Precious had told him everything about where I lived at.

Q. Did that scare you?

A. Yes.

Q. Why?

A. Because he had just robbed me.

Q. All right.

A. And so him and Marcus Marinelli had just robbed me. He didn't have the gun, but he was a part of it.

And so I was scared, yeah.

Q. All right. Did he call you again?

A. Yes.

Q. And then what happened?

A. He would call and say that he was on his way over to the house. He would name certain locations, like Dunbar High School that's near where my location to where I live at. Yeah,

and it was -- yeah.

Q.   And I think I forgot to set the context.  You guys are in the south part of the city, right?

A.   Yes.

Q.   When you went to do the gun deal, where did you drive to?

A.   I believe that was the north side or west side or something like that.

Q.   All right.  So a different neighborhood?

A.   Yes.

Q.   All right.  Was he threatening you?

A.   Yes.

Q.   All right.  How much after the incident was he threatening you?

A.   Literally right after, like, as soon as -- as soon as he had talked to Precious and found out that I had told her, it was like the gloves were off.

Q.   All right.  And then did there come a time when he became less scary to you?

A.   Yes.  So it was -- he called one day and told me that he was in the Jewel's parking lot right outside my school -- right outside our building where we lived at.  And so I was already up getting ready for school and everything already, and this is after he had been calling for probably like maybe like a week or so taunting.

        And so at this point, I hadn't -- I wasn't really

taking him serious because a lot of time had went past, and so when he told us that he was outside in the parking lot, me and Riff and I believe Stick, too, we went downstairs.

And when we went outside, the parking lot was empty. There was no cars out there. There was no people out there, there was no nothing.

And so from that point on, it was, like, I'm done. I'm not -- I don't even want to talk to him. I'm not taking him serious. It's over with. And so, Riff, you talk to him, and that was the end of it.

Q. All right. So that's about you said within a week of the incident?

A. This was probably within a few weeks, yeah.

Q. Okay. Was there a period of time when you cut off contact with him?

A. Well, I stopped communicating with him. So if he did call and once I found out it was him, I would give the phone to Riff or I would just ignore it.

Q. All right.

A. Because it's like -- he's not -- he's not serious, just trying to get under my skin.

Q. All right. And if you thought it was serious, what would you have done?

A. I would have called the police.

Q. Why?

A.   Because that's what you do when you have a problem.  You call the police.

Q.   All right.  So in the first 24 hours, first few calls, were you scared?

A.   Yes.

Q.   After it was clear it was just all talk, did you remain scared?

A.   Not -- not as much -- not as I was initially.  It weighed as time went on.

Q.   Did there come a point where you stopped taking it seriously at all?

A.   Yes.

Q.   And did there come a point where he stopped bothering you?

A.   Yeah.  The calls would just stop, yeah.

Q.   All right.  And then a week goes by, another week goes by, another week goes by?

A.   And then just randomly out of nowhere, I get a text, and the text said, I'm-a kill you.  But back then, I had a Nextel phone, and so when people would text message just like now, it says the phone number in which they're texting from.

So I didn't know how to text back then.  So I just called the number back.  And when I called the number back, a girl answered the phone.  And I was like put Peanut on the phone.  And she like I don't know who you're talking about, what you're talking about.

I'm like I just got a text message from this phone number saying I'm-a kill you, and I don't know who you are. So put Peanut on the phone.

And she's like I don't know what you're talking about, and she hung up and that was the end of it.

Q. All right. So that was the end. So now I wanted to shoot for a week goes by, another week goes by, another week goes by. Did there come a period of time where you stopped thinking about this?

A. Yes.

Q. What were you thinking about?

A. Life, graduation, prom.

Q. Had you -- did you ever have any more contact with Collazo or even think about him again then within the weeks that passed after that?

A. No.

Q. All right. I want to fast-forward then to March 9th of that year.

Did you kill Chris Collazo?

A. No, I did not.

Q. Did you ever see him again?

A. No.

Q. Did you decide that he absolutely needed to die?

A. No.

Q. Why didn't you think he needed to die if he took $15 from

Fulton - direct

149

you?

A.   Repeat that?

Q.   If he robbed you for $15, why didn't you go have to kill him?

A.   I'm not a murderer.  I don't --

Q.   Did you bind him, gag him, stuff him in a trunk, beat him to death and suffocate him and light him on fire?

A.   No.

Q.   Did you have anything to do with this crime?

A.   No.

Q.   Do you know anything about it?

A.   No.

Q.   All right.  Do you know -- apparently someone did.  Do you know any of his enemies?

A.   No.

Q.   Do you know anything about who else might have had an interaction with him that was negative?

A.   No.

Q.   Do you know other people who might want to have a problem with him?

A.   No.

Q.   All right.  I want to fast-forward to the day that somebody murdered him, March the 9th -- well, the day he disappeared, March the 9th, 2003.  You now know where you were that day, right?

A.   Yes.

Q.   And how is it that you know that?

A.   Because that day was the beginning of the rest of my life that they took away from me.

Q.   Where were you that day?

A.   I was at the University of Chicago Hospital.

Q.   And what -- how did you find yourself there?

A.   Well, Yolanda was sick.  She was throwing up blood all week, not bad, but every time she threw up, it would be blood in her, in her throw-up.  And so it was, like, baby, I need you to go to the doctor, I'm scared, you know.

And so I ended up taking her to the University of Chicago Hospital on March 9th.

Q.   Was that far from your home?

A.   No.  It was, like, maybe ten minutes, five minutes, not even that long.

Q.   Do you remember what time you got there?

A.   We got there around 8:30, 8:45, somewhere around there, I believe.

Q.   And you've seen video subsequent to that, right?

A.   Yes.

Q.   And on the video, do you remember that you -- how long did you stay at the hospital?

A.   I stayed there from 8:30, 8:45 until probably about 10:30.

Q.   All right.  And do you remember that the video shows you

leaving the hospital?

A.   Yes.

Q.   Where did you go?

A.   Home.

Q.   And what time does the video show you entering your apartment thereafter?

A.   A little bit before 11:00, like maybe five minutes or ten minutes or somewhere before 11:00.

Q.   And what did you do when you got home?

A.   I changed clothes and I ordered a movie, a porno.

Q.   Why had you left?

A.   Because I wanted to put on some comfortable clothes.  My mom was -- my mother died in a hospital, so hospitals make me really uncomfortable, and so it was one of those things if I was going to be there for a while, I wanted to be comfortable.

So I went home to kind of get into like some jogging pants, a jogging suit because I came in with, like, jeans and kind of like formal wear on.

Q.   All right.  Did you explain to Yolanda that you were going to be doing that?

A.   Yes.

Q.   And so approximately how long were you gone from the hospital?

A.   Probably maybe 45 minutes to an hour, somewhere like that.

Q.   All right.  Do you -- do you -- have you seen a record of

the movie rental?

A.   Yes.

MR. LOEVY:  Okay.  Your Honor, at this time, we would like to introduce Plaintiffs' Exhibit 63.

THE COURT:  All right.  Is this agreed?

MR. NATHAN:  No objection.

MR. LOEVY:  No objection.

THE COURT:  Exhibit 63 is received in evidence.

(Plaintiffs' Exhibit No. 63 received in evidence.)

MR. LOEVY:  Can we have --

THE WITNESS:  Excuse me.  Jon, can I have some water, please?

MR. LOEVY:  Sure.

THE COURT:  There's a pitcher right there.

THE WITNESS:  Thanks, Angel.

BY MR. LOEVY:

Q.   All right.  Showing you Plaintiffs' Exhibit 63.  And with the name of the porno blacked out, can you identify for the record the time, the start time?

A.   11:00 p.m.

Q.   All right.  Showing you plaintiffs' demonstrative exhibit --

MR. LOEVY:  Does the demonstrative have a number, was it marked?

MS. NEKRITZ:  233.

Fulton - direct

153

MR. LOEVY:  We'd mark this 233 then, Your Honor.

BY MR. LOEVY:

Q.  Showing you hospital record, the hospital video.  Does that refresh your recollection of the time that you arrived at the ER?

A.  Yes.

Q.  And what time was that?

A.  8:33 p.m.

Q.  And showing you the vision, page 16 of the demonstrative, does that refresh your recollection of the exact time you left the ER?

MR. NATHAN:  Objection, Your Honor.  Leading.

THE COURT:  Sustained.

MR. LOEVY:  Should we go on the --

THE COURT:  It's okay.

BY MR. LOEVY:

Q.  Well, what time did you leave?

MR. NATHAN:  Your Honor, the exhibit, the leading exhibit, is on the ELMO.

THE COURT:  Sorry.

MR. LOEVY:  Should we go to the sidebar?

THE COURT:  Turn on the white noise.

   (Proceedings heard at sidebar:)

THE COURT:  What's the problem?

MR. NATHAN:  Your Honor, there's been -- there's no

suggestion that this witness doesn't have a memory, so there's no reason to refresh his recollection.

What's happening is Mr. Loevy is providing a demonstrative with his suggested testimony and telling him, well, this is the time, marching him through, and on that basis, it's a leading objection. Keeping -- after Your Honor sustained the objection, I have a further objection to leaving that same exhibit in front of the witness.

MR. LOEVY: Your Honor, the issue is the video is not -- none of this is disputed. I don't want to play the whole video. It just seems like a much simpler way to introduce the testimony since these times are not disputed.

THE COURT: Well, he's -- he -- you are leading him, and he is not one to lay the foundation for this, but I agree that why are we fighting about this? There's no --

MR. LOEVY: No dispute.

MR. NATHAN: I think he's going to be able to remember most of this without being led. There is a -- there's going to be testimony that the times on the video were not exact, and --

THE CLERK: Oh, sorry, sorry.

MR. NATHAN: And for that reason, I don't think it's proper to go through it and suggest that the times are exact.

THE COURT: So you have a witness that's going to talk about the inexactness?

MR. LOEVY: No. They have someone who says I heard

from somebody it might not be exact.  That's hearsay.

MR. NATHAN:  So what we're talking about is there's no foundation to say it's an exact time.

THE COURT:  All right.  Well --

MR. LOEVY:  Should we introduce the whole tape and play the whole tape?  I mean --

MR. NATHAN:  That doesn't resolve the foundational problem.  And I don't -- the thing is we should just have non-leading questions.

THE COURT:  All right.  He did not indicate that he didn't remember, so it's improper to lead him in this way.

MR. LOEVY:  Should I ask him if he remembers the exact time, and if he doesn't, should I say does this refresh your recollection?

THE COURT:  Yeah, I suppose you could do that.

MR. LOEVY:  Okay.  Thank you.

(Proceedings heard in open court:)

BY MR. LOEVY:

Q.  All right.  Sir, do you remember the exact time that the video shows you leaving the hospital?

A.  I don't remember the exact time, no.

Q.  If I could show then just for the witness, show you the still from the video of you leaving, does that refresh your recollection?

A.  Yes.

Q.   All right.  What time did you leave?

A.   10:36 p.m.

Q.   Do you remember the exact time that the apartment video showed you entering the apartments?

A.   Not exactly.

Q.   All right.  If I could show you that video --

MR. LOEVY:  And, Your Honor, we would ask permission to publish this one if there's no objection.

THE COURT:  Is there an objection?

MR. NATHAN:  No, Your Honor.

THE COURT:  All right.  You may publish.

MR. NATHAN:  What exhibit is this?

MR. LOEVY:  This is page 17 -- what did we call the demonstrative?

MS. NEKRITZ:  233.

MR. LOEVY:  233.

THE COURT:  So 233 is received in evidence.  You may publish.

MR. LOEVY:  Thank you, Your Honor.

   (Plaintiffs' Exhibit No. 233 received in evidence.)

BY MR. LOEVY:

Q.   Who is wearing the blue hat and the white hoodie there?

A.   That's me.

Q.   And what time?

A.   10:57 p.m.

Fulton - direct

157

Q.   And then do you remember exactly what time you left to go -- after you went home, ordered the movie, changed clothes, what time you went back to the hospital?

A.   It was sometime after I ordered the movie, so sometime after 11:30.

Q.   All right.  Showing you page 19.  Does that refresh your recollection of the time?

A.   Yes.

Q.   Why did you go back to the hospital?

A.   Because Yolanda had called and said that she no longer wanted to wait in the hospital, that she had talked to her mom, and her and her mom had came to an agreement that the next day, they were going to go to Trinity Hospital.

Q.   All right.  Did you go back and get her?

A.   Yes.

Q.   How long did it take you to go back?

A.   Maybe five to ten minutes maybe.

Q.   All right.  And then showing you page 20, do you remember if the video showed you going back into your apartment after you took Yolanda back?

A.   Yes.

Q.   So tell the jury what happened, and then we'll talk about that.

A.   I went and picked her up.  After I picked her up, we came back.  I dropped her off at the front.  I parked the car, and

Fulton - direct

158

then I came into the building a little while later after behind her.

Q. So do you remember if it was a cold night or not a cold night?

A. Yeah, it was cold.

Q. Do you remember how cold from reviewing reports and refreshing your recollection?

A. I don't remember exactly, but it was cold.

Q. All right. What does the video show -- showing you page 20, what does the video show as far as returning?

A. It shows me coming back in at 11:53 p.m.

Q. Was this before or after you parked the car?

A. After.

Q. And do you remember if Yolanda is shown on the video before just a few minutes?

A. Yes.

Q. About how long before?

A. Maybe a few minutes before.

Q. And that's while you were parking the car?

A. Yes.

Q. All right. What did you do that night after you dropped off -- after you returned to your apartment around midnight?

A. Me, Yolanda talked a little while. It was short. I had to go to school the next day, and so she suggested that it would be a good idea for me to sleep in the bedroom and for her and

the baby to sleep in the front room because the front room was where the TV and stuff was at. And so she didn't want us to sleep in the same room because she didn't want to get me sick.

Q. And did -- is that how it went?

A. Yes.

Q. Was there a bed in the bedroom or the front room?

A. No, we didn't have -- we had just moved in, so we didn't have no furniture or anything. We just had pallets.

Q. All right. And did you go to sleep that night?

A. Yes.

Q. Did you wake up the next morning, Monday?

A. Yes.

Q. What happened on Monday morning?

A. Monday, I had Yolanda drop me off at school, and she took the car to go meet her mom at Trinity Hospital.

Q. And what time did you have to get up to go to school?

A. School days, school started at somewhere between 8:15 and 8:30, so I'd usually get up somewhere around 7:30. I stayed in walking distance, but I still drove.

Q. All right. And showing you --

MR. LOEVY: I'd like, Your Honor, at this time, we move to admit into evidence Plaintiffs' Exhibit 120, which is the school record.

Is this in evidence, or is there an objection?

MR. NATHAN: Objection, foundation.

THE COURT: May I see it? Put it on the screen.

MR. LOEVY: Sure.

THE COURT: Okay. So lay a foundation.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. Have you seen this record, sir?

A. Yes.

Q. And can you identify what it is?

A. It's the attendance report.

Q. For what -- for what?

A. For me, for it looks like my senior year.

Q. And as part of your defense in the criminal case, did you go about obtaining these records, you and your attorneys?

A. Yes.

Q. Do you know how they acquired this record?

A. I believe it was from De La Salle.

MR. LOEVY: All right. Your Honor, at this time, we'd move to admit it in the record.

MR. NATHAN: Objection, foundation.

MR. LOEVY: There's no objection in the pretrial order, Your Honor. That's why we relied on it.

THE COURT: Okay. There was no objection, you say?

MR. LOEVY: Yes, no objection.

THE COURT: I'll receive it in evidence. I don't think there's any dispute about -- any genuine dispute about

it.

(Plaintiffs' Exhibit No. 120 received in evidence.)

BY MR. LOEVY:

Q.   Does the record show that you were in school that day?
Showing you the days that you were absent --

MR. NATHAN:  Objection, leading.

BY MR. LOEVY:

Q.   -- if talking about March 11th?

MR. NATHAN:  Excuse me.

Objection, leading.

THE COURT:  Okay.  Leading.

BY MR. LOEVY:

Q.   All right.  What does it show?  You were absent or in
school that Monday?

A.   In school.

Q.   All right.  Now, fast-forward.  That's Monday.  Maybe a
week or so later, March 18th, 2003, did something happen that
disrupted your life?

A.   Yes.

Q.   Tell the jury what -- what happened that day?  Was it -- do
you remember what day of the week it was, March 18th?

A.   A Tuesday.

Q.   All right.  What happened?

A.   I was laying down in the bed asleep, me and Yolanda and the
baby, and I heard a big thump bang, like boom, boom, boom.  And

I got up, and I initially thought it was kids playing ding dong ditch in the building because usually around that time, a lot of the kids that were in the building would go and bang on people's door, and they would run down the stairwell, right, and so that's what I thought what it was.

So I went to the door, I looked out the peep hole. I didn't see anybody.

And so I went and laid back down. And so once I laid back down, maybe a few minutes later, I heard banging again, bang, bang, bang. I got up, I went to the door, and that's when I seen the little neon vests of the security outside the door.

And so I cracked the door to kind of, you know, see what was going on, and then that's when the police just pushed the door wide open and stormed on in.

Q. And then what happened?

A. I was told that I was being taken to the police station for questioning for a jewelry robbery.

Q. And did you have any idea what they were talking about?

A. No.

Q. Were you dressed?

A. No. Only thing I had on at that time was probably some underwear and a dego T-shirt.

Q. Did they allow you to dress?

A. Yes. One of the officers had a gun pointed at me, and he

told me to hurry up and get dressed or else they was going to take me out the house naked as I was.

Q. All right. Did you ever make it to school that day?

A. No.

Q. Did you ever get to school again in your life?

A. No. Physically, no.

Q. All right. How about Yolanda and the baby, what were they doing?

A. They were in the bedroom 'sleep.

Q. And when the police barged in, what do you remember?

A. One police officer stayed with me. The other one went and checked the apartment, found her in the room, and then came back out and told the other officer that it was somebody in there with a baby.

Q. And was there a gun involved here from the police?

A. Yes, the officer had a gun, yes.

Q. What was he doing with it?

A. It was pointed at me.

Q. What were your emotions?

A. I was scared. I didn't know what the hell was going on.

Q. Where did they take you?

A. They took me to what I found out is the old Board of Education building. I'm guessing the police had got the old Board of Education building, and so they were doing work out of it. But I didn't know that at the time.

So when we pulled up in front of the police station, it literally says Board of Education. It don't say police station. It don't say nothing on the outside.

Q. Did they take your car?

A. Yes.

Q. How did your car get to the police station?

A. One of the officers drove it there.

Q. And where, when you got to the Board of Ed building, where were you taken to? Where exactly?

A. Well, when I got out the car, the police officers that had came to my home, one of the officers had even gave me a compliment on how -- the officer that was driving on how nice the car was, how good it drive.

And then they took me upstairs in the apartment building -- I mean, in the Board of Education building.

Q. And where did they place you?

A. In, like, an interrogation room, holding cell room.

Q. All right. How big was it? What do you remember about that room?

A. It was small. It had no windows. It had no chairs in it. It had no bench or nothing in there to sit down. They brought chairs in there to sit down.

Q. All right. How long did you end up spending in that room?

A. A lot of time.

Q. Was it easy for you to tell time?

Fulton - direct

165

A.   No.

Q.   Can you explain why?

A.   Because I had no way of telling day from night.  I didn't have a watch on.  Didn't have no window to be able to see the sun go down and come up, and so I was literally at the mercy of my -- the people that kidnapped me.

Q.   All right.  When they were asking you about a jewelry robbery, what did you tell him?

A.   I have no idea what you're talking about.

Q.   Did you -- did they ask you about the time that this kid Marinelli and Collazo robbed you?

A.   Yes.

Q.   What did you tell them?

A.   I told them about the robbery.

Q.   Were you honest?

A.   Yes.

Q.   Did you think you had anything to hide?

A.   No.

Q.   Why not?

A.   Because I ain't did nothing.

Q.   Did they seem concerned that you were the victim of this robbery?

A.   Not really.

Q.   All right.  Were they -- at some point, did they start accusing you of being involved in a murder?

A.   Yes.

Q.   At the time they were saying this, did you -- did you even know that Chris Collazo was dead?

A.   No.

Q.   Did you have any idea who might have wanted to kill him?

A.   No.

Q.   Do you know anything about his murder?

A.   No.

Q.   What did you say when they started accusing you of being involved in the murder?

A.   I didn't do it.

Q.   How many times over the time you were incarcerated there do you think you told them that you had no idea what you were talking about, you're innocent?

A.   A lot of times.

Q.   Did they ever accept your insistence that you were innocent?

A.   No.

Q.   Were you innocent?

A.   Yes.

          MR. LOEVY:  Your Honor, what time is your intention to take the mid-morning break today so I can --

          THE COURT:  I can break at a quarter of.

          MR. LOEVY:  Well, I'm about to start a new area, so would it make sense to start it now and then come back a little

Fulton - direct

167

earlier, or should I press on a little bit more?

THE COURT:  Keep going.

MR. LOEVY:  Got it.

THE COURT:  Yeah.

BY MR. LOEVY:

Q.  Sir, when they started asking you about the murder, did they suggest a murder scenario to you and a motive?

MR. NATHAN:  Objection, leading.

THE COURT:  Did they suggest -- sustained.

BY MR. LOEVY:

Q.  What was the gist of what they were saying?

A.  That me and my friends wanted to get a little payback for the robbery, so we wanted to do a little payback beating, and the payback beating just went just a little too far.

Q.  All right.  What did you tell them?

A.  That's not true.

Q.  What did they say?

A.  Come on, we know that you was there.  I think they even said something like you were identified there, your car was identified there, or something like that.

Q.  Were they making threats?

A.  Yes.  They told me that if I didn't cooperate, that my son would be taken to DCFS, that Yolanda would be arrested for concealment of a homicide, and I would spend the rest of my life in prison.

Q.   At any point during this interrogation, were their voices raised?

MR. NATHAN:  Objection, foundation as to this line.

MR. LOEVY:  I don't understand the objection, so I can't respond.

MR. NATHAN:  Who, when, where.

THE COURT:  Who was present, is that what you're saying?

MR. NATHAN:  Yes.

MR. LOEVY:  Should I ask a little more background?

BY MR. LOEVY:

Q.   All right.  Sir, all these years later, are you exactly sure which police officers were talking to you at what points?

A.   At what points?  The main points, yeah, but, you know, it's been a while.  So details for details, I don't recall.

Q.   Who were the main police officers interrogating you?

A.   Oh, it was Zalatoris and Breen.

Q.   And you recognize them here in the courtroom?

A.   Absolutely.

Q.   All right.  And they did most of the questioning?

A.   Just about.

Q.   Were there other police officers that would come in from time to time?

A.   Yes.

Q.   Tell us what you remember.

Fulton - direct

169

A.   Zalatoris and Breen were more of the -- more of, like, the bad cops.  They were ones that were more pushing the agenda of that you guys wanted to just get a payback beating and it went too far; to save myself; that they could help me, but first I had to help myself.  You know, they were the ones that were feeding me the stories.

The other officers were more like when they would come in, they would be more like are you ready to talk?  Are you ready to talk?  No.  Okay.  Walk out and leave.

Q.   All right.  When -- you mentioned the threats.  Were they making any promises?

A.   Yeah, they told me if I cooperated, I'd be able to go home.

Q.   And what did you tell them early on in this interrogation?

A.   That it wasn't me that did it.  It wasn't us.

Q.   All right.  Did they tell you anything about Precious Griffin?

A.   I believe so, yes.

Q.   Did they suggest -- what did they suggest to you?

MR. NATHAN:  Objection, foundation as well.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   You can answer when the judge --

A.   Okay.  Can you repeat the question?

Q.   Sure.

Did they show you Precious Griffin's statement, her

Fulton - direct

170

written statement?

A.   Yes, yes.

Q.   And do you remember reading through it what it said?

A.   Yes.  Her statement basically said that she talked to us and gave us directions to where Christopher Collazo was going to be at so we can get some payback beating.

Q.   All right.  Was any of that true?

A.   No.

Q.   Do you know why they showed you that?

A.   I guess they purpose now as I look back over it, it was to convince me that I'll be able to be a witness and go home just like her if I just cooperated.

Q.   And did the police tell you what happened to Precious when she cooperated?

A.   Yeah, they told me that she went home, that she was a witness, I believe.

Q.   All right.  What was the story that was in Precious's statement that the police were trying to get you to say?

A.   That she gave us -- to summarize it, that she gave us directions to where he was going to be at, that he was supposed to be getting off a bus.  And, yeah, that's -- that's it, I think.

Q.   All right.  Did -- and they told you that when she cooperated, she went home I think you said?

A.   Yes.

Q. All right. What were you supposed to do, according to what the police were telling you?

A. Just basically piggyback off her story, and they told me they were going to call assistant state's attorney in, and they would be the one to have the last say-so, so I would have to convince them that it was true. And in the event that I was able to convince them, then I'd be able to be let go home.

Q. How often did the police officers repeat their threats?

A. Regularly.

Q. And what were -- were there other threats you remember?

A. Yeah, you know, the ones I mentioned about my baby being taken away, Yolanda being arrested for concealment of a homicide, and, you know, me doing life in prison.

Q. All right. Did you want to do life in prison?

A. No.

Q. Did you remember if they mentioned the death penalty?

A. It's possible.

Q. How often did they repeat the promises that you could go home if you cooperated?

A. Regularly.

Q. All right. Did the police get increasingly frustrated or not get increasingly frustrated as you were denying it?

A. Increasingly frustrated.

Q. Did they start telling you that you were running out of time?

A.   Something like that.

Q.   All right.  Did you keep cooperating in terms of answering questions?

A.   Yes.

Q.   Did you ever refuse to answer a question?

A.   No.

Q.   Had you ever been in a situation like this?

A.   No.

Q.   Did you have any idea how to make it stop?

A.   No.

Q.   Did you ever ask to use the phone?

A.   Yes.

Q.   Tell us what happened.

A.   This is right after I had got done talking to an ASA by the name of McRay Judge, and this was --

Q.   I guess that's shooting ahead in the story, so --

A.   Okay.

Q.   To your recollection, you had not asked for a phone yet is my understanding?

A.   Not up until that point, no.

Q.   Okay.  Had the police asked you if you -- had they given you *Miranda* rights?

A.   No.

Q.   All right.  If the police would have told you, you have a right to remain silent, you don't have to talk to us, what

would you have done?

A.  I'd still talk to them.

Q.  You still would have talked to them?

A.  Yeah.

Q.  Why?

A.  I ain't got nothing to hide.  We ain't did nothing.

Q.  All right.  When they -- were the police in the room the whole time?

A.  While I was in interrogation room?

Q.  Yeah.

A.  Not all the time.  They would come in, leave out.  Come in, leave out.

Q.  What would you do when you were in there alone sometimes?

A.  Well, there's no chair, so you just sit on the floor.

Q.  So what would you do?

A.  Lay down, try to nod off.  But you're scared, you're nervous, so you're crying.

Q.  Did you cry?

A.  Absolutely.  I still cry today.

Q.  All right.  At some point, were you able to figure out the dates they were asking you about and work backwards?

A.  Yes.

Q.  So if they said to you where were you on March 9th, would that have had any meaning to you?

A.  No, not initially, no.

Q.   How did you figure out what was going on?

A.   Well, just going through your mental Rolodex.  You know, you're sitting still, you're scared, there's a lot of stuff going through your mind, so you're trying to find something in your memory that you can tell them where they can go and check it out to corroborate your story.

Q.   And what do you remember?

A.   I remember being at the hospital with Yolanda.

Q.   And when you figured out that that was the date they were talking about, the previous Sunday, I guess it would have been --

A.   Okay.

Q.   -- what -- what did you do?

A.   I told them.

Q.   You told who?

A.   The officers.

Q.   Tell me what you said.

A.   That I was at the hospital with Yolanda the night this happened.

Q.   And did you say you could prove it?

A.   Yes.

Q.   What did you tell them?

A.   I told them to go to the hospital and check.

Q.   Did they accept that?

A.   Not -- not at first, no.

Q. What do you remember happening?

A. I believe they told me they was going to check it out, but the main agenda was I need to stick to the story 'cause, you know, this story is what's going to allow me to be able to go home.

MR. LOEVY: All right. Your Honor, we did pass the quarter hour there. Is that --

THE COURT: Okay. If you insist.

We'll take a 15-minute recess.

MR. LOEVY: Thank you.

THE CLERK: All rise.

(Jury out at 10:48 a.m.)

(Recess at 10:48 a.m., until 11:07 a.m.)

THE COURT: Go ahead.

MR. LOEVY: Thanks, Judge.

BY MR. LOEVY:

Q. All right. Were they asking you -- you were describing they were asking you about this crime that you didn't know anything about, right?

A. Correct.

Q. Did you know the locations that they were asking you about?

A. No, not at the time.

Q. And now that you've prepared for trial, do you have an understanding on where the murder supposedly happened?

A. Yes.

Q.   Where was that?

A.   They say that it's supposed to start at Foster and Rockwell or something like that.

Q.   Foster and Rockwell.

A.   Yes.

     (Pause for technical difficulties.)

Q.   All right.  Did the police do anything to help you familiarize yourself with where this happened?

A.   Yes.  They took me, they took me out of the police station, and they drove me to Foster and Rockwell to show me where we were supposed to have seen him getting off a bus and then --

Q.   Before we leave there.

A.   Okay.

Q.   Had you ever been to Foster and Rockwell in your life?

A.   No.

Q.   Could you have been able to confess to committing a crime there if they hadn't educated you on what it looked like?

A.   No.

Q.   Where did they take you next?

A.   They took me to an alley not too far from there.  It almost felt like walking distance right up the street.  And then from there, they pulled in an alley, and they said that this is supposed to be where we supposed to duct taped and gagged him because he was supposed to be in the trunk of our car still making noise while we were driving, so we pulled over to gag

him and keep him closed, keep his mouth closed or something like that.

Q. Did you know the victim had been gagged?

A. No.

Q. Did you know what alley?

A. No.

Q. Had you ever been to this alley?

All right. Where else did they take you?

A. We left there, and then we got on the expressway and we got off at Garfield Boulevard, and they took -- they took me to, like, an alley, but right before we got off the expressway, they pointed to the gas station. It's a BP Amoco gas station on the corner.

Q. What were they pointing out this gas station to you?

A. They was telling me that's the gas station where you bought the gas can and got gas from.

Q. And what did you tell them?

A. "I have no idea what y'all talking about."

Q. Had you bought gas?

A. No.

Q. Had you bought a gas can?

A. No.

Q. Did you light Chris Collazo on fire?

A. No.

Q. All right. How -- who pointed out the gas station? You or

the police?

A.   The police.

Q.   Did they take you anywhere else?

A.   Yeah.  So we never -- we didn't stop in the gas station. We just drove past the gas station.  They pointed it out when we got off the exit.  And then they pulled into this alley, and they said that, "This is the alley that you guys took Christopher Collazo out the car."

And there was supposedly a refrigerator box already sitting right there, so we supposedly took him, put him inside the refrigerator box and then drove to the gas station, got a gas can with some gas, and came back and poured it all over the box and then light it on fire.

Q.   Was any of that true?

A.   No.

Q.   How did you find out that this is what had happened to the body?

A.   They were telling me this along -- as we're here at the scene, of course, with other details along the way.

Q.   This ride you took with the police, was this the only time you left the room, to your memory?

A.   Yes.

Q.   And did they take you anywhere else while you were on the ride in the car?

A.   Well, initially when we left the police station, they put

some gas in they squad car. And so the place where they put gas in the squad car was literally probably, like, walking distance, like, diagonally to McDonald's on the corner. It's a McDonald's. Because when we came out of them getting gas, we hopped right on the expressway to go to Foster and Rockwell.

Q. All right. Did they take you to see any other detectives or police officers or polygraphers?

A. Yes. They took me to 1011 West Homan where I end up meeting Officer Bartik.

Q. How did you happen to be meeting Officer Bartik?

A. Because I had told Zalatoris and Breen that if they didn't believe my story, and all of the officers for that matter, if they didn't believe my story, give me a lie detector test. Y'all think I'm lying, give me a lie detector test. Take me for a lie detector test if y'all think I'm lying. So it was either Breen or Zalatoris that came up with the idea, like, "You know what, Fulton, we going to take you," right.

So they took me to 1011 West Homan after we had did the canvass ride. And then when we got to 1011 West Homan, I was introduced to Officer Bartik. Officer Bartik instructed me that he was not my attorney. He was not a lawyer, so basically he wasn't there to help me in any type of way. He's just the administrator of the lie detector test.

Q. All right. What did you do? Did you cooperate?

A. Yes. I went in. He asked me to sign a form to take the

lie detector test. I signed the form, and immediately after I signed the form, Zalatoris told him, "Let me speak to you outside for a second."

Q. Then what happened?

A. So Zalatoris and Breen, they went outside to speak to Bartik in the hallway or wherever they was. I was still in the room. They closed the door. They came back, it seemed like 15 minutes later and Zalatoris said, "Let's get him out of here. This ain't going to hold up in court. Let's get him out of here."

Q. So did you ever get to take a lie detector?

A. No.

Q. Did they ever claim that you took a lie detector?

A. No.

Q. If they would have asked you questions, would you have answered them truthfully?

A. Yeah. I signed to take the test. I wanted to take the test.

Q. Why did you want to take the test?

A. Because I ain't did nothing.

Q. All right. Speaking of forms, did you also sign a form to consent to search your car?

A. And my home.

Q. Why did you sign the form to consent --

A. Because I don't have nothing to hide.

Fulton - direct

181

Q. Do you remember at some point if they put you in a lineup?

A. While I was in the police station, I believe they did. They told me that they -- I believe it was, like, they didn't have enough bodies or something to fill up the lineup. And so they just put me in there, but they didn't say the lineup was for me or nothing like that. It was just for me to...

Q. That's just what they told you?

A. Yeah.

Q. You don't have any idea who was in the lineup?

A. No.

Q. Do you know who saw the lineup?

A. No.

Q. All you know is what?

A. I was just told to just fill in a body. That's it, just fill in real quick.

Q. Did you participate in the lineup?

A. Yes.

Q. At some point, were you shown photographs to identify?

A. I believe so, yes.

Q. And some of the people that you knew?

A. Yes.

Q. All right. I want to now get back to the station. After you did the field trip with the officers, was there more interrogation?

A. Yes.

Q. And do you remember any more? Like, how many sessions, what sessions, who was when?

A. Well, I just know once me, Zalatoris, and Breen came back from our canvass ride and we went to, like I say, 1011 West Homan, from 1011 West Homan, we went directly back to the police station.

Q. All right. Had you -- do you know what time it was or what day it was --

A. No.

Q. -- at this point?

A. No. I'm not knowing time and days at this time.

Q. You woke up that morning at what time before you were arrested?

A. I want to say around 5:00, between 5:00 and 5:30 a.m.

Q. And then you're going now into the night into the next morning, presumably.

A. Yeah, it was nighttime because when we was on the expressway, it was night outside, yeah, but I don't know what time it was. You know, they don't have no clock inside the cars.

