436

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN FULTON, | ) | Case No. 20 C 3118 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| ROBERT BARTIK, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ------------------------------ | ) | |
| ANTHONY MITCHELL, | ) | Case No. 20 C 3119 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| ROBERT BARTIK, et al., | ) | Chicago, Illinois |
| | ) | February 12, 2025 |
| Defendants. | ) | 9:32 a.m. |

VOLUME 3
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Plaintiffs:        LOEVY & LOEVY
                          BY:  MR. JONATHAN I. LOEVY
                               MR. RUSSELL R. AINSWORTH
                               MS. JULIA T. RICKERT
                               MS. FATIMA LADHA
                               MR. ISAAC GREEN
                          311 N. Aberdeen Street, 3rd Floor
                          Chicago, Illinois  60607

                          LYON & KERR, PLLC
                          BY:  MS. ANDREA D. LYON
                          53 W. Jackson Boulevard, Suite 1650
                          Chicago, Illinois  60604

For Defendant Officers:   NATHAN & KAMIONSKI, LLP
                          BY:  MR. SHNEUR Z. NATHAN
                               MR. AVI T. KAMIONSKI
                               MS. BREANA L. BRILL
                               MR. JOHN M. CERNEY
                               MS. NATALIE ADEEYO
                          206 S. Jefferson Street
                          Chicago, Illinois  60661

437

APPEARANCES (Continued):

For Defendant City:          MICHAEL BEST & FRIEDRICH, LLP
                             BY:  MR. JAMES P. FIEWEGER
                             444 W. Lake Street, Suite 3200
                             Chicago, Illinois  60606

Court Reporter:              KATHLEEN M. FENNELL, CSR, RMR, FCRR
                             Official Court Reporter
                             219 South Dearborn Street, Room 2328A
                             Chicago, Illinois  60604
                             Telephone:  (312) 435-5569
                             Kathleen_Fennell@ilnd.uscourts.gov

                        *   *   *   *   *

              PROCEEDINGS REPORTED BY STENOTYPE
    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

(Call to order.)

THE COURT:  Good morning.

MR. LOEVY:  Good morning, Your Honor.  Same appearances for the plaintiff.

MR. NATHAN:  Good morning, Your Honor.  Same appearances for the defendants.

THE COURT:  We're in the middle of cross of Mr. Fulton.

MR. LOEVY:  We are.  He's here today.  There was a line -- he's coming in.

THE COURT:  Go ahead.

MR. LOEVY:  Oh, there he is.  He can get up on the stand.

There was a line, you know, one of those super lines for the immigration stuff.  I don't know if all the jurors got here on time.  I hope so.

THE COURT:  They're here.

MR. LOEVY:  Oh, that's good.

THE COURT:  You can come back up to the witness stand. Do you need to talk to him?

MR. NATHAN:  Is the jury up already?

The plaintiffs filed a motion.  I think it's a motion to reconsider.

THE COURT:  Yes.

MR. NATHAN: Your Honor has ruled previously last night that we were going to be allowed to play an excerpt of a prison call with the plaintiff, Mr. Fulton, in order to rebut the evidence of good character that he put in. He testified about how he -- he quoted Scripture, about how he goes to church, he testified in prison how he was a model citizen in prison, where he even initiated this pilot program where he was -- it was for, like, conflict resolution relating to the prison phones, and Your Honor had ruled that we were permitted to get into an excerpt.

And after court, the parties, Mr. Loevy and I, worked out a narrowed portion of that call. We prepared an audio clip to eliminate some of the call and make it tighter to basically shorten it, remove some of -- some concern that the plaintiff had that there was an N-word referenced in there.

There's a few of them. We took some of that out, and we came up with what we thought was an agreed-upon narrowed clip, and now we showed up to court here and plaintiff has a motion again, so --

THE COURT: I see.

MR. LOEVY: I have to take issue with that because Mr. Nathan knows we walked out of here without an agreement because where we disagreed was we said we -- and we tried -- remember Your Honor directed us to see if we could agree and come together on what would be played or read, and we told

Mr. Nathan we will agree to the language he wants if he agrees to read it because then if you read it, we could take out the N-words instead of playing it. There's prejudice associated with it.

We did file something. I don't know if had you a chance to see it.

THE COURT: I did see it.

MR. LOEVY: You did see it, so our argument, of course, is he did say he had good character in the sense that he was in a church, but he did not deny that he was -- prison was a violent place. He did not deny that he was in fights. So this isn't actually impeachment.

And cutting to it, there is prejudice for the N-words in 2025, and our position, Your Honor, is it shouldn't be in at all, but if it is, it should be read instead of played so we can excise the prejudicial parts.

THE COURT: It seems to me it is -- you know, the real effect of it is prejudicial because here it is, what, he's been in prison for six years, and he's talking to someone, we don't know who, and it's clearly, you know, street talk for young men.

So I would be inclined to just exclude it altogether, but if -- if we can compromise on, you know, reading this into evidence as edited, I can go with that.

MR. LOEVY: All right. Well, we move to exclude it.

441

MR. NATHAN: It would not be an agreement. If Your Honor's excluding the audio over our objection, you know, we dispute that. We think it's inherently more probative to hear -- if what we're trying to do is rebut evidence of good character, producing actual audio/video is substantively different than reading a transcript.

If Your Honor is excluding that, then we would take you up on doing the transcript.

THE COURT: What would you say? What would it say?

MR. NATHAN: What would -- the transcript? It would be the language that we had discussed last -- last night.

MR. LOEVY: Well, maybe the Court should hear it because I hear the Court inclined to not allow it. What they would read is --

MR. NATHAN: One second, Mr. Loevy. This is not -- we have a better transcript. This is not quite accurate.

MR. LOEVY: Oh, you got --

MR. NATHAN: We have a better one.

MR. LOEVY: We took this transcript from the phone, they didn't, so I think what has just been suggested is they don't agree to our -- they think there's a word missing or something, or wrong. That's the first time we're hearing that.

MR. NATHAN: No, I don't think this -- we're quibbling about nothing. We're just saying we have something slightly more accurate, that's all, for us to be working from. But

we've agreed on the sections already.

MR. LOEVY: We do not think it's relevant or probative. He doesn't deny it. We'd like -- our motion is to exclude it.

THE COURT: So, okay, well, my clerks have looked into this, and I have a draft order from them which I think is actually correct on the law, so I'll just rule that way, and we'll be done.

Plaintiffs' motion to exclude defendants' trial Exhibit 112 is granted. The call is not tethered to good character evidence of Fulton's faith. The call also does not impeach any testimony about fighting.

On direct, Fulton admitted that he fought in prison. In the absence of a concrete impeaching purpose, the call only serves as evidence of a highly prejudicial prior bad act. The Court has already ruled that the call is inadmissible for this purpose.

That's cited at Docket 399 at 11.

MR. NATHAN: Am I permitted, under the Court's ruling, to inquire on cross-examination -- I'm going to be a little bit vague because the witness is here, inquire on cross-examination relating to the incident about there being a stomping and an elbow that happened?

MR. LOEVY: There -- in the call, there's no stomping.

MR. NATHAN: It says that word.

443

THE COURT: If -- I guess -- I don't know what it's impeaching of, but -- what is it impeaching of?

MR. NATHAN: His -- his direct testimony of good character. There's a list of it, which I've referenced last night. I've referenced this morning.

THE COURT: Well, typically, you impeach character with a character witness who knows this person and can attest to his character, so I think we'll just leave it at that. You know, if there was a certain --

MR. NATHAN: Your Honor --

THE COURT: -- incident that he denied being involved with and you can impeach him with that, that's one thing.

MR. NATHAN: Say that one more time? If he denied --

THE COURT: The incident that you're talking about in the memo there or the transcript. If you ask him about that, he denies that it happened, then you could impeach him with that, but I -- at that point, I don't -- you know, what is the relevance in terms of the rules of evidence?

MR. NATHAN: So under your ruling, I will be permitted to inquire as to the incident on cross-examination but not play the audio; is that right?

THE COURT: I suppose, although I think it's a little tenuous.

MR. NATHAN: Okay.

We will separately file an offer of proof with the

audio call.

THE COURT:  Okay.

MR. NATHAN:  And --

THE COURT:  Let's get our jury in.

THE CLERK:  All rise.

(Jury in at 9:41 a.m.)

THE COURT:  Good morning.  You may be seated.

THE JURY:  Good morning.

THE COURT:  Thank you all for getting here on time. I'm sorry we're a little late getting started, but we will continue the cross-examination of Mr. Fulton.  He's already been sworn, so we don't have to do that.

Good morning, Mr. Fulton.

THE WITNESS:  Good morning, Your Honor.

THE COURT:  And the defendants over there, good morning.

JOHN JONATHAN FULTON, PLAINTIFF HEREIN, PREVIOUSLY SWORN,

CROSS-EXAMINATION (Resumed)

BY MR. NATHAN:

Q.  Good morning, Mr. Fulton.

A.  Hey, how's it going?

Q.  I just wanted to bring to your attention --

MR. NATHAN:  If we could just publish this. Mr. Loevy --

MR. LOEVY:  Yeah.

MR. NATHAN: -- it's just a demonstrative.

BY MR. NATHAN:

Q. We left off yesterday talking about the conversation that you had with Detectives Zalatoris and Breen after you went to the polygraph unit. Do you remember that?

A. Okay.

Q. And that was later in the evening or in the evening of March 18th, the day that you were arrested, correct?

A. If -- it sounds about right.

Q. So not to rehash the whole thing, but you do agree that you did, in fact, have that conversation where you told them about the background, about the gun sale, about -- and about the conversations you had with Precious, correct?

A. Which conversation are you speaking about with Precious?

Q. Where she helped introduce you to Mr. Collazo --

A. Yes.

Q. -- and you did the gun transaction?

A. Yes.

Q. And --

A. The robbery, right?

Q. Correct.

A. Okay, yes.

Q. Isn't it true that you did also tell Detectives Zalatoris and Breen that you participated in murdering Collazo?

A. No.

Fulton - cross

446

Q. You deny saying that to them?

A. Yes.

Q. Isn't it true that you did tell Detectives Zalatoris and Breen at this time that after the murder, you brought a gas can to your grandparents' garage?

A. No.

Q. Isn't it true you told -- told Detectives Zalatoris and Breen that after the murder, you vacuumed out the car and cleaned it, correct?

A. No.

Q. Isn't it true you told them actually a specific car wash that you went to?

A. They asked me where did I get my cars detailed at, and I told them the car wash where I take it to.

Q. You did have a conversation about the car wash at that time, correct?

A. Yes, car wash came up.

Q. Car wash and --

A. I said car wash conversation came up.

Q. You told them that you went to a place called Pete's Car Wash, correct?

A. Yes, that's a place where I used to get my cars detailed at.

Q. And that's -- that's a place that's no longer around, right?

A. Yes.

Q. It's not a kind of place that has a sign on it, right?

A. It did then, yes.

Q. Okay. It was at 67th Street on the south side of Chicago?

A. 67th and I believe South Chicago, between South Chicago and King Drive.

Q. And you do agree that there's no way they would have known that you take your car to Pete's Car Wash specifically unless you told them that, correct?

A. Correct.

Q. You also told them that you would store your gas can in your grandfather's garage, didn't you?

A. No. So they asked me did I have access to a gas can, and I told them that we have a lawnmower and a gas can at my grandparents' house.

Q. So you did have a conversation with them about a gas can and that the gas can is at your grandparents' garage?

A. Yes. They asked me did I have an access to a gas can, and I told them, yes, it's at my grandparents' house in the garage.

Q. So if you remember yesterday, the state at your trial was saying that the murder happened sometime between 12:00 a.m. and 3:00 a.m., correct?

A. I believe so.

Q. And that's on March 10th of 2003, correct?

A. I believe so.

Fulton - cross

448

Q.   Isn't it true that you don't even have any idea if you washed your car on March 10th of 2003?

A.   I don't recall.

Q.   That's my question.  Isn't it true you don't know if you did or didn't wash your car that day?

A.   As I sit here now, I don't recall.  I don't know.

Q.   You very well could have.  True?

A.   Could have, and I couldn't have, yes.

Q.   And you told Detectives Zalatoris and Breen on -- during this interview on March 18th that you vacuumed out the car and cleaned it at the car wash, right?

A.   No.  So at Pete's Car Wash, you bring the cars there, and then the customer is instructed to go sit in the waiting room while the employees are the ones that's servicing the vehicle.

So they open all four of the doors, they take out the floor mats and they vacuum the interior and they wash the outside.  They never open up your trunk or go inside your trunk or do any of that stuff.

Q.   You also testified about how you -- you know what, there's one other point I wanted to ask you about in this conversation with Zalatoris and Breen.

A.   It's the equivalent of what they do at Delta Sonic.

Q.   Isn't it true that during this same conversation on March 18th of 2003 with Zalatoris and Breen, you told them that Riff and Stick, meaning Mr. Mitchell and Mr. Shaw, beat Chris?

Fulton - cross

449

A.   No.

Q.   And specifically, isn't it true you told them that Riff pulled out a pole or what appeared to be a little metal or wooden baseball bat?

A.   No.

Q.   So you deny saying that Riff appeared to pull out a pole as one item and a second item what appeared to be a little metal or wooden baseball bat.  True?

A.   I did say that.

Q.   Before we get to the next interview you had with Assistant State's Attorney McRay Judge, you testified yesterday about how you drove around with Zalatoris and Breen as well on March 18th, correct?

A.   Yeah, they drove me around.

Q.   And isn't it true that they stopped at a 7-Eleven while they drove around and got you a hot dog?

A.   No.

Q.   You deny that?

A.   Yes.

Q.   Okay.  So now just moving on to your conversation with McRay Judge.

        You do remember him, right?

A.   I don't remember what he looks like, but I remember the interview.

Q.   But the first time you ever -- according to you, the first

Q.   time you ever said yes, I did beat, tie up, duct tape and burn Christopher Collazo was to -- in a conversation you had with Assistant State's Attorney McRay Judge, right?

A.   Yes.

Q.   And isn't it true that before you went into that room with McRay Judge and gave him that confession, you were never physically abused, right?

A.   Not at that point, no.

Q.   ASA Judge or Assistant State's Attorney Judge introduced him to you -- introduced himself to you and said he was a lawyer and not your lawyer, correct?

A.   Yes.

Q.   He gave you *Miranda* warnings?

A.   I believe so.

Q.   And meaning he told you you had a right to remain silent, right?

A.   I believe so.

Q.   That he was a lawyer but not your lawyer, right?

A.   Yes.

Q.   And you told McRay Judge about the gun deal that we had talked about yesterday, right?

A.   Yes.

Q.   All about how Precious set up that gun deal with you and Collazo, right?

A.   Yes.

Q.   And you told him about how you, after you got robbed and you thought you were going to get robbed of 300 but you ended up getting robbed of $15, you demanded that Precious pay you $300.

A.   I didn't demand it, but, yes.

Q.   You did ask Ms. Griffin to pay you $300 that was not taken from you?

A.   So to explain it --

Q.   I'm just asking if you did or didn't right now.

A.   Yes.

Q.   You told Mr. -- Assistant State's Attorney Judge that you waited with Mitchell and Shaw for Collazo to arrive by Ms. Griffin's friend's house around Foster and Rockwell, right?

A.   I believe so.  I don't recall.

Q.   And you told Mr. Judge that the plan was to find Christopher Collazo and beat him up, right?

A.   I believe so.

Q.   You told him that Ms. Griffin helped you locate Mr. Collazo, right?

A.   I believe so.

Q.   And you also told Mr. -- ASA Judge that you helped put Mr. Collazo in a garbage bag, correct?

A.   I believe so.

Q.   You also told him that you taped him up and put him in your trunk?

A.   I believe so.

Q.   You told the Prosecutor Judge that you helped put Mr. Collazo, together with Mr. Mitchell and with Mr. Shaw, in a large cardboard box before lighting him on fire, right?

A.   I believe so.

Q.   Isn't it true that there was a point in the conversation with ASA Judge where he asked you what were you, Mitchell and Shaw wearing?

A.   It's possible.

Q.   And you told him you were wearing black, red, and white hoodies, correct?

A.   It's possible.

Q.   Right.  So just to be clear, when you say it's possible, you're not denying that.

A.   Correct.

Q.   So if Mr. Judge comes in here later today or tomorrow and says you, in fact, told him that at the time of the murder, you and your friends were wearing black, red, and white hoodies, you don't contest that.

A.   Correct.  It's possible.

Q.   After you told Mr. Judge that, isn't it true that he told you something along the lines that what if I were to tell you that a witness was saying that he saw people with the same color clothing?

A.   It's possible that happened.

Q.   And at that -- at that point, you told Mr. McRay Judge that if that witness said that, it wouldn't be good for me, would it?

A.   It's possible.

Q.   Okay.  So to be clear, when you say it's possible, you're not denying that you may have said that.

A.   I'm not denying, and I'm not admitting.  It's possible.

Q.   After you made these admissions to the kidnapping and murder, I understand Mr. -- Mr. Judge asked you -- asked Detectives Zalatoris and Breen to step out of the room, right?

A.   Yes.  I had asked him to ask the officers to step out the room.  I wanted to talk to him alone.

Q.   And you're saying it wasn't him who asked the officers to step out, it was you who told him, hey, can the officers leave?

A.   No, I didn't tell him anything.  I asked him could I speak to him alone, and then he asked the officers to remove themselves from the room.

Q.   This didn't appear to you as part of his routine procedure where every time he took a statement, he would say okay, time to leave --

   (Court reporter interruption.)

BY MR. NATHAN:

Q.   To you, them leaving the room was prompted by your question to Judge, correct?

A.   Yes.

Fulton - cross

454

Q.   It wasn't prompted by Judge just randomly saying can you guys leave the room?

MR. LOEVY:   Your Honor, there's a lot of asking the same question over and over again.

THE COURT:   It's what he said, but he's testing his memory, I guess.

Go ahead.

BY THE WITNESS:

A.   Can you ask the question again?

MR. NATHAN:   Now I have to -- it would be helpful to just let me ask the questions, but I'll move on just in the interests of time.

BY MR. NATHAN:

Q.   So this is the point where you say you recanted your confession to Prosecutor Judge, correct?

A.   Yes.   Once the officers left the room, then I told McRay Judge the truth about where I was that --

Q.   You said actually at 10:30 p.m., I was at the hospital with my girlfriend, Yolanda Henderson?

A.   I don't remember exact times that I told him, but I told him that I was at the hospital with Yolanda.

Q.   Now, at this point when you were having this conversation with Mr. Judge, it was -- it was on March 19th of 2003, so just about 23 hours or so after you were arrested, correct?

A.   Sounds about right.

Fulton - cross

455

Q.   So you were arrested in the morning on March 18th, and now it's the morning of March 19th, correct?

A.   Okay.

Q.   At that point, you were aware that your alibi was going to go be -- was going to be investigated at this point, right?

A.   After I told it to him, he told me that's what he was going to go do.

Q.   He said we're going to go check it out.

A.   Yeah, he said he was going to go check it out, yeah.

Q.   After they went and checked it out, you had a period of time where you were -- you were left alone, for lack of a better term?

A.   After McRay Judge left?

Q.   Right.

A.   Yes.

Q.   It wasn't until almost --

A.   Wait, when you say left alone, do you mean in the interrogation room by myself, like as soon as he left, I was put in a room and nobody talked to me, or what do you mean by alone?

Q.   The next conversation that you talked about in your direct examination yesterday where you confessed again was to a prosecutor named Jake Rubinstein, right?

A.   Wrong.  So what I said yesterday was was that after my conversation with McRay Judge, I was escorted out of the -- I

Fulton - cross

456

was escorted out of that interview room, and I was put back into the room that I came out of before I went in there. But in between there, I had asked could I use the telephone, and Zalatoris told me I couldn't use the telephone unless I wanted to be charged. Did I want to be charged? I said no.

He took me in the interrogation room, and then that's when the assault happened.

Q. And you testified yesterday you claim that Mr. Zalatoris hit you on the head and then kicked you?

A. Yeah, he hit me with the open palm like this, and then when I fell, he turned around and he kicked me in my leg between my ankle and my thigh.

Q. And you're saying that he hit --

A. A couple times.

Q. You're saying he hit you so hard you fell out of your chair.

A. Yeah, he blindsided me with it. I wasn't in a chair. I was standing up.

Q. Okay. So we're going to talk about that in another part of your testimony today, but I want to talk about the next time you gave a confession at this point, okay?

A. Okay.

Q. So moving on from the confession you gave to McRay Judge on the 19th, it wasn't until March 21st of 2003 you talked to State's Attorney Jake Rubinstein and you tell him that you're

tired of lying, right?

A.   I spoke to Jake Rubinstein before the 21st.  Spoke to him twice.

Q.   You spoke to him initially, and you said --

A.   I'm innocent.

Q.   -- they're checking out my alibi?

A.   I'm innocent.  I have nothing to do with it.

Q.   The first time you talked to him you said I'm innocent, you're checking out my alibi, let me out.

A.   I don't know if I told him they checking out my alibi.  I know I was being introduced to a new state's attorney which wasn't the one I just told I was innocent, so I was telling the new state's attorney what I told the last one, which was that I'm innocent.

Q.   So then, again, on March 21st at around 8:30 a.m., you tell assistant state's attorney you're tired of lying, right?

A.   Correct.

Q.   And you actually tell him that you know what?  The whole alibi story, that's a lie.

A.   Correct.

Q.   And you say the reason you gave that hospital story to Prosecutor McRay Judge is because it's partially true, correct?

A.   Correct.

Q.   So you recognized at this moment you were saying I told them some details that were true, some are false, right?

A. Correct.

Q. That's what partially true means, right?

A. Correct.

Q. Your statements that you're giving to the prosecutor are not totally true, not totally false, just partially true, right?

A. Correct.

Q. At that point after you told Prosecutor Jake Rubinstein you're tired of lying, you said: In fact, I did participate in the beating, kidnapping, and burning of Christopher Collazo, right?

A. Correct.

Q. You also had an opportunity to meet with Mr. Rubinstein alone as well, right?

A. I could have requested it, yes.

Q. Well, not that you could have requested it. He spoke to you alone, correct?

A. I don't recall.

Q. So you don't deny that.

A. I don't deny.

Q. Isn't it true he asked any detectives to step out of the room, and he interviewed you by himself, correct?

A. It's possible, yes.

Q. And by the way, when you were talking to Jake Rubinstein, it wasn't the detectives asking you questions. It was Jake

Rubinstein asking you the questions, right?

A. Correct.

Q. Same thing with Judge. When you were talking to ASA Judge, he was asking the questions, not any detectives, right?

A. Correct.

Q. When you talked to Jake Rubinstein and he had any detectives step out of the room and he asked you how you were treated, right?

A. Correct.

Q. And you told him that actually this guy Detective Struck was "cool and just told you to tell the truth," correct?

A. Possible, yes.

MR. NATHAN: 264, lines 8 through 4.

MR. LOEVY: 8 through what?

MR. NATHAN: 264, 8 through 11.

MR. LOEVY: Do you want to change that?

MR. NATHAN: No, go ahead.

(Video played.)

BY MR. NATHAN:

Q. And that is what you told Rubinstein at that time, correct?

A. Yes.

Q. And isn't it true you also told Assistant State's Attorney Rubinstein that the police treated you okay?

A. Yes.

Q. You told Assistant State's Attorney Rubinstein that you had

plenty of food and you got sleep.

A.   Probably, yes.

Q.   Now, plenty of food is different than not being fed for three or four days, right?

A.   Correct.

Q.   Isn't it true you also told Assistant State's Attorney Rubinstein that Detective Girardi treated you "very, very well"?

A.   It's possible, yes.

Q.   And you never recanted your confession to Rubinstein, right?

A.   Correct.

Q.   In fact, you told Rubinstein that the reason you were confessing -- strike that.

     You told Rubinstein that the reason why you initially confessed, recanted, and now were willing to confess again is because you didn't want Riff, meaning Mr. Mitchell, to blame you for everything, right?

A.   It's possible, yes.

     MR. NATHAN:   264, line 22 through 265, line 1, please.

   (Video played.)

BY MR. NATHAN:

Q.   You said that, right?

A.   Yes.

Q.   You were worried that Mr. Mitchell was going to blame you

for this murder, right?

A.   No.

Q.   That's what you told Mr. Rubinstein though.

A.   Yes.

Q.   And you also told him that you were scared of Riff, Mr. Mitchell's family because they burned someone's house up and he's got crazy cousins who can get people anywhere.

A.   Yes.

Q.   You were worried about that, right?

A.   No.

Q.   But you did tell Mr. Rubinstein that?

A.   Yes.

Q.   Isn't it true that you did have a real concern that Mr. Mitchell was going to tell the police and prosecutors that you were the main guy who killed this guy, Mr. Collazo?

A.   Did I -- was I -- say the question again?

Q.   Isn't it true that while you were in the police station at Area 1, you were really worried that Mr. Mitchell was going to say, no, I didn't do it, Mr. Fulton did it?

A.   No.

Q.   After you gave the confession to ASA Jake Rubinstein, you were going to actually give a videotaped statement, correct?

A.   Yes.

Q.   And that never happened because your lawyer came to the police station, right?

Fulton - cross

462

A.   Correct.

Q.   Your lawyer, Eliot Zinger, came to the police station, and he told you, no, don't do that videotape.

A.   Well, he told me that -- he asked me did I do it.  I told him no.  He say, well, if you didn't do anything, don't do no videotape because they're not going to let you go home.  They're trying to trick you.

Q.   So he told you not to do the videotape.

A.   If I didn't do anything, then not to do the videotape.

Q.   Did he tell you if you did do it, then, as your lawyer you should confess right now and do the videotape?

A.   Well, he didn't say that, no --

Q.   No.

A.   -- but it's the insinuation.

Q.   He never said you know what?  You should really -- if you did it, you need to come clean and tell the police?

A.   Well, he said if you -- so what he said was is that did -- he ask me did I do it?  I said no.  He said, well, if you didn't do it, then I don't think it's a good idea for you to do a videotape confession because I don't think they're going to let you go home.

Q.   Now, let's talk about your alibi.  We said already that the body is found burning at 3:00 a.m., not -- not 10:30 p.m., right?

A.   I don't -- if that's what the report says.

Fulton - cross

463

Q. That's -- this 3:00 a.m. March 10th body found burning. That day -- that same -- that day earlier on March 9th, isn't it true you took a nap?

A. Say it again?

Q. Isn't it true on March 9th during the day, you took a nap?

A. Yes.

Q. And that nap was for more than an hour?

A. It's possible.

Q. Now, according to you, you never left the back door of your apartment building that early morning hours of March 10th to go kill Collazo, right?

A. Correct.

Q. But your girlfriend, Ms. Henderson, had just been in the hospital waiting to be treated in the evening of March 9th, but she didn't get medical treatment, right?

A. Correct.

Q. But she was sick.

A. Correct.

Q. She was sick, so sick that she passed out in your house, correct?

A. No.

Q. She -- meaning she was out cold, sleeping.

A. What's the question?

Q. All right. She was sick on March 9th to the point where you took her to the hospital, right?

Fulton - cross

464

A.   Yes.

Q.   She didn't get treatment.  You brought her home to go to sleep, right?

A.   Yes.

Q.   And you're saying at 8:00 a.m. the next morning, you had Yolanda go take your car for an oil change?

A.   No.  So I have to be at school between I believe it's 8:00 and -- somewhere between 8:00 and 8:30 school starts.  So Yolanda dropped me off at school, and then she went to go meet her mother so they could go to Trinity Hospital so she can get service at Trinity Hospital for her being sick.

Q.   You're --

A.   But I also told her that the car needed an oil change, too. So after you leave the doctor's office on the way back, if you can, swing by and get an oil change.  If not, no big deal.

Q.   You agree with me that you had Yolanda take your car to be serviced on March 10th, 2003?

A.   At Jiffy Lube, yes.

Q.   You said that you told her to take your car to Jiffy Lube to get an oil change even though she's sick, right?

A.   Right.  I told her the car needed an oil change.  If she can, get an oil change when she come back from the doctor.

Q.   Was this some kind of emergency oil change that was happening?

A.   Yes.  It was -- the date that we was supposed to get the

oil changed had passed, and I didn't want nothing to happen with the car.

Q.   Okay.  So how often do you -- does one get an oil change to the point where it's an emergency?

A.   Well, according to maintenance and the manufacturer, they suggest that you get an oil change every 3,000 miles.

Q.   And what about dates?

A.   Well, dates usually -- they usually put dates on there because they suspect that you're usually probably going to drive probably about a thousand miles a month, so it's usually an estimate when they give you, but 3,000 to 5,000 miles is usually the time that they suggest you change your oil.

Q.   Right.  So it's anywhere between 3,000 and 5,000 miles; that was the suggestion, and that's what you did, right?

A.   That's what I have learned now.  I didn't know that then, right?  What I knew then was that when either the mileage or this date surpasses, whichever comes first, take the car and getting serviced because if the car ends up messing up and the motor ends up locking up or something like that, you're not going to be able to return the car because the fault was on you.

Q.   But for whatever reason, you decided that even though your girlfriend is sick enough to go to the hospital, she's got to get you this oil change that day on March 10th?

A.   I didn't tell her it was mandatory.  I just said if you can

on your way back stop and get an oil change.  The car needs an oil change.

(Counsel conferring.)

MR. NATHAN:  Your Honor, I'd like to show the witness and the jury to publish -- it's Plaintiffs' Exhibit 121.

MR. LOEVY:  Right.

MR. NATHAN:  Without objection.

MR. LOEVY:  No objection, Your Honor.

THE COURT:  All right.

BY MR. NATHAN:

Q.  Do you see here in front of you a document that says Vehicle History Report, right?

A.  Okay.

Q.  And this actually -- it has a name on the top.  Wayne Bunch, right?

A.  Correct.

Q.  You recognize that name, correct?

A.  I believe so.

Q.  He was an investigator that Eliot Zinger had hired, right?

A.  Yes.

Q.  Meaning he was your investigator?

A.  I guess you could say that, yes.

Q.  And this indicates customer name John Fulton and your address, 500 East 33rd Street, correct?

A.  Correct.

Q. It lists your vehicle, the Oldsmobile Aurora, right?

A. Correct.

Q. And it indicates you got something called a full service on March 10th, 2003, correct?

A. Correct.

Q. What is your mileage -- when was the time you got an oil change at Jiffy Lube before March 10th according to this document? That was on January 23rd, right?

A. Cor- -- correct.

Q. And this document also reflects that your mileage at -- on January 23rd, 2003, was 32,323, correct?

A. Correct.

Q. And then on March 10th, your mileage was 36,205, right?

A. Correct.

Q. So it had been less than two months since your last oil change, right?

A. Correct. It looks about, yeah. Yes.

Q. But you thought it was imperative that Ms. Henderson, who's going to the hospital in the night and the day, has to get an oil change that day.

A. No, it's not imperative. I asked her if she could get the oil changed. If not, it's no big deal. I'll get it done.

Q. Isn't it true you told her to go get your car washed as well?

A. No.

Q.   By the way, where were you going where you had, like, almost 4,000 miles in the under two months?  Were you making deliveries or something like that?

A.   I have no idea.

Q.   Now, showing you what's been marked as Defendants' Exhibit 143.

MR. NATHAN:  I don't think there's an objection to this one, the car.

MR. LOEVY:  No objection.

MR. NATHAN:  Without objection, I'd ask permission to publish, Your Honor.

THE COURT:  All right.

MR. NATHAN:  It's a multi-page exhibit, and I'm showing the witness -- I'll go through the first three pages.

BY MR. NATHAN:

Q.   Showing you Defendants' Exhibit 143 -- 147.  This is a picture of the interior of your car, correct?

A.   Correct.

Q.   And the next page of 147, that's also an interior picture of your car from the front passenger side, right?

A.   Correct.

MR. LOEVY:  Your Honor, can we get a foundation for what period of time the pictures are from?

THE COURT:  Yes.

MR. NATHAN:  Well, I think --

BY MR. NATHAN:

Q. During March of 2003, this is what your car looked like, right?

MR. LOEVY: What the pictures -- he knows where the pictures are from.

THE COURT: Ask him if he knows.

BY MR. NATHAN:

Q. These are pictures that were taken by the Chicago Police Department of your car after your arrest, correct?

A. Correct.

Q. And that was after your arrest on March 18th, 2003.

A. Correct.

Q. Showing you the next photo in the sequence, it's numbered 847 of Exhibit 147, this is now a close-up, a closer picture of your front passenger's seat, correct?

A. Correct.

Q. Do you see here in the middle of the photograph there's -- there's an object that looks like it's under your seat?

A. It look like it's something, like a stain or something right there. I don't know what it is.

Q. Isn't it true that that's a hammer, that you kept a hammer under your seat?

A. It's possible.

Q. Because you did keep a hammer under your seat?

A. We kept a hammer in the car because the tool box is in the

trunk.

Q.   The tool box is in the trunk, but the hammer is under your seat.

A.   It's possible.

Q.   And isn't it true the hammer was covered with tar?

A.   Yes.

Q.   Black tar, right?

A.   Correct.

Q.   And you would keep this hammer in your grandfather's garage, right?

A.   No.  So the hammer was a part of my tool kit.

Q.   And you kept your tools in your grandfather's garage, right?

A.   They were inside the trunk of my car.

MR. NATHAN:  Page 164.  Actually, page 163, line 20, through 164, line 2 -- 12.  163:20 through 164:12.

(Video played.)

BY MR. NATHAN:

Q.   Isn't it true you did, in fact, store your hammer in your grandparents' garage normally?

MR. LOEVY:  Your Honor --

BY THE WITNESS:

A.   No.

MR. LOEVY:  -- said the opposite.

BY MR. NATHAN:

Q.   You --

A.   So if what you're getting at is do I have tools --

Q.   Let me ask the question, sir.

          THE COURT:  Wait.

          Ask your question.

BY MR. NATHAN:

Q.   You did have access to your grandfather's garage, right?

A.   Yes.

Q.   And you kept a gas can in there?

A.   I didn't keep a gas -- it was a gas can in there.
Lawnmower, a lot of other stuff in there.

Q.   And you would keep -- you would personally store things in
there, though, right?

A.   Yes.

Q.   And on this occasion, the hammer was under the seat of your
car, correct?

A.   I believe so, yes.

          MR. NATHAN:  I'd like to show you Exhibit 124.  Any
objection?

          MR. LOEVY:  No.

          MR. NATHAN:  Seeking to publish this to the jury in
evidence without objection.

          THE COURT:  You may then.

BY MR. NATHAN:

Q.   Showing you Defense Exhibit 124, numbered at the bottom

9533, the -- this is a photograph of the interior of your grandfather, Adolphus Lucas's, garage, correct?

A.   My grandparents' garage, correct.

Q.   And this is the gas can that we've been talking about, right?

A.   That's the gas can that we had at my grandparents' house that we used for the lawnmower.

Q.   That's the gas can that you told Detectives Zalatoris and Breen about, right?

A.   They asked me did I have access to a gas can, and I told them yes, and this is the one I was referring to.

Q.   In other words, that's the one you told them about, correct?

A.   The one I was referring to when they asked me did I have access to a gas can, correct.

Q.   Is there -- strike that.

     Going back, just rewinding all the way to your arrest, you did sign a Consent to Search Form for Detective Leonard Rolston, correct?

