734

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN FULTON,                          ) Case No. 20 C 3118
                                      )
            Plaintiff,                )
       v.                             )
                                      )
ROBERT BARTIK, et al.,                )
                                      )
            Defendants.               )
------------------------------        )
ANTHONY MITCHELL,                     ) Case No. 20 C 3119
                                      )
            Plaintiff,                )
       v.                             )
                                      )
ROBERT BARTIK, et al.,                ) Chicago, Illinois
                                      ) February 13, 2025
            Defendants.               ) 9:30 a.m.

                          VOLUME 4
          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
           BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Plaintiffs:      LOEVY & LOEVY
                         BY:  MR. JONATHAN I. LOEVY
                              MR. RUSSELL R. AINSWORTH
                              MS. JULIA T. RICKERT
                              MS. FATIMA LADHA
                              MR. ISAAC GREEN
                         311 N. Aberdeen Street, 3rd Floor
                         Chicago, Illinois  60607

                         LYON & KERR, PLLC
                         BY:  MS. ANDREA D. LYON
                         53 W. Jackson Boulevard, Suite 1650
                         Chicago, Illinois  60604

For Defendant Officers:  NATHAN & KAMIONSKI, LLP
                         BY:  MR. SHNEUR Z. NATHAN
                              MR. AVI T. KAMIONSKI
                              MS. BREANA L. BRILL
                              MR. JOHN M. CERNEY
                              MS. NATALIE ADEEYO
                         206 S. Jefferson Street
                         Chicago, Illinois  60661

735

APPEARANCES  (Continued):

For Defendant City:          MICHAEL BEST & FRIEDRICH, LLP
                             BY:  MR. JAMES P. FIEWEGER
                             444 W. Lake Street, Suite 3200
                             Chicago, Illinois  60606

Court Reporter:              KATHLEEN M. FENNELL, CSR, RMR, FCRR
                             Official Court Reporter
                             219 South Dearborn Street, Room 2328A
                             Chicago, Illinois  60604
                             Telephone:  (312) 435-5569
                             Kathleen_Fennell@ilnd.uscourts.gov

                        *   *   *   *   *

                PROCEEDINGS REPORTED BY STENOTYPE
       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE CLERK: 20 C 3118, Fulton v. Bartik; 20 C 3119, Mitchell v. Bartik.

MR. AINSWORTH: Good morning, Your Honor. Same appearances for plaintiffs.

THE COURT: Good morning.

MR. KAMIONSKI: Good morning, Your Honor. Same appearances for the defendants.

THE COURT: All right. I understand we have one juror who's in line downstairs, but should be here momentarily, so do we have any preliminaries that we need to talk about?

MR. LOEVY: Not today, Your Honor. Not for the plaintiff.

THE COURT: Well, isn't that good. There was a filing by the defense. Do you want to respond to that?

MR. LOEVY: Which thing was filed?

MR. AINSWORTH: To admit the Griffin statement -- Griffin transcript.

MR. LOEVY: Oh, yeah. We definitely want to file a response. We're going to catch up this weekend and tomorrow.

THE COURT: Okay. It's a lot of work, I know.

Well, then just be at ease until they get here.

(Pause.)

THE CLERK: All rise.

(Jury in at 9:33 a.m.)

THE COURT: Please be seated.

All right. We will -- oh, where's our witness?

MR. AINSWORTH: May we resume with Dr. Leo? Doctor, would you please take the stand?

THE COURT: Be seated. Good morning.

THE WITNESS: Good morning.

RICHARD ANGELO LEO, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN,

DIRECT EXAMINATION (Resumed)

BY MR. AINSWORTH:

Q. Good morning, sir.

A. Good morning.

Q. So yesterday we were talking about the lack of food and sleep and its effect on people.

Based on your review of the record, in what setting were Mr. Fulton and Mr. Mitchell during their stay at the police department?

A. Well, they were in an interrogation room.

Q. And in that interrogation room, was there a toilet?

A. Not that I saw in the materials I reviewed. That would be very atypical.

Q. Was there access to water?

A. Not that I saw in the materials I reviewed.

Q. And could they access food on their own?

A. No.

Q. And you mentioned yesterday that the light switch was on

Leo - direct

738

the outside of the room?

A. Correct.

Q. And so could they control the lighting inside the room by themselves?

A. My understanding is the door was locked, so no.

Q. And so who were Mr. Fulton and Mitchell dependent upon to meet their basic needs of food, water, access to the bathroom and, you know, darkness to sleep?

A. It would be the officers who were interrogating them.

Q. Does it matter that Mr. Fulton and Mr. Mitchell were dependent on their interrogators for, you know, food, water, access to the bathroom, and the opportunity to sleep?

A. I think it's relevant to the analysis, especially given how long those interrogations lasted. It creates a sort of power control dependency, so they're disempowered, and that creates more power and control in addition to everything else in the interrogation, for the interrogators in the interrogation.

Q. And how does it make people who are being interrogated as far as their vulnerability to giving a false confession, how does the fact that they're not in control of their environment affect their analysis?

        MR. NATHAN: Objection, leading; form.

        THE COURT: Overruled.

BY THE WITNESS:

A. Well, combined with the length of the interrogation, it

would increase the risk of -- it would make them more vulnerable or susceptible to coerced compliance or making or agreeing to a false confession or statement.

BY MR. AINSWORTH:

Q. And let's talk about interrogation tactics.

Are there -- does the way an interrogation is conducted have risk factors in terms of, you know, the risk of eliciting a false confession?

A. Yes. So we talked yesterday about risk factors. Most interrogation techniques are not risk factors, but there -- for false confession, but there are some that are known risk factors for false confession.

Q. What is a false promise of leniency?

A. Well, a promise of leniency would be either implied or explicitly suggesting that in exchange for an outcome, a more lenient charge, more lenient sentence, a more lenient outcome, the suspect has to confess.

So it could be implied, it could be explicit. The category of promises that go under promises of leniency sometimes are a little bit broader than leniency. It might be freedom in exchange for compliance or confession as well.

Q. Did you see examples of false promises of leniency in the record that you reviewed with respect to Ms. Griffin, Mr. Fulton, and Mr. Mitchell?

A. In their accounts, yes, of the interrogations that they

experienced, yes.

Q.   And what were some examples of those false promises of leniency?

A.   In Mr. Fulton's case, I think he said that avoiding the death penalty was a -- was mentioned, avoiding long incarceration, being told he could go home or understanding that he could go home based on what he was told, that his girlfriend or wife would not be charged, that he'd get to see his child again, if I'm remembering correctly.

Q.   And did you also see examples of that with Mr. Mitchell and Ms. Griffin?

A.   Yes.

Q.   And what were they told, according to their accounts?

A.   Again, being treated as a witness as opposed to a suspect, being allowed to go home, not being charged versus being charged.

Q.   And when a suspect is told that they can go home in exchange -- in exchange for a statement, what effect does that have on the suspect as far as the risk factors of giving a false confession?

A.   So this has been well studied, and that technique, implied or express promises or the equivalent of leniency in exchange for confession is a known risk factor.  It increases the risk that somebody will comply and that if they are innocent, they will falsely confess.  It's a very powerful inducement --

Q.   Why?

A.   -- to stop denying and start admitting.

Well, I think it's important to think of the totality of the interrogation, so especially the longer it goes, but interrogations are very accusatory.  The goal of the interrogation is to move a presumed guilty suspect from denial to admission, and so they can become aggressive, but they are accusatory as a baseline and they become -- they can become very unpleasant, stressful, even coerced experiences, and so the promise of being able to escape that environment is a very powerful inducement.

I think there's -- we find in -- in our research also there's fear of the unknown.  There is -- it's not always obvious to lawyers, but many people don't understand how the criminal justice system works and that they don't understand necessarily the difference between the police and the prosecution and the judge and think that the police really do have this power to control what -- whether they stay, whether they go, whether they get charged, whether they don't, whether they go to prison for a long time, whether they don't.

So it -- it overwhelms and strikes fear into people especially if they're thinking about their long-term freedom.

Q.   And what are minimization and maximization techniques?

A.   So this is academic jargon.  These are big words for a very simple concept.  Minimization, maximization.  It's a technique

Leo - direct

742

where police give two choices to a suspect in an interrogation. Sometimes it's a scenario, a good scenario, a bad scenario.

And the good scenario is if you admit to the underlying act, then you won't be seen as blameworthy, and the consequences will be minimized, or minimal. But if you continue to deny, you'll be seen as more blameworthy, and the consequences will be more severe.

And so the classic example might be in a homicide case, was this just self-defense? Everybody will understand. Self-defense is not a crime. Or was this a premeditated planned murder, and the implication sometimes made more explicit in that example is that if you admit to the act, to killing the person in question, then the -- it will be portrayed as self-defense, which is not a crime, and which minimizes blame worthiness and consequences; but if you continue to deny, then you'll be seen as somebody who did the worst possible crime, planned it, premeditated it in cold blood.

And so this technique sometimes by implication, if not explicitly, communicates more lenient treatment, the good scenario, in exchange for compliance -- complying and confessing and implies harsher treatment, punishment, deprivation of freedom, the worst possible outcome sometimes in the absence of complying and confessing.

Q. And so for Mr. Fulton and Mr. Mitchell, did they report

Leo - direct

743

police using minimization and maximization techniques with them?

A.   Yes.

Q.   And so what are examples of those from the records that you reviewed?

A.   Well, an example would be being treated like a suspect and being prosecuted, going to prison for a long time, not seeing your family versus being treated like a witness, like Ms. Griffin, and being able to walk out of the courtroom and not be charged and be able to see your family and not have to deal with the criminal justice system.

Q.   So being told that you're just a witness, that's an example -- and you can go home, that's an example of a minimization technique?

A.   Yes.

Q.   And then maximization is, you know, if you deny, you're going to get the death penalty and the worst things are going to happen to you?

A.   That would be an extreme example, but, yes, the implication that you'll be charged and you could go to prison, face a long sentence, yes.

Q.   Did you see evidence that the, according to Mr. Fulton and Mr. Mitchell's accounts, that the officers were playing them against each other?

A.   Yes.   That's a technique, playing one against the other.

So when there's multiple co-defendants, the idea is whoever admits first gets the least punishment, and also telling the suspect that if you don't admit, the other suspect or accomplice or alleged co-conspirator is going to admit first, and they'll get the deal, and then you'll be holding the bag and get the worst punishment.

Q.   And so what effect does that have on people who are told that, you know, if you don't point the finger at that guy, that guy's going to be pointing the finger at you, and you're going to be the one, you know, holding the bag?

A.   So it depends on how that technique is used, but the more extreme version of that technique would be to be more explicit about the threat of harm if you don't admit and the promise of benefit if you do, and to the extent that technique conveys a promise and conveys a threat, it would be more potent and it would be a risk factor for false confession because, again, it conveys a threat if you don't confess, a serious threat in the example you're giving, and a promise of freedom or leniency if the person does.

Q.   And so when you're -- are you saying if the -- playing one against each other is combined with maximization and minimization techniques, that it makes it more potent?

A.   Yes.  And if it conveys a threat and a promise, yes.

Q.   And, like, when you say threat, what do you mean?

A.   A threat that if you don't tell the police what they

believe occurred or what they want to hear, that you will be the one who is charged, and not only that, that your alleged co-conspirator will -- will rat you out.

And so you'll be charged, there will be strong evidence against you, and then in some cases more explicitly told about sentences or the death penalty, the kinds of outcomes that would occur, which would be very serious especially in a homicide case.

Q. And if the converse is you're told you can go home if you, you know, cooperate and point the finger at the other guy, is that a risk factor?

A. Yeah, so promises and threats are really two sides of the same coin.

So if somebody is threatened that a bad outcome will occur if they don't behave in a particular way, they're implicitly promised that a good outcome will occur if they do behave that way; and if somebody is first promised a good outcome, like leniency, then it's -- a threat is necessarily implied if they -- if they don't take the good outcome.

And the example that I gave about the suspect and the witness, it's understood. It may be made explicit in an interrogation, particularly one that goes on a long period of time, but if you're just a witness, you're going home, right? Witnesses don't get typically charged with crimes. That's our common understanding, whereas suspects do unless the charges

Leo - direct

746

are dropped.

Q.   What is a false evidence ploy?

A.   So this is another academic term.  What it refers to is when police lie about evidence or misrepresent evidence.  They say they have somebody's fingerprints or they have DNA or they have them on surveillance, and it turns out those are factually false.

     And it doesn't matter if the police mistakenly think that evidence is true.  It's lies about evidence or falsifying evidence that doesn't exist in their interrogation of the suspect.

Q.   Did you see examples of false evidence ploys with Mr. Mitchell and Mr. Fulton?

A.   Yes.

Q.   And what are some examples of those?

A.   My recollection is they were told that there were multiple witnesses who had identified them, and if I'm remembering correctly, I believe Mr. Fulton was told that there was evidence of his car being present at the crime scene.

Q.   What effect does being -- you know, is there research regarding younger people being given false promises of leniency or being -- or having false evidence ploys used upon them in interrogations?

A.   Yes.  What we're talking about here really is multiple risk factors, right?  False evidence ploys or lies about evidence

Leo - direct

747

we've shown through experimental and real-world studies increase the risk of false confession. So does promises of leniency or threats, implied or explicit.

These would be more potent, more impactful as a general matter on youthful individuals, on teenagers, because as I discussed yesterday, that's a different kind of risk factor, one having to do with personality traits, as opposed to the interrogation environment.

It's a little artificial to just take one -- I know we need to do it sort of in the way we talk and think about things, but these things combine, and like the heart disease example I gave yesterday, the more risk factors you have, the greater the likelihood of the outcome.

Q. And is it widely accepted in the community that false evidence ploys with younger people create a higher risk for false confessions?

MR. NATHAN: Objection, foundation; leading.

MR. AINSWORTH: In the research and the literature.

THE COURT: I think -- we'll never get through this if we have to lay a foundation for every opinion, so overruled.

BY THE WITNESS:

A. Yes. Based on the social -- body of social science, empirical research going back decades with the methods that I discussed yesterday, it is generally accepted in the scientific community that false evidence ploys are a risk factor for false

confessions.

BY MR. AINSWORTH:

Q.   And have legislative bodies taken steps to, you know, prevent that outcome as -- from using false evidence ploys with younger people?

A.   Yes.   Currently ten states have -- have, by legislative statute, banned the use of deception, lies about evidence, in juvenile interrogations.

Q.   Is that because of the risk that telling kids that there's a lot of evidence against you falsely might lead them to give a false confession?

A.   I would say yes, but it's because the research shows that, and legislative bodies have become aware of the research, and, of course, some cases that have been very well known have embodied that and been very troubling cases of false confession, of juveniles where there were lies and false evidence ploys.

Q.   Let's talk about physical abuse.   Is that a known risk factor for false confessions?

A.   Yes.

Q.   And did Mr. Fulton and Mr. Mitchell report receiving physical abuse during their interrogations?

A.   Yes.

Q.   How does the imposition of physical abuse affect suspects during their interrogations?

Leo - direct

749

A.   Well, I think it's quite clear.  It terrorizes suspects, and there's, again, an element of the unknown, a fear of the unknown.

If somebody crosses that line, if a police officer crosses that line, one really doesn't know if it's going to happen again, especially if it's a long interrogation.

Q.   And so, you know, sometimes when we think about physical abuse, we think about Medieval torture, and does the research say that in order for physical abuse to be a factor in whether somebody gives a false confession that they have to be continuously abused with, you know, lasting physical injury, or is it -- well, tell us what the research says on that topic.

A.   Well, it's pretty clear.  Like any human phenomena, there's variation, so there could be a little bit or a lot or something in between.  And, again, we're talking about multiple risk factors, and we're talking about teenagers.

So, yes, it doesn't need to be Medieval or barbaric to be a risk factor for false confession.

Q.   And is that because of what you were saying about once they learn that their interrogators are willing to cross the line and put their hands on them, they don't know what the interrogators might do?

A.   I think in part, yes.

Q.   Do people confess even in the absence of physical abuse?

A.   Yes.

Q. And is that just some people or, you know, are there -- does it happen often that people confess even in the absence of physical abuse?

A. The typical false confession case in the United States, if that's the jurisdiction that you're asking about, does not involve physical abuse. Most of the cases that we've studied are from the era of 1989 to the present, so the last 35 years, so -- the hundreds and hundreds of cases that I mentioned yesterday.

So there are a subset of them that involve physical abuse or allegations of physical abuse, but the majority do not. The typical false confession case in the United States does not involve physical abuse.

Q. So people have confessed to rape and murder even if they haven't been struck by their interrogators?

A. Correct.

Q. And I mean falsely confess.

A. Correct, yes.

Q. Is the fact that one is innocent a risk factor to giving a false confession?

A. It is considered in the research literature, yes, to be a risk factor, and there have been studies that support that, and it might seem counter-intuitive, but it makes sense.

Q. Why is that?

A. When somebody is innocent and they know they haven't

Leo - direct

751

committed a crime, they tend to be more cooperative with the police and more trusting that the truth will come out, that if they just try hard enough to persuade their interrogator that they're innocent, that the truth -- that the interrogator will see that.

And even in the cases where people have falsely confessed, they think, well, you know, we'll just clear this up; you know, once we have a lawyer or a trial, this will get cleared up because I'm innocent.

Innocence protects the person. The truth is a protection against false conviction, initially against false confession, but if they can't persuade the interrogator, they often think it will be sorted out down the line once they get out of that interrogation room.

Q. Are innocent people more likely to waive the right to silence and talk?

A. Yes. So -- so one way this has been demonstrated is --

MR. NATHAN: Objection, disclosure.

MR. AINSWORTH: I don't see it directly -- I'll ask him another question, and I think we can get to the same place.

BY MR. AINSWORTH:

Q. Sir, we've mentioned risk factors such as youth, the, you know, the youth of Mr. Fulton, Mr. Mitchell and Ms. Griffin, the length of time that they were in custody, their lack of access to sleep, to food, the interrogation techniques that

Leo - direct

752

were employed upon them, such as the false evidence ploys, the promises of leniency, the threats that they would spend the rest of their lives in prison if they don't cooperate.

Do researchers look at each of these risk factors in isolation, or do they assess them cumulatively?

A. Well, both by necessity, but cumulatively ultimately because, again, one wants to look at the totality of the situation and especially when there are multiple risk factors and especially the longer the interrogation goes.

Q. And so yesterday you talked -- you mentioned something about the pressure building and needing a release. What did you mean by that?

A. That in response to extreme stress or disorientation or fear that sometimes confessing, falsely confessing, can be an act of psychological release and release that pressure especially if the person thinks that that's the only way to put an end to the interrogation, which is often the implied, sometimes the explicit, message of the interrogation.

Q. What is scripting?

A. So --

MR. NATHAN: Objection, asked and answered yesterday.

(Counsel conferring.)

THE COURT: Did you ask this?

MR. AINSWORTH: No. We talked about contamination yesterday. We did not talk about scripting.

Leo - direct

753

THE COURT:  I didn't recall it myself.

Go ahead.

BY THE WITNESS:

A.  It's a technique related to contamination, so scripting is -- refers to when the police pressure and persuade the suspect to adopt the narrative or account that they either believe occur or want the suspect to accept.

BY MR. AINSWORTH:

Q.  And so what are examples of scripting?

A.  An example of scripting would be let's say if you have a robbery and it involves several people, pressuring one of them to take on the role that they -- the police believe that person took on if that person was the front man.

Another example would be pressuring the person to accept or agree with the motive for the robbery if police had -- or if it was a sexual assault case, the motive for the sexual assault, so those would be examples of scripting.

When I say narrative, a confession involves a story, and even if a suspect confesses about doing the act, that doesn't provide the narrative or the story.  And so sometimes police pressure the suspect to provide a narrative or story, or even if they do provide a narrative or story sometimes the police don't believe it or don't agree with it.  And so they pressure them to change that narrative or story to conform to what the police believe occurred or want to hear occurred.

So that's what we mean by scripting, pressuring the suspect to adopt the police narrative.

Q.   So not just saying I did it, but including details about how the crime -- why the crime occurred and how it was carried out?

A.   How and why the crime occurred, yes.

Q.   What's a non-public detail in terms of, you know, false confessions?

A.   Well, one that isn't in the public realm, and sometimes we also talk about details that are not likely guessed by chance.

Q.   If there are non-public details in a confession, what does that suggest about the accuracy of the confession?

A.   Well, here we have to begin by talking about contamination. So if the person learned those details from the police who knew those details, then it has no truth value, no discriminating -- no discerning value.

On the other hand, if the non-public details are not likely guessed by chance and they weren't learned by the police, then that could be very significant in evaluating the reliability of the confession.

And I think I gave an example of this with the body face up, face down yesterday, 50 percent likelihood of guessing, let's say it's a non-public detail, versus finding a murder weapon 20 miles away buried under a bridge covered by something that would be almost impossible to guess by chance.

The problem is when you don't have a full transcription of an interrogation, then you can't -- you don't have an objective record to tell whether there was contamination or not.

Q.   And yesterday you told us that in two different studies, 95 percent had contamination in false confessions and the other study you said had 91 percent contamination.

Does that make it difficult to determine whether the facts that ultimately appear in the confession came from the suspect voluntarily or were just provided by investigators and then the suspect is repeating them?

A.   Yes.   So the question is where did those non-public details, not likely guessed by chance, originate from?  Did they originate from the suspect, or did they originate from the police?

Q.   Given your familiarity with false confessions, is it always clear to the person who's giving a false confession where the information in the confession came from?

A.   I think I might need a little bit more context to answer that question.

Q.   Sure.  For example, would it surprise you if someone who gave a false confession didn't remember who brought up a particular detail first?

A.   No, it wouldn't surprise me, especially if it was a long interrogation and a lot of time was involved or a lot of time

had passed since the interrogation.

Q.   And why is that?  Why do -- you know, why do people, if they're giving a -- a confession, it's their statement, why do they sometimes have a hard time telling whether it was a fact they made up or whether it was a fact that was fed to them by police?

A.   Well, nobody has a perfect photographic memory, and so if the interrogation goes on for a long time especially, you could imagine it would be like, you know, you don't necessarily remember in a conversation that lasted six hours or eight hours who said what at exactly what time.

But interrogations are different.  They're accusatory. Sometimes there's multiple people accusing the suspect.  They sometimes go on overnight or the person becomes very tired, so they're very stressful especially the longer that they last. And so it would be understandable and not uncommon if somebody didn't remember every detail and where it came from, even every false detail, which might be making something up or guessing or inferring or repeating back something that was told which may be true or false.

Q.   Is it expected that innocent people who have given false confessions will feel confused about the process that led to their statement?

A.   Some will feel confused, yes.

Q.   And why is that?

Leo - direct

757

A.   Well, it can be a very disorienting experience.  There are times when police are so aggressive and a person is so vulnerable that they come to doubt their memory, they come to doubt their sense of recollection.

          So I think it has to do with the nature of the stress and sometimes coercion of the experience.

Q.   And does the literature -- like, how do you know that people who are innocent who've confessed be- -- you know, report being confused about their experience and, you know, what led to their false confession?

A.   So -- so sometimes they testify in pretrial hearings and we have the testimony.  Sometimes they testify at their trials if their case goes to trial.

          If they're convicted, sometimes they testify in post-conviction proceedings.  In some cases, civil cases, they're deposed.  Oftentimes when people are exonerated by DNA, they're approached by the media, and they're interviewed.

          So the way we would know would be by their recollections, by what they tell us.  And, of course, in the cases where you know the confession is provably false in the types of examples that I gave yesterday, then you know you have an honest account or at least the person's best account because the innocence/guilt issue has been resolved and you know the confession is false to a certainty.

Q.   And when you -- when the researchers are looking at the

Leo - direct

758

data, are they relying on just one or two people's accounts of, you know, what happened to them, or are you aggregating the data?

A.   Right.   And so like I mentioned yesterday, the beauty of looking at these cases in databases that either we put together or the ones that are put together by the National Registry of Exonerations and the Innocence Project is that we can look across the cases for patterns as opposed to one-offs or outliers.

Q.   In the research on false confessions, is there a generally accepted methodology for testing out whether a confession is more likely to be a reliable confession or an unreliable confession?

A.   Yes.

Q.   What is that method to help discern between more reliable confessions and less reliable confessions?

A.   So we sometimes refer to this as the fit test, and so we look at the suspect's narrative, confession narrative, and we essentially ask two questions.

One is what does that tell us about the suspect's knowledge of the crime facts, particularly the non-public crime facts, not likely guessed by chance, that are not the product of contamination or being educated by the police or an outside source, and on that one question, you see a pattern.   People who give true and reliable confessions volunteer non-public

Leo - direct

759

details that are not likely guessed by chance, and the significance of that is it demonstrates personal knowledge, that this is what you would expect somebody who committed the crime to know, like the example I gave about leading the police to a murder weapon 20 miles away under a bridge, buried in a particular way.

And then the opposite would be true in a false confession, or I should say an unreliable confession, it would be indicia of reliability that they get facts wrong, that they guess facts that are not likely guessed by chance, and the -- those facts turn out to be proven false.

Again, this is absent contamination because if they get some facts wrong and some facts right and the ones they get right are also non-public details not likely guessed by chance but they learn that in the process of the interrogation, that, again, that has no discerning or truth value in this kind of analysis.

So that's the pattern you see on Question No. 1.

And the underlying issue is what it tells us about their knowledge of the crime, non-public crime facts, or lack of knowledge. So that's the first, the fit between their knowledge of the non-public crime facts and the crime as described in the confession narrative.

And then the second is comparing that confession narrative to the physical and scientific and other credible

evidence in the case, and, again, this is called the fit test, so does the evidence -- does the confession narrative fit the evidence?  Does it match the physical evidence?

And, again, you see patterns, people getting the murder weapons wrong or not being able to lead police to new or missing or what's called derivative evidence, not mentioning things in their confession statement that you would expect them to know, contradictions in different types of evidence; if there's multiple defendants, inconsistencies between one I should say suspect and the other suspect.

So looking at the fit not only in their knowledge of non-public crime facts not likely guessed by chance absent contamination, but also how does it fit or not fit with the credible evidence, particularly the physical and scientific evidence.

And, again, the pattern there that reliable confessions or what we call indicia of reliability is when there's consistency, and inconsistency would be indicia of unreliability.  And that might be a matter of degree, too, depending on the type of evidence that's being -- that's being tested against the confession narrative.

Q.  And in your research, have you used that process to test the, you know, the confession against the available evidence to determine whether it's an indicia of reliability or unreliability?

A.    In the research where that's been one of our research questions or an issue in a study, it's not the issue in every study, but, yes, it's a generally accepted methodology.

Q.    And you've done that before?

A.    Many times, yes.

Q.    All right.  And just to be clear, you're not here to testify if Mr. Fulton or Mr. Mitchell or Ms. Griffin's statements are true or false; is that correct?

A.    Correct.  I'm not a fact witness.  I'm not offering any opinions about that.

Q.    And you weren't present for the, you know, actual crime, so you don't know one way or the other if those statements are true or false, correct?

A.    Correct.

Q.    But I want to ask you about in your review of the confessions, did you determine that the confessions indicated indicia of reliability or indicia of unreliability?

         MR. NATHAN:  Objection, vague.

         THE COURT:  Overruled.

BY THE WITNESS:

A.    In my analysis, they contained multiple indicia of unreliability.

BY MR. AINSWORTH:

Q.    Let's walk through that.

         All right.  Do you recall, according to Ms. Griffin

and the other confessions, what time generally the murder was supposed to happen?

A. My recollection is between 9:00 and 10:00 a.m. on one of the nights -- 9:00, 10:00 p.m., I'm sorry.

Q. All right. And did you review evidence that contradicted the time frame, you know, that time frame of the murder?

A. Yes.

Q. What evidence did you review that contradicted the narrative that the murder occurred sometime between 9:00 and 10:00 p.m. on March 9th?

A. Well, there was, if I'm recalling correctly, video evidence from the hospital. There were phone records. There were cable TV records, and there was surveillance videos from the apartment complex as well of Mr. Fulton.

Q. And what did those records that you reviewed from the hospital, from the apartment building show about Mr. Fulton's alibi the night of the murder?

A. Well, they corroborated it, in my opinion, because they place him between roughly 8:00 p.m. that night and midnight either at his apartment or at the hospital or en route to the hospital or back to the apartment.

And so if Ms. Griffin's description of when the crime occurred is 9:00 to 10:00 p.m., he's accounted for elsewhere during that time period. And so that would be an indicia of unreliability. It would corroborate the alibi.

Leo - direct

763

Q.   All right.  And do you recall that there were phone calls referenced in the various confessions in this case?

A.   Yes.

Q.   And were those phone calls -- and do you recall what the, in general, the phone calls were alleged in the confessions?

A.   Well, my recollection is that the allegation was that Ms. Griffin helped set up a payback murder in the phone calls, and that's what -- the reason why, in the police theory of the crime, Mr. Collazo was murdered.

Q.   And showing you Plaintiffs' Exhibit 45, the transcribed statement of Mr. Mitchell, page 22.

     All right.  So according to Mr. Mitchell's confession on page 22, it says:

     "We called Precious, asked her, you know, for directions.  She -- she said she was gonna lead us there, and we weren't gonna get off the phone with her until we got there."

     And then he's asked:

     "So you stayed, somebody stayed on the phone with her?

     "Yeah, 'cause it was on the weekend, so minutes were free so it didn't matter.  We stayed on her -- on the phone with her the whole time."

     Do you see that, sir?

A.   Yes.

Q.   All right.  So in your review of the phone records, was

Leo - direct

764

there evidence that corroborated that Ms. Griffin was on the phone with Mr. Fulton on March 9th?

A.   No.

Q.   All right.  So you had access to Mr. Fulton's records and to Ms. Griffin's phone records, right?

A.   Yes.

Q.   And there were no phone calls between them at all on March 9th?

A.   In the materials I reviewed, correct, there were none.

Q.   And what does that tell you about the reliability in the confessions when Ms. Griffin, Mr. Fulton, and Mr. Mitchell are all saying they were on the phone with Ms. Griffin as they were driving up Lake Shore Drive to get to the crime scene, what does that tell you about the indicia of reliability of the confessions?

A.   Well, that would be multiple indicia of unreliability. That would go to the second part of the fit test, the physical or medical or scientific or in this case other credible phone evidence, which is presumptively accurate, not fitting with the details of the confession statement.

        MR. AINSWORTH:  And then showing you again Plaintiffs' Exhibit 45, page 6, if I may publish, Your Honor?

        THE COURT:  Yes.

BY MR. AINSWORTH:

Q.   You see it says, they're talking about the victim, Chris,

at that time he was all bloody?

A.   Yes.

Q.   Do you see that?

And so according to the confessions, Mr. Collazo had been beaten and was quite bloody; is that right?

A.   Yes.

Q.   Did you review evidence related to the crime scene investigator's processing of Mr. Fulton's vehicle?

A.   Yes.

Q.   And was there any evidence from Fulton's car that connected any of Mr. Fulton, Mr. Mitchell or Mr. Shaw to the murder?

A.   Not that I saw, no.

Q.   And so no evidence of blood; is that right?

A.   Correct.

Q.   Are you aware of DNA testing that was conducted during post-conviction proceedings?

A.   Yes.

MR. NATHAN:   Objection, foundation.

BY MR. AINSWORTH:

Q.   And how are you aware?

MR. NATHAN:   Objection, foundation; undisclosed *Daubert*.

BY MR. AINSWORTH:

Q.   If you'd look at Plaintiffs' Exhibit 133, page 47, points 1 and 2 on that page.

THE COURT: I don't have the exhibit in front of me.

MR. AINSWORTH: Oh, I'm so sorry, Your Honor.

MR. LOEVY: It's the report. It's Leo's report.

THE COURT: So is it -- which --

MR. AINSWORTH: The first two bullet points, Your Honor.

THE COURT: Yeah, it appears to be in the report.

MR. NATHAN: Foundation as to DNA analysis with this witness.

THE COURT: Okay. What he knows about DNA.

MR. AINSWORTH: Sure.

BY MR. AINSWORTH:

Q. Sir, in your study of false confessions, have you, as we talked about earlier, have there been times when you've compared the evidence to the confessions?

A. Yes.

Q. And, you know, approximately how many times have you done that in your career?

A. Hundreds or thousands.

Q. And in those times, have you compared DNA results to the confessions?

A. Yes. I want to be really clear, I'm not a DNA expert, but there would be DNA -- there would be reports from scientific laboratories that would be part of the file that either in research or in cases I work on, I would be making that

comparison and relying on that information in the analysis of indicia of reliability or unreliability.

Q. And so then in this case, did you review lab reports from testing agencies that reviewed DNA evidence?

A. Yes.

Q. And can you tell us, sir, what DNA testing was conducted according to those lab reports that you reviewed during post-conviction proceedings in this case?

A. My recollection is that there was a hair found in the trunk of Mr. Fulton's car and also --

Q. Well, let's talk about that hair first.

So there was a hair found in Mr. Fulton's trunk, right?

A. Correct.

Q. So indicating that the car wasn't cleaned so meticulously that there's no trace evidence found.

MR. NATHAN: Objection, leading.

THE COURT: Sustained.

BY MR. AINSWORTH:

Q. What does the fact that there was a hair found in the trunk tell you about the available evidence to investigators?

A. Well, it creates a test -- an ability to test that against the theory of the crime or the narrative of the confession.

Q. And what DNA -- or what were the results of the testing on that hair found in Mr. Fulton's trunk?

A.   My recollection is that it did not relate to Mr. Collazo. It was not Mr. Collazo's hair.

Q.   So they found a hair in Mr. Fulton's trunk, and it was not Collazo's?

A.   Correct.

Q.   And did investigators collect duct tape from Mr. Fulton's home?

A.   Yes.

Q.   And was that duct tape compared to the duct tape that was used to bind Mr. Collazo?

A.   Yes.

Q.   And what was that -- what were the results of that analysis?

A.   It wasn't the same duct tape.

Q.   Did any physical evidence that was recovered from the -- either the scene of the crime at 52nd and Peoria in the alley or from Mr. Fulton's car connect any of Mr. Fulton, Mr. Mitchell or Mr. Shaw to this crime in any way?

A.   No.

Q.   Did you investigate to determine if the alleged murder weapon was consistent or inconsistent with the wounds suffered by the victim?

A.   Yes.   Based on the materials that I reviewed, in my opinion it was inconsistent.

Q.   And how did you determine that?

Leo - direct

A.   Well, I guess there were two things.  One is that my recollection is the medical examiner said there was a small hole in the back of the scalp, and that would not be consistent with being hit by a stick or a baseball bat.  There would have had to have been something like a nail at the end of it to cause that.  So that was No. 1.

And then No. 2, my recollection is there were no broken bones, and a vicious physical assault like the one described with a stick or a baseball bat like the one described in the confessions would have likely caused broken bones, especially in an area as sensitive as the face or head.

Q.   And showing you again Plaintiffs' Exhibit 45, page 27.

MR. AINSWORTH:  May I publish, Your Honor?

THE COURT:  Yes.

BY MR. AINSWORTH:

Q.   All right.  And you see there Mr. Mitchell is reporting that John hit Chris in the face with the baseball bat?

A.   Yes.

Q.   And that the baseball -- it was a long aluminum bat?

A.   Yes.

Q.   All right.  And so in conducting that analysis, did you review testimony from the medical examiner in this case?

A.   Yes.

Q.   And so is that how you were able to conclude whether the evidence was consistent or inconsistent with the -- with the

Leo - direct

770

confessions?

A.   Yes.

Q.   You're not a medical doctor?

A.   Correct.

Q.   All right.  So you were relying on the testimony from the medical examiner who did the forens- -- did the autopsy to help assess whether the evidence was consistent or inconsistent with the murder weapon?

A.   Correct, and that's the kind of analysis we always do where people in my field are not experts typically in medicine or medically-related fields.

Q.   And were the confessions consistent about what the murder weapon was?

A.   That's my recollection, that generally they were consistent, yes.

Q.   And do you recall what different types of items the confessions stated were the murder weapons?

A.   I thought stick, bat, that's -- that's my recollection.

Q.   And was it always a full size baseball bat?

A.   If I'm recalling correctly, no.

Q.   What else was used?

A.   If I'm recalling correctly, in one of them there was mention of a smaller baseball bat.

Q.   Like a miniature replica bat?

A.   Yes.

Q. And what does it tell you about the reliability or unreliability of the confessions when the confessions are stating that a baseball bat or a miniature bat or a pipe was used to beat the suspect, but you're finding a round hole in the scalp that's inconsistent with an item such as a baseball bat?

A. Again, it goes back to the fit test and does the confession narrative fit with the physical, scientific, or other credible evidence, and that would show an absence of fit, so that would be an indicia of unreliability.

Q. And did the medical examiner take X-rays of the victim?

A. That's my recollection.

Q. And did the X-rays show there were any broken bones on Mr. Collazo's body?

A. Yes. That's my recollection, that there were no broken bones.

Q. And so what does it tell you when the manner of the murder weapon being a baseball bat is employed on the victim's face, but there are no broken bones to the victim's body?

MR. NATHAN: Objection, foundation as to medical testimony.

MR. AINSWORTH: I can -- I can lay a little more foundation.

THE COURT: Okay.

BY MR. AINSWORTH:

Q.   Did the medical examiner testify about the likelihood of the wounds to the victim's face being caused by a baseball bat?

A.   That's my recollection, yes.

Q.   Do you recall what the medical examiner said about the likely origin of those injuries to the victim's face?

A.   That it would likely have been caused by heels or fists, not by a baseball bat.

Q.   And so based on that testimony, what does that tell you, and the lack of broken bones to the victim's face or head, what does that tell you about the reliability or unreliability of the confessions saying that the victim was beaten with a metal pole or a baseball bat?

A.   Again, it just goes back to the methodology of the fit test, and it's a lack of fit between the confession narratives and the evidence, the medical evidence, and that, again, would be an indicia of unreliability.

Q.   Did you look to see if the police recovered any evidence to corroborate the confessions?

A.   Yes, I did not see any.

Q.   Why did you look to see if there's any evidence that would corroborate the confessions?

A.   Well, that's the -- that's another way of talking about the fit test, right?  When I say does the evidence fit the confession narrative, another way of describing that is does the evidence corroborate the confession narrative, which would

be indicia of reliability, or does the evidence discorroborate, if that's a word, or disconfirm or is it inconsistent with the confession narrative, which would be an indicia of unreliability.

So that's what we always look at in these cases, and it may sound weird to say, but there are some cases where there's not a lot of evidence, and there are other cases where there is. And the homicide cases, from a researcher's perspective, often give us a lot of physical evidence to confession -- to compare -- sorry, I'm still on West Coast time -- to compare against the confession narrative.

Q. And so what kind of things were you looking for to see if the investigation would corroborate the confessions?

A. Well, in a bloody crime, the physical evidence, whether the physical evidence matches the people who confessed to the crime and if there were instruments used in the crime or things taken from the decedent, if those can be found either in the suspects' homes or cars or relatives' homes or in places where they say, if they say in the confession statement where those items would be.

Q. So like --

A. Anything that links the suspect to the physical evidence.

Q. So if there's a jewelry heist and the police say, where are the diamonds, and then they say, oh, the diamonds are under my mattress and they go and recover the diamonds from under the

mattress, that's a good indication that this is a reliable confession?

A. Yes, because, again, the methodology would be how likely would the suspect know that by chance? Could an innocent person have guessed that?

And, of course, if it's the suspect who is making that statement, then it shows -- it shows inside knowledge not likely guessed by chance and what you would expect the true perpetrator to know and have done.

Q. And so in the confessions, was there evidence that could have been recovered to corroborate the confessions?

A. In this -- in this case, yes.

Q. Like what?

A. If I'm recalling correctly, I believe there was a hoodie and there was jewelry that was mentioned in the confessions but not recovered.

Q. And what about the murder weapon?

A. And that there -- the alleged stick or baseball bat or pole was not recovered either.

Q. Did you see in the records any effort made to recover the murder weapon in this case?

A. Well, I recall that it wasn't recovered. Yes, I think there was because there was -- there were extensive items that were tested from the homes and the cars and the home, car and garage, grandfather's garage, of Mr. Fulton.

Q.   But was there any effort made to recover specifically the murder weapon by asking the suspects where is the murder weapon or where can we recover it?

A.   I don't recall.

Q.   Take a look at your report at page 47, the third bullet point from the bottom, and let us know if that refreshes your recollection.

A.   Thank you.  Okay.  So page 47, the third bullet point from the bottom?

Q.   I said 47, right?

A.   I think so.

Q.   Hopefully, okay, good.

A.   Yes, so -- I'm sorry.  So this refreshes my recollection.

There was not an attempt to recover the items, Mr. Collazo's sweatshirt, jewelry, and the baseball bat or stick that was alleged to have been the murder weapon.

Q.   All right.  And so according to the confessions, Mr. Collazo was wearing a hoodie; is that right?

A.   Yes.

Q.   And was that hoodie ever recovered?

A.   To my knowledge, based on the materials I reviewed, no.

Q.   And Mr. Collazo wasn't wearing the hoodie when he was -- his body was recovered, correct?

A.   Correct.

Q.   And was there any effort to find out what happened to that

Leo - direct

776

hoodie?

A.   Not that I recall.

Q.   And the same with the jewelry.  According to the confession, jewelry was taken from Mr. Collazo?

A.   Correct.

Q.   And was there any effort to recover the jewelry that was taken from Mr. Collazo?

A.   Not that I recall.

Q.   And Mr. Collazo was supposedly killed with an either baseball bat, a miniature bat, or a pole; is that right?

A.   Yes, according to the confession statements, yes.

Q.   And was there any effort to recover the murder weapon in the case?

A.   No.

Q.   What does that tell you about the -- either the indicia of reliability or the indicia of unreliability of these confessions?

A.   Well, it would be indicia of unreliability and, again, that goes back to corroborating versus the lack of corroboration. If those items had been found, if they had tested and linked back to Mr. Fulton or Mr. Mitchell, that would be indicia of reliability.  But this was -- that did not happen, so therefore it would be indicia of unreliability.

Q.   I want to ask you, the confessions, what did the confessions say the victim was gagged with?

Leo - direct

777

A.   My recollection is they said the victim -- the decedent was gagged with a rag.

Q.   According to the medical examiner who examined the victim's body, what was actually used to gag the victim?

A.   A sock.

Q.   And whose sock?

A.   The decedent's sock.

Q.   And why is that relevant to your inquiry, the fact that the confessions are all saying that a rag was used to stuff in the victim's mouth, but it was actually the victim's own sock that was used to gag the victim?

A.   So it's -- it again goes to the lack of fit, but there's another issue that it raises as well, because obviously there's a difference between a rag and a sock.  And if somebody, whoever put the sock in the mouth of the decedent, Mr. Collazo, would have known it was a sock, not a rag.

The second layer of significance to that would be if the police thought it was a rag and if the interrogated suspects were pressured or the scripting technique was used to repeat back what the police's theory of the crime was, then that would be significant because that would be a fact that the police investigators thought was true at the crime that was then repeated back by the suspects in the interrogation incorporated into the confession and then subsequently proven false, which, in an interrogation where you don't have a full

Leo - direct

778

record of what occurred, allows you to infer that there was suggestion and the incorporation of a false fact into the confession, which, again, would be an indicia of unreliability, but it would also be an indicia of police contamination.

Q.   All right.  So if the police at the time they were interrogating Mr. Fulton, Mr. Mitchell, and Mr. Shaw thought that the murder weapon could have been a baseball bat and it turns out it couldn't have been a baseball bat, what does that tell you about the confessions?

A.   Again, indicia of unreliability and, again, it could be incorporation of a fact that the police thought was true but then turned out not to be true, and so that would be also indicia of contamination.

Q.   And the same for if the police interrogating Mr. Fulton, Mr. Mitchell, and Mr. Shaw believed that it could have been a rag that was stuffed in the victim's mouth and didn't know that it was actually the victim's sock, what does that tell you when the confessions all say it was a rag, but it was actually the victim's own sock?

A.   Again, another indicia of unreliability and of contamination, potential contamination.

Q.   All right.  I want to show you Plaintiffs' Exhibit 45, page 7.

          All right.  This is, again, Mr. Mitchell's, a transcript of his confession, and he says:

"You and Stick held Chris's body while John put him in a black -- in a plastic garbage bag?"

Do you see that?

A. Yes.

Q. All right. According to the materials that you reviewed, what kind of bag was used to encase the victim?

A. I think it was a large, industrial-sized plastic bag if I'm remembering correctly.

Q. And how much of Mr. Collazo's body did it cover?

A. I don't recall the exact amount it covered.

MR. AINSWORTH: Let me hand you what we've marked as Exhibit No. 2.

May I approach, Your Honor?

THE COURT: Yes.

(Tendered.)

THE WITNESS: Thank you.

BY MR. AINSWORTH:

Q. And, sir, is that one of the documents that you reviewed in preparation for preparing your report in this case?

A. It is, yes. Thank you.

Q. And if you'd take a look at page 4 of that -- of Plaintiffs' Exhibit 2 and let us know if that refreshes your recollection as to how much of Mr. Collazo's body the industrial plastic bag covered?

A. Thank you, yes.

The entire body.

Q. From --

A. Extending from the head to his feet, so that he'd been placed inside this large, industrial-sized bag.

Q. Okay. So it was an industrial-sized bag that covered him from his head all the way to his feet?

A. Correct.

Q. And so we're not talking about a, you know, a Hefty trash bag that would come up to a person's waist, is that --

A. Correct. I've never used a Hefty trash bag that is that large.

Q. All right. Was it significant to you that the confessions contradicted each other about where the industrial-sized plastic bag came from?

A. Yes.

Q. And was it significant to you that the confessions contradicted each other about when the industrial-sized plastic -- the industrial-sized plastic bag was placed on the victim?

A. Yes.

Q. And so can you walk us through, you know, what you saw in the confessions on those points and what significance it had to you?

A. Yes. Very briefly, when you have multiple individuals either involved or alleged to be involved in a crime and

Leo - direct

781

they're motivated to confess, they're the true perpetrators or they're completely innocent, they usually get the details correct, at least the ones that aren't as incriminating, the small details, right?

So in a bank robbery, you know, who did -- who actually shot the victims is a big deal, but the small details should be consistent, and that's what you see in reliable confessions in multi-perpetrator crimes. What you see in the multiple false confession cases is often inconsistencies and contradictions, particularly if the people don't know the details, if they haven't been publicly reported.

And so this would be indicia of unreliability. It's -- you're not just comparing the confession narrative to the evidence and the suspect's knowledge of the non-public details, but you can compare the confession narrative to other confession narratives when there are multiple false confessions or allegations of multiple false confessions in a case.

Q. Do you recall all the locations where the various suspects said the industrial-sized plastic bag came from?

A. I do not, no.

Q. Take a look at page 48 of your report, Plaintiffs' Exhibit 133, and look at the first bullet point on that page and let us know if that refreshes your recollection about the different locations that the suspect said the industrial-sized plastic bag came from?

A.   I see, yes.  Sorry.

So one said purchased at a gas station, one said from a bowling bag, and one said from the scene of the crime, so they all contradicted each other.

Q.   And what does that tell you when people -- when people are asked where did you get the industrial-sized plastic bag and they're saying, well, I purchased it at a gas station, or they're saying I purchased it -- or it came from my bowling bag?

A.   In a reliable confession, you would expect a trivial detail like that to be accurately reported, and the inconsistency, what it tells me, the best hypothesis is that --

MR. NATHAN:  Objection, calls for speculation.

MR. AINSWORTH:  Based --

THE COURT:  Overruled.

BY THE WITNESS:

A.   -- is that they're guessing, that they don't know and they're each making up a different account to fill in the gaps of the confession.

BY MR. AINSWORTH:

Q.   And then, again, showing you Plaintiffs' Exhibit 45, page 6, the confessions talked about the victim being all bloody, correct?

A.   Yes.

Q.   And then after he was beaten, being placed in the

victim's -- in Mr. Fulton's trunk, correct?

A.   Correct.

Q.   And then at some later point placing the body into the plastic bag?

A.   Correct.

Q.   And so you would expect that there would be blood transferred from the body to the trunk before the plastic bag was placed over the victim's body --

A.   Yes.

Q.   -- if the confessions were true?

A.   Reliable, yes.

Q.   And in each of the confessions, did they have the same basic narrative about intending to intercept the victim when he was getting off the Foster bus?

A.   I believe so.

Q.   And was there evidence that you reviewed that was inconsistent -- apart from the alibi evidence, the video and the video rental and the phone calls, was there evidence that you reviewed that was inconsistent with the narrative that Mr. Fulton, Mr. Shaw, and Mr. Mitchell were going to intercept the victim when he exited the Foster bus sometime after 9:00 p.m.?

A.   Yes.  I reviewed bus records that showed that the bus wasn't running at that time.

Q.   What does that tell you about the indicia of reliability or

unreliability of the confessions?

A.   Again, that would be another indicia of unreliability, another example of the lack of fit between the confession narrative and actual evidence that you would expect to match if the confession was reliable and is consistent with what we've seen in so many false confession cases, the lack of fit.  It's essentially a physical impossibility, if the bus records are accurate, as we would assume them to be.

Q.   And was there any evidence, any other evidence to corroborate this -- these confessions, such as video evidence from the gas station showing that Mr. Fulton's car was there, or a receipt from the gas station showing that they purchased a gas can, or that the same brand of gas can that was found in Mr. Fulton's grandfather's garage had -- was sold at the gas station that they stopped at?

A.   No.

Q.   And did you look for that evidence?

A.   Yes.

Q.   And you didn't find it?

A.   Correct.

Q.   And so, you know, again, are you looking at each one of these points in isolation?  Are you doing an analysis of all of the evidence?

A.   Again, all of the evidence.

Q.   And what does -- you know, based on your review of all of

Leo - direct

785

the evidence that you looked at, what does that tell you about the indicia of reliability or unreliability of these confessions?

A.   That in this case where there was such an evidence-rich crime scene and so many multiple pieces of evidence that could be compared against the confession narrative, that there wasn't a single indicia of reliability, and there were numerous indicia of unreliability as we've discussed.

Q.   Did you render any opinions about Mr. Fulton, Mr. Mitchell, and Ms. Griffin's vulnerability to providing a false confession based on all the risk factors that we talked about today?

A.   Yes.

Q.   And what is your opinion about their vulnerability to giving a false confession?

A.   Well, the opinion, as we discussed yesterday, was -- is that they were all youth, they were all teenagers.  If I recall correctly, Mr. Fulton was 18, and Ms. Griffin and Mr. Mitchell were 17 at the time.  And for the reasons I discussed yesterday about psychosocial immaturity, the development of the brain and the cluster of personality traits that go along with youth and adolescents, they were more vulnerable, they were more suggestible, more compliant, all things being equal, more likely to make or agree to false confessions in response to an interrogation.

Q.   And is it your opinion that based on the conditions that

the three people -- Mr. Fulton, Mr. Mitchell and Ms. Griffin -- were subjected to during their interrogations, those conditions made them more vulnerable to giving a false confession?

A. Yes. There were multiple risk factors, including their individual vulnerability.

MR. AINSWORTH: Thank you, Your Honor. I have no further questions.

THE COURT: All right. We'll take a 15-minute recess.

THE CLERK: All rise.

(Jury out at 10:47 a.m.)

(Recess at 10:47 a.m., until 11:05 a.m.)

THE COURT: You may be seated, if you wish. The jury will be right here.

(Jury in at 11:05 a.m.)

THE COURT: You may be seated.

MR. NATHAN: May I proceed, Your Honor?

THE COURT: Yes.

MR. NATHAN: Thank you.

CROSS-EXAMINATION

BY MR. NATHAN:

Q. Mr. Leo, you're an academic?

A. Good morning. Yes.

Q. You're not a police officer.

A. Correct.

Q. And you do agree that crimes occur in this world, right?

A.   Of course.

Q.   Unfortunately.  Violent crimes also occur?

A.   Of course.

Q.   Murders occur?

A.   Yes.

Q.   Rapes occur.

A.   Yes.

Q.   Beatings occur.

A.   Of course.

Q.   It is a legitimate societal goal to solve crimes, correct?

A.   Correct.

Q.   And deter crimes?

A.   Yes.

Q.   You do need police officers in the world.

A.   Of course, yes.

Q.   And prosecutors.

A.   Yes.

Q.   And criminal courts.

A.   Yes.

Q.   As a law professor, you know that police officers investigate crimes, right?

A.   Of course, yes.

Q.   And prosecutors assess the evidence and prosecute crimes?

A.   Yes.

Q.   Juries look to the facts and evaluate those things and try

to determine outcomes, right?

A.    Correct.

Q.    You're not a clinical psychologist, correct?

A.    Correct.

Q.    You're a lawyer?

A.    It depends on how you define "lawyer."  I have a law degree, but I've never taken a bar exam or practiced law.

Q.    You're a law professor?

A.    Correct.

Q.    And you're what is called a social psychologist, correct?

A.    Correct.

Q.    That means you do research on human behavior.

        Sir, you do research on human behavior?

A.    Yes.

Q.    You did not do any type of psychiatric or psychological examination of Mr. Fulton or Mr. Mitchell, correct?

A.    Correct.

Q.    There are tests that psychologists or psychiatrists can do to evaluate someone's psychological state, correct?

A.    Yes.  It depends on what psychological state, but yes.

Q.    Just for example, one could do IQ testing, yes?

A.    Correct, yes.

Q.    And there's a battery of other tests that could be done to evaluate someone's level of intelligence and sophistication, correct?

A. Yeah. Their cognitive or intellectual abilities, yes.

Q. You did not do that in this case, correct?

A. Correct. That's not something a social psychologist would do.

Q. You have no data that would help you assess the particular intelligence of Mr. Fulton at the time of his interrogation or -- in 2003, correct?

A. Not that I recall, correct.

Q. And same thing, that also applies with Mr. Mitchell?

A. Correct.

Q. And Ms. Griffin?

A. Correct.

Q. Just to get this -- this is slightly out of order here from my thought process, but we've dealt with it before.

You're not a DNA expert, correct?

A. Correct.

Q. You have no idea how to analyze DNA evidence, true?

A. Correct. I haven't been trained in DNA analysis.

Q. But you've seen cases where they are called DNA exoneration cases, right?

A. Correct.

Q. And you've evaluated those cases?

A. Not for the DNA, but, yes, I've evaluated whether they're false confessions or whether they're coerced confessions or other aspects related to my research on those cases, yes.

Q. An example of a DNA exoneration would be where, say, someone was accused of a rape and convicted of a rape, and then DNA evidence is found on the victim that shows it's someone else, not the person who was originally accused.

A. That would be an example, yes.

Q. There's no such evidence in this case, correct?

A. No such evidence that links to the true perpetrator? Is that your question?

Q. Correct.

A. Yes.

Q. And the DNA evidence that you talked about earlier, that was evidence not found on the body of Mr. Collazo at all, correct?

A. I think you're talking about the hair and the -- both of the hairs that we described, we discussed earlier.

Is that correct?

Q. I think you described a single hair earlier, when you were being asked questions by Mr. Ainsworth.

A. Okay.

Q. Right?

A. Correct, yes.

Q. A single hair that was found in the trunk of Mr. Fulton, correct?

A. Correct, yes.

Q. So we're not talking about anything that's happening by the

body of Mr. Collazo, true?

A.   In terms of that single hair that was discussed in the trunk, correct.

Q.   And that's the only hair we're talking about, correct?

A.   If I'm recalling correctly, that was the only hair I was asked about.  But I may not be recalling correctly.

Q.   So to be clear, analyzing a hair inside of the trunk of Mr. Fulton, a hair in his trunk, does not prove, one way or another, whether Collazo was there, correct?

A.   Yeah, but it's just one of many indicia of unreliability. So I never said it proved whether he was there or not.

Q.   Right.  So to be clear, this hair in Mr. Fulton's trunk is not objective evidence that he's innocent, correct?

A.   I think it's consistent with evidence that he's innocent. If -- I don't think, by itself, it's dispositive, but when you put the whole picture together, yeah, I think it adds significantly to the picture.

           MR. AINSWORTH:  Your Honor, may we have a sidebar?

           THE COURT:  Yes.

        (Proceedings heard at sidebar:)

           MR. AINSWORTH:  My concern, Your Honor, is that if Mr. Nathan keeps asking him:  That doesn't prove he's innocent, when he's barred from opining about their innocence, it's -- you know, it creates a difficulty for the doctor to respond to those questions.

And so if the defendants have moved to bar him from saying that he's -- you know, can't opine on their innocence, then they shouldn't be able to exploit that by then saying: Well, you can't say he's innocent.

MR. NATHAN: Where I'm going with this, Your Honor, is the witness' methodology includes an analysis -- really, all of his papers used this analysis. It talks about -- he has four criteria for assessing what he terms "a proved false confession."

So he -- one of those criterion, which is the basis of his -- all of his research, is if there's objective evidence of innocence. So I am going to be establishing that this case is not -- did not fit within that particular criteria of his.

MR. AINSWORTH: So then he should examine him on that point.

Asking him about individual pieces and say: That doesn't prove his innocence, you know, runs into my problem.

THE COURT: You could say: Is it consistent?

MR. LOEVY: Your Honor, maybe he should peg it to reliability, you know, because that's the framework Mr. Ainsworth used.

THE COURT: Right. Well --

MR. NATHAN: I am planning on moving to his own term and his research about whether it fits in his category 4 of his research.

THE COURT: Okay. But if you're allowed to talk about innocence, then barring the other side from asking him about it would be -- you know, it's just opening the door to that.

MR. NATHAN: It's not me opening the door. Mr. Ainsworth asked him about DNA evidence that he considered and tried to establish that that proved the confession was false.

THE COURT: Okay. So how about the confession was true? Can you use those terms?

MR. NATHAN: I -- it's not what I'm trying to establish right now. I mean, I -- sure, I am trying to argue here that the confession is true, but it's not linked to this piece of DNA evidence. I think the DNA evidence here is just saying there's an absence of evidence.

THE COURT: Well, go ahead and answer -- ask your questions and then I'll decide whether to change my ruling based on how it comes out.

MR. NATHAN: Okay.

MR. AINSWORTH: And our position is it should be based on the reliability and using that framework in talking with the doctor. Otherwise, it opens the door.

THE COURT: Okay.

(Proceedings heard in open court:)

BY MR. NATHAN:

Q. In your literature, when you're analyzing various

confessions, you have a few different criteria that you use in order to categorize something as what's called a proven false confession, correct?

A. Correct.

Q. That's your paradigm that you use?

A. I wouldn't call it a paradigm, but, yeah, there are times when you could say a confession is provably false to an absolute certainty. So that's a category.

Q. But that -- and I'll come back to it later. But that is something you referred to in your research as when scientific evidence dispositively establishes the confessor's innocence, correct?

A. Well, that the confession is false and, thus, the confessor is innocent, yes.

Q. That's in your report, correct?

A. It's probably in my report. If you want to show me -- if you want to tell me where, I'm happy to look and confirm that.

Q. While I'm doing that, this case does not fit within that criterion, correct?

A. I'd have to go through the categories. But I'm not here to say this is a provably false confession.

Q. I'm sorry?

A. I'd have to go through the step-by-step criteria, but, no, I'm not here to say this is a proven false confession.

Q. So you are not saying that this is a proven false

confession, correct?

A.   Correct.  I've just been talking about indicia of unreliability, substantial indicia of unreliability.

Q.   And when you were referring to the DNA evidence found in Mr. Fulton's car, you weren't saying that, "I've analyzed this DNA evidence, and now it shows me it's a proven false confession," correct?

A.   Correct.  The DNA evidence doesn't lead to the true perpetrator.

Q.   Mr. Leo, you're charging $500 an hour to testify today?

A.   For my time in this case, yeah, which includes today's testimony.

Q.   You regularly work on cases like this one?

A.   Yeah.  I'd say -- but if you mean by "cases like this one," if you mean civil as opposed to criminal cases, my estimate would be 5 to 10 percent of the cases are civil cases.

Q.   You regularly evaluate confessions for lawyers and present your findings either in consulting, a report, or testimony, right?

A.   Correct.  Interrogations and statements and confessions.

Q.   And you gave your deposition in this case in 2022 -- 2023, and you said -- back in 2021 and 2022, isn't it true you had -- one-half or two-thirds of your income came from this type of consulting and testifying work?

A.   That would make sense, yes, if I said that.

It's sometimes in that range.  I don't recall specifically what I said in the deposition.

Q.  But it does make sense that at that time, it was about one-half to two-thirds of your income?

A.  That it could be, yes.

Q.  And is that true today as well?

A.  My income varies by my professor job every year and the number of cases I work on and bill that year.

So the range is any -- has been anywhere from 15% to two-thirds.  So that's why I said that 50% or two-thirds, whatever you just asked, sounds very plausible.

Q.  Even today?

A.  Correct.  I don't know the exact number.  It could be 30%. It could be 60%.  But that range is plausible, yes.

Q.  So the range of two-thirds to one-half of your income being derived from this type of consulting and testifying would make sense in 2021, 2022, 2023, and 2024, correct?

A.  Well, yes, with qualifications.

So at my university job in 2024, I got a significant raise, so it would presumably go down.

And secondly, when you say "and testimony," testimony's a very small part of what I do.  Most of what I do is review documents and consult with lawyers.

So it's the full scope of what my university calls outside professional activities or what I would call litigation

consulting, which involves -- a small part of which involves actual courtroom testimony.

Q.   Okay.  So let's -- so you prefer to use the term "litigation consulting" which encompasses all of your work --

A.   Correct.

Q.   -- helping lawyers?

A.   Correct.  Or working for lawyers, yes.  Sometimes I don't help them.

Q.   Okay.  So it's still true, even today, that about half of your income to two-thirds of your income include -- is derived from litigation consulting?

A.   Yeah, again, I would say a third to two-thirds.  It could be a half.  It could be two-thirds.  I don't know the exact number.

Q.   Isn't it true that you estimate that you worked on about 2,300 cases involving disputed interrogations and confessions?

A.   I have, going back to 1996, yes.  I've been doing this for a very long time.

Q.   And out of the 2,300 cases that we just referenced, when Mr. Ainsworth was asking you questions about how you testified for five -- for prosecutors five times, that would represent about .2% of your 2300 cases.

A.   That's correct.  But that's the wrong comparison, because I testified in 400 of those -- 400 some-odd of those 2300 cases.

So the five cases would be out of the 400 cases.  Some

Leo - cross

798

of those cases are civil cases where there's no prosecutor or a criminal defense attorney.

But I am rarely contacted by the prosecutor. Mostly, I'm contacted by civil attorneys or public defenders or criminal defense attorneys.

Q. Mostly, you're contacted by people who are trying to challenge their confessions, correct?

A. Correct.

Q. And not just mostly. That's just, I mean, the vast, vast majority of your situations, correct?

A. Correct.

Q. The times when you would be not challenging a confession would be infinitesimal, correct?

A. Well, if you consider one or two percent of the phone calls I get and one or two percent of the cases I testify infinitesimal, then yes.

Q. You're -- I mean, given these over 2,000 cases of your experience, you are very comfortable giving testimony in a court, correct?

A. Well, to the extent it's a repetitive experience, yes, but I also have butterflies in my stomach.

Q. Well, it is a repetitive experience because often you're giving very similar testimony in each case, correct?

A. Well, there's similar and different testimony, yes.

Q. You're talking about the type of interrogation in America,

Leo - cross

799

right?

A.   Yes.  Laying foundations about the type of interrogation, typically, generally.

Q.   When you testify, you talk -- you typically always talk about how the interrogation rooms are small and that they are -- the police officers control the food, right?

A.   If it's relevant, yes.  Usually food is not relevant in an interrogation.

Q.   And you talk about minimization and maximization, right?

A.   If it's relevant, yes.

Q.   And that's usually relevant in your reports.  That's what you talk about in most of 'em, right?

A.   Well, if you're -- so in criminal cases that go to trial, it's rare that I do a report because it's typically not required by the State Evidence Code.

In civil cases, federal civil cases, then yes, I do a report because it's required by the rules.  And often in those cases, there is minimization and maximization.

Q.   Right.  And so much of it is the same that very often you're able to copy-and-paste a lot of your report, correct?

A.   Well, in the general section, yeah, there's a template, and sometimes I draw on that template with modifications.

Q.   You draw on all of this background that Mr. Russell was talking about yesterday about the context of interrogation.

That would all be the same in every single case,

Leo - cross

800

right?

A.   Are you talking about the report or are you talking about the testimony?

Q.   The same subject matter.

A.   Yes, but sometimes some of the stuff is -- some of the techniques or some of the science, some of the findings are relevant, and sometimes they're not.

     Of course, there's a core that typically occurs across cases.

Q.   And, actually, talking about your past cases, you actually were hired by Elliot Zinger back in 2005 on behalf of Mr. Fulton, right?

A.   No.  Not that I recall.

Q.   I'd just like to hand you something to refresh your recollection.  I don't think this is an exhibit.

     (Counsel confers.)

          MR. NATHAN:  May I approach, Your Honor?

          THE COURT:  Yes.

          MR. NATHAN:  Actually, may I just publish it to the witness through the ELMO?

BY MR. NATHAN:

Q.   I'm showing you a document that was filed in --

          MR. LOEVY:  Well, for refreshing your recollection, you're supposed to ask him, not tell what it is.

          THE COURT:  Just point him to where you want him to

read and --

BY MR. NATHAN:

Q.   Do you -- can you read this (indicating) --

A.   Yes.

Q.   -- title of the document, please?

A.   Yes (witness reads).

Q.   And does that refresh your recollection that you were hired in this case in 2005?

A.   No.  I can tell you, my recollection is that I absolutely was not hired, and this document does not demonstrate that I was hired.

Q.   Well -- okay.  You deny you were hired by Mr. Zinger?

A.   Correct.  I do not recall being hired by Mr. Zinger.

          There are times when these motions occur where I have not been hired.  I have no recollection of ever being hired by Mr. Zinger.

Q.   You were giving this type of testimony back in 2005, correct?

A.   When you say "this type of testimony," yes, testimony to -- in pretrial hearings, at trials, and post-conviction proceedings on disputed interrogations and confessions, yes.

Q.   Okay.  And you also have worked with the Loevy law firm before, correct?

A.   Correct.

Q.   Before I get there, on this case alone, where you're

billing $500 an hour, isn't it true that you've billed, at the time of your deposition -- so that was back in 2023 -- you billed between 40,000 and 50,000 dollars?

A. That would be my best estimate, yes.

Q. And then to give your deposition, you charged another $5,000, correct?

A. Correct.

Q. And you're charging more money to testify today, right?

A. Correct.

Q. And you're charging more money to prepare for your testimony, right?

A. Correct. Whatever work I do on this case, I charge.

Q. In traveling here, you charge for that, too?

A. Correct.

Q. So in the past few years you've worked on cases -- a case -- you worked on a case for the Loevy law firm in 2021, right?

A. I suspect I did, but you'd have to tell me what case it was to refresh my recollection.

Q. And you've worked on cases with them in 2022, totally unrelated to this?

A. Again, I suspect I did, but you'd have to tell me which case to refresh my recollection.

Q. You've worked on numerous cases with them, correct?

A. I -- yeah. I would estimate eight to ten cases. Maybe

Leo - cross

803

six, maybe twelve.  Something in that range.

Q.  So six to twelve.

And is the amount you're charging here pretty typical for your work on a case?

A.  Yes.  But an older case, I might have charged a lower rate.

So as my rates increase, I often don't update them.  I just stay with the rate I had charged that year.

Q.  You have in front of you a copy of your report, correct?

A.  I do, yes.

Q.  Now, in order to evaluate this case, you reviewed materials, correct?

A.  Correct.

Q.  And you reviewed the materials that Mr. Ainsworth sent to you, correct?

A.  That the Loevy firm sent to me, correct.

Q.  And on page 2, 3, and 4 -- actually, going through page 6 of your report, that lists your materials that you reviewed before -- in reaching your conclusions, correct?

A.  Correct.

Q.  Now, if you look to page 5 of your report, the third bullet there, one thing that you did review was the report of Assistant State's Attorney Jake Rubinstein, correct?

A.  Give me just a minute here.

So you're on page 5.  Where on page 5 are you?

Q.  The third bullet down.

Leo - cross

804

A.   Yes.

Q.   And that was a six-page report where he documented in a memo that Mr. Fulton confessed to him, correct?

A.   But you -- I don't recall specifically.  I didn't review that document in preparation for my testimony today.

So if you want to ask me about it, I'd like to see it.

Q.   When you talked yesterday, you talked about expecting there to be documentation that Mr. Fulton was fed.

Do you remember that?

A.   Yes.  Typically, in police reports, yes.

Q.   Isn't it true that in that report that you listed in -- on page 5 of your report, Jake Rubinstein documents that Mr. Fulton said he had plenty of food to eat, stuff to drink while he was at the police station?

A.   If you're going to ask me what's in a document, I'd want to see the document.

Q.   Sure.

A.   If that's your question.

MR. NATHAN:  May I show the witness here?

THE COURT:  Yes.

BY MR. NATHAN:

Q.   Defendants' Exhibit 98, do you see that in front of you?

A.   Yes.

Q.   Does that -- do you recognize this report?

A.   It looks to be what it says it is.

Q.   It is -- it looks to be what, sir?

A.   It looks to be a memo from Assistant State's Attorney Jake Rubinstein, Rubinstein, to Assistant State's Attorney Darren O'Brien, his felony supervisor.

Q.   And this is a document that you relied on in evaluating this case?

A.   It looks to be, yes.

          MR. NATHAN:  Permission to publish this, Your Honor.

          THE COURT:  Is there any objection?

          MR. AINSWORTH:  No, Your Honor.

          THE COURT:  All right.  Then you may publish.

BY MR. NATHAN:

Q.   You see that Defendants' Exhibit 98 is a memorandum from Assistant State's Attorney Jake Rubinstein to a supervisor, Darren O'Brien, correct?

A.   Yes.

Q.   And it's a memo regarding the oral statement of John Fulton, correct?

A.   Correct.

Q.   Isn't it true, sir, that at page 6 of this memo, Mr. Rubinstein documented that Mr. Fulton said he had "plenty of food to eat and stuff to drink while he was at the police station and had gotten sleep"?

A.   That's what it says, yes.

Q.   So to the extent that Mr. Fulton is saying he was denied

Leo - cross

806

food and Mr. Rubinstein is saying he did get food, that would be something you can't answer, correct?

A.   Again, I'm not a fact witness.  And I was asked about the police reports.  But I don't know, I wasn't there, whether he was provided food or not.

Q.   Now, we talked about the fact that solving crimes is an important societal goal, correct?

A.   Correct.

Q.   Isn't it true that interview and interrogation is a critical component of police work in solving crimes?

A.   Yes.

Q.   And interviewing suspects is part of the everyday business of a police detective, correct?

A.   In large cities, yes.

Q.   And interviewing suspects, if you're a detective, that's a good thing, right?

A.   Well, it depends on how you do it.  But yes, we -- it's an important method of gathering information and potentially solving crimes.

Q.   It's a necessary aspect of investigating a murder, correct?

A.   Typically, yes.

Q.   I mean, typically -- you've looked at over 3200 cases, and all of them involved interviews of a suspect, right?

A.   Well, yes, but there's a selection bias there.  People obviously contact me when there's an interview or

interrogation. If somebody's captured on videotape or there's other forms of evidence that conclusively establish a person did it, then I wouldn't be contacted. Or if there's other controverted forms of evidence.

Q. Explain to the ladies and gentlemen of the jury what is a selection bias.

A. So attorneys would contact me because I am an expert on interrogation and confession. If there was mistaken eyewitness identification, they would go to an eyewitness identification expert. If there was erroneous jailhouse informant testimony, they would go to that type of expert. So there's a filtering that would cause an attorney to go to me as opposed to a different type of expert.

So if there were cases -- getting back to your question -- where there was no need for an interview in a homicide case, typically no one would contact me about that, since my expertise is police interviewing and interrogation and the statements and confessions that follow from that process.

Q. And inherently, if you're looking at cases that are subject to a selection bias, you're not getting the whole random sample of possible police cases, right? That's your point.

A. Well, that statement is correct. That wasn't -- that's part of my point, yes.

Q. Your point was that you can't answer the question about whether there's a confession -- there's an interrogation in

Leo - cross

808

every case, because you're looking at the interrogation cases, not every case, right?

A.   Well, in the cases that I take, yes, but as my -- in my training as a criminologist, I have read more broadly than just my area of research expertise.  So --

Q.   So the problem -- let's just use an example.

If I take a basket of -- rotten vegetables, let's say. Okay?

A.   Uh-huh.

Q.   I'm looking at this basket of rotten vegetables, and it's outside of a grocery store, and I look at that basket of just rotten vegetables that -- I can't tell if all the produce in the grocery store is rotten vegetables, right?

A.   Correct.

Q.   And why is that?

A.   Because you don't know the relationship between those rotten vegetables and the rest of the vegetables in the store just by looking at them.

Q.   Right.  So if I am looking at the basket of rotten vegetables, it could be the trash can, correct?

A.   It could be.

Q.   And it could also be -- it doesn't necessarily tell me that everything in the store is dead, right?

A.   Correct.

Q.   The store could be a very, very large store, and you have a

small, small basket relative to the store that isn't as bright and shiny as the rest of the vegetables in the store.

A.   Correct.

Q.   And if I were to look at just that basket of the rotten vegetables, that would be a selection bias.

A.   You could say that.  But in your hypothetical, it sounds kind of random that somebody just happens to see that.

Q.   Isn't it true that a true confession is a very important indicator of guilt?

A.   Yes.  If it's true and if it's corroborated, yes.

Q.   And a true confession is something that is very helpful to solving crimes.

A.   Correct.

Q.   And it's something very helpful to help take murderers off the street, correct?

A.   In homicide cases, yes.

Q.   And it also helps avoid any wrongful convictions.  Because if you solve the crime, then someone else doesn't get charged, right?

A.   Correct.

Q.   So it is a good -- it's a societal good to get a true confession.

A.   Correct.

Q.   Isn't it true that it's very common for suspects across the United States to provide confessions?

Leo - cross

810

A.   Yes.

Q.   It happens every single day.

A.   Presumably.

Q.   Presumably in every single major city in the country, right?

A.   Again, we don't know, but yes, that seems like a reasonable hypothesis.

Q.   And that's true probably for the entire civilized world, right?

A.   I don't know about the entire civilized world.

Q.   And in this country where you have Miranda warnings, you probably have additional protections relative to countries where there are no Miranda warnings, right?

A.   Yes.   But many countries have Miranda warnings these days.

Q.   Isn't it true that Professor Paul Cassell derived a ballpark figure of approximately 20 million persons questioned by the police during the 25 years encompassed by your 60-case study that's cited in your 1996 *UCLA Law Review* article?

A.   That sounds like something Professor Cassell would come up with, but, again, I'd have to see the document to confirm that.

Q.   And that would mean that there's about 800,000 people questioned by the police every year in the United States, right?

A.   Those are make-believe numbers.   But yes, if those make-believe numbers were true, then yes.

Leo - cross

811

Q.   And you have no idea how many of those 800,000 police interviews or questioning per year result in a false confession, right?

A.   Correct, for the reasons that I said earlier, if that's an accurate number.

Q.   But your studies tend to rely on datasets of, say, 60 confessions, a hundred confessions, correct?

A.   Correct, or more.  The registry now has almost 500.  But yes.

Q.   Okay.  And those are out of the entire basket of statements in the entire country that could be up to 800,000 a year.

A.   Well, they would be the ones we know about of the entire basket, which is an unknown number.

Q.   But that does suffer from a selection bias that you described before, correct?

A.   Well, yes, because the -- as I said earlier, there's no known uni -- there's no government organization that collects all of the confession cases, the interrogations and confessions.  So there's no other way of studying it other than going out into the world and collecting the data.

And this is the nature of the phenomenon that we study.  So there are other phenomena in the social sciences where you can do random samples of known universes and there are other phenomena where you can't, and you do the best with the scientific or social-scientific methods that you have.

Q. Suspects who regularly confess -- or suspects who confess to the police, it's always against their self legal interest, correct?

A. Well, the way we conceptualize self-interest in Western societies, yes.

Q. And there are times -- hold on here. I think you mentioned this earlier, or you referenced it.

There are many police tactics that are completely appropriate, lawful, and not, as you say, associated with false confessions, correct?

A. Yes. There are appropriate and lawful tactics, and those techniques sometimes are used in cases that lead to false confessions, but they may not be the primary or even contributing factor.

Q. I think you -- if I understood you correctly, you're saying in your view -- or in your -- according to your view of your research, there are things that are entirely legal for the police to do, but you think they are associated or are risk factors for false confessions?

A. Yeah, but it's not just me thinking about it. There's a body of literature. I'm one person in it that has established empirically that those techniques, though legal, like lying about evidence, are risk factors for false confessions, or I should say lying to adults about evidence.

Q. So it is permissible or legal to -- for a police officer to

Leo - cross

813

say, "Hey, somebody saw you at the scene of the crime.  We know you did it"?

A.   You're -- in your question, you mean if it's not true?  If it's a lie?

Q.   Yes.

A.   It's legal as a matter of constitutional law.  But in the ten states that have, by statute, outlawed lies to juveniles, it wouldn't be legal in that case.

Q.   And in the 40 other states, it would be legal?

A.   At the current time, yes.

Q.   And in Illinois, it is legal?

A.   I thought Illinois was one of the states that didn't permit it, that legislated against it, but I'd have to --

Q.   And you know --

A.   -- confirm that.

Q.   -- that wasn't true in 2003, correct?

A.   Correct.  It wouldn't have been true in 2003, but I believe it's true today.

Q.   The use, the tactic of putting suspects in separate rooms and then saying, "We know you did it.  This other guy's saying you did it," that's also -- that would be legal in the 40 states, right?

A.   Just as you've described it, yes.

Q.   That's called a classic prisoner's dilemma, correct?

A.   No.  That's -- you'd have to lay the foundation for a

Leo - cross

814

prisoner's dilemma. You wouldn't just call that a prisoner's dilemma.

Q. And it sounded like you were describing something different, so I want to -- if we're messing up the term -- you were talking about minimization/maximization. But the idea of saying, "Oh, you only did" -- minimizing the role in the crime. So I'm saying, "You only did" -- "You only hit the guy two times," trying to tell the suspect what you did, or create the feeling that it's okay to confess, that's a legal tactic, correct?

A. Minimization is typically a legal tactic, but if it implied or expressed explicitly a promise of leniency or a threat, in the eye of the judge who's deciding the case, then it would not be a legal tactic.

Q. So a promise of leniency is not a legal tactic, right?

A. Typically not, yes.

Q. So I'm not talking about that. I'm talking about a minimization technique, saying, "We know" -- you know, "You" -- you know, the victim probably deserved it, or something like that.

A. You can't talk about minimization techniques without talking about promises of leniency. Some versions of minimization do not imply or express the equivalent of promises of leniency; some do.

Q. This notion of guilt-presumptive interviewing, you're

Leo - cross

815

familiar with that?

A.   Yes.

Q.   That's something that's widely used in the United States?

A.   Correct.

Q.   It's the predominant method of interviewing or interrogation in the United States?

A.   Not of interviewing.  Of interrogation, yes.

Q.   Okay.  And that's the method that's used by the FBI, right?

A.   Yes, but you're oversimplifying.  So police are supposed to do a thorough investigation before they launch a guilt-presumptive interrogation.

Q.   I'm talking about an interrogation right now.

A.   When you get to the interrogation, yes, the typical method in America is guilt-presumptive.

Q.   That's done in the New York City Police Department, right?

A.   Again, when you get to interrogations, yes.

Q.   And that's probably the largest police department in the United States.

A.   Probably, yes.

Q.   And that's done in the FBI as well?  We talked about that.

A.   Typically, yes.

Q.   Okay.  And when we say "guilt-presumptive," it's in the interview -- or the interrogation saying, "We know you did it," right?

A.   Well, that would be the accusation.  But, yes, the idea is

that the police presume the guilt of the suspect they're interrogating. And we have to make sure we're distinguishing between interviewing and interrogating.

Q. And when the suspect denies involvement in the crime, under that method of interrogation, you'd say, "I know you're lying. We know you did it."

A. Correct. That technique would be attacking or challenging the denials, yes.

Q. And that tactic, which is used throughout the United States and in the biggest police departments of the United States, is not illegal, right?

A. Accusing somebody of committing a crime and challenging their denials, no, that's not unlawful.

Q. You know, we've established that confessions happen in the country every day, right?

A. Presumably, yes.

Q. In any event, your research does not allow you to say police interrogation tactic X caused a false confession, right?

A. Well, you can say it in the experimental studies where we can control the environment and do random testing -- or random assignment, rather.

So on the experimental studies, you can tease out causation directly. The real-world studies, which corroborate the experimental studies, are correlational, and so you're making descriptive and statistical inferences.

Q.   And there's a difference between computer studies or your lab studies and real-world interrogations, right?

A.   Yes.

Q.   And that's because you can't duplicate the environment of a real-world murder interrogation in a lab study, right?

A.   I think I mentioned yesterday, yeah, we -- for ethical reasons, there's a limit to how much pressure and in what types of transgressions we can recreate interrogations in experiments in laboratories.

Q.   But because of this, what you call selection bias problem, when you're looking at various studies of false confessions, you picked out to study the exact exoneration cases, right?

A.   Well, several things.  One, there's no selection bias in the experimental studies.

     Two, the exonerations, that's only one database. We've also studied other false confessions that didn't involve exonerations in the sense of a conviction being reversed.

     Sometimes false confessions drop out before there's a conviction or don't go to trial.

Q.   Well --

A.   And then, also, it's the only way to do it.

     If you want to study airplane crashes, you have to put together a dataset of airplane crashes.

Q.   Right.  And I'm not suggesting there's a better way to do it.  I'm just talking about the way you do it.

Leo - cross

818

A.   Correct.

Q.   So let -- my point is, you referenced this study of 250 cases where you say people were exonerated through DNA, and you draw conclusions from that study, correct?

A.   When you say "250 cases," can you refresh my recollection which study you're talking about?

Q.   I thought it was at 27 of your report.  Right.

You see that?  It's the Brandon Garrett study.

A.   Oh, okay.  Thank you.  Yes.  So this is the study on contamination in the first 258 DNA exonerations, yes.

Q.   And that study is an important study in your research, correct?

A.   Yes.

Q.   And you're -- you relied on that study in your opinions here today, correct?

A.   Correct, correct.

Q.   In that study, it's picking out from all of the cases in the United States where there are confessions and taking only these 250 cases of DNA exonerations that were derived over a period of, what, 25, 35 years?

A.   They probably would have been 1989 to early 2010s.  So whatever that is.

Q.   Okay.  So about 30 years or so?

A.   20, 20 some-odd years, yeah.

Q.   You said 2010?

A.   Yeah.   2 -- well, in that period.

Q.   Okay.

A.   1989 to --

Q.   Same 20-year period?

A.   Sorry, I don't mean to talk so fast.

Yes.

Q.   I mean, that is not a random sampling, correct?

A.   Correct.   It's not a random sample.   Just like in other phenomena, you can't do random samples to study.

Q.   That is a selection bias, right?

A.   You could call it a selection bias, but, again, if you wanted to study train wrecks, you gotta select the cases, you gotta put 'em together.

Q.   And because you are dealing with the real world where you just have an inherent selection bias problem, you don't know the denominator or the entire universe of confessions.

A.   Correct.   But this study was a study of contamination in false confession cases.   It wasn't a study of contamination in all confession cases.

Q.   In order to get -- I mean, it would be helpful to know what the actual rate is of false confessions, right?

A.   It depends on what you're studying, what the research question is and what you're trying to get at.

Surely, it would be helpful if we knew, is it 1%?   Is it 10?%?   Is it 20%?   But it doesn't affect this study.

Q.   Okay.

A.   This particular study, the rate of false confession is completely irrelevant.

Q.   If you wanted to know how -- what percentage of confessions are false, that would be a helpful fact to know, right?

A.   As a general matter, it would be helpful for certain reasons, but it has nothing to do with this study.

Q.   In order to know that rate of false confessions, you would need to know an enumerator.  You'd need to know:  This is the number of false confessions.  Let's take the DNA exoneration cases and divide it by the total confessions.  Right?

A.   Well, there's non-DNA exonerations as well.

     But I think what you're getting at is you would need to know the true denominator, which we don't know, and you'd need to know -- or the true enumerator and the true denominator.  And yes, we don't know that.

     So, again, we don't know.  Is it 1%?  Is it 5%?  Is it 10%?  We ask police, and they say it's 5% or more, but we don't know.

     And what I'm saying is that's -- you know, that's relevant in a sort of 30,000-feet-up way, but it doesn't affect various studies or our knowledge about why false confessions happen, what correlated with them, what causes them.

Q.   Because you don't have the exact enumerator, you don't have the denominator, you can't give an exact frequency, right?

A.   Correct.

Q.   You can't --

A.   Again, yes, we can't give the exact frequency.

Q.   So you're left with using these fuzzy terms like three -- like associated with false confessions, it's a risk factor, right?

A.   I wouldn't call those fuzzy terms.  But, more precisely, what you're left with is -- and it's not really related to the frequency issue at all -- is you're left with, we can talk about causes in experimental settings and then we talk about correlations where we try to adduce evidence to infer causation in the real-world studies.  That's the limit.  But it has nothing to do with the frequency of how often false confessions occur or don't occur.

Q.   But, again, we can't say this confession here was a false confession, right?

A.   Well, in my research, I could evaluate and answer that question, but it's not appropriate for me to say that in a court of law.

Q.   Now, in 1993, actually, your dissertation study, you did draw a sample of what was a random sample of 182 cases from the California Bay area, correct?

A.   I would not call that a random sample.

Q.   It was just cases that you saw.  You didn't preselect them. Right?

Leo - cross

822

A.   Correct.   I didn't preselect those 182 cases.   And those were cases of felony interrogations.

Q.   Right.   So those were just felony interrogations that you were able to look at and evaluate.

A.   Correct.   Either in person or by videotape.

Q.   And they didn't get preselected by some database to say: Oh, these are bad confessions, first.

A.   Correct.   And it wasn't a study of bad confessions --

Q.   Okay.   It was just --

A.   -- either.

Q.   -- let's look at this group of 182 cases where there are confessions.

A.   When I went into the study --

Q.   But let me just --

A.   -- I didn't know how many cases.

THE COURT:   There's no question pending.

MR. NATHAN:   There was.   I apologize, Your Honor.   I asked a bad question.   I'd like to withdraw the question.   I apologize.   I should have used the word "interrogations."

BY MR. NATHAN:

Q.   So these cases that you were observing, the 182 cases, those were cases of interrogate -- of interrogations, right?

A.   Correct.

Q.   And they weren't preselected for being good or bad interrogations.   They were just interrogations.

Leo - cross

823

A.   Correct.

Q.   So they didn't suffer from that same selection bias, correct?

A.   Well, they weren't random.  And if you're using the term "selection bias" to denote nonrandom, they weren't randomly selected.  And I'd have to explain that, if you wanted an explanation.  But they weren't randomly selected.

Q.   Isn't it true that when you evaluated that dataset of 182 interrogations for your study, you didn't report on seeing a single instance of a false confession?

A.   It wasn't a false -- it wasn't a study about false confessions, so I wasn't looking for that.  So I don't know whether it contained any false confessions or did not.

Q.   You were not interested in that question?

A.   For purposes of that study in that dataset, no.

Q.   Nothing prevented you from considering that, correct?

A.   Well, I could've considered that, but that wasn't the purpose of the study.

Q.   If you didn't identify a single instance of a false confession in the 182 cases that you evaluated, wouldn't that tell you that the rate of false confessions in your cases is, like, basically zero?

A.   Well, no, because it wasn't something I was looking at in the study, number one.

         And then, number two, if I had been looking at it, it

Leo - cross

824

wouldn't have been a representative sample. It was three Bay area police departments.

So even if I had been looking for false confessions, and I found zero or one or ten, it wouldn't have been something I could extrapolate to the general population.

Q. It's not really fair to look at one group of 182 cases and then extrapolate it out to all confessions and all interrogations, right?

A. Well, for purposes of the frequency, yes, but I've never said we know how frequently false confessions occur.

Q. Would you agree that confessions provided by murder suspects are routinely retracted for strategic reasons?

A. No.

Q. Would you agree that confessions made by criminal defendants are routinely walked-back in court and they don't stand by them? They're not saying, "Oh, yeah, I confessed. Please convict me."

A. I guess it depends on what you mean by "routinely." Sometimes, yes.

Q. I mean, there would be strategic reasons to avoid punishment to walk-back your confession, right?

A. Correct. But most cases don't go to court. They're resolved by plea bargain. So they don't go to court in the sense you mean it, I think, in your question.

Q. I mean, it's probably fair to say that virtually every

single person who's ever confessed to a murder has at least thought about retracting that confession, saying, "Oh, I wish I didn't say that."

A.   I would have to speculate.

Q.   Okay.  It's common sense, you'd say?

A.   It seems like a reasonable speculation.

Q.   Isn't it true that it's very common for guilty suspects to provide statements that may be incriminating but are not 100% accounts of what happened?

A.   I wouldn't say very common, but yeah, I've seen that.

Q.   That happens where somebody, say, admits to killing someone but not raping 'em?

A.   Yes, I've seen that.  I've seen that happen before.

Q.   Or vice versa.

A.   Correct.

Q.   Or someone might admit to some small role in a murder but not their entire role.

A.   Correct.

Q.   And that's plausible, right?

A.   Yes.

Q.   And as a social psychologist, you're aware that two people can observe the same event and walk out of the room and report it a little bit differently?

A.   Correct.

Q.   And you've seen studies that show that, right?

A.   Maybe you're speaking of memory studies where people have different memories.  I'm not sure --

Q.   I realize --

A.   -- what you're talking about.

Q.   -- you're not a memory expert, but you -- that's within your -- your colleagues that you talk to all the time do that, those kinds of studies as well, and you've reviewed studies like that, right?

A.   Your question's too vague for me to answer.  I'm not sure exactly what you're getting at.

Q.   Well, as a social psychologist, somebody who observes and studies human behavior, would it at all surprise you if two people saw somebody run by and then you asked them five minutes later to give a description, their description might vary?

A.   No, that wouldn't surprise me if there were differences in an eyewitness description like that.

Q.   That's how human memory works, right?

A.   Well, that's a particular context in which you could say human memory or the mechanics of human memory work.

Q.   Human memory is not a tape recorder, right?

A.   Correct.

Q.   Isn't it common for -- actually, going back.  Going back to your database, please.

     We talked about, on page 5, you had -- you looked at the report of Jake Rubinstein, the memo.

A.   Correct.

Q.   And what was the next thing that you considered?

A.   Well, the next thing that was listed is -- on page 5 of the report, is the video and audio recording of the statement --

MR. AINSWORTH:  Objection, Your Honor.

MR. LOEVY:  No, just let it go.

THE COURT:  All right.  What's -- do we need a sidebar?

MR. AINSWORTH:  Yeah.

THE COURT:  What's your objection?

MR. AINSWORTH:  Yes.

(Proceedings heard at sidebar:)

MR. LOEVY:  You know, that was an unfair question, because he just asked the jury to read something that Your Honor had told him not to.

MR. NATHAN:  No, that's not true.  Your Honor didn't say that he can't say that.

MR. AINSWORTH:  Oh, yes.

THE COURT:  Well, Mr. Nathan, what are you going to ask him?

MR. LOEVY:  He just said the video statement, that --

THE COURT:  I know.

MR. NATHAN:  I'm asking if he reviewed that.

And Your Honor barred us from playing the video and did not bar us from mentioning the word "video."

MR. LOEVY:  Your Honor, I don't know if it's inexperience or nefariousness, but if Mr. Nathan thought that Your Honor said he could tell the jury there was a video and then the jury would think it didn't see it, then he shouldn't be trying cases.  And he's trying to pretend like:  Oh, I was allowed to talk about it.  The jury just couldn't see it.  I mean --

THE COURT:  Yeah.

MR. NATHAN:  Am I barred from mentioning the term "video"?

MR. LOEVY:  I can't believe we're having this conversation.

MR. NATHAN:  I'm asking that question.

THE COURT:  I believe it was clear.

MR. NATHAN:  That --

MR. LOEVY:  It's worse for us if the jury would hear that and then they don't see it.

MR. NATHAN:  That was mentioned by both sides in the opening statement.

MR. AINSWORTH:  No.

THE COURT:  Uh-uh.

MR. AINSWORTH:  And this is not the first time this issue has come up.  It came up before with the audio and --

(Proceedings heard in open court:)

THE COURT:  All right.  We're going to take a recess

now. It'll be our lunch break. It'll be one till 12:45.

(Jury out at 12:02 p.m.)

MR. LOEVY: You know, it would have been so easy to say, "You reviewed Mitchell's statement." Why make him read that word?

THE COURT: I did keep it out by a motion to bar videotape of Mitchell's confession.

MR. LOEVY: I mean, this game that's being played: Well, you barred us from showing it, but we could tell the jury that there is a video, and then they'll just wonder where the video was, is worse.

MR. NATHAN: It's not a game. Your Honor barred us playing the video. Didn't bar us from saying any reference to "video."

It was asked about on his direct examination, on Mr. Russell's -- Ainsworth's direct examination.

MR. LOEVY: Not true.

MR. NATHAN: He asked about video -- whether or not this was videotaped.

MR. AINSWORTH: No, no. That, actually -- and we -- this came up yesterday, because Mr. Nathan made a -- what I characterize as a disingenuous objection, that because the doctor had reviewed the video, he had to -- we had to then introduce the video.

I did not. I talked about it as "the transcript,"

because that is what he reviewed and relied upon.

MR. LOEVY: And that's the relevant part, that there's a transcript. So there's no ambiguity that we got every word. There's a court-reported transcript. The additional information that it was a video has been barred.

MR. AINSWORTH: My concern here, Your Honor, is that when -- you know, we all make mistakes. But if Mr. Nathan is asserting that he was allowed to do this because of a fabricated reason, that, you know, somehow plaintiff had gone into it, you know, it just -- these are mischaracterizations on -- and at a certain point, it becomes very concerning that there's a deliberate effort here to prejudice plaintiffs in front of the jury.

MR. NATHAN: By your ruling, I am talking No. 399, No. 3. There was a barring of the videotape of Mitchell's confession.

The plaintiffs -- everybody was using a transcript that was gonna be used in evidence. We were permitted to use that transcript. The transcript itself says on it, says "videotape."

I was not barred from --

MR. LOEVY: We redacted that.

MR. NATHAN: -- mentioning the word "videotape." I wasn't.

MR. LOEVY: We redacted "videotape."

MR. NATHAN: And if Your Honor is barring me from saying that, then just let me know.

MR. LOEVY: Your Honor, it sounds like he's saying he did it on purpose. He referenced -- he asked -- instead of saying he reviewed the statement, he said: Hey, read that word, and he read "videos," because he thought he was allowed to do it.

MR. NATHAN: No. I asked that --

MR. LOEVY: And that's not a fair inference from your ruling. If you bar something, then you can't -- lawyers can't talk about it and make the jury worry where it is.

MR. NATHAN: I elicit -- I asked the question, giving them an opportunity to object.

I believed I was permitted to reference the word "video." I am not saying I did it by accident. I did it in a deliberate way. I asked the question to allow them an opportunity to object. And that's what happened.

I didn't say the word "video." I --

THE COURT: You understand that now they know there's a video, and so it raises the question of, is this a way to get in the video, which I excluded, because --

MR. NATHAN: I understand --

THE COURT: -- of a question to the jury that there was a video.

MR. NATHAN: I understand that we cannot play the

video. We were not trying to play the video. You did not exclude any reference to a term "video" that is in part of this case.

THE COURT: Yeah.

MR. FIEWEGER: Your Honor, if I could add just one other piece of context?

THE COURT: All right.

MR. FIEWEGER: Yesterday, during Mr. Loevy's examination of Mr. Judge, he walked through with Mr. Judge various techniques that could be used to document a confession or statement. He talked about a handwritten statement, he talked about a court-reported statement, and he talked about a video-recorded statement.

The implication from that examination was that Mr. Judge and the other people involved in this investigation had these techniques available to them and they weren't all utilized. They didn't give them -- they didn't give Mr. Fulton the opportunity to give -- this is what he went into: You didn't give him the opportunity to give a video statement.

MR. LOEVY: This is --

MR. FIEWEGER: And that these techniques were not used in the investigation.

So this is a different -- we've got an additional piece of context to this whole issue that you've ruled on. So I think that it is worth reconsidering in that context.

MR. LOEVY: Well, it sounds like what Mr. Fieweger is saying is: Hey, I think Mr. Loevy opened the door. So instead of raising it with the Court, Mr. Nathan intentionally elicited "video," because Mr. Fieweger thinks: Hey, we're allowed to do that. You know, because Mr. Loevy made a suggestion, so I can now say there's a video.

You can't do that. You know, you've barred this evidence.

When a court bars evidence, that doesn't mean that the defense counsel can get up and say: Well, let's talk about it, even though you can't see it, jury, but I'm gonna talk about it.

I mean, as I said on the sidebar, I don't know if it was inexperience or nefariousness, but you can't do that.

MR. NATHAN: It's --

THE COURT: Well, the question now is, what do we do now?

MR. NATHAN: Are we barred from saying the word "videotape"?

THE COURT: You're barred to -- this ruling barred you from referencing the videotape, yes.

MR. NATHAN: From referencing the word "videotape"?

THE COURT: That the -- referencing that the confession was taped, yes.

MR. NATHAN: I did not understand that to be the

ruling, but I'm happy that it's clarified.

MR. LOEVY:  I mean, I'm trying to think of an analogy. If you barred a piece of evidence, and they could talk about it, but the jury couldn't see it, that doesn't -- it doesn't even make sense, what he's saying.

MR. NATHAN:  We've been --

MR. LOEVY:  If something's been barred, it's barred.

MR. NATHAN:  What wasn't barred was the transcript which says "videotape" on it.  That was -- that came into evidence.

THE COURT:  Okay.

MR. LOEVY:  We have a transcript.  They have 95% to 98% of the probative value.  Because the jury knows every word Mitchell said, and they have access to that.

Your Honor ruled before court for reasons that you put in writing.  You didn't want us to talk about the video so the jury wouldn't see it and they wouldn't wonder about it.

So Your Honor's question is what we do now.  I think we have to do what happened yesterday, when Mr. Nathan accidentally did this about the audio that he wasn't supposed to mention, is just move on.

MR. AINSWORTH:  But if -- you know, it's -- it really raises a concern.  This is an ongoing problem.  And, frankly, this is not the first time that this side has had problems.

THE COURT:  Well --

MR. LOEVY: We're always willing to give the benefit of the doubt, but Mr. Nathan is saying he did it on purpose. That's what's upsetting.

MR. NATHAN: I did it in a way that they would be able to object. I didn't say the word "videotape."

I understood that it's a point that they might be upset about. I'm not counsel for plaintiff. I thought I was complying with the Court's ruling. That's why I gave them an opportunity to object.

THE COURT: All right. So we're clear now.

MR. AINSWORTH: Are there other issues that Mr. Nathan, you know, thinks are, you know --

MR. NATHAN: No.

MR. LOEVY: We have to object at the time.

MR. AINSWORTH: -- in the gray area?

MR. NATHAN: No.

I do want to point out that plaintiffs' counsel, in opening statement, said that Mitchell's statement was done by a court reporter.

That's just not true. It was done by a videotape. And --

MR. LOEVY: No.

MR. NATHAN: And that's -- you know, that's maybe --

MR. FIEWEGER: They actually brought in a videographer.

MR. LOEVY: No. A videotape was transcribed by a court reporter. It has to be by a court reporter.

We have the statement. You've seen it on the screen, Your Honor.

MR. NATHAN: Well --

MR. LOEVY: So I complied with Your Honor's order. Instead of mentioning "video," I said we have it recorded.

MR. NATHAN: His words were: They break out the court reporter and they have a statement. So Anthony gives a statement on the court reporter's statement and -- a video-recorded statement.

That was what he said.

MR. LOEVY: So what do we do now, Your Honor?

THE COURT: Well --

MR. FIEWEGER: Your Honor, I think that we would agree that -- you've made it clear. Okay. You believe that your ruling prohibits us from referencing the video at this point.

I still think that the point that Mr. Loevy raised yesterday with Mr. Judge merits revisiting that. Because Mr. Loevy intentionally -- and I thought it was effective. I thought that was, you know, very good cross. But he intentionally presented to that jury the argument and implication that the people involved in this investigation had available to them the ability to take a videotaped statement

from these people, and they didn't do it, and he's faulting them for that.

MR. LOEVY: Well, we're not faulting that. Maybe we could cure that --

MR. FIEWEGER: You had --

MR. LOEVY: Maybe we could cure that by saying -- an instruction from the Court that: The law at the time did not require videotaping.

And, you know, let's not lose sight of every word Mitchell said was written down, and they have a transcript. So whether it's audio or video, it's like the marginal difference is not that much different. But now the jury's been told something the Court didn't want them to hear.

We would not be opposed to working out an instruction with the defense along the line --

THE COURT: Excuse me. Would you like to step down, take a break?

(Witness exits.)

MR. LOEVY: We're not opposed to an instruction along the lines Mr. Fieweger just -- in trying to work something out, so that it's clear that they're not being blamed for not videotaping, because that has not been our implication, and we have no trouble -- you know, what I'm saying is: You wouldn't give him a pen, you wouldn't give him a statement, you wouldn't give him a court reporter. You wouldn't let him do anything.

Not that they wouldn't videotape it. They wouldn't let him do anything. And if we want -- and we can maybe cure that.

But what do we do about this problem? Because let's not change the subject. I think we should just move on, I guess, is -- we don't want to bring attention to it. And maybe that instruction will solve the problem, too.

MR. FIEWEGER: Well, I don't think revisiting the motion *in limine* is changing the subject, because I do think that Mr. Loevy has opened the door.

I mean, it's not fair to imply to the jury that the investigators did not use a technique that they, in fact, used, and we can't tell them about it because they moved to bar it.

MR. LOEVY: Again, if we were having that conversation this morning --

THE COURT: Of course, let me -- I always -- I can think more clearly when I am not being bombarded, so I will go out and come back.

But the testimony yesterday was -- with Mr. Judge was along the lines of: Fulton told you that he did -- that his confession was false, and Mr. Judge didn't take any action to pursue that or make a note of it or videotape it.

So that had occurred before or after the confession that was videotaped?

MR. LOEVY: Before. And we said: You didn't give him a court reporter, you didn't give him ink. You know, he

basically was like:  I don't want to take your statement.

It wasn't that they used the wrong method of taking his statement.  It's, they wouldn't take his statement at all.

THE COURT:  Yeah.

MR. LOEVY:  That's the point.

THE COURT:  Yeah.  I don't really think that affects -- the reason that I barred this, and the reason that other judges have barred this, is that it's prejudicial in the sense that it shows Mr. Fulton or Mr. Mitchell being very calm and comfortable when, in fact, the other parts of the inter -- you know, the time in the police station were not videotaped.

So it would indicate that, maybe improperly if what Mr. Fulton says is true, that he was treated well when he wasn't.

So that's the reason for the ruling.  And I think it's within my discretion.  I don't think I'll get reversed for keeping it out.

MR. LOEVY:  No.  And the Seventh Circuit -- as you recall, you relied on that Seventh Circuit case that found it.

THE COURT:  Right.

MR. LOEVY:  But I'm upset about the cart before the horse.  Mr. Fieweger is making interesting arguments.  Maybe they have merit.  But you can't do it and then say:  Hey, the door was open.  You have to say the door was opened, ask to do it, and --

THE COURT: Yeah, I get it, I get it.

MR. NATHAN: The door being opened is a question of whether or not the videotape comes in. That's the question.

THE COURT: So your --

MR. NATHAN: It's not the reference to the videotape.

THE COURT: -- point would be if you had the opportunity to ask further about -- ask Dr. Leo about the videotape, what would you -- I mean, how could you ask him about that in light of my ruling? What would you like to say?

MR. NATHAN: I would like to say that he did rely on that for the purposes of his analysis. And when he was assessing the risk factors for a false confession, he reviewed it or didn't review it. It sounds like he didn't review it.

THE COURT: Okay. But what's your point?

MR. NATHAN: My point is that his --

THE COURT: Because he'll say, "Yes, I reviewed it," and then what's the next --

MR. NATHAN: Well, if he says he didn't review it, then I would inquire about how that is available, that was available to him, and that he didn't even do it. He had 30 minutes of video to look at the guy, and he didn't. He didn't even look.

THE COURT: But you don't really expect him to say that, do you?

MR. NATHAN:  I don't know what he's going to say to that.

MR. AINSWORTH:  It's in his list of materials "reviewed."

MR. LOEVY:  Yeah, that was the question, actually, that, "You reviewed this."

MR. NATHAN:  And if he did review it, then I would ask him, "Did that impact your opinion?  Was that important as part of your review?"

MR. LOEVY:  When the judge has barred something, I don't understand how you could pretend it wasn't barred.

MR. AINSWORTH:  But to what end?

THE COURT:  Yeah.  To what end?  I mean, I would -- is he here?

MR. AINSWORTH:  He's out of the courtroom.

THE COURT:  Yeah.  I mean, he's a very skilled witness.  He knows exactly where you're going.  He's not going to say, "Oh, I didn't review it," or he'll say, "I did review it, and it didn't affect my opinion."

I mean, you're not going to get anything out of him for this, other than that there was a video.

MR. AINSWORTH:  So what's --

THE COURT:  So I just think we'll move on.  And let's give our reporter a break.

(Recess at 12:17 p.m. until 12:45 p.m.)

842

```
              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION

JOHN FULTON,                      )  Case No. 20 C 3118
                                  )
              Plaintiff,          )
         v.                       )
                                  )
ROBERT BARTIK, et al.,            )
                                  )
              Defendants.         )
------------------------------    )
ANTHONY MITCHELL,                 )  Case No. 20 C 3119
                                  )
              Plaintiff,          )
         v.                       )
                                  )
ROBERT BARTIK, et al.,            )  Chicago, Illinois
                                  )  February 13, 2025
              Defendants.         )  12:45 p.m.

                          VOLUME 4
          TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
            BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Plaintiffs:      LOEVY & LOEVY
                         BY:  MR. JONATHAN I. LOEVY
                              MR. RUSSELL R. AINSWORTH
                              MS. JULIA T. RICKERT
                              MS. FATIMA LADHA
                              MR. ISAAC GREEN
                         311 N. Aberdeen Street, 3rd Floor
                         Chicago, Illinois  60607

                         LYON & KERR, PLLC
                         BY:  MS. ANDREA D. LYON
                         53 W. Jackson Boulevard, Suite 1650
                         Chicago, Illinois  60604

For Defendant Officers:  NATHAN & KAMIONSKI, LLP
                         BY:  MR. SHNEUR Z. NATHAN
                              MR. AVI T. KAMIONSKI
                              MS. BREANA L. BRILL
                              MR. JOHN M. CERNEY
                              MS. NATALIE ADEEYO
                         206 S. Jefferson Street
                         Chicago, Illinois  60661
```

843

APPEARANCES  (Continued):

For Defendant City:          MICHAEL BEST & FRIEDRICH, LLP
                             BY:  MR. JAMES P. FIEWEGER
                             444 W. Lake Street, Suite 3200
                             Chicago, Illinois  60606

Court Reporter:              KATHLEEN M. FENNELL, CSR, RMR, FCRR
                             Official Court Reporter
                             219 South Dearborn Street, Room 2328A
                             Chicago, Illinois  60604
                             Telephone:  (312) 435-5569
                             Kathleen_Fennell@ilnd.uscourts.gov

                  *    *    *    *    *

                PROCEEDINGS REPORTED BY STENOTYPE
       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

MR. LOEVY: Your Honor, may we tender to the Court a proposed curative instruction on the issue?

THE COURT: Okay.

MR. LOEVY: We've given a copy to defense counsel. Shockingly, they don't agree.

THE COURT: Is there any objection to this?

MR. FIEWEGER: Your Honor, it's the defendants' position that the best way to deal with this is to move on and not bring further attention to it. We don't think -- we think a curative instruction at this point is just going to bring further attention to the issue.

MR. LOEVY: But we are the victims of the problem. So it should be our choice from our perspective.

THE COURT: Well, I would think I could say the videotape has been excluded from this trial or is not going to be available at trial or something more neutral.

MR. LOEVY: Well, that makes it worse for us because it looks like, you know, something relevant is being withheld from them.

Your Honor, I probably don't even have to do it right now, but this is what we propose, because we think since they caused the problem, this is a little, you know, punitive toward them, but they caused the problem.

MR. FIEWEGER: Your Honor, again, for the record, it's

our position that a curative instruction is not needed. If there was going to be a curative instruction, now is the time for it. We shouldn't be waiting two days and then raise this issue again.

THE COURT: Well, you haven't proposed one.

MR. FIEWEGER: Well, Your Honor --

THE COURT: So it's fair enough.

MR. LOEVY: Thank you.

MR. FIEWEGER: Your Honor, just so the record is abundantly clear, we do not agree with giving a curative instruction. But if you are inclined to give an instruction, we would tender the proposed edits to what Mr. Loevy has done.

THE COURT: Okay.

MR. LOEVY: They took out the reason that it looks like we're just keeping the video from them, so we would not want any instruction if that was what you were going to give, because then it makes it worse for us. Then we're highlighting that the jury didn't get something.

MR. FIEWEGER: But, I mean, I understand Mr. Loevy's point to be that the concern that needs to be addressed with the curative instruction is that there has been flagged for them that there's a piece of evidence out there that they're not able to receive. You don't need to go into why they're not receiving it.

MR. LOEVY: Well, then that -- sorry.

MR. FIEWEGER: The instruction is adequate, Your Honor, if you just tell the jury: There was a ruling about this. You don't get it. You don't have to worry about it.

MR. LOEVY: Well, that just highlights that they don't have the video. So it makes it worse.

THE COURT: Right. It makes it looks like I'm the one at fault.

MR. FIEWEGER: Right.

THE COURT: I excluded it. So, you know, you need not concern yourself.

MR. FIEWEGER: And, Your Honor, I wouldn't say "at fault." I mean, it's the rules of the road.

THE COURT: No, I don't mean fault. But in their minds, if the Judge says you can't see it, then it's not on either of you, right.

MR. LOEVY: You could say the Court excluded the videotape from this trial.

MR. FIEWEGER: That's fine. We have no objection.

MR. LOEVY: Because -- well, no, because for the reason though. Otherwise it just highlights the missing video.

MR. FIEWEGER: They don't need to know the reason to know that they're not getting the video. The reason they're not getting the video is because the Court issued an order that they're not getting the video.

MR. LOEVY: But that suggests --

MR. FIEWEGER: That's all they need to know.

MR. LOEVY: That suggests that there is evidence that might have helped the plaintiff that they can't see. This was caused by the defendants' problem. So the explanation should -- that should be the price that they pay.

MR. FIEWEGER: Well, it's actually evidence that could help the defendants' case that they can't say.

THE COURT: Yeah, well, presumably they want it in, the defense wants it in because it would help them or they believe it would help them.

34 recorded, it only recorded 34 minutes of the --

MR. LOEVY: 38 hours.

THE COURT: Well, they know --

MR. FIEWEGER: Your Honor, I can't agree with the characterization of 38 hours of interrogation.

THE COURT: This is Mitchell?

MR. LOEVY: Yes.

THE COURT: Well, is there any dispute about how long he was in custody?

MR. LOEVY: We could leave it "in custody" and cross off "being interrogated" because I guess that would be --

THE COURT: "Only 34 minutes of the entire time" --

MR. LOEVY: Yes.

THE COURT: -- "that Mr. Mitchell was in custody." I would later not be asked later on, you know, jury note, "Can we

see the video?"

MR. FIEWEGER: Your Honor --

THE COURT: This might --

MR. FIEWEGER: Your Honor, an instruction that simply says "The Court excluded the video" answers that question, period.

MR. LOEVY: But that would be to our detriment. And then the problem that they caused they would benefit from.

MR. FIEWEGER: I don't understand how it's to -- I don't understand how it's to anybody's detriment. The jury doesn't know one way or the other what's on this video, how long this video is, what it covers, why it was excluded.

THE COURT: Right. So I think this --

MR. FIEWEGER: Why anybody wants it in or out.

MR. LOEVY: We just objected, we just objected that he said video, and then the jury had to go to lunch.

THE COURT: Okay. This is what I'll do. "You may have heard an inadvertent reference to a videotape of a transcribed statement of Anthony Mitchell. I have excluded the videotape from this trial because the police only recorded 34 minutes of the entire time that Mr. Mitchell was in custody.

MR. FIEWEGER: Your Honor, the police didn't record any of it.

THE COURT: Okay.

MR. LOEVY: We could say that "Only the last 34

minutes of the entire time he was in custody was recorded."

THE COURT: Okay. "Only" --

MR. LOEVY: "The last" is the important part.

THE COURT: -- "the last 34 minutes of the" --

MR. LOEVY: "Entire time."

THE COURT: -- "entire time that Mr. Mitchell" --

MR. LOEVY: "Was in custody was recorded."

And then the last sentence seems to still fit too, or last two sentences.

MR. NATHAN: We have to object -- sorry, Jon.

MR. LOEVY: Sorry, Jim.

MR. NATHAN: We have to object to all of that. I mean, I think going into --

THE COURT: I think this is okay.

MR. FIEWEGER: If I could just make my record, Your Honor? I apologize.

THE COURT: Okay.

MR. FIEWEGER: I think going into the explanation about who did what or why the video is in or out goes way beyond anything that's necessary to cure any perceived harm from an inadvertent reference to this.

And by going into and explaining to them why this video is not admissible, it creates the implication that there was something else wrong about this, that somehow the way that this video was prepared was itself improper. And there is no

850

argument of that, there is no claim based on that.  But the implication by this explanation is that there is something wrong with how the video was prepared.

MR. LOEVY:  Well, Your Honor, it wasn't an inadvertent reference.  It was an on-purpose reference, as has been explained to us, and this is a fair way to cure the prejudice caused by it.  So he's made his record.

THE COURT:  We'll go with it.

MR. FIEWEGER:  It's creating more prejudice, Your Honor.

THE COURT:  It could be.  I cannot predict the future.

MR. NATHAN:  Your Honor, if an instruction is being given about how much video was taken, then it should also be included that there was no procedure at the time to be recording the rest of it.  So we shouldn't be held at fault for the absence of a recording for that entire time period.  It wasn't the procedure.

MR. LOEVY:  And we don't have a problem if they want to put on evidence that the rules didn't require them to do more than do the confession.  They could have, they chose not to.

THE COURT:  Okay.  That should be sufficient.

MR. LOEVY:  All right.

MR. NATHAN:  When is this being given, this instruction?

Leo - cross

851

THE COURT: When they come back.

MR. NATHAN: Okay. Thank you.

(Jury in at 12:59 p.m.)

THE COURT: You may be seated.

Good afternoon, ladies and gentlemen.

I want to give you a brief instruction.

Before the break, you may have heard an inadvertent reference to a videotape of the transcribed statement of Anthony Mitchell. I excluded the videotape from the trial because only the last 34 minutes of the entire time that Mr. Mitchell was in custody was recorded.

So you will have the transcript of all of the words recorded on the video, and you are not to concern yourself with evidence that is not admitted in the trial.

RICHARD LEO, PLAINTIFFS' WITNESS, PREVIOUSLY DULY SWORN,

CROSS-EXAMINATION (RESUMED)

BY MR. NATHAN:

Q. Mr. Leo, back in March of 2003, there was no requirement for the entire interrogation or length of custody from arrest through charging to be videotaped, correct?

A. At some point around that time there was a requirement. I don't know if in March of 2023 in Illinois there was or was not.

Q. And over time, policing has progressed and the criminal justice system has changed over time and changed rules, just

Q. like laws change every day, correct?

A. Is that a question?

Q. Yes. Do you want me to rephrase?

A. Yeah. I think you're saying over time laws change?

Q. Yes.

A. Yes.

Q. Okay. And over the course of time, different states enacted rules about interrogations, now -- before they weren't going to be videotaped and now they are videotaped, right?

A. Correct. Different states have different rules.

Q. And that's still up in the air throughout the country, right?

A. Well, I think 30-plus states now require it, including Illinois.

Q. So I referenced like New York before, I'll go back to it. For example, in New York, it wasn't until 2018 that they changed their law on that, right?

A. I don't know exactly when, but probably around that time period.

Q. You have no evidence, nothing that you reviewed suggested that there was a requirement back in March of 2003 in Illinois to videotape the entire thing, correct?

A. I would know the answer to that question if I had access to my materials. But there was nothing in this case that I reviewed specifically on that issue.

Leo - cross

853

Q.   So there is nothing in your materials that say that there was a duty to do that, correct?

A.   Not that I recall.

Q.   Now --

MR. NATHAN:   One moment, Your Honor.

(Discussion off the record between counsel.)

MR. NATHAN:   I'd like to show the witness Defendants' Exhibit 100, which is in evidence.   It's the statement of Anthony Mitchell.

MR. AINSWORTH:   Your Honor, this is also Plaintiffs' Exhibit 45.

THE COURT:   All right.   No objection then?

MR. AINSWORTH:   None.

BY MR. NATHAN:

Q.   This is a document that you reviewed in connection with this case?

A.   Can you remind me what this document is again?

Q.   Sure.   Do you see it says "Interview at Area 1 Headquarters"?

A.   Yes.

Q.   "Present, Nick D'Angelo and Detective Struck"?

A.   Yes.

Q.   "Statement of Anthony Mitchell"?

A.   Yes.

Q.   Well, you were actually asked questions on direct

examination where Mr. Ainsworth focused on the beginning of this statement where there were questions that were yes, yes/no questions, correct?

A.   Yes.

Q.   And so the statement starts out, just so we get like the entire context, they're taking the statement of Anthony Mitchell.  "We're here to take the statement of Anthony Mitchell."

And then the statement starts out with these questions, the prosecutor, Mr. D'Angelo, is asking, for example, line 7:

"And, Anthony, I talked to you earlier and you told me about the beating of Chris, isn't that right?

"Yes."

A.   I don't know what page this is on, but you are reading it correctly.

Q.   Do you see that's page 2 of the statement?

A.   Yes.

Q.   All right.  We're just going to -- and during Mr. Ainsworth's questions, you were saying that this shows that the prosecutor was telling Mr. Mitchell what to say.  You were calling it, I think you were saying scripting or leaking?

A.   Contamination.

Q.   Contamination, okay.

And Mr. Ainsworth went through other examples.

"And you contact the girl by the name Precious, and John knew and you knew, right?"

And his point was that's a yes/no question, so it shows contamination, right?

A. Well, not because it's a yes/no question. But yes, it does. It's feeding of case facts.

Q. Well, isn't it true that it starts off saying, the prosecutor, Mr. D'Angelo, is saying:

"And, Anthony, I talked to earlier and you told me about the beating of Chris, isn't that right?

"Yes."

A. I don't see where you're reading from.

Q. Line 7.

A. Yes, correct.

Q. So Mr. D'Angelo is actually telling -- this is capturing a statement that Mitchell gave D'Angelo earlier, correct?

A. Well, it's reiterating it. But we don't have a record of whether that's accurate or not.

Q. Right. So we don't have a record. But isn't it true that you can't look at this statement and say: See, this statement shows that there was, there was -- what was your term again, "leaking"?

A. Contamination.

Q. Contamination. Those were synonyms, right?

A. I don't know what you mean by "synonyms" in this context.

Q.   All right.   I'll use your word "contamination."

You were saying that this is evidence of contamination?

A.   Correct.

Q.   But you don't know if Mr. Mitchell gave a full narrative with no contamination whatsoever right before this, correct?

A.   Correct.   We don't know that.   But this is evidence of contamination, there is no doubt about that, or recontamination.

Q.   Well, you just told me a minute ago that there isn't evidence, because we don't have a video or a transcript of what happened during the entire process.

A.   On its face this is educating the suspect, Mr. Mitchell, about the details of the crime.   So it meets the definition of "contamination," which police are trained not to do.

Q.   But you agree that Mr. Mitchell gave Mr. D'Angelo a statement prior to this statement that we're looking at, correct?

A.   Yes.

Q.   All right.   And that's what it says here?

A.   Well, I don't know if it was Mr. D'Angelo.   But that there were words given before that, yes.

Q.   Mr. D'Angelo is asking the questions here, right?

A.   Yes.

Q.   And Mr. Mitchell is giving the answers?

A.   Yes.

Q.   And Mr. D'Angelo asks a question on line 7:

     And, Anthony, I talked to earlier, and you told me about the beating of Chris, isn't that right?

     "Yes."

     MR. LOEVY:  That's asked and answered, Your Honor, that exact question.

     MR. NATHAN:  He's denied it a second ago.  I don't know why, but --

     THE COURT:  I don't think he denied that.

     Asked and answered, yes.  Sustained.

BY MR. NATHAN:

Q.   And isn't it true that before Mr. Mitchell talked to D'Angelo, he also talked to a different assistant state's attorney?

A.   I don't recall if he spoke to a different state's attorney.

Q.   He spoke to Jake Rubinstein, do you remember that?

A.   Oh, right, correct, yes.

Q.   So after Mr. D'Angelo orients Mr. Mitchell here and says: Hey, you remember you just told me about the murder, let's talk about it.  And he continues, I'm talking now on line -- on page 10.  He's asking about -- do you see he's asking about John Fulton, right?

A.   Yes.

Q.   And then he says, "And does he have a nickname?"

And what did Mr. Mitchell say?

A. "Yes. His name is Lou."

Q. And D'Angelo asked about how long he knew him. And what did Mr. Mitchell respond?

A. "I've known John for about three or four years."

Q. Continue.

A. "Because him and my cousin Darnell have been close since John was little."

Q. And he asks, "Have you lived with John?" He says "Yes."

He talks about how long.

Mr. Mitchell gives the address, correct?

A. Yes.

Q. Now, he continues and asks about a picture, about Antonio Shaw, right?

A. Are you talking about the top of the page?

Q. I'm talking about the statement, the exhibit we're looking at right now.

A. Okay. So line number 1.

MR. NATHAN: Your Honor, this is in evidence. I thought it was being published to the jury. If I may?

THE COURT: There is no objection to this, I feel sure, so --

MR. AINSWORTH: No, there is not.

THE COURT: Okay. You may publish it.

BY MR. NATHAN:

Leo - cross

859

Q.   And then Mr. D'Angelo asks on line 10:

"And Antonio Shaw and Stick, how long have you been friends with them?"

And what does Mr. Mitchell said?

A.   "I known Stick since I was about 7 or 8 years old."

Q.   Is that yes/no answer or it's an actual answer?

A.   Well, it's not a "yes" or "no" question, so it's not a yes/no answer.

Q.   Okay.  So it's not a "yes" or "no" question, not a "yes" or "no" answer, correct?

A.   Yes.

Q.   Okay.  So then he identifies Precious out of a photo.  And then let's start with line 24.  What does State's Attorney D'Angelo ask?

A.   "Back in January or February of this year, you and John trying to buy a gun, right?"

Q.   And the answer?  What's the answer?

A.   I don't know what the answer is because you're on line 6 there.  Okay.

Q.   Good point.

A.   "Yes."

Q.   And the question:

"Can you tell us a little bit about what happened?"

What does Mr. Mitchell say?  Please read that.

A.   "All right.  Me and John were trying to get a gun for

protection because, you know, time after time someone -- he had an Olds (inaudible) Cutlass. And someone tried to break in the trunk, you know. He done had radio sounds in there or what, whatever you want to call it, and someone was trying to get in his trunk at the time, and also other things were happening too like --"

Q. Okay. And that's also not a "yes" or "no" question, true?

A. Correct.

Q. Now, I noticed, did you see here it says "Olds Cutlass"?

A. Yes.

Q. In fact, are you aware based on your review of the case that it was an Oldsmobile of a different model?

A. I don't recall.

Q. Let's assume it wasn't a Cutlass. That would be under your methodology a false fact?

A. I need to know a little bit more about what this is referring to when you say a false fact.

Q. Just because that detail is wrong does not make the confession false, right?

A. I don't know how this detail relates to the confession.

Q. Well --

A. That's what I'm trying to get at.

Q. Isn't it true it's completely undisputed that Mr. Mitchell was in the car of Mr. Fulton, correct?

MR. AINSWORTH: Objection, foundation. At what time

are we talking about?

MR. NATHAN:  I can clear that up.

THE COURT:  Okay.

BY MR. NATHAN:

Q.   Isn't it true that Mr. Mitchell actually lived with Mr. Fulton at his apartment, right?

A.   Yes.

Q.   And he's testified, and you reviewed his deposition transcript, he testified that he's been in that car multiple times, right?

A.   He has been in the car, yes.

Q.   He's even driven the car?

A.   I don't recall.

Q.   And he's misdescribing the model of the car here in his statement, correct?

A.   I don't know.

Q.   Let's say he was.  If he misdescribed the model of the car, does that make the whole statement false?

A.   No.  But this isn't really a relevant fact, unless it's related to the crime.

Q.   Okay.  So the next question --

A.   The description or type of the car.

Q.   Next question, Mr. D'Angelo says "Okay."  And what does Mr. Mitchell say?

A.   I think you're referring to line 11:

"Gang-banging, you know, in the neighborhood."  Is what you are referring to?

Q.   "Question:  Who did John go to to try and buy this gun?"

And Mitchell say?

A.   "We tried more than one person, but eventually it didn't work.  He was having a conversation with Precious one day and just was curious if she knew anybody who had guns and he asked her."

Q.   And D'Angelo asked, "And was she able to suggest someone?"

Mr. Mitchell says what?

A.   "Yeah.  She told us that she was going to assist us.  She knew someone that had a hold to a lot of guns."

Q.   "Question:  And how did she get -- have you guys get in contact with this person?"

And what did Mitchell say?

A.   "She -- she knew his phone number.  She called him on three way, you know.  It seemed like" --

Q.   "She did a three way call"?

A.   Yes.

Q.   And he asked, "Between you guys and this other person?"

A.   "Yes."  And he says "Yes."  "Yeah," I'm sorry.

Q.   And Mr. D'Angelo asks, "Do you know who this other person was now?"

Answer?

A.   "Yes."

Q.   D'Angelo continues:  "What's his name?"

A.   "Chris."

Q.   Question from D'Angelo:  "I'm going to show you a picture, Exhibit Number 4.  Do you recognize who is in this xerox copy of a photo?"

And the answer from Mr. Mitchell was?

MR. AINSWORTH:  Your Honor, we object.  It seems cumulative, but I don't know where this is going, if we are going to read the entire transcript.

MR. NATHAN:  It's not cumulative.  This is the statement that he evaluated.

MR. LOEVY:  Do you want to just read the whole statement to him?

THE COURT:  Okay.  Just a quick sidebar here.

(Proceedings heard at sidebar:)

MR. LOEVY:  We're trying to complete the trial.

THE COURT:  I know.  I thought that you were getting to the point that all of his questions were not "Yes, yes, yes."

MR. NATHAN:  That was my point.  And there are also certain details that I want to elicit, but that is the large point.

THE COURT:  Okay.  So how does this question --

MR. NATHAN:  I'm trying to walk through the statement. That's what I'm doing.

MR. LOEVY: Well, Your Honor, there is going to be other witnesses that I, you know -- our objection is going to be cumulative. If he chooses to do it with this witness, then we're going to do it again with D'Angelo and do it again with --

THE COURT: And Mitchell, yeah. I mean, I said you could read it into the record if you want to. But, you know, I would like you to be focused on, you know, impeaching or --

MR. NATHAN: I'm not trying to impeach.

THE COURT: -- or pointing out -- impeaching, that is weakening the witness's testimony.

MR. NATHAN: Okay.

THE COURT: So I don't know.

MR. LOEVY: But if we just read the whole statement, our objection later is going to be they can't do it with other witnesses.

THE COURT: Yeah, you can't do it again with Mitchell or whoever.

MR. NATHAN: I'm not going to go through the entire statement with him. But I am going to make the point that Your Honor referenced, that it's not a "Yes, yes, yes."

THE COURT: Okay. That's legitimate in my view.

MR. NATHAN: There is also maybe a couple details I do want to elicit though.

THE COURT: Okay. We'll see when you get there.

(Proceedings heard in open court:)

BY MR. NATHAN:

Q.   Here they're discussing in this statement, they're discussing the gun deal, right?

A.   "Did you negotiate to buy a gun?

     "Yes."

Q.   And in response on page 13, line 20, this isn't a "yes" or "no" question either, is it, on line 23 and 24?

A.   Yes, that's not a "yes" or "no" question.

Q.   Okay.  Then on page 16, also not a "yes" or "no" question, right?

     "What happened when you guys stopped the car?" and he continues.

     What does Mr. Mitchell say -- oh, hold on.

     He says that -- he talks about how they spoke with Mr. Collazo, right?

A.   Counsel, you are testifying.  I can't see what you are referring to.  And you're answering your own question.

     MR. NATHAN:  Your Honor, may I hand the witness a full copy of it?

     THE COURT:  Yes.

BY MR. NATHAN:

Q.   I'm on page 18.  On page 18 and 19, those are not "yes" or "no" questions, correct?

A.   You're going to have to give me a minute to review this.

Leo - cross

866

Some of these are "yes" or "no" questions, at least on page 18.

Q. Okay. So let's talk about after the robbery happens then --

A. Same with 19.

Q. We're looking at page 19, lines 8 through 12. Mr. Mitchell says what about what Chris, the victim, was saying?

A. Okay. Did you want me to read the non-"yes" or "no" question there?

Q. Yes. Please read 9 through 12.

A. Okay. "Chris was just saying you guys are bogus. I know where you live. Precious gonna tell me your address. She knows your apartment number. He was saying 1608 and all that. He, he knew everything, he knew the whole address and everything."

Q. Okay. So look through the next, the next 10 pages and tell me if those are all "yes" or "no" questions, okay.

A. Well, they're not all "yes" or "no," but some of them are "yes" or "no" just looking at page 20.

So the answer to your question, even though I haven't looked at 21 through 30, is that not every single question from pages 20 to 30 are all yes/no questions.

Q. Turn to page 25, line 6. Please read that for the ladies and gentlemen of the jury.

A. "Now, when you guys got out of the car, who got out of the

car first?"

Q.   Keep going.

A.   "No, no one" -- I'm sorry.  "No one got out of the car first.  It was just whoever opens the damn door first, everybody's gonna get out."

Q.   Keep going.

A.   "Okay.  Did everybody get out of the car?

       "Yes."

Q.   Keep going through line 16, please.

A.   "When everybody got out of the car, what did you guys do?

       "We, we didn't run, we just walked in a steady pace, because we didn't want to make it look like a scene and run up on him --

       "Right."

Q.   Right.  And those aren't all "yes" or "no" questions, right?

A.   Not all of them, no.

Q.   Mr. Mitchell is describing in a narrative form about how they're approaching Christopher Collazo at the time of the killing, right?

A.   I'm not sure I would characterize it as narrative.  But it's not all yes/no questioning.

Q.   Okay.  And then they asked, they crossed the side of the street, and then line 5, what does Mr. Mitchell say happened?  What did he do?

A. Are we still on page 25?

Q. No. 26.

A. And then he says, "He immediately started walking fast, so we immediately started running up on him."

Q. Okay. And then keep going through the end of this page, please.

A. "Okay. When you ran up on him, what happened?

"John hit him then --

"When, when you say --

"-- I don't know who hit him next. But I know I hit him, too."

Do you want me to keep going?

Q. Yeah, please, until the end of the page, please.

A. I'm sorry.

"Okay. When you say John hit him, could you show us how John hit him?

"He hit him like --

"With a fist in the face." That's the question.

"Yeah, yeah."

"Okay. How did you hit him?

"I hit him, I hit him the same exact way, hit him in the face.

"Question: With a fist in his face." There is no question mark after that.

"I don't know where, but I hit him in the face."

Leo - cross

869

Q.   Now, let me stop for a second.  That's not a "yes" or "no" question, right?

A.   Are you referring to --

Q.   Lines 20 through 21.

A.   Lines 20 to 21 isn't even a question.  It doesn't have a question mark.

Q.   Right.  So that's Mr. Mitchell describing what he's saying happened, correct?

A.   Counsel, you have to let me finish my answer.

Q.   Okay.

A.   My answer to your prior question was line 20 is a statement.  It's telling him that a fist in the face.  It's not a question.  There is no question mark.

Q.   And what does, what does Mr. Mitchell say?

A.   On line 21, "I don't know where, but I hit him in the face."

Q.   Is it fair to say that this continues with a mixed narrative where Mr. Mitchell is describing how he, Mr. Fulton, and Mr. Shaw beat, abducted, and burned Christopher Collazo?

A.   I don't think that's fair.  I think this is not a mixed narrative.  I think it's a stilted narrative at best.  It's a combination of yes/no questions and it's a combination of feeding facts.

Q.   Okay.  Let's go to page 29 at the top.  It says, "What did you do with Chris?"  That's what the prosecutor asks.

And what was Mr. Mitchell's answer at the time?

A.   "We -- all three of us picked Chris up and we put him in the trunk.  Closed the trunk.  Got in the car and blasted the radio.  Backed up.  We went to Rockwell and we went the opposite way on Foster."

Q.   Keep going through 8.

A.   "How far did you guys drive before you stopped?

"We drove about three blocks before we stopped at a Citgo gas station."

Q.   And that's not a yes/no sequence of questions and answers, right?

A.   Lines 1 through 8, correct.

Q.   That's a narrative, lines 2 through 5, about how they closed the trunk and drove away, correct?

A.   Again, I wouldn't call it a narrative.  I would call it an answer to a non-yes/no question.

Q.   Okay.  Let's go to page 30, line 23.  We're going to keep reading at the top of 31.

MR. LOEVY:  Your Honor, again we object to the cumulativeness.

MR. NATHAN:  I'm trying to go through it quickly.

THE COURT:  I think you've made your point.

MR. NATHAN:  Let me just do this one last one.

THE COURT:  Okay.

BY MR. NATHAN:

Q.   23, please read.

A.   "Okay.  So when you guys made a u-turn to go down the alley, did you stop in the alley?

"We stopped to look and see what the scenery looked like, and it was a big brown garage.  And there was like cars coming this way, and you could see cars coming this way on another street.  So we decided that it was a place, it was part that you can turn in the alley.  You can either keep straight, go to the other street, that's the way we came in.  We turned -- the brown garage right here, then you can go that way, and you can exit out the way we came in.  We turned and it was like two old, you know, them little beetle looking cars."

Q.   Okay.  That also was not a yes/no question, right?

A.   Correct.

Q.   This notion that you described on direct examination -- for some reason I can't get the difference between scripting and -- what did you say?

MR. AINSWORTH:  Contamination.

MR. NATHAN:  Contamination.  Thank you.  Call a friend, call Russell Ainsworth.

BY MR. NATHAN:

Q.   Scripting and contamination.  In theory, you could look at any statement, if it's not video or audio recorded from like the entire time the person was in custody, then you could always make a claim that it was fed to me, right?  So the

suspect who confesses can always say: No, I gave them that fact. Meaning -- strike that.

If the interrogation is not video or audio recorded for the entire length of custody, it's always possible and every time a suspect gives a statement they can say, "That detail was fed to me"?

A. If the time during which they talk is not recorded, then there is no way to rule out contamination.

Q. Right. So you're just really back to square one where the person who is recanting the confession says, "I didn't confess. They fed it to me." And then the person who took the confession is saying, "No. You told it to me"?

A. Yes. But that's why it's important to look at other facts in the case, particularly the indicia of unreliability or indicia of reliability, which makes the contamination claims more or less compelling.

So if there is high indicia of unreliability, it gives credence to the hypothesis that there was police contamination. And if there is low -- or if there is high indicia of reliability, then it would give plausibility or credence to the opposite conclusion.

Q. Okay. So, for example, showing you what's in evidence Defendants' Exhibit 124, this is the gas can that was recovered in Mr. Fulton's garage.

If, if the grandfather, Adolphus Lucas, said -- well,

let me back up.  I have to back up.  Sorry.

If Fulton said to the detectives and prosecutors that "You can find the gas can that I used to burn Collazo in my grandfather's garage."

And then the detectives go and actually find a gas can in that garage.

And in the hypothetical, then the grandfather says, "I never saw that before."

Wouldn't that tend to corroborate Mr. Fulton's confession?

A.   Well, if that's all you knew, then you could say that's an indicia of reliability.  But if you knew more and you could show that that wasn't the gas can that came from the gas station or it wasn't the gas can that was used in the crime, then you would call it an indicia of unreliability.  So you need to know more about that fact.

Q.   We'd always like to know more.  But in the facts that I gave you, which was Fulton said it was the -- said he killed the guy with burning him with a gas can; said that he stuck it in the grandfather's garage; and the grandfather said "I never saw that before," I only know those facts, that is corroborating of the confession, correct?

A.   Not necessarily.  It depends on whether, on whether it fits the other facts of the crime.

Q.   Okay.  You also looked at the statement of Johnitta Griffin

provided on March 14, 2003 to Assistant State's Attorney Jake Rubinstein, correct?

A.   Correct.

Q.   And in that statement --

          MR. NATHAN:  This is in evidence, right?

          MR. LOEVY:  Yes.

BY MR. NATHAN:

Q.   In that statement she talks about -- she says her home phone number is -- she says Precious's home number is 773-782-3164, correct?

A.   Yes.

Q.   She says Lu's cellphone number is 773-858-8217, correct?

A.   Yes.

Q.   And Lu is a nickname for the plaintiff, Fulton?

A.   Yes.

Q.   She also gives another phone number in this statement. Isn't it true that she says that she called Chris, who is the victim, right?

A.   Yes.

Q.   And she called him at 773-637-4177, correct?

A.   Well, that's what the statement says, yes.

Q.   You reviewed phone records in this case as well, right?

A.   Yes.

Q.   You reviewed records from Ms. Griffin or the ones that we were just associating with 773-782-3614, correct?

A.   I don't recall specifically.

Q.   And you reviewed Mr. Fulton's records as well, right?

A.   I believe so.

MR. NATHAN:   I'd like to show the witness the demonstrative.  Any objection?  It's just going to be faster.

MR. AINSWORTH:   No problem.

BY MR. NATHAN:

Q.   So we just established that according to Griffin, this is her phone number, right, 782-3164?

A.   I believe so.

Q.   And this is the victim, Collazo's phone number?

A.   I believe so.

Q.   And according to her statement, that's Mr. Fulton's phone number, correct?

A.   Okay, yes.

Q.   And you in your review of the case -- I don't know why this is -- you noted that Ms. Griffin and Mr. Fulton spoke on March -- this is March 8th of 2003?

A.   I think that's March 3rd.

Q.   I think --

A.   Oh, you're right.  I'm sorry.  It's March 8th, I guess.

Q.   This is March 8, 2003.  Griffin and Fulton --

   (Discussion off the record between counsel.)

MR. NATHAN:   I thought this was published as well.  May I publish this?

THE COURT: If it's not objected to, you may publish. Okay.

MR. LOEVY: No objection, Your Honor.

MR. NATHAN: Okay. I apologize about that confusion.

BY MR. NATHAN:

Q. All right. So we've got just quickly, we've got Griffin, Collazo's number, Fulton's number in front of us, right?

A. Yes.

Q. Okay. And on Griffin's number, she's connecting with the Fulton number, one, two, three, four, five, six, seven, eight, nine times on March 8, 2003, correct?

A. Yes, if that document is accurate, yes.

Q. Okay. And then about 10 minutes later -- so the last call between Fulton and Griffin is at 13:53, meaning 1:53 p.m., correct?

A. Yes.

Q. And then at 2:03, 14:03 hours, Griffin and Collazo speak, correct? Because this is Griffin's number, 782-3164, and this is Collazo's number, 637-4177, correct?

A. Yes.

Q. In your review of the materials, do you know of any reason why Griffin and Fulton would be talking other than talking about Collazo?

MR. AINSWORTH: Objection, foundation, Your Honor.

THE COURT: Overruled.

Leo - cross

877

BY THE WITNESS:

A. Well, I'm sure there could be other reasons why they were talking.

BY MR. NATHAN:

Q. Well, you read Mr. Fulton's deposition transcript, right?

A. Yes.

Q. And you remember him talking about the gun deal that Griffin set up between Fulton and Collazo, right?

A. Yes.

Q. And that's not disputed in the case, right? That's what she was connecting them about, right?

A. That's my understanding, yes.

Q. Right. And then that happens sometime earlier before the murder, not the day of the murder, right?

A. That's my understanding, yes.

Q. Okay. But subsequent to the gun deal, the gun deal went bad, right, because Fulton got robbed, Collazo robbed him, right?

A. Correct.

Q. And there was some bad blood, for lack of a better term, between them afterwards, right? They weren't happy with each other, true?

A. I don't recall how bad the blood was, but I'm sure they were unhappy with each other.

Q. And they were talking with each other, they were

threatening each other?

A.   I don't recall specifically.

Q.   And Collazo actually threatened to kill Mr. Fulton, right?

A.   I don't recall specifically that.

Q.   And then Fulton was calling Ms. Griffin, Precious, saying "I want $300," right?

          MR. AINSWORTH:  Objection, foundation.  When?

          MR. NATHAN:  After the gun deal went bad.

          THE COURT:  Well, he seems to be familiar with the record.  So I think that's what we're talking about. Overruled.

BY THE WITNESS:

A.   At some point.

BY MR. NATHAN:

Q.   Okay.  And at that point in time, the relationship, like, it's not like Griffin was dating Fulton, right?

A.   Correct.

Q.   In fact, Fulton was dating somebody else at the time, right?

A.   I don't recall.

Q.   He had, he had a baby and a girlfriend and he lived with the girlfriend, right?

A.   Ms. Fulton, yes.  Sorry, sorry.  I thought -- I'm sorry. I'm mistaking the names in my head.  Yes.

Q.   So the connection between, at this point between Fulton and

Collazo, the midpoint is -- I'm sorry.  Let me strike that.

The connection between Fulton and Griffin, the reason they have a connection is because of this gun deal with Collazo, correct?

A.   Well, I don't know what their preexisting relationship was. They might have other reasons for having a connection as well.

Q.   Isn't it true that this background with this phone record tends to corroborate a motive for Fulton to go interact with Collazo on March 9th?

A.   I don't think this corroborates a motive, no.

Q.   Were you also aware of the fact that a fingerprint of Mr. Shaw was located by the tire cover inside of Mr. Fulton's car?

A.   Yes.

Q.   Don't you think that that is some physical corroboration of Shaw being in the trunk and of the story where they stuffed Collazo in the trunk?

A.   No.  My understanding was they lived together, and he had been in the car many times before, so you would expect a fingerprint to be in the car.

Q.   And if the car had -- was there any evidence in this case about the car being cleaned after the murder?

A.   Not that I recall.

Q.   Do you remember that there was a general progress report where Fulton talked about taking the car to Pete's Car Wash?

Leo - cross

880

Do you remember reviewing those records?

A.   I do not remember that fact --

Q.   Now --

A.   -- or assertion.

Q.   If you did review that fact with Fulton going to Pete's Car Wash to clean the car, it wouldn't really help you to say, well, there is no, there is no blood in the trunk, right?

A.   It depends, because you could go to a car wash and just have the exterior of the car cleaned, not the interior.  So I would want to know more about that.

Q.   Right.  But if somebody --

A.   I'd also want to know more about the timing.

Q.   But if somebody, say, put the victim in a garbage bag that totally sealed up the victim, that would be an explanation, one explanation why there is no blood in the trunk, right?

A.   It's a hypothesis.  I don't know that it would be an explanation.  I need to know more.

Q.   Well, it's not just any hypothesis.  I thought you said on direct examination that you saw evidence that the victim was bagged from head to toe?

A.   Correct.  But I think your hypothetical is incomplete.  I think one needs to know more to answer it.  And that's what I was getting at in my prior answer.

Q.   And it is possible if somebody took the car to a car wash to also wash the trunk, correct, to clean out the trunk?

Leo - cross

881

A.   That's possible.   But, again, I'd want to know more about what was done at the car wash, and I'd want to know more about the timing.

Q.   And if Mr. Fulton took his car to Pete's Car Wash to get washed on March 10th, that would tend to corroborate his confession, right, or that would be consistent with his confession?

A.   No.   That would not be consistent with his confession in my view.

Q.   Meaning if he didn't dispute that he did go to Pete's Car Wash?

MR. LOEVY:   Objection, Your Honor.   He definitely disputes that he washed out his car after the murder.

MR. NATHAN:   I didn't ask a question yet.

BY MR. NATHAN:

A.   If he doesn't dispute that he did, in fact, take his car to Pete's Car Wash, and that detail was in the confession, that tends to corroborate the confession, right?

MR. LOEVY:   Are we talking about the confession or he doesn't dispute?   I'm just trying to clarify.

THE COURT:   What is your question?

BY MR. NATHAN:

Q.   My question is:   If it is true that Mr. Fulton doesn't dispute that he does, in fact, take his car to Pete's Car Wash on occasion, that's where he goes to get his car washed, and

that that fact, that detail is also in the confession, that could corroborate his confession, right?

A. I don't see how.

Q. That's a strange fact that the police wouldn't know unless Mr. Fulton told them, right?

A. We don't know. We don't have a transcript of the entire questioning back and forth, so we don't know.

Q. Yeah, and --

A. They might have found that out in a different way.

Q. Well, we do know that the gas can was recovered in Mr. Fulton's grandfather's garage, right?

A. A gas can. I don't know that we know it was the gas can. In fact, I thought there was evidence that it was not the gas can.

Q. And what is that evidence?

A. I have to review my report. I know I described that in my report. Give me a moment.

So there was no evidence that from -- no video evidence from the gas station, no receipt from the gas station documenting the purchase of a gas can that night or evidence that the gas can that was recovered from the garage was of the same type or brand as those sold at the gas station.

Q. What page is that?

A. I'm on the bottom of page 63 of my report.

Q. Right. I think what you are telling us is that you agree

with me that you can't identify any evidence that that was not

the gas can.  What you are saying is that you haven't

identified affirmative evidence?

A.   No.   And then I go on on 64 that the gas can that

Mr. Mitchell described had a yellow top, but the gas can

described from Mr. Fulton's grandfather's house and purported

to be the gas can used in the fire had a red top, and that

there were multiple different accounts of where the gas can

came from.   Again, inconsistent confession statements.

So no, there is more evidence that that's not the gas

can in question.

Q.   And the tops are the pieces that you screw on to pour gas

out of?

A.   Presumably, yes.

Q.   And this gas can that was recovered didn't have that top

on, right?

A.   I don't recall if it had the top on.

In my report I say that it had a red top.   So at the

time I wrote my report, based on the materials I reviewed, I

thought it had a red top.

Q.   But you don't know?

A.   Well, as I sit here today, I don't recall.   It's been a

couple years since I reviewed most of the discovery in this

case.

Q.   At the end of the day, if Mr. Fulton is saying he was never

fed, and Mr. Rubinstein is saying he was fed and he said that he was fed, you can't make a determination who is correct, right?

A.   So you're not talking about feeding details.  You're talking about feeding food, is that right?

Q.   I'm going as to credibility determinations.  And I'm going to wrap up.  So I'm just asking my question here.  You cannot determine who is correct.  Mr. Fulton said that he was not given food, and according to Rubinstein, Fulton said he was given food.  You can't, you can't tell us which one of those two things is true, correct?

A.   Right.  I'm not the fact witness.  I'm not a fact witness.

Q.   And you can't tell us if Mr. Fulton did kill Mr. Collazo or if he didn't kill Mr. Collazo?

A.   Again, that's not for me to determine or opine about.

MR. LOEVY:  Your Honor, that's opened the door.  He's asked him again if he thinks he did it.

BY MR. NATHAN:

Q.   I'm just saying you're not --

MR. NATHAN:  That's all I have.

THE COURT:  All right.

MR. AINSWORTH:  May I, Your Honor?

THE COURT:  You may.

MR. AINSWORTH:  Thank you.

REDIRECT EXAMINATION

BY MR. AINSWORTH:

Q.   All right.  Doctor, why do many states require videotaping the entirety of the interrogation and not just the last 34 minutes?

A.   There is two problems.  One is whether or not there was, for lack of a better word, coercion was used.  Oftentimes there would be what we call swearing contests, where the police would say, give one set of facts or a description of what allegedly occurred, and the suspect would give another set of what occurred, and they would be dramatically different.

And so having a full recording of the entirety of the interrogation would allow you to -- would allow anyone who watched that or read the full transcript to adjudicate whether or not the police version was accurate or the suspect's version was accurate, whether there was psychological coercion or not. That was one issue.

The other issue was the issue of contamination and the feeding of the facts.  Many cases where the police said "We didn't feed them the facts," the suspect said, "I didn't know the facts, they fed me the facts," without a record, we couldn't tell.

So essentially a recording is a preservation of evidence, very important evidence as we all agree in any criminal case.

Q.   And showing you what we've previously marked as Plaintiffs'

Exhibit 45.

MR. AINSWORTH: If I may publish?

THE COURT: You may.

BY MR. AINSWORTH:

Q. All right. So from pages 2 to 10, it's questions, and I'm showing you page 6 here, pages 2 to 10 contain questions that are yes/no questions in general, correct?

MR. NATHAN: Objection, asked and answered, cumulative.

THE COURT: What was your question?

MR. AINSWORTH: I'm just trying to orient.

THE COURT: All right. No need to answer then.

BY MR. AINSWORTH:

Q. Sure. And so in this section of the report where there is yes/no questions going on, do you see at line 6 there is a question: "It was an aluminum baseball bat?"

A. Yes.

Q. And then Mr. Mitchell's answer is "Yes"?

A. Yes.

Q. And then on page 27, they ask, "What kind of bat was it?"

And the answer is, "It was a long aluminum bat."

Do you see that?

A. Yes.

Q. Is there any way to tell whether the fact about the aluminum bat was first raised by Mr. Mitchell or first raised

Leo - redirect

887

by the interrogators?

A.   Prior to that transcript, no.  But in that transcript, it appears that it was first raised by the person doing the questioning there.  I think it was an ASA.

Q.   And that assistant state's attorney, as Mr. Nathan showed us on that second page of Exhibit 45, talked about a discussion between Mr. Mitchell and the assistant state's attorney --

A.   Correct.

Q.   -- before the questioning and that's recorded?

A.   Correct.

Q.   And so do we know from -- can we tell, for example, looking at page 7 of Exhibit 45 where the assistant state's attorney asked questions:

        "You duct-taped Chris's body?

        "Stick put a rag in his mouth?

        "Stick duct-taped his head?

        "You had duct-taped his arms?

        "And John duct-taped his legs?"

        Whether those facts came from Mr. Mitchell or, when Mr. Mitchell repeats them on page 32 of Exhibit 45, where it says:

        "I taped his arms.  John taped his feet.  Stick put a towel in his mouth and wrapped some tape around his face."

        We don't know if those facts came initially from the interrogators or from Mr. Mitchell?

Leo - redirect

888

A.   Not prior to this.

Q.   All right.   But we do know that the fact about a towel being in the mouth of the victim is false, correct?

A.   Correct.   It was a sock.

Q.   Do you see on page 8 of Exhibit 45, the discussion saying, where the prosecutor is asking:

     "About 51st or 52nd and Peoria?

     "And then there was a big abandoned building there?"

     And Mr. Mitchell says "Yes."

A.   Yes.

Q.   And then on page 33, when Mr. Mitchell is giving, you know, responding to non-yes/no questions, he then says, "Into the alley.   I saw an abandoned building.   That's what gave me the conclusion to enter the alley."   Do you see that?

A.   Yes.

Q.   Do we know if the fact about the abandoned alley came from the interrogators or from Mr. Mitchell?

A.   If we're looking at that transcript, it looks like it came from the interrogators as in the prior example.

     But what we don't know is what occurred prior to the transcription of this small portion of the whole time in custody.

Q.   And detectives took Mr. Mitchell on a drive through the city to the various spots that they allegedly went to during the commission of the crime, is that correct?

A.   Right.

Q.   Could that be a source of contamination?

A.   It is a source of contamination, yes.

Q.   How so?

A.   It's educating the suspect about the crime facts, the location and other facts related to the crime.  It's a classic type of contamination.

Q.   And, you know, where we have ten -- well, yeah, pages 2 through 10 of going through the whole story with yes/no answers, is that a typical way that confessions are recorded, where the person asking the questions asks yes/no questions to -- or strike that -- where the person asking the questions provides the details in the questions for the first 10 pages?

MR. NATHAN:  Objection, vague, form, leading.

THE COURT:  Try again.

BY MR. AINSWORTH:

Q.   Sir, you've looked at a number of other Chicago cases, correct?

A.   Yes.

MR. NATHAN:  Objection.

THE COURT:  Sustained.

(Discussion off the record between counsel.)

BY MR. AINSWORTH:

Q.   You've seen a lot of confessions, not necessarily from Chicago, is that correct?

A.   Correct.

Q.   In those confessions, is it typically where the prosecutor goes through pages 2 through 10 of, pages 2 through 10 -- well, strike that.

Is it typical for a prosecutor or whoever is asking the questions in obtaining a confession to ask leading questions that suggest what their answer is for pages and pages before then turning over to asking open-ended questions?

MR. NATHAN:  Objection, form, foundation, calls for speculation, relevance.

THE COURT:  Overruled.

BY THE WITNESS:

A.   It's not typical for prosecutors to do interrogations. Typically that's what police do, not prosecutors.  And it's not typical to ask leading questions like that when taking a confession statement.

BY MR. AINSWORTH:

Q.   Have you seen something where there is questions asked to this degree where all the facts are stated in the first beginning part before then going into open-ended questions? Have you seen that before?

MR. NATHAN:  Objection.  Objection, form, leading, vague.

THE COURT:  Well, I suppose you should give a little background on that.

MR. AINSWORTH: Sure.

BY MR. AINSWORTH:

Q. And so in your work you've looked at, what would you say, thousands of confessions?

A. Correct.

Q. And in your review of those thousands of interrogations, have you seen it happen before where the person asking the questions goes through the entire, you know, story start to finish with yes -- with asking for -- asking leading questions, suggesting the answer in the questions before, then going into open-ended questions?

MR. NATHAN: Same objections.

THE COURT: Overruled.

BY THE WITNESS:

A. I'm sure I've seen it before in the many cases I've looked at, but I think it's rare.

BY MR. AINSWORTH:

Q. And why do you say it's rare?

A. Because it's considered good practice to get the suspect to volunteer information when taking a confession statement rather than getting them to repeat the information so that there is no implication or inference that the information was fed, but, rather, it was provided knowingly and voluntarily by the suspect.

Q. Why do innocent people, you know, after they give up and

are willing to confess, provide confessions that have lots of detail in it?

MR. NATHAN:  Objection, beyond the scope, cumulative.

THE COURT:  Yeah, it may be.

MR. AINSWORTH:  It goes directly to the questioning about that these are narrative answers by Mr. Mitchell and --

MR. LOEVY:  Details.

MR. AINSWORTH:  -- thus came from him and would make them appear to be truthful.

MR. NATHAN:  That's asked and answered.  He went into that just now.

THE COURT:  I'll sustain.

BY MR. AINSWORTH:

Q.  All right.  Mr. Nathan showed you this demonstrative with phone calls, correct?

A.  Yes.

Q.  All right.  I'm going to show you Plaintiffs' Exhibit 40. This is the statement from Johnitta Griffin.  And I'm going to show you page 5 of that exhibit.

All right.  Do you see the highlighted portion where it says, "Chris called Precious in the afternoon of Sunday, March 9th, and they made plans to meet at Precious's godmother's"?

A.  Yes.

Q.  Do you see that?

Leo - redirect

893

A.   Yes.

Q.   And so in all of the confessions, the plan when Precious --
well, strike that.

In all the confessions, the phone calls that occurred
between -- strike that.

According to Ms. Griffin, she learned about Chris's
plan to be at her godmother's on March 9th, correct?

A.   In the statement, yes.

Q.   And then according to Ms. Griffin's statement, she then
contacted Mr. Mitchell -- Mr. Fulton and let him know about
Chris Collazo's plan to be at her godmother's house?

A.   Yes.

Q.   All right.  And according to the confessions, that happened
on March 9th, correct?

A.   The statement, yes.

Q.   And it was also on March 9th, when there was the phone
calls between Mr. Fulton and Ms. Griffin, as Mr. Fulton was
driving up north to allegedly abduct Collazo off the bus?

MR. LOEVY:   In the confession or the records, Russell?

BY MR. AINSWORTH:

Q.   Sorry.  In the confessions.

A.   March 9th, right?

Q.   Yes.

A.   Yes.

Q.   And so looking at the demonstrative that you were shown,

this doesn't -- this has phone calls from March 8th, right, the day before?

A. Correct.

Q. There are no phone calls between Ms. Griffin and Mr. Fulton on March 9th, correct?

A. Not that I recall, correct.

Q. And so in order for there to -- in order for the confessions to be true, you would have to change the facts to make the facts fit the confessions, is that right?

MR. NATHAN: Objection, leading, vague.

THE COURT: Sustained.

BY MR. AINSWORTH:

Q. So tell us, if there are no phone calls on March 9th, and the confessions state that they were talking with Ms. Griffin as they drove up Lake Shore Drive on March 9th on the way to abduct Mr. Collazo, how does that fit the evidence showing that there were phone calls on March 8th, but none on March 9th?

A. It's not corroborative of the confession statement. It doesn't confirm the accuracy. It's not an indicia of reliability because it logically precedes what was -- the date of what was stated in the confession.

Q. And so according to the confessions, is there any corroboration for the statements that Ms. Griffin talked to Chris Collazo on March 9th, communicated that to Mr. Fulton March 9th, and then Mr. Fulton had phone calls with Ms. Griffin

on March 9th while driving up Lake Shore Drive to abduct Collazo?

A.   I didn't see any corroboration, no.

Q.   And do you recall that Ms. Griffin and Collazo were friends?  That's how she was able to put Mr. Fulton in contact with him?

A.   Yes.

Q.   And Mr. Fulton and Ms. Griffin were friends, right?

A.   Yes.

Q.   And so friends call each other all the time, right?

A.   Yes.

Q.   And so the fact that Ms. Griffin was talking to Mr. Fulton or Ms. Griffin was talking to Mr. Collazo is not incriminating in any way based on these confessions?

A.   It's not corroborative of a confession, so yes, it's not incriminating in my view.

Q.   You were asked questions about the fingerprint from Shaw in Mr. Fulton's car.  Do you recall that?

A.   Yes.

Q.   And so the fact that there was a fingerprint from Shaw in Mr. Fulton's trunk, does that suggest that the trunk was washed or not washed?

A.   Well, it would suggest it's not washed, I guess.

Q.   In your experience reviewing criminal cases, have you seen the use of luminol by criminal investigators, forensic

investigators to detect the presence of blood even after something has been cleaned?

MR. NATHAN: Objection, foundation, undisclosed opinion testimony.

MR. AINSWORTH: That's what I'm trying to find out.

MR. NATHAN: Objection.

THE COURT: It's within his --

MR. NATHAN: *Daubert*.

THE COURT: -- expertise.

MR. AINSWORTH: I'm trying to find out if he has experience with it, because if there is blood -- if the trunk isn't clean --

THE COURT: Okay. Don't testify.

MR. NATHAN: He's eliciting undisclosed opinion testimony is what he's asking.

THE COURT: I think --

MR. AINSWORTH: He talks about the blood in the trunk and that there is no blood in the trunk.

THE COURT: All right.

MR. NATHAN: Well, Your Honor, can we be heard on this?

THE COURT: Go ahead, answer.

Let's see, let's go back to the question.

BY MR. AINSWORTH:

Q. Are you familiar with luminol?

THE COURT: He may answer this question.

BY THE WITNESS:

A. Yeah. That's come up in many cases that I've evaluated in the police reports typically.

MR. NATHAN: Your Honor, I'd like to be heard as to the *Daubert* issue.

THE COURT: All right. Let's have a brief sidebar.

MR. AINSWORTH: We can move on, Judge. We'll get it, it will come in elsewhere.

THE COURT: Okay, okay.

BY MR. AINSWORTH:

Q. Mr. Nathan suggested to you that when there is in every unrecorded -- well, it's a truism. In every unrecorded interrogation, you cannot tell if there is contamination going on, correct?

A. He asked a question about that, correct.

Q. And so why is the fit test important when you don't have a record of what exactly happened during the interrogation?

A. Well, when there are multiple indicia of unreliability or if there are multiple indicia of reliability, it makes one account more consistent with the evidence than the other account. So that would be one reason, because essentially what you have is a dispute about where the facts originated from and whether it was the personal knowledge of the suspect as you'd expect if they were involved in the crime, and these were

Leo - redirect

898

nonpublic not-likely-guessed-by-chance facts, or whether the facts originated from the police, as you would expect if it was a false confession.

So when you have indicia of reliability, that would weigh in favor of the police account. When you have indicia of unreliability it would weigh in favor of the suspect's account. And the more you have, the more it would weigh in favor.

And then there is also, secondarily, there is also when you have a fact that the police believe to be true and that fact -- at the time, and that fact ends up in the confession statement, and then that fact is subsequently shown to be wrong, that's like a fingerprint of police contamination. So that's why it would -- that's why the indicia of unreliability would be helpful or possible evidence of the source of contamination.

Q. So like the sock in the mouth being unknown to the interrogators, and then it turns out that it's actually a sock and not a rag shows up in the confessions?

A. Yeah, if their theory was that it was a rag, yes, or if they believed it was a particular weapon, and it turned out it wasn't that weapon according to medical evidence.

Q. Mr. Nathan asked you about the gas can. And how did Mr. Mitchell describe the gas can?

If you need to refer to your report, I think it's in two places. One is you were at 6465 of the report.

A.   Okay.   Thank you.

Thank you.   I needed to refresh my recollection here.

He described the gas can as having a yellow top.

And he -- is that the answer you were --

Q.   Yeah.

A.   Okay.

Q.   So he described it as having a yellow top.   And the gas can that the police -- showing you Defendants' Exhibit 124, page 3. This has a red top, correct?

A.   Yes.

Q.   And so, again, that's an indicia of unreliability, correct?

A.   Yes.   It's a trivial fact.   There would be no reason to incorrectly describe that if one knew that fact.

Q.   All right.   Mr. Nathan asked you about the amount that you've billed on this case.   Did you spend a lot of hours on this case?

A.   I did, yes.

Q.   Can you explain what you did and why it took so many hours?

A.   So I was required to write a report.   And I wrote a report that was 77 single-spaced pages.   And as part of that report, it was necessary for me to review thousands and thousands of pages of deposition testimony, courtroom testimony, police reports and other related materials.   And so it was just a function of how much time I spent in order to be able to write this report.

And part of what's involved in a case that's this complex is not just reviewing thousands and thousands of pages of documents, but actually trying to synthesize that, and that takes additional time. So it was just a matter of how complicated the case is. And this was a very -- for my area of expertise on the kinds of cases I work on, this was very fact intensive, there are multiple defendants, voluminous record for an expert like me to review and then to write a comprehensive report.

Q. And so for a big, significant case like this that goes all the way to trial in a civil case, is this a fairly typical fee for you?

A. For a civil case, yes, that goes to trial, yes, of this sort.

Q. And there have been other cases that you've worked for our firm, right?

A. I have, yes.

Q. And can you tell us, you know, how has it come up that you've worked with us on other cases?

MR. NATHAN: Objection. Sidebar.

MR. AINSWORTH: I can lead him, but --

MR. NATHAN: Maybe start there.

THE COURT: Is it relevant? I mean, I guess --

MR. AINSWORTH: He's suggesting that, and so I'll -- let me try it this way.

BY MR. AINSWORTH:

Q. Sir, our law firm does a lot of different civil rights cases, is that right?

MR. NATHAN: Objection.

MR. LOEVY: Maybe we should go to sidebar, Your Honor.

THE COURT: All right. Let's do a sidebar.

(Proceedings heard at sidebar:)

MR. LOEVY: Mr. Nathan implied on the cross, you know, that this guy is a hack for our firm and, you know, he does so much work for Loevy & Loevy. And Mr. Ainsworth was just going to elicit --

MR. AINSWORTH: I'm going to ask him why that is, why has he worked for our firm. And we do, you know, big cases. They're important cases.

And, you know, I can stay away from the fact that Chicago is the false confession capital of the world. But the fact is that we've done a lot of big cases, and our cases are important and, you know, we vet them.

And so if the defense is going to attack him for having worked with us before, to suggest that he's doing it, saying these things just because we have a relationship, we're allowed to explore that that's not it.

THE COURT: Okay. Let's hear from --

MR. NATHAN: Financial bias is a classic area of cross-examination for an expert. That's all I asked about. He

testified that he's worked on 3,200 cases and maybe over, I don't know, he said I think it was like eight to a dozen for the Loevy firm.

I don't see how that means they should be getting into bolstering all about their firm and how great they are and how bad Chicago is. It's a sideshow.

THE COURT: Yeah, we're not going there.

MR. AINSWORTH: Well, if the defendants won't --

THE COURT: What are your precise questions?

MR. AINSWORTH: Well, if defendants won't argue that his relationship with Loevy & Loevy is an issue, you know, in closing, then I don't have to say anything more. But otherwise then we have to go into why it is that he has worked for our firm.

MR. NATHAN: We're not going to be arguing that he's a hack for Loevy & Loevy. We will be arguing that he has a financial motive, that he gets paid to testify.

MR. AINSWORTH: And that if part of that financial motive is because of his relationship with Loevy & Loevy, then, you know, then it's fair game for cross.

MR. NATHAN: We're not talking about his relationship with Loevy & Loevy. We are saying he earns so many dollars.

MR. AINSWORTH: That's fine.

THE COURT: Yeah, well, all witnesses, all expert witnesses earn money, or almost all of them do.

MR. AINSWORTH:  I can move on so long as the defendants aren't going to be talking about Loevy & Loevy in closing.

THE COURT:  Okay.  Let's wrap this up.  I think both sides have made, you know, their point.

(Proceedings heard in open court:)

BY MR. AINSWORTH:

Q.  All right.  Sir, Mr. Nathan asked you about Mr. Fulton saying he was fed.  And that's a memo from Jake Rubinstein.  Do you remember that?

A.  Yes.

Q.  And that memo was written after Mr. Fulton's 100 hours of custody, being in custody and interrogated, correct?

MR. NATHAN:  Objection.  Counsel is testifying.  There is leading.

THE COURT:  Well --

MR. AINSWORTH:  I'm trying to get to the end here.

THE COURT:  Can you say not go -- ask that question --

MR. AINSWORTH:  Sure.

THE COURT:  -- which it's already been testified to.

BY MR. AINSWORTH:

Q.  The statement that Mr. Fulton gave, after how long had Mr. Fulton been in custody when he told Mr. Rubinstein that he had been fed?

MR. NATHAN:  Objection, asked and answered.

MR. AINSWORTH:  Not for this particular statement.

THE COURT:  All right.  I do not remember myself, but I'll rely on your word.

BY THE WITNESS:

A.  A little bit more than four days.

BY MR. AINSWORTH:

Q.  And so at that time Mr. Fulton was willing to confess that he had beaten and murdered somebody, right?

A.  Correct.

Q.  And he was also saying that he had been fed at that point?

A.  Correct.

Q.  Up until that point, after four days of interrogation, was there any record anywhere that Mr. Fulton either said he had been fed or had been fed?

A.  Not that I recall.

Q.  Now, you were asked about why you didn't -- that you didn't conduct any IQ tests on the plaintiffs.  Do you remember that?

A.  I was asked about that, yes.

Q.  Does it matter how intelligent youth is in order to assess whether they're vulnerable to being -- to giving a false confession based on their age?

A.  No.  It would be a different risk factor if there was low cognitive or intellectual functioning, low IQ.

Q.  In your study of 182 cases that Mr. Nathan asked you about, why weren't you able to look for false confessions in that

data?  Can you explain that?

A.  Sure.  So this was my doctoral dissertation.  I had watched 122 live interrogations inside the Oakland Police Department, excuse me, Oakland Police Department, and then 60 videotaped interrogations from two other local Bay area police departments.

The doctoral dissertation study was about the history and practice of police interrogation in the 20th century, this was the 1990s, and how it had transformed and what the implications were for police practice, for law, for psychology, for policy.

It was not a study about false confessions.  It was a study about routine police interrogation practices over the course of the 20th century.

So when I got out of the field, so to speak, I stopped watching those, I stopped watching interrogations.  I didn't follow the cases forward.  I didn't gather evidence or see who got convicted, who didn't get convicted.  I didn't ask for case files.  It simply wasn't part of the research design of that particular study.

Q.  So you couldn't do a fit analysis in those cases because you didn't have the case file to compare it to to find out what was going on?

A.  Correct.  I was just sort of doing a snapshot in time of those cases, those 182 interrogations, which was only one piece

Leo - redirect

906

of data in this broader historical psychological study of interrogation over the course of the 20th century.

Q. Mr. Nathan asked you a lot of questions about proving false confessions. Do you recall that?

A. Yes.

Q. Is it your understanding of your role in this case to decide if the confessions are a proven false confession or not?

A. That's not for me to decide, correct.

Q. You are not allowed to say if it's true or false, right?

A. Correct.

Q. That's the jury's job?

A. Correct.

Q. And Mr. Nathan pointed out that, you know, it's a good thing to find criminals and prosecute them, right?

A. Correct.

Q. Now, are you anti-police?

A. No.

Q. Do you help train police?

A. Whenever asked, I've helped train police. I've been on an advisory committee at a police department, yes.

Q. But do we have a right to expect that police will find criminals properly?

A. I think that's of paramount importance, both procedurally that the rules are followed and substantively that they get the right person.

Q.   Are you saying that police shouldn't interrogate people at all?

A.   No.   I believe interrogation is legitimate so long as done fairly and legally.

Q.   And so are there right ways to interrogate people and wrong ways to interrogate people?

A.   Yes, yes.   There are better and worse practices, and there are clear red lines.

Q.   And based on the record in this case, what did the evidence suggest to you about whether the confessions were reliable or unreliable?

MR. NATHAN:   Objection.

THE COURT:   Overruled.

BY THE WITNESS:

A.   Again, substantial indicia of unreliability in my analysis and no indicia of reliability.

MR. AINSWORTH:   I don't have any further questions, Your Honor.

THE COURT:   All right.   We'll take a recess for 15 minutes.

MR. NATHAN:   Your Honor, I do have some more questions.   I don't know if that impacts the schedule.

THE COURT:   I have told you all that it's witness, cross, redirect and that's it.   Over the break we can --

(Jury out at 2:16 p.m.)

THE COURT: You can step down. Before you leave, just step out of the courtroom, please.

THE WITNESS: Okay.

(Witness exits the courtroom.)

THE COURT: So I don't know if you want to put your request on the record, but --

MR. NATHAN: Yes, please.

THE COURT: -- I think we're in sort of an arena of beating a horse to death at this point.

MR. LOEVY: We do want to try to get our two witnesses on here.

MR. NATHAN: I would like to make a record. I thought we were, and we have been operating under there has been a direct, cross, redirect and then recross. That's what we've been doing until now.

THE COURT: Yesterday we had the witness for both sides. So you each had two turns. So that's not a redirect.

MR. NATHAN: I did have topics that Mr. Ainsworth brought up that I wanted to clarify.

MR. LOEVY: Your Honor -- I'm sorry.

THE COURT: Which topics?

MR. NATHAN: He brought up, he brought up for the first time the call, Mr. Ainsworth on redirect brought up for the first time the March 9th call from Ms. Griffin's statement. I want to just address that as to there is more than one phone

Leo - redirect

909

going on.

He brought up the aluminum bat for the first time. I'd like to address the physical evidence. He highlighted that physical bat being in the confession. I'd like to just address that with the medical examiner's testimony. That's what I want to bring up.

THE COURT: Aren't those things that you --

MR. LOEVY: Yes.

THE COURT: You covered those issues in your direct -- or your cross. I'm sorry.

MR. NATHAN: I didn't cover that physical evidence.

MR. AINSWORTH: It was on --

MR. NATHAN: And the medical examiner's testimony as to the bat.

MR. AINSWORTH: It was on direct. That was the testimony on direct, that he talked about the medical examiner, reviewing the medical examiner's testimony.

THE COURT: That was on direct.

You know, my feeling is that, you know, the longer a witness is on the stand, the less the jury understands or absorbs. And both of you have had a good long time to examine this witness. I could make him stay, and you could ask some more questions, but tell me if this is going to make a difference in your case.

MR. NATHAN: May I have one moment, Your Honor?

THE COURT: Yes.

(Discussion off the record between counsel.)

MR. AINSWORTH: Our position is still that both of those things were brought up on direct that Mr. Nathan referenced.

MR. LOEVY: Particularly the phones. You saw him go through the phones with his demonstrative.

THE COURT: Yeah.

MR. NATHAN: I think I could address it in 5 minutes.

MR. LOEVY: But it's not about the time, Your Honor. It's just about then we get another turn. You told us before the trial it was going to be direct, cross, redirect. You've let them spend a few chips. And they said: Wait, just this witness, just this witness.

We can't -- you should only be able to do it where it is actually justified. They covered both these subjects.

THE COURT: All right. I think it's been adequately covered. You know, I told you in advance --

MR. LOEVY: Yes.

THE COURT: -- that's the way I was going to run it. So let's do that.

MR. LOEVY: Thank you.

MR. NATHAN: Thank you.

(Recess at 2:20 p.m. until 2:35 p.m.)

THE CLERK: All rise. Court resumes in session.

(Jury in at 2:35 p.m.)

THE COURT: Be seated, please.

Next witness?

MS. RICKERT: Plaintiff calls Yolanda Henderson.

THE COURT: Good afternoon.

THE WITNESS: How you doing?

THE COURT: Would you raise your right hand to be scorn.

(Witness sworn.)

THE COURT: Be seated.

YOLANDA HENDERSON, PLAINTIFFS' WITNESS, SWORN,

DIRECT EXAMINATION

BY MS. RICKERT:

Q. Good afternoon, Ms. Henderson.

Could you spell your name for the record?

A. Yolanda, Y-O-L-A-N-D-A. Last name is Henderson, H-E-N-D-E-R-S-O-N.

Q. All right. And just to orient the jury about who you are, do you know the plaintiffs in this case --

A. Yes.

Q. -- John Fulton and Anthony Mitchell?

A. Yes.

Q. Who did you know first?

A. John.

Q. Who introduced you to Anthony?

A.   John.

Q.   Okay.  And how do you know John?

A.   Met him at KFC in my drive-through.  From then on, we started talking and dating.

Q.   All right.  And what year was this?

A.   2001.

Q.   So did you know John Fulton before he was arrested for murder?

A.   Yes.

Q.   And were you, in fact, with John Fulton on the night of March 9th and 10th, the day of the murder that John was arrested for?

A.   Yes.

Q.   Why were you with John that night?

A.   March 9th?

Q.   Uh-huh.

A.   I was sick.  Didn't know I had strep throat, but I was sick.

Q.   All right.  We'll talk about the details of that, but did you and John live together?

A.   Yes.

Q.   Were you also there when John got arrested?

A.   Yes.

Q.   Do you remember that date?

A.   Roughly the 17th or 18th, one of those days.

Q.   Does March 18th sound right?

A.   Yeah.

Q.   Okay.  So let's just talk about your background a little bit.  Where did you grow up?

A.   South side of Chicago, mother and father.

Q.   Lived there your whole life?

A.   Pretty much, yes.

Q.   So you went to high school in Chicago?

A.   Yes.  I went to -- attended CVS.

Q.   And did you graduate?

A.   I did.

Q.   What year did you graduate from high school?

A.   2002.

Q.   Did you go further with your education at that point?

A.   I attempted to try culinary school, Le Cordon Bleu.

Q.   So you went to culinary school for a time?

A.   Yes.

Q.   Do you still like to cook?

A.   Don't have a passion for it now, no.

Q.   Still good at it?

A.   Still good at it, but not a passion.

Q.   Are you employed now?

A.   Yes.

Q.   Where do you work?

A.   Currently, I work for the City of Chicago Department of

Aviation.

Q.   And what do you do in the Department of Aviation?

A.   Assistant administrator.

Q.   And how long have you been in this job?

A.   Roughly going on six months.

Q.   Okay.  So it's pretty new?

A.   Yeah, pretty new.

Q.   Where did you work before you worked for the City?

A.   Before then, I was a shift supervisor for Starbucks for 17 years, and before that, KFC.  Started off as a cashier, then went to a shift supervisor, and that was, like, a total of seven years.

Q.   Okay.  So you were working at KFC when you met John?

A.   Yes.

Q.   And then you were there for seven years?

A.   Yes.

Q.   And your next job after that, Starbucks?

A.   Yes.

Q.   And were you there for 17 years?

A.   Yes.

Q.   And now -- now you're at the City?

A.   Yes.

Q.   Okay.  And are you married?

A.   I am.

Q.   How long have you been married?

A.   12 years.

Q.   What's your husband's name?

A.   Anthony White.

(Phone interruption.)

THE WITNESS:   I'm so sorry.

BY MS. RICKERT:

Q.   And Ms. Henderson, do you have children?

A.   I do, two.

Q.   Two?   Tell me who's the oldest?

A.   Cam'ron Fulton is the oldest.   He's 22.

Q.   And who's Cam'ron's father?

A.   John Fulton.

Q.   Okay.   And then you have a younger child?

A.   Yes, Andrea White.   She's 11.

Q.   11.

And Andrea is your daughter with your husband?

A.   Yes.

Q.   Okay.   I want to talk about your relationship with John Fulton before his incarceration.

So you said you met when John came through the KFC drive-through, right?

A.   Correct.

Q.   And then you said you guys started dating?

A.   Correct.

Q.   Did you start dating right away after you met him?

Y. Henderson - direct

916

A.   I guess you could say we did.  We was talking, hanging out. He met my parents.  I met his grandmother, grandfather, his aunt, so yeah.

Q.   So you said you met his grandparents?

A.   Yes.

Q.   And he met yours?

A.   Yes.

Q.   What kind of relationship did you have with his family?

A.   It was a pretty okay relationship.  You know, I used to go over there visit, talk to grandmother, grandfather.

Q.   And what about John's relationship with your parents?

A.   It was pretty good, too, because he was able -- he was comfortable enough to go over to my house when I'm not there, so pretty good relationship.

Q.   So they got along?

A.   Yeah.

Q.   And what did you like about John when you met him?

A.   We both goofy, so it was like his goofiness matched my goofiness, silly, charismatic, charming, well taken care of. Like, he was, you know, clean cut, not a street person that I -- you know, wasn't hanging on the streets.  He took care of his self, so --

Q.   You guys have fun together?

A.   Yeah.

Q.   So at some point after you guys had been dating for a

while, did you become pregnant?

A.   I did.

Q.   And what -- what did you decide to do when you found out you were pregnant?

A.   Initially, I was supposed to get an abortion, but I didn't. And John went to go tell my mother behind my back, and she came and talked to me about keeping the baby and that they would support me and he would support me, so end up having my son.

Q.   No regrets about that, right?

A.   No, none.

Q.   So at this point, was John still in high school?

A.   He was.  I graduated a year before him.

Q.   Okay.  So you said you graduated in 2002?

A.   Yes.

Q.   And then when was -- when was Cam'ron born?

A.   2002.

Q.   What month?

A.   September.

Q.   Okay.  So was your relationship with John always on solid footing?  I'm talking about before his arrest.

A.   We was two teenagers, you know, pregnant, baby on the way, emotions run high, so was it perfect?  No, I don't know anybody else who had a perfect relationship, but, you know, we were sticking together.

Q.   Did you ever break up for any periods of time?

Y. Henderson - direct

918

A.   We did.

Q.   And then what about after Cam'ron was born, what was your relationship like then?

A.   At that point, we was back together.  Then we moved into Lake Meadows.

Q.   So things were pretty serious?

A.   Yeah.

Q.   What did you foresee for your relationship with John?  Did you guys have plans?

A.   Oh, sorry.  We did.

Q.   That's okay.

A.   We -- we was -- we was talking about marriage, so, yeah.

Q.   Okay.  So you just said that when you and John moved in together, you lived at Lake Meadows Apartments --

A.   Uh-huh.

Q.   -- right?

A.   Correct.

Q.   And where was Lake Meadows?

A.   I believe off 33rd and King Drive.

Q.   Okay.  And let me just ask is it easy for you to be here today?

A.   It is not.  It's, you know, been -- I don't know how many times been before a court, but it's -- it's not easy.  It's like opening old wounds and a wound that hasn't healed yet, like ripping a Band-Aid off.  So you bringing back a lot of

suppressed emotions that, you know, you try to suppress as much as you can.

MS. ADEEYO: Objection, Your Honor.

THE COURT: Ask another question.

BY MS. RICKERT:

Q. When you said that you've been in court a number of times, do you mean about this case?

A. Yes.

Q. About John and his arrest?

A. Yes.

Q. Okay.

Okay. So let's talk about Lake Meadows. Was this a nice building?

A. Yeah, very nice, secure building.

Q. And who paid for the apartment?

A. John.

Q. And you said you felt like it was a secure building. What kind of security did they have there?

A. You had to enter -- enter the doors with a key fob. There was security cameras there, a security guard.

Q. Okay. Do you -- do you know how many cameras there were?

A. Far as I know, just the two because it was only two entrance that I know of, the front and back door.

Q. And do you remember if there was a camera at the back door in 2003?

Y. Henderson - direct

920

A.   Yes.

Q.   Is that a distinct memory you have?

A.   Yes, because it was in a gated -- it was kind of like gated, like a gate around it, so, yeah, I remember it.

Q.   Okay.  And was it your belief that any time you were in the lobby there that you were on camera?

A.   Yes.

Q.   And did John have a car --

A.   He did.

Q.   -- at that time?

What kind of car did he have?

A.   A gray Oldsmobile.

Q.   And would you drive his car sometimes?

A.   Yes.

Q.   And did you know any of John's friends back then?

A.   I knew Riff, Stick, which is Antonio, and Riff is Anthony.

Q.   Is Anthony here today?

A.   Yes.

Q.   Did you know a girl named Johnitta Griffin who was nicknamed Precious?

A.   Yes, I knew about Precious.

Q.   You knew about Precious?

A.   Yes.

Q.   Did you know Precious personally?

A.   No.

Q.   You never met her?

A.   No.

Q.   Did you hear about her -- who did you hear about her from?

A.   John.

Q.   Was she someone you knew to be a friend or acquaintance of John's?

A.   Yes, yes.

Q.   At some point in 2003, did you hear from John that he had been robbed?

A.   Yes.

Q.   Do you remember exactly when that was?

A.   I don't remember the exact date that he got robbed, but I do remember him coming in the house and somebody was on the phone arguing with him.

Q.   When you say somebody was on the phone arguing with him, say more about that.  Did you know who he was on the phone with?

A.   No.  Didn't know the person name, but I just know that the guy was really upset, cursing, you know, calling him the N-word, just making little threats over the phone.

Q.   And how did you know that he was making threats over the phone?

A.   Because John had him on speakerphone.

Q.   And what was your understanding of what had happened that caused this man to be so angry?

A.   From what John told me that he was mad that he robbed him -- the guy robbed John and it was only like 13 or $15 that he got out of John.

Q.   Did you ever talk --

(Phone interruption.)

THE WITNESS:  Sorry.  Cut it off.

I'm sorry.  It's off.

BY MS. RICKERT:

Q.   Did you ever talk on the phone with the man who was calling?

A.   I -- I did pick up the phone one time because he kept calling, and then I handed the phone off to John.

Q.   How long did these calls from this man happen as far as you know, as far as you recall?

A.   Roughly that whole evening maybe back and forth, hanging up, calling, John would answer it, sometime he don't.  So about a good three or four times maybe out the evening.

Q.   And you said this man was angry and making threats.  Were you scared?

A.   At first I was, but after the calls stopped, I was -- I was at ease.  He didn't call anymore, so it didn't really -- I didn't feel a threat.

Q.   How did John seem to you?  Did he seem like he was really scared?

A.   From my recollection, no, he didn't.

Y. Henderson - direct

923

Q.   Did you take the threats that the man on the phone was making seriously enough to call the police?

A.   I didn't feel like it was -- I didn't feel like I was in harm's way that I needed to.

Q.   If you had thought you were in real danger, would you have called the police?

A.   I would have, yes.

Q.   At that time, did you have any reason not to trust the police?

A.   No, not at that time.

Q.   So I just talked about the calls that John was receiving, and I think you said your recollection was that there -- it wasn't for a very long period of time.

     Do you know were there more calls after that first day, or what do you remember?

A.   I don't remember any more calls after that first particular day.  I don't.

Q.   But after the calls stopped as far as you were aware, did John talk about this robbery anymore?

A.   No.  Everything went back to normal, pretty normal day with us.

Q.   Did you have the impression that John was thinking about it?

A.   No.

Q.   Did anybody else talk about it?

A.   No.

Q.   Did Anthony or Antonio talk about it in your presence?

A.   No.

Q.   So as days and weeks went by, did this issue remain central, or did it kind of fade away?

A.   It was like it never happened --

        MS. ADEEYO:  Objection, form.

        THE COURT:  Sustained.

        MS. RICKERT:  Let me ask that a different way.

BY MS. RICKERT:

Q.   Did this issue with the robbery continue to be part of conversation in life from your perspective, you know, after those first couple days?

A.   No.

Q.   Did you move on with your lives?

A.   We did.

Q.   Okay.  Now I want to ask you about March 9th and 10th of 2003.  Are those days significant to you?

A.   Yes.

Q.   Why are those days significant to you?

A.   That was the day that I was sick and I went to the emergency room.

Q.   Why do you remember that that was March 9th?

A.   I remember 'cause I was sick that day and went to the emergency room, and after all that -- that had passed and we

went back to the tapes, I remember, like, he was with me at the emergency room.

Q.   Okay.  So is it fair to say that you -- you learned later that that date was significant?

A.   Yes.

Q.   And do you remember what made that date significant?

A.   Yes.

Q.   What was it?

A.   They supposedly did a murder that day.

Q.   All right.  So we're going to start with March 9th, you know, in more detail, and then we'll talk about March 10th.

     So you already mentioned you were sick on March 9th.

A.   Yes.

Q.   How long had you been sick?

A.   A few days before I finally decided I wanted to go to the emergency room.

Q.   Did you know what was wrong?

A.   I didn't at the time.

Q.   What kind of symptoms did you have?

A.   Sore throat.

     (Phone interruption.)

BY THE WITNESS:

A.   A sore throat, had a lump on the right side of my neck, very raw, like my throat tonsils was very raw.

BY MS. RICHTER:

Y. Henderson - direct

926

Q.   Okay.   Where was Cam'ron on this day that you were so sick?

A.   When I got sick, we had took him to my mom's house so that he wouldn't be around.

Q.   And you said you eventually decided you needed to go see a doctor?

A.   Yes.

Q.   So how did you -- how did you go see the doctor?  How did you attempt to go see the doctor?

A.   John took me to University that evening.

Q.   When you say the University, do you mean the University of Chicago Hospital?

A.   Yes.

Q.   Was it also called Mitchell Hospital at the time?

A.   Yes.

Q.   And so John took you to the emergency department, right?

A.   Yes.

Q.   Do you remember when or what time on March 9th John took you to the emergency department?

A.   Time frames might be a little off because it's been over 22 years, but roughly a little bit after 7:30, maybe 8:00.

Q.   Okay.  And you've, over the years, you've had reason to go over the times --

A.   Yes.

Q.   -- involving these events --

A.   Yes.

Q.  -- numerous times, right?

Let me just show you real quickly a photo.  This is Plaintiffs' Exhibit 76, page 6.  And I believe this is already in evidence, but we're just going to -- just to refresh Ms. Henderson's recollection.

So do you -- I should have practiced with this.

MR. LOEVY:  Got it.  This brings it out.

MS. RICKERT:  Got you.

BY MS. RICKERT:

Q.  All right.  Can you see this photo?

A.  Yes.

Q.  Now, what is this a photo of?

A.  John and me leaving the Lake Meadows apartment.

Q.  Okay.  And you see -- do you see the time there in the bottom corner?

A.  Yes.

Q.  So it's in military time, but does it say 8:09?

A.  Yes.

Q.  So there's a lot of video evidence, right, about your movements on March 9th and 10th?

MS. ADEEYO:  Objection to the form of the question.

MS. RICKERT:  I can rephrase that.

THE COURT:  Yes.

BY MS. RICKERT:

Q.  Over the years, dating back to the trial and the

investigation, did you become aware that there is a lot of video footage of your and John's movements on March 9th and 10th?

A. Yes.

Q. So -- so you went to the hospital. John took you to the hospital, and then you signed in there, right?

A. Yes.

Q. Do you know what time you signed in?

A. After 8:00.

Q. Okay. I'm just going to show you real quick another exhibit. This is Plaintiffs' Exhibit 74, which I think is also already in evidence.

This is a sign-in sheet from Mitchell Hospital. Do you recognize this, Yolanda?

MR. LOEVY: That's not in evidence. You have to move it in.

MS. RICKERT: I'd like to move this into evidence if there's no objection.

THE COURT: Any objection?

MS. ADEEYO: No objection, Your Honor.

THE COURT: All right. You may publish.

(Plaintiffs' Exhibit No. 74 received in evidence.)

BY MS. RICKERT:

Q. Do you recognize this record?

A. Look like a triage maybe what the nurse had took down of my

symptoms, and, yeah, that's what it look like.

Q.   And can you see the time on there?

A.   Look like 8:45.

Q.   Okay.

All right, so John Fulton came to the hospital with you; is that right?

A.   Correct.

Q.   And did he stay at the hospital?

A.   He did for a period of time.

Q.   So you say he stayed for a period of time.  Did he leave at some point?

A.   He did.

Q.   And do you know how long he was there before he left?

A.   Maybe an hour, hour and a half.

Q.   And when he left, did you stay at the hospital and wait to be seen?

A.   Yes.  I tried to.

Q.   And did you end up seeing a doctor that night?

A.   I didn't.

Q.   Why not?

A.   Got impatient.  It was fairly crowded.  The triage nurse said it would be a while before I'd be seen.

Q.   So did you just decide you weren't going to see a doctor at all?

A.   Yes.

Q. Ever?

A. No, just not that day. It was just -- I didn't want to wait that long to see a doctor, so I decided I'd probably go in the morning, the next morning.

Q. Okay. So what did you do when you decided that you weren't going to stay?

A. Called John to come pick me back up.

Q. All right. And do you remember what your phone number was at that time?

A. Not the whole number. I know it start with 708 or 704, something like that.

MS. RICHTER: Okay. I'd like to move into evidence Plaintiffs' Trial Exhibit 61.

MS. ADEEYO: No objection.

THE COURT: Okay.

(Plaintiffs' Exhibit No. 61 received in evidence.)

BY MS. RICKERT:

Q. So, Ms. Henderson, this is a T-Mobile telephone record, correct?

A. Correct.

Q. And do you see the highlighted number there at the top?

A. Yes, I do.

Q. And I believe it says (773)704-8886? Sorry.

A. I believe it was 8689, I think.

Q. 8689, great. Was that your phone number?

Y. Henderson - direct

931

A.   Yes.

Q.   And do you remember what time you called John Fulton to pick you up?

A.   It was a little bit after 11:00 maybe.

Q.   All right.  If you look -- do you remember what John Fulton's phone number was at the time?

A.   His number was -- started with, like, an 858 or 828 or something like that.

Q.   Okay.  If you look at the highlighted numbers right here from March 9th, what number are those calls to?

A.   Those are to John's cellphone.

Q.   All right.  And are those the calls you made to have John come pick you up from the hospital?

A.   Yes.

Q.   After John picked you up, where did you guys go?

A.   Home.

Q.   Back to Lake Meadows?

A.   Yes.

Q.   And did John return to Lake Meadows with you?

A.   Yes.

Q.   Is there any doubt about that?

A.   No doubt.

Q.   What time did you get back to Lake Meadows?

A.   Roughly 20 minutes, maybe 25 minutes after he picked me up from the hospital.

Q.   Okay.  And we talked about Lake Meadows had some cameras, yeah?

A.   Yes.

Q.   I want you to tell me a lot of -- some of this old video footage isn't super clear, but let me know if you can identify John and yourself.

A.   Okay.

Q.   This is Plaintiffs' Trial Exhibit 77.  First I'm going to show page 4.

     Okay.  Do you recognize who's in that photograph?

A.   Yeah, that's John with the blue hat.

Q.   Okay.  And then this is page 17.  This is very dark, but who's that?

A.   That's me.

Q.   Okay.  So -- and we're talking about it's 11:54 at this point, yeah?

A.   Yes.

Q.   Okay.  When you got back to Lake Meadows that night shortly before midnight on March 9th, did you and John go up to your apartment?

A.   Yes.

Q.   When you got there, what did you do?

A.   Took my clothes off.  He proceeded to go in the room, and I stayed up front because I didn't want him to get sick.

Q.   So when you say stayed up front --

Y. Henderson - direct

933

A. In the front living room.

Q. Is that where the door was --

A. Yes.

Q. -- to leave the apartment?

Did you go to sleep right away?

A. I didn't.

Q. Do you know how long you were up?

A. Not -- don't know how long I was up, but it was a very uncomfortable night because I was in pain, so could have been a few hours before I finally dozed off.

Q. And what was John like? What was he acting like when you guys were in the apartment that night after you got back?

A. Normal. He just went in the room, laid down, and went to sleep. He had school the next morning.

Q. So John went into the bedroom to go to sleep, and you stayed in the front room?

A. Yes.

Q. Did he seem tense?

A. No.

Q. Did he seem like he was anxious for you to go to sleep?

A. No.

Q. Did he seem like he had plans to go somewhere that night?

A. No.

Q. So I think you said this, but did you sleep in the same room as John that night?

Y. Henderson - direct

934

A.  No, not that night.

Q.  Okay.  And you mentioned you didn't sleep very well.

A.  I didn't.

Q.  Were you on any medication?

A.  No.

Q.  So no NyQuil?

A.  No.

Q.  Any kind of cold medicine?

A.  No.

Q.  What about sleeping pills?

A.  No.

Q.  What about alcohol?

A.  No.

Q.  Hadn't had any drinks that day?

A.  No.

Q.  What about drugs?

A.  No.

Q.  No marijuana?

A.  No.

Q.  So you said you were in the front room, John was in the bedroom.

        Do you believe that you would have heard John if he had left the apartment that night?

        MS. ADEEYO:  Objection, calls for speculation.

        THE COURT:  Overruled.

Y. Henderson - direct

935

BY THE WITNESS:

A.  I can answer?

BY MS. RICKERT:

Q.  Yes.

A.  Yes, because the door is pretty close to the living room, and it was kind of like a heavy door, so you can hear it open and shut.  Have like this whoosh sound, so you'll hear it when it open.

Q.  And you think that would have --

A.  Yeah, it would have woken me.

Q.  Do you have any doubt about that?

A.  No.

Q.  Did John leave that night?

A.  No.

Q.  How sure are you of that?

A.  Positive.  I'm not -- I'm not a heavy sleeper, so I'm positive.

Q.  Any doubt?

A.  No doubt.

Q.  Did you hear anything from John after he went into the bedroom before --

A.  I did hear him get up to use the restroom.

Q.  Do you know what time that was?

A.  I don't remember the time.

Q.  And other than him using the restroom once, you didn't hear

anything from him that night?

A.   No.

Q.   So now let's talk about the morning of March 10th.  What was that morning like?

A.   A typical morning, he getting ready for school.  I asked him can I use the car to go to Trinity because I didn't get seen at the university, and he said okay.  Took the car, dropped him off, and he asked me could I get an oil change.

Q.   All right.  Let's back up a little bit.

So John got up and got ready for school?

A.   He got up for school, yes.

Q.   And around what time would that have been?

A.   Like 6:30, 7:00.

Q.   And did anything seem out of the ordinary?

A.   No.

Q.   Did John seem tense that morning?

A.   No.

Q.   Did he seem like he had been up all night?

A.   No.

Q.   Did the two of you leave the apartment together that morning?

A.   Yes, we did.

Q.   Do you know what time you left?

A.   A little bit before 8:00.  I think school started at 8:00 for him.

Q.   I'd like to -- I believe that this is already in evidence, Plaintiffs' Trial Exhibit 80?  No?

I'd like to move into evidence Plaintiffs' Trial Exhibit 80.

MS. ADEEYO:  No objection.

MS. RICKERT:  And this is page 3.

(Plaintiffs' Exhibit No. 80 received in evidence.)

BY MS. RICKERT:

Q.   What's this a picture of, Yolanda?

A.   John and I exiting the building.

Q.   So is that John in front with the hood?

A.   Yes.

Q.   And is that you --

A.   Yes.

Q.   -- behind right here?

A.   Yes.

Q.   Okay.  You said you asked if you could borrow his car?

A.   Yes.

Q.   And why did you want to borrow his car?

A.   So I can go to another hospital to get treated.

Q.   And so to borrow his car, did that mean you were driving him to school first?

A.   Correct.

Q.   Did you drive him to school?

A.   I did.

Y. Henderson - direct

938

Q. When you asked John if you could borrow his car, did he hesitate to let you?

A. No.

Q. Did he seem nervous about letting you take the car?

A. No.

Q. Did he tell you, you know, not to look in the trunk?

A. No.

Q. Did you sometimes use the trunk of that car?

A. I did.

Q. What for?

A. Baby formula, baby water, some baby items, groceries.

Q. So just normal trunk usage?

A. Yes.

Q. And while you were in the car, did anything seem weird about it?

A. No.

Q. Did you -- did you see any blood?

A. No.

Q. Did you see any sign of anything amiss?

A. No.

Q. Okay. So you dropped John off at school. What did you do after that?

A. I dropped him off, and then I proceeded to go to Trinity to get seen and found out I had strep throat.

Q. Okay. So you did get to see a doctor at Trinity?

Y. Henderson - direct

939

A.   Yes.

Q.   You found out you had strep throat.  Did they prescribe medication?

A.   They -- antibiotics and some fever medicine, maybe some Tylenol or ibuprofen.

Q.   And had John -- let me strike that.

Did you go anywhere else that day after the hospital?

A.   To get the oil changed at Jiffy Lube.

Q.   Why did you do that?

A.   'Cause he asked me, and I didn't mind.

Q.   So John had asked you -- you were borrowing his car and going to the hospital and he asked you if you could take it to get an oil change?

A.   Sure.

Q.   Where did you go to get the oil change?

A.   Jiffy Lube.

Q.   All right.  And do you know what you -- what services did you get at Jiffy Lube?

A.   Just the oil change.

Q.   Did John ask you to get your -- to get his car cleaned that day?

A.   No.

Q.   And did you ask Jiffy Lube to clean his car?

A.   No.  They don't do that.

Q.   Did they clean his car in any way?

Y. Henderson - direct

940

A.   It's a complementary service to vacuum the carpets inside the car, the front and back seat, the floors.

Q.   So they vacuumed the floor of the car?

A.   Yes.

Q.   Did they do anything in the trunk?

A.   No.

Q.   Did they use any kind of solvent or cleaner?

        MS. ADEEYO:  Objection, foundation.

BY MS. RICKERT:

Q.   You were there, right?

A.   Yes.

Q.   To your knowledge, did do anything other than vacuum?

A.   No.

Q.   Okay.  So do you remember what time you were at the Jiffy Lube?

A.   I don't remember the time frame of Jiffy Lube.

Q.   That's all right.

        All right.  Did John, when he asked you to get the oil changed, did he express any concern about a stranger having access to his car?

        MS. ADEEYO:  Objection, form.

        THE COURT:  Yeah.

        MS. RICKERT:  Let me ask it a different way.

BY MS. RICKERT:

Q.   When John asked you if you could get the oil changed, did

Y. Henderson - direct

941

he say:  I really need an oil change, but I'm worried about a stranger having access to my car?

A.  No.

Q.  Did he say anything like that?

A.  No.

Q.  Did you get that impression in any way?

A.  No.

Q.  All right.  And just to close the loop on this, I'm going to show you a record, this is already in evidence, Plaintiffs' Trial Exhibit 121.

Do you see this record, Yolanda?

A.  Yes.

Q.  And what's the date of the oil change listed under service date here?

A.  March 10th.

Q.  All right.  And who is the customer?

A.  It would have John's name because that's the vehicle registered under him, but I was the customer.

Q.  Okay.  And this is his car, the Oldsmobile Aurora?

A.  Yes.

Q.  Okay.  So is this the oil change from that day?

A.  Yes.

Q.  What did you do the rest of the day, do you remember?

A.  Went back to the house, laid down because I was -- still wasn't feeling as well, and then picked him up from school.

Y. Henderson - direct

942

Q.   Okay.  So you picked up John from school that day?

A.   Yes.

Q.   How did John seem when you picked him up?

A.   Fine.

Q.   Normal?

A.   Normal.

Q.   Did he seem really tired?

A.   No.

Q.   What about in the days that followed March 10th, was there anything out of the ordinary?

A.   No.

Q.   John just still seemed normal?

A.   Yes.

Q.   What was going on in your lives at that time?

A.   Just regular normalcy, I don't -- nothing out the ordinary. Going to work, he going to school.  We got a baby.  It was normal life stuff.

Q.   All right.  So I want to fast-forward for -- to eight days, eight days to March 18th.

        We talked about this already, but March 18th is the day John got arrested, right?

A.   Yes.

Q.   Would you consider that day to be a major event in your life?

A.   It is.

Q.   Had you ever been around for another arrest like that?

A.   No.

Q.   And you have strong memories of these unusual events?

MS. ADEEYO:  Objection, relevance.

THE COURT:  Overruled.

BY THE WITNESS:

A.   I do.

BY MS. RICKERT:

Q.   All right.  So do you remember -- tell me what you remember about the day John was arrested.

A.   Early that morning, still kind of kind of dark outside, heard a forceful knock at the door.  John get up and answer it. The door fling open, they push him aside, flashlights everywhere.  They're looking around.  They asked him is he John Fulton.  He said yes.  They need to take him down to question.

They put handcuffs on him, or before they put the handcuffs on, he was in his under clothes, so they told him to hurry up and get dressed or they was going to take him in his under clothes.  He got dressed.

They handcuffed him.  He said that he had school, and they said don't worry about it, you'll be back in time for school, and that day, he didn't return.  He -- he --

Q.   Here, let me ask.  So did -- did the police say anything about murder that morning when they --

A.   No, we had no idea what they was there for.

Y. Henderson - direct

944

Q.   But you said they said they needed to take John down for questioning?

A.   Yes.

Q.   And did John -- John asked them about school, is that --

A.   Yes.  He said he had school.  He said don't worry about it, you'll be back.

Q.   And did you believe the police that John would be back in time for school?

        MS. ADEEYO:  Objection, relevance.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   I did.

BY MS. RICKERT:

Q.   So did you wait?

A.   I did.

Q.   And did John get back in time for school?

A.   No.

Q.   Did John get back when school was out?

A.   No.

Q.   At some point, did you realize John was not coming back?

A.   That -- to that evening, yes.  He didn't get to school.  He didn't leave school.  It's going into the evening.  I haven't heard anything, cellphone going to voicemail.

        I eventually left the apartment to go to my parents' house to kind of let them know, like, I haven't heard from him,

Y. Henderson - direct

945

and some police, undercover police, came and picked him up.

Q.   When you say undercover, do you mean that they weren't wearing police uniforms?

A.   Yeah, they was like plain clothes.

Q.   Okay.  So after you went to your parents' house to tell them that John had been taken and hadn't come back, what did you do next?

        MS. ADEEYO:  Objection, relevance.

        MS. RICKERT:  It's relevant.

        THE COURT:  I think it's probably relevant.  Go ahead.

BY THE WITNESS:

A.   I'm sorry, repeat that for me again?

BY MS. RICKERT:

Q.   Sure.

        After you went to your parents' house and told them what had happened, what did you do next?

A.   We finally had called his grandmother.

Q.   John's grandmother?

A.   Yes, Ms. Lucas, and she then proceeded to try to locate who picked him up and where was he at.

Q.   So -- so John's grandmother started trying to find him is your recollection?

A.   Yes.

Q.   And did you hear from the police?

A.   Some days later.

Y. Henderson - direct

946

Q. Did they interview you?

A. They did.

Q. Did the police interview you more than once?

A. Yes. They came to my parents' house, and then they came back to my parents' house to pick me up to take me to a location I had no idea where I was at.

Q. So did they ask you to come to the police station?

A. They did.

Q. And did you agree to go?

A. I did.

Q. Why?

A. 'Cause I want to know where my boyfriend was at and what was going on.

Q. Did you know at that point what he was being accused of?

A. Not at that moment.

Q. And you said you were at your parents' house. Did they let you go?

MS. ADEEYO: Objection, form, vague.

THE COURT: Did they let you go, is that a vague question?

BY MS. RICKERT:

Q. Yeah, did your parents allow you to go to the police station?

A. I mean, at that time I was 18, so they couldn't tell me no.

Q. When did you learn that John was being accused of murder?

A.   Oh.  When I got down to the station, they put me in the room, and I don't remember what detective it was, but he had said it, and my heart, like, just dropped.

Q.   What did you think when they told you that John was accused of murder?

MS. ADEEYO:  Objection, Your Honor, relevance.

THE COURT:  Sustained.

BY MS. RICKERT:

Q.   Were you surprised to hear that John was being accused of murder?

MS. ADEEYO:  Objection, Your Honor, relevance.

THE COURT:  What's it relevant to?

MS. RICKERT:  Well, she's his alibi witness, and I think it's fair to ask how she felt when he was told he was accused of murder.

MS. ADEEYO:  Your Honor, her damages or how her feelings at the time are not relevant of any of the claims in this case.

MS. RICKERT:  It's not about her damages.  It's about her perception of the situation that she intimately --

THE COURT:  I think it's part of the context of the story, so she may answer.

BY THE WITNESS:

A.   Yeah, I was definitely shocked.  Right out back, I'm, like, there's no way he could have did this.  Like, he's not that

type of person.

BY MS. RICHTER:

Q.  Did you ever know John to be a violent person --

A.  No.

Q.  -- prior to his arrest?

MS. ADEEYO:  Objection, Your Honor.  It's improper character evidence.

THE COURT:  It's what?

MS. ADEEYO:  My apologies.  Improper character evidence.

THE COURT:  You can ask him if she's ever seen any.

BY MS. RICKERT:

Q.  Did you ever see John Fulton commit any violent act prior to his arrest?

A.  No.

Q.  While you were at the police station, did you learn what day this murder John was being accused of was supposed to have happened?

A.  I did.

Q.  When you learned the day of the murder, what did you think then?

MS. ADEEYO:  Objection, relevance.

MS. RICKERT:  I can ask it in a more leading fashion to make the relevance clear.

THE COURT:  Okay.

BY MS. RICKERT:

Q.  Did you realize that the -- when you found out the day of the murder, did you realize that that was a day you had been with John?

MS. ADEEYO:  Objection, leading.  And it's still irrelevant, Your Honor.

MS. RICKERT:  She is an alibi witness.

MS. ADEEYO:  Her thoughts on when the murder occurred are not relevant to any issue in this case, Your Honor.

MS. RICKERT:  Her awareness of the day of the murder and her knowledge that she was with him --

THE COURT:  Goes to her credibility.

MR. LOEVY:  Informs her further actions.

THE COURT:  Overruled.

BY MS. RICKERT:

Q.  So when you learned what day this murder was supposed to have happened, did that tell you any important information?

A.  It did 'cause the day that they said that the murder happened, John and I were together that evening, that night, the next morning.

Q.  Did you think it was possible that John could have committed this murder?

A.  No.

Q.  Did you know it was impossible?

A.  It was very much impossible.

Q.   Did the police, while you were at the station, tell you anything about John other than that he was charged with the murder?

A.   I really can't reflect or recollect what was told after they said the murder 'cause I just went deaf and numb, so I really can't recollect now.

Q.   When they told you that it was March 9th or 10th or that night of March 9th, 10th, what -- what did you tell them?

A.   I tell him that he was with me.  There's no way he could have did this.  He was with me.

Q.   Did they give you any information about John's character during these conversations?

          MS. ADEEYO:  Object to form.

          THE COURT:  Can you ask --

          MS. RICKERT:  Let me ask that in a different way.

BY MS. RICKERT:

Q.   Did they tell you things about John that they thought you would -- that they thought would make you angry at John?

          MS. ADEEYO:  Objection, leading, and as to what they thought?  It's a convoluted question.

          THE COURT:  If need be, you can go through the whole conversation.

          MS. RICKERT:  Sure, okay.

BY MS. RICKERT:

Q.   Did the police give you any information about John while

Y. Henderson - direct

951

they were talking to you about what you knew about these days?

A.   You said about the days?

Q.   While the police were talking to you about March 9th and 10th, did they tell you anything about John that they thought you would want to know or that they --

A.   I feel like -- well, not feel like.  I know that they were trying to make me look at him in a bad -- in a different light, saying that he was messing with this person and this person, and do I know Precious and -- you know, just trying to say that he wasn't being faithful to me.

Q.   You say that they were saying he wasn't being faithful to you?

A.   Yes.

Q.   You mean with other women?

A.   Yes.

Q.   Now, while you were at the police station, did they ask you about the hospital visit that you had made on March 9th?

A.   They did.  We eventually watched the video.

Q.   When you say we eventually watched the video, you and the detectives watched the video from Mitchell Hospital?

A.   Yes.

Q.   Now, is that video a high-quality video?

A.   It's not.

Q.   And -- but you sat down with the detectives and watched the whole thing?

Y. Henderson - direct

952

A.   I did.

Q.   Okay.  And I'm just going to -- we're not going to go through all these, but just this is Plaintiffs' Trial Exhibit 86, which is not in evidence.  Would like to move to admit it.

        MS. ADEEYO:  No objection.

        MR. LOEVY:  I don't think you ought to admit it right now, Julia.

        MS. RICHTER:  Don't need to?

        MR. LOEVY:  No, just ask her what she did.  Let's go forward.

BY MS. RICKERT:

Q.   All right.  So with the detectives, you went through the video, you watched the video, and you said it was not very good quality.  Do you remember the name of the detective you watched the video with?

A.   I just know two detectives, and that's Winstead and Rolston.

Q.   So it was one of those two?

A.   It was one of those two.

Q.   You said you told these detectives that you had been with John March 9th all the way to the morning of March 10th, yeah?

A.   Yes.

Q.   Did they accept your answer?

A.   I felt like they did.

Y. Henderson - direct

953

Q. And as you watched this video with them, it was poor quality, but were you able to point out yourself and John Fulton in that video to the police?

A. Yes.

Q. And did they -- were you able to convince them that this was, indeed, you and John Fulton in the video?

A. I was.

Q. How were you able to do that?

A. I was able to tell him our next moves pretty much on the film. When I got up, when he got up, when he got the wheelchair, when he wheeled me in, when he got up to leave, when I moved from the wheelchair to the seat next to him.

Q. So you were able to predict --

A. Yes.

Q. -- actions?

A. Yes.

Q. Okay. And did they accept that those were --

A. They did.

Q. Okay. Now, if Detective Winstead -- sorry, let me back up for just a second.

Have you seen the video footage from Lake Meadows as well?

A. I did.

Q. But not that night at the police station, right?

A. Not at the police station, no.

Y. Henderson - direct

954

Q.   When did you see the Lake Meadows video?

A.   John's lawyer Elliot, he brought the -- brought it over to my mom's house.

Q.   Okay.  So going back to the hospital video and your discussion with -- with Detective Winstead, if Detective Winstead said in a police report that you said John might not have been with you at the hospital, would that be false?

MS. ADEEYO:  Objection, Your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A.   Yes, that would be false.

BY MS. RICKERT:

Q.   If Detective Winstead said in a report that you told him you went to sleep immediately after you returned from the hospital, would that be false?

A.   Yes, that's false.

Q.   If Detective Winstead wrote in a report that you said you did not know if John Fulton ever came home the night of March 9th into the 10th, would that be false?

A.   That would be false.

Q.   Did you ever tell Detective Winstead or any other police officer that you might have been wrong about the day that you went to the hospital with John?

A.   No.

Q.   Did you ever tell them that it might have been your mother

with you at the hospital instead of John?

A. No.

Q. So if they wrote that in a report, would that be false?

A. Yes.

Q. Did you always know that it was March 9th when you went to the hospital?

A. I did.

Q. How long were you at the police station that night they took you down there?

A. Quite a few hours. I couldn't give you a time -- an exact time frame, but well over two or three hours.

Q. And how did you eventually leave?

A. My parents eventually showed up.

Q. They showed up looking for you?

A. Yes.

Q. Do you know whether the police talked to your parents?

A. I don't know on that day that they picked me up that they did.

Q. I want to fast-forward now a bit to the trial, John's trial.

Did you testify at John's trial?

A. I did.

Q. Did you testify truthfully?

A. I did.

Q. What did you tell the jury about March 9th? Just

paraphrase or in summary.

A.   That he was with me.

Q.   How did you feel when John and Anthony got convicted?

          MS. ADEEYO:  Objection, relevance.

          MS. RICHTER:  Let me rephrase that.

          THE COURT:  Sorry.  You withdraw?

          MS. RICKERT:  I'll withdraw the question.

          THE COURT:  Okay.

BY MS. RICKERT:

Q.   Were you surprised when John and Anthony got convicted?

          MS. ADEEYO:  Objection, relevance.

          THE COURT:  Sustained.

BY MS. RICKERT:

Q.   Did you believe that because of the evidence that John was with you that he would be acquitted?

          MS. ADEEYO:  Objection, relevance.

          THE COURT:  What's the relevance?

          MS. RICKERT:  I'll withdraw it.

BY MS. RICKERT:

Q.   So John was convicted, right?

A.   Yes.

Q.   And he had already been in Cook County Jail for three-ish years at that point; is that right?

A.   Correct.

Q.   What did you observe about how being separated from his

Y. Henderson - direct

957

family affected John?

A.   He tried to, you know, be brave, but we had this connection where we look in each other's eyes, and it's like you can -- I could see the pain, like, it was weighing on him 'cause he -- he was innocent.

Q.   What did it mean for him to be separated from his son?

MS. ADEEYO:   Objection, Your Honor.

BY MS. RICHTER:

Q.   From what you observed?

THE COURT:   What did she observe?

BY MS. RICKERT:

Q.   What did you observe about how being separated from his son impacted John?

A.   Stressed.   He started thinning around -- his hair started thinning.   Painful visits, separation anxiety.

MS. ADEEYO:   Objection, Your Honor, motion *in limine*. We move to strike her testimony regarding anxiety.

MS. RICKERT:   She's not speaking medically.

THE COURT:   She's not speaking medically you said?

MS. RICKERT:   Yeah, she's not diagnosing him.   She's just speaking about his --

THE COURT:   Okay.

MS. RICHTER:   -- in the colloquial sense.

MS. ADEEYO:   Your Honor, that violates the motion *in limine*.   That's counsel's impression of her testimony.   The way

it stands, it violates the MIL.

MS. RICKERT: Can I attempt to cure this?

THE COURT: Pardon me?

MS. RICKERT: Can I attempt to address --

THE COURT: Yes, you should try. I mean, what point of proof are you going to?

MS. RICKERT: I mean, this goes to damages.

THE COURT: Oh, it does?

MS. RICKERT: Yes.

THE COURT: Okay. Overruled then.

BY MS. RICKERT:

Q. Did you perceive John as experiencing anxiety?

A. I did.

Q. And you're not a medical doctor or psychologist, right?

A. I'm not.

Q. You're not diagnosing him with --

A. No.

Q. What else did you observe about how being incarcerated affected John?

A. He was getting small, like -- it was just the hurt that words can't even be put into -- I can't even put into words what it is, but you can definitely see the struggle, again, telltale signs, he was losing weight, his hair, having to leave and say good-byes was tearful.

Q. Do you mean at the end of visits?

Y. Henderson - direct

959

A.   Yes.

Q.   Did you continue to date John after his arrest?

A.   I did.

Q.   What about after his conviction?

A.   When he got convicted, the relationship kind of went left. He felt like he was doing time and -- sorry -- I'm so sorry.

Q.   That's okay.

A.   He felt like he got this time, and he didn't want to have me just hanging around, so pretty much broke up with me.

Q.   Prior -- prior to that, had John proposed to you?

A.   He did.

Q.   Had you said yes?

A.   Yes.

Q.   Did you know how long he was going to be in prison?

A.   I want to say he was sentenced 25-plus years or 30-some years or could be more than that.

Q.   So for your part, did you try to stay together?

A.   I wanted to.

Q.   Is it hard to keep a relationship going with someone who's incarcerated?

A.   It is.

Q.   Why is it hard?

A.   The distance, loneliness, physicalness, touch, it's like -- it's -- that person's not here.

Q.   When John went to prison, was he able to -- well, let me

back up.

How old was Cam'ron when John got arrested?

A.   Cam'ron might have been almost eight months, seven to eight months.

Q.   So he wasn't talking yet?

A.   No, he wasn't.

Q.   Was John -- strike that.

After John went to prison, was he able to maintain his relationship with his son?

A.   He did.  When he was in the County, I definitely made sure that he visited his dad on every visitation day.

When he got convicted, with the help of my parents, they made sure that he seen his son.

When I wasn't working, I tried to take him, and even if I didn't take my son, I would try to go visit him occasionally by myself.

Q.   What about after you guys broke up, did --

A.   The same.

Q.   You still would bring Cam'ron?

A.   Yes.

Q.   And your parents would also?

A.   Yes.

Q.   Was John able to support your son from prison in some ways?

A.   Yes.

Q.   How?  Or let me ask a different question.

Y. Henderson - direct

961

What kind of support was John able to provide from prison?

A. Financial support, emotional support.

Q. How did -- how did John provide emotional support from prison?

A. Calls, letters, we sent him pictures, visitation.

Q. After Cam'ron was old enough to walk and talk, did you continue to bring him to see John?

A. Yes.

Q. Now, you said that you and John eventually broke up?

A. We did.

Q. After you guys broke up, did John continue to support Cam?

A. He did.

Q. Did he continue to support him financially?

A. Yes.

Q. And did he ever stop providing support during the time he was incarcerated for Cam?

A. No.

Q. What did it mean for your son not to have his dad around?

A. You're raising a -- a child by yourself, a black child by yourself, a male black child by yourself, and you're trying to keep him busy and in sports and active so that he won't be another statistic on the street with an incarcerated father and the child soon to follow. I didn't want that for my son, so I did as much as I could as a single mother.

Q. Did you have concerns about bringing your son into a prison environment to see his father?

MS. ADEEYO: Objection, relevance.

THE COURT: Sustained.

BY MS. RICKERT:

Q. So eventually John -- his conviction was overturned and he got released, right?

A. Correct.

Q. And do you remember what year that was?

A. Oh, '22 maybe? '23? I can't remember.

Q. Was it before COVID?

A. It was a little after COVID maybe -- it might have been right -- right at '21.

Q. Does 2019 sound possible?

A. Oh, I'm so sorry, yeah.

Q. Don't apologize.

Did you play any part in getting John home when his conviction was reversed?

A. I did. I was the one that went to go bond him out.

Q. So you actually came down with the money to pay his bond?

A. Yes.

Q. And it wasn't your money, was it?

A. It wasn't my money, no.

Q. Was it John's money?

A. Yes.

Q.   What did John do when he got out?

A.   That -- that evening, I tried to wait around for them to get out, but I had a daughter at home, so I had to get back to the house.

Riff sister eventually came to pick them up when they did get released, and then they came back to my parents' house.

Q.   To your parents' house?

A.   Yes.

Q.   And you were married by then, right?

A.   Yeah.

Q.   What year did you get married?

A.   '02, 2002 -- no, I'm sorry, Lord, 2012.  I'm so sorry.

Q.   No, no.  That's fine.

A.   Sorry.  It's 2012.

Q.   From what you observed, how did John adjust to life outside prison?

A.   He -- it was a -- it was a hard adjustment.

Q.   What made you think it was a hard adjustment?

A.   Him coming back into a almost grown boy, his son, trying to figure out the relationship dynamic between them two, how can he be a parent.  So I think he kind of just came off being a friend 'cause he didn't know -- he wasn't there to be a parent, so he didn't know exactly how to be a parent.

So sometime money kind of, like, filled in for -- for those things, for him being gone, so adjusting to society was

and parenthood was, yeah, a big adjustment.

Q. What do you mean when you say that sometimes money would fill in for other things?

A. John is very generous when it comes to that, but he didn't need -- he didn't need money. He needed his dad.

Q. So were there times that were rocky?

A. There were.

Q. Did it cause tension in your relationship with John?

A. It did.

Q. If you recall, around the time of your deposition in this case, were things tense between you and John?

A. It was.

Q. When things have been tense with you and John, did that -- does that impact in any way what you know about the night of March 9th into the 10th?

A. No.

Q. And have you ever -- well, strike that.

Let's talk about more recent times.

How are things between you and John now?

A. It's great. We, you know, at the end of the day, we always promise that we'll be family no matter what. He's came to my house to events. We went bowling. Barbecues, birthdays, you know, his family, my family, we all kind of celebrated together.

Q. How -- how long approximately would you say things have

been more stable between you?

A.  A few years now, yeah.

Q.  So you said you guys do sometimes get together to do family stuff?

A.  Uh-huh, yes.

Q.  Okay.  So here's the last area we're going to cover, Ms. Henderson, and thank you so much for your time today.

What are some of the life events that John missed in Cam'ron's life?

A.  Oh, he missed his child growing up.  He missed him talking, walking, school, day care, preschool, kindergarten, getting accepted into high school in 7th to 8th grade.  Graduations.  I think I said birthdays.  Yeah, he missed showing him how to throw a ball, catch a football, defend his self.

Q.  A lot of things.

A.  Yeah.

Q.  But how's Cam'ron doing now?

A.  Oh --

MS. ADEEYO:  Objection, Your Honor, relevance.

THE COURT:  What's the relevance?

MS. RICKERT:  Just goes to damages, what John Fulton's life has been like as a result of this event.

THE COURT:  I guess their relationship might be relevant.

MS. ADEEYO:  Your Honor, not to interrupt, but the

question was what is Cam'ron's life like now.  That wasn't a question regarding their relationship.  She covered their relationship in depth.

MS. RICKERT:  Can I ask more specific questions about Cam'ron's life?

BY MS. RICKERT:

Q.  What's Cam'ron doing now?

A.  He's in college.

Q.  And what year is he?

A.  This is his last year.  He'll be graduating in December.

Q.  Where is he in school?

A.  Western Illinois.

Q.  And what's his -- what's his major?

A.  Technology engineering, or engineering technology.  I'm sorry.

Q.  And what kind of relationship, to your knowledge, do John and Cam'ron have now?

A.  They have a good relationship.  When he come home from school, he go straight to his dad house, so he got a good relationship.

MS. RICKERT:  Thank you very much, Ms. Henderson.

THE WITNESS:  No problem.

CROSS-EXAMINATION

BY MS. ADEEYO:

Q.  Good afternoon, Ms. Henderson.  Are you okay?  Do you need

a moment?

A.   Yeah, please.

Q.   Sure.   Just let me know when you're ready, okay?

A.   Okay.   Ooh, okay.

          Okay.   I'm ready.

     (Counsel conferring.)

BY MS. ADEEYO:

Q.   Ms. Henderson, you testified on your direct examination that you share a child with Mr. Fulton, correct?

A.   Correct.

Q.   And your son's name is Cam'ron?

A.   Yes.

Q.   Now, while Mr. Fulton was incarcerated, he financially provided for Cam'ron, correct?

A.   He did.

Q.   And while Mr. Fulton was incarcerated, you took Cam'ron to see his father, correct?

A.   Correct.

Q.   And you were once engaged to Mr. Fulton, correct?

A.   I was.

Q.   And your engagement ended while he was incarcerated?

A.   Yes.

Q.   Did your engagement end due to infidelity on your part?

A.   No.

Q.   So if Mr. Fulton had said that you cheated on him and

Y. Henderson - cross

968

that's why your engagement ended, that's incorrect, right?

MR. LOEVY: Objection, Your Honor. There's no foundation for the question asked that way.

THE COURT: Sustained.

BY MS. ADEEYO:

Q. When your son Cam'ron turned 18 years old, Mr. Fulton had financially cut him off, correct?

A. Correct.

Q. And at that time when Mr. Fulton cut him off financially, Cam'ron was still in high school, right?

A. Correct.

Q. At that time when Mr. Fulton cut off his son, he called his son a ward of the state; isn't that correct?

A. I don't recollect.

Q. Do you recall giving a deposition in this case?

A. I do.

Q. And do you recall it was me who was asking you questions at that deposition?

A. You look familiar.

Q. Okay. Page 27, lines 14 through 19:

"Q. Is there any particular reason why you didn't pursue child support at that point?

"A. I didn't because John would tell me that he was a ward of the state and that I wasn't entitled to file child support because he was a ward of the state."

Y. Henderson - cross

969

Did I ask that question, and did you give that answer at your deposition?

A.   If that's what it say, yes.

Q.   Now, once Mr. Fulton was released from prison, he still did not financially provide for Cam'ron, correct?

A.   Sorry, say that again?

Q.   Sure.  When Mr. Fulton was released from prison in 2019, he still did not provide for your son Cam'ron, correct?

A.   I can't speak on what he did.  My son graduated out of high school, so whatever they did amongst themselves, that was between them.

Q.   To your knowledge, Mr. Fulton did not financially provide for Cam'ron when Mr. Fulton was released from prison in 2019, correct?

A.   No.

Q.   You are aware though that when Mr. Fulton was released from prison, he would provide for Anthony Mitchell financially, correct?

A.   I believe so, yeah.

Q.   In fact, when Mr. Fulton was released from prison, he stopped speaking with his son Cam'ron.  Do you remember that?

A.   Had a little -- for a little point of time.

Q.   I'm sorry, what was that?

A.   For a little point of time.

Q.   And that was when Cam'ron was about 17 years old.  Do you

remember that?

A.   I don't remember if he was 17 or 18.  One of them.

Q.   Mr. Fulton disowned Cam'ron at that time, right?

A.   I wouldn't say disown.  He was -- he just got out, trying to adjust to society.  So I wouldn't say disown.  He was adjusting to society and adjusting to having a grown son that's taller than him.

Q.   I'm turning to Ms. Henderson's deposition, page 32, lines 8 through 19:

"Q.   Okay.  And so when you said that this disagreement initially occurred over Anthony Mitchell's daughter, do you know the specifics about what it had to do with her?

"A.   I can't really go into detail because it was like a bro code between them, so I can't go into specific detail. But I don't know if they was trying to date and he was trying to say he's, like, that's family and when they're really not family.  And he kind of sided with Mitchell and his daughter and disowned his son because of that matter."

Was that the question you were asked and the answer you gave?

A.   If that's what it say.

Q.   Mr. Fulton didn't attend Cam'ron's graduation in June 2020, correct?

A.   No.

Q.   Do you know why he didn't attend?

A.   COVID.  Graduation wasn't a traditional graduation.  It was a walk-through graduation, so it was limited tickets, so he was not one of them that got the ticket.

Q.   Did you have a graduation party for Cam'ron?

A.   No.  I had a trunk party for him.

Q.   Did Mr. Fulton attend that trunk party for Cam'ron?

A.   No.

Q.   I want to go back to late 2002, early 2003.  Ms. Rickert asked you some questions about that time period in March when you were living with Mr. Fulton.  Do you remember that testimony?

A.   Say that again?

Q.   Do you remember that testimony when you were living with Mr. Fulton in late 2002, early 2003?

A.   Yes.

Q.   Now, you previously testified that you lived at Lake Meadows apartment complex in early 2003, right?

A.   Correct.

Q.   And you lived there with Mr. Fulton?

A.   Correct.

Q.   Mr. Mitchell lived there as well, correct?

A.   I wouldn't say he lived there, but he -- he did come over.

Q.   He spent multiple nights a week there back in early 2003, correct?

A.   Correct.

Q.   Now, John paid all the bills at that apartment, right?

A.   Correct.

Q.   And the apartment, the lease was in his name?

A.   Correct.

Q.   And John was 18 at that time, correct?

A.   I believe so.

Q.   Now, Ms. Henderson, you testified that Cam'ron's now 22 I think you said, right?

A.   Yes.

Q.   So you've raised a teenager, right?

A.   Yes.

Q.   Was John your typical teenager back in 2003?

A.   What do you mean by typical?

Q.   Well, John had his own apartment in 2003, correct?

A.   I mean, if I had the money, I'd have my own apartment, so I don't know where you going with it.

Q.   John had his own apartment in 2003, correct?

A.   He did.

Q.   He had his own car in 2003, correct?

A.   Most teenagers do.

Q.   John had his own car in 2003, correct?

A.   Most teenagers do.

Q.   Is that a yes to my question about Mr. Fulton?

A.   Yes.

Q.   So John was mature for his age; fair?

A.   Correct.

Q.   And John was also smart?  Is that a yes?

A.   Correct.

Q.   Now, you testified on direct examination that the Lake Meadows apartment building had a security system, right?

A.   They do.

Q.   You also testified on direct examination that there was a camera at the back door?

A.   Correct.

Q.   So it's your testimony that there's a camera -- that there was a camera at the back door of the Lake Meadows apartment building in March of 2003?

A.   Yes.

Q.   Turning to your trial testimony, page 131, lines 22 through 24.

        MR. LOEVY:  If you could just give us a moment. Thanks.

        MS. ADEEYO:  Sure.

        MS. RICKERT:  Would you say that page again, Natalie?

        MS. ADEEYO:  Sure, 131, lines -- hold on, I lost my place here -- 22 through 24.

        Do you have it, counsel?

        MR. LOEVY:  Yes.  Thank you.

BY MS. ADEEYO:

Y. Henderson - cross

974

Q.   Okay.

     "Q.   In March of 2003, they did not have a security camera on the back doors of that building, correct?

     "A.   I don't know."

     Was that the question you were asked and the answer you gave at Fulton's criminal trial?

A.   If that's what it say.

Q.   Now, Ms. Henderson, you are aware that there was a camera at the front door of Mr. Fulton's apartment building in March of 2003, correct?

A.   Correct.

Q.   And the building had a system where if someone came into the lobby and buzzed an apartment number, you could then buzz that person in, a resident could buzz them in; is that fair?

A.   Yes.

Q.   And there was also a way for you to see that individual who came into the lobby and buzzed you on a TV in your apartment, right?

A.   Correct.

Q.   And you don't recall ever receiving a letter in November of 2002 regarding an upgrade in the security system, correct?

A.   Not to my recollection, no.

Q.   Now, we just -- you just testified a moment ago about Fulton having a car back in 2003.  You remember that testimony?

A.   Correct.

Q.   And that was a silver Oldsmobile Aurora?

A.   Correct.

Q.   Back then, Fulton liked to keep a clean car, right?

A.   Yes.

Q.   He liked to keep the outside of his car clean?

A.   Correct.

Q.   And he liked to keep the inside clean, correct?

A.   Correct.

Q.   And on occasion, you would drive Fulton's car?

A.   Correct.

Q.   You didn't drive it every day though, right?

A.   Not every day.

Q.   When you would drive it on occasion, it would be to pick up groceries, right?

A.   Groceries, go visit my mom, drop him off at school, go to work.  I used it for multiple.

Q.   And you testified on direct that sometimes you used the trunk of his car, right?

A.   Yes.

Q.   And I think you mentioned it was to put, for example, baby food in the trunk, right?

A.   Yeah, baby food, groceries, the baby water.

Q.   And when you would put groceries, baby food, water in the trunk, you would touch the trunk, right?

A.   Yes.

Q.   And you would also sometimes have to touch the inside of the trunk, right?

A.   Correct.

Q.   And you don't recall on every occasion when you had to touch the trunk that you were wearing a glove or anything, right?

A.   No.

Q.   Back in 2003, Mitchell would also sometimes drive Fulton's car, right?

A.   Correct.

Q.   Do you ever recall an instance when Mitchell was in Fulton's trunk?

A.   No.

Q.   Can you ever think of an instance in which Sticks, Antonio Shaw, was in Fulton's trunk?

A.   No.

Q.   When you went on those errands to get baby food or groceries, was Antonio Shaw, or Sticks, ever helping you put groceries in that trunk?

A.   I can't recall.

Q.   Now, you testified on direct examination about a woman named Precious, right?

A.   Yes.

Q.   And you were aware that Fulton and Precious were friends, right?

A. Yes.

Q. Were you aware that Fulton had a romantic relationship with Precious in early 2003?

A. No, I can't recall.

Q. And in 2003, you were aware that Fulton was committing infidelity, right?

A. To my recollection, it was just me and him, so I really can't recall if he was messing around.

MS. ADEEYO: I'm turning to her deposition, page 41. Lines 11 through 23.

MS. RICKERT: Objection, this is improper impeachment. She said she doesn't recall.

MS. ADEEYO: Oh, I'll withdraw, Your Honor.

THE COURT: Okay.

BY MS. ADEEYO:

Q. And you're aware that in February 2003, Mr. Fulton was involved in a gun deal that turned into a robbery. Remember that testimony?

A. Correct.

Q. And you learned about this because someone had called Fulton's phone while you were home with him in the apartment, right?

A. Correct.

Q. And I think you testified that you had actually picked up the phone; is that correct?

Y. Henderson - cross

978

A.   Yes.

Q.   And you picked up the phone because that person was calling again and again and again, right?

A.   Correct.

Q.   And when you answered that phone, the other person on the other end, that was a male, right?

A.   Correct.

Q.   And you thought it was a Hispanic male, correct?

A.   I don't -- I don't recall the nationality, but he could have sounded Hispanic.

Q.   Now, when that person, that male who was on the phone with you, he was talking crazy to you, right?

A.   Correct.

Q.   You said he was using the N-word?

A.   Correct.

Q.   And he sounded really angry on the phone, correct?

A.   Correct.

Q.   At this point, you thought Fulton was in trouble for something, right?

A.   At that moment, yes.

Q.   And you thought that the male on that phone was going to come and find Fulton, right?

A.   At that moment, yes.

Q.   And so you then gave Fulton the phone, right?

A.   Yes.

Q. And Fulton and that male, they exchanged some words on the phone, right?

A. More so the person on the phone, but, yeah, both.

Q. Could you overhear what that person on the phone was saying?

A. Just threats like I'm-a find you, just -- just threats.

Q. And then Fulton hung up the phone, right?

A. Yes.

Q. Once Fulton hung up the phone, you asked him what's going on, right?

A. I did.

Q. That's because that was a crazy situation that had just happened, some guy randomly called and was aggressively screaming at Fulton, right?

A. Correct.

Q. And so then Fulton explained to you what happened with this gun deal and this robbery, right?

A. Correct.

Q. That the guy only made away with $20 or $15, and that's why he was upset, right?

A. Correct.

Q. Now, after Fulton explained this story to you, you were scared.

A. At that time, yes.

Q. And you were scared because, one, this guy had Fulton's

Y. Henderson - cross

980

phone number, right?

A. Correct.

Q. You didn't know if this guy was going to do anything to you or your family, right?

A. Correct.

Q. And you didn't know if he was even going to come to the apartment, right?

A. Correct.

Q. And at the time, I think you said Cam'ron was only seven or eight months; less than that, right?

A. Probably less than that, yeah.

Q. About five months?

A. Maybe.

Q. And so you're also scared for your child.

A. Correct.

Q. So you went and got your culinary knives to protect yourself, right?

A. No, ma'am, I don't recall.

Q. So after hearing this unknown male scream and yell at Fulton, threaten him, you were scared, you just sat down?

A. Pretty much, yes.

Q. I want to turn now to the evening of March 9th.

I think we covered on direct examination you were sick that day, right?

A. Correct.

Y. Henderson - cross

981

Q.   And you told us some of your symptoms, that you had a sore throat and a lump on the side of your neck, right?

A.   On what date are you talking about?

Q.   On March 9th.

A.   Yes.

Q.   Okay.  Can you tell us approximately the size of the lump that was in your neck?  Do you remember?

A.   I don't remember.

Q.   Did it protrude out though?

A.   It didn't protrude out, but you can kind of feel a lump.

Q.   Okay.  So you could feel a lump in your throat?

A.   Yes.

Q.   And you had a fever, too, right?

A.   It was slightly high.

Q.   And were you tired that day?

A.   No.

Q.   You weren't tired?

A.   No, just -- I just remember being in pain.

Q.   So you weren't tired, but you were sick.  Fair?

A.   Fair.

Q.   You had muscle aches?

A.   Sorry?

Q.   You had muscle aches?

A.   I don't recall muscle aches.

Q.   Were you coughing up blood?

Y. Henderson - cross

982

A.   I don't recall coughing up blood.

Q.   Well, your symptoms were serious enough that you needed to go to the emergency room, right?

A.   Yes.

Q.   You didn't go to urgent care?

A.   No.

Q.   You didn't call your doctor and see when was the next available appointment, right?

A.   No.

Q.   So Mr. Fulton drove you to the University of Chicago Hospital, correct?

A.   Correct.

Q.   And you and Fulton went to the hospital?

A.   Correct.

Q.   And you were there about two hours before Mr. Fulton left the hospital?

A.   Yes, I believe so.

Q.   Did Fulton ever tell you why he needed to leave after two hours?

A.   I don't recall.

Q.   So you don't recall him saying he needed to change his clothes to get comfy?

A.   I don't recall.

Q.   You don't recall him saying that he doesn't like hospitals and needs to get out of here.  Don't recall that, right?

A.   It sound familiar.

Q.   When you say it sounds familiar, you have an independent recollection that Fulton said that to you on March 9th while you were sitting in the hospital?

A.   I said it sound familiar.  He never really did like hospitals.

Q.   Right.  Did he say that to you that night?

A.   I can't recall if he said it that night.

Q.   Now, when Fulton left, do you know what he was doing once he left?  Do you have any idea?

A.   From my recollection, he went home.

Q.   And then at some point, you called him to come and pick you back up, right?

A.   Yes.

Q.   And that's because you were tired of waiting, you were sitting in the ER all night, right?

A.   Yes.

Q.   And you were still sick.  No one had treated you, no one saw you, right?

A.   Correct.

Q.   So Fulton then, after you called him, he picked you up and took you back home.

A.   We both retreated back home.

Q.   You both went back home?

A.   Yes.

Y. Henderson - cross

984

Q.   And that was at approximately, I think you said on direct, about 11:54 p.m., something around that time?

A.   Correct.

Q.   Now, you weren't given any medicine at the hospital?

A.   No.

Q.   I think you established on direct you didn't take any NyQuil, any Tylenol, nothing like that?

A.   No medication at all.

Q.   So you were still in pain?

A.   I was still in pain.

Q.   Now, you testified on direct that once you both returned back home, you went upstairs, the both of you, and you slept in the front room, right?

A.   Correct.

Q.   Fulton slept in the back room, the bedroom, right?

A.   Correct.

Q.   And then you went to sleep?

A.   Not right away.

Q.   What were you doing during that time after you arrived home but you hadn't fallen asleep yet?

A.   Can't recall what I was doing, but I didn't go to sleep right away.

Q.   Did you have a TV in the front room?

A.   We did.

Q.   Were you watching TV?

Y. Henderson - cross

985

A.   I don't recall.

Q.   Were you looking at your phone, any recollection of that?

A.   Could have been on my phone.  Could have been watching TV.
I just -- I didn't go to sleep because I was in pain.

Q.   So we established that you and Fulton arrived back home at
11:54 p.m.  What time did you fall back asleep?

A.   A few hours later.

Q.   What specific time?

A.   I can't give you a specific time because I don't know, but
it wasn't right away.

Q.   When Fulton went to the back of the bedroom, what was he
doing?

A.   Far as I know, he was in the room laying down.  I did hear
him get up to use the restroom, laid back down, and the next
morning we got up.

Q.   You just said for all you know, he was laying down.  So you
don't know that he was laying down?

A.   He was in the room.  He never did -- he didn't leave out
the apartment, I know that.

Q.   Did you go in the room and check on him?

A.   No.

Q.   So you didn't physically see with your two eyes if he was
laying down, right?

A.   No.

Q.   Do you know if he was watching TV?

A.   No.

Q.   Do you know if he was on his phone?

A.   I don't.

Q.   So you said a couple hours after arriving home, you fell asleep, right?

A.   Sure.

Q.   You don't know if he left the apartment, correct?

A.   He didn't.

Q.   And you're saying that with certainty, right, despite the fact that you fell asleep?

A.   Very much so with certainty.

Q.   Now, you dropped Fulton off at the school -- at school the next morning, correct?

A.   Correct.

Q.   De La Salle was his high school at the time, right?

A.   Correct.

Q.   And that was fairly close to Lake Meadows apartment?

A.   Correct.

Q.   About five minutes away, right?

A.   Correct.

Q.   Just about a mile down the road?

A.   Correct.

Q.   Then you took Fulton's car to go to Trinity Hospital.  You testified about that on direct, do you remember?

A.   Correct.

Y. Henderson - cross

987

Q.   And that's because you were still sick?

A.   Correct.

Q.   So to go to Trinity Hospital, you actually asked your mother to come with you, right?

A.   Yes, she went with me.

Q.   In fact, your mother took you to the hospital, right?  She drove you.

A.   She took the car, yes.  I took -- I drove my car -- I drove John car to my mom's house, and then she took me.

Q.   And your mother drove you to the hospital because your symptoms had actually worsened by that point.

A.   It was about the same.

Q.   Is it your testimony that your symptoms hadn't worsened on March 10th?

A.   I don't recall it worsening, but I felt like it was the same.

         MS. ADEEYO:  Turning to the deposition, page 117, lines 5 through 8.

         MR. LOEVY:  Not impeaching, Your Honor.

         MS. ADEEYO:  Your Honor, she testified no.

         MR. LOEVY:  We'll withdraw the objection.  She can read the answer.

         THE COURT:  Okay, thanks.

BY MS. ADEEYO:

Q.   "Q.  So at that point that you arrived at your mom's house,

Y. Henderson - cross

988

do you think your symptoms worsened?

"A.  Possibly."

Were you asked that question, and did you give that answer?

A.  If that's what it say.

Q.  And you were treated at Trinity Hospital, correct?

A.  Correct.

Q.  In fact, you were diagnosed with strep throat?

A.  Correct.

Q.  And as you testified on direct examination, you were given antibiotics and pain medication, right?

A.  Correct.

Q.  You were at Trinity for about three-and-a-half hours.

A.  Roughly, yeah.  Sounds about right.

Q.  And you were told at Trinity to get some rest and take it easy, right?

A.  Correct.

Q.  But instead of going to lie down and get some rest, you went and got an oil change for Mr. Fulton, right?

A.  Correct.

Q.  Even though you were still sick at this point, right?

A.  Correct.

Q.  Did Fulton ever tell you that this was an emergency oil change, that you needed to do this or his car was going to stop in the middle of the road?

Y. Henderson - cross

989

A.  No.

Q.  Did Fulton ever tell you, well, if you can't go, it's no big deal, you don't have to go?

A.  I wasn't pressured to go.  I don't recall him saying that, but it wasn't a pressure -- I didn't feel like it was a pressure thing to me, so --

Q.  You weren't pressured.  You were sick, and you still decided to go get it done, right?

A.  Correct.

Q.  Fulton told you to get his car washed that day, too, right?

A.  Incorrect.

Q.  Well, when you went to Jiffy Lube, they vacuumed out Fulton's car, right?

A.  That's not a car wash.

Q.  When you went to Jiffy Lube, they vacuumed out Fulton's car, correct?

A.  They vacuumed but not car wash.

Q.  Jiffy Lube cleaned his windows, too.

A.  I don't recall.  They might have, but that's not a car wash.

Q.  Turning to the deposition, page 121, lines 8 through 11:

        "Q.  Was the car washed as well as a courtesy?

        "A.  They don't -- no, they don't wash the car.  They just clean windows and vacuum."

        Were you asked that question, and did you give that

answer?

A.   Correct, if that's what it say.

Q.   Are you aware of Pete's Car Wash?

A.   Say it again?

Q.   Are you aware of Pete's Car Wash?

A.   Been so long, I don't even know where Pete's Car Wash is located at right now.

Q.   So you're aware of it, you just can't recall where it's located, right?

A.   Can't recall.

Q.   When Fulton -- you previously testified that Fulton kept his car pretty clean.  Do you recall where he'd go to wash his car?

A.   I can't recall what car wash he goes to.

Q.   So after this oil change on March 10th, you then went home to lie down, right?

A.   That day, yep, I got the car washed and went home, and then I picked him up from -- it's probably about almost time to get him from school, and I picked him up from school.

Q.   And after you picked him up from school, do you recall what else you did that day?

A.   Pretty much went in the house and laid down.

Q.   You probably took the medicines the doctor prescribed to you, right?

A.   At that time, I might have.

Y. Henderson - cross

991

Q.   I now want to turn to the day that Fulton was arrested. We've established on direct that you were present when he was arrested, right?

A.   Correct.

Q.   And you also testified on direct examination that Fulton was handcuffed for this arrest, right?

A.   Correct.

Q.   So is it your testimony that Fulton was handcuffed on March 18th, 2003 at 5:30 a.m.?

A.   Correct.

Q.   Turning to your deposition, page 97, lines 16 through 19:

        "Q.   Did they handcuff Fulton?

        "A.   No, they didn't handcuff him or that I can remember.  I don't -- let me take that back.  I don't remember them handcuffing him."

        Were you asked that question, and did you give that answer?

A.   If that's what it say.

Q.   So when Fulton's arrest occurred, you were initially sleeping at that time, right?

A.   We both were.

Q.   And you were sleeping right next to him?

A.   Correct.

Q.   And you were on a front -- excuse me.  You were in the front room on a pallet, right?

A.   Correct.

Q.   And then you heard a knock at the door?

A.   A forceful knock, yes.

Q.   And when you heard that knock, Fulton went to open the door, correct?

A.   Correct.

Q.   And when he opened the door, what did you see, if anything?

A.   The plain clothes come in, flashlights, looking around.

Q.   You saw two officers in plain clothes, right?

A.   Correct.

Q.   Was there a security guard for the building present at all?

A.   I don't recall.

Q.   So you don't recall anyone standing there in a fluorescent vest or a vest of any sort?

A.   I don't recall.

Q.   The officers asked him if he was John Fulton, right?

A.   Correct.

Q.   And Fulton answered that was him, right?

A.   Correct.

Q.   And as you testified, the officers told Fulton that they need to take him down for questioning, right?

A.   Correct.

Q.   And do you recall having a conversation with one of the officers -- or detectives?  Excuse me.

A.   On the day that he was arrested?

Q.   Correct.

A.   I might have.  I -- I might have asked them what they was taking him down for.  I can't recall really.

Q.   Do you recall a detective coming over to you and asking to take your information down?

A.   Yeah, they -- I do remember somebody getting my wallet or something of that nature.

Q.   And that same officer -- excuse me -- detective who took your information down, that officer also asked for Fulton's keys, right?

A.   I believe so, correct.

Q.   And then the officers then left with Mr. Fulton, correct?

A.   Correct.

        MS. ADEEYO:  Permission to publish what's been entered into evidence, Plaintiffs' Exhibit 81?

        THE COURT:  You may publish.

BY MS. ADEEYO:

Q.   Now, Ms. Henderson, do you see the exhibit on the screen, Plaintiffs' Exhibit 81?

A.   Correct.

Q.   And I believe Ms. Rickert went over this photograph with you, correct?  That's Mr. Fulton exiting Lake Meadows apartment on March 18, 2003 at 5:36 a.m.?

A.   Correct.

Q.   Now, that's Mr. Fulton pictured there with the coat over

his shoulders, correct?

A. Correct.

Q. And do you see that his left arm is dangling on the side of his body?

A. Look like the left sleeve.

Q. And before those detectives took Mr. Fulton out of the apartment, no officer physically manhandled Mr. Fulton, right?

A. Before?

Q. At the moment in the apartment when the officers, after they identified themselves, they said, hey, are you Fulton; he said, yes, I am; they said we're taking you in for questioning, and they went to leave. You didn't see anyone manhandle Mr. Fulton, right?

A. When they entered the apartment, they pushed him out the way, but it wasn't, like, a roughness when they took him out.

Q. Okay. So you didn't see any detectives, like, throw him to the ground, anything like that, right?

A. No, no, not that I recall, no.

Q. Now, later that same day on March 18th, do you recall detectives coming back to the apartment?

A. I can't recall the -- if they came back that day, but when I left and I came back to the apartment, the apartment was -- looked like it had been ransacked.

Q. When you say the apartment had been ransacked, you didn't physically see any officer or detective rummage through any of

your belongings, right?

A. I didn't physically see.

Q. When you came back to the apartment and you say the apartment was in a disarray, had you noticed that anything had been taken from the apartment?

A. Little -- little minor things, I did.

Q. Like duct tape?

A. I remember -- I recall duct tape being taken.

Q. Speaking of duct tape, Fulton would use duct tape on the windows, right?

A. I believe. I can't recall.

Q. Do you recall if Fulton had multiple rolls of duct tape? Was he a regular duct tape user?

A. No.

Q. Now, you testified on direct that you had conversations with detectives about Mr. Fulton's whereabouts on March 9th, 2003. Do you remember that testimony Ms. Rickert asked you?

A. You said on what date?

Q. March 9th, 2003, the night you were at the hospital?

A. You say I had -- repeat the question?

Q. Yeah, I'll strike that. Let me re-ask.

Do you remember speaking with detectives about your and Mr. Fulton's whereabouts on March 9th, 2003?

A. You're saying did I talk to the detectives at a later date and mentioned March 9th?

Y. Henderson - cross

996

Q. Sure.

A. Yeah.

Q. Yeah, I'm just trying to establish if you even remember talking to them in the first place --

A. Yes.

Q. -- about March 9th? You do?

A. Yes.

Q. Okay. And that later conversation happened on March 19, 2003; sound about right?

A. I can't recall if it was the 19th or a few days later.

Q. That's fair.

So the first time that you had spoke to detectives about March 9th, you and Mr. Fulton's whereabouts, that occurred at your mother's house, right?

A. Correct.

Q. And your mother's Laverne Henderson, right?

A. Correct.

Q. So detectives came and spoke with you at her home at 8540 South Manistee?

A. Correct.

Q. Okay. Do you recall those officers introducing themselves as Detective Winstead and Rolston?

A. Those names sound familiar.

Q. You told the detectives on March 19th at your mother's house when you had that conversation with them, you said that

you went to the hospital with Fulton on March 9th, right?

A. Correct.

Q. And you said he got bored and he left.

A. Don't recall those words, but he did leave.

Q. You don't recall saying he got bored and left?

A. I don't recall those words, but he did leave.

Q. Turning to your trial testimony, page 141, lines 1 through 6:

"Q. Well, in fact, what you told Detective Winstead when you met with Detective Winstead the first time on March 19th, 2003, you said that you went to the hospital, that you were with John, that he got bored and left, you told us that.

"A. Yes."

Were you asked that question, and did you give that answer?

A. Sound familiar.

Q. You also told --

(Counsel conferring.)

BY MS. ADEEYO:

Q. You also told Detective Winstead that when you called John to come back, he came back pretty quickly though, right?

A. Correct.

Q. And that you and Fulton then went home and went to sleep.

A. We didn't go to sleep -- well, I didn't go to sleep right

Y. Henderson - cross

998

away.

Q.   Turning to your trial testimony, page 142, lines 11 through 15:

"Q.   Again, my question to you is you told the detective when he asked you your whereabouts on that night of March 9th, you told him you went home and went to sleep.  Isn't that right?

"A.   Okay.  All right."

You were asked that question, and you gave that answer, correct?

A.   If that's what it say.

Q.   Now, you also told Detective Winstead that you think Fulton went to sleep, too, right?

A.   I can't recall.

Q.   Turning to your trial testimony, page 142, lines 16 through 18:

"Q.   Okay.  And you told Detective Winstead that you believe John went to sleep, too; isn't that right?

"A.   Yes, I did."

Were you asked that question, and did you give that answer?

A.   If that's what it says.

Q.   Now, when you met with Detective Winstead, he treated you nicely, right?

A.   I -- I can't recall.  I don't see -- I didn't -- I don't

Y. Henderson - cross

999

feel myself being mistreated, so --

Q. Right. Detective Winstead treated you with respect during that interview, right?

A. Correct.

Q. Now, the next day -- well, actually, that day that you met with Detective Winstead, you said you don't recall if that was March 19th, right?

A. With Winstead, no, I don't recall if it was the 19th or a few days later.

Q. Turning to the trial testimony, page 141, lines 10 through 12:

"Q. By the way, Detective Winstead originally spoke to you back on March 19th at your mom's house, correct?

"A. Yes, he did."

Were you asked that question, and did you give that answer?

A. If that's what it says.

Q. So you spoke to Detective Winstead just the next day after Fulton was arrested, correct?

A. If that's what it says.

Q. Now, after that interview on March 20, 2003, you called Winstead, correct?

A. I don't recall calling him.

Q. Trial testimony, page 142, starting at line 23 through page 143, line 2.

MS. RICKERT: Objection, Your Honor. This is improper impeachment. She said she doesn't recall.

THE COURT: She's under cross. Let's go ahead with it.

BY MS. ADEEYO:

Q. "Q. And then the following day, Detective Winstead -- well, actually, you called Detective Winstead the following day on March 20, right?

"A. Correct."

Were you asked that question, and did you give that answer?

A. If that's what it says.

Q. And when you spoke with Detective Winstead, you told him that you might actually be mistaken about the visit to the hospital, correct?

A. Never said that.

Q. Trial testimony, page 143, lines 3 through 6:

"Q. And you told him that you thought you might be mistaken about the visit to the hospital; is that right?

"A. The day that he gave me wasn't the day that we went, so I called and told him the correct day."

Were you asked that question, and did you give that answer?

A. I don't recall.

Q. Now, on March 21st, 2003, Detective Winstead went and

picked you up and transported you to a police station.  Do you remember that?

A.   Correct.

Q.   And that was at 39th and Pershing?

A.   I didn't know at that time the location, but I soon found out, it was, yes.

Q.   Do you recall it being at the old Board of Education building?

A.   That's what I found out later, yes.

Q.   When you say you found out later, are you saying when you arrived, you realized it was the old Board of Education building?

A.   I didn't know what building it was until later when my parents came and later as I pass by it now when I was working in that area that that's what the building was.

Q.   And you weren't handcuffed when he came and picked you up, right?

A.   No.

Q.   You weren't under arrest.  No one said that to you, right?

A.   No.

Q.   You voluntarily went down with Detective Winstead, right?

A.   Correct.

Q.   And that's because you wanted to tell Detective Winstead what you knew about March 9th, right?

A.   Correct.

Q.   Now, also present in that room when you sat down with Detective Winstead was an assistant state's attorney, right?

A.   I don't recall.

Q.   Now, when you sat down in that room, you reviewed the video stills that we looked at a moment ago on direct examination. Do you remember that?

A.   You said video?

Q.   Yeah, you reviewed --

A.   Yes.

Q.   -- video from your trip to the emergency room at the University of Chicago Hospital, right?

A.   Correct.

Q.   And when you went to the University of Chicago Hospital on March 9th, that was approximately around 8:00 p.m., 8:15 p.m., through 11:54 when you went back to Lake Meadows Apartments with John Fulton, right?

A.   Those time frames sound familiar.

Q.   You -- you were still in a relationship with Mr. Fulton when his criminal trial occurred in 2006, correct?

A.   Correct.

Q.   And did you attend and watch his criminal trial?

A.   I couldn't watch the trial until after I testified.

Q.   Fair.

     So after you testified, did you then attend his criminal trial and watch in support of him?

A.   Yes.

Q.   And were you able to hear the closing statements of the prosecutors and his attorneys?

A.   I heard -- I heard the closing, but I don't recall exactly the nature or what was said word for word.

Q.   Okay.  So you heard the closing statements, so you're aware --

MR. LOEVY:  Objection to hearsay, Your Honor.  I mean, this is not the witness to be asked about hearing closing statements.

MS. ADEEYO:  Your Honor, counsel has gotten into what has occurred at the trial multiple times in the last three days.  I'm asking this witness, who's already established that she was present, what she heard.

MR. LOEVY:  This is not a witness who can interpret closing statements.

MS. ADEEYO:  Your Honor, may I have a sidebar --

THE COURT:  I think there are better ways to get the closing.

MS. ADEEYO:  Your Honor, may I have a sidebar?

THE COURT:  Yes, let's have a sidebar.

(Proceedings heard at sidebar:)

MR. LOEVY:  We have a transcript of the closings, so there's not going to be a dispute about what it was.  Her interpretation of it or cross-examining her is irrelevant.

Let's talk about it with the state's attorney.

MS. ADEEYO: Your Honor --

THE COURT: What is your point? What are you getting at?

MS. ADEEYO: Sure. Multiple times Ms. Rickert asked this witness about her understanding of the murder occurring on March 9th. I'm trying to elicit from this witness that she was present at the trial, she heard the closings argument that they -- that their theory was that the murder occurred between midnight and 3:00 to establish that she's not -- can't pinpoint specifically where John was. She claims she was asleep. I have a right to cross her on that.

MR. LOEVY: On Thursday afternoon, they're trying to backdoor that there's some kind of proof that he got out at a different time. This is not that witness. She's a fact witness. Why would it be relevant that she heard a closing argument?

MS. ADEEYO: No one's backdooring. Counsel asked questions about her understanding of when the murder occurred. I'm just trying to rebut that.

MR. LOEVY: Well, why don't they just ask her --

THE COURT: So she is saying that to the extent -- she remembers coming home on the 9th and they went to bed --

MS. ADEEYO: Correct.

THE COURT: -- which would put them, according to her,

on the 10th at their apartment, right?

MS. ADEEYO: Correct, and she was asked on direct what did detectives tell her when this murder occurred? She said March 9th. I'm just trying to clarify that she was present at the trial, and she heard that this murder was -- the state's theory was between midnight and 3:00.

MR. LOEVY: Three years later.

THE COURT: So what does it -- why does that matter?

MS. ADEEYO: Your Honor, it's to rebut the testimony that counsel had elicited on direct examination that the murder occurred at 9th, and that was her belief. It shows that it was not. She's aware that there was a different theory.

MR. LOEVY: Three years later. This is at the trial. Her belief in 2006 has no relevance, Your Honor. They're just trying to backdoor --

MS. ADEEYO: Your Honor, we objected that there was no relevance to her beliefs about March 9th either, but you allowed that, so I think it's only appropriate that I'm able to rebut that.

MR. LOEVY: It was relevant when she was speaking to the police what time she thought the murder was in 2003 when he was arrested. It's not relevant what she learned three years later because it doesn't go to anything.

THE COURT: I'll sustain.

We were trying to get two witnesses in this afternoon.

Y. Henderson - cross

1006

How much more do you have?

MS. ADEEYO:  Oh, I'm on my last question, so.

THE COURT:  Okay.

MR. LOEVY:  Your Honor, we'll probably have 15 minutes -- or 10 minutes, and I guess we're not going to be able to start the video, are we?

THE COURT:  What video?

MR. LOEVY:  I mean, the next testimony, next witness's video.  I don't think we're going to be able to.

THE COURT:  I think probably our jury is pretty tired.

MR. LOEVY:  Yeah.  Okay.

THE COURT:  Okay.  Finish up.  I'll sustain.

(Proceedings heard in open court:)

BY MS. ADEEYO:

Q.  Ms. Henderson, we established that you were still dating John Fulton even while he was incarcerated, right?

A.  Correct.

Q.  And do you recall approximately when you two broke up?  Was that around 2006 or 2007, or was that later than that?  Do you recall?

A.  Roughly around '6 or '7.

Q.  But when his criminal trial was occurring, you two were still in a relationship, right?

A.  Correct.

Q.  And I think we established that you testified at his

criminal trial, correct?

A.   Correct.

Q.   And at that time, you didn't want John to go to prison, right?

A.   Say that again?

Q.   When you testified at John's criminal trial, you didn't want him to go to prison, right?

A.   Not for something he didn't do, no.

          MS. ADEEYO:   No further questions, Your Honor.

          THE COURT:   All right.

                    REDIRECT EXAMINATION

BY MS. RICKERT:

Q.   Hi, Ms. Henderson.

A.   Hi.

Q.   Ms. Adeeyo just implied that you have lied about the events of March 9th and 10th and the fact that John Fulton was with you all night.

          Did you lie?

          MS. ADEEYO:   Objection, Your Honor, to that mischaracterization of what I did.   That's inappropriate.

          THE COURT:   Try again.

BY MS. RICKERT:

Q.   All right.   Ms. Adeeyo suggested that you are not telling the truth about March 9th and 10th when you say that John Fulton was with you the entire night.

Are you telling the truth?

MS. ADEEYO:  Objection, Your Honor.  Bolstering.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Yes.

BY MS. RICKERT:

Q.  Would you lie to cover up a murder under any circumstance?

A.  No.

Q.  The apartment at Lake Meadows, was it possible for someone to leave the bedroom without going past where you were sleeping the night of March 9th?

A.  No.  It was only one entrance, one way in, one way out.

Q.  Describe where you were sleeping in relationship to the bedroom.

A.  In the front room.

Q.  How was it oriented?  Was it --

A.  It's a -- it's a small apartment, so it's -- the door, the kitchen, the living room, and then it's a little hallway, and it's the bedroom and the bathroom.  So it's really not a big space, but --

Q.  So would someone have to go past you to leave?

A.  Yes.

Q.  You were asked questions about this guy who was mad at John and calling.

A.  Correct.

Y. Henderson - redirect

1009

Q.   After days went by following the robbery and the calls, did you guys worry about this, about the man who had been calling?

A.   After or that day?

Q.   After, after that day.

A.   No.  We went -- everything was normal to me.

Q.   Four, five weeks later, were you guys thinking about this at all?

A.   No.

Q.   Did this guy have any relevance to your life five weeks later or four weeks later?

A.   No.

Q.   I want to talk about the hospital again.

     So you don't recall John Fulton's exact words when he left the hospital; is that right?

A.   I don't recall if he said he was bored or not.

Q.   And he wasn't gone for very long from the hospital, was he?

A.   He wasn't.

Q.   He came back.

A.   Yes.

Q.   And was that because you called him?

A.   Correct.

Q.   And when he left the hospital, did he tell you he would pick you up when you called?

A.   Say it again?  I'm sorry.

Q.   When he left the hospital, did he tell you that he would

Y. Henderson - redirect

1010

pick you up when you called?

A.  Yes.

Q.  And did he tell you that it had to be, like, by any particular time?

A.  No time frame.

Q.  So he was going to pick you up whenever you called?

A.  Correct.

Q.  You were asked questions about your trial testimony where you said you called the detectives to give them the correct date of the hospital visit.  Do you remember that testimony that Ms. Adeeyo had you read from the trial?

A.  If I called them, it's because they tried to give me the wrong date from -- initially from the March 9th date.

Q.  And so you were calling them to give them the correct date?

A.  Correct date.

Q.  And what was the correct date?

A.  The 9th into the 10th.

Q.  You were asked about your recollection whether John Fulton was handcuffed, right?

A.  Say that again?  I'm sorry.

Q.  Do you remember a little bit ago Ms. Adeeyo asked you about your recollection that John Fulton got handcuffed when he was arrested?

A.  Correct.

Q.  So are you doing your best, as you sit here --

A.   I'm trying to remember as much as I can as far as minor --
those details, like.  I know for a fact March 9th, he was with
me.  I know I dropped him off at school.  I know I picked him
up.  I know I went to Jiffy Lube.  Certain dates and time
frames, am I going to be on point with it?  No.  I'm -- that's
22 years ago.  I'm not going to remember every exact thing.

Q.   Do you remember the important stuff?

A.   I remember the important stuff because I know for a fact
that this man was with me when I was sick.

Q.   If there's video of Mr. Fulton being taken away in
handcuffs, would you trust that video over your memory?

A.   He was handcuffed because the coat was over his -- over
him.

Q.   And Ms. Adeeyo also asked you if you remember there being a
security guard when John got arrested?

A.   I don't remember a guard.  I just remember plain clothes
coming in with flashlights.

Q.   And so you don't remember a security guard being there, but
you do remember that there were security guards at the
building, right?

A.   There are guards at the building, yes.

Q.   Okay.  I want to talk now, final thing just about, the
issues that were discussed between John and Cam'ron after
John's release.

     Did John provide financially for Cam'ron until he was

18?

A.   Correct.

Q.   And when Cam'ron turned 18, John didn't give you any money anymore; is that right?

A.   No, he didn't.

Q.   And there was talk about Cam being cut off.  Did John Fulton never give Cam'ron money again?

A.   I can't speak on that because, like I said, Cam'ron was 18, and he had whatever relationship he had with his father.  So I don't know what he did outside of what I know.

Q.   At some point after Cam'ron's graduation, did you hear that John had given him some money?

A.   He did give him some money after the graduation.  That was -- I don't want to say around graduation, but kind of a little bit after.

Q.   But probably while Cam'ron was still 18?

A.   Yeah.

Q.   It was not a little bit of money, right?  Do you remember how much it was?

          MS. ADEEYO:  Objection, leading.

          MS. RICKERT:  All right.  Let me strike that.

          THE COURT:  The second question is okay.

          MS. RICKERT:  I withdraw it.

BY MS. RICKERT:

Q.   Ms. Henderson, do you remember how much money John Fulton

gave Cam'ron?

A. I want to say roughly 10,000 maybe.

Q. Okay.

MS. RICKERT: Can I have just one moment?

THE COURT: Yeah.

(Counsel conferring.)

BY MS. RICKERT:

Q. Did you -- you said you believed that John gave Cam'ron around about $10,000 sometime after his graduation.

Did you think it was appropriate for John to give Cam'ron that much money?

MS. ADEEYO: Objection, form; relevance.

MS. RICKERT: There was a lot on cross about whether John Fulton was supporting Cam'ron and to what degree and whether he cut him off and whether --

THE COURT: But her opinion of whether it was appropriate --

MS. RICKERT: Okay.

BY MS. RICKERT:

Q. Did you have any conflict with John Fulton over this money?

A. I did.

MR. LOEVY: Explain.

BY MS. RICKERT:

Q. Can you explain that?

A. I believe I said it before, that he kind of -- I used the

term I think manipulate or something like that. Well, John was trying to pull Cam'ron back in to talk, and I guess he didn't really know how to go about reconnecting with his son, so just like kids like candy, kids love money, too.

So give him a little money, he'll come around. So gave him a little money, and now John adjusting to society is learning to be a parent, but he was really being a friend to him and not the parent, so that's what my dismays came in with.

Q. And --

A. Have a conversation that don't include the money. Get the conversation first, and then whatever you do after that is fine, but have a conversation first so it's not all about money.

Q. And you were also asked about an argument between John or a disagreement, an issue between John and Cam'ron that related to someone that Cam'ron might have been dating. You know, you said that you didn't really know about this firsthand; is that right?

A. I can't speak on it 'cause it was pretty much hearsay. Like I said, that's something that happened between them two, and I don't know the exact detail, but I do know of some nature that it had something to do with him dating or messing around with somebody.

Q. And do you know how long that argument lasted or that dispute?

Y. Henderson - redirect

1015

A.   Could have been over six months, could have been a year. At that time, I'm really focusing on work, trying to take care of household.

Q.   I'm sorry, didn't mean to cut you off.

A.   So I was really trying to focus on working and take care of household, so I can't really tell you how long that it was that they didn't speak.  Could have been a year, could have been less than a year.

Q.   Have they made up?

A.   Yeah, they definitely made up.

Q.   And did John ever actually disown his son?

A.   Disown might have been thrown out again because, like I said, I didn't know the terms or how to express myself, so it was like disown was the first thing I probably it threw out. But no, John didn't disown his son.  John love his son very much, and after his whole fight --

Q.   What do you mean his fight?

A.   His whole fight trying to get home to his son, so he didn't disown his son.

Q.   And at the time you gave that deposition testimony, were you frustrated with John?

A.   At the time, yeah.

Q.   Can you explain in your own words sort of the ebb and flow of John's relationship with his son since his release?

Have there been ups and downs?

Y. Henderson - redirect

1016

A.   No -- no relationship is perfect.  I've said that once before.  Even my parenting skill is not perfect, you know.  If Cam'ron not happy with me, he's going to go to his dad's house.  If he's not happy with his dad, he's going to go wherever he going to go.

     It's no way to explain parenting skill.  We learn as we go.  You know what I'm saying?  So everyone is learning.  We were young, I was young, he was young, we're learning.  We're both learning.

Q.   So is it fair to say that it hasn't all been easy?

A.   It has not been easy, no.

Q.   Is it -- from your perspective from what you've seen, is John damaged by what happened to him by his imprisonment?

     MS. ADEEYO:  Object to form.

     THE COURT:  Overruled.

     MS. ADEEYO:  It's also outside the scope.

     MS. RICKERT:  I'm almost done.

     I'm sorry --

     THE COURT:  She can answer.  She may answer.

     THE WITNESS:  Oh, I'm sorry, I didn't know if I could answer or not.

     Repeat the question for me?  I'm sorry.

BY MS. RICKERT:

Q.   From your perspective from what you've observed yourself, was John damaged by his conviction and incarceration, his long

Y. Henderson - redirect

1017

incarceration?

A.   Yes.

Q.   What have you seen to make you say that?

        MS. ADEEYO:   Objection, Your Honor, outside the scope.

        MS. RICKERT:   That's fine.

        THE COURT:   Sustained.   Let's wrap it up.

        MS. RICKERT:   I'll wrap it up.

BY MS. RICKERT:

Q.   From what you can see, is John Fulton doing his best?

A.   He's doing his best.

        MS. ADEEYO:   Objection, Your Honor.   Outside the scope.

        THE COURT:   I don't know if it was or wasn't.

        MS. RICKERT:   Can I just ask one final question?

        THE COURT:   Yes.

BY MS. RICKERT:

Q.   Okay.   From your perspective, Ms. Henderson, is John Fulton trying hard?

A.   To be a great father, yes.   To be a friend, yes.   To be supportive, yes.   To be there emotionally, yes.   He's trying.

        MS. RICKERT:   Thank you so much, Ms. Henderson.

        THE COURT:   All right.   You may -- you are excused. Thank you for your testimony.

        THE WITNESS:   Thank you.

     (Witness excused.)

1018

THE COURT: All right. We'll recess for the day, and this is Thursday, so we won't be holding court tomorrow, and then Monday is a federal holiday, so the next day would be Tuesday, the -- whatever the date that is. You know what it is.

THE CLERK: 18th.

THE COURT: Thank you for your patience and continued attention to the case. You're excused.

THE CLERK: All rise.

(Jury out at 4:55 p.m.)

THE COURT: All right, so where are we?

MR. LOEVY: The only thing I can think of to say, Your Honor, is we're slower than we had all hoped. I, from the plaintiffs' side, am going to be reaching out to them to try to make deals to shorten things, maybe cut witnesses mutually, maybe stipulate.

THE COURT: Okay. Let's go off the record.

MR. LOEVY: Yeah.

THE COURT: May I excuse our reporter?

MR. LOEVY: Sure.

(Off the record.)

(Adjourned at 4:55 p.m., until 2/18/25 at 9:00 a.m.)

                    *   *   *   *   *

1019

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Kathleen M. Fennell*

*/s/ Jennifer Costales*

*/s/ Colleen M. Conway*                    February 14, 2025
                                                    Date

Official Court Reporters
United States District Court
Northern District of Illinois
Eastern Division

1020

I N D E X

WITNESSES                                              PAGE

RICHARD ANGELO LEO

Direct Examination (Resumed) By Mr. Ainsworth          737
Cross-Examination By Mr. Nathan                        786
Redirect Examination By Mr. Ainsworth                  884

YOLANDA HENDERSON

Direct Examination By Ms. Rickert                      911
Cross-Examination  By Ms. Adeeyo                        966
Redirect Examination By Ms. Rickert                   1007


PLAINTIFFS' EXHIBIT                                RECEIVED

No. 61                                                 930
No. 74                                                 928
No. 80                                                 937