1021

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
JOHN FULTON,                        )  Case No. 20 C 3118
                                    )
              Plaintiff,            )
       v.                           )
                                    )
ROBERT BARTIK, et al.,              )
                                    )
              Defendants.           )
-----------------------------      )
ANTHONY MITCHELL,                   )  Case No. 20 C 3119
                                    )
              Plaintiff,            )
       v.                           )
                                    )
ROBERT BARTIK, et al.,              )  Chicago, Illinois
                                    )  February 18, 2025
              Defendants.           )  9:25 a.m.
```

VOLUME 5
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Plaintiffs:      LOEVY & LOEVY
                         BY:  MR. JONATHAN I. LOEVY
                              MR. RUSSELL R. AINSWORTH
                              MS. JULIA T. RICKERT
                              MS. FATIMA LADHA
                              MR. ISAAC GREEN
                         311 N. Aberdeen Street, 3rd Floor
                         Chicago, Illinois  60607

                         LYON & KERR, PLLC
                         BY:  MS. ANDREA D. LYON
                         53 W. Jackson Boulevard, Suite 1650
                         Chicago, Illinois  60604

For Defendant Officers:  NATHAN & KAMIONSKI, LLP
                         BY:  MR. SHNEUR Z. NATHAN
                              MR. AVI T. KAMIONSKI
                              MS. BREANA L. BRILL
                              MR. JOHN M. CERNEY
                              MS. NATALIE ADEEYO
                         206 S. Jefferson Street
                         Chicago, Illinois  60661

1022

APPEARANCES  (Continued):

For Defendant City:          MICHAEL BEST & FRIEDRICH, LLP
                             BY:  MR. JAMES P. FIEWEGER
                             444 W. Lake Street, Suite 3200
                             Chicago, Illinois  60606

Court Reporter:              KATHLEEN M. FENNELL, CSR, RMR, FCRR
                             Official Court Reporter
                             219 South Dearborn Street, Room 2328A
                             Chicago, Illinois  60604
                             Telephone:  (312) 435-5569
                             Kathleen_Fennell@ilnd.uscourts.gov

                       *   *   *   *   *

                 PROCEEDINGS REPORTED BY STENOTYPE
       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE CLERK: 20 C 3118, Fulton v. Bartik and 20 C 3119, Mitchell v. Bartik.

THE COURT: Good morning.

MR. AINSWORTH: Good morning, Your Honor. Same appearances for plaintiffs.

MR. NATHAN: Good morning, Your Honor. Same appearances for defendants.

THE COURT: All right. I just what wanted to check if you have any preliminaries. I think at least -- last I checked, we had one juror missing.

MR. LOEVY: We're going to start with the video this morning and play Johnitta Griffin if we're hooked up for that.

THE COURT: Okay.

MR. LOEVY: She'll testify by deposition.

MS. ADEEYO: And, Your Honor, one matter we wanted to bring to your attention. We filed a motion seeking to admit her trial testimony designations.

THE COURT: Right.

MS. ADEEYO: And I don't believe the Court ruled on that order. It's our position that the reading of those -- that trial testimony should follow the video deposition.

MR. LOEVY: We have a response prepared, Your Honor.

THE COURT: All right. Well, I think --

MR. AINSWORTH: And that would be part of their case.

1024

THE COURT: What I worked through in my mind last week when this came up was that the defendants had the opportunity to use Ms. Griffin's trial testimony when they took the deposition and, in fact, did.

MS. ADEEYO: Yes.

THE COURT: That they might have asked additional questions is unfortunate, but it would be unfair to put those statements in the record without giving the plaintiffs the opportunity to respond.

MS. ADEEYO: Well, Your Honor, then we ask that in our case-in-chief we be able to admit that trial testimony, and plaintiffs can cross-designate it. She was crossed at the criminal trial, so obviously there's testimony that's advantageous to them.

We think it's appropriate though considering her deposition testimony, where she gave a lot of "I don't knows" and "I don't recalls" to my questions regarding her prior testimony that it be read in for the jury.

MR. LOEVY: No, Your Honor. That would be cumulative and redundant just to call the same witness again twice just because of the fortuity that she's not available.

THE COURT: Yeah, I mean, I just --

MS. ADEEYO: Well, that's why I wanted to follow --

THE COURT: I think under the law, I think it's not admissible at this point.

1025

MR. LOEVY: All right.

MS. ADEEYO: Your Honor, just to make our record, it is admissible under 804. I mean, she's unavailable. She could not recall the subject matters.

THE COURT: Okay. I mean, we've made all these -- you made your record.

I do want to confess error on one ruling, which I don't think matters particularly, but you were saying, Ms. Adeeyo, that when the witness is on cross and says she doesn't recall that she can be impeached with her prior testimony where she admitted it, so as we go forward, I will allow that.

MR. LOEVY: Thank you, Your Honor.

MS. ADEEYO: Yes, Your Honor.

THE COURT: Okay. Then I think if the jury's here, we're ready.

MR. NATHAN: Your Honor?

THE COURT: Yes.

MR. NATHAN: Yesterday plaintiffs filed a memorandum on the 48-hour issue.

THE COURT: I heard about that. I haven't read it.

MR. NATHAN: I just wanted to -- it's not linked on the docket to our prior motion, but in my mind, I just wanted to remind Your Honor that we had filed a motion to enforce this Court's prior ruling as to the 48-hour issue. That's been on

the docket. And we interpret this as being a response to that, although it's not -- it's not docketed that way. So I just wanted to connect those two things for Your Honor.

THE COURT: All right. Do you have anything more to say about it, that you would like to file something, I mean?

MR. NATHAN: We don't need to file something additional. Our interpretation is that they are saying it's relevant to punitive damages. That's precisely the point that we already filed. We said it was -- it was not a claim in the case. We didn't have time to do discovery on it. It shouldn't be coming in because of that. So it's the same arguments we've been making.

MR. LOEVY: Your Honor, our recollection of the ruling was we're going to say, hey, you can't hold people more than 48 hours. We're not going to talk about it being a law or unconstitutional and that he's presumably not going to deny that, or that would open the door to why you can't.

I think that's all we need to elicit at this time. Our filing, which you haven't seen yet, proposes an instruction and a limiting instruction, so you'll have a chance to review our position on it.

THE COURT: All right. Well, I can defer this for a while at least.

MR. LOEVY: Sounds like it.

THE COURT: Okay.

1027

MR. NATHAN: I just want to make clear if -- they are planning to call Detective Zalatoris this afternoon, and it shouldn't come up unless it's been ruled upon.

MR. LOEVY: Well, what is going to come up is we're going to say you know you can't do that.

THE COURT: Right, and I think that's within my ruling.

I'll review it.

MR. NATHAN: We made a record. I don't think it's appropriate for them to be saying you can't based on some vague standard. It's --

MR. LOEVY: I'd be happy to be specific.

MR. NATHAN: One second. The ruling was that -- was that he was held from a certain time to another time.

MR. LOEVY: No, that was the argument. Mr. Nathan said he should only be allowed to say he was held a long time. And we said, no, that's half of it. The other half is you can't do that.

THE COURT: We're ready.

MR. LOEVY: Thank you.

THE CLERK: All rise.

(Jury in at 9:31 a.m.)

THE COURT: You may be seated.

Good morning, ladies and gentlemen of the jury. Thank you for coming out so kindly on this very, very cold day.

Case: 1:20-cv-03118 Document #: 493 Filed: 03/14/25 Page 8 of 244 PageID #:26731
Griffin - video deposition
1028

We will be as efficient as possible and continue the presentation by the plaintiffs.

MR. AINSWORTH: Thank you, Your Honor.

At this time, plaintiffs call Johnitta Griffin via video deposition.

THE COURT: All right.

(Video played in open court.)

MR. NATHAN: Objection. Objection.

MS. ADEEYO: Your Honor, based on your rulings to the designations, the testimony that just came out was sustained, and we asked for it to be barred regarding that witness's beliefs as who committed Collazo's murder.

THE COURT: Is that an error?

MR. LOEVY: Well, her surprise would be relevant, but obviously you've already ruled, so if the mistake was on our video editing end, we apologize. I don't know if we can get to the bottom of it right now.

THE COURT: All right. Well, check it out and we can have an instruction later if needed. Let's go forward.

(Video played in open court.)

MS. ADEEYO: Objection, Your Honor. This violates your ruling.

(Video played in open court.)

MS. ADEEYO: Your Honor, we ask that --

THE COURT: Excuse me. One second.

Case: 1:20-cv-03118 Document #: 493 Filed: 03/14/25 Page 9 of 244 PageID #:26732
Griffin - video deposition
1029

Did someone object?

MS. ADEEYO:  Yes, Your Honor, I did.  I'm objecting because they're playing a portion -- can I have a sidebar, Your Honor?

THE COURT:  Yes.

(Proceedings heard at sidebar:)

MS. ADEEYO:  Your Honor, this is the second time now that plaintiffs are playing a portion of Johnitta Griffin's deposition that we objected to that testimony should be barred, and you sustained our objections.

MR. LOEVY:  Your Honor, they were wrong the first time, and Mr. Green can explain, please.

MR. GREEN:  Your Honor, on page 4 of your rulings, we designated when Juanita Griffin was asked whether she believed that John Fulton committed the murder, we designated her response, which was on page 24, line 2 of the transcript.

They objected to page 24 starting at line 3 of the transcript.  We did not respond to that, and you sustained their objection.  They did not object to 24, line 2, which was her response, no, she did not believe that John Fulton committed the murder, and Your Honor --

MS. ADEEYO:  Your Honor, that's patently false.  If we take a look at what you provided to each side, lines 24, 2 through 18, we objected on 402 and 403.  Plaintiffs did not respond to our objections, and you sustained it.

Case: 1:20-cv-03118 Document #: 493 Filed: 03/14/25 Page 10 of 244 PageID #:26733
Griffin - video deposition
1030

MR. GREEN: Your Honor, they only objected to line 3 through 16. They did not object --

MR. LOEVY: Says it on the piece of paper.

MS. ADEEYO: Your Honor, I'm taking a look at your ruling.

MR. GREEN: Your Honor, they did not object to our designation of 24, line 2.

MS. ADEEYO: Your Honor, your ruling says it's out. We believe it. Counsel should follow your ruling.

MR. GREEN: Your Honor --

THE COURT: Well --

MR. GREEN: -- we did follow the letter of your ruling. We had no way of knowing --

MR. LOEVY: Let's go to the other one, too, I guess.

THE COURT: I can only -- I'll look it up, but if you didn't object, oppose --

MS. ADEEYO: Your Honor, we're going to stand on our position that you sustained that, but for the next one, page 5 of your rulings, starting at page 34, line 1 of her deposition testimony, we objected saying it calls for speculation and lack of foundation. Plaintiffs did not provide a response to our objection, and so you sustained it.

THE COURT: Okay.

MS. ADEEYO: And multiple portions of that page are sustained. So, I mean, based on what I heard, none of that has

Case: 1:20-cv-03118 Document #: 493 Filed: 03/14/25 Page 11 of 244 PageID #:26734
Griffin - video deposition
1031

been taken out of the video.

THE COURT: All right. Is that correct?

MR. LOEVY: May we have a moment, Your Honor?

THE COURT: Yes.

(Counsel conferring.)

MS. LADHA: Your Honor, as to lines 3 to 9 on page 34, defendants are correct that we did not respond to that. That was the testimony that plaintiffs were objecting to -- or defendants were objecting to?

MS. ADEEYO: Your Honor, it starts at page 34, line 1.

MS. LADHA: Well --

MS. ADEEYO: Where -- excuse me, where you sustained that objection. It starts at 1 and it goes all the way through 13 on page 34, looking at your ruling.

MS. LADHA: Your Honor, those seem to be defendants' designations. We -- they just objected to -- but we added "did you" --

MR. LOEVY: That was their designation.

MS. LADHA: We added "did you" on line 1. They objected. We inadvertently did not respond, so that part of the statement did not come in, but "Do you recall the name Jake Rubinstein," the answer "No," that is their designation, not ours.

MR. LOEVY: They designated it.

MS. ADEEYO: Right, Your Honor. The point I'm

Case: 1:20-cv-03118 Document #: 493 Filed: 03/14/25 Page 12 of 244 PageID #:26735
Griffin - video deposition
1032

bringing this up is 1 through 13 is out.  Yes, a part of that was what we designated.  They objected.

MS. LADHA:  Well --

MS. ADEEYO:  You sustained it.

Similarly, the next lines --

MS. LADHA:  We didn't get there.

MS. ADEEYO:  -- we objected and you sustained.

MS. LADHA:  We haven't gotten there, Your Honor.

MS. ADEEYO:  And the problem now is, Your Honor, they're playing portions that you've already ruled upon --

MS. LADHA:  I just want to clarify --

MS. ADEEYO:  -- and sustained, which is inappropriate.

MS. LADHA:  That's incorrect, Your Honor.  The part that was played was lines 1 to 2 on that page.  Those were their designations.  We did not respond to portion "Did you" on line 1 at page 34.  Your Honor sustained their objection because we did not respond.  That part did not come in.

Ms. Adeeyo objected after lines 1 and 2 were played, which is -- which was their designation.  We haven't even gotten to the rest of the --

MS. ADEEYO:  Your Honor, I heard 3 through 9.  I have made my objection, but --

THE COURT:  Hold on, hold on.

I think the thing to do is to take a little break and you guys doublecheck what is going on.  You're not -- I don't

Griffin - video deposition

1033

know, are you in a position to --

MR. LOEVY: Your Honor, this testimony is about Rubinstein, the state's attorney. It's not even, like, what are we talking about, why do we care?

MS. ADEEYO: Well, Your Honor, we care because if you make a ruling, it's under our understanding we should follow it. And I know that hasn't been happening a lot throughout this trial, but once again, you've made a ruling, and it's not being abided by. 3 through 9 should be out.

THE COURT: Well, if you designated it, then obviously I made a mistake by --

MS. LADHA: Well, we didn't designate it.

THE COURT: -- by taking it out and it wasn't objected to. So I don't know what we're talking about, but that maybe just -- the only thing I can think of is either stop and take a bunch of time, or you can check this out later and we'll check it out and then if there's things -- portions to strike, I can strike them at some point.

So let's do that to keep going.

MS. LADHA: Yes.

THE COURT: All right.

(Proceedings heard in open court:)

(Video played in open court.)

MS. ADEEYO: Objection, Your Honor, for the third time now, this is testimony that we moved to bar and you sustained.

THE COURT: All right.

MR. LOEVY: Your Honor, they were wrong the first two times, so she keeps saying that.

MS. ADEEYO: Your Honor, that's incorrect.

THE COURT: We'll proceed and deal with it later.

(Video played in open court.)

MR. LOEVY: It's stuck.

(Video played in open court.)

THE COURT: Could you stop?

MR. LOEVY: Stop.

THE COURT: Thank you.

All right. Let's take a recess. 15 minutes.

(Jury out at 10:59 a.m.)

MR. LOEVY: There is 24 minutes in the video, Your Honor.

We did -- did we tender to the Court our --

THE COURT: 24 minutes left?

MR. LOEVY: In the video.

In front of you, that piece of paper there.

THE COURT: Yes.

MR. LOEVY: We have shown a copy to defense counsel, too. In our view, they inappropriately objected three times that the video was wrong, and as we've annotated on that piece of paper, actually they were right. So we've asked you to give that two-sentence instruction that, you know, the objections

Case: 1:20-cv-03118 Document #: 493 Filed: 03/14/25 Page 15 of 244 PageID #:26738
Griffin - video deposition
1035

were misplaced.

You know, from our side obviously, we apologize that -- well, I think both sides should have hammered it out, but, you know, here we are.  But the objections were not -- were not correct.

THE COURT:  Well, we'll take -- okay.

MS. ADEEYO:  Your Honor --

THE COURT:  Have you looked at it?

MS. ADEEYO:  Yeah, if I can respond to that.

My objections were based on the Court's ruling.  I recall last week the Court tendered a Word document copy of its rulings, and also it was put on the docket.

Based on the Court's rulings and what the Court sustained, those were my objections.

MS. LADHA:  That's incorrect, Your Honor.  So as we laid it out in this instruction here, the first objection they made was as to Ms. Griffin's response on page 24 at line 2, but they had only objected starting on line 3 of that page.

That was never played.  And Your Honor had sustained their objection.  None of that -- none of the portions that Your Honor had sustained the objections to on that page were actually played.

Then they interrupted a second time on page 34. They -- Ms. Griffin responded -- or the testimony was played on lines 1 to 2.  Defendants had only objected to the phrase "did

Case: 1:20-cv-03118 Document #: 493 Filed: 03/14/25 Page 16 of 244 PageID #:26739
Griffin - video deposition
1036

you," in fact, that designation was theirs. They objected to the phrase "did you" on line 1 of page 34. The Court upheld that objection, and it wasn't played before the jury, and the Court did sustain the defendants' objections on page 34, starting on lines 3 to 9 and then again at 12 to 13. Those lines were never played before the jury.

And then the third time they interrupted was on page 38, the Court only upheld the defendants' objections starting on page -- on line 14, excuse me, not as to lines 11 to 13, and that was what was played to the jury.

But the problem is that Ms. Adeeyo said this is the third time that plaintiffs have incorrectly -- or violated the Court's rulings, and that's just not what happened, and it really prejudices the plaintiffs for the jury to have heard that.

MS. ADEEYO: Your Honor, this instruction is not necessary. My objections were made based on the Court's rulings. I'm going to stand on those objections. There were portions that were inappropriately played.

After I gave my third objection and Your Honor stated that we'll address it there after the fact, I did not object to the fact that they played -- excuse me -- that they played portions of the video, pages 39 through 41, that we objected to, which Your Honor also sustained per your instructions.

So I don't believe this is necessary. The jury ended

Case: 1:20-cv-03118 Document #: 493 Filed: 03/14/25 Page 17 of 244 PageID #:26740
Griffin - video deposition
1037

up hearing it anyway despite our objections, and so I don't believe this instruction needs to be read to them.

THE COURT: All right. Well, I'll have to check this out. If I excluded something that no one objected to, then I would say that's harmless. If -- so, let's see, 39 to 41, what was the response to that?

MS. ADEEYO: For 39 through 41, Your Honor, that's approximately two to three pages of testimony. By that point, Your Honor, you said we'd deal with this after the fact.

THE COURT: Okay.

MS. ADEEYO: And so I did not object at that time, but that was --

THE COURT: You had objected to these pages?

MS. ADEEYO: No, I had not objected to those at that time, although it was sustained. Per Your Honor's instruction, it was something that we would deal with after the fact.

THE COURT: Okay. So I'll have to check that.

MS. LADHA: Your Honor, they only objected to portions of those pages. They objected to page 39, lines 18 -- is that right? Sorry, let me --

MR. LOEVY: No, it looks like that's excised.

MS. LADHA: Oh, yes.

MR. LOEVY: So that appears to be where the disconnect was, Your Honor. It looks like this was edited based on the objections instead of objections sustained, and what was

Griffin - video deposition

1038

played, I'm looking at the transcript, is the part -- the part that they didn't object to got played, and, you know, it was like what was the State's Attorney Rubinstein -- you know, this was not controversial stuff.

So if I was to make sense of it, I think that's what happened is that we edited based on what they objected to if you sustained it, and it's possible if I'm inferring that maybe your order said a broader range including stuff that wasn't objected to. That's probably what happened.

THE COURT: All right.

MS. ADEEYO: Correct, Your Honor, and I was going based on your rulings.

THE COURT: Okay.

MR. LOEVY: So that's why the two sides approached it differently. We should have exchanged it and gotten on the same page, and I apologize for imposing that on you.

MS. ADEEYO: And we didn't have a copy of this video beforehand to be able to take a look at it and be able to make sure that it was, you know, to our satisfaction as well before it being played to the jury, and that's might have caused a lot of these issues --

MR. LOEVY: That's on both sides though.

MS. ADEEYO: -- as well.

MR. LOEVY: That's on both sides because you guys could have asked for it, and we should have given it to you.

We're all learning as we go here.

THE COURT: Okay. So maybe I could say the parties have conferred about the objections, and you may consider all the testimony you heard on the video.

MR. LOEVY: I guess that's sort of a middle ground without saying the objections were properly/improperly overruled.

MS. ADEEYO: That's fine, Your Honor.

MR. LOEVY: Thank you, Your Honor.

THE COURT: Okay. Now, if I forget when I come back, remind me.

MR. LOEVY: Your Honor, if we have 24 minutes, we have a witness next that's going to be a short witness. I don't know if you wanted to get to her before lunch or after.

What time did we tell the jury we're coming back?

THE COURT: Well, I have a committee meeting at 12:00, so if we could finish at 12:00, that would be great.

MR. LOEVY: We'll probably start, I don't want to waste the time, if it's okay with you, to start the witness then. So after the video, we'll start a witness?

THE COURT: Yes.

MR. LOEVY: Thank you.

THE COURT: Okay.

(Recess at 11:06 a.m., until 11:18 a.m.)

THE CLERK: Court resumes in session.

Griffin - video deposition

1040

(Jury enters at 11:19 a.m.)

THE COURT:  Be seated.

MR. LOEVY:  Should we proceed, Your Honor?

THE COURT:  Go ahead.

(Video played in open court.)

MR. LOEVY:  I guess that got cut off.  Do you have the transcript to read it?

That concludes the deposition, Your Honor.  That concludes the deposition.

THE COURT:  That concludes?

MR. LOEVY:  Yes.

THE COURT:  All right.  Let me just tell you that over the break, the parties conferred about the objections that the defense made to some of the statements in the video deposition of Ms. Griffin.  You may consider everything in the video.

All right.  Next witness.

MS. RICKERT:  Plaintiffs call Laverne Henderson.

THE COURT:  Good morning, ma'am.

THE WITNESS:  Good morning.

THE COURT:  Before you sit down, would you raise your right hand to be sworn?

(Witness sworn.)

THE COURT:  You may be seated.

Go ahead.

LAVERNE HENDERSON, PLAINTIFFS' WITNESS, SWORN,

DIRECT EXAMINATION

BY MS. RICKERT:

Q.   Good morning, Mrs. Henderson.

A.   Good morning.

Q.   Thank you so much for being here.  Could you state and spell your name for the record?

A.   My name is Laverne Henderson.  First name spelled L-a-v-e-r-n-e, last name spelled H-e-n-d-e-r-s-o-n.

Q.   And Mrs. Henderson, you know the plaintiffs in this case, John Fulton and Anthony Mitchell; correct?

A.   Yes, I do.

Q.   And my understanding is that you met Anthony Mitchell after John and Anthony were released from prison; is that right?

A.   Yes.

Q.   But John you've known much longer?

A.   Yes.

Q.   How long have you known John Fulton?

A.   I've known him since 2001 until now.

Q.   Going on 25 years?

A.   Yes.

Q.   And you're here today to talk about John; right?

A.   Yes.

Q.   Let's talk about your background a little bit first.  Are you a Chicago native?

A.   Yes, I am.

Q. Where did you grow up?

A. I'm sorry, can you repeat that? My hearing aid went out on me.

Q. I apologize. I'll try to speak up. Where in Chicago did you grow up?

A. I grew up in Chicago, Illinois.

Q. What part of the city?

A. City of Chicago.

Q. Okay. Tell me a little bit about your family. Are you married?

A. Yes, I am.

Q. And how long have you been married?

A. I've been married 41 years. Next month will be 42.

Q. Do you have any children?

A. Yes, two, two daughters.

Q. What are their names?

A. Yolanda Henderson's the oldest and Belinda Henderson is my baby.

Q. All right. And since you got married and had kids, have you been primarily a homemaker?

A. Yes.

Q. When you did work outside the home, what did you do?

A. I took care of senior citizens, like home care for senior citizens, help them bathe, go shopping, you know, and do whatever else they need me to do for them.

Q.   All right.   And does Mr. Henderson still work outside the home?

A.   Yes, he does.

Q.   What does he do?

A.   He works at O'Hare.  He's like cater to the airline.  So he's been out there about 20-some years, 20-plus years.

Q.   Okay.  So now I want to talk about the beginning of your relationship with John Fulton.  How did you meet John Fulton?

A.   I met him through my daughter when she first met John Fulton.  She brought him home to the house to meet us.

Q.   And were they dating?

A.   Yes, they were dating.

Q.   And I think you said this is 2001?

A.   Yes.

Q.   What did you think about John?

A.   Oh, John is a nice young man.  I took to him soon as we met him.  It was just something about John.  Yeah.

Q.   And did you get to know him pretty well?

A.   Oh, yes.  Very well.

Q.   Did you become close?

A.   I'm sorry, can you repeat that?

Q.   Did you become close to John Fulton?

A.   Very close, yes.

Q.   What kind of role did he have in your life at that time?

A.   John is like a son to me, a son that I never had, that God

blessed me with.  I had two miscarriages and they both were boys.  I said, "Lord, I know one day you'll bless me with a son."  And that was John.

Q.   And when you knew John back in 2001, 2002, 2003, prior to his arrest, was he involved in a street gang?

A.   No.

Q.   You're confident of that?

A.   I'm sorry, can you repeat --

Q.   You're very confident of that?

A.   Very.

Q.   John and your daughter Yolanda were dating, and sometime after they'd been dating for a while, Yolanda became pregnant; is that right?

A.   Yes, she had.

Q.   How did you find out that Yolanda was pregnant?

A.   Well, Yolanda was very afraid to come to me, so John is the one that came to me and we sat down at the table and talked, so.  He was -- I guess was letting me know that Yolanda --

            MS. ADEEYO:  Objection, Your Honor.  Relevance.

            MS. RICKERT:  Context of their relationship.

            THE COURT:  Overruled.

BY MS. RICKERT:

Q.   You can go on.

A.   She was afraid to come to me and talk to me, so John came, you know, and spoke with me, and then soon later, they both

came and we all sat down and we talked.

Q. Did you -- please go ahead.

A. And John pretty much said, you know, "I'm there for Yolanda, whatever choice she decide. Whether she want to keep the baby or not, I'm there for her. I'm going to support her." And I really admire that in John.

Q. And did he stand by her?

A. Yes, most definitely, he stood by my daughter.

Q. Okay. And your grandson then was born in September of 2002; right?

A. Yes.

Q. And what's his name?

A. His name is Cam'Ron Fulton.

Q. Was John an active father to Cam'Ron?

A. Oh, yes. He was there even when Yolanda -- when it was time for her to take the sonogram, the sex of the baby, he was there. Yeah, he was there at the hospital, there at the appointments, yeah.

Q. From your perspective, did it seem like John was a proud father?

A. Oh, yes. Most definitely.

Q. So around this time, did you get to know John Fulton's family as well?

A. Yes.

Q. Who did you get to know from John's family?

A.   I got to know Ms. Lucas.  She's a very nice lady.  And I can't recall the day we was introduced to each other, but I know I met her and she just -- you know, we took to each other. She was just so nice to me.

Q.   And Ms. Lucas, that's John's grandmother; right?

A.   John's grandmother, yes.

Q.   And what -- was John close to his grandmother?

A.   Oh, yes, very much.  He's very close to his grandma.

Q.   What did you know about John's mother?

A.   John's mother, she told me how John's mother, how she died, you know, and -- and John never got to know his mom.  So I think a few days after John was born, I think she told me that's when she died.

Q.   Ms. Lucas told you about this?

A.   Ms. Lucas was telling me about that.

        MS. ADEEYO:  Objection.  Relevance, Your Honor.

        MS. RICKERT:  Moving on.

        THE COURT:  Okay.  Let's go on.

        MS. RICKERT:  Sure.

BY MS. RICKERT:

Q.   So did you form a friendship with Ms. Lucas?

A.   Yes, I have.

        MS. ADEEYO:  Objection.  Relevance, Your Honor.

        THE WITNESS:  More than a friendship.  We became family.

THE COURT:  All right.  There's a point to this?

MS. RICKERT:  Yes.

THE COURT:  Go ahead.

BY MS. RICKERT:

Q.  So in 2003, in March of 2003, John was arrested; right?

A.  Yes.

Q.  How did you learn that John had been arrested?

A.  My daughter called me.

Q.  This is Yolanda?

A.  Yes, Yolanda called me and she told me that John was in jail, got arrested.  I mean, she didn't say "arrested," but he was in jail.

Q.  And what did you say to Yolanda at that point?

A.  Well, she -- after she called me, she did come to my house and she was telling me that John's not there, he's in jail, she don't know how long he's going to be there.  So I just told her, you know, come on back home.

Q.  And did you have any idea at that point why John had been arrested?

A.  No.

Q.  Were you confused?

A.  I'm sorry?

Q.  Were you confused?

A.  Yes, I was, because I didn't know what he was in jail for. No, I didn't.

L. Henderson - direct

1048

Q.   Did it make any sense to you?

A.   No, it didn't.

          MS. ADEEYO:  Objection, Your Honor.  Relevance.

          THE COURT:  Sustained, I guess.

BY MS. RICKERT:

Q.   At some point, did the police -- sometime soon after John's arrest, did the police come to your house to speak with Yolanda?

A.   Yes, they did.

Q.   And the first time they came, did they just speak to her at the house?

A.   They came to the door, rang the doorbell.  I went to the doorbell.  It was two officers, and they came in and they asked Yolanda a few questions and they asked her, do she mind coming down to the police station, by her being of age of 18 years old, so she just volunteered to go.

Q.   Okay.  So they came to the house --

A.   They came to the house.

Q.   And they asked Yolanda --

A.   And they asked her, can she come down to answer a few questions.

Q.   Okay.  And she agreed to go?

A.   Yes, she agreed to it.

Q.   And was Mr. Henderson there as well?

A.   Yes, he was.  We both were home.

L. Henderson - direct

1049

Q.  Okay.  And did you know what police station the police were taking Yolanda to?

A.  No, we did not.

Q.  And so she went?

A.  I'm sorry?

Q.  She went along with them to the police station?

A.  Yes, she went with them to the police station.

Q.  Were you worried?

        MS. ADEEYO:  Objection.  Relevance.

        THE WITNESS:  Yes, after hours passed by, yes, we got worried.

        THE COURT:  Overruled.

BY MS. RICKERT:

Q.  And what did you do?

A.  We -- what I did was I called John's grandmother, Ms. Lucas, and she was saying that "I think that you need to probably go and look for your daughter," find our daughter and bring her home.  So we just started making some calls and we didn't know where she --

        MS. ADEEYO:  Objection, Your Honor.  Relevance.

        MS. RICKERT:  This is highly relevant to how this investigation was conducted.  It's --

        THE COURT:  Right.  It's her memory of what happened. Overruled.

BY MS. RICKERT:

1050

Q. So you had to try to figure out where --

A. Yes, we had to figure out where Yolanda was at.

Q. How did you try to figure that out?

A. We made phone calls, got on the phone and started calling around to different police stations, and finally we found her, where she was at. It took like about three hours.

Q. So it wasn't easy for you to get an answer?

A. No, it was not.

Q. When you finally found out where she was, what did you do?

A. We got in -- you know, got dressed, went in the car and we went to pick Yolanda up. Went down and found out where she was at and went to go pick her up and bring her home, because we didn't know what was going on.

Q. And so you went to the police station, Your Honor?

A. Yes, we went to the police station.

Q. Mr. Henderson also?

A. Yes, we both went.

Q. Okay. And did the police talk to you at all while you were there?

A. That, I can't recall. But we just asked for our daughter, you know, and they didn't bring her out right away but soon they did bring her out and we took her home.

Q. How did Yolanda seem to you when you picked her up?

A. She just seemed a little confused and not right in her face. She just didn't look right.

Q. Did she tell you that she had learned John was being charged with murder?

A. Yes.

Q. What did that -- strike that. How did you feel when you heard that?

MS. ADEEYO: Objection. Relevance.

THE COURT: Sustained.

BY MS. RICKERT:

Q. So you -- at that point, did you know that John Fulton was being held at Cook County Jail, or is that something you subsequently learned?

A. I didn't learn until later that he was in the county jail.

Q. And while John was awaiting trial at Cook County Jail, did you visit him?

A. Yes, I did, me and my husband and daughter, Cam'Ron, yes.

Q. I'm sorry to interrupt. He was there for a significant amount of time; right?

A. Yes, he was.

Q. Okay. And you said you would visit him with your husband?

A. Yes.

Q. And who else would you visit him with?

A. Yolanda came, Baby Cam'Ron came. If I'm not mistaken, his aunt, she came with us.

Q. Now we're going to talk more about your visits with John and what you observed, but did John's incarceration change your

relationship with him?

A.   Very.  We got closer.  Closer relationship.  Very, yes.
Got closer to John.  Very, yes.

Q.   Okay.

MS. RICKERT:  Your Honor, I know you have something at
noon.  Is this a good place to stop?

THE COURT:  I was mistaken.  We have until 12:15, so
you can go ahead.

MS. RICKERT:  Okay.  Then I will keep going.

BY MS. RICKERT:

Q.   When you would go visit John with Baby Cam'Ron, how did
John seem?

MS. ADEEYO:  Objection.  Form, Your Honor.

BY MS. RICKERT:

Q.   When you would go visit John at Cook County Jail with Baby
Cam'Ron, how did John seem to you?

MS. ADEEYO:  Objection.  Form.

THE COURT:  Overruled.  Do you want foundation or
what?

MS. ADEEYO:  I'll withdraw, Your Honor.

THE COURT:  All right.

BY MS. RICKERT:

Q.   What did you observe about John?

A.   I observed the look on his face, how he looked, you know.
Just -- it just really hurt me, it really hurt me and touched

me.  And how Baby Cam'Ron was, you know, had to see his dad through a glass, even though he was a baby.  How he put his little hands up to the glass to his dad.

MS. ADEEYO:  Objection, Your Honor.  Relevance.

MS. RICKERT:  This is a damages witness.

THE COURT:  Overruled.  Overruled.

BY MS. RICKERT:

Q.  Go on.  You said Baby Cam'Ron would --

A.  Put his hands on the glass, and John would play with him through the glass, and watching them back and forth, and, you know, and it just broke my heart.

Q.  What was it -- what did you see about how it was for John when the visit would end?

A.  He just looked lost, totally lost.  He was -- he would just see us go.  I hated to go.  It just hurted me so bad.

Q.  Did you let John see that you were hurt?

MS. ADEEYO:  Objection.  Form.

THE COURT:  Sustained.

BY MS. RICKERT:

Q.  Let me ask that a different way.  Do you know whether John was aware that his incarceration was making his loved ones sad?

MS. ADEEYO:  Objection.  Form.

THE COURT:  Well, I'll just overrule the objection before.  It was a better question.

BY MS. RICKERT:

Q.   Did John know that you were sad?

A.   No, because I tried to be strong in front of him.  And I didn't want him to see that I was hurting.  Maybe I should have.  But I was really hurting, and I didn't want him to see me crying because it would probably -- you know, it would make him more sad and hurt knowing that he see me, how I'm hurting.

Q.   To your knowledge, was John aware --

A.   I'm sorry.  My battery went out in my hearing aid.  You're going to have to speak up now.

Q.   Okay.  Can you hear me all right?

A.   A little bit.

        MR. LOEVY:  Does the witness have headphones up there, Your Honor?

        THE COURT:  Oh, that would help.

        THE WITNESS:  I'm hard of hearing, so.

        THE COURT:  Yes.

        THE CLERK:  Put your headphones on.

        THE COURT:  See that if helps.

BY MS. RICKERT:

Q.   Does this help?

A.   Yes, very.

Q.   So to your knowledge, did John ever hear about other loved ones being sad?

A.   Yes.

Q.   Tell me about that.

A.   He knew -- I told him a little bit how his grandma was hurting and how his aunt was hurting.

Q.   And this is his Aunt Susan?

A.   Yes, his Auntie Susan.

Q.   Is there any other way that John would have known how they were feeling?

         MS. ADEEYO:  Objection.  Form.

BY MS. RICKERT:

Q.   That you were personally aware of?

A.   When he talks to them, I don't think -- I know his auntie showed a great deal of hurt, how she felt when she always --

         MS. ADEEYO:  Objection.  Relevance.  Calls for speculation.

         MS. RICKERT:  I can ask if she observed --

         THE COURT:  Well, okay.  Lay a foundation.

BY MS. RICKERT:

Q.   All right.  Were you ever present when John's grandmother, Ms. Lucas, or his Aunt Susan were speaking to him on the phone?

A.   Yes, I was at his grandmother's house a lot when John would call.

Q.   And what did you observe during those calls?

A.   She talked to him and I observed the look on her face when she was talking to him.  Even though he couldn't see her, I observed how painful she was -- she tried to keep up a good appearance in front of -- you know, to John because she didn't

want John to know how she was hurting.  But when she would get off the phone, that's when she would cry to me.

Q.  So still during the time that John was in the county jail -- you know, I'm sure he was in different moods on different visits.

A.  Mm-hmm.

Q.  But in general, what did you see when you would sit across from him?  How did he seem to be doing?

A.  He seemed to be doing a little okay.  But inside, he was hurting --

MS. ADEEYO:  Objection.

THE WITNESS:  -- from being --

MS. ADEEYO:  Witness is speculating.

THE COURT:  Sustained.  Just tell us what you observed.

THE WITNESS:  I observed him -- the look in his eyes. I observed how he was hurting.  I observed that in John.  And he just was in pain.

BY MS. RICKERT:

Q.  Did he express hope?

A.  He expressed a little hope of giving us hope that he would be home.  But that didn't happen.

Q.  So sometime after the trial, after John was convicted, he and Yolanda, your daughter, broke up; right?

A.  Yes.

Q.   Did their breakup change anything about your relationship with John?

A.   No, it hasn't.  It didn't at all.

Q.   You stayed close?

A.   I stayed very close.

Q.   And is that true throughout the long years of John's incarceration?

A.   Yes.

Q.   So when John was at Stateville Prison in Joliet, were you able to visit him?

A.   Yes.

Q.   How often would you visit?

A.   My husband and I would go visit and take Baby Cam'Ron with us like every month, maybe every two months.

Q.   Eventually -- let me back up for a second.  Would -- would you go with other people besides your husband sometimes?

A.   No, just me and my husband, and sometimes Yolanda, you know.

Q.   And Baby Cam'Ron?

A.   Yes, and Baby Cam'Ron.

Q.   I guess by then, Cam'Ron was a toddler, or --

A.   Oh, yes.

         MS. ADEEYO:  Leading.

         THE WITNESS:  He ran into his father's arms and he just jumped and ran to his dad's arms, and it was just

overwhelming for me.

BY MS. RICKERT:

Q.   So during the visits at Stateville, it wasn't behind glass anymore?

A.   No, it wasn't.

Q.   All right.

A.   So we was able to touch, hug each other.  You know, it was just -- it was just overwhelming.

Q.   And when those visits would end, how did John seem to feel?

         MS. ADEEYO:  Objection.  Form.

BY MS. RICKERT:

Q.   What did you observe about John?

A.   I observed, you know, the look in his eyes and he really seemed -- hated to see us leave.  I hated to leave because we only had a short time to visit, because it wasn't too long, so.

Q.   So --

A.   It was very -- it was just very overwhelming and hurting for us all.

Q.   Now eventually John was moved to a prison much further away than Joliet?

A.   Yes, they moved him further away and I wasn't able to go see him because he was too far away from me.

Q.   Did you stay in touch with him in other ways?

A.   Yes, he called, called every day, and we talked every day.

Q.   And --

A.   Write letters to each other.

Q.   Letters back and forth --

A.   Yes.

Q.   -- lots of calls?  During the time that John was incarcerated, do you know whether he provided financial assistance to help with the upbringing of Cam'Ron?

A.   Yes, he did.  He made sure that he sent financial assistance to me for the upbringing of his son and take care of his son financially.

Q.   So he sent money to you --

A.   Sent money to me as well.  Yes.

Q.   And was this court-ordered child support or was this voluntary?

A.   This was voluntary.  It was not a court order for him to do that for his son, to send money to me.  It was voluntary.  It was not a court order.

Q.   And did he do that because he knew that you --

          MS. ADEEYO:  Objection.  Leading.

BY MS. RICKERT:

Q.   Why would he send you money to take care of Cam'Ron?

A.   So that his son would be taken care of and he trusted me to do that.  And that's what I did.

Q.   And to your knowledge, did John's financial support of Cam'Ron last throughout his incarceration?

A.   Yes, it did.

Q.   What was the source of the money that John was sending you, if you know?

A.   Sometimes the amount -- you mean you talking about the amount, or?

Q.   No, where did -- how did John have money?  Do you know?

A.   From a trust fund that he had.  And he would make sure that I get the funds that I needed for Cam'Ron.

Q.   And was this --

A.   It was -- I can't recall her name -- I think Priscilla at a bank.  At the time, I can't recall what bank.  I can't remember the name --

        MS. ADEEYO:  Objection.  Relevance, Your Honor.

        THE COURT:  That's enough.

BY MS. RICKERT:

Q.   So the fund you're talking about, was that related to John --

        MS. ADEEYO:  Objection.  Leading.

        THE WITNESS:  Yes, related to John.

BY MS. RICKERT:

Q.   If you know.

A.   Yes.

Q.   Okay.  So while John was incarcerated, did your friendship with his grandmother, Ms. Lucas, continue?

        MS. ADEEYO:  Objection, Your Honor.  Relevance.

        THE WITNESS:  Yes, very much.

MS. RICKERT: It is related to his damages.

THE COURT: All right. Overruled.

BY MS. RICKERT:

Q. Did you spend time with her?

A. Yes, very much. A lot of time with her.

Q. And do you know whether John did things to help her out while he was incarcerated?

A. I'm sorry, can you repeat that?

Q. Yeah. Do you know whether John did things to help out his grandmother while he was incarcerated?

A. Yes, he took care of his grandmother as well financially. Yes. He would send money to me and he would get money to his grandma, so whenever she need me to go to the store or pay a bill or something, I have the money available for me to go.

Q. Okay. And let's talk about Ms. Lucas's health during the time of John's incarceration.

MS. ADEEYO: Objection, Your Honor. Relevance.

MS. RICKERT: I'm happy to explain the relevance, if...

THE COURT: Overruled.

BY MS. RICKERT:

Q. Did she -- she was quite elderly at this --

A. Yes.

MS. ADEEYO: Objection. Leading.

THE WITNESS: Yes.

L. Henderson - direct

1062

BY MS. RICKERT:

Q.  Can you tell me about Ms. Lucas's health during the later part of John's incarceration?

A.  She started -- her health started to turn a little bit bad, you know, as she got older.  So that's normal for senior citizens.

Q.  What about her mental state?

A.  Her mental state --

MS. ADEEYO:  Objection.  Relevance.  Foundation.

THE COURT:  All right.  Sustained.

MS. RICKERT:  Could we -- this is --

THE COURT:  Just, how does --

MS. RICKERT:  Can I lay a foundation?

THE COURT:  Yes.

MS. RICKERT:  Okay.

BY MS. RICKERT:

Q.  Ms. Lucas, was she the same when John got out of prison as she was when he went in?

A.  No, she wasn't.

Q.  What changed?

A.  A little dementia.

MS. ADEEYO:  Objection, Your Honor.  This --

THE COURT:  Overruled.

BY MS. RICKERT:

Q.  So you said she had begun to suffer from dementia?

A.   Yes, she had, yes.

Q.   Did she still know who John was?

A.   I think she knew who her -- I think she knew who he was, but she didn't know where he was during the time of his -- incarcerated.  So John's uncle called me up one day --

         MS. ADEEYO:  Objection, Your Honor.  Relevance and hearsay.

         THE WITNESS:  Okay.

         THE COURT:  Pose another question.

         MS. RICKERT:  Okay.

BY MS. RICKERT:

Q.   You said she no longer -- she knew who John was, but --

A.   She didn't know where he was at.  She didn't know he was incarcerated.

Q.   Do you know where she thought he was?

         MS. ADEEYO:  Objection, Your Honor.  Relevance.

         MS. RICKERT:  It's relevant to her condition and how she was by the time John got out and --

         THE COURT:  Well, not sure that's relevant.

         MS. RICKERT:  We'll move on.

BY MS. RICKERT:

Q.   Do you know how old Ms. Lucas was by the time John got out?

A.   I know she was in her 80s, but I don't know exactly what age.

Q.   All right.  Let's talk about John's adjustment to society

after he was released.  What was your impression of John's adjustment?

A.  It affected him --

MS. ADEEYO:  Objection.  Form.

THE COURT:  "What was your impression?"

MS. RICKERT:  Sure.

BY MS. RICKERT:

Q.  When John got out of prison, you spent time with him; right?

A.  Yes, I did.

Q.  And he was reentering society --

A.  Reentering society.  Had to adjust to a whole new society. This was a different society from when he was out here, when he was 18 years old.  So it's just a new environment, new adjustment to him.

Q.  And did you interact with him as he was going through this adjustment?

A.  Yes, yes, I did.  When I would come over, we would talk. You know, I would encourage him.  Yeah, we would do family things.  Laugh, talk, yeah.

Q.  Was his adjustment always smooth?

MS. ADEEYO:  Objection, Your Honor.  Form.

THE COURT:  Sustained.

BY MS. RICKERT:

Q.  From what you observed of John, did he have any

difficulties readjusting to society after his release?

A.   It's not easy for anybody, you know, that's been incarcerated for those many years.  And when you getting out to a different society, to adjust to a new society out here, you know, it's not easy at all.  So he had to -- I mean, he was adjusting.

Q.   Was John, at the time of his release, was he prepared to be the father of a teenager?

        MS. ADEEYO:  Objection.  Form.  Calls for speculation.

BY MS. RICKERT:

Q.   From what you observed?

A.   Well, he had --

        THE COURT:  Overruled.

        THE WITNESS:  -- to learn how to be a dad.  You know, he just got out, and then he have this teenager, no longer a little bitty baby.  So he had to learn how to be a dad to his teenage son.  Who wouldn't?  So it just was all new to him.

BY MS. RICKERT:

Q.   And to your knowledge, did John and your daughter Yolanda have some clashes over Cam'Ron and his upbringing?

A.   Yeah, they had some clashes over Cam'Ron when John got out.  But this is a young man that missed his dad so much that he wants to be with his dad.

        MS. ADEEYO:  Objection, Your Honor.  The witness is speculating as to how Cam'Ron feels.

BY MS. RICKERT:

Q.  Was your impression that Cam'Ron missed his father and wanted to spend time with him?

A.  Yes, he just wanted to spend time and be with his dad.  And I didn't see anything wrong with that.

Q.  At some point, did John and Cam'Ron also have clashes?

A.  I mean, yeah, they had some clashes.

Q.  And do you have knowledge of like what those clashes were about?

MS. RICKERT:  I think, you know, Your Honor, if this is an okay place to stop --

THE COURT:  So it is.  Yes.  All right.  We'll come back.  We'll take a 45-minute recess for lunch, so you'll have to come back.

THE WITNESS:  Okay.

THE COURT:  All right.

(Jury exits at 12:16 p.m.)

THE COURT:  You may step down, Ms. Henderson.

(Recess at 12:16 p.m., until 1:00 p.m.)

1067

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN FULTON,                          )  Case No. 20 C 3118
                                      )
              Plaintiff,              )
         v.                           )
                                      )
ROBERT BARTIK, et al.,                )
                                      )
              Defendants.             )
------------------------------        )
ANTHONY MITCHELL,                     )  Case No. 20 C 3119
                                      )
              Plaintiff,              )
         v.                           )
                                      )
ROBERT BARTIK, et al.,                )  Chicago, Illinois
                                      )  February 18, 2025
              Defendants.             )  1:08 p.m.

VOLUME 5
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Plaintiffs:       LOEVY & LOEVY
                          BY:  MR. JONATHAN I. LOEVY
                               MR. RUSSELL R. AINSWORTH
                               MS. JULIA T. RICKERT
                               MS. FATIMA LADHA
                               MR. ISAAC GREEN
                          311 N. Aberdeen Street, 3rd Floor
                          Chicago, Illinois  60607

                          LYON & KERR, PLLC
                          BY:  MS. ANDREA D. LYON
                          53 W. Jackson Boulevard, Suite 1650
                          Chicago, Illinois  60604

For Defendant Officers:   NATHAN & KAMIONSKI, LLP
                          BY:  MR. SHNEUR Z. NATHAN
                               MR. AVI T. KAMIONSKI
                               MS. BREANA L. BRILL
                               MR. JOHN M. CERNEY
                               MS. NATALIE ADEEYO
                          206 S. Jefferson Street
                          Chicago, Illinois  60661

1068

APPEARANCES   (Continued):

For Defendant City:            MICHAEL BEST & FRIEDRICH, LLP
                               BY:  MR. JAMES P. FIEWEGER
                               444 W. Lake Street, Suite 3200
                               Chicago, Illinois   60606

Court Reporter:                KATHLEEN M. FENNELL, CSR, RMR, FCRR
                               Official Court Reporter
                               219 South Dearborn Street, Room 2328A
                               Chicago, Illinois   60604
                               Telephone:  (312) 435-5569
                               Kathleen_Fennell@ilnd.uscourts.gov

                     *   *   *   *   *

            PROCEEDINGS REPORTED BY STENOTYPE
   TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE CLERK:  Court resumes in session.

THE COURT:  All right.  Good afternoon.  You may be seated if you like.  Jury will be right here.  We usually stand when the jury comes in, just to let you know.

(Jury enters at 1:09 p.m.)

THE COURT:  You may be seated.  Good afternoon, everyone.  We'll continue with the examination of Ms. Henderson.

BY MS. RICKERT:

Q.  Good afternoon, Mrs. Henderson.

A.  Good afternoon.

Q.  So when we left off before the lunch break, we were talking about John's adjustment to society after his release from prison.  And you had said that he struggled to know how to be a father?

A.  Yes.

Q.  And that that resulted in some clashes, both with your daughter Yolanda and with your grandson Cam'Ron?

A.  Yes.

Q.  Over time, from what you know, did John learn how to be a father to a teenager?

A.  Yes, it came over time, to learn how to be a dad to his son, because first of all -- I mean, first off, like I said, when he got out, it was kind of hard for him to struggle -- to

1070

learn how to be a dad, so therefore they became like friends, because John just getting out, you know, out of jail and Cam'Ron's 16 years old. So he had to learn how to be a father to his son, so they just became like friends.

Q. And was that always the best thing for Cam'Ron, do you think?

A. Cam'Ron accepted it, yes. It didn't bother him, so yeah. He liked being friends with his dad.

Q. And to your knowledge, do they have a close relationship now?

A. Yes, very close relationship.

Q. Let's talk about your ongoing relationship with John. Do you still see John Fulton sometimes?

A. Oh, yes. We see each other all the time.

Q. What kind of things do you guys -- or when do you see John?

A. He comes over to my house, you know, visit a little bit. We sit down and we talk, you know, just having a nice little conversation and laugh, talk about the good old days sometimes, and yeah, and then he go back home. Yeah. Or wherever he goes.

Q. Do you include John in family events?

A. Oh, yeah. We have family -- we went -- matter of fact, we went to Yolanda's house and we had like a little barbecue, you know, all the family back together. It was really nice and fun. And John, being the big old kid in the jumping bean house

1071

with the kids just jumping up and down. He don't know, but I videotaped him, so I have that.

Q. You're talking about the bounce house?

A. Yes, the bouncy house. I said, "Look at you, being a big kid."

Q. Any other kinds of family events that you --

A. Yeah, we did bowling. We went to bowling together, and, you know, we really enjoyed ourself as a family, laugh and talk, and enjoyed ourselves.

Q. So how -- what's your -- from what you can see and observe of John, how is he doing today?

A. Today, he's -- you know, he's hanging in there and, you know, always encourage him and tell him, you know, just speak the truth and hang in there. You know, everything will be okay. I try to be encouraging to him.

Q. From your perspective, are there long-term consequences for John of his incarceration?

      MS. ADEEYO: Objection. Form. Foundation.

      THE COURT: You're going to have to lay a foundation.

      MS. RICKERT: All right.

BY MS. RICKERT:

Q. So you've just testified that you spent time -- you spend time with John regularly?

A. Yes, I do.

Q. And you speak with John regularly?

1072

A.   Yes.

Q.   Is John fine?

        MS. ADEEYO:  Objection.  Form.  Foundation.

        THE COURT:  Sustained.

BY MS. RICKERT:

Q.   Okay.  Does John have ongoing effects, from what you know, caused by his wrongful conviction and incarceration?

        MS. ADEEYO:  Objection.  Form.  Foundation.  And leading, Your Honor.

        THE COURT:  Let's just take a minute here and sidebar.

   (Proceedings heard at sidebar:)

        MS. RICKERT:  This is my last question, Your Honor.

        THE COURT:  It seems to me that she's not an expert on, you know, his mental health or anything.  All she can testify is to what he was like before and what he's like after, which I think you've pretty much covered, so.

        MS. ADEEYO:  That's our position, Your Honor.

        MR. LOEVY:  Your Honor, I think this was almost on -- instead of saying -- how about if she just asked, how he's doing with the -- and then ends it?

        MS. ADEEYO:  Your Honor, that's been established.

        THE COURT:  Are we okay with this?

        MS. ADEEYO:  It's cumulative, Your Honor.  It's cumulative.  He's already answered it.

        MS. RICKERT:  I don't think she's answered how --

1073

whether he is just -- you know, has no effects or whether he does have an impact. And this is appropriate for her to observe. She's close to him, she sees him, she knows how he's doing.

MS. ADEEYO: Your Honor, she testified that he's okay but he's still struggling. She just testified to that. And so --

THE COURT: Ms. Rickert? I asked if you were okay with this.

MS. RICKERT: I mean, I'd like to --

THE COURT: I can't hear.

MS. RICKERT: Sorry. I'd like to ask a final question, to just --

THE COURT: Something's wrong. Hold on. I can't hear her.

(Discussion off the record.)

MS. RICKERT: Can you hear me now?

MS. ADEEYO: The witness also has headphones on. Your Honor, can you hear me? This is Natalie Adeeyo. The witness has been privy to this entire conversation. She has headphones on.

THE COURT: I'm able to hear what you're saying.

(Discussion off the record.)

MS. RICKERT: I'd like to just ask one final question.

THE COURT: No, it's not coming through.

1074

(Discussion off the record.)

THE COURT: Let's just have a quick sidebar over here.

(Proceedings heard at sidebar:)

MS. RICKERT: I'd like to ask one more final question. I'd like to ask one final question, and if we can agree, ask her, you know, "From what you know, is Mr. Fulton still suffering?"

THE COURT: Is he still --

MS. RICKERT: Suffering.

THE COURT: Suffering. As a result of his --

MS. ADEEYO: And, Your Honor, we believe that that is eliciting expert opinion. This witness already testified that he was struggling now as of today. I think any further questioning is cumulative at this point.

THE COURT: I kind of think -- I think it's -- she's not really qualified. It's her observation. She's talked about what it was before.

MS. RICKERT: All right.

THE COURT: I don't think her opinion is really that relevant.

MS. RICKERT: Okay.

THE COURT: I'll sustain.

MS. ADEEYO: Thanks, Your Honor.

(Proceedings heard in open court:)

THE COURT: Go ahead.

MS. RICKERT: Mrs. Henderson, I don't have any further questions for you right now. They may have some questions for you on the other side. And then I may come back again with a couple of followups after that.

THE WITNESS: Okay.

MS. RICKERT: Thank you so much.

CROSS-EXAMINATION

BY MS. ADEEYO:

Q. Good afternoon, Ms. Henderson.

A. Good afternoon.

Q. Now you testified on direct examination that you've known John Fulton since 2001; is that correct?

A. Correct.

Q. Were you aware that he had a romantic relationship with a woman named Johnitta Griffin?

A. No.

Q. Were you aware that back in February of 2003, Mr. Fulton was trying to purchase a firearm, a gun?

A. No.

Q. Do you know the reason why he would have been trying to purchase a firearm in February 2003?

MS. RICKERT: Objection. Relevance.

THE WITNESS: I'm not aware of this. I don't know anything about that.

BY MS. ADEEYO:

Q.   Are you aware of any nicknames that John Fulton goes by?

MS. RICKERT:  Objection.  Relevance.

THE WITNESS:  No.

BY MS. ADEEYO:

Q.   Are you aware --

THE COURT:  Overruled.

BY MS. ADEEYO:

Q.   Are you aware if John Fulton went by the nickname Lu?

A.   No.

Q.   Now are you aware that John Fulton was robbed in February of 2003?

A.   I don't recall that.  I don't remember anything about that.

Q.   And so therefore you don't know that he was robbed when he was trying to purchase a gun in February 2003?

MS. RICKERT:  Objection.

THE COURT:  She said --

THE WITNESS:  I don't know anything about that.

BY MS. ADEEYO:

Q.   Did you ever learn from Mr. Fulton or your daughter Yolanda Henderson that threatening phone calls were being made to Mr. Fulton after this gun robbery in February 2003?

MS. RICKERT:  Objection to relevance.

THE WITNESS:  I don't know anything about that.

THE COURT:  What weight of proof does this go to?

MS. ADEEYO:  I'm sorry, Your Honor, what was that?

THE COURT: What point of proof does this go to?

MS. ADEEYO: Well, Your Honor, I'd ask for a sidebar to explain.

MR. LOEVY: The witness said she didn't know, Your Honor. So move on.

THE COURT: Yeah, let's just go forward. She said she didn't know.

BY MS. ADEEYO:

Q. Mrs. Henderson, you'd agree that Fulton is protective of his family; correct?

A. Yes.

Q. And so he'd do anything to protect his family?

A. I mean, he's protective of his family, but not to a point where he would just go out and hurt someone. Wouldn't do that.

Q. You're not aware if John Fulton ever had any fights with anyone; is that correct?

A. No, I'm not aware of that at all.

MS. ADEEYO: Nothing further. Thank you.

MS. RICKERT: Nothing from Plaintiffs.

THE COURT: All right. Then you are excused, Mrs. Henderson.

THE WITNESS: Okay.

THE COURT: Thank you for your time.

THE WITNESS: You're welcome. Thank you, Your Honor.

THE COURT: You can leave those there.

MR. LOEVY: Your Honor, at this time, the plaintiff would call the defendant Mr. Zalatoris.

THE COURT: All right. Good afternoon. Raise your right hand to be sworn.

(Witness sworn.)

THE WITNESS: I do.

THE COURT: Be seated.

JOHN ZALATORIS, DEFENDANT HEREIN, SWORN

DIRECT EXAMINATION

BY MR. LOEVY:

Q. Good afternoon, sir. If you'd state and spell your name for the record, please.

A. Sure. John Zalatoris. J-o-h-n, Z-a-l-a-t-o-r-i-s.

Q. And you are a former Chicago police officer?

A. Yes.

Q. What year did you retire from the police department?

A. 2013.

Q. After that, you were a part-time patrol officer in Forest View?

A. Yes.

Q. Are you still or you're since retired?

A. I'm retired from there too.

Q. All right. Are you a high school graduate?

A. No.

Q. What year did you leave high school?

A.   '74.

Q.   And you did start at the CPD of what year?

A.   1986.

Q.   And you worked narcotics for a bit?

A.   I did.

Q.   A buy-bust team?

A.   Yes.

Q.   And you got kind of burned out on that?

A.   A little bit.

Q.   And you worked in Englewood for a year?

A.   Yes.

Q.   8th District after that?

A.   Yes.

Q.   At some point, did you become a detective?

A.   Yes.

Q.   What year was that, sir?

A.   1995.

Q.   What was your assignment at that time?

A.   Area One.

Q.   And what's that?

A.   It's one of the detective areas.

Q.   I'm sorry, what did you say?

A.   I said it's one of the detective areas.

Q.   I apologize.  Pull the mike towards you a little bit if you would, sir.

A.   Okay.

Q.   How long did you stay as a detective?

A.   18 years, until I retired.

Q.   Now you were the detective who secured the convictions of John and Anthony; correct?  You conducted the investigation that led to their convictions?

MS. ADEEYO:  Objection.  Form.

THE WITNESS:  One of them, yes.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   Are you the detective that deserves the primary credit for getting the conviction to put those men in prison?

MR. NATHAN:  Objection.  Form.

THE COURT:  Overruled.

THE WITNESS:  Credit?

BY MR. LOEVY:

Q.   Credit.

A.   No.

Q.   In other words, somebody at the police department was responsible for gathering and developing the evidence that put them in prison; right?

A.   Yes.

Q.   That was you and your partner Mr. Breen; right?

A.   Other detectives too, yes.

Q.   All right.  So you are the person responsible for

Zalatoris - direct

1081

developing the case that put them in prison; right?

A.   One of them, yes.

Q.   Are you proud of that, sir?

A.   Am I proud of it?  Not proud of it.  We did our job.

Q.   All right.  Let's back up, sir, and talk about being a police detective.  The job involved solving crimes.  Is that a fair summary?

A.   Yes.

Q.   Got to conduct your investigations?  That's a question.

A.   Yes.

Q.   And that could involve hard work; correct, sir?

A.   It involves work, yes.

Q.   Interviews, witnesses, you got to get out there on the street and do the work; right?

A.   Sometimes, yes.

Q.   Sometimes they can last days, weeks, months, years; right?

A.   It can last any amount of time, yes.

Q.   And you don't know going in how long it's going to take; right?

A.   No.

Q.   Now big part of the job involves taking notes, would you agree?

A.   That's part of it.

Q.   Human memory being what it is, detectives have to do a real good job of writing things down.  Is that a fair summary?

A.   You take notes.

Q.   And you then take the notes and memorialize them into police reports; right?

A.   Yes.

Q.   And they become part of the official file?

A.   Yes.

Q.   And you're supposed to file your reports as you go, so if you talk to a witness, you create a report, you put it in the file, and that's called a supplementary report; right?

A.   Well, taking your notes, you're taking reports already.

Q.   When you -- but when you create these reports, you're not supposed to save them all up.  You do a report, you submit it, you submit it, you submit it, they become supplementary reports; right?

A.   You take your notes from a general progress report and they would be put in a supplementary report.  But we are taking notes on a report the whole time.

Q.   All right.  But my question was, you complete a report, you submit a report, and then you go on to the next thing; right?

A.   No.  Could you -- could you give me the question again?

Q.   If you're a detective and you talk to Andrea Lyon and you complete a police report, you submit that report; right?

A.   If you create a police report, yeah, you submit it, yes.

Q.   That's right.  And that becomes a supplement, and the file builds on itself over time; right?

Zalatoris - direct

1083

A.   It all depends on what the investigation is, what the case is.

Q.   All right.  Let's talk about notes.  The notes detectives create are supposed to be preserved; correct?

A.   Yes.

Q.   Why are they supposed to be preserved?

A.   Because they're an official Chicago police report.

Q.   Even the notes themselves are official documents; right?

A.   Yes.

Q.   And they're evidence in a case; right?

A.   Yes.

Q.   They're not -- no notes are supposed to be destroyed; right?

A.   No.

Q.   You agree with me; right?

A.   Yeah.

Q.   All right.  What are some of the reasons why you're supposed to preserve the notes?

A.   Because one of the main reasons is that you're creating the supplement -- the supplemental report from the notes that you took and the GPRs.

Q.   And another reason is when it comes time for the trial, if these men are standing trial, they're entitled to your notes; right?

A.   Oh, yes.

Q.   They're not private notes, they're official documents that they're entitled to; right?

A.   Correct.

Q.   And another reason to take notes is you don't know what's going to become important until later; right?

A.   You take the notes, you take down -- yeah.

Q.   And so at the police department, they created a system to preserve the notes; right?

A.   Well --

Q.   The GPR report you referenced earlier?

A.   Yes.

Q.   Tell the jury what's supposed to happen there.

A.   You turn them in with the supplemental reports.

Q.   So in other words --

         MR. LOEVY:  Your Honor, we'd move Plaintiffs' Exhibit 11 into evidence.  It's the official file and we'd ask permission to publish page 2.

         THE COURT:  Any objection?

         MR. NATHAN:  What are you --

         MR. LOEVY:  Exhibit 11.

         MR. NATHAN:  The entire file?

         MR. LOEVY:  Yes.  Exhibit 11, Plaintiffs' Exhibit 11 which is all the GPR notes.  We move that into evidence, Your Honor, all the police notes.  May I publish page 2?

         THE COURT:  Was there no objection?

MR. NATHAN:  No objection.

THE COURT:  All right.

(Plaintiffs' Exhibit No. 11 received in evidence.)

BY MR. LOEVY:

Q.  All right.  This is an example of a GPR report; right?

A.  Yes.

Q.  This one looks like it was created by a Winstead.  At the time, it was a Juan Doe.  What does that refer to?

A.  Unidentified person.  Victim.

Q.  All right.  And this is like an example of -- this is Winstead's notes; right?

A.  Yes.

Q.  And it's a general progress report?

A.  Right.

Q.  Now these general progress reports become part of the official file; right?

A.  Yes.

Q.  And they're supposed to be turned over to the defendants to get a fair opportunity to defend themselves; right?

A.  Well, yes.  I mean, not from us, but through the police department.

Q.  All right.  Let's turn to the investigation in this case. Let's go back to the beginning.  The crime that you investigated, the murder of Chris Collazo, what were your shift hours in March of 2003?  What shift were you working?

A.   Afternoons.

Q.   And tell the jury what hours that is.

A.   It's 4:30 p.m. until approximately 1 a.m.

Q.   And what date were you assigned this case?

A.   It was the -- actually when we came in, the day that the body was found.

Q.   The 10th of March?

A.   Yes.

Q.   Now this has been a long time since these events; right?

A.   Yeah.

Q.   You've had a chance to review the file before you testified today?

A.   Somewhat.

Q.   Looked at some of the documents and the testimony?

A.   Looked at some of them, yes.

Q.   All right.  And just as you did back in March of 2003, when you came into work, get assigned the case, you would have reviewed the information; correct?

A.   Yes.

Q.   The police reports that had been created, the notes that existed; right?

A.   Yes.

Q.   And you learned that a man named Sid Taylor had called 911 in the middle of the night there and said that there was some kind of fire in the alley and that police responded and found a

Zalatoris - direct

1087

dead body; right?

A. Yes.

Q. Do you remember the address where the body was found burning?

A. 5228 Peoria.

Q. That's on the south side of Chicago?

A. Yes.

Q. And you learned this from talking to some of the detectives at the scene?

A. And where the actual box was at, where it was burning.

Q. You learned a lot of things about -- or some things about the murder; right?

A. Yes.

Q. What did you learn about the victim's arms? That they had been duct-taped behind his back?

A. That's not the first thing we did.

Q. All right. I'm just asking, did you learn in the course of this investigation that the victim's arms had been duct-taped behind his back?

A. Yes.

Q. What is the first thing you did?

A. Well, we went and got him identified.

Q. Excuse me?

A. We got the victim identified.

Q. Got the victim identified. I'm going to ask you --

A.   We went and we notified his family.

Q.   All right.  I'm going to ask you now what you learned about the murder.  Okay?  You learned that his arms had been duct-taped behind his back; correct?

A.   Right.

Q.   What did you learn about his feet?

A.   I don't recall what I learned before we identified him.

Q.   Well, I'm not asking before you identified him.

A.   That's what you're asking me.

Q.   You started talking about the order.  I'm just asking what you learned about the victim.  Okay?  You with me?

A.   Well -- okay.

         MR. LOEVY:  All right.  I would like permission -- actually, this is Plaintiff's Exhibit -- we move all the police reports into evidence as well, Your Honor.  This is Plaintiff's Exhibit 1.

         THE COURT:  Any objection?

         MR. NATHAN:  Objection.  Compound.  Foundation.

         MR. LOEVY:  Compound?

         THE COURT:  Compound?

         MR. LOEVY:  And I thought we weren't going to have a foundation objection.  This is the police reports from his file.

         MR. NATHAN:  I'm not sure why we're arguing about it.  That's my objection.

THE COURT: All right. I'll receive them in evidence.

(Plaintiffs' Exhibit No. 1 received in evidence.)

MR. NATHAN: Your Honor, it's 86 pages of reports having miscellaneous, I would call them.

THE COURT: Only -- we'll only show the jury the portions that are relevant here.

MR. LOEVY: All right.

BY MR. LOEVY:

Q.   Showing you Bates-stamped --

MR. NATHAN: Your Honor, one second.

THE COURT: I'm sorry?

MR. NATHAN: Objection, Your Honor. What's -- something's being published to the jury right now. I don't think there's a foundation for it yet.

BY MR. LOEVY:

Q.   You said you reviewed the police reports during the course of this investigation; right?

A.   Yes.

Q.   All right.

A.   As they were done.

Q.   Sure.

MR. LOEVY: So maybe -- should I just show the witness or may I publish this page, Your Honor?

THE COURT: Show the witness.

BY MR. LOEVY:

Zalatoris - direct

1090

Q.   All right.  Can you see the screen, sir?

A.   Yes.

Q.   All right.  This is some of the information that you reviewed when you were investigating the crime; right?

A.   Yes.

Q.   All right.

MR. LOEVY:  Permission to publish to the jury?

THE WITNESS:  Well, can I see when that was typed and submitted?

BY MR. LOEVY:

Q.   Sure.  This is the first scene report.  Showing you the first page.  First-degree homicide, see that?

A.   One second, please.

Q.   Sure.  I think we're --

A.   I found out when it was submitted --

Q.   I'm going to ask you questions, all right?  Did you learn the victim's arms had been bound behind his back when you're investigating this murder?

A.   We learned that.

Q.   Did you learn his feet had been bound together?

A.   I don't recall about that part, but I imagine we had.

Q.   All right.  Did you learn that there was an industrial-size bag, body bag that the victim was placed in?

A.   It was a plastic bag.  Nothing about industrial.  Just plastic bag.

Q. All right. And you knew there was the odor of gasoline that the detectives had found at the scene; right?

A. Yes.

Q. And you knew it was an exceptionally cold night; right?

A. Yes.

Q. Do you remember the temperature?

A. Not offhand, but I know it was cold.

Q. 3 degrees sound right?

A. Could be.

Q. Negative 11 windchill?

A. Could be.

Q. Take a look at the reports, see if that refreshes your recollection. Windchill, negative 11?

A. That's what was typed by the scene officer, yeah.

Q. All right. So an unusually cold night, would you say?

A. Like today.

Q. Was the body -- as you were getting to do this investigation, did you understand that the body had been burned while he was alive or he was dead?

A. I'm trying to recall from the -- ME's protocol.

Q. So you didn't know until the ME came back?

A. Yeah, we didn't know.

Q. All right. Taking a look at Mitchell, 00011. Does this refresh your recollection that --

A. I can't read it.

Q.   Sure.   That the victim in fact had been placed inside a large industrial-type plastic bag prior to the fire?

A.   Oh, it says that there, yeah.

Q.   All right.   Did you know that?

A.   I didn't know it was industrial-type.   We just saw a plastic bag when we went to the morgue.   You know, it was plastic.

Q.   All right.   Was there anything about Chris's pants that were unusual?

A.   I don't remember.

Q.   Remember they were pulled down; right?

A.   Well, I don't remember that at the morgue.

Q.   You didn't remember it?

A.   I don't remember that at the morgue, no.

Q.   Somebody had really done a number on Chris Collazo; right?

A.   What do you mean, "did a number"?

Q.   It looked like he had very much pissed off somebody, made somebody very angry, would you agree?

A.   Well, I mean, somebody killed him.

Q.   Didn't look like random violence; right?

A.   Well, no, of course not.

Q.   Yeah, this looked like a planned execution?

         MR. NATHAN:   Objection.   Form.

         THE WITNESS:   I don't know about a planned execution.

BY MR. LOEVY:

Q. Did it look like a planned execution?

A. No.

Q. All right. To your trained detective eye, did it look like maybe it had a gang angle?

A. Not really, no.

Q. Never really considered that?

A. No, not really. Didn't look like that.

Q. All right. You did identify the victim; right?

A. Yes.

Q. Now as a detective, it's your job to go out and solve the crime, solve this crime; right?

A. Investigate it.

Q. All right. And one of the things that would involve is finding out who Chris's enemies were; right?

A. Well, we did talk to his brother. We talked to his mom.

Q. I'm asking a general question. When --

A. If that came up and found out who his enemies were, yeah.

Q. Just try to follow my question. In the investigation, one of your goals was to determine who this kid's enemies might have been; right?

A. That would be something that we would probably find out down the line, yes.

Q. People who had a motive to execute Chris; right?

A. If it came up, yes.

Q. And that could take a long time; right?

A. It may.

Q. There's no time limit on getting this done; right?

A. No.

Q. In a murder investigation, you might talk to dozens of witnesses; right?

A. We may.

Q. All right. How many police officers were involved in this investigation?

A. I don't know.

Q. You, Breen, Winstead, Rolston. Name some more.

A. Well, it was myself, Breen, Winstead, Rolston, Girardi, Struck.

Q. A Gary Dunigan?

A. Yeah. Yeah.

Q. So there wasn't really a lack of manpower that the police brought to this investigation; right?

A. Well, everybody's on a different shift, you know.

Q. And when you were investigating who might have wanted to do this, one of the first things you had to look at was this kid's gang affiliation; right?

        MR. NATHAN: Objection.

        THE WITNESS: One of the first things.

        MR. NATHAN: Motion in limine.

        MR. LOEVY: No, Your Honor, we just had to lay a foundation. This is what we're doing.

THE COURT: Overruled.

THE WITNESS: Not one of the first things, no.

BY MR. LOEVY:

Q. Why not?

A. Well, the first thing we did is talk to his mom and his brother.

Q. All right.

A. And the gang affiliation was not in the forefront of our minds.

Q. All right. He was in a gang, though; right?

A. That's what we found out.

Q. And when men get -- young men get murdered on the northwest side during that time period, a lot of times it was gang related, would you agree?

A. I don't know how many people get murdered that are gang related on the northwest side.

Q. Well, if you're a detective, you would know; right?

A. I don't work in the northwest side, so.

Q. All right. What gang was Chris Collazo a member of?

A. I'm trying to recall now.

Q. The Maniac Latin Disciples; correct?

A. Could be, yes.

Q. All right. Take a look at Plaintiff's Exhibit 1, page 26. See if that refreshes your recollection.

MR. LOEVY: And may we publish to the jury, Your

Honor?

THE COURT: Yes.

MR. NATHAN: No objection to that page.

BY MR. LOEVY:

Q. That was -- Chris Collazo was a Maniac Latin Disciple; correct?

A. That's what Rolston typed in there, yes.

Q. Because he had tattoos on his body; right?

A. I don't remember the tattoos.

Q. Take a look at page -- Mitchell 00012. He had tattoos of --

MR. NATHAN: One second. You're publishing again without foundation. Objection.

MR. LOEVY: I've moved this exhibit into evidence, Your Honor.

MR. NATHAN: And I objected.

THE COURT: Is it --

MR. NATHAN: Your Honor, I'm unclear as to Your Honor's ruling. I apologize. Is the entire 86 pages of Exhibit 1 in evidence? Or are we laying foundation for it?

MR. LOEVY: Do I have to go page by page, Your Honor?

THE COURT: I don't remember, you can point me to somewhere --

MR. LOEVY: All right.

THE COURT: Exhibit 11 is, it says objection, no Bates

stamp.  So it doesn't have any substantive objection.

MR. NATHAN:  We're talking about I think Exhibit 1.
Is that right, Mr. Loevy?

MR. LOEVY:  Yes, Exhibit 1.

THE COURT:  Oh, 1.

MR. LOEVY:  I can keep it moving, Your Honor.  Should I just move forward?

THE COURT:  These say ID only so they shouldn't be published without admission.

BY MR. LOEVY:

Q.  All right.  He had a pitchfork on his arm; right?

A.  That's what it says.

Q.  The tattoos the police determined were Maniac Latin Disciple related; right?

A.  That's what it says.

Q.  His family in fact confirmed that; right?

A.  Yeah, I think his brother did.

Q.  And as a detective back in the early 2000s, gangs were involved in crime; right?

A.  Gangs were involved in crimes, yes.

Q.  And gangs were often killing each other; right?

A.  Not often, but they were involved in crimes and conflicts.

Q.  All right.  As the person who was investigating the murder of Chris Collazo, tell the jury who the enemies of the Maniac Latin Disciples were at the time.

Zalatoris - direct

1098

A.   I don't recall.

Q.   All right.  You didn't write anything down; right?

A.   I don't recall who their enemies are.

Q.   All right.  So the reason you don't recall is because it's been too long; right?

A.   It's been a long time and I didn't work the northwest side.

Q.   So you did no investigation into who might have been the enemies of the Maniac Latin Disciples; correct?

A.   No.

Q.   And the body was found in a different territory; right?

A.   Yes.

Q.   All right.  Did you determine if there was any gang rivalry or anything going on right there?

A.   Between who?

Q.   Between the Maniac Latin Disciples and other gangs.

A.   This was nowhere near the northwest side.

Q.   Were there any gang wars going at the time?

A.   Not that I know of.

Q.   And you didn't check, sounds like; right?

A.   I mean, how do you check if there's a gang war going on?

Q.   Well, his brothers, for example, were in the Maniac Latin Disciples; right?

A.   Right.

Q.   Did you ever talk to Chris Collazo's brothers if there was ever any gang tension?

A.   Nothing between where he lived and down there, no.

Q.   All right.  The question was, did you ever talk to Collazo's brothers about whether there was anything going on with gang tension at the time?

A.   Between 52nd and Peoria and the northwest side?

Q.   No.  Between Chris Collazo's gang, the Maniac Latin Disciples, and any other gangs.  You didn't talk to them at all, did you?

A.   Not about gang conflicts, no.

Q.   All right.  Let's look at the notes you made.

MR. LOEVY:  Plaintiffs' Exhibit 26, Your Honor.  We'd move this into evidence.  This is actually already part of the file but this is his own note.  We move this into evidence, Your Honor.

THE COURT:  Can you put it on the screen?  Is there an objection?

MR. LOEVY:  This is his own GPR note.

MR. NATHAN:  No objection.

THE COURT:  All right.

MR. LOEVY:  Permission to publish it?

THE COURT:  Yes.

   (Plaintiff's Exhibit No. 26 received in evidence.)

BY MR. LOEVY:

Q.   This is the note you took when you talked to Victor and Jason; right?

A.   Yes.

Q.   The brothers?

A.   Yes.

Q.   And they told you about a La Raza; right?

A.   Yeah, and I don't really know --

Q.   The question was, they told you about La Raza; right?

A.   We wrote down La Raza.

Q.   All right.  What is La Raza?

A.   It's a Hispanic gang.

Q.   All right.  Now you didn't create any reports about why the brothers were telling you about this gang, Hispanic gang, La Raza?

A.   And I don't recall why we wrote it down either.

Q.   My question was, you didn't create any reports; right?

A.   I don't recall why I wrote it down either.

Q.   If you could answer the question.  You're familiar --

A.   It is here.  It's on the GPR.  It's on the general progress report, sir.

Q.   You've testified in court many times; right?

A.   I have testified in court, yes.

Q.   And you're familiar with the question-answer format of court; right?

A.   Right.

Q.   It's not a discussion --

A.   I just answered.  I put it down on a general progress

report.

Q. I see. All right. But you didn't create any police report or anywhere else where you explained why the brothers were naming this gang? You created no such documents; right?

A. No, I don't recall why.

Q. I didn't ask why. You said you didn't create any documents explaining why the brothers are telling you about a La Raza gang; right?

A. This is what I have written down right here, sir.

Q. All right. And there are no other documents?

A. Not that I know of.

Q. So we can no longer remember why the brothers were telling you about the La Raza gang; correct?

A. I guess not.

Q. All right. And you didn't do any investigation into whatever they told you about the La Raza gang; correct?

A. No.

Q. And you never followed up on that lead; correct?

A. No.

Q. Now this report has no date on it; right?

A. No, it doesn't.

Q. And that's not how it's supposed to be; right?

A. No.

Q. And it wasn't submitted to the supervisor; right?

A. No.

Q.   And this --

A.   Well, it might have been, but it wasn't signed by a supervisor.

Q.   All right.  This one ended up in the basement file at the --

MR. NATHAN:  Objection.  Foundation.  Sidebar.  Move to strike.

MR. LOEVY:  I don't want a sidebar.  I'll ask a different question, Your Honor.

BY MR. LOEVY:

Q.   This report should have been put in the official file; right?  That's -- do you understand the question?  Should have?

A.   It may have been.

Q.   I didn't ask if it may have.  Should have; right?

A.   That's what we would have done, yes.

Q.   Would there have been any reason why this report shouldn't have been put in the main file?

A.   No.

Q.   Would there have been any reason why this report should have ended up in the basement in a street file that didn't get turned over to the defendants?

MR. NATHAN:  Objection.  Move to strike.

MR. LOEVY:  Any reason.  We can tie it up later with where this report was found.  I'm just asking, it should have.

THE COURT:  All right.  I'll reserve ruling.  You may

answer.

THE WITNESS:  I don't know what you're referring to as a street file.

BY MR. LOEVY:

Q.  That's not a term you've ever heard?

A.  Yeah, from the 1970s.

Q.  All right.  The victim's family, Chris Collazo's family, you did speak to them; right?

A.  Yes.

Q.  There was a mother and at least two brothers?

A.  Mother and I remember one brother, but evidently there's two.  There was two.

Q.  All right.  And the mother was obviously sad and that's a hard part of your job; right?

A.  Yes.

Q.  Tell somebody that there's been a deceased.  Did you ask her who might have wanted to hurt Chris Collazo?

A.  We asked her who he was seen with or who he was with.

Q.  The lead you followed up was, the last person he saw alive; right?

A.  The last person that they saw him with, yes.

Q.  And that's what you followed up, that's how you found Marinelli, who got you to Fulton; right?

A.  That's where it led to, yes.

Q.  All right.  So that's one good question.  Who's the last

one to see him alive, that's a good question?

A.   Yeah.

Q.   Do you think you should have also asked, is there anybody else in the world who would want to hurt Chris Collazo?  You should have asked that too; right?

A.   Not necessarily.  At that point, no.

Q.   All right.  Chris was the kind of kid who was not afraid to rip people off; right?

A.   Well, at least one time.

Q.   Well, you actually had his rap sheet.  It was actually multiple times, wasn't it?

A.   I don't remember the rap sheet.

Q.   All right.  He was not someone who was unafraid to make enemies; right?

A.   I don't know about -- I don't know about being unafraid of making enemies.

Q.   Well, your theory of the case was, he met this kid John Fulton, had -- smokes a joint with him in a car and then says, "You know what, I'm going to rob this kid."  Kid's seen his face.  This is a kid who's not afraid to make enemies; right?

A.   Not that day.

Q.   The report described -- Ms. Caldera described him as, quote, a wild kid.  Do you remember that?

A.   I don't remember that.

Q.   Was that consistent with the -- the sense you were getting

of Chris Collazo?

A.   You know, not really.  I mean, we really didn't know much about Chris Collazo, to tell you the truth.

Q.   It was kind of your job to know something about Chris Collazo?

A.   We can't know something about a guy that's dead.

Q.   There's ways; right?  You could like talk to people?

A.   And we did.

Q.   All right.  The brothers, that would have been a real good source of information about Chris Collazo; right?

A.   That would have been one source.

Q.   All right.  Something strange happened when you went over to tell the brothers that Chris had been killed; right?

A.   I don't recall.

Q.   You know, you got all set to interview them and what'd they do?

A.   I don't remember.

Q.   Do you remember they got in a car and drove away?

A.   You know, I really don't recall.

Q.   All right.  Do you remember testifying at a pretrial hearing in October of 2004?  This is page 144, lines 1 through 18.  Do you remember giving these answers to these questions?

          MR. LOEVY:  And, Your Honor, we showed it on the Griffin video, the impeachment with the transcripts.  I'd like to show the transcript.

THE COURT: Okay.

MR. NATHAN: Just --

BY MR. LOEVY:

Q. "Did you interview a person by the name of Victor Collazo?" "Yes."

"One of the brothers?" "Yes, we talked to the brothers at the house."

"And you also interviewed Jason Collazo, the younger brother of the victim?" "Yeah, for a little bit. They kind of --"

(Interruption by court reporter.)

BY MR. LOEVY:

Q. "They kind of -- they went to the house on the 10th, you're talking about?"

MR. FIEWEGER: Could we have a page reference?

MR. LOEVY: This is page 144, Plaintiff's Exhibit 130, page 136.

BY MR. LOEVY:

Q. "Yeah, on the 10th, we notified them their brother was dead. They kind of went off and they jumped in their cars and drove off. And we tried to find them again. We found them. We only talked to them for a few minutes." Did you give those answers?

A. Yes.

Q. All right. So --

MR. NATHAN:  One second.  Objection.  Not impeaching.

MR. LOEVY:  He said he didn't remember at all, Your Honor.

THE COURT:  He said he didn't recall so.

BY MR. LOEVY:

Q.  Does that refresh your recollection that when you went to see the brothers, you told them their brother was dead, they thought they had somebody they really needed to talk to apparently; right?

A.  I don't know what they did.

Q.  Well, you had their cell phones?

A.  I don't know why they did that.

Q.  You had their cell phones; right?

A.  Okay.

Q.  On your notes?

A.  Yes.

Q.  So did you wonder, "We just told them their brother is dead.  Why are they driving off?  Maybe they know something about their brother's death?"  Right?

A.  Well, they came back.

Q.  All right.  Did you ever -- and you said you talked to them a few minutes.  Why didn't you ask him, "Hey, what do you think happened to your brother?"

A.  We asked them about who he was seen with last.  That's --

Q.  The last person he saw alive?

A.   Yes.

Q.   That's the Marcus Marinelli lead?

A.   That's exactly --

Q.   And that's a lead; right?

A.   That's the lead we were going on, yes.

Q.   That's the lead you're going with, but there's other leads you could have developed too; right?

A.   If there were leads.

Q.   Well, the only leads are the ones you're going to develop; right?  You pulled his criminal record; right?

A.   I don't remember.

Q.   Take a look at Plaintiff's Exhibit 1, page 61 through 69. This is from the official file.

         MR. LOEVY:  Permission to publish, Your Honor?

         THE COURT:  Any objection?

         MR. NATHAN:  Yes, Your Honor.

         MR. LOEVY:  This is an official rap sheet.  It's not foundation.  It's not in dispute.  And it's evidence that would be relevant --

         MR. NATHAN:  It's also subject to a motion in limine.

         MR. LOEVY:  Should I lay more foundation?

         MR. NATHAN:  It's --

         THE COURT:  It's a motion in limine?  Which one?

         MR. LOEVY:  It's about whether it was related to his investigation I presume.  But should I lay some foundation?

MR. NATHAN: He's seeking to lay the foundation for an entire criminal history report.

THE COURT: Okay. I didn't --

MR. NATHAN: Which --

THE COURT: Did I exclude it?

MR. LOEVY: No.

MR. NATHAN: -- is irrelevant.

MR. LOEVY: No.

THE COURT: All right. You'll have to tell me very quickly, because I don't recall --

MR. NATHAN: I don't have that at the moment, but there's no foundation and it's Rule 403 objection.

MR. LOEVY: This is in the file, their murder file that they consulted to investigate the crime.

THE COURT: Overruled.

BY MR. LOEVY:

Q. All right. Showing you the file. You guys would have pulled the rap sheet of the guy you're investigating; right?

A. Well, somebody did, yes.

Q. And that would have gone into the file; right?

A. It did.

Q. And then if you're investigating this murder, you would have reviewed it; right?

A. May have, yes.

Q. Because you want to get to know this victim who you're

investigating's death?

A. We may have reviewed it.

Q. Looks like he used a lot of aliases; correct? Or at least got arrested a lot of times?

A. Well, looks like Christopher Collazo every time.

Q. Let's look at the second page. Did you learn that he had committed an aggravated assault with a knife, gun, or other dangerous weapon on February the 22nd, 2003?

A. I don't recall anything that's on here to tell you the truth.

Q. All right. So that's shortly before his death on March 9th. He robbed somebody that wasn't Fulton; right?

A. I -- again, I don't recall anything that's on this rap sheet or when I reviewed it.

Q. All right. Did you learn that at least two weeks after he robbed John, he got arrested for robbing somebody else with a gun, knife, or dangerous weapon?

A. Again, I don't recall that.

Q. Is that the kind of thing you would have reviewed?

A. I don't recall looking at this.

Q. All right. If the idea is that people that he robbed -- Chris Collazo robbed might be suspects, did you treat this person who he robbed on February 22nd as a suspect?

A. Could you -- could you -- give me that again.

Q. Sure. It looks like Chris was arrested for robbing

somebody a week after Valentine's Day.  Did you treat the person he robbed as a suspect?

A.  I have no idea who he robbed.  Again, I don't recall any of this on this rap sheet.

Q.  All right.  So you didn't make any effort to track down this lead?

MR. NATHAN:  Your Honor.

THE WITNESS:  I don't recall anything in his rap sheet, sir.

MR. NATHAN:  I object based on Defendant's Motion 34, Docket Number 400.  We'd ask that this be removed from being published and be stricken.

MR. LOEVY:  We laid the foundation that this is relevant to a murder investigation.

MR. NATHAN:  Your Honor --

THE COURT:  Hold on.  I've got to find it.

MR. NATHAN:  Your Honor.  Docket 400, page 21 of 26.

THE COURT:  I have it.  Thank you.  I have it.  So I reserved ruling and it seems to me there's a foundation, so overruled.

MR. NATHAN:  Your Honor, may I be heard for a moment?

THE COURT:  Yes.  We'll go on sidebar.

(Proceedings heard at sidebar:)

MR. NATHAN:  Your Honor, we brought this up in a motion -- can you hear me, Your Honor?

THE COURT: Wait a second. Go again.

MR. NATHAN: Is Your Honor able to hear me?

THE COURT: Yeah.

MR. NATHAN: Your Honor, we brought this up in advance. We filed a motion in limine relating to these alternative suspect theories without foundation. The -- it included the topic of whether Collazo was murdered by a rival gang. And Your Honor reserved ruling and stated that Plaintiffs may preview any evidence with the Court before it is presented to the jury. He didn't do that. He violated that part of your ruling.

On that basis alone, this should be barred as a violation of your motion in limine ruling. He just blew through your motion, your ruling, and allowing him to continue here is just encouraging him to do it again.

MR. LOEVY: Your Honor, that's not how we understood your ruling. We've --

THE COURT: I -- well, number one, there's no connection with this particular incident of a robbery that it's gang related; right? That's just a person, so. But there's quite a bit of evidence that this victim was a member of a gang, so. I'm not sure what --

MR. LOEVY: Foundation objection is...

MR. NATHAN: What he's doing is speculating about this potential suspect that was -- all he's doing is taking the rap

sheet from Mr. Collazo, amplifying a victim's criminal history, and making up suspects.  It's unfairly prejudicial.  Didn't give us an opportunity to explore any of it.  And we raised it with a motion in limine, which Your Honor reserved ruling on.

MR. LOEVY:  Your Honor, he's just obstructing my exam at this point.

THE COURT:  All right.  I'm overruling your objection for the reasons I stated.

(Proceedings heard in open court:)

BY MR. LOEVY:

Q.  All right.  If the idea was that people Chris Collazo had robbed could be legitimate suspects, you probably should have investigated this robbery; right?

A.  I don't remember looking at that rap sheet.  Okay?

Q.  All right.  Does it refresh your recollection that in July, he'd also -- aggravated assault with a gun, knife, or dangerous weapon?

A.  Sir, I don't recall this rap sheet.  Okay?

Q.  Showing you -- but you would have looked at his rap sheet; right?

A.  May have.  You know, I don't recall doing it.

Q.  I mean, if you're investigating a murder --

A.  I'm telling you I don't recall doing it.  Okay?

Q.  All right.  But as a detective, if you're investigating a murder, wouldn't it have been your responsibility to get some

Zalatoris - direct

1114

understanding of what the victim's all about?

A.   Reviewed a lot of stuff, but I don't recall reviewing that.

Q.   Because it's been 20 years; right?

A.   Well, it's -- I don't recall it, sir.

Q.   I understand.  But you -- probably would have been the kind of materials you would have looked at; right?

A.   There's a lot of material we might have looked at.

Q.   All right.  And you would have seen that he has pages and pages of arrests, including -- there's more assaults, there's people's -- aggravated assaults.  This is a violent, dangerous guy, would you agree?

A.   He's a troublemaker.

Q.   All right.  You knew that back then?

A.   Well, I know it now by looking at this rap sheet that you're showing me.

Q.   Did you know it when you were investigating the murder?

A.   I mean, I knew he's a gang member, you know.

Q.   All right.  Did you have reason to believe that maybe Collazo had actually been a snitch?

A.   For what, the FBI?

Q.   No.  Sometimes if people on the street talk to the police, then they make enemies; right?

A.   I imagine so.  Yeah.

Q.   Chris was found with an unusual shirt on that his family didn't recognize, wasn't he?

A.   I don't recall that part.

Q.   A CAPS shirt, 14th District Police Department?

A.   Those are given out left and right in the city.

Q.   That didn't mean gang members wore them, did it?

A.   Everybody wears those things.

Q.   Isn't it true when Chris Collazo's body was found --

            MR. LOEVY:  This is Plaintiff's Exhibit 1, page 11.
With permission to publish it, Your Honor?

            THE COURT:  All right.

BY MR. LOEVY:

Q.   He was found wearing a 14th District Police CAPS pullover
shirt?

A.   Okay.

Q.   And his pants were pulled down; right?

A.   I don't remember that part, but.

Q.   All right.  And that's an angle that could have been
explored too, whether he had snitched on somebody; right?

A.   Because of the T-shirt he's wearing.

Q.   Yeah, a gang member usually wouldn't wear a Chicago Police
Community Cooperation shirt probably?

A.   All kinds of people wear them.  They give them out left and
right.  Boxes and boxes of them in the districts and people
take them.

Q.   All right.  But this angle was never considered, I think we
agree; right?

A.  Well, we wouldn't -- we wouldn't have over that, no.

Q.  All right.  There came a point about a year into the investigation where the family -- victim's family was very unhappy with the fact that they thought the wrong people had been arrested; correct?

MR. NATHAN:  Objection.  Foundation.

MR. LOEVY:  I'm asking him if he knows.  We have a foundation for it.

THE WITNESS:  I don't recall that part.

BY MR. LOEVY:

Q.  Did -- do you remember Nancy Nazarian, the prosecutor?

A.  Nancy Nazarian.  Oh, Nazarian?

Q.  Yes.

A.  Yeah.

Q.  You interacted with her; right?

A.  I have, yes.

Q.  Did she bring it to your attention that the family thought she had the wrong guys and that there were other witnesses?

A.  I don't recall --

MR. NATHAN:  Objection.  Foundation.  Calls for layers of hearsay.

THE COURT:  He's under cross-examination, so if you can follow up with it.

MR. LOEVY:  We can when she testifies.

THE COURT:  That's the point I made this morning.  If

they don't remember, you can cross-examine.

BY MR. LOEVY:

Q.   All right.   Showing you --

MR. LOEVY:   Should I show just the witness and see if this refreshes his recollection?

BY MR. LOEVY:

Q.   Showing you Plaintiff's Exhibit 106.   The second page. These are some notes.   I won't say what they are, since they're not being shown to the jury.   But see if that refreshes your recollection?

MR. NATHAN:   Objection.   Foundation.   Not saying what they are, it's not his notes.

MR. LOEVY:   I'd be happy to say what they are.

THE COURT:   He's refreshing memory.   You show the other side?

MR. LOEVY:   This is Plaintiff's Exhibit 106.

MR. NATHAN:   Okay.

MR. LOEVY:   He's got it, Your Honor.

THE COURT:   Okay.

THE WITNESS:   I don't know what I'm looking at here.

BY MR. LOEVY:

Q.   These are the notes?

A.   From?

Q.   Nancy Nazarian, the state's attorney?

A.   Okay I didn't write these notes but go ahead.

Q. See if that refreshes your recollection that the victim's family thought that there were witnesses the police weren't investigating.

MR. NATHAN: Objection. Mischaracterizes what's in front of us here.

THE COURT: He can read it, so.

BY MR. LOEVY:

Q. Are you finished reading the part highlighted there? It's only three lines.

A. Oh, I thought you wanted me to read the whole thing here. Let me read it again.

Q. Just the three lines there.

A. Okay.

Q. Does that refresh your recollection or not?

A. I never saw this, no.

Q. All right. Did you do any followup investigation to see these other witnesses that the family was talking about?

A. I didn't know about any other witnesses.

Q. All right. Mr. Fulton and his friends were not the only people in the universe who had a motive to kill Chris Collazo, do we agree?

A. No. Can't agree on that. We don't know who did or who didn't.

Q. All right. But that was your job to find people who did; right?

Zalatoris - direct

1119

A.   I don't get what you're asking here.

Q.   In other words, I don't know who had a motive to kill Chris Collazo, but it was your job to find that out; right?

A.   Well, it was our job to find out who killed him, yes.

Q.   Okay.  And you had this lead from Marcus Marinelli; right?

A.   Right.

Q.   Marcus Marinelli, according to the family, was the last person that they knew to see him alive; right?

A.   Right.

Q.   About 10 o'clock that night, Marcus and Chris had been together; right?

A.   Somewhere in there.

Q.   Where?  I didn't hear what you said.

A.   I said somewhere in there.

Q.   Somewhere in there, okay.  So hey, that's a lead, let's go talk to Marcus Marinelli; right?

A.   Right.

Q.   And you figured out who he was, you went and figured out who it was and found him in Elmwood Park?

A.   Other detectives did, yes.

Q.   But you and Breen went and arrested Marcus Marinelli; right?

A.   No.  I don't remember us arresting him.

Q.   Well, was he handcuffed?

A.   We didn't go and talk to him.

Zalatoris - direct

1120

Q. Who did?

A. Other detectives did.

Q. So you never talked to Marcus Marinelli?

A. No.

Q. All right. Would there have been any reason to handcuff Marcus Marinelli?

A. We didn't go talk to him.

Q. You heard that Marcus Marinelli was being treated as a suspect, the last one to see him alive; right?

A. He was -- he was being treated as a person of interest because we wanted to talk to him. You know, I mean, well, the other detectives did, but wanted to talk to him. He's the last guy seen with him, yes. Not saying he's a suspect.

Q. You never talked to him, though?

A. No.

Q. But you understood that he admitted he had committed an armed robbery against Mr. Fulton and -- correct?

A. We found out about that.

Q. And he was allowed to go home; right? He didn't get prosecuted?

A. Wasn't our call.

Q. So he cooperated by saying, "All right, I'll tell you, I committed a crime," and then he was allowed -- he was released and he was allowed to go home after he cooperated?

A. Again, not our call.

Q.   Right.   He said, "I'll give you a tip.   Me and Chris robbed this kid five, six weeks ago, trying to buy a gun."   He told you that story; right?

A.   Well, he did tell the detectives that story, yes.

Q.   And then it came to you, that that was a suspect; right?

A.   Well, that he told that story, yes.

Q.   All right.   So that gives you a suspect; right?   You got your first suspect?   The kid that Chris Collazo robbed, that's someone you got to investigate, see if he might have been involved; right?

A.   That'd be one person we'd want to find, yes.

Q.   All right.   And, well, you didn't have to stop your investigation and say, "Aha, we've solved the crime."   Right?

A.   No.

Q.   Just one person you'd want to find?   And that's John Fulton; right?   That's John Fulton; right?

A.   Was there a question?

Q.   Yeah, that's John -- because we were talking about the suspect.   It's John Fulton; right?

A.   Well, we wanted to talk to somebody before we ever did that.   We wanted to find out about the setup, who set it up.

Q.   Who set what up?

A.   The gun rip.

Q.   I see.   So --

A.   We have to find out what the link is between these guys and

Zalatoris - direct

1122

the kid on the northwest side.

Q. And you found out it's Precious Griffin; right?

A. Precious Griffin, yes.

Q. You learned Precious Griffin had already been interviewed; right?

A. Yes.

Q. Who had interviewed her?

A. Winstead.

Q. And Rolston?

A. May have.

Q. All right. They went to her home, talked to her in her home; right?

A. Right.

Q. And you talked to Winstead and Rolston, or read their reports. How did you learn about it?

A. Winstead.

Q. And he told you he went and talked to Precious and she admitted that she had introduced these -- Fulton and Collazo; right?

A. Right.

Q. And she said that the gun deal had gone bad and that's all she knew; right?

A. Pretty much. And he told us we may want to go reinterview her.

Q. I'm talking about Precious. Precious said she's told them

Zalatoris - direct

1123

everything she knows.  She doesn't know anybody -- why he got killed.  "I know nothing about nothing other than I set these two kids up."  That was her story to the other detectives; right?

A.   Right.  And Winstead said, "You should reinterview her."

Q.   I didn't ask that, but I will.  I will.  But I didn't ask that.

A.   That's what we did.

Q.   All right.  Let's stay with the first part before we get to why you went to talk to her.  All right?  The first part, what they told you was that that they had accused her of providing information of being in a revenge plot; right?  Providing information to Fulton about how to kill Collazo?  They made this accusation against her?

A.   I don't understand what you're saying here.

Q.   Rolston and Winstead had a theory that maybe Precious was involved in the murder.  Perhaps she set up Collazo so that Fulton could kill him?  That was their theory; right?

A.   You know, I don't remember them saying that it was their theory.

Q.   Take a look at Plaintiff's Exhibit 23, page -- I'm sorry, Plaintiff's Exhibit 1, page 23.

          MR. LOEVY:  And permission to publish this report, Your Honor?

          MR. NATHAN:  One moment.

THE COURT: Any objection?

MR. NATHAN: One moment, Your Honor.

THE COURT: Is there a line number you can...

MR. LOEVY: It's the Rolston-Winstead report we're talking about.

MR. NATHAN: Foundation. Objection. Foundation.

MR. LOEVY: He says he has reviewed this information. He didn't even talk to her. This is what he reviewed. So it's not being offered for any purpose other than that.

THE COURT: Overruled.

BY MR. LOEVY:

Q. All right. It looks like Winstead and Rolston -- showing you their report, their police report. That's Leonard Rolston, that's the guy you knew; right?

A. Okay.

Q. According to him, you know, that she had set up the gun deal and money had gotten stolen. And then she denied providing any information to John that would aid in the revenge against Peanut. Do you see that line?

A. I see that line.

Q. Do you see that?

A. I see that in there, yes.

Q. So she wasn't saying, "I provided information to Fulton to get revenge," she was denying the police allegation that she had provided information; right?

A.   She denied I guess to Rolston that.  It wasn't to us. That's not my report either, so.

Q.   So if she -- and I guess the point I'm trying to make, if she denied it, it wasn't her idea that this was a revenge plot. This was the police saying to her, "Isn't it true that there was a revenge plot here?"  And then she denied it.  That's how you understood it; right?

A.   No.  I didn't type that up.  I didn't understand it as that.

Q.   Well, when you talked to Rolston, he wasn't claiming that Precious claimed that there was a revenge plot; right?

A.   I don't recall what I said to Rolston or Rolston said to me.

Q.   Sorry.  Rolston was saying Precious says, "I don't know nothing about nothing."  This was her story; right?

A.   Well, that's -- I mean, I'm looking at this, and this is what I know, and I didn't talk to Lenny.  I mean, I don't remember talking to Lenny about it.

Q.   But you did know that when they talked to her, she said, "I don't know nothing about nothing."  Right?

A.   That's what he typed down, I guess; right?

Q.   And apparently they threatened her, didn't they?  Did you know they threatened her?

A.   I heard that.

Q.   What did you hear?  That they threatened Precious when she

Zalatoris - direct

1126

said she doesn't know nothing about nothing and didn't know about this revenge plot?  What did you hear?

A.   Well -- and we got it from her actually, from Precious.

Q.   You got it in the police report too; right?

A.   We got it from Precious.

Q.   Precious became very nervous when the RDs -- that's the police officers; right?

A.   Right.

Q.   -- queried her again about aiding and being forced to help the revenge plot against Collazo?

A.   I don't know if they were talking right here about the first time they talked to her or when we talked.

Q.   No, no, this is their report before you ever met her.

A.   Oh, it's a progress.

Q.   Right.  Before you met her, she's being threatened that she could be in trouble unless she agrees that this was a revenge plot, wasn't she?

A.   And she said it again when we talked to her, yes.

Q.   All right.  So both the police admitted they threatened her and then when she got to you, she said, "The police threatened me that unless I say this revenge plot --"

A.   What are you talking about?

Q.   I thought you just said she said it to you that she was threatened.

A.   That she was threatened by these guys, yes, not by the

Zalatoris - direct

1127

police.

Q. The police -- when I use the word "threat," they told her that -- they told her something that could make her very nervous about aiding and abetting a murder; right?

A. I guess that's the way it's typed. Whatever they said. Yeah.

Q. All right. But before I leave the area then, and I will, this idea about the revenge plot, as you're getting ready to talk to Precious, that's coming from the police, not Precious; right?

A. No, no, it came from Precious.

Q. No. You haven't met her; right?

A. What's that?

Q. You haven't met her yet. I'm talking about the --

A. No, What I'm talking about, when she was talking to us, it came from Precious.

Q. I'm talking about before you go see Precious. All right?

A. I don't know about this right here, no.

Q. Before you go see Precious, she was not claiming there was a revenge plot, she was claiming she didn't know nothing about nothing?

A. We never talked to Precious until we went and reinterviewed her.

Q. Let's talk about when she -- went to reinterview her. Did you have any reason to believe that Winstead and Rolston

weren't good at their job?

A.   No.

Q.   Were they good detectives?

A.   I thought so.

Q.   Were they thorough?

A.   Yes.

Q.   Whose idea was it to talk to her again, see if maybe you could help her come to this police theory that it was a revenge plot?

A.   Winstead said we should reinterview her.

Q.   All right.  What was Winstead thinking there?  I guess that's a bad question.

A.   What was that?

Q.   You decided to go reinterview her; right?

A.   Winstead said we should reinterview her, so we did.

Q.   Did Winstead tell you what questions he forgot to ask?

A.   No.

Q.   Just maybe ask them again?

A.   Ask them anything else we might want to ask, yes.

Q.   All right.  Because there was a lot of other people you could talk to rather than re-interviewing Precious; right?

A.   No, she was pretty much the main person at that point.

Q.   That's -- you ever heard the phrase "tunnel vision"?

A.   Not tunnel vision.

Q.   All right.  You don't have to lock into the first suspect

Zalatoris - direct

1129

to the exclusion of all others; right?

A.   That means if you have somebody that you want to interview, just don't interview them, because?  You know, it doesn't make any sense what you're saying.

Q.   She was interviewed?

A.   Right.

Q.   Okay.  So did you ask Rolston and Winstead how they came up with this theory that maybe Precious was involved in setting up Collazo in a revenge murder plot?  Did you ask them how they came up with that theory?

A.   I don't recall asking them about that.  Or if I did, I don't recall.

Q.   Objectively you had no reason to believe that Precious was lying; right?  When she said she didn't know anything about any revenge plot, she wasn't part of it, you had no objective to think she was lying; right?

A.   Well, we didn't know if she was lying or not.

Q.   You had no reason to think she was?

A.   We didn't know if she was or not.

Q.   Okay.  Were you working afternoons -- you said you were working afternoons.  What time did you pick up Precious?

A.   Around 10 o'clock at night maybe.

Q.   How old was she?

A.   17.

Q.   You told her you were going to take her to the police

Zalatoris - direct

1130

station to talk about the Collazo murder?

A.   We pulled up next to her, yes.

Q.   And you're saying this from memory or from other testimony or your memory?

A.   No, I remember when we got her.

Q.   All right.  You claimed you said, "Hey, can we interview you about this murder?"  And she hopped in the car and is like "Sure"?

A.   She did.

Q.   All right.  You heard her testimony today?

A.   I did.

Q.   You deny that?

A.   Well, she also was getting out of a car a guy was in.  She was in a car with a guy.

Q.   You admit you couldn't make her go with you; right?

A.   No, we couldn't just grab her off the street, no.

Q.   She said, you know, "I don't think I want to go all the way across town.  It's 11 o'clock, 10 o'clock at night.  I don't want to go."  Was she allowed to say no?

A.   She didn't say any of that.

Q.   But she was allowed to say that?

A.   But she was sitting --

Q.   Okay.  Just stay with my question.  She was allowed to say that, if she wanted to --

A.   If she wanted to.

Q.   You didn't have probable cause to arrest her?

A.   We didn't arrest her.

Q.   This was a weeknight; right?

A.   I imagine so.

Q.   Did you ask her parents if you could take her?

A.   No.  But they were advised.

Q.   Well, the question was, did you ask her parents?

A.   We didn't talk to her parents.  She's 17.  She's not being charged with anything.  She's not being arrested.  She's a witness.

Q.   Did you suggest she go in the house, tell her parents that you're going to take her over to Area One on the south side?

A.   No, the guy in the car actually asked who we were.

Q.   What guy in the car?

A.   She was getting out of a car with a guy.

Q.   Is this in a police report somewhere?

A.   No, I'm telling you what happened.

Q.   All right.  But you're telling me from memory, though; right?

A.   I'm telling you what happened.  She got out of a car with a guy and we told the guy who we were and he says, "I'll go tell their people, her people," and we left.

Q.   We heard that story.  I'm asking a different question. That's all from memory; right?

A.   Okay.  So nothing here's going to be from memory?

Q. No, just -- not trying to argue. Just answer the questions. I mean, there's some things that are written down so you can say --

A. And I just explained what happened.

Q. All right. But you didn't write in your notes, "She was getting out of a car. I told the guy to go tell her parents." That didn't get written down; right?

A. If it's not written down, it's not written down, but that's what happened.

Q. Got it. All right. There was no rule that prohibited you from interviewing her at home; correct? She could have been interviewed in a home?

A. I guess we could have.

Q. And where did you drive her to?

A. Area One.

Q. How far was that from where her house was?

A. Let's see. It was up on the north side.

Q. She lived on the north side?

A. Yeah. Like somewhere around, I don't know, Addison or something.

Q. You took her all the way to the south side?

A. Took her to 39th, so about six miles, seven miles.

Q. But all the way through the Loop on to the other side of the city; right?

A. I don't know if we went through the Loop or drive or how we

Zalatoris - direct

1133

went there.  I don't remember how we went there.  It was late at night.  Not a lot of traffic.

Q.   Just on the map, though, so everybody's oriented, the north side is up here.  This is Collazo's house; right?

A.   Okay.

Q.   And the south side of the city is where Fulton lives, where the hospital is.  That's the south side of the city; right?

A.   Well, yeah, but it wasn't that far south.  It was about four miles north of where you're pointing there.

Q.   This looks like 31st Street, so 39th Street?

A.   39th and off -- near Ashland.

Q.   So somewhere -- just so -- and it's not terribly important, but just to orient, you're just about here on the map?

A.   I guess.  It's hard for me to see.

Q.   All right.  When she -- she had no ride home; right?

A.   We would have gave her a ride home if she wanted to go home.

Q.   All right.  Was she there voluntarily?

A.   Yes.

Q.   What time did she get to the station?

A.   Couldn't tell you.  From, you know, from the time we left up there to the time we got to the station.

Q.   Sometime getting close to midnight?

A.   I don't know if it was getting that late, but could be.

Q.   All right.

A.   Could have been.

Q.   She described being put in a room.  You dispute that.
Locked in a room?

A.   She wasn't locked in a room.  She was put in an office.

Q.   But you have interview rooms that people can be locked in;
right?

A.   We do.  None of them are painted black like she was saying.

Q.   All right.  And that's her memory.  But she remembers --

A.   There was no -- I remember black -- painted black room.
There is no painted black room.

Q.   She remembered being locked in a room.  They had rooms that
locked; right?

A.   Those are -- yeah, those would be interview rooms, yeah,
which she wasn't in one.

Q.   And we don't have any notes that reflect where she was
placed; right?

A.   She was placed in an office.

Q.   Now she tried to claim she didn't know anything when you
talked to her; right?

A.   I'm trying to remember the first thing she was talking
about to us, to tell you the truth.  I don't remember offhand.
From my GPR, I could tell you.

Q.   Well, I do have a copy of Winstead's GPR.

A.   No, no, my GPR.

          MR. LOEVY:  Why don't you pull a copy of his GPR while

I continue this.

BY MR. LOEVY:

Q.   Let me ask you some questions while we look for that. Actually I'd like to ask you first from memory, just from memory.  When you started talking to Precious Griffin, was she like, "I don't know anything about this murder"?  Was that her first reaction?

A.   You know, I'd like to look at my GPRs first before --

Q.   I'm going to read you your sworn testimony.  This is from October 1st, 2004.  Do you remember giving this testimony under oath?  This is page 159, lines 21.

A.   Where was this at?

Q.   This is at the hearing before court on October 1st, 2004.

A.   This is a motion hearing or is this the trial?

Q.   Yeah, it's not relevant what hearing it was, but it is before the trial in 2004.

        MR. LOEVY:  And if we could publish, Your Honor.

        MR. NATHAN:  Object to the publishing.

        THE COURT:  This is impeachment.  Just ask the question.

BY MR. LOEVY:

Q.   All right.  Do you remember being asked this question, giving this answer:  "When Precious was in the police station, did she ever tell you something to the effect of, 'I don't know anything about this murder'?"  And the Court asked the

question, and then the witness says, that's you, "I think initially she said she didn't know anything about it, that she just set up a gun deal."

Let me ask you the question. Did you give those answers under oath?

A. I gave those answers, yes.

Q. And were they true?

A. Yes.

Q. And did you write that in your GPR, that she said she didn't know anything about it?

A. I don't know. You haven't shown me my GPR yet.

Q. Well, let me ask you. Should you have written down that she denied knowing anything about it?

A. I want to look at my GPR, sir.

Q. I'm asking a different question. Should you have written down that she said she doesn't know anything about this murder?

A. I don't know. I mean, I have to look at my GPR and see if I did.

Q. No.

A. You're asking me if I did, and I have to look at the GPR to tell you if I did or didn't.

Q. Sir, I'm not asking if you did. You follow me? I'm asking you, should you have? Wouldn't it have been proper if she was denying being involved in the murder?

A. Maybe.

Zalatoris - direct

1137

Q.   Maybe?

A.   Maybe.

Q.   All right.  Might have been proper to just leave that fact out?

A.   Let me look at my GPR and I'll tell you.

Q.   I'm not asking you what you did yet.  I'm just asking you to admit unequivocally, if a witness says "I don't know anything about this murder," you shouldn't write down, "Well, let me tell you about the time I participated in a murder."  Do you agree with that?

A.   What was that question again?

Q.   She -- at some point, she stops saying that she didn't know anything about it; right?

A.   Yes.

Q.   And were you taking notes while you talked to her?

A.   No.

Q.   Why not?

A.   Because usually you don't write in front of people.

Q.   All right.  So why would checking your GPR be helpful if you weren't taking notes?

A.   Because what you do is you talk to people, they give you answers, and then you go over it again and ask them again and then you write it down.

Q.   All right.  We're having trouble finding -- are you sure you wrote a GPR on Precious Griffin?

A.   Pretty sure I did.

Q.   All right.  That should exist; right?

A.   It should.

Q.   All right.  And Precious Griffin was denying being involved, and taking a look at -- was Griffin being treated as a witness or a suspect?

A.   Witness.

Q.   Would it have been appropriate to hold her all night?

A.   Would it have been appropriate?

Q.   Yeah.

A.   We were talking to her, so as long as it takes, we're talking and she's answering, yeah.

Q.   She should not have been held against her will; right?

A.   She wasn't.

Q.   She did stay at the police station all night; correct?

A.   Yes.

Q.   And you were her only ride home?

A.   Well, us or any other detectives that were working.

Q.   How long did it take Precious Griffin to go from "I don't know anything about this murder" to your revenge theory?

A.   I don't recall the exact timeframe.

Q.   All right.  Did she get any sleep that night?

A.   She may have.

Q.   There's no place to sleep; right?

A.   Well, I mean, in the office.

Zalatoris - direct

1139

Q.   There's no bed?

A.   There's no beds up in there, no.

Q.   So if she nodded off, it was in a chair; right?

A.   Yes.

Q.   You started interrogating her at what time?

A.   Well, whenever we got back to the area, I want to say, you know, whatever -- however long it took to get from her house to --

Q.   All right.  So maybe around 11, 12?

A.   Somewhere in there.

Q.   Was she ready to tell the police theory about "This was a revenge set up deal" at 1, 1 a.m.?

A.   I don't remember, to tell you the truth.

Q.   Was she ready at 3 a.m.?

A.   I don't remember the times.

Q.   All right.  Was she ready at 5 a.m. to say --

A.   I don't remember the times.

Q.   What time did you end up -- did she take a statement from the state's attorney?

A.   Again, you'd have to look at that.  I can't recall the time.

Q.   Any reason why it would have taken 12 hours, all night?

A.   If we're going back and forth, and state's attorneys, you're waiting for them to come in, that kind of stuff, yeah, it could take some time.

Zalatoris - direct

1140

Q. All right. So she was up all night, wasn't she?

A. So were we, yes.

Q. Okay. Let me ask you, yes-no question or "I don't remember." Did Precious Griffin ever ask to speak to her family, to call her family?

A. No.

Q. Did Precious Griffin, up all night, ever ask to go home?

A. No.

Q. Did you ever lead Precious Griffin to believe that she had no choice, she wasn't going anywhere, until she cooperated?

A. No.

Q. Did you ever feed Precious Griffin?

A. Don't remember if we did or not.

Q. There wouldn't have been any food at this area; right?

A. Not at the area, no.

Q. Now before -- eventually you did flip her; right?

A. What's that?

Q. You did flip her? In other words, she was going from "I don't know nothing" to "All right, I agree with the police revenge plot." At some point, she transitioned from A to B; right?

A. Eventually she did tell us the truth, yes.

Q. All right. You don't know what the truth is; right?

A. It's what she told us.

Q. No. She told you she didn't know nothing about it. Why

wasn't that the truth?

A. Because it wasn't the truth.

Q. All right. You were trying to get her to implicate herself in this plot; right?

A. We weren't trying to get her to implicate anything. We wanted her to tell us what happened.

Q. Well, the theory that the police had was that she was going to provide aid to John Fulton in getting revenge; right?

A. Again, I didn't type that, so, you know.

Q. All right. Well, you were trying to get her to admit involvement in the crime; right?

A. No.

Q. She did admit, ultimately admit involvement in the crime; right?

A. Well, I mean, you could maybe say minor involvement. She's not one of the people that kidnapped and murdered him, of course.

Q. Right. So the play was, "Just admit minor involvement and you can go home." That's what you told her; right?

A. No, not at all.

Q. She did admit minor involvement; right?

A. Right.

Q. And she did go home; right?

A. The determination was the state's attorney's, whether she -- well, the state's attorneys decide that, not us.

Q.   I said, she went home; right?

A.   The state's attorneys said, yes.

Q.   And I didn't yet ask who made the decision.  But she cooperated and then she got to go home; right?

A.   She cooperated and state's attorneys made the decision for her to go, yeah.

Q.   Was she ever told she had a right to remain silent?

A.   She was a witness.

Q.   Okay.  Was she ever told she had a right to remain silent?

A.   We never gave rights to a witness, no.

Q.   Was she ever told she had a right to remain silent?

A.   Absolutely not.

Q.   Thank you.  With the benefit of hindsight, since you're interrogating her about admitting a minor role in a murder, don't you think she should have been told, "You have a right to remain silent and you have a right to a lawyer"?

A.   We had her up there as a witness.

Q.   Well, what if she said, "All right, I confess, I confess, I set up Collazo, I told John where he was, I knew John was going to go get him"?  She might have said that; right?

A.   She may have.

Q.   In fact, that's what you got her to say; right?

A.   That's what she said, yeah.

Q.   So don't you think she should have been read her rights, "You have a right to remain silent, you have a right to a

Zalatoris - direct

1143

lawyer"?  It's not like that?

A.  I don't -- I mean, at the point -- we're talking to her as a witness.  Okay?

Q.  You'd already decided, you play witness, you play guilty, you don't know how it's going to play out; right?

MR. NATHAN:  Objection.  Form.  Argumentative.

MR. LOEVY:  I'll ask a different question, Your Honor.

BY MR. LOEVY:

Q.  For all you knew, she was going to say, "I'm the criminal mastermind, I asked John to kill him."  She might have said that; right?

A.  Well, if she would have said that, yeah.  That's a little different.

Q.  So in hindsight, you probably should have said, "Ma'am, you have a right to remain silent, you have a right to a lawyer, you don't even have to talk to us."  You should have said that; right?

MR. NATHAN:  Objection.  Asked and answered.

THE COURT:  What was his response?

MR. LOEVY:  He's not being responsive, Your Honor. I'll move on.

BY MR. LOEVY:

Q.  Did you ever threaten Precious Griffin in any way about what could happen to her if she didn't cooperate?

A.  No.

Q.   Did you tell her if she didn't cooperate, she's going to be charged with a crime?

A.   No.

Q.   All right.  Do you remember -- let's play your deposition. Do you remember giving a deposition in this case?

A.   Yes.

Q.   This is page 132, lines 1 through 4.

        MR. LOEVY:  If we could have the video, Your Honor.

        MR. NATHAN:  Can I just have a minute?

        THE COURT:  Wait, wait, wait.

        MR. LOEVY:  Take it off the screen, Alyssa.  Okay?

        THE COURT:  What's the exhibit number?

        MR. LOEVY:  This is Defendant's Exhibit -- deposition, Your Honor.  It's Exhibit 217.

        THE COURT:  Any objection to this?

        MR. LOEVY:  It's impeachment, Your Honor.

        MR. NATHAN:  No, Your Honor.

BY MR. LOEVY:

Q.   All right.  You said you didn't tell her she could be charged with murder.  You did not threaten her with that?

A.   We didn't threaten her, no.

        MR. LOEVY:  All right.  If you could play it then, Alyssa.

   (Video played in open court.)

        MR. LOEVY:  All right.  That's good, so -- and then

take it down.

BY MR. LOEVY:

Q. If you -- you're talking to Precious. She's saying, "I don't know nothing." And you say, "Look, you can be charged with murder." Right?

A. That's not the whole thing I said, no.

Q. But you did imply or give her the impression --

A. No, I didn't imply. I told her, "If you're involved in this, you can get charged. Do you understand that?"

Q. And she said, "I am involved"?

A. No, she didn't say that.

Q. Yes, she did --

(Interruption by court reporter.)

THE COURT: One at a time. Both of you are very quick to respond or ask. So slow down.

BY MR. LOEVY:

Q. You said to her -- isn't it true you said, "You could be charged with murder unless you cooperate with us"? That's the gist of what you were saying; right?

A. No, that's not.

Q. You're saying you just said, "Hey, you could be charged," and she said, "Okay, well, then I'd like to confess that I did assist in this murder"? That's your story?

A. That's not my story either. I don't know what you're asking me here. I told you what I said.

Zalatoris - direct

1146

Q. All right. And she kept telling you she didn't know nothing about it and you kept telling her, "Unless you cooperate, you could be charged with murder." Right?

A. No. That's not what I said.

Q. Well, it came up that she could be charged; right?

A. Well, we're getting a little different now. I told you what I said. And that's not what you're saying.

Q. All right. At -- was she saying it -- at 6 a.m., was she ready to say what you wanted her to say?

A. I don't recall the time.

Q. She wasn't ready until 9:45 a.m.; correct?

A. I believe that's when the state's attorney was in.

Q. And that you wouldn't have wanted the delay, once you got her where you wanted her; right?

A. What do you mean, "got her where we wanted her"?

Q. Let's say once she was ready to tell your story, you called the state's attorney; right?

A. Once she told us the story, we went through it and she told it to us again to reaffirm what she said. Then we called a state's attorney, yes.

Q. So if you didn't call the state's attorney until 9, 10 in the morning, can we infer she wasn't saying it at 5 a.m.? Right?

A. Oh, if you have -- you have down that we called the state's attorney at 10 in the morning?

Zalatoris - direct

1147

Q. No. I'm asking you if in fact the state's attorney got there and took her statement at -- let's look at the time, about 9:45. This is Plaintiff's Exhibit 1, page 80. State's attorney takes the statement about 9:45. Do you see that?

A. Okay.

Q. So can we infer from that that, say, at 4 a.m., she wasn't ready to talk to the state's attorney?

MR. NATHAN: Objection. Asked and answered. Form.

THE WITNESS: We can't infer from that.

BY MR. LOEVY:

Q. Cannot infer?

A. No.

Q. All right. Because it seems like if she was ready to tell the story at 4 a.m., you wouldn't want her to like sleep on it or change her mind. Seems like you'd want to get the state's attorney in a hurry, wouldn't you?

A. You can't get the state's attorney in a hurry. That's why I'm saying you can't infer it's 4 clock.

Q. You were in court when Judge McCray said it's a 24-7 operation and "we don't delay because people might change their mind." They hustle over, don't they?

A. That's not what he said.

Q. They don't hustle over to take confessions and statements?

A. Sometimes you call, sometimes they're not available. You have to wait. They're changing their shift. They're changing

the shift.  That's automatic two-hour wait right there.

Q.  So you're saying sometimes you could have a guy in the police station ready to confess and you couldn't take a confession because the state's attorneys couldn't get there?

A.  Well, if they can't get there until a certain time, that's what happens.

Q.  Is that what happened with Precious Griffin?  She was ready to go in the middle of the night, but you waited until 9:45?

A.  May have been.

Q.  But you don't remember either way?

A.  It may have been.

Q.  You don't remember either way?

A.  I said it may have been.

Q.  And I asked you a follow --

A.  You're saying it again.  I'm saying it may have been.  I don't know.  I don't remember.

Q.  And you dispute her version on the screen that you saw this morning; right?

A.  Oh, yeah.

Q.  At some point, 9 in the morning, she did give that statement; right?

A.  Yes.

Q.  Who was the person primarily responsible for getting her to go from "I don't know nothing about this" to admitting that she had set up Collazo so that John Fulton can go get her him?  Who

was the detective primarily responsible for developing that information?

A.   Well, we asked her and she told us.

Q.   So you; right?

A.   It was both of us, my partner and I, yeah.

Q.   You and Mr. Breen?

A.   Yeah.

Q.   And she wasn't allowed to go home even after she gave the statement; right?

A.   What do you mean "wasn't allowed"?  She never asked to go home.

Q.   She never asked to go home?

A.   Right.

Q.   There was no place she wanted to be rather than that police station talking to you all night?

A.   I don't know.

        MR. NATHAN:  Objection.  Argumentative.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Let me ask you this.  Do you think she understood, at 5 a.m., 6 a.m., 7 a.m., do you think she understood that all she had to do was ask if she could go home and this was over? Do you think she understood that?

A.   I don't know what she understood.

Q.   Did you give her the impression that maybe she couldn't?

A. No.

Q. All right. In any event, she did cooperate and she did go home; right?

A. I don't know if she went right home or went to grand jury first. I don't remember.

Q. Well, actually that was the price of the ticket home. She had to go lock in at the grand jury?

A. That would be up to the state's attorneys, yes.

Q. And the statement she gave was -- actually we'll use the ELMO -- was that she orchestrated a thing where she was going to set up Collazo on the phone. She called -- yeah, she was setting up Collazo, and she called Fulton at -- on March 9th at 3 and 7:30 in the afternoon. And said "This is where Collazo's going to be." Right? That was the gist of Precious Griffin's statement?

A. That's the gist of it.

Q. And he was going to get off the Foster bus at the Rockwell stop?

A. That's the gist of it. I'd like to see my GPR to make sure.

Q. And we did find the GPR.

A. Yeah, I know it's there.

Q. But just from memory, it was sometime between 9:30 and 10:30; right?

A. Somewhere in there.

Zalatoris - direct

1151

MR. LOEVY: And, Your Honor, can we publish this, please?

THE COURT: Any objection?

MR. LOEVY: This has already been seen by the jury. It's just our demonstrative.

THE COURT: We didn't identify what it is.

MR. LOEVY: I'm sorry. It's Demonstrative -- we'll call it 258.

MR. NATHAN: Do you have an extra copy?

MR. LOEVY: Here.

BY MR. LOEVY:

Q. All right. The gist of Precious Griffin's statement was, on the phone, she's telling Fulton that the victim was going to be on the Foster bus at the Rockwell stop somewhere around 9:30, 10:30 at night. And she's going to be on the phone with Fulton in the afternoon on March 9th, telling him these things. That was the gist of the statement; right?

A. That's what you have there, yes.

Q. All right. Now you've got a grand jury convened against John Fulton; right?

A. After Precious talked to us?

Q. Yeah.

A. That wasn't the next thing that happened, no.

Q. Well, after Precious talked to you, didn't she go to the grand jury?

A.   She did.

Q.   All right.  So the train has left the station.  Before you ever talked to John Fulton, there's a grand jury investigating John Fulton; right?

A.   There's a grand jury that's taking her statement, yes.

Q.   All right.  So that's before you've even spoken to John Fulton?

A.   Right.

Q.   The case was closed; right?

A.   No, it wasn't closed.

Q.   You have probable cause to arrest John Fulton now for murder; right?

A.   Yes.

Q.   And you were persuaded that John Fulton was guilty?

A.   Well, we went by what Precious said, yes.

Q.   All right.  Were you persuaded at this point, "Game over, I've solved the crime"?

A.   No, not yet necessarily, no.

Q.   All right.  Did you arrest John on the 14th, the day that Precious Griffin's statement was taken?

A.   No.  Myself and my partner didn't arrest him.

Q.   Was John arrested on the 15th?

A.   He was arrested.  I don't remember the exact date.

Q.   Was he arrested on the 16th?

A.   Again, I don't remember the exact date, I said.

Q.   Why was there a delay in arresting him?

A.   I don't know.  You're asking me?

Q.   Was it because the case was weak?

A.   Oh, it was?

Q.   I'm asking you.  Was the reason --

A.   I don't know.  You know, I don't remember the date he was arrested offhand.

Q.   All right.  The motive here was revenge as I understand it; right?  15 bucks, and he was going to get him back.  Five or six weeks go by, Precious Griffin helps set him up.  That was the theory of the case; right?

A.   Well, that was part of it.

Q.   Now there was some reasons to think maybe it wasn't John Fulton.  Can you think of any?  Any at all?

A.   Well, I mean, not right now offhand, no.

Q.   All right.  How about the fact --

MR. LOEVY:  And, Your Honor, instead of using the easel, I'd just like to publish, you know, and write it.

THE COURT:  Okay.  We better take a recess, so, after this.

MR. LOEVY:  All right.  Thank you.

BY MR. LOEVY:

Q.   One of the reasons that -- maybe to wonder if this was right is John Fulton did not fit the profile of someone who would execute somebody; right?

Zalatoris - direct

1154

A.   I didn't know his profile.

Q.   Well, you pulled his criminal record history and the five days --

A.   I didn't know his profile.  You're saying he doesn't fit a profile.

Q.   Okay.  I did say that.  But the next question was, you pulled his criminal history; right?

A.   We may have.  I don't remember it, but.

Q.   You would have pulled his criminal history; right?

A.   But I don't remember it, okay?

Q.   But you would have pulled his criminal history; right?

A.   But I don't remember it.  So you're going to ask me questions about it, where I don't really remember his criminal history.

Q.   I get it.  You don't remember his criminal history.  I think we're all clear.

A.   Okay.

Q.   But now I'm asking before you went and proceeded, you would have pulled his criminal history?

A.   I'm sure it was pulled.

Q.   That's all I'm asking.  And you saw -- and if he had a cannabis arrest for $15 of cannabis and a trespass, that wouldn't be the profile of someone who would execute this -- someone that way; right?

A.   I wouldn't know what the profile is for somebody that

Zalatoris - direct

1155

executes somebody.

Q.   Another reason to -- well, it could be a gang member, it could be organized crime, could be a serious criminal that had done this before; right?

MR. NATHAN:   Objection.  Calls for speculation --

THE WITNESS:  -- psychopathic, all kinds of things.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   All right.  Another reason it might not be John, and there's only four --

MR. LOEVY:  And did you say you wanted to keep going until when, Your Honor?

THE COURT:  Well, I like to take a break an hour and a half.  We're past that now, so.

MR. LOEVY:  All right.  This might be a time to take a break then.

THE COURT:  Okay then.  We'll take a 15-minute recess.

(Jury exits at 2:37 p.m.)

(Recess at 2:37 p.m., until 2:52 p.m.; jury in.)

THE COURT:  Please be seated.

MR. LOEVY:  All right.  If we could have the ELMO camera back?

BY MR. LOEVY:

Q.   And where we left off, sir, I was asking you -- you told me some reasons why you could suspect that it was John Fulton.

Could you think of any more reasons to wonder: Well, you know what? Maybe it wasn't John Fulton?

A. At that time, no.

Q. How about ever?

A. I'd say no.

Q. All right. Well, how about this one? It was actually Marcus Marinelli who stuck up John, right?

And showing you page 3 of Plaintiffs' Exhibit 11. This is in evidence.

Marinelli's the one who told "dude to get down" and "hands me the money," right?

A. Yes.

Q. So, you know, if he was gonna murder somebody, Marinelli would probably be the one he'd murder, right?

A. I don't know what he was thinking.

Q. All right. Apparently, there was some bad blood between Marinelli and Collazo, too, about the robbery? Marinelli -- Collazo thought Marinelli ripped him off.

A. Oh, I didn't know anything about that.

Q. Did you know that -- you know, when they only got $15, Collazo's like, "Where's the 300?" And that they had gotten in an argument?

Did you read those reports?

A. I don't recall that.

Q. All right. Did Marinelli have an alibi for where he was on

Zalatoris - direct

1157

the night of the murder?

A.   Again, I didn't interview him, so I don't recall.

Q.   All right.  Maybe he snuck out the back and murdered Collazo.  Did anybody check?

A.   Again, I didn't interview him.  I don't recall.

Q.   Did anybody see if he got an oil change on the 10th?  Marcus Marinelli?

A.   I --

Q.   All right.  Let's look at the motive.  This is another reason -- and, by the way, that was a joke.  It's okay to get an oil change on March 10th, right?

A.   I don't know what you're talking about.

Q.   Well, why was all that focus on Mr. Fulton getting -- and Yolanda going for an oil change?  Did you understand the significance of that to the investigation?

          MR. NATHAN:  Objection, argumentative, form.

BY MR. LOEVY:

Q.   Did oil changes have any significance to your investigation?

A.   I -- I don't know.  No, I don't think it would.

Q.   All right.  Another problem with thinking that Fulton might be the murderer is he only lost 15 bucks, right?  That's true, right?

          That would cut the other way against duct-taping somebody, you know, beating him, putting him in a plastic bag

Zalatoris - direct

1158

and lighting their body on fire.  That's not the kind of thing you would do over $15, right?

A.   Not only over $15, no.

Q.   All right.  And, in fact, Mr. Fulton was kinda like ha-ha, right?

A.   Was kind of --

Q.   Showing you the same report.  Marinelli reported he only got the $14.  "Victim thinks I cheated him," victim being Collazo.  "I show him the money."

         "Victim calls dude back" -- he's Dude (indicating) -- "who laughs about how little money we got."

         Do you see that?

A.   Yes.

Q.   You never talked to Marinelli, right?

A.   I didn't, no.

Q.   So it didn't seem like Marinelli thought Fulton -- well, he thought Fulton got over on Collazo, right?

         Ha-ha, he only got $15.

A.   I mean, I don't know what he thought.

Q.   The story got changed when it got reported to Fulton being mad about it, didn't it?

A.   He got mad, yeah.  When he got mad about it, yeah.

Q.   It went from laughs to got mad.

         And showing you Plaintiffs' Exhibit 1, page 16.  Peanut called -- when the report got written later, "Peanut

calls the male black," and the "male back was mad but laughed" that they did not get so much money.

That's how it got reported, right?

MR. NATHAN: Objection, foundation. It's vague and confusing, the reference to Exhibit 1, which is 84 pages of miscellaneous reports.

MR. LOEVY: Well, let me just ask a different question, then, Your Honor.

BY MR. LOEVY:

Q. If the victim called Dude back, who laughs about how little money --

MR. NATHAN: Objection.

BY MR. LOEVY:

Q. -- it shouldn't --

MR. NATHAN: One second, sir. You're publishing to the jury. Is that intentional?

MR. LOEVY: Yes.

THE COURT: Take it down.

MR. LOEVY: Both of these have been already reviewed by the jury.

MR. NATHAN: Objection, foundation.

THE COURT: What did you say?

MR. LOEVY: I would say the foundation objection's been recovered. This is an official police report. And the notes that have already been -- it's the same page that was

shown to the jury a second ago. We already have laid the foundation.

MR. NATHAN: It's the same problem we talked about before.

Objection, foundation as to Exhibit 1 being miscellaneous batches of reports, which were identified for identification only.

THE COURT: Well, all of these excerpts of the report --

MR. LOEVY: Yeah.

THE COURT: -- have not been received in evidence.

MR. LOEVY: All right.

THE COURT: So you'll have to -- if there's an objection, you'll have to lay a foundation and offer them.

MR. LOEVY: Okay.

BY MR. LOEVY:

Q. Another reason to wonder if this was a revenge murder plot is like something like five weeks had gone by between the robbery and somebody lighting Chris Collazo on fire, right?

A. Okay.

Q. That cut against that this was a revenge murder plot?

That on Sunday night, on a school night, coldest night of the year, five weeks later, he's gonna go get his revenge, that cut the other way, right?

A. I wouldn't say "cut the other way."

Q. Well, it wouldn't -- it doesn't prove anything, but it is in the other column of "maybe not John Fulton," right?

MR. NATHAN: Objection, asked and answered.

THE COURT: Overruled.

Do you want to answer that?

BY THE WITNESS:

A. Oh. What was the question again?

BY MR. LOEVY:

Q. If you're gonna put it in the column of "probably John Fulton" or "probably not John Fulton," that's a fact that probably goes against it being John Fulton, right?

A. I'm not gonna say it tips too far in that direction, no.

Q. All right. Did you consider a single other suspect for this crime other than Fulton and his friends?

And I'll write down the names of any suspect you considered other than Fulton and his friends.

Anybody?

A. Okay. What do you want to know? What was your question?

Q. Did you consider any suspect for this crime other than John Fulton and his friends?

A. We went where the statements led us.

Q. Okay. That's your explanation for why you didn't, but my question was -- I'm going to write down the name of any other suspect you considered other than John Fulton and his friends.

Can you answer that question?

A.   The real ones --

         MR. NATHAN:  Objection -- one second.  Objection, asked and answered.

         MR. LOEVY:  No.  He didn't answer it.

         MR. NATHAN:  And, Your Honor, objection, form as well, and argumentative.

         MR. LOEVY:  Wait.  I don't think we heard your ruling.

         THE COURT:  He did not answer the question.

BY MR. LOEVY:

Q.   Can you name any other suspect, sir?

A.   No.

Q.   How about your motive?  You had a motive to close this case, right?

A.   I had a motive?

Q.   Yeah.

A.   I don't -- not that I know of.

Q.   Did you believe John was guilty?

A.   If there was -- after an investigation was done?

Q.   Yeah.

A.   Yes.

Q.   So you wanted to bring him to justice, right?

A.   Well, we did what we're supposed to do.

Q.   And at work, you get sort of judged or graded on whether you close cases, right?

A.   No.

Q. Nobody notices if you close your cases or don't close your cases?

A. I don't know who would notice it, no.

Q. How about your supervisors or the bosses? Nobody notices if you close cases?

MR. NATHAN: Objection, asked and answered.

THE COURT: It was asked.

MR. LOEVY: It was a follow-up.

BY MR. LOEVY:

Q. Your bosses? Your supervisors? Nobody notices if you close your cases?

A. I mean, it gets put in a computer, but other than that --

Q. It's good for your professional standing at work if you get confessions. Do we agree or disagree?

MR. NATHAN: Objection, Your Honor, form.

THE COURT: Overruled.

BY THE WITNESS:

A. I don't know. I mean, you get paid the same no matter what goes on, whether you clear it or not.

BY MR. LOEVY:

Q. And once you had Precious Griffin's statement saying that it was Fulton, it was going to be very hard to prosecute somebody else; would you agree?

A. Depending on where that led.

Q. Yeah. Let's say Collazo's brother said it was the La Raza

gang, and they told you who did it.

By then, it's too late, because that guy would have a defense, right?

A.   Wait.  I don't understand what you're saying.

Q.   His defense would be, "Hold on.  Precious Griffin just said Fulton did it.  I didn't do it.  Fulton did it."

It's too late to go after somebody else at that point, right?

MR. NATHAN:  Your Honor, objection, form, argumentative.

THE COURT:  I think he's under cross-examination.  He can press him.

BY MR. LOEVY:

Q.   In other words, let's say a La Raza gang member had been identified.  That La Raza gang member would have been entitled to Precious Griffin's statement saying, "Hey, we set up Fulton," right?  He would've got that, right?

A.   Yes.  I --

Q.   So that would've made it a lot harder to prosecute anybody else in the universe other than Fulton at that point, right?

A.   Just go where -- you know, where the statements and the evidence take you.

Q.   All right.  You do go to arrest John Fulton, right?

A.   It wasn't us.

Q.   All right.  Showing you the arrest report.

MR. LOEVY: We'd move this into evidence, Your Honor. This is Plaintiffs' Trial Exhibit 1, page 38.

It's John's arrest report. We'd move it into evidence.

MR. NATHAN: Objection.

MR. LOEVY: He said, "No objection." May I publish, Your Honor?

THE COURT: Yes.

BY MR. LOEVY:

Q. Do you recognize the document?

A. I can't read it, though, but --

Q. Are you -- John Fulton's arrest report, right?

A. Okay.

Q. Looks like at the time, he was 5'9, 155.

Do you see that?

A. Uh-huh.

Q. He's arrested on date and time, March 18th, 5:30 in the morning, right?

A. Yes.

Q. Now, you are listed as an arresting detective, you and your partner, along with Struck and Winstead, right?

A. Right.

Q. Now, at the Chicago Police Department, if there's a document created saying "a detective" -- "arresting detectives, colon," and your name's on there, doesn't that mean you're an

Zalatoris - direct

1166

arresting detective?

A.   Yes.

Q.   Doesn't that mean you arrested him?

A.   We didn't go out there and actually do the arrest, no.

Q.   Okay.  So this is a typo?

A.   No, it's not a typo.  You would put down other officers that are involved in it when the arrest is made.

Q.   Okay.  And it says:  The subject was arrested on -- charge indicating that he was named as the person who abducted the victim and beat him, thereby causing his death.

        Do you see that?

A.   Yes.

Q.   That's a sloppy use of words, right?

A.   Well, I didn't type it, but --

Q.   Yeah.  'Cause he wasn't named by anybody as having abducted and beat him before he confessed, right?

A.   Ah.  I don't believe so, but --

Q.   Yeah.  You agree with me, nobody named him?

A.   I'm not agreeing.  I just don't believe so.

Q.   But it's an ambiguous you don't believe so.

        You would agree with my statement that nobody had named Fulton as the person who abducted and beat him at the time Fulton was arrested, right?

A.   I don't believe so.

Q.   So you agree with me?

Zalatoris - direct

1167

A.    I said I don't believe so, sir.

Q.    All right.  You don't believe -- it's a little bit ambiguous, but I think it's clear enough.

      That statement was used as probable cause to hold him, correct?

A.    That was one of the things, yes.

Q.    There is nothing else, right?

      There is no probable cause to arrest John other than what Precious Griffin's saying, right?

A.    Yes.

Q.    All right.  And you did -- you don't remember the arrest, right?

A.    No.

Q.    You don't remember not being there, do you?

A.    I wasn't there.

Q.    Do you have a memory of not being there or are you just saying you don't remember either way?

A.    We weren't there at that time.

Q.    All right.  'Cause you probably did hundreds, if not thousands, of arrests, right?

A.    Made a lot of arrests, yes.

Q.    That was something you did every day as part of your job, right?

A.    Right.

Q.    So it's possible you were there and you don't remember --

Zalatoris - direct

1168

A.   No.

Q.   -- right?

A.   It's -- we weren't there.

Q.   All right.  Did you arrest other people that week?

A.   Don't know about other people.  In this -- well, in this case, yeah, we did arrest other people.  But we weren't there for John Fulton's arrest, no.

Q.   All right.  So you don't deny, because you have no basis to deny, the way John described the arrest?

         You don't say that that didn't happen.  You say you weren't there.

         That's a bad question.  I'm going to move forward here.

         You took John to the police station, right?

A.   What's that?

Q.   You took John -- somebody took John to the police station.

A.   Somebody did, yes.

Q.   Where was he placed?

A.   Originally?  I wouldn't know.

Q.   Well, you encountered him, right?

A.   Later on.

Q.   Where was he?

A.   Well, later on that night, when we came into work?

Q.   Where was John?

A.   We came in that night to work.  I believe he was in an

Zalatoris - direct

1169

interview room at night when we got there.

Q.   All right.   These are small interview rooms, right?

A.   Yeah.   They're not real big, no.

Q.   Six by eight?   Something like that?

A.   A little bigger than that.

Q.   There's a little door, right?   Locks?

A.   There's a door.

Q.   A little bench?

A.   There's a bench.

Q.   Is there room for chairs?

A.   Yes.

Q.   All right.   And there's no windows in those rooms, are there?

A.   No.   You can't have windows in there.

Q.   So McRay Judge was mistaken, wasn't he?

A.   About the interview room?

Q.   Yeah.   There's no windows in interview rooms.

A.   Oh.   He wasn't talking about an interview room.

Q.   Okay.   Now, as a matter of practice back then, if a suspect was left in the interview room, you'd handcuff their hand to the wall, right?

A.   You do.

Q.   There's a ring, right?

A.   You might, yeah.

Q.   Well, you do, right?

A.   Well, you might.

Q.   You remember giving a deposition, sir?  And do you remember giving these answers to these questions?

         MR. LOEVY:   This is page 232, line 18, to 233, line 7.

         MR. NATHAN:   One second.

     (Pause.)

         MR. LOEVY:   May we proceed, Your Honor?

         THE COURT:   Yes.

         MR. LOEVY:   All right.   Then we need the video there.

         MR. NATHAN:   Objection, not impeaching.

         MR. LOEVY:   It's his statement regarding --

         MR. NATHAN:   I'd ask that Your Honor rule before.

         MR. LOEVY:   It's his statement, so it doesn't even matter, Your Honor, because he's a party.

         MR. NATHAN:   Right, but it's misleading the question, so I'm asking --

         MR. LOEVY:   It's also directly --

         THE COURT:   The last question was:   Okay.   And now as a matter of practice -- is that it?

         MR. LOEVY:   Yes.

BY MR. LOEVY:

Q.   You would cuff them to the wall, right?

A.   You would, but not in every situation.

Q.   All right.   How about if the person's accused of lighting a man on fire, abducting him, putting duct tape on their mouth?

Zalatoris - direct

1171

That's the kind of person you'd want to handcuff to the wall, right?

A. Well, that's a person we'd lock in the room.

Q. Yeah. And the reason you'd cuff 'em to the wall is 'cause when you open the door, you got to make sure that they don't jump out at you, right?

A. Well, I guess, yes.

Q. And the General Order at the time required that, right?

MR. NATHAN: Objection, foundation.

THE COURT: Overruled.

BY THE WITNESS:

A. If you show me the General Order, it probably does say that.

BY MR. LOEVY:

Q. Probably did say that?

A. Yeah. I don't know the General Order, but --

Q. All right. So whenever John's in a room, if his hand is cuffed to the wall -- it's hard to sleep with your hand cuffed to the wall, right?

A. I don't know.

Q. Well --

A. I never had to do it, so, you know --

Q. What's that?

A. I never had to do it, so --

Q. Lucky for you, right?

A.   Yeah.

Q.   Now, when you did interview John, you explained to him he had a right to remain silent.

     That's not a trick question, sir.

A.   Well, is there a question you're asking me, sir?

Q.   Yeah.

A.   What?

Q.   Did you --

A.   What is it?

Q.   -- tell him he had a right to remain silent?

A.   Yeah.

Q.   All right.  And are you confident he understood it?

A.   We ask.

Q.   I'm saying, are you confident he understood it?

A.   I would be confident, yes, 'cause we ask, yes.

Q.   All right.  And he said, "I'm happy to talk to you.  I didn't do nothing," right?

A.   Initially, when we talked to him the first time?  Us, my partner and I?

Q.   At all times, John said, "I" --

A.   Well, the first time we talked to him.  Is that what you're talking about?

Q.   No.  At all times, whenever you asked John a question, he answered it, right?

A.   Well, I don't know what he said before we encountered him

at 6:00 o'clock --

Q.   How about you?

A.   -- that night.

Q.   Sir, he never was anything other than cooperative with you, right?

A.   No.  With us, he was fine.

Q.   All right.  And you told him he had a right to a lawyer, right?

A.   Yes.

Q.   And he said he doesn't need a lawyer.  He didn't do anything, right?

A.   He didn't say that.  We just told him he had the right to a lawyer.  We gave him his rights.

Q.   All right.  And you're confident that he understood them.
     Now, you also asked him if you could search his house, right?

A.   I don't recall going to his house.  That wasn't us.

Q.   No.  I said, you asked him if you could search his house, right?

A.   I don't believe I did.

Q.   All right.  Did you ask him if you could search his car?

A.   I don't believe I did, no.

Q.   You know that somebody had him sign a consent form, correct?

A.   Somebody did, yes.

Q.   And he voluntarily allowed the police to go in his house, go in his car, look for whatever they wanted to look, right?

A.   Again, I wasn't there for that, so --

Q.   All right.  They didn't find a murder weapon.  They didn't find any human-size body bags.  They didn't find any bats.  They didn't find any red jackets.  They didn't find any blood, no evidence that corroborated the crime, correct?

A.   Again, I wasn't there.

Q.   But you, as the detective working on the case, assigned to the case, you learned that you couldn't find any evidence in his house or his car, right?

A.   Again, I wasn't there.  And it's really Rolston's case, so --

Q.   Well, it sounds like it was your case, too, wasn't it?

A.   Well, Rolston's the guy who got this case assigned to him, yes.

Q.   No.  It was your case.  You're the one who got the evidence, isn't it?

A.   What are you talking about?

Q.   The only evidence that was ever developed are the statements and confessions of John, Anthony, and Shaw, right?

A.   Well, it was Rolston's --

        MR. NATHAN:  Objection, mischaracterizes.

BY THE WITNESS:

A.   It was Rolston's assigned case.

MR. NATHAN:  Form.

BY THE WITNESS:

A.   It's Rolston's case.

THE COURT:  Hold.  There's an objection.

THE WITNESS:  Oh, I'm sorry.

THE COURT:  You got to stop.

MR. NATHAN:  Objection, form, argumentative.

MR. LOEVY:  He's just obstructing, Your Honor.

THE COURT:  Yeah, I -- I mean, put a time on it, if you can.

MR. LOEVY:  All right.

BY MR. LOEVY:

Q.   You're the one who developed the evidence that convicted the boys, right?

A.   We did --

MR. NATHAN:  Objection.  Motion.

THE COURT:  Sustained.

MR. LOEVY:  What?

THE COURT:  "The boys."

MR. LOEVY:  Oh.  "The boys."  All right.

BY MR. LOEVY:

Q.   You're the one who --

MR. NATHAN:  Excuse me.  Objection.

THE COURT:  All right.

BY MR. LOEVY:

Zalatoris - direct

1176

Q. They were adults under the law, right?

A. Yes.

Q. All right. So you're the one who developed the evidence that convicted the adults.

A. Yes.

Q. Not Rolston and not Winstead. Correct?

A. I mean, it's a conglomeration of everybody's work that does it.

Q. But you got the primary credit, wouldn't you say?

A. I never got credit, no.

Q. All right. I'm going to talk about your interrogation of John, but, first, would it be fair and accurate to say that other than what is written in the GPR report, you recall nothing about the conversation with Fulton before he gave the inculpatory statement?

A. Could you --

Q. Sure.

A. -- give me --

Q. You've read the GPR report, right?

A. I read it, yes.

Q. And it says a lot of things, right?

A. Yes.

Q. But other than what's written on that page, you have no actual memory of it; is that true?

A. No. Just what's written down.

Q. So you said "No," but you agree with me, right?

A. Agree that -- what?

Q. Apart from what's written on the GPR, you have no recollection of what Fulton told you, right?

A. Only recollection we have is for what's on that GPR, yes.

Q. All right. You do know that he denied for at least a long period of time having anything to do with this crime, right?

A. I believe so.

Q. All right. 'Cause you didn't write that on the GPR, did you?

A. I don't know. Is it in the GPR?

Q. I mean, should it be in the GPR that he said, "Listen, I was at the hospital with Yolanda. I had nothing to do with the crime"?

Is that the kind of thing you should have written down?

A. Again, you know, we just -- we just write down what they tell us.

Q. All right.

A. Okay?

Q. So if he told you, "I was at the hospital. I didn't do it," shouldn't you have written that down?

A. I'm sure it's written down somewhere, but I don't remember writing it down.

Q. Okay. Back to my question.

Shouldn't you have written it down?

A.  I'm sure it's documented, sir.

Q.  No, I didn't -- it's not, but --

A.  Oh, okay.

Q.  By you in your notes.  Do you want to show us in your notes --

MR. NATHAN:  Objection, form.  It's compound.  It's unclear what the question is.

MR. LOEVY:  Because he won't answer it.

THE COURT:  One at a time, one at a time.

MR. LOEVY:  All right.  May I approach and hand him his notes, Your Honor?

THE COURT:  Yes.

BY MR. LOEVY:

Q.  This is Plaintiffs' Exhibit 11, 31 through 37.  It's seven pages of handwritten notes that were created after the interrogation of John Fulton.

It should say in there somewhere:  Hey, this guy says he was at the hospital.  He had nothing to do with it.

Can you answer the "should" question?

A.  It does say it in somebody's.  I know that.

Q.  Can you answer my "should" question?

A.  That should -- I don't understand the question.

Q.  If there are seven pages of notes documenting your conversation with John Fulton, those notes should say

somewhere, "I didn't do this. I was at the hospital."

Do we agree?

A. If that's what he told us.

Q. All right. Did he tell you that?

A. We only ask questions and write down what we're told.

Q. All right. If you could put the notes down. I'm going to try one more time just for a real clear question that I hope you'll answer.

A. Well, you're asking me. I'm looking through this. Okay?

Q. I want you to stop looking. I want you to put it down.

A. Okay, okay.

Q. Okay? 'Cause we'll look through it together. But here's my question.

A. Right.

Q. John Fulton told you a hundred times he didn't do this, right?

A. He didn't tell us a hundred times, no.

Q. He told you for hours and hours and hours that he was at the hospital, he didn't murder anybody. He had nothing to do with this crime, right?

A. I don't recall how long it went on.

Q. All right. I mean, you're not good at these "should" questions, but I'm gonna try one more time.

You should have documented his first story, right?

A. You know, we document what we're told.

Q.   Okay.  So you -- his first story should have been written down for a lot of reasons, right?

A.   We document what he tells us.  Okay?

Q.   And one reason you should do it is because, later, he might change his first story, right?

A.   I don't know all the reasons you would do it, but --

Q.   But you should do it.

A.   Well, again, we document what we're told.

Q.   Anthony Mitchell's entitled to have it written down that Fulton says he's at the hospital, because he's allowed to have exculpatory evidence, too, right?

So if Fulton's claiming, "I didn't do it," wouldn't Mitchell be entitled to notes where Fulton's saying, "I didn't do it"?  Would you agree with that?

A.   Agree with -- what's the question again?

Q.   One of the reasons you have to write down in your notes that he's saying he didn't do it -- not just write down the guilty part -- is because he has a right, when he's standing trial, to know that Fulton was saying he was innocent.

He has that right, right?

A.   Right.

Q.   So there's really no reason why, in those seven pages of notes, you should have only said the parts about him guilty and left out the parts that, for the first however many times he said it -- we no longer know -- he was saying he was innocent.

Zalatoris - direct

1181

You shouldn't have left that out, right?

A.   But he did give an alibi, and it was checked out.

Q.   But it wasn't written down, right?

A.   Not by me or my partner, no.

Q.   All right.

A.   But it was written -- it was written down, because people did check that alibi.

Q.   All right.  Now, you knew, at some point in this interrogation, the goal is to get him from denial to admission, right?

A.   The goal of this investigation is to come to the truth, find out what the truth is.

Q.   All right.  So he told you the truth, right from the get. He said, "I was at the hospital on video.  I didn't murder anybody.  I'm innocent."

     He told you that when you first started talking to him, right?

A.   That's one of -- originally, yes.

Q.   Okay.  And you didn't let him take his statement and say: Okay.  Here's your statement, "I'm innocent."  Let's get this to Felony Review.

     You didn't do that, right?

A.   No, because it wasn't true.

Q.   All right.  Because you decided it wasn't true, right?

A.   Well, no.  It wasn't true.

Zalatoris - direct

1182

Q.   All right.  But you weren't there when Collazo was killed, right?

A.   No.

Q.   And you weren't in the hospital when he was there with Yolanda, right?

A.   No.

Q.   So you don't know what's true, right?

I'll ask a different question, sir.

You were trying to move him from, "I didn't do it," to, "I did it."  That was the goal of this four-day interrogation, correct?

MR. NATHAN:  Objection, form, asked and answered.

MR. LOEVY:  Well, he hasn't answered it, Your Honor.

THE COURT:  Overruled.

BY THE WITNESS:

A.   What was it again?

BY MR. LOEVY:

Q.   The goal of this four-day interrogation was to move him from, "I didn't do it," to, "I did it," right?

A.   The goal of the interrogation is to find out the truth. That's the goal of the investigation.

Q.   All right.  And he was trying to resist the truth, right?

A.   Well, as we know, he wasn't telling the truth originally.

Q.   Okay.  Well, we don't know that, do we, sir?

A.   We do.

Q.   Okay.  But he -- you had some advantages in trying to get him to confess, would you agree?

A.   Which would be?

Q.   Well, let's start with his age.

He was very young, right?  He was 18 years old? Correct?

A.   Yeah.  We know that, yes.

Q.   All right.  That's an advantage in an interrogation, right?

A.   I don't know.

Q.   How old were you at the time?

A.   I don't remember.

Q.   Roughly in your 50s, something like that?

A.   Well, I don't know.  Trying to think now.  22 years ago.

Q.   Approximate.

A.   Mid- 40s.

Q.   All right.  So you had done this before, right?

A.   Done what?

Q.   Interrogated someone for murder.  You'd done that many times?

A.   We've done that before, yes.

Q.   And he hadn't ever been on the other end of that, right?

A.   I don't know.

Q.   All right.  Did you consider -- did you do anything different when you interviewed someone who was 18?

A.   Different than?

Q.   Than, let's say, you had a hardened 35-year-old gang member.  You'd interrogate them one way.  An 18-year-old high school student, did you interrogate them any differently?

A.   We ask questions.

Q.   Okay.  Did you do it any differently if the person's 35 or 18?

A.   No.

Q.   Did you take into account at all that this was a teenager with inexperience in the criminal justice system?

A.   No.

Q.   Would you agree that teenagers, their brains are not fully done?

A.   Well, I don't know about that.

Q.   Have you had sons or daughters or children?

A.   Have I had?

Q.   Yeah.

A.   What does that have to do with it?

Q.   Well, do you have experience with teenagers?

A.   I have.

Q.   Yeah.  They're knuckleheads sometimes, right?

          MR. NATHAN:  Objection, form.

BY THE WITNESS:

A.   My kids were fine.

BY MR. LOEVY:

Q.   All right.  Teenagers are not fully developed cognitively,

right?

MR. NATHAN:  Objection, foundation.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  They're not cognitively fully developed, would you agree with that?

A.  I don't know.

Q.  All right.  Would you agree that an 18-year-old would be more vulnerable to suggestions?

A.  I don't know about that either.

Q.  How about to short-term thinking?

An 18-year-old might be more focused on getting out of the room and worrying about it later.  Would you agree with that?

A.  Again, I don't know about that.

Q.  Would you agree that an 18-year-old would be more vulnerable -- sorry, Colleen -- to pressure by authority figures?

A.  I wouldn't know about that either.

Q.  Did you -- you listened to Dr. Leo's testimony, right?

A.  Well, I listened to what he said, yeah.

Q.  All right.  Would you agree that there is a real problem that youth are more vulnerable to false confessions?

Do you see it that way or you don't?

MR. NATHAN:  Objection, Your Honor, form.

THE COURT: Well --

MR. LOEVY: It's cross-examination, Your Honor.

MR. NATHAN: Objection, form, foundation, argumentative.

THE COURT: I will sustain that.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. Do you -- as you're interrogating John Fulton back in 2003, did you say to yourself: You know, this kid's just a kid. He's an adult under the eyes of the law, but he is really a high school teenager. If I pressure him too hard, there's a risk of false confession?

Was there anything like that going through your mind?

MR. NATHAN: Objection. Motion *in limine* 12.

MR. LOEVY: Is this about the language again?

THE COURT: It is.

MR. NATHAN: It is about the same objection we've made repeatedly.

BY MR. LOEVY:

Q. This young adult who was a teenager.

THE COURT: Overruled.

BY THE WITNESS:

A. What was the question again?

BY MR. LOEVY:

Q. Back in 2003, did you consider that this young adult, who

Zalatoris - direct

1187

was a teenager, was maybe vulnerable to pressure of a false confession if you pushed too hard?

A.   No.

Q.   All right.  How about another advantage you had was he didn't have a lawyer, right?

A.   He didn't have a lawyer at the time, no.

Q.   And before we leave age, Anthony Mitchell was even younger, right?  He was 17?

A.   Something like that.

Q.   And Shaw was 15, right?

A.   Right.

Q.   Did you interrogate a 17- and a 15-year-old the same way you would a 35-year-old?

A.   We asked them questions the same way we asked him questions.

Q.   Would you interrogate a 15-year-old and a 17-year-old in the same manner you'd do a hardened 35-year-old?

A.   Yes.

Q.   All right.  Back to the lawyer, then.

       Would you agree that them not having a lawyer -- you know, they waived it -- that was an advantage for you in getting their confession, right?

A.   I mean, depends on what their lawyer would have told 'em.

Q.   All right.  And you were aware there could be a dispute later about whether there is *Miranda* rights given, correct?

A.   I don't remember that.

Q.   And you claim you gave 'em, right?

A.   We gave 'em, yes.

Q.   And there's usually a way you can prove that someone's *Miranda* rights were given, right?

A.   What do you mean "usually a way you can prove"?

Q.   The Chicago Police Department has a form where you could say:  You have a right to remain silent.  You have a right to a lawyer.  Sign here.

     You could have had the boys -- young men sign that, right?

A.   I've never seen that form.  I've never seen it.

Q.   At the Chicago Police Department, you've never seen the form that says, "I consent to Miranda"?

A.   No, never.

Q.   In the notes, they're also supposed to document -- you're supposed to document when the *Miranda* was given, right?

A.   Yes.

Q.   All right.  Showing you Plaintiffs' Exhibit 11, page 8. This is in evidence.

     Here's an example of Winstead's notes, where he says: You know, we're doing an interview.  This is probably Mitchell. And he documents -- whoever it is, he documents "10:05 Miranda," right?

          MR. NATHAN:  Objection, foundation.

MR. LOEVY:  This is just an example of --

THE COURT:  Overruled.

BY MR. LOEVY:

Q.  That's what you're supposed to do in your notes.  You're supposed to document the time *Miranda* was given, right?

A.  Usually, yes.

Q.  All right.  In your notes with John, it looks like this sorta got written in after-the-fact; would you agree?

A.  No.

Q.  You didn't write it on the line where it started, right?

A.  No.

Q.  So it looks like, doesn't it, that it came after-the-fact?

A.  No.

Q.  Okay.  This is your deposition, page 304, lines 7 through 10.

MR. NATHAN:  Give me a minute, please.

BY MR. LOEVY:

Q.  You don't know if it was written before or after?

THE COURT:  Please wait.

MR. LOEVY:  I'm withdrawing that question.

THE COURT:  Okay.

MR. LOEVY:  Asking a different one.

BY MR. LOEVY:

Q.  You don't know if this went on before or after, right?  After-the-fact.

Zalatoris - direct

1190

A.   Before or after what?

Q.   In other words, maybe the notes were created, and you forgot to -- nobody -- he wasn't given his *Miranda* rights, so you went back later and wrote "Miranda given" at the top.

     Do you recall either way?  Or you know, either way, that's what happened?

A.   That's not what happened.

Q.   All right.  This is your deposition, page 304, lines 7 through 10.

     Let's read 4 through 10.  And we need the video turned over.

     (Said video played in open court.)

BY MR. LOEVY:

Q.   All right.  That was your answer under oath, right?

A.   Right.

Q.   All right.  If there was a lawyer seeking to see John during those four days, that lawyer should have been provided access to John, right?

A.   He would've been.

Q.   Well, let's start with should have been.  Okay?

A.   He would've been, yes.

Q.   Well, could we start with should have been?

     If a lawyer was trying to see John for four days, he should not have been turned away, right?

A.   No.

Zalatoris - direct

1191

Q.   And you're saying you would have let him in.  That was my next question.  You anticipated it.  Right?

A.   Yes.

Q.   And that's because you're required to let him in if he wants to get in, right?

A.   Yes.

Q.   You don't have a right to keep a lawyer out.  If a lawyer is -- if Mr. Zinger was at the desk saying, "I want to speak to my client," he cannot be turned away, right?

A.   Right.

Q.   And it would have been very serious, in your mind, if a lawyer was trying to see his client and he got turned away, right?

A.   Well, yeah.

Q.   And who would have made the decision?

     Does the person at the desk get to decide or they have to call up to the interrogating detectives and say, "Hey, there's a lawyer trying to get in"?

     Who makes the decision?

A.   Makes the decision on what?

Q.   On whether the lawyer's going to get in.

A.   Well, they go to the desk.

Q.   Right.  They go to the desk --

A.   Right.

Q.   -- and then the desk guy says, "Who you here to see?"  And

they say, "I'm here to see John Fulton."  And they might say, "Oh, we can't find him.  Maybe he's at 35th and Michigan."

Let's say they go different places, and they come back and they say, "We want to see John Fulton."  The desk person can't say, "Okay.  Go up, first room on the right, the third interview room.  Knock on the door."  They don't say that?

A.   No, not at all.

MR. NATHAN:  Objection, form.

THE COURT:  Yeah, it's a long question.

MR. LOEVY:  All right.  I'll break it into pieces.

THE COURT:  More like a speech.

MR. LOEVY:  All right.  Into pieces.

BY MR. LOEVY:

Q.   So the lawyer doesn't just get sent upstairs, right?

A.   Right.

Q.   The desk guy goes and finds the interrogating detective and says, "Hey, there's a lawyer here.  What do we do," right?

A.   It's not, "What do we do?"  Just informs us there's a lawyer here, yes.

Q.   And you would have been the person who got informed, right?

A.   Well, myself, my partner, anybody involved in this case, yes.

Q.   Well, if you were the one talking to John, it would have been yourself or Partner Breen, right?

MR. NATHAN:  Objection, calls for speculation.

Zalatoris - direct

1193

THE COURT:  Overruled.

BY THE WITNESS:

A.   Anybody who's involved in this case, yes.

BY MR. LOEVY:

Q.   It did take Mr. Zinger about a hundred hours to get in to see Mr. Fulton, correct?

MR. NATHAN:  Objection, vague, foundation, calls for --

MR. LOEVY:  Mr. --

MR. NATHAN:  And calls for speculation.

MR. LOEVY:  I'll ask a different question.

BY MR. LOEVY:

Q.   Mr. Zinger didn't get to see him on the 18th, didn't get to see him on the 19th, didn't get to see him on the 20th, right?

MR. NATHAN:  Objection, form as to "get to."

BY MR. LOEVY:

Q.   He didn't have access to his client, right?

MR. NATHAN:  Objection, form.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   You agree?

A.   He did have access to his client.

Q.   Well, he didn't have access in terms of getting to talk to him, right?

A.   He could have.

Zalatoris - direct

1194

Q.   How was he going to do that if John was locked in an
interrogation room and he wasn't allowed in?

A.   I don't know anything about him not being allowed up there.

Q.   All right.  Let's talk about sleep.

How long was John in the room?

A.   Well, my partner and I dealt with him the first day, so --

Q.   A hundred and five hours, right, sir?

A.   I mean, my partner and I dealt with him one day.

Q.   All right.  But he was in there 105 hours, right?

A.   That's what I heard.

Q.   All right.  The day you dealt with him, he got up at 5:30
in the morning, right?

A.   What's that?

Q.   The day you dealt with him, you knew he'd been awake at
5:30 in the morning, right?

A.   Okay.

Q.   And McRay got there to take his statement at 3:00 a.m. the
next night, right?

A.   Okay.

Q.   That's true, right?

A.   Yeah.

Q.   So he's going on an all-nighter at 3:00 a.m., right?

A.   Okay.

Q.   Coming up on 24 hours of being awake, right?

A.   Well, yeah, close.

Q.  Sleep deprivation is a real thing, right?

A.  Well, that's if he didn't sleep in the room.

Q.  Sleep deprivation is a real thing, right?

A.  If you don't sleep.

Q.  Yeah, 'cause it could cause foggy thinking; it could cause disorientation, right?

A.  If you don't sleep.

Q.  Now, in that room, there's no bed, right?

A.  No.

Q.  No sheets, no pillow.

A.  No.

Q.  But before -- before we get to the overnights -- I'm just talking about the first night.  He's woken up at 5:00 a.m. He's interrogated all day, right?

        MR. NATHAN:  Objection, calls for speculation.

BY MR. LOEVY:

Q.  If you know.

A.  I don't know.  I --

        THE COURT:  Wait, wait.  Yeah.  I mean, "all day."

        MR. LOEVY:  All right.

BY MR. LOEVY:

Q.  What time did you interact with him?  Starting?

A.  When we -- after we came in at 6:00 o'clock that night.

Q.  Six o'clock.  All right.  From 6:00 o'clock till 3:00 in the morning, you, for a fact, know he hasn't slept, right?

A.   Oh, yeah.  During that time, no.

Q.   All right.  So he was coming up on 24 hours awake, right?

A.   Again, unless he slept sometime before we were there.

Q.   Fair enough.  All right.  And if he's in the room -- and, by the way, on the second night, the third night -- there's no beds in those rooms, right?

A.   Yeah, I didn't know anything about those nights.

Q.   Well, there is -- you know there's no bed in the room, right?

A.   There's no beds up there, no.

Q.   No sheets, no pillows, no blankets.  Right?

A.   Well, you --

Q.   There's nothing but a --

A.   No.  The police --

Q.   -- metal bench.

A.   No.  The police department doesn't have that.

Q.   Yeah.  There's a thing called a lockup, right?

A.   Okay.  Yes.

Q.   The lockup -- if you want to keep a prisoner overnight, you could send them to a place called the lockup where prisoners can sleep in a bed, get meals, and have access to other people.
     That's the lockup, right?

A.   Well, that's in the district, yes.

Q.   You could have -- on these overnights, somebody could have driven John to a place where there was a bed, right?

A.   No.

Q.   Well, he could have, right?

A.   What?  I mean, where would we drive him to?

Q.   A lockup.

A.   Well, what district?

Q.   All right.  You -- the police officers went home and came back, right?

A.   We did.

Q.   And, by the way, those benches are -- they're narrow, right?

A.   Well --

Q.   They're too narrow for a person to sleep on, by design, aren't they?

A.   Not really.  Not by design, no.

Q.   Are they this big (indicating)?  Three feet?

A.   I don't think they're that big.  A little bit less.

Q.   A little bit less.  So you --

A.   Maybe like that.  Maybe -- yeah, somewhere in there.

Q.   We're talking about the length of them, right?

     You can't put your --

A.   Oh, the length of 'em?

Q.   You cannot stretch out a human body on a whole -- a whole human body can't fit on those benches, right?

A.   Oh, sure.

Q.   You agree with me?

A.   Oh, yeah, you can, yeah.

Q.   Your whole human body can fit on those benches?

A.   Right.  They're not short as you're doing with your hand.

Q.   I didn't say they were as short as doing my hand, but a human body -- he could not have gone head-foot and stayed on the whole bench.  Would you agree with that?

A.   I think he might have been able to, yes.

Q.   They have pictures of those benches, right?

A.   I don't know.  I don't have a picture, but --

Q.   In any event, there's -- if you're handcuffed to the wall, and there's a bench that may or may not have been too narrow, may or may not have been too short, it's not easy to sleep on, right?

MR. NATHAN:  Objection, form.

BY MR. LOEVY:

Q.   Not easy to sleep on those benches, correct?

A.   No.

THE COURT:  Is that the question?

BY MR. LOEVY:

Q.   Not easy to sleep on those benches?

A.   I'm sure it's not comfortable.

Q.   Teenagers need a lot of sleep, would you agree?

A.   I don't know.

Q.   You said you don't know?

A.   I don't know.

Q.  All right.  Over four days of limited sleep.

By the way, at any time, people could come in and interrogate John, right?  At any time.

A.  When we're not -- yeah, we could.

Q.  Then the police would come in and out, right?

A.  Well, I don't know if they did or not.

Q.  All right.  He's saying they did.  Can you dispute that?

A.  I mean, again, we have what he told us, you know.

Q.  Right.  So do you dispute that?

If he's saying, "Whenever I tried to sleep, they'd come in and start asking me more questions," do you dispute that?

MR. NATHAN:  Objection, mischaracterizes.

THE COURT:  It's not quite what he said.

BY MR. LOEVY:

Q.  If he said what he said, do you dispute what he said?

A.  Well, wait.  What are you saying again?

Q.  I'll move on.

A.  I kinda --

Q.  All right.  Do you think sleep deprivation might have been a factor over this 104 hours?  Yes or no?

A.  Again, I don't know when he fell asleep and when he didn't sleep.

Q.  All right.  Sleep deprivation can lead to false confessions, right?

MR. NATHAN:  Objection, calls for speculation.

THE COURT:  If he knows.

BY MR. LOEVY:

Q.  All right.  When you were interrogating John, did you consider that:  You know what?  We have to be careful 'cause sleep deprivation can cloud someone's judgment?

A.  I don't know.

Q.  All right.  If his grandmother had been at the police station, or his aunt or his mother-in-law asking to see him, would they have been allowed access?

A.  You're asking me a hypothetical.

Q.  Yes.

A.  I don't know.  Maybe.

Q.  Maybe.  So it's possible, if the grandmother showed up and said, "I want to see John.  You know, I don't agree with this. I want to get in that room and talk to John," she might have been turned away?

MR. NATHAN:  Objection, relevance.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Yes, might have.  He's an adult.

BY MR. LOEVY:

Q.  All right.  Did that happen?

A.  I don't remember it happening.

Q.  But you don't remember either way, right?

A.   I don't remember it happening.

Q.   You don't remember it not happening.  You don't remember either way?

A.   I don't remember it happening.

Q.   You don't remember either way?

A.   I don't remember it happening, sir.

Q.   All right.  Let's talk about the length.

One hundred and five hours, four days, three nights, that's a long time to be interrogated; would you agree?

A.   I guess.

Q.   Have you ever interrogated somebody for four days, three nights, other than John Fulton?

MR. NATHAN:  Objection to the form.  It's vague.

And I just would like to highlight to Your Honor the motions that are pending relating to this, which makes the vague nature of the questioning --

MR. LOEVY:  I think it's been ruled on, Your Honor.

MR. NATHAN:  -- more particular.

THE COURT:  It's time for a recess.

MR. LOEVY:  All right.

THE COURT:  We'll take a 15-minute recess.

(Jury out at 3:34 p.m.)

THE COURT:  You may step down.

THE WITNESS:  Oh, okay.

THE COURT:  Should the witness leave the room?

Zalatoris - direct

1202

MR. NATHAN:  Not for -- yeah.

(Witness exits.)

THE COURT:  Okay.  So enlighten me.  What's the objection?

MR. NATHAN:  Your Honor, may I -- I just wanted to pull our document, of the motion that we filed.

THE COURT:  Okay.

(Pause.)

MR. LOEVY:  Are we arguing?

MR. NATHAN:  One moment, Your Honor.

MR. LOEVY:  Yeah, I thought we had covered it this morning, that I was going to ask him:  Is it prohibited?  You can't do that.  And presumably, he's not going to deny that, because his counsel has spoken to him.  So I'm not sure what the objection is.

The question he objected to that caused the sidebar was:  Have you ever interrogated somebody that long?  Which is a reasonable question, and I didn't understand the objection.

MR. NATHAN:  No.  And I don't have a problem with that, that question necessarily.  Although, it's irrelevant.

But we had filed motion *in limine* No. 32, excluding evidence of any 48-hour rule violation.  This Court had ruled. Mr. Loevy -- had ruled keeping that out, keeping the fact -- keeping out the fact that there was a constitutional violation by holding Mr. Fulton between arrest and a *Gerstein* hearing for

more than 48 hours.  That's supposed to be out.

Your Honor kept that out in response to motion *in limine* No. 32.  And that's at docket No. 400, page 20.  And then it came up also at the pretrial conference.

MR. LOEVY:  We're past that.  Aren't we past that?

MR. NATHAN:  Now, now, I understand that Mr. Loevy consistently is trying to get Your Honor to reconsider that ruling.

MR. LOEVY:  No.  We're past that.

MR. NATHAN:  And we've talked about it.  And he's come up with ideas of how to push right up against the line of your ruling.  And we have a pending motion to enforce your ruling.

It's fine, according to your ruling, for him to say how long they were held in custody, but he should not be saying that it's a constitutional violation.  He shouldn't be asking questions like:  Don't you know it's improper?

I know that's what he would like to do.  It's not -- using different language to say "improper" versus "constitutional" runs afoul of the same problems that we raised in our motions and Your Honor excluded.

Number one, Your Honor.  The problem --

THE COURT:  Let me clarify what I believe I said, is not to call it a constitutional violation.

MR. LOEVY:  Yes.

THE COURT:  But the police, I believe, are aware that

Zalatoris - direct

1204

they have a limit on the time that they can hold someone in custody, and it is -- we all know it's 48 hours.

So he could -- it's fair to ask him, you know, what -- if he held him longer than he was allowed to.

MR. LOEVY: And, Your Honor --

MR. NATHAN: If one --

MR. LOEVY: -- he's trying to pretend like this is, like, brand new. We dealt with this, like, three times, including this morning.

The motion *in limine* said to bar argument that plaintiffs should be compensated for being detained longer and bar evidence of a settlement. And then we're like six miles past that.

THE COURT: Yeah.

MR. LOEVY: Where you said: Listen, don't call it a constitutional violation. Just say it was improper.

We covered this this morning. It's not -- he's trying to pretend like you haven't ruled. He's going back to the start and just saying: Look, look at the motion *in limine* again.

MR. NATHAN: Your Honor, it -- respectfully, the -- it's beside the point that the police, in general -- you know, that is a rule under *County of Riverside.* There's 48 hours. I'm not disputing that.

THE COURT: I know that. They know that.

MR. NATHAN:  No, no.  That's actually not correct. There was a whole class-action litigation where Mr. Fulton was a part of that class, because the individuals did not know that.  They were operating under the wrong guidance.

So what they're doing -- so Your Honor's impression is, respectfully, incorrect.  And that's why they got a settlement.

So trying to inject that and double-dip in that is wrong.

MR. LOEVY:  Your Honor, here's the deal.

THE COURT:  Is this a --

MR. LOEVY:  We're in a --

THE COURT:  -- *Mount Holly Hall* issue?  Okay.

MR. LOEVY:  We're in a coerced confession case.  If this police officer held him for 104 hours, when you're only allowed to hold him 48, you can infer bad intent.  You can infer that he wasn't getting what he wanted.  You can infer -- this is the best, most probative evidence you could imagine.

Mr. Nathan finally has put his cards on the table.  He thinks his witness is going to say, "No.  I thought you could do that."  If he does that, if he says you're allowed to do that, then Your Honor's probably not going to let that testimony stand.  You're probably going to tell the jury.

If he's going to insist on saying you could, then the Constitution says you can't.

Zalatoris - direct

1206

The analogy would be -- if I said: Hey, you denied him a right to a lawyer, and he said: Yeah, you're -- I don't have to tell him he has a right to remain silent. I don't have to tell him that, then you would say: Well, actually, you do.

MR. NATHAN: Well --

MR. LOEVY: Now, he's gonna say: At the Chicago Police Department, nobody knew that. He's saying: At the police department, we had this unconstitutional policy where we did hold 'em too long.

He wants to say that. That's his defense. I don't think I would if I was them, but I think that would open a whole other door.

MR. NATHAN: What he's doing is he's trying to open his own door. He's trying to say: I'm gonna bait him into giving testimony that's gonna open the door wide open to unconstitutional violations.

THE COURT: So respond to the *Miranda* analogy. Why isn't it the same thing?

MR. NATHAN: It's different because -- I'm not exactly clear on Your Honor's question. But if Your Honor is saying why isn't --

THE COURT: He didn't object when he asked about Mirandizing. In fact, we spent quite a bit of time on establishing that. So there's --

MR. NATHAN: It --

THE COURT: Isn't this the same thing?

MR. NATHAN: No, it's not, Your Honor, because in Miran -- there was no separate litigation about *Miranda* relating to a mistake that was happening within the entire police department relating to *Miranda*.

THE COURT: Irrelevant.

MR. LOEVY: Yeah. And I think the analogy is -- let's say on the witness stand, he said: We're totally allowed to not -- to deny people right to lawyers. And, jury, you find me more credible than him. We can deny people lawyers. But they can't. So the judge is supposed to instruct on the law.

So if he says: Yeah, we're allowed to do something that we're not, then you should tell them that you're not.

Now, you've said: I don't want to get into the Constitution. So, as long as he admits that it's not proper, we'll leave it right there. So you should -- Mr. Nathan should talk to his client and don't say something that's unconstitutional is permitted. Because if he wants to say something that's unconstitutional is permitted -- all right.

(Witness reenters.)

MR. LOEVY: Well, I don't -- you know, then maybe he should hear this.

I think Mr. Nathan should tell his client that it's --

THE COURT: They don't know -- the jury does not know that that case existed.

MR. LOEVY: Right.

MR. NATHAN: It's not the same as *Miranda* at all. There was no separate litigation --

THE COURT: Okay.

MR. NATHAN: -- relating to *Miranda*.

THE COURT: Get exhausted by the back-and-forth, back-and-forth. I think, you know, you made your record. I disagree with you, but --

MR. NATHAN: So --

THE COURT: Let's move on and take a break.

MR. NATHAN: -- what is permitted and what's not permitted? 'Cause I am going to -- am I at least allowed to advise him what he's allowed to say and not supposed to say?

THE COURT: You can tell him to answer truthfully when he's asked about how long he can -- if it was wrong to hold 'em more than 24 hours, 48 hours, I don't know, something like that.

MR. LOEVY: And we would ask Your Honor -- if he does say: Yeah, we were allowed to do that, then Your Honor is then going to tell the jury: No, you can't. You're the law, so --

THE COURT: Okay.

(Recess. Jury in at 3:57 p.m.)

THE COURT: Please be seated.

MR. LOEVY: May I proceed, Your Honor?

THE COURT: You may.

BY MR. LOEVY:

Q. All right. When you were interrogating John Fulton, and the other detectives, at the time he was in custody, it was not allowed to hold somebody for 48 hours without taking them to see a judge absent extraordinary circumstances not present here, correct?

A. Correct.

MR. NATHAN: Objections that I've made previously.

THE COURT: Overruled.

BY MR. LOEVY:

Q. What was -- it was not allowed, right?

A. It wasn't allowed, no. We -- I didn't know it at the time, but it wasn't.

Q. Well, you anticipated my question. Let's take it one at a time.

A. Okay.

Q. You don't dispute that it was not allowed, right?

A. No.

Q. And he was held for quite a bit longer than 48 hours without seeing a judge, right?

A. Yes.

Q. And now your testimony is you didn't know that he wasn't allowed to be held for more than 48 hours.

A. Right.

Q. And even Mitchell, who was held for -- between 35 and 40

hours, it's also not allowed to hold somebody longer than it is reasonably practical to get them to see a judge, correct?

MR. NATHAN: Objection, relevance. Same as my prior motions.

THE COURT: All right. You don't --

MR. LOEVY: Same argument.

THE COURT: Your -- don't object for the same reason. Okay? Your objection is noted.

MR. LOEVY: May he answer the question, then, Your Honor?

THE COURT: Yes.

BY THE WITNESS:

A. What was it again?

BY MR. LOEVY:

Q. Holding someone for up to 40 hours, the rule, as you understood it, was you're not allowed to hold them longer than is reasonably practical to get them to a judge, right?

A. With -- yeah, within that time frame.

Q. And there was nothing stopping you from bringing Anthony Mitchell to a judge sooner than 40 hours, correct?

A. Again, I don't know. I don't remember if it was or not.

Q. All right. Have you ever held a sus -- or aware of any suspect ever being held longer than John Fulton during all your interrogations?

MR. NATHAN: Objection, seeking 404(b) information,

discovery.

THE COURT: Overruled.

MR. NATHAN: Relevance.

MR. LOEVY: May he answer, Your Honor?

THE COURT: Yes.

BY THE WITNESS:

A. I don't know.

BY MR. LOEVY:

Q. And can you remember a single person in your entire career who you ever interrogated this long?

A. I don't know. I don't remember.

Q. Do you think it ever happened?

A. I don't know.

Q. Would you agree that every person under interrogation eventually has a breaking point?

A. No.

Q. Well, you didn't tell John, "Hey, you're gonna get out of this room after five days," after six days?

He never got told when he was gonna get out, right?

A. Again, my partner and I only had him for the first 24.

Q. Did you ever -- well, you never spoke to him again?

A. No.

Q. All right. We'll talk about that in a minute. But let's talk about phone calls.

Even though John was a young adult at 18, that doesn't

Zalatoris - direct

1212

mean he doesn't get a phone call, right?

A.   Right.

Q.   He should've got a phone call if he wanted one, right?

A.   If he wanted one, yes.

Q.   All right.  So you're saying he never got a phone call, right?

A.   Never asked for one.

Q.   All right.  Well, that's two questions.  Let's start with mine and then we'll answer yours.  Okay?

He never got a phone call, right?

A.   No.

Q.   No, you agree with me?

He didn't get a phone call, correct?

A.   I said "right."

Q.   All right.  Now, you're saying the reason is 'cause he just didn't ask for a phone call.

A.   Right.

Q.   Did you make it clear to him that he had a right to a phone call?

MR. NATHAN:  Objection, foundation.

BY THE WITNESS:

A.   Had he asked, we would've let him make a phone call.

MR. LOEVY:  Well, it was a different question, but Your Honor didn't get a chance to rule.

THE COURT:  All right.  Overruled.

BY MR. LOEVY:

Q. Did you make it clear to him that he had a right to a phone call, if he wanted one?

A. I can't remember if we told him that or not.

Q. Isn't that in the litany of you have a right to remain silent, you have a right to a phone call?

MR. NATHAN: Objection, foundation.

THE COURT: All right. Lay your foundation.

BY MR. LOEVY:

Q. Did you ever say to him, "You have a right to a phone call. You have a right to remain silent"?

MR. NATHAN: Objection, asked and answered.

THE COURT: The last part, yes, it was asked and answered.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. If he had asked for a phone, he absolutely should've got it, right?

A. Yes.

Q. Why is that?

A. What do you mean, why is that?

Q. Why -- if he asked for a phone call, why would you have given him a phone call?

A. If he wants a phone call, he could make a phone call.

Q. It's required, right?

A.   Well, it's required.  He -- you know, if he wanted to call a lawyer, call whoever, yeah.

Q.   All right.  But he did not get that opportunity.

A.   He didn't do it.

Q.   Let's talk about food.

     Who was responsible for making sure that John got fed?

A.   It would be the detectives that are up there on the floor.

Q.   All right.  There -- we already talked about, there's no lockup at this particular building where John was being held, right?

A.   Right.

Q.   So there's no kitchen, no food?

A.   Not in the building.

Q.   What building was it?

A.   It was an old Board of Education building on Pershing Road.

Q.   All right.  Where is the nearest lockup?

     If you wanted to bring John to a place where there was beds and food, where could you have brought him?

A.   Well, beds?  Probably --

Q.   That's --

A.   -- District Lockup 9.

Q.   All right.  Where would he have got access to meals?

A.   Right across the street.

Q.   Are there lockups in the lockup where you can lock up a prisoner and feed him?

Zalatoris - direct

1215

A.   Lockup in a lockup?

Q.   In other words, he could've been held securely in a lockup, right?

A.   He was held by -- up in our area, yeah.

Q.   But where you were, there was no food, right?

A.   Yeah, right across the street.

Q.   Oh, you could've brought him across the street for food.

A.   No.  We would've went across the street and got him food.

Q.   Oh.  Well, let's talk about that.

     You remember feeding Antonio Shaw one meal, correct?

A.   I do.

Q.   What was the meal?

A.   It was a meatball sandwich and a piece of pizza.

Q.   And that was Antonio Shaw, right?

A.   Or a combo.  A combo and a piece of pizza.

Q.   And that was Antonio Shaw, right?

A.   Yeah.

Q.   And that's not written down in your notes anywhere.  You just remember it?

A.   Well, there's a picture of him even eating.

Q.   All right.  Do you remember it or you're just going off the picture?

A.   Do remember it.  I do, 'cause I bought it for him.

Q.   You bought it out of your own pocket, right?

A.   When I went to get something to eat, I got him something to

eat, too, yeah.

Q. Out of your own pocket, your money, you paid for Antonio Shaw to eat, right?

A. Yes, I did.

Q. And why did you do that? Were you trying to get him to cooperate?

A. Want to get him something to eat.

Q. Just the right thing to do, right?

If you're going to hold somebody, and they can't go get food, you should feed him, right?

A. We did.

Q. And Antonio Shaw, by the way, when he was fed, his uncle was present in the station, right?

A. Can't remember if he was there right when he was eating or he came after or before, to tell you the truth.

Q. All right. But you had to feed Shaw because he had a relative in the station, right?

A. I don't know if he was there when we got him food.

I don't remember him being there when we got him food, actually.

Q. You don't recall --

A. Or when I got him food.

Q. -- buying any other suspect food in your entire career other than this occasion, correct?

A. Do I -- could you say it again?

Zalatoris - direct

1217

Q.   You don't remember a single other time in your career where you purchased food out of your own pocket for a person in an interrogation room other than this one?

A.   Sure.  We have.

Q.   Do you remember it?

A.   I remember going to McDonald's, getting food when we're on 51st.

I remember the hotdog guy across the street.  That was our go-to guy for food.  The hotdog guy across the street, he had hotdogs, chips, pop.

Q.   All right.  Just --

A.   If we went and got Mexican, we'd pick up a couple tacos.

I do remember getting a kid Chinese one time.  'Cause we had these big wings that -- they were monster wings.  And so gave him, like, half the wings we had.

Yeah, we have.

Q.   All right.  This is your deposition, page 234, lines 5 through 21.

MR. NATHAN:  Hang on one second.

(Pause.)

MR. LOEVY:  May we play it, Your Honor?

MR. NATHAN:  Yes.

THE COURT:  Okay.  Yes.

(Said video played in open court.)

BY MR. LOEVY:

Q.   All right.   Did you give those answers under oath, sir?

A.   Pardon me?

Q.   Did you give those answers under oath?

A.   I did.

Q.   Now, sometimes if people were held for multiple days, the criminal defense lawyers could say, "Oh, he wasn't fed," right? That would happen?

A.   And they do.

Q.   And so you knew you got to create documents or records showing that people got fed, right?

A.   A lot of times, we'd take a picture of 'em eating.

Q.   And you did that in this case, right?

A.   Well, I know what we do with Shaw.   I don't know if there were pictures of the other guys or not.

Q.   Showing you Plaintiffs' Exhibit 73.

        MR. LOEVY:   We'd move this into evidence and ask for the ELMO.

BY MR. LOEVY:

Q.   By the way, you said "Mitchell" on there, but you later corrected it.   You meant Shaw, right?

A.   It was Shaw.   I did correct it in there.

Q.   Yeah, you did correct it, because -- you said "Mitchell" in those answers, but later you said you meant Shaw, not Mitchell.

A.   Right.

Q.   The 15-year-old.   Okay.

Showing you the pictures. These are -- after people would give confessions, the state's attorneys and the police, the practice was to put food in their hand and document they were fed, so they couldn't say later that they weren't fed, correct?

MR. NATHAN: Object to the form of the question.

MR. LOEVY: It's cross-examination, Your Honor.

THE COURT: Yeah. Overruled.

BY THE WITNESS:

A. No.

BY MR. LOEVY:

Q. This -- these pictures are taken after the boy -- the young men have confessed, right?

A. I don't know.

Q. By the way, 15 is not a boy. 15 is a -- I mean, not a young man. 15 is a boy, right?

A. 15 is a juvenile.

Q. Juvenile. Okay.

This -- the state's attorneys would take Polaroids to show: You can't say you didn't eat, 'cause I got a picture of you eating after they confessed, right?

A. Sometimes it's the state's attorneys. Sometimes it was us with a Polaroid. But we take a picture of them eating, yes.

Q. All right. Of course, we don't have one of John Fulton here eating, right?

A.   I don't know if there is one or not.

Q.   Another way you can document that somebody ate is there's logs, right?  You document it on the GPR?

A.   Well, sometimes you would; sometimes you wouldn't.

Q.   Showing you Plaintiffs' Exhibit 11, page 38.

          This is an example of a log where you -- you know, you say "transported to the interview room," "crime lab."  The times.

          This is a log, right?  Typical log?

A.   It's a general progress report.  I don't know whose it is.

Q.   Well, it doesn't really much matter.  I'm just asking you if this is a typical log.

A.   It's not a log.

          MR. NATHAN:  Object to the form.

BY THE WITNESS:

A.   It's not a log, no.

BY MR. LOEVY:

Q.   All right.  It's got times.  It's got --

          THE COURT:  Overruled.

          MR. LOEVY:  I'm sorry, Your Honor.

BY MR. LOEVY:

Q.   It's got events.  And this is the kind of record where a police officer would write, you know:  Bought him McDonald's.  Can't later complain didn't eat, right?  You'd log it.

A.   It's not a log.

Zalatoris - direct

1221

Q.   All right.   But you're supposed to write in your GPR:
Bought him McDonald's.   Nobody can later say he didn't eat.

You're supposed to write that down, right?

A.   Nobody said you're supposed to write it down, no.

Q.   All right.   But you knew the criminal defense attorneys
were going to say:   This kid was in here for four days.   He
didn't eat.

You gotta have some proof that he ate, if he ate,
right?

A.   Right.   And majority of the time, we take pictures.

Q.   Okay.   Now, you don't have any memory to deny that John
didn't eat, right?

A.   That John didn't eat?

Q.   Yes.

A.   Oh, I remember John eating.   We took him up to a 7-Eleven
up north.

Q.   And your testimony is that he ate food and not just drinks?

A.   I think we got him a hotdog, one of those 7-Eleven hotdogs.

Q.   This is all from memory, right?

A.   Well, I remember being in that 7-Eleven.   Not too --

Q.   Yeah.

A.   -- many -- yeah.

Q.   You were there with Mr. Breen, right?

A.   Yes.

Q.   And would you dispute his testimony that you got him a

drink?

A.   We got him a drink?

Q.   Yeah.  Just a drink.

A.   Oh, just a drink?  I don't know.

Q.   All right.  So you're not claiming you bought him a hotdog, right?

A.   I think we got him something to eat.  I think we got him a hotdog.  Or that's what I kind of remember, yes.

Q.   All right.  Any other time you bought John any food in that time he was in custody?

A.   Nah.  We were just with him that one day.

Q.   All right.  So -- but if John ate, it's 'cause some detective went out and got him food and brought him food.

That's the only way he's eaten, right?

A.   Yes.

Q.   And that would be out of the detective's pocket.  I think we established that, right?

A.   Pretty much.

Q.   So let's say John was so terrorized or so scared that he wasn't thinking about food and wasn't bugging you, "Can I eat?  Can I eat?"

Do you understand my hypothetical?  He's not asking for food.  Are you with me?

A.   Not really.

Q.   Okay.  Let's say, in this hypothetical, he was so concerned

about survival that he wasn't saying, "Can you feed me?"

Under those circumstances, do you think it might have gotten overlooked to feed him?

A. I -- I don't understand.

Q. All right. Different police officers were doing different shifts and changing shifts, right?

A. Right.

Q. And so if nobody -- if he wasn't bugging people to bring him food, maybe nobody brought him food, right?

MR. NATHAN: Objection, calls for speculation.

THE COURT: Sustained.

BY MR. LOEVY:

Q. You didn't bring him food into the station, right?

MR. NATHAN: Objection, asked and answered.

MR. LOEVY: No. He was -- talked about when they went on a road trip, which we'll talk about. I'm saying he didn't bring food into the station, Your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. I don't believe so.

BY MR. LOEVY:

Q. All right. These rooms are isolated, right?

That's when you put someone in a room, they don't have access to the outside world, right?

A. You can't, no.

Q.   They become dependent on the police officers.  If they want to go to the bathroom, they have to get permission, right?

A.   Well, they knock on the door, take 'em to the bathroom.

Q.   If they want to eat, they got to depend on the cap doors, right?  If they want a drink?

        MR. NATHAN:  Object to the form.

        THE COURT:  Overruled.

BY MR. LOEVY:

Q.   They become dependent on the interrogators in this situation, right?

A.   Well, they have to knock on the door.  They're in a locked room, so they have to knock on the door, yeah.

Q.   All right.  Over the course of these four days, limited sleep, limited food, no access to the outside world, do you think the risk of a false confession goes up?

        MR. NATHAN:  Objection, form, calls for speculation, compound.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   No.

BY MR. LOEVY:

Q.   No, you don't think the risk of a false confession goes up?

A.   I don't -- I don't believe in that, no.

Q.   You don't believe in it or believe that?

A.   Don't believe in it.

Zalatoris - direct

1225

Q.   You don't believe in false confessions?

A.   Not really, no.

Q.   Do you remember your training as far as interrogations?

A.   No, I don't.

Q.   All right.  Did you get any training about false confessions?

A.   Again, I don't remember.  You're going back over 30 years ago.

Q.   So how can you say you don't believe in false confessions if you don't even remember getting trained on the possibility of a false confession?

           MR. NATHAN:  Objection, argumentative.

           THE COURT:  Sustained.

BY MR. LOEVY:

Q.   You've had very limited training in interrogation, would you agree?

           MR. NATHAN:  Objection, foundation.  Withdrawn.

           THE COURT:  Overruled.  I mean, you can lay a foundation that he went through training, if you'd like, if you want.

BY MR. LOEVY:

Q.   Did you get any training?

A.   I did go through training.

Q.   Okay.  And you don't really remember.  Just maybe a couple of days, a day or two, right, on interrogations?

Zalatoris - direct

1226

A.   We were in class for -- as detectives for, I think, over a month.

Q.   And as far as interrogations, you remember a day or two of training, right?

A.   I don't remember how many days.

Q.   All right.  Let's talk about ways you can overcome someone's will.

       And you were trying to overcome John's will.  Do we agree?

A.   No.

Q.   He was trying not to confess, right?

       Can you answer that question?  He was trying not to confess, right?

A.   Well, he was lying to us, yes.

Q.   Now, sir, he was trying not to confess.

       MR. NATHAN:  Objection.

BY MR. LOEVY:

Q.   He was trying to say he was innocent.

       MR. NATHAN:  Asked and answered, argumentative.

BY THE WITNESS:

A.   He was lying to us originally, yes.

BY MR. LOEVY:

Q.   When he was trying not to confess and trying to tell you he was innocent, you were trying to get him -- you were trying to break down his resistance, correct?

A.   I wouldn't say "break down his resistance."

Q.   He was resisting what you were trying to do, right?

A.   I mean, he's -- he's lying.  He's saying he's not involved, yeah.

Q.   Yeah.  And so that's resistance.

And you tried to break down his resistance, right?

MR. NATHAN:  Objection, asked and answered.

MR. LOEVY:  He's not answering.  He just keeps saying he's lying.

THE COURT:  Overruled.

BY THE WITNESS:

A.   There was questioning --

BY MR. LOEVY:

Q.   You were trying to break down his resistance, right?

A.   We're trying to get to the bottom of the truth.  That's what we're trying to do.

Q.   All right.  And, you know, when he told you what the truth was, "I wasn't involved," you didn't accept that, obviously.

A.   Because it wasn't the truth.

Q.   All right.  He -- there came a time when you finally did get him to confess.  Sometime after midnight, he's ready to talk to the state's attorney, right?

A.   Yes.

Q.   And McRay Judge described how you guys sat in there.  He said, "Hey, I did it, I did it, I did it."

Zalatoris - direct

1228

Do you remember that meeting with McRay Judge at 3:00 in the morning?

Actually, what time was that? When did it start with McRay Judge?

A. Something like that.

Q. What time -- okay. I thought maybe McRay got there at 3:00 a.m., and it took a couple hours to get him ready, and then he was ready at 5:00 a.m.

A. Could be right.

Q. All right. And then after he had done confessing, they asked you, the detectives, to leave the room. Just John and the state's attorneys, right?

A. Yes.

Q. And then you leave, right?

A. Yes.

Q. And then McRay comes out, and McRay says, "We got a problem here. This kid says it's not true. He says you made him say it," right?

A. You know, the thing is, I don't remember talking to McRay Judge.

Q. Well, how would you know that he didn't confess if McRay Judge didn't say, "We got a problem"?

A. I wanna say we found out when we came back to work.

Q. All right. We'll talk about that in a minute.

Were you -- would it have been irritating to you to

Zalatoris - direct

1229

have learned that you just did this whole confession for an hour, and then John got out of the room -- and you got out of the room, sorry, and John said to the state's attorney, "Those police officers pressured me"?

Would that have made you mad at John?

A. Again, we found this out --

Q. Okay.

A. -- later on that night.

Q. When you found it out, did you get mad at John?

A. No. It's what happens.

Q. Well, if John told the state's attorneys, "I understand that" -- John told the state's attorneys that, "Hey, it's not true. The confession's not true. The police" -- you know, "I did it to get the police off my back. They pressured me," is that true or not?

A. I don't know what he said to Judge.

Q. No. If John told the state's attorneys, "The confession's not true. The cops made me say it," in your mind, that's a big, fat lie, right?

A. It would be.

Q. All right. So were you mad at John for giving a big, fat lie to the state's attorneys?

A. No.

Q. So you went in there and did you have a -- after the state's attorneys left, did you have a word with John?

Zalatoris - direct

1230

A.   No.   We went home.

Q.   All right.   At some point, did you have a word with John about why he didn't confess when he -- "John, you know, you said you were guilty, and now you're telling the state's attorney I made you say it," did you ever have a word with John?

A.   No.

Q.   You weren't trying to, like, resolve the discrepancy?   "Why did you just confess to me for two hours and then tell the state's attorney I pressured you"?

You didn't want to talk to him about that?

A.   No.   We went home.

Q.   Are you allowed to put hands on suspects?

A.   Put hands on suspects?

Q.   Yeah.

A.   You talking about during the course of an arrest?

Q.   No.   During an interrogation in this kind of situation.

A.   No.   You don't do that.

Q.   And, now, that would create a danger of a false confession, would you agree?

A.   I don't know.   I'd never done it, so I wouldn't know.

Q.   All right.   Well, even if you don't believe in false confessions, would you agree that if you put your hands on somebody, that would increase the risk of a false confession?

A.   It may increase the risk, but, you know, I don't know.

Q. But you don't dispute you -- actually, you don't agree with me, that if you -- if you slapped John or kicked him, that that would increase the risk of a false confession?

I know you say you didn't do it, but would you agree with me that if you did do that, that could increase the risk of a false confession?

A. Again, I don't know what increases or decreases that, so I wouldn't know.

Q. All right. You were big then, right?

A. I was -- pardon me?

Q. You were physically imposing to a man like John, John Fulton, right?

MR. NATHAN: Object to the form of the question, vague.

THE COURT: I guess so, yes.

BY MR. LOEVY:

Q. What was your weight and height?

A. I don't recall what my weight was 20-something years ago.

Q. Approximately the same as at the deposition, though, right?

A. When was the deposition?

Q. 2002. 2022. Sorry.

A. Ah, maybe somewhere, yeah, close to that.

Q. All right. Showing you Plaintiffs' Exhibit 257, pages 1 and 3 -- 2.

MR. LOEVY: Permission to publish, Your Honor.

Zalatoris - direct

1232

Photographs from then.

MR. NATHAN:  No objection.

THE COURT:  All right.

BY MR. LOEVY:

Q.  Which guy were you?

A.  On the right.

Q.  And then showing you page 1.  Which guy were you?

A.  On the left.

Q.  All right.  You were a physically imposing man, would you agree?

A.  Well --

MR. NATHAN:  Object to the form of the question.

THE COURT:  Overruled.  He can answer if he --

BY THE WITNESS:

A.  Well, he's short, the guy that's next to me.

BY MR. LOEVY:

Q.  So is Fulton, right?

A.  Well, I don't know.  I don't remember his height and weight.  But I know Dave's short.

Q.  All right.  Did you, during the interrogation, use your size to cause any intimidation at any point?

A.  I didn't use it, no.

Q.  All right.  This was -- did you grab his shirt roughly at any point?

A.  No.

Zalatoris - direct

1233

Q.   And showing you what's already in evidence, I believe, Plaintiffs' Exhibit 73, page 2, the Polaroid.

Did you cause his shirt to be ruffled?

A.   No.

Q.   And showing you his collar when he came in.  This is Plaintiffs' Exhibit 154, page 1.

His collar did not look the same when he came in as when he went out, correct?

MR. NATHAN:  Object to the foundation, as to the timing of the photographs.

MR. LOEVY:  Well, I'll back up.

BY MR. LOEVY:

Q.   Which is the before picture and which is the after picture?

A.   Well, I don't know, but I'm gonna assume the one with his -- well, you know what?  I don't know.  That might be his lockup photo when he got charged.  I don't know.

Q.   It looks like a Polaroid, right?

Lockup photos weren't Polaroids, were they?

A.   Well, let me see the other one again.

Q.   Looks like -- this looks like the official version when you're arrested, right?

A.   That's -- that's the -- yeah.  When he made it to the lockup, that would probably be that, yes.

Q.   Or when he's arrested.  They take an arrest photo.  And you're booked when you're arrested, right?

A.   Not up in the Area.

Q.   All right.  Looking at the Polaroid.  This is the one you take at the end to prove that there's no physical abuse, right?  You have to take a picture of him?

A.   Well, this was taken sometime when he was up there.  I don't know exactly when.

Q.   All right.  Why would his coat and sweater have been taken away?  Any good reason?

A.   Well, what I can think of is that you wouldn't want him to have something he could hang himself with in that interview room.  So that's why he wouldn't have the sweater, the jacket, shoelaces, things like that, belts.

Q.   Second day, third day, fourth day.  At some point, a young man might start wanting to harm themselves, right?

A.   You don't know what he was gonna do.

Q.   All right.  But as far as the sweater --

     (Cell phone interruption in gallery.)

        MR. LOEVY:  You got that?  Okay.

BY MR. LOEVY:

Q.   As far as the sweater, it was very cold in those interrogation rooms, wasn't it?

A.   No.

Q.   Was it cold at all?

A.   Again, I don't remember how cold it was.

Q.   I mean, but those rooms, as a matter of practice, suspects

were constantly complaining that the temperature of those rooms are too cold.  Would you agree?

A.  No.

Q.  And, in fact, that was by design that they kept those room colds [sic].  Would you agree with that?

A.  No, not at all.

Q.  There was no bedding -- no blankets were given either, right?

A.  No.  The rooms weren't kept cold.

Q.  Can you think of a good reason why this kid's sweater should have been -- sorry, this young adult's sweater wasn't taken?

MR. NATHAN:  Objection.

BY MR. LOEVY:

Q.  Or was taken?

MR. NATHAN:  Objection, asked and answered.

THE COURT:  I don't think it was.

BY MR. LOEVY:

Q.  Because he could hang himself with his T-shirt, right?

A.  I imagine he could.

Q.  All right.  So you didn't take his T-shirt, right?

A.  No.  But we took two other things from him.

Q.  So why did you take his sweater?

A.  It was --

MR. NATHAN:  Objection, asked and answered.

BY THE WITNESS:

A.   I answered that.

BY MR. LOEVY:

Q.   But I asked you a follow-up cross-examination question, which is if he could hang himself with his T-shirt, then what good does it do to hang -- to take his sweater?

A.   He has to wear something.  Okay?

Q.   And if he had a sweater, he could use it for a pillow, right?

A.   I don't know.

Q.   All right.  Did you at any point tell John Fulton, "Hey, you're in big trouble"?

A.   Did I tell him, "You're in big trouble"?

Q.   Yeah, words to that effect.

A.   I don't know.  I don't remember words to that effect, but --

Q.   When you were trying to overcome his resistance, did you tell him, "You're going down for murder for life, and you could get the death penalty unless you start cooperating"?

Did you say words like that to him?

A.   No.

MR. NATHAN:  Object to the form of the question as to "overcome his resistance."

MR. LOEVY:  Sorry.  I didn't hear the answer.

BY THE WITNESS:

Zalatoris - direct

1237

A.   I said "No."

MR. LOEVY:  Oh, I'm sorry.  We had an objection.
Sorry.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   Did you say words to that effect?

A.   I just answered you.

Q.   I didn't hear you.

A.   I said "No."

Q.   Would it have been improper to say, "You know, you could get the death penalty.  You're gonna get" -- "go to prison for life unless you start cooperating"?

Would that have been an improper interrogation technique?

A.   Oh, yes, it would.

Q.   Tell the jury why.

A.   Because you have no idea what his sentence is gonna be, or if he's gonna be convicted.

Q.   So that's not something you would've done?

A.   No.

Q.   Did you ever lie to him?  Well, let me ask this.

Do you sometimes lie to suspects during an interrogation?

A.   Yes.

Q.   You were allowed to lie to them, right?  Suspects?

Zalatoris - direct

1238

A.   Yes.

Q.   And you didn't document if you lied.  Like, "I lied to him.
I'm gonna write that down," right?

A.   That would be something that would be in the course of the
conversation back and forth.

Q.   All right.  So you can't say anymore, either way, whether
you lied to Fulton, Mitchell, or Shaw; fair to say?

A.   No.

Q.   The nos and the yeses are ambiguous a little bit, so you
gotta say -- I'll ask you again.

     Do you agree with me, you can no longer say, either
way, whether you lied to Shaw and Mitchell and Fulton?

A.   I don't agree with you.

Q.   You do not agree with me?

A.   I do not agree with you.

Q.   Okay.  Did you lie to Fulton, Shaw, and Mitchell?

A.   No.

Q.   But if you sometimes lie to people, why do you say that you
didn't lie to him?

A.   Because we didn't.

Q.   But you sometimes did.

A.   Not to them.

Q.   You just remember:  I'm allowed to lie to people.  I
sometimes lie, but I didn't lie to John Fulton?

     MR. NATHAN:  Objection, argumentative.

MR. LOEVY: I'm probing his answer, Your Honor, trying to understand it.

THE COURT: Overruled.

BY THE WITNESS:

A. All right. What is it you want to hear again?

BY MR. LOEVY:

Q. All right. If I understand what you're saying is, like, you would lie to suspects because you weren't prohibited from it. But you're saying you didn't lie to John, and I'm just trying to understand why you remember.

A. Because we didn't lie to him.

Q. If I asked you if any other suspect, random suspect, start pulling your files, would you remember if you lied to him, didn't lie to him?

A. If it was something that I remember lying to him about, yeah, I would remember.

Q. All right. John said that you told him that people had identified him at the scene. You better start cooperating.

Did that happen?

A. I don't remember that.

Q. Might've happened?

A. I don't remember that.

Q. Okay. So since you don't remember it, it might've happened; it might not have happened. You can't say either way, true?

Zalatoris - direct

1240

A.   I don't remember it happening.

Q.   I think we established that.  But --

A.   Okay.

Q.   -- how about telling him his car was identified at the scene?  He says you said, "Hey, you better start cooperating. Your car was identified at the scene."

        Sounds like you don't remember, either way, whether you said that or didn't say that, true?

A.   What was it again?

Q.   You don't remember, either way, if that happened.

A.   I don't remember telling him that stuff.

Q.   Although the rules allowed you to lie, you weren't required to lie to suspects, right?

A.   No.

Q.   You had a choice if you wanted to lie or not, right?

A.   Yes.

Q.   Did you ever see Breen lie to suspects in your presence?

A.   Don't recall.

Q.   He might have; he might not have?

A.   I don't recall.

Q.   Okay.  But you lied to suspects.  We've established that, right?

A.   Said you can, yes.

Q.   No.  You said you did.

A.   And I have, yeah.

Q.   Yeah.  All right.  And do you remember -- would you have said -- if Breen started lying to a suspect, you wouldn't say, "Hey, hold on, Mr. Breen.  We don't do that"?

You wouldn't have done that.  You wouldn't have stopped him, right?

A.   Well, not if it's -- it's nothing that's prohibited.

Q.   Okay.  How about false promises that, "You can go home if you cooperate," or, "We'll be lenient with you"?

Did you ever use that tactic with John or Anthony or Antonio?

A.   I've never seen that tactic ever used by anybody in my career.

Q.   Ever?

A.   Ever.

Q.   So you --

A.   Ever.

Q.   -- never once in the course of an interrogation said, "Hey, you're in real trouble.  You're gonna get in trouble, but if you cooperate, tell us the truth, it'll maybe go easier for you"?

A.   Absolutely not.

Q.   Tell the jury why that is so prohibited.

A.   It's so ridiculous that somebody would tell you they committed a murder and then believing that they were going to go home.

Zalatoris - direct

1242

Q. So that's sort of nonresponsive to my question.

A. You asked me to explain to the jury, and I just did.

Q. Yeah, but I'm -- the question I wanted you to explain was, you're interrogating somebody for, say, a robbery or any kind of crime.

A. Right.

Q. And you're saying you would never say, "Hey, I got the goods on you, Buddy. You better start cooperating or you're gonna be in big trouble. And if you cooperate, maybe I'll go a little easier on you."

You never suggested that, implied or otherwise?

A. No, because I don't make the determination on that.

Q. That's why it would be improper to do it, right?

A. Well, yeah, it'd be improper. And, again, I've never, ever told anybody they could go home if they tell us what happened.

Q. Of course, Precious Griffin, you told her if she cooperated, she could go home, right?

A. I didn't tell her that.

Q. All right. She cooperated and she went home.

A. She cooperated and she went home. I didn't tell her that.

Q. All right. But your testimony is it would be prohibited to give someone an implication that if: Hey, if you just, you know, tell that, you know, you were maybe a witness, you didn't have anything to do with it, but you saw it, and they can go home, that would be -- that would increase the risk of a false

confession. Do we agree?

MR. NATHAN: Objection to the form, asked and answered.

THE COURT: It's pretty long and convoluted.

MR. LOEVY: All right. I'll move on to another topic.

BY MR. LOEVY:

Q. You heard Dr. Leo describe the concept of "minimization." Are you familiar with that concept?

A. The who? What was the --

Q. Minimization.

A. Who said this?

Q. During -- Dr. Leo, the false confession expert.

A. Oh.

Q. Did you hear that testimony?

A. I don't remember it.

Q. Are you familiar with the phenomenon of "minimization"?

A. I mean, explain it to me.

Q. Sure. Let's say you got an interrogation suspect. Maybe it's Anthony Mitchell. And you say: Mitchell, you're in real trouble. You're going down for murder. But, you know, maybe you just drove the car. Maybe you were just the lookout, and you get him to confess that they had a minimized role by pressuring him.

Are you aware of that play? You ever seen that play?

A. I understand what you're talking about, yes.

Q. All right. Did you ever run that play?

A. You know what? I can't recall, to tell you the truth.

Q. All right. Try to talk a guy into: Maybe you were just the lookout, and then they -- in that scenario, once the guy admits he was a lookout, he's down for the whole murder, too, right?

A. Well, you know, something you just said. We don't try to get them to say anything. That's like --

Q. Well, you spent quite a bit of time --

A. No, no. What --

Q. -- trying to get him to say something, right?

A. What you said before, the way you characterized it, no, we don't go there trying to make people say things that aren't true.

Q. Well, it's -- well, leaving aside the truth, it sounds like you spent a whole lot of time trying to get John to say something, right?

You were trying to get him --

A. We were trying to get him to tell us what happened is what we wanted, yes.

Q. And he said he was innocent, so you were trying to get him to tell you what you want to hear, right?

A. To tell us what happened.

Q. All right. To get him to do that, have you ever run this play where you're like, "Hey, say it was Riff's fault, and

it'll be better for you"?

A.   No, not like that.  Not at all.

Q.   And when -- if you do get people to say, "Fine.  I'll be a witness.  I was just the lookout," the suspect might not realize that they are nonetheless still guilty of murder, right?

Do you understand what I'm asking?

A lookout is guilty of murder, too, right?

A.   You're asking me about a hypothetical here.

Q.   Yes, hypothetical.

MR. NATHAN:  Objection, calls for speculation, foundation.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   A lookout's still guilty of murder, right?

A.   I would say so.

Q.   Accomplice liability, aiding and abetting, conspiracy, right?

A.   Unaccountability.

Q.   Yeah.  So the suspect might not understand at the time -- if you're hammering him with:  You're gonna go to prison for murder.  This guy's saying you did it.  This guy's saying you did it.  Just, we know you were the lookout.  We know you weren't really part of it.  It's not as serious, there's a risk that the person could confess, right?

Zalatoris - direct

1246

We agree there would be a risk if you ran that play?

A.  I -- you know, that was kind of long.  Now, we didn't do that, so, you know --

Q.  Take a look at Anthony's GPR.  This is page 30 of Plaintiffs' Exhibit 11.

Anthony has -- this is Anthony's R, Riff, walks to 53rd and the alley.  Lookout for police while J is pouring the gas, right?

A.  Yes.

Q.  So you guys did persuade Anthony, "Hey, you could just be a witness.  You know, it was really John's crime.  You'd just be a witness, and you'll go" -- "we'll go easy on you."

That's what happened, isn't it?

A.  Not at all.

MR. NATHAN:  Objection to the form of the question.

THE COURT:  Overruled.

BY THE WITNESS:

A.  Not at all.

BY MR. LOEVY:

Q.  All right.  You're familiar with the prisoner's dilemma as an interrogation technique?

A.  The what?

Q.  Prisoner's dilemma.

A.  No.

Q.  Two prisoners, each in a different room, and you go back

Zalatoris - direct

1247

and forth and say:  You know, you guys are in real trouble.
First guy that admits that you did it, we'll go easy on him.
And if the other guy points at you, then you're in real
trouble, that -- I'm not saying you've run that play, but are
you familiar with that kind of interrogation tactic?

A.  I think I saw that on TV.

Q.  All right.  You saw it on TV.  Have you ever run that play
yourself?

A.  No.

Q.  No.  Why not?

A.  Because we're just trying to find out what happened.  We're
not trying to make people point at other people.

Q.  Weren't trying to get other people to point at other
people.

A.  What's that?

Q.  Because it sounds like you were trying to get John to point
at the people, and you were trying to get Anthony to point at
the people, and you were trying to get Shaw to point at the
people.

A.  What they did is they told us what happened.

Q.  All right.  Did you go into one room and say to Anthony
Mitchell, "Fulton's gonna" -- "Fulton's saying you did it.  You
better say he did it or you're gonna go down for murder"?

        Did you do that?

A.  No.

Zalatoris - direct

1248

Q.   Did you say to Fulton, "Mitchell's saying you did it.  You better say he did it or you're going down for murder"?

A.   No.

Q.   Did you tell either of them if they'd just be a witness, they can cooperate, they can go home, like Precious Griffin?

MR. NATHAN:  Objection, asked and answered.

BY MR. LOEVY:

Q.   Did you tell either of them that they could be a witness?

MR. NATHAN:  Objection, asked and answered.

THE COURT:  I'm not sure.  I think so, yeah.

BY MR. LOEVY:

Q.   All right.  Let's look at the reports, then.

When Mitchell finally gave his confession, it wasn't really a confession, was it?

It was more of a point the finger at Fulton, right?

MR. NATHAN:  Object to the form of the question.

BY THE WITNESS:

A.   I'd have to take a look at the GPRs.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   Let's take a look.  This is Plaintiffs' Exhibit 11, page 30.

When Mitchell's confession says that:  "J pulled up" -- that's John Fulton, right?

A.   Uh-huh.

Q.   Precious would tell him where it is.

And then J and R are the ones who set up the victim, right?

A.   Oh.  Hang on.

Q.   That's Fulton --

A.   Well, hang on.

Q.   -- and Riff.

A.   You're skipping around on me.

Q.   I'm sorry.  "Run up on the victim."

I am skipping around.  I'm not going to read the whole thing.

A.   Oh, okay.  Well, that's why I was -- I was trying to look at the GPR.

Q.   All right.  Let's orient you, then.

This is the notes of Anthony Mitchell's confession, right?

A.   That's his interview, yes.

Q.   All right.  And that's your signature on there?  Or it's just Breen?

A.   Both of us.

Q.   Both of you.  All right.

Looks like Shaw punched the victim in the head.  And let's see what Riff says.  They're punching, fighting back.

Who gets the bat in Riff's confession?

A.   In this one, John, I guess, yeah.

Q.  Who hits the victim with the bat?

A.  It says John does.

Q.  Who hits him approximately three more times on the ground?

A.  Right.  But he admits to hitting him, too, so --

Q.  Who admits him --

A.  Well, he admits to hitting him, also.

Q.  Yeah.  He admits to punching him, right?

A.  Yeah.

Q.  And then John's the one who does the bat work, though, right?

And then who gets the gas?

A.  John with the gas.

Q.  John puts the gas in the car.  John does the taping.  John stops in the alley.  John gets the box.  Riff walks to go be the lookout, lookout for police.  John buys the gas.  And then John strikes the match and says to Stick and Riff, "What happens here stops here."

Basically, what you guys did was you persuaded Mitchell, "If you cooperate with us getting John, you could be a witness and you could go home."

That was what you guys did to pressure Mitchell, right?

A.  Not --

MR. NATHAN:  Objection, asked and answered.

THE COURT:  Overruled.

BY THE WITNESS:

A. Not at all.

BY MR. LOEVY:

Q. And then once he agreed to do it, unbeknownst to him, that made him liable for the murder, too, right?

A. What is the question?

Q. He thought he was just being a witness against Fulton, right?

MR. NATHAN: Objection, calls for speculation.

THE COURT: Yes.

MR. LOEVY: All right.

BY MR. LOEVY:

Q. Well, Anthony Mitchell's motivation was not to go to prison for the rest of his life, right?

MR. NATHAN: Object to the form of the question.

BY MR. LOEVY:

Q. In your mind.

MR. NATHAN: Argumentative.

BY MR. LOEVY:

Q. In your mind, Anthony -- it's against someone's self-interest to confess, right?

A. I would imagine, yes.

Q. All right. So isn't it true that you led Anthony Mitchell to believe that if he said Riff did it -- I mean, if he said Fulton did it, he could be a witness. He's not gonna be in as

much trouble.  He'll maybe get, you know, a little bit of time?

MR. NATHAN:  Object.

BY MR. LOEVY:

Q.  Did you give him that impression is the question?

MR. NATHAN:  Objection, asked and answered.

THE COURT:  Was it answered?  I don't know.  I think he denied it.

MR. LOEVY:  And I don't think he answered it.

THE COURT:  Answer the question.

BY THE WITNESS:

A.  What was the question again?

BY MR. LOEVY:

Q.  Did you give Mitchell the impression that if he just was a witness against Fulton, if he cooperated and said Fulton did this, that the law would go easy on him?

Did you give him that impression?

A.  No.

Q.  All right.  Fulton's confession points the finger at Riff, right?

A.  Yes.

Q.  Fulton's confession's got Riff being the one with the bat, Riff being the one who hit him with the bat, Riff being the one who lit him on fire, Riff being the one who taped him up.  Riff said, "Let's get rid of the body," right?

A.  Of course.

Zalatoris - direct

1253

Q.   Did you tell Fulton that, "Hey, you could be a witness. You can go home.  All you got to do is cooperate.  You can go home"?  Did you tell Fulton that?

A.   No.

Q.   And then Shaw, of course, blames the other two, right?

A.   Pretty much, yeah.

Q.   Now, there did come a point in time when John Fulton gave up, right?

He went from innocence to guilt.  I think we've talked about that.

MR. NATHAN:  Objection, asked and answered.

BY MR. LOEVY:

Q.   I'm orienting you to a point in time, so I can ask you more questions.

THE COURT:  What did you say?

BY MR. LOEVY:

Q.   I'm orienting to the point in time when you broke -- when John broke.  There came a time when he broke, right?

MR. NATHAN:  Object to the form.

THE COURT:  I -- if that's all the question's about, I'll overrule.

BY THE WITNESS:

A.   What was the question again?

BY MR. LOEVY:

Q.   John was resisting, and at some point, you overcame his

Zalatoris - direct

1254

resistance, right?

MR. NATHAN: Objection to the form of the question. It's a legal question.

THE COURT: He's under cross-examination. Overruled.

BY THE WITNESS:

A. At one point, he did tell us what happened.

BY MR. LOEVY:

Q. All right. Who -- do you remember who was in the room when he first -- his will to resist broke?

MR. NATHAN: Object to the form of the question. Calls for a legal conclusion.

BY MR. LOEVY:

Q. Who was in the room?

A. I don't know what time his will broke, as you're saying.

Q. You were there, right?

A. Well, you're talking -- no, I wasn't -- I don't know when his will broke.

Q. Okay. He was -- he was trying to say he was innocent, right?

He was -- when you first encountered him, he was trying to say he was innocent.

A. Originally, yes.

Q. Yeah. And he maintained his innocence for some period of time, right?

A. Yes.

Q. And you knew that was a big lie, right?

A. Yes, we did.

Q. So you did everything in your power to convert him from innocent to admitting against his interests, right?

MR. NATHAN: Objection, form.

BY THE WITNESS:

A. We did everything we could to find out what happened.

BY MR. LOEVY:

Q. All right. There had to come a point when he flipped over from resisting what you were trying to do to acquiescing.

That's the point I'm asking about. Okay?

A. There was a time when he eventually told us the truth, yes.

Q. All right. Who was in the room when he gave up?

A. To me and Breen. It was me and Breen in the area, when he gave us the full admission.

Q. Was there anybody else present at that moment in time?

A. No.

Q. Did you -- when he gave up or started saying, "I'm guilty," do you think he understood -- you've already said you didn't think he was cooperating to go home. Do you think he understood that he was confessing to a heinous crime that was gonna put him in prison forever?

A. I think he did.

Q. All right. So what was his motivation, then, to tell you that, you know, "Okay, fine. I'm guilty"?

Zalatoris - direct

1256

Other than he thinks he's gonna be a witness cooperating, what else motivation might it have been?

MR. NATHAN:  Objection, calls for speculation.

MR. LOEVY:  Just cross-examination, Your Honor.  I'm trying to understand --

THE COURT:  I know.  The question -- your questions are long.

MR. LOEVY:  They are long.

THE COURT:  Okay.

MR. LOEVY:  I'll try to break it down.

BY MR. LOEVY:

Q.  It's against someone's self-interest to confess to murder, right?

MR. NATHAN:  Objection, asked and answered.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  What was your understanding of why John Fulton is confessing?

A.  I really don't know why he did.

Q.  Do you believe he understood he was going to prison for many decades when he told you, "Fine.  I'll say that Riff did it"?

A.  I don't know.

Q.  Now, we talked about McRay a little bit.

At that moment when you overcame his resistance and he

Zalatoris - direct

1257

agrees to go from innocent to guilty, there wouldn't have been any reason to delay calling the state's attorney, correct?

MR. NATHAN: Object to the form.

THE COURT: Overruled.

BY MR. LOEVY:

Q. There wouldn't have been any reason to delay calling the state's attorney, right?

A. What was the question? The full question?

Q. There wouldn't have been any reason to delay calling the state's attorney once you got him where you want him.

A. Well, we did wait.

Q. All right. But there wouldn't have been a reason to wait, right?

A. There was.

Q. All right. Let's break that down into pieces.

If John finally agreed to confess -- what time do you say he finally agreed to confess?

A. I'm gonna say somewhere around 9:30, 10:00 o'clock, somewhere in there, approximately.

Q. All right. And at 9:00 -- he doesn't meet the state's attorney till 3:00 in the morning, right?

A. Right.

Q. And that's because there was some work to do between 9:30 and 3:00 a.m. to get him ready to confess, would you agree?

MR. NATHAN: Object to the form, vague.

THE COURT: Overruled.

BY THE WITNESS:

A. No, there was no work to do to get him ready to confess, no.

BY MR. LOEVY:

Q. All right. Well, if you -- the delay was a risk that he would decide he didn't want to confess anymore, right?

A. That wasn't it.

Q. All right. But the delay -- every second that delayed, before you called the state's attorney, there was a risk that he would lawyer up, right?

A. Don't know.

Q. Every minute you delayed in getting that on paper was a risk that he'd say, "You know what? I've thought about it. I don't want to confess."

A. Could have done it at any time.

Q. Yeah. So your incentive would have been to lock him in as fast as possible, right?

A. No.

Q. But you waited -- the first thing you had to do was show him where the crime took place, right?

A. No. The first thing we did is verify what he told us.

Q. Okay. You decided to show him the scene, right?

A. We didn't show him anything. He showed us.

Q. All right. 'Cause he -- he's a south side guy. He didn't

Zalatoris - direct

1259

know the north side, right?

A.   I don't know.  He told us where to go, and we went there.

Q.   So you got in a car and you took a little ride, right?

A.   That's right.

MR. LOEVY:  Now, before we talk about that -- and let me -- may I have a moment, Your Honor?

THE COURT:  Yes.

MR. LOEVY:  Are we -- we're going to go till 5:00, I trust?

THE COURT:  Are you all all right over there?

(Jurors nod.)

THE COURT:  Yes?  Okay.  We'll go till 5:00.

MR. LOEVY:  Thank you, Your Honor.

BY MR. LOEVY:

Q.   I'll tell you what.  Let me ask you this.  Let's talk about McRay Judge for a minute.

After you left the room, Fulton and McRay are in there alone.  Then they come back out.

Isn't it true that you did speak to McRay again?

A.   I don't remember speaking to him, no.

Q.   When your memory was fresher in 2005 -- this is your April 12th, 2005 transcript, page 27, line 17, through page 28, line 16.

You remember giving these answers to these questions:

"I mean, after McRay spoke -- McRay Judge spoke to the

Zalatoris - direct

1260

defendant alone, did you have a conversation with him?"

A.   What is -- what is this off of?

Q.   This is your testimony at the hearing on April 12th, 2005.

A.   Is that a motion hearing or is that the trial?

Q.   This is a motion hearing.

A.   Okay.

Q.   Would you like to see it?

MR. LOEVY:   Can we show the witness, then, Your Honor?

THE COURT:   Yes.

BY MR. LOEVY:

Q.   "Talking about McRay Judge.  Did you talk to McRay Judge? I mean, after McRay Judge spoke to the defendant alone, did you have a conversation with him?

"Answer:  Yeah, we did.

"Question:  'We' meaning yourself and --

"Answer:  Myself and Breen.

"And Detective Breen?

"Yes.

"Where did that conversation take place?

"Area One.

"How long was that conversation?

"I don't recall.

"Do you remember the sum and substance of the conversation?

"Answer:  Probably about what was going on with the

Zalatoris - direct

1261

case, what we're doing with the case.

"Question:  Well, didn't McRay Judge tell you that the defendant had recanted his involvement in the crime?"

You said:  "I don't understand what he's asking me. He asked me about being pissed off?"

Did you give those answers to those questions?

A.   What year is this?

Q.   2005.

A.   Okay.  It's two years after, yeah.

Q.   All right.

A.   Must have, if it's on there.

Q.   Right.  So --

A.   I don't recall this stuff 22 years later, though.

Q.   All right.  So after McRay left the room, and John told him what John told him, McRay did talk to you, didn't he?

A.   According to that.

Q.   And when you got to John's criminal trial a year later, 2006, the State didn't call you, correct?

A.   I don't know.  I don't remember.

Q.   And Mr. Fulton's attorney, Mr. Zinger, ended up calling you to the stand, correct?

A.   I -- I don't remember which attorney.

Q.   All right.  You've -- at the criminal trial, you flat-out denied that McRay had told you that Fulton was saying it was a lie, right?

Zalatoris - direct

1262

A.   I might have.

Q.   It makes no sense at all that McRay wouldn't have told you, "Hey, you just spent an hour with me, Detective.  This kid confesses, and now he's saying you forced him."

You're not seriously contending McRay didn't tell you that, are you?

A.   You're asking me to make a call on something that I don't really remember.  Okay?  I don't know.

Q.   Would it have bothered you if you're learning that the confession was fake and it was fabricated, and he told the state's attorney that?

MR. NATHAN:  Objection, asked and answered.  This topic --

THE COURT:  Probably --

MR. NATHAN:  -- was covered two hours ago.

THE COURT:  Probably, yes, asked and answered.

MR. LOEVY:  All right, Your Honor.  Maybe, at this point, we could take a break.  I guess it's getting late.

THE COURT:  I think.  It's been a long afternoon.

MR. LOEVY:  Before we start another area.

THE COURT:  So you're not -- clearly not finished yet?

MR. LOEVY:  Not finished, no.

THE COURT:  Okay.  All right.  Ladies and gentlemen, thank you for your attention today.  We'll start again tomorrow.  Same time, same place.

(Jury out at 4:47 p.m.)

THE COURT:  You may step down.

(Witness returns to counsel table.)

THE COURT:  We're adjourned for the day.

(Adjournment at 4:48 p.m. until 9:30 a.m., 2/19/25.)

\* \* \* \* \*

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/s/ Kathleen M. Fennell*

*/s/ Hannah Jagler*

*/s/ Colleen M. Conway*                          02/19/2025
Official Court Reporters                              Date
United States District Court
Northern District of Illinois
Eastern Division

1264

I N D E X


WITNESSES                                                    PAGE

JOHNITTA GRIFFIN

Via Video Deposition                                         1028

LAVERNE HENDERSON

Direct Examination By Ms. Rickert                            1041
Cross-Examination By Ms. Adeeyo                              1075

JOHN ZALATORIS

Direct Examination By Mr. Loevy                              1078


PLAINTIFFS' EXHIBIT                                      RECEIVED

No. 1                                                        1089
No. 11                                                       1085
No. 26                                                       1099