Q. All right. Did they let you sleep?

A. They didn't let me sleep, but when they wasn't in the room, I probably nodded off a little bit. But it seemed like as soon as I got to sleep, somebody was coming in the room to talk to me.

Fulton - direct

183

Q. All right. Was there beds?

A. No.

Q. Was there pillows?

A. No.

Q. Was there a problem with the temperature in the rooms?

A. Yes. It was cold in there.

Q. What do you remember about that?

A. Initially, it felt cool in there, like maybe they might have had the air-condition on a little bit but probably on low or something like that. And then a little while later, it got colder.

Q. All right. Did you get -- over time, did it ever get warmer?

A. No.

Q. Did you get fed?

A. No.

Q. Of the four days you were in custody there, how many times did you get fed?

A. They didn't feed me not one time.

Q. Were you getting stressed in that room?

A. Stressed?

Q. Yes.

A. Absolutely.

Q. You mentioned before the break that -- the threats and the promises. After you came back from the field trip, did they

Fulton - direct

184

continue the threats and the promises?

A.   Yes.

Q.   Can you explain?

A.   Well, it was, "Hey, listen.  So we just did the canvass ride.  You're familiar with everything.  Let's go over the story.  You can save yourself this way 'cause other than that, not cooperating, you're not going to go home.  So let's go along to get along.  The guy was a bad guy," you know.

Q.   What guy was a bad guy?

A.   They're saying Collazo, Collazo was a bad guy.  "So, you know, you guys just wanted to do a little payback beating.  That's all.  And it just went a little too far, right.  You just need to stick to the story that we're trying to give you.  We're trying to help you, right.  Stick to the story, but you have to convince McRay Judge."

Q.   Who is McRay Judge?

A.   This ASA, the State's Attorney.

"You have to go in there.  He's going to be here.  You gonna be in a room with him.  You gonna have to tell him this story."

Q.   Did you believe if you cooperated, you could be a witness and go home?

A.   Yes.

Q.   Now, you are no longer an 18-year-old person, right?

A.   That's correct.

Q.   Can you describe exactly what an 18-year-old person was thinking back then?

A.   At that point it was, I just wanted to go home.

Q.   Would they have been able to convince an adult version of yourself, a present version of yourself?

A.   Not at all.

Q.   Were they able to convince an 18-year-old version of yourself?

A.   Yes.

Q.   Once you agreed, "Fine, I'll cooperate," did they go over the story with you?

A.   Yes.  We rehearsed the story probably, like, three or four times.  There were still some details about the story that were off according to them, so we kept rehearsing and rehearsing it. And then right before I went in, it was kind of like, "Hey, listen, you know, just stick to the story."

Q.   All right.  Let's go over some of the details in the story. The confession talked about between, you know, 9:30, 10:30, somewhere in the evening hours.  How did you know when the abduction supposedly happened?

A.   They told me.

Q.   Did you have any idea when Chris Collazo last was seen or heard from your own mind?

A.   No.

Q.   How did you know that supposedly he was abducted getting

Fulton - direct

186

off the Foster bus?

A.   It's the story that Zalatoris and Breen told me.

Q.   And you said you had access to Griffin's written statement?

A.   Yes.  They showed it to me.

MR. LOEVY:  And, your Honor, we'd move into evidence Plaintiff's Exhibit 40.  This is Griffin's statement.

THE COURT:  Any objection?

MR. NATHAN:  No.

THE COURT:  Exhibit 40 is received in evidence.

(Plaintiffs' Exhibit No. 40 was received in evidence.)

BY MR. LOEVY:

Q.   Do you recognize this statement?

A.   Uh-huh.

Q.   All right.  And you said -- did they let you read it?

A.   I do recognize the statement, and I did read it, yes.

Q.   All right.  Did that familiarize yourself with what the story they were trying to get you to say?

A.   Yeah.  It almost made me feel like they were trying to help me because they told me that they did the same thing with Precious, right, and Precious was able to go home.  I seen the statement.  I didn't know it was her signature, but I would assume it looked like hers because it had scratch-outs with her initials on it.  So it looked like something that somebody 16, 17 would write, right.

And so since she -- they said it happened for her, I

kind of figured, okay, well, maybe this is what they want.

Q. Did you think it was appropriate to let one witness see what the other witness was saying, or did you not know either way?

A. I ain't know either way. I wasn't no lawyer.

Q. Where did you get the information like a bat and duct tape and a gag?

A. That all came from Zalatoris and Breen.

Q. Would you have had any knowledge about duct tape if they --

A. No.

Q. How about the address, 5228 South Peoria? How did you know that?

A. That came from Zalatoris and Breen.

Q. Did they show it to you?

A. Yes.

Q. How did you know there was gasoline involved?

A. Because that's where they told me, "You bought the gas can from this gas station" because that was a part of the story.

Q. Was -- the part of the story about you being on the phone with Precious, what was your understanding of what the story was?

A. That I -- that I was on the phone with Precious and that Precious was giving me and Riff and Stick instructions to where the victim would be getting off a bus.

Q. Okay. Did that ever happen?

A.   No, it never happened.

Q.   So were you concerned that if you told the story, the phone records were going to show it was false?

A.   Was I concerned that the phone records were going to show it was false?

Q.   Yes.

A.   I figured that the video footage from the hospital would prove my innocence.

Q.   All right.  Did they bring in the State's Attorney?

A.   Yes.

Q.   Do you know how many days had gone by or hours before --

A.   No.

Q.   -- you talked to McRay?

A.   No.

Q.   And what was your job with the State's Attorney as you understood it?

A.   To convince him that we did it, you know, just a little payback beating for the robbery, nothing -- nothing major just, it just got out of hand.

Q.   All right.  Did you tell him the story that had been rehearsed?

A.   Yes.

Q.   After you were done telling the State's Attorney the story, what happened next?

A.   I literally heard my grandmother's voice in my head telling

me, "Baby, tell the truth."

Q.   All right.  And what did you do?

A.   I asked could I speak to them alone -- could I speak to McRay Judge alone.

Q.   You asked to speak to the lawyer alone?

A.   Yeah, the ASA.

Q.   Had Breen and Zalatoris been in the room while --

A.   Yes, they was in the room from the very beginning of the interview.

Q.   Why did you want to speak to McRay alone?

A.   Because I wanted to tell McRay the truth with them not in the room.

Q.   Did they leave the room?

A.   Yes.  He asked them to leave.

Q.   And then what happened?

A.   I told McRay Judge that the story that I had told him was a lie, that they had fed it to me; and it was the fat detective that told me that if I came in here and told you this story that I'd be able to go home like Precious did.

Q.   Were you clear to McRay Judge why the story was false, like why you were saying it?

A.   Well, I told him that me and Yolanda were at the University of Chicago Hospital the day it happened.

Q.   And do you think he understood what you were saying?

A.   Well, he told me he was going to go check it out.

Fulton - direct

190

Q. Why didn't you tell McRay that while the police were still in the room?

A. Because while we was prepping for that, it seemed like that wasn't the story that they wanted me to tell. So I figured that I'll tell them, I'll tell them I'll go along with it since the paperwork showed that Precious had potentially did the same thing, and she was able to go home. So I would go in there and tell them but it just, it didn't sit right with me saying it.

Q. All right. When you told the State's Attorney that it wasn't true, what did he do?

A. He started asking me details about how did I know certain details of the case.

Q. What did you tell him?

A. And I told him, "This is the story that we had been rehearsing before you got here."

Q. All right. What -- did he leave? What did he do next?

A. He told me he was going to go check out the alibi. And then he walked out the room, and he told Zalatoris and Breen what I had did. And then from that point on, both of them were -- excuse my French. They was pissed. They was mad.

Q. All right. What -- did they come back in the room?

A. Yeah.

Q. How could you tell they were mad that you had told the State's Attorney that the confession that they had --

A. Because I seen the anger on Zalatoris' and Breen's face.

Q. Did they do anything to you?

A. Well, they -- one of them snatched me out the room. And then on the way back to the interrogation room, I asked Zalatoris could I use the telephone. And he told me I couldn't use the telephone unless I wanted to be charged with murder. So since I didn't want to be charged with murder, I made my way on to the room with 'em.

Q. And when you said "snatched," did it affect your clothes at all?

A. Yes. The only thing I had on at that time was a T-shirt. I had a T-shirt on, my jogging pants, and my Kenneth Cole school shoes.

MR. LOEVY: Now, you were shown -- I'm going to show you the arrest photo. This was shown in opening. This is Defendant's Exhibit 154, Page 1.

Permission to publish this then, your Honor.

MR. NATHAN: No objection.

THE COURT: All right. It's received in evidence. You may publish this as what? Exhibit 1?

MR. LOEVY: No. 154, Page 1.

(Defendants' Exhibit No. 154 was received in evidence.)

BY MR. LOEVY:

Q. Is this the coat and the shirts you were wearing when you were arrested?

A. Yes. That's my Phat Farm coat with a De La Salle sweater

with a T-shirt on under there.

Q.  And there was a suggestion that this is how you looked when you left police custody four days later.  I want to show you Plaintiff's Exhibit 73, Page 2.

MR. LOEVY:  Permission to publish, your Honor.

MR. NATHAN:  No objection.

THE COURT:  You may publish.  It's received in evidence.

(Plaintiffs Exhibit No. 73 was received in evidence.)

BY MR. LOEVY:

Q.  Which photo showed the before and which was the after?

A.  This is how I looked afterwards.

Q.  All right.  Did this show anything with your shirt?

A.  Yes.  As you can see, the collar of my shirt is stretched out like I'm wearing my daddy's clothes.

Q.  And how did that happen?

A.  Either Zalatoris or Breen had grabbed me by my collar when I left up out of the ASA.  This is the part when they was mad when I was on my way -- they was taking me back to the interrogation room after I didn't cooperate with they story.

Q.  Did they do anything physical to you?

A.  Yes.  In that time I was in the room, and Zalatoris and Breen brought me in the room.  At that point, Zalatoris had basically said in a nutshell that I had messed up, my baby was getting ready to be taken to DCFS, that Yolanda would be

Fulton - direct

193

arrested for concealment of a homicide, and I was getting ready to go to prison for the rest of my life, that they could keep me here as long as they wanted to until the case closed, that I done really f'd up.

And then at that point, Zalatoris, he hit me with the palm of his hand. And after he hit me, I fell to the ground, and then that's when he put his feet on me a couple times.

Q. All right. How did that make you feel?

A. It felt, made me feel like I should have stuck to the script that he wanted me to stick to.

Q. Did you think that maybe you were going to get him in trouble if you told the State's attorney they had told you to give a false confession?

A. I figured that the way they addressed it to me was that the ASA was the one that had all the control, right. So if the ASA is the one that got all the control and can be the one that has the keys to open the door to letting me go home, then why not tell the police officer leave and tell him the truth.

Q. Did you --

A. If he finds out it's the truth, he can get me out.

Q. Didn't you consider whether it might get them in trouble if you said that they rehearsed the false statement?

A. I was trying to go home.

Q. All right. How many hours and days go by until -- you know, until the next thing happens?

Fulton - direct

194

A.   I don't know.

Q.   You do know today how long you were in custody, right?

A.   Yes.

Q.   How long were you in custody?

A.   I believe 108 hours or 104 hours or something like that.

Q.   Starting on the morning of the 18th --

A.   At 5:30, yes.

Q.   -- Tuesday.  You're there all day Wednesday?

A.   Uh-huh.

Q.   You're there all day Thursday?

A.   Yes.

Q.   And do you know today how long you were there on Friday?

A.   I believe I left out the police station at night at probably, like, 8:00 o'clock, 8:45 or something like that.

Q.   All right.  Do you recall how many detectives interrogated you?

A.   No.  It was a lot.

Q.   Do you know now from the records the names of some of the people who interrogated you?

A.   Yes.

Q.   Who?

A.   For sure Zalatoris and Breen, Girardi, Rolstein.  The rest of the names, if you name they names off, I can affirm or deny 'em.

Q.   All right.  Were they playing any good cop/bad cop?

A.   Zalatoris and Breen was.

Q.   Did you meet a second State's Attorney in there somewhere?

A.   Yes.  ASA Rubinstein.

Q.   And can you say exactly how much time had gone by before you met Rubinstein?

A.   It was not too much longer after Zalatoris had assaulted me.  It was probably, like, some hours after that.  It felt like probably the same day maybe.

Q.   What do you remember about the first meeting with Rubinstein?

A.   He introduced his self just like McRay, told me that he wasn't my lawyer and that he wanted me to tell him the truth, tell him what's gong on.

Q.   And what did you tell him?

A.   I told him that I was in the hospital with Yolanda when all this stuff happened.

Q.   Did you tell him that you were guilty or innocent?

A.   Innocent.

Q.   So this is now the second State's Attorney you've told you're innocent?

A.   Yes.

Q.   Did they let you give a statement saying you were innocent?

A.   I spoke to Rubinstein, and I told him what I was.  And he told me he was going to check it out.

Q.   Did he go get a court reporter and say, "All right, we're

going to" --

A.   Nah, no court reporter.

Q.   Did he let you sign something saying you were innocent?

A.   He wasn't even -- none of them was writing during none of the time.

Q.   All right.  Did he seem to accept it when you told the second State's Attorney you were innocent?

A.   Yes.

Q.   What do you remember happening next?

A.   It's blurry.

Q.   Was there more interrogation?

A.   Say it again.

Q.   Was there more interrogation?

A.   Yes.

Q.   Did they tell you anything about Riff and Stick?

A.   I believe sometime after I talked to Rubinstein, they ended up arresting Riff, and they brought him into an interrogation room that was right next door to mine.

Q.   How do you know that?

A.   Because I heard him talking, and I started talking to him under the door in the door crack.

Q.   All right.  What were you guys able to converse?

A.   He wanted to know what was going on.  I told him I had no idea what was going on.  He asked me how long I had been there. I told him a while.  I told him I hadn't been able to talk to

nobody, but I told him don't worry about it, Yolanda going to call, my grandmother, my grandmama going to get the lawyer down here. Just whatever you do, just tell the truth, you're going to be okay.

Q. Do you know why the police put you in rooms where you guys could communicate? You wouldn't know?

A. I don't know.

Q. All right. Did they tell you anything about what Riff was going to do as the interrogations went on?

A. Yeah. It became where, we're going to offer a deal and, you know, whoever takes the deal first is going to be able to go home.

Q. And tell us more about that.

A. They said that they were going to speak to him and talk to him, and if he decided that he wanted to tell the truth and cooperate then, you know, I'd be going to jail for murder.

Q. At some point did they take -- did it become harder for you to deal with the cold? Did they --

A. Yes. So after -- after we had the incident, after the McRay Judge situation, when they took me into the room after I was assaulted by Zalatoris and Breen, the room just seemed like they turned the AC up. Like, now it's to the point where I'm almost shivering, where I got my hands inside my T-shirt, right.

And then on the midnight shift, of course there was

different officers because I'm asking for Zalatoris and Breen. And the guys, the officers that's there is telling me they're not there no more, right. So now I'm asking, "Can I get my sweater? Can I get my coat?"

Q. What happened to your sweater and your coat?

A. They took it.

Q. All right. Did anybody give you your sweater and your coat?

A. No.

Q. Did anybody give you a pillow or bedding?

A. No. The only thing that they gave me was, you know how you go to the hospital and you getting ready to take an x-ray and they give you the little gown where you got your whole back open, your behind and everything. They gave me that to cover up with. So I turned it inside out and tried to turn it this way to try to tie it up in the front.

Q. Were you able to get, during this period of time, any deep sleep?

A. No.

Q. Why not?

A. Mainly 'cause I'm scared and also because it's, like, every time I nod off, it seemed like it's somebody coming in the room.

Q. Why didn't you tell them, "Hey, guys, cut it out, I need some sleep"?

A. Man, I tried telling them the truth and I got my behind whupped, so it's like I ain't trying to tell them nothing other than I'm ready to go home.

Q. Was there -- to an 18-year-old young person, was there an authority figure situation at play here?

A. Yeah. They was the authority figures, and I was the child.

Q. Were you able to boss them around or tell them what to do?

A. No.

Q. As a student, a high school student, were you used to being obedient to authority figures?

A. Yeah. I cooperated. That's the way I was raised.

Q. At the time, did you have anything against police officers or any reason to distrust them?

A. No.

Q. All right. How about the food? You said you did not get food. Were you -- were you asking for food?

A. Probably not. Ain't no telling. I don't know.

Q. Tell the jury what you mean.

A. Well, I was trying to go home, so kind of, like, eating wasn't on my first agenda, you know. I'm trying to get up out of here. We can get food later when I go home.

Q. You didn't know when it was going to end obviously, right?

A. No. They told me, they told me I could be there as long as they needed me to be there until the case closed.

Q. All right. In terms of your hierarchy of needs then, was

Fulton - direct

200

food up there on the top of the priority?

A.   Yeah.  With freedom, yes.

Q.   What was ahead of it?

A.   Freedom.

Q.   All right.  How can you explain then going that long without food and not begging for food?  Explain.

A.   I guess adrenaline.

As far as being able to drink, I asked them, you know, when I was allowed to use the bathroom, inside the bathroom, you know, when you push the button, the water doesn't come all the way out.  It streams on the little sink.  So I would put my hand up under the sink and then drink in my hand to get some water.

Q.   Were you demanding a lawyer?

A.   No.

Q.   Why not?

A.   I didn't know nothing about to demand a lawyer or none of that.  I didn't know.

Q.   Did you ask for a phone call?

A.   Yes.

Q.   Tell us what -- how many times would you estimate you asked for a phone call?

A.   Probably a few times, but after the first time, it wasn't really nothing serious to ask for no more because I know they told me I couldn't use the phone unless I wanted to be charged.

Fulton - direct

201

Q.   Did you want to be charged?

A.   No.

Q.   As the days went on, did Zalatoris and Breen start asking you when you were going to start cooperating?

A.   Yes.

Q.   Did they tell you anything about what happened to Riff?

A.   They told me that Riff was cooperating and that Riff was going to get the deal and that it was too late.

Q.   And did you have any reason to believe them that Riff was cooperating?

A.   Well, he was no longer in the room right next door to me, so I kind of felt like everything was probably lining up the way they said it.

Q.   Which was --

A.   You know, they had already shown me Precious' statement and said that she could be a witness.  Now that Riff was right here, now they took him away from me, and now they said that he had gone home because he was going to get the deal.  So it was kind of like, man, I'm lost, like.  I need to -- I need to save myself.  I need to cooperate.

Q.   You believe that Riff had cooperated and been sent home?

A.   At that point, yeah.

Q.   Did they tell you at some point that you were running out of chances, last chance?

A.   Possibly.

Fulton - direct

202

Q. Do you know how much time had gone by at that point or at the point when you gave up?

A. No.

Q. Did you eventually agree to talk to the State's Attorney a third time?

A. Which -- Rubinstein?

Q. Yes.

A. Yes.

Q. And what happened at that point?

A. I decided to cooperate.

Q. Why?

A. I was tired, man. I was tired. I was scared.

Q. Had you already told Rubinstein you were innocent?

A. Yes.

Q. How did it go the second time?

A. I just told him that, "The story that I told you was BS and that I really want to tell you the truth this time."

Q. All right. Is that a smart decision?

A. Now looking over it, no.

Q. All right. Do you feel embarrassment about having thought that if you did what the police were saying, you could go home?

A. No.

Q. Do you feel shame?

A. No.

Q. Why not?

A.   I was 18 years old.  I didn't know nobody.  I didn't know anything.  You know, they trained professionals.  This is what they do for a living.

Q.   How did you first find out there was a lawyer looking for you?

A.   When he showed up.

Q.   What happened then?

A.   He showed up.  I was happy to see him.  And the first couple of words I told him out of my mouth is, "Man, I'm getting ready to go home.  They getting ready to let me go home."

Q.   What did you mean?

A.   Because they had told me that the only thing I needed to do was do what I did the first time but don't renege on the story, tell Rubinstein, convince Rubinstein that it happened and that we are going to formalize it, and you'll do a videotape confession and then once you do the videotape confession, you're ready to go home.

     So I told him I'm getting ready to go home, you know.  I'm just waiting on Rubinstein.

Q.   Did singer -- the attorney, what's his name?

A.   Elliot Zinger.

Q.   Did he give you any explanation for why it had been four days since he got there?

A.   Well, he told me that he had drove around from police

station to police station trying to find me, and all the police stations told him that I wasn't there.

Q. And then when he finally found you and you told him all you had to do was give a statement, you could go home, what did he tell you?

MR. NATHAN: Objection. Hearsay, foundation.

THE COURT: Lay a foundation.

MR. LOEVY: All right.

MR. NATHAN: Your Honor?

MR. LOEVY: What were you saying to Zinger?

MR. NATHAN: One second.

Your Honor, may we have a quick sidebar?

MR. LOEVY: I think I can lay a foundation, your Honor.

THE COURT: I don't see that it's hearsay.

BY MR. LOEVY:

Q. All right. The question, sir, is what did you say to Zinger?

A. I told Zinger that they getting ready to let me go home, that I just have to wait on Rubinstein, as soon as Rubinstein gets here. They told me I need to do a videotape confession to formalize it and then after that, I be ready -- I'd be able to go home.

Q. So if you were a witness statement and you cooperate, you get to go home?

A.   Yes.

Q.   And what did Zinger tell you?

     MR. LOEVY:  And it's not being offered for the truth.
It's being offered for the effect on him.

BY THE WITNESS:

A.   He asked me had I did anything, and I told him no.  He
said, "Well, if you ain't did nothing, I don't think that's a
bright idea because they're not going to let you go home."

Q.   Did you believe him?

A.   No.  I fought with him.

Q.   What do you mean?

A.   They just told me I'm getting ready to go home.  And Riff
left already.  He gone.  Precious go home.

Q.   Did you decide to follow your lawyer's advice?

A.   Yes.

Q.   And so what happened?

A.   When they came in and told me that Rubinstein was there, I
told him, "On advice of my attorney, I don't want to speak
anymore."

Q.   All right.  What happened next?

A.   They walked out the room, and that was it.  It was kind of
like a ghost town after that.

Q.   All right.  What were you experiencing?

A.   I was scared.  I was afraid.  I didn't know what was about
to happen.

Fulton - direct

206

Q. What happened next?

A. I thought I was going home because they came to the door a while later, opened the door and was, like, "All right. Let's go. You can go."

So I'm thinking, this is my freedom. And as I'm getting ready to walk out the door, they cuff me. Out the interrogation room, they cuff me. And I'm like, "Why are you guys cuffing me?"

And they say, "Oh, it's just protocol."

So I'm like, "All right. Fine."

So then they walk me down the hallway, and then I end up, they walking me down to another hallway. And they open the front, the first door to that hallway, and then Riff is sitting there, right. He's sitting there. He got food and everything.

And I'm like, "Wait a minute. I ain't getting no food. Where my food? Let me get some."

So I asked Riff, could I have some of the food. And they said no. They told him, come on out. So he stepped out. And when he stepped out, they uncuffed one of the cuffs from my hands and cuffed me to him, right. And then they walked us down the hallway. And at the end of the hallway, they opened another room, and then that's where Stick was, and he had food in there, right.

And so Stick came out, and then they cuffed -- so Riff was on one side cuffed to me, and Stick was on the other side

Fulton - direct

207

cuffed to me. I don't know whether it's left or right, but we was cuffed together.

MR. LOEVY: All right. Your Honor, at this time, we'd move Plaintiff's Exhibit 73 into evidence.

MR. NATHAN: No objection.

THE COURT: All right. Exhibit 73 is received in evidence. You may publish.

(Plaintiffs' Exhibit No. 73 was received in evidence.)

BY MR. LOEVY:

Q. All right. This is a document showing Polaroids signed by Breen and Zalatoris, four Polaroids.

Who is the Polaroid on the top left?

A. That's Anthony Mitchell.

Q. And what does he have in front of him?

A. He's got food.

Q. So that's a Polaroid showing that he's been fed --

A. Yes.

Q. -- so he can't dispute it later?

A. Yeah.

Q. How about Mr. -- who is this?

A. That's Antonio Shaw.

Q. Is he also photographed in the presence of food?

A. Yeah. He's got a pop with some food in his hand, and Mitchell's got a bag of food, looks like, between his leg with a pop sitting next to him.

Fulton - direct

208

Q. And who is this?

A. That's me.

Q. All right. Back to the story then. You're cuffed. And where do they take you next?

A. We're led into a paddy wagon that's parked in front of the police station, and then from there, we're taken to another police station.

Q. Now, you hadn't actually gone through and given a -- a recorded statement or a taped --

A. No.

Q. Your attorney told you not to and you didn't?

A. Correct.

Q. Where did you think you were going to get to go at that point?

A. I thought I was getting ready to go home.

Q. Where did you go?

A. They end up taking us to another police station. And when I got to that police station, they uncuffed us. Me and Riff went into a cell together with bars, and Shaw, they told him to sit at the front -- well, not at the front desk, but it was a desk in a room that we was in. And he sat up front at the desk because he had to go to the Audy Home because he wasn't old enough to go where we were going.

Q. How old was he?

A. He was 15.

Q. All right. Did you ask for a phone at some point in there?

A. Yes. We asked for a phone call. They gave us a phone call. And Riff called his mom and his sister.

Q. And who did you call?

A. I tried calling my grandmother and my auntie but obviously, it was, like, maybe somewhere between -- it was sleep hours. So it was somewhere between 1:00 a.m. and 5:00 a.m. in the morning.

So I know if my family is not answering the phone, it's got to be because they're asleep, right. And so I knew it was nighttime because we just walked and got into the paddy wagon, so I know it was dark outside.

Q. Had you known that your grandmother had been to the police station with Zinger? Is that something you knew at the time?

A. My grandmother -- well, Zinger told me that my grandmother was in the car.

MR. NATHAN: Objection. Foundation. Hearsay.

MR. LOEVY: All right. Leaving aside -- he's right. I agree to strike that.

BY MR. LOEVY:

Q. Leaving aside what you were told, had you known that your --

A. No.

Q. Okay. Where did they take you? Did you find yourself in a bullpen?

Fulton - direct

210

A.   That happened the next day, but yes.

Q.   Where did they take you to?

A.   They took me out of that police station -- and that police station was the first time I ate too.  They took me out of that police station.  Then they took me to 26th and California.

Q.   And where did they put you at 26th and Cal?

A.   Me and Riff was inside of a bullpen.

Q.   What's a bullpen?

A.   A bullpen is a caged cell where there's benches.  There's a toilet with a sink connected.  And that's it.

Q.   All right.  Had you ever been in a bullpen?

A.   No.

Q.   How many guys in there?

A.   It was a lot of people in the bullpen.

Q.   Was it a scary experience?

A.   Yeah.

Q.   Who was the youngest?

A.   I mean, we is.  We surrounded by grown men.

Q.   All right.  Did they write anything on you?

A.   Yeah.  They wrote what I learned to be an ID number that we was going to have to memorize throughout the time of us being in the county jail.

Q.   What was your ID number, sir?

A.   My ID number was 20030021482 -- 1483.

Q.   And it was written right there on your arm with what?

A. That was my inmate number.

Q. No, what did they write it with?

A. Oh, they wrote it with a marker.

Q. How did that make you feel?

A. Like a slave.

Q. At what point did you find out you were being charged with murder?

A. I believe I asked one of the officers, one of the sheriffs that was there what we were being arrested for. And I believe either he told me, or it was either when I went in front of the judge in bond court that I heard all the charges.

Q. How did that make you feel?

A. Like I wasn't getting ready to go home.

Q. All right. Were you scared?

A. I was scared. I was scared to death, man.

Q. All right.

A. I was an 18-year-old kid. I ain't never been to jail before. Now you putting me in here around all these grown men. There's people throwing up in here. It smell bad in here. It's a scary place.

Q. All right. Did you start telling people that you didn't belong there?

A. Man, I started talking to every cop I could.

Q. What did you say?

A. "Hey, man, they got the wrong people. Me and Riff ain't

did it."

Q. Anybody in particular that you remember?

MR. NATHAN: Objection.

BY THE WITNESS:

A. Yes. One of the --

MR. NATHAN: Objection. This is hearsay.

MR. LOEVY: It's what he said. He's professing contemporaneously his innocence. I'm not saying --

MR. NATHAN: Objection. Bolstering.

THE COURT: I haven't -- I don't have the question in front of me. What was the question?

BY MR. LOEVY:

Q. First I said, the foundation is, were you telling people you were innocent?

A. Yes.

Q. All right. Do you remember some of the people you told?

A. Yes.

Q. Who did you tell?

A. A specific officer, a Cook County sheriff. He's retired now. His name is Mike Washington.

Q. What do you remember about that?

A. He was -- he was a black brother that was at the -- so he would sit at the table right before you go and see the judge, get on the elevator to go to the courtrooms. So he was there right in front of the bullpen. He's in charge of all the guys

Fulton - direct

213

that's in the bullpen.

So I asked could I speak to him alone. He came to the bullpen, walked up to the bars, and we spoke to him.

Q. What did you tell him?

A. "We innocent. We not supposed to be here, man. They got this wrong, man."

Q. Did you make a relationship with him over time?

A. Yes.

Q. Tell us about that.

A. Well, over the course of the almost four years I was in the county jail, he worked there. And I would see -- we would see him all the time when we went to court, right, because he's the officer right before you get on the elevator to go upstairs to the courtroom.

And so usually when we go to court, we see him walking past because we have to check in with him. And then usually when we come back from court, we have to check in with him too because he's the one that's going to call for transportation to take me out of the court building to where the other inmates are housed.

Q. Did he show you kindness?

A. Yes.

Q. Did he -- being a young person, was he able to protect you a little bit?

A. Yes.

Fulton - direct

214

Q. Tell us about that.

A. So when we used to come to court, he would allow us to be the last persons to go to court. So basically, everybody goes in the bullpen right before court, right. You go in the bullpen. And then the judge, when they take the bench, they have a docket, and they read off the docket. And the people come out the back. The inmates come out the back that's arrested, and they hear their court cases.

And so usually what would happen is, they would kind of, like, make our case as last as far as the bailiffs taking us downstairs. So it would be another group of guys that would already leave out that would make the transportation team. So they would make sure that they had enough people to transport first, and then they'll leave me and Riff behind so we can clean up.

And they would feed us, allow us to eat whatever they brought to work: Chicken, Chinese food. None of the baloney and the food that we eat inside the jail.

Q. All right. When this was all over and your conviction had been overturned, did you go back and find Mr. Washington?

A. I absolutely did.

Q. What do you remember about that?

A. I wrapped my arms around him, and I cried with him.

Q. Did you thank him?

A. Yep.

Q. All right. They took you to the County. How long did you stay at the County? I think you mentioned it, but can you just tell me how long?

A. It's close to four years. Three years, nine months, and some days.

Q. Were there bond hearings?

A. Yes.

Q. Were you able to get bond?

A. No.

Q. What do you remember about those bond hearings?

A. Well, initially when I went in front of the judge, the State had asked for me to have a "no bond" because they said that the murder was a heinous murder and that I was supposed to be the ringleader or something like that.

And so there was a "no bond" for me, but they gave Mitchell, they gave Riff a bond and they gave Stick a bond. They bond was $1 million, $100,000 to walk apiece.

Q. All right. At the bond hearings, was there ever any evidence introduced against you other than your confession?

A. No.

Q. When you got sent to the Cook County Jail as a young person, were you -- what were your emotions?

A. It was a scary place.

Q. What was it like?

A. Most of the people on the wing where I was were older than

me.  They were, like, not my dad's age but they were either my -- if I had an older brother, an older brother's age, right. These were men, somewhere between 25 and older.

Q.   When you first got there, did you experience violence or witness violence?

A.   Yeah.  The first week I was there, actually the day that my attorney came to visit me, I had an attorney-client meeting.  I went and met him, and I told him there, like, "Man, look, these guys, they got knives in here.  Man, it's crazy.  It's fist-fights.  It's stuff going on in here, man.  You need to get me up out of here."

And he like, "Man, we're working on it.  We're trying to set a bond hearing.  We're trying to work on it."

The minute me and him left out the room and he went downstairs and they put me back on the wing, when I walked back to the wing, all -- everybody on the wing was in a full circle. They was all standing around in a circle.

And so I didn't know nothing.  This is my first week here.  So the first thing I did, I went and walked in the middle of the circle and, like, "Hey, what's going on, y'all?" The TV wasn't unplugged, but everybody was just standing around looking at each other.

And then somebody told me, "Hey, look, man, you need to get out the way, man.  It's about to be a fight going on. You need to watch out."

So they pulled me out the middle of the circle, and then two individuals started fighting. And then the fighting escalate, and a knife was produced. And then I watched an individual get a knife shoved through his chest.

Q. Was that an easy thing to watch?

A. No.

Q. Did you over the course of your incarceration witness all kinds of violence?

A. Yeah.

Q. Is it difficult to experience and witness violence?

A. Yeah.

Q. What division were you put in?

A. Initially I was put in Division 11, super max.

Q. What does super max mean?

A. It means you have to have a case that's got aggravating factors like murder, armed robbery, rape. It's got to be violence.

Q. Did you know a soul there in super max Division 11?

A. No.

Q. If you're scared, and I think you said you were, are you supposed to show it in there?

A. No.

Q. What happens if you show fear or show weakness?

A. So you get preyed upon. They end up treating you the same way the cops treated me in the police station.

Q.   What was your strategy to survive and avoid the violence?

A.   Mind my business and stick to my cell.  My grandmama always told me, "Baby, you want to live long in this life, you got to follow the rules.  You don't seen nothing.  Be the three little monkeys.  You ain't seen nothing, you ain't heard anything, you don't know nothing.  Mind your business, you're going to live a lot longer."

Q.   All right.  Did you attempt to implement that strategy in the jail?

A.   Absolutely.

Q.   Were there times when you would cry?

A.   Yeah.

Q.   Were you in there with Riff?

A.   He was in a different division.

Q.   Were you able to finish high school in the Cook County Jail?

A.   No.

Q.   Was it -- was there a school wing?

A.   Yes.  They did have a GED program in the Cook County Jail, but most of the kids, most of the people that were on the school wing were kids, and the kids were young gangbangers.  So it was like --

Q.   Young what?

A.   Gangbangers.

     And so it was, like, it would almost be like a suicide

mission for me to go join the school wing. Like, I can go and join and try to get a GED, but I'm going to be subjected to what's going on on the wing.

Q. Was the school wing with the very young prisoners a dangerous place?

A. Well, they were inmates at the time, but yeah.

Q. In some ways were the young people more dangerous?

A. Yeah.

Q. Can you explain?

A. Because, you know, being young, you feel like you know everything, right. So you don't want to listen to authority figures at times. You know, it's being young, thinking you grown.

Q. Was it dangerous to be in the Cook County Jail and not be in a gang?

A. Yes.

Q. Did you consider joining a gang in jail to protect yourself?

A. No.

Q. Was there a time when you were in cells with gang members?

A. Yes.

Q. Can you give us an example?

A. You don't get to pick your cellmates that go in the cell with you. And so they moved guys around all the time. So you might end up in a cell with a person you really like and that

Fulton - direct

220

you all really get along good with, and then all of a sudden out of nowhere they will move him and put somebody in there, and they'll be the total opposite of the type of person that you get along with, but you deal.  It's jail.  You don't have no choice.

Q.   Was there a time you had a high-ranking gang member in your cell?

A.   Yes.  When I first -- when I first moved into the County Jail, the first cell I went into, my cellie name was, his nickname was 49th.  He was from 49th and Federal from the Stateway project buildings.  He was what they call the overseer for the Gangster Disciples.

Q.   How often would you go to court?

A.   Once every 30 days or once every 60 days or once every 90 days.

Q.   What would happen at these court hearings?

A.   Continuances.

Q.   Did you feel powerless or powerful?

A.   Powerless.

Q.   Can you explain to the jury?

A.   'Cause it seemed like more days was going by.  You know, I'm talking to my grandmother on the phone.  She crying.  My family destruct.  My son is six months old.  Yolanda is at home trying to raise a baby by herself.  It's like my world been torn apart, and I don't know how I got here.

Fulton - direct

221

Q.   Were you thinking that it was going to get cleared up?

A.   The truth shall set you free, is what I was always told.

Q.   All right.  Were you asking or were you -- in court, were you hoping that it was going to progress and it was going to be resolved?

A.   Yes.  I hired -- I hired attorneys to fight the case and I thought -- I thought the truth would come out.

Q.   Did you know it was going to take that long to get to trial, four years or three years?

A.   No.

Q.   Did you believe you were going to be released?

A.   Yes.

Q.   Now, as you got closer to trial, who was your trial attorneys?

A.   Elliot Zinger and Richard Beuke.

Q.   And was there an issue involving the documentation, that you remember, shortly before the trial involving the polygraph form, for example?

A.   I just remember at some point in pretrial motions, my lawyer put me on the stand during a motion to suppress to speak about that the police had drove me around to all these different places and that I had signed to take a lie detector test.

But up until that point, there was no evidence of me ever leaving the police station at that point, and so they were

asking me about it. And even the judge went so far to ask me about it.

Q. And you're saying, "I got taken to a polygraph"?

A. Uh-huh.

Q. And they were --

MR. NATHAN: Objection. Leading.

THE COURT: Sustained.

BY MR. LOEVY:

Q. What was the State's response when you said that?

A. That there's no evidence of it, that there was no evidence that I ever left the police station. They had no proof that I ever signed for a polygraph exam, none of the stuff that I was talking about.

Q. Did you explain anything to them about how they could prove it?

MR. NATHAN: Objection. Hearsay.

MR. LOEVY: It's not being offered for the truth, your Honor.

THE COURT: Overruled.

THE WITNESS: Okay. Ask the question again. I'm sorry.

BY MR. LOEVY:

Q. Did you explain how you could prove that you were at the polygraph?

A. Yes. I told them that I had gave the polygraph -- I told

the polygraph examiner the truth, and if you all go talk to him, he'll tell you all the truth.

Q. Did you say whether or not you had signed anything?

A. Yes. I told 'em I signed for a polygraph exam, and as soon as I signed for it, they left out the room.

Q. All right. At any point did they find that record that you had signed?

A. Yes.

Q. Tell us what that is.

A. They ended up finding the record the day before we supposed to start trial, so magically the day before we're supposed to start trial, one of the officers involved was cleaning out his garage, regular spring cleaning, I guess, and he came across the documents. So he notified the State's Attorney's office that the documents that I had been claiming the whole time, he found them during regular cleanup.

Q. All right. Did that affect the trial date when they found these documents?

A. Yes. So the judge asked us did we want to submit that into evidence, did we want to use it, or did we want to go ahead with the trial. Of course, we said that we did want to go along with the trial because this is further evidence that proves that I didn't do it, and so we reopened the motion.

Q. Did you want to go ahead with the trial?

A. No, not with the new evidence. I wanted the new evidence

to be presented.

Q.   All right.   But were you hoping that this was going to get resolved?

A.   Yes, yes.

Q.   How long had you been in the Cook County Jail before the trial happened?

A.   About three years, six to seven months.

Q.   Did you have any control over having that much delay?

A.   No.

Q.   How did you think the trial went?

A.   I didn't -- I didn't think it went fair at all.

Q.   All right.   Did you -- would you have to attend trial from jail?

A.   Yes.

Q.   How did that work?

A.   So they would bring me to court every day.   They would transport me.   I would be in the back.   And then I would change into my suits and stuff and then come out in the front and then sit at one of the tables.

Q.   What time would you have to wake up?

A.   They usually get you up for court around 3:00 a.m.   You get up at 3:00 a.m.   You allowed to take a shower.   Then by, say, about 4:30, 5:00 o'clock, they take you out of Division 11 -- well, before they take you out of there, they take you into the gym room, and then they strip search you where they make you

take all your clothes off, open your mouth, lift your tongue up. You lift -- you lift your penis up, your scrotum.

Then they ask you to turn around, grab your ankles, spread -- if you can, spread your butt cheeks and cough. And they literally wouldn't allow you to progress in the shakedown as far as the process to put your clothes back on because they say they needed to make sure you didn't have nothing in your booty hole. So they would make you cough until your booty hole moved to show that -- because guys, sickly, would hide stuff in their ass. They would.

Q. How did this make you feel to have to go through this process?

A. Disgusted, un-human. Like, there were some officers actually got they roll off watching it, sick, twisted.

Q. Did it feel fair to you?

A. No. I felt -- I felt -- I didn't feel human. I felt like if my grandmama knew about this, she would be raising some hell.

Q. All right. At the trial, to summarize, was there any evidence presented against you?

A. No. Outside of the -- outside of the oral confessions that they say I gave, that's it.

Q. All right. Was there any physical evidence?

A. No.

Q. Any witnesses?

A.   No.

Q.   Any weapon, any murder weapon?

A.   No.

Q.   Any blood?

A.   No.

Q.   Any forensic evidence from the car or anything?

A.   No, no, and no.

Q.   All right.  Aside from what they were claiming was your oral confession, who were some of the witnesses who testified against you?

A.   Of course, those gentlemen that's sitting over there, the defendants.  They testified, but that's it.  Outside of police officers, there were no witnesses against me.

Q.   Some State's attorneys testified too?

A.   Yes.

Q.   All right.  Who would attend the court dates?

A.   As far as what?

Q.   Your family.

A.   My auntie was at every court date.

Q.   Every court date for the trial and the court dates?

A.   Yes.

Q.   Who was your auntie?

A.   Her name is Reverend Susan S. Greenlaw.

Q.   Was she someone close to you growing up?

A.   Yes.  I call her my big Auntie.  She's like my second mom.

Q. All right. Did it help you to have her support there every time?

A. Absolutely. She sent me letters every single solitary week that I was there to make sure I had letters. She's a very religious person, and so she literally writes a thousand scriptures on everything. She writes the scriptures on the envelope. They're all Bible scriptures just to, you know, give you some inspiration, just to let you know that, you know, she's here. If you need anything, she got you.

She didn't know how to drive, so literally she would take the cab and the train and the bus to court.

Q. Did that mean a lot to you?

A. Yeah, because there were family members and, quote, unquote, friends that I thought I had that they never showed up, and they had cars.

Q. All right. How did that make you feel? Although we're jumping ahead to prison. Let's stay with the trial here.

A. That was in the County, though.

Q. All right. Did you feel like in the County, your friends were there for you when they should have been?

A. No. They weren't there for me at all --

Q. Tell us --

A. -- my friends, at least the ones, the guys I thought was my friends, they weren't there. I got locked up, and I got maybe a visit and then after that it was, "Hey, man, you know, we

don't do jails and all that other stuff so, you know, we ain't, you know, coming to visit you, nothing like that."

Q. In fairness, John, they didn't know, like, maybe you would be home next week. They didn't know that you were going to --

A. They ain't know when I was coming home. They didn't know.

Q. All right. At your trial, did you testify?

A. No.

Q. And what was the decision-making there?

A. Well, me and my attorneys Elliot Zinger and Richard Beuke, in the bullpens in the back, we had discussed it. I wanted to testify because I felt like I wanted to tell my story.

MR. NATHAN: Objection. Your Honor, may I just have a very brief sidebar?

THE COURT: All right.

(Proceedings heard at sidebar:)

MR. NATHAN: Your Honor, I'd like to clarify in my previous objection when he was talking which I was trying to make, I --

THE COURT REPORTER: I can't hear the sidebar.

MR. NATHAN: Because it's the same issue here, there was a foundation objection as well as a hearsay objection. The objection includes the fact that during Mr. Zinger's deposition, we asked him questions about his conversations with Mr. Fulton, and he asserted attorney-client privilege and wouldn't answer the questions.

And in light of that, I think it's unfair to be introducing testimony about the questions that he -- his conversations. For example, at --

MR. LOEVY: I can short circuit it because that makes sense to me. If he asserted a privilege during the dep, we can move on. I'm okay with that.

THE COURT: All right.

(Proceedings heard in open court:)

BY MR. LOEVY:

Q. All right. At the trial, did you think it was going well? Could you tell how it was going?

A. No.

Q. No, you couldn't tell? I asked two questions.

A. No, no, no. So I couldn't -- I couldn't tell how it was going. So there was a lady on the jury --

Q. Without getting into too much detail, you felt like -- how did you think the evidence was going? I want to get at your emotions as the trial is happening.

A. I figured that the hospital tape was shown and that the building footage was shown, so how can I be at two places at one time?

Q. And did you feel like it was fair, the process?

A. The process didn't seem fair, no. I didn't feel like I was innocent until proven guilty. I felt the whole time that I was guilty and I had to prove my innocence.

Fulton - direct

230

Q. Did the judge seem fair?

A. No. During my trial, the judge was sleep.

Q. What do you mean?

A. You can go look at the record. He was snoring.

Q. And then how would the judge wake up?

A. He didn't. So I would hit my attorney when he was asleep, and I told my lawyer, like, "Wait a minute. The judge, it seems like" -- you hear him. You could hear him sleep. He was sitting back with his head back like this, right, as the trial was going on.

So I guess my auntie, she got tired of hearing that, so she said, "In Jesus' name, wake up."

And, "Hold on, order in the court. Wait a minute. I'm going to put you out the courtroom, lady."

You up there asleep. She actually yelled out.

Q. All right. Did you have confidence in your mind that you were going to get a fair trial in this circumstance?

A. I thought I was.

Q. All right. As the jury was deliberating, do you remember how long they were out thinking about your case there?

A. I believe the jury went into deliberations, I believe, on a Wednesday, I believe.

Q. And how -- do you remember how long they were out?

A. I think I got my decision that Friday.

Q. Tell us what you remember.

Fulton - direct

231

A.   Like, it was different than any other court date because they was actually calling me around daytime, like 10:00, 9:00 o'clock instead of the normal when you have court, they wake you up at 3:00 a.m. and do the process.

Now they were saying, "Fulton, you know, get dressed. Put your stuff on.  You got court."

And so it's like, okay, I already know what I'm going to court for.  I know the jury is deliberating, and so I'm nervous.  I'm scared.  My heart is pounding.  But I'm figuring that justice is going to be served, and I'm getting ready to go home.

Q.   And what happened?

A.   I get in the courtroom.  The jury comes in, and they read the verdict.  The first one that they read was the aggravated kidnapping, aggravated kidnapping charge.  They found me guilty on the aggravated kidnapping charge.

Q.   What happened to your heart?

A.   And my heart, in my mind I was thinking, okay, well, it's not the murder charge.  It's not the -- it's not the big one, so I should be okay because if I beat the murder charge, I should be going home.

I didn't know nothing about how the process works.  I didn't know nothing about nothing, man.  I'm trying to go home.

Q.   What did they say about murder?

A.   Then the second charge was murder, and it was guilty.  And

Fulton - direct

232

then the third charge was concealment of a homicide, and it was guilty. I was crushed. I felt like, it's over. It's over.

Q. What kind of sentence were you looking at?

A. 60 years.

Q. Where did you spend most of your sentence?

A. So from -- I got my time in November of 2005, November 30th of 2005, I believe. And then December 1st, I was transferred to Stateville penitentiary.

Q. What is Stateville penitentiary?

A. Stateville is a super max penitentiary. Most of the people in Stateville have a lot of time, if not natural life. Some of them even got natural life, two natural life sentences, natural life plus 30. They get ridiculous with the numbers.

Q. Actually you met a guy who --

A. Right, I met a guy -- I met a guy in the county jail, his nickname was King Snake. He had, like, three or four murders. He ended up getting found guilty, they gave him 888 years.

Q. People that have that much time, do they have anything to lose in prison?

A. Some don't. Some feel like they ain't got nothing to lose, I already been convicted so what's -- what's wrong with me whiling out. It ain't going to hurt nothing.

Q. Was Stateville a violent and dangerous place?

A. Yes. And nasty place too.

Q. What are you supposed to do in a place like that if you're

attacked?

A.   They instruct you that you need to -- like in grammar school, you need to tell the teacher or tell the CO and then, you know, the CO will deal with it.

Q.   Is that a smart move in jail?

A.   No, because then you notified as a snitch.

Q.   All right.   What are you supposed to do if somebody tags you?

A.   If somebody tags you, you'd better defend yourself.

Q.   Now, by the time you got to prison, you're a bit older now, right?

A.   Yeah.   I'm in my 20s.

Q.   If you were 18 when you were arrested, how old are you when you got to Stateville?

A.   Probably about 21, 22 years old.

Q.   By then were you better at dealing with institutional incarceration?

A.   A little bit, but the county jail, the county jail compared to prison, it's like graduation.   It's a step up, right.   So now when you go to prison, now you're surrounded by all the guys that got time already.   So now it's literally nobody really feel like they got nothing to lose.

        You got some people that's there that's like myself that, you know, want to go to the law library, want to familiarize they self with the law and try to get home.   But

for the most part it's like, man, grab a Snickers. Get comfortable. It's going to be a while.

Q. How about cellmates? Did you have difficult or scary cellmates in Stateville?

A. Yeah. You don't get your chance to pick your cellmate 99 percent of the time.

Q. Were there some bad ones?

A. Yeah.

Q. Examples of people with terrible crimes?

A. Yeah, terrible crimes and then, you know, guys while incarcerated, they -- they commit crimes while incarcerated.

Q. What were some examples of people that they stuck you in a cell with?

A. So one of the cellies that I had -- so in jail, they call alcohol in jail, they call it hooch, right. And they make hooch from old oranges and old grapes and old juices and stuff like that, and they cook it and try to turn it into alcohol.

And they ended up putting a guy in the cell with me that was a notorious hooch maker. So now it's one of them things, well, now, if they shake down the cell, they come in here and find hooch, depending on who the officer is, we both might end up going to the hole for this, right, because it's in the cell.

And they'll give you a, what they call a committee meeting court date, right. And that's when they'll take each

Fulton - direct

235

one of you individually. And whoever takes the weight for it, the other one can go, but if don't nobody take the weight, y'all both go down for it.

Q.   So you had to risk that your cellmates could --

A.   Yeah, and that's a six-month sentence in the hole.

Q.   All right. How about cellmates who had either had racist beliefs or, you know, committed heinous crimes against children? Did you have to deal with those people?

A.   Yeah. I done had a few pedophiles in the cell with me.

Q.   How do you know they're a pedophile?

A.   Because when they move -- you know, my thing was, I don't know people. And people usually tell you a lot when they first meet you because they don't know you, right. And so a lot of people aren't honest about what they locked up for. So the average type of case that's in super max is murder, right.

So if you was a person that had a rape or something like that, they know in the jails rape and rapists are frowned upon on. Sex offenders and child abusers are frowned upon on. So if you know you got that type of case and you don't want people to mess with you, you would tell them you got a murder, right.

But for me, when the guys would move in the cell with me, I need to know who I'm around. I'm about to be sleeping in here, and you're going to be either on top or the bottom, right. And so we all had IDs, and we have ID numbers on them.

So I would have my family look them up on IDOC to see what type of case they had.

Q. And what did you find out sometimes?

A. That they was locked up for not what they told me they was locked up for.

Q. All right. How about Aryan beliefs? Did you have to deal with that?

A. I didn't -- I didn't have a cellie that was a racist. He was actually a Nazi with a swastika on his back.

Q. Was that convenient for you to be in a cell with a Nazi?

A. No, but...

Q. How about -- it sounded like you had some conversations with him?

A. Yeah, I had a few conversations with him. He was actually accused of killing his father. His father was an abuser, abused him as a child growing up and abused his mom growing up.

Q. Without going too much down that, you had to deal with all kinds of people?

A. Yeah, yeah.

Q. Did you meet some people you liked?

A. Yes.

Q. Did you meet one of your better friends who's here in court?

A. Yes. George Morales, he's in the back next to my wife.

Q. How did you meet George?

Fulton - direct

237

A.   I met him at Danville.

Q.   All right.  So that's jumping ahead in the story?

A.   Yes.

Q.   Let me ask you this.  There were some people that were okay in prison?

A.   Yes.  Everybody in prison isn't guilty of the crime that they locked up for --

Q.   All right.

A.   -- like myself.

Q.   How about the guards?  Would the guards sometimes let people in the cells to hurt each other?

A.   Yes.

Q.   What would happen there?

A.   Well, you know, sometimes -- you know, there are gangs in the jail, right.  But just like there are gangs in the jail, these gangs come from someplace.  There are jails with gangs in the world as well, right.  And some of these officers that work here used to be and still are gang members, right.  And so just because your occupation means you're an officer doesn't mean that your life before you became this occupation leaves.

So they would find officers that was a part of they gang, and if they wanted to get somebody, you know, "Hey, listen, open his door.  I'm trying to get to him."

So they would wait until, like, it would have to be a line movement, like when they move us to the chow hall to go

eat or when we go to the gym or something like that where there's going to be mass movement and most of the inmates are not going to be in the house, then he would go unlock the door, and he would walk off, he or she.

Q.   Who were the kind of people who got victimized in prison?

MR. NATHAN:  Objection.  Foundation.

MR. LOEVY:  I think he was there, your Honor.

MR. NATHAN:  Relevance.

THE COURT:  I think we have sufficient foundation. Overruled.

THE WITNESS:  What was the question again?

BY MR. LOEVY:

Q.   About victimizing.  Were you at some danger when you got there of being a victim?

A.   Yes.

Q.   Why?

A.   Because I wasn't a part of a gang so it's, like, if you don't -- not a part of a gang, you by yourself, right.  So now it's operation.  Somebody going to try you.  It's preying on the weak.

Q.   What kind of weapons did people have in prison?

A.   Knives.

Q.   How would you --

A.   Homemade knives.  They would break steel pieces out of the light, and then they would sharpen them against the ground

Fulton - direct

239

until they was like a knife and then take the bedsheet. And they would tear pieces, a string off the bedsheet and then wrap it around the knife as a handle.

Q. Would people use them?

A. Absolutely.

Q. All right. Did you consider carrying one to protect yourself?

A. No.

Q. Why?

A. Because in the event you get caught with it, they treat it like if you got caught with a gun in the world. It's a new case.

Q. What kind of penalty could you get?

A. It's a new case. I mean, you go to -- you go to the hole for at least 30 days, but now it's a new charge. So now you're not in jail just fighting the charge that you got locked up for which would be first degree murder, aggravated kidnapping, aggravated concealment, now you have a weapons charge now.

Q. Were there some times in the IDOC where riots would happen and gang fights would happen?

A. Yeah, there were gang fights. There would be gang fights that happened.

Q. Did that create --

A. Sometimes inmates would assault officers. Officers did get stabbed before.

Q. Were there people that were mentally ill in prison?

A. Yes.

Q. Was that a danger?

A. Yes, because they didn't -- they didn't -- the mental health people usually got, most of the time, thrown in with everybody else.

Q. How about sexual violence? Was there a concern about sexual violence in the penitentiary?

A. Yes.

Q. Can you tell the jury about it?

MR. NATHAN: Objection. Motion in limine.

MR. LOEVY: This was denied.

THE COURT: What number was it?

MR. NATHAN: Your Honor, we're renewing our motion in limine 39.

MR. LOEVY: It says it was denied.

THE COURT: 39?

MR. LOEVY: 39.

THE COURT: I'll get there. Give me a moment.

Well, it says here that motion is denied.

MR. NATHAN: May I be heard, your Honor?

MR. LOEVY: I can move on in the interest of time, and we'll come back to it.

THE COURT: All right. Thank you.

BY MR. LOEVY:

Fulton - direct

241

Q.   Can you describe the cells in prison?

A.   The cells that they had me in, you could stick your arms out and there still would be a little room.

Q.   Was it -- how many people in such a cell?

A.   Two per cell.

Q.   What else was in the cell?

A.   So the toilet was here, and then the sink was connected right to it.

Q.   Was it tight to live with another person in that cell like that?

A.   Yeah, yeah.  It's limited space --

Q.   Was --

A.   -- to walk around.

Q.   -- there any privacy in prison?

A.   Say it again.

Q.   Any privacy in prison?

A.   No, no.

Q.   How about the toilet?  Explain the layout there.

A.   Well, if me and George was in the cell together and George had to move his bowels, George would put up a sheet.  So we made a line that would go from the light above the toilet that would run all the way to the other big light because there were two lights in our room, one that was small and one that was big.

     And we'd take a string, and we'd make a knot on it and

then push the knot inside the back of the light and then push the knot on the other side to put up a line, and then we would put a sheet up. And the sheet would block George from me while he's using the bathroom but --

Q. So --

A. -- I can smell that he ate spicy food last night.

Q. You tried to create some privacy?

A. Yes.

Q. And you didn't have as good as cellmates as George all the time?

A. No, not all the time, no.

Q. Were there pests in prison?

A. Yes. They had roaches, mice, rats.

Q. How was the soap?

A. So if you didn't have money, the State would give you what they call a indigent package, right. And it was for people that didn't have money. So they would give you State toothpaste, State-issued toothpaste and State-issued soap.

Well, the problem with the toothpaste was, the toothpaste, you would brush your teeth with it and literally like two minutes later, your breath would be stinking. It didn't hold. And then the soap was State soap. It had lye in it, right. And so when you washed up with it, your skin would literally be peeling. Like, you could see your skin peeling over the course of days. It dries your skin out, right.

Washing up with lye soap is not good.

Q.   How about the temperature --

MR. LOEVY:  And I think, your Honor, are we going until the quarter, half hour?

THE COURT:  12:30.

BY MR. LOEVY:

Q.   Sorry to interrupt you.  Tell us about the temperature issues in prison.

A.   In the summertime, it gets extremely hot, no air-conditioning.  They don't have no air-conditioning for the inmates.  Up front where the officers be at, they get all the air-conditioning, but in the back we don't have no air-conditioning.  It's a sweat box.

So if you were able to afford a fan off commissary, you can buy a little small floor fan, but that fan is blowing hot air, right, because the windows is not open.  And if the windows are open, it's humid in there.

Q.   In the real hot part of the summer, did it get oppressive?

A.   Yeah.  The walls will be sweating.  It would be to the point where you would have to sit still with the fan literally right here.  I had -- so they allow you to have two fans for the weather like that.  So I would have a fan at the foot of my bed and a fan at the top of the bed so I can keep air blowing this way and air blowing this way.  But if I got up to walk to the toilet which is literally right here, I instantly start

sweating.

Q. How about the cold in the winter?

A. Wintertime, they only turned the heat on when they was required to. So whenever the State required them to turn the heat on, that's literally the day they turned it on. Whatever the day that the State said that you no longer have to have the heat on, that's the day they turned it off.

Q. Was it tough to be super cold?

A. Yes, yes. So you just put on your thermals and your jogging suit. You put on enough clothes. You had a blanket. You could order blankets and sheets off commissary, you know. You try to -- you do the best with what you got, wear a skullcap.

Q. How about the food in prison?

A. Most of the food that they served when I was in there had soy in it, right. And soy is not a good thing for -- to be consumed regularly anyway, especially not for men because it creates a imbalance in their body. And now you'll see a lot, not a lot but some of the men begin to develop --

MR. NATHAN: Objection. Foundation.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Eating soy meal after meal, did it affect you?

A. Well, I didn't eat it a lot like that. I was fortunate enough to be able to go to the commissary. So I kind of really

stayed away from those meals because it was inmates that was cooking the food.

Q. And at the commissary, was that healthy food they served you there?

A. No. It was the same food they selling at your normal gas station.

Q. So it's gas station food?

A. Yeah. Noodles, chips, cookies, cakes, cupcakes, honey buns. Whatever gas station you go to, that's our commissary.

Q. Was that a healthy way to eat?

A. It was better than eating the State food.

Q. And do you feel, is your stomach different than before you went in?

A. Yeah. I can't eat a lot of the stuff that I used to be able to eat before I got locked up.

Q. Was prison a racially segregated place?

A. Yes. The officers at times could be racist. And, of course, you know, you got inmates in gangs that's racist too.

Q. Were you able to integrate with all the different communities as best you could?

A. Yeah.

Q. How about the guards? Tell us about the guards. Were there some nice ones?

A. Yeah, there was some -- there was some officers that worked there that actually treated you like you was human, right. It

was like, "Hey, listen, man. I'm not here to judge whether or not you did your case or not, but I'm going to give you everything you got while you're here, right. So if you want, you need some state soap or you need some disinfectant to clean your cell or if you need me to take you to the -- get you a nurse," they wouldn't take you there but they would call the nurse for you or something like that, yeah.

Q. How about the bad ones? Were there some bad guards?

A. Yeah. There were some officers that they didn't give a damn whether you lived or died. "Man, I'm here to do my eight hours and go home."

Q. Any of them abusive?

A. Yeah. Some of them, some of them you would get the sense that the only reason why they became officers, the only reason why they became correctional officers is because they didn't have what it took to be regular officers. So this was like the next best thing for them.

But you could tell a lot of them guys, like, bullied in school or stuff because they would come to work with, like, all their problems, and they would take they frustrations out on you.

Q. You said State -- or I don't know if you said it, but was Stateville a 23 and 1, 23 hours --

A. Yeah. So you was in your cell 23 hours of the day. If the penitentiary wasn't on lockdown, the only time you came out the

cell was for lunch and dinner. On odd days they had, like, programs that you could come out for like GED, different type of religious services, and stuff like that. But other than that, you going to be in the cell 23 hours of the day.

Q. And that's if it wasn't on lockdown. What if it was?

A. If it was on lockdown, it's 24 and 24.

Q. All right. Were the holidays tough in prison?

A. Yes, yes.

Q. Could you tell the jury why?

A. Because growing up like any other kid, you know, you look forward to Christmas. You look forward to gifts. You look forward to your birthday. At my house, my grandmother was a cooker. So my grandmother had five children. So all my uncles and aunties used to come over during Christmastime, New Year's. We watched the Super Bowl and stuff like that.

And then, you know, when you get to jail, now you're calling home during the holidays, and now you're getting a chance to hear people all together during the holidays, but as far as yourself, you don't have nothing to celebrate. You in jail. This ain't a holiday. What's fun about this?

They'll serve you different something for Christmas and holidays. They'll have some stuffing and some dressing, but it ain't homemade like mom's cooking. It's all out of a can, and it ain't even seasoned right. It don't even taste good.

Fulton - direct

248

Q.   All right.   But was it about the food or the people?

A.   Both.

Q.   All right.   The last thing I want to talk about before lunch.

A.   Okay.

Q.   Did the effect of -- being a person who didn't commit the crime, did that affect your mindset in prison?

A.   Yes.

Q.   Can you explain to the jury why?

A.   Because it's -- it's easier to adapt in prison when you're there for the crime that you committed.   So you kind of after a while, after your appeal has been denied, you kind of just let go.   It's like, okay, the jig is up.   I'm caught now, right.   So now I just got to do my time.

But if you're an individual like me that's innocent, every day and every moment that you here, you feel like you're not supposed to be here, right.   But you're literally screaming the same story because very few people in jail actually say that they're guilty of the crimes that they're there for, right.   Very few people actually say, "Yeah, I did the crime I did."

So really you saying you innocent is what everybody's saying.   Get in line.   Get in line.

Q.   How about yourself?   Did it feel fair --

A.   No.   It didn't feel fair for me.

Fulton - direct

249

Q.   What did the unfairness do to you?

A.   It made me do some soul searching, and it made me have a better relationship with God.

MR. LOEVY:  Maybe we can talk about that after lunch, your Honor.  Would you like me to keep going, or is this an okay place?

THE COURT:  This is close enough.  We'll take a recess.  I think -- do we need an hour to get everybody?

MR. LOEVY:  I'd rather shorter than later.

THE COURT:  Can you make it back in 45 minutes?

All right.  Let's do that.  We'll start at 1:15.

THE CLERK:  All rise.

(Recess from 12:30 p.m. to 1:15 p.m.)

250

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN FULTON,                         )  Case No. 20 C 3118
                                     )
            Plaintiff,               )
      v.                             )
                                     )
ROBERT BARTIK, et al.,               )
                                     )
            Defendants.              )
-----------------------------       )
ANTHONY MITCHELL,                    )  Case No. 20 C 3119
                                     )
            Plaintiff,               )
      v.                             )
                                     )
ROBERT BARTIK, et al.,               )  Chicago, Illinois
                                     )  February 11, 2025
            Defendants.              )  1:15 p.m.

VOLUME 2
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Plaintiffs:        LOEVY & LOEVY
                           BY:  MR. JONATHAN I. LOEVY
                                MR. RUSSELL R. AINSWORTH
                                MS. JULIA T. RICKERT
                                MS. FATIMA LADHA
                                MR. ISAAC GREEN
                           311 N. Aberdeen Street, 3rd Floor
                           Chicago, Illinois  60607

                           LYON & KERR, PLLC
                           BY:  MS. ANDREA D. LYON
                           53 W. Jackson Boulevard, Suite 1650
                           Chicago, Illinois  60604

For Defendant Officers:    NATHAN & KAMIONSKI, LLP
                           BY:  MR. SHNEUR Z. NATHAN
                                MR. AVI T. KAMIONSKI
                                MS. BREANA L. BRILL
                                MR. JOHN M. CERNEY
                                MS. NATALIE ADEEYO
                           206 S. Jefferson Street
                           Chicago, Illinois 60661

251

APPEARANCES (Continued)

For Defendant City:        MICHAEL BEST & FRIEDRICH, LLP
                           BY:  MR. JAMES P. FIEWEGER
                           444 W. Lake Street, Suite 3200
                           Chicago, Illinois  60606

Court Reporter:            KATHLEEN M. FENNELL, CSR, RMR, FCRR
                           Official Court Reporter
                           219 South Dearborn Street, Room 2328A
                           Chicago, Illinois  60604
                           Telephone:  (312) 435-5569
                           Kathleen_Fennell@ilnd.uscourts.gov

                    *    *    *    *    *

             PROCEEDINGS REPORTED BY STENOTYPE
       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE COURT: You may be seated if you wish. We'll be bringing the jury in soon.

Let me ask just a quick question about this exhibit of Ms. Griffin. I gather you want, I think you said you wanted to, plaintiffs want to play the video.

MR. LOEVY: No. There is no video of her.

THE COURT: There is no video. Is it a tape?

MR. LOEVY: I'm sorry, the deposition. Griffin's deposition, yes. We want to -- she's not coming to court. She's in Las Vegas. She's unavailable.

THE COURT: Right.

MR. LOEVY: So when you adjudicate the objections, we'll put the video together.

THE COURT: Okay. So, you know, there are a lot of what I would call just like things like "okay" and so on where the questioner is affirming the answer of the witness, which is, you know, kind of tedious and not proper. But you're saying you want that in?

MR. LOEVY: No. I think Mr. Nathan just whispered he agrees.

But what I'm saying, Judge, is when you chop up a video, if you try to take out a word, it looks like it's AI generated or something like that.

MR. NATHAN: I agree with that.

THE COURT: Oh, I see. So you just leave it in?

MR. LOEVY: They originally didn't designate certain words. And then we designated the missing words. So I think it's just got to flow. It's a video.

THE COURT: Okay. So I won't worry about that.

MR. LOEVY: Yes.

THE COURT: It's just what goes in, what goes out.

MR. LOEVY: Otherwise on the video it looks very choppy.

THE COURT: Yes, I get that.

All right. So let's bring in the jury.

MR. NATHAN: Your Honor, we do have a number of things to raise about --

THE COURT: Sorry. Let me get my headphones.

(Discussion off the record.)

THE COURT: Okay.

MR. NATHAN: Your Honor, I do think we should argue with the white noise, because it concerns the witness's testimony. So I'm going to sit down at the table and argue.

MR. LOEVY: Although, you know, the witness might need to hear the rulings.

THE COURT: Well, he can step out.

MR. LOEVY: Okay.

THE COURT: Would you just step outside the courtroom.

(Witness temporarily excused)

MR. NATHAN: The first one we resolved. There was a motion in limine to keep out the witness's criminal background. But he had testified on direct examination that he was never arrested before.

So Mr. Loevy agrees that at this point we should be able to get in his background.

MR. LOEVY: I didn't agree he'd said he'd never been arrested. He said he'd never been in a situation like this. But we do agree that it is now relevant, that they can bring in his history.

THE COURT: All right.

MR. LOEVY: So that's agreed.

THE COURT: Okay.

MR. NATHAN: The witness also testified, "I wasn't part of a gang." That was, I believe, a direct quote. It was in the context, I believe, of him being in prison.

And Ms. Griffin's statement is in evidence right now. There is a very small portion where she references that both Fulton and Collazo were members of gangs, and that's not an issue, meaning they're not going to be upset at each other. I think that should come into evidence to rebut Mr. Fulton saying he was never part of a gang.

MR. LOEVY: And to be in response, Your Honor, he was, you know -- he said, "In prison I was in danger not being in a gang."

It doesn't rebut him to say -- we have a hearsay statement, an out-of-court statement by Precious Griffin saying he was in a gang. She's wrong. It doesn't matter. But you can't impeach him with another witness' hearsay says you were in a gang.

THE COURT: You have to be able to prove it up.

MR. LOEVY: And there is no way to prove it up.

THE COURT: Yes.

MR. NATHAN: Well, we're going to be able to -- I won't do that until I make sure that I could prove it up with potentially an officer's statement.

MR. LOEVY: That would be hearsay, too. An officer heard from somebody that she said that he's in a gang. That's hearsay, because he's not in gang. We're going against the stream here.

MR. NATHAN: Well, there is evidence that he was.

THE COURT: There seems to be a foundation for her statement that Collazo was in a gang.

MR. LOEVY: Yes. It's not disputed.

THE COURT: But I haven't gotten to the part where she said that Fulton was in.

MR. NATHAN: It's exactly the same foundation. They're both coming from Ms. Griffin. She's saying that she believes that each of them are in a gang.

THE COURT: Well, I don't agree with you. If you look

at the testimony about what she said, she and her mother or her aunt or whoever was her -- I think it was her mother, were trying to convince him to get out of gang life.

MR. LOEVY: Collazo?

THE COURT: Collazo, right. But she doesn't say anything -- show me in the deposition where she says that John Fulton was in a gang.

MR. NATHAN: Mr. Fulton's attorney, Elliot Zinger, took a videotaped statement from Ms. Griffin. And this was in preparation for the criminal trial. On that video, she testifies, she says repeatedly that Mr. Fulton is in a gang.

MR. LOEVY: We dispute that. But it would still be hearsay. It is somebody making an out-of-court statement to somebody else that he's in a gang. That's hearsay.

THE COURT: That's hearsay.

MR. LOEVY: You can't impeach him. I suppose they could say, "Were you in a gang?" and he would say "No." How am I going to impeach him with Zinger heard from her that he is? And, you know --

THE COURT: All right.

MR. NATHAN: Is there a ruling as to whether I'm able to inquire as to his gang membership based on the foundation that I've explained Ms. Griffin has said that repeatedly. It's in evidence as well in Ms. Griffin's statement.

MR. LOEVY: We would not object if they say to him,

"Were you in a gang?"

What we would object to say, "Isn't it true that someone out of court said you were?"

THE COURT: Yes. See, that's the problem, without any foundation of how she knew that.

MR. NATHAN: So I am able to ask him, "Isn't it true you were in a gang?"

THE COURT: Yes. But how are you going to --

MR. LOEVY: Yeah, how are they going to prove it then without hearsay? Nobody is saying it.

THE COURT: If he denies it, that's the problem you face.

MR. LOEVY: Yeah, then they can't say they opened their own door.

MR. NATHAN: I wouldn't be able to prove it up as a collateral matter either way. That's not how it work. I'm able to ask, inquire on cross-examination.

THE COURT: You may ask him, yes.

MR. LOEVY: As long as he doesn't say later, "Well, I've opened the door. Now I have to prove it up with hearsay." Then we would object.

THE COURT: Yeah.

MR. LOEVY: They had the opportunity at her dep to ask about that statement and they didn't, because she would have denied it.

THE COURT: All right. Let's --

MR. NATHAN: Your Honor, I do have several other issues that are relevant to this examination. And I understand we -- on direct examination, Mr. Fulton described an incident where, as I predicted -- if Your Honor remembers, there was a motion to exclude any playing of prison calls.

There is two prison calls. Your Honor ruled that one call relating to a statement by Mr. Fulton that he paid Antonio Shaw $500, that can come in for evidence of bias. That was your ruling. The second --

MR. LOEVY: I don't agree that was your ruling.

MR. NATHAN: Let me finish.

THE COURT: Let him finish.

MR. NATHAN: The second component of that, there was another part of the call that we identified where he talked, Mr. Fulton talks about stomping on somebody in prison, where he was in a fight. Your Honor excluded that over our objection.

However, in direct examination, Mr. Fulton testified about an incident with a knife, he watched a knife through a guy's chest in Cook County jail. He talked about witnessing all kinds of violence. He was about to be going -- he testified at length about his fear of violence in prison. And the fact that he was able to defend himself and, in fact, did defend himself is relevant. We think he opened the door to that.

MR. LOEVY: Yeah, not even close from our perspective that he opened any doors. You know, this video -- and before you decide, you should listen to it if there is any question. You got it right the first time.

It's just he's saying: N word, N word, "fight." You know, he doesn't say anything. They just want to get in prejudicial prison talk. And that's the same with the $500 call. Our understanding of your ruling was if he denied having given Stick $500, then they can impeach him with the prison call. On the prison call, you can't really hear, it just sounds like N word, N word, N word, very prejudicial. He's not going to deny it.

MR. NATHAN: No. There is --

MR. LOEVY: So there is no reason to play the call.

MR. NATHAN: He says that he stomped a guy. That's what we're trying to elicit.

THE COURT: But has he --

MR. LOEVY: Denied?

THE COURT: -- denied that he --

MR. NATHAN: He admits that he, at his deposition, he admits that that is him on the call. That's him talking about his own incident. That's an admission.

THE COURT: I guess if you were to ask him if he stomped a guy and he denied it, then you could impeach him with this phone conversation.

MR. NATHAN: Okay.

THE COURT: But we don't have any other basis to bring it in so far.

MR. NATHAN: Okay.

MR. LOEVY: Yeah, but if they say to him, "Did you ever stomp a guy?" He's like, "What are you talking about? No." This phone record doesn't say he stomped on anybody.

MR. NATHAN: Yes, it does, it does.

MR. LOEVY: Now we're going to be on the fly. The jury is going to be standing there.

Do we have the transcript to it? Can somebody pull that for the Court?

You know, they looked at 16 years of phones, and this is all they could find is a reference to -- you know, Mr. Fulton has been in fights in prison. I stayed away from it just so we wouldn't have this problem.

THE COURT: Okay.

MR. LOEVY: Should I bring out his fights in prison?

MR. NATHAN: There is no foundation for that in his entire record. The only -- and this is relevant admissible evidence. He admitted to it. It's his own words.

MR. LOEVY: He admitted to one.

MR. NATHAN: And we're seeking to admit it to rebut his direct testimony.

MR. LOEVY: You know, they can't cite you to what he

said on the call because it's not relevant, the language of the call.

MR. NATHAN: Well, I can.

THE COURT: Okay. First of all, we're not under cross-examination yet. So let's move on with this testimony.

MR. LOEVY: Okay.

THE COURT: But I've got your issue in my head.

If you have a transcript though of that phone call, I'd appreciate it.

MR. LOEVY: We'll print it, Your Honor.

THE COURT: Okay.

(Discussion off the record. Jury in at 1:30 p.m.)

THE COURT: You may be seated.

JOHN JONATHAN FULTON, PLAINTIFF HEREIN, PREVIOUSLY SWORN,

DIRECT EXAMINATION (Resumed)

BY MR. LOEVY:

Q. All right, sir, when times got dark in prison, did you turn to religion for support?

A. I had religion before I went to prison.

Q. All right. Tell the jury a little of the background.

A. My family is a very God-fearing family. We're very spiritual individuals. I was born and raised in the church since I could remember, going to church, having -- going to Sunday school as well as having to go to church service. The adult service has, you know, been a part of my life since I was

a kid.

Q.   What ages did you do it?

A.   I don't know when it started, but it progressed all the way through my teenage years.  I ended up -- because my grandmother would tell me that the only way I could go out and ride my bikes on the weekends is if, you know, I go to church on Sunday, all right.

So Sunday school was a requirement for me to have to go.  I didn't have to go to service, but Sunday school was a requirement.

And then I end up progressing in the church.  I became one of the musicians in the church.  I played the drums.  Then I ultimately ended up joining the choir, because by default the musicians are connected to the choir.  I ended up singing slightly.  I'm not great, no Barry White, but I did tenor in the choir.  We traveled, went to different churches and singed and, you know, prayed and worshiped together.

Q.   Your mother and your aunt, were they involved?

A.   Yes.  My grandmother was on the usher board, usher board at church.  And my aunty went to a separate church.  But they both were named Calvary Baptist Church.  And my aunty was a reverend there.

Q.   A reverend there?

A.   Yes.

Q.   All right.

A.   Not the head reverend, but one of the reverends.

Q.   So you're in prison.  You, as I understand it, feel the situation isn't just.  What did you ask God?  And how did you make sense of this?

A.   Well, I knew I wasn't in prison for the crime I was being accused for, right.  And at the end of the day, I am one of them people that was raised that God is always in control, right.

And as a child, you know, of course with Christianity being something that's been instilled in me as a child, the Bible is, you know, the basic instructions before leaving earth is what we believe.

And so we live our life by it as close to it as possible.  But we're not perfect people, so we fall short.

Q.   Did you feel that this affected your relationship with God?  I mean, did it shake your foundation of religion?

A.   No, I never questioned God, because God knows all and is all.  So I felt as though that if God allowed this situation to happen, just like he allowed it to happen to Job in the Bible, that I need to keep my head up high and keep forward.

Q.   Were there parts of the Bible that gave you strength through this ordeal?

A.   Yeah.

Q.   And you mentioned Job?

A.   Yeah.

Fulton - direct

264

Q.   How did --

A.   The book of Job.

My grandmother is very strong on proverbs.  I think it's John 3:16:  For God so loved the world that he gave his only begotten Son, that whoever shall not believe in him shall not perish, but have everlasting life, you know.

Q.   All right.  We've got a court reporter, and she's good, but she's not that good.

A.   Just John 3:16.  You can look it up.

Q.   All right.  That's okay.

How about let's switch topics, prison visits.  When you first got there in Cook County, would your grandfather visit you?

A.   Yes.  My grandfather would visit me.  The only person that I didn't allow to come visit me during none of my incarceration was my grandmother.  My grandmother was a very emotional person.  And as I explained to you all before, my grandmother losing her favorite child, it hurt, right.  Because the only thing my mother ever wanted was to be a mother.  And as soon as she had the opportunity to bring me into the world, she was taken.  And so my grandmother felt like she didn't feel whole.  And so growing up, it was, it was tough.

Q.   And in prison, did you want your grandmother to see you in jail, in prison?

A.   No, I didn't want her to see me like that.

Q.   Why not?

A.   Because I knew she couldn't take it.  She would probably end up having dreams about it.  She already felt like me being in prison was her fault somehow some way, that maybe she could have did something, that maybe she could have got to me faster in the police station.  You know, she just feels like it was her responsibility.

Q.   Did she correspond with you in prison?

A.   Yes.  I talked to my grandmother at least two, three times a week.  She wrote me letters, sent me cards.

Q.   What kind of things would she write?

A.   I love you.  Keep your head up.  Remember, you ain't got no friends in jail.  Remember that the people in jail, they don't know nothing, because if they did, they wouldn't be in jail, you know.

Q.   Did it give you strength to have this connection?

A.   Yes.

Q.   You said your grandfather would visit you in the jail?

A.   Yes -- well, no.  My grandfather would visit me when I was in the county jail.  My grandfather passed due to complications dealing with prostate cancer back in 2004 or '5.

Q.   Before your trial?

A.   Yes.

Q.   Before he died, was he a regular visitor?

A.   Yes.

Q.   Tell me about those visits.

A.   We would talk.  My grandfather was my favorite person.  Because, of course, my grandmother was the disciplinary.  I loved my grandmother.  My grandfather used to let me have my way.

     And so when he used to come to visit me, we would sit, talk.  He would ask me how I was doing.  I would tell him I'm, you know, taking it day to day.  I'm making it.

     And then he would tell me the real true story of what my grandmother is really going through, because, of course, she don't tell me on the phone what she's feeling.

     It's, "Baby, I'm doing okay.  As long as you doing okay, I'm doing okay."  But my grandfather would really give me the story, like she's not sleeping.  It's almost reminding me of how it was when your mother died, where she didn't eat for almost 30 days.  She lost a lot of weight.

Q.   John, let me interrupt you because it's your trial.  How did that affect you to hear that your grandmother was upset?

A.   It hurt me that, you know, the defendants were the ones responsible for inflicting that type of pain on my family and me.

Q.   All right.  When your grandfather died, were you able to go to his funeral?

A.   No.  I wrote to counselor.  I talked to the counselor.  The counselor told me that I needed to have my family send me

$5,000, because the Cook County sheriffs that work inside the jail, if they are going to escort you to a funeral, then they give them what's called time and a half. You know, they get paid for that, right.

And so if this is unforeseen circumstances and unusual circumstances, then you have to foot the bill for what it costs for them to do security for you.

Q. All right. John, did your family put together the money?

A. Yes.

Q. Were you allowed to go to the funeral?

A. No. They said it would end up being a breach of security is what Springfield said.

Q. Did it mean something to you to not be able to go to your grandfather's funeral?

A. You say did it mean something to me?

Q. Yeah.

A. It hurt. It broke my heart. But, you know, it was something that was somewhat expected, because I've seen other guys in there actually lose their children, and they don't let them go to the funeral. They tell them the same story, but it ultimately be denied.

Q. When you had female visitors, what was your understanding as it affected you of what they had to go through?

MR. NATHAN: Objection, foundation. Calls for speculation.

MR. LOEVY: I'm asking for the impact on him and why he did or didn't want female visitors, not for the truth.

MR. NATHAN: I understand. It's nevertheless the same objection.

THE COURT: Well, the effect on him is relevant. Let's see, I guess why he can -- I don't know.

MR. LOEVY: Should I lay some more foundation, Your Honor?

THE COURT: Try to do, yes.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. When you had to decide whether you were going to have female visitors, your aunt or your grandmother visit you, were there factors that made you reluctant to do that?

A. Absolutely.

Q. Can you explain what they would have to go through to get to you?

A. Well, by being a penitentiary and a place of security, right, then anybody that was coming in from the outside, then they wanted to make sure that they didn't have any drugs or weapons or cellphones or anything that they would sneak in.

So for women, it was a little different than guys. For women, they would have a woman officer escort them into a closed room. And then from that point forward they would ask them to lift they shirt up. They would ask them to pull their

Fulton - direct

269

breasts out of they bra to make sure that they weren't hiding anything under their breasts.

They would have them take their shoes off. They would have them unbuckle they pants and push their panty line forward so they can see inside of your panties and make sure that you're not hiding anything in there.

MR. NATHAN: Objection, relevance. Move to strike.

THE COURT: It's all hearsay.

BY MR. LOEVY:

Q. As you understood it, this information --

MR. LOEVY: Your Honor, if I may?

BY MR. LOEVY:

Q. -- did that affect your willingness to have female visitors come to --

A. Yes, because --

MR. NATHAN: Objection.

MR. LOEVY: That's the point we are trying to make.

THE COURT: Okay. Yes.

MR. NATHAN: Objection.

THE COURT: Whether it's true or not --

MR. LOEVY: Right, exactly.

THE COURT: -- that's what he believed. Okay.

BY THE WITNESS:

A. Question?

BY MR. LOEVY:

Fulton - direct

270

Q.   All right.  You weren't there.  You don't know if it happened, right?  You just --

A.   Right.  I wasn't physically there when the shakedowns was happening, no.

Q.   All right.  So all I'm asking, sir, knowing that or believing that to be true, did that affect whether you were willing to put your family through that?

A.   Yes.

Q.   How about your father in prison, what was your relationship with him?

A.   When I was in the county jail, my father came to visit me probably a handful of times.

Q.   Did you feel like he let you down?

A.   I felt like, I felt like my father, my father didn't support me as strong as my grandparents and my aunty did.

Q.   Have you since your release made some peace with your father?

A.   Yes.

Q.   And is he younger or older than he used to be?

A.   He's a little wiser.

Q.   How is he doing physically?

A.   He's not that great, but he's making it.

Q.   Are you able to help him now and have you rebuilt the relationship with him?

A.   Yes.  I take him to the doctor, take him to all his

doctors' appointments, his physical therapy, any problems that he may have with around the house, I try to get over there and help him.

Q. How often is that?

A. Whenever he call.

Q. How often?

A. Sometimes once, twice a month, sometimes once a month. But I talk to him.

I do this thing where, you know -- when we were in jail, we're not allowed to get on the phone whenever we want to. It would be schedules. So now I just call my family members just randomly on awkward days and just, "Hey, man, I love you. I just wanted to call you to tell you I love you. That's all."

Q. Was it easy to maintain relationships with people on the outside? You're in prison. You talked about your friends. Was it easy to maintain relationships?

A. No.

Q. Were people willing to invest in to somebody who has got a long sentence, people on the outside?

A. No.

Q. Can you explain to the jury how that affected you?

A. It hurt, because it's one of those things where if this situation never happened, all of these people that you grew up around, whether they were blood related to you or not, you felt

as though that the love was genuine, right. You felt as though when they wrap they arms around you and gave you Christmas presents at Christmastime, that they genuinely wholeheartedly wanted to be there and love you, right.

But now tragedy has struck where family is supposed to step in and help, right. And my family was limited to who was inside my household plus my aunty. It's like family members that was there during Christmases and New Year's and birthdays ain't nowhere to be found, right.

And, you know, when you in jail, love is all about action. "Love" itself is an action word, but especially while you're in jail, it's an action word. If you love me, show me you love me. Send me a card, right. Put some money on the phone so I can call, or even answer the calls that I'm paying for, right.

You have to do some action on the other end of it for the person in prison to know and receive that you're there for them, because other than that, everybody inside this environment doesn't care, right. Everybody in here saying they innocent in here. Most of the officers in here, they working 9:00 to 5:00. They don't care. They don't care if you sleep or die. They don't care.

I've watched officers literally see inmates that are sick and need help, young guys, 23, 24 years old, "I need to go to Cermak, I'm messed up." They won't take them, and they

literally die. And now after they die, an investigation is launched, now everybody wants to be concerned because they're worried about their jobs.

Q. All right. John, you're angry, aren't you?

A. It, it, it bothers me.

Q. All right. Let's talk about Yolanda.

A. Yolanda.

Q. Sorry.

A. It's okay.

Q. I'm not good at names, I apologize.

A. It's all right.

Q. When you first got locked up, backing up --

A. Okay.

Q. -- you and she were more together or less together?

A. When I first got locked up, we were more together.

Q. All right. You didn't know if you were -- which way it was going to go back then, right?

A. No.

Q. Tell us about what you -- your relationship.

A. Now?

Q. No. Back then, at that moment in time. You are arrested --

A. Mm-hmm.

Q. -- and you're in the Cook County jail. Did she visit you?

A. Yes.

Q. Did you try to be close to her?

A. Yes. So she would bring my son to come visit me. Usually on the visits, it would usually be her mom or her dad. Usually one of her parents would come with her.

And I ended up proposing to her from jail. She came to visit me on a visiting day one day, and I got out on one knee and I proposed in the visiting room.

Q. Who else was present?

A. Her mom. I believe her dad was there, too. I'm not for certain.

Q. Who is her mom?

A. Laverne Henderson.

Q. Have you developed a relationship with Laverne over the years?

A. Yeah. That's moms. I love her.

Q. All right. Why did you develop a close relationship with Laverne Henderson, Yolanda's mom?

A. Because she didn't have to be there for me while I was incarcerated. It was nothing in it for her. You know, her daughter was the one that I was in a relationship with. So her loyalty should lie with her daughter, right. But when me and her daughter broke up while incarcerated, you know, she changed, the daughter changed, but the mom stayed the same.

Q. Did the mom help you have access to your child too?

A. Yes.

Q. All right. Let's talk about that. You proposed to her. What did she say?

A. Yes.

Q. All right. And you didn't know at this point how long you'd be in there, right?

A. No.

Q. All right. Time is going by, and you are not getting out, right?

A. Well, the trial hasn't came yet, but yeah.

Q. And so time is going by. Did you feel that she was slipping more distance to you?

A. Yes, yes.

Q. Can you explain?

A. You know, when you first get locked up, you calling. A person normally picks up the phone the third, maybe even the fourth ring. It never rings five, six, seven, eight times. And then as the years progress, you start noticing that sometimes she don't answer the phone, sometimes she do.

She used to be able to answer -- she used to answer the phone in noisy environments. Now she only answers the phone when it's a quiet environment. So it's like what are you hiding? Like, what's different?

Q. So a guy is sitting in jail, so you've got nothing to do but think about what is going on there. How did you feel about -- were you jealous, frustrated? What were you?

A.   Well, I knew it was probably because I was incarcerated. And so it was one of those things where it's like it would be best for me, since I'm starting to see the signs and symbols, I think it would be best for me for us to break up.

Q.   Did she give you signs that maybe there was another guy?

A.   Yes.  We talked, so she told him about the guy that was interested in her that she ultimately ended up being married to 20 years.  They've been married now going on 20 years.

Q.   So she told you about him while you were in prison?

A.   Yes.  Well, this was when I was in the county.  This was before prison.

Q.   Right.  Was this hard, you know?

A.   Yeah.  You find out your lady done found another man. Yeah, it's hard.  Your heart get broke.  There is about to be another man playing father to your kids.  It's hard.

Q.   Is there anything you could do about it?

A.   No.

Q.   After you and Yolanda broke up, were you able to maintain your relationship with your son?

A.   Yes.

Q.   How did you do that?

A.   We talked frequently throughout the course of the week, sometimes two, three times a week.

Q.   How old is he in this time period?

A.   At this time period?

Fulton - direct

277

Q.   Yes.

A.   When I got locked up in '03, he was 6 months old.  So I watched Cam'ron grow up while incarcerated.

Q.   Was it tough to be separated from your baby as a 6-month-old baby?

A.   Yeah, yeah.  I felt like, I felt like, I felt like I should have fought harder somehow some way, but don't know how, how I should have.

Q.   It sounds like you blame yourself?

A.   Well, when you think about your baby in the moment, and you're not there, and potentially what your baby might be going through for that moment, you have guilty thoughts, right.

Q.   It's natural.

A.   But macro sense, I don't blame myself, no.

Q.   All right.  Were you able to maintain a continuing relationship with your son?

A.   Yes.

Q.   How did that work?

A.   We would talk over the phone, and his grandmother and his mother would bring him to come visit me.

Q.   Now --

A.   As well as we used to write each other mail and stuff like that.  I would write him letters.  He would send me cards and letters.

Q.   How about Yolanda's mother, did she facilitate the

relationship too?

A. Yes, she helped. So for the first part of Yolanda and her now husband's relationship, my son stayed with his grandmother for probably like maybe the first seven years maybe. And he would go over his mom's house on his mother's off days.

And then I decided that I thought it would be a good idea, because I was paying child support while I was incarcerated, and so since his grandmother is primarily taking care of him most of the time, then I thought it was only fair for me to give the child support to the grandmother because he's at her house 90 percent of the time.

And so when I talked to Yolanda about switching the payments over, that wasn't something that she wanted to do. And so she took Cam'ron away from her mom's house and permanently put him at her house so she could keep getting the checks.

Q. And what did you do?

A. What can I do?

Q. Did you give -- did Cam'ron still have a relationship with Ms. Henderson, the mother?

A. Yes.

Q. Were you able -- did both of them or either of them facilitate the relationship with you?

A. So Ms. Henderson, Ms. Henderson, she would help. So I would call her, and if I couldn't get contact with Cam'ron, she

would call and get in contact with him so we all could be on the phone talking.

Q.   Did Cam'ron get a new stepdad?

A.   Yeah.  That's the husband I was talking about.

Q.   Was that hard for you to be in prison for something you didn't do and your son has got a new dad?

A.   Yeah, it was.  And it was told to me -- I actually heard it where -- a conversation where he prevented her from bringing Cam'ron to see me because she didn't give him a heads-up that she was going to be bringing my son to see me.  So he blocked it, and she allowed it.

Q.   Was it hard to watch Cam'ron grow from 6 months and 2 and 3 to grow up without you?

A.   Yes.

Q.   Did you want to be a different kind of dad than your dad?

A.   Absolutely.  I wanted to be a dad like my grandfather was.

Q.   All right.  Now that you've had a new, a new child since you've been released, have you had an opportunity to do it right?

A.   Absolutely.

Q.   And have you taken advantage of that opportunity?

A.   Yeah.  My queen has given me an opportunity to do it over.

Q.   And are you taking advantage of that?

A.   Absolutely.  Been there every moment from the birth, first walks, first steps.  I'm there.  I work 90 percent from home

because my wife asked me to, because, you know, my wife is, you know, she's dealing with issues with postpartum depression, you know. So raising five children is a lot for one woman. So as her husband, it is my job to carry half the weight.

Q.   All right.   We'll talk about your new relationship in a minute.

I want to go back to prison for a minute and cover a few more topics. Can you tell the jury, you know, in prison, there is no liberty. That's an abstract concept. You don't have freedom to make your own decisions. Can you put into words how that affected you?

A.   Yeah, not being able to go home will make you drive yourself crazy.

Q.   Were you concerned about becoming your environment in there?

A.   No.

Q.   Explain.

A.   I try to walk in the light, right. I try to, I try to do things and carry myself in a way that will make my grandmother proud. My mother gave her life so I can be here. So she was a sacrifice for me to be here. So I owe it to her to walk right.

Q.   Do people tend to get institutionalized in prison?

A.   Yes.

MR. NATHAN:   Objection, foundation, vague.

BY THE WITNESS:

A.   So I'll wait --

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  Are you familiar with the term as I just used it?

A.  "Institutionalized," absolutely.

MR. NATHAN:  Objection, objection.

BY MR. LOEVY:

Q.  All right.  Did you observe --

THE COURT:  Okay.  Get his understanding of what that means and what his opportunity to observe was.

BY MR. LOEVY:

Q.  All right.  We'll start with your understanding, sir.  What is your understanding of people in prison getting institutionalized?

A.  People that are no longer striving to go home, people that have adapted to their environment.

Q.  All right.  Did you have an opportunity to observe people being institutionalized?

A.  Yes.

Q.  Did you let yourself be institutionalized?

A.  Some portions, yes.

Q.  Did you resist it?

A.  I tried.

Q.  Did you miss other life events or life events during the

Q. time you were in prison?

A. Yes.

Q. Give examples of holidays.

A. Well, my son was six months when I got locked up, so I missed all his birthdays. Every birthday I missed. My grandmother, I missed all of her birthdays. All the Christmases, all the Thanksgiving, all the holidays that you're taught the reason why holidays are important, the camaraderie, I missed everything.

Q. You lost your late teens and your twenties and your thirties. Are you able to put into words what it means to lose those important years?

A. It's tragedy, real tragedy.

Q. Now, you didn't know it -- I'm sorry, I didn't mean to cut you off.

A. Go ahead.

Q. Are you done?

A. I said real tragedy.

Q. You didn't know that your conviction was going to be thrown out and that you would be walking free at the time, right?

A. I've always felt that -- I never felt as though that I was going to be in prison for the rest of my life. I felt as though that when God was ready and he felt as though I was ready, he was going to let me back out.

Q. What was your strategy for the negative emotions when you

would feel them, how would you deal or cope?

A.   Exercise, pray, talk to my family members.  When I was in prison, talk to my cellies, you know.

Q.   I'm going to show you --

MR. LOEVY:  Maybe it would be just easier if I approach, Your Honor.  This is Plaintiffs' Trial Exhibit 255, pages 39.  I think it's a one-page exhibit, 39.  And this one doesn't have a page.

I'll identify 13268 and 13246.

May I approach and show the witness, Your Honor?

THE COURT:  Yes.

MR. NATHAN:  Have you got a copy for me?

THE COURT:  They've seen it.  They know what it is.

(Discussion off the record.)

MR. LOEVY:  May I approach, Your Honor?

THE COURT:  Yes.

BY MR. LOEVY:

Q.   Can you identify these, sir?

A.   The first one is a letter from Pops, who legal name is Clifton Satterfield, who position in my life is my godfather. He was also my PE teacher, basketball coach, flag football coach, track and field.  And I also dated his daughter, Kiana Satterfield, in seventh and eighth grade.

Q.   That's the guy you mentioned this morning?

A.   Yes.  The second one is Pops as well.

Q. It's also a letter, right?

A. Yes.

MR. LOEVY: All right. Your Honor, we move the letters into evidence.

MR. NATHAN: Objection, hearsay.

THE COURT: What are they offered to prove?

MR. LOEVY: Damages, Your Honor.

Your Honor, rather than lay the foundation and take the time, the plaintiff would propose that you'd reserve ruling and we can either admit it or not. I'm not going to do it in front of the jury anyway.

THE COURT: All right. I'll reserve ruling.

BY MR. LOEVY:

Q. All right. Did there come a time, sir, where you gave up in prison?

A. No.

Q. What stopped you from giving up?

A. I'm living for my momma. I'm fighting for my momma. And my grandmom is at home waiting for me. Giving up is not an option.

Q. Did some people in prison give up?

A. Yes.

Q. What would happen when people would give up?

A. They become their environment. They just, some of them -- I mean, it looks different for different people. You know,

Fulton - direct

285

some people, they give up, stop taking showers, like that.

You know, some people, they give up, decide that they're going to go full-fledged in gangbanging, and it looks different. Some people turn into alcoholics, drug addicts, heroin addicts.

Q. Did some people take their lives?

A. Yes, yes. Like suicide is for real in jail. It's a real thing.

Q. Did you consider suicide?

A. No.

Q. Did you get tested? Did your hope get tested?

A. Yes, my hope was tested, but it never strayed though.

Q. All right. Did there come a time when you got moved to a different prison?

A. Yes.

Q. What prison was that?

A. Danville, Department of Corrections.

Q. How did you go to Danville?

A. I was put in for a transfer by the administration because they felt as though that I was no longer supermaximum security material anymore.

Q. Over time you had developed a record in prison?

A. Yes.

Q. Did you have --

A. Well, not a record. So they go by your aggression level.

And your aggression level is really all tied in to the case that you are fighting and stuff like that. And so they need an evaluation period to determine whether or not you are an aggressor or not so aggressive.

If you don't catch disciplinary reports, you don't get in trouble, that knocks points off your aggression level.

Q. Okay. And you are not -- I mean, you got in fights in prison, correct?

A. Yes.

Q. But you were able to get your record in such a place that you could go to a different prison?

A. Yes.

Q. What prison? Where is Danville?

A. I think Danville is in Danville.

Q. What part of the state?

A. Danville, I think.

Q. Is it far from here?

A. It's 2 hours and 45 minutes.

Q. Did that make it harder for your family to visit?

A. Yes.

Q. All right. Why did you choose to go?

A. Say it again.

Q. Why did you choose to go?

A. I didn't choose to go.

Q. All right. Were there advantages in Danville?

Fulton - direct

287

A.   Yes.   So Stateville, of course, is 23 and 1, and Danville is 18 and 6.   And so you have more time to come out your cell now.   You have more availability to the telephone now.   They have more programs available if you want to join programs, recreation, more recreation for exercise.

Q.   Were you a reader before you went to prison?

A.   No.

Q.   Did you become a reader in prison?

A.   Yes.

Q.   What kinds of things did you like to read?

A.   Self-help books, real estate books, business management, "48 Laws of Power," "Behold the Pale White Horse."

Q.   That kind of stuff?

A.   Yeah.

Q.   All right.   How about your high school diploma, did you double back and get your degree?

A.   Yes.

Q.   What did you have to do for that?

A.   So they only offer, and when I was in supermax, they only offered a GED program.   But in order to get in the GED program, you have to go on a waiting list.   And the waiting list is according to how much time you got.

          So when I first went to prison, I had 31 years.   So if I would have signed up for the GED program, I would have went on the list.   But let's say somebody that came in had 29 years.

Fulton - direct

288

Then if I was bumped down on the list, I would be bumped down and would be replaced by them, right, because they felt as though they were going home sooner than me, so they needed the education more so than I did because they were leaving before I was.

Q. All right. And there came a time when you -- how did you go about getting your GED then?

A. Well, so I had my godmother look up a program called Ashworth University, I seen they commercial on TV, where they offer you an opportunity to be able to get your high school diploma instead of a GED.

Q. Did you do that?

A. Yes.

Q. Did you continue on at Ashworth?

A. Yes. So it's a program that you do by mail. You also have to pay for it. It's not free. And so that's the way I obtained my high school diploma, as well as started taking college courses in business management and paralegal studies.

Q. How many college credits did you acquire?

A. I did two semesters.

Q. How do you get college credits in prison? How did it work?

A. Well, they send you the material. And then when they send you the material, in order for you to take the exams, just so you're not cheating, they ask for you to have a proctor. And so the proctor is the person that, you know, makes sure that

Fulton - direct

289

it's you taking the exam.  So my counselor would be my proctor, and she would watch over me as I did the exam.

But the warden found out about it, and it was outside of her job description with the Illinois Department of Corrections, and so they told her that she could no longer help me in the program.  So I had to stop --

Q.   All right.

A.   -- my education.

Q.   Did you get some certificates at Danville?

A.   Yes, I did.

Q.   How would you do that?  You just put in for the --

A.   So at Danville, me and probably nine other individuals put together this program called the Building Block Program.  It is a lifestyle and redirection program for inmates that are -- it's basically to reintroduce them into society.  It's to help them, if they don't know how to read, to help them with reading, if they don't know how to write, help them with writing, just basically be there with them step by step to get them formidable.

Q.   How did you get involved in the Building Block Program?

A.   Well, the creator of it, Renaldo Hudson and some other individuals, came to me and asked me to be a part of it, and I agreed.

Q.   Did you participate actively?

A.   Yes.

Fulton - direct

290

Q.   Did you have a project of your own?

A.   Yes.  So in the state of Illinois during my incarceration, there was a huge problem with the telephones in all the penitentiaries.  There would be fistfights, you know, potential stabbings and stuff like that that would happen over the telephones, because your only ways of communication with the outside world is phone or mail or visits, right.  And so the average person isn't getting mail or visits, so telephone is it for them, right.

And so some people tend to be a little greedy with the phone.  And since they don't have no other form of communication, they may stay on the phone for an hour, which means you can't talk to your people, and now a fight potentially may break out.

So the warden asked us to come up with a program that would eliminate the fighting and try to find a way where everybody that's on the deck will be able to have the equal, same amount of time to use the phone.

So they came to me and asked me to come up with a phone system and to design a phone system where over 108 inmates would be able to use the phone throughout the course of the day.

Q.   Did you design such a program?

A.   Yes, I did.

Q.   Did the prison implement it?

A.   Yes.

Q.   Did you help execute it?

A.   Yes.

Q.   What did that look like?

A.   Well, first the inmates had to buy in.  But it was one of those things where you begin to categorize people, right.  So there are some inmates in jail that have jobs, right.  The guys that have jobs in the industry, they leave earlier in the morning.  So it's usually a lot of industry workers that leave, which means it's more time for other people to use the phone.

So you calculate how many people that's left over after they leave they jobs and you divide it by how much time was left over.

Q.   But what was your role actively?  Were you --

A.   To facilitate and coordinate the phone system.

Q.   Did you take it seriously?

A.   Yes.

Q.   Did the program succeed?

A.   Yes.

Q.   All right.  Did there come a time, switching topics, when you got sued by the victim's family, by Chris Collazo's family?

A.   Yes.

Q.   Were you able to defend that case?

A.   Ultimately, no.

Q.   Why not?

Fulton - direct

292

A.   Because my conviction was affirmed on appeal.  And once my conviction is affirmed on appeal, it's basically a suicide mission for me to take a case to trial when my conviction has been confirmed already.

Q.   Now, backing up, when your mother died, was there -- did you receive any -- not you -- indirectly receive any money from her death at the hospital?

A.   Yeah.  When my grandmother -- I mean, when my mother died, my grandmother sued the hospital, and there was a settlement awarded, and there was a trust account set up.

Q.   And what happened to most of that trust account?

A.   It was used to pay for legal fees, as well as I ended up using 400,000 of it to pay the victim's family for wrongful death.

Q.   All right.  Did you think that was fair, that your mother's death resulted in money that went to Chris Collazo's family?

A.   No.

Q.   How did that make you feel?

A.   Once again, I was losing.  But I felt as though that settling with the victim's family was the best course of action, because if I didn't settle and I would have went to trial, I would have lost.  And I wouldn't have been able to continue to take care of my grandmother, because I was paying all the bills at home, taking care of my grandmother as far as the nurses and staff was concerned.

Fulton - direct

293

I wouldn't have been able to pay for a legal defense for myself or Anthony Mitchell. I wouldn't have been able to take care of Cam'ron.

Q. And were you paying child support all through prison?

A. Yes.

Q. All right. After you had been in prison for some time, did you fight the case in court? Did you try to appeal and file appeals?

A. On the criminal case, yes.

Q. Did you work on it yourself some?

A. Yes.

Q. How would that -- how would you do that?

A. Usually go to the law library or go to the law library and get different procedural books, make copies of them, come back, try to study, try to learn the law.

Q. Were you relying on the lawyers anymore?

A. During prison?

Q. Yes.

A. Yes, absolutely.

Q. All right. Did you try to do it some of it yourself too?

A. Yes.

Q. And did you get good at the cases and the paralegals and stuff like that?

A. I got familiar with how to read the material, yes.

Q. Were you able to help other guys too?

Fulton - direct

294

A.   Yes.

Q.   Did you meet an attorney who helped you with your post-conviction attempts?

A.   Yes.

Q.   Who was that?

A.   My angel, Andrea Lyon.

Q.   You cannot say her name without saying "my angel."  Why is that?

A.   She believed in me when wasn't nobody else believing in me. She was the only attorney that showed up that didn't want money.  She's the only one that looked at me like a human being, like I was her child.  She's the only one that gave me a chance.

        And for that, I love you.  I forever love you, forever.  You are always my angel.

Q.   All right.

A.   And I am forever indebted to you, woman, forever.

        THE WITNESS:  Sorry, Judge.

BY MR. LOEVY:

Q.   You won?

A.   I haven't won yet.

Q.   Fair.  But you got your conviction overturned?

A.   Yes.

Q.   How did you find out that was going to happen?

A.   From a phone call.

Fulton - direct

295

Q.   What do you remember about it?

A.   Well, we were going through the post-conviction proceeding. The proceeding took seven years.  And, you know, Angel had gave me a heads-up that it was going to take a while.  Because it's easy to get to prison, but it's hard as hell getting out.  And she told me it was gonna be hard.

And we fought.  And those court dates, the state's attorneys would come up for a whole bunch of excuses for continuances:  They cat died, they cat had chemo, all type of garbage excuses to drag this thing longer than what it needed to be dragged.

Q.   But you did eventually find out that your conviction was going to be reversed?

A.   Yes.

Q.   When they first reversed your conviction, the state has a right to retry you, right?

A.   Yes.

Q.   Okay.  Were you able to bond out?

A.   Yes.  But they fought that.  They didn't want us to bond out, because they felt as though -- they asked the judge, they literally asked the judge:  Judge, Your Honor, can you hold them, even though you've granted them a new trial, can you hold them until we decide whether or not we want to appeal or not?

Q.   Did the Court agree?

A.   No.  And so since my angel knew that they was gonna

probably pull that, because that's what they do, she put in a pre-motion with the judge that in the event that you did decide to grant favor to me, that we would already have a motion that you could be familiar with. So when that time comes, it will already be on the record.

And so when that time came, once again, the state act like they didn't know what happened. They act like she didn't file no motion or she fought hard. And the judge reviewed it, and the judge said: Well, you know what, since Ms. Lyon did what she was supposed to do, and you're contesting, then to please both sides, then I'm going to raise the bond to $94,000 cash.

So in order to bond out, I had to come up with $94,000 for myself and $94,000 for Anthony Mitchell.

Q. Did you still have that money left from your trust from your mother?

A. Yeah, what was left over that Collazo and his family didn't take and I didn't end up paying out in attorney fees.

Q. Why did you decide to use some of it on Mr. Mitchell?

A. Because I feel like I'm one of them type of people that I was taught to lead by example. It's the way my grandmother raised me. So we came in here together, we leave together. They framed us together, we walk out of here together. And we gonna come back and we gonna fight them together. That's the way it go. That's what justice looks like for me. This is

Fulton - direct

297

justice for me.

Q. All right. And do you consider yourself -- over the years, have you grown close to Mr. Mitchell?

A. Yeah.

Q. Did you guys go through this together in prison?

A. Yeah.

Q. Were you able to give each other strength?

A. Yes.

Q. Were there times you felt like maybe Mr. Mitchell was losing strength, considering giving up?

A. Yes.

Q. Were you able to try to help him?

A. Yes.

Q. What would you tell him?

A. Ain't no giving up. You can give up if you want to, but I'm dragging you up here out of here with me. And I'm not leaving without you.

Q. Do you consider him a brother?

A. Yes.

Q. When you got out of prison, did you think, I mean, do you walk out the door? What happens?

A. He actually walked out before me.

Q. All right. Does a person leave out the front door? I mean, how does it go down?

A. It's a process. They process you out. It takes forever.

It takes at least six to seven to eight hours.

Q. Well, you waited 16 years, you can wait 8 hour more.

A. Hey, I did it with my feet kicked up.

Q. All right. Did you think it was real?

A. Yeah.

Q. Then what happened?

A. He walked out. And then probably like 45 minutes to an hour later, my number was called, and I walked out too.

Q. Who was there waiting for you?

A. His little brother Stan.

Q. And, you know, nobody could be sure what date you would get out or when you got out?

A. Right. So when Yolanda had came, when Yolanda came with the bond money, they told her that they were going to release me sometime, release us sometime after 3:00 o'clock, because initially when we won a new trial, Yolanda had came up there to bond me out, but since they set the bond so high, I didn't liquidate enough funds for Mitchell too, because I didn't think our bonds was going to be that high.

And so since I didn't have enough money at the time in the check form with Yolanda to bond him out, then I chose to go back in jail until he could leave with me. And the reason why that happened is because the state didn't do they job.

Q. All right. Sir, did you have an intention to surprise any of your family members?

A.   Yes.

Q.   Who was going to be surprised?

A.   So I had this thought in my head to show up at my son's high school.  You know, I've always seen those -- I'm pretty sure you guys have seen those times and those episodes on the news where the guy from the military or the mother from the military doesn't tell the children when they're coming home.  And now when the kid comes out the classroom or they walk through the doors, it's a total surprise.  It's like a complete meltdown, but a joyous meltdown, right.

And I wanted Cam'ron to experience that, because I got snatched away from Cam'ron before Cam'ron knew what daddy was, right.  And so I wanted him to feel that.

But my wonderful godmother, that's his grandmother, she couldn't hold water.  She broke the secret the day I was coming home.

Q.   Well, maybe you don't want to like totally freak somebody out, you know.  But was it good to see him?

A.   She did good all the way up until the day.  We had been planning this for three years, four years.

Q.   All right.  Was he happy to see you anyways?

A.   Yeah.

Q.   Did you go visit your grandmother?

A.   That was the first stop I did.

Q.   All right.  Your grandmother, was she the same person as

Fulton - direct

300

when you got taken away?

A.   No.   So while incarcerated, my grandmother got diagnosed with dementia, June 5th of 2015.   It was like, it was like a light switch.   I called her, talked to her like I normally do. She was older at this time.   And it would be times where she would call like -- all my family members called me Jonathan. My name is John Jonathan.   And so Jonathan is the name that they call me by.

And so I talked to her.   She told me she was getting ready to go to the doctor, like a regular doctor's appointment. I called back at like 3:30 to check up on her.   And it was like she was gone like.

Q.   All right.

A.   She knew me, but it was space.

Q.   Was it tough for you to go in when she was herself and to come out and she had dementia?

A.   No, it wasn't tough.   She took care of me when I couldn't take care of myself when she was experiencing a loss of her child.   I owe her.

Q.   Was she able to recognize the significance of the occasion when you left prison and went to her house?   Did she understand what was happening?

A.   No.

Q.   What do you remember?

A.   She was just laying there in the bed watching TV.

Fulton - direct

301

Q.   And you're like, "Grandma, I haven't seen you in a long time."

A.   Yeah.  She ain't seen me in 16 years, the whole time I was incarcerated.  And so I walked in the room, put my arms around her and I cried.

Q.   Your grandfather wasn't there anymore?

A.   No.  My grandfather died in '05.

Q.   Where did you go live?

A.   Well, Angel and my godfather thought it would be a good idea for me to move with my godfather, Clifton Satterfield.

Q.   That was the gym teacher?

A.   Yes.

Q.   Did you live with him for a while?

A.   Yes.

Q.   Now, I assume, you know, you're very happy when you were released, right?

A.   Somewhat.

Q.   Does the euphoric phase wear off and you have to make a life out there?

A.   Yeah.

Q.   Did you have trouble operating on the outside after having been gone?

A.   Yes.

Q.   Can you tell the jury why it was hard to function?

A.   Everything was different now in the world.  Literally

Fulton - direct

302

everything went from filling out an application to now everything is online and emails, right.

When I got locked up, AOL had just started, right. There was no -- that was the chatroom, right. But now literally everywhere you wanted to go you had to go online. Even to go to the DMV, you couldn't just go into the DMV no more, you had to make an appointment, right, and you had to do that online. It wasn't pick up the phone and call. It was you have to learn how to use technology. And I've been away from technology for 16 years.

Q. Was it a hard adjustment?

A. Yes.

Q. How about your sleep, has this experience affected your sleep?

A. Yes. I literally still live on my prison schedule. So every day, no matter what time I go to sleep, I wake up at 5:00, no later than 6:00. And my body won't allow me to go back to sleep.

Q. Do you have dreams about prison?

A. I don't have dreams, but as I'm sitting here talking to you I'm standing in prison. I remember it. I don't want to forget it.

Q. Did you feel like you still had a stigma attached to you as a, you know, convicted murderer?

A. Yes.

Q. Did there come a point when the state had to decide if they were going to retry you or let the charges go?

A. Yes.

Q. And did they -- all the same evidence still existed, right?

A. Yes, sir.

Q. Which was what?

A. The video footage from the hospital, the cameras from Lake Meadows, the no physical evidence, the no witnesses, the no murder weapon, to no blood in my trunk of the car. You name it.

Q. They still had your oral confession, right?

A. Yes.

Q. What did the state decide to do?

A. Oh, the state, they wanted to -- they decided to dismiss all charges. But they wanted to do it in a way in which the people that this injustice has been done to can't celebrate.

MR. NATHAN: Objection. Objection, foundation. Move to strike.

THE COURT: I think we'll just stop at "dismiss all the charges."

BY MR. LOEVY:

Q. All right. The charges were dismissed, sir?

A. Yes.

Q. Were you happy?

A. Well, we couldn't celebrate in the courtroom. That was one

of the rules.

Q.   What do you mean?

A.   Well, the state's attorney, when we walked into the courtroom, we sat in the pews for a minute, and then the state's attorney walked in and asked Mrs. Lyon, my attorney, Angel, to step outside, outside the room, she wanted to talk to her.

She went outside to talk to her.  This was supposed to be just a regular court date because we had agreed that we was gonna potentially, if there was going to be another trial, it was going to be after New Year's sometime.  And so this was July at the time, July of 2019, and Angel came back in, and she said, "Okay, I need you guys to hurry up and come outside real quick."  So we went outside the courtroom.  And she said, "Well, I got some good news."  She say, "The state has finally decided that they got some sense and they want to drop all charges."

She say, "But you can't -- the rules is they say that you can't celebrate in the courtroom.  And they're not gonna say they're dismissing all charges.  They're going to use a Latin term called 'nolle prosecute.'  When they say 'nolle prosecute,' that basically means that they're dismissing all charges.  But you can't celebrate.  You can't cheer.  You can't do nothing.  You have to wait until you get outside the courtroom, and then you can yell as loud as you want to."

Fulton - direct

305

Q.   And what did you do?

A.   Followed the instructions.

Q.   What did you do when you got out of the courtroom?

A.   Well, we didn't yell, because it was still unbelievable.

Q.   All right, sir.  I want to cover a few more topics about your life since this experience.

Where did you go to work when you got out?

A.   I started working for a used car dealership by the name of DDNS Automotive Group.

Q.   And was Riff's dad there?

A.   Not initially, no.

Q.   What did Riff's dad do?

A.   He's a mechanic.

Q.   All right.  And you told us this morning about the auto dealer.  You eventually went off on your own?

A.   Mm-hmm.

Q.   Took the test, got your own dealer?

A.   Yes.

Q.   Do you also -- are you trying to start a property management company?

A.   Yes.  So last year in March I started a property management company by the name of John Fulton.  We are a property management company in which we try to make customers' lives easier, right.  So if you have property that you don't want to manage because it's too hard or it's too much of an

inconvenience, but you would still like the passive income or just the ability to have the property, we provide our service where we will manage the property for you.

Q.   Okay.   Now, when you first got out, did you do any other jobs with your car?  And I mean driving it.  Sorry.

A.   Oh, yeah.  I started doing DoorDash.  I started doing DoorDash, I want to say November of 2023.

Q.   What did you like about DoorDash?

A.   It allowed me to be isolated away from people.  I didn't have to really have to come in contact with people like that, because crowds and stuff made me nervous.  They still make me nervous.  I don't like crowds of people.

Q.   Is that how you were before prison?

A.   No.

Q.   What is it about prison that made you not like crowds?

A.   Because it's always loud, noise, crowds in prison.

Q.   How many DoorDash drives did you end up doing?

A.   I've done over 3,470 deliveries.

Q.   All right.

A.   Since November of 2023.

Q.   I want to talk about your wife Dominique.  Had you known her before prison?

A.   No.

Q.   How did you meet her?

A.   I was introduced to her by Anthony Mitchell.

Fulton - direct

307

Q.   And Anthony Mitchell, I guess we can call him Riff, right?

A.   Riff.

Q.   Is that what you call him?

A.   Yes.

Q.   Where did she work at the time?

A.   She was a nurse in a CILA home.  So a CILA home is a nursing home, but they converted a regular residential home into a nursing home and --

Q.   And -- I'm sorry.

A.   And her job there was, she was a nurse, so she would go, she would help them, she would change they diapers, they dressings, give them baths, feed them, make sure they had their medications, change their beddings.  You know, a nurse's job.

Q.   Was it easy to date after having had this experience you had?

A.   No, it wasn't easy, because this experience made me, it kind of made me second-guess people.  Because in jail you can't trust hardly nobody.  People will manipulate you and become your friend just so they can use you.  So it literally makes you evaluate every person that you come across.

Q.   Did you grow to love Dominique?

A.   Absolutely.

Q.   Did she have children?

A.   Yes, she have four children already.

Q.   And have you made them part of your life?

A.   They my kids.

Q.   Do you have strong relationships with them?

A.   Absolutely.

Q.   What other ways does your prison experience affect your marriage and your ability to be in a marriage?

A.   Repeat that.

Q.   As far as being in a marriage, being a partner in a marriage, did your effect in prison -- did prison have an effect on your ability to, you know, celebrate holidays or be in family gatherings and stuff like that?

A.   Yeah.  My wife is, she's a very family-oriented person. She likes to do the big dinners, and she likes to cook and camaraderie.  And me, since my bad experience that I had while being incarcerated, I don't like celebrating holidays.  I don't feel the camaraderie.

I feel the camaraderie with our family that we have in the house with her and our kids.  But any outside family members, me personally, I only have my dad and my uncle Jerome and my aunty, and they older people.

So that's the reason why I wear my shirt everywhere, because it has, it has my mom on the front.  I never got an opportunity to take a collage picture with my family, with my mom and my dad.  And so when I got out, I created this shirt because it allowed me to be able to have all my family members at once with me, and I can wear it every day all day.

And so my mother's picture of course is in the front, because the dealership is named after her. My grandmother and my grandfather who raised me, they're on my back. My grandmother protects and watches my back for me.

MR. LOEVY: Your Honor, with permission, can he show the jury the back of his shirt?

THE COURT: Yes.

BY MR. LOEVY:

Q. Can you stand up and turn around.

A. (Standing).

Q. Who are they looking at there?

A. My grandmother and my grandfather.

Q. All right. And if you'd turn back around. You wear something around your neck as well?

A. Yes.

Q. How often do you wear that?

A. Every day.

Q. Who is on it?

A. My mother and my grandmother, the same you see, the same pictures you see here.

Q. Okay. And then respect for the court, why don't you put it back in since we're still in court.

Did you and Dominique move in together?

A. Yes.

Q. Where?

A.   Hazel Crest, Illinois.

Q.   And when did you marry?

A.   August of 2020.

Q.   And what do her children do that have now become your children?

A.   You say what do they do?

          MR. NATHAN:  Objection, relevance.

          MR. LOEVY:  I'll move on in the interest of time, Your Honor.

          THE WITNESS:  Okay.

          MR. LOEVY:  I'll withdraw the question.

BY MR. LOEVY:

Q.   Did you and Dominique try to have kids?

A.   Yes.

Q.   How did that go?

A.   We lost three children along the way.

Q.   Was that hard?

A.   Yeah.

Q.   Were you blessed with a successful birth of a child?

A.   Yeah, God blessed us.  Our last child that we lost, the projected birthday for that child was supposed to be on Thanksgiving.  But we end up losing that child.  And then ultimately, the baby that she ultimately got pregnant with, Jo'han Adolphus Devontae Fulton, spiritually, the following year, he was born actually on Thanksgiving, the same day that

our previous child that we lost was supposed to be born the year before.

Q. And Thanksgiving is --

A. And it wasn't planned.

Q. Thanksgiving is a day of thanks. Do you have things to be thankful for, sir?

A. Absolutely.

Q. You are also a godparent to somebody?

A. Yes.

Q. Who is that?

A. So my wife's -- not my wife's. I'm sorry, I apologize.

My son's best friend, Miguel, they've been, they've been friends since I think like sixth grade or fifth grade. They both share -- they both have father issues. His father was murdered when he was 10 years old. And so he grew up in a house with a single mom, just like Cam'ron did. So they ended up bonding like that. And since he doesn't have a father figure in his life, then why not.

Q. All right. Do you still have connections to the people that you went to prison with or that you met in prison?

A. That are still incarcerated?

Q. Yes.

A. Absolutely.

Q. And have you made -- I think you mentioned before that you've made good friends with somebody that you've got out of

Fulton - direct

312

prison with?

A.   Yes.

Q.   And who is that?

A.   Somebody that has gotten out of prison?

Q.   Yeah, that got out.  George.

A.   Yeah, yeah.  Me and George, that's my brother.  I love him.

Q.   And do you and George work together at the dealership?

A.   Absolutely.

Q.   You've mentioned trust issues.  Do you have a hard time on the outside trusting people?

A.   Yes.  I only trust people 99 percent of the way.  And as much as I love my wife, I'll give anything for her, she's in that 99 percent too.  I don't a hundred percent trust nobody.

Q.   And is that how you were before this experience happened to you?

A.   No.

Q.   Do you feel like you've recovered?

A.   No.

Q.   You've used an ice cube analogy.  Can you put it in your own words?

A.   So the best way I can explain my experience in jail, in prison, is picture, picture an ice cube.  And if possible, picture a human-sized ice cube, right.  You're inside the ice cube.  It's clear.  It's glass.  You can see everybody else, and everybody can see you.

You can see everybody age and get older. They can see you age and get older. But you're not there. You're stuck. You're trapped. You can scream out, but nobody really hears you. So you feel like you stuck inside this ice cube no matter where you go. No matter how hot it gets, it doesn't melt. No matter how cold it gets, it doesn't crack. You are just here.

Everybody expects for you to -- oh, you're out of prison. You should be normal. You should get back. Get back, get back to -- you know, you shouldn't be crying.

I literally hug trees sometime. I go outside and put my bare naked feet in the grass. I'm happy to be free. Every moment is an experience for me. I don't take none of it for granted.

But there is a portion in the back of my mind that feel like all of this can be snatched from me at any given moment, because my life was snatched from me at any given moment. So why do I believe that it can't happen again?

Q. As far as emotions, are you angry?

A. Yes.

Q. It's not healthy to be angry, sir, is it?

A. No.

Q. So why don't you let it go?

A. I guess time will fix all wounds.

Q. Do you forgive the people that did this to you?

A. Who, those people (indicating)?

Q.   Yes, sir.

A.   Absolutely not.  I don't forgive them.  And if I had it my way, each one of them would do 16 years in prison.  Then we'll be even.

Q.   Has anybody ever apologized to you?

A.   No.

Q.   Why not just put it past you, let it go and move on, sir?

A.   Because I'm broken, and they broke me.  And I had to put myself back together with the help of my creator.

Q.   Have you found closure?

A.   My wife and my family is closure for me.  My angel is closure for me.

Q.   Now, you're going to be cross-examined.  Is it easy for you to be called a murderer?

A.   Say it again.

Q.   Is it easy for you to be asked questions suggesting you are guilty of murder?

A.   I'm not no murderer, so it don't affect me.

Q.   Do you get frustrated and angry?

A.   No, because he they lawyer, he's supposed to represent them.

Q.   Is this easy for you being in a trial?

A.   It's not easy for me sitting in no courtroom, period.  I was once -- every time I came to a courtroom, I was treated like a slave.  My hands had to be put behind my back, and I

couldn't talk.

The judge didn't want to hear nothing I had to say. "I'll talk to your counsel. I don't want to talk to you." So shackle up, slave, and go back in the back.

Officers, when they talk to you, "You're not John Fulton. Inmate, what's your number?

"R57568. That's my number.

"Right. That number goes over here."

They don't want to know your name.

Q. Are you hoping that if this experience concludes, that you can put it behind you?

A. Yeah. Me and Angel, we got some things we working on.

Q. All right. Do you think would justice make you feel better?

A. Absolutely. It will help.

Q. All right.

MR. LOEVY: I don't have any other questions, Your Honor.

THE COURT: All right. We'll take a recess.

(Jury out at 2:35 p.m.)

THE COURT: You may step down.

THE WITNESS: Your Honor, may I have a minute? If I was disrespectful at all, I apologize. I just got a lot going on.

THE COURT: Yes, I understand.

(Recess at 2:36 p.m. until 2:50 p.m.)

(Jury out.)

THE COURT: So I am going to give you a ruling on the Fifth Amendment issue based on *Harris versus City of Chicago*, where the court --

(Witness reenters.)

THE COURT: -- reversed for allow -- for excluding the Fifth Amendment invocation because of prejudice. But then the court goes on to say: "If" -- this is dicta, but: "If, as defendants contend, Ramos waived his privilege well before trial and agreed to testify to matters concerning Harris' arrest, then Harris had sufficient opportunity to obtain discovery from Ramos on all issues related to the trial. Thus, the probative value of Ramos' prior silence was extremely low, and the district court was justified in excluding it pursuant to Rule 403."

And then it goes on to say: If, on the other hand, is what happened in that case, the evidence was excluded, that that was prejudicial error.

So since the defendants haven't been able to find any case that a judge let this in -- and I think this is wisdom from the Court of Appeals, at least guidance. So that's going to be the ruling.

MR. NATHAN: Your Honor, since we filed our response this morning --

THE COURT: Uh-huh.

MR. NATHAN: -- Mr. Fulton testified on direct examination that he would have talked to the police if they had Mirandized him and then -- because he didn't do anything, and he said, "I don't have anything to hide." And in our view, that's opened the door.

In addition, to clarify Your Honor's ruling --

THE COURT: All right. Well, you --

MR. NATHAN: -- it did come out --

THE COURT: -- made your record, but I --

MR. NATHAN: It did come out on cross-examination -- on direct examination that Mr. Fulton took the Fifth Amendment at his trial. So --

MR. LOEVY: No. He said he didn't testify. He didn't take the Fifth.

MR. NATHAN: Right, right.

MR. LOEVY: He didn't take the stand.

MR. NATHAN: Right, that's true.

THE COURT: He didn't testify.

MR. NATHAN: That's -- yes. So I just want to make sure I understand --

THE COURT: I am not going down that --

MR. NATHAN: I understand --

THE COURT: I don't want --

MR. NATHAN: -- Your Honor --

THE COURT: -- us having this satellite litigation over why things happened at the trial, and --

MR. NATHAN: Your Honor, I'm trying --

THE COURT: Stay focused.

MR. NATHAN: -- to make sure I'm complying with your ruling, so I just want to be clear.

My understanding is that you're excluding me from raising the fact that he invoked his Fifth Amendment privilege at a deposition.

THE COURT: Yes.

MR. NATHAN: Okay.

(Pause.)

MR. LOEVY: Your Honor, we were trying to figure out what Mr. Nathan was just getting at there.

If he starts saying: You didn't testify at trial, then Mr. Fulton's presumably going to explain why. But, remember, they wanted to keep out --

MR. NATHAN: Excuse me. One second. Mr. Fulton's right here. If we're talking about what his testimony should be --

MR. LOEVY: I'm not --

MR. NATHAN: -- he should be excluded.

MR. LOEVY: All I'm saying is --

THE COURT: Don't talk --

MR. LOEVY: Remember what we were talking about

before? What Mr. Fulton's explanation was for why he didn't testify.

Mr. Fulton's the one who gave that explanation. He would be opening that door if he asks him. He shouldn't ask him if he doesn't want to open that door.

MR. NATHAN: I understand that I am not supposed to ask him about any questions about his prior deposition, and I --

MR. LOEVY: No.

MR. NATHAN: -- am fine with that.

THE COURT: All right. Then the fact that he didn't testify?

MR. NATHAN: That was reason --

THE COURT: Is that what you --

MR. NATHAN: That was reason --

THE COURT: -- want to bring out?

MR. NATHAN: -- on direct examination. I do think it's fair game.

THE COURT: Well, I have ruled.

MR. LOEVY: We don't have a problem with that, Your Honor. But the answer -- he's not going to like the answer. So if he doesn't like the answer, why should he ask it?

MR. NATHAN: But --

THE COURT: I guess I --

MR. NATHAN: I understand Your Honor's ruling.

Fulton - cross

320

THE COURT: Okay.

(Pause. Jury in at 2:55 p.m..)

THE COURT: You may be seated. Go ahead, Mr. Nathan.

MR. NATHAN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. NATHAN:

Q. Good afternoon, Mr. Fulton.

A. Good afternoon.

Q. You testified on direct examination, when Mr. Loevy was asking you questions, that there were many people in prison who were saying that they were innocent, and that's what everybody was saying, and he said, "Get in line," right?

A. That's what the officer said.

Q. That was your testimony today.

A. But I testified that that's what the officer stated.

Q. Now, it is true that many people in prison believe they were innocent, right?

A. You said -- is that a question?

Q. Yeah. Isn't that true?

A. State it again.

Q. Sure. You would agree with me that many, many people who you encountered in prison, including the people you talked about trying to help with their convictions, they all were claiming they were innocent, true?

A. Most.

Q.   And that's what the officer was talking about when he was saying, "Well, if you're claiming you're innocent, get in line," right?

A.   So, to clarify what I said, is that if you're an individual in jail claiming that you're innocent, the universal acceptance that you're gonna get from the officer's ears is, "Hey, get in line.  Tell me something that all the other inmates aren't telling me that you're innocent."

     There's not a lot of people saying they're guilty.  It's very --

Q.   Right.

A.   Uh-huh.

Q.   And prison for all of the people, guilty people included -- and there are many of them -- it's a tough place, right?

A.   Yes.

Q.   If somebody, unfortunately, commits a very violent murder, and they go to prison, it is very difficult for them to endure that experience, correct?

A.   It's a case-by-case basis.

Q.   For every single person who has to experience time in prison, it's not a good experience, right?

A.   I can't speak for every single person.  I can only speak for myself.

Q.   That's because -- and, by the way, guilty or otherwise, if somebody is finished with their sentence and goes out of prison

and does -- gets a business together and successful in life, that's a good thing, right?

A.   Yeah.   Should be.

Q.   You know, congratulations on accomplishing that.

A.   Do you mean it?

Q.   I do.

A.   Okay.   Thank you.

Q.   Now, going back to the case of -- that we're talking about here today, the investigation into the murder of Christopher Collazo.

You did tell Assistant State's Attorney McRay Judge on March 19th, 2003 that you participated in a beating, kidnapping, and burning of Christopher Collazo, correct?

A.   Correct.

Q.   And you also referenced that earlier, that he testified at your criminal trial that he, in fact, heard you confess to him as to the killing, burning, and kidnapping of Christopher Collazo, right?

A.   Repeat your question.

Q.   Assistant State's Attorney Judge testified at your criminal trial in 2006, right?

A.   Correct.

Q.   And he testified about the fact that you confessed to him.

A.   As well as other things.

Q.   You also told Assistant State's Attorney Jake Rubinstein

that following day, on March 20th, 2003, that you participated in the kidnapping, burning, and killing of Christopher Collazo, true?

A.   Is that the first time I spoke with Rubinstein or the second time?

Q.   Did you ever confess to Jake Rubinstein, saying that you did participate in kidnapping, beating, and burning Christopher Collazo?

A.   Yes.

Q.   At your trial that we just referred to in 2006, you were represented by a man named Elliot Zinger, correct?

A.   He was one of two lawyers.

Q.   And Elliot Zinger is the man we also heard about who saw you at the police station, right?

A.   Correct.

Q.   He was with you as an attorney from, essentially, day one, correct?

A.   No.

Q.   He started off, he was with you as your attorney at the police station, continued to -- as your attorney all the way through your trial in 2006, true?

A.   He became my lawyer that Friday, and from that Friday forward until the conviction, he was my attorney.

Q.   Okay.  So we agree that from March of 2003 through the end of August of 2006, he was your lawyer, right?

Fulton - cross

324

A.   Wrong.   He became my attorney March 21st, or that Friday, when he came to see me, is when he became my attorney.

He wasn't my attorney when I got arrested on the 18th, he wasn't my attorney on the 19th, and he wasn't my attorney on the 20th.

Q.   Okay.   I don't think we're disagreeing, so I can move on.

A.   But we are, 'cause you said the month of March up until now.   So that would include March 9th, 10th, 18th, 19th, 20th.

I'm speaking about him being my attorney for specific days, from that Friday, which was the second interview from Rubinstein --

Q.   And one second.

A.   -- forward.

Q.   And that was in March of 2003, right?

A.   Yes.

Q.   Okay.   And he was your attorney from that moment in time through the end of your criminal trial, true?

A.   Yes.   One of two lawyers.

Q.   At your criminal trial, we talked about evidence that was introduced there.   That included these polygraph records that was talked about at your criminal trial, right?

A.   I believe so.

Q.   And this issue about the bus and the bus schedule, that was also talked about at your criminal trial?

A.   I believe so.

Fulton - cross

325

Q.   And the question about your phone records, that was also in the criminal trial?

A.   I believe so.

Q.   And this notion about you going into -- there being a video showing that you go into your apartment building at around 11:57 p.m. on March 9th, that was also part of your criminal trial, right?

A.   What's "notion" mean?  Explain that.

Q.   Sure.  I'll try to rephrase.

      The -- part of your criminal trial included your defense of alibi, right?

A.   Correct.

Q.   You were saying that you were in your apartment as of 11:57 p.m., correct, on March 9th?

A.   Correct.

Q.   And the State, meaning the prosecutors, were saying that, really, Christopher Collazo's body was found at 3:00 a.m., correct?

A.   I don't know what the State was saying.  I can't speak to what they were saying.

Q.   You remember that the State's theory was that your alibi or that video didn't prove anything because you could've left out of the back door of your apartment, right?

A.   Yeah.  That was their theory.

Q.   Right.  Their theory was that you could've left from 11:57

from your apartment and gone and committed the murder, right?

A.   That was their theory.

Q.   And you said -- and you offered, at the trial, these videos showing that you had an alibi from an earlier time period, right?

A.   Right.  The alibi was from 8:30, from the time I arrived at the hospital, up until midnight.

Q.   So you had a video from around 10:30 at the hospital and then also a video at around 11:57, right?

A.   So I had a video from the hospital from 8:30, when we got there, till 10:30 when I left, until -- you see the Lake Meadow camera shows me walking through the front door of Lake Meadow. Then it shows me walking out of Lake Meadows.

        Then the video at the hospital shows Yolanda leaving the waiting room.  Then it shows Yolanda at the building again, walking through the building.  And then the building video shows me walking into the building a little bit after her.

        That's what the videos show.

Q.   Right.  And that's why the State was saying:  No, no. These videos, they didn't prove anything, because he left out of the back door of his apartment from sometime after 11:57 and 3:00 a.m. when the body was found burning, right?

A.   I don't know what they theory exactly was.

Q.   In any event, at your trial, you did not testify there, correct?

Fulton - cross

327

A.   Correct.

Q.   Isn't it true that you got to wait until your deposition in 2022 before you ever testified about what happened relating to your alibi and whether or not you killed Christopher Collazo?

A.   Say that again.

Q.   Sure.  By the time you testified at your deposition in 2022 --

A.   Okay.

Q.   -- you had the benefit of hearing all of the evidence that the State was going to present, correct?

A.   Okay.

Q.   You sat through your entire trial, right?

A.   Okay.

Q.   You heard all about the bus records, right?

A.   Okay.

Q.   You heard about -- all of the testimony from every single officer who testified at your trial, right?

A.   Okay.

Q.   From State's Attorney Jake Rubinstein, right?

A.   Okay.

Q.   And you also heard the testimony, for example, from State's Attorney McRay Judge, right?

A.   Okay.

Q.   But you didn't actually put yourself on record, did you, at that point in time?

A.   No.

Q.   At the time of your 2006 trial -- well, let me back up before that.

          Before you were even arrested, you were very good friends with Antonio Shaw and Anthony Mitchell, correct?

A.   Correct.

Q.   And you actually had nicknames for them, right?

A.   No.  They had they own nicknames.

Q.   All right.  What were the nicknames that you called Mr. Mitchell?

A.   Riff.

Q.   And the nickname you called Mr. Shaw?

A.   Stick.

Q.   And they actually were so close with you that they lived in your apartment, right?

A.   Correct.

Q.   And they'd go everywhere with you, right?

A.   Not everywhere.

Q.   They'd drive around in your car all the time with you, right?

A.   Not all the time and not everywhere.  I just stated that.

Q.   In any event, you were good friends with Mr. Shaw, right?

A.   Correct.

Q.   Shaw or Stick, the same person?

A.   Correct.

Fulton - cross

329

Q.   It would have been pretty -- well, the State, at your trial, was saying that you, Mr. Mitchell, and Mr. Shaw were present at the abduction, beating, and burning of Mr. Collazo, right?  That's what they were saying?

A.   Yes.

Q.   So it would've been pretty helpful for you if Mr. Shaw testified at your trial and said, "Wait a second.  No, no.  We weren't there," correct?

A.   Now we're talking strategy.

Q.   Would it have been helpful at your trial if he got on the stand and said, "I was there, and we didn't do any of that"?

A.   It's possible.

Q.   It would've been helpful -- I kind of misspoke, but it would've been helpful if he said, "I was never at the abduction, burning, and killing of Collazo, and, therefore, Mr. Fulton couldn't have done it," right?

A.   What's your question?

Q.   That would've been helpful, true?

A.   It's possible.

Q.   And it would've been helpful -- strike that.

         But Mr. Shaw did not testify at your trial, did he?

A.   No.

Q.   Isn't it true that while you were awaiting trial, you were at Cook County Jail, you told Mr. Shaw to get out of Cook County, right?

A.   I told -- what -- when are you stating this?

Q.   Isn't it true, sir, that you paid Sticks, Mr. Shaw, $500 so that he would leave the state and go to Wisconsin?

A.   No.   I told him I would.   I didn't never give it to him, though.

MR. NATHAN:   Your Honor, I'd like to play page 324 of Mr. Fulton's deposition, lines 8 through 17, please.

MR. LOEVY:   Objection, Your Honor.   It's not impeaching.

Would you like a copy of the deposition?

THE COURT:   Yes.

MR. NATHAN:   It's an admission.

(Document tendered to Court.)

THE COURT:   What page are we on?

MR. NATHAN:   324, lines 8 through 17.   Actually, 8 through 24.

MR. LOEVY:   Our objection is it's not inconsistent.

THE COURT:   Sorry?

MR. LOEVY:   It's not inconsistent --

THE COURT:   It's not impeaching?

MR. LOEVY:   -- with his testimony.

THE COURT:   Okay.   Just let me find it.

What line did you say?

MR. NATHAN:   8 through 24.   And we're seeking to include this as an admission, whether or not it's impeaching.

MR. LOEVY: He's not denying it, Your Honor.

THE COURT: You objected to that? I mean --

MR. LOEVY: I mean, he's not denying it.

THE COURT: Yeah. He admitted that he talked, so -- I mean, it's cumulative, but I guess it's admissible.

We're talking about what lines?

MR. NATHAN: 8 through 24.

THE COURT: 8 through 24.

MR. LOEVY: 17, Shneur.

THE COURT: Well, I --

MR. LOEVY: Well, then we object from 18 to 24, Your Honor, because that's been covered by a different issue.

MR. NATHAN: 8 through 17 is fine.

THE COURT: Okay. That's fine. Lines 8 through 17 are received in evidence.

MR. NATHAN: We just need to play the video.

(Said video played in open court.)

BY MR. NATHAN:

Q. So, Mr. Fulton, isn't it true you did pay $500 to Stick, also known as Antonio Shaw, so that he would go out of Cook County and go to Wisconsin?

A. I answered no.

Q. You deny that?

A. I did not give him $500 to get out of Illinois to go to Wisconsin.

Fulton - cross

332

Q.   And that would be pretty incriminating if you had, correct?

A.   What's incriminating about it?

Q.   If you sent -- paid $500 to a key witness in your case to make sure he was unavailable for trial.  True?

A.   Now, that's -- that's -- repeat your question again.

Q.   Can we agree that it would be highly inappropriate for you to be paying a key witness --

A.   Okay.

Q.   -- at your criminal trial to make sure he wasn't around to be able to give testimony?

A.   That's one way of looking at it.  It's perspective.  That's the way you look at it.

Q.   But you clearly now deny giving Mr. Shaw $500.

A.   I've never given him $500 to leave Illinois.

Q.   And you deny -- to my point, you deny saying, "You should go to Wisconsin"?

A.   I don't deny saying he should go to Wisconsin.  He was just arrested by those officers over there, and he was charged for a first-degree murder, aggravated kidnapping, a concealment of a homicide, and now the judge has decided --

Q.   One second, one second, one second.  There's a motion.

THE COURT:  Just answer the question.

BY THE WITNESS:

A.   Okay.  What's the question?  Give me the question again.

MR. LOEVY:  Well, it does open the door to the motion,

because he has to explain why he did it.

MR. NATHAN: Well, we can --

THE COURT: Well, let me hear the question again.

THE WITNESS: Yeah.

(Proceedings heard at sidebar:)

THE COURT: Let me go back. Wasn't it something like: You deny that you paid him to go to Wisconsin?

MR. LOEVY: I mean, there's been a million questions of: It was inappropriate to do that. His explanation, which he started to give him, was cut off, was: This kid got out. He's safe because the judge granted his suppression motion. There's Chicago cops on the street. He could be prosecuted. So I thought he was in danger, so I thought he should get out of town. Not because I'm trying to keep him away from my trial.

MR. NATHAN: He --

MR. LOEVY: It's because --

THE COURT: Well, that --

MR. LOEVY: -- the charges weren't pending.

THE COURT: That could be his response. But what was your question? I can't see --

MR. NATHAN: I honestly don't remember.

THE COURT: Well, then where are we? I thought it was -- how do I get back to this, Colleen?

(Court confers with court reporter.)

THE COURT: "To my point, you deny saying, 'You should go to Wisconsin'?" That was --

MR. NATHAN: Right.

THE COURT: -- the question. And the answer was: "I don't deny saying he should go to Wisconsin."

MR. NATHAN: That's the answer. We don't need to get into a suppression ruling.

MR. LOEVY: Well, he has asked him six times: Wouldn't it be inappropriate? Wouldn't it be inappropriate?

I guess I could ask him on redirect why he did it.

THE COURT: Yeah.

MR. NATHAN: Yeah, that's fine.

THE COURT: Okay. Move on. I don't think --

(Proceedings heard in open court:)

BY MR. NATHAN:

Q. After you presented -- through your attorneys, you presented your alibi defense at the criminal trial, you were convicted, correct?

A. Uh-huh, yes.

Q. And you heard Mr. Loevy, during the opening statement, and I think during your examination, saying that you were "wrongfully convicted," correct?

A. Correct.

Q. And I understand it's your position that you didn't kill Mr. Collazo, and I'm not trying to quibble with that.

Fulton - cross

335

A.   Are you sure?

Q.   I -- I'm not trying to, like, trick you and say that you -- trying to get you to say that you did or didn't, but --

A.   Are you sure?

Q.   The -- no court said that you were "wrongfully convicted," correct?

A.   Correct.

Q.   After your conviction was vacated for procedural issues, you went out on bond, correct?

A.   Correct.

Q.   And then the State was going to decide whether it should retry you, right?

A.   Correct.

Q.   And you talked about how the State didn't want to say "dismissed."  They used this term "nole" or "nole," right?

A.   Nole prosecute.

Q.   That's Latin for "dismiss," right?

A.   Right.  It means they dropped all charges.  They didn't want to prosecute the case --

Q.   Now --

A.   -- so they gave up.

Q.   -- isn't it true that the attorney, the prosecutor who was at that hearing where you were present, where they nole'd the case, her name was Ms. Carol Rogala, right?

A.   I don't know.  You have to ask Angel.

Q.   And you were at that proceeding.  It was on May 29th, 2019.

And Ms. Rogala told the Court --

MR. LOEVY:  Your Honor, we object to just reading testimony to the plaintiff, unless it's going to -- both sides can read testimony to witnesses.

MR. NATHAN:  It's not testimony.  It's two line -- three lines.

THE COURT:  Are you doing impeaching or anything? What are you doing here?

MR. NATHAN:  I'm exploring -- in response to direct examination testimony, he had an interpretation of what occurred at the dismissal proceeding, and I'm inquiring on cross-examination about what actually occurred at that proceeding.

MR. LOEVY:  But, Your Honor, it's hearsay.  Sorry.

MR. NATHAN:  And I intend to use the transcript to explain exactly the words that were used, so we don't get misinterpreted.

MR. LOEVY:  Your Honor, then we should hear from Ms. Rogala.  Let's -- this is hearsay to just read him somebody else's testimony.

MR. NATHAN:  It's not being offered for the truth.  It is a fact of legal significance.  It's independently admissible.

THE COURT:  Maybe we can stipulate to something.

This is not -- I'll sustain the objection. But maybe you can get at it another way.

BY MR. NATHAN:

Q. Now, you remember we talked about how it was the State's theory at your criminal trial that you went out of the back door of your apartment.

MR. LOEVY: Objection, mischaracterization. He didn't say anything about what the State's theory was.

MR. NATHAN: We -- that's what we covered.

MR. LOEVY: No. That's what Mr. Nathan said, not the witness.

THE COURT: Right. Well --

MR. NATHAN: That's what Mr. Loevy asked him about, questions about what happened at his criminal trial, and I'm doing the same thing.

THE COURT: As I recall, he didn't testify about going out the back door of his apartment.

MR. NATHAN: No. And I'm not asking him that question.

THE COURT: So you say was that the State's -- that was the State's theory of the case?

MR. NATHAN: Right. I'm going to be asking him questions about what his theory was at trial and what evidence he did produce or didn't produce.

THE COURT: Well, if -- I mean, I -- it's an odd way

to get the State's theory of the case, but I guess his understanding of their theory would be relevant if it goes to, you know, something else.

MR. NATHAN: Sure. It goes to the core issues in the case that he's alleging.

THE COURT: Okay. Go ahead.

BY MR. NATHAN:

Q. Mr. Fulton, we had already covered before the State's theory at your trial, given your alibi, which was you went home as of -- you had a video of you going into your apartment as of 11:57. The State's theory was that you must have left through a different door after 11:57, correct?

A. Repeat that one more time.

Q. Sure. You were saying: Hey, I didn't commit this murder. I have a video showing I walked into my apartment, front door of my apartment at 11:57 p.m. on March 9th, correct?

A. I believe -- yes.

Q. And the State, in opposition to that, was saying: No. In fact, there was a back door that he could have walked out of, and there is no video camera on the back door, right?

MR. LOEVY: Objection to whether that was the State's theory.

MR. NATHAN: At the trial.

MR. LOEVY: On rebuttal, not at the trial.

MR. NATHAN: Talking about at his trial.

THE COURT: Okay. At the trial. You can redirect him on that.

BY THE WITNESS:

A. Repeat your question.

BY MR. NATHAN:

Q. Sure. So the State's theory at your criminal trial was that you must have left out your back door of your building at your apartment building where there was no camera.

That's what they were saying at your trial, true?

A. That was their theory.

Q. Right. And I understand, you deny that, right?

A. Yes, obviously.

Q. There is nothing that prevented you from presenting evidence at your criminal trial to -- about your own building and what cameras were in the back of your building, correct?

A. We presented evidence at trial that the building had security cameras.

And that what I knew as of the time of me living in the building is that they passed out a memo saying that the building had 24-hour surveillance cameras. I didn't know where the cameras were, but the memo says 24-hour surveillance cameras.

So anybody in their right frame of mind would assume that if they pass out a memo to every person that lives in the building that says that there's 24-hour cameras, I don't think

you're wrong to assume that there's security everywhere.

Q.   But that's something that easily, you know, was available for all to figure out back in 2006 at the time of your trial, right?

A.   Well, I mean, you would like for it to be figured out before it get to trial.

Q.   Okay.  Let's move on.

A.   Okay.

Q.   Back in mid-February of 2003, you talked about how you were friends with a girl named Ms. Johnitta Griffin, correct?

A.   Correct.

Q.   And she's been referred to as Precious.  Is that her nickname?

A.   That was her nickname then, correct.

Q.   I'm going to call her Ms. Griffin.  Okay?

A.   Okay.

Q.   But it's the same person that we're talking about, fair?

A.   Okay.

Q.   At that time, you also met a man named Christopher Collazo through Ms. Griffin, right?

A.   If you're talking about the robbery day, yes.

Q.   And you were trying -- the reason you met Mr. Collazo is you were trying to buy a gun from him, right?

A.   Correct.

Q.   So you reached out to Ms. Griffin to see if she could

introduce you to someone who would sell you a gun, right?

A. Correct.

Q. You were hoping to buy a handgun.

A. Correct.

Q. And we talked about how presently you own a legal gun, right?

A. Correct.

Q. But back then, you were not trying to buy a legal gun, right?

A. Right. CCL wasn't available back then.

Q. Back then, you didn't have a FOID card with State of Illinois, true?

A. Correct.

Q. And when you say that card wasn't available back then, back then, it was actually illegal to own a handgun at all in the City of Chicago, correct?

A. Right. In the City of Chicago, it was illegal to practice your Second Amendment right. You're correct about that.

Q. In any event, we agree that the gun you were trying to buy, that was going to be illegal?

        MR. LOEVY: Objection, asked and answered, Your Honor.

        THE COURT: Sustained.

BY MR. NATHAN:

Q. Ms. Griffin talked to you on the phone, and she connected you to Mr. Collazo via the phone, right?

Fulton - cross

342

A.   Correct.

Q.   And she patched you in to that phone call?

A.   So when she would call me, he would already be on the phone.

Q.   Okay.  So you didn't have to call him directly?

A.   I never had his phone number.

Q.   Well, you did call Mr. Collazo at some point in time, right?

A.   No.

Q.   Collazo said he'd sell you this gun for $300?

A.   280, 300 dollars sounds about right.

Q.   And you personally went to Ms. Griffin's house all the way on the north side to go try to buy the gun, right?

A.   Correct.

Q.   And you went there together with Mr. Mitchell, right?

A.   And Mr. Shaw.

Q.   You called Ms. Griffin many times on the phone, true?

          MR. LOEVY:  Objection.

BY THE WITNESS:

A.   When are we --

          MR. LOEVY:  Time frame?

BY THE WITNESS:

A.   -- talking about?  Yeah.

BY MR. NATHAN:

Q.   Just in general.  Did you call her on the phone many, many

Fulton - cross

343

times?

A.   I mean, we had a few conversations over the phone during the course of us knowing each other.  We've had several conversations.

Q.   And around February 14th, Ms. Griffin put you in touch with Collazo, who gave you directions to somewhere else on the north side, right?

A.   Say that date again.

Q.   Sure.

A.   Well, just repeat what you just said.

Q.   This happened around Valentine's Day, right?

A.   This happened two weeks before Valentine's Day.

Q.   Okay.  And two weeks before Val -- what's in between February and March?  What's the midpoint?

A.   January and February.

Q.   Between February and March is January?

A.   No, no.  February -- between February and March would be February and March.

Q.   Okay.  So what's the exact midpoint between February 1st and March 1st?

A.   You tell me.

Q.   That'd be February 14th, about?

A.   Is the middle point between February and March, February 14th?  Is that your question?

Q.   Yes.

A.   Okay.  February has 28 days in it.  March has 31.  So that's 59 days.  So half of 59 is -- I don't know.  My math could be wrong.

Q.   We're not talking about January.  We're talking about between --

A.   I'm doing --

Q.   -- February and March.

A.   Right.  February has 28 days.  Leap Year has 29, right?

Q.   Yeah.

A.   And you're asking about March, right?

Q.   I'm not asking for an exact date.  Just between February and March is the middle of February, correct?

     Between February 1st and March 1st is the middle of February?

A.   Or it could be the later February.  It could be the last week of February.

Q.   So if you testified that this transaction happened between February and March, that'd be in the middle of February, right?

A.   So I testified that this transaction happened two weeks before Valentine's Day.  That's when the robbery happen.

Q.   So you go to meet up with Collazo and he flags you down, right?

A.   What you mean he flagged me down?

Q.   In order to buy the gun.  You're going to meet him and you see him on the street.  He flags you down.

A.   No.

Q.   You explain how -- explain to us how you meet him.

A.   We arrive -- we arrive in front of the house that he gave us directions to come to.  We pulled in front of the house.  We called Precious.  Precious called him.  And then they both called us back, and he told me he was on his way outside.

Probably about a half a block up, we seen somebody starting to walk towards in our direction.  He walked to the car.  He asked us if we were Riff and Lou, say yes.  He say, "Man, my man is not in the house yet.  He's not home yet.  He's on his way home from work.  Do you guys smoke weed?  If so, let's pull around the corner and let's smoke."

Q.   Okay.

A.   "Until my friend gets home from work."

Q.   So you did that.  And then you -- then after that was done, what happened next?

A.   He made a phone call to see if he was home.  And then after that, he got out the car and he walked into the building.

Q.   So you go into the building --

A.   No.  He did.

Q.   Okay.  He goes into the building, and then --

A.   He goes into the building.  And then after he goes into the building, he comes back out the building and walks to the car, and he says, "All right.  Let's go."  So then we all literally opening the car door to get out the car.  And then he says,

"Oh, oh. I didn't know all y'all was coming. Only the person that's buying the gun can come in." So then that's when I followed him in there.

Q. Okay. So you go into the building. It's then -- you described earlier -- and I don't want to, like, rehash that exactly. But you described earlier you go into the building. It's dark. And then what happens?

A. I walk into the corridor building behind him. There's a light on at the top of the stairs, and it's pitch black in the back.

Q. And then, at some point, you get held up by this guy, Marcus Marinelli? Or someone you later learned to be Marcus Marinelli?

A. Yes.

Q. So explain that, you know --

A. Series of events?

Q. Yeah. How he ends up sticking you up with a gun.

A. I follow Collazo into the hallway. We were walking towards the steps and then he realize that the door didn't close. So that's when he said, "Hold. Let me close this door. The tenants be tripping about the door being open." So he walked past me to go close the door, and then he told me go ahead and go upstairs and go knock on the door.

I took a couple steps up and then I thought about it, I'm getting ready to go knock on some strange person's door,

Fulton - cross

347

right?  So I stop to wait on him.  And once he closed the door and started walking back towards the stairs, then that's when Marcus Marinelli came out of the pitch black and put a gun in my face and told me, "It's a robbery.  Get down on your knees."

Q.  So at that moment when Marinelli sticks a gun in your face, is it in front of your face or behind your face?  Behind your head?  Where --

A.  I said in front of my face.

Q.  Where's the gun?

A.  I didn't say behind my head.  I said in front of my face.

Q.  Okay.

A.  The front of my face is right here, right?

Q.  So what was going on in your mind at that moment in time?

A.  I was scared.

Q.  You were scared to death, right?

A.  I was scared.  I got a gun in my face.

Q.  And after that, isn't it true Mr. -- you say you waited ten minutes in that vestibule or that stairway and then you went out to where Mitchell and Shaw were waiting, right?

A.  Yes.

Q.  And then what did Mitchell do?

A.  I told him, and then he jumped out the car and he ran towards, like, the alleyway of the building.

Q.  Mr. Mitchell ran towards the people with the gun?

A.  And then he asked me, "Where they go?"  I said, "They

Fulton - cross

348

walked out" -- "He went out the building.  He ran that way."

Q.  Did he have any kind of weapon with him when he --

A.  No.

Q.  Did he have a bat?

A.  No.

Q.  Did he have a hammer?

A.  No.

Q.  So that same day, after you get robbed, actually you kind of chuckled, because the guy, he thinks he's robbing you of $300 actually just robbed you of $15, right?  Or $14?

A.  I didn't realize that till afterwards.

Q.  So you're saying you didn't plan to rip him off.

A.  No.

Q.  But Collazo then calls you from an anonymous number, right?

A.  Correct.

Q.  And he told you he knew where you lived, right?

A.  Correct.

Q.  And not just he knew where you lived.  He gave you an address.

A.  But that wasn't the initial time he call me, no.  But that did happen, yes.

Q.  But he did tell you he knew your exact address, right?

A.  Correct.

Q.  Not just the building.  He told you he knew your actual apartment number, too, right?

Fulton - cross

349

A.   Yes.

Q.   And he told you he knew you had a baby, right?

A.   I believe so.

Q.   And he told you that he's gonna come kill you, right?

A.   Yes.

Q.   And he gave you little detailed things that only Precious would know, right?

A.   Well, anybody that was familiar with the area would know.

Q.   And, in fact, Mr. Collazo called you numerous times, right?

A.   Yes.

Q.   And the nature of that conversation was pretty much the same, right?

A.   Yes.

Q.   What did it make you think when Collazo, who had just stuck you up, and he thinks you ripped him off, and he's telling you, "I know your apartment building.  I know your code to your building.  I know you have a baby.  And I'm gonna come kill you"?

A.   He didn't say nothing about no code.

Q.   Okay.  Let's take out the code.

A.   Okay.  Thank you.

Q.   He says, "I know exactly where you live.  I know where you are, your unit number.  You got a baby.  And I'm gonna come kill you," what did that make you think?

A.   I was scared.

Fulton - cross

350

Q.   And you said you didn't call the police 'cause you didn't take it seriously?

A.   I wasn't scared enough to call the police right then and there 'cause of the phone call.

Q.   You didn't --

A.   There's levels to scared.

Q.   You didn't think it was concerning enough to call the police when somebody stuck you up with a gun?  Is telling you the apartment number you're in?  Telling you he's -- and telling you that he's gonna kill you?

A.   No.  I didn't think that was smart at the time.

Q.   Is that -- well, you took it seriously enough to go get a weapon, right?

A.   When are you talking about?

Q.   You had Yolanda sharpen her knives, right?

A.   Did I have Yolanda -- I didn't have Yolanda sharpen no knives.

Q.   She did sharpen her knives, right?

A.   Yolanda is a culinary chef.  She's got knives, so she need 'em sharp to cut her food.

        I didn't tell her to cut -- sharpen no knives.

Q.   And she distributed those knives to you, correct?

A.   No.

Q.   She gave you a knife, right?

A.   No.

Fulton - cross

351

Q.   And she gave Mr. Mitchell a knife?

A.   No.

Q.   She gave Mr. Shaw a knife?

A.   No.

Q.   You did need to protect Yolanda, who's living with you, right?

A.   From who?

Q.   From Mr. Collazo.

A.   If he showed up.

Q.   You met -- I'm switching topics.

You met Johnitta Griffin on this party line?

A.   Yes.

Q.   And just -- is it a simple way to understand the party line, it kind of works like a conference line?

A.   So the party line is like Facebook.  You can enter Facebook from anywhere.  The party line has multiple different phone numbers.  So just because this phone line is busy, it doesn't mean you can't call another line and still enter the party room.

Q.   Right.  So I -- I've never been on a party line.  I'm just trying to understand it.

Basically, everyone calls in to the same number, and you can speak on the line --

A.   It's not the same number.  They have different numbers.

Q.   And you're able to speak to somebody without calling them

Fulton - cross

352

directly at their phone number, is that true?

A.   With the party line, you would call this number and then it will tell you, you would be in the chatroom, but you didn't know who all was in the chatroom.

You would enter the room, and then once you enter the room, you would just hear people talking, right?  And then you would ask people, or not, what their name is and make an introduction and go like that.

Q.   Were -- in this party line, were you able to interact with the same people at the same chatroom, so to speak?

A.   What do you mean about the same people?

Q.   Would you speak to, for example, Ms. Griffin in -- would you speak to Ms. Griffin on this party line in the same place in that party line?

A.   So when I met Ms. Griffin on a party line, we exchanged phone numbers.  And then we no longer talked on the party line. We talked directly from my cell phone to her home phone.  No party line.

Q.   Back in 2003, Mr. Fulton, you had at least three -- access to at least three phones, correct?

A.   I had access to one phone, and the other phone I had gave to my godbrother, Darnell.

That was his phone he was paying the phone bill for.

Q.   Okay.  You had a home phone, like a landline, right?

A.   Yes.  That got installed right before I got arrested.

Q.   And you also -- you also had a phone with a phone number --
this is a cell phone -- (773) 858-8217, right?

A.   8216 was my phone number, the personal phone that I used.

         The Nextel account was in my name.  So there was two
cell phones, 8216 and 8217.

         To my recollection, Precious and everybody involved in
this case has stated on the record that my phone number was
(773) 858-8216.

Q.   Was it your -- you're saying you did not have access to
(773) 858-8217 on March 8th --

A.   No, I did not have access to that.

Q.   Let me just ask the question.

A.   Okay.

Q.   Is it your testimony that you did not have access to a cell
phone number (773) 858-8217 on March 8th, 9th, and 10th?

A.   I did not have access to Darnell's phones on March 8th,
9th, and 10th.

         MR. NATHAN:  Your Honor, may I show the witness
Defendants' Exhibit 84?

BY MR. NATHAN:

Q.   Showing you what's been marked as Exhibit 84.

         You see this is a copy of your phone -- Nextel phone
record?  At the top, it says Account Name:  "John Fulton."

A.   Account Name, yes.  So this is my account, correct.

Q.   Okay.  And if you look at the top -- also at the top, after

it says "John Fulton," it says (773) 858-8217, correct?

A.   Correct.

Q.   This is your phone record, correct?

A.   So, again --

Q.   One second.  Is this your phone record?

A.   This is my phone account.

Q.   Okay.  Your --

A.   This is my Nextel account.

        MR. NATHAN:  Your Honor, seeking to publish Defendants' Exhibit 84.

        MR. LOEVY:  The foundation has not been laid, I don't believe, Your Honor.  He says it's not his.

        MR. NATHAN:  No.  He -- it is his.  He said it is his.

BY THE WITNESS:

A.   I said it's my account.  It's not my cell phone.

BY MR. NATHAN:

Q.   Okay.

A.   I'm not the primary user of that phone.  I don't have access to that phone.

        THE COURT:  Okay.

        MR. NATHAN:  This also has been stipulated to, this exhibit.

        THE COURT:  All right.  You may -- you want it admitted in evidence?

        MR. NATHAN:  Yes.

Fulton - cross

355

THE COURT:  Or it's been stipulated?

MR. NATHAN:  Yes.

MR. LOEVY:  If it's been stipulated, no objection, Your Honor.

THE COURT:  All right.  The exhibit is received.  You may publish.

(Defendants' Exhibit No. 84 received in evidence.)

BY MR. NATHAN:

Q.  Okay.  So this is your Nextel account, correct?

A.  Yes.

Q.  And it shows (773) 858-8217?

A.  It shows that (773) 858-8217 is one of the numbers on the Nextel account that's belonging to John J. Fulton.

Q.  Right.  And if I understand your testimony, you're saying you also paid -- in your name, you had a separate account that was (773) 858-8216, and you're saying that account was with your friend, Darnell?  Meaning the phone itself was with your friend, Darnell?

A.  Repeat your question.

Q.  Sure.  If I understand you correctly, you're saying that you also had a separate Nextel phone that was associated with a number ending in 8216, and you didn't have physical access to that phone.  It was with a friend, right?

A.  You just heard me tell you that my cell phone number that I primarily used was (773) 858-8216, not 17.

Fulton - cross

356

THE COURT REPORTER: Judge, could you ask the witness to please keep some distance from the mic?

THE WITNESS: I apologize. I apologize. I'll stay away from the mic.

MR. NATHAN: Your Honor, I'd like to --

BY MR. NATHAN:

Q. Isn't it true, sir, that back in March of 2003, you actually used the number 8217, correct?

A. To my recollection, my cell phone number that I primarily used was (773) 858-8216.

MR. NATHAN: Your Honor, page 79, lines 1 through 10.

MR. KAMIONSKI: Video dep.

MR. NATHAN: Video dep, please.

THE COURT: Okay. Go ahead.

MR. NATHAN: I'm trying to play the -- from the HDMI.

(Said video played in open court.)

BY MR. NATHAN:

Q. Sir, were you asked those questions and --

(Said video played in open court.)

BY MR. NATHAN:

Q. Were you asked those questions and did you give those answers?

A. Yes.

MR. NATHAN: If I may have the ELMO back?

BY MR. NATHAN:

Fulton - cross

357

Q. It's true, sir, that this -- Defendants' Exhibit 84 actually is the phone number that you were using at that time, correct?

A. Incorrect.

Q. And so it's your testimony that you were using the cell phone number 8216, right?

A. I was using 8216, not 17.

And my testimony in deposition, it says, I believe.

Q. Okay. Nonetheless --

A. That means possible as well as impossible.

Q. It's a little blurry, so I apologize. But you notice that on your phone record here, Defendants' Exhibit 84, you can see entries for March 8th of -- March 8th of 2003, correct?

A. You're asking me about a phone that I didn't have access to and wasn't using.

Q. I'm asking you if you see the same thing that I see in front of me on Defendants' Exhibit 84.

A. Yes.

Q. Okay.

A. I see the same thing. I'm answering yes, that I see the same thing that you're looking at.

Q. Now, we're also looking at your phone record of 8217, and you're able -- just let's pick a random number.

You're able to see that calls that are incoming calls, it only records as "incoming," correct?

A.   That's the way it looks.

Q.   It doesn't say -- it doesn't list the number of the phone who called you, correct?

A.   Well, this is not my phone.

Q.   Yeah.  But it's your phone record, true?

A.   It's my phone record.

Q.   Okay.  So I'm talking about your phone record.

A.   Okay.

Q.   You paid this bill, right?

A.   Say it again?

Q.   You were the one who paid this bill?

A.   No.  I just told you, I paid 858-8216.  That was my primary phone.  Darnell Smith used 858-8217.

     So when you speak of that number, speak in reference to Darnell Smith, not me.

     It's my account, but I gave it to him.  He uses that phone.  Ever since the very first day I got the Nextel account, that's been his phone, period.

Q.   I'm look -- I'm looking at the record that's in front of us, and it says "John Fulton" on it, and you --

A.   It says that it's my account.  It doesn't say it's my phone.  It says that I'm -- I'm the responsible party for the account.

Q.   Okay.  Let me -- all I'm saying is, we can agree it says "John Fulton" on the record, true?

A.   It agrees that it says the account is John J. Fulton, it's the account of John J. Fulton.

Q.   And, and, and --

A.   It doesn't mean that these calls came from John J. Fulton. It doesn't say that, does it?

Q.   Can we also agree that on the record, it indicates phone numbers that are outgoing but not phone numbers that are incoming, correct?

A.   Well, how did you determine that they are outgoing calls? 'Cause it doesn't say "outgoing" on there.

Q.   Right.   There's numerous examples here where it says Number Called, and it gives a number in this column that says Number Called, correct?

A.   How do you determine that that's outgoing --

Q.   All right.   Well --

A.   -- and not incoming?

Q.   Can we agree that it says, on Defendants' Exhibit 84, Number Called?

A.   Well, if that's the case, that incoming call that you say -- that the rest of 'em incoming calls, those could've been calls, too.

Q.   I'm simply asking if we can agree that it says, on Defendants' Exhibit 84, the words Number Called.

A.   It says Number Called in a category on this exhibit.

Q.   Okay.   And under Number Called, it lists, for example, a

Fulton - cross

360

phone number (312) 225-5430, right?

A.   Yes, I can see that.

Q.   There's a number of other numbers listed, correct?

A.   Yes.

Q.   And --

A.   As a matter of fact, Number Called, it says the second one -- if you go to the second one, it says (773) 858-8216, which would be my phone number that I'm using.

     So I can't call myself with myself, can I?

Q.   Or you gave your phone to someone else who's calling you, right?

A.   Theory.

Q.   That's a possibility --

A.   That's not what the facts say.

Q.   That's a possibility, true?

A.   Anything is possible.

Q.   Well, it's possible if you own two phones, you have one and you're calling the other phone; you're not holding them together, right?

A.   So you're saying that I -- I called myself while holding both phones and held a minute conversation with myself?  And then in the next session, where it says Usage, it says "zero"?

Q.   What I'm asking right now is, would you agree it's theoretically possible, if you are paying for two phones or you have two phones on your plan, and you're holding one --

Fulton - cross

361

A.  I wasn't paying --

Q.  One second.

A.  -- for two phones.

Q.  One second.

A.  I was only paying for one phone.

Q.  Let me just please ask my question.

Do you agree it's theoretically possible if you are paying for two Nextel phones, you can call on one and call the other phone if you hand it to someone else?

A.  Do I think -- repeat that.

Q.  Is it -- is it theoretically possible --

A.  Uh-huh.

Q.  -- if you have two phones on your plan, you can give a phone to someone else, use one to call and -- use one to call the other phone?

A.  Yes.  I can use my phone to call, just as well that number can -- if somebody else is -- Darnell using that phone, he could use that number to call me.

Q.  Right.  So now going back to Defendants' Exhibit 84.

There are entries where it says Number Called, and then there are actual telephone numbers associated with that, right?

A.  It says Number Called, yes.

Q.  And then there are a number of entries where it just says Incoming, correct?

A.   Correct.

Q.   And it doesn't reflect -- when it says Incoming, doesn't say the number associated with the incoming call, true?

A.   True.

Q.   Now, did you call Ms. Griffin on March 8th from --

A.   I don't --

Q.   -- 8217 at approximately 1:15 p.m.?

A.   I do not use the telephone number (773) 858-8217.  I don't have access to that phone.

        The person that does have access to that phone stayed at that time at 7905 South Crandon.  And at that time, I was staying at 33rd and King Drive.

Q.   Okay.  So here where it says 1:15, Incoming, you deny that this is a call reflecting you to Precious, right?

        MR. LOEVY:  Objection, asked and answered and -- asked and answered.

        THE COURT:  I believe so, yes.

        MR. NATHAN:  I'm sorry?

        THE COURT:  Do you disagree that you didn't ask this question before?

        MR. NATHAN:  I don't think it was answered.

        THE COURT:  You did not get an answer?

        MR. NATHAN:  I don't think so.

        THE COURT:  All right.  Go ahead.

BY THE WITNESS:

Fulton - cross

363

A.   What's the question?

BY MR. NATHAN:

Q.   Sure.   I'm looking at this entry.

On the Exhibit 84, where it says March 8th, 1:15 p.m., and is it your contention, you totally deny that you called -- that this reflects an incoming call from Johnitta Griffin?

A.   This is not my phone, so I don't know who this call is coming from.

Q.   So you're saying you didn't get a call on March 8th at this number at this time from Johnitta Griffin?

A.   From this number, correct.

Q.   Okay.   And what about the next entry, 1:17 p.m.?

A.   I didn't get a phone call from none of these numbers --

Q.   All right.   So --

A.   -- on this list.

Q.   -- this -- you also deny that this reflects an incoming call from Precious, right?   You deny that?

A.   I don't know who these phone calls came from.   I can't speak to this record because this is not my phone.

Q.   Well, you were the one who was friends with Ms. Griffin, correct?   Not Darnell.

A.   True.

Q.   Okay.   So you would be calling Ms. Griffin, not Darnell, right?

A.   True.

Q. All right. And vice versa? Ms. Griffin would be calling you, not Darnell, correct?

A. True. Unless she accidentally hit 7 instead of 6. Then she will call him.

Q. Okay. And, here again, that's a voicemail.

A. Who number is this?

Q. 1:26. Here, you -- this is Incoming Call. You deny that that was Johnitta Griffin calling you, correct?

A. The record doesn't even say "Johnitta Griffin." Where are you getting that from?

Q. It says Incoming, and I'm --

A. It doesn't say from whom.

Q. Right. So you're denying that this reflects an incoming call from Johnitta Griffin to you?

A. I don't know who this incoming call is coming from.

Q. Okay. Did Johnitta Griffin call you on March 8th of 2003?

A. You would have to pull up the phone records of 858-8216. I don't know.

Q. Did Johnitta -- isn't it true Johnitta Griffin never called you again after March 10th?

A. I don't remember when the last time I spoke to Precious.

Q. What was -- isn't it true that Ms. Griffin's home number is (773) 782-3164?

A. I don't recall Ms. Precious' phone number.

Q. Okay.

MR. NATHAN: Your Honor, I'd like to publish -- it's an exhibit that was shown in -- a demonstrative shown in opening.

MR. LOEVY: Is it an exhibit?

MR. NATHAN: No. It was the --

MR. LOEVY: Can you use the exhibit so we can have the exhibit? Because we have to pull the exhibit.

(Counsel confers. Court confers with clerk.)

THE COURT: Okay. We'll have to take a brief recess. Say ten minutes?

THE WITNESS: One minute. Just one minute. Just -- I could be two minutes. I could be two minutes.

THE COURT: Two minutes? Okay.

THE WITNESS: Two minutes.

THE COURT: All right. Well, let's just all stay in court, then.

(Witness exits.)

THE COURT: If anyone else needs to use the restroom?

(Jurors raise hands, then exit.)

THE COURT: All right. But you come back this way.

(Pause. Witness reenters. Jurors reenter.)

THE COURT: All right. Is everyone in place?

THE CLERK: Court resumes back in session.

(Counsel confers.)

MR. NATHAN: Your Honor, it's a stipulated exhibit,

Defendants' 130, just a single page from that exhibit,
Fulton-Mitchell 30 -- 9309.

MR. LOEVY: It's stipulated, Your Honor.

THE COURT: All right.

BY MR. NATHAN:

Q. Mr. Fulton, this is not your phone record. This is another person's phone record.

Do you -- but you recognize this number (773) 858-8217, correct?

A. Yes.

Q. And that is a number that was associated with your account, right?

A. Correct.

Q. And isn't it true that -- you did speak with Ms. Griffin on March 8th, correct?

A. I don't recall.

Q. All right. And you actually spoke to Ms. Griffin up to eight different times on March 8th, 2003, right?

A. I don't recall.

Q. Isn't it true that you spoke to Ms. Griffin on March 8th of 2003 about Christopher Collazo?

A. No.

Q. I mean, what else did you have to talk about with Ms. Griffin on March 8th of 2003 other than this gun transaction with Collazo?

Fulton - cross

367

A.   We could've been talking about a number of things, if you say that phone call happen.

Q.   You tell Ms. Griffin that she should pay you $300, right?

A.   Yes.

Q.   And even though you were never robbed by -- from $300, you felt like she should pay you $300?

A.   Yes.

Q.   And you called her and told her, "You need to pay me $300."

A.   Not in that manner, but yes.

Q.   And isn't it true, those were the kinds of conversations you were having with Ms. Griffin after you were robbed?

A.   We spoke about that once or twice.

Q.   You also -- your Nextel phone had some other features other than calling, right?

A.   Such as?

Q.   Such as push-to-talk?

A.   Yes.

Q.   That's kind of like a walky-talky?

A.   Yes.

Q.   And so you'd be able to use your walky-talky function on your phone, and with one phone on your account, then let's say put somebody else on the other phone with your -- your phone on your account could also use the push-to-talk function, and you could talk as a walky-talky?

A.   You could talk as a walky-talky to anyone that has a

Nextel.

Q. You also had the ability to send and receive text messages?

A. Yeah, but I never used it.

Q. And you actually did receive a text message from someone you think is Christopher Collazo, right?

A. Yes.

Q. And that text message stands out in your mind, right?

A. Yes. 'Cause I've never had got text messages on my phone before or after that.

Q. And it also stands out because he told you he was gonna kill you, right?

A. Well, I don't know if it was a he. I'm assuming it's him, but there's no -- there's no way to determine if that was him.

Q. That's who --

A. I assume -- well, I testified that I believed that that was him, but when I called the number, a lady answered the phone. I never heard a man in the background. I've never testified that I heard a man in the background.

I asked, can I speak to Peanut? And she say she didn't know what I was talking about, and she hung up on me.

Q. In any event, you believed that was Christopher Collazo sending you that message.

A. I believe so.

Q. Did you respond via text message?

A. I told you, I didn't know how, so I called the number.

Fulton - cross

369

Q.   Back in March of 2003, you were not, let's say, a typical 18-year-old, correct?

A.   What's typical?

Q.   Well, you had a live-in girlfriend, right?

A.   True.

Q.   And you had some responsibilities, right?

A.   True.

Q.   You were a mature guy.

A.   You could say that.

Q.   You paid your own bills.

A.   True.

Q.   You had a child.

A.   True.

Q.   You paid for that child.

A.   True.

Q.   Meaning you supported your new child.

A.   Yes.  I took care of my son, yes.

Q.   You had your own cable bill.

A.   Yes.

Q.   Your own apartment.

A.   Yes.

Q.   Your own car.

A.   Yes.

Q.   Your own auto insurance.

A.   Yes.

Q.   And you also had your own tools.

A.   Yes.

Q.   You said on direct examination that you had almost completed high school at the time of your arrest in March of 2003.

A.   Yeah.  I got locked up in March.  Graduation was in May or June.

Q.   And you're a bright guy, correct?

A.   Now or then?

Q.   Well, now it seems like you're a pretty bright guy, right?

A.   If that's what you say.

Q.   Back then, you would get As and Bs and Cs in school?

A.   Correct.

Q.   When you would apply yourself?

A.   Correct.

Q.   You didn't always attend school, though, right?

A.   What year you talking about?

Q.   In March of 2003.

A.   So my senior year, I had enough credits to graduate from my senior year since my junior year.  So it was only mandatory for my attendance to be at school.  Or if my attendance wasn't at school, it was an absence.  But I already had the credits to graduate, so the only requirement that the Archdiocese said that I had to do was pre-SATs and SATs.

        So any event, I would've graduated in that year.  Had

Fulton - cross

371

they not done this injustice to me, I would have graduated, yes.

Q. Do you agree with me that you were absent a lot from school in 2003?

A. My senior year, yes.

Q. Before you were arrested.

A. Yes.

Q. If you had applied yourself even more, this -- according to you, the sky's the limit as far as your potential, right?

A. True.

Q. Meaning because -- back then, you were a pretty smart guy, but you didn't necessarily attend school every day.

A. My senior year.

Q. Right. Back in March of 2003. Okay. And today, we talked about how you own an auto sales business as well as a property management company. So it -- I guess what I'm saying is it's not like you -- strike that.

You testified on direct examination that you were never arrested before, correct?

A. No.

Q. I thought I heard that. So that wasn't true?

A. I have been arrested before. Not for no first-degree murder.

Q. Yeah, but you were arrested pre -- before March 18th, 2003 for --

A.   Right.   I was arrested for trespass, and I was also arrested for cannabis, marijuana, yes.   Two different incidences in two different locations, yes.   Both cases were dismissed, yes.

MR. NATHAN:   Let's try to not speak over each other, just because we're going to make it difficult for the court reporter to take things down.

BY MR. NATHAN:

Q.   Now, that December 8th, 2002 arrest, that ended in the same way that this case did, correct?   Meaning it ended with that nole, correct?

A.   I can't testify to that.   I don't know.

Q.   It was dismissed?

A.   It's poss -- yeah, it was dismissed.

Q.   Okay.

A.   Are you speaking of -- you speaking about the trespassing case, right?

Q.   I'm talking about the possession case.

A.   The possession case, I had to do four Saturday classes for that.   I completed three Saturday classes, but I couldn't come to the fourth one because your defendants arrested me for first-degree murder wrongfully.

Q.   And the trespass case, the criminal trespass case, that was an arrest from November 16th, 2002, correct?

A.   Correct.

Q.   So if you testified on direct examination -- not to belabor this, but if you testified on direct that you were never arrested, that was just -- you were mistaken?

MR. LOEVY:  Objection, Your Honor.  He did not say he was never arrested.  He said never been in a situation like this.

THE COURT:  Sustained.

BY MR. NATHAN:

Q.   We're going to talk in detail about the different times you were interviewed by police and prosecutors; but before we get into that, there was testimony earlier where you said you were in custody, meaning in police custody, for about -- over a hundred hours, right?

A.   Yes.

Q.   Now, you were not being interviewed the entire 104 hours.

Do we agree on that?

A.   Correct.

Q.   Okay.  In fact, you can't say that any single interview lasted more than an hour, correct?

A.   I can't say that.

Q.   Meaning you agree with me.

A.   I don't know -- I didn't have a sense of time while I was incarcerated.  I just know I was being held against my will, and I didn't voluntarily agree to be there.

Q.   But we're not talking about these lengthy, continuous

Fulton - cross

374

interrogations that are hours long, right?

A.   Okay.

Q.   So it's not like there was this five-hour-long interrogation, correct?

A.   I don't know -- I have no sense of time during the whole entire time I was there.

        I only know that I was incarcerated for longer than a hundred hours because I have time to read transcripts and discovery on this and realized that your defendants are the ones that did this to me for over a hundred hours.  So yes.

Q.   But all I'm trying to understand is, can we agree, you were not being interviewed that entire time continuously?

A.   I was being held against my will that entire time.

Q.   There were times when you were left alone in the room.

A.   Yes.

Q.   There was times when you went driving around, right?

A.   It wasn't times.  They drove me around once.

Q.   Well, you drove to the Polygraph Unit once, we talked about.

A.   That was all part of the same day, all part of the same drive.

Q.   Okay.  While you were in the interview room at that temporary Area 1 police station, you were mainly in what's called an interview room, correct?

A.   I don't -- I guess that's what they call it.

Q.   There were chairs and a table, right?

A.   Okay.   There were no chairs in the room that I was in. There was no tables in the room that I was in.  It was completely empty.  It was nothing but walls.  No windows.  It had a light that looked like these (indicating).

Q.   And you're saying there was not even a bench to lie down on?

A.   Did you hear what I just said?

Q.   I'm asking a question.

A.   There's nothing in the room except for a wall, a light, and that's it.  There's no benches.  There's no chairs.  There's a floor.  The officers brought chairs into the interview room.

Q.   Do you agree that you were not handcuffed while you were in the interview room?

A.   I agree.

Q.   Isn't it true that, actually, the interview room you were in did have a bench?

A.   I just answered that.

Q.   Okay.  So page 177.  177, line 23, through 178, line 2.

        MR. KAMIONSKI:  Start from 20.

        MR. NATHAN:  177, line 20, through the next page, line 2.

        THE CLERK:  Playing this?

        MR. NATHAN:  Yes, please.

    (Said video played in open court.)

MR. LOEVY: Your Honor, foundation. They're talking about a different room than the one this room was in in the context of the deposition. I can show that to defense counsel.

THE COURT: All right.

MR. NATHAN: Your Honor, he can do that, but it's -- he shouldn't be arguing.

MR. LOEVY: But he shouldn't be allowed to trick him.

THE COURT: You should have the right room.

MR. NATHAN: I think we do, but we can -- I'm sure Mr. Loevy will clear it up, but it's not the time.

THE COURT: You can point it out later.

BY MR. NATHAN:

Q. Okay. So at some point in time, after you got arrested -- it was still March 18th, the same day you got arrested -- you went over to the Polygraph Unit, correct?

A. It was between the 18th and the 19th. It was --

Q. It was in --

A. -- sometime within -- like I say, I had no sense of time. I just know when they took me out of the police station the day that I was arrested, when they took me out the police station, it was nighttime. So I'm assuming it's the night of March 18th --

Q. Right.

A. -- when I was taken to those different areas by Breen and Zalatoris. And then I was ultimately taken to 1011 West Homan,

Fulton - cross

377

where I signed to take a lie detector test but wasn't administered one.

Q. So we agree, then, you were arrested on March 18th, and that was in the morning. And then in that evening, you went to the Polygraph Unit, correct?

A. I have no sense of time. So if it was the same day, fine. If it was the 19th, I don't know.

It was dark outside. I didn't ask them, "Hey, listen. Is it still March 18th?" I don't know. I don't have no watch on. I don't -- I don't know. I don't have no sense of time.

Q. Even though it -- if it's the same day, you're saying you were still --

A. How do I know it's the same day when I been sitting inside of an interrogation room? How do I know?

Q. You have to let each other finish.

A. You were done talking.

THE COURT: Let him finish his question --

THE WITNESS: Okay.

THE COURT: -- and then you respond. Then try not to argue with him.

BY MR. NATHAN:

Q. Isn't it true that you went to the Polygraph Unit before 24 hours elapsed after you were arrested?

A. I believe so.

Q. Okay. When you went to the Polygraph Unit, you were driven

there by Mr. -- Detective Zalatoris and James Breen, right?

A.   Correct.

Q.   And they brought you to that Polygraph Unit and introduced you to Polygraph Examiner Robert Bartik, right?

A.   Correct.

MR. NATHAN:   I'd like to show the witness what's been marked as Defendants' Exhibit 18, Polygraph Consent form.

MR. LOEVY:   No objection, Your Honor.

MR. NATHAN:   May I publish this?

MR. LOEVY:   No objection from the plaintiff, Your Honor.

BY MR. NATHAN:

Q.   First of all, that's your signature at the -- near the bottom of this form, correct?

A.   Correct.

Q.   And this form says Polygraph Subject Consent form, true?

A.   Correct.

Q.   March 18th, 2003, right?

A.   Correct.

Q.   And it says:   "The examination concerns the death of Christopher Callazo, a/k/a Peanut, which occurred on or about March 10, 2003," right?

A.   Correct.

Q.   And before you signed this, you read that it said:   "I understand I have the right to remain silent and that anything

Fulton - cross

379

I can" -- "I say can be used against me in a court of law," correct?

A.   Correct.

Q.   And you also read:  "I understand that I have the right to talk to a lawyer and have him present with me during questioning, and if I cannot afford a lawyer, one will be appointed with the court" -- "by the court to represent me before any questioning," correct?

A.   Correct.

Q.   It further says:  "I understand that I have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting a lawyer," correct?

A.   Correct.

Q.   And then it continues, "I," blank, and then it has a handwritten "John J. Fulton."

          Is that your handwriting over there?

A.   Yes.

Q.   It continues, after you put that in with your own handwriting, it says:  "I, John J. Fulton, voluntarily agree to take a polygraph examination," right?

A.   Correct.

Q.   And you agree that the results of the examination may be known and available to the proper person or persons requesting the examination.

          It continues that you have a release in there.  And

upon request, you can get a copy of the results of a polygraph, yes?

A. Yes.

Q. So you signed this document, then Mr. Bartik read it to you, correct?

A. I don't know if he read it to me, but he probably put it in front of me and I read it myself.

Q. Mr. Bartik never threatened you, right?

A. No.

Q. He didn't physically mistreat you, right?

A. No.

Q. You're not saying that Mr. Bartik coerced you, correct?

A. No.

Q. According to you, you were with Mr. Bartik for about 10 or 15 minutes?

A. About that. Somewhere around there.

Q. And on direct examination, you told the ladies and gentlemen of the jury that you told the polygraph examiner the truth, correct?

A. Correct.

Q. Isn't it true that at the time of your deposition, you said that the only thing you -- the only thing that you talked to the polygraph examiner was -- about was about an introduction? He said, "Hey, I'm Bartik." That's it?

MR. LOEVY: Not a fair impeachment, Your Honor.

MR. NATHAN: It's not impeachment. It's asking.

MR. LOEVY: Is the question whether it happened or what he said at his deposition?

THE COURT: So the question is, isn't it true -- yeah. What's the pending question?

MR. NATHAN: Let me ask a different question.

THE COURT: Okay.

BY MR. NATHAN:

Q. Isn't it true, sir, that at your deposition, you were saying that you don't remember Bartik saying anything to you?

MR. LOEVY: Can we get a page and a line, Your Honor?

MR. NATHAN: Yeah. Well, no, not yet.

MR. LOEVY: Well, then that's not proper impeachment, Your Honor. He can't say: At your deposition, can you tell us.

MR. NATHAN: Okay.

THE COURT: Okay. I lost my --

MR. NATHAN: It's 198 and 199.

THE COURT: Amanda, I need your help again.

(Court confers with clerk.)

MR. NATHAN: Your Honor, I'm going to ask a different question.

(Pause.)

THE COURT: All right. You may continue.

BY MR. NATHAN:

Fulton - cross

382

Q. Isn't it true you told Mr. Bartik on March 18th, 2003 that Saturday, March 8th, you were on the phone with Precious?

A. No.

Q. But you don't dispute that you were on the phone with Precious on the 8th?

A. I don't recall talking to her on the 8th.

Q. And you told Mr. Bartik that you found out from her that the victim, who's Collazo in this case, was going to be attending a party on Sunday, the 9th, correct?

A. What's the question?

Q. And you told Mr. Bartik that Precious, Ms. Griffin, told you that Collazo was going to be attending a party on the 9th, correct?

A. No.

Q. And that you also told Mr. Bartik that you had your friend, Stick, and you asked him if he wanted to get even with Collazo because they had robbed you, because Collazo had robbed you.

A. No.

Q. Isn't it true you told Mr. Bartik that you found Riff somewhere on 79th Street and asked him if he also wanted to assist in the beating of the victim?

A. No.

Q. And you also told Mr. Bartik that Riff told you that if -- when he was gonna kill the victim.

A. No.

Q.   You also told Mr. Bartik on the 18th of March that back on the 10th of March, during the evening hours, you drove to the north side of the city in order to get the victim or intercept the victim.

A.   No.

Q.   You also told him that you were in the driver's seat, and you observed the victim wearing -- get off the bus wearing a black hoodie.  You'd said that?

A.   No.

Q.   You stated that you told Riff and Sticks that Collazo was approaching when Riff and Sticks exited your car and started to beat the victim.

A.   No.

        MR. NATHAN:  This is in evidence (holds up document), correct?

        MR. LOEVY:  Yes.

        MR. NATHAN:  Okay.

        MR. LOEVY:  If it's not, we don't object.

        MR. NATHAN:  No.

        MR. LOEVY:  It might -- well, we don't object.

        MR. AINSWORTH:  It's the Bartik police report?

        MR. LOEVY:  Yeah.

        MR. AINSWORTH:  We objected.

    (Plaintiffs' counsel confer.)

        MR. NATHAN:  I'm just going to show it to you,

Defendants' Exhibit 18, City-Fulton-Mitchell 454.

I'm asking to publish it because it was relied on by the plaintiff earlier.

MR. LOEVY: Although, I don't think I -- Mr. Ainsworth points out, we didn't admit it into evidence. But just -- can we lay a foundation for what it is? This witness has never -- didn't create it.

THE COURT: I don't have the documents.

Yeah, how is he --

MR. NATHAN: Sure. I'll just use --

THE COURT: -- able to lay a foundation? You can use it -- show it to him, if you want. See if that --

MR. NATHAN: Okay. I can leave it at that.

BY MR. NATHAN:

Q. And isn't it true that you told Mr. Bartik that you "moved over to the driver's side of the vehicle and drove up to where Riff and Sticks were beating the victim so as to cut off the victim's escape if he tried to run"?

A. No.

Q. You also told Mr. Bartik that you then exited your car and struck victim a couple of times.

A. No.

Q. You told Bartik that the victim fell to the ground, at which point, Riff -- you handed the keys to Riff so he could open the trunk.

A.    No.

Q.    You also told Mr. Bartik that after Riff and Sticks placed the victim in the trunk, you drove around for about 15 minutes where you found a dark street.  And then you exited the vehicle where Riff and Sticks bound the victim with duct tape that was in your trunk.  Correct?

A.    No.

Q.    You further said that you placed a plastic bag over the victim that was inside your bowling bag, and that you helped Riff and Sticks get the victim back into the trunk.  True?

A.    No.

Q.    You stated that Riff, meaning Mitchell, was driving your vehicle, and you drove towards the south side.  You exited off the Dan Ryan Expressway.  And it was Mr. Mitchell's idea to dispose of the victim by burning him.  And that you found a refrigerator box, placed the victim inside, and poured gasoline and lit it.

A.    No.

Q.    You also said to Bartik that the gasoline was from a can that was in your trunk, and you keep that trunk -- you keep that in your trunk in case you run out of gas.  Correct?

A.    No.

Q.    So you deny saying any of that stuff to Mr. Bartik?

A.    Yes.

Q.    And you actually say that any time that you were with

Bartik, you were also with Zalatoris and Breen, right?

A.   To my memory, I believe so.

Q.   And you are saying that Bartik did say to you that it's a voluntary process, and that he told you to sign the form that we looked at earlier, right?

A.   Right.  He said that if you want to give consent to a polygraph exam, which I had been asking for, sign the form, which I did.

Q.   And then, according to you, Zalatoris and Breen stepped out of the room, you signed the form.  A little while later, maybe five or ten minutes later, they came back in the room, and you guys left.

A.   No, that's not what happened.

Q.   They came back in the room and said, "It's not gonna" -- Zalatoris and Breen said, "It's not gonna hold up in court.  Let's go"?

A.   That's what happen.

Q.   After Zalatoris and Breen said that it's not gonna go -- hold up in court, you didn't even say anything, right?

A.   They weren't talking to me.

Q.   And you just got up and left, right?

A.   Yeah.  It's three guys with guns standing around you in a police station.

Q.   And at that point, you're saying Bartik said nothing to you?

A.   No.   He wasn't talking to me.

Q.   That was your account that you gave at your deposition, correct?

A.   What?   What's that?

Q.   What you just gave me right now, about that interaction you had with Bartik and Breen and Zalatoris, and how they came in and then you left, that whole discussion we just had, that's what your counsel --

A.   They came in --

Q.   One second, sir.

That was your account at the deposition, correct?

A.   I believe so.   My account at the deposition was that Zalatoris and Breen came back in with Bartik in the room, and they told Bartik that, "It's not gonna hold up in court.   Let's go."

Q.   Right.

A.   And then what's then they told me, "Come on, let's go." They took me out the room.   They put me back in the squad car and took me back to the ol' Board of Education building.

Q.   Right.   And it's not until today for the very first time that you're saying, "I told the polygraph examiner the truth."

A.   I've been saying that since the whole time.   But nobody even believed that I even went to a polygraph.

Q.   But at your deposition, you're saying you didn't say anything to Bartik.   Now you're saying you did say something to

Bartik, and it was the truth, correct?

A.   So when Bartik was speaking to me, right, he was explaining to me that he wasn't my lawyer and the rest of it.  I told him I understood all those things.  And I wanted to take a lie detector test, because I was the one that had requested the lie detector test in the beginning, right?

After I signed to take the lie detector test, Zalatoris or Breen asked to speak to him out in the hallway. All three officers left out.  I was left in, right?  The officers came back in, and Zalatoris or Breen said, "This not gonna hold up in court.  Come on, let's go."

So based on my memory now of reflecting back on that, it doesn't sound like I even had an opportunity to even tell Bartik my side of the story.

Q.   But -- 'cause I just went through what your deposition testimony was, which at your deposition, you were saying you told nothing of substance other than just procedural stuff --

MR. LOEVY:  Your Honor --

BY MR. NATHAN:

Q.   -- "Yeah, I'll volunteer" -- one second -- "I'll participate in the process."  You told nothing to Bartik.  And then today, when Mr. Loevy's asking you questions, you said, "Yes, I did.  I told him the truth."

MR. LOEVY:  Your Honor, at an impeachment, you have to show that he was asked a specific question.  You can't just

say, you know: You didn't say that.

MR. NATHAN: He's acknowledged it on cross-examination.

THE COURT: Okay. I don't follow your -- yeah. I don't think this is proper impeachment.

MR. NATHAN: I -- I'm trying to establish -- and the witness has testified that he said something at a deposition, which he's testified to. And today he's testified to something else.

THE COURT: He said: "I told Bartik the truth," and now you're -- and your impeachment is now he's saying he didn't say those things to Bartik?

MR. NATHAN: He's acknowledged, just a moment ago, that he said something different at his deposition. That's all.

MR. LOEVY: Yeah, I would just say: What question and answer did he say different at the deposition?

MR. NATHAN: We can go through it again, if --

THE COURT: No.

MR. NATHAN: But I'd rather not.

THE COURT: We're not going to do that, no.

I will sustain the objection.

BY MR. NATHAN:

Q. So after you leave the Polygraph Unit, you go back to the police station, correct?

A.   Yeah, the ol' Board of Education building.

Q.   And according to you, you don't say to Zalatoris and Breen that you participated in the murder, beating and burning of Mr. Collazo, correct, at this point in time?

A.   Correct.

Q.   Because, according to you, the first time you ever said something like that was to Mr. -- the prosecutor, McRay Judge, right?

A.   I believe so, yes.

Q.   Isn't it true that actually you gave an account, a pretty detailed account, to Zalatoris and Breen right after you came back to Area 1 after leaving the Polygraph Unit, and that account is reflected in seven pages of handwritten notes from Zalatoris and Breen?

        MR. LOEVY:  Objection, compound question.  And he never signed or saw the notes.

        MR. NATHAN:  Well --

        THE COURT:  Sustained.

BY MR. NATHAN:

Q.   You've seen the seven pages of notes reflecting that confession that was attributed to you at your trial?

A.   Say it again.

Q.   Sure.  You're familiar with the fact that at your trial, you're saying Zalatoris and Breen were saying that you did confess to them after the Polygraph Unit, correct?

A.   If that's what's -- if that's what they are saying in their report, then that's what they are saying.  That's their opinion.

My account of how the events went is when we came back from the polygraph examination, then that's when Zalatoris and Breen, we started rehearsing the story, because I needed to convince the ASA, McRay Judge, because McRay Judge had the last say-so, and McRay Judge was the one that was gonna let me go home.

So I had to convince him.  That was the rehearsal. That's called rehearsal time during that time.

Q.   You did tell Zalatoris and Breen that two weeks before February 14th, 2003, you talked to Johnitta Griffin and asked her if she knew anyone was selling a gun, right?

A.   Correct.

Q.   That's just something that did happen, right?

A.   Correct.

Q.   And you told that to Zalatoris and Breen, right?

A.   Correct.

Q.   You talked -- you told them that you talked to her on the phone for 20 to -- 15 to 20 minutes, and Precious called back and had her friend, Chris, three-way call so you could talk to Chris, right?

A.   Sounds about right.

Q.   Okay.  Because that happened.

Fulton - cross

392

A.   Right.

Q.   Prec -- you also told Zalatoris and Breen that Precious said that Chris would be able to help you out with a gun, right?

A.   Well, if she called me on three-way with him on the phone, now I'm talking to him, I'm not talking to her.

Q.   Right.  I mean, we established that you did have that conversation with Precious about Chris being able to get you a gun, right?

A.   She was on the phone.

Q.   And you told that to Zalatoris and Breen, right?

A.   I'm pretty sure of that, yes.

Q.   So -- you also told Zalatoris and Breen the part of the story where Chris said he and his friend were -- had a lot of guns, and you should come to the neighborhood, and that Chris gave you directions to go down to Diversey, right?

A.   Yes.  He gave me directions, yes.

Q.   So that part of what Zalatoris and Breen are saying you said is true.

A.   Thus far sounds like it, yes.

Q.   You also told Zalatoris and Breen, after the Polygraph Unit on March 18th, that Chris said he'd be standing outside and that he waved the car down, he stopped the car.  You were driving in the front -- you were in the front passenger.  Stick was in the back seat, and Riff was in the driver seat.

Fulton - cross

393

A. And what was the beginning of it? He was just standing outside?

Q. Yes.

A. Nah, that's wrong, 'cause that didn't happen.

Q. You didn't say that to them?

A. No. He got that detail wrong.

Q. And you did tell them that Chris told you to, "Hang tight. I'll see if my guy is home." He came back out and said the guy isn't in yet, and that's when he gets in, you pull the car around the corner, and you smoke with him, right?

A. Repeat that again.

Q. Sure. It is true that you told Zalatoris and Breen on March 18th that when Chris came to the car, he got in, you got in the back, and then you guys had a smoke.

A. That part is true, yes.

Q. And you told them at the same time that approximately 20 minutes later, you pulled back on to Diversey. Chris ran in and then came back to the car. He said his guy's in, and everyone started to get out, but Chris said, "Hold on. Let me see if my guy will take company."

A. Only the person that's purchasing the gun can come in is what I said.

Q. All right. So you agree that you told Zalatoris and Breen that Chris didn't want Mitchell and Shaw to come with?

A. Basically, yes.

Fulton - cross

394

Q.   And you told Zalatoris and Breen that you followed about --
how you followed Chris into the building, and the things that
you -- you know, you told the ladies and gentlemen of the jury
today, about how the light was out, and you walked up and you
saw another person with a gun and told -- the guy said it was a
stickup.

A.   Uh-huh.

Q.   That's true?

A.   There was a light on at the top of the stairs.  Everything
I spoke about earlier, yes.

Q.   Okay.  And you told Zalatoris and Breen at that time that
you pulled out $15, you handed the money, and you were told not
to move ten minutes, correct?

A.   I didn't know it was the $15.

Q.   Right.  But that's what you did, and that's what you told
Zalatoris and Breen.

A.   Right.  I just reached in my pocket and handed them some
money.

Q.   And you also told them that Chris and his friend left, and
that you ran to the car and told Mitchell and Shaw about what
happened.

A.   Correct.

Q.   And you also told Zalatoris and Breen that Chris -- about
how Chris called you to taunt you, right?

A.   Correct.

Q.   And how Chris told you, "I know you have more money than that" -- "than this.  You gotta come back," and there was some motherf'ing going on.

A.   I don't know about no motherf'ing.  But there was some taunting calls going back and forth, and he did ask me to come back 'cause he felt as though I had more money.

Q.   And you also told them at that time that you called Precious at about 8:30 or 9:00 o'clock and asked if she knew about the robbery, correct?

A.   I called Precious and told her about the robbery.  I didn't ask her if she knew.

Q.   Okay.  And she hung up?

A.   Yeah.  She say, "I don't, I don't" -- her exact words is, "I ain't got" -- "I don't know nothing about it," click, or, "I ain't got nothing to do with it," click, and she hung up on me.

MR. NATHAN:  Do you have an objection to me putting this up?  Defendants' Exhibit 61?

MR. LOEVY:  As long as it's clear what it is.

MR. NATHAN:  Okay.

THE COURT:  Okay.

MR. NATHAN:  Your Honor, I'd like to publish the general progress report dated March 18th, seven pages of handwritten notes from Breen, and signed by Breen and Zalatoris.

MR. LOEVY:  Actually, do we have a foundation yet for

it?

MR. NATHAN:  That's why I was --

MR. LOEVY:  I apologize for saying it.

MR. NATHAN:  -- asking if you object.

MR. LOEVY:  But he hasn't seen it.  It's not -- he didn't sign it.  It's not --

THE COURT:  Yeah.

MR. LOEVY:  It's not his.

MR. NATHAN:  I understand that.  I was asking if he objected, and he said he didn't.  But if that's -- if you object, that's fine.

MR. LOEVY:  I think I might have misunderstood.

He didn't sign it or see it, so I don't understand how he could comment on it.

MR. NATHAN:  I -- that's fine.

THE COURT:  So you're not using it?

MR. NATHAN:  I'll continue it.  I just thought it was easier to do it the other way.  That's fine.

BY MR. NATHAN:

Q.  But you don't dispute that you told Zalatoris and Breen about the call you had with Precious and how she hung up, right?

A.  Yes.

Q.  And you also told Zalatoris and Breen that Mitchell called Precious four to five times, and finally someone answered and

said -- and someone said Precious is not taking any calls.

A. I was the one that was calling Precious? Riff was driving. I was the one that was calling.

I called her a few more times after that. She didn't answer. And then, finally, her auntie end up answering the phone. Again, that's when I told her auntie everything that happened, and then she said she was gonna talk to Precious.

Q. All right. And you also don't dispute that you told Zalatoris and Breen on March 18th of 2003 that Precious told you that Collazo or the guy who robbed you knew where you lived, and you -- correct?

A. What's the question again?

Q. Yeah. You told Zalatoris and Breen on the 18th that Precious told you that Collazo knew where you lived.

A. Precious didn't tell me that.

Q. You're saying --

A. Collazo told me that.

Q. If they put that down, that Precious told you that, then --

A. Then they lying. Like everything else.

Q. Or mistaken, 'cause they might've misunderstood what you're saying.

A. Ain't no misunderstanding. That's a frame job.

Q. So if -- you're saying if they understood that Precious told you where -- told you that Collazo knew where you lived, but really it was Collazo who knew where you lived, that's a

frame-up?

A.   What I'm telling you is that when they -- when I was talking to them, none of those officers were taking notes.

So all of these notes that you're reading now, all of these notes are coming off their memory.  They weren't writing it as they were talking to me.  That's why most of those reports are dated from July, right?

Q.   Well, your -- I think the record will be clear it's dated March 18th, but --

MR. LOEVY:  No.  We dispute that strongly.

THE COURT:  Let's take a break here and -- I think it may be time to stop for the day.  I don't know how much more you have.

MR. NATHAN:  I mean, I was gonna go through these notes.  It would've been easier if I could show them.  That'd make it go faster, probably.

THE COURT:  Yeah.  Well, I don't think I gave you an afternoon break, so you could probably use one, right?

I understand there's going to be a snowstorm tomorrow.  We don't know for sure because, you know, predictions, weather predictions are weather predictions.

I would very much hope to keep going here tomorrow.  If the storm is so bad that you can't get here, cannot get here, we'll let you know.  And, obviously, if you cannot get here, let Amanda know.  All right?  But let's plan on going

ahead tomorrow.

Same time.  Same location.

(Jurors nod.)

THE COURT:  Thank you for your attention today.

(Jury out at 4:49 p.m.)

THE COURT:  You may step down.  Thank you.

(Witness excused to counsel table.)

THE COURT:  Off the record.

(Discussion held off the record.)

THE COURT:  Okay.  Back on the record.

MR. LOEVY:  The first issue, Your Honor, is -- relates to a subpoena that we've served on the City for the original files of the GPR notes and the police reports and the basement file.

We've served an original -- a subpoena like that for the original file in many cases we've tried in this building, and we've never had a problem, to my recollection, but the City in this case has taken a position that they won't respond to the subpoena, even though it's a valid trial subpoena.

Like many trial issues, we want to use the original evidence.  Oftentimes the original evidence looks different than the photocopies.  It has whiteout or, you know, lines.

But the point is it's a valid subpoena, and the defendants won't obey it and they won't explain.

At first, they said that:  Well, somebody would have

to watch it, which is usually the protocol. They usually bring a court officer to come in and not let it out of his sight. We said: Fine. Let's use the usual protocol. Then they said they're not going to cooperate with the subpoena, and we would ask you to ask them --

THE COURT: Okay. Well --

MR. LOEVY: -- to cooperate with the subpoena.

THE COURT: -- this should be a motion to quash, right?

MR. FIEWEGER: Your Honor --

MR. LOEVY: If they're not going to respond.

MR. FIEWEGER: -- I understand Mr. Loevy to now be raising a motion to enforce the subpoena. We have a written objection to that motion that we'll file either this evening or first thing tomorrow morning.

But in short, Your Honor, Mr. Loevy -- they've never needed the original copy of this file. It was available during discovery. They could've come over and looked at it at any time. They didn't need it. They've used copies.

They've litigated this case for years without any need for the original file, and now what they want to do is get the original file, at the very last second, at trial -- they served the subpoena, Your Honor, on Wednesday, last week.

THE COURT: Okay.

MR. FIEWEGER: Saying: Bring this to trial. And

what -- and what Mr. Loevy explained to me he would like to do is try to find what he called authenticity issues. So are there whiteouts? Are there crossouts? Are there notes on one -- on the original that aren't on a copy?

But, Your Honor, confronting any witnesses with this at this point is grossly unfair because nobody's had an opportunity to look at these "authenticity issues" that Mr. Loevy is talking about.

THE COURT: It does seem a bit late.

MR. LOEVY: Well, Your Honor, at trial, original evidence is subpoenaed.

You know, on Wednesday, if they're saying: Well, there wasn't enough time to bring the original evidence in -- you know, a lot of trials, I want this shirt -- you know, original evidence, you bring the original.

What they're -- you know, they can't say it's a surprise. They've had it in their custody for 20 years. It's their evidence. And why -- we don't have to rely on substitutes when there's original evidence.

If there was a piece of physical evidence, they wouldn't say: You have to use the picture of the physical evidence. We'd say: We want the gun, not the picture of the gun.

The report, we have a photocopy, but there's actually a report. And we can show the jury: Wait a minute. This pen

402

mark is in a different -- you know, he just -- for example, Mr. Nathan just said: Oh, these reports are dated in July. Sometimes you can tell by looking at the original that it wasn't, it was written later. It's original evidence.

We've never had -- the City has never not brought the file to trial in other cases. And if they balked, judges have enforced the subpoena.

So the only reason I'm hearing in response is: Wait a minute. We might be surprised by what our own evidence shows, and that's the only evidence -- reason I'm hearing, that the original evidence would cause them prejudice.

MR. FIEWEGER: Your Honor --

MR. LOEVY: It's prejudice, not unfair prejudice. Sorry.

MR. FIEWEGER: Sorry. Sorry, Jon.

MR. LOEVY: My fault.

THE COURT: Okay.

MR. FIEWEGER: Your Honor, it is. It's unfair prejudice. Because if the issue about whether or not there are notations, or different color ink, or a date, or any of that that was actually material to the case, it should've been covered in discovery. And they should've asked for an exam of these so everybody could take a look at it and have time to examine it and come to an actual understanding as to why there may or may not be whiteout, for example.

What Mr. Loevy wants to do, instead, is put it in front of people, in front of the jury, where there's no time to figure it out, and ask somebody: Gee, why is this different than the copy that you have?

Or there may be a dozen explanations for why it is, but because of the way they've sprung this at trial and never brought it up before, it's unfair. It's designed to confuse the witnesses, Your Honor.

And we'd like -- as I said, we have a written response to this that we'd like to go ahead and file.

THE COURT: Okay, okay. I mean, there are two issues. One is whether the subpoena -- I mean, whether they have a legitimate reason, excuse me, to refuse the subpoena. The other is how you can use it, so --

MR. LOEVY: That's true.

MR. FIEWEGER: Right. And, Your Honor, our objection, the reason we object to having to produce the records in response to the subpoena is there is a burden involved. We can't just bring it in and turn it over and leave it here. We have -- because of record-keeping policies, the police department has to have a custodian sit with it.

And that is a burden. And my point is that burden should not be imposed so that the plaintiffs can try to trick witnesses.

MR. LOEVY: Well --

MR. FIEWEGER: That's what they're doing, Your Honor. Because if what we wanted to do was really figure out, are there authenticity issues with respect to these records? And are there questions about them, we would have done this six, eight months, two years ago.

THE COURT: Uh-huh. Well --

MR. FIEWEGER: Not on the Tuesday of trial.

MR. LOEVY: You know, Your Honor, if they want to admit these records, we could say: Objection, foundation. You know, they have to show the original. But I don't want to go down a sideband.

THE COURT: Well --

MR. LOEVY: Your Honor has properly identified how we should handle this. There's two issues. The first is, do they have to respond to a subpoena? And they do. And if they brought it to court, maybe the best way to look at it is we inspect it, see if we want to use the original, because we want to hold up the clothes or hold up the original. But if there's no issue, then there's no issue and it's over, and the record-keeper can go home that day.

If there is an issue -- let's say it turns out that when we get the original evidence -- because although it's paper, Your Honor, it is original evidence. It's evidence. And if there's -- and if we look at -- and there is an issue with the evidence, then Your Honor could decide how you want to

handle that issue.

MR. FIEWEGER: And what Mr. Loevy --

THE COURT: All right. So --

MR. FIEWEGER: -- is describing right now is discovery.

THE COURT: -- let me sort of process this.

This is -- the City's a party to this.

MR. LOEVY: Yes.

THE COURT: And so this was discoverable, right?

MR. LOEVY: True.

THE COURT: You could have asked for it.

MR. LOEVY: Yes.

THE COURT: And you didn't.

MR. LOEVY: True.

THE COURT: So there are two ways to look at this. But, you know, I guess it's my call.

It seems to me -- well, I don't know. You said you had a response to the motion?

MR. FIEWEGER: Yeah. We could file a written response, Your Honor.

THE COURT: Okay. All right. So we'll leave it at that.

MR. LOEVY: Is it our motion? Or do they got to quash our subpoena? Or do we have --

MR. FIEWEGER: We're filing an objection to Mr.

Loevy's oral motion.

MR. LOEVY: But if I am making a motion -- if I have a subpoena, do I -- I guess I have to enforce it. It's my motion.

MR. FIEWEGER: You are asking us to produce it, so --

MR. LOEVY: All right. So your turn to quash.

THE COURT: Okay. It's your motion to quash, I guess.

MR. FIEWEGER: I -- procedurally, my position is Mr. Loevy stood up and said, "I have an oral motion to make. I want to enforce the subpoena." Our response is an objection to his oral motion.

MR. LOEVY: Okay.

MR. FIEWEGER: It may be a distinction without a difference.

THE COURT: It's a way -- yeah, I would say so.

I would like to hear what each of you has to say. I mean, I think that's the issue. It's just discretionary.

MR. FIEWEGER: Yeah.

THE COURT: You know, I guess I would say that it's too late at this point, and so I won't require them to produce the original.

MR. LOEVY: All right. Thank you for considering our position, Your Honor.

THE COURT: Okay.

MR. LOEVY: The other issue is the polygraph. A

different polygraph.

Mr. Fulton took a polygraph with his attorney after the proceedings were over. And a different kind -- you know, a polygraph. And there is no record/report of the results.

So we don't object to questions that, "Hey, Mr. Fulton, did you go with your attorney" -- actually, we do object. It's not relevant.

But he took a polygraph. The person who read the results of the polygraph is not a witness. There are no results that anybody could look at.

So what I think they want to elicit -- Mr. Nathan and I have attempted to work this out and were unsuccessful. But they want to elicit from Mr. Fulton or someone else: What did the polygraph examiner tell you the results were?

That's hear -- it's got two problems. First of all, it's hearsay. He doesn't know what the results were, except that somebody's telling him that. And second, it would be a *Daubert* problem, because polygraphs are not real, you know.

So this is not an issue that should be part of this trial. And what they -- in discovery, they got an email from the polygrapher, but that's hearsay, too. I won't even talk about it. Because the non-witness sent them an email. That's hearsay.

MR. NATHAN: They are saying that a polygraph examination should've been administered. Mr. Fulton said, on

direct examination, "I wanted to take the polygraph test because I ain't -- I didn't do anything," to paraphrase what he said. He said, "I would like to have taken it, because I didn't do anything. They didn't give it to me. They said it's not going to hold up in court. Let's go."

They're going to cross-examine the officers: Why didn't you give him the test? They're going to say that to Bartik. And we should be entitled to say: Anyone's allowed to go get a polygraph test, and you did get a polygraph test.

MR. LOEVY: We don't have a problem with that.

MR. NATHAN: So you got your own polygraph test.

MR. LOEVY: We don't have a problem with that. We have a problem with: Oh, by the way, what did somebody tell you the result was?

MR. NATHAN: But --

MR. LOEVY: So, as long as he's going to be -- have fidelity to the principle we're talking about here, we don't object.

MR. NATHAN: I'm not -- I don't have a result. And we don't know -- there is no result in the record. So I'm not going to be asking him about the result.

THE COURT: Okay. So --

MR. LOEVY: Okay. Sounds like we're understood.

THE COURT: So what's the point?

MR. LOEVY: Yeah, that's -- so why is it relevant, I

guess?

MR. NATHAN: It's relevant because they are criticizing the officers for not giving a polygraph test, and we are rebutting that by saying: A polygraph test is something -- if you want one so badly, you can get one, and you did.

THE COURT: When did he get this test?

MR. NATHAN: What happened was his criminal defense attorney got a court order --

THE COURT: Okay.

MR. NATHAN: -- in the -- I don't have the exact date, but sometime before the 2006 trial. And had a polygraph examination administered. So it's --

THE COURT: But it wasn't admissible?

MR. LOEVY: It's not admissible.

MR. NATHAN: It's not admissible. Or I -- there was no ruling on admissibility.

But the point is that they shouldn't be able to criticize the officers for not giving him one when he was able to get one.

MR. LOEVY: No.

THE COURT: Oh, no. I'm not so sure that's the point.

MR. NATHAN: We issued a subpoena to the polygrapher, and we got a "no records" statement back.

MR. LOEVY: He has no records. And Mr. --

THE COURT: Well, I think it's a tangent. I mean, if there's no objection to asking, I guess you can ask.

MR. LOEVY: I think we --

THE COURT: But it's just leaving it open to the jury, like: Well, what was the result?

MR. LOEVY: Yeah.

MR. NATHAN: No. The opposite. They're -- what's leaving -- what they're leaving open is they're saying: These officers should have given him a polygraph, should have given Fulton a polygraph, and they didn't. Then Mr. Loevy is going to criticize them for that, I imagine, on cross-examination.

If he's committing that he's not going to do that, then I don't need to go into the polygraph.

MR. LOEVY: What Mr. Fulton has already testified to is: I said, "Give me a polygraph." They wanted to see if I'd sign the form, because they're trying to -- and I called their bluff. I said, "Let's bring it." And then they said, "No. We're not giving you a polygraph." That's in the record.

What he's talking about doesn't add anything to that at all. And it does -- Russell is right, it does leave an open question: Well, what happened to the polygraph? You know, apparently, it was inconclusive, which makes it even worse.

MR. NATHAN: Well, that's made up.

MR. LOEVY: It's not --

MR. NATHAN: There's no evidence to the -- in the

record of that. He's just saying that there's "no records" statement.

MR. LOEVY: No, that's --

THE COURT: Well, okay.

MR. LOEVY: -- what Mr. Fulton's testimony would be, is inconclusive.

MR. NATHAN: He said he didn't know.

THE COURT: She can't --

MR. NATHAN: I'm sorry, but he -- you can't just invent a polygraph conclusion when we don't have records. That's the answer.

MR. LOEVY: Well, then why --

MR. NATHAN: There's a "no records" statement.

What Mr. Loevy wants is to be able to say that these officers had a duty to administer a polygraph, giving the inference to the jury that had he taken a polygraph, it would've been favorable to him, and just leave that window open. And I'm trying to just close that loop, or at least get an agreement from Mr. Loevy that he's not going to go there.

MR. LOEVY: Well, I am saying that we do object whatsoever to this polygraph issue. Now we're thinking it through, it just leaves an open question to the jury that he went and got a polygraph. It wouldn't have been admissible anyways. And there's no evidence what the result was.

And that is not -- the door isn't opened by Mr. Fulton

saying:  I called their bluff, and I said, "Give me a polygraph," and they said, "Never mind."

So that's what we're trying to argue.

THE COURT:  Yeah, I think it's sort of a -- what should we say, a red herring.  I mean, that isn't related to the theory of the plaintiff's case that, you know, he was entitled to a polygraph.

MR. LOEVY:  Yeah.  And I --

MR. NATHAN:  No.

THE COURT:  It's a question of -- I guess it goes to the good faith of the officers if, you know -- or their motive or whatever.

MR. NATHAN:  Sure, it is.  And that's what they're going to be arguing.

THE COURT:  But this is post the events that happened in -- 2003?  '02?

MR. LOEVY:  Yeah.  I mean, this is hearsay.

THE COURT:  Or 2000 --

MR. NATHAN:  I'd like to make an offer of proof, then, at this time.

THE COURT:  Okay.

MR. NATHAN:  If I'm being excluded.

THE COURT:  You may.

MR. NATHAN:  We would -- if permitted, we would establish, through Mr. Fulton, that he previously -- he hired a

lawyer, Elliot Zinger, to represent him.

Mr. Zinger arranged for a polygraph examiner, who worked for Mr. Zinger, to have him take a polygraph test. That polygraph examiner's name was Larry Beumont, B-e-u-m-o-n-t.

In fact, Mr. Fulton did take a polygraph test, at the behest of Mr. Zinger, his criminal defense attorney, and that that was never presented in court, one way or another.

That's --

MR. LOEVY: Well, that would be super-misleading because it's never presented in court because the judge doesn't let 'em in. So what would the jury think? Oh, it must've been -- you know, he might not have liked the result.

THE COURT: Right.

MR. NATHAN: That's my offer of proof.

THE COURT: All right. Well --

MR. NATHAN: And one more thing. We would call Mr. Beumont, the polygraph examiner, to say that he doesn't have any records of the polygraph, because he's -- what he would say is that when the polygraph results are not favorable to his private clients, he typically destroys the records.

MR. LOEVY: Well, that's his offer of proof, and we dispute it.

THE COURT: Yeah. Well, I don't -- I don't know. That's your offer of proof.

Is he on your witness list, this Beumont?

MR. NATHAN:  Yes.

MR. LOEVY:  If I said he wasn't, I stand corrected, because it just hasn't been -- he wasn't deposed.  It hasn't been an issue in the case.  And I must've missed him.

MR. NATHAN:  I do have a few other issues.

Based on the direct examination, the lengthy direct examination about how Mr. Fulton is a legal gun owner and how he -- it's a longstanding tradition in his family, his father, his grandfather, they all have legal guns, and he's a Second Amendment enthusiast, that opens the door to the fact that Mr. Fulton did own another gun.

Your Honor, I believe, reserved ruling on that, but I -- it's possible you previously excluded it.

But he owned another gun during March.  And it's also relevant -- so, first, it's relevant to rebut his testimony.

It's separately relevant because what's going to come out later in his examination is that -- there's going to be a dispute, maybe, about whether or not he told detectives that he had this gas can, and he stored it in -- I think it's actually more appropriate for me to go into this without the witness in the room.

THE COURT:  Yes, yeah.  You would -- yes, you're excused.

MR. LOEVY:  Go home, John.  Thank you.

(Plaintiff stands, confers with counsel.)

THE COURT: Go ahead.

MR. NATHAN: I expect there to be evidence that --

THE COURT: Wait. He's still here.

(Plaintiff exits.)

MR. NATHAN: I expect there to be evidence that Mr. Fulton told detectives that he took this gas can and stored it in his grandfather's garage. You know, exactly how that comes up -- if Mr. Fulton will admit that or not, I'm not sure. But assuming he denies that, then the fact that he would store his gun in that same garage is probative to rebut a denial of storing his illicit items in the garage.

So we're saying the gas can is the -- is part of his instruments of the crime, and he stores those in his garage. And it also happens to be true that he stores this gun in the garage.

He testified at his deposition that he stores it in his closet. I believe it's Mr. Mitchell who says that he stored it -- that the gun was stored in the garage.

So I would like to inquire as to Mr. Fulton and Mr. Mitchell about whether or not this gun is stored in the garage.

MR. LOEVY: Well, I could deal with the second one easy because he's not going to deny that that's the garage where he stored things. That is his gas can in his grandfather's garage. He cut the grass.

416

So they don't have to prove up that he would put things in the garage. That excuse drops out.

As far as the first excuse, it's actually incoherent. He says: John's a gun owner. He's a gun enthusiast. We wanna prove, therefore, that he had a gun. It would be the opposite.

If John denied he was a gun owner, and denied he liked guns, then he would bring in that he had a gun. It doesn't eat it.

And the important thing, though, is this gun didn't fire. It had -- by all accounts, undisputed, it didn't have a firing pin. So that --

MR. NATHAN: I --

MR. LOEVY: That's --

THE COURT: So that's redirect, I suppose, but I --

MR. NATHAN: Correct. We --

MR. LOEVY: But it's got to be relevant.

MR. NATHAN: I'd like -- I think it's relevant for the two reasons I stated.

THE COURT: Was there any relevance that there was a gun in this murder?

MR. LOEVY: No.

THE COURT: I mean, was there?

MR. LOEVY: No.

THE COURT: Any evidence, I mean?

MR. LOEVY: No. In fact, the opposite. There was no

gun involved in the murder.

MR. NATHAN: There's no gun directly involved in the murder. But we just heard testimony about how you can get people to comply with a gun, whether or not it is an operable gun.

So Mr. Fulton explained that he was robbed by a gun that turned out to be a BB gun. So what? He believed at the time that it was a real gun. That's why he complied and gave over his money.

Same thing here. He owned at the time of this murder a gun. It looked like a gun, it felt like a gun, it was a gun. He's just -- according to his own testimony, it doesn't fire. We can't test that.

But if he had a gun at the time, that is a plausible way that he could have gotten Collazo to comply with him.

MR. LOEVY: Although, you know, there's no scenario, no confession scenario ever where he brandished a gun. They are not alleging that this crime involved a gun.

MR. NATHAN: That's true. But I just articulated three different reasons why it would be relevant.

MR. LOEVY: And this was --

THE COURT: It seems speculative. If there was no gun in the murder -- the gun that he owned was -- I suppose it could've been used to threaten someone, even though it was not operable.

MR. LOEVY:  But nobody alleges that.

THE COURT:  But there wasn't anything in the alleged confession about a gun.

MR. NATHAN:  There is one more evidentiary purpose that I forgot, and my colleague just told me, reminded me.

Mr. Shaw testified that after they get -- after they get robbed by Collazo, they go back and get that gun.

MR. LOEVY:  It had no --

THE COURT:  Two weeks before.

MR. LOEVY:  No.  Six weeks before.

MR. NATHAN:  It's totally unclear when that happened. And it's a disputed issue in the case, exactly.  But it was prior to the murder.

THE COURT:  To the murder.

MR. LOEVY:  You know, Your Honor --

THE COURT:  Yeah.

MR. LOEVY:  -- this was briefed before trial, and you ruled that it's out.  So by the same surprise ruling that -- you know, that we can't surprise them with the new -- we would be surprised.  I've already done his direct.

THE COURT:  Have I -- well, that's true.

MR. NATHAN:  No.  He opened --

MR. LOEVY:  You have ruled.

MR. NATHAN:  -- the door to it.

MR. LOEVY:  You have ruled.

419

THE COURT: Wait, wait, wait a second.

Mr. Nathan said I reserved, and you're saying I --

MR. LOEVY: You kept it out.

THE COURT: -- kept it out, so --

MR. NATHAN: I said that I wasn't sure if you reserved or kept it out.

THE COURT: All right. I misunderstood that.

MR. LOEVY: I relied on the premise that it was out when I did the whole direct exam, so it would be unfair to imply that I hid the fact that he had a gun.

MR. KAMIONSKI: It was reserved.

MR. NATHAN: It was reserved. What number?

MR. LOEVY: All right. Well --

THE COURT: Number what?

MR. NATHAN: Plaintiffs' 13.

MR. LOEVY: Yeah. They had to show relevance, so --

MR. NATHAN: And I think we showed three different -- three or four different ways it's relevant.

(Document tendered to Court.)

THE COURT: Ah, thank you. Okay.

(Court reads.)

MR. LOEVY: There's nothing that has changed, Your Honor, that makes it relevant.

THE COURT: Let me read this, just so --

MR. LOEVY: Sure.

(Court reads.)

THE COURT: "Unless individual defendants can show a foundation for a reason a nonworking gun could have played a role in the murder, the prejudice outweighs any probative value it might have."

MR. LOEVY: And nothing has changed. The Shaw stuff that he just mentioned existed before the trial.

THE COURT: Right.

MR. NATHAN: They --

MR. LOEVY: Before trial started.

Nothing has changed, Your Honor.

MR. NATHAN: It's relevant.

THE COURT: Relevant to what issue?

MR. NATHAN: First of all, it's relevant to show that they do, in fact, store illicit things in the garage. Just like the officers are saying he told them.

THE COURT: Okay.

MR. NATHAN: That's a core issue in the case. It goes to the same story about how Shaw is saying they were so scared of Collazo after this robbery that happened that they went and armed themselves.

Mr. Fulton denied on cross-examination to having armed himself. He said -- he kind of thought it was a joke at the end. He minimized it. Even though Collazo said he was gonna kill him. That's the whole motive for this murder.

So Shaw's gonna testify that they were worried. They were worried enough to go get a gun.

So it's relevant to that. It's also relevant to impeach the plaintiff --

THE COURT: Wait, wait, wait. They were worried that Collazo would come after them?

MR. NATHAN: Yes.

THE COURT: Enough that they went to get a gun?

MR. NATHAN: Yes.

THE COURT: When did they go get --

MR. NATHAN: After they were robbed, Shaw is going to testify --

MR. LOEVY: About a week before the murder.

MR. NATHAN: Shaw is going to testify --

THE COURT: Oh. Shaw said that.

MR. NATHAN: -- that after -- after they were robbed, they went to Fulton's grandfather's garage to go grab this gun.

THE COURT: Okay.

MR. LOEVY: So he -- first of all, he didn't open a door, Your Honor, because he admitted, "I was scared."

MR. NATHAN: No. He --

MR. LOEVY: And the thing that Shaw says that's disputed is five weeks before the murder and nothing has changed. That's not a -- you know, if Mr. Fulton had said, "I wasn't scared," then that would've opened the door.

Mr. Fulton said the opposite. He said, "I was scared."

MR. NATHAN: On cross-examination, Mr. Fulton denied arming himself.

THE COURT: Okay. So what my ruling was "a reason a nonworking gun would have played a role in the murder," and you're saying that reason was that it could've, it could have caused Collazo to be compliant or something.

MR. NATHAN: That's --

THE COURT: But we don't --

MR. NATHAN: That's how it could've played a role in the murder. But it's also relevant to these other issues.

It's relevant to the motive. It's relevant to the core issue in this case about whether or not evidence was fabricated, whether a confession was fabricated.

So it's not just relevant to the murder. It's relevant to rebut plaintiffs' claim that the officers fabricated their statements.

I -- if you would like, I could explain that again.

MR. LOEVY: It's not in their statement.

MR. NATHAN: They're -- he's going to say that they fabricated the statement --

THE COURT: Right.

MR. NATHAN: -- about how he took this gas can, after using it in the murder, and brought it to the grandfather's

garage. And this is going to rebut that by saying: You did store things in your grandfather's garage, and these officers would have no way of knowing that without you telling them that.

THE COURT: Right. And that's --

MR. LOEVY: He doesn't deny that.

THE COURT: He's not denying that, so this is -- you're just really trying to get this gun in on a sort of speculative basis, that even though the officers didn't get any information in their reports that he had this -- a gun was involved.

So we -- it seems to me very speculative, so I just think we're not going to go there.

What else?

MR. NATHAN: The plaintiff on direct examination testified about how he saw violence.

I think -- did we rule on this already? That -- let me just do it, because I don't want to --

THE COURT: Yeah, make your record.

MR. NATHAN: -- do an improper cross area.

The plaintiff testified on direct examination that he -- at Cook County Jail, he witnessed violence, this incident that was graphic, where he saw somebody get stabbed right in the chest.

THE COURT: Yes.

424

MR. NATHAN: He talked about another incident where two guys were circling up and fighting. He talked about fights and fear in prison. He played that up for his damages.

In order to rebut that, we would like to inquire on cross-examination about how, in fact, he knew how to defend himself in prison. And he himself was violent. He -- and he, quote, stomped a guy.

MR. LOEVY: Have you seen the transcript, Your Honor? We gave it to you.

THE COURT: Yeah, I have it, but -- do you guys have it?

MR. LOEVY: He said something, "I was gonna stomp the guy."

MR. KAMIONSKI: It's helpful to listen to the audio as you're reading the transcript.

MR. LOEVY: Although, the audio is what we find prejudicial, Your Honor, because it's --

MR. KAMIONSKI: It's a two-fer.

MR. NATHAN: Can we play it for you, Your Honor?

THE COURT: Just hold on. So who is he talking to? We don't have a -- when does this happen? And who's he talking to? He was --

MR. NATHAN: He's discussing the -- he's discussing an incident --

MR. LOEVY: Well --

MR. NATHAN: -- that happened in Cook County Jail after, after --

THE COURT: Before the --

MR. NATHAN: Right after he's convicted.

THE COURT: Okay.

MR. NATHAN: In 2006. The call is from later, but he's discussing that earlier incident.

MR. LOEVY: Well, what -- the question was, when is the call?

MR. NATHAN: Well, I --

THE COURT: Do we know?

MR. NATHAN: We can get that information very easily. But --

THE COURT: And to whom was it?

MR. KAMIONSKI: 2012. To Laverne. So he's talking to Laverne.

THE COURT: Sorry. I --

MR. KAMIONSKI: And another person on the call.

MR. LOEVY: 2012, Your Honor. November 2012.

MR. NATHAN: November 18th, 2012 is the call, and he's talking to Laverne Henderson, this --

MR. KAMIONSKI: Somebody else is on the call as well.

MR. NATHAN: And there's also a third party who's patched in. But it's undisputed that the person speaking who -- and whose voice we are seeking to use --

THE COURT: Uh-huh.

MR. NATHAN: -- is Mr. Fulton.

THE COURT: Okay. So --

MR. LOEVY: That's --

THE COURT: -- what's he saying?

MR. NATHAN: They're giving you a lot of text here that I -- we can shorten it for you.

MR. LOEVY: Well, we can -- the part about "gonna stomp" is what they want in.

What we object to is it's prejudicial. When you listen to this call, it's very prison-sounding and a lot of N word, and it seems like they're just trying to use an excuse to play this call, because there's nothing relevant, nothing he would --

THE COURT: He says: "I heard him say I'm glad he got -- he got found guilty, so I come clean out of this cell." Is that what we're talking about? "Like, man, let the" --

MR. LOEVY: Yeah.

THE COURT: -- "shit in the cell come in, me come get your shit."

MR. LOEVY: Yep.

THE COURT: Who's he talking about?

MR. LOEVY: Unclear.

THE COURT: "I'm gonna lock the door and stomp his brains out."

MR. LOEVY: It says, "I'm gonna." That's how people talk in prison.

MR. NATHAN: The call continues about how he gets into an altercation. The guy hits his head, and he thought the man died.

MR. LOEVY: You know, this was described before the trial as, like, Mr. Fulton had a plot to stomp somebody or something. This is nonsense. This call is just a bunch of --

MR. KAMIONSKI: Can we play the call so that Your Honor could hear the call as you're reading the transcript now?

MR. LOEVY: I think if you play the call, Your Honor --

THE COURT: We have to go through the whole thing?

MR. KAMIONSKI: It's not the whole thing. It's actually four minutes or less, so --

MR. LOEVY: It's super-prejudicial.

MR. KAMIONSKI: Well, there's no jury. We're just playing it for the judge right now.

THE COURT: Go ahead.

MR. KAMIONSKI: Okay. Can we plug it in?

THE CLERK: HDMI?

MR. KAMIONSKI: Yeah. You know, I'm actually gonna -- I'm going to plug in the section so Your Honor can read on the screen the transcript, because that -- of what we're playing as we're watching it.

428

MR. LOEVY:  While he's setting up, it is still not clear to the plaintiff to what purpose this goes to.

THE COURT:  He admitted that he did some fighting, right?

MR. LOEVY:  Yes.

THE COURT:  In -- okay.  So does this go to damages?  Or it goes to impeachment?  Or what?

MR. NATHAN:  It goes to damages.

THE COURT:  Okay.

MR. KAMIONSKI:  Can Your Honor see the transcript on the screen?

THE COURT:  Over here?

MR. LOEVY:  Well, she -- you have the --

(Said video with audio played in open court.)

MR. LOEVY:  That's a lot of N words in there.

THE COURT:  It's hard to figure out what he's saying.

He's talking about he had a fight with someone in his cell?

MR. LOEVY:  Correct.

MR. NATHAN:  Correct.  He stomped him and he elbowed him.  The guy hit his head, and he thought he died.

MR. LOEVY:  No.

MR. NATHAN:  So it's saying --

THE COURT:  Okay.  So --

MR. NATHAN:  He testified about these incidents where

he's fearing physical violence, and we'd like to establish through this evidence that, in fact, he was the one doing the physical violence.

MR. LOEVY: No. It said the guy grabbed his nuts, and he elbowed him.

THE COURT: I can't even -- I couldn't follow it, with all the, you know --

MR. LOEVY: N words.

THE COURT: I don't know. I mean, he said -- he did make himself out to be a real gentleman, you know, and he was a kid, and he isn't -- being in prison was terrifying or scary.

MR. LOEVY: This is 2012, you know, which is -- he's been in prison for nine years at the time he --

THE COURT: That this happened?

MR. LOEVY: Yeah. He'd been in --

MR. NATHAN: No, no, no.

MR. LOEVY: -- for nine years. 2000 -- no, this phone call. This phone call happened in 2012.

MR. NATHAN: The phone --

THE COURT: Oh, in 2012.

MR. NATHAN: Can I just clarify that? Because I think it's confusing.

The phone call is a recording from a conversation in 2012. He's describing an incident that happened in -- after he's found guilty, which is in 2006.

MR. LOEVY: But he's comfortable in 2012. He's nine years into prison at this point. And I think he said he got more comfortable in prison in nine years.

So it's not -- he said some guy grabbed his nuts, and he elbowed him. He said he was gonna do something.

But our point is the prejudice, Your Honor, because it's N word, N word, N word.

THE COURT: It's prejudice because it's --

MR. NATHAN: It's also very prejudicial to us to have the plaintiff describing himself as a churchgoing young man who -- I mean --

MR. KAMIONSKI: Quoting scripture.

MR. NATHAN: He's literally -- I mean, it's not figuratively. He was quoting scripture on the witness stand and talking about how scared he was as an 18-year-old going into prison, or going into jail.

THE COURT: Okay.

MR. LOEVY: Yeah. And he was someone who quoted scripture and said, "I went to prison and got in fights."

So he admitted he got into fights.

THE COURT: Is this the Exhibit 112 we're talking about?

MR. NATHAN: Yes.

THE COURT: Okay.

MR. NATHAN: That's the audio.

THE COURT: He beat up on another --

(Court reads.)

MR. LOEVY: You know, Shneur, maybe we can agree if we just cut off the bad parts here. So, I mean, we can do it by -- I don't like all the N words.

So, like, if we did this part and if we did -- where you want the stomping part?

(Counsel confers.)

THE COURT: So I wrote in the ruling that: "Any probative value is substantially outweighed by the risk of unfair prejudice. If, at trial, the plaintiffs introduce good character evidence regarding Fulton, then the Court will consider whether this evidence can be admitted for impeachment purposes alone."

MR. LOEVY: Your Honor, we might make it easy for you. If we can just cut out a lot of the N words and abbreviate it substantially, then we would withdraw our objection. If we could work with the defendants to find a piece of this.

THE COURT: Yeah. I mean, it seems to me that -- yeah, this would show that he maybe wasn't the good Christian that he -- but I don't want all this "nigga" stuff and "fuck that" and so on. Just limit it to the part where -- parts where he is threatening someone else or --

MR. LOEVY: He didn't.

THE COURT: -- you know --

MR. NATHAN:  It --

MR. LOEVY:  So if we -- I think Mr. Nathan and I could work together.  And if we take out the N words and stuff and get in the parts that we're trying to get --

(Counsel confers.)

THE COURT:  I hope you can, so I don't have to.

MR. LOEVY:  All right.  We'll try together.  We'll work together.

THE COURT:  Okay.

(Counsel confers.)

THE COURT:  Can we let our court reporter go home?

MR. LOEVY:  Yes, Your Honor.

You know -- and Julia is right.  You know, if we can reach an agreement, then I'm going to agree to let this in.  But if we can't reach an agreement -- the first thing they should probably do with Mr. Fulton is ask him if he denies it.

THE COURT:  If he --

MR. LOEVY:  Ask him if he denies it.  Maybe he admits that this happened and then we don't have to play the prejudicial part.

MR. NATHAN:  I think the audio, this capturing him talking about how he was -- what he was doing in prison, is independently relevant to rebut the character -- affirmatively positive character evidence that he put in, about being a churchgoing Christian who played music at the church and -- I

433

mean, he literally -- I mean, he had me eating out of it, you know, eating it up, too, so --

THE COURT: All right. Well, see if you can work it out.

MR. LOEVY: Will do.

THE COURT: Okay.

MR. LOEVY: Thank you.

(Counsel confers.)

THE CLERK: Court is adjourned.

MR. LOEVY: Thank you. Nothing further, Your Honor.

MR. NATHAN: There's one more thing. I think it will be quick.

At the beginning of the direct examination, plaintiff testified that -- how he had this great relationship with Mitchell and how they worked on a car -- at a car dealership together until the COVID-19 pandemic; in which case, he had to lay off Mitchell.

And there is deposition testimony about the reason he laid off Mitchell was because Mitchell made a withdrawal from his bank account without telling him.

So it's not because they were in love and just COVID happened.

THE COURT: Uh-huh.

MR. NATHAN: It's not that at all. Mr. Fulton testified that he was upset. At his deposition, he testified

that he was upset with Mr. Mitchell because Mr. Mitchell --

THE COURT: Yeah. Okay.

MR. NATHAN: -- withdrew funds from his account, and I think that that should be fair game based on the trial testimony.

THE COURT: Okay.

MR. LOEVY: If they wanted to ask him: Was this situation -- I guess, what's it relevant to? But what is it relevant to?

THE COURT: His credibility.

MR. LOEVY: Okay. Then I won't object.

THE COURT: Okay.

MR. NATHAN: That's all. Thank you, Your Honor.

THE COURT: Good night.

(Adjournment at 5:33 p.m. until 9:30 a.m., 2/12/25.)

* * * * *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ *Kathleen M. Fennell*


/s/ *Judith A. Walsh*


/s/ *Jennifer Costales*

/s/ *Colleen M. Conway*                          February 12, 2025
Official Court Reporters                          Date
United States District Court
Northern District of Illinois
    Eastern Division

435

I N D E X

WITNESSES                                              PAGE

JOHN JONATHAN FULTON
Direct Examination By Mr. Loevy                         113
Cross-Examination By Mr. Nathan                         320

PLAINTIFFS' EXHIBIT                                RECEIVED

No. 40                                                  186
No. 63                                                  152
No. 73                                                  192
No. 73                                                  207
No. 120                                                 161
No. 233                                                 156

DEFENDANTS' EXHIBIT                                RECEIVED
No. 154                                                 191
No. 84                                                  355