A.   Correct.

Q.   You signed a Consent to Search saying that they could search your apartment and your car, correct?

A.   Correct.

          MR. NATHAN:   I'd like to show --

          MR. LOEVY:   No objection.

MR. NATHAN: No objection, like to publish Plaintiffs' Exhibit 122.

THE COURT: Yes.

MR. NATHAN: One moment.

BY MR. NATHAN:

Q. This is a Consent to Search Form that you signed on March 18th at 6:15 in the morning, right?

A. Correct.

Q. You said that you were advised of your constitutional right to not have a search made of the premises/vehicle described below without a search warrant being first obtained, and you had a right to refuse this consent, correct?

A. Correct.

Q. And then you said that you did consent to a complete search at this time of your premises, vehicle under your lawful control described in here it says 500 East 33rd Street. That is your apartment, right?

A. Correct.

Q. And your unit number was 1608?

A. Correct.

Q. And that is a description of your car, the 2001 Oldsmobile Aurora, right?

A. Correct.

Q. And you affixed your signature to the bottom?

A. Correct.

Q. You don't dispute that.

A. No.

Q. By the way, you never told Assistant State's Attorney Judge that you were hungry, correct?

A. No.

Q. And we already covered you never told that to Rubinstein, right?

A. That I was hungry?

Q. Correct?

A. No.

Q. And you didn't -- you testified about how you got -- you got knocked out of your chair by Zalatoris after the conversation with Prosecutor McRay Judge and that he stomped on you or kicked your ankle area, right?

A. You testified about the chair. I said I was standing up. I wasn't sitting in no chair when I got hit.

Q. I thought you said he knocked you down.

A. No, I corrected you and said that there was no chair. I was standing in front of him, and then he blindsided me and he hit me upside my head, the side of my head. I fell, and then he kicked me a couple times.

Q. Okay. I just misunderstood you, I guess.

A. That's okay.

Q. You agree with me that there was no swelling on your body from that alleged interaction, correct?

A.   Correct.

Q.   So no swelling on your head, and no swelling on your legs, right?

A.   Correct.

Q.   Do you remember what time you were -- and let me clarify.

We saw a booking photo I think it was during opening statements in this case where there was a photo that looked like it was taken in the lockup at the police department.  Do you remember that booking photo?

A.   Which one?  Where I had my coat and stuff on?

Q.   Yes.

A.   Okay.

Q.   Do you remember when exactly that photo happened?

A.   I believe that photo was taken when I first arrived at the police station.

Q.   Who are you saying took that photo?

A.   I don't know.

Q.   Isn't it --

A.   The police took it.

Q.   Isn't it true that your booking photo took place in the police lockup after you finished all of your statements and you went to another facility that you described and then there was a lockup keeper who took your booking photo?

A.   It's possible.

Q.   So it is possible that the booking photo with you having

the coat on, that happened at the end of all of your interviews, right?

A.   It's possible.

Q.   And just so we're very clear, this is the photo we're talking about, right?

A.   Correct.

Q.   Defendants' Exhibit 154, for the record.

It's possible and very possible that this photo actually was taken at the police lockup facility.

MR. LOEVY:   Objection, asked and answered, Your Honor.

THE COURT:   Sustained.

MR. NATHAN:   You know, Mr. Loevy --

(Counsel conferring.)

BY MR. NATHAN:

Q.   Now, you described after you completed -- you gave that oral confession to Rubinstein, then you went -- you were sent to another facility, there was a booking photo, and after that, you went for a bond hearing, right?

A.   When I left that police station, they took -- they took me and Riff to 26th and California.

Q.   You were processed at 26th and California, right?

A.   Yes.

Q.   And then attached to the building at 26th and California or next door is the criminal courthouse, right?

A.   So they never took us out of no building.  When they took

us in through the -- I guess you could say the back entrance or underground entrance or whatever the entrance is where they bring inmates through, they brought us through that back entrance.

That back entrance was literally right next to the bullpens where you walk in to go to court at. We were sent inside those bullpens. Numbers was written on our arms, and we stayed there in that bullpen until our number was called, and then we went before the judge.

Q. So as I was saying, after you were processed at Cook County Jail, you went in front of a judge at 26th and California court building, right?

A. So I wasn't processed -- what's your definition of processed?

Q. I'm actually not trying to talk about the processing. I'm saying after you went to the jail, you went to the court?

A. So I went to court first, then I went to the jail.

Q. Okay. Fine.

So after the booking happens at the police department, you go to the court.

A. I go to 26th and California and they place us in a bullpen. They write numbers on our arms, and then they call our number, and then we went into another room individually and that's where the judge's --

Q. I understand.

A.   -- office was.

Q.   So now you're -- but you're at the courthouse at 26th and California is my point, right?

A.   Yes.

Q.   And this happens on Saturday, March 22nd of 2003, right?

A.   Correct.

Q.   And when you're at court, you actually have your lawyer present, Mr. Eliot Zinger, right?

A.   Correct.

Q.   Before court, you got to meet with Mr. Zinger.

A.   I don't recall.

Q.   That's normal.  You would sit before court, you'd talk to your lawyer?

A.   I don't recall if I got a chance to talk to him before that day, during that time that you're asking.

Q.   Isn't it true that at that point in time, Mr. Zinger got up in front of the court, it was Judge Raymond Myles, and argued that you should be released on bond?

A.   Correct.

Q.   And he made an argument.  You were there.  He made an argument saying you should be released on bond in part based on the length of custody that you were in the Chicago Police Department?

A.   Sounds about right.

Q.   And he told the court at that time that you were denying

involvement, right?

A.   Correct.

Q.   He told the court your age, which was 18, right?

A.   Correct.

Q.   He said that you were graduating in two months, that you lived in Chicago, that you had a child, you were raised by your grandparents, right?

A.   Correct.

Q.   He also told the court that he was complaining about how you were treated in the police department, right?

A.   I believe so.

Q.   He said you had been in custody he said the entire week, bouncing from room to room, site to site, and, again, he denies involvement, right?

A.   Correct.

Q.   He told you that -- and then he tells the court that you were refused a phone call, you were put in a cold room, and then he asked for you to be set -- for bond to be set, correct?

A.   Correct.

Q.   So his complaints to the court were you were held for a long time, it was cold, and you were refused a phone call?

A.   Don't forget the denied involvement part.

Q.   His complaints about how you were treated were length of time, it was cold, denied phone call, right?

A.   That's not what you just read.

Q.   I'm asking you a question.

A.   Repeat the question.

Q.   Isn't it true that the complaints Mr. Zinger had to the court, to the judge, when you were there was that you were held -- held for a long time, it was cold, and you didn't get a phone call?

A.   It's possible.

Q.   He never told the court that you were hit, right?

A.   I don't recall.

Q.   He never told the court at that time that you were denied food for four days, right?

A.   I don't recall.

Q.   Is there some reason you wouldn't have told him that?

A.   He knew that.  I told him that.  I told my lawyer that.  My lawyer knew that.

Q.   So you did have a conversation with Mr. Zinger before you went to the bond hearing, right?

A.   No, I had a conversation with Mr. Zinger about what I ate and didn't eat when I first seen him in the police station on Friday.

Q.   All right.  So --

A.   Because he was the first person to bring me food, my lawyer.

Q.   You're saying he just forgot to tell the court that you had been denied food for four days?

MR. LOEVY: Objection, Your Honor. He can't speak for Mr. Zinger and Mr. Zinger's reasons.

THE COURT: Sustained.

BY MR. NATHAN:

Q. Isn't it true that Mr. Zinger did not tell the Court that the reason you gave a statement was because -- strike that.

Isn't it true that Mr. Zinger did not tell the court at your bond hearing that the reason you gave a statement was because somebody promised you you could go home?

A. I don't believe so.

Q. You agree he didn't tell that to the court, right?

A. It's possible, yeah.

Q. Isn't it true that Mr. Zinger did not tell the court at your bond hearing that the reason you gave a confession is because your kid was being threatened to be taken away from you?

A. Correct.

Q. Now, at that bond hearing, you personally were there, right?

A. Correct.

Q. You didn't say, hey, Judge, can you look at my head? Zalatoris hit me in the head, right?

A. I was instructed by my attorney not to say anything in court.

Q. Do you remember on direct examination by Mr. Loevy

yesterday, you talked about how you have a car business and you had some challenges to the business because of COVID, right?

A.  Yes.

Q.  In fact, you testified that you worked with Mr. Mitchell in that business, but you had to let him go because of COVID.

A.  Yes.

MR. LOEVY:  Objection, it was his father.

BY MR. NATHAN:

Q.  You had to let Mr. Mitchell go because of COVID, right?

A.  Wait, so if you're asking about the staff that I had at that time, I ended up having to let my staff go because of COVID, yes.

Q.  Okay.  And Mr. Mitchell was on your staff?

A.  Yes.

Q.  Isn't it true that the reason you stopped working with Mr. Mitchell was because he took money out of your business account without your permission?

A.  That's one of the things.

MR. NATHAN:  103, line 9 through 104:10.

(Video played.)

MR. LOEVY:  Objection, Your Honor, not impeaching.

THE COURT:  Sustained.

MR. NATHAN:  I just --

BY MR. NATHAN:

Q.  What shirt are you wearing in this video?

A.   A white shirt.

Q.   You testified on direct examination that you paid for Mr. Mitchell's bond, correct?

A.   Yes.

Q.   So in the sequence, you had your conviction vacated, right?

A.   Yes.

Q.   And then the state, the prosecutors, had an option to retry you, right?

A.   Correct.

Q.   We discussed this yesterday relating to Mr. Shaw, right?

A.   Relating to Mr. Shaw?

Q.   So they had an option to retry you, meaning you could have all had a whole 'nother trial where they put you on for charges of murder, kidnapping, and concealment of a homicide, right?

A.   Correct.

Q.   During that time period, that's when you paid Mr. Mitchell's bond, correct?

A.   Yes.

Q.   And at that point in time, you recognized that Mr. Mitchell also was a key witness in the case, correct?

A.   No.

Q.   If Mr. Mitchell during that time period decided, you know what, I'm going to tell -- I'm going to cut a deal with the state, I'm going to testify against -- against Fulton, that would have been good for you -- that would have been good for

Mitchell and bad for you, right?

A. What's the question?

Q. During this time period after the conviction is vacated and you're still deciding am I going to be retried for this, Mr. Mitchell is potentially a key witness in your case, correct?

A. No.

Q. Well, hypothetically, if the state offered a deal to Mr. Mitchell to testify against you to say, no, Fulton did kill Collazo, that would be bad for your case, right?

A. I guess.

Q. So it's pretty important that he's on -- on your team at this point, right?

A. If you're asking me what was the reason why I bonded him out --

Q. My question is at that point in time when you paid the $90,000 --

A. Okay.

Q. -- for Mr. Mitchell's bond --

A. Okay.

Q. -- it was pretty critical that he stayed consistent with your side of the story, right?

A. No.

Q. Isn't it true that at this point, you and Mr. Mitchell, somebody you referred to in this trial as your brother, you no

longer talk?

A.   We talk right now.

MR. NATHAN:   102, 14 through 18.

MR. LOEVY:   Not impeaching because he just said at this trial no longer, now he's asking about three years ago.

THE COURT:   Maybe you can ask the question that was asked in the deposition.

MR. LOEVY:   On the date of the deposition.

BY MR. NATHAN:

Q.   Well, the date of the deposition is September 19th, 2022. Now that's after the state already decided not to retry you, correct?

A.   Correct.

Q.   All right.   And at that point in time, isn't it true you and Mr. Mitchell were not talking?

A.   At that time, correct.

Q.   And somehow for this trial, by this trial, you're back to talking, right?

A.   Correct.

Q.   You talked earlier about how you were sued by the family of Christopher Collazo, right?

A.   Correct.

Q.   His mother, Madilen Mercado, sued you on behalf of his estate, correct?

A.   Correct.

Q.   And that -- the nature of that was a wrongful death lawsuit.  True?

A.   Correct.

Q.   They were trying -- they were asking the court for money damages, similar to this case where you're asking for money damages, but they were asking for money damages because they said you killed Mr. Collazo, right?

A.   Correct.

Q.   And you hired a lawyer to represent you in that case, right?

A.   Correct.

Q.   And eventually you decided that you were going to pay the estate of Collazo for his death about $400,000, correct?

A.   Correct.

Q.   And that was supposed to compensate the family for his actual death.

A.   Correct.

          MR. NATHAN:  Just very -- we're taking a break in five minutes, Your Honor?

          THE COURT:  I like to go an hour and a half, but do you need a break?

          MR. NATHAN:  No, but I'm trying to wrap up.

          THE COURT:  Okay.

          Oh, we're almost an hour and a half, aren't we?  We started at 9:30, 10:30, 11:00 -- yeah, can we go to 11:00?

MR. NATHAN:  Sure.

BY MR. NATHAN:

Q.  Isn't it true, sir -- well, do you recall testifying yesterday about how you're into Bible study, right?

A.  Say it again?

Q.  You quoted Scripture yesterday?

A.  Yeah, I quoted a Scripture yesterday.

Q.  And you talked about how you were a model citizen in jail, right?

A.  Yes.

Q.  You talked about how there were fights and that was -- you know, that caused you some anxiety, right?

A.  There were fights that happened in jail, yes.

Q.  Isn't it true you were part of the fights?

A.  I've had a few fights in there, yes.

Q.  That's not really being a model citizen, correct?

A.  No.

Q.  Isn't it true, sir, that while you were in Cook County Jail, you tricked a guy to come into your cell, and then you stomped his brains out?

A.  No.

Q.  You said that you stomped his brains out, right?

A.  In the Cook County Jail?

Q.  Yes.

A.  First off, I never stomped anybody's brains out, and I've

Fulton - cross

488

probably -- I've had a few fights with my cellies while in the County, so yes.

Q.   Isn't it true that --

   (Counsel conferring.)

BY MR. NATHAN:

Q.   You agree that you have told somebody that you stomped a guy's brains out, right?

A.   Yes.

Q.   You said that, right?

A.   Yes.

Q.   Those were your words, "stomped his brains out"?

A.   Yes.

Q.   And isn't it true that you also told somebody that during your fight in -- while you were in custody, you had an instinct, you elbowed him, you elbowed your opponent, hit him in the chin with your elbow, and he fell, hit his head on the bed rail, boom.  He hit the floor, and he wasn't moving and you're, like, oh, S, this [expletive] is dead?

A.   I don't recall saying that.

Q.   You did hit somebody with your elbow, you hit his head on a bed rail, and he wasn't moving and you thought he almost died, right?

A.   I don't recall that.

Q.   But you had fights, and it could have happened?

A.   Yeah, I had fights when I was in the County jail.

MR. NATHAN: Your Honor, I'd like to perfect the impeachment, and he says he doesn't recall.

MR. LOEVY: Your Honor, I think he's acknowledged the incident here.

MR. NATHAN: He said he doesn't recall.

THE COURT: Then you could refresh his recollection.

MR. NATHAN: I'd like to refresh it with the audio.

THE COURT: No -- well, not in the presence of the jury.

Show him the transcript.

MR. LOEVY: I have a copy, Your Honor.

THE COURT: And point him where you want to.

MR. LOEVY: I have a copy of it. Can we show the witness the transcript?

MR. NATHAN: No, it's not going to -- I don't need to do that right now.

I'd like to -- I'm asking to refresh his recollection with the exhibit that there's been a ruling on.

THE COURT: You can do that, but I'll excuse the jury while we do it.

All right. We'll take a recess.

THE CLERK: All rise.

(Jury out at 10:46 a.m.)

MR. LOEVY: Mr. Nathan said in the presence of the video I'd like to play the audio. So now the jury --

THE COURT: Knows there was audio.

MR. LOEVY: Yeah, that was really un- -- a big mistake, it wasn't fair, because it's like trying to force you to say, okay, where's the audio because he told the jury there's an audio. He didn't need to do that because he knew you'd already ruled that he wasn't supposed to hear the audio.

MR. NATHAN: I didn't do that on purpose. I shouldn't have done that.

THE COURT: All right. Well, it's done, so let's move on, and let's get this done. We need to take a break.

MR. NATHAN: Your Honor --

THE COURT: Just tell me precisely what you want to do here. Refresh -- why don't you have a seat, everybody.

You're refreshing his memory about kicking someone in the jail cell.

MR. NATHAN: Your Honor, I'm a little unclear as to what procedure is happening right now because if he's not on cross-examination -- if I were cross-examining him, I would want to impeach him with this audio, not refresh his recollection. It's inconsistent with that.

THE COURT: He said he didn't recall, so you have to show him evidence that he -- that might refresh his memory.

MR. NATHAN: I will do that. I just wanted to make it clear for the record it's over my objection because I -- I am inherently now not going to be able to impeach him because I'm

playing it to him based on the ruling right now, and any time -- and any time a witness says they don't remember, we should be able to introduce their own words to -- to impeach them. But we'll go with -- you know, that's just my objection. I want to make that clear for the record.

MR. LOEVY: But you've already ruled. On these circumstances, I think you've ruled appropriately, and he can't just keep arguing. And also --

THE COURT: We're spending a lot of time on this. Let's go.

MR. NATHAN: Okay. We're playing an excerpt of a recorded prison call of Mr. Fulton, Defendants' Exhibit 112, from November 18th, 2012, and to the extent that this is necessary, this is the evidence we would have used for impeachment, and we'd like this to be considered as well as an offer of proof.

THE COURT: All right.

MR. LOEVY: Your Honor, we did that yesterday. We already played the offer of proof --

(Audio playing.)

MR. LOEVY: -- is the purpose for the witness to hear it? And if so, I'd request that the witness get the transcript, too, so he can follow it.

MR. NATHAN: The witness is getting a transcript on the screen.

MR. LOEVY: Okay. I misunderstood.

(Audio/video played.)

MR. LOEVY: Your Honor, it sounds like somebody tried to grab his nuts and elbow.

MR. NATHAN: I'm sorry, it's leading. I'm sorry.

THE COURT: Let's excuse the witness so we don't have any issues here.

(Witness exits courtroom.)

THE COURT: All right. My -- I'm receiving a message that the jury is asking why they couldn't see the audio, is that what you're saying?

MR. LOEVY: So that's unfortunate.

MR. NATHAN: Yeah.

THE COURT: It's very unfortunate, yes.

So I could say something about that, like this is -- I ruled that you are not allowed to hear it. I don't know.

MR. LOEVY: I think that would be an unfortunate bringing attention to it like there's something to hide.

THE COURT: Just let it go?

MR. LOEVY: I think since it was Mr. Nathan's problem, I think we should tell the jury that he misspoke and he shouldn't have said there was an audio.

Or maybe -- I mean, I don't know how you feel, but, you know, he misspoke or just leave it at that. I don't want to say something that's not true, but it would be accurate that

he misspoke.

And I think we should also leave this subject because, you know, he's now made all his points, and, you know, he's now created a problem.

THE COURT: I'm going back to the question that we're trying to impeach him on: Isn't it true that you also told somebody that during your fight while you were in custody, you had an instinct, you elbowed him, you elbowed your opponent, hit him in the chin with your elbow, and he fell, hit his head on the bed rail, boom.

MR. LOEVY: Boy, Your Honor, how fair is that to ask a witness if in 16 years in prison, he doesn't have any context, he's, like, remember that time you were on the phone in 2012?

THE COURT: He said I don't recall saying that, so, I mean, it's multiple questions, you know.

MR. LOEVY: It's super unfair. How would he remember?

THE COURT: It's just -- I don't know how you -- I mean -- he said he had fights in prison, so what's your point?

MR. NATHAN: I -- my point is to -- he said that he's a model citizen, and I'm trying to impeach him as to not a model --

THE COURT: Well, that's what I ruled earlier that you couldn't do. That's not character evidence.

MR. NATHAN: You said I could bring this up on cross-examination --

THE COURT: All right. That's an offer of proof. It's denied.

MR. NATHAN: There's one more.

THE COURT: Might as well take a little break at this point.

MR. NATHAN: Do you want to -- there's one --

MR. LOEVY: We do have an issue.

MR. NATHAN: There's another issue.

MR. LOEVY: Are you sure you need to do it? Let me self-report here. Which way do you want to go?

Can I confer with counsel for a second?

THE COURT: Off the record or on the record.

MR. NATHAN: Off the record, may we confer?

MR. LOEVY: Off the record, may we confer for a minute?

THE COURT: Yes.

(Counsel conferring.)

MR. LOEVY: Your Honor, I think we would be comfortable then jointly -- Mr. Nathan is going to move on from this subject, and we would be agreeable not to bring the jury's attention to the audio, just not bring attention to it.

So Mr. Nathan, how would you propose that we handle it?

MR. NATHAN: Well, Mr. Loevy and I conferred. There was an issue that -- a private matter that Mr. Loevy raised

that he would prefer to remain private. We are agreeing to that. In exchange for that, he is -- I thought he was agreeing that we were not going to raise again my slip-up where I mentioned in front of the jury something about audio.

MR. LOEVY: Now, Mr. Nathan, I -- you know, there was some private things, maybe we should involve the Court, we'll talk about it and see whether we do involve the Court, but that shouldn't have been part of this.

What we are talking about is we agree not to embarrass Mr. Nathan and say let's have a curative instruction. Mr. Nathan is going to move on. The question now is what do we do with that note? So should we do nothing, or should we tell them something? And I asked Mr. Nathan what would you propose we do with that note? And your understanding of how you'd like to proceed.

THE COURT: Okay. Let's clarify, where did this information come from, you, Amanda?

THE CLERK: Yes. When I took them back to the room, a couple of the jurors wondered why they couldn't hear the audio, and I said I did not know.

MR. LOEVY: So how do we -- you know, Your Honor --

MR. NATHAN: I thought we just stipulated to something. I'm willing to stick to that.

MR. LOEVY: Well, I'm just not sure we're meeting of the minds here.

MR. NATHAN: No, you said something. I'm willing to agree with that. You're saying, he said, I thought, Mr. Loevy said he doesn't want or we agree that we're not going to do a curative instruction as to this slip-up with the audio.

MR. LOEVY: Right, but we have to do something.

THE COURT: Let me think.

MR. NATHAN: If Your Honor wants to tell them that -- I think it's best not to highlight it, but I understand it was my mix-up so I'm not going to be leading the show in terms of how it's going to be remedied, but I'm willing to hear another option. But I thought we agreed with how to deal with it, so --

MR. LOEVY: We agreed -- I think we're trying to figure it out as we go. We agreed not to do anything that would be embarrassing to Mr. Nathan, saying he shouldn't have said that or something like that.

But we should now talk about whether we say anything and, if so, what? How do we solve this problem? We don't want to make it, you know, detrimental to us.

MR. NATHAN: What do you want to say?

MR. LOEVY: I'm trying to think.

(Counsel conferring.)

THE COURT: What about saying the audio is not relevant to the issues in this case?

MR. LOEVY: Well, Your Honor, that makes -- it

reinforces that there is an audio they're not hearing. Our proposal having conferred, group consensus is you should just say I've asked Mr. Nathan to move on, or Mr. Nathan just moves on and just don't answer it. Just move on. That's -- to us, that would be the least damage than bringing attention to the audio that they're not going to hear. So just do nothing is our proposal.

THE COURT: Okay. Just don't answer, just move on. It wasn't formally a note. It was a comment.

MR. LOEVY: Yeah.

THE COURT: Okay. That may be the best. You know, no trial is perfect.

MR. NATHAN: There's one other -- as long as we're on a break, there's another evidentiary issue that I'd like to raise. Respectfully, Ms. Lyon, it relates to you, so I would ask that we talk about it outside of your presence.

MS. LYON: Oh, good heavens, all right. Want me to leave, Judge? I'll leave.

THE COURT: Well, does it have to do with the relevance of her testimony?

MR. NATHAN: It's substantive.

THE COURT: Okay. I guess so.

(Pause.)

THE COURT: All right. We're ready.

MR. LOEVY: May we have a moment, Your Honor?

THE COURT: Yes.

(Discussion off the record.)

MR. NATHAN: Your Honor.

THE COURT: Go ahead.

MR. NATHAN: Mr. Fulton testified during direct examination about Ms. Andrea Lyon, one of his attorneys. He said that she was his angel, and she basically, she rescued him from prison. It was a very emotional piece of testimony.

And we would like to be able to cross-examine Mr. Fulton relating to one of his recorded phone calls with Ms. Lyon, it's dated November 29, 2012, where -- and we'd like to play, Your Honor, the call. And we would ask, to the extent Your Honor excludes it, we would ask that call to be considered an offer of proof.

MR. LOEVY: And we object, first of all, on unfair surprise. He was in prison for 16 years. They have hours and hours and hours of phone calls. We've asked them to identify in the pretrial order or elsewhere the relevant ones. And I don't know what he's talking about.

MR. NATHAN: Well, I was surprised by him calling his attorney an angel, his angel. I mean, that was --

THE COURT: So what is it, first of all?

MR. NATHAN: So I'll play the entire thing for Your Honor. But the nature of it is he's telling -- he's having a discussion with Ms. Lyon about how Elliot Zinger was -- they're

having a challenge with getting Elliot Zinger, his attorney, to sign an affidavit relating to whether or not he, whether or not he saw a back-door camera at his apartment building, at Fulton's apartment building.

So I'd like to play that audio clip.

THE COURT: Okay. What does that have to do with anything that Mr. Fulton has said?

MR. KAMIONSKI: I apologize, I'm stepping in, Your Honor.

THE COURT: Yes.

MR. KAMIONSKI: In the audio clip which we'll play for Your Honor, there is Mr. Fulton -- Ms. Lyon is talking to Mr. Fulton and telling him how she is expressing that Zinger is reluctant to sign the affidavit because he denies that he did not see the camera and that he actually did know -- he did investigate, and there were no cameras. And she needs an affidavit for the post-conviction petition.

And she says, "I'm going to get him to do it if I have to go to his damn house to get him to do it." That's part of the quote.

We'd like to play you the tape, to play you the audio so you could see it. It's not that long, this section. And we'd like to cross-examine, or Mr. Nathan would cross-examine him on it and be able to -- and if not, if Your Honor is not going to let it, we'll have it in as on offer of proof. But

we'd like to show you the audio.

MR. LOEVY: Your Honor --

THE COURT: What did Fulton say?

MR. LOEVY: Nothing.

MR. KAMIONSKI: No. Fulton said, he actually said, "Weren't you going to bring that up as a bombshell? Why are you, why are you confronting him now?"

I'd like to play it and put it in context. I don't want to speak out of turn. I'd like to play it for Your Honor. It's not that long. And I don't want to be misquoted and accused of being misquoting things.

THE COURT: Okay. But tell me --

MR. KAMIONSKI: Mr. Fulton --

THE COURT: Why would you call -- what issue of proof are you talking about?

MR. KAMIONSKI: We're trying to rebut the notion that she was his angel and by showing that, in fact, it seems somewhat nefarious how the Zinger affidavit came to be.

MR. LOEVY: Well, Your Honor --

MR. KAMIONSKI: So that's the notion of the phone call. And I think if Your Honor sees the phone call, sees the text, you'll have a better understanding of our position.

MR. LOEVY: Your Honor --

MR. KAMIONSKI: Because it's out of context right now what we're talking. We're arguing out of context.

THE COURT: How long is it?

MR. NATHAN: A minute.

MR. KAMIONSKI: A minute.

MR. LOEVY: Your Honor --

THE COURT: Okay. I'll let you make it as an offer of proof, but I don't see why we would call an attorney of record to testify to this.

MR. NATHAN: No. We're asking to cross-examine John Fulton about it. It's his phone record.

MR. LOEVY: And if I could be heard on that, Your Honor?

THE COURT: Yeah, let's hear your position.

MR. LOEVY: What they're saying is they caught an attorney-client conversation on tape, because that's what they did, they got 16 years of tapes, and they want to play it now. They didn't disclose it. You know, you hit us yesterday on, hey, you know, it's not fair to be surprised as you remember with the originals. This is a surprise.

They want a pretext to get it in. So they're like what can we say to get it in. Oh, he said Andrea Lyon is an angel.

So then they're like let's play a tape where -- not where she's not being an angel. It's actually consistent with that.

According to the story I just heard -- and I don't

know what he's talking about. I've never heard this tape.

THE COURT: Yes.

MR. LOEVY: But he's saying: Andrea Lyon was an angel. She helped me with my other attorney.

So it's not inconsistent with her being an angel. It's just a pretext to try and play an attorney-client communication that's not relevant to anything, and at best, I think what they are trying to do is avoid calling Ms. Lyon or, you know -- but this is not proper testimony. It's not -- a door has not been opened. And our primary objection is completely untimely, unfair surprise, just like yesterday to us. They could have disclosed this.

MR. NATHAN: It's been disclosed. It's been identified. It's not surprise. And it's rebutting something that Mr. Fulton testified to on direct. But either way, we'd like to play it. It's under 2 minutes, I think.

(Said audio recording played in open court.)

THE COURT: Okay. Go ahead.

(Said audio recording played in open court.)

MR. LOEVY: You know, Your Honor, they give us 16 years of tapes. So when he --

MR. NATHAN: One second. It's not complete.

THE COURT: The offer of proof is denied. You cannot --

MR. LOEVY: Your Honor --

MR. NATHAN: One second.

THE COURT: -- question Fulton about this.

MR. LOEVY: All right. What time are we coming back?

THE COURT: Well, let's just take 10 so you can relax for a minute.

MR. LOEVY: Thank you.

MR. NATHAN: Your Honor, we were -- I think Mr. Kamionski was saying he didn't complete the audio for purposes of the offer of proof. It sounds like there is another few seconds.

MR. LOEVY: Maybe he should file it then, Your Honor, so we don't --

MR. NATHAN: That's fine. We'll file both audio clips.

THE COURT: Yeah, fine. You can file whatever you want.

(Recess taken at 11:14 a.m. until 11:24 a.m.)

THE COURT: Can we bring the jury in now? Okay.

(Jury in at 11:26 a.m.)

THE COURT: You may be seated.

BY MR. NATHAN:

Q. I'm just about done, Mr. Fulton. I just have a few more questions for you.

Showing you what we looked at earlier in your examination, Defendants' Exhibit 147 with a numbering on it,

847 in there as well.

We talked about this hammer that was under your seat, right?

A.   Correct.

Q.   I just wanted to show you one more picture.  This is the same hammer, right, Defendants' Exhibit 147, numbered 849.

That's the same hammer, just a different perspective?

A.   It looks like a blowup of the other picture.

Q.   Just like a closer version?

A.   Yes.

Q.   And here you see at the top here, you'd have that's the part of the hammer that would hit the nail theoretically, and this is the part at the bottom of the photo that would pull out the nail?

A.   Yes.

Q.   And the handle would be under the seat?

A.   Correct.

Q.   The reason you kept it in the car was because you used it for self-defense, right?

A.   Yes.  So it was for our protection.

Q.   Right.  So it wasn't in the toolbox because it was for protection?

A.   Right.  So it would be inside the car for anybody that was driving the car, whether it be me, Riff, Yolanda.  In the event that something happened and you needed to defend yourself, it's

here.

Q.   And isn't it true you used it for protection when Mr. Collazo was trying to -- was threatening to kill you, right?

A.   No.

Q.   Mr. Collazo, we covered earlier or yesterday, we covered that he had called you and told you he was going to kill you, right?

A.   Did he call me and tell me he was gonna kill me or I got a text?

Q.   I think it was both, right?

A.   Well, initially, yes.  After the robbery, yes.

Q.   Right.  And if somebody is saying they're going to come kill you, that would qualify as needing self-defense in order to not be killed, right?

A.   If they're already in front of me?

Q.   If you don't want to be killed, and you need self-defense, a hammer would be helpful?

A.   Yes.

          MR. NATHAN:  All right.  That's all I have.  Thank you.

                    REDIRECT EXAMINATION

BY MR. LOEVY:

Q.   All right.  Sir, how long were you just examined there by Mr. Nathan?  Do you know?

Fulton - redirect

506

A. Today or including yesterday too?

Q. Including yesterday, approximately how many hours?

A. Yesterday I got on the stand from 9:40 'til probably 12:00, then to 5:00. So that's an eight-hour shift. So today that's nine, that's ten, eleven, about ten hours look like.

Q. Well, not of actual time being --

A. Not actual time, because we had breaks. Yeah, so give or take, eight to ten.

Q. All right. Did you enjoy being called a murderer, someone who had killed Chris Collazo?

A. No.

Q. Did you appreciate the opportunity to be able to defend and explain what actually happened?

A. Yes.

Q. All right. Back then, Mr. Nathan asked you questions about your life at the time. He pointed out you were a mature guy. You had bills. You had childcare. You had Yolanda, right?

A. Yes.

Q. That was all true, right?

A. Yes.

Q. How were you -- was there anybody assisting you in making the bill payments?

A. No.

Q. And what about Yolanda, what was she doing for a living?

A. She was working at KFC.

Q. And you guys were getting by, right?

A. Yes.

Q. Do you dispute that at that time in your life you were being a responsible young man?

A. No, I don't dispute that.

Q. All right. Back in your earlier years before you were arrested, you, as Mr. Nathan pointed out, had been arrested, right?

A. Yes.

Q. The first time I think you said was cannabis. How much cannabis was involved?

MR. NATHAN: Objection, leading.

BY MR. LOEVY:

Q. How much cannabis was involved?

THE COURT: Overruled.

BY THE WITNESS:

A. Probably less than 15 grams.

BY MR. LOEVY:

Q. Do you remember how, just very briefly, how you got caught with 15 -- and by the way, $15, how much money --

A. I said less than 15 grams.

Q. Okay. How much dollars in cannabis is that?

A. It's like $15.

Q. All right. Do you remember how you got caught with $15 worth of cannabis?

A.   We had -- we were on our way home, me, Riff and Stick, we were on our way to my house, and we wanted to stop and get some snacks.  So we pull -- I was driving.  I pulled inside a Food Basket, and Riff and Stick got out and went inside the grocery store.

While they was inside the grocery store, Chicago PD had grabbed somebody that was walking past, and they turned they lights on them and they started patting them down.

Q.   Let me cut it off.  I don't want to go through the whole sorry.

A.   Okay.

Q.   But it was not an unusual event in a neighborhood to happen?

A.   No, it's not unusual.

Q.   And you had a trespass case too?

A.   Yes.

Q.   What was the disposition of those two cases?

A.   They were dismissed.

Q.   All right.  Is there anything about those that prepared you for being arrested by the Chicago Police Department and interrogated for 105 hours?

A.   No.

Q.   Were the experiences different?

A.   Yes.

Q.   You were asked some questions about your school records.

MR. LOEVY: And, Your Honor, these were admitted is my recollection, but they were not published. If I could, permission to publish Plaintiffs' Exhibit 120.

THE COURT: If they're in evidence, you may.

BY MR. LOEVY:

Q. All right. Showing you and the jury this record. This is De La Salle. That's your school, right?

A. Yes.

Q. And that's you?

A. Yes.

Q. All right. Let's look at the records from March. You told Mr. Nathan yesterday that you didn't always go to school every day in March, right?

A. Right.

Q. Why was that?

A. Well, because Riff and Stick were no longer living with me anymore, and so it was hard for us to find a babysitter. So if we couldn't find a babysitter for the baby, then I would stay at home, and Yolanda would go to work and school.

Q. Although it looks like your only absences in March was the 3rd. And you had one on the 25th of February, 24th of February, 18th of February, 21st, and then it looks like there is some in February.

You had only missed one day in March until the 18th. What happened on the 18th?

A.   That's the day that I was arrested.

Q.   All right.  So it looks like then the day that Chris Collazo was apparently murdered, on Friday the 3rd -- the 9th of March, were you absent the next day?

A.   No, no.

Q.   You went to school that Monday, right?

A.   Yes.

Q.   Were you out until 4:00 in the morning murdering somebody, cleaning out your car, and then going to school that morning?

A.   No.

Q.   You were asked about the Jiffy Lube, the oil change.  Did you change your oil because you had murdered Chris Collazo?

A.   No.

Q.   You said you asked Yolanda to change the oil, even though she was sick.  Do you remember those questions?

A.   Yes.

Q.   Did you mean to imply there was an emergency?

A.   No.

Q.   What do you remember?

A.   I remember telling her that the car needed an oil change. So if she could on her way back home, because the Jiffy Lube was on the way home, if she could stop and get an oil change.

Q.   And this is Plaintiffs' Exhibit 121.

     How often did you think you were supposed to get an oil change?

A.   Every 3 months or every 3 to 5,000 miles.

Q.   All right.  And it looks like the last one was in January.

When you're young, was it important to you to make sure you took care of this car?

A.   Yes.

Q.   Was it one of your more important possessions?

A.   Yes, if not probably my only one.

Q.   And it looks like your investigator, Wayne Bunch, was the one who found this record.  Do you remember why you asked or somebody asked Wayne Bunch to prove there was an oil change?

MR. NATHAN:  Objection, foundation.  Calls for speculation.

MR. LOEVY:  Just asking if he knows, Your Honor.

THE COURT:  Well, you're telling him about Wayne Bunch.

MR. LOEVY:  Should I ask him who Wayne Bunch is?

THE COURT:  Yes.

BY MR. LOEVY:

Q.   Who is Wayne Bunch?

A.   A private investigator that Elliot Zinger hired.

Q.   Do you know why Wayne Bunch was looking for the oil change records?

A.   He was probably trying to help the lawyer build a defense for me.

Q.   All right.  If you had stuffed a bloody body into your

trunk the night before, would it have been a good idea to take the car, have somebody else take the car to Jiffy Lube?

MR. NATHAN: Objection, foundation.

THE COURT: We had the foundation on direct I think.

MR. LOEVY: Yeah.

THE COURT: Let's not go through it again.

BY MR. LOEVY:

Q. Well, was it your intention to evade a murder by taking the car to Jiffy Lube to have the oil changed and have people look at the car?

A. No.

Q. Now, you were asked a lot of questions about hammers. And you remember counsel just showed you a picture of a hammer?

A. Yes.

Q. That's Defendants' 147.

Now, do you know whether the state conducted forensic testing on that hammer?

A. No.

Q. Okay. I'd like to show you Defendants' Exhibit 116.

MR. LOEVY: Permission to introduce Defendants' 116.

THE COURT: Is it agreed?

MR. NATHAN: What is it?

There is no objection to that.

MR. LOEVY: No objections.

THE COURT: Okay.

Fulton - redirect

513

(Defendants' Exhibit No. 116 was received in evidence.)

BY MR. LOEVY:

Q.   All right.  Did you know that the Illinois State Police investigated this hammer?

A.   No, I didn't know.

Q.   All right.  And then showing you Plaintiffs' Exhibit 36.

Well, did you know that they did -- the hammer had tar on it, you said?

A.   Yes.

Q.   Why would somebody have a hammer with tar on it?

A.   Because the hammer was used to replace something dealing with the roof.

Q.   All right.  Do you know the results of the state's forensic testing on the hammer, if they found any trace whatsoever of the murder?

MR. NATHAN:  Objection, calls for speculation, foundation.

BY THE WITNESS:

A.   No, I don't know.

THE COURT:  He said he doesn't know.

MR. LOEVY:  Okay.  Your Honor, we'd like to introduce Plaintiffs' Exhibit 36.

MR. NATHAN:  Foundation.

THE COURT:  Is it an agreed exhibit?

MR. NATHAN:  I don't believe so.

MR. LOEVY: All right. If he objects, then we won't. We'd like to introduce it. We'd move it into evidence.

MR. NATHAN: We object.

THE COURT: Well, I would say this is not the witness to introduce that exhibit with.

MR. LOEVY: Okay.

THE COURT: So I will sustain.

BY MR. LOEVY:

Q. You were asked if you were carrying that hammer around to defend against Collazo, right?

A. Yes.

Q. Now, the one thing you knew about Collazo, did he have, did he have guns or did he carry hammers?

A. Associated with guns.

Q. All right. Were you carrying that hammer around just for Collazo or were you carrying it around because of the neighborhood you lived in?

A. Carried it around because of the neighborhood in which I lived in.

Q. You mentioned that Chris Collazo had said threatening things to you after he robbed you?

A. Yes.

Q. What period of time was that?

A. Right initially when -- right after the robbery happened initially, like that first week or so.

Fulton - redirect

515

Q. And that scared you or didn't scare you?

A. Yeah, I was scared.

Q. All right. Over time, did you become less scared?

A. Yes.

Q. Tell the jury why.

A. Because after he called that morning and told us that he was in the Jewel's parking lot, and we went out there, and it was empty, and we didn't see nobody, from that point forward I know that Precious had told him all the details of what was around my building, and that he was using that to try to scare me, but he wasn't serious.

Q. All right. Did then another week go by, another week go by, another week go by?

A. Yes.

Q. After a while, did you stop being afraid of him?

A. Yes.

Q. Were you thinking about him --

A. No.

Q. -- four or five weeks after the robbery?

A. No.

Q. As far as Precious, he asked you, counsel asked you if you did ask for $300 from Precious, right?

A. Correct.

Q. Why did you do that?

A. Because I felt like she set me up.

Q. All right. And it felt like justice to you?

A. Yes.

Q. Did she give you $300?

A. No.

Q. Did you do anything about it?

A. No.

Q. Back to the police. You did get asked by them whether you would consent to have them search your apartment or your car, correct?

A. Correct.

Q. And showing you Plaintiffs' Exhibit 122.

MR. LOEVY: I think this is already in evidence, Your Honor.

BY MR. LOEVY:

Q. This is your signature, right?

A. Correct.

Q. Why did you sign it?

A. Because I had nothing to hide.

Q. You knew they would go to your house and search anywhere in your house, go in your car, search anywhere in your car, right?

A. Correct.

Q. Now, they asked you about a gas can, right?

A. Correct.

Q. And was it a crime to have a gas can in your grandfather's garage?

A.   No.

Q.   Why was there a gas can in your grandfather's garage?

A.   Because the lawn mower was in there.  We used it for to put gas inside the lawn mower.

Q.   All right.  At the trial, was there ever any ability of the state to connect the gas can from your garage from the gas cans that were sold in the gas station where Riff supposedly said you bought the gas can in his confession, were they able to connect those gas cans?

MR. NATHAN:  Objection, foundation.

MR. LOEVY:  He was asked a lot of questions about what happened at the trial.

THE COURT:  Overruled.

BY THE WITNESS:

A.   No, they weren't able to make a connection.

BY MR. LOEVY:

Q.   In other words, Riff had given a confession that Fulton went and bought a gas can at a gas station.  And then they had this gas can in your garage.  Did they match?

A.   No.

Q.   How about a car wash.  Mr. Nathan asked you about if you got a car wash on a certain date.  And you said you didn't remember.  Do you remember that question?

A.   Correct.

Q.   Okay.  Did you get your car washed on March 1st?

Fulton - redirect

518

A.   I don't remember.

Q.   Did you get your car washed on March 2nd?

A.   I don't remember.

Q.   March 5th?

A.   I don't remember.

Q.   March 10th?

A.   I don't remember.

Q.   So is the point you're not saying you don't remember if you washed your car after the murder or you have no idea when you washed your car, because you weren't involved in any murders?

A.   That's true.

Q.   Let's talk about the interrogations with Mr. Bartik.  I'll start with Mr. Bartik.  And this is Plaintiffs' Exhibit 51, page 5.  This is already in evidence too.

     That's your signature, right?

A.   Correct.

Q.   You were consenting to a polygraph, right?

A.   Correct.

Q.   Now, Mr. Bartik, you now understand, is claiming that you, instead of doing a polygraph, you confessed to the murder, right?

A.   Correct.

Q.   Did he ever give you anything to sign that says that "I confess to the murder"?

A.   No.

Q.   Would you have signed it if he showed you anything that had you confessing?

A.   No, I wouldn't have signed it.

MR. NATHAN:  Objection, calls for speculation.

MR. LOEVY:  What?  I didn't hear the objection, Your Honor.

THE COURT:  What was that?

MR. NATHAN:  I just said calls for speculation.

THE COURT:  I suppose.  Sustained.

BY MR. LOEVY:

Q.   All right.  Sir, you didn't sign a confession for Mr. Bartik, right?

A.   Correct.

Q.   But you had a pen and you had an ability to sign your name, right?

A.   Correct.

Q.   If Mr. Bartik had presented you a confession and said, Hey, let's memorialize this, is there any doubt in your mind -- or would you have signed it?

MR. NATHAN:  Objection, calls for speculation.

THE COURT:  I mean, he can say it.  Overruled.

BY THE WITNESS:

A.   I wouldn't have signed it.

BY MR. LOEVY:

Q.   Did he give you an opportunity to sign anything?

A.   Outside of that form, no.

Q.   All right.  Did you tell Mr. Bartik that you intercepted the victim on Friday, March 9th, getting off a bus at the Foster and Rockwell stop?

     Mr. Bartik -- you're aware Mr. Bartik claiming you confessed that to him, right?  You've heard that?

A.   I've heard that.

Q.   When's the first time you heard it?

A.   I can't recall.

Q.   Was it in the lead-up to the trial or well before the trial?

A.   Well before the trial.

Q.   And when Mr. Bartik was making that allegation, was it true?

A.   No.

Q.   You were asked some questions about confessing to Mr. McRay.  Do you remember Mr. Nathan asking you those questions?

A.   Yes.

Q.   And he asked you:  Did you confess to the cardboard box and the gas and the duct tape and the Foster bus?  Do you remember those questions?

A.   Yes.

Q.   All right.  How did you know those details?

A.   The police officers fed it to me.

Q.   And was there a period of time before you talked to McRay where you went over it with the police?

A.   Yes.  And he --

Q.   I'm sorry to interrupt you.

A.   Right.  Zalatoris and Breen and myself, we went over the story to present to McRay Judge.

Q.   Mr. Nathan asked you if it's possible you said that the three of you were wearing a black, a blue or a white or a red hoodie.  Do you remember him asking you those questions?

A.   Yes.

Q.   What did you say?

A.   Yes.

Q.   Yes, that it's possible?

A.   Yes.  So I said that I told McRay Judge.  That he asked me did I tell McRay Judge that.  I said, Yes, it's possible.

Q.   All right.  You did tell McRay Judge about duct tape and gas cans, right?

A.   Yes.

Q.   Where did you get that information?

A.   Zalatoris and Breen.

Q.   If you had mentioned a blue or a black or a white or a red hoodie, where would you have gotten that information?

        MR. NATHAN:  Objection, leading.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q. Do you have any idea when you're in the police station on March 19th what you and your friends were wearing 11 days earlier?

A. No.

Q. In other words, if I was to ask you what Yolanda was wearing 11 days ago, what color she was wearing, would that be a hard thing to do?

A. Yes.

Q. All right. So would you have had any ability to tell the police officers who were interrogating you: Oh, 11 days ago I was wearing red. Riff was wearing blue. Shaw was wearing white.

Is that something as a human you could have even done?

A. No.

Q. Did you make a note of what people were wearing as a regular course of your life?

A. No.

Q. Do you know where that information came from, if in fact you gave it to McRay?

A. Yes.

Q. Where would it have come from?

A. Zalatoris and Breen.

Q. Now, after you confessed to Mr. McRay, there was a period of time when the police left the room, right?

A. Correct.

Q. And what did you tell McRay?

A. The truth.

Q. Why didn't you tell the truth while the police were still in the room?

A. Because the plan was to go in there and tell them the lie.

Q. And then what made you decide to tell McRay that it wasn't true?

A. It didn't sit right with me.

Q. Did you tell -- what did you tell McRay?

A. That I didn't do it and that I was at the hospital with Yolanda.

Q. Did you make it very clear that the confession was not a true confession?

A. Yes.

Q. Did McRay or anybody else give you the ability to make a statement, "I would like to say I'm innocent. I was at the hospital. I didn't do this"? Did you get that opportunity?

A. No.

Q. You were asked some questions about Shaw and whether you had thought about giving him $500. Do you remember those questions?

A. Yes.

Q. Did you give Mr. Shaw $500?

A. No.

Q. Why in your mind in light of those questions would it have

been good if Shaw -- Shaw was someone who was arrested by the police, right?

A.   Yes.

Q.   And then he was released eventually, right?

A.   Yes.

Q.   Why would it have been a good idea in your mind if Shaw was not in Chicago?  What were the dangers to Shaw?

A.   Well, I felt like since we all had just been wrongfully arrested by the police officers, and he had just beat his case, I thought it would be a good idea to get out of the state, because these police officers, if they framing all of us for murder, and you got out, they not gonna like that, they might do something else.

Q.   Was Shaw a vulnerable kid, person?

        MR. NATHAN:  Objection, foundation.

BY MR. LOEVY:

Q.   Was Shaw a vulnerable -- you interacted with Shaw?  Sorry. You interacted with Shaw?

A.   Yes.

Q.   You knew him well?

A.   Yes.

Q.   Did he have characteristics that would make him vulnerable if the CPD went and talked to him?

        MR. NATHAN:  Objection, foundation.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Was Shaw an intelligent young person?

        MR. NATHAN:  Objection, foundation.

        MR. LOEVY:  Should I lay more foundation, Your Honor?

        THE COURT:  Overruled.  Overruled.

        MR. LOEVY:  All right.

BY THE WITNESS:

A.   He wasn't that bright of an individual.

BY MR. LOEVY:

Q.   Did he have a strong family background?

A.   Not that I knew of.

Q.   Was his mother addicted to drugs?

        MR. NATHAN:  Objection, foundation.

BY THE WITNESS:

A.   I don't know.

        MR. LOEVY:  All right.  He doesn't know, Your Honor.

BY MR. LOEVY:

Q.   How old was he?

A.   15.

Q.   Was he good at school -- or did he go to school?

        MR. NATHAN:  Objection, foundation.

        THE COURT:  If you know.

BY THE WITNESS:

A.   He didn't go to school.

BY MR. LOEVY:

Q. All right. Was he, based on that foundation, the kind of person that might have been vulnerable if the Chicago police picked him up and said, "Shaw, we'd like to continue the conversation"?

MR. NATHAN: Objection, leading, foundation, calls for speculation.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Let's talk about the next prosecutor, Mr. Rubenstein. What was -- in your first interaction with Rubenstein, what did you tell him?

A. I didn't do it.

Q. Now, there came a time after approximately 100 hours where you did tell Rubinstein that you wanted to confess, right?

A. Yes.

Q. Why did you tell him that?

A. Because at that point I just wanted to go home. So it was like let's, let's go along with what the police are saying and see if it work.

Q. And you told Mr. Nathan that you told Mr. Rubenstein that you had had plenty of food?

A. Correct.

Q. And you told Mr. Rubinstein something about Riff committing an arson?

A. Yes.

Q. And you told him that you had committed the murder?

A. Yes.

Q. Were any of those things true?

A. No.

Q. Did you commit the murder?

A. No.

Q. Were you given plenty of food?

A. No.

Q. Were you concerned about Riff and an arson?

A. No.

Q. When you did tell those things to Rubenstein, were they in any way related to the threats the police officer had made to you?

A. Yes.

MR. NATHAN: Objection, asked and answered.

MR. LOEVY: I didn't ask anything about threats yet.

THE COURT: Okay. Overruled.

BY MR. LOEVY:

Q. What threats in specific?

A. That my baby was going to be taken to DCFS, that Yolanda was going to be arrested for concealment of a homicide, and I was going to spend the rest of my life in prison.

Q. And did they make you any --

A. Or get the death penalty.

Q. Before you talked to Rubinstein and gave the confession

that Mr. Nathan went through, did they make you any promises?

A.   Yes, that I would have to go along and try to convince -- I would have to convince the state's attorney that me and the other individuals did it; and if I did that, he had the last say so, and he was gonna be the one that was going to let us go home.

Q.   All right.  Let's talk now about Mr. Nathan's questions about maybe the murder happened after midnight.  Do you remember him asking you those questions?

A.   Yes.

Q.   Okay.  Did you ever give to your knowledge an oral confession that you had committed a different crime after midnight than the Foster bus on March 9th?

A.   No.

Q.   All right.  When you got to trial, which confession were you preparing for?

A.   The one that happened for Foster and Rockwell.

Q.   And that was on Friday night in the evening hours at the Foster and Rockwell bus stop, right?

A.   Yes.

Q.   At the trial, did the state change the time and the place of the crime?  Let's start with the time.  Did they try to change the time?

         MR. NATHAN:  Objection, foundation.

         MR. LOEVY:  Your Honor, he was asked a lot of

questions about what the state's theory was at trial.

THE COURT: I know. He was there. We know that. So overruled.

BY THE WITNESS:

A. Repeat the question.

BY MR. LOEVY:

Q. Sure. You show up. You thought the confession was March 9th, Friday night, evening hours.

Did the state change the time at trial of your supposed confession?

A. Yes.

Q. What was your memory of the sequence?

A. It first started out at 9:30, and then they changed it to 10:30. Then they changed it again to 11:30. And then they changed it to between 12:00 o'clock and 3:00 a.m.

Q. So after you showed the evidence at the hospital, they changed it between 12:00 and 3:00 a.m.?

A. Yes.

Q. Do you remember if that was in the state's case or in the state's rebuttal case at the end of the trial where they changed it again?

A. I don't recall.

Q. Now, did you leave your apartment after midnight on March 10th, the next day, go round up Riff and Shaw and murder Collazo?

A.   No.

Q.   After midnight on March 10th, would you have any idea where to find Chris Collazo if you wanted to meet him with your hammer?

A.   No.

Q.   Why not?

A.   I don't know who to call.  Like I don't know.  I don't have no idea like where to even start.

Q.   And you know the temperature that day, right, you now know?

A.   Yeah.

Q.   Which was?

A.   It was below zero.

Q.   And the wind chill as low as negative 11?

A.   Yes.

Q.   All right.  Knowing yourself and your foundation, would you have been someone that after midnight on a school day, after having spent the night at the hospital, five weeks after having been robbed, you would go try to find your friends, try to talk them into coming with you, and try to look for Chris Collazo so you could get revenge for that robbery?

A.   No.

Q.   Were you living with Riff and Shaw at the time?

A.   No.

Q.   Do you know -- you would have probably known where to find them, right?

A.   Yes.

Q.   But after midnight, you would have had to wake them up, right?

A.   I would have had to find them.

Q.   You would have had to find them?

A.   Yeah.

Q.   Did you go out and try to find Riff and Shaw after midnight on Sunday night and say:  Let's go find this Collazo guy?

A.   No.

Q.   Did that happen, sir?

A.   No.

Q.   What does the video show about what time you entered the apartment?

        MR. NATHAN:  Objection, asked and answered.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   What is the time that you're seen leaving the apartment?

        MR. NATHAN:  Objection, asked and answered.

        MR. LOEVY:  There was a lot of questions about whether he did it at 3:00 a.m.  I just want to establish that --

        THE COURT:  All right.  Go ahead.

BY THE WITNESS:

A.   Ask the question again.

BY MR. LOEVY:

Q.   What does the video at the apartment show when you entered

and left the apartment?

A.   It shows that me and Yolanda initially left at around 8:00, somewhere between 8:15 and 8:30.  We -- you're talking about the Lake Meadows videos, right?

Q.   Yes, Lake Meadows.

A.   Okay.  It shows us leaving out about 8:30, somewhere between 8:30 and 8:40 -- no.  Somewhere between 8:15 and 8:30.

Then it shows me walking into Lake Meadows at around 10:35, 10:40.

Then it shows me leaving Lake Meadows again at like 11:30, between 11:30, 11:45.

And then it shows me and Yolanda coming in right before midnight.

Q.   And then what time does it show you leaving the next time?

A.   Probably around somewhere between 7:45 and 8:00 o'clock a.m.

Q.   Going where?

A.   To school out the front door.

Q.   All right.  Mr. Nathan asked you, "Nothing prevented you from trying to prove that there wasn't another camera in the building in the back."

Do you remember those questions?

A.   Nothing prevented me?

Q.   Yeah.  Do you remember Mr. Nathan asking that yesterday: Hey, you could have gone to try to find more cameras about the

back?

A.   Yeah.

Q.   All right.  Did you know before the trial that the state was going to try to change the time of the murder and the confession?

A.   No.

        MR. NATHAN:  Objection, foundation.

        MR. LOEVY:  It's did he know.

        THE COURT:  Overruled.

BY MR. LOEVY:

Q.   All right.  You were asked some questions about whether you were a model citizen in prison.  Do you remember those questions?

A.   Yes.

Q.   And you actually said you considered yourself a good citizen, right?

A.   Yes.

Q.   Did you get a lot -- and just what you meant by that, why don't you tell the jury what you meant since he asked you.

A.   I followed the rules.  I only not followed the rules when I felt like I was being attacked for any odd reason.

        Have I gotten, have I gotten into fights that are against the rules?  Yes, I have.

        Have I done things while I was incarcerated that was against the rules and regulations of IDOC?  Yes.

Q.   All right.   But is it pretty hard to maintain a good record in the IDOC?

A.   Yes.

Q.   Why?

A.   Because you're dealing with so many different personalities and characters of people.

Q.   Are there a lot of rules too?

A.   Yes.

Q.   All right.   Did you have a good record in prison?

A.   Yes.

Q.   But you don't deny that you got in fights in prison?

A.   Yes.

Q.   And counsel asked you about --

A.   Prison and jail, and the Cook County jail.

Q.   And let's talk about the fight he asked you about at the Cook County jail.   And he asked you if you remember it.   I'm going to see if I can refresh your recollection more.

     "Do you remember there was a situation when a guy you were interacting with, he elbowed you?

     "He reached down, grabbed my nuts.   And when he grabbed my nuts," unintelligible.   "I opened my arm to let him out.   And when I opened my arm to let him out, I turned and off instinct I elbowed him."

     Does that refresh your recollection, yes or no, about the incident counsel was asking you about?

Fulton - redirect

535

A.   No.

Q.   Do you remember grabbing somebody --

          MR. NATHAN:  Your Honor, this is opening the door.

          THE COURT:  I know.

          MR. LOEVY:  What's that?

          THE COURT:  I think that's enough on that issue.

          MR. LOEVY:  Okay.

BY MR. LOEVY:

Q.   Let's talk about Mr. Collazo's settlement.  He asked you why you gave $400,000 to the victim's family.  Do you remember those questions?

A.   Yes.

Q.   Why did you?

A.   Because at that point, I had appealed my case, and the appellate court had affirmed my conviction.  So if I would have took the civil case to trial, it would have been an automatic losing for me because a court had already confirmed my conviction.  So I can't fight if the court is saying that I'm guilty of all charges.

Q.   All right.  Do you remember yesterday Mr. Nathan asked you if there was a bench in the room?  Do you remember the line of impeachment on the screen?

A.   Yes.

Q.   All right.  What is your best memory as you are here today?

A.   That the room was empty, it didn't have nothing in it, and

that the officers brought chairs into the room in order to sit down on.

Q. And it sounds like that's your memory, right?

A. Yes.

Q. How long has it been?

A. 22 years.

Q. All right. Is it possible there was a bench and you don't remember there was a bench?

A. It's possible.

Q. You're just -- are you doing your best to remember it as you do?

A. Yes.

Q. Now, Mr. Nathan asked you questions where you said at the deposition, and he played it, "It's a small room with a bench and a chair, right?"

Do you remember him asking you that question and playing it on the screen?

A. Yes.

Q. Isn't it true that -- that was on page 177, lines 20, through 178, lines 2. Isn't it true that at the same deposition on a page several pages prior, page 174, you also gave this answer, question -- this is page 174, lines 5 through 14:

"So do you know where the lockup area was?

"Answer: No.

"Where you get fingerprinted?

"Yes.

"Question: And photographed. That would be the lockup area, okay.

"Answer: I know it's a different location.

"That was a totally different building?

"Different location, yes."

And then you were asked on page 177, lines 3 through 8:

"So just going back, just bring us back to a specific point in time, we covered were you arrested. You're saying by Rolston and Girardi. You interact with them. We talked about that. You're transported to Area 1, right?"

Do you remember giving those -- getting asked that question?

A.   Yes.

MR. NATHAN:  Objection, leading.

THE COURT:  Yeah, that's not exactly proper interrogation.

MR. LOEVY:  Well, it's perfecting the incomplete -- he impeached him on an answer.  I wanted to -- what's it called?  It's completing, completing the rest of the context.

THE COURT:  Okay.

MR. LOEVY:  Rule of completeness, Your Honor.

BY MR. LOEVY:

Q. So isn't it true that when counsel asked you --

MR. NATHAN: Just one second. This is just rank leading. If he wants to show him a transcript or something --

BY MR. LOEVY:

Q. I guess the point is did you know what room Mr. Nathan was talking about when he was asking you about the bench?

A. Yes.

Q. All right. Speaking of confusion here, you said your phone records, you believed your phone call -- you had a phone with two numbers associated with it, right?

A. Yes. I had an account that had two numbers on it.

Q. And you only used one of those two?

A. Yes.

Q. Who used the other one?

A. Darnell Smith.

Q. Darnell Smith is who?

A. At the time he was my godbrother and friend.

Q. All right. I'm going to show you Yolanda's record.

MR. LOEVY: This is Plaintiffs' Exhibit 61.

MR. NATHAN: Objection, foundation.

MR. LOEVY: Your Honor, we had all the phone records in yesterday.

MR. NATHAN: This did not come in.

MR. LOEVY: Well --

THE COURT: Are there objections in the pretrial --

MR. AINSWORTH: No, there are not, no objections.

THE COURT: -- for phone records? No?

MR. NATHAN: One moment, Your Honor.

MR. LOEVY: I'm told there is no objection in the pretrial order, which means I relied.

THE COURT: Okay. Go ahead.

BY MR. LOEVY:

Q. All right. It looks like --

MR. NATHAN: One second. May I just have a moment to check our prior objection?

THE COURT: Yes.

MR. NATHAN: Thank you.

It was objected to.

(Discussion off the record.)

MR. LOEVY: Your Honor, we believed that we didn't have to call a record-keeper for the phone records, and that's why we permitted them to put the phone records in.

THE COURT: Okay. Let's go on white noise, sidebar.

(Proceedings heard at sidebar:)

THE COURT: Okay. What's the objection?

MR. AINSWORTH: Well, Your Honor, both sides have agreed to allow all phone records in and that we weren't going to require record-keepers to come in. And so both sides withdrew their objections to any of the phone records.

MR. NATHAN: Well, I was inquiring as to phone

records, but it was a different phone record. I was inquiring yesterday as to a phone record associated with Ms. Griffin. And I couldn't show it to him because it wasn't his record. So it's the same -- it should be the same here. This is someone else's record. It's not a proper person for him to be talking -- he shouldn't be talking about someone else's record.

MR. LOEVY: I guess I could ask it in the hypothetical, Your Honor. I could say "If this was Yolanda's, and looking at the time," if that refreshes his recollection, because the fact is he was wrong yesterday about the phone records.

MR. NATHAN: That would be leading.

MR. LOEVY: Well, I'll ask it and saying "If this was Yolanda's phone number," because otherwise I would have to prove it with the document.

And we do move it in, Your Honor. It's got a foundation. It's an official, authentic phone record. We did not bring a record-keeper to court because we were relying on and believed that nobody was objecting to the authenticity of this business record.

MR. AINSWORTH: And at the final pretrial conference, on page 49 of the transcript, defendants admitted that they had withdrawn their objections to any of the phone records.

THE COURT: All right. It's just a question. I mean, you've done this with other records, both sides. But I don't

remember what we did.

MR. NATHAN: I couldn't do it yesterday, and that's my problem with them doing it today.

THE COURT: I'm not sure what you were asking.

MR. NATHAN: I was asking, I was asking Mr. Fulton about Ms. Griffin's record, and I wanted to show it to him, and I couldn't because it wasn't his record, because they objected.

So it's the same exact context here. The plaintiff is now trying to use Yolanda Henderson's record with Fulton. It's not his record. They haven't even established that he knows her number.

MR. LOEVY: So I guess, you know what, I'll do it the way Nathan did it. He said, "See this call here from Precious? Was that from Precious?" So I'll tell him that this was from Yolanda.

MR. NATHAN: No. That would be leading. I was doing cross-examination, and I asked a question on cross-examination. Mr. Loevy is doing redirect, and he's not allowed to do leading questions.

MR. LOEVY: How about if I do it hypothetically?

THE COURT: All right. Just to move on.

MR. LOEVY: Thank you.

(Proceedings heard in open court:)

BY MR. LOEVY:

Q. All right. I'm going to show you your records, Mr. Fulton.

Fulton - redirect

542

This is Defendants' Exhibit 84. This is the phone records that Mr. Nathan showed you yesterday, Mr. Fulton, right?

A. Mm-hmm.

Q. And it's the 8217 number, right?

A. Correct.

Q. Before I ask you that, were you someone who sometimes talked on the phone with Precious Griffin?

A. Yes.

Q. Was there anything suspicious or illegal about talking to Precious Griffin?

A. No.

Q. What kinds of things would you talk to Precious Griffin about?

A. Everything.

Q. Were you angry at her after you got -- you felt she set you up?

A. Angry, no.

Q. Did you make up with her?

A. No.

Q. What do you mean?

A. Well, after the robbery, I didn't, I didn't want to really have nothing to do with Precious no more. And so for me it was trying to get -- because she had lent us some movies and stuff in the house, so I wanted to return all her belongings and don't have anything to do with her no more.

Q.   All right.   But you did have some interactions with her?

A.   Yes.

Q.   And showing you the record again.   I'm going to draw your attention to, this is the 8217 number.   Do you see that?

A.   Okay.

Q.   That's the number yesterday, do you believe that that was not yours, you said yesterday.   Do you remember that yesterday?

A.   Yes.

Q.   If I was to show you this call here on that number, on the 8217 number, on March 9th, that's the night of the hospital, at 11:27 p.m., and 11:29 p.m., on the night you took Yolanda to the hospital, if I was to say hypothetically --

        MR. NATHAN:   Object to the leading nature of this question.

        MR. LOEVY:   I was given permission to ask a hypothetical.

        THE COURT:   Overruled.   Finish your question.

BY MR. LOEVY:

Q.   Hypothetically, if that was coming from Yolanda Henderson's phone number, would that change your belief about whether this number was associated with you?

A.   Yes.

Q.   Would Darnell have been talking to Yolanda Henderson at 11:27 or 29?

A.   No.

Q. Why not?

A. Because why would, why would he be talking to her? What she calling him for?

Q. Who was talking to Yolanda at 11:27 and 11:29 on March 9th?

A. Me.

Q. Why were you talking to Yolanda then?

A. Because she was asking me to come pick her up from the hospital.

Q. So whose phone records are these, sir?

A. Mines.

Q. All right. And are there calls on here -- if Mr. Nathan asked you, "Did you talk to Precious Griffin," would there be calls from Precious Griffin on your line?

A. Yes, if I talked to her.

Q. Have you ever denied that you talked to Precious Griffin?

A. No.

Q. Did you talk to Precious Griffin on Friday, March 9th, the night you supposedly confessed to the murder?

A. No.

Q. And the murder scenario that you supposedly confessed to was you were literally on the phone with Precious Griffin, right?

A. Correct.

Q. Would there be any phone records showing you on the call with Precious Griffin on March 9th?

A.   No.

Q.   Why would there have to be if your confession was true?

A.   Why would, why would there have to be phone records?

Q.   What was the state's theory and the confession theory?

MR. NATHAN:  Objection, calls for argument, not testimony, and speculation.

THE COURT:  Do you respond?

BY MR. LOEVY:

Q.   All right.  Was the state's theory at trial that you had been on the phone or not on the phone with Precious on March 9th leading up to the murder?

A.   On the phone.

Q.   Tell the jury what the state's theory was.

A.   The state's theory was is that Precious was giving me directions to where Christopher Collazo was going to be and a bus route or something that he supposed to be getting off of so we can get payback.

Q.   And when you say "directions," where were you supposedly according to the evidence at trial while you were getting these directions?

A.   Inside the car with Riff and Stick.

Q.   Driving to go abduct Collazo, right?

A.   Yes.

Q.   All right.  And at trial it was an issue about whether any of your phone records showed any call that was consistent with

your confession, correct?

A.  Correct.

Q.  Did your phone records show any call that was consistent with what Griffin was claiming and what your confession was?

A.  No.

Q.  All right.  And just to show you Plaintiffs' Exhibit 78, page 1, another still.  The Yolanda call was at 11:27.

MR. LOEVY:  And, Your Honor, we move to admit Plaintiffs' Exhibit 78, page 1.

THE COURT:  That one is --

MR. LOEVY:  It's one of the stills from the video.

THE COURT:  Any objection?

MR. NATHAN:  No objection.

MR. LOEVY:  "No objection," he said.

THE COURT:  Any objection?

MR. NATHAN:  No, Your Honor.

THE COURT:  All right.

(Plaintiffs' Exhibit No. 78, page 1 was received in evidence.)

BY MR. LOEVY:

Q.  And showing you the still, does that show the time that you left the apartment?

A.  Yes, yes.

Q.  What time is that?

A.  It says 23:30:26.

Fulton - redirect

547

Q.   All right.  So just a minute after getting the second call from Yolanda, right?

A.   Yes.

Q.   All right.  So you were a good boyfriend.  You didn't even wait.  You went and got her?

A.   Yes.

Q.   All right.  Let's talk about the bond.  You did bond out Mr. Mitchell, right?

A.   Yes.

Q.   Why did you bond out Mr. Mitchell?

A.   Because it's no need for him to be in jail.  He ain't did nothing.

Q.   All right.  Now, you were asked at your deposition in 2022 whether you and Riff were having an issue, right?

A.   Yes.

Q.   And you said at the deposition you weren't talking to him then, right?

A.   Correct.

Q.   Have there been times in your life where you and Riff weren't talking?

A.   Yes.

Q.   All right.  What do you know about what was going on in 2022?  You were also asked questions about some money?

A.   Yes.

Q.   Tell the jury what happened.

Fulton - redirect

548

A.   Well, at the current time I was, I was running day-to-day operations as far as making sure the employees got paid and taking care of all the bills of the business.

And then there came a time where I was no longer, we was no longer partnered with DDNS Automotive Group, how we started, and it was time for us to get our own dealer's license.  And so somebody was going to have to do the training in order to get the dealer's license.

My original idea was, since we're all co-CEOs and we're not -- we have no bosses, we are our own boss, then why not everybody go and get the training.  So this way if everybody goes and gets the training, if anything happens on the job, then it's not blamed on me for what you did, right. If you have the training, then it shouldn't be no reason why you shouldn't do your training.

Q.   All right.  John, I'm going to cut you off a little bit just to narrow it.

A.   Okay.

Q.   You did have a dispute with Riff about money, right?

A.   Yes.

Q.   Were you disappointed?

A.   Yes.

Q.   All right.  Did you get over it?

A.   Yes.

Q.   You presently have made up?

A.   Yes.

Q.   All right.  And if you hadn't told Mr. Nathan at the deposition that you had this issue about the money and the account with Riff, was there any way he would have known about it?

MR. NATHAN:  Objection, foundation.

THE COURT:  Overruled.

BY THE WITNESS:

A.   Ask the question again.

BY MR. LOEVY:

Q.   Why did you tell, at the deposition, why did you bring this up that this had happened?

A.   Because it was the truth.

Q.   Because it was the truth.

MR. NATHAN:  It mischaracterizes the questioning.

THE COURT:  I'm sorry?

MR. LOEVY:  I asked a different question, Your Honor.

THE COURT:  You did ask a different question.

BY MR. LOEVY:

Q.   Let me double back to the first question.

If you hadn't told the truth at the deposition, would they have even known about it?

A.   No.

Q.   Are you trying to hide anything?

A.   No.

Q. All right. About Mr. Zinger at the bond hearing, you sat in court while your lawyer made arguments, right?

A. Yes.

Q. Do you get to talk?

A. No.

Q. How many times do you say you were in court while your lawyer made arguments over the years?

A. A lot.

Q. All right. Were you always happy with what your lawyers said?

A. No.

MR. NATHAN: Objection, foundation. Motion in limine --

MR. LOEVY: Your Honor, this line --

MR. NATHAN: -- relating to court proceedings.

THE COURT: I think we can get ahead.

BY MR. LOEVY:

Q. All right. So would your lawyer pre-approve with you, "This is what I am going to say to the Judge"?

MR. NATHAN: Objection. Your Honor, it goes to ineffectiveness.

MR. LOEVY: There was a whole line of inquiry what Mr. Zinger didn't say according to Mr. Nathan.

THE COURT: Right. His conversations, why he didn't talk to the judge or something --

MR. LOEVY: Right.

THE COURT: -- like that.

MR. LOEVY: Yeah. May I proceed?

THE COURT: So Stick with that. Go ahead.

BY MR. LOEVY:

Q. All right. So did Mr. Zinger preclear with you: This is what I'm going to say?

A. No.

Q. Were there times where Mr. Zinger was making the arguments you thought he shouldn't have been making and wasn't making the arguments he should have been making?

MR. NATHAN: Objection. We had this motion. It was a plaintiffs' motion.

MR. LOEVY: I don't know what motion he's talking about. But he seems to have opened the door.

MR. NATHAN: Effectiveness.

THE COURT: I do have to ask this, I don't know, do we need to go down this -- I think you can ask, focus on what Mr. Nathan asked him about, and that's the area that's in the scope of the cross.

MR. LOEVY: Okay.

BY MR. LOEVY:

Q. Do you remember Mr. Nathan asking you, "Isn't it true Mr. Zinger didn't mention that you hadn't been fed or didn't mention, you know, being hit?" Do you remember him asking you

that question?

A.   Yes.

Q.   Might Mr. Zinger have had strategic reasons not to accuse the Chicago Police Department of violence at a bond hearing?

       MR. NATHAN:  Objection, calls for speculation, leading.

       MR. LOEVY:  Otherwise the exam stands unrebutted.

       THE COURT:  Well, you're asking what Mr. Zinger might have thought.  So I don't think he's competent to answer that.

       MR. LOEVY:  All right.  I'll move on then, Your Honor.

BY MR. LOEVY:

Q.   You were asked some questions about the photo, Defendants' Exhibit 154 in evidence.  And you were asked if that was the before picture or the after picture.  Do you remember that, those questions?

A.   Yes.

Q.   And Mr. Nathan was telling you that this is the booking photo, the after picture.  Do you remember that?

       MR. NATHAN:  Object to the characterization.

BY MR. LOEVY:

Q.   Which one did Mr. Nathan suggest that was?

A.   After I had confessed and left that police station and went to another one.

Q.   All right.  Showing you Plaintiffs' Exhibit 73.  Which picture was taken first, the one I just showed you or this one?

A.   I believe this one.

Q.   If you got the two pictures here, which one looked how you looked when you came in to the police station and which one looked how you left the police station?

          MR. NATHAN:  Objection, asked and answered.

BY THE WITNESS:

A.   Well, then that's a different --

          THE COURT:  Sustained.

BY THE WITNESS:

A.   You asked it differently.

          MR. LOEVY:  I'm asking a different question, Your Honor.  Which one?

          THE COURT:  Okay.

          MR. LOEVY:  Thank you, Your Honor.

BY THE WITNESS:

A.   So the one with the coat looks --

          MR. NATHAN:  What's the question?

          MR. LOEVY:  Should I ask it again, Your Honor?

          THE COURT:  Ask the question.

BY MR. LOEVY:

Q.   Okay.  Which one of these looked like, represented how you looked when you came into the police station and which one looks like how you left, when you left the police station?

          MR. NATHAN:  Objection, asked and answered.  Now it's calling for speculation.

MR. LOEVY: Your Honor, if he's confused, then I think we should be able to clarify it.

THE COURT: Yeah, well, I think you're stuck with his answer.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. You were asked about the white shirt you were wearing at his -- he was wearing at the deposition on the screen. Do you remember that?

A. Yes.

Q. All right. Was it your idea or your lawyer's idea to wear a white shirt for the deposition?

A. My idea.

Q. All right. At the trial, did your lawyers try to persuade you to wear a white shirt and look more court like, like this lawyer?

MR. NATHAN: Objection. Are they waiving attorney-client privilege here? Is that what is happening?

MR. LOEVY: Yeah, limited to his wardrobe.

THE COURT: What issue of proof does this go to?

MR. LOEVY: Mr. Nathan asked him, he tried to imply that he's not dressed the way he always dresses. Remember, he asked about the white shirt.

THE COURT: Okay. Overruled.

BY THE WITNESS:

A.   Ask the question again.

BY MR. LOEVY:

Q.   Did anybody try to persuade you to please wear a nice-looking white shirt?

A.   Yes.  They tried to get -- you all tried to get me to wear a suit, yes.

Q.   And what did you decide?

A.   No, not to wear a suit.

Q.   Why?

A.   Because I don't wear suits.

Q.   All right.  Mr. Nathan asked you, and I'm really almost done here, Mr. Nathan asked you:  Isn't it true that you waited until your deposition to say that you were at the hospital with Yolanda?  You didn't say that until 2022.

Do you remember him asking you that question?

A.   Yes.

Q.   Is it true that you waited until 2022 to say you were at the hospital?

A.   No.

Q.   When did you first start saying you were at the hospital on the night Chris Collazo was killed?

MR. NATHAN:  Objection, foundation.  Where are we talking about?

THE COURT:  Foundation?

MR. NATHAN:  Yeah.  He's asking about first start,

saying I don't know where -- well, what are we saying?

MR. LOEVY:  Should I try to make it clearer, Your Honor.

THE COURT:  Yes, if it needs to be.  Go ahead.

BY MR. LOEVY:

Q.  All right.  Did you wait until 2022 to start saying you were at the hospital during the murder?

A.  No.

Q.  When did you first start saying that you were at the hospital?

A.  When I was arrested by the officers and asked about this crime.

Q.  Did they accept that?

A.  No.

Q.  Did they let you write it down?

A.  No.

Q.  Did they let you give a statement saying "I was at the hospital"?

A.  No.

MR. NATHAN:  Objection, leading.

THE COURT:  It's leading.

MR. LOEVY:  I don't have any further questions, Your Honor.

THE COURT:  Okay.

MR. NATHAN:  I do just have some brief ones.

THE COURT: All right. I think you're excused. Mr. Fulton, you may step down.

MR. LOEVY: Your Honor, our next witness is -- we could start him or we could take the break.

THE COURT: Well, let's take our lunch break since --

MR. LOEVY: Okay.

MR. NATHAN: Your Honor, I apologize, I didn't hear if you said I can't ask additional questions. I just had a few.

THE COURT: You have two?

MR. NATHAN: I have a few.

THE COURT: A few?

MR. NATHAN: Based on Mr. Loevy's questions.

THE COURT: Well, I don't like to keep going back and forth, but --

MR. NATHAN: They're limited.

THE COURT: We can do it if it's very brief.

Come back up.

RECROSS-EXAMINATION

BY MR. NATHAN:

Q. Mr. Loevy asked you some questions about how you would have no way of knowing what you were wearing on March 9th or 10th. Do you remember those questions?

A. Correct.

Q. Sometimes there are things in your life that are memorable and you do remember what you're wearing, right?

A.   What you are wearing?  Yeah, like at a wedding, a funeral or something.

Q.   For example, you remember you were wearing a white shirt at your deposition, right?

A.   Not until you showed me the video.

Q.   And you know exactly -- you testified on direct examination you know what you always wear with your t-shirt, right?

A.   Testified to what?

           MR. LOEVY:  I object.  It's not brief and not going anywhere.

           MR. NATHAN:  I'm moving on.

BY MR. NATHAN:

Q.   You also --

           THE COURT:  Go ahead.

BY MR. NATHAN:

Q.   In February and March, you were not dating Ms. Griffin, right?

A.   Correct.

Q.   The reason you were talking to Ms. Griffin in February and March only had to do with she was helping, you said, get together with Collazo to get that done, right?

           MR. LOEVY:  Your Honor, objection to "February and March."  And this is scope and repeated of the direct.

           MR. NATHAN:  It had to do with the phone calls. That's what I'm getting to.

MR. LOEVY: But he talked to her in February for a different reason, Your Honor. This was --

MR. NATHAN: I'm laying the foundation for my question for phone calls.

THE COURT: Well, I don't know that it's within the scope, but go ahead.

BY MR. NATHAN:

Q. My point is you were not, during let's say March, in March of 2003, you were not dating Ms. Griffin?

A. Correct.

Q. The reason you would be calling her only would have to do with this Collazo gun deal or the fact that Collazo was threatening you, right?

A. We spoke about a lot of different things.

Q. And you spoke to her on March 8th of 2003 multiple times, right?

MR. LOEVY: Objection, Your Honor. This is repeating his exam at this point.

THE COURT: Yes, it is, I think.

MR. NATHAN: He brought up that he had no reason to be -- that it was all water under the bridge as of March 8th. So that's what I'm rebutting.

MR. LOEVY: This was --

THE COURT: Well, that was testified to on his direct, but no one objected, so I went ahead with it. But this is an

objection, and it's sustained.

BY MR. NATHAN:

Q.  You were asked questions about, from Mr. Loevy, about what phone you were actually using.  Do you remember those questions just a moment ago?

A.  Yes.

Q.  Yesterday you were adamant you were using one of your Nextel phones and today you are adamant the other way around, right?

A.  Correct.

Q.  You had multiple phones, right?

A.  I had one phone that I was using.

Q.  You had two phones on your account, true?

A.  Yes.

Q.  You also had a landline, true?

        MR. LOEVY:  Objection.  That was covered yesterday as well, Your Honor.

        THE COURT:  Yes.

        MR. NATHAN:  That's all I have.

        THE COURT:  Okay.  Then you are excused.

        THE WITNESS:  Okay.

    (Witness excused.)

        THE COURT:  All right.  We'll take a recess until 5 minutes after 1:00, yes.

    (Jury out at 12:19 p.m.)

THE COURT: Okay. So we're having Dr. Leo next?

MR. LOEVY: Next will be Mr. Judge, the state's attorney, and then Leo. The state's attorney is the guy who had to go today. Hopefully that won't --

THE COURT: Oh, Mr. Judge, okay.

MR. LOEVY: Yeah. Not you, Judge. We're not calling you.

THE COURT: A fortuitous name for him.

Okay. So that's all then for now.

MR. NATHAN: What time should we come back?

THE COURT: If you are going to have any issues, let's be here at least 5 minutes ahead, a little before 1:00.

MR. KAMIONSKI: So 1:00 o'clock.

MR. LOEVY: What time did you tell the jury?

THE COURT: I said 5 after.

MR. LOEVY: 5 after. Okay.

(Recess taken at 12:20 p.m. until 1:05 p.m.)

562

```
                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
                             EASTERN DIVISION

JOHN FULTON,                        )  Case No. 20 C 3118
                                    )
               Plaintiff,           )
          v.                        )
                                    )
ROBERT BARTIK, et al.,              )
                                    )
               Defendants.          )
-----------------------------       )
ANTHONY MITCHELL,                   )  Case No. 20 C 3119
                                    )
               Plaintiff,           )
          v.                        )
                                    )
ROBERT BARTIK, et al.,              )  Chicago, Illinois
                                    )  February 12, 2025
               Defendants.          )  1:05 p.m.

                               VOLUME 3
                TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
                 BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Plaintiffs:        LOEVY & LOEVY
                           BY:  MR. JONATHAN I. LOEVY
                                MR. RUSSELL R. AINSWORTH
                                MS. JULIA T. RICKERT
                                MS. FATIMA LADHA
                                MR. ISAAC GREEN
                           311 N. Aberdeen Street, 3rd Floor
                           Chicago, Illinois  60607

                           LYON & KERR, PLLC
                           BY:  MS. ANDREA D. LYON
                           53 W. Jackson Boulevard, Suite 1650
                           Chicago, Illinois  60604

For Defendant Officers:    NATHAN & KAMIONSKI, LLP
                           BY:  MR. SHNEUR Z. NATHAN
                                MR. AVI T. KAMIONSKI
                                MS. BREANA L. BRILL
                                MR. JOHN M. CERNEY
                                MS. NATALIE ADEEYO
                           206 S. Jefferson Street
                           Chicago, Illinois 60661
```

APPEARANCES (Continued)

For Defendant City:          MICHAEL BEST & FRIEDRICH, LLP
                             BY:  MR. JAMES P. FIEWEGER
                             444 W. Lake Street, Suite 3200
                             Chicago, Illinois  60606

Court Reporter:          KATHLEEN M. FENNELL, CSR, RMR, FCRR
                         Official Court Reporter
                         219 South Dearborn Street, Room 2328A
                         Chicago, Illinois  60604
                         Telephone:  (312) 435-5569
                         Kathleen_Fennell@ilnd.uscourts.gov

                    *   *   *   *   *

                PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE COURT:  Okay.  Good afternoon, everyone.  Have a seat.

I am told the Chief Judge has said that the court will close at 3:00 o'clock.  So what does that do to our --

MR. LOEVY:  Well, that would be --

THE COURT:  -- schedule?

MR. LOEVY:  -- a disaster.  Would Your Honor consider continuing till 5:00 today?

THE COURT:  I would consider it.  I know that many of the jurors are from the suburbs, but --

MR. LOEVY:  We are doomed if we do not keep this moving.

THE COURT:  I know, it would be hard.  I can --

MR. NATHAN:  Whatever works for the Court's fine with us.

THE COURT:  Yeah.  I guess I would say, let's just go ahead, and if things look worse at 3:00 o'clock, we'll reconsider.

MR. LOEVY:  Thank you, Your Honor.

THE COURT:  Okay.  Bring in the jury.

(Jury in.)

THE COURT:  You may be seated.

And, Mr. Loevy, call your next witness.

MR. LOEVY:  Thank you, Your Honor.

At this time, the plaintiff calls McRay Judge.

THE COURT: Good afternoon. Would you raise your right hand to be sworn.

(Witness duly sworn.)

THE COURT: Go ahead.

MR. LOEVY: Thank you, Your Honor.

McRAY JUDGE, II, PLAINTIFFS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. All right. If you'd state your name for the record, please.

A. McRay Judge, II.

Q. What do you do for a living?

A. I'm an attorney.

Q. Where do you work?

A. A law firm, Swanson, Martin & Bell here in Chicago.

Q. You are the national coordinating counsel defending the asbestos companies, right?

A. Some of them, yes.

Q. And so people get cancer from asbestos --

MR. NATHAN: Objection, relevance.

MR. LOEVY: This is his job, Your Honor.

THE COURT: It's introductory. It's all right.

BY MR. LOEVY:

Q. You defend the asbestos companies, right?

Judge - direct

566

A.    That's correct.

Q.    As well as the companies that commit toxic torts, you defend those as well, right?

A.    I defend companies that sold products years ago that had asbestos in them, that's correct.

Q.    All right.  Let's turn you back to 1995 and 2004, that time period.

      You were an Assistant State's Attorney, correct?

A.    Yes, sir.

Q.    At the Cook County State's Attorney's Office?

A.    Correct.

Q.    That -- a State's Attorney is a prosecutor, correct?

A.    That's right.

Q.    So to orient the jury.  In a criminal case, you have the defense, the criminal defendant on one side, the prosecutor on the other, and they do battle at a criminal trial, right?

A.    That's correct.

Q.    And you're on the State side at the time?

A.    Correct.

Q.    Now, you did a number of felony trials when you were in the Cook County Prosecutor's Office.

A.    I did.

Q.    As a prosecutor, you were trying to win the case, right?

A.    Yes.

Q.    Prosecutor's Office, would you agree, filled with

competitive people who were trying to win?

Would you agree with that?

A.   Trying to do justice.

Q.   Well, they're -- there's trying to do justice and there's trying to win the case.

Would you agree that the Prosecutor's Office, the way you got ahead was to win cases, right?

A.   I wouldn't agree with that.

Q.   All right.  That wasn't how you treated it?

A.   I am not sure that most prosecutors treated it like that.

Q.   All right.  You were assigned, in 2003, to something called Felony Review, correct?

A.   Yes, sir.

Q.   And that Felony Review -- tell the jury what Felony Review is.

A.   Felony Review is a unit with the State's Attorney's Office that consists of four teams.  At any given time, 24 hours a day, 365 days a year, there is a Felony Review unit consisting of approximately eight attorneys that is on duty.

Back then, the shift was 5:00 a.m. in the morning to 5:00 p.m. for one team.  And then a corresponding team would be 5:00 p.m. in the evening to 5:00 a.m. the next morning.

That team would work three days on and then you'd have three days off.  And during your three off days, the other two teams were on duty.

The Felony Review unit would receive calls at 26th and California -- again, 24 hours a day -- to assist the police in reviewing cases, reviewing evidence, interviewing witnesses, suggesting additional investigatory procedures that could be undertaken, and reviewing cases and evidence for the charges that could be brought.

Q. No more open questions for you, sir. That was a long answer.

A. Sorry about that.

Q. That's all right.

A. I have a habit of that.

Q. Fair. It was not an uncommon thing for you to do back then, to respond to calls on Felony Review, correct?

A. That's correct.

Q. So years later, it might be hard to remember the exact details of all the different trips you made to the police station. Would you agree with that?

A. All of the different -- I didn't understand. I'm sorry.

Q. This was your regular part of your job at the time, right?

A. Yes. At some point during my eight-year career, I'd reviewed a hundred-plus cases.

Q. All right. And so going back 20 years in your memory, they -- some of them sort of run together, right?

A. I've forgotten about most of 'em, probably.

Q. All right. So that's why you create notes at the time,

right?

A. Yes, sir.

Q. And before you testified today, you reviewed your notes.

A. I did.

Q. And your testimony from before and things that would help you refresh your recollection, right?

A. Yes, I did.

Q. And you had an opportunity to review your deposition as well?

A. I did.

Q. Have you had an opportunity to speak to the attorneys, any of the attorneys on -- at the defense table here?

A. I spoke to one of the counsel at the defense table last week for about 20 minutes.

Q. Well, the question was, have you had the opportunity.

A. I have.

Q. Which one?

A. I honestly don't know his name, sitting beside you there waving at me.

MR. NATHAN: Mr. Nathan.

MR. LOEVY: All right. Let the Court reflect an identification.

BY MR. LOEVY:

Q. So I want to refer you back to the time period when you would get these calls.

Judge - direct

570

You know from reviewing the records that you were involved in the case that we're trying today here in court, right?

A.   I do.

Q.   You were the Felony Review attorney, the first one who got the call to go to the police station for the Collazo murder, right?

A.   I don't think that's accurate.

Q.   Did you get a call to go to the police station?

A.   I did.

Q.   All right.  And you think somebody might have been before you?

A.   I think Jake Rubinstein may have gone out before me to take witness statements.  But I could be wrong on the timing.

Q.   All right.  But you know from reviewing the records that you got there and you spoke to Zalatoris and Breen, right?

A.   Yes, sir.

Q.   Do you recognize 'em or has it been too long?

A.   I think I do, but -- two gentlemen sitting at the end of the table there.  But it's been 20-plus years since I saw them.

Q.   All right.  And they're not the same age, anyways.

A.   No.  We all look a bit older these days.

Q.   Fair enough.  Now, you don't remember going to the station, but you know it happened; is that fair?

A.   I remember being in the station.

Judge - direct

571

Q. Well, I didn't ask that. I said going to the station.

A. I don't remember driving to the station, no.

Q. But you know it happened, right?

A. Correct.

Q. You would've spoken to the police officers.

A. Yes, sir.

Q. And they would've briefed you on the case, right?

A. That's right.

Q. And your understanding was that they brought you to the case -- to the station to review a case, right?

A. Yes.

Q. They had -- they got you apprised that a guy named John Fulton had supposedly given a confession to the Collazo murder, right?

A. Did you say got me apprised?

Q. Yeah. Brought you up to speed.

A. Yes.

Q. Yeah. And you know from reviewing the documents that a young man named Chris Collazo had been murdered about a week earlier, right? A little longer than a week?

A. That's correct.

Q. It was a pretty serious crime?

A. A murder's fairly serious, yes.

Q. This one looked like an execution, didn't it?

MR. NATHAN: Objection, form.

Judge - direct

572

THE COURT: Overruled. If he knows.

BY THE WITNESS:

A. I mean, a body was beaten and burned to death, so yeah, looks like somebody wanted to kill him.

BY MR. LOEVY:

Q. Right. So he had his hands bound behind his back.

Do you remember that?

A. I don't remember the details of how he was found.

Q. All right. Do you remember if his feet were bound?

A. I don't.

Q. Do you remember he was found without a coat?

A. I don't recall that.

Q. And basically, the details you remember, if at all, are from reviewing the records; would that be fair?

A. Reviewing my Felony Review file as well as the testimony I've given in the case.

Q. All right. Would it be a fair summary that the way it worked is the police department was responsible for investigating a case, trying to identify the suspects, and then there's the transition period where they bring it to the prosecutors to review the case and then the prosecutors decide if they're going to charge it; and if they do, they go to court and they prosecute the case?

Have I got it generally right?

A. Those are the right steps. I don't know if I'd call it a

Judge - direct

573

transition period.  But, yes, you've pretty much nailed the steps.

Q.   Okay.  So once they decide to prosecute, your office is gonna take over and try it in court and try to do justice.

A.   Yes, sir.

Q.   And I want to talk now about the middle phase.  The police -- your understanding is you've been brought in after the police have identified John Fulton, right?

A.   He was at the station, correct.

Q.   You didn't have any role in deciding that he was the suspect.

A.   I did not.

Q.   They brought to your attention, "We think we got a guy who had confessed to the crime," right?

A.   That's right.

Q.   How long -- do you know, from the records, what time you got to the station?

A.   I know from my folder that I arrived at about 3:00 in the morning.

Q.   And do you know from your folder about how long you spent talking to the officers, getting familiar with the facts?

A.   I can only surmise that it was roughly two hours, because I documented the time that I went in to see Mr. Fulton the second time, and it was at 4:55 a.m.

Q.   And you would've spent that roughly two hours reading any

reports that were available, talking to the detectives, trying to get the information you could, fair?

A. Fair.

Q. And you would've reviewed Precious Griffin's handwritten statement if it was available, right?

A. That's right.

Q. Have you reviewed it before your testimony today?

A. I have not.

Q. All right. When you got briefed by Zalatoris and Green [sic], you know from reviewing the records that they had a theory, based on information they claimed to have gotten from Fulton, about how the crime had happened, right?

A. Yes.

Q. They believed that a young woman named Precious Griffin had directed Fulton and his buddies on the phone to where Collazo was gonna be.

That was part of the confession, right?

MR. NATHAN: Objection to the leading nature of the examination.

MR. LOEVY: This is adverse examination, Your Honor.

MR. NATHAN: There's nothing that's been established to that effect.

MR. LOEVY: Your Honor, we're seeking permission to call this witness adversely. He prosecuted our client.

THE COURT: Yes, I think it's fair to say, you can

cross-examine him.

BY MR. LOEVY:

Q. All right. Do you remember the question?

A. I do.

I am not sure that I recall them being directed on the phone by Precious, but I do recall during my time at the station, Mr. Fulton indicated that Precious had told him where Mr. Collazo would be that evening.

Q. Do you remember the confession -- part of the confession from Precious was that while they were driving down Lake Shore Drive -- in her statement, they were driving down Lake Shore Drive. She was on the phone directing him to where he was gonna be, and that she called him twice that day on March 9th?

Do you remember either way?

A. I don't remember either way.

Q. You do remember, though, that their theory of the case that he confessed to was that they were going to abduct him getting off the Foster bus that night on Sunday, March 9th, right?

A. Off of a bus in the area of Foster and Rockwell, that's correct.

Q. Foster and Rockwell, right?

A. Yes.

Q. You familiar with that intersection?

A. I'm not at all.

Q. A suburban or city guy or --

Judge - direct

576

A.   I lived in the city until I had a family, and I moved to the suburbs.

Q.   Fair.  And then after you learned this theory of the case, the detectives told you that Fulton had confessed to the crime, right?

A.   Yes.

Q.   Now, about 5:00 a.m., you decide to go in there and talk to John, right?

A.   Correct.

Q.   The goal at this point is to lock in his confession.

Do we agree?

A.   If he was giving a confession, then yes, the goal would've been to document that confession.

Q.   'Cause, I mean, as you understood it -- and you don't -- you don't know what happened before you got there, right?

A.   That's right.

Q.   Because you weren't there.

A.   Correct.

Q.   But, as you understood it, your role in the system was the police had identified a suspect, the suspect was reportedly ready to confess, you are the Felony Review guy, you're gonna take his confession, right?

A.   Correct.

Q.   And if there's ever gonna be a trial, and he tried to disavow it, you could say, "Hey, I'm the Felony Review guy.  I

Judge - direct

577

was in that station.  He gave me the confession."

You were going to be the confession witness, right?

A.  In fact, that's what happened.

Q.  And that you knew if there's going to be a criminal case, you're gonna put on your suit and tie, you're gonna come to court and you're gonna say, "This guy confessed to me."

That was your goal going into the room?

A.  I don't know if I'd say that's my goal.

My understanding, based on where we were at at the time, was that he had confessed, and so my goal was to go in, speak with him, figure out what the story was, and then make a determination, at the end of that discussion, whether or not to document it at that time or continue the investigation.

Q.  All right.  But your goal as a prosecutor, trying to prove a criminal case, your goal was to get a confession.

You can agree with that, right?

A.  No.

Q.  Okay.

A.  I don't agree with that.

Q.  That was not your goal.  Okay.

The police told you he was ready to confess, right?

A.  They -- he had already confessed, yes.

Q.  Now, when you walked into the room, you didn't know that John was on video at the hospital on the south side of town when the crime supposedly happened.

You didn't know anything about the video, right?

A.   I did not.

Q.   And when you walked into the room, you didn't know that there were no phone calls between Precious Griffin and John Fulton on the day of the murder, March 9th.

You didn't know that, right?

A.   I did not.

Q.   And at the time you walked in, you didn't know that the Foster-Rockwell bus had stopped earlier in the evening than the police were saying it happened.

You didn't know that either?

A.   I didn't know any of these things then, and I still don't know them now.

Q.   All right.  You walked into the room.  Who walked in with you?

A.   I would've gone in with the detectives.

Q.   Which is who?

A.   Detective Zalatoris and Detective Breen.

Q.   When you're in the room with John taking the confession, why is Zalatoris and Breen in the room with you?

A.   They had already been in speaking with him, and so they're in there to hear what he has to say to me.

Q.   Well, you could've heard what he had to say.  Why did you want to bring them in with you?

A.   Well, because they -- as you pointed out, they were

Judge - direct

579

documenting this case in their reports, and it'd be very difficult for them to do that if they weren't in the room.

Q.   So the idea was you proceeded to talk to John for about an hour, right?  Close to it?

A.   Yes, sir.

Q.   So the idea was you could all have a conversation.  If John forgot something, they could say, "Hey, John, what about that?"

They were allowed to talk, right?

A.   Sure.

Q.   All right.  Your goal -- I'm sorry.  It wasn't your goal to take a confession.  But if John had confessed, there are different ways to memorialize it, right?

A.   Yes, sir.

Q.   You can take a handwritten statement, where the person gives you a handwritten and then they -- you guys write it out, and then they review it and they sign.

That's one way to document a confession, right?

A.   That's right.

Q.   Another way to document a confession is a court-reported statement, right?

A.   Correct.

Q.   You bring in someone like Colleen, and she types down the words, right?

A.   Yes.

Q.   And in 2003, there also was the capability to do a video

statement, too, right?

A.   I believe that's right.

Q.   All right.  Now, when you take a confession, your usual practice would be, as part of that statement -- in whichever form you used -- to get the suspect to acknowledge he'd been treated correctly by the police.

That would generally be part of the court-reported statement or the handwritten, correct?

A.   I mean, again, that wasn't a goal, but that is an area that we covered when we were interviewing suspects.

Q.   That's all I'm asking, is that when you take the confession, your practice would be, "All right.  Thank you for confessing," if somebody confesses.  "You've been treated okay by the police?"  You want 'em to acknowledge that so they can't disavow it later, right?

A.   Every single time I ever took a confession, I had that conversation with the suspect.

Q.   Not conversation, sir.  I'm saying when you go to memorialize a confession, it gets written into the confession, right?

A.   If that's what the individual tells me, then yes, I would write it into the statement.

Q.   And same with food?  You'd have to make sure that they've been fed, right?

A.   If they're hungry, yeah.

Q. Did you write that in to the statement, that people have been fed?

A. I have on occasion, yes.

Q. All right. There is no confession statement of John Fulton where he signed something saying -- and without getting into why, because we will, but he didn't sign something saying he'd been treated well by the police and had been fed, right?

A. Certainly not while I was there.

Q. All right. Now, when you walked into the room with John, did you bring a paper or pen?

A. I don't recall.

Q. Was it your practice to take notes during this one-hour session we're talking about?

A. No.

Q. So you're talking to him for an hour and you're just listening, right?

A. Listening and asking questions as we went along.

Q. And John gave you the confession scenario, right?

A. He did.

Q. He talked about how, on March 9th, he was on the phone with Precious, and she directed him to where the victim was gonna be, and then abducted him on a bus -- getting off a bus at Rockwell and Foster, correct?

A. Again, I don't remember whether he said the word "phone." But he did tell me during his confession that he had talked to

Judge - direct

582

Precious, and she had indicated to him where Chris Collazo would be later that -- later that day or that day.

Q. And that he was gonna get off a -- and he got off a bus, and that they abducted him, right?

A. That's right.

Q. All right. You later memorialized the confession, right?

A. Yes, sir.

Q. And you didn't -- you left the room. And at some later time, you wrote it down in your Felony Review notes, right?

A. That's right.

MR. LOEVY: So I'd like, Your Honor, at this time to show Defendants' Exhibit 97. And if we could have the ELMO? And we'd move it into evidence.

MR. NATHAN: No objection.

THE COURT: Is it -- no objection?

MR. NATHAN: No objection.

THE COURT: All right.

(Defendants' Exhibit No. 97 received in evidence.)

BY MR. LOEVY:

Q. These are -- this is what you wrote up after you left the room, correct?

A. Yes, sir. That's part of it.

MR. NATHAN: Mr. Loevy, can you just give me one second?

MR. LOEVY: Sure.

(Defense counsel confer.)

MR. NATHAN:  That's fine.  Go ahead.

THE COURT:  This is in evidence.

MR. LOEVY:  Yeah.  And it's agreed.  If we could publish to the jury, please?

THE COURT:  Okay.

MR. LOEVY:  Thank you.

BY MR. LOEVY:

Q.  All right.  So these are your notes.  Let's start at the top here.  That's you (indicating).  And that's the time and that's the date, reflects when you're talking to him, right?

A.  Yes, sir.

Q.  And the people present, Judge, Breen, and Zalatoris, right?

A.  Correct.

Q.  They talked about the gun deal.  And they got robbed at gunpoint.  Never gave 'em the gun.  Called Precious.  Wanted his money back.

Do you see that part there?

A.  I do.

Q.  And you've reviewed that before your testimony today, right?

A.  I did.

Q.  All right.  Now, I want to take the next -- and, by the way, why is it in three parts?  Can you explain to the jury why it's in three parts?

A. It's the way that the Felony Review folder was. There were boxes at different points. It's a large folder that opened up, and there were different boxes where you could write these things in.

Q. So I would be reading it correctly if I read: On March 9th, Sunday, March 9th, the defendant -- that's Fulton -- spoke to Precious and found out where the victim would be?

That's how I should read it?

A. It -- yes.

Q. Okay. And then: Defendant and 2 co-offenders, Stick and Riff, drove north to Rockwell and Foster with a small metal replica bat -- oh, no. And waited for the victim to get off the bus.

Do you see that?

A. I do.

Q. And that's what Fulton told you during this one-hour session?

A. Correct.

Q. And then he chased and beat the victim. And Riff had a small metal replica bat.

That's what Fulton told you, you say, right?

A. Yes.

Q. What is a replica bat?

A. That's not a word that I would use, but that was Mr. Fulton's word, and what I took it to be was if you take your

Judge - direct

585

kids to a baseball game, you can buy a small bat and --

(Counsel holds up item.)

BY MR. LOEVY:

Q. One of these guys, basically?

A. Something like that, yes.

I've never seen a metal one, but that's what I understood he was talking about.

Q. All right. And you just wrote it down, right?

A. Yeah.

Q. Now, defendant drove to his car to where the victim was being beaten, opened the trunk, and helped put the victim in the trunk.

That's what Fulton confessed to you, right?

A. Correct.

Q. So there's nothing about any plastic or anything yet. He's -- they beat him and then they put him presumably bloody in the trunk, right?

A. They beat him and put him in the trunk, yes.

Q. Then they hit him twice and then they drove to an alley, and all three victims took him out. And Defendant Fulton and Stick held him up while Riff taped him with duct tape. Victim was put back in the trunk.

That's what he was telling you with Zalatoris and Breen in the room, right?

A. That's right.

Judge - direct

586

The only thing I would correct -- you said, "They hit him twice." That's actually defendant, Mr. Fulton, hit victim twice.

Q. Thank you for correcting that. Let's see where that was.

That's here (indicating).

A. Yes, sir.

Q. You make your triangles upsidedown sometimes.

A. Well, it looks like I probably, as I was writing it, wrote "V" instead of the --

Q. Ah.

A. -- triangle and then I corrected it.

Q. All right. 'Cause the victim didn't hit the victim twice.

The defendant hit the victim twice. Riff drove to an alley. All right. Then it continues.

They put him in the trunk. Drove everyone north, no south, to where the victim was -- I couldn't read that word.

A. "Dumped."

Q. "Dumped." Thank you.

Defendant told him about a plastic bag in the bowling bag. The bag was placed over the duct tape, applied. They got the refrigerator box. Took the gasoline from the trunk. Poured the gas and set it on fire. Right?

A. That's what it says.

Q. And that's what he told you?

A. Yes, sir.

Judge - direct

587

Q. All right. And the plan had been to find the victim, force him into the car, take him somewhere to beat him, and then take the others home, right?

A. Yes.

Q. Now, I think we've established, you don't know what happened before you got there, right?

A. Only what I read in the police reports and what the detectives told me.

Q. So you don't know either way if John had insisted that he was innocent for many hours, right?

A. I do not.

Q. Did the police tell you that, "We asked him a hundred times, and he kept saying he was innocent"?

A. I don't recall the police telling me that.

Q. All right. Did they -- and you don't know either way whether they threatened him or made him promises?

A. Well, based on what Mr. Fulton told me, they did not.

Q. Well, I said personal knowledge.

A. Oh.

Q. Before you got there --

A. Yes.

Q. Before you got there, you don't know if they did that, right?

A. That's correct.

Q. And if you would've known that, in fact, they said, "John,

you're gonna get the death penalty, you're gonna go to prison for life. All you gotta do is cooperate and you can go home," that's information you would've wanted to know, right?

A. Yes, sir.

Q. But you don't know if it happened because you weren't there.

A. I wasn't there.

Q. Now, as far as where all this information came in the statement, like Rockwell and Foster, hitting him with a bat, duct tape, you don't know if that information came from John Fulton before you got there or if the police suggested it to him before you got there, right?

A. No. What I wrote in my report there that you've shown the jury is what Mr. Fulton told me while I was in the room.

Q. But you have no personal knowledge, before you got there, if they had fed him the information or not. You can't say?

A. I have no idea what happened before I got there.

Q. The conversation lasted about an hour, I think?

A. Yes, sir.

Q. All right. Were -- is at least one detective present the whole time?

A. Yes.

Q. Now, how big was the room?

A. Roughly 20 feet by 20 feet.

Q. All right. Was it tight with the four of you in there?

A.   Not at all.

Q.   You have some general practices when you take a confession, right?

A.   That's fair.

Q.   One of your practices is that the police department, Chicago Police Department, if a confession is finished, you ask the police to leave the room.

A.   Every single time.

Q.   Why do you ask the police to leave the room?

A.   To ask questions with the -- of the suspect, to see if he's had any issues with the police, if he's been provided for during his time in custody, and, frankly, to confirm that his confession to me is voluntary.

Q.   All right.  Why does it make sense to confirm it's voluntary by asking them to step out of the room?

A.   Well, I'm hopeful that by the police -- the police officers leaving the room, the suspect will be more forthcoming with me if there aren't things to be concerned about.

Q.   Well, can you explain?  I'm not sure I understand.

     Why can't they be forthcoming with the police in the room?

A.   Because they don't want to say something bad about the police while the police are sitting there looking at 'em, I guess.

Q.   All right.  So you followed that practice here, right?

A.  Yes, sir.

Q.  And so John finishes, and you ask the police to leave the room.

A.  I did.

Q.  Now, before we get into what John said, I just want to establish some things.  So we'll talk about what John said, but just stay with me on this part.

A.  Okay.

Q.  When John said whatever he said after the police left, you did not have -- you weren't taking notes.

A.  I was not.

Q.  And you did not subsequently make notes about what John told you after the police left.

A.  Correct.

Q.  So there are no contemporaneous notes about whatever John said to you in that police station back in 2003.

A.  That's right.

Q.  So when you're gonna -- I'm about to ask you what he said, but we're talking about a memory that's a 22-year-old memory at this point, correct?

A.  Yes.  Maybe a little longer than that, I think.  '03 to -- yeah, about 22 years.

Q.  But you're not claiming you're gonna be able to remember his words because you took notes and you refreshed 'em.  You're just gonna have to give us your best guess about what he said,

right?

A.   Yeah, it's a little more than a guess.

Q.   Well, you didn't write anything down to which to consult, right?

A.   Correct.

Q.   Fair.  Now, without getting into his exact words, the gist of what John told you, after the police left the room, was, "This is not a true confession.  This is a false confession.  It's not true"?  That's the gist of what he said?

A.   I remember exactly what he said, but yes, that is the gist.

Q.   And you remember it all these years, exactly -- his exact words?

A.   I did.

Q.   I won't ask you what the exact words are, but you just -- 22 years later, you remember his exact words?

A.   I do.

Q.   Why didn't -- and I shouldn't argue with you, but why didn't you write 'em down if you were going to remember his exact words?

A.   Because I thought he was lying.

Q.   All right.  So he says -- well, wouldn't that be a -- I shouldn't argue with you, but that'd be a better reason to write it down, wouldn't it?

        If you thought he was lying, then you'd want to have the notes about what he said, right?

A.   No.

Q.   Okay.  Well, the gist of what John said to you was, "This is a false confession," right?

A.   The gist, yes.

Q.   He said, "It's fabricated.  It's BS.  It's made up."

A.   Didn't say "fabricated," I don't think he said "BS," but he did say "made up."

Q.   And he said, "I didn't do this crime," right?

A.   He said the confession was made up.  He didn't say, "I didn't do this crime."

Q.   Well, are you saying he was --

A.   He did say he was somewhere else at the time, so -- but I gathered from what he was telling me that his claim was he didn't do the crime.

Q.   Okay.  You did figure that out, and --

A.   Sure.

Q.   -- he was pretty adamant about it, right?

A.   I don't know what you mean by "adamant," but yes, he relayed that to me.

Q.   All right.  And without remembering his exact words, he just want -- you asked him -- well, let's get to his exact words in a bit.

       You admit, he told you he's innocent, right?

A.   He told me that the confession was made up.

Q.   And he told you he was at the hospital with his girlfriend

Judge - direct

593

at the time that this crime was supposedly happening.

A.   Yes.

Q.   He'd told you that after that, he went home with his girlfriend to Lake Meadows apartment.

A.   He told me he went home with his girlfriend, correct.

I don't remember him telling me the name of the apartment complex, but I'm sure that he did.

Q.   And that he told you he went to sleep till Monday morning, when he went -- woke up at 8:00 and went to school, right?

A.   I remember him saying that he was at home the entire night and went to school the next day, but I don't remember any more detail than that.

Q.   All right.  That's awkward, isn't it?

A.   Not at all.

Q.   The whole thing?  Not at all.  So you sat in the room with the Chicago Police Department, taking a one-hour confession.  They leave the room.  He says, "It's all made up.  I'm innocent.  I was somewhere else," and that wasn't awkward?

A.   I'm not sure what you mean by "awkward."

Q.   That's a fair point.

You must have had some concern that something's not adding up.  These Chicago police officers told me I got a confession.  They leave the room.  He's saying, "It's fake.  It's not true," and were you concerned?

I don't ask you why.  Were you concerned?

A. I'm not sure that "concerned" would be --

Q. Okay.

A. -- the word that I would use.

Q. Did you raise it with their supervisors?

A. No.

Q. Did you raise it with your supervisors?

A. At some point before I left, I believe that I did.

Q. All right. It's a very serious accusation, wouldn't you agree?

MR. NATHAN: Objection, form, vague, and foundation.

THE COURT: Yeah. I'm not sure.

MR. LOEVY: All right.

THE COURT: Clarify your question.

BY MR. LOEVY:

Q. If Mr. Fulton -- if the police leave the room, he's saying, "I just, in their presence, gave you a false confession," and he had you -- with them in the room, he had you believing, he was selling this thing, it's fabrication, this is a very serious situation, isn't it?

A. It wasn't uncommon. And --

Q. It wasn't uncommon, did you say?

A. No, it wasn't uncommon for people who had killed someone to try and get out of committing the crime.

Q. At the Chicago Police Department, it wasn't uncommon where they would call you, say, "We got a guy who confessed," and

then he'd come in and give you the confession, and the police would leave the room and then he'd say, "No. It's not true. It's not true"?

A. No.

Q. That wasn't uncommon?

A. What I'm suggesting wasn't uncommon is for individuals who were in custody, as a suspect in a crime, it was not uncommon for them to try and figure out a way out of the situation.

Q. How about my question? Was this uncommon?

A. In my experience, this was uncommon where an individual would go through an entire confession and then, at the end of the confession, tell me that he made it all up.

Q. All right. Now, you have -- we already established, you have no notes.

Isn't it true you have no memory about asking him to elaborate on why he just spent an hour confessing? You have no memory?

A. Only what I've seen in the transcripts. But as I sit here now, I do not have a memory of that.

Q. You don't remember even asking him to elaborate, correct?

A. I do, yes.

Q. All right. This is your deposition, page 102.

Do you remember giving a deposition a few years ago?

A. I do.

Q. Okay. This is page 102, lines 18 to 20.

Judge - direct

596

MR. LOEVY: If we could have the camera on for the deposition?

(Said video played in open court.)

BY MR. LOEVY:

Q. All right. Did you give those answers under oath, sir?

A. I'm sorry. Did you just read my -- was that my deposition that was playing or my testimony --

Q. Yes.

A. -- here in the courtroom?

Q. No. That was from before.

A. I will not dispute anything that I said at my deposition.

Q. Was it true that when he said to you, "Hey, this is what happened," you didn't ask him to elaborate?

A. Yes. I wouldn't use the word "elaborate," so that's correct.

Q. All right. Would you agree, you lost an opportunity to find out why John Fulton gave you a one-hour false confession by not asking him to explain, in your mind?

A. No.

Q. All right. You understand that he's claiming that he said to you, "I was threatened," that, "I'm gonna be in big trouble. I only did this 'cause they said I could go home."

Did that happen?

A. Did he tell me those things?

Q. Yes.

A.   Never.

Q.   Did he tell you that he's innocent, and that the only reason he did it is 'cause they rehearsed it with him, and it's not true?

A.   He did not tell me that.

Q.   Did he tell you that if he cooperated, he was told he could promise to go home?

A.   No.

Q.   If he had told you that, what would you have done?

A.   If he had told me what?

Q.   "Look," you said, "why did you just give me a false confession for an hour?  Now they leave the room, and you're telling me it's false?  And if he said, "Well, 'cause they told me I could go home.  And they were threatening me.  I'm in trouble.  And that's why I did it," would you have taken that seriously?

A.   Sure.

Q.   What would you have done?

A.   Well, in this case, I continued the investigation to check out the alibi he had given me.

Q.   So he did tell you that, and that's what you did.

A.   No.  He gave me an alibi.

Q.   No, I'm asking you about something different.

     I'm saying if a guy explains why he gave a false confession to you, and he says, "Cause they made me promises

Judge - direct

and they threatened me," that's misconduct, right?

A.   It would be if it were true, and I would've looked into it.

Q.   All right.

A.   But that did not happen in this case.

Q.   Right.  Well, you weren't there.  You don't know if it happened, right?

A.   I was there talking to him, and he never told me that.

Q.   And you're claiming you just -- never occurred to you to even ask him why he had confessed?

A.   He told me why he had given those -- given his confession.

Q.   Because the police were bothering him and he wanted 'em to shut up, I think --

A.   He wanted to shut the detectives up.

Q.   All right.  And so you just left it at that?

A.   Yes.

Q.   You sure you were trying to get to justice or were you trying to win the case?

A.   I was not interested in winning the case at that point.  We were interested in figuring out who killed Chris Collazo.

Q.   Getting justice, right?

A.   Sure.

Q.   Did Mr. Fulton ever tell you that one of the detectives was, quote, pissing him off?

A.   He never told me those words, other than he was trying to shut them up.

Q. Well, what do you mean "shut 'em up"? You don't know, 'cause you didn't ask him, right?

A. I think it's pretty obvious what it means.

Q. All right. But it didn't occur to you to ask him what he meant in your telling?

A. I didn't ask him, "What do you mean by trying to get the detectives to shut up," you're correct.

Q. You left the room, right?

A. I did.

Q. And then you found a pen and a piece of paper.

A. Well, I talked to the detectives after leaving the room. And eventually, yes, I found a pen and my Felony Review folder.

Q. Now, you knew that you were going to create these notes because you might have to testify about them years later, right?

A. Yes.

Q. And that's why you create notes, right?

A. It's one of the reasons. But the main reason is so that when the next State's Attorney comes on to the case, they have an idea of what has happened up to that point.

Q. 'Cause you might drop off the case, right?

A. I did.

Q. And so it's very important that the next State's Attorney gets apprised of all the information.

A. Correct.

Q.   There's also a *Brady* consideration, right?

A.   At that time, I -- I'm not sure that I was even thinking about that.

Q.   Well, as a prosecutor, it's never far from your mind that you have an obligation to ensure that all exculpatory information makes it into the criminal justice system, right?

MR. NATHAN:  Objection, relevance, motion *in limine*.

MR. LOEVY:  This is not irrelevant, Your Honor.

THE COURT:  Not irrelevant.  Was there a motion *in limine* on this?

MR. LOEVY:  There is not, Your Honor.

MR. NATHAN:  The -- that's -- I don't want to get into an argument here, but --

THE COURT:  Yeah.  Okay.

MR. NATHAN:  -- if we need to, we can go off.

THE COURT:  I think it's outside the ruling.

Go ahead.

BY MR. LOEVY:

Q.   All right.  So to orient the jury, in a criminal proceeding, let's say Mr. Fulton -- let's say Mr. Mitchell's on trial.  Are you with me?

A.   Yes.

Q.   The State has to turn over all the information that points the finger at him, right?

A.   Yes.

Judge - direct

601

Q. And they also have to turn over all the information that's good for him, that helps him, right?

A. Correct.

Q. That's your obligation, to make sure that if he's defending the charges, he doesn't just get the bad stuff, he also gets the stuff that helps him prove his innocence, right?

A. Correct.

Q. So that's one of the reasons that, in this police station, you have to take good notes, right?

A. Again, at the time that I was taking notes, it was not for that purpose at all.

It was a continuing investigation. I advised the detectives what he told me, and I eventually testified to it at least three times.

MR. LOEVY: All right. If we could put the screen back up to Exhibit 97.

BY MR. LOEVY:

Q. Now, these are the only notes you created, right?

A. This is the only note I created regarding his statement, that's correct.

Q. Yes. All right. So tell the jury where in it it says that John Fulton says all this is false (indicating).

A. It does not say that anywhere.

Q. The notes that you created, where does it say that he's actually saying he's innocent, he was in a hospital, and it's

all made up?

A. Doesn't say it.

Q. And you knew you could drop off the -- if you dropped off the case, the next prosecutor's gonna pick this up, right?

A. It's one of the things they would pick up, yes.

Q. And this is the only written thing they're going to pick up from you, right?

A. From me, that's correct, the Felony Review folder.

Q. All right. So in hindsight, don't you think it would've been a better practice to say, maybe a footnote here, "By the way, he says this is false"?

You should've probably written that down, right?

A. I stand by what I wrote in the Felony Review folder.

Q. Do you think if the next State's Attorney, the trial State's Attorney picked this up, they might get the impression he actually had confessed to the murder?

A. He did confess to the murder.

Q. Okay. But then he told you it was false.

A. He did.

Q. So he's confessed and he's told you it's false.

You could have gotten a court reporter, right?

A. I -- yeah, I could have called a court reporter.

Q. Was it your call or their call to get a court reporter?

A. It was not their call. It would've been my call.

Q. All right. And if you would have gotten a court reporter,

John would've said, "This isn't true.  It's made up.  It's not true," right?

MR. NATHAN:  Objection, calls for speculation.

MR. LOEVY:  How about in his mind, what he believed?

THE COURT:  All right.

BY MR. LOEVY:

Q.   In your mind, did you believe if you went and let John give a statement, he would've said, "I'm guilty," or he would've said, "I'm innocent"?

A.   Well, he had already said, "I'm guilty," and then he said it didn't happen, so I'm not sure what he would've said the next time we spoke to him.

Q.   All right.  So let's do justice, right?  Let's get a court reporter and take his statement and find out what the truth is.

You could have done that, right?

A.   Anything at that point is possible, but that's not what I would have done at this stage in the investigation.

Q.   All right.  After the alone session with John, you left the room, right?

A.   Yes.

Q.   And you went and spoke to Zalatoris and Breen.

A.   Yes, sir.

Q.   Now, are you aware of any disputed fact about whether you told them or not?

A.   I'm not sure what you mean by that.

Q. All right. Do you -- let's be real clear about something.

A. Sure.

Q. Didn't you tell Zalatoris and Breen, after you walked out of that room, that Fulton's confession, knew that he was disavowing it?

A. I would have told them what he had just told me, so yes.

Q. And --

A. He made it all up.

Q. Any doubt in your mind that the -- you did tell the defendants that Fulton was saying the confession's a lie?

A. I don't recall specifically having that discussion with them, but there's no doubt in my mind that's exactly what I would have done.

MR. LOEVY: All right. So I'm going to put a demonstrative on the screen here.

BY MR. LOEVY:

Q. "Did McRay Judge tell Zalatoris and Breen that Fulton's confession was false?"

And, actually, that wouldn't be accurate, would it?

A. Yeah. No, that wouldn't be accurate.

Q. It would be that: "Fulton claims his confession was false."

And is that fair, a fairer summary?

A. It is.

Q. All right. You want a "Yes" or "No" right there?

A.   I want a "Yes."

Q.   Did you make the detectives explain to you why they brought you down to the station at 3:00 a.m. to hear a young man confess, heard the confession for an hour, and then as soon as they leave the room, he's like, "It isn't true"?

A.   I knew why I was down at the station.

Q.   I asked you if you asked them to give you -- were you angry at them?

A.   Not at all.

Q.   Were you concerned about how they had performed their duties?

A.   Not at all.

Q.   Fulton told you that if you got the video from the apartment building, it would show you he's telling the truth, correct?

A.   That's one of the things he mentioned.

Q.   All right.  And you told Zalatoris and Breen, "Why don't you guys go check that building," right?

A.   I made suggestions to them that -- additional things that could be done after I left that night.

Q.   And how about what I'm asking about?

A.   Or morning.

Q.   You said, "Hey, the kid's saying he's in this building. Why don't you go check the video"?

A.   Yes.

Q. Why'd you ask 'em to check the video?

A. Because he had given an alibi and that's something that you go and check out.

Q. You want to see if he's telling the truth, right?

A. Correct.

Q. And you don't know if the video showed him or not, right?

A. I have no idea.

Q. Did John have a choice about whether he was gonna give a statement at that point?

A. Yes.

Q. So did you -- did you show him your notes and ask him to sign off on this?

A. I did not.

Q. Wouldn't that have been fair to let him, you know, sign it and agree with it or not agree with it?

A. I don't know that I would say it's fair. I think it was fair that he was giving -- given an opportunity to tell me his side of the story. I documented it and then we continued the investigation.

Q. Right. But let -- are you saying John didn't want to give an official statement that he was innocent?

A. He wasn't asked at that point.

Q. You didn't give him that opportunity, right?

A. Well, he gave me a statement. But if you mean a handwritten or a court reporter --

Q. Yeah.

A. -- or a video, I did not offer those options to him at that time.

Q. All right. And he doesn't get to do it if you won't give it to him, right?

A. That's correct.

Q. Did you talk to Zalatoris and Breen, after you left the room, and said, "You know, you think we should get that court reporter? Or probably not a good idea?"

A. I didn't talk to them about that at all because that was not an option that was viable at that time in my mind.

Q. Let's talk about the polygraph from that night.

You said that Zalatoris and Breen got you up to speed on the facts, right?

A. Yes.

Q. And they -- a couple hours, they told you about everything that happened in their investigation.

A. Well, I -- during that two hours, between the time I arrived and when I spoke to Mr. Fulton, I would have reviewed reports, anything that was in the file. I would have asked questions, and, yes, I would have spoken to the detectives.

Q. All right. Did Zalatoris and Breen ever tell you, during that conversation, that Fulton had previously been driven to a polygraph examination and had given a confession to the polygraph examiner?

A.   As I sit here today, I do not recall that.

Q.   In fact, that's what you testified to at the criminal trial in 2006, too, didn't you?

A.   If that's what the transcript says, then yes, that's what I testified to.

Q.   Take a look at page 304 --

MR. LOEVY:   May I publish it, Your Honor?

MR. NATHAN:   What are you publishing?

MR. LOEVY:   Well, it's the transcript.

Could I read it to him, his --

MR. NATHAN:   Why don't you hand it to him to refresh his recollection?

THE COURT:   Is there any objection to this?

MR. NATHAN:   Yes.   I have no objection to him refreshing the recollection.

THE COURT:   Okay.

MR. LOEVY:   Let me ask -- may I ask him a question, then, Your Honor?

THE COURT:   Yes.

BY MR. LOEVY:

Q.   Did you, at the criminal trial back in 2006, testify that they did not tell you that he had been taken for a lie detector?

A.   If that's what the transcript says, I would not doubt that I said that.

Judge - direct

609

Q.   Take a look.

MR. LOEVY:   May I approach, Your Honor?

THE COURT:   Yes.

(Witness reads.)

THE WITNESS:   Okay.

BY MR. NATHAN:

Q.   Does that refresh your recollection?

A.   Yes, sir.   That's what I said.

Q.   Which is that nobody mentioned to you he had given a confession to a polygrapher, right?

A.   That's what I testified to.

Q.   And that's what happened, isn't it?

A.   Well, that -- as I sit here today, I don't recall them telling me that, and that's what I testified to in 2006.

Q.   All right.   And it's hard to remember anymore what actually happened because it's been too long, right?

A.   I remember some things; some things I do not.

Q.   What we have is notes and we have testimony from 2006, right?

A.   And some of my personal recollections.

Q.   But this is not among them, apparently.

A.   Yes, sir.

Q.   All right.   But I'm going to show you another demonstrative here:   "Did Zalatoris and Breen mention to McRay Judge that Fulton had supposedly already confessed to Polygraph Examiner

Judge - direct

610

Bartik?"

If you can give me a "Yes" or "No."

A. I think I would give you, I do not recall them telling me that.

Q. Okay. But you testified in 2006 that they --

A. You're correct.

Q. That they did not.

A. That's right.

Q. So what's the truth?

A. The truth is, as I sit here today, I do not recall them telling me that he had been to a lie detector.

Q. Well, let me ask you this.

As a witness, if you said under oath unambiguously in 2006, would you have said it if it wasn't true?

A. If that's what I believed at the time, then yes, that's what I would have said.

Q. Apparently, that's what you believed and said --

A. Yes, sir.

Q. -- unambiguously at the time, right?

A. Correct.

Q. So should we put a "No" here or put, we won't rely on your testimony?

A. You can check whichever box you like. But, again, my testimony is I do not recall them telling me that.

Q. All right. I'll put: "Not sure" -- how about -- I'll

change this here.

"Did McRay testify under oath in 2006 at John's criminal trial that Zalatoris and Breen did not mention this?"

We can put a "Yes" on that, right?

A.   You can.

Q.   Okay.  So we can infer, then, from that answer that nobody told you that John Fulton, a few hours before you talked to him, had apparently given a confession to a completely different person.

A.   Again, I'll stand by my answers to that question.

Q.   All right.  You tried a number of murder trials as a felony -- as a prosecutor, right?

A.   Yes, sir.

Q.   How many did you win?

A.   Most of them.

Q.   You're a competitive guy, right?

A.   Yes.

Q.   Trying to win.

A.   Again, it's -- that's not why I'm trying cases, to try and win.

Q.   Well, would it be --

A.   If someone had committed a crime, yes, I want to convict him.

Q.   Winning beats losing, right?

A.   Yes.

Q.   And would it be fair to say that back then, you were trying to build a case that would hold up in court?

A.   Sure.

Q.   Now, you would have known back then that John Fulton had no criminal -- prior -- serious prior involvement in law -- with the law, right?

A.   I think that's something that I would've been apprised of. I don't recall that as I sit here right now.

Q.   All right.  But if his only record was for trespass and 15 bucks of cannabis, you would have asked the detectives, "Tell me about his record," right?

A.   Yes.

Q.   Now, did Zalatoris and Breen brief you about any other suspect in the universe other than John Fulton?

A.   I remember there were two other suspects.

Q.   His buddies, you mean?

A.   Yes.

Q.   All right.  But aside from the John Fulton scenario, of all the other people in the universe, did they brief you about any other suspects?

A.   No.  Not that I recall.

Q.   Was it your job to go out and find other suspects or their job?

A.   It was not my job.

Q.   Now, at the criminal trial, and it's the pretrial, you used

the word "manipulative" to describe John, right?

A.   Yes.

Q.   You testified in his criminal trial, right?

A.   Yes.

Q.   He was trying to manipulate his way into innocence, right?

A.   Yes.

Q.   And that's not really a fair characterization, is it?

A.   Well, I -- yeah.  At the time, I felt that it was a fair characterization, and I still do today.

Q.   Still do today?

A.   Yes.

Q.   If you could -- everything you just told the jury happened, if you did it over, you'd do the same thing?

A.   Yes.

Q.   All right.  Twenty years later, I take it, that you don't really remember his demeanor or his temperament, right?

A.   I do.

Q.   You have no notes on that, right?

A.   Correct.

Q.   So it's all from memory, right?

A.   Well, memory, transcripts from the motion to suppress, the trial, and my deposition.

Q.   And those transcripts are more than a year later, right?

A.   I believe that's right.

Q.   All right.  And you've done this drill with lots of

Judge - direct

614

suspects, right?

A.   I'm not sure what you mean by that.

Q.   Did John -- in other words, how many suspects did you think you interviewed as a Felony Review guy?

A.   Fifty-plus, maybe a hundred.

Q.   All right.  And you don't remember all their demeanors, right?

A.   I don't.

Q.   In testing your memory, did John tell you how he met up with the alleged accomplices?

A.   As I sit here today, I don't recall that.

Q.   Did you ask it?

A.   I don't recall asking any of that, and I don't recall him telling me.

Q.   Did John tell you what time these events supposedly happened?

A.   As I sit here today, I don't remember that.

Q.   Did you ask it?

A.   I don't recall.

Q.   Did you ask what time Collazo arrived?

A.   I don't recall asking him that, and I don't remember him telling me that.

Q.   And it's been just too long to remember, right?

A.   Yes, sir.

Q.   And you're not going to tell us you remember that after he

gave a confession for an hour, they leave the room, and then he says, "It's all untrue.  It's all untrue," that he just seemed calm, happy, relaxed, in a good mood?

He must have been tense, right?

A.  I'm not sure I would use the word "good mood," but he was very calm, he was conversational at the time.

Q.  All right.  What we do know as far as his conversation -- at all times when they were in the room, he said he confessed to the murder, right?

A.  Yes.

Q.  And at no time when they were in -- weren't in the room did he confess, that he said it was all a lie, right?

A.  I'm sorry.  Sir, could you repeat?

Q.  At no time was he willing to say he was innocent while he was in their presence, right?

MR. NATHAN:  Objection, asked and answered.

MR. LOEVY:  This is going to his demeanor, Your Honor, whether he was afraid.

THE COURT:  He didn't answer the question, but --

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  He was afraid to say that he was guilty in their presence.

Was that your inference?

A.  No.

Q.  And when he wasn't in their presence, he was saying he was

innocent, right?

A.   He did.

Q.   You don't remember if you asked him to eat, did you?

A.   I couldn't hear you.

Q.   You don't remember if you asked him to eat all these years later, right?

A.   If I asked him to eat?

Q.   If he needed to eat.

A.   That's something I would've asked him, because I asked every single suspect I ever interviewed.

Q.   All right.  How about the -- well, as far as the eating, I think what you said was -- before you started the interview, the one-hour interview, you would have poked your head in there to see how he's doing, right?

A.   Yes.

Q.   And there's no notes of that conversation, right?

A.   That's right.

Q.   And you no longer recall anything about sticking your head in there, right?

A.   I remember sticking my head in and introducing myself, and that's about it.

Q.   All right.  But to your best memory, 20-plus years later, you would've stuck your head in there and said, "Nice to meet you.  You all right?  You good," that kind of thing?

A.   That's correct.

Judge - direct

617

Q. And that -- when you said, "Hey, you all right, you good," he probably said, "Yeah, I'm all right, I'm good," right?

A. Yes.

Q. But you didn't say, "Hey, I'm your waiter here to take your food order," right?

A. No. But I've done that.

Q. All right. But, you know, when you're saying, "Hey, you all right, you're good," that's what -- you're saying, "Hey, you didn't tell me you needed food." That's your basis, right?

A. He did not tell me that, you're correct.

Q. All right. Now, in the scenario you wrote down, he did put a beaten body in his trunk, right?

A. Yes.

Q. So, in other words, they beat him up and they stuffed him in the trunk.

A. Correct.

Q. All right. So 2003, you know, was CSI, you know, they started this forensic stuff back in 2003. It's not the 1800s, right?

A. It's not.

Q. All right. So you thought it might be a good idea to go check his car, right?

A. Yes, I did go and check his car.

Q. And his car had been taken by the police to the police station and impounded, right?

Judge - direct

618

A.   I remember it was in the parking lot.  I don't know if it had been impounded.  But it wouldn't surprise me if it was.

Q.   All right.  And you walked down there and checked in the trunk, right?

A.   I did.

Q.   And you didn't see any sign of blood or any kind of sign that a body had been in the trunk, correct?

A.   Nothing that I could see.

Q.   And the car wasn't particularly clean is your recollection?

A.   I remember it was a very nice car, but there were ashes and things like that in the interior of the car.

Q.   So it did not --

A.   That's what I remember.

Q.   It didn't look like anybody had sterilized it or cleaned it out?

A.   No.

Q.   All right.  A few more areas, sir.

     The police did ask you to come down and approve murder charges against John Fulton, right?

A.   They came -- yes.  They asked me to come out and review the case to determine whether or not charges were appropriate at that time.

Q.   And you did not approve charges.

A.   Correct.

Q.   And, you know, John could've been let go then, right?

Judge - direct

619

A.   No.

Q.   All right.  You asked the cops -- I'm sorry, the defendant officers to go check -- try to get some more evidence, right?

A.   I don't think I said it like that.  I think I suggested that they go and check his alibi, which would have been the hospital, his apartment complex, and to interview the other two suspects.

Q.   All right.  So let's talk about the hospital first.

     The idea is the police had a theory about a murder happening at a certain time.  He's saying, "I'm in a hospital," at a certain time.  And you said let's get the answer, right?

A.   Yes.

Q.   You told the police, "Go check."

A.   Well, I didn't say, "Go check."  I suggested that they go and check.

Q.   All right.  And if he -- it showed he wasn't at the hospital during the murder time, he's in big trouble, right?

A.   Well --

Q.   Yes?

A.   Yeah, sure.

Q.   And if it shows he was at the hospital during the murder time, then they're in big trouble, right?

A.   Well, it depends on what it showed.

Q.   Yeah.  Okay.  You also told them to get the apartment video.

A.   I didn't -- it wasn't my job to tell them what to do.  That would not have gone over very well.  I suggested that they go to his apartment and see if there was a video.

Q.   All right.  Did you know or think at the time that the time of the confession was gonna change?

A.   I don't understand what you're asking.

Q.   It wouldn't even make sense, would it?

A.   I don't know what your question is.

Q.   All right.  Let me ask you a different question.

At this point in the procedure, when you asked to speak to the suspect alone, see if they'd been mistreated by the police, would you have assured John that you're not just gonna leave him alone with the detectives again?

Would that have been something you did?

A.   No.

Q.   If a suspect told you that they had been abused by the police, other than mentioning it to your supervisors, there's really nothing you would have done; isn't that true?

A.   I absolute --

MR. NATHAN:  Objection, asked and answered.  I'm sorry.

BY MR. LOEVY:

Q.   Other than telling your supervisors and maybe the supervisor of the detectives.

A.   He and I would have documented that.  I would have told all

Judge - direct

621

of the supervisors involved, and I would have documented it.

Q.   All right.   When you go talk to the police and you explain to them, "We're not going to charge this crime" -- right?

A.   We weren't going to charge the crime at that time.

Q.   Right.

A.   Correct.

Q.   Because -- and they probably were like, "Wait a minute.  We got a guy confessing.  Let's charge him."  And you had to say, "Well, not so fast," right?

A.   No, not necessarily.  If something comes up in the investigation that needs to be checked out, the police generally had no issue with that.

Q.   So you didn't rule out charges.  You said, but something's gonna have to change to get him charged, right?

A.   I still believed he would be charged based on the way he confessed to me, but there were things that needed to be checked out before we did that.

Q.   Yeah.  You had to see if he was lying about the hospital and lying about the apartment.

A.   Right.

Q.   All right.  But you did say generally to the police something's gonna have to change, because with him denying it, it's not gonna fly.

A.   Not necessarily.

Q.   And then you left Mr. Fulton with the police.

A.   Yes.

Q.   Never to be heard from again in this investigation.

A.   May never be heard -- yes, I was not involved.  That was my last day of three days.  Although, I did speak to the State's Attorney who came on the case later.

Q.   At what --

MR. LOEVY:  I need the photos of John.  May I have a moment, Your Honor?  The Polaroid and the double.  Thank you. This one and then the one with the -- 154, Defense 154.

(Pause.)

BY MR. LOEVY:

Q.   All right.  When you left, was John's shirt -- when you left with the police -- and understood they were going to go finish talking to him, right?

A.   Yes.  Well, no.  I understood that when I left, they were going to go and continue the investigation, like we discussed.

Q.   And John -- you left John in the room, right?

A.   I believe that John was moved to another room because he was in custody.

Q.   You know he stayed in custody.

A.   Yes.

Q.   So he wasn't going home.

A.   No.

Q.   So you knew you were leaving John with the detectives.

A.   Yes.

Q. And you fully anticipated that they would go in there to have a word with John about what had happened.

A. Not necessarily.

Q. I mean, somebody's got to ask John why he confessed to murder and then said it was a lie.

Somebody's got to ask him, right?

A. Not necessarily. I mean, it's possible they did, but someone doesn't have to ask him that.

Q. And you didn't.

A. I told you, he told me he was trying to shut the detectives up.

Q. All right. So you really -- it's left to them to explore why John has given a confession, is now saying that it was not true.

A. What I left to them to explore was whether or not there were videotapes documenting his alibi.

Q. Anybody ever tell you there were?

A. I really know very little about what happened after I left.

Q. When you left, was John's shirt ruffled in any way?

A. I don't remember anything being ruffled about his shirt.

Q. Excuse me? You don't remember or there was nothing ruffled about his shirt?

A. I would've noticed if anything was out of place, if he appeared as though he had been roughed up. I don't remember anything like that during my interactions with him.

Q. And back in 2004, at the earlier proceeding, you, in fact, gave testimony, didn't you?

A. Which testimony is that?

Q. That there was -- when you left, there was nothing ruffled about his shirt. He looked fine.

A. I think what I would have said is the entire time I observed him, there was nothing out of place about his clothing, his appearance, his demeanor. Nothing to be concerned about in my opinion.

Q. And that's not going from memory. That's testimony you gave 21 years ago in court, right?

A. Well, I do remember there was nothing that I was concerned about about the way he had been treated while I was there.

Q. And I --

A. Yes, I would have testified to that.

Q. I'm asking specifically. You testified his shirt was not ruffled, right?

A. I think I was asked if his shirt was ruffled, and I said it was not.

Q. All right. And taking a look at Plaintiffs' Exhibit 73, page 2.

Then, I take it, this is not how he appeared when you left the police station?

A. It's possible --

MR. NATHAN: Objection.

BY THE WITNESS:

A.    -- it's --

MR. NATHAN:  Sorry.  Objection, foundation.

THE COURT:  Well, it doesn't need a foundation with this question.

BY MR. LOEVY:

Q.   The boy in this photograph looks like his shirt is ruffled, right?

A.   To me, it does not.  It looks like the neck of his collar is stretched out, but it -- I don't know if I would call that "ruffled."  And it's --

Q.   And we gotta try to focus it a little bitter.  But down here --

MR. LOEVY:  Your Honor, could I hold it up to the jury?  Can I approach and hold it up?  Because it's not working good on the ELMO.

THE COURT:  Yeah.  Okay.

MR. LOEVY:  I'll start with the witness, Your Honor.

THE COURT:  Yes.

(Counsel approaches.)

BY MR. LOEVY:

Q.   Do you see the shirt there?

A.   I do see it.

Q.   All right.

MR. LOEVY:  Can I publish it to the jury, Your Honor?

Judge - direct

626

(Counsel approaches jury box, displays exhibit.)

BY MR. LOEVY:

Q.   All right.  You're saying -- you would agree with me that his shirt in there looks a little rough, doesn't it?

A.   It looks like it's bunched up around his waist, and the neck is stretched out.

Q.   All right.  Is that how he appeared when you were there, sir?

A.   I don't recall.  But if it is, that's not something I would've been concerned with based on all of the circumstances.

Q.   Are you familiar with the phenomenon of -- this is the last area -- false confessions?

A.   Yes.

     MR. NATHAN:  Objection to foundation of this -- for this witness.

     MR. LOEVY:  He -- he said "Yes," Your Honor, but that was a preliminary question.  Okay.

BY MR. LOEVY:

Q.   You took a false confession on that night, correct?

A.   No, I did not.

Q.   Well, you took a confession, and then he told you it was false, right?

A.   Correct.

Q.   So you took a false confession.

A.   No.

Q. And it wasn't your fault, was it?

A. There was no false confession, other than there was an alibi that was false.

Q. Oh, the alibi was false?

A. Yes.

Q. Because you believe he wasn't at the hospital when he said he was at the hospital when the bus was running.

A. I believed he had committed the murder. And where he was at other times during that night, I have no idea. But based on the way he relayed the confession to me, I had no reason to doubt it.

Q. All right. So if you -- and I shouldn't argue with you, but if you didn't take a false confession, then why didn't you take his confession?

Why didn't you get the court reporter and take his confession?

A. Because the investigation was continued.

MR. LOEVY: All right. I have no further questions for this witness, Your Honor.

THE COURT: All right. As I indicated to you earlier, both sides are going to question their -- these witnesses. So this is the defense testimony.

THE WITNESS: Notes? Do you want those?

MR. LOEVY: May I approach to retrieve 'em?

THE COURT: You may.

Judge - cross

628

MR. LOEVY:  Thank you.

(Document tendered to counsel.)

THE COURT:  So you proceed as if on direct.

MR. NATHAN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. NATHAN:

Q.  Good afternoon, Mr. Judge.

A.  Good afternoon.

Q.  When did you start working at the State's Attorney's Office?

A.  In June of 1995.

Q.  And when did you end that job?

A.  In -- sometime in August of 2003 when I left to go into private practice.

Q.  And you testified about your current job.  You're still working as a lawyer?

A.  Yes, sir.

Q.  You mentioned, I think on your direct examination, you haven't seen Detectives Zalatoris or Breen in over 20 years or so, is that it?

A.  Yes.

Q.  Do you recognize anyone else at -- sitting back here?

A.  There are a lot of familiar-looking faces over there, but I couldn't put a name with a face.

Q.  Possible you worked with them before, but you just don't

Judge - cross

629

know for sure?

A.   Correct.

Q.   You don't socialize with any of them?

A.   That's right.

Q.   And that's true for Detective Zalatoris, Breen, Sergeant Bartik, Detective Winstead, Rolston, Struck, Franko, and Girardi, correct?

A.   Correct.  No socializing whatsoever.

Q.   When you were working as a Felony Review prosecutor, can you explain to the ladies and gentlemen of the jury, like, what that means?

        MR. LOEVY:  Objection, asked and answered, Your Honor. I mean, that was the long answer.

        THE COURT:  I think he's gone over that well enough. You can follow up if you need.

BY MR. NATHAN:

Q.   You described earlier that as part of your job as a Felony Review attorney, you would get called out by police officers to review a case as a Felony Review Assistant State's Attorney, right?

A.   Yes.

Q.   And that was a shift that you would have three days on, three days off, and you'd work 12-hour shifts, right?

A.   Correct.

Q.   Were you assigned throughout the entire city?

Judge - cross

630

A.   At the time, in 2003, I was a supervisor on that team.  And so yes, I would have been assigned throughout the entire city.

Q.   So it's not like you were working at a police station or something like that, right?

A.   Correct.

Q.   Your office was where?

A.   26th and California.

Q.   And that happens to be the court building, but there's also an office building as part of that?

A.   Correct.  The administrative building.

Q.   And that's where you worked.

A.   Yes.  Although -- yes, that's correct.  That's where the Felony Review office was.

          MR. NATHAN:  Your Honor, I'd like to show the witness Defendants' Exhibit 95, which --

          MR. LOEVY:  No objection, Your Honor.

          MR. NATHAN:  May I publish that as well?

          THE COURT:  Yes.

BY MR. NATHAN:

Q.   Earlier you testified about something called a Felony Review folder.  Is that -- do you remember that testimony?

A.   I do.

Q.   And what's the purpose of a Felony Review folder?

A.   Generally, if a State's Attorney was called out to document a witness statement, to interview a suspect, to review a case

to determine whether charges were appropriate, a folder was filled out, and eventually that folder made it to preliminary hearings, the grand jury, and then to the ultimate courtroom after the case had been charged.

Q. And on a case, would multiple Felony Review attorneys work on the same folder?

A. We could, yes.

Q. And it would be -- it would open up, and you'd be able to fill in parts, and then another Felony Review attorney working on the same case might fill in a different box along the lines of what we're seeing in Defendants' Exhibit 95, right?

A. That's correct. And often, there was more than one folder used for a given investigation or case.

Q. So, for example, when we're looking -- first of all, are we -- we're looking at a part of a Felony Review folder here as Exhibit 95, right?

A. Yes. I believe this would be page 1. As you open the folder up, it would have been on the left-hand side of the folder.

Q. Do you recognize your handwriting on part of this document?

A. I do.

Q. And where is that?

A. I believe everything down to the first line under RD would have been mine. I think that I filled in "Rubinstein" at the top.

Q.   (Indicating.)

A.   Yes.  And everything from there down to maybe the box that begins with "Arrest."  Although, it looks like maybe the RD, the Arresting Agency, and the Area District may have been my handwriting, also.

Q.   It looks -- this part, this portion here (indicating) is your handwriting, right?

A.   Yes.

Q.   Where you're talking about -- well, let me back up.

     "ASA Judge," that's you, right?

A.   Yes.

Q.   And you documented that you were writing this on March 19th, 2003?

A.   Correct.

Q.   And what did -- you put Start:  3 --

A.   0300 hours, or 3:00 a.m.

Q.   And why did you do that?

A.   That's when I would have arrived at Area 1.

Q.   And what did you put down by Finish?

A.   That 0900 hours is when I would have left Area 1.

Q.   Now, continuing here, there's -- I may have mispronounced this -- Heilegoetter.

A.   That was Heilengoetter, who was a supervisor of the Felony Review unit at the time.

Q.   Is that your handwriting?

Judge - cross

633

A.   Yes.  I would say over to the right of that, where you see it again, "Notify Heilengoetter" and "Approved" above that to the right.

Q.   Here (indicating)?

A.   Those two things are not my handwriting.  But everything to the left of that is.

Q.   Another -- what does this Approved here mean to you?

A.   I suspect that was written once the charges of murder were approved.

Q.   Does that indicate to you that you were working along with other Felony Review attorneys on the same Felony Review folder, and everyone was filling in their portions into the same folder?

A.   Yes.

Q.   Showing you what's been --

        MR. NATHAN:  I'd like to show the witness Defendants' Exhibit 96.

        MR. LOEVY:  Is that his handwriting?

        MR. NATHAN:  It's part of the folder.  It's not --

        MR. LOEVY:  We object, then, Your Honor, to somebody else's notes.

        MR. NATHAN:  We laid the foundation.  It's the same folder.  It's part of his document.

        There was cross-examination about what he did write and what he didn't write, what he did document or what he

didn't document based on the statement, and --

THE COURT:  Okay.  So --

MR. NATHAN:  -- this is to rebut that.

THE COURT:  -- you can show him -- I mean --

MR. LOEVY:  This is somebody else's notes, Your Honor.

MR. AINSWORTH:  It's hearsay.

MR. LOEVY:  Which makes it hearsay, whatever it is.

MR. NATHAN:  Let me lay the foundation.

THE COURT:  What are you trying to establish?  What he wrote on the paper?

MR. NATHAN:  Mr. Loevy was arguing that Mr. Judge did not tell anybody or didn't put in his notes that --

THE COURT:  Right.

MR. NATHAN:  -- Mr. Fulton had recanted, and this is rebutting --

THE COURT:  And you have evidence --

MR. NATHAN:  -- that from the same Felony Review folder.

THE COURT:  -- that he did put it in his notes?

MR. NATHAN:  This is evidence that he -- it was documented in the same folder.

MR. LOEVY:  Your Honor, he's misleading.  He's -- Mr. --

THE COURT:  Okay.  Let's go off --

MR. NATHAN:  I'd like to --

(Proceedings heard at sidebar:)

MR. LOEVY: Mr. Nathan just implied that there's evidence that he documented that the confession was false. He did not.

This witness said, "I told somebody." He said that. I assume -- I'm inferring what he's gonna show is somebody else's notes saying, "He told me."

That's someone else's notes. That's hearsay. You can't go through this witness. You can -- you know, he said he told somebody. You can't bring in someone else's notes to prove that happened.

MR. NATHAN: This is part of the same document. He laid the foundation for it. It's one and the same. He wrote some things into the document. Another State's Attorney, who will also be testifying, wrote what I'm about to ask him into the document.

MR. LOEVY: There you go.

MR. NATHAN: I believe this witness is going to testify that he -- after hearing from Mr. Fulton that he was at the hospital, he told Mr. Rubinstein, and he made sure that that was checked out.

MR. LOEVY: So we don't have an objection to him saying he told Rubinstein. We do have an objection if those are Rubinstein's notes.

We asked them to bring the original folder so we could

see how it's put together, because all we have is photocopies --

MR. NATHAN: No. This is the State's Attorneys. Not us.

THE COURT: Okay.

MR. LOEVY: We had subpoenaed that, too.

THE COURT: So you can ask him if he told Rubinstein. If he doesn't remember, then you can refresh his memory with anything.

MR. LOEVY: Although, Your Honor, that's somebody else's notes. As long as he doesn't say, you know, what it is -- I mean, it's hearsay. Rubinstein's going to testify. Rubinstein can say, you know, that, "He had told me."

THE COURT: That's true, Rubinstein is here.

MR. NATHAN: Okay. I'll lay the foundation.

(Proceedings heard in open court:)

BY MR. NATHAN:

Q. So I'm going to ask you questions going through chronologically. So I -- but I apologize, I'm bouncing around a little bit.

Just Mr. Loevy had asked you questions about whether you personally documented the fact that Mr. Fulton, after confessing, then said, "No. I was at the hospital."

Did you actually tell your colleague, Mr. Rubinstein, about that?

A. Yes.

Q. Okay. Going back to your process.

So you arrived at the police station, according to your notes, at 3:00 a.m. and you learn about the investigation, right?

A. Correct.

Q. And you covered -- you were trying to familiarize yourself as much as you can, and then you talked to Mr. Fulton, right?

A. Right.

Q. When you went in there to talk to Mr. Fulton, who was doing the questioning?

A. I would interject questions, but for the most part, he was giving his statement.

Q. Was it the detectives asking questions or you were asking the questions?

A. It would have been me.

Q. And why is that?

A. Because I wanted to hear what Mr. Fulton had to say. And so as he was going through his story, if I had a question or needed an additional bit of information, I would ask for that information.

Q. And I understand you weren't taking notes as he's talking.

Why is that?

A. I didn't need to take notes at that time.

Q. When would you have taken those notes?

A.   Well, I -- after I was done speaking with him, then I documented the confession in the Felony Review folder. That's -- and that would have happened after I left the room.

Q.   And just showing you what's been marked as Exhibit 97.

You would have written these notes as soon as you left the room with Mr. Fulton?

MR. LOEVY:  Objection, leading, Your Honor.

MR. NATHAN:  Well --

THE COURT:  Sustained.  We've been leading all day, but let's see.

MR. LOEVY:  Well --

BY MR. NATHAN:

Q.   When would you have written these notes relative to your conversation with Mr. Fulton?

A.   After leaving the room and before leaving Area 1.

Q.   Before 9:00 a.m.?

A.   Yes.

Q.   You testified earlier about a practice you had.  At the conclusion of an interview, you would always ask certain questions.

Remember that?

A.   Yes.

Q.   What would you ask?

A.   I would always ask an individual how the police had treated them; whether they had been given something to eat or drink,

whether they wanted anything to eat or drink; whether they had any complaints whatsoever about their interactions with the police.

Q. And why did you do that, ask those questions?

A. Because I wanted to make sure there were no issues. And I wanted to make sure that if, for example, in this case, the confession was final and we were gonna memorialize it, wanted to make sure that that confession was voluntary.

Q. And, in fact, you did ask Mr. Fulton those same questions, right?

A. Correct.

Q. And you remember times in your career where you got an answer of, "I would like to eat," and what would you do in response in those situations?

A. Usually if I was at a police station and we had been there for hours -- sometimes it could be 12 hours, it could be 24 hours that I was there -- as we're bringing witnesses in and interviewing them, if a suspect was hungry and I was hungry, I would go and grab something for everybody to eat and bring it back.

Q. And you would buy it yourself?

A. I've done that, yes.

Q. Do you remember the interview room that you were in with Mr. Fulton?

A. Yes.

Judge - cross

640

Q.   Describe it for us, please.

A.   Like I said earlier, it was roughly 20 by 20.  There was a table similar to the one that Mr. Fulton's sitting at now, a little bit smaller, though.  And there were chairs on either side of it.  I recall either a blackboard or a whiteboard in the room.

       This was a temporary police station, so it wasn't an interrogation room or anything like that.  This was simply a conference room.

Q.   Were there any windows?

A.   There was a window, yes.

Q.   So you could see the daylight?

A.   I don't recall if there was anything on the windows, but my recollection is, yes, you could see out.  There were no bars on the windows or anything like that.

Q.   Before talking to Mr. Fulton, did you give him any warnings?

A.   I had advised him of his Miranda warnings.

Q.   And did he agree to speak to you?

A.   He did.

Q.   Did he ask for a lawyer?

A.   No.

Q.   So I don't want to read this entire thing, but in summary, when you were talk -- you were talking to Mr. Fulton for about an hour here?

A.   Yes.

Q.   And the gist of it is he tells you about this story about -- he tells you about how he was gonna buy a gun from the victim, right?

A.   Correct.

Q.   And ultimately, he ends up getting ripped off by the victim.

A.   Correct.

Q.   And then Precious, Ms. Johnitta Griffin, puts him in touch with the victim, and then he, along with Mr. Mitchell and Mr. Shaw, kill the victim.

A.   That was the gist of his statement.

Q.   Did he tell you anything about the way -- about what he and Mr. Mitchell and Shaw were wearing that night?

A.   Yes.

Q.   What did he say about that?

A.   As he was going through his statement, I asked him what they were wearing.  I don't recall which one of them had on what, but he indicated they were a wearing black hoodie, a red hoodie, and a white hoodie.

Q.   And why did you ask him that question?

A.   As he was going through his statement and the detectives were in the room, I had, before going into the room, read the offense report or the RD report.  And the RD report, my recollection -- I haven't looked at it for a number of years --

there's an individual looking out of his back window, saw a fire in the alley, and called the fire department. And when they arrived, they found Mr. Collazo's body burning.

He described two individuals out in the alley standing at or over the fire, one wearing, I believe, a black top and one wearing a red top or coat.

Q. And what happened next?

A. Well, that came up during the one hour that Mr. Fulton was relaying his story to me.

After the detectives stepped out of the room, that's when he leaned over and told me he had made it all up.

Q. And what did you say?

A. Well, his exact words at the time -- he leaned over and he said, "What if I were to tell you that everything I just said, I made it up?" At that point, I said, "Well, are you telling me you made it up or are you giving me a hypothetical question here?" And he said, "No. That's what happened. I made it all up." And so then I asked a few more questions to get closer to the bottom of it.

Q. And what was that?

A. I told him that, "I've seen you sit in here with the detectives for almost an hour. You're calm. You don't appear to be fearful of the detectives. Why would you make this story up?" And he said that he just wanted to shut the detectives up.

Judge - cross

643

Q. When you were talking to him for that about hour, and he's telling you about abducting Mr. Collazo and killing and burning him, what was his demeanor like?

A. It was very conversational. He was calm, no distress, wasn't agitated, he wasn't scared, at least to my eyes. I couldn't see any of that.

Q. I mean, you were an experienced Felony Review prosecutor, correct?

A. Yes.

Q. You had done 50 to a hundred interviews.

A. Yes.

Q. And you, I mean, for lack of a better term, like, you're socially aware.

A. I think I understand what you're saying, and yes, I am.

Q. Mr. Loevy is saying: Well, you didn't know what happened before you got there, and that's obvious, right?

A. Right.

Q. But when you're interacting with Mr. Fulton for a full hour, having a conversation with him, did he, like -- was there anything going off in your head?

A. There was nothing going off in my head.

Q. Was he -- like, any indication whatsoever that he was being pressured at all?

A. None.

Q. Anything -- did you believe him when he was giving this

confession?

A.   I did.

Q.   Why?

A.   Well, number one, it lined up with what other witnesses in the case were saying.  It lined up with evidence that had been collected in the case.  And just the way he was telling the story, it's not something that a person will tell you if they weren't involved.  People don't tell you they murdered and burned someone if they didn't murder and burn someone.

Q.   Were you telling him what to say or was he telling you his account?

A.   He was telling me his account of the story.

Q.   I mean, I am kind of guilty of asking leading questions a lot, but was he -- were you asking questions, giving him information, or he was giving you the information?

A.   He was giving me the information.

Q.   When he finally said he made it all up, did he say that anyone told him what to say?

A.   No.

Q.   So what did you interpret by him making -- saying, "I made it all up"?

A.   I interpret an individual who was sitting there -- he was a fairly young man.  This didn't seem to be the type of thing that he would have been involved in, and certainly had never been involved in before.  And I interpreted that the wheels

were turning and he was still trying to figure out a way to get out of it.

Q.   So you interpreted that he was -- he had committed this murder, but he didn't know how to get out of the situation?

A.   Correct.

Q.   Just to be clear -- I asked a question before.  I just want to make sure I ask specifically.  Did -- when he said, "I made it up," he didn't say the police told him to say anything, right?

A.   He never told me that.

Q.   Nothing of the sort?

A.   Nothing.

Q.   So you said earlier on direct examination that in your view, after he told you this confession for an hour and then he said, "Wait.  I was really at hospital," you may have -- you think you probably had enough to charge him at that point?

A.   Certainly.

Q.   Why?

A.   Well, because he had confessed to a murder.  What I didn't want to happen, though, is we go out and we get the tapes, and he's on the tapes, and now nothing lines up.

So I believed everything he had told me about the murder.  Again, it all lined up with the evidence in the case. It was all consistent.  And it's not something that I believe he would have been confessing had he not been involved in the

Judge - cross

646

murder.

THE COURT: How much more do you have? It's about time for a break.

MR. NATHAN: I probably have about ten minutes.

THE COURT: Can you take ten minutes? Okay.

(Jurors nod. Counsel confers.)

BY MR. NATHAN:

Q. Relating to your Felony Review notes -- actually, let me pick up where I left off.

Even though you thought you had -- you did have enough to charge, because he had confessed to you, you decided to continue the investigation, right?

A. Yes.

Q. And you indicated that in your notes, right?

A. Yes.

Q. What does that mean, "continue the investigation"?

When you say in your notes "continue the investigation," what does that mean?

A. It means that suggestions have been made to the police, additional things that need to be checked out or could be checked out. And so before we approve charges, we want to know what the answers to those outstanding issues are.

Q. And in this case, part of continuing the -- well, I'll show you Defendants' Exhibit 95 from your notes.

Here, where it says "CI," "BY: ASA Judge, CI" --

Judge - cross

647

A.   Yes.

Q.   -- what does that mean?

A.   "Continue investigation."

Q.   And you testified before on direct examination that continuing the investigation in this case included what?

A.   Well, the suggestions I had made were checking into the alibi he had given, the visit to the hospital, going back home, seeing if there were videotapes, and then talking to the other individuals who he was telling us were involved in the murder.

Q.   When Mr. Loevy was asking you questions about why didn't you document in your notes that he had -- that Mr. Fulton was now saying, "Really, I was at the hospital," do you believe it was, in fact, documented?

A.   Well, that's what the "continuing the investigation" was for.

Q.   And did you also talk to your fellow Felony Review attorneys?

A.   Yes.

Q.   And do you have an understanding of whether they actually did some continued investigation?

A.   I know very little about what happened after I left, but I do understand that there was more investigation done, and eventually charges were approved.

Q.   Do you have an understanding of whether or not Mr. Rubinstein, your colleague, did go to the hospital?

A. I'm not certain what he did after I left or not.

Q. Mr. Loevy asked you why didn't you have Mr. Fulton sign your notes.

Do you remember that question?

A. Yes.

Q. Is that protocol?

A. I never had a suspect or a witness sign a Felony Review folder ever during the entire time I was there.

Q. And why is that?

A. Because that -- these are my notes. It's not -- this is a summary. It's not word for word what he told me, but this was more of a summary to let the people that picked up the folder in the future know where things stood when I left.

Q. And, in fact, if a suspect would like to give a statement, there is a way for him to do that that's not in your notes, right?

A. Correct.

Q. And what would that look like?

A. Well, I think counsel held up a handwritten statement earlier. That would be a more detailed, more thorough recitation of what the witness or suspect had told me.

At the end of writing that down, we would then go through it word for word. I'd let the individual who I was taking the statement from review it, make changes to it. If changes were made, we would initial them.

And at the end of the statement, once it was exactly the way the witness or suspect wanted it, I would sign it, the suspect would sign it, and I think the detectives would normally sign off on that as well.

Q.   On the handwritten statement?

A.   Yes.

Q.   And a suspect -- if you wanted to record a statement, you could also give a transcript, a court-reported statement?

A.   Yes.  If we were to the point where we were going to formally document the statement, I would offer:  We can stick with the oral statement, and you can trust me to make a detailed memo of what you told me.  You can give a handwritten. In that case, I write it down as we're talking through it again.  You get to make changes.  You get to finalize it.  I can call a court reporter out.  I'll ask you questions, you'll answer those questions as the court reporter is typing down everything.  Or we can bring a videographer out and we can videotape your statement while I'm asking questions and you're answering those questions.

Q.   Do you have an understanding about whether or not Mr. Fulton was offered to give a videotaped statement?

A.   He was not offered by me to give a videotaped statement.

Q.   So you just don't know if somebody else may have done that or not?

A.   That's correct.

Q.  You talked about how your memory of Mr. Fulton was that he was calm and conversational.

Is that actually -- you actually remember him, right?

A.  Yes.

Q.  And do you know why you remember him as opposed to any of the other fifty?

A.  There are some cases that stick out in my head this many years later.  And this was a fairly brutal murder.  Again, Mr. Fulton didn't fit the profile at the time in my opinion.  He was a young kid.  No disrespect there.  But -- and just the way that he presented himself and relayed the facts of the case to me, it sticks with me.

Q.  If the body was found at 3:00 a.m. on March 10th and Mr. Fulton had a video showing him somewhere else at, say, 11:57 p.m., to you, does that mean you can't approve charges?

A.  No.

Q.  I think I may have gotten sidetracked before.

You testified that Mr. Fulton talked -- told you in your initial statement, in the hourlong statement, that -- about what he was wearing.  He was --

A.  Yes.

Q.  What they were wearing, red and black and -- what was it, white?

A.  A white hoodie, yes.

Q.  And then in the recant, did that come up again?

Judge - cross

651

A.   It did.

Q.   What happened there?

A.   Well, after I made my observation that, "I've seen you sitting here with the detectives this entire time.  You don't appear fearful.  You've been conversational with me.  You don't seem to be in any distress.  So why would you make up a statement?"  And he said, "Well, I wanted to shut the detectives up."

And I said, "Well, let me ask you a question.  Do you remember earlier, as you were going through your statement, I stopped you and I asked you what the three of you were wearing that night?"  And he said, "Yes."  "And you told me, a red hoodie, a black hoodie, and a white hoodie."  He said, "Yes." And I said, "What if I were to tell you" -- and I leaned over the table, kind of like he had leaned over with me.  I said, "What if I were to tell you that the man who saw Chris Collazo's body burning, while looking out his window, described two individuals, and they had on a black top and a red top?" And he said, "That wouldn't be good for me, would it?"  And I said, "No, it wouldn't.  So do you want to stick with this, that you're making it all up, or do you want to tell me the truth?"  And he said, "No.  It's all made up.  Go check the videos."

Q.   And what about that encount -- what did that encounter make you think?

Judge - cross

652

A.   It made no sense to me.  Because I then asked him, "How did you come up with that information?  Did the police tell you that, what the individuals were wearing?"  And he said, "No.  I made it up."  And I said, "How would you make up what you were wearing?"  And he said, "Well, I know that one of my friends has a black hoodie.  I've got a red hoodie and a white hoodie.  And I knew if the police wanted to come out and check into this, to see if it was accurate, that they would find these hoodies."  And I said, "That makes no sense to me whatsoever."

Q.   And why -- what did that leave you with the impression?  What impression did that leave you with?

A.   That he was being less than honest with me about making it all up.

Q.   And when you left that conversation, did you believe the hourlong statement that he had given you about the murder or his story about the hospital?

A.   I believed that he was involved in the murder.

Q.   Did you testify at Mr. Fulton and Mr. Mitchell's criminal trial?

A.   I don't think I've ever been involved with Mr. Mitchell's case at all.  And I don't remember if they were tried together.  But I did testify at Mr. Fulton's trial.

Q.   And did you testify over there, to the best of your ability, about the statement that Mr. Fulton gave you?

A.   I did.

MR. NATHAN: That's all I have.

THE COURT: All right. We'll take a 15-minute recess.

(Jury out at 2:41 p.m.)

THE COURT: So you understand, I'll give each of you one more crack at the witness. So you can redirect, both sides.

MR. LOEVY: Thank you, Your Honor.

THE COURT: Or recross, however it is.

(Recess at 2:42 p.m. until 3:00 p.m.)

(Proceedings heard in open court; jury in.)

                    REDIRECT EXAMINATION

BY MR. LOEVY:

Q.   Hello, sir.  If I understand your testimony, you do have a memory about this case somewhat, right?

A.   Yes.

Q.   Something was off about the situation, right?

A.   I don't know if I'd say "off."

Q.   Well, you had a kid who just didn't really fit the profile of someone who would beat someone to death, execute them, light them on fire, right?  You just didn't -- I think you said that to Mr. Nathan, it just didn't seem to fit?

        MR. NATHAN: Objection.  Motion in limine.

        MR. LOEVY:  There's no such motion, your Honor.

        THE COURT: He said something to that effect.

BY THE WITNESS:

Judge - redirect

654

A.   No, that's -- that's not what -- I didn't think that was off in any way.  That was not unusual.

BY MR. LOEVY:

Q.   Didn't you say to Mr. Nathan, you know, it just wasn't adding up, this kid seemed like not the kind of kid.  Did I misunderstand you, or you did say that?

A.   No, he didn't seem like that.

Q.   Okay.  You did say that?

A.   Yes.

Q.   Okay.

A.   Yeah.

Q.   So that was strange, right?

A.   I don't know if I'd say "strange."

Q.   You said his affect was a little bit off for the situation, right?

A.   No, I did not.

Q.   I thought you said he's confessing to lighting a man on fire, a crime that could put him away forever, right?

A.   Yes.

Q.   Yet he seemed like all he had to do was get through this and he could go home.  He seemed calm and ready to go, right?

A.   I don't think he believed all he had to do was through this and he could go home.

Q.   But he said --

A.   But he was calm, absolutely.

Q.   So he didn't seem like a guy who was, like, "Listen, I appreciate the gravity of the situation.  If I give you this confession, I'm going to get the death penalty and die."  He didn't seem like that?

A.   The death penalty was never discussed while I was there.

Q.   He more seemed consistent with a kid who figured he had to get through this and then he's good to go.  He seemed calm, and he thought he was done, right?

A.   I -- no, not at all.

Q.   All right.  This conversation you told Mr. Nathan about where he leaned over the table and he said this and he said that and how his voice went, there are no notes about that conversation, right?

A.   Other than the transcripts, nothing in my felony review folder.

Q.   Transcripts from testimony you gave at his trial three years later, right?

A.   Yes.

Q.   All right.  So that -- there's nothing contemporaneous that allowed you to remember all that detail you told Mr. Nathan, right?

A.   No notes taken that evening.

Q.   So you couldn't -- if you wanted to remember, there was nothing to look back at; you're just all going on what you remember or think happened?

A.   Correct.

Q.   And you told Mr. Nathan there was no indication whatsoever that he had been pressured.  Do you remember telling Mr. Nathan that?

A.   Yes.

Q.   Well, one indication was as soon as the police left the room, he said, "I just gave you a false murder confession because I had to get those guys to stop."

That's some indication of pressure, right?

A.   Not necessarily.

Q.   You said that the confession seemed to line up with everything the police knew, right?  That's what made this true for you?

A.   Everything that I had read in the documents, the statements by the other witnesses, yes, it all added up.

Q.   So he's talking about duct tape and gas, gasoline and Foster buses, and that's exactly what the police's theory of the case was.  It matched, right?

A.   It matched all of the evidence that had been collected up to that point.

Q.   Right.  And you don't know if those ended up in Fulton's mouth because Fulton was actually the killer or because the police transmitted it to him.  That's not something you know either way?

A.   That's correct.

Q.   Now, I understood you to tell Mr. Nathan -- can I have the ELMO, please -- that although we agree -- we agree that your notes do not in any way reflect that he was saying the confession was false, right?  That's true?

A.   Correct.

Q.   But up here in the corner, this letter CI?

A.   Yes.

Q.   That's supposed to tell everybody that reads this file next that the confession was false?

A.   No.

Q.   All right.  If I -- that's not what you meant to tell Mr. Nathan?

A.   No.  By continuing the investigation, anyone that came on to the case after that would read my notes and talk to me to figure out what I had been involved with and what my observations were.

Q.   All right.  You asked -- Mr. Nathan asked you if it was not protocol to have Mr. Fulton sign your notes, right?

A.   Correct.

Q.   You're never going to do that?  He doesn't get to sign your notes, right?

A.   It never happened --

Q.   Sure.

A.   -- in any case I was involved in.

Q.   It would never happen?

Judge - redirect

658

A.   Right.

Q.   What happens is, you're supposed to let Fulton give a statement in his own words, have an opportunity to make changes, and then sign it.  You could have given him that opportunity, right?

A.   Not at that time because there were still issues hanging out there that needed to be investigated.

Q.   I said you could have.  You could have locked him in right there and then about what his story was, right?

A.   I wouldn't do that if -- since he had given me an alibi.

Q.   Yeah.

A.   I would never do that.

Q.   Well, another reason you wouldn't do it is because he said it's all false.  Did that play into you not taking a statement?

A.   Absolutely not.

Q.   But just so we're clear, he never got the opportunity from you to give a court-reported statement or a video statement, it was not up to him?

A.   I didn't offer that to him --

Q.   All right.

A.   -- and he didn't ask for it.

Q.   You asked the -- about the windows in this room.  You must have been in this room many times or in rooms like it many times, right?

A.   No.  I think actually, this was a temporary police station

while 51st and Wentworth was being remodeled, and I believe this may have been one of the only times I was there. And I think it's the only time I was ever in that room. Every other time I was there at Pershing, I was in one of the holding cells where individuals were kept.

Q. So in most of the rooms you were in back then, there's no windows, right?

A. Correct.

Q. Because the whole point of the interrogation room is the person is supposed to be isolated, right?

A. Well, there was always a window on the door, I believe, if memory serves correct.

Q. They put paper over it, right?

A. I guess they could. I don't recall one way or the other.

Q. You don't remember either way whether they used to put paper on that window?

A. Yeah, it certainly didn't apply in this case. And again, maybe it happened sometimes, maybe it didn't. I'm not sure.

Q. All right. But you don't claim to remember the furniture and configuration and window setup of every room you ever interviewed somebody in, right?

A. No.

Q. And you have no notes that say there was a window, no picture that say there was a window, right?

A. No. This was a unique room.

Judge - redirect

660

Q.   When is the last time you've been in that room?

A.   That day.

Q.   22 years ago?

A.   Yes.

Q.   And you remember the room?

A.   The details I provided, yes, I remember them.

Q.   But you're not going off notes, you're not going off transcripts, you're just remembering?

A.   Yes, correct.

Q.   Do you remember the other rooms that you were in on other occasions with other suspects?

A.   Some of them.

Q.   Mr. Nathan asked you if there were times when you'd be at the police department and suspects would complain that they hadn't been fed.  Do you remember those questions?

A.   Yes.

Q.   All right.  And when suspects at the police department who you were interrogating said that they were complaining that they hadn't been fed, you would go out and buy it yourself, right?

A.   I don't think I said they complained about not being fed. I think what I said is if I asked someone if they wanted something to eat and they said, "Yeah, I'll take something to eat."

Q.   All right.

Judge - redirect

661

A.   There were occasions where I would go get it.  There were occasions when the police officers would go get it.

Q.   Why would you have to go out and get them food?

A.   Because I was also going to get myself food, so why should I drive to McDonald's and the detectives drive to McDonald's when I was already going.

Q.   All right.  Wouldn't it make sense if the police officers were actually feeding people at regular intervals?

A.   If -- in my experience, they did.  If people asked for food, if they asked for drink, it was provided to them.

Q.   All right.  If they're in a police station with a lockup, there's meal service, right?

A.   Not -- well, you'll have to ask the police officers, but I don't believe there was meal service at this station.

Q.   I'm not asking about this station.  I'm asking at a lockup, there's usually meal service, right?

A.   I've never had a meal at a police station lockup ever, and I've never seen a service at a police station lockup bring out a prepared meal ever.

Q.   People stay in these rooms for days and days.  There's got to be some system for feeding people other than, "Hey, the State's Attorney will go to McDonald's for you"?

A.   Or the police will go and get food.

Q.   All right.  So at the police department, no matter how long you stayed there, you weren't going to eat unless he was in the

kind of mood to reach into his wallet and go to McDonald's for you? That's how he could eat?

A. I have no idea what their financial arrangement was for providing food to suspects.

Q. All right. But if you wanted to buy McDonald's, it was coming out of your pocket?

A. It did, yeah.

Q. That's not a very good system for getting people fed, is it?

MR. NATHAN: Objection. Foundation. Relevance to "system."

MR. LOEVY: I'll move on, your Honor.

BY MR. LOEVY:

Q. Did you tell Mr. Nathan you stayed until 9:00 a.m.?

A. That's what my folder says, yes.

Q. All right. So between when you left the room -- what time did you leave the room after he said it's all not true?

A. Roughly an hour. I was in the room for roughly an hour, so sometime around 6:00, 6:15, give or take.

Q. So what time is he done telling you it's all false?

A. Sometime around 6:00 or 6:15, give or take.

Q. So you spent another two and a half hours, and there wasn't a whole lot of conversation with the police and Mr. Fulton about what's going on here?

A. After I advised Detectives Zalatoris and Breen that he had

told me he made it all up and given me the alibi, my recollection is their shift was done and new detectives were coming on at the time.

Q. I'm just trying to understand where that two and a half hours went if not trying to get to the bottom of this.

A. Well, at some point I would have spoken to my supervisor as indicated in the felony review file. I went down to the parking lot, looked at the car. I came back up. I wrote the folder. I'm not sure where it went.

Q. All right. You said you remember Mr. Fulton now. You are not a disinterested witness, would you agree?

MR. NATHAN: Object to the form.

MR. LOEVY: Bias is always relevant, your Honor.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Would you admit you have some bias here?

A. I'm not sure what you mean by that.

Q. In other words, if Mr. Fulton's telling the truth, then you committed a pretty serious professional misconduct, would you agree?

A. Absolutely not.

Q. If Mr. Fulton's telling the truth, do you think that puts you in a bad light?

A. No.

Q. If he told you that, "The Chicago Police Department, I just

Judge - redirect

664

gave a false confession to them," as soon as they get out of the room he said, "Look, they made me false promises, they told me I was going to go home, they told me I was going to get in big, big trouble if I don't, that's the only reason I confessed" and you didn't do something about it, that would look -- you would look bad, wouldn't you?

A.   Yeah, but that didn't happen in this case.

Q.   I understand.  And you have a motive to say it didn't happen, right?

A.   It didn't happen.  That's my motive.  It didn't happen.

Q.   Let's talk about the red hoodie.  You told Mr. Nathan that story about the red hoodie?

A.   Yes.

Q.   That's not in your notes?

A.   Correct.

Q.   That's not in a memo?

A.   Correct.

Q.   It's not in a police report that he told you these things?

A.   Correct.

Q.   It's just all from memory?

A.   That's right.

Q.   How do you know he didn't say a yellow hoodie and a red hoodie and a blue hoodie?

A.   I was struck by the fact that what he told me while he was going through his statement lined up with what an independent

eyewitness had seen while looking out their window at the body while it burned in the alley. It lined up.

Q. And --

A. If he would have told me purple and brown, I never would have thought twice about it.

Q. Are you saying there's a witness who saw a black hoodie, a white hoodie, and a red hoodie?

A. My recollection is that the RD or the offense report in this case indicated that when the individual looked out the window and saw the body burning -- he didn't think it was a body, but he saw something burning, called the fire department, that he saw two individuals standing over the, whatever was burning, with a red top or coat and a black top or coat or something along those lines.

Q. So let's break that down. First of all, the eyewitness saw not three people, right?

A. Two people.

Q. Right. In the confession scenario, how many people were there?

A. Three.

Q. Correct. So that's a first problem, right?

A. It's not a problem. It was his observation, and it lined up with the story that I had been provided.

Q. You just said it lined up. In the story you were told, three guys, Riff, Fulton, and Sticks, did this crime and then

an eyewitness said, "I looked out the window, and I saw fire and I saw two guys."  And you're saying it lined up.  It doesn't line up.

A.   It absolutely lines up with the --

Q.   Okay.

A.   -- story that was provided to me.

Q.   You would have had access to the police report, the arrest report, right?

A.   I would not have or would have?

Q.   Would have.

A.   I think I did, yes.

Q.   All right.  And you're saying that there was a white hoodie, a black hoodie, and a red hoodie?

A.   No.

Q.   What are you saying?

A.   What I'm -- I've said that there were two individuals, correct.

Q.   Yes.

A.   So there were two hoodies, two tops, two coats that this individual observed.

Q.   So how do you remember it was white, black, and red?

A.   Because it lined up with Mr. Fulton told me.

Q.   No, it doesn't line up.

A.   It was consistent with what --

Q.   I mean, that's not.  There's two people in the story the

witness is saying --

MR. NATHAN: Objection. Argumentative. Asked and answered.

MR. LOEVY: -- and Fulton's saying red, white, and black. How does that fit?

THE COURT: He's under cross. Go ahead.

BY THE WITNESS:

A. It fits because two of the three people involved were observed out the window. The guy didn't testify he was looking out his window for an hour. He didn't observe that he saw everything that happened. He glanced out, saw fire, and called the fire department.

BY MR. LOEVY:

Q. All right. And he actually wasn't talking about hoodies, was he? He was talking about jackets?

A. That's my recollection.

Q. All right. So that doesn't match at all, does it?

A. My recollection is the colors matched.

Q. All right. But he said he saw jackets, and in this allegedly false confession -- actually, the hoodie didn't get into the confession, did it? It's not in your notes?

A. That's correct.

Q. So I don't want to belabor it, but when you wrote it up, you didn't say anything about, "He told me I had a white and a black and a red hoodie," right?

Judge - redirect

668

A.   That's right because it had nothing to do with commit -- the commission of the murder.

Q.   No.  You wrote the notes of what he told you, and he didn't say red, white, and black hoodie.  It's nowhere in your notes, right?

A.   That's right.

Q.   How did -- how do you know that it was significant that there was a red hoodie?  Who told you that?  The police?

A.   No.  The police never mentioned it to me.  It wasn't a fact that they had even referenced.

Q.   You spent two hours before you went in the room with Fulton familiarizing yourself with the reports, right?

A.   Familiarizing myself, looking at the -- talking to the police officers, looking at anything that would have been in the file at the time.

Q.   Right.  And you would have had access to the reports, right?

A.   I believe I would have if it was in the file.

Q.   All right.  So John told you there was duct tape, right?

A.   Yes.

Q.   That he used duct tape?

A.   Yes.

Q.   And then he later said that was false, right?

A.   He said the entire story was false.

Q.   All right.  The entire story:  The duct tape, the bus, the

gasoline, the hoodie. He said the entire story was false?

A. Yes.

Q. So what's the difference between him saying, "I didn't have a red hoodie and I used duct tape and I used gas"? He's saying it's all false. I don't get why we're talking about hoodie.

A. We're talking about hoodies because it's quite a coincidence that it lined up with what an independent witness had observed.

Q. I see. But everything lined up. The duct tape lined up.

A. It did.

Q. It all lined up?

A. Yes.

Q. But you don't know if it came from Fulton or the police, right?

A. No, it came from Mr. Fulton to me.

Q. You don't know where it came first?

A. I wasn't there prior to 3:00 a.m. that morning.

Q. You know, if Mr. Fulton's saying, "Hey, I committed a murder 11 days ago" -- because you're talking to him on the 18th, right?

A. No. I think it was the 19th.

Q. 19th. Sorry. And the murder is back on the 9th?

A. The 9th and 10th, yeah.

Q. So it's ten days ago. Wouldn't it have been strange if he actually did remember, "Oh, one friend is wearing white. One

friend is wearing black."

That's not the kind of memory humans actually remember, is it?

A. I'm not sure about that, but the fact is that's what he told me.

Q. All right. Just one more area, sir. Was -- was this just business as usual at the police department, or do you think there's something very strange going on here?

A. This was pretty much business as usual.

Q. All right. And you said, I'm not charging this until we check out the hospital video, right?

A. Yes.

Q. Why was it important to check out the hospital video?

A. Because he was giving an alibi, and if that alibi checked out, if it established that there was no way that he could have been at Rockwell and Foster in that area that night or around where the body was burning, absolutely no way, then we would have -- we would have had to dig further.

Q. Because the confession you took had him get -- abducting the body at Rockwell and Foster when the bus dropped him off, right?

A. That's what it -- that's what it says in my notes.

Q. And the idea was he was talking to Precious Griffin in the evening hours on the 9th, right?

A. I believe it indicated on the 9th, he spoke to Precious,

yes.

Q.   All right.  So it's all going to come down to if that video shows him on the hospital at March 9th that evening, right? You weren't going to charge it until you got the answer to that question?

A.   It doesn't all come down to that.  I think you could have both things happen.

Q.   You weren't going to charge it until that -- until you determined whether he was on that video, right?

A.   We were going to check the alibi.

Q.   All right.  If it didn't matter, then why not charge him anyways?

A.   Because there may be more to it.  The other -- the other part of the continuing investigation was the other suspects had not been interviewed.

        MR. LOEVY:  I have no further questions.

        MR. NATHAN:  Just very briefly.

                RECROSS-EXAMINATION

BY MR. NATHAN:

Q.   Mr. Judge, was the case report one of the documents that you had available to you that night -- that day when you were interviewing Mr. Fulton?

A.   Yes.

Q.   Would it help --

A.   I believe you're referring to the RD, or the general

offense case report.

Q. The general offense case report.

A. Yes.

MR. NATHAN: I'd like to show you that. At this point, I'm not publishing it. I'm just showing it to the witness.

BY MR. NATHAN:

Q. Is this the general offense case report --

A. Yes.

Q. -- that you were referring to earlier?

A. Yes.

Q. And what time does it list as the date of the occurrence, date and time?

A. March 10th, 2003, at 3:05 a.m.

Q. In your mind, is the occurrence, meaning the body being found or reported burning at 3:05, is that inconsistent with Mr. Fulton being at the hospital at 10:00 o'clock or 10:30?

MR. LOEVY: Objection. Scope, your Honor, unless I'm going to be permitted to go into this area too.

MR. NATHAN: I can move on.

THE COURT: What did you say?

MR. NATHAN: You know, I'd like the witness to answer.

MR. LOEVY: I was saying that it's scope then, your Honor, unless I can be permitted to ask it too. We didn't cover this.

THE COURT: Was it covered on your direct?

MR. LOEVY: Not about the 3:05 when they discovered the body, your Honor.

MR. NATHAN: The alibi issue was brought up on recross.

THE COURT: I'll let him answer.

BY THE WITNESS:

A. The answer is, the body burning at 3:05 would not be inconsistent with Mr. Fulton being at the hospital the day before at 10:00 p.m., 10:30 p.m.

MR. NATHAN: That's all I have. Thank you.

THE COURT: All right then. Thank you for your testimony. You're excused.

THE WITNESS: Thank you, Judge.

(Witness excused.)

MR. AINSWORTH: Your Honor, at this time plaintiffs call Dr. Richard Leo.

Doctor, if you'd just take the stand.

THE COURT: Good afternoon, Dr. Leo.

THE WITNESS: Good afternoon.

THE COURT: Would you raise your right hand to be sworn?

(Witness sworn.)

THE WITNESS: I do.

RICHARD ANGELO LEO, PLAINTIFFS' WITNESS, DULY SWORN,

Leo - direct

674

DIRECT EXAMINATION

BY MR. AINSWORTH:

Q.   Good afternoon.

A.   Good afternoon.

Q.   Would you please state and spell your name for the record?

A.   Sure.  My name is Richard Angelo Leo.  My last name is spelled L-e-o, and my first name is spelled R-i-c-h-a-r-d.

Q.   We've asked you to be an expert witness in this case; is that right?

A.   Correct.

Q.   And are you an expert in the field of the phenomena of false confessions?

A.   I am, yes.

Q.   All right.  Sir, and I saw you walked up to the stand with some paper in your hand.  What do you have with you?

A.   So I have my curriculum vitae, which is a fancy word for resumé, and a report that I prepared in this case in 2023.

Q.   All right.  And so if you need to refresh your recollection at any time, just let us know, but for purposes of the questioning, I'll ask you the questions and we won't have to refer to your report.  Okay?

A.   Thank you.  Yes.

Q.   What's your current position?

A.   I'm currently a professor of law and psychology at the University of San Francisco in California.

Leo - direct

675

Q.   And let's talk about your education.   Do you have a Ph.D.?

A.   I do.

Q.   What's -- what's your Ph.D. in?

A.   It's in what is called an interdisciplinary field of law and social science that goes by the name of jurisprudence and social policy that allows people to specialize in different disciplines.  And I specialized in academic criminology and what's called social psychology.

Q.   And where did you get your Ph.D. from?

A.   From the University of California at Berkeley.

Q.   What other degrees do you have?

A.   I have a master's degree from the University of Chicago in sociology.  I have a bachelor's degree in sociology from UC Berkeley and a J.D., which is a law degree, from UC -- University of California, Berkeley as well.

Q.   All right.  Have you published in your field of study?

A.   I have, yes.

Q.   And tell us about the publications you've issued.

A.   So I received my Ph.D. in the early 1990s, and as a professor, one of my primary job responsibilities has been to do research and to write articles and books.  And so now I've been doing this for over 30 years, so I've published dozens of articles and I believe about half a dozen books at this point.

Q.   And what's the basic subject matter of those articles and those half a dozen books?

Leo - direct

676

A.   So I specialized in a few areas.  One area is police interrogation practices or the psychology of police interviewing and interrogation.  Another related area is how and why the false confessions occur in response to police interrogation.

Another related area to that is psychological coercion in different contexts.  And then finally, the last primary area in which I've done research which is also related is what's often referred to as wrongful convictions of innocent people, factually innocent people in the criminal justice system.

Q.   Have you presented on the topics related to your research at professional groups?

A.   I have, yes, extensively.

Q.   And can you tell us about, you know, what kinds of groups you present to?

A.   Sure.  So one audience is universities.  I've been invited to present ongoing research or synthetic talks summarizing research to universities across the country.  And then another type of talk that I've given many, many times is at professional scientific meetings or social-scientific meetings, the American Society of Criminology or the American Psychological Association or other organizations like that that are national research organizations.

And then finally, my work is applied.  My academic work is about how the criminal justice system works.  And I'm

often invited to give presentations to lawyers, to judges, to others who work in the legal system, particularly the criminal justice system, forensic psychologists, psychiatrists, paralegals, things like that.

Q. Have you been asked to testify before legislative bodies?

A. I have, yes.

Q. Can you tell us about what legislative bodies you've testified before?

A. Yes. The first time I did it actually was here in Chicago in the late '90s. I've testified in California, in Texas, in Wisconsin, and New York. And these would be on issues related to the research I do. So, for example, in Illinois in the late '90s, I testified about what the empirical -- what the social science research showed about videotaping, electronically recording interrogations of suspects.

Q. And so when I say "legislative bodies," you're going before the lawmaking arm of the state to talk about what policies should be implemented?

A. Correct, but it's usually subcommittees of the state-making arm of the state, and it's state, individual states.

Q. Have you won awards in your field?

A. I have, yes.

Q. Can you tell us about the awards you've won?

A. So I've won a number of research awards. They basically break down into two types. One is awards, specific awards for

Leo - direct

678

books that I've written, and then the other type of award is career achievement or lifetime awards for the body of research that I've written and published. And these awards are -- I'm what's known as an interdisciplinary scholar, so I am part criminologist, part social psychologist, part sociologist. And so I've won these awards from organizations in all those fields.

Q. Have you been selected as one of the leading experts in your field?

MR. NATHAN: Objection. Form. Vague.

MR. AINSWORTH: I can explain.

THE COURT: Okay.

BY MR. AINSWORTH:

Q. Are there leading experts in your field, sir?

A. Yes. There are many experts in my field, yes.

Q. All right. And in 2010, there was a white paper that was published. Can you tell us what that means to have a white paper in your field of study?

A. Very briefly. One of the organizations that I belong to is called the American Psychology-Law Society which is a division of the American Psychological Association. It's that division of psychologists that studies law and the legal system through social science methods.

Every decade or so, they put out what's called a white paper -- it's very infrequent -- when the body of scientific

research has reached a point where they want to summarize it for policymakers and legal officials. And so they pick the top scholars in a particular area to write that white paper which then is extensively vetted by others in the institution.

And in 2010, the American Psychology-Law Society picked six authors. I was one of them. Again, in 2024, seven authors, I was one of them to summarize the extensive body of research on police interrogation and true and false confessions.

Q. And that most recent white paper, when did that come out?

A. It was published yesterday online for the first time.

Q. And so are you one of the leading experts in your field, sir?

A. I'm probably just one of the oldest.

Q. Have you conducted trainings with police on how to conduct -- or how to conduct interrogations?

A. I have. Not recently, but I have. So in the summer of 2002, I put on three eight-day training sessions with the Fort Lauderdale sheriff's office which is a huge sheriff's office. Each day for eight hours, I trained 100 investigators, felony investigators. And then six months later, in early 2003, I put on the same eight-day training session for the Miami Beach Police Department felony detectives. Miami Beach is very close to Fort Lauderdale.

Since then, I've, whenever invited, given lectures to

police, either invited lectures at police departments or talks at their conferences, though not recently.

Q. Do you consult with police and prosecutors about training curriculum?

A. I have in the past, yes.

Q. And so police and prosecutors have looked to you for guidance about how to put policies in place surrounding interrogations?

A. In a few cases, yes.

Q. Have you testified on behalf of prosecutors?

A. I have, yes.

Q. Can you tell us about the times that you've cross -- you've testified on behalf of prosecutors?

A. So most of the time my testimony is in criminal cases, not civil cases. And most of the time I'm contacted by criminal defense attorneys, not by prosecutors. I have testified five times for prosecutors in my career. Three of them were for the State Attorney General's office in California. One was for the U.S. Department of Justice civil rights division in federal court in Massachusetts. And then one was for the district attorney's office in Austin, Texas.

Q. And so prosecutors from around the country have reached out to you to assist them in their prosecutions?

A. From time to time.

Q. And in addition to your professional responsibilities with

your research and your teaching, do you sometimes do consulting work in litigation?

A.   I do.

Q.   And so when you're being asked to be an expert in a case, do you review the case and determine whether you want to be involved?

A.   Yes.  Usually I'm asked whether I'm willing to consult on a case and review materials and offer opinions before we get to the stage of whether I would be an expert or not.

Q.   And so do you get a lot of requests?

A.   I guess it depends on what you mean by "a lot," but yes, a few every week.

Q.   All right.  Do you accept everyone who asks you to be an expert?

A.   No.

Q.   And so what kind of -- what kind of cases or how do you determine which cases you take and which ones you don't?

        MR. NATHAN:  Objection.  Bolstering.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   Well, first, I'm a full-time professor, so I have to be selective in the cases I take.  Sometimes I have limited availability.  Sometimes I have more availability.  There are many cases -- I try to figure out whether I can be helpful in cases, and sometimes I refer cases to a different type of

Leo - direct

682

expert. The attorney may be misguided. Or if I'm not interested in the case or I'm not available or I don't think I can be helpful, I might refer the attorney to a different expert in my field.

Some cases are more interesting to me than other cases, particularly cases that raise potential research issues since I'm a researcher or unique or novel or raise other compelling justice issues.

BY MR. AINSWORTH:

Q. Does it happen that sometimes a lawyer will reach out to you and you talk to them and you tell them, you have to tell them, "I don't think I can help you"?

A. Oh, all the time, yes.

Q. And why do you have to tell them that?

MR. NATHAN: Objection. Asked and answered.

THE COURT: Overruled.

BY THE WITNESS:

A. Well, if I haven't been retained and it's just a phone call, I would feel guilty if I can tell from the phone call that I can't help them if I didn't tell them that.

BY MR. AINSWORTH:

Q. Meaning your testimony would not be helpful to the -- their client?

A. Meaning that my opinions would not be helpful to their client, and that could involve potential testimony.

Leo - direct

683

And then when I agree to work on a case, then I become a consultant, and I review documents and I offer opinions related to the reason why the attorney retained me. And in most of those cases, I can't be helpful. And to your question of why, oftentimes my opinions are not the opinions the lawyer -- that would be helpful to the lawyer's case, and then sometimes those cases also settle prior to going to trial.

Q. When you do consult, do you get paid even if your opinions are not favorable to the side that retained you?

A. Usually, yes. Sometimes I do pro bono cases which means you don't get paid, but I do usually charge for my time. And if I agree to consult on a case, I review the documents and I can't be helpful then, yes, I would still charge for my time.

Q. And you're being compensated for your work on this case, correct?

A. Yes.

Q. What's your hourly rate?

A. $500 an hour.

Q. And are you familiar with the rates charged by other experts in your field?

A. Some of the other experts in my field, yes.

Q. Are your rates consistent with the rates charged by other experts?

A. I would say consistent, higher than many, lower than some.

Q. And so we hired you to review documents in this case and

Leo - direct

684

provide your opinions, right?

A.   Correct.

Q.   What did you do -- what did you review in order to form your opinions in this case?

A.   I read a lot of documents:  Police reports, trial and pretrial transcripts, depositions, other reports, volumes and volumes of materials.

Q.   Is it a big record?

A.   For the kinds of cases I work on, yes.

Q.   All right.  Sir, so what is a false confession?

A.   It would be a confession to a crime that is factually false.  The person did not commit the crime.

Q.   Is there a consensus in your field that false confessions happen?

A.   Yes.  There's no dispute.  And the science, social sciences that I work in are empirical which means we go out and we gather data, test our hypotheses, develop knowledge.  We've documented hundreds and hundreds of false confessions.  There's no dispute in the social sciences, and there's not even any dispute in law enforcement.  False confessions, as counterintuitive as they are, do happen, and they've been well documented.

Q.   But how do we know, how do we know that people falsely confess?

A.   Well, we document the cases.  So we have to go out into the

world and gather them. Sometimes there are organizations that have documented them. There's an organization called the Innocence Project in New York, and they've documented false confessions, confessions that are proven false through DNA scientific evidence of people released from prison because their confessions were proven false.

There's another organization that's focused not just on the DNA cases but also non-DNA cases called The National Registry of Exonerations. They've documented hundreds and hundreds of false confessions. And then researchers like myself and others in my field have put together databases of indisputable false confessions that overlap with but are not identical to those databases.

And either through scientific evidence that proves the confession false or, believe it or not, sometimes if you could show the crime didn't even occur, or sometimes we could show that it was physically impossible for the confessor to have committed the crime and then more commonly, after somebody confesses it's later discovered that there was somebody else who committed the crime and that the original confessor could not have committed that crime. So the true perpetrator is identified, and the confession from the prior individual is proven to be false.

So that's how we know. We've gone out into the world. Others have gone out in the world. Hundreds and hundreds of

Leo - direct

686

cases have been documented.

Q.   All right.  And so what are we looking at?  For example, the Innocence Project data, what does that data tell us about whether there are false confessions among people who are indisputably innocent?

A.   So in the Innocence Project cases, the people were convicted, and there was biological evidence left at the crime scene, typically not tested prior to the trial, and then many years later tested, and that shows the person who was convicted of the crime did not commit the crime.  And because so few cases have biological evidence to test, those cases really are the tip of the iceberg.

I'm sorry.  Your question was, what does that tell us?

Q.   Well, my question is, for the Innocence Project data where you looked at the cases where there was convictions that had been overturned and it was indisputable that people were innocent, how many of those people had confessed?

A.   Oh, so in those cases, the Innocence Project collected the data through the first 375 DNA exonerations.  And in those cases, on their website they tabulated that 29 percent of those cases involved false confessions.

Q.   So you got 375 people who are all indisputably innocent, and close to 30 percent of them had confessed even though they were innocent?

A.   Or there had been a confession in their case if there had

been more than one defendant.

Q.   And what did you find when you looked at The National Registry of Exonerations?  What did that data tell you about false confessions?

A.   So The National Registry, which again is non-DNA as well as DNA exonerations, if you just look at the individuals, it's about -- individual cases, it's about 13 percent of their cases involved false confessions.  So they have over 3600 exonerations, almost 500 false confessions in their database.

          And then if you look at the cases, there's about 20 percent of the cases involve false confessions.  There might be a case where, for example, five innocent people were convicted -- there have been some here in Chicago like that -- and, say, three or four of those five falsely confessed.  And so when you look at the case as the unit of analysis, the number goes up because there's some people who are convicted on the basis of a false confession of a co-defendant.

          MR. NATHAN:  Objection.  Move to strike.

          MR. AINSWORTH:  What's the basis?

          THE COURT:  Basis?

          MR. NATHAN:  Sidebar, please.

          THE COURT:  Okay.

     (Proceedings heard at sidebar:)

          MR. NATHAN:  Your Honor, we're objecting to the reference about other Chicago cases which have been excluded.

MR. AINSWORTH: Your Honor, the expert will not talk about police misconduct in other cases, but the fact that false convictions have happened or the fact that people have falsely confessed is not in any way implicated by the defendants' motions in limine. He's not going to talk about police have coerced other -- you know, specific examples of police coercing confessions.

But certainly the fact that there have been other times in other instances in other cases where people have falsely confessed, that's how he obtains his data to study.

MR. NATHAN: The problem is the reference to Chicago specifically.

MR. AINSWORTH: I --

THE COURT: Well, I think it's minor. I mean...

MR. NATHAN: It's not minor to us. It's very prejudicial talking about other cases within the Chicago Police Department. There's no foundation. We haven't vetted it. It's a prior bad act that should be excluded. There's -- for the limited purpose that the plaintiff is offering this, there's no need to be referring to Chicago.

MR. AINSWORTH: No, actually that's wrong because he's not saying that in Chicago, there have been police misconduct. He's simply saying that in Chicago, there have been false confessions. False confessions can happen with no misconduct on behalf of the police. That's -- you know, those cases have

happened.  He's not going to say --

THE COURT:  Are you going anywhere else with this in terms of data about Chicago cases?

MR. AINSWORTH:  I mean, he -- you know, I can keep it away from Chicago but, for example, he might bring up either the Central Park 5 where there's interlocking confessions of juveniles, but those confessions have been proven false in what the data tells us.

MR. NATHAN:  That --

THE COURT:  All right.  It would be preferable to leave Chicago out of it.

MR. AINSWORTH:  Very good.

THE COURT:  Okay.

(Proceedings heard in open court:)

MR. AINSWORTH:  It was overruled, your Honor?

THE COURT:  Well, overruled as stated on the record.

MR. AINSWORTH:  Thank you, your Honor.

BY MR. AINSWORTH:

Q.  What -- did you find anything in the data when you looked just at murder cases?

A.  Well, yes.  So in the Innocence Project data that they publish on their website, they say that 62 percent of the homicide cases were solved by false confessions even though only 29 percent of the cases involve false confessions.  Over twice as many of the case -- the homicide cases are solved

Leo - direct

690

by -- were solved by confessions that were false than the -- all the DNA cases.

Q. And what does the research tell us why that is, why there are -- there are false confessions but then there's a lot more false confessions in homicide cases?

A. So there's been a lot of research on this including in other data sets. So there's not a body in homicide cases, so police are more dependent on confession evidence. And the homicide cases receive the greatest amount of attention. Police put more resources. They interrogate for longer periods of time. So that's -- those are the primary explanations.

Q. So the database, the hundreds of false confessions that you referred to, does that capture the full universe of all the false confessions that are out there?

A. No. The consensus in the field is that it's really the tip of the iceberg or put differently, we believe there's many more confessions out there than the ones we've documented and proven to be false.

Q. And how do you know that? How do you know that there's more false confessions out there?

A. Well, there are many, many cases where people don't have DNA evidence or a crime did occur or it was physically possible for them to have committed the crime and they allege the confession is false, and there's evidence that researchers believe suggests the confession is likely or highly likely

Leo - direct

691

false.

There are many cases we just don't hear about. There's no database of all allegations of false confession. So The National Registry database, the DNA, the Innocence Project database, these are selective databases. People have to go out into the world to find these cases. There's no centralized source.

Q. So because there's false confessions in cases with DNA, it stands to reason that there's false confessions in cases without DNA?

A. Correct.

Q. What do -- when you survey police officers, what do they say about how often false confessions occur?

MR. NATHAN: Objection. Foundation.

MR. AINSWORTH: It's part of the research.

THE COURT: Let's find out the circumstances under which he would...

BY MR. AINSWORTH:

Q. Have you surveyed police officers as part of your research, sir?

A. Yes.

Q. And have you surveyed them about their view of how often false confessions occur?

A. Yes.

Q. And what has your research told us?

Leo - direct

692

A.   I'm not the only one who's done these surveys.  One of the studies that I was on in 2007 said they estimated that either partially false statements, incriminating statements, or false admissions or false confessions, in their view, occurred almost 5 percent of the time.  And then there have been subsequent surveys which have replicated that finding.

Q.   And so almost 5 percent of the time according to police they would find either a partial or a full false confession?

A.   That was their estimate in that one survey that's been replicated by others.

Q.   Is it possible to calculate a -- you know, how often false confessions occur?

A.   It is not, no, currently.

Q.   Why can't we calculate that?

A.   There's no database that collects all cases of alleged false confession.  And in order to calculate the prevalence rate of false confessions, we'd have to have a database of all interrogations leading to confessions.  And then we'd have to be able to do a random sample of that.  And then we'd have to be able to assess which ones are likely true, which ones likely false.

So because there's no database that contains the universe of alleged false confession cases and interrogations leading to confessions, we don't know what the percentage is even though we've documented hundreds of cases and studied

those hundreds of cases.

Q.   Let's talk about the literature and studies regarding false confessions.  Have you conducted research -- or what kind of research is being done and has been done on false confessions?  We've talked about the mining the data from the Innocence Project and the Registry.  What else is out there?

A.   Well, there's just a few different types of research.  One would be observational research of police interrogations either in person or with videotapes, electronic recordings.  Another type of research that I've done would be interviewing police, interviewing suspects, interviewing criminal justice officials, police interrogation trainers.

Another type of research as mentioned would be surveying police suspects, the public about interrogation and confession issues.  And then another type of research would be experimental recreations in laboratories where people are interrogated and through the use of interrogation techniques, make true and sometimes false confessions.

And then finally, what's sometimes called documentary or archival research where you look at case files, police reports, trial transcripts, electronic recordings of interrogations, and analyze documents in real-world cases of police interrogation and false confessions.

Q.   And have you yourself observed real-life police interrogations?

A.   I have, yes.

Q.   And can you tell us about that?

A.   For my doctoral dissertation in the '90s, which is the major research project one has to do to get the Ph.D. degree, I spent nine months inside the Oakland Police Department near Berkeley, California, where I went to school.  And I sat in and observed, I think it was, 122 interrogations, felony interrogations.

     And then since that time, I've observed hundreds, I've listened to and/or observed hundreds if not thousands of interrogations.  Sometimes they're recorded by audiotape, these days more commonly electronically, visually recorded.  And so that's the basis of my own observational research.

Q.   Now, can you tell us why confessions have such a big impact on criminal cases?

A.   So confessions are a very powerful form of evidence.  In our culture, we tend to trust confessions.  We know this as researchers because we go out and gather data.  And as I mentioned earlier, we survey ordinary people, in some cases real jurors, mock jurors, demographically matched jurors in large survey studies.

     So what these surveys show is that most people tend to believe confessions, believe the truth of the confessions; that most people are very skeptical that somebody would falsely confess to a crime they didn't commit, particularly a very

Leo - direct

695

serious crime. And the reasons really are because the confessions are seen as irrational against self-interest. Why in the world would somebody confess to a crime they didn't commit?

And the individual, the people who were surveyed, individuals have a hard time seeing themselves confess falsely to a crime they didn't commit, again, especially a very serious crime.

Q. And how -- has there been research on how jurors will view confessions as opposed to -- or as compared to, you know, physical evidence or eyewitness evidence?

A. Yes.

Q. And what does that research tell us?

A. That the biasing effect of coerced or false confession evidence is stronger, that jurors put more weight on confession evidence than they do on eyewitness evidence and other forms of evidence as well.

Q. And what about DNA evidence? Do jurors tend to credit confessions over even DNA evidence at times?

A. In some cases, yes.

Q. Have there been real-life examples where people have been convicted despite DNA evidence?

A. Oh, yes. I wrote a whole book about four people in Virginia who were all convicted wrongly, eventually exonerated when there was DNA evidence that not only exculpated them -- it

was a rape/homicide on a military base -- but also led to the true perpetrator who eventually was also convicted.

Q.  So four people who confessed; despite DNA evidence being introduced, they were still convicted?

A.  Correct.  And that's not the only case, yes.  There are many others.

Q.  And so if confessing is against people's self-interest and it's irrational, you know, if you're innocent and you're confessing, why do innocent people confess?

A.  Well, that's the big question.  We tend to look at it in this field through the interrogation environment, the interrogation techniques, and then aspects of individuals' personality.  And so all human behavior is an interaction between the influences in the environment and the suspect's personality or predispositions.

Q.  Well, let's break that up and talk first about people's individual risk factors.  Is youth an individual risk factor?

A.  Yes.

Q.  Explain the -- please explain.

A.  I just think we have to spend a second here talking about what we mean by a risk factor.

Q.  Yes.

A.  So I think everyone understands risk factors.  You know, for heart disease, we know genetics, diet, exercise, family history, smoking, right.  So these risk factors increase the

risk that somebody would get heart disease, but it's a statistical probability.

So one could have a risk factor and not get heart disease. The more risk factors, the more likely somebody would get heart disease. It might be somebody with multiple factors does not get heart disease, but that's less common than somebody with zero or no risk factors. So it's a tendency to predict the outcome.

And so in our field, we have risk factors for false confessions, interrogation practices or aspects of the individual that increase the likelihood that they would falsely confess.

You asked about youth. So this is one of the personal risk factors that research has extensively documented. Individuals, young individuals, particularly juveniles or teenagers, are at greater risk when interrogated for making or agreeing to a false confession. This --

Q. How do we know that?

A. Well, we know it through our empirical research, research by developmental psychologists, criminologists, and other social scientists.

Q. What does empirical research mean?

A. Sorry. So empirical research means out going out and gathering data, whether it's surveys or experiments or analyzing real-world documents or the other examples that I

gave.

So first of all, in the known universe of documented false confessions, whether it's the Innocence Project's data or it's The National Registry of Exonerations or it's the data sets put together by scholars like me and others, juveniles are disproportionately represented across all those studies. They usually come out between 30 and 40 percent of the known false confessions. When you look at the arrest data that the government puts out by age it's, like, 15 percent. So a much higher proportion of juveniles who -- of false confessions are made by juveniles, we believe were made by juveniles. So that's just a fact.

So how do we explain that fact? And what we see based on the developmental psychological literature, social psychological literature is that juveniles' brains are not fully developed. They as a result are often referred to as psychosocially immature. They have a whole set of characteristics or personality traits that involve the way they make judgments and make decisions. They're more impulsive. They're more naive. They're more gullible. They have less experience in life. They're more trusting of authority.

And in the language of clinical psychologists, psychologists who study individuals, they're more suggestible, more compliant. They're more likely to be moved from denial to admission, to shift their answers in response to pressures even

Leo - direct

699

if those answers are false.  That's what it means to be suggestible.  They're more compliant which means more obedient.

And so this is why youth, particularly individuals who are 18 and younger, are more vulnerable to making or agreeing to a false confession when interrogated as compared to adults.

Q.   And so in this case, Mr. Mitchell was 17, Ms. Griffin was 17, and Mr. Fulton was 18 at the time of their interrogations. Based on the research, is there a difference between a 17-year-old and an 18-year-old in terms of having a risk factor for giving a false confession?

A.   There's not much difference, no.  18's not a hard line. What research has shown in the last couple decades is that the brain continues to develop into the mid-20s.  So an 18-year-old's brain development at the source of the psychosocial immaturity may be a little bit further along than a 17-year-old, but it's not going to be a dramatic difference.

Q.   And has that been borne out in the research looking at false confession rates among 18-year-olds and 17-year-olds?

A.   Yes.

Q.   And so has the research shown that people who are 18 or 17 are at a higher risk of giving a false confession?

A.   Compared to adults, yes.

Q.   And is there -- has there research been conducted solely on, you know, how people 18 and younger react when in interrogation settings?

Leo - direct

700

A.   No, when I say 30 to 40 percent of the known false confessions in various studies are by juveniles, it still means the majority are not by juveniles.  It's just that it's disproportionate to their numbers in the population.

So we study false confessions to understand why does this counterintuitive phenomena exist and how can we do research that helps us better understand and make recommendations to minimize it, but primarily it's a study of adults.

Q.   And but have there been studies on juveniles?

A.   Yes, many studies on juveniles.

Q.   And how do those studies -- you know, what kind of studies have been done on juveniles to allow us to understand that juveniles are at a greater risk for false confessions?

A.   So there's experimental studies where juveniles are induced to make false confessions in university laboratory settings where they essentially cause a norm violation:  A computer to crash when they're told not to do a certain thing or they end up cheating or not cheating and falsely confess to cheating or truthfully confess to cheating under threat of potential expulsion from their university.

So for ethical reasons, we can't in university laboratories interrogate undergraduates the same way that police could interrogate somebody in a homicide case, but that's an environment where we can do controlled blind

randomized studies. So that's one methodology.

And then another methodology is looking at real-world cases of provable false confessions and then doing what's called retrodicting which is academic jargon, but just going back in time and trying to figure out what was it that led to that false confession. And the beauty of these databases that researchers have put together or the Innocence Project and The National Registry of Exoneration have put together is that when you aggregate many cases, then you can look for patterns across the cases.

And these two lines of research, the experiments where you can't -- you can't interrogate in -- as aggressively as police interrogate, but you can control the environment, in the real-world cases where you study the phenomena in the real world but you can't control the environment the way you can control the experiment, they complement each other because they're such different methodologies. The weakness of one complements the weakness -- or the strength of the other.

Q. And so taking a step back, does the teenager's particular intelligence matter when it comes to their age being a risk factor?

A. The teenager's intelligence does not matter. If the teenager was of subnormal or low intelligence, what we sometimes refer to as people with intellectual disabilities or retardation, in that range, it would matter. But many of these

Leo - direct

702

juvenile false confessions are people who have high, normal or high IQs, or intelligence quotients.

So a very intelligent or average intelligent juvenile would still be at risk as a juvenile. The intelligence wouldn't matter unless the intelligence was so low that that was an additional risk factor.

Q. So they're looking at maturity as opposed to intelligence when you're talking about, you know, younger people being interrogated?

A. Correct. It comes down to brain development and the kind of decision making and perceptions that juveniles and teenagers have, not the level of intelligence if it's normal or above average.

Q. Do juveniles tend to behave differently than adults in terms of how they respond to authority figures like police officers?

A. Yes.

Q. And what does the research tell us? Because I've got to tell you, as a father of teenage girls, I would think no, but go ahead.

A. Yeah, I'm a parent of teenagers as well. Teenagers tend to be, again, general, the generally more compliant, more obedient. They have less experience. They have less information about how the world works. They tend to be more naive, more trusting of authority, more impulsive in their

Leo - direct

703

decision making which means they don't think through always the long-term consequences as adults are more likely to do.

So they are more easily led and manipulated in response to interrogation or aggressive pressure from an adult figure. They tend to have less psychological resources and, again, experience to draw on in a situation of high pressure or conflict.

Q. And is it your opinion that Mr. Fulton, Mr. Mitchell, and Ms. Griffin's age affected their vulnerability to giving a false confession?

A. Yes. I would say being 18 and 17 and 17 would, based on the scientific research in my field, elevate the risk for a false confession.

Q. Let's talk about other risk factors. Is length of time a risk factor?

A. Yes.

Q. What impact does the time in custody have on the likelihood that an innocent person would confess?

A. Well, the longer an interrogation goes, the greater the likelihood. We know that most interrogations, based on a number of studies, typically last a half hour to an hour, an hour and a half. And when you get to two hours, 95 percent of the interrogations have already ended.

So when we study routine police interrogations, that's what we see, routine felony interrogations.

Q.   So you're saying that, so 95 percent of all interrogations are two hours or shorter?

A.   Yes.

Q.   And --

A.   Based on the studies, yes.

Q.   And what happens when a person's interrogation lasts longer than two hours?

A.   Well, the greater the length of the interrogation, the greater the likelihood of fatigue, exhaustion.  Interrogation is a process that's very accusatory.  It can be stressful, high pressure.  It involves the repetition of interrogation, accusatory confrontational interrogation techniques.  So the longer it goes, the more stressful it can and often does become, the more exhausted, fatigued, possibly confused, hopeless the suspect becomes.

So it makes sense that you would expect false confessions as a general matter to occur over lengthier periods of time than the shorter interrogations.

Q.   And has the -- have there been studies looking at lengths of interrogation and rates of false confessions?

A.   There have been studies that have, yes, looked at interrogation cases and studied the length, and there have been studies, yes.

Q.   And so what happens after -- in the data after an interrogation goes for six hours or more?

Leo - direct

705

A.   Well, in these studies, the interrogations that lead to false confessions, the majority of them, some of them can be shorter, but the majority of them go six hours or longer.

Q.   And when we're talking about length of interrogation, are we just talking about the time that somebody's being questioned, or does it include other time as well?

A.   The way researchers in my field count the time is when the purpose -- when the suspect is typically deposited in the interrogation room to when they are released or when the interrogation ends.  Oftentimes there would be a break.  Sometimes police would leave the person in the interrogation room for a period of time and then come back and interrogate them or interrogate them, leave, interrogate them, leave.

     And so we count the entire period of time, the time they're in custody for purposes of interrogation even if there are breaks in between or before and after the questioning.

Q.   Why?  Is that just for convenience that you count the whole period of time, or why are you -- why do you include the whole period of time when you're calculating -- when you're determining if length of time can affect people's vulnerability giving a false confession?

A.   Well, there are two reasons.  One reason is that some police departments intentionally deposit somebody in an interrogation room and, in the words of one department I'm thinking of, let them stew, so let them just stay by

themselves. It's thought to increase anxiety. So it's an intentional interrogation technique in some departments.

And the other reason goes back to something I've mentioned which is the longer the period of time, particularly in interrogations that go overnight, but in all interrogations, the longer period of time, the more fatigue, the more exhaustion, the more tiredness sets in, and the more vulnerable to making or agreeing to statements, false statements or confessions the suspect is. So we want to count the whole period of time.

And I think people can intuitively relate to it. If you go to the Department of Motor Vehicles and you spend five hours there but you're only questioned for 20 minutes, you know, you come back a lot more tired than if you had just gone for 20 minutes.

Q. And so in the -- in the research when you're looking at how many, the length of interrogation, are you looking at adults and juveniles together?

A. Well, there are studies, yes. The databases have adults and juveniles together, yes, and then there are some separate studies just of juveniles. And I don't think there's any just of adults. There might be.

Q. But length of time is a risk factor for both adults and juveniles?

A. Correct.

Leo - direct

707

Q.   And the time when a suspect is in a room not being interrogated, is that a -- based on your experience and research, is that a period when the person is without stress and able to recuperate?

A.   Well, it's hard to imagine.  I mean, sometimes people are left in interrogation rooms overnight where they don't really have sleeping facilities or access to food or other things. It's sort of hard to imagine.

Interrogation rooms are by design barren.  They're not supposed to have distractions:  A table, a desk, no phone.  And so it's hard to imagine how one would experience that environment as restful or restorative or comparable to one's normal environment of sleep or rest.

Q.   Is it stressful for humans to be in that situation?

A.   Well, you're talking about interrogation, or are you talking about just being left in an interrogation room?

Q.   I'm talking about being left in an interrogation room after the person's been questioned.

A.   I would think it would be stressful unless one had a lot of experience inside police stations and didn't experience that environment as stressful.

Q.   And is that one of the reasons why researchers look at the entirety of the time from the time they've -- they go into custody until the time of their confession when looking at the length of interrogations?

Leo - direct

708

A.   Yes because again, the length has an impact on breaking down one's defensive -- psychological resources for resistance making one more vulnerable, more tired, more fatigued.

A lot of times people say, "I just wanted to get out of that room."  The longer it goes, the greater the desire to release the pressure the suspect is experiencing and put an end to what, if it goes on long enough, could be an insufferable or seemingly insufferable process or period of time.

Q.   You mentioned resistance and resistance being affected by length of time.  Can you explain what you mean by that?

A.   Yes.  I don't mean to talk in jargon, but we all have psychological resources or energy or mental stamina to resist pressures in our environment.  And the longer an interrogation goes, the more stressful, the more accusatory, the more certain techniques are used, the more depleted an individual's psychological resources or ability to resist becomes.  That's what I was referring to.

Q.   And so approximately how long was Mr. Fulton in custody?

A.   My recollection is that for around four days, or give or take 100 hours.

Q.   And so he was brought into custody Monday morning at 5:30 in the morning, and then he was still being questioned after being in custody all day Tuesday, all day Wednesday, all day Thursday, and all day -- and then up until Friday morning?

MR. NATHAN:  Objection.  Leading.

THE COURT: I guess.

MR. AINSWORTH: I guess so too, Judge.

BY MR. AINSWORTH:

Q. Can you tell us from what day to what day Mr. Fulton was in police custody?

A. Well, my recollection is not precise. I believe it was something like March 18th to March 22nd, 2003, roughly, so roughly four days, in that time period.

Q. So that would have been the Monday through the Friday; is that right?

A. I don't recall which days of the week, but that sounds right.

Q. Is that a long time for somebody to be in custody based on your experience with police interrogations?

MR. NATHAN: Objection. Vague, calls for a narrative.

THE COURT: I guess "long time" is vague.

BY MR. AINSWORTH:

Q. Well, based on your research, can -- and your experience in your field, can you tell us how that relates to typical interrogations of suspects?

A. Yeah, it's extraordinary. I have seen some others that have gone in that time period but 100 hours --

MR. NATHAN: Objection. Undisclosed opinion testimony.

MR. AINSWORTH: His report talks --

Leo - direct

710

THE COURT: Overruled.

BY MR. AINSWORTH:

Q. Go ahead, sir.

A. So just one sentence: That is extraordinary based on the thousands of interrogations I've studied. 100 hours is extraordinary, very rare.

Q. And what about Mr. Mitchell? For how long was he in custody?

A. My recollection is roughly two and a half days -- or not quite two and a half days. Roughly 40 hours, so almost two days.

Q. And Ms. Griffin, how long was she in custody?

A. Well, my recollection is about 12 hours, but then I think she was to the point where she made the statements, but I think that she was then held in the station before being taken to, I think it was, the grand jury, so maybe around 16 or 17 hours total.

Q. And so for an adult being held for those periods of time, would that be a risk factor for giving a false confession, 100 hours or 40 hours or 12 to 17 hours?

A. Yes, unquestionably.

Q. And what about for a 17-or 18-year-old in custody for that many hours? Is that a risk factor for a false confession?

A. Yes, but there are two different risk factors. One is the risk factor of being a teenager or a juvenile. The other is

Leo - direct

711

the risk factor of lengthy interrogation.  And so as in my example of heart disease, the more risk factors you have, the greater the likelihood of the outcome of a false confession.

Q.  Based on the record that you reviewed, while Mr. Fulton, Mr. Mitchell, and Ms. Griffin were in custody, were they alone the whole time, or did they get to see or consult with a trusted adult?

A.  My recollection is they were alone the whole time.

Q.  Does that isolation impact juveniles' vulnerability to giving a false confession?

A.  It could impact their vulnerability especially the longer the period of time goes, yes.

Q.  Why?

A.  Well, by being isolated, taken out of one's environment, being removed from familiar people or sources of social support, one might feel more vulnerable, less supported, especially if there's multiple interrogators, a long interrogation, accusations, lies, threats, a lot of things that could go into it that could make the person feel more alone and vulnerable and not have as much psychological strength or support to resist as if they were not isolated.

Q.  And did Mr. -- in your review of the record, did Mr. Fulton or Mr. Mitchell report being able to eat during their time in custody before their false confessions?

A.  My recollection is no.

Leo - direct

712

Q.   And so -- and did you see any evidence in the record that there's any documentation that they had been fed?

A.   Not that I recall.

Q.   In your review of the testimony, were there any food facilities at the temporary Area 1 police station?

A.   Not that I recall, no.

Q.   How does not having food affect somebody during an interrogation that's lengthy?

A.   Well, if somebody doesn't have food, obviously it affects them physiologically and it weakens them, and that would affect what I've been referring to as their psychological resources to resist.  It also would create in a police station a kind of dependency relationship where one has to rely on the very people who are interrogating them to have their physical or physiological needs met.

Q.   Were you looking to see if there's documentation of them being fed in the record?

A.   At one point, yes.

Q.   And why were you looking to see if they -- if there's documentation to show that they were fed?

A.   Well, one of the issues that researchers are interested in is whether or not people have their physical needs met.  Were they allowed to go to the bathroom?  Were they provided food and water?  Did they get sleep?  Were there any physical or physiological deprivations that could have increased their risk

for making or agreeing to a false confession?

Q. And did you expect to see documentation that they had been fed if they, in fact, had been fed?

A. Yes.

Q. And why is that?

A. Well, for two reasons. In my experience having attended numerous police interrogation trainings and studied dozens if not hundreds of published and unpublished manuals, as a general matter, police are trained to always document that so they're not accused of depriving the suspect of essential necessities or liberties.

And police are sensitive to being falsely accused of things, and so that's -- they would, in my experience, and I have studied thousands of case files which include police reports, they would document that typically to protect themselves against the accusation that they didn't feed or allow a suspect to go to the bathroom or get sleep.

MR. NATHAN: Objection. Move to strike. Motion in limine as to police procedures.

MR. AINSWORTH: He's limiting his testimony to why he -- it explains his reason. He's not going to be talking about police practices, your Honor.

THE COURT: Overruled.

BY MR. AINSWORTH:

Q. From a -- from a scientific perspective, what happens to

Leo - direct

714

humans when they're deprived of sleep?

A. Well, humans who are deprived of sleep, a lot of things happen. They tend to become more irritable. They tend to lose focus. If it goes on long enough, it affects short-term memory.

Relevant to what I study, they become more suggestible, more compliant. Again, the psychological resources kind of are depleted. People who are sleep deprived don't have the same mental strength to resist accusations. They become more easily confused, and they are more easily led and manipulated to make or agree to false statements or incriminating statements or confessions.

Q. And so in this case, did you see -- were there allegations by Mr. Fulton, Mr. Mitchell, and Ms. Griffin that they didn't get sufficient sleep while they were in custody?

A. My recollection based on the materials I reviewed is yes, but there was a difference also. Just like there was a difference in length, there was different testimony about this as well.

Q. And is it -- what's the difference that you're referring to?

A. My recollection is that Mr. Fulton said in one of his testimony, I can't remember if it was the motion to suppress or at deposition, that he maybe got an hour of sleep the time he was there. My recollection is that Mr. Mitchell did get some

Leo - direct

715

sleep. I don't recall how much, was also sleep deprived but was able to get a little bit more sleep at the police station.

And Ms. Griffin was there for a shorter period of time, just one night overnight, and my recollection is she also didn't get much sleep, if any.

Q. And based on your review of the record, in the police station where was the light switch for the rooms that the people were being held?

A. My recollection is it was outside of the room, so one couldn't turn it off from the inside.

Q. Was there bedding available for the -- for Mr. Mitchell and Mr. Fulton to use to sleep?

A. No.

MR. AINSWORTH: Your Honor, what time are we going to break for the day?

THE COURT: Well, I think 4:30 would be good in light of the weather.

BY MR. AINSWORTH:

Q. I want to ask you, sir, about contamination. What is contamination?

A. So contamination refers to the leaking or disclosing of non-public case facts to the suspect. It can occur in an interrogation where police either unintentionally or intentionally feed facts to the suspect about the crime. It can also occur from outside sources where a suspect learns

non-public details about a crime.

Q.   And can you tell from looking at a confession if it's false or not?

A.   No.

Q.   Why not?

A.   Well, if you just see a confession statement, you wouldn't know the confession -- false and true confession statements contain details.  They typically contain a description of how and why the suspect did or might have committed the crime.  So they're often indistinguishable.

What one has to do is get outside the confession statement and compare it to other things that would give us insight into whether the confession statement has what we call indicia of reliability or indicia of unreliability.

Q.   And so have you looked at confessions in those databases of proven false confessions and examined them and compared them to, you know, true confessions?

A.   Yes.

Q.   And are you able to -- you know, without knowing anything about the case, are you able to distinguish one from the other?

A.   No.

Q.   True from false?

A.   No.  You have to -- you have to know case facts in order to do that kind of analysis.

Q.   And is there -- does the research tell us how many of the

Leo - direct

717

proven false confessions have contamination or facts that were provided to them during the course of their interrogations?

A. There have been studies of the DNA exonerations, the confession cases. And one study found that 95 percent of those cases involved contamination or feeding of non-public details in those cases by the police, and then the second study -- the first was 95 percent. The second study of the next wave of DNA exonerated false confessions found 91 percent.

Q. So they're looking at cases where somebody's innocent but in their confession, it provides non-public crime scene facts in the confession? Is that what you're saying?

A. Exactly, facts that the confessor could not have possibly have known, that the police knew, that the confessor alleges was learned from the police in the course of the interrogation. And in those DNA cases, all of them were convicted.

So these are people who were convicted typically by trial asserting their innocence, asserting that they were contaminated or fed facts by the police and then years later when the DNA technology was developed and applied to their case showed they were innocent and then they were exonerated, released from prison. And in a large number of those cases, the true perpetrator was found because of the DNA.

Q. In the proven false confessions that you've examined, are there specific details in the confessions that you would not expect somebody to, you know, make up or include in their

Leo - direct

718

confession unless it was true?

A.   Right.   So we're interested in the details that are not public, not publicly known and in the likelihood of a detail being guessed by chance.   So if somebody were to say, if the police were to say in the interrogation, is the body face up or face down, well, you know, you can guess that at 50 percent.

But if you have hypothetically a murder case where there's an uncommon murder weapon that's deposited 20 miles away, you know, under a freeway near a creek, something like that, just like so highly improbable that somebody would be able to provide that non-public fact, that's a lot more what we call probative or discerning of reliability or unreliability -- I should say, of reliability in that case, rather -- unreliability.   Sorry.   It's late.

Q.   And when you're talking about contamination, are there -- is there also a phenomena where innocent people will make up details in a confession to make it appear realistic?

A.   Yes, but again, just a little context very briefly.   When innocent people falsely confess, typically in response to interrogations that are longer, more aggressive, involve certain techniques, they're typically broken down and feeling hopeless and are motivated to please the interrogator to get out of the interrogation room, put an end to what is an awful experience.

And so the false confessions typically either repeat

back details that they were fed or details that they could guess by chance, or sometimes they infer what the correct answer is from what they've been told. Sometimes they fill in the blanks by previous experiences. If they're asked, for example, "How did you drive to the crime scene" and they think of an experience where they were driving in that part of town, they might be recalling a true event so -- but even if they're innocent of that crime.

So there are various ways false confessions are made, so to speak. The details are filled in, and those are the primary ways.

Q.   Did you see evidence of contamination in this case?

A.   Well, yes. I mean, the -- there was no recording of these interrogations, and so we have disparate accounts. And in the accounts of Mr. Fulton, Mr. Mitchell, Ms. Griffin, yes, they all allege that they were educated about the crime. They were taken to crime scenes. They were shown crime scene photos. Yes.

MR. AINSWORTH:   And, your Honor, I'd move admission of Plaintiffs' Exhibit 45.

MR. NATHAN:   Over our objections as to the form, but I'd like to hear -- I'd like to be heard on sidebar on this issue.

THE COURT:   All right.

(Proceedings heard at sidebar:)

MR. NATHAN: Your Honor, the witness just testified that there was no recording of the interrogations, so they're disparate accounts. That's not true. There is a recording. There's a 30-minute recording as to Mitchell. He relied on -- Mr. Ainsworth is intending on showing Dr. Leo a transcript to rely on for purposes of his methodology, but he listed in his report that he relied on the video.

So we think it's improper to be using the transcript in light of that testimony, and he should be relying on the video.

MR. AINSWORTH: The doctor also reviewed the transcript. He said that the interrogations were not recorded, which is factually true. And it will be clear by showing him the transcript of Mr. Mitchell's statement that the statement was recorded, and he's not going to dispute that. So I'm not sure what the objection is.

THE COURT: Well, I already ruled that the video wasn't coming in, didn't I?

MR. AINSWORTH: That's right, and so I'm showing him the transcript.

THE COURT: All right.

MR. NATHAN: And, your Honor, what I'm saying is that them offering opinion testimony from Dr. Leo who is relying on that video opens the door --

MR. AINSWORTH: He didn't --

MR. NATHAN: -- to the video that he relied on for purposes of his analysis.

THE COURT: Well, let's wait and see.

MR. AINSWORTH: No, but I just want to make clear that the doctor relied on the transcript. Mr. Nathan is not being fair with the facts, and I don't appreciate it because in his report, he said he didn't -- he never said he relied on the video. He relied on the transcript of the recorded statement. It's part of the materials provided to him. And so I think it's a disingenuous objection.

MR. NATHAN: At Page 5 of his report he lists, video and audio recording statement of Anthony Mitchell, March 21, 2023. I think that 2023 is meant to be a 2003, but he listed it as material that he relied upon. It further contradicts his testimony saying that there's no video.

MR. AINSWORTH: He didn't say there's no video.

THE COURT: He didn't say that. Well, we're not to the open door part yet. I mean, there's nothing wrong with his showing him the transcript. So I'll just reserve ruling, I suppose.

(Proceedings heard in open court:)

MR. AINSWORTH: Plaintiff moves admission of Plaintiffs' Exhibit 45.

THE COURT: The exhibit is received in evidence.

(Plaintiffs' Exhibit No. 45 was received in evidence.)

MR. AINSWORTH:  May I publish, your Honor?

THE COURT:  Yes.  Go ahead.

MR. AINSWORTH:  Thank you.

BY MR. AINSWORTH:

Q.  All right.  So I'm showing you Page 5 of Exhibit 45.  And to orient you, this is the transcript of Mr. Mitchell's statement on March 21st, 2003.  And I'm going to ask you, sir, do you see evidence of contamination in this exhibit, Plaintiffs' Exhibit 45?

MR. NATHAN:  Objection.  Leading.  Under the doctrine of completeness, he should be shown the entire transcript as well --

THE COURT:  Well, let's --

MR. NATHAN:  -- and associated material.

THE COURT:  -- get a foundation of who was present.

And he's talking to the police officer; is that right?

BY MR. AINSWORTH:

Q.  So you reviewed this transcript in -- as part of the materials you reviewed; is that correct?

A.  Correct.

Q.  And this is a transcript where the prosecutor D'Angelo is questioning Mr. Mitchell; is that correct?

A.  Yes.

Q.  All right.  And so is there evidence of contamination in this transcript?

Leo - direct

723

A.   I'm just pausing in case there's an objection.  I'm trying to be respectful here.

Give me just a second to look at this, review this again.

Yes.  I mean, there's details that are being communicated, essentially leading questions where the facts are being conveyed in the question, and the form -- the facts about the case are being conformed -- conveyed in the form of a question.

Q.   All right.  So the -- Mr. Mitchell is asked, "John came and picked you up and told you that Precious had told him where you guys can find Chris?"

And Mr. Mitchell is just answering, "Yes," right?

A.   Correct.

Q.   And the questioner says, "Foster Avenue and Rockwell" before Mr. Mitchell mentions any street names, right?

A.   Yes, yes.

Q.   And then looking down, Mr. Mitchell's answers to these questions are just "yes, yes, yes," correct?

A.   Or "right," yes.  One-word answers.

Q.   And going on to Page 6 of the transcript -- so just to orient us, this portion of the -- well, let me go back to Page 4 for a second.  So Page 4 are -- also contains questions where Mr. Mitchell is just saying "yes" or "right" and giving one-word answers, right?

MR. NATHAN:  Objection.  Leading.

THE COURT:  Yes, it's leading.

MR. AINSWORTH:  I'm just trying to get us to where we need to be.

THE COURT:  It's 4:30, so I think we'd better stop.

MR. AINSWORTH:  Okay.  We'll pick this up tomorrow.

THE COURT:  We'll need you back tomorrow morning.

THE WITNESS:  Thank you very much.

THE COURT:  You may step down.

THE WITNESS:  Thank you.

THE COURT:  Before you go, barring any further weather disaster, I think we're okay for tomorrow.  So have a good evening.  Stay warm.  Thank you.

(Proceedings heard in open court; jury out at 4:32 p.m.:)

THE COURT:  All right.  What's the road ahead?  Let's go off the record.

(Discussion off the record.)

MS. ADEEYO:  Your Honor, with regard to the designations for Johnitta Griffin's video deposition, we also designated and provided them to counsel yesterday her trial transcripts.  And the reason why we did so, your Honor, is because after reviewing her deposition again, she provides a lot of "I don't know's" and "I don't recall's" to a good amount of the questions whereas at her trial, she was able to specify certain individuals, certain events, certain phone numbers.

And so if she were called to testify, we would refresh her recollection or treat her as unavailable with all the "I don't know's" and be able to move in that testimony substantively. So as a result, it's a long explanation, your Honor, but that's just to say that's why we designated her trial transcripts.

We provided it to plaintiffs. They objected. It's approximately 30 to 40 pages of designations. We did not designate the entire 153-page transcript of the transcript. It's more so to clarify those "I don't know," "I don't recall" answers.

MR. AINSWORTH: That wasn't the case when I took a look at it because it seemed to be cumulative of all the testimony that she gave in the video-recorded deposition.

And the problem is that we had the deposition out of state where Ms. Griffin made it clear to both sides that she wasn't coming to trial, she wasn't having anything more to do with this.

And so we did our exam of Ms. Griffin at that time expecting that that would be her examination for trial, and now mid-trial after we've gone through openings and expected that her testimony, the record would be what it is, defendants are trying to designate additional testimony that we didn't have -- you know, that they could have presented to her at the deposition but chose not to, and we don't have the opportunity

to then clarify or address and -- in the deposition.

And so we think it's untimely and, you know, a lot of it is just her saying the same thing that she said in the deposition.

MS. ADEEYO: Your Honor, she was presented with her trial testimony at her deposition to which she responded, "I don't recall that" and "I don't know's." I have a copy of her trial transcript if you'd like a copy, your Honor, as well as our designations so you can see comparatively that we're just trying to get background information on her "I don't know's," "I don't recall's."

If she was here to testify and she said that, we'd show her the trial transcript. So because she's not here, your Honor, we believe it's fair that we're able to supplement those "I don't know's" and "I don't recall's" with the facts she testified to closer in time to the events.

MR. AINSWORTH: This is the exact same record we had when we made designations before trial and why we did it before trial instead of now.

MR. NATHAN: Your Honor, may I just add one thing?

THE COURT: So what you're saying is that she was -- she testified at the trial, and her trial testimony is sometimes inconsistent with what she said at her deposition.

MS. ADEEYO: Not only is it inconsistent but she would say "I don't know" to questions such as, "Your phone number in

2003 was this." As you've seen, your Honor, the phone numbers is a big issue, a part of this case.

MR. AINSWORTH: We can stipulate to that.

MS. ADEEYO: Well, there's multiple things. If they'd like to stipulate to all of the facts that we would like to have been read into the record, that's fine, but there's multiple things she says "I don't know" to.

And so as a result, it's left that she just doesn't know that information whereas she testified to that before at the plaintiffs' criminal trials, and we think that's important and should come out.

THE COURT: Okay. And so why didn't you designate this before?

MS. ADEEYO: Your Honor, that was an oversight on our part, that it should have been designated before. We were relying on the transcripts. Once it was brought to our attention that plaintiffs would be playing that video this week, I took another look, and I realized a lot of those responses were "I don't know's."

And also, your Honor, just last week this was an issue that was brought to the Court that plaintiff provided us late designations. We objected. Your Honor required us to still respond to those designations, which we did. And so we believe that, you know, in terms of fairness, this should be allowed as well.

MR. NATHAN: May I add one more thing, your Honor?

THE COURT: Oh, sure. Go ahead.

MR. NATHAN: Thank you. Because the plaintiffs have the fabrication of evidence claim which is assessed -- the materiality aspect of that is assessed in the context of trial, her testimony is going to be relevant and admissible anyway, the past testimony here. You have the relevance for the testimony on that independent basis as well as through the deposition designations that the plaintiff is making.

The plaintiff -- Ms. Griffin is saying she doesn't remember which means she's unavailable. So we need to be able to use prior sworn testimony in order to refresh recollection or actually have substantive testimony.

THE COURT: Is there something in that -- in those inconsistencies that is important? I mean, a lot of this may not be important to your side of the case --

MS. ADEEYO: Yes, your Honor.

THE COURT: -- is the difference.

MS. ADEEYO: Yes, your Honor. As I mentioned, first the phone number issue. Whether or not she was speaking with Fulton on the day of March 8th or March 9th, she was confronted at her deposition with that. And I received a lot of, "I don't know," "I don't recall's," whereas there's trial testimony where she clarifies that that's her phone number.

She specifies, "I didn't" -- it's true that she says

at her trial that she didn't speak to Fulton on the 9th. However, when she was cross-examined, she did eventually admit that she spoke to him on the 7th or the 8th. And we think that's important to our case.

THE COURT: So we have phone records that that occurred.

MR. AINSWORTH: Right. We will stipulate that the phone record, that it is her phone records and they show phone calls between Mr. Fulton and Ms. Griffin on the 8th, yes.

THE COURT: So, you know, it's just, a deposition read into evidence or even a video is really tedious. So if you can limit it to just something that is not otherwise covered in the evidence, you know, or some disputed issue of fact, then I'll consider it.

MS. ADEEYO: Yes, your Honor. It's our position that the designations I've made, it's just a page worth of designations, that they are to help address those issues where -- those specific facts where she says "I don't know," "I don't recall" that's central to our theory of the case.

MR. AINSWORTH: There were 40 pages.

MR. NATHAN: We can take another look to try to narrow it further. And we appreciate your Honor saying that, to the extent we can't, you'll consider -- you'll consider it.

THE COURT: Okay.

MR. NATHAN: Thank you.

730

MS. RICKERT: Your Honor, can I just add one more thing on this topic?

THE COURT: Yes.

MS. RICKERT: To the extent that Ms. Griffin didn't remember things during her deposition, they had her trial testimony. That would have been the time to refresh her recollection, and perhaps she would have had something more to say beyond that. Now it's too late for us to let her actually respond to --

THE COURT: Yes, that's a factor.

MS. RICKERT: -- to that prior testimony and her refreshed recollection.

So the time to do this, to refresh her recollection, was during the deposition. We can no longer refresh her recollection. She can't disagree with anything. She can't say, "You know what, actually, that was incorrect and now I remember," or anything like that.

So it's really quite unfair. They had every opportunity to present her with her past testimony. They also had every opportunity to designate this ahead of time. They, in fact, did designate criminal trial testimony from Detective Rolston in addition to his deposition.

So they were aware that they could do this. All of these people testified at the trial. They chose some, not others. It's late, and we think it's totally improper.

731

THE COURT:  Well, it's a timeliness problem for sure. And I did exclude the originals.  I didn't enforce the subpoena of the original documents or police files.

MR. NATHAN:  This isn't a discovery issue.

THE COURT:  It's discretionary.

MR. NATHAN:  This is a Rule 804(a)(3) issue.  It's prior testimony.  It's admissible because she testified at her deposition that she didn't remember the subject matter.  It's, therefore, non-hearsay and it's admissible.

MR. AINSWORTH:  We're not saying that it's not -- you know, could be potentially admitted.  We're saying that it was untimely and this should have been done at the deposition.  And so that's when it could have been done.  Under 804, it could have been presented to her.

MS. ADEEYO:  Your Honor, it was, and my position is she said "I don't know" and "I don't recall's" to those questions.

MR. AINSWORTH:  That's --

THE COURT:  Of course, you got the trial that occurred, when was it, '05?

MS. ADEEYO:  It was in '06.

THE COURT:  '06.  And when was the deposition?

MR. AINSWORTH:  2022.

THE COURT:  So what does it mean, you know?  I wouldn't remember my phone number.  I might but, you know --

732

MR. NATHAN: It's not --

THE COURT: Someone might not.

MR. NATHAN: It's not impeachment at all. We're saying she has -- she's unavailable because she doesn't remember.

THE COURT: Well, show me what -- show me what it is you want in. That's all I can say for now.

MR. NATHAN: Okay.

THE COURT: Okay.

MR. AINSWORTH: Thank you, Judge.

THE CLERK: Court is adjourned.

(Adjournment at 4:43 p.m. until 9:30 a.m. on 2/12/25.)

\* \* \* \* \*

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Kathleen M. Fennell*

*/s/ Jennifer Costales*

*/s/ Colleen M. Conway*

*/s/ Judith A. Walsh*                                    February 13, 2025
                                                              Date

Official Court Reporters
United States District Court
Northern District of Illinois
Eastern Division

733

I N D E X

WITNESSES                                               PAGE

JOHN JONATHAN FULTON
Cross-Examination (Resumed) By Mr. Nathan               444
Redirect Examination By Mr. Loevy                       505
Recross-Examination By Mr. Nathan                       557

MCRAY JUDGE, II

Direct Examination By Mr. Loevy                         565
Cross-Examination By Mr. Nathan                         628
Redirect Examination By Mr. Loevy                       653
Recross-Examination By Mr. Nathan                       671

RICHARD ANGELO LEO

Direct Examination By Mr. Ainsworth                     674


PLAINTIFFS' EXHIBIT                                  RECEIVED

No. 45                                                  721
No. 78, page 1                                          546


DEFENDANTS' EXHIBIT                                 RECEIVED

No. 116                                                 513
No. 97                                                  582