1265

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN FULTON, | ) Case No. 20 C 3118 |
| | ) |
|             Plaintiff, | ) |
|     v. | ) |
| | ) |
| ROBERT BARTIK, et al., | ) |
| | ) |
|            Defendants. | ) |
| ---------------------------- | ) |
| ANTHONY MITCHELL, | ) Case No. 20 C 3119 |
| | ) |
|             Plaintiff, | ) |
|     v. | ) |
| | ) |
| ROBERT BARTIK, et al., | ) Chicago, Illinois |
| | ) February 19, 2025 |
|            Defendants. | ) 9:28 a.m. |

VOLUME 6
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

| | |
|---|---|
| For the Plaintiffs: | LOEVY & LOEVY<br>BY:  MR. JONATHAN I. LOEVY<br>       MR. RUSSELL R. AINSWORTH<br>       MS. JULIA T. RICKERT<br>       MS. FATIMA LADHA<br>       MR. ISAAC GREEN<br>311 N. Aberdeen Street, 3rd Floor<br>Chicago, Illinois  60607 |
| | LYON & KERR, PLLC<br>BY:  MS. ANDREA D. LYON<br>53 W. Jackson Boulevard, Suite 1650<br>Chicago, Illinois  60604 |
| For Defendant Officers: | NATHAN & KAMIONSKI, LLP<br>BY:  MR. SHNEUR Z. NATHAN<br>       MR. AVI T. KAMIONSKI<br>       MS. BREANA L. BRILL<br>       MR. JOHN M. CERNEY<br>       MS. NATALIE ADEEYO<br>206 S. Jefferson Street<br>Chicago, Illinois  60661 |

1266

APPEARANCES   (Continued):

For Defendant City:          MICHAEL BEST & FRIEDRICH, LLP
                             BY:  MR. JAMES P. FIEWEGER
                             444 W. Lake Street, Suite 3200
                             Chicago, Illinois  60606

Court Reporter:              KATHLEEN M. FENNELL, CSR, RMR, FCRR
                             Official Court Reporter
                             219 South Dearborn Street, Room 2328A
                             Chicago, Illinois  60604
                             Telephone:  (312) 435-5569
                             Kathleen_Fennell@ilnd.uscourts.gov

                        *   *   *   *   *

            PROCEEDINGS REPORTED BY STENOTYPE
    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

1267

(Proceedings heard in open court; jury out:)

THE CLERK:  All rise.

(Call to order.)

MR. LOEVY:  Good morning, Your Honor.  Same appearances for the plaintiff.

THE COURT:  Yes, good morning.

MR. NATHAN:  Good morning, Your Honor.  Same appearances for the defendants.

THE COURT:  All right.

All right.  I don't think there's anything on the docket that has to be addressed immediately, so let's bring in the jury.

THE CLERK:  All rise.

(Jury in at 9:30 a.m.)

THE COURT:  You may be seated.

Where's our witness?

MR. LOEVY:  Mr. Zalatoris.

THE COURT:  Would you come back to the witness stand, sir.

MR. LOEVY:  I'm going to need the ELMO.

THE COURT:  Good morning.

THE WITNESS:  Good morning.

THE COURT:  You may be seated.  You've already been sworn.

MR. LOEVY:  All right.  If I could have the ELMO.

Zalatoris - direct

1268

JOHN ZALATORIS, DEFENDANT HEREIN, PREVIOUSLY SWORN,

DIRECT EXAMINATION (Resumed)

BY MR. LOEVY:

Q.   Good morning, sir.  I want to reorient you back to the part of the discussion, got a little muddled at the end there, but you go in there with McRay and Breen and Fulton and he, for an hour, gives a confession, right?

A.   Yes.

Q.   3:00 in the morning, and then you guys leave the room.

A.   Right.

Q.   And then McRay comes out, and you said you did have a conversation with McRay, correct?  You did talk to him.  We read your transcript from 2005?

A.   Yeah, but I don't recall what was said.  It wasn't very long.

Q.   All right.  Now, I want to show you the same poster that we showed Mr. McRay.

Did McRay Judge tell you that Fulton was claiming the confession was false?

A.   I don't recall that.

Q.   Now, is that a yes or a no?

A.   It's I don't recall that.

Q.   Now, you testified at Mr. Fulton's trial, right?

A.   Yes.

Q.   And you told that jury unequivocally that that never

happened; that Fulton never said to McRay, McRay never said to you that this was false, didn't you?

A.   If it's in the transcripts, that's what I said 22 years ago.

Q.   All right.  This is page 44, line 18 to 45:7 of your testimony on August the 30th, 2006.  Isn't it true you gave the following answers to the following questions -- oh, we didn't have this published, Your Honor.  Sorry.

We'll come back to that.

Did you give these answers:

"And McRay Judge filled you guys in on what John Fulton told him in the private conversation?

"A.   Not that I recall.

"Q.   You don't remember John McRay -- McRay Judge telling you this guy recanting his whole confession?

"Not that I recall.

"And you don't remember McRay Judge telling you that he made it all up and says because the detectives -- he just wanted to get them to shut up?

"I don't recall that.

"He didn't tell you anything like that, is that your testimony?

"I don't recall that."

That's what you testified under oath at his trial, correct?

MR. NATHAN: Objection, not impeaching.

THE COURT: It's not impeaching.

MR. LOEVY: It's a witness, right?

THE COURT: Pardon me?

MR. LOEVY: I mean, it's a party. It's a party admission, Your Honor.

THE COURT: But I'm not -- I would say it's not impeaching because that's what he said now, "I don't recall."

BY MR. LOEVY:

Q. All right. Now, it's a pretty significant detail if Mr. Fulton really did come out of that room -- Mr. McRay came out of that room and said to you, listen, he just confessed for an hour, and now he's saying the police pressured him and it's not true.

That's the kind of thing you would remember, right?

A. Again, I don't remember it.

Q. All right. Would you -- so we should put an "I don't recall" here for the box, not "yes," "no." It's an "I don't recall"?

A. That's what I said.

Q. Okay. What was your understanding of why the confession didn't get taken? You went in there, there's a confession. He comes out and says, well, Fulton didn't do the confession.

What was your understanding of why?

MR. NATHAN: Object to the form.

THE COURT: All right. Yes, sustained.

BY MR. LOEVY:

Q. Okay. Did you have any understanding of why, if the plan was to have him confess, you leave the room, you talk to McRay, and there's no confession? What was your understanding of why there was no confession?

MR. NATHAN: Object to the form.

THE COURT: Overruled.

BY THE WITNESS:

A. What was the question again?

BY MR. LOEVY:

Q. What was your understanding of why there was no confession?

A. You know, again, I don't remember, to tell you the truth. You know, I didn't find out until I think I came back to work that he didn't give a handwritten or a video.

Q. And isn't it true what you found out was that Fulton was saying that the police had pressured him to say the statement, but that it wasn't true?

A. I don't remember that.

Q. Did you go in there and have a word with John and say, why are you telling the state's attorney that I told you to give a false confession?

A. Never had contact with him after that.

Q. All right. Let's talk about Mr. Mitchell.

Do you remember anything about your interactions with

Anthony Mitchell other than what's written in the GPR reports?

A. I mean, what's in the GPRs, yes. I mean, I'll go through that, to refresh my memory. But, I mean, you're asking me about a hypothetical.

Q. Apart from what's written in your GPR, do you have any recollection of what anything Anthony Mitchell told you?

MR. NATHAN: Objection, form. Calls for --

THE COURT: Overruled.

BY THE WITNESS:

A. I don't know.

BY MR. LOEVY:

Q. You do not?

A. I don't know.

Q. All right. Do you remember giving this answer at your deposition? This is page 290, lines 14 through 16:

"Q." --

MR. NATHAN: Please hold on one moment.

BY MR. LOEVY:

Q. You have no recollection, right?

A. Well, is there a question, sir?

MR. NATHAN: Go ahead.

BY MR. LOEVY:

Q. Yeah, you have no recollection, right?

A. I said I don't recall anything other than what would be in there.

Q.   There we go.

Do you remember what time, from reviewing the records, that Anthony Mitchell was arrested?

Do you remember the time?

A.   If it's on there, yes.

MR. LOEVY:   All right.   Let's take a look at the arrest report.   This is Plaintiffs' Exhibit 42, and we'd move it into evidence, Your Honor.

THE COURT:   Any objection?

MR. NATHAN:   No, Your Honor.

THE COURT:   All right.

MR. LOEVY:   And publish to the jury if we may?

THE COURT:   Yes.

(Plaintiffs' Exhibit No. 42 received in evidence.)

BY MR. LOEVY:

Q.   This is Anthony, Riff's, arrest report, correct?

A.   Yes.

Q.   And at the time, he was considerably smaller than he is now, right?   He was 17.   He was 5'8" and 140, right?

A.   That's his height and weight on there, yes.

Q.   And the arrest report states that he was arrested on charge that he was named as the person who abducted the victim causing the victim's death.   Do you see that?

A.   Yes.

Q.   Now, that was false, right?   Nobody had named him?

Zalatoris - direct

1274

A.   It was false?

Q.   Right.

A.   No, it wasn't.

Q.   Nobody had named him.

A.   Well, didn't Fulton?

Q.   Well, Fulton had told the state's attorney it was false, right?

A.   No.  I mean, not to us.

Q.   All right.  The time of the arrest was 11:30 at night on Wednesday the 19th, right?

A.   Yes.

Q.   All right.  Were you part of that arrest?

A.   Let me see the bottom.

Q.   Do you remember, sir?  Should have been.

A.   Yeah, I do, but let me see the bottom of that.

Q.   Do you remember --

A.   Can I see the bottom of that, sir?

Q.   No.

A.   Oh, okay.

Q.   I'm asking you if you remember being part of the arrest?

A.   I do, but I'd like to see the bottom of that.

Q.   All right.  So you do remember.  Now let's look at the bottom.

A.   Oh, okay.

Q.   Looks like you're not --

Zalatoris - direct

1275

A.   No, all the way up, sir, okay.  No, you're doing it the other way.

Q.   Which way would you like to go, sir?  Because it sure doesn't look like you were part of the arrest, does it?

A.   It sure does.  See right there.

Q.   Struck, Girardi, Breen --

A.   No, no.

Q.   -- Winstead.

A.   You're not looking at where my name is though.

Q.   Oh, there you go.

A.   There I am.

Q.   All right.  So you were there.  What do you remember about the arrest?

A.   I remember us finding him on the street.

Q.   What do you remember?

A.   I remember him -- finding him on the street.

Q.   All right.  He was taken to the station, right?

A.   Yes.

Q.   And the same things we talked about yesterday with Mr. Fulton's interrogation, Mitchell was very young, right?

A.   He was 18.

Q.   He was 17, right?

A.   Well, 17, 18, yeah.

Q.   All right.  And you said you didn't treat him any differently as a 17-year-old than a 35-year-old or 40-year-old,

Zalatoris - direct

1276

right?

A.   What do you mean, different?

Q.   Well, you know, you said yesterday you would treat an 18-year-old as an adult, right?

A.   I don't understand what you're asking me.

Q.   When you're interrogating someone who's very young, 17 years old, say, don't you think you should maybe treat the interrogation differently than you would, say, a hardened adult?

A.   I mean, asking questions?  No, you'd ask questions the same way.

Q.   All right.  Mr. Mitchell also did not have a lawyer, right?

A.   No.

Q.   And he had no family member present, right?

A.   No.

Q.   Never got a phone call?

A.   Could have made a phone call.

Q.   And you don't remember him getting any food?

A.   Yeah, I do.

Q.   Oh, you do remember him getting food?

A.   I do remember something, yeah.

Q.   Remember yesterday you said only Shaw got food, and then you thought it was Mitchell and you switched it.

A.   No, I didn't say only Shaw got food.

Q.   All right.

A.  I didn't say only Shaw got food.

Q.  This is all from memory about getting -- feeding?

A.  Exactly.

Q.  All right.  Let's talk about the timeline then.  On the 19th at 11:00 p.m., he's arrested.

Put some paper under there.

What time does Shaw give his confession?

MR. NATHAN:  Are we talking about Shaw or Mitchell?

MR. LOEVY:  I'm sorry, Mitchell.

Thank you, Mr. Nathan.

BY MR. LOEVY:

Q.  Do you remember what time the state's attorney takes the recorded statement?

A.  No, I don't really recall offhand.

Q.  All right.  2:00 p.m. on the 21st, does that sound right for the recorded statement?

A.  Is that what they have down?

Q.  Yes.

So when did he first confess to you?

A.  Well, it was after he was into the station, so after 11:00 p.m.  I couldn't give you an exact time.

Q.  All right.  Did you keep him up all night?

A.  We didn't keep him up all night, no.

Q.  Did you interrogate him all night?

MR. LOEVY:  And if we could have it published, too.

BY MR. LOEVY:

Q. Did you -- you arrested him at 11:00, right?

A. Right.

Q. Did you let him go to sleep?

A. If he wanted to go to sleep, he could have went to sleep, yes.

Q. So you questioned him, I take it, when you arrested him, right?

A. We did talk to him, yes.

Q. And he must have told you he was innocent, right?

A. I'd have to look at the GPRs to see what they say.

Q. All right. Did Anthony Mitchell at any time say I don't know what you're talking about, I didn't kill anybody?

A. If I could look at the GPRs, I could see.

Q. How about from memory, sir? You remember feeding him. Did he ever say I had nothing to do with this murder?

A. I believe, to the best of my recollection, he initially denied it.

Q. All right. That makes sense, right, that you questioned him. You sit him down and you say, hey, did you commit a murder? He says I don't know what you're talking about, right?

A. I don't know if he said it in that exact way, but I'm just telling you what -- my best of recollection what I remember him saying.

Q. How many times did he insist he was innocent?

Zalatoris - direct

1279

A.   I don't know, don't remember.

Q.   All right.  You said we'd have to look at your GPR, right?

A.   Well, if it's on there, yeah.

Q.   All right.  Let's take a look at your GPR.  This is Plaintiffs' Exhibit 11, pages 28 through 31.  This is already in evidence.

This is your GPR of the Mitchell confession, right?

A.   All right.  Let me take a look.

It's the GPR on Mitchell, yes.

Q.   All right.  It looks like the story starts right here at the top:  John Fulton pulls up and they say Precious is going to get the victim.  That's where the story starts, right?

A.   Where he told us, yes.

Q.   So then it just continues on down and tells the story of the abduction and the murder, right?

A.   We document what he was telling us, yes.

Q.   Where did you document the part where he said I had nothing to do with this?

A.   I said we just documented what he told us.

Q.   So you're saying that from 11:00 p.m. until 2:00 p.m. the next day, he never told you I had nothing to do with this murder?

A.   He may not have.  I mean, again, to the best of my recollection, this is what he told us right here.  That's why we documented this.

Zalatoris - direct

1280

Q.   So you sit him down in this interview room, it's 11:00 p.m., you say, sir -- what did you say to him?

A.   I don't remember exactly what I said to him, no.

Q.   What did you say to him approximately?

A.   Pardon me?

Q.   What did you say to him approximately?

A.   Approximately?  We asked him about what happened with this.

Q.   He's, like, what happened with what?

A.   Is that what he said?

Q.   I mean, how would he know what he's talking about?

A.   Well, they committed a murder, so they have an idea what we're asking them about.

Q.   You said, okay, what's up with this?  And he said:  Let me tell you what happened.  John pulled up, 79th, they said that Precious would tell -- this is what he said in response to your question?

A.   That's what he told us, that's what we documented, yes.

Q.   All right.  So what was the question you asked again?  I forgot it, I'm sorry.

A.   I don't remember.  We asked a lot of questions.

Q.   He doesn't know what you're talking about when he sits down, right?

A.   I mean, that would -- you know, I don't remember that.

Q.   All right.  So whatever he told you, if he told you he was innocent, if he told you he had an alibi, told you he had

nothing to do with it, that's gone for the rest of time, right?

A. Well, what I had done before, if somebody said that, I would put down "initially denies" at the top, but I don't have it on this one.

Q. All right. So whatever he said from 11:00 until 2:00 p.m., if he ever said, "I was somewhere else," "I don't know what you're talking about," "I'm innocent," you didn't write that down anywhere, right?

A. If he initially denied it, I probably would have put it down. That was my practice.

Q. So the very first thing he said to you is John pulls up at 79th and Luella?

A. That's the first thing we documented, yes.

Q. Well, is that the first thing he told you?

A. That's the first thing we documented here, sir.

Q. That's not the first thing he told you though, right?

A. Again, what I usually did, my practice was if somebody denied it, I would put down "denies involvement" at the top.

Q. All right. So since this is your very first note of entry of Anthony Mitchell, are we to infer he never said "I had nothing to do with this"?

A. I'm just telling you what my practice was.

MR. NATHAN: Objection, argumentative; asked and answered.

BY MR. LOEVY:

Zalatoris - direct

1282

Q.   I understand your practice.  Are you saying then based on your practice that he, therefore, must not have denied anything from 11:00 until 2:00?

MR. NATHAN:  Objection, asked and answered.

THE COURT:  He didn't answer.

Overruled.

BY THE WITNESS:

A.   Could you ask me again what you're asking?

BY MR. LOEVY:

Q.   Sure.

A.   Give me the question.

Q.   If I'm understanding your testimony based on your practice, it's your belief that he never denied this between 11:00 p.m. on Wednesday and 2:00 p.m. on Thursday or you would have written it down?

A.   Well, that was my practice to write it down.  If I didn't, it could be an oversight or he denied it.  I don't know.

Q.   It could be an oversight that 12 hours of denials is missing?

A.   12 hours of denials?

Q.   In other words, if his first story, you would have wanted to write down his first story so you could poke holes in it, right?

A.   Oh, we wrote down what he said, yes, right here.

Q.   By his first story, I mean let's say he said, oh, I was

Zalatoris - direct

1283

home playing video games with Bob, you'd want to write that down so you could go talk to Bob and prove it was false, right?

A.   If he had told us that, we would have wrote it down, yes.

Q.   Sure.  It's very important to record the first story, right?

A.   But he didn't tell us that.  He told us this right here, sir.

Q.   I understand, but my question is it would have been very important if he had told you my alibi is I was at home.  I was with my girlfriend.  You would have wanted to write all that down so you could poke holes in it, right?

A.   You're asking a hypothetical to me.

Q.   Yes.

A.   I don't know.  I mean, we documented what he told us.

Q.   All right.  So isn't it true that there were previously notes where he told you he was innocent, he told you where he was, he told you his alibi, and those notes no longer exist.

        MR. NATHAN:  Objection.

BY MR. LOEVY:

Q.   That's true, isn't it?

        MR. NATHAN:  Objection to the form of the question.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   There were once notes that no longer exist.  Do we agree?

        MR. NATHAN:  Objection to the form of the question.

Argumentative.

THE COURT:  Overruled.

BY THE WITNESS:

A.  I don't agree.  You're asking me about notes that don't exist that I know nothing about.

BY MR. LOEVY:

Q.  All right.  You did manage to get Anthony to confess -- to confess, give a statement, right?

MR. NATHAN:  Your Honor, objection form to the -- objection to the form of the question.

THE COURT:  Under cross-examination, I suppose it's okay.

BY THE WITNESS:

A.  What was the question again?

BY MR. LOEVY:

Q.  At some point, whether it was the very first second or 11 hours later, Anthony did tell you he was involved in this crime, right?

A.  He did.  We documented what he told us, yes.

Q.  How many hours did that take?

A.  I couldn't tell you.

Q.  Well, it was sometime between 11:00 p.m. and 2:00 -- 11:00 p.m. on Wednesday and 2:00 p.m. on Thursday -- on Friday, sorry.  Thursday, Friday.  And I've got the timeline wrong.

Did you at any time -- we'll come back to the

Zalatoris - direct

1285

timeline -- did you at any time tell Mr. Mitchell, hey, if you cooperate, give a statement against Fulton, we'll go easier on you?

A.   No.

Q.   At any time did you threaten Mitchell that, hey, you're in really big trouble.  You better start cooperating?

A.   No.

Q.   It was against his self-interest to implicate himself in this crime, correct?

A.   I don't know what he was thinking.

Q.   All right.  But it was against his self-interest, right?

A.   I would imagine.

Q.   All right.  So you had to do something to get him to give you this statement, right?

A.   What do you mean, do something?

Q.   Well, you had to -- he was trying to resist, do we agree? He was trying not to confess?

         MR. NATHAN:  Object to the form of the question.

BY MR. LOEVY:

Q.   Was he trying not to resist -- trying not to confess?

A.   Was he -- what do you mean by trying to resist?

Q.   In other words, isn't it true he was saying I didn't do this, and you were trying to get him to say he did.  Was there any of that going on?

A.   I don't really recall the questions we were asking him.

Q.   All right.  At this point in your mind, Fulton had already confessed, right?

A.   Yes.

Q.   So did you tell Mitchell, you got a real problem.  Your buddy is in the room saying you did it.

Did you tell him that?

A.   We asked him a lot of things.  Could have been.  Could have been.

Q.   You might have told him that, right?

A.   Maybe, maybe not.  I don't remember.

Q.   Would you have told him that?

A.   I don't remember.

Q.   Didn't you say yesterday you would never do that, tell a suspect that there was a guy in another room pointing the finger at him?  Yesterday.  Didn't you say that yesterday?

A.   Talking -- what are you talking about, telling him something false?

Q.   No.  I said didn't you say yesterday you would never take a guy in one room and say there's guy in another room saying you did it; did you say that to the jury yesterday?

A.   Well, if the guy didn't tell us, I would have never said that to him, no.  I wouldn't tell him something false like that.

Q.   All right.  In this case, did you tell Anthony things like, hey, Mitchell is saying you hit him.  Mitchell is saying you

Zalatoris - direct

1287

did it.  Mitchell is saying you did it -- I'm sorry.  Fulton said you did it, you did it, you did it.  Anything like that going on?

A.   We did say a lot -- we talked to him a lot, yes, but I don't recall exactly the conversations, but we didn't make up anything.

Q.   Was it the prisoner's dilemma, where you had the two guys in the room and you're saying to Mitchell Fulton's going to say you did it, you better say you did it; was that the play you were running?

A.   No, not at all.

Q.   Why not?

A.   Because that's wrong.  You don't do it that way.

Q.   Why don't you do that?

A.   Well, what you're doing is you're trying to induce somebody to say something over something that may not be true.

Q.   And that would be the risk, right, say something that might not be true?

A.   Yeah.

Q.   And did you say to Mitchell if you cooperate, say that he did it, Fulton was the one who hit him with the bat, Fulton is the one who lit him on fire, it was Fulton's idea, that you can just be a witness and go home?  Did you say anything like that to Mitchell?

A.   No.

Q.   And that would have been improper if you had?

A.   Yeah.

Q.   Why?

A.   Well, you're trying to get him to put the crime on someone else.

Q.   All right.  Well, take a look at the same exhibit, Plaintiffs' Exhibit 11, pages 28 through 32.

That is what you got him to do, right?

MR. NATHAN:  Objection to form of the question.

BY MR. LOEVY:

Q.   That is what you got him to do, put it on someone else?

MR. NATHAN:  Object to the form of the question.

THE COURT:  Overruled.

BY THE WITNESS:

A.   We didn't get him to do anything.  That's what he told us.

BY MR. LOEVY:

Q.   John got the bat; John hit him.

A.   And he told us all that.

Q.   Yeah, John got the gas can; John goes and gets the car?

A.   That's what he told us, sir.

Q.   John taped the mouth; John got the box; John lit the box; Riff just was the lookout, lookout for police, right?

A.   That's one of the things, yeah.

Q.   And isn't it true that you told Mitchell that, hey, all he's got to do is cooperate, give a statement against Fulton,

and he can go home?

A. No, not at all.

Q. And that would have been improper if you gave him that impression?

A. It would really be improper to tell him to confess to a murder and we let you go home.

Q. How about you confess to a murder, we'll go easy on you, you can be a witness. It's much more serious to be the murderer than to be just somebody who punched him and assaulted him. Did you give him that impression?

MR. NATHAN: Objection, asked and answered.

THE COURT: I think you covered that yesterday.

BY MR. LOEVY:

Q. All right. Well, we're talking about Mitchell now.

Did you delay in calling the state's attorney once Mitchell agreed to implicate himself?

MR. NATHAN: Object to the form of the question.

THE COURT: Overruled.

THE WITNESS: Could you ask me that again?

BY MR. LOEVY:

Q. Sure.

Once Mitchell agreed to give this statement, did you delay in calling the state's attorney?

A. We verified what he said.

Q. Okay. Do you remember being asked this question at your

deposition?  This is page 258, lines 18 through 20:

"Q.  Did you delay contacting the felony review state's attorney after Anthony Mitchell confessed?

"A.  No."

Did you give that answer to that question, sir?

MR. NATHAN:  Objection, not impeaching.

THE COURT:  Overruled.

BY THE WITNESS:

A.  I may have two-and-a-half years ago, but I know what we did.

BY MR. LOEVY:

Q.  All right.  And you testified yesterday that the reason you want to bring the state's attorney in quickly is because people could change their mind about confessing, right?  Right?

A.  And we did call him.

Q.  I'm asking though the reason you want to call a state's attorney quickly is because they could get a lawyer, they could change their mind.  You want to lock them in as soon as they confess, right, sir?

A.  Well, once we verify their story, yes.

Q.  All right.  So if the -- going back to the timeline, he's arrested on March 19th, Wednesday, at 11:00 p.m.  What time does he first confess?

A.  I couldn't tell you the exact time.

Q.  Why can't you tell me the exact time?

Zalatoris - direct

1291

A.   Because I just don't remember the exact time.

Q.   Because it's not written in your GPR, is it?

A.   I don't remember the exact time.

Q.   All right.  Take a look at your notes.

          MR. LOEVY:  May I approach, Your Honor?

          THE COURT:  Yes.

BY THE WITNESS:

A.   Oh, it's on there.

BY MR. LOEVY:

Q.   No, it's not.

A.   Well, then why are you handing it to me?

Q.   Because that's the only notes that exist.  Do you know --

A.   Well, if it's not on here, sir, I can't tell you the time.

Q.   All right.  Why didn't you write down when he confessed?

A.   It's not on here.  I don't know.

Q.   The question was why didn't you write it down?

A.   I don't know.

Q.   What is it -- it has a date on there, right?

A.   On here?

Q.   Yes.

A.   Yeah.  Tell you the date.

Q.   What's the date he confessed?

A.   Oh, the date he confessed, it's not on here, sir.

Q.   What's the date of the report?

A.   Well, this was 20 March.

Zalatoris - direct

1292

Q.   All right.   So it's the report of a confession that happened sometime on 20 March, is that fair?

A.   Yeah, so it would be into the morning hours evidently.

Q.   And Anthony Mitchell says that you shared with him your GPR of the John Fulton story.   Did you do that?

A.   No.

Q.   Would that have been proper?

A.   No.

Q.   Why would that have not been proper?

A.   You're not going to hand an offender the notes you have, the GPRs you have.

Q.   So if Mr. Mitchell says you gave him this statement, told him to read it and say look how much trouble you're in, that didn't happen?

A.   That didn't happen.

Q.   And if we were to look at this statement, this is Plaintiffs' Exhibit 13, it's notes already -- the notes are already in evidence.   This is basically a script of the crime, right?

          MR. NATHAN:   Objection, argumentative.

          MR. LOEVY:   Just cross, Your Honor.

          THE COURT:   Sustained.

BY MR. LOEVY:

Q.   It says Sunday, March 9th, right?   This is your notes of John Fulton's supposed confession.   That's what we're looking

Zalatoris - direct

1293

at, right?

A.    Okay.

Q.    And it's got the time -- the date of the murder, right?

A.    Yes.

Q.    It's got the time, Precious said to be up there around 9:00, right?

A.    Yes.

Q.    It says that John talked to Precious a couple more times on March 9th, right?

A.    Where are you looking at?

Q.    Right down here.  Talked to Precious two more times for directions.  Precious said to be up there heading north.  Do you see that?

A.    That's what we're told.

Q.    Yes, by John, and this is information you would not have given to Fulton, you're saying, right -- I'm sorry, would not have given to Mitchell?

A.    Well, you know, are we on page 1 of this?

Q.    This is on page 3.

A.    Okay.  Let's see page 1.

Q.    All right.  Let's go all the way back to the top.

A.    Let's, see, make sure --

Q.    This is talking about the gun robbery.

A.    That's Fulton's that you're showing me.

Q.    Right.  I'm saying this is Fulton's statement.  You should

not have given this to Mitchell, right?

A. We did not.

Q. All right. If Mitchell had access to this, let's talk about what information he would have been given. He would have went back to the story, Foster and Rockwell, that's in the notes, right?

A. Again, he didn't have it, so --

Q. Well, he says he did --

A. Well, he's lying, okay.

Q. All right. All I'm trying to establish is if he did have it, he would have had access to Foster and Rockwell, right?

A. He didn't have it, so --

Q. All right. We've got that.

The bus, the bus story was in the notes, right?

A. It's right there, you're looking at it, yes.

Q. Baseball bat, the trunk, the rag in the mouth, the alley, the tape, all the details are in this statement, right?

MR. NATHAN: Object to the form of the question.

THE COURT: Not all the details, I suppose. Try again.

BY MR. LOEVY:

Q. Well, the important details, the baseball bat, the trunk, the rag, the alley, taped his hands, the bag, the plastic bag, the box in the alley, the gas can, lighting the box, driving them home.

If Mitchell had access to this and spent a bunch of hours going over it, then he would have been given the details of the crime, right?

A.   Are you --

MR. NATHAN:  Object to the form of the question.  It's argumentative and compound.

THE COURT:  Overruled.

BY THE WITNESS:

A.   Are you accusing us of giving him the GPRs?

BY MR. LOEVY:

Q.   Actually, sir, I am.

A.   Well, that's a lie.

Q.   Okay.  How do you remember you didn't give him the GPR?

A.   'Cause we wouldn't do that.  We never did that.

Q.   That would be extremely improper.

A.   We don't do it.

Q.   Right.  He just knew all those details without having the GPR?

A.   He knew all those details because he was involved.

Q.   All right.  Sir, if the statement that Anthony Mitchell gives is -- I'll show you the time here.  Ultimately, it is March 21st -- I had it right -- March 21st at 1:58.  Does that refresh your recollection on the time?

It's right there.

A.   What are we looking at right here?

Q. You're looking at the official statement that Mitchell gave to the state's attorney when he gives that confession.

A. That's what's typed on here, yeah.

Q. March 21st at 2:00 p.m.

So you're saying that you walked in the room, you say, hey, Mr. Mitchell, what's up? And he said I'd like to tell you about the time I was standing on the corner and John came and picked me up and we went and murdered the guy. That left a lot of time between that confession and 2:00 p.m. the next day, didn't it -- or actually two days later?

A. Well, depending on how long before he told us about it, yeah.

Q. All right. Isn't it true that you spent that time rehearsing with Mitchell, going over it and over it and over it, until he got in a position where he could actually deliver it?

A. No.

Q. He wasn't able to give that confession in the morning on Thursday, was he?

MR. NATHAN: Object to the form.

BY THE WITNESS:

A. What are you asking me?

THE COURT: What he was able to do?

MR. LOEVY: All right.

THE COURT: Sustained.

BY MR. LOEVY:

Q.   You were not confident enough to call the state's attorney in the morning of the 20th, right?

          MR. NATHAN:  Objection, argumentative; form.

          MR. LOEVY:  No, it's cross, Your Honor.

          THE COURT:  Overruled.

BY THE WITNESS:

A.   We were verifying his story, yes.

BY MR. LOEVY:

Q.   All right.  You were confident enough to call the state's attorney until at noon on the 20th, right?

A.   Not saying confident, I don't recall exactly what time we called the state's attorney.

Q.   When you say you were verifying his story, you had to take him for a ride, right?

A.   He showed us, yeah.

Q.   Yeah, you had to show him the scene of the crime.

A.   No, he had to show us, which is what he did.

Q.   But Fulton had already showed you.

A.   Right.

Q.   So you didn't need to see it.

A.   Oh, no, we wanted him to show us.

Q.   No, you wanted to show him --

A.   Not at all.

Q.   You were not confident, isn't it true, sir, that he ever

Zalatoris - direct

1298

could have given that confession to the state's attorney unless you showed him where he supposedly did the abduction. You drove him to the abduction site, right?

MR. NATHAN: Objection, form, argumentative.

THE COURT: It's complicated. Try again.

BY MR. LOEVY:

Q. All right. Who was driving the car, you or Mitchell?

A. Me.

Q. All right. Did you take him to Foster and Rockwell?

A. Yeah -- we asked him where he got off, and he was showing us, yes.

Q. All right. And did you take him to 5228 South Peoria?

A. He showed us that, too.

Q. All right. So you did show him the places --

A. No, he showed us, sir. You keep saying I showed him. He showed us.

Q. All right. How about the alley? Did he show you the alley?

A. He did.

Q. All right. And apparently he said there's -- you asked him about the alley, he said something about a brown garage?

A. He did.

Q. All right. There's a lot of brown garages in the City of Chicago, right?

A. Up in that area.

Zalatoris - direct

1299

Q.   Yeah?

A.   I don't know.  I don't know.  Up in that area, I couldn't tell you how many brown garage doors there are.

Q.   All right.  Well, he didn't say brown garage door.  He said brown garage, right?

A.   Brown garage door.

Q.   All right.  So there's a lot of brown garages, right?

A.   I don't know.

Q.   So you said you sort of got lucky.  You were driving around the neighborhood -- it had been at least two weeks since he'd been there, a week and a half, right?

A.   Right.

        MR. NATHAN:  Objection, form, compound, argumentative.

        MR. LOEVY:  He answered, Your Honor.

BY MR. LOEVY:

Q.   It had been about ten days, two weeks, whatever it was?

A.   Whatever it was.

Q.   Yeah.

        So you're driving around, and you're saying show me the alley and the garage door, right?

A.   Right.

Q.   And then all of a sudden we're riding around, I happen to see an alley behind Ashland, and I go how does that look?  And he goes yep.

        That's what happened right, sir?

A.   That's exactly what happened.

Q.   So you suggested the brown garage to him -- well, let me get the sequence right.

     He told you it was a brown garage, right?

A.   Right.  I pointed down there and asked him because we're doing that on every alley, how about down here?  How about down here?  How about down here?  And he goes yeah.

Q.   All right.

A.   And then he told us, he goes, and when you go down that alley, there's an old blue car parked.

     So we did go down the alley.  You couldn't see it from where we were --

Q.   Got it.

A.   -- because it was on a garage pad.

Q.   Just back to my questions.  I just want to make sure --

A.   I'm explaining to you what happened, sir.

Q.   Just trying to get the sequence.

     You're driving around the north side looking for a brown alley -- brown garage, right?

A.   He's directing us where they were, driving around.

Q.   But he couldn't find it, right?  So then you said --

A.   Well, he's looking down the alleys, and he happened -- I happened to look down the alley, there's a brown garage door.  I says how about this?  And he said, yeah.

Q.   All right.  Then I think we're on the same page.

Zalatoris - direct

1301

A.   I didn't take him to that brown garage door.

Q.   Got it.  Well, you were driving.

A.   I know, but I didn't go down that alley even until he said that's the alley.

Q.   And did he take you to the same alley as Mitchell?

A.   No.

Q.   As Fulton?

A.   No.

Q.   Now, at some point, he was ready to talk to the state's attorney, right?

A.   Yes.

Q.   Who made the decision when he's ready?

A.   I don't know who called the state's attorney.

Q.   Well, who made the decision, you know what, I think this kid's finally ready to give this confession?

A.   I really don't know.

Q.   Would it have been you or Breen?

A.   Could have been one of us, could have been Rolston, whoever.  I don't remember to tell you the truth.

Q.   You remember the brown -- the Beetle car in the alley, but you don't remember who called the state's attorney?

A.   I don't remember a Beetle car.

Q.   The state's attorney came and took the statement, right?

A.   Yes.

Q.   And the statement is -- you've seen the statement, right?

Zalatoris - direct

1302

A.   I may have.

Q.   It's in three parts.  Would you agree?

A.   I don't know.  I'd have to look at it.

Q.   The first part, ten pages, the state's attorney basically tells Mitchell the story.  Then you did this, and he says yes. Then you did that, yes.  All he says is yes for the first ten pages, correct?

A.   I don't know.  I'd have to look at it.

Q.   All right.  Take a look.

A.   Let's go through it.

Q.   Did you say let's go through it?

A.   Let's go through it then.

Q.   All right.  Let's do that.  This is Plaintiffs' Exhibit 45, Your Honor.

     It starts here.

A.   And this is all being asked by the state's attorney.

Q.   Understood.

A.   Not us.

Q.   Understood, sir.

A.   Okay.

Q.   And it says:  We're here to investigate, and it starts on page 1, page 2.

     All right.  You agree to do this statement.  I talked to you earlier.  It says you wanted to buy a gun.  Do you see him saying yes?  His answer is yes, yes, yes, right?

A.   To the state's attorney's questions.

Q.   Right.

A.   Yes.

Q.   Contacted a girl named Precious, thought she was going to help you get a gun.  Next page.

A.   We didn't ask these questions.

Q.   I understand.  Didn't even ask you a question yet.  I'm just saying what was asked.  This happened in January?  Yeah, right, right.  You went to buy a gun.  Uh-huh, yes; smoke some marijuana; yes, yes, yes.  So far all he said is yes, right?

          MR. NATHAN:  Objection, compound; attorney testifying.

BY MR. LOEVY:

Q.   So far all he said is yes, right?  That's the question.

          THE COURT:  All right.

BY THE WITNESS:

A.   So far all he's doing is answering the state's attorney's questions, yes.

BY MR. LOEVY:

Q.   And so far his only answers so far is yes, right?

A.   He's answering the state's attorney's questions, sir.  It's right in front of us here.

Q.   All right.  The next page here.  Shortly after that, Chris was calling on the phone.  Yes, yes, yes.  She was the one who set up the deal, right?  Yes.  Now later John contacted her, right?  Right.

Zalatoris - direct

1304

A couple weeks ago, this is when the murder stuff starts, John came and picked you up and told you that Precious had told him where you guys can find Chris. And he says yes, right?

Do you see that?

A. You're pointing your finger at it, yes. Again, this is all asked by the state's attorneys, not by us.

Q. And he wanted you and Stick to go in there and beat up Chris, right? You guys went to the north side where Chris is going to get off a bus, and Anthony says right.

That was near Foster and Rockwell? Anthony says yes, right?

So this is the state's attorney's asking these questions, and all Anthony is saying is yes, right?

A. According to this paper, yes.

Q. All right. Let's look at the next page.

John pulls up, takes out a bat. It was an aluminum baseball bat. And then he says what?

A. You're pointing at it.

Q. Well, what does he say? We have a record here. The court reporter is writing it down.

A. He says yes to the state's attorney, yes.

Q. You guys stop, put Chris in the car. Yes. He was all bloody. Uh-huh. Put him in the trunk. Yes. Right. Yes. Right.

Zalatoris - direct

1305

Keeps going.  He just keeps saying yes, right?  The state's attorney is telling him the story, and he said -- oh, we got some words here.  He said arms.  On page 7, his first word is "arms," right?

A.   What page are we on here?

Q.   7.

A.   Could I see the bottom?

Q.   Sure.

A.   See what page you're talking about, 7?

Evidently he said that to the state's attorney, yes.

Q.   But, of course, the question was you had duct-taped his arms?

A.   I didn't ask that question.

Q.   I didn't ask that.  I just asked --

A.   Well, you're reading it right there.  You're reading something that we had nothing to do with.

Q.   All right.  And then you drove south, and he did say south, right?

A.   He did.

Q.   But then he was asked:  And then you drove south, right?

A.   Again, he was asked that by the state's attorney, not by us.

Q.   Yes.  He says yes.  You got off at the expressway.  51st and Peoria.  He says, uh-huh.  Now, you'd showed him 51st -- you had driven to 51st and Peoria with him, right?

A.   He showed us 51st -- or 52nd and Peoria, yes.

Q.   And the state's attorney said there's a big abandoned building there, and the answer is yes --

MR. NATHAN:  Objection, Your Honor.  He's -- I think the term is badgering.  He's arguing with him about a document he didn't create.  It's argumentative.

THE COURT:  Well, it's relevant.  I mean, you have maybe made your point.

BY MR. LOEVY:

Q.   All right.  Well, there's -- he did say a word "trunk" here, not yes, right?

MR. NATHAN:  Objection, argumentative to the entire line of questioning.

MR. LOEVY:  All right.  I'll tell you what, Your Honor, I'll move on.

BY MR. LOEVY:

Q.   But do we agree that the first ten pages of this statement, he has to do nothing other than repeat and say yes, right?

A.   It's not my questioning.

Q.   All right.  But that's what happened, right?

A.   With the state's attorneys, yes.

Q.   Did you have any interaction with the state's attorney before the statement where there was a discussion of how should we do this statement?  Should we just say, hey, Anthony tell us what happened, or should we say let's do it in a leading way?

Did you have any discussion with the state's attorney?

A.   No --

MR. NATHAN:   Objection.

BY THE WITNESS:

A.   -- the state's attorneys do what they're going to do.

BY MR. LOEVY:

Q.   All right.  The second half of this statement he tells the gun story, right?

A.   I -- what are you talking about, what the state's attorney's asking?

Q.   When they got ripped off by the gun.

A.   You're talking about what the state's attorney is asking him?

Q.   Yeah.

A.   Well, let's see.  Take a look.

Q.   All right, let's see.  Now we're on page 9.  He's still saying right.  Yeah.  Yeah.  To finish off the yes questions. Then you get to page 10.

And then they say -- then they start asking him questions.  Here's Fulton, okay.  How long have you known John? You live with John?  He identifies John, Anthony and Stick, start talking about Precious, and then it gets into the story.

Did you negotiate to buy a gun?  Yes.  And they said tell me what happened.  And then Anthony starts talking about buying the gun, right?  Looks like he's not being asked yes/no

Zalatoris - direct

1308

questions anymore, he starts telling the story, right?

A.   That's what the state's attorney asked him, and that's what he answered.

Q.   All right.

     MR. NATHAN:  Objection, Your Honor.  We believe he's just opened the door to the --

     THE COURT:  Overruled.

BY MR. LOEVY:

Q.   So Anthony never denied he was there when John got ripped off at the gun sale, right?  Never denied that.

A.   To the state's attorney?

Q.   To you.

A.   Again, I couldn't remember to tell you the truth.  I usually put that down if he denied it.  I may have.  I may not have.

Q.   All right.  And then at the end of the confession, all Anthony had to do was tell the state's attorney back the same story that he had said yes to, yes, yes, yes, right?

     MR. NATHAN:  Objection, argumentative as to something that --

     MR. LOEVY:  Would you like --

BY THE WITNESS:

A.   You've got me confused here.  He didn't say yes, yes, yes to us.  He said it to the state's attorney.

BY MR. LOEVY:

Zalatoris - direct

1309

Q. Right. So all I want to establish, and you can review the statement if you like, is beginning of the statement, the state's attorney tells him the story, and he says yes. And they say, okay, Anthony, tell me what happened, and then he basically told the same story, right?

MR. NATHAN: Objection, calls for speculation. Argumentative.

MR. LOEVY: It's not speculative, Your Honor. It's the actual statement.

MR. NATHAN: It has nothing to do with him.

THE COURT: Well, you tend to ask pretty compound questions, so break it down.

MR. LOEVY: We'll try to break it down.

BY MR. LOEVY:

Q. Phase 1 of the interview, they tell him the story, and he has to say yes, yes, yes, right?

MR. NATHAN: Objection, foundation. What interview are we talking about?

THE COURT: It's asked and answered.

BY MR. LOEVY:

Q. All right. Phase -- the end phase, they asked Anthony to tell the same story that they had just told him, right? Is that a fair summary?

MR. NATHAN: Objection. Calls for speculation; foundation; argumentative; asked and answered.

THE COURT:  Overruled.

BY THE WITNESS:

A.  I don't see it broken up into phases.

BY MR. LOEVY:

Q.  All right.  Isn't it true that between 11:00 p.m. and his arrest and 2:00 p.m. on Friday, he got arrested on Wednesday night, 2:00 p.m. on Friday, you spent most of that time teaching him the statement so that he could at least try to do it credibly?

A.  Teaching him the statement?

Q.  Going over the details with him, over the details until he had it right.

A.  No, not at all.

Q.  He did -- he did ultimately give the statement against Fulton, right?

A.  Yes.

Q.  And you then spoke to a boy named Shaw, right?  Shaw was a youth, right?

A.  Yes.

Q.  How old was he?

A.  15, 16.

Q.  And if I understand you, your testimony correctly, you have no memory about Shaw either other than what's written in the GPR?

A.  Pretty much, yes.

Zalatoris - direct

1311

Q.   Pretty much, or you have no memory?

A.   Pretty much.  You know, there might be something else that I see that might bring back something, but --

Q.   All right.  Did you go arrest Shaw?

A.   Yes.

Q.   Given his age, were you trying to pick a time when no parent or guardian would come with him down to the station?

A.   No.

Q.   What time did you go arrest him?

A.   It was early morning hours.

Q.   Let's take a look at his arrest report.  This is Plaintiffs' Exhibit 44.

        MR. LOEVY:  And we move this into evidence, Your Honor.

        MR. NATHAN:  No objection.

        THE COURT:  The exhibit is received in evidence.  You may publish.

   (Plaintiff's Exhibit No. 44 received in evidence.)

BY MR. LOEVY:

Q.   On the 21st of March at 4:00 a.m., you did arrest Anthony Shaw, right?  Antonio Shaw.

A.   Yes.

Q.   And your name is listed here on the arresting officers?

A.   Yes.

Q.   Now, who else went to arrest Antonio Shaw?

A.   Myself and my partner.

Q.   Rolston, Struck --

A.   No, myself and Breen.

Q.   Rolston, Struck, Girardi --

A.   Myself and Breen.

Q.   My question, sir, is were Rolston, Struck, and Girardi also the arresting detectives?

A.   They also are, but they weren't the ones that made the physical arrest, no.

Q.   But they showed up at the house?

A.   No.

Q.   Was he arrested at the house?

A.   Yes, by myself and Breen.

Q.   And it does say arresting detectives, this list of names, right?

A.   Well, everybody that was involved in this case would be on the arrest, yes.

Q.   All right.  Did you try -- did you explain to the adults in the home that they had a right to accompany Anthony?

A.   Yes.

Q.   Why did you do that?

A.   Because he's a juvenile.

Q.   So you told the adult what?

A.   We told them where he was going.  I think we may even have told them what it was about.  And then the woman that was

there, and, again, I don't remember exactly who she was, if she was an aunt or something -- oh, you want me to tell you what happened?

Q.   No, I'm going to get to the what they said.  I want to get to what you said, okay?  Just focusing on what you said before we get to what they said.

A.   Okay.

Q.   So you said you did tell them what it was about?

A.   I can't remember if we told him exactly what it was about or not.

Q.   All right.

A.   We told him he was under arrest.

Q.   Did you tell them your -- this 15-year-old is under arrest for murder?

A.   Probably did.

Q.   Probably did?  Well, let's look at how you reported it.

It says R/Ds went to the -- this is your report, the 12-page report.

MR. LOEVY:  Your Honor, we move to admit his 12-page report into evidence.  This is Plaintiffs' Trial Exhibit 1, pages 28 through 37.  This is his own report.

MR. NATHAN:  No objection to that report.

THE COURT:  All right.

(Plaintiffs' Exhibit No. 1, pages 28-37 received in evidence.)

Zalatoris - direct

1314

THE WITNESS:  Can you show me the top to see who actually did this report?

MR. LOEVY:  This is a 12-page report.  Do we have a copy of it, Alyssa, the full page?

(Documents dropped.)

MR. LOEVY:  That's not what you're trying to do when you're cross-examining, but it happens to everybody.

BY MR. LOEVY:

Q.  All right.  I'm showing you the top of the report.

A.  Yeah, that's Detective Rolston's report.

Q.  No, this is the 12-pager.  This is the closing report, right?

A.  This is Detective Rolston's report.

Q.  Your name is listed on the ending of the report, right?  In fact, you're listed first.

A.  That's -- Detective Rolston typed this report, sir.

Q.  All right.  The question was you're listed first on that report, right?

A.  I'm listed as one of the detectives, yes.

Q.  All right.  But the question was you're listed first --

A.  As -- it doesn't make a difference.  I didn't type that.

Q.  All right.  But you've got to just answer my questions.

A.  I know.  I didn't type it.

Q.  We have a record that needs to be created.  You're listed first.  Can you answer that question?

A.   Detective Rolston listed my name first.

Q.   All right.  And the person who's listed first by custom and practice of the Chicago Police Department, that's whose report it is if you're listed first, right?

A.   No.

Q.   Do you know why Rolston typed it and listed him behind you guys?

A.   Again, go to page 1, you'll see Rolston typed it.

Q.   All right.  I'm asking you if you know why Rolston listed you and Breen ahead of him?

A.   I have no idea.

Q.   This is the closing summary report, right, sir?

A.   And all three of our names are on it, yes.

Q.   Understood.

          Now let's go back to how it was reported.  Was Rolston present when the kid was arrested?

A.   No.

          MR. NATHAN:  Objection, motion.

          MR. LOEVY:  Oh, the kid -- well, actually, this was a kid.

          MR. NATHAN:  Excuse me.

          MR. LOEVY:  He was a kid.

          MR. NATHAN:  No, excuse me.  Sidebar, please.

          THE COURT:  You are repeatedly -- wait.

          Remember.

MR. LOEVY: This is a different person though.

MR. NATHAN: We shouldn't be arguing about this in front of the jury. I'd like a sidebar, Your Honor.

THE COURT: Okay.

(Proceedings heard at sidebar:)

MR. LOEVY: This one is 15. He is a kid.

THE COURT: Hold on.

MR. NATHAN: Your Honor, I -- it's very frustrating that I have to keep making this same exact objection. Mr. Loevy, every time I make the objection, which is calling Your Honor's attention to your ruling at Document No. 400, page 10, which precludes plaintiffs from referring to themselves, Shaw, or Griffin as kids or other similar terms.

Every time I do that, instead of complying with Your Honor's ruling, Mr. Loevy showboats about it and pretends like I'm being -- I'm being in the wrong for objecting and obstructing his examination.

What he's doing is flagrantly violating your motion over and over and over again. It's one of the things we have moved for a mistrial about earlier in the trial, I believe the first day. I don't understand why I have to keep making this same exact objection, and it's not fair for him to be doing it and then when he does it, pretending like I'm the one at fault.

MR. LOEVY: It's not -- he's not an adult. He's 15. Shall I call him an adult?

MR. NATHAN:  It's Your Honor's ruling, and we're renewing our motion for mistrial, which we've made --

THE COURT:  Your motion is denied.  That is I think most people on the jury would understand that a teenager can be called a kid.  However, I do want you to do better and remember this, okay, Mr. Loevy?

MR. LOEVY:  What should I refer to him as?

THE COURT:  A teenager or a young man or --

MR. NATHAN:  Or Mr. Shaw.

THE COURT:  -- or a 15 a-year-old.

MR. LOEVY:  All right.  I will.  Thank you.

(Proceedings heard in open court:)

BY MR. LOEVY:

Q.  All right.  You ready, sir?

A.  Yes.

Q.  The 15-year-old young adult, you -- did you talk to Mr. Rolston about this -- how it got reported before he reported it?

A.  Talked to Mr. who?

Q.  Rolston.  I thought you said Rolston wrote the report?

A.  Roston wrote the report, yes.

Q.  And what he wrote was R/Ds went to the residence of Shaw, where he was taken into custody and brought to Area 1.  Shaw's aunt was present when the subject taken into custody and advised where Shaw was being taken.

Now, the aunt's response is on the next page, and we'll go to that, but is that inaccurate, that you just said hey, we're taking Shaw and you didn't tell her he's being arrested for murder?

A.   I don't recall if we told them or not.

Q.   All right.   Because it's really -- if you had given her the impression, hey, we just got to ask him a few questions, we'll have him back in the morning, that's different than, ma'am, Antonio is under arrest for murder, and we're taking him to the station, and you have a right to be present with him.   Those are two different things, right?

MR. NATHAN:   Object to the form of the question.

THE COURT:   Sustained.

BY MR. LOEVY:

Q.   All right.   Did you try to persuade this aunt to come with to the station for Antonio Shaw?

A.   What do you mean persuade?   We told her, and she said she wasn't going.

Q.   She said she didn't want to come.

A.   She didn't want to go.

Q.   Let's look at what you wrote, what Rolston wrote on the next page.

R/Ds attempted to get her, aunt, to come to Area 1. She replied that she had to work, was tired and was not coming to the Area.   She also related she would notify the

grandmother, but the grandmother was in New Orleans and probably would not be able to come. A cousin was called. A message was left. That's what the report says, right?

A. In fact, she did call that other person while we were there. She --

Q. Okay. The question was --

(Court reporter interruption.)

THE WITNESS: I'm trying to answer the question.

BY MR. LOEVY:

Q. The question was that's what's reported, correct?

A. That's what Rolston put down.

Q. Thank you.

Now, did you, when the aunt said, hey, you know, we're too busy, I got to get up for work, do you think she understood that he was being interrogated for murder?

A. I don't know what she understood.

Q. Would it have been misleading to tell her, look, it's just a few questions. We'll bring him back in the morning. That would be misleading, right?

A. Yeah, we didn't say that.

Q. You would not say that.

A. We didn't say that.

Q. Did you think that this kid was in a vulnerable position?

THE COURT: Wait.

MR. NATHAN: Objection.

MR. LOEVY: Oh, was there an objection? I missed it. I apologize.

THE COURT: Sustained.

BY MR. LOEVY:

Q. A person 17 and older the law treated as an adult, right?

A. Yes.

Q. And a person under 17, the law did not treat as an adult, right?

A. Juvenile.

Q. Juvenile.

This person was -- was a little bit on the slow side, would you agree, when you interacted with him?

A. I really don't remember if he's slow or not.

Q. Do you remember anything about him, that he couldn't read well?

A. I don't remember that either.

Q. Did you think that this was going to be a difficult interrogation or a hard interrogation?

A. I had no idea.

Q. All right. Did you -- where did you take him?

A. Area 1.

Q. And where did you put him?

A. He was in an office.

Q. So because he had a right to a parent, but there was no -- there was no guardian with him, right?

A. No.

Q. There was no guardian with him, right?

A. Well, a youth officer acting as his guardian.

Q. So another police officer came in and served that role?

A. As per Illinois state law, a youth officer, yes.

Q. And that was defendant Officer Franko, right?

A. Yes.

Q. And did defendant Officer Franko do anything to protect Antonio's rights?

A. He did. He was safeguarding his rights, yes.

Q. Well, he's standing there, right?

A. He's listening to what's going on, and if we had done something improper, he would tell us.

Q. All right. Let's take that in two parts.

He was sitting passively listening, right?

A. He was guarding his rights, yes.

Q. But the actions he was taking was sitting there, right?

A. Well, I don't know how -- what other action he would take.

Q. Well, you don't remember him taking any other actions other than sitting there. Do we agree?

A. Sitting there and listening and watching -- making sure that what we were doing was proper, yes.

Q. All right. The only thing you remember him doing is never talking, right?

A. There was nothing for him to say.

Q. Okay.

A. We were doing everything proper.

Q. Well, I'm just focused on him. He did nothing but serve as another police officer in the room, right?

MR. NATHAN: Objection. Asked and answered.

MR. LOEVY: All right. I'll move on.

MR. NATHAN: Argumentative.

BY MR. LOEVY:

Q. You don't remember him doing anything to protect Anthony's rights actively, right?

MR. NATHAN: Objection, asked and answered.

MR. LOEVY: Actively.

THE COURT: Overruled.

BY THE WITNESS:

A. He was there guarding his rights, yes.

BY MR. LOEVY:

Q. Okay. But you don't remember him actively saying, like, back off, slow down, he's just 15?

A. Because we weren't doing anything proper.

Q. Okay. But he didn't do anything?

A. Because we weren't doing anything improper, sir.

MR. NATHAN: Objection. This is asked and answered.

MR. LOEVY: He's not answering the question, but I'll move on, Your Honor.

BY MR. LOEVY:

Zalatoris - direct

1323

Q.   Was Anthony picked up at 4:00 a.m. and kept up all night the rest of the night?

A.   He was there all night.

Q.   Was he handcuffed when you took him home?

A.   When we took him home?

Q.   I'm sorry, when you took him from his home?

A.   I believe so, yes.

Q.   All right.  You did not get a formal statement from Anthony -- Antonio -- sorry.  Thank you.

And if we -- he's arrested at 4:00 a.m. on the 21st.  How long did it take to get a formal statement from Antonio?

A.   I don't really recall how long.  If you tell me when the handwritten was, I might be able to come up with something.

Q.   Well, how about if we go from your memory.  How long did it take --

A.   Oh, again, I don't recall.

Q.   You have no memory either way.

A.   I don't recall, sir.

Q.   All right.  Was it more than 24 hours?

A.   I don't recall.  I don't think it was 24 hours.

Q.   All right.  Taking a look at his statement, looks like he gave his statement on March 22nd at 1:25 a.m.

Do you see that?

A.   Okay.

Q.   So that's about -- not quite 24 hours later where he gives

Zalatoris - direct

1324

the statement, right?

A.   That's when he gives the handwritten to the state's attorney, yes.

Q.   All right.  He was -- he wouldn't have been alone this whole time, right?

A.   Again, you know, we were in the room, we were out of the room, we were in the room.  Yes.

Q.   All right.  Do you remember at your deposition, and this is page 250 -- 263, lines 5 through 8, giving these answers to these questions --

          MR. NATHAN:  John, what's the page again?

          MR. LOEVY:  Page 263, lines 5 through 8.

          MR. NATHAN:  Okay.

BY MR. LOEVY:

Q.   He would not have been left unattended in this office, right?

A.   Again, we were in and out, so --

Q.   "Q.  Antonio was 15, right, and so you wouldn't leave a homicide suspect in the office unattended, right?

          "A.  No."

          That's true, right?

A.   Okay.

Q.   I mean, the office is full of police files and business?

A.   I don't really know what was in that office, but it wasn't a file room, no.

Q. All right. You can't sleep in an office.

MR. NATHAN: Objection. For the rule of completeness we ask that lines --

MR. LOEVY: You know, the way --

MR. NATHAN: -- 14 through 20 also be read.

MR. LOEVY: The way we've been doing it is on redirect, but I will read the rest of the lines, too.

BY MR. LOEVY:

Q. "Q. So for Mr. Shaw, I'm sorry, Antonio, the 15-year-old, to sleep at the police station, he'd have to lie on the either wooden or metal bench with his wrists cuffed to the ring? He wasn't in an interview room. Shaw was not in an interview room.

"A. No."

That completes it. I'm not sure why that completes it, but does that -- does that change your memory?

MR. NATHAN: No, have you to read through 25, I'm sorry, and that completes it.

BY MR. LOEVY:

Q. Through 25:

"Where was Shaw being held?

"A. In our office.

"Q. Right, and how was he restrained in the office?

"A. He was not."

MR. LOEVY: I'm not sure how that completes it either,

Zalatoris - direct

1326

Your Honor, but --

THE COURT:  All right.  Move on.

BY MR. LOEVY:

Q.  All right.  He wasn't doing a whole lot of sleeping, right?

A.  I don't know if he fell asleep or not.

Q.  Who was doing the interrogating?

A.  Who was interviewing him?  Myself and Breen.

Q.  Did you accuse him of being involved in a murder?

A.  I don't remember exactly what we said to him.

Q.  So you might have been like, hey, Fulton and Mitchell are saying you were involved in a murder.  Do you want to be a witness?

A.  No, we wouldn't have said that.  That's wrong.

Q.  Why is it wrong?

A.  To do that?

Q.  Yeah.

A.  To tell him to be a -- you're a witness?

Q.  Yeah.  If he cooperates, you could say to this 15-year-old, hey, I know you didn't do it, it was really Fulton, I know you were there --

A.  We didn't say that.

Q.  You didn't say that, but you say, listen, if you just tell us -- if I could ask the question -- if you just admit that they did it, you could go home, you can be a cooperator.

Did you say anything like that?

Zalatoris - direct

1327

A.   Absolutely not.

Q.   That would have been improper.  That would have been improper, right?

A.   Of course, it would.

Q.   Did you mention to this 15-year-old that Fulton and Mitchell had already confessed to the crime putting him in it?

A.   Again, I don't remember.  We said a lot, so I don't remember if we said that exactly or not.

Q.   In this 22-hour period --

A.   I don't recall if we said that or not, sir.

Q.   Isn't it true that you absolutely would have said to him you better -- you better give us what we want, sir, because these two are saying you were in it?

A.   That's improper to say it that way.

Q.   It would have been improper.  Why?

A.   To sit there and try to get him to tell us something that didn't happen?  Yeah, that's wrong.

Q.   All right.  Let's take a look at the same report.  This is page 11.  This is how it got reported:  Shaw was advised of his constitutional rights by Zalatoris from the FOP handbook in the presence of Franko -- that's the youth officer, right?

He replied he understood each of his rights, and then Shaw related he was with Mitchell.  Fulton drives up.  He gets in the car, began driving, and then they went to go kill the victim.

Zalatoris - direct

1328

That's how it got reported, right?

A.   That's how Rolston typed it up, yes.

Q.   All right.  There's a part missing in there, isn't it?
Like the part where he said I don't know what you're talking
about?

A.   I don't know.

Q.   Did he say I don't know what you're talking about?

A.   Does my GPR say he denies initial involvement?

Q.   Well, let's break that down, then we'll talk about your
GPR.

A.   Okay.

Q.   When you got Antonio in the room, what did you ask him?

A.   If I can see the GPR.

Q.   Let's start from memory.

A.   I'd have to look at the GPR.

Q.   What do you think you told Antonio?

A.   I'd have to look at the GPR.

Q.   Well, I'm not going to show you just yet --

A.   Okay.  Well, then --

Q.   -- so I'd like your best memory.  Did you say to Antonio
I'm here to talk to you about a murder?

A.   Again, I'd like to see the GPR so I can refresh my memory.

Q.   All right.  Do you think you would have told Antonio the
purpose of why he was arrested?

A.   Again, sir, I'd like to see my GPR so I can refresh my

Zalatoris - direct

1329

memory.

Q. Without -- without looking at your GPR, you have arrested a 15-year-old for murder. Do you tell that 15-year-old why he's being arrested?

A. You're talking about any 15-year-old, or you're talking about Shaw right now?

Q. I'm talking about if you arrest somebody for murder, are you supposed to tell them why they're arrested?

A. Yes, we would.

Q. All right. So you know you told Shaw he was arrested for murder.

A. I don't know if I told him that he was under arrest for murder at that time. Again, I'd like to see the GPRs, but you won't let me see them.

Q. All right. If I understand what you just said, you would -- you're supposed to tell somebody they're arrested for murder, but you don't know if you told him, right?

A. Well, you're asking me about something 22 years ago, sir.

Q. All right. Let's look at the GPR. This is Plaintiffs' Exhibit 11, page 32. This is already in evidence.

These are your notes, your handwriting with --

A. Right, okay, and the answer is he did not deny it. Otherwise, I would have had he denied involvement right at the top.

Q. All right. The very first --

A.   So you asked me that before.

Q.   Right.   The very first thing you wrote was Stick is Shaw, Riff is Mitchell, J is Fulton, right?

A.   He didn't say he denied it, sir.   That would have been the first thing up there, "denies involvement."

Q.   Right.   The first thing he said to you is Stick and Riff are at 7754 Corella, and Fulton drives up?

A.   I don't know where Corella is at.

Q.   I'm sorry, I'm not good at names, but what's that say? Some street, Crandon probably.

A.   Crandon.

Q.   All right.   Stick and Riff get in the car.   We're going to go whoop him.   And he just starts telling you we see the victim, and that's the end of that, hits him with a bat, the trunk, all the same details.   That's how this interrogation went down?

A.   That's what he told us.

Q.   He never told you I don't know what you're talking about?

A.   Again, sir, it would have said at the top.   That's what I usually did.   I will put down "denies initial involvement."

Q.   And your next question --

A.   "Initially denies involvement," sir, that's what I put down, but I don't see it on there.

Q.   So, therefore, he didn't deny involvement?

A.   Therefore, he must not have.

Q.   All right.  My next question is I'm not a detective.
Presumably you said to him, hey, where were you, what were you
doing that night, right?

A.   He did.  He told us right here what they did that night.

Q.   All right.  He never said I was at home, I was somewhere
else.  He never said anything other than I went to participate
in a murder?

A.   He told us right here, sir.

Q.   All right.  The story that you wrote down in this GPR is a
pretty coherent narrative that pretty much matches exactly the
other stories.  Would you agree?

          MR. NATHAN:  Objection to the form of the question,
argumentative.

          MR. LOEVY:  I'll break it down.

          THE COURT:  Okay.

BY MR. LOEVY:

Q.   The notes here are a narrative story, right?  With a
beginning, a middle and an end, and just the exact story,
right?

A.   This is what he told us, yes.

Q.   All right.  And you're saying there were no intermediate
notes where you took other notes and then turned them into this
GPR.  Do you understand what I'm asking you?

A.   No, I don't.

Q.   All right.  In other words, maybe what happened was you

talked to him for 11 hours, took a lot of notes, and then when you wrote it up, you ripped those up and said this is what I'm going to go with here.

And it started on Crandon, gets in the car, and go and murder him. Was there another set of notes from which you wrote this up?

A. That never happened.

Q. All right. It looks like you did not submit this. Tell the jury when you submitted it, the date?

A. It says 4 July.

Q. 4 July?

A. Yeah.

Q. It would have been improper --

A. Can I look at that again?

Q. Sure.

It would have been improper, would it not, sir, if -- are you done looking at that?

A. Well, I'm just trying to think if that's --

Q. Because that's a weird fact, right?

A. -- if that's my writing with the time or if that's when the sergeant did it. The sergeant signed it.

Q. That's a weird fact, isn't it, that so many months went by till the sergeant --

A. Well, hang on. Could I look at the top of this, sir?

Q. Top of it is.

Zalatoris - direct

1333

A.   Top.  See right here.  It's 21 March 03, third watch, it says, okay.

Q.   That's the date that you called it, right?

A.   No, that's the date that we talked to him right here.

Q.   Yeah.

A.   That's the date this was done, yes.

Q.   Yeah, okay.  But the sergeant didn't sign them until July, right?

A.   You're asking me when the sergeant signed.  I guess.  I mean, that's a sergeant that looked at it.

Q.   If there were once notes where you had a kid denying it and saying where he was and I was with Bob and Ted, those notes no longer exist, right?

A.   Those notes would be there then, right?

Q.   They should exist, right?

A.   They would be there.

Q.   All right.  Now, when you took Antonio from his home, do you remember that his family was trying to find him?

A.   Well, we told people at the house.  We told the woman at the house.  She called somebody in New Orleans.  So they did know where to find him.

Q.   Okay.  Do you remember there were efforts by the family to try to find this kid -- this -- sorry, this young adult?

A.   Which family member are you talking about?

Q.   Antonio.  I'm talking about Antonio.

Zalatoris - direct

1334

A.   Yeah, I know, but which family member are you talking about?

Q.   Were there any family members trying to find Antonio?

A.   There was an uncle that came to the Area.

Q.   And you might have -- you acknowledge that you might have caused some of the confusion about where Antonio was, about the address?

A.   No.

Q.   Isn't true you told them in Area 1 but the address had changed?

A.   No.   The uncle did come to the Area.

Q.   All right.   This is your deposition page 269, lines 23 through 270, lines 13.

        MR. LOEVY:   And why don't we play it.   Can we play the video deposition?   Are we able to do that?

        MR. NATHAN:   What was the line?

        MR. LOEVY:   269, lines 23 through 270, lines 13.

   (Video played in open court.)

BY MR. LOEVY:

Q.   All right.   Did you give those answers?

        MR. NATHAN:   Objection, not impeaching.

BY MR. LOEVY:

Q.   Did you give those answers?

A.   You're looking at me doing it.

Q.   All right.

THE COURT: I'd have to go back.

MR. LOEVY: Should I continue, Your Honor?

THE COURT: Yes.

BY MR. LOEVY:

Q. All right. So you told them Area 1, and for 30 or 40 years, Area 1 was in a different place, and then it was temporarily being held somewhere else. Is that a fair summary?

A. Yes.

Q. All right. You learned at some point that the uncle was looking for him, right?

A. Yes.

Q. Do you remember -- what do you remember about Ronald Smith, the uncle?

A. You know, he was -- he worked either for CHA or CTA. I do remember that. I can't remember if he was an electrician, something like that.

Q. Do you remember what he looked like?

A. No, I don't.

Q. All right. Do you remember your conversations with him?

A. No, I don't.

Q. All right. But do you remember he was an electrician?

A. I do. I remember him saying that.

Q. All right. Do you remember him saying he had been taken to 35th and Michigan. He was told 35th and Lowe, 39th and Wood, and he kept getting the run-around; do you remember that?

A.   Oh, he didn't get the run-around.  I came downstairs to our desk.  They said he was there.  We went down there, one of us did, I forget which one of us went down there.

He had left within five minutes, but then he came back about 45 minutes later.

Q.   All right.  Let's take that a little slower.

A.   Okay.

Q.   If someone -- if he had gone to the station, I think you said yesterday the interrogating detectives would have been the ones notified, right?

A.   Well, they would say there's somebody down at the desk upstairs and find out who it is and figure out if it's one of us that has to go down there, yeah.

Q.   And in the case of Antonio, that someone would have been you, right?

A.   Well, myself or Breen, one of us.

Q.   And you did learn at some point that Antonio's uncle was trying to get in there with him, right?

A.   Trying to get --

Q.   Trying to get in the room with him, right?

A.   What do you mean, trying to get into the room?

Q.   In other words, Antonio Mitchell's uncle went to the station saying --

MR. AINSWORTH:  Shaw.

BY MR. LOEVY:

Zalatoris - direct

1337

Q.   Sorry, Shaw.   Shaw's uncle went to the station saying I'd like to see my nephew?

A.   He did.

Q.   Did he have an absolute right to see his nephew?

A.   He did.

Q.   Why?

A.   Because we let him.   He's a juvenile.

Q.   He's under 17, so this juvenile did not have to be interrogated without his uncle, right?

A.   No.

Q.   And if you had known that the uncle was trying to get in there, you would have let the uncle in, I presume?

A.   We did know.

Q.   All right.   You would have let him in, right?

A.   We did.

Q.   He got turned away, right?

A.   He didn't get turned away.

Q.   He did not get turned away?

A.   No.

Q.   Did you take notes saying he got -- he left the station?

A.   That he left.   About five minutes after we were told somebody was downstairs, he had left, and then he came back about 45 minutes later.

Q.   Now, the confession, Antonio's confession, we don't know exactly what time it was, right?

MR. LOEVY:  If we could have --

BY THE WITNESS:

A.  I don't know exactly, no.

MR. LOEVY:  -- if we could have the ELMO.

BY MR. LOEVY:

Q.  But we do know from your notes that it was sometime on the 21st of March, right?

A.  Yes.

Q.  So if he confessed sometime on the 21st of March, sometime after his arrest at 4:00 a.m. on the 21st, I'd like at this time to show you page 37 of the notes, what time was the uncle -- this is your partner's notes.  Zalatoris and Breen, right?

A.  Yes.

Q.  What time was Smith allowed to speak to Shaw?

A.  It's documented right there, 2355.

Q.  So he didn't get in until 5 minutes before midnight, is that a fair summary of what's going on?

A.  That would be 2355, sir.

Q.  All right.  So he didn't get in until after Shaw had already agreed to give the statement, right?

A.  If that's what -- if he gave the statement before or after, I don't recall.

Q.  Well, he gave the statement sometime on the 21st, right?

A.  Yes.

Q.   And the uncle doesn't get in until 11:55 p.m. on the 21st, right?

A.   Yeah, but if you look, it says third watch right there, so it would be sometime during that evening.

Q.   All right.  But, sir, it says -- police departments are precise, right?  They try to be precise about dates?

A.   And I am precise with the date on there, sir.

Q.   March 21st?

A.   21st in the evening.

Q.   All right.  So if -- then back to where I was, if the uncle got there at 11:55 p.m. on that day he confessed, then he got there after confess -- Shaw had given the statement, right?

A.   Could be.

Q.   Unless, of course, maybe Shaw confessed in the 55 to midnight, he might have, right?  Is that what you're saying?

A.   No, I'm not saying that.  You're saying that.

Q.   All right.  You knew there was going to be a challenge because this 15-year-old had given a statement and he hadn't had a parent --

         MR. NATHAN:  Objection, form.

BY MR. LOEVY:

Q.   In your mind, did you believe there was going to be a challenge is the question?

         MR. NATHAN:  Objection.

         THE COURT:  Go ahead.  What's your objection?

Zalatoris - direct

1340

MR. NATHAN: It leads to a motion *in limine*.

MR. LOEVY: This explains his actions, Your Honor, in creating this document.

MR. NATHAN: Relating to a challenge.

THE COURT: Hold on.

MR. NATHAN: I could explain it very briefly.

MR. LOEVY: All right. How about --

THE COURT: I'll sustain.

BY MR. LOEVY:

Q. You created documents to, as a CYA so that later you wouldn't be able to be accused of keeping the uncle out. Do we agree with that?

A. No.

MR. NATHAN: Objection, form.

MR. LOEVY: That's -- I'm crossing him, Your Honor.

MR. NATHAN: Yeah, the CYA is argumentative. Form.

BY THE WITNESS:

A. Yeah. No, I don't agree with that.

BY MR. LOEVY:

Q. So you wrote this document, you wrote that the uncle had showed up at 10:55, right? He identified himself as the uncle of Shaw?

A. That's what's written there.

Q. 2155 is 9:55?

A. That's what's written there, sir.

Q. All right. And then your document says that he left five minutes later before you could let him in. That's what you wrote?

A. That's what's written there, sir.

Q. All right. And then you said he came back at 11:50 p.m., and you let him in five minutes after he got there, right?

A. That's what it says, sir.

Q. And you created this document because in your mind, you believed that there was going to be a challenge that Shaw would say later --

MR. NATHAN: Objection. This was sustained.

THE COURT: Overruled.

THE WITNESS: Now, what did you say again?

BY MR. LOEVY:

Q. In other words, you created this document with an eye toward defending against a suggestion that maybe this kid didn't have -- sorry -- this teen didn't have access to a relative, right?

A. That was done because that's what happened.

Q. All right. What happened was you're saying that the uncle got there at 9:55, and before you could get down there, he fled, he left.

A. He left, yes. He wasn't there when we got downstairs.

Q. So he said I'm here to see my nephew. I'd like to see him at 9:55. And then you hustled down there, and in five minutes

you got down there, and he'd already gone?

A.   He's gone.

Q.   Yeah, he's gone.  But then he came back, of all the crazy things, at 11:55?

A.   He did come back.

Q.   All right.  And then you got -- and then you let him in?

A.   When he came back, we were advised he was there and then came up, yeah.

Q.   And you let him in and he talked to Antonio, right?

A.   Of course.

Q.   When you say, "of course," why?

A.   Well, if he wants to talk to him, he's his guardian, yeah. I mean, otherwise, if he's not there, the youth officer is there.

Q.   Now, did you say to Antonio in Ronald Smith's presence:  I can help you if you help us get John Fulton?

A.   Did I say what again?

Q.   Did you say in the presence of the uncle to young Antonio: I can help you but only if you help us get John Fulton?

A.   No.

Q.   Did you say in Ron Smith's presence that Antonio was going to have to go to jail, but if he helped the detectives, you'd help him get out of this mess?

A.   No.

Q.   Did you say in Ron Smith's presence that if you don't

cooperate in helping us get John Fulton, you're going to jail for the rest of your life?

A.   No.

Q.   Why -- how do you know you didn't say those things?  That would have been improper.

A.   Because I would never say that.

Q.   And isn't it true that at some point during the questioning, you asked Smith to leave the room?

A.   I don't remember doing that.

Q.   And then later, you let him back in.

A.   I don't remember that.

Q.   That wouldn't have been proper if it happened, right?

A.   If he came there and he was in the room with him, he was in the room with him.  We didn't ask him to leave.

Q.   Yeah, so if Smith said you did, you would say that shouldn't have happened, right?

A.   I don't remember that happening.

Q.   It might have happened though?

A.   I don't remember that happening.

Q.   All right.  So if you don't remember, it might have happened?

A.   It might not have happened.

Q.   But it shouldn't have happened, right?  Smith should not have been asked to leave the room.

MR. NATHAN:  Objection, form, asked and answered.  By

whom?

MR. LOEVY:  By him.

THE COURT:  Is it clear by whom?

MR. NATHAN:  I'm just --

BY MR. LOEVY:

Q.  Smith should not have been asked by you to leave the room, right?  Should not have.

A.  I would say probably not.

Q.  All right.  Antonio did agree at some point to cooperate, right?

A.  Yes.

Q.  And showing you his statement, he gives a court reported statement -- we showed that a minute ago -- at 1:25 a.m., right?

MR. NATHAN:  You're talking about Shaw now.

MR. LOEVY:  Shaw.  Sorry if I mess up the names.

BY MR. LOEVY:

Q.  Talking about Shaw gives a court-reported statement at 1:25 a.m., right?

A.  If that's the time on it.

Q.  All right.  And in between --

MR. NATHAN:  Mr. Loevy, you're talking about a handwritten statement, I think.

MR. LOEVY:  Thank you.  Thank you, Mr. Nathan.  You're correct.

BY MR. LOEVY:

Q.   If I said court reported, he actually -- what Shaw did was they wrote it out for him, the state's attorneys, right?

A.   Yeah.

Q.   And then --

A.   I do.

Q.   And then they read it to him, right?

A.   They read it.  They both read it.

Q.   And then he signed it?

A.   Then he signs it.  He makes any corrections he wants on it.

Q.   And he, of course, makes corrections, right?

A.   I don't know if he did or not.  I'd have to take a look at it.

Q.   Well, you do know, because you're never seen a handwritten statement in your entire career in the Chicago Police Department where they didn't make at least one handwritten change to show that they make changes, right?

A.   Oh, I didn't know that's the reason why.  I thought they just correct stuff and then they initial it, which is what you do if you make a correction.

Q.   All right.  But in your 40 or 30 years at the CPD, you've never seen one where they didn't have at least one initial, right?

A.   I don't remember.

Q.   All right.

A. I don't know if we did or not.

Q. In between 4:00 p.m. on the 21st --

(Court reporter interruption.)

BY MR. LOEVY:

Q. Between 4:00 p.m. -- 4:00 a.m. on the 21st and 1:28 on the 22nd, you and Antonio had a lot of conversations, right?

MR. NATHAN: Objection, asked and answered.

MR. LOEVY: I'm laying a predicate for the new area here, the rehearsal.

THE COURT: All right. Probably was, but he may answer again.

BY THE WITNESS:

A. What was the question again?

BY MR. LOEVY:

Q. During this 24-hour period, you had spent some time --

MR. NATHAN: Objection.

BY MR. LOEVY:

Q. -- 22-hour period, you had to spend quite a bit of time with Antonio getting him up to speed on the story, right?

A. No.

Q. Isn't it true you confronted Antonio with all the facts that what Fulton was saying he did and what Mitchell said he did, and you educated him about the crime?

A. There's a lot of questions asked.

Q. A lot of questions.

A.   There's a lot of questions asked, and he -- this is what he told us.

Q.   You might have asked him:  Where did you get the gas?  Where did you get the gas?  And he's, like, I don't know.  Did Fulton go to the gas station?  I don't know.  There was a lot of questions, right?

A.   There was a lot of questions that were asked, sir.

Q.   All right.  Let's look at the state's attorney's handwritten statement that got written down.

         MR. NATHAN:  Object to the characterization that it's the state's attorney's statement.

BY MR. LOEVY:

Q.   Well, whose handwriting is this, Shaw's or the state's attorney's?

A.   It would be the state's attorney's.

         MR. LOEVY:  All right.  We'd move this into evidence, Your Honor.  This is Plaintiffs' Exhibit 102.

         MR. NATHAN:  No objection.

         THE COURT:  All right.  Received in evidence.  You may publish.

   (Plaintiffs' Exhibit No. 102 received in evidence.)

BY MR. LOEVY:

Q.   Looks like it starts out that the prosecutor tells him -- this is Shaw's statement here, Antonio Shaw.  See that?

A.   I see it.

Q.   It looks like you were present for this statement.

A.   I see it.

Q.   And by then, the uncle was present, too, right?

A.   I see that.

Q.   After being advised that he is subject to being tried, charged and, if convicted, sentenced as an adult, Shaw agreed to give the following statement, right?

A.   That's what the state's attorney wrote.

Q.   All right.  So was it your understanding that Shaw was doing this because he wanted to go to prison forever or because he thought he was going to get a deal?

A.   I don't know what --

        MR. NATHAN:  Objection, argumentative.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  Let's go.  They tell the gun story.  I want to focus your attention to the murder part on page 6.

        Antonio says that late in the evening of March 9th, that Sunday night, right?

A.   Yes.

Q.   That fits with your theory of the crime, right, that this happened on late in the evening on the 9th?

A.   What do you mean?  It does fit with what happened, yes.

Q.   All right.  Riff and he were hanging out in front of his house when John pulled up his car.  It says that, right?

Zalatoris - direct

1349

A.   Yes.

Q.   Now, that -- this was that cold night.  It was 11-degree wind chill below zero, right?

A.   Right.

Q.   And he says, yeah, I was just hanging out in front of the house, and Anthony says he got in because John said they were going to go get some females, right?

A.   That's what that says, yes.

Q.   And before we go further, isn't it true that the statement Shaw gave, Shaw minimizes his role completely and points the finger at Fulton, right?

A.   All three were trying to minimize their roles in this.

Q.   I'm focusing on Shaw.

A.   Well --

Q.   Shaw was -- Shaw's statement here is I didn't do anything. I just was a witness, right?

A.   No, I don't believe it is.

Q.   All right.  Let's take a look at it.  Antonio says that John wanted to beat Chris, right?

     Antonio says that John said he wanted to beat Chris?

A.   This keeps getting blurry in and out, so I'm having a hard time following it.

Q.   Right at the top.  Do you see that?

A.   I see it now.

Q.   And then the next sentence says Antonio says that Anthony

Zalatoris - direct

1350

and he agreed to beat Chris, and he crossed that off, right?

A.   That's crossed out.

Q.   Yeah, so he's saying I didn't agree.  I was just along for the ride, right?

A.   I mean, it's crossed out.

Q.   Yeah.  And then who's doing the hitting?  Is Antonio doing any of the hitting?

A.   You know, if I'm not mistaken, according to one of the defendants, one of the offenders, it was -- it was Shaw and Mitchell that ran up on the guy --

Q.   Yeah.

A.   -- and started hitting him, so --

Q.   Somebody else's statement, but I'm really focusing on --

A.   No, but that's what we were told, sir.

Q.   I know, but I'm focusing on what -- Shaw's statement.  Okay?  You following my questions?  What Shaw is admitting.

         Shaw is admitting that Anthony hit Chris with the pipe, right?

A.   That's what he's saying in there, yes.

Q.   With the pipe?

A.   Yes.

Q.   And -- but by the time he got to Chris, Chris was already down.  That's what Shaw is saying, right?

         Antonio is saying John is the one who got the bat out of the trunk, and John hit Chris about six times with the bat,

and John was swinging the bat real hard, right?

A. That's what he's saying there, yes.

Q. And he says Antonio -- sorry. Antonio says that the pole that Anthony hit John with was a metal pipe about a foot long, right?

A. That's what he's saying, sir.

Q. All right. And there was no pipe in the story until this point, right?

A. Well, we know it was a blunt object.

Q. That's what you knew.

A. That's what we knew, yeah.

Q. All right. Antonio says John parked in the alley. All of the three pulled out Chris. Anthony pulled out the duct tape. Anthony was the one who taped Chris. John and Anthony put the bag over his head. John was the one who told him to put the gas in the can at the gas station.

That's weird to have the 15-year-old buy the gas, isn't it? That would be -- might be noteworthy at the gas station, right?

A. What's weird about a 15-year-old pumping gas on a car?

Q. Well, you know, you had to be 16 to drive, and maybe if they were going to -- did you go back to the gas station and say do you remember a 15-year-old buying gas that night?

A. How would he know how old he is pumping gas outside?

Q. Fair. Sorry for the tangent.

Zalatoris - direct

1352

So Antonio says he asked John about why they needed the gas can. John said they were going to torch Chris. Antonio said he told John to take him home, right?

A. That's what it says there.

Q. All right. So, Antonio, they've got the alley, they got the box. Antonio says he was in the car when John poured the gas. Antonio says that they lit the fire, and John and Anthony ran back to the car, right? Correct?

A. That's what it says, right.

Q. And they told him he'd better not tell anybody.

So Antonio -- and then he says he's been treated fine and fed and slept, right?

A. Pardon me?

Q. He says he's been treated fine, fed and slept, right?

A. And slapped?

Q. Slept. Sorry.

A. Oh, slept.

Q. He did not say he was slapped. He said he was treated fine, right?

A. That's what it sounded like you said.

Q. Sorry, sir. Didn't mean to imply it.

So Antonio at this point, in your mind, were you trying to give Antonio the impression that if he gives this statement pointing at these two, he's okay?

A. No. It's not my determination to make anyhow.

Q.   All right.  But I'm asking the impression you gave Antonio and his uncle.

A.   You're asking me what he thought.

Q.   No.  I'm asking you what you tried to convey to Anthony -- Antonio and his uncle.  Didn't you try to give them the impression that, hey, you can just be a witness, and you'll be okay?

MR. NATHAN:  Objection.

BY MR. LOEVY:

Q.   Didn't you try to give them that impression?

MR. NATHAN:  Objection, asked and answered.

MR. LOEVY:  He hasn't answered it yet, Your Honor.

THE COURT:  No.  He said, no, it's not my determination.

MR. LOEVY:  Okay.

THE COURT:  So it's about time for a recess.

MR. LOEVY:  Thank you, Your Honor.

THE COURT:  Let's take a 15-minute recess.

(Jury out at 10:53 a.m.)

MR. NATHAN:  Your Honor?

THE COURT:  Yes.  Let me put my headphones on.

MR. NATHAN:  Your Honor, we just wanted to remind the Court to admonish the jury not to discuss the case with one another or do any outside research.  I don't believe the Court ever gave that instruction to them yet.

Zalatoris - direct

1354

THE COURT: I did at the beginning, but I haven't reminded them, so I will do my best to remind them before the lunch break.

MR. NATHAN: Thank you.

MR. LOEVY: And, Your Honor, if I could make an apology to the Court, this is the third false confession case I've tried lately where there was a very young person, most recently Marcel Brown, and I spent the whole time calling him a kid because he was a kid and nobody objected to calling him a kid. So it's, like, stuck in my mind to try the case that way.

You've told me to change it, and I apologize. I should have done better. You're absolutely right. But by way of explanation, this is the third time I've done it talking about a kid because he is a kid. But you've told me not to call him a kid, and I've got to do better, so I will.

THE COURT: All right.

MR. LOEVY: Thank you.

THE COURT: You're doing better. In the last half hour, you did better.

MR. LOEVY: Thank you, Your Honor.

THE COURT: All right.

MR. NATHAN: Your Honor, we -- one moment.

(Counsel conferring.)

MR. NATHAN: Your Honor, I just, in anticipation of the redirect, I just want to clarify the present state of your

ruling. You barred the videotape of Mitchell's confession. After that, I know the Court gave an instruction and the term videotape was out there.

I'm just trying to understand if Your Honor barred us from even referencing the term videotaped confession or saying that there was a videotaped confession?

MR. LOEVY: Your Honor, I -- my understanding what happened was before the trial, you said the issue is out. Then Mr. Nathan stood in front of the jury and said I think the door is open to the videotape, and everybody said videotape? And then you gave a curative instruction.

THE COURT: One at time, please. Go ahead.

MR. LOEVY: Then you gave a curative instruction and said to the jury there is a video, but for reasons that you explained to them, I've instructed, you know, we're just going to use the transcript of the video.

So you've told them there's a video and you've told them why they're not getting the video. So at this point, now that Mr. Nathan told the jury there's a video, my understanding is it's no longer improper to mention the video, and that's how I've been going because you told them there's a video.

MR. NATHAN: And I wasn't accusing Mr. Loevy of anything. I'm just trying to understand the rule of play. It sounds like Mr. Loevy thinks that it's okay at this point to use the term videotape in light of the history, and I get that,

and is that correct?

THE COURT: Well, I don't know exactly how you intend to use it. I mean --

MR. NATHAN: I'm just -- if I refer to the statement, he's now -- Mr. Loevy has been referring to it as the transcript. I would say the transcript of the videotaped statement. That's what I'm asking if I'm allowed to say.

MR. FIEWEGER: And, Your Honor, if I could clarify one point as well --

THE COURT: I would guess so, yes.

MR. FIEWEGER: Your Honor, given your instruction and having told the jury that there is a video, I don't see any reason now to pretend like there isn't one, and I think it makes sense for all parties to be able to refer to the video. The jury knows it's there.

It doesn't make sense to pretend that this statement was recorded in some other manner, so --

MR. LOEVY: We don't object to that, although they filed a motion last night saying that they think there's prejudice. So if they're going to start referring to it, they can't make their own prejudice, you know, oh, make this video part of the trial and then say on appeal, we didn't get to show them, so that's our argument.

MR. FIEWEGER: And, Your Honor --

THE COURT: Well, it's --

MR. NATHAN: Just to clarify.

THE COURT: Okay.

MR. FIEWEGER: The argument about the prejudice is not that we can't say that there's a videotape. It's that the jury can't see the videotape. And I think that it makes sense for us to address that motion once you've had an opportunity to read it, and I think it does make sense for us to also address that motion before Mr. Mitchell testifies.

THE COURT: All right. So I look at it, your motion, in a couple of ways, but one is that this is Mr. Loevy's trial, and he has to defend it on appeal. If I excluded the video, I did so for reasons I've stated to you repeatedly. I don't think any of that has changed.

It's a discretionary call, and my reason was that it would give a false impression. Now, I don't know that -- I mean, it could come in, and I don't know that it would make a difference, but, you know, to keep repeatedly asking me to do something that I decided, I -- it's a little frustrating, so --

MR. FIEWEGER: Well, Your Honor, the reason we filed and renewed the motion is we believe that circumstances have changed since the time that you entered your ruling at the pretrial conference.

We do believe that the door has been opened, and we also wanted to make sure that the record was abundantly clear about our position, which is that the *Fox* case, on which you

basically entirely rely, is both factually and legally distinct --

THE COURT: Well, that's -- yeah.

MR. FIEWEGER: -- and I appreciate that's not a new argument. We just wanted to make sure that the record's clear on that because, as you said, there likely is going to be an appeal in this case.

So we filed the motion not to be badgering you or to be second guessing you.

THE COURT: I understand.

MR. FIEWEGER: We just want the record to be clear, and we do think that there are circumstances that have changed since the ruling during the pretrial conference.

THE COURT: Okay. Well, I did -- I don't think it's quite fair that you say I relied only on that case because I asked you to find me any case where the Court had let this in in these circumstances, and apparently you weren't able to find one. So, you know, that was another factor in my decision.

What else? Your arguments are two. The primary arguments are: One, the plaintiffs never moved to bar mention of the videotape, which is true, only the video itself, and our instruction to the jury last week you argue was unduly prejudicial warranting a mistrial.

Well, I'm not granting a mistrial. Mr. Loevy referenced a video at opening, but I think we gave the

instruction because the defendants continued to reference a video with Dr. Leo and as a means by which to open the door --

MR. NATHAN: Your Honor --

THE COURT: -- to --

MR. NATHAN: -- the only reference with Dr. Leo was I had asked him a question what -- he was going through his database, and I said: What's the next thing on your database, and he said the word video. He didn't even say Mitchell. He just said the word video. That's all that happened.

MR. LOEVY: No, but, Your Honor -- Your Honor --

THE COURT: I would like to finish my little statement --

MR. NATHAN: I apologize.

THE COURT: -- and then you can talk.

I think this was -- either it was -- it was noted anyway, but I think the question was asked to introduce the video during his cross-examination or to talk about it.

So then we learned that the jury was asking about the video. So I think it was apparent that this was going to go the wrong way, so I said let's not talk about the video anymore.

As for the instruction I gave being prejudicial, I don't think that -- I just disagree with you, so that's that.

MR. LOEVY: The only thing we would add from the plaintiffs' side, if we may, although I know we're running out

of break, but --

THE COURT: Yeah.

MR. LOEVY: Mr. Nathan said he did it on purpose -- actually, I've already made these arguments. They're in the record. You need a break. Let's take a break.

THE COURT: All right.

MR. NATHAN: I'm still not clear, are we or are we not allowed to reference the term videotaped confession?

THE COURT: It's been referred to. This is the Mitchell confession, right?

MR. NATHAN: Yes.

THE COURT: So let's see where it goes, you know, but I know that Mr. Loevy's referred to it.

MR. LOEVY: Yeah, we don't oppose, now that Mr. Nathan, on purpose as he admitted, said -- made the jury aware there was a videotape and now that you've explained why they're not going to get to see it, I think it is in the trial, but I do think, like I said before, if they're going to start making it an issue, then they're going to not be able to say later, oh, look how prejudiced we are because everybody kept talking about a video that we couldn't see, then that's making their own prejudice. That's our position.

But we agree that it's not barred at this point. You've told them about it.

MR. NATHAN: I don't agree with Mr. Loevy's

characterization of how that happened.  It's been in the record.  I've explained it.  I don't have anything further to say about it.

THE COURT:  All right.  The record is the record.  All right.

MR. FIEWEGER:  Thank you, Your Honor.

(Recess at 11:04, until 11:20 a.m.)

(Jury in at 11:20.)

THE COURT:  You may continue.

BY MR. LOEVY:

Q.  Next I'd like to talk about the confessions.  One of these reasons these confessions were so powerful is they contained a lot of details that only the killer would know, right?

MR. NATHAN:  Object to the form of the question.

MR. LOEVY:  Your Honor, this is --

THE COURT:  Overruled.

MR. LOEVY:  -- cross-examination.

THE COURT:  Overruled.

BY THE WITNESS:

A.  They include details of the murder, yes.

BY MR. LOEVY:

Q.  But the question was, they include the kinds of details that either the police knew or the killer knew but if you didn't -- weren't the killer, you wouldn't know, right?

A.  If you're not the killer, you wouldn't know, right.

Zalatoris - direct

1362

Q.   And they also tracked each other very closely.  That's another reason they were powerful, right?

          MR. NATHAN:  Object to the form of the question.

          MR. LOEVY:  Is he just going to object to everything I ask, your Honor?

          THE COURT:  Okay.  Just a minute.

          Overruled.

          THE WITNESS:  What was the question again?

BY MR. LOEVY:

Q.   Another thing that made these confessions powerful was that they closely tracked each other.  Mitchell, Fulton, Shaw, they all had the same story more or less?

          MR. NATHAN:  Object to the form.

          THE COURT:  Overruled.

BY THE WITNESS:

A.   Yes.

BY MR. LOEVY:

Q.   All right.  Now, the police knew the details, correct?

A.   No.  We didn't know all the details, no.

Q.   Some of the details you knew, would it have been proper to feed those to the suspects?

A.   No.

Q.   Why not?

A.   Because we want them to tell us what happened.

Q.   It would have been improper if it first came out of your

Zalatoris - direct

1363

mouth instead of their mouth, correct?

A.   Again, we want them to tell us what happened.

Q.   All right.  Let's talk about the essentials of the detail -- of the confession, the fact that Griffin was on the phone in the evening, the Foster bus, they were going to grab him coming off the Foster bus sometime around 9:30, 10:30, somewhere in the evening hours.

THE COURT:  Objection.  Argumentative.  Form.

MR. LOEVY:  I haven't asked the question yet.

MR. NATHAN:  You're inserting things like "essential," and it's you testifying.  That's my problem.

MR. LOEVY:  May I ask a question, your Honor?

THE COURT:  Try again.

BY MR. LOEVY:

Q.   Did these things come first from their mouth or your mouth?

A.   Come from our mouth to who?

Q.   You got these things first brought up by Mitchell and Fulton or first brought up by the police?

A.   Well, this was first brought up by Griffin about the phones back and forth, I believe.

Q.   All right.

A.   To the best of my recollection on that one.

Q.   So let's slow down --

A.   As far as the Foster Avenue bus, that came from Mitchell and Fulton.

Zalatoris - direct

1364

Q.   Let's slow down then.  We'll take the first one first.  The phone, who first brought up that this was orchestrated by Griffin on the phone; the police or these guys?

A.   It wasn't us.  I don't believe it was.  I believe it was Griffin that told about the phone calls back and forth.

Q.   All right.  So Griffin tells you about the phone calls?

A.   Right.

Q.   Now you get in a room with Fulton.  Who brings up the phone calls first; you or him?

A.   They start telling us about it.

Q.   Before you told him?

A.   Right.

Q.   How about the bus?  Before you told him or after you told him?

A.   It would have to be before we told him.  We never told him about the bus.

Q.   Well, let's take a look at your report.  This is Page 7 of the same report that's already in evidence.  Breen and Zalatoris were advised that Fulton was in custody.  He denied having anything to do with the murder.  R/Ds confronted him with what had been told to the R/Ds.

That's reporting detectives, right?

A.   Yeah.

Q.   By Griffin and by Detective Rolston concerning Fulton asking Griffin about the time of the meeting, the victim's

travel itinerary, and his destination. Do you see that?

A. That was what was typed by Rolston, yes.

Q. All right. Now, you say it's typed by Rolston, but it says the R/Ds, the reporting detectives --

A. Which is all of us actually.

Q. All right. But they're saying it was report -- the reporting detectives, R/Ds confronted Fulton with what had been told to the reporting detectives by Griffin and by Rolston.

A. Again, I didn't type this.

Q. All right. It looks like you typed it, though?

A. But I did not type it.

Q. All right. Did --

A. Look at the -- I told you, look at the top. It will show you Rolston did.

Q. All right. Now let's forget about who typed it completely. Okay. Forgetting about who typed it, doesn't this say that you brought up to him Precious' statement before he brought it up to you?

A. That is what someone else typed on this report, yes.

Q. All right. And Precious' statement very clearly, showing you again Precious' statement, Plaintiffs' Exhibit 40, Precious' statement says March 9th, phone calls, what buses Chris was going to take, the Foster bus, 9:30 p.m.

If what Rolston typed was true, then you're confronting them with buses, 9:30, phone calls with Precious.

Zalatoris - direct

1366

Do you agree with that, if he typed it accurately?

A.   If we confronted him with that.

Q.   All right.  And that's what the report says?

A.   Again, I didn't type that report, sir.

Q.   Okay.  All right.  As far as other details like, for example, the duct tape and the gag, did they bring it up first or you brought it up first?

A.   No, they told us.

Q.   Now, you showed them photographs, right?

A.   We showed them?

Q.   Yeah.

A.   No.

Q.   You didn't show them any photographs?

A.   No.

Q.   All right.  Take a look at the report.

     Why would it have been improper to show them photographs, sir?

A.   We didn't.  We wanted them to tell us what happened.

Q.   All right.  You showed them a photograph of Griffin?

A.   I can't read this.

Q.   I'm sorry.  I'm trying to focus it.  Let me get the auto-focus going.

          MR. NATHAN:  What page is this?

          MR. LOEVY:  This is Page 6.

BY MR. LOEVY:

Zalatoris - direct

1367

Q.   For example, you showed them a photograph of Griffin, Collazo, and Marinelli, right?

A.   Again, I didn't type this, sir.

Q.   All right.  And you did -- you heard Griffin say that you were throwing crime scene photos at her.  You heard that testimony, right?

A.   At her.

Q.   Right.  You remember that?

A.   I remember that.

Q.   All right.  You did that, right?

A.   We put them on the desk in front of her, yeah.  We didn't throw them on the floor like she said.

Q.   All right.  But you put her in front of the desk, you said look at this murder victim, right?

A.   We said, "Look what they did to your friend."

Q.   Yeah.  So those photos had the duct tape, right?

A.   No.  I believe it was just like a head shot actually.

Q.   The head shot's really gross, isn't it, sir?

A.   Well, you know what, it's not as bad as you would think because the plastic seemed to have sucked his face.  I said, the plastic seemed to have sucked his face, so his face wasn't burned.

Q.   All right.  This is showing you Plaintiffs' Exhibit 38, Page 3.  And this is a warning, they're tough photos, right?

A.   I don't know.  I don't know what you're going to show me.

Q.   The crime scene photos are tough photos, right?

A.   Depends on what they look like.  It's 22 years later.

          MR. LOEVY:  All right.  Permission to publish, your Honor.

          THE COURT:  This is in evidence?

          MR. LOEVY:  It should be.  Plaintiffs' Exhibit 38, Page 3.

          MR. NATHAN:  No objection.

          THE COURT:  All right.

BY MR. LOEVY:

Q.   The photos show duct tape, right?

A.   I never saw this photo, but yeah.

Q.   All right.  And the photo -- do you have the hard copy?

          You're saying this is not a tough photo to be showing Johnitta Griffin?

          MR. NATHAN:  Objection.  Argumentative.

          MR. LOEVY:  Let me show just the witness, your Honor.

          THE COURT:  All right.

          MR. LOEVY:  Can we put it on the witness-only screen?

BY MR. LOEVY:

Q.   You didn't have any problem showing Johnitta this photograph?

A.   I don't think I showed her that one.

Q.   You said the plastic, the black on the face --

A.   I think it was, the photo that I showed, from what I could

Zalatoris - direct

1369

recall, was one that was taken at the morgue.

Q.   No, you said there was black melted on the face.

A.   I said there was -- well, at the morgue it was peeled away, and you could see the plastic.  You could see his face.  It kind of protected his face.  That's the one I remember showing.

Q.   You remember showing her a photo where the black plastic was melted onto his face, right?

A.   I said --

MR. NATHAN:  Objection.  Mischaracterizes his testimony and argumentative.

MR. LOEVY:  It is --

THE WITNESS:  And that is not what I said.

THE COURT:  Wait a second.  Stop.  You say, "You remember"?

MR. LOEVY:  Here's the question, your Honor.

BY MR. LOEVY:

Q.   Five minutes ago to the jury, did you tell the jury that you showed Johnitta Griffin a photo of the victim with the black plastic melted on his face?  Yes or no?

A.   No, I didn't.  I said --

Q.   You didn't tell that to the jury?

A.   No, I didn't.  I said the plastic had melted to his face, and it peeled away and it protected his face.  And that's the morgue photo, sir.

Q.   All right.  In any event, you were showing crime scene

Zalatoris - direct

1370

photos to the witnesses, "Look at this, look at this"?

A.   I showed a morgue photo.

Q.   Why?  Why are you showing Johnitta -- why are you showing crime scene photos to witnesses?

A.   I showed her the photo to show what they did to her friend.

Q.   All right.  So if you showed the photo to John and, look what you did to -- and if we could have the scene back -- the screen back to the jury, please.

You actually -- before they mentioned duct tape, you showed the crime scene photos to the boys -- I'm sorry, to the young men?

MR. NATHAN:  Objection.  Asked and answered. Argumentative.

THE COURT:  To the young men?  Before it was Griffin, right?

MR. LOEVY:  Now I'm switching to Fulton and Mitchell.

MR. NATHAN:  He asked that as well.

BY MR. LOEVY:

Q.   All right.  You showed them too?

A.   You already asked me.  I said no.

Q.   Oh, you said no?

A.   I said no, I didn't show it to these guys.

Q.   All right.  Why just Griffin and not these guys?  It would have been --

A.   Because it was a witness.  We wanted to find out what

happened.

Q.   All right.  It would have been improper if they saw the crime scene photos, right?

A.   I don't think so.

Q.   Then how do you know you didn't show them?

A.   Because I didn't show it to him.

Q.   But if it wouldn't have been improper, how do you remember 20 years later that you didn't?

MR. NATHAN:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  Taking a look at your notes here, this is Page 26 of your notes.  This is Breen's writing about John's confession, right?

A.   Yes.

Q.   And Breen says, you know, John and Riff put Stick back in the trunk, Riff said, we have to get rid of the body.  It's the whole story.  And then 5228 South Peoria, stopped car, popped the trunk button.

This is what John Fulton is telling you?  5228 South Peoria, he remembered where he --

A.   That's why it's in parenthesis, sir.  It's in parenthesis because that was where he showed us, and we got the address of that building.

Q.   It's not in parenthesis, sir, is it?

Zalatoris - direct

1372

A.   I'm looking at it.  Or it's circled.

Q.   I guess I circled it.  I'll show you the original.

A.   Okay.  Well, that's why it's on there.  That's where they showed us.

Q.   Yeah.  So when you're taking your notes from John, he says all these things and he says 5228 South Peoria?

A.   No, he didn't.  That's where he stopped the car.

Q.   All right.  So did he -- this is your notes of your conversation --

A.   I understand that.

Q.   Let me ask the question.

A.   That's where he stopped the car, sir.

Q.   Let me ask the question.  This is your notes of what John said, right?

A.   These are the notes of what we're told here, and that's what we documented.

Q.   All right.  So you were told these things?

A.   He didn't tell us the address.  He didn't know the address.

Q.   All right.  It looks like he told you the address, wouldn't you --

A.   You might think that, but that's not what happened.

Q.   All right.  Would you agree with me -- just let me finish the question -- if you read these notes, it looks like he told you the address?

A.   You might assume that, but that's not what he said.

Q. All right. Because he wouldn't have remembered the address, right?

A. He wouldn't know the address.

Q. Right. Well, you showed him the address, right?

A. We didn't show him the address.

Q. No, you drove him to 52 --

A. He showed us the alley and where it happened, but there's no address on a vacant lot.

Q. All right. Let's talk about the actual confession. The time of the crime being in the early evening hours, you believed walking into this room that the crime was sometime around 9:30, 10:30 on March 9th, correct?

A. You know, I really don't remember what time --

Q. All right.

A. -- it would have been.

Q. You believe Griffin was telling you the truth, right?

A. Well, we believed -- yeah, most of what she was telling us was the truth. She might not have the times right.

Q. She might have been lying?

A. Well, she might have not had the times right.

Q. Well, let's look at her statement. Would be getting off the Foster bus near Foster and Lincoln around 9:30. Chris would be wearing a black hoodie. This is what Griffin is telling Fulton so he can grab her, right?

A. Is that -- that's not my GPR, is it?

Zalatoris - direct

1374

Q.   No, no.  I'm sorry if it wasn't clear.  This is --

A.   No, it's not.

Q.   -- Griffin's statement?

A.   No, it's not.

Q.   All right.  Are you with me on Griffin's statement?

A.   I see it's not mine, yeah.  It's the State's Attorney's statement.

Q.   Yeah.  This is the statement, the six-page, seven-page statement she gave.  Are you with me now of what we're talking about?

A.   Yeah, and I wasn't even in that statement, sir.

Q.   Al right.  But you had a copy of it, correct?

A.   I don't remember seeing a copy of it.  But I wasn't in that statement, and I didn't take that statement.

Q.   Five days later when you were talking to Fulton, haven't you already testified you had a copy of her statement?

A.   I didn't have this.

Q.   Five days --

A.   I didn't have this, sir.  I didn't sit in on this.  It looks like it was -- it was Rolston.  See, it was Rolston right here and Rubinstein.  Okay.

Q.   That was taken on March 14th, right?

A.   It wasn't me in here, sir.

Q.   The question was, this was taken on March 14th?

A.   It's taken on March 14th --

Zalatoris - direct

1375

Q.   All right.

A.   -- correct.

Q.   Now you're talking to him four days later, right?

A.   By Jake Rubinstein and Detective Rolston, okay, not me.

Q.   And when you're talking to him four days later, you wanted to educate yourself on how to interrogate him?  You would have wanted to arm yourself with this statement, right?

A.   I wouldn't have that statement.

Q.   All right.  In any event, did you believe that they'd be getting off the Foster bus around 9:30?

A.   That's what's written here.

Q.   And that they -- Precious ended up around 10:30.  That was your understanding going into the interview, right, sir?

A.   That's what's written there, sir.

Q.   All right.  Now we've established that's what's written there.

A.   It is.

Q.   My next question is, when you went in with John Fulton, did you believe that's what happened?

A.   Essentially, yes.

Q.   And then his confession ended up tracking that, right?

A.   It ended up what?

Q.   It ended up tracking your belief that it was 9:30?

A.   "Tracking."

Q.   In other words, his confession matched that?

Showing you Plaintiffs' Exhibit 11, Sunday, March 9th, if I don't get my money, Precious said be up there around 9:00 o'clock.  So around 8:00 p.m., he got into his car with Stick and Riff and drove north, talked to her two more times for directions.  She said, you know, don't be there any later than 10:30, 11:30.

A.  I couldn't read that, no.

Q.  Right?

A.  Okay.

Q.  So you had a belief that Precious talked to him that night. It ends up in the confession.  It turned out to be false, correct?

A.  What ended up being false?

Q.  John was in a hospital on the south side of Chicago during those hours, correct?

A.  I don't know about that.

Q.  All right.

A.  That wasn't part of our investigation, so I really don't know about that.

Q.  All right.  But as you sit here today, you don't dispute, do you, that between roughly 8:00 p.m. and close to midnight, his whereabouts are accounted on the video, right?

A.  Again, we weren't part of that investigation.

Q.  I understand.  So you --

A.  Okay.  So I don't know.

Q.   You didn't know it then?

A.   I don't know.

Q.   But --

A.   I don't know anything about the video.  Okay.

Q.   Let me ask you this then.  Since you didn't know then, you've been in court -- and I'm not going to show you again, right.  You've seen his whereabouts are accounted for, right?

A.   I see what you're showing.

Q.   And you don't dispute that, do you?

A.   Well, I don't remember what -- you showed me a picture of -- some blurry picture of a guy with a jacket on.  I don't know what it is.

        MR. LOEVY:  All right.  Let's take a look at Plaintiffs' Exhibit 1, Page 18, the report.  We move this report into evidence, seven-page report.  This is part of Plaintiffs' Exhibit 1.  This one here, the seven-pager, Page 13.

        We'd move this into evidence, your Honor.

        MR. NATHAN:  Objection.  Foundation.

        MR. LOEVY:  The foundation objections are not supposed to be made here.

        MR. NATHAN:  It was identified for identification only.

        MR. LOEVY:  Now I'm moving it into evidence.

        MR. NATHAN:  And it's not with this witness.  This is

the report of Edward Winstead.

THE COURT: Okay. It's 7, Plaintiffs' 7?

MR. LOEVY: It's Page 18 of Exhibit 1. It's part of Exhibit 1 which was originally marked for identification only. I'm moving it into evidence.

THE COURT: Foundation -- overruled. I think we have foundation for this.

BY MR. LOEVY:

Q. All right. Let's look at what was reported here. This is the report of Leonard Rolston, right?

A. Edward Winstead, yeah.

Q. Edward Winstead. Thank you. He's the reporting detective. That makes him the R/D, the reporting officer?

A. It makes him an R/D, yes.

Q. All right. Let's look at what he wrote. You didn't know any of this at the time, right --

A. No.

Q. -- about the hospital?

A. I haven't even reviewed this, so I don't know anything about this videotape.

Q. Right. So let's take a look. It looks like on March 21st, Winstead picked up Yolanda, transported her to Area 1. She had drawn a map of the emergency room area. She explained how she had been pushed in a wheelchair by Fulton to triage, and the surveillance tape showed the wheelchair. He wheeled her up,

Zalatoris - direct

1379

etcetera, etcetera.

Now, Winstead and Yolanda watched the video. Even though the faces are not distinct, Yolanda was accurate in foretelling what actions would come next from the two people she claimed were her and Fulton. It was approximately 11:30 when she believed he had left the emergency room. It was actually 11:30:18 -- 11:18 on the tape when she left the emergency room, and then it goes on and then, you know, etcetera, etcetera.

Didn't you in the course of the investigation talk to Winstead and say, "Geez, this guy is on videotape the whole evening on March 9th"? That never came up with Winstead?

A. I do recall Winstead saying something about the video stuff and how there was no camera in the back of his building, that there was just a housing for a camera.

Q. We're talking about the hospital.

A. No, but that would be the in and out and how he would not be on video going in and out of his building. So I do remember that stuff.

Q. Just for the hospital, though, his whereabouts until 11:30 were accounted for, correct?

A. Again, I don't really recall what Winstead told me 22 years ago.

Q. All right. But the gist of it was, what you do remember is you took a confession from a guy that between 9:30 and 10:30,

he was abducting somebody off a bus, and it turned out he was on videotape in a hospital on the other side of town. You have a memory of that, right?

A. I have a memory of him being seen on that tape at, like, one time and then not being seen anymore. So you really don't know when he left there. I remember Winstead telling me that part.

Q. All right. So --

A. So to me that wasn't an alibi, you know.

Q. Oh, to you, you thought the fact that he was on videotape at the hospital didn't -- wasn't an alibi?

A. The fact that they just had him for a little bit on videotape and it doesn't match the times that this happened and --

Q. All right. What --

A. -- and that you don't see him later.

Q. What about when Winstead said to you, "Listen, sir, I went through it with Yolanda, and we walked through the whole thing, and she was able to predict, 'Yeah, now we're about to go there. Now we're about to go there. Now we're about to go there.'"

And did he explain that to you, that he really believed they were on videotape?

A. Again --

Q. Did he explain it to you?

A. -- I'm trying to recall what he told me 22 years ago. Okay.

Q. All right. But that's not like a small detail?

A. Well, that's something I don't remember from 22 years ago, exactly what he said. Okay.

Q. But it's not a small detail that you just took a confession from a guy that it was physically impossible for him to have been present, right?

A. But, see, that's the thing, and that's why the State's Attorneys charged because what Winstead -- with the video and everything, they didn't consider that an alibi. There was no alibi. In other words --

Q. Showing you --

MR. NATHAN: Let him finish the answer, please.

THE WITNESS: There was no alibi.

BY MR. LOEVY:

Q. All right. Showing you, he was on video entering the ER at 8:33, correct? You don't dispute that?

A. I see that time. I don't see where he is.

Q. You don't -- well, Winstead walked through with Yolanda, right?

A. Well, where is he at on this video?

Q. Did Winstead explain to you that, "You know what, sir, I did walk through with Yolanda, and she was able to account for" --

A.   Well, you're showing me a picture, and I'm asking you where he is in there.

Q.   I'm asking you a different question.  Didn't Winstead tell you, you know, "I talked to his girlfriend, and she was able to account for that video"?

A.   I don't remember that.

Q.   All right.  Did you ever see his report explaining that?

A.   Again, I don't recall if I saw the report.  I mean, you put it up here once already, but...

Q.   All right.  The hospital business wasn't something you were real focused on, right?

A.   No, not at all.

Q.   All right.  Then I'm going to show you a new demonstrative here.  You believed going into the interview that the victim had arrived around, between 9:30 and 10:30.  You believed this was true, right, because Precious told you that?

A.   What am I looking at here?

Q.   The left column.  I just want to make sure --

A.   I know, but what is this piece of paper I'm looking at?

Q.   I created it, sir.

A.   Oh, it's yours.

Q.   Yes.

A.   Okay.

Q.   So what the police believed to be true, you believed going into the interrogation that Collazo had been abducted sometime

Zalatoris - direct

1383

in this time range, right?

A.   Somewhere approximately in that area.

Q.   Approximately.  Okay.  You did believe that, so I'm going to put a check by that.  It did end up in the confession, right?

A.   Yes.

Q.   And it turned out to be false because of the hospital video.  Would you agree with that?

A.   No.

Q.   All right.  It --

A.   You showed me a video.  I believe it said 8:33 on that video, didn't it?

Q.   Yes, sir.

A.   Okay.  So --

Q.   Entering the hospital?

A.   Entering, but they don't find him anywhere else in there, do they?

Q.   Well --

A.   Do you have pictures of him in there at, like, 9:30?

Q.   Here's when he exits, 10:36.  Do you see that?

A.   Well, where is he at in here, sir?

Q.   Well, that's what Yolanda and Winstead went through.

A.   Well, you're showing me a picture, and I can't tell you if he's exiting or not.

Q.   Do you dispute Winstead's report that he walked through the

Zalatoris - direct

1384

video with Yolanda, and she was able to account for him being in the hospital?

MR. NATHAN: Objection.

BY MR. LOEVY:

Q. Do you dispute that?

MR. NATHAN: Foundation. Calls for speculation.

BY MR. LOEVY:

Q. Do you dispute what's in Winstead's report?

MR. NATHAN: Objection. Foundation. Calls for speculation.

THE COURT: Overruled.

THE WITNESS: I'm asking you who's in this video.

BY MR. LOEVY:

Q. I'm asking you --

A. You showed me a bunch --

Q. I'm asking you --

A. Well, why don't you show me the video, sir?

Q. I'm asking if you dispute Winstead who watched the video with Yolanda, do you dispute his account of what happened?

A. I --

MR. NATHAN: Objection. Foundation. Calls for speculation.

THE COURT: Overruled.

BY THE WITNESS:

A. I didn't write that report.

Zalatoris - direct

1385

BY MR. LOEVY:

Q.   All right.  Let's talk about the next thing, the bus.  What did Precious tell you about the bus?

A.   Can I take a look at my GPRs?

Q.   No, I'm asking you from memory.

A.   Ah, I'd look at my GPRs.

Q.   Sometimes you have a real good memory, right?

A.   Well, sometimes I do on certain things, sometimes I don't. That's why I'm asking to refresh my memory, sir.

Q.   All right.  I'll show you her statement.

A.   You're telling me no, so I guess I can't, right.

Q.   Let's take a look at the -- can you get the Precious GPR about the bus?

         Let's take a look at her statement.  She said that the idea was that Collazo is going to get off a bus at Foster and Rockwell, right?

A.   That he's going to take a bus up there, yes.

Q.   Right.  And tell the jury why it was so important that Fulton knew where the victim was going to be getting off a bus. Why was that the key to the whole thing?

         MR. NATHAN:  Object to the form.

         THE WITNESS:  I don't understand what you're asking.

         THE COURT:  Wait, wait.

         MR. LOEVY:  He doesn't understand, so should I keep asking?

Zalatoris - direct

1386

THE COURT:  Okay.  Well, withdraw that last question.

BY MR. LOEVY:

Q.   All right.  John Fulton has no way to know where Chris Collazo is going to be on any given moment on the other side of town, right?

A.   I mean, I don't know what he knows, but as far as we knew at that time, no.

Q.   If he wanted to go get revenge for his $15 robbery, he needs to know where to find the victim, right?

A.   And talk to Precious, yes.

Q.   Yes.  So Precious tells him, the whole key is Precious says he's going to be getting off a bus at Foster and Rockwell sometime between 10:30, somewhere in there.  That's what you believed, right?

A.   Yes, that he took a bus up there.

Q.   And if there wasn't a bus, then there's no way he could have found Collazo even if he wanted to do him harm, right?

A.   Well, she directed him to -- she did direct him to Foster and Rockwell.  I mean, if they're sitting there, they're going to see him.

Q.   Yeah.  And the statement talks about a bus, the buses Chris would take, right?

        Same statement.  This is Precious' statement.  Foster bus near Foster and Lincoln, right?

A.   Okay.  There's more on here.  Hang on.

Q.   Take your time.  Tell me when you're done.

A.   Could you let me see the page before that?

Q.   Sure.  Really, sir, I'm just trying to establish that you believed he was showing up on a bus.

A.   Yeah, and that what I do remember is that it was said that he altered his bus route depending sometimes too.

Q.   And because he was worried about gangs, right?

A.   Well, he didn't want to go through the opposing gangs' territories, I guess.

Q.   So let's talk about that just for a quick second.  You were told that he was afraid to go to Foster and Rockwell because gangs could get him, right?

A.   No, that's not what we were told.  We were told that at times, he would alter his routes up there depending on the gang conflicts that were going on.

Q.   Right.  So if he was going to Foster and Rockwell, that would be a dangerous neighborhood for him; he had to alter his schedule so the gangs wouldn't get him, right?

A.   No.

Q.   That's what you just said?

A.   No, that's not what I just said.

Q.   Tell me what you just said.

A.   I just said he altered his route up there because of that, not that Foster --

Q.   Because of what?

Zalatoris - direct

1388

A.   Because of any gang conflicts between Harlem and Diversey and Foster and Rockwell --

Q.   All right.

A.   -- which is a big chunk of the city.

Q.   So if you knew as a detective that if he was going to go to Foster and Rockwell, he would take care to avoid his itinerary because there was rival gangs that could get him, why didn't you explore that angle?

A.   I don't understand what you're asking me to do here. Explore what angle?

Q.   I'll break it down.  Why didn't you treat a possibility -- if this guy is so afraid to go to Rockwell and Foster because there's rival gangs there, why didn't you say to yourself --

A.   He's not afraid to go to Rockwell and Foster.

Q.   I thought you just said he would alter his --

A.   Well, you keep switching my words around.  What I told you is, he would alter his route going up there depending on what gang conflicts might be occurring or not.

Q.   I gotcha.

A.   Okay.  So you kind of got that wrong.

Q.   I guess so.  Maybe we're just missing each other.

A.   What's that?

Q.   I guess we're missing each other because --

A.   Yeah, because you're taking something I answered and --

          MR. NATHAN:  Objection.  Argumentative.

Zalatoris - direct

1389

THE COURT: Strike that.

BY MR. LOEVY:

Q. All right. The Foster bus ends up in all the confessions, right?

A. It ends up that there's a bus on Foster.

Q. All right. And this, showing you Fulton's confession, Foster and Rockwell. He says John said, I'll be there. He's talking to Precious. He parks his car at Foster and Rockwell. Precious told John that Chris was going to be taking a bus up to Rockwell and Foster. Do you see that?

A. Right.

Q. And then it says a bus pulls up, right?

A. Right.

Q. And they notice Chris, and they grab him?

A. And then drives away, right.

Q. Yeah. But the bus pulls up, and then they grab him, right?

A. Yeah.

Q. All right. And that same thing ended up in the confession that McRay Judge took. This is Plaintiffs' Exhibit 50, Page 20. "Drive north to Rockwell and Foster and waited for victim to get off the bus," right?

A. That's what they said here, yes.

Q. And then when you look at Mitchell's, he's got the bus too, right? Bus pulls up going eastbound, victim gets off, Rockwell and Foster?

A.   That's what he said.

Q.   John said that Precious told us this is where he's going to be getting off the bugs, right?

A.   Right.

Q.   Now, at what point did you learn that there were no buses that night after 8:21 p.m.?

A.   I don't recall when I learned that, but that doesn't preclude not being a bus on Foster Avenue.

Q.   Well --

A.   Because there's buses always going up and down the major streets out of service, back and forth.  And you have one person say he saw him after the bus went by.  So it doesn't have to be he got off the bus.

          MR. LOEVY:  All right.  I'd like to move into evidence, your Honor, Plaintiffs' Exhibit 62, the bus schedule.

          THE COURT:  All right.  I think we ruled on this before, right?

          MR. LOEVY:  I think so.

          MR. NATHAN:  Subject to our objection.

          THE COURT:  Okay.

BY MR. LOEVY:

Q.   You don't dispute that the last bus was -- on Sundays was at 8:21, right?

A.   I can't see it.

Q.   All right.  That's because I messed it up.

Zalatoris - direct

1391

Sunday schedule?

A.   I can't read it.  It's all blurry.

Q.   I know.  I'm working on it, sir.

A.   All right.

Q.   Sunday schedule back at the time, 8:21 last bus at Foster and Rockwell, right -- I'm sorry, Foster and Lincoln which is a block from Rockwell, right?

A.   Foster and --

          MR. NATHAN:  Objection.  Foundation.

          THE WITNESS:  Eastbound.

          THE COURT:  Overruled.

          MR. LOEVY:  I'm going to give him a copy if that would make it easier.

          THE WITNESS:  Yeah, I mean, I can't read this.  It's going all over the place.

BY MR. LOEVY:

Q.   I guess my next question, sir, is --

A.   I definitely can't read this.

Q.   All right.  At what point did you learn that he couldn't have grabbed him getting off a bus at Foster because the buses weren't running?

A.   Well, you have people say they didn't actually see he got off the bus.  There's a bus goes by, and then he's there. Well, there's buses all the time going down these major streets.  They're out of service going to the barns, going to

get gas.  So because there's no bus running doesn't mean there's no bus driving on that street.

Q.  Well, it says, "bus pulls up going eastbound, victim gets off."  That's what --

A.  That's what one of them said.  I think he assumed he got off that bus.

Q.  All right.  But -- so if we were to go to a demonstrative here, when you walked into the room with the guys, you believed that the victim got abducted getting off the Foster bus, right?

A.  At Foster and Rockwell --

Q.  Yeah.

A.  -- we knew he either got off the bus or he was there when a bus was going by, one of the two.

Q.  So I can check that as true.  You believe that to be true, right?

A.  Not getting off.  I mean, you could put a line through that "getting off," and you could check, true, Foster and Rockwell is where it happened.

Q.  Now, when you walked into the room, wasn't Precious' story that, "I called John, John, and I said, hey, this is where Collazo is going to be.  He's going to be getting off a bus at Foster and Rockwell."

That's what you believed was true, right?

A.  Well, that's what Precious told us, but I don't believe Precious knew that it's a Sunday schedule, daily schedule, you

know, so --

Q. That's the problem, right? She didn't even know?

A. Exactly. And that's why there's buses go up and down Foster all the time.

Q. All right. But you believed, at the time you walked into the room with these guys, you believed that they abducted him off the Foster bus, right?

A. No, not off the bus. He got abducted on the street, on the corner there, Foster and Rockwell.

Q. All right. So you didn't believe that he was supposed to -- what Precious told you? Precious did tell you that, right?

A. Yeah. I don't believe she knew that there's a different schedule for days and holidays and stuff. And she said he would adjust his route, so he might not, you know, have taken a bus up there on Foster Avenue. He might have taken Western and walk two streets --

Q. It ended up in the confession, right, the Foster bus stop?

A. The Foster bus stop did, and that corner did, yes.

Q. Foster and Rockwell, right?

A. Foster and Rockwell is where he got grabbed, yes.

Q. All right. Can we admit that that is not true, that he did not get grabbed getting off the Foster and Rockwell bus after 9:00 o'clock?

A. He got grabbed at Foster and Rockwell --

Q. All right. But he didn't --

A. -- and he was not on a bus when it happened.

Q. All right. So that is false, you agree?

A. What's that?

Q. You agree that this is false? He did not get abducted --

A. I don't see what you're asking here. What's false?

Q. The fact that the victim was abducted getting off the Foster bus at the Rockwell stop, that's false, right? He was not abducted getting off a bus?

A. He was abducted after a bus went by. Okay. Whether he got off or not, I doubt if he got off because there's no bus running so, you know...

Q. All right. So it was false, right?

MR. NATHAN: Objection. Asked and answered.

MR. LOEVY: He won't answer it, your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. Again, we put down what we were told here.

BY MR. LOEVY:

Q. Okay. But it was false, right?

A. That he got off a bus?

Q. Yes.

A. I guess if you got that schedule, it must have been false, yes.

Q. All right. Let's take a look at what Precious told you --

oh, no, this is Mitchell's.  I think we established that.

All right.  Let's talk about the phone.  Precious' story was that she had been on the phone with Fulton on March 9th to set up the abduction, right?

A.  Yes.

Q.  And that's what she put in her statement, is that she called him?

A.  She didn't say she set up the abduction.  She was telling him where they were -- where he was going to be.

Q.  Where he's going to be, right?

A.  Right.  I think she assumed they were going to get the money back from him.

Q.  Or beat him up or something?

A.  Or something.

Q.  That's what her -- that's what your story was?

A.  Or something.

Q.  All right.  And but it was all about being on the phone on March 9th, right?

A.  Right -- well, some of it.

Q.  Because they -- supposedly she called them several times on the way and gave him directions to where he's going to be on the phone on March 9th, right?

A.  They were back and forth on the phones, yes.

Q.  All right.  So you believed at the time you walked into the room with Fulton and Mitchell that there were phone calls with

Griffin around March 9th, on March 9th driving to set up the abduction. You believe that to be true, right?

A. We did.

Q. Okay. I'll check that. Check means true.

And it did end up in the confessions, right?

A. It did.

Q. Now, just to be clear about that, Fulton says, March 9th, talked to Precious early afternoon. Talked to Precious two more times for directions. Precious called on March -- these all happening on March 9th, right?

A. I believe so.

Q. Looking at Mitchell's confession, "Talking to Precious o cell most of the time. Precious tells R to get off at Foster on the phone." Right?

A. Yes.

Q. That was your theory of the crime, that Precious was guiding them to where the victim was going to be on the phone on March 9th?

A. Told them how to get up there, yes.

Q. And then it shows up in Shaw's too, doesn't it? "J is on the phone with Precious, get off at Lake Shore Drive." Right?

A. Yeah.

Q. And then we had that bit we saw yesterday where Mitchell says that the recorded statement, you know, there's all these free minutes, weekends, minutes are free, so we stayed on the

phone with her the whole time, right?

A.   I -- what am I looking at right here?

Q.   This is Mitchell's recorded statement from -- with the State's Attorney.  He's saying, hey, the theory of the case was that they were on the phone with Precious while it went down, right?

A.   Is that a transcript from the video?

Q.   Yes, sir.  The theory of the case was that they, on March 9th, John Fulton and Precious were in phone contact, right?

A.   Yes.

Q.   And at the time you believed those things, you did not have access to the phone records, correct?

A.   No, and that wasn't our part of the investigation either.

Q.   I said "correct" and you said "no," so if we could just make the record clear.

A.   I didn't have -- I didn't have access to him at that time, no.

Q.   All right.  Now, it turned out that that was false, right?

A.   What was false?

Q.   Eventually, the phone records showed up in Rolston's garage, right?

A.   Rolston --

          MR. NATHAN:  Objection.  Foundation.

          THE WITNESS:  Rolston had 'em, yeah.

BY MR. LOEVY:

Q.   Do you know why they were in Rolston's garage?

A.   I don't know where they were.

Q.   All right.  Did you ever -- they were getting ready for trial.  Everybody says, where are Precious' phone records, and the police couldn't come up with them, right?

MR. NATHAN:  Objection.  Foundation.  Calls for speculation.

THE COURT:  Overruled.

BY THE WITNESS:

A.   The records are subpoenaed by the State's Attorneys, and it goes through the police department somehow, how they get them.

BY MR. LOEVY:

Q.   All right.  But do you remember there was some issue that nobody could find them, Precious' records?

A.   Again, I don't remember that.  I just know --

Q.   What do you remember about Rolston's garage?

A.   Well, I was never in his garage.

Q.   No, what do you remember about the records showing up in Rolston's garage?

A.   I --

MR. NATHAN:  Objection.  Foundation.

MR. LOEVY:  He just said it three minutes ago.

THE COURT:  Overruled.

THE WITNESS:  I just said --

THE COURT:  It's cross-examination.

BY MR. LOEVY:

Q.  Didn't you say the phone records showed up in Rolston's garage?

A.  No, I didn't say that.

Q.  You didn't say that to the jury a minute ago?

A.  No, you said that.

Q.  And I thought it came, you said that?

A.  No, you said it.

Q.  I guess we got a record, and we'll all just have to go off our memory.

A.  Take a look, yeah.

        MR. NATHAN:  Objection.  Argumentative.

BY MR. LOEVY:

Q.  Do you remember, do you remember there being an issue where the phone records showed up in Rolston's garage?

A.  Again, I don't remember about Rolston's garage.

Q.  Okay.  But when the records showed up, you don't dispute, do you, that -- first of all, Fulton and Precious had the ability to call each other, and they had called each other, right?

A.  Yes.

Q.  But they didn't call each other on March 9th, did they?

        MR. NATHAN:  Objection.  Foundation.  Calls for speculation.

        MR. LOEVY:  If he knows.

THE COURT: If he has reason to know.

THE WITNESS: Yeah, I never looked at the phone records.

BY MR. LOEVY:

Q. All right. So you never knew that there was no match between Fulton and Precious' phone on March 9th?

MR. NATHAN: Object to the form.

BY MR. LOEVY:

Q. You're just hearing that for the first time today?

MR. NATHAN: Object to the form of the question. It's the attorney testifying, argumentative.

MR. LOEVY: Can I ask it again, your Honor, a different way?

THE COURT: Ask it a different way.

BY MR. LOEVY:

Q. You don't dispute, do you, that there are no calls between Fulton and Precious Griffin on March 9th, 2003? You don't dispute that?

MR. NATHAN: Objection. Calls for speculation.

THE COURT: Overruled.

BY THE WITNESS:

A. I don't look at the phone records.

BY MR. LOEVY:

Q. All right. It never came up in your investigation that, hey, we got this whole theory of the case that they're on the

phone and, you know what, the phone records don't show it. Nobody brought that to your attention? It wasn't discussed?

MR. NATHAN: Objection. Foundation. Argumentative.

MR. LOEVY: So it's cross-examination, if it ever came up.

MR. NATHAN: He answered that.

THE COURT: It's argumentative.

BY MR. LOEVY:

Q. All right. Did you discuss with any of the detectives the fact that the young men had confessed to being on the phone with Precious and the phone records didn't corroborate it? Was there any discussion along those lines?

A. No, that I can recall.

Q. All right. Do you agree or dispute that Precious was not on the phone with the plaintiff setting up the abduction on March 9th? There's no phone record that proves that, right?

MR. NATHAN: Objection. Asked and answered. Calls for speculation. Argumentative.

BY MR. LOEVY:

Q. Do you dispute that?

THE COURT: Overruled.

THE WITNESS: Do I dispute what?

BY MR. LOEVY:

Q. That there is no existing phone record that anybody's ever been able to find that shows Precious and Fulton talked to each

other on March 9th.  That's a fact, right?

A.  I have never seen the phone records.

Q.  Okay.  You could have asked John Fulton to look at his call logs, right?

A.  I mean, I don't know.

Q.  I mean, you could have --

A.  I don't know.

Q.  -- right?

A.  I don't know.

Q.  He was cooperative that night, right?

A.  Again, I don't know, sir.

Q.  All right.  The question was, Fulton was cooperative that night, right?

A.  Yes.

Q.  He consented to let you search his house and his car, right?

A.  Well, that wasn't me, but he did consent to somebody doing it, yes.

Q.  All right.  So if you had believed that this would corroborate his phone, why didn't you say, "Let's take a look at your log"?

A.  Again, I don't know.

Q.  All right.  Let's talk --

A.  I can't recall why or why not.

Q.  Let's talk, take a conversation about the murder weapon.

Zalatoris - direct

1403

Some of the photos of the victim's face look like he had been beaten very badly, right?

A.   I -- where is that written, sir?

Q.   In the photographs, didn't it look like the victim had been beaten badly?

A.   Again, I saw his face at the morgue.  Okay.

Q.   So it looked like --

A.   And yeah, there were some marks but...

Q.   It looked like he had been beaten, right?

A.   There were some marks, yeah.

Q.   All right.  What -- tell the jury what object you thought had caused the beating.

A.   Some sort of blunt force instrument.

Q.   Like a bat, right, sir?

A.   Like a bat, a pipe, a hammer, something like that.

Q.   That was your belief at the time?

A.   That it was a blunt force trauma, yeah.

Q.   All right.  And, in fact, one of the officers told you that he thought the murder weapon was a bat, correct?

A.   One of the officers told me?

Q.   Yeah.

A.   Which officer?

Q.   Didn't you say that you thought the injuries had been caused by a bat because you were talking to them and you had one of the other guys tell you it was a bat?

Zalatoris - direct

1404

A.   I don't know whose conversation you're talking about.

Q.   All right.  Did you expect that the medical examiner -- well, actually, if we do the confession, the scenarios here, you believed at the time that the victim had been beaten in the head with some kind of blunt object like a bat.  That was your belief, right?

A.   Like a bat or a pipe, yes.

Q.   Like a bat or pipe.  All right.  So I can check that as true, right?

A.   Well, that's what we believed.

Q.   Yes.  That's what it says, "believed."  All right.  It ended up in the confession with a bat, right?

A.   Yeah.

Q.   When did you find out that the coroner said it wasn't a bat?

        MR. NATHAN:  Objection.  Foundation.

BY MR. LOEVY:

Q.   Did you find out?

        MR. NATHAN:  It's still objection, foundation.  It's assuming something that's not in evidence.

        MR. LOEVY:  Did you -- should I ask a different question?

        THE COURT:  Yes.

BY MR. LOEVY:

Q.   All right.  Do you know who the coroner is, Dr. Kalelkar?

Zalatoris - direct

1405

A.   I remember the name.

Q.   The coroners would frequently speak with the police in these investigations, right?

A.   What they do is they do the protocol, and you get that several months later.

Q.   But you could call them, right?

A.   I guess you could call them and they could tell you if they did the post.

Q.   Yeah.

A.   But that's not immediately, so it would be a day or two later.

Q.   Yeah, not immediately.  At the time you did the interrogation, you thought it was a bat, right?

A.   Right.

Q.   But then later in a murder investigation, you get on the phone just like on TV and you talk to the coroner?

          MR. NATHAN:  Objection to the form of the question.

          MR. LOEVY:  I'll leave out the, "just like on TV."

BY MR. LOEVY:

Q.   As part of a murder investigation, you follow up with the coroner and you say, "Hey, can you give me more information how they died?"  That's protocol, right?

A.   Again, this is Rolston's case, so Rolston would have got the protocol.  Rolston might have made calls.  I don't know.

Q.   Did Rolston tell you that the coroner said it wasn't a bat?

MR. NATHAN: Objection to the form of the question. It assumes facts not in evidence. There's no evidence about what the coroner said or didn't say.

BY MR. LOEVY:

Q. Did anybody tell you --

THE COURT: Rephrase the question.

BY MR. LOEVY:

Q. Did anybody tell you that, "You know what, the coroner doesn't think it was caused by a bat"?

MR. NATHAN: It's the same objection. He's assuming facts that are not in evidence. There's no evidence of that.

THE COURT: He'll be able to do direct. If this is incorrect, you can bring out your evidence to the contrary.

BY MR. LOEVY:

Q. Anybody ever bring that to your attention?

A. What's the question again?

Q. Anybody ever bring to your attention that the medical examiner believed it wasn't a bat?

A. I don't remember that.

Q. But at the time of the interrogation, you did think it was a bat?

A. I thought it was blunt force trauma. It was from something, yeah.

Q. And, of course, the bat ended up in all the confessions, right?

Zalatoris - direct

1407

A.   I believe it ended up in -- you know what, I'd have to look at the confessions to see.

Q.   All right.  Let's take a look.  This is Fulton's to the State's Attorney?

A.   Well, I'd like to see the GPRs.  I'll see what was told to us.

Q.   All right.  We've actually gone through those a million times.

A.   Well, let's do it then --

Q.   All right.

A.   -- if you're asking me a question about it.

Q.   All right.  We'll find the bat.  This is John's GPR.

A.   Okay.

Q.   It says, "Riff pulled out," and then there's some space here.  And then it says, "pole or" -- can you guys get me the other GPRs too, okay -- what appeared to be a little metal or wooden baseball bat like you get at a game.

It looked like John confessed to a bat?

A.   That's what it says, yes.

Q.   And your memory --

A.   Let's see Mitchell's.

Q.   Showing you Mitchell's now, "J gets an aluminum baseball bat," right?

A.   Yes.

Q.   And he starts hitting him a bunch of times on the ground,

right?

A.   Right.   He actually gave a description of the thing too.

Q.   All right.   And then showing you -- do you believe Shaw also tracked a bat, or you don't remember?

A.   I don't remember.   I'd have to take a look at it.

Q.   All right.   Let's see if -- let's see.

A.   Let's see.

Q.   Because that would be weird if they all tracked something that you believed was true and turned out to be false, right?

        MR. NATHAN:   Object to the form of the question. Argumentative.

        THE COURT:   Sustained.

BY MR. LOEVY:

Q.   All right.   Finding the bat, punches, comes out with a bat. There it is.   "J goes to the trunk, comes out with a bat."   So that fact ended up --

A.   Well, this one says bat, and I think it says pipe too.

Q.   Well, that's interesting.   When you start a point in your notes, you make a dash, right?   That's how you do it, right? You go dash and then --

A.   That way I know that that's one thing on each line.

Q.   You're allowed to say yes, though.   When you start a thought --

        MR. NATHAN:   Objection.   Argumentative.

BY MR. LOEVY:

Zalatoris - direct

1409

Q.  -- you make a line that says dash, right, and then you make a thought?

THE COURT:  Overruled.

BY THE WITNESS:

A.  The thought, no.  That's when I record what they're saying.

BY MR. LOEVY:

Q.  All right.  So each thought, you make a dash and you start a new thought, right?

A.  I'm not doing thoughts.  I'm doing what they're telling me.

Q.  All right.  Here, this is the only place where you start a new thought still on the right side of the line, right?

A.  No, I didn't do that.

Q.  Well, it sure looks like this got added later, doesn't it?

MR. NATHAN:  Objection.  Argumentative.

THE WITNESS:  It was a statement.

BY MR. LOEVY:

Q.  Doesn't it appear from this piece of paper --

A.  There's a line in front of it and a line in back of it.

Q.  Yeah.  Doesn't it look like that -- actually, you said "comes out with a bat, J hits victim," and then later you went back and added, "with a pipe"?

A.  No.  There's a line before and a line after it.

Q.  All right.  But is it possible what happened was that he was telling you the story, you're going dash, dash down the line and then later you doubled back but you couldn't insert it

here, so you put it on the right.  Is that what happened?

A.   Absolutely not.

Q.   All right.  Anyways, there was other problems with the bat theory, wasn't there?

A.   What do you mean by "problems"?

Q.   Well, when the ME --

MR. LOEVY:  And I believe these are in evidence.  This is Defendants' Trial Exhibit 121, Pages 3 and 05008, the photos.  We move these into evidence.

MR. NATHAN:  I'm just -- I don't think it's appropriate with this particular witness but.

MR. LOEVY:  These are photos of the victim, your Honor.  There's no objection to these photos.

THE COURT:  Okay.

MR. LOEVY:  And, in fact, I'm sure they're in evidence, the photos.  Well, we'll move them into evidence.

THE COURT:  All right.

MR. LOEVY:  It's the defendants' exhibit.

THE COURT:  If it's defendants' exhibit, then I'll receive it in evidence without objection.

   (Defendants' Exhibit No. 121 was received in evidence.)

MR. NATHAN:  Marked for identification, your Honor, just an objection, foundation.

THE COURT:  All right.

MR. LOEVY:  Are the crime scene photos --

Zalatoris - direct

1411

THE COURT: Haven't these photos already been shown?

MR. LOEVY: I think so.

MR. NATHAN: What exhibit is that?

MR. LOEVY: May I proceed, your Honor?

THE COURT: Just a moment.

Yes.

MR. LOEVY: Thank you.

BY MR. LOEVY:

Q. All right. It looks like they shaved his head at the coroner's office, right?

MR. NATHAN: Objection. Foundation. Calls for speculation.

BY MR. LOEVY:

Q. Does your observation look like they shaved his head?

A. I don't even know what I'm looking at here, sir. I don't recall ever seeing this photo.

Q. All right. You didn't know it at the time of the interrogation, right, but there was actually a roundish wound that looked like a puncture wound underneath his hair. You didn't know that, right?

MR. NATHAN: Objection to the attorney testifying, form.

BY MR. LOEVY:

Q. All right. Let's break that down. There does appear to be a roundish wound on the man's head once you shaved away his

hair, would you agree?

A.   There's some kind of wound it looks like there, yeah.

Q.   And in the reports it was described as a puncture wound that they first thought it was a gunshot and then it turned out it was just a puncture.  Do you remember that?

MR. NATHAN:  Objection.  Calls for speculation. Attorney is speculating.  Hearsay.  It's totally an inappropriate question.

THE COURT:  Is the medical examiner's report in evidence?

MR. LOEVY:  We move it into evidence, your Honor, if it's not.

MR. NATHAN:  No, it's not in evidence.

MR. LOEVY:  Well, we move it into evidence.

MR. NATHAN:  The appropriate place is for the medical examiner who may be a witness here to testify about what this is, not this witness.

MR. LOEVY:  I'll -- I'm in the interest of time going to move forward if that's okay, your Honor.

THE COURT:  Okay.

BY MR. LOEVY:

Q.   You didn't know at the time that this guy had unexplained puncture wounds in the back of his head, did you?

MR. NATHAN:  Objection.  Object to the form of the question.

BY MR. LOEVY:

Q. You didn't know that?

THE COURT: Overruled.

THE WITNESS: Was that a question again?

BY MR. LOEVY:

Q. You didn't know at the time you took the bat confession that the victim underneath his hair had round puncture wounds that looked like they had been caused by a sharp, like a nail-like object. You didn't know that? That's the only question.

MR. NATHAN: Object to the form of the question. Assumes facts not in evidence.

MR. LOEVY: We'll prove the facts, your Honor.

THE COURT: Overruled.

BY THE WITNESS:

A. I didn't know what wounds he had.

BY MR. LOEVY:

Q. All right. And obviously, none of the three boys confessed to doing anything that would have caused a puncture wound -- I'm sorry.

None of the three young men did anything that would have caused the -- confessed to doing anything that would have caused a puncture wound on his head, right?

MR. NATHAN: Objection. Motion in limine to the term.

THE COURT: Sustained.

Zalatoris - direct

1414

BY MR. LOEVY:

Q. To the term. None of the young men said anything in their confession about having caused any kind of puncture wound in the guy's head, right?

A. I didn't know anything about the wounds.

Q. All right. And it didn't end up in the confession, right?

A. I didn't know anything about the wounds, sir.

Q. All right. Let's talk about the duct tape. You did know about the duct tape, right?

A. I knew he was duct taped. That's what I heard, yeah.

Q. And you seized duct tape from John's home, right?

A. No, I didn't.

Q. Somebody did?

A. Somebody did.

Q. What was the significance to your mind of the duct tape in John's home?

A. Well, again, I didn't seize it so...

Q. All right. What was the significance to the investigation that there was duct tape in John's home?

A. Again, I didn't seize it. I didn't go there.

Q. I think it's clear you didn't seize it. Now I'm asking you a different question. Okay?

A. Right.

Q. What was the significance to the investigation that there was duct tape from John's home?

A.   Well, I'm thinking it was duct tape.  Duct tape was involved.

Q.   And the theory of the case from the police at the time was that the duct tape you found in John's home was the same duct tape that was used to tape up the victim.  That was the theory at the time, right?

        MR. NATHAN:  Object to the form of the question.

BY MR. LOEVY:

Q.   Was that the theory at the time, sir?

        THE COURT:  Okay.  Reask the question.

BY MR. LOEVY:

Q.   That was the theory that the prosecutor put on evidence against Fulton.  They said victim's got gray duct tape, we found gray duct tape in his home.  You believe that that was significant to the investigation, right?  Yes or no.

A.   Yeah, it would be to check, to check that out.

Q.   All right.  And when it got checked, it turned out it didn't match, right?

A.   The duct tape came from a different roll, yeah.

Q.   But you didn't find that out until years later, right?

A.   Oh, I don't know when we found that out.

Q.   It was not until the post-conviction proceedings many years after they had been convicted, right?

        MR. NATHAN:  Objection.  Foundation.  He just said he doesn't know.

MR. LOEVY:  It's a question.

MR. NATHAN:  So now he's testifying about it.

THE COURT:  He said he didn't know.

BY MR. LOEVY:

Q.  At the time you were taking this confession, you thought it was a match, right?

A.  I didn't know.

Q.  All right.  And but it is false that they matched, right, that the duct tape matched?  You believed at the time that the victim was bound in duct tape that matched Fulton's tape, right?  You believed that?

MR. NATHAN:  Objection.  Asked and answered. Mischaracterizes the testimony.

BY MR. LOEVY:

Q.  Can I check it yes or no?  I don't know the answer.

THE COURT:  Wait just a minute.

MR. NATHAN:  What's the question?

BY MR. LOEVY:

Q.  Did you believe this?

MR. NATHAN:  Objection.  Form.  Vague.

THE COURT:  Okay.

BY MR. LOEVY:

Q.  When you went --

THE COURT:  Ask him exactly what's on this form.

BY MR. LOEVY:

Zalatoris - direct

1417

Q.   Okay.  Did you believe to be true at the time you interrogated Fulton that the victim was gagged and bound with duct tape that matched Fulton's tape?

A.   I didn't know where that duct tape came from.

Q.   Did you believe --

A.   I didn't know where that duct tape came from.

Q.   So you didn't believe it?

A.   I didn't know.

Q.   Okay.  Let's talk about the red hoodie.  Can you explain to the jury the significance of the red hoodie to the case?

A.   I don't know.  I don't recall what the significance would be.

Q.   Because the red hoodie is not mentioned anywhere in any reports, right?

A.   I don't recall what the significance would be of that.

Q.   Okay.  My question was, the red hoodie is not mentioned in any reports or notes or memos, right?

A.   I don't know.

Q.   You don't -- you haven't seen it, right?

A.   I don't -- I don't even know what red hoodie we're talking about.

Q.   Remember when McRay Judge was here last week, and he started saying, "I asked Fulton, and he told me a red hoodie and, what do you know, the perpetrator had a red hoodie."  Were you here for that testimony?

Zalatoris - direct

1418

A.   I don't recall about red hoodies.

Q.   Were you here when McRay Judge testified about it?

A.   Yes, I was here, but I don't recall that.

Q.   All right.  That was never part of the case?

A.   I don't -- I don't remember anything about a red hoodie.

Q.   All right.  So if he did or didn't have a red hoodie, it wouldn't make him more or less guilty; it had nothing to do with it?

        MR. NATHAN:  Object to the form of the question.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Did the police find a red hoodie at his home?

A.   I don't know.

Q.   They searched, right?

A.   Again, I wasn't there.

Q.   All right.  There was an eyewitness at the scene, right, who saw -- not eyewitness, somebody who saw the fire and saw people running away, right?

A.   Oh, in the alley?

Q.   Yeah.

A.   Again, yeah, that was Rolston's scene, so Rolston would know all that.

        MR. LOEVY:  Can we get the stipulation?  Do we have a copy of the stipulation?

        Your Honor, there's been a stipulation which we'd like

to admit.  And maybe your Honor could explain what a stipulation is for the jury.

THE COURT:  A stipulation is an agreement by both sides that a particular fact is true, and you accept that as true.

MR. NATHAN:  We think that the appropriate thing to do would be to conclude the cross-examination and the testimony and then introduce evidence of the stipulation.

MR. LOEVY:  We would like to put it in through the cross-examination as part of the examination.

THE COURT:  There's no rule to that effect, so go ahead.

MR. LOEVY:  All right.

MR. NATHAN:  Just for the record, we object to this procedure.

THE COURT:  All right.

MR. LOEVY:  All right.  The first stipulated fact is that at approximately 3:06 a.m. on March 10th, 2003, a man named Sid Taylor called 911 to report a fire in the alley that ran behind his home.  Plaintiffs' Exhibit 127 is a recording of Mr. Taylor's 911 call.  Mr. Taylor lived on the second floor at 5218 South Peoria Street, Chicago.

And if we could then play Exhibit 127, please.  And we need the audio.

MR. NATHAN:  One second.

Zalatoris - direct

1420

(Counsel conferring off the record.)

(Audio played in open court.)

MR. LOEVY:  This is the 911 call that the guy called in at approximately 3:06 a.m. on March 10th.

Okay.  Try it now, Liz.

(Audio played in open court.)

BY MR. LOEVY:

Q.   All right.  Sir, before I read the rest of the stipulation, were you aware of the 911 call back at the investigation?

A.   I mean, I know somebody called 911.  I never heard this.

MR. NATHAN:  Objection.

MR. LOEVY:  All right.  If we --

MR. NATHAN:  We made a stipulation.  It's only stipulated if we do the full stipulation.  Otherwise, it's not a stipulation.

THE COURT:  I thought you said you were going to read the full stipulation.

MR. LOEVY:  It's got it on the screen, if we could put it back.  I just asked the question about Paragraph 1.

MR. NATHAN:  Right, but we should introduce the full stipulation.  That's what we did.  And we did stipulate to the full stipulation.

MR. LOEVY:  Okay.  But I --

THE COURT:  If you wish, though, you can bring the rest of it in at --

MR. NATHAN:  Well, no.

MR. LOEVY:  I'm bringing it in now.  That's what I'm doing.  I asked the question --

MR. NATHAN:  Your Honor, I'd like to just make my objection.  My objection is just if we're doing the stipulation, it's only stipulated if it's read in its entirety.

MR. LOEVY:  I am going to read the entirety, your Honor.

THE COURT:  All right.  Your objection is being accommodated.

MR. LOEVY:  Thank you.

Officer Matthew Schmitz of the police department was assigned to Beat 923 on March 10th, 2003, and was one of the officers who responded to the scene.  Schmitz observed Mr. Taylor watching the activity in the alley from his back porch.  Schmitz then interviewed Taylor for a few minutes.

Officer Schmitz testified that Taylor told Officer Schmitz that he had called 911 about the fire and also testified that Mr. Taylor gave him a description of two individuals he saw by the fire.  Sid Taylor is the only witness Schmitz observed or interviewed at the crime scene.  That is also stipulated.

Now, Exhibit 114 is a recording of the police radio communication generated by Schmitz or his partner at approximately 4:07 a.m.  And can we play that, please?

(Audio played in open court.)

BY MR. LOEVY:

Q.   All right.  Were you aware of that radio traffic back at the investigation?

A.   No.

MR. LOEVY:  After returning to the police station -- if we could have the ELMO back.

After returning to the police station, Schmitz wrote a report, signed a general offense case report regarding his response to the alley fire including his interview with Mr. Taylor.  Plaintiffs' Exhibit 6 is a copy of this report. Taylor and Schmitz testified about the above events at John Fulton and Anthony Mitchell's criminal trial.

And thus completes the stipulation.

BY MR. LOEVY:

Q.   So I'm going to show you now Plaintiffs' Exhibit 6.  This is the scene report.  You're familiar with this kind of police report, right?

A.   That's not a scene report.

Q.   All right.  Whatever it is, it's a case report?

A.   Well, it's a general offense case report.  It's done by a beat car.

Q.   All right.  And this is the report memorializing the interview of Sid Taylor, right?

A.   Again, I didn't write this report, so I've never seen this

report.

Q. All right. He's got two black males running away, not three, right?

A. I mean, that's what he wrote in there.

Q. And he says one was wearing a red jacket, one was wearing a black jacket, right?

A. Again, I didn't write this report.

Q. Right.

A. You're asking me to read somebody else's report here.

Q. But they never found a red jacket in Mr. Fulton or Mr. Mitchell or Mr. Shaw's house, right?

A. I didn't know anything about a red jacket.

Q. All right. So there was no, nothing about a red jacket that tied him to any crime?

A. Again, I didn't know anything about a red jacket.

Q. Okay. So we can stop talking about red, red?

A. Well, you could be asking about something I don't know anything about here.

Q. Fine. Do we agree red has nothing to do with this case? The color red, we can forget?

MR. NATHAN: Object to the form of the question.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. The gas can, you knew at the time of the investigation that there was an odor of gasoline at the scene,

right?

A.   That's what Rolston had put in his scene report.

Q.   All right.  So the police's theory was that the victim had been lit on fire, right?

A.   Yes.

Q.   And the confession incorporated a scenario where the young men brought a gas can to the scene where they burned the body, right?

A.   Yes.

Q.   And then lo and behold, you found a gas can, right?

        MR. NATHAN:  Object to the form of the question.

        THE COURT:  Sustained.

        MR. LOEVY:  Showing you Defendants' Exhibit 124, Page 3 and Page 1, permission to publish.

        MR. NATHAN:  It's in evidence.

BY MR. LOEVY:

Q.   All right.  This is a gas can that -- in John Fulton's garage, right?

A.   That's in his grandfather's garage.

Q.   And his grandfather was where he had lived before he moved out with Yolanda, right?

A.   I don't know if he lived there or not.

Q.   All right.  Now, it's not uncommon to have a gas can in a garage, right?

A.   I guess not if you have gasoline-operated things.

Zalatoris - direct

1425

Q.   Lawnmower.  Back in the early 2000s, it was before electric lawnmowers, right?

A.   No.

Q.   All right.  Well, there was a lot of gas cans in a lot of garages, right?

MR. NATHAN:  Object to the form.

THE COURT:  It's a rhetorical question, I suppose.

BY MR. LOEVY:

Q.   All right.  I'm going to show you -- did you claim that him having a gas can was significant to the investigation?

A.   Did I claim -- excuse me.  I don't understand what you're asking.

Q.   I mean, I have a gas can in my garage.  That doesn't mean you're guilty, right?

A.   Having a gas can?

Q.   Yeah.

A.   No.

Q.   All right.  Was there something about this gas can that you thought made him guilty?

A.   Well, a gas can was used to douse the box.  We have at least -- I believe it's Mitchell talking about John buying a gas can at a gas station.  And when John tells us where this gas can is -- I mean, otherwise we'd have no idea where the gas can would be.

We go there, and his grandfather lets us in the garage

Zalatoris - direct

1426

and tells us he's never seen this gas can before.

Q. So let's break that down. The first thing is Mitchell says, "We went and bought a gas can"?

A. John went in and got a gas can when they were in the gas station.

Q. And John drove you around, didn't mention any gas station, right?

A. No, he didn't.

Q. So that didn't match at all?

A. Well, each guy is trying to minimize their part in it.

Q. I see. And then the second thing you said is, "John said I've got a gas can in my garage," and lo -- and you found a gas can in his garage?

A. Not lo and behold.

Q. I mean, he said -- did you say to him, "Hey, John" -- during that four days, somewhere in there did you say, "John, do you got a gas can in your garage," and he said --

MR. NATHAN: Object to the form.

BY MR. LOEVY:

Q. -- yes. Did that ever happen?

MR. NATHAN: Object to the form of the question with the windup.

THE COURT: Hold on a second. Just stick to the question.

BY MR. LOEVY:

Q.   Did you at any point say to John, "John, do you got a gas can," and he said, "Yeah, in my grandfather's garage"?  Did that happen?

A.   We might have asked him where the gas can was, and he told us his grandfather's garage.  And, in fact, he even said he used the remote control from the garage door opener to put it in there.

Q.   All right.  So there's two things, though, and I don't think you said the same thing I said.  Either you said to him, "Hey, John, do you got a gas can," and he said, "Yeah, in my grandfather's garage;" or you said to him, "John, where's the gas can that you used to burn up the body," and he said, "It's in my grandfather's garage," isn't it true he said the first thing?

A.   It's not true he said the first thing.

Q.   All right.  You started -- the third thing you mentioned is that the grandfather tried to say it wasn't his gas can?

A.   He did say it's not his gas can.

Q.   You've got notes of that conversation, right?

A.   I don't believe we do, but he did say it.  It's documented, I believe, in the case report.

Q.   This is Page 36 of Plaintiffs' Exhibit 11.

A.   Can I see the supplemental closing, please?

Q.   We'll get there, sir, but let's start with the notes.  Okay.  This, tell the jury what we're looking at on the screen

Zalatoris - direct

1428

here.

A.   Looking at a GPR, general progress report.

Q.   And what is it reporting?

A.   What is it?  It's a general progress report.

Q.   Okay.  It's reporting an interview with Lucas, Adolphus Lucas, his grandfather, right?

A.   It's telling what we did there, yes.

Q.   Yeah, grandfather of Fulton, right?

A.   What's that?

Q.   It says, it's identifying him.  It's his name, his age. It's your notes from your interview with John's grandfather, right?

A.   That's -- that's the notes of what we did in his house, yes.

Q.   It says you opened the garage?

A.   Right.

Q.   And you took all these notes, right?

A.   Well, my partner did, but yeah.

Q.   All right.  It doesn't say in his notes, "Oh, we talked to the grandfather, and he said, 'I've never seen that gas can'"? It's not in the notes?  Can we just --

A.   It's not the notes.  That's a report that you're looking at here.

Q.   We're going to -- instead of arguing with each other, we'll take it in two parts.  It's not in the notes.  That's true,

Zalatoris - direct

1429

right?

A.   That is an official Chicago police report you're looking at, sir.  It's not notes.

Q.   All right.  This was taken at the scene, right?

A.   That was taken at that garage.

Q.   All right.  In the notes that were taken at the garage, there's no reference to John's grandfather saying, "I don't recognize that gas can."  Do we agree?

A.   It is documented, though.

Q.   Okay.  But do we agree it's not in the notes?

A.   We're looking at it right here, sir, aren't we?

Q.   What you're saying is, when you later wrote up the police report, you added a fact that John's grandfather said, "I don't recognize that."  That got added when you wrote the report, right?

        MR. NATHAN:  Object to the form of the question.  Argumentative.

        THE COURT:  Overruled.

BY THE WITNESS:

A.   It wasn't added.  I didn't -- in fact, we didn't type the report so, you know, Rolston was apprised of it one way or the other.

BY MR. LOEVY:

Q.   All right.  Now, you have no proof that John's grandfather said, "I've not seen the garage," right?

MR. NATHAN: Objection. Burden shifting.

BY MR. LOEVY:

Q. In other words, you could have taken a statement from his grandfather, "I've never seen that gas can," had him sign it. That would be proof, right?

MR. NATHAN: Objection. Burden shifting.

MR. LOEVY: No.

THE COURT: Overruled.

BY MR. LOEVY:

Q. You could have taken a statement, "I've never seen that gas can" and had him sign it. That would have been proof, correct?

A. I mean, we recovered a gas can and we -- I mean, we had Bomb and Arson recover the gas can. He let us in the garage. He saw the can. We saw the can. And he told us he never saw it before.

Q. Returning to my question because we've got to keep it going forward --

A. Well, I am trying to do that.

Q. So you're saying you remember 22 years later that he made this statement to you. And that's hearsay, right? That's you claiming he made the statement, right?

MR. NATHAN: Object to the characterization, form.

THE COURT: Sustained.

BY MR. LOEVY:

Q. But you have no -- he didn't sign anything, you have no way

to prove it, right?

     MR. NATHAN:  Objection.  Form.  Burden shifting.
Argumentative.

     MR. LOEVY:  I'll move on, your Honor.

BY MR. LOEVY:

Q.  All right.  The gas can did not -- the theory was that John had, when he was driving around, he went and bought it, right?

A.  Yes.

Q.  The story was that, "What are we going to do with this body, let's go buy some gas," and they went -- where was the gas station that supposedly they bought it?

A.  Foster and Lincoln.

Q.  And you went to Foster and Wentworth, right?  You went there?

A.  No, we didn't.

Q.  Lincoln.  Sorry.

A.  There's no such street.

Q.  Got it.  Sorry.  Although there might be but --

A.  There's no Foster and Wentworth.

Q.  All right.  You went to Foster and Lincoln, and you went to the gas station, right?

A.  Mitchell directed us to that gas station, yes.

Q.  And you found there's some gas cans there, right?

A.  There are.

Q.  Now, gas cans, a lot of gas cans look alike?  They're red,

right?

A.   They're all red.

Q.   And they're all like roughly the same size, right?

A.   Not really.  There's two gallon, four gallon, five gallon, ten gallons.  I mean, there's a lot of different sizes.

Q.   All right.  Showing you plaintiffs' demonstrative that was shown during opening, there's a lot of different styles of gas cans, would you agree?

A.   There are.

Q.   All right.  Now, when you got to Foster and Lincoln, it turned out that the gas cans that were being sold at gas -- at the gas station didn't match the gas can in Fulton's garage; isn't that true?

A.   No, that's not.

Q.   Isn't it true it resembled the gas can but it was a different manufacturer, a different size, and a different type?

A.   Again, we couldn't find that out because there was no SKU numbers for us to check.

Q.   Well, let --

A.   They looked the same, yes.

Q.   No, they didn't look the same.  They resembled each other, right?

A.   Well, they looked like the same kind of gas can, yes.

Q.   Let's see how it got reported.

A.   Are you asking me about something that Rolston typed?

Zalatoris - direct

1433

Q. Yeah. I'm showing you the closing report, the ten-page closing report. R/Ds, that's reporting detectives, found a new -- by the way, who found the gas can in the rear of the garage?

A. Well, myself, Breen. And we had a detective from Bomb and Arson recover it.

Q. All right. So you are the reporting detectives. Reporting detectives found a new plastic gas container in the rear of the garage of the west wall.

MR. NATHAN: Object to the first part of that question about, "you are the reporting detective." It's argumentative.

MR. LOEVY: Let's break it down.

MR. NATHAN: It mischaracterizes his testimony.

THE COURT: You're right. Go on.

BY MR. LOEVY:

Q. R/Ds means reporting detectives, right?

A. It would encompass all of us, yes.

Q. All right. Well, in this sentence, "R/Ds found a new red plastic gas container in the rear of the garage on the west wall. This container resembled the same type as those were sold in the gas station."

Do you see that?

A. I didn't type that.

Q. All right. But that's what it says, right?

A. That's what somebody typed, not us.

Zalatoris - direct

1434

Q.   And you guys had a camera, right, because you took a picture?

A.   No, we didn't have a camera.

Q.   Well, then how did you take a picture of the gas can?

A.   I believe Bomb and Arson did that.

Q.   And if you were able to take a picture of the one gas can, why didn't you take a picture of the other gas can?

A.   What other gas can?

Q.   The gas can at Foster at Lincoln in the gas station that resembled that gas can.

A.   We didn't have a camera.

Q.   Did you ask the gas station attendant, "Hey, we need to see the records of who bought a gas can on Saturday -- on Sunday night, March 10th"?

A.   I did ask him about that.

Q.   Did you write down that you asked him that?

A.   No.

Q.   So let's go off memory now.

A.   Okay.

Q.   So when you said, "Hey, we got to prove that some kid -- some people came into your gas station, bought $4 worth of gas and a gas can, do you guys have receipts?"  Did you ask him that question?

A.   No.  Do you want me to tell you what I asked him?

Q.   I'm going to ask you, did you ask him --

Zalatoris - direct

1435

A.   Oh, okay.

Q.   -- that question?

         Did you say, "We're looking to know if somebody bought $4 of gas and a gas can on Sunday night.  Do you have receipts?"  Did you ask him if they keep receipts at this gas station?

A.   Receipts for what now?

Q.   Gas stations have to pay taxes, right?

A.   I don't own a gas station.  I imagine they do.

Q.   Gas stations must keep track of how much gas is sold and when it's sold, right?

A.   And that's all done on computers, I guess.  I mean, I don't know.

Q.   Sure.  Even in 2003 they had computers, right?

A.   I mean, I didn't ask him that, though.

Q.   All right.  You weren't -- you didn't want to see if you could corroborate that John bought a gas can?

A.   I asked him about the gas cans, yes.

Q.   All right.  Now, since you've never -- what you're about to say, you've never said before, right?

         MR. NATHAN:  Objection.

         MR. LOEVY:  I don't know what the answer is going to be because he's never said --

         MR. NATHAN:  He's entitled to ask.

         THE WITNESS:  You asked me from memory what I did, and

I'm telling you what I did.

BY MR. LOEVY:

Q.   All right.   Let's hear it.   What did you ask?

A.   Okay.   Went in there, asked him -- I found the gas cans. We looked at them.   We asked him -- there was no SKU numbers on the gas can, first off, so there's no way to tell if it's sold or not.   Asked him, "Do you keep track of the stuff you sell with these gas cans?"

He goes, "No."

Asked him if he had video.   "No."

I would love to get your client on video buying a gas can there at that time, but it was impossible.

Q.   There's no notes on anything you just said about the SKUs and stuff?

A.   I just told you.   You asked me, and I answered it.

Q.   Why didn't you write down --

A.   I don't remember --

Q.   -- that this gas can that they had on the shelf, it resembled the gas can but we checked the SKU and it was the manufacturer, you couldn't write any of that down?

MR. NATHAN:   Objection.   Argumentative.   Asked and answered.

MR. LOEVY:   All right.   Your Honor, this might be a good place for lunch then.

THE COURT:   All right.   We'll resume in 45 minutes.

Thank you all for your attention.

Oh, before you leave, I have not reminded you, but I hope you remember what I said at the beginning that you should not talk with each other about the case or anyone else until all of the evidence is in.  Got it?

Okay.  Very good.

(Jury out at 12:33 p.m.)

THE COURT:  Officer, you may step down.

(Recess from 12:36 p.m. to 1:15 p.m.)

1438

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JOHN FULTON,                        )  Case No. 20 C 3118
                                    )
              Plaintiff,            )
         v.                         )
                                    )
ROBERT BARTIK, et al.,              )
                                    )
              Defendants.           )
------------------------------      )
ANTHONY MITCHELL,                   )  Case No. 20 C 3119
                                    )
              Plaintiff,            )
         v.                         )
                                    )
ROBERT BARTIK, et al.,              )  Chicago, Illinois
                                    )  February 19, 2025
              Defendants.           )  1:22 p.m.

VOLUME 6
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE JOAN H. LEFKOW

APPEARANCES:

For the Plaintiffs:      LOEVY & LOEVY
                         BY:  MR. JONATHAN I. LOEVY
                              MR. RUSSELL R. AINSWORTH
                              MS. JULIA T. RICKERT
                              MS. FATIMA LADHA
                              MR. ISAAC GREEN
                         311 N. Aberdeen Street, 3rd Floor
                         Chicago, Illinois  60607

                         LYON & KERR, PLLC
                         BY:  MS. ANDREA D. LYON
                         53 W. Jackson Boulevard, Suite 1650
                         Chicago, Illinois  60604

For Defendant Officers:  NATHAN & KAMIONSKI, LLP
                         BY:  MR. SHNEUR Z. NATHAN
                              MR. AVI T. KAMIONSKI
                              MS. BREANA L. BRILL
                              MR. JOHN M. CERNEY
                              MS. NATALIE ADEEYO
                         206 S. Jefferson Street
                         Chicago, Illinois  60661

1439

APPEARANCES   (Continued):

For Defendant City:          MICHAEL BEST & FRIEDRICH, LLP
                             BY:  MR. JAMES P. FIEWEGER
                             444 W. Lake Street, Suite 3200
                             Chicago, Illinois   60606

Court Reporter:              KATHLEEN M. FENNELL, CSR, RMR, FCRR
                             Official Court Reporter
                             219 South Dearborn Street, Room 2328A
                             Chicago, Illinois   60604
                             Telephone:  (312) 435-5569
                             Kathleen_Fennell@ilnd.uscourts.gov

                        *    *    *    *    *

                PROCEEDINGS REPORTED BY STENOTYPE
        TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

Zalatoris - direct

1440

(Proceedings heard in open court:)

(Jury in at 1:23 p.m.)

THE COURT:  You may be seated.  Good afternoon, ladies and gentlemen of the jury.  We'll continue with examination.

JOHN ZALATORIS, DEFENDANT HEREIN, PREVIOUSLY SWORN,

DIRECT EXAMINATION (Resumed)

BY MR. LOEVY:

Q.  All right.  At the time -- we were talking about facts that you believed were true at the time of the interrogations.  It's true, sir, is it not, that when you were interrogating John and Anthony, you didn't know that a victim had been -- it was a sock that was -- gagged him; correct?  You didn't know it was a sock?

A.  We didn't know there was anything in his mouth.

Q.  You didn't know it was a sock; right?

A.  We didn't know anything --

Q.  Just answer my question --

(Interruption by court reporter.)

MR. NATHAN:  Objection.  Asked and answered. Argumentative.

BY MR. LOEVY:

Q.  I don't want you to answer a question I'm not asking.  Just asking about a sock.  Okay?

MR. NATHAN:  He answered the question.

MR. LOEVY:  He's not answering, Your Honor.

THE COURT: He did not answer directly the question.

BY MR. LOEVY:

Q. You didn't know that the victim had a sock stuffed in his mouth; correct?

A. No.

Q. No, that is correct?

A. Yeah, correct. We didn't know.

Q. All right. And in the confessions, the victim had been gagged; right?

A. Excuse me?

Q. The victim had been gagged?

A. Duct taped.

Q. On his mouth?

A. Duct taped, yes.

Q. And there was --

MR. LOEVY: If we could have the ELMO, please.

BY MR. LOEVY:

Q. John guessed that -- John said it was an oil rag from the trunk; right?

A. Yes.

Q. And Riff I think said it was a towel; right?

A. I don't recall. Have to look at the GPR.

Q. Neither of those turned out to be true; right?

A. There was no rag in his mouth?

Q. Yeah.

Zalatoris - direct

1442

A.   Yeah.   There was something stuffed in his mouth.

Q.   Yeah.   There was something stuffed in his mouth, but John said it was a rag from the transmission; right?

A.   I don't understand -- rag from the transmission.

Q.   Transmission rag, oil transmission rag in the trunk; right?

A.   Oh, trans fluid maybe on a rag or something.

Q.   Yeah.   John's telling you that; right?

A.   Right.

Q.   And turned out to be false; right?

A.   Right.

Q.   Because the real killer knew --

A.   Well, there is a cloth in his mouth, so we understand where one thinks it's one thing, one thinks it's another.

Q.   Sure.   You thought maybe it was a rag or a towel.   They didn't -- only the killer knew somebody had removed the boy's -- young man's shoe, taken his sock off, stuffed his sock in his mouth, and put his shoe back on.   The real killer would know that; right?

          MR. NATHAN:   Object to the form.

          THE COURT:   Overruled.

BY MR. LOEVY:

Q.   The real killer would know that; right?

A.   I guess they would.

Q.   Yeah, but you didn't know that; right?

A.   We didn't know there was anything in his mouth.

Q.   And they didn't know it either; right?

A.   What's that?

Q.   They didn't know it either; right?

A.   They knew there was something stuffed in his mouth, yes.

Q.   They just didn't know what it was?

A.   They were saying rag, cloth, rag, yeah.

Q.   All right.  Let's talk about the victim.  The photos had him looking like he got beat up really bad; correct?

A.   What photos are you talking about?

Q.   The photos, say, from the morgue.  Looked like he had been beaten badly?

A.   Well, what we saw at the morgue, he didn't appear to be beaten that badly.  We just saw his face actually, so.

Q.   All right.  Showing you Plaintiffs' Exhibit 34, page 2.

         MR. LOEVY:  And, Your Honor, this is sort of a gruesome photo.

         MR. NATHAN:  One second.

         MR. LOEVY:  I think it's in play at this point.

         THE COURT:  Is it in evidence?

         MR. LOEVY:  It should be.

         MR. NATHAN:  It's not in evidence.

         MR. LOEVY:  We move it into evidence, the crime scene photo that described what he just described.

         MR. NATHAN:  Objection.  Foundation, to start.  It's not a crime scene photo.  It's a morgue photo.

MR. LOEVY:  Morgue photo.

MR. NATHAN:  This is not -- he's asking -- if he's crossing on medical testimony, it's not the right witness. It's a foundational concern.

MR. LOEVY:  The foundation we weren't going to object --

THE COURT:  You can show him but I won't receive it in evidence at this point.

BY MR. LOEVY:

Q.  All right.  You said you saw the body in the morgue; right?

A.  Yes.

Q.  All right.  Showing you Plaintiffs' Exhibit 34, page 2. This is the body at the morgue; correct?

A.  That's the body at the morgue.

Q.  That's what you saw; right?

A.  Well, no, not exactly.  He had plastic like around his face, not over it but around it.  So like the stuff around the side of his face and maybe his head, I don't remember that.

Q.  All right.  He's lying on a tin at -- a morgue tin; right? A morgue tray?

A.  Yeah.

MR. LOEVY:  All right.  Permission to publish the photo, Your Honor?

MR. NATHAN:  Same objection.

MR. LOEVY:  Foundation objections are not supposed to

Zalatoris - direct

1445

be -- you know, we can lay a foundation for this.  We can call the recordkeeper.

THE COURT:  We could.  Do you plan to?

MR. LOEVY:  If they require it.  We will --

THE COURT:  I'll receive it then.

(Plaintiffs' Exhibit No. 34, page 2, received in evidence.)

MR. LOEVY:  All right.  All right.  If we could publish then.

BY MR. LOEVY:

Q.   This victim looks like he'd been beat up pretty bad?

A.   It looks like he was beat up, yes.

Q.   All right.

A.   I can't tell what's beating, what's from maybe heat.  It's kind of hard to tell.

Q.   Hard to tell.  But we already talked about, you thought the weapon could have been a bat; right?

A.   We knew it was blunt, some kind of blunt object, yes.

Q.   And the confessions had Collazo bleeding quite a bit; right?

A.   I don't know about quite a bit, but he was bleeding, yes.

Q.   All right.  Take a look at Plaintiffs' Exhibit 45, page 28, of Mitchell's confession.  "Where was he bleeding from?" "Anthony says he was bleeding from his face, his mouth, his nose."

"Okay."  "I think he had a cut up under his eye."

Zalatoris - direct

1446

"And then what'd you guys do?"  "I think we just -- like we were basically stuck in a state of shock.  What are we going to do?  We didn't know what we were going to do next."  Continuing on the next page.  "All three of us picked up Chris, we put him in the trunk, closed the trunk, got in the car and drove away."

That was Anthony's confession; right?

A.   What paper was that that I was looking at?

Q.   That was the statement he gave at 2 o'clock in the morning at the end of his interrogation.

A.   It's handwritten?

THE COURT:  About Mitchell; right?

MR. LOEVY:  Yes, Mitchell, thank you.

THE WITNESS:  That the transcript from the video recording?

BY MR. LOEVY:

Q.   Yes, sir.

A.   Oh, okay.

Q.   "Oh, okay"?

A.   I mean, I didn't know.  You're showing me this.  I don't remember a handwritten, that's why --

Q.   All right.  The gist of it was that they had bloodied up this victim real good; right?

A.   He was bloodied, yeah.

Q.   They put him straight into the trunk was the story; right?

A.   He was in the trunk, yes.

Q.   No, but not -- I mean, the story as I understood you had -- are telling it is, they beat him up at the scene, it's a bus stop, there's too many people around, they panic, they throw him in the trunk, and then they drive him to another location where they tape him up.  That was the consistent confession scenario; right?

A.   We never said there were too many people at the scene. They said they wanted to get out of there in case somebody calls the police, so.

Q.   Right.  But we agree that they beat him up at the scene, they throw him in the trunk, and they drive him somewhere else where they tape him up and put him in the body bag; right?

A.   He was beat up at the scene, put in a trunk, and he was taken into an alley, and there was plastic bags put over him, yes.

Q.   So there was some period of time when he was in the trunk, bleeding, not in a bag?

A.   Evidently, yes.

Q.   Now showing you some pictures of the trunk.  This is Plaintiffs' Exhibit -- Defendants' Exhibit 106, page 1.

        MR. LOEVY:  I believe it's in evidence.  If not, we move it into evidence.

        MR. NATHAN:  No objection.

        THE COURT:  All right.

Zalatoris - direct

1448

(Defendants' Exhibit No. 106, page 1, received in evidence.)

BY MR. LOEVY:

Q. This is a picture taken of his -- the trunk of Fulton's car; right?

A. I don't know. I never really saw the car.

Q. Didn't you go down with McRay Judge and look at the trunk?

A. I didn't.

Q. Who did?

A. I don't know. I didn't.

Q. Okay. Showing you another picture. This is Defendants' Exhibit 145, page 2.

MR. LOEVY: And I'd move in page 2 and page 4, Your Honor, of Defendants' 145.

THE COURT: Any objection?

MR. NATHAN: No objection, Your Honor.

THE COURT: Okay.

(Defendants' Exhibit No. 145, pages 2 and 4, received in evidence.)

BY MR. LOEVY:

Q. It looks like at some point, the crime scene guys must have taken the trunk apart, and then --

MR. NATHAN: Object to the testimony from counsel.

BY MR. LOEVY:

Q. Does it look like that to you, sir? That the trunk went from, you know -- when it was finished, it got put back

together but in between they took it apart?

A.   Again, I'm looking at a trunk of a car I never seen before, you know, so.

Q.   All right.  But for the record, it looks like --

A.   I don't know what that is.

Q.   All right.  But does it look like this trunk was examined, things were taken out, and then things were put back in?

MR. NATHAN:  Objection.  Form.  Foundation.  Calls for speculation.

THE COURT:  I'll sustain that.  I'm not sure...

BY MR. LOEVY:

Q.   All right.  Going back to the first one, if this is what the trunk looked like, it would have been hard to stuff a body in there; right?

A.   If that's what the trunk looks like, I don't know.  You know, again, I didn't see that car.  There might be space between that and the front.  I don't know.

Q.   All right.  But you did understand that the car was -- John signed a consent to search and the car was brought to the police station; right?

A.   I didn't bring it there.

Q.   All right.  But the car was brought to the police station; right?

A.   The car was brought there by other detectives, yes.

Q.   And you guys saw -- the detectives collectively saw there

Zalatoris - direct

1450

was a toolbox and a bowling bag in the trunk; right?

A.   I didn't see it.

Q.   Both those things ended up in the confession scenario; right?

A.   They told us that, yeah.

Q.   So at the time you took the confession, you knew there was a toolbox and a bowling bag in the trunk?

A.   No, I didn't.

Q.   All right.  And in fact, he said he got the industrial body bag out of the bowling bag and he got the duct tape out of the toolbox.  That was part of the confession?

A.   That was part of it, yes.

Q.   All right.  Now you in the course of the investigation must have thought about, "Hey, if he put a bloodied body in the trunk, perhaps we can find some biological evidence of blood in the trunk."  That must have been part of your thought process; right?

A.   What technician are you talking about?  Which one?

Q.   Any technician.  At the Chicago Police Department, they have forensic technicians; right?

A.   And I'm not one.

Q.   All right.  They have forensic technicians at the Chicago Police Department?

A.   Yes.

Q.   Do the forensic technicians assist detectives doing murder

Zalatoris - direct

1451

investigations?

A.   They do.

Q.   All right.  Is that something you had at your disposal when you were investigating this crime?

A.   Again, I had nothing to do with this car, so I don't know who the crime lab guys were, if they were called, and who called them, sir.

Q.   All right.  Well, your understanding of the confession, when you were thinking about it and strategizing with Officer Breen, did you believe that if the crime scene technicians searched that trunk high and low, they would find evidence that Collazo had been in that trunk?

          MR. NATHAN:  Objection.  Form.  Assumes facts not in evidence.

          MR. LOEVY:  It explains his actions, Your Honor.

          THE COURT:  Overruled.

          THE WITNESS:  I don't know.

BY MR. LOEVY:

Q.   All right.  I know you don't know, but I'm saying, as you were trying to develop evidence against Fulton, did you say to yourself, "You know what, I bet you if I told the crime scene guys to look in that trunk, they'll find a spec of blood or a hair or a DNA"?  Was that part of your process -- thought process?

A.   No, because I don't know what they're going to find or not

find, sir.

Q.   All right.  Did you suggest that the crime scene guys should go in the trunk, or you didn't think of that?

A.   You know what, I think somebody else must have.

Q.   But you didn't?

A.   I didn't, no.

Q.   And at some point, you learn there wasn't a single human cell of Chris Collazo in that trunk; right?

A.   I don't remember when I found that out, but it was a while down the road, yes.

Q.   Then as far as when you found it out, at the end of the confession, on page 7 of the handwritten confession, there's three lines here that would explain why there's no blood in the trunk; right?

A.   Yeah, that could be right there, yeah.

Q.   Now it looks like this is slightly different sized writing, and maybe I'm being conspiratorial, but doesn't this look like bigger writing than this writing here at the bottom?

A.   No.

Q.   It doesn't look like this maybe was squeezed in after the fact when there wasn't enough room to fit it there?

A.   No.

Q.   You know, because there's no -- really no other place in the notes where things got squeezed like that --

MR. NATHAN:  Object to the characterization.  Asked

Zalatoris - direct

1453

and answered.

MR. LOEVY:  Well, there's no other place in the notes was the question.  I don't believe that's been asked.  Do you have a copy of the notes?

BY MR. LOEVY:

Q.  Do you know the answer?

A.  What was the question now?

Q.  This is the only place in the notes where things seem to be squeezed in?

A.  No.

MR. NATHAN:  Object to the form.

THE WITNESS:  I'd have to go in the notes and see.

BY MR. LOEVY:

Q.  In any event, the car was vacuumed out according to the confession and cleaned at Pete's Car Wash, and it was -- the spare tire, the toolbox all had blood on them, but they got washed off with soap; right?

A.  That's what it says.

Q.  And you wrote that down.  Now we know that John went to school the next day from -- you learned that in your investigation; right?

A.  The next day.

Q.  Next day, after -- somebody killed Chris Collazo.  The body's discovered on March 10th.  He goes to school on Monday morning; right?

Zalatoris - direct

1454

A.   Yeah, I believe that.  Yeah, I believe I remember that.

Q.   And we know from the records that somebody couldn't have been him because he was in school.  He says it was his girlfriend, Yolanda, got the oil changed; right?

A.   You know, I don't know anything about that oil change stuff.

Q.   All right.  Now was it your theory of the case that after he murdered Collazo, set him on fire, sometime around 3 in the morning, he went home and cleaned the trunk that night?

A.   Could you ask me that question again?

Q.   Sure.  It was real cold that night; right?

A.   The day it happened, yes.

Q.   Colder than, say, today; right?

A.   It was cold.

Q.   All right.  So are you saying that he went into the parking lot and got out -- you know, washed it off with soap, all the blood out of his trunk that night at 4, 5 in the morning?

A.   I don't know where he might have done it.

Q.   Did you ask him?

A.   Didn't know where he might have done it, sir.

Q.   All right.  But you're the detective.  What'd he say?

A.   He's the one telling us about the car wash over there.

Q.   All right.  Did you tell him where -- when he went to the car wash?

A.   Well, he says he cleaned the car at Pete's Car Wash on

Zalatoris - direct

1455

South Chicago and King Drive.

Q. Now are you sure you didn't add that later after you realized there was no blood in the car?

A. Excuse me?

Q. Are you sure you didn't add that later after you discovered there was no blood in the car?

A. No.

Q. All right. Then if he really told you that contemporaneously, why didn't you say, "John, when'd you go to the car wash? What time?"

A. We put down he went to the car wash.

Q. Yeah, but you could have corroborated --

A. There was a lot of things probably could have asked and we might have asked.

Q. You couldn't ask if he wasn't there anymore; right?

A. Because he wasn't --

MR. NATHAN: Objection. Argumentative.

MR. LOEVY: If he wrote it at a time --

MR. NATHAN: One second. Objection. Argumentative.

THE COURT: Yes, I will strike that question.

BY MR. LOEVY:

Q. It was probably not realistic that between 5 and 6 in the morning, he was out there wiping the blood down on a night that cold; right?

A. I don't know.

MR. NATHAN:  Object to the form.

BY MR. LOEVY:

Q.  Did you ask him?

MR. LOEVY:  He answered it, Your Honor.  He said he didn't know.

THE COURT:  Okay.

BY MR. LOEVY:

Q.  Did you ask him?

A.  I would imagine you wanted to get the blood out of there as fast as you could, yes.

Q.  All right.  So why wait to take him to Pete's Car Wash?

A.  Could have been at Pete's Car Wash in the middle of the night.  A lot of those car washes are open 24-7 on the south side.

Q.  All right.  Did you check that out, sir?

A.  No, we didn't.  We wrote down where he took it, though.

Q.  All right.  Pete's Car Wash, like all those car washes, is a detailing place; right?

A.  It's a car wash.

Q.  Yeah.  So you go sit in the lobby and pay them 20, 25 bucks and they clean your car; right?

A.  It's a hand-wash place --

Q.  It's not a hand-wash, sir.  Where are you getting that?

A.  Those are what they are.  They're hand-wash places.

Q.  Okay.  You're just making that up, though; right?

MR. NATHAN:  Objection.  Argumentative.

THE WITNESS:  You're asking me about car washes.

MR. NATHAN:  Objection.  Objection.  Argumentative.

BY MR. LOEVY:

Q.  Are you saying -- may I --

THE COURT:  He's already responded to you.

MR. LOEVY:  If he responded, then I can --

THE COURT:  Go ahead.

BY MR. LOEVY:

Q.  So are you saying you went to Pete's Car Wash, confirmed it's not the kind of place where you pay them and they wash your car?  You confirmed that or you're just guessing?

A.  You're the one saying that.  You're asking me about car washes and I'm telling you about car washes.

Q.  I'm not talking about car washes --

A.  Well, that's what you said, sir.

Q.  I'm talking about Pete's Car Wash.

A.  That's what you said.

Q.  Then let me ask the question.

A.  Okay.

Q.  Are you saying you went to Pete's Car Wash and confirmed it's the kind of place where you take it there and you wash your own car, or just guessing?

A.  I didn't go there.

Q.  You have no idea what --

Zalatoris - direct

1458

A.   You're asking me about car washes and I told you, most of them are hand-wash places.

Q.   Got it.  Because it wouldn't make sense in the theory of the case if he brought it to Pete's Car Wash and it was the kind of place where you pay them and they wash your car.  He wouldn't have brought a bloody trunk to Pete's Car Wash?

A.   You never know.

Q.   You never know.  All right.  Let's go to the facts that you know.  This is a summary of all the ones we've been talking about.  These are the things you believe to be true and whether it ended up in the confession.  We talked about these.  I'm not going to talk about them again.

     But I want to talk next about things that you didn't know.  Now, for example, did you know -- let me ask this.  Can you think of any facts that John and Anthony knew about this crime that were provable that you didn't already know?

A.   I don't understand your question.

Q.   In other words, were they able to tell you like, "Hey, I put the murder weapon in Stick's closet"?  You didn't know that and you could prove it, something you could prove.

A.   Well, all we can do is document what they tell us.

Q.   Understood.  So now --

A.   That's what we did.

Q.   Here's my question.

A.   That's what we did.

Q.   Did you learn anything from them, either of them or Shaw, that you didn't already know?  Anything?

A.   Well, the thing about the car wash, him saying the car wash, that's a detail.  Mitchell told us about when they went in the alley.  Mitchell told us about a car that there's no way we would know it was down there.  That's another detail we had no idea about.

Q.   All right.  Anything provable?

A.   That was provable.  We saw it.

Q.   We have your memory that, "Hey, you told us about a car, there's a car --"

A.   You don't believe that then?

Q.   It's not my job, sir.  That's the jury's job.

A.   That's why I'm telling you.

Q.   All right.  How about the murder weapon?  Did you ask any of the boys where the murder weapon was?

            THE COURT:  Mr. Loevy --

BY MR. LOEVY:

Q.   Teenagers.  Did you ask any of the young men where the murder weapon was?

            MR. NATHAN:  Objection.  Just for the record, objection.  Motion in limine.

            THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Did you ask any of the young men where the murder weapon

Zalatoris - direct

1460

was?

A.   You know, there was a lot of questions asked and I don't recall if we asked them that or if they told us that.

Q.   All right.  None of the paperwork documents that you asked them that; is that correct?

A.   I guess not if it's not on there.

Q.   And that's because they couldn't tell you where the murder weapon was, isn't it?

A.   Again, you're asking me about questions that we might have asked that aren't on a piece of paper.  I don't know.

Q.   Surely you would have asked them, "What'd you guys do with the bat?"  Right?

A.   Again, we asked a lot of questions during this.

Q.   Did you ask them that one?

A.   Don't remember now at this point.

Q.   All right.  This is your deposition, page 173, lines 6 through 12.

          MR. NATHAN:  One second.

BY MR. LOEVY:

Q.   You ready?

A.   What we doing here?

          MR. LOEVY:  May I proceed, Your Honor?

          THE COURT:  Yes.

BY MR. LOEVY:

Q.   Question:  "So you asked John Fulton, 'Where can we get

Zalatoris - direct

1461

that little pole or metal bat from.'  Right?"  Answer:  "I don't know if I asked them or if anybody did, to tell you the truth.  I know I didn't."

Question:  "How do you know you didn't ask John Fulton how you could recover the murder weapon?"  Answer:  "Because I didn't ask him."

Did you give those answers under oath?

A.   That's what I just told you too.

Q.   All right.  Isn't it true you claim you didn't ask John Fulton where the murder weapon is because he couldn't tell you where the murder weapon was?

MR. NATHAN:  Objection.  Asked and answered. Argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.   All right.  You told us yesterday you didn't know the victim's pants were pulled down.  Did I hear you correctly?

A.   Yeah, I don't remember that part, no.

Q.   All right.  So if you didn't know the victim's pants were pulled down, did John Fulton confess he pulled the victim's pants down?

A.   Again, I don't remember his pants being pulled down.

Q.   Did John Fulton confess pulling down his pants?

A.   I don't remember him saying anything about pulling down anybody's pants.

Zalatoris - direct

1462

Q. Did Mitchell say he pulled down his pants? No.

A. I don't remember that, no.

Q. Shaw didn't say he pulled down the pants; right?

A. No.

Q. Because you didn't know the pants were pulled down; right?

A. Right. You know what, that picture you showed, the victim, I'm thinking about it, I don't remember seeing his pants pulled down in that picture.

Q. All right. It turns out, if it --

A. It might be --

Q. Take a look at the ME's report.

MR. LOEVY: This is Plaintiffs' Exhibit 33 just for the witness.

THE WITNESS: We can see the picture that you put up before, sir.

MR. LOEVY: Just for the witness.

BY MR. LOEVY:

Q. Does that refresh your recollection that the pants were pulled down to the knees?

A. Now whose report is this?

Q. This is the Report of Postmortem Examination.

A. Well, that might be written on there. I've never seen that report, nor did I write it. If you want to put that picture up, we can look and see if his pants are pulled down.

Q. Point is, you didn't know his pants were pulled down;

right?

A.   Sir, I'm telling you right now.  You showed me a report from -- that I never seen, from somebody who -- I mean, I didn't document that.  I didn't do that report.

Q.   The victim --

A.   You're asking about something which we could show in a picture, would show whether they're down or up.

Q.   Did the victim have a coat on?

A.   Again, I'm going by that picture that you showed up there.

Q.   I'm asking if you remember that on this very cold night, part of the investigation was the victim was found just wearing T-shirts.

A.   Again, sir, I'm going by the picture you showed here.  I don't know.

Q.   I'm not asking about pictures.

A.   I don't remember.

Q.   That's fair.  Now if in fact the victim was found just in a T-shirt on the super cold night, wouldn't that suggest to you as a homicide detective that, you know what, maybe somebody abducted this guy from an indoor location?  Is that a fair inference for a murder detective?

          MR. NATHAN:  Object to the form of the question.  Mischaracterizes the evidence.

          MR. LOEVY:  It's cross-examination, Your Honor.

          THE COURT:  Overruled.

THE WITNESS: What was the question again?

BY MR. LOEVY:

Q. If Chris Collazo's body was found wearing three T-shirts but no jacket, wouldn't that as a murder detective suggest to you on this really super cold night that you needed to think about the possibility he was abducted from an indoor location?

A. Not necessarily.

Q. But you can't rule that out; right?

A. Well, you can't rule that in either.

Q. Right. You got to go investigate it; right?

A. Well, you know, his jacket could have came off during the scuffle. It could have got thrown out when he was put in the trunk. A lot of things could have happened.

Q. Did John Fulton or Anthony Mitchell explain what happened to his jacket?

A. Never asked what happened to his jacket.

Q. All right. My question was, did they ever talk about the missing jacket?

A. I don't remember ever asking them.

Q. Because you didn't know?

A. I didn't know what?

Q. If you didn't know that he was missing a jacket, you weren't asking about a jacket; right?

A. Again, we didn't ask about a jacket.

Q. How about, did you know if the victim had been burned alive

or dead when you were talking to these boys, these young men?

A.   I don't believe I knew at the time.

Q.   All right.  Did he confess, did John Fulton confess to trying to burn him alive or dead?

A.   I don't know if he was alive or not.

Q.   No, I get it that you don't know.

A.   Right.

Q.   Because the medical examiner hadn't come back and said that yet; right?

A.   No, right.

Q.   When you're sitting there, you don't know if he got burned when he was alive or burned when he was dead; right?

A.   Yeah, we don't know.

Q.   All right.  So when you're talking to Fulton, did Fulton say he burned him when he was alive or burned him when he was dead?

A.   Well, one of them says that they were hearing loud -- or some guttural sounds from the trunk and John turned up the stereo so they couldn't hear it.  So at that point, we know he's alive during that ride to the south side.

Q.   So the theory was they burned him alive?

A.   We don't know if they burned him alive.  He might have died in that trunk on the way down there, sir.

Q.   Sir, when you're investigating the murder, did John Fulton confess to you that he -- "I wanted to light him on fire when

he's alive" or waited -- he was dead and he burned him?  Which story did he confess to?

A.  If he's unconscious, you don't know if he's alive or dead, do you.

Q.  These are not things we're thinking about for the first time ever, are we?

MR. NATHAN:  Objection.  Argumentative.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  Can you answer the question?  If when you talked to John Fulton between those four days, if he confessed to burning someone alive or dead?

A.  Putting an unconscious person in a box and burning it, yes. Don't know if they were dead at that time or not dead.

Q.  No, you didn't know if they were dead.  Did they -- did --

MR. NATHAN:  Objection.

THE WITNESS:  He was unconscious.

MR. NATHAN:  Objection.  Asked and answered.

BY MR. LOEVY:

Q.  The murder confession was they put him in -- he beat him up at the scene, threw him in the trunk, drive to another place, tape him up and gag him, and then take him to the south side alley.  That's the sequence; right?

A.  Yes.

Q.  All right.  So at what point did they kill him?

A.   Well, sounds like he may have died in that trunk during the ride.

Q.   You know that now; right?  You now know he may have asphyxiated; right?

MR. NATHAN:  Objection.  Argumentative.  Asked and answered.

MR. LOEVY:  He's not answering --

MR. NATHAN:  No, he -- he said he doesn't know.

THE COURT:  Overruled.

BY MR. LOEVY:

Q.   So in the murder confession, before you knew that he asphyxiated, at no point did John or the guys say -- after they taped him up so he couldn't run away and they took him out of the trunk, did they kill him?  They forgot to kill him, didn't they?

A.   They forgot to kill him?  No, they killed him.

Q.   All right.  If they're taping him up, that means he's alive; right?

A.   They're taping him up.  They don't know -- they don't know if he's going to try to run or not.

Q.   He's still alive?

A.   Mitchell does talk about those guttural sounds from the trunk of the car, which means he's dying.

Q.   All right.  So in the --

A.   He's dying at that point.

Q.   In the trunk of the car, he's making noises.  They tape him up so he can't run.  Then they drive to the south side.  Then they go to the gas station to buy gas to burn him; right?

A.   Right.

Q.   So they're going to burn him alive; right?

A.   They're going to burn him.  I don't know if they knew he was alive or not.  They're going to burn him.

Q.   He's making guttural noises?

MR. NATHAN:  Objection.  Argumentative.  Asked and answered.

BY MR. LOEVY:

Q.   All right.  The reason -- I'm wrapping it up.  The reason you didn't have them confessing to burning him alive or dead is because you didn't know if he was alive or dead?

A.   Didn't know at the time, no.

Q.   Now how about the victim's jewelry?  One of the confessions had Chris taking jewelry -- Chris's jewelry being taken off by Riff; right?

A.   I guess so.

Q.   Taking a look at page 25 of Plaintiffs' Exhibit 11.  This looks like it might have gotten added later too, would you agree?

MR. NATHAN:  Objection.  Characterization.

MR. LOEVY:  It's a question.  It's a question.  If it looks --

Zalatoris - direct

1469

THE COURT:  You can --

THE WITNESS:  Not at all.

THE COURT:  The question is clear.

BY MR. LOEVY:

Q.  In other words, your writing, spacing, spacing, spacing, spacing.  Did you add this later?

A.  No.  I mean, what do you mean "added it later"?  It's written right in there.

Q.  All right.  Chris's jewelry taken off by Riff.  Did you -- that's what Fulton told you; right?

A.  That's what Fulton said.

Q.  All right.  Now you got something you can prove; right?

A.  If we find the jewelry, yeah, I guess.

Q.  Because jewelry, you don't just throw it away?

A.  Don't know.  Don't know what they might have done.

Q.  If they bothered to take it, he would have either stashed it somewhere or sold it to someone?

A.  Again, a lot of questions were asked and I don't remember if there was an answer given to that.

Q.  They couldn't tell you where the jewelry was, could they?

A.  Again, I don't remember if there was an answer given to that.

Q.  What was -- when you asked Anthony Mitchell during interrogation, "Hey, where's the jewelry?" what did he tell you?

Zalatoris - direct

1470

A.   Again, we asked a lot of questions.  We just documented what they tell us.

Q.   All right.  What did he tell you?

A.   Well, is it on there?

Q.   It sounds like Anthony --

A.   Well, sir, is it on the GPR?

Q.   I've never seen anywhere where the jewelry -- what happened to the jewelry, sir?

A.   It's not on there.

Q.   Mitchell could not account for the jewelry?

A.   Then he didn't tell us where the jewelry was.

Q.   You're trying to confirm this confession, you got news that he's stolen the jewelry, and he can't tell you where the jewelry is?

A.   He didn't tell us where it's at.

Q.   All right.  But he was in a confessing kind of mood, wasn't he?

A.   Again, he didn't tell us.  Okay?

Q.   He couldn't tell you; right?

A.   He didn't tell us.

Q.   He answered every other question you had.

A.   Well, whether he could or not, I don't know, but he didn't tell us.

Q.   All right.  The confession scenario, leaving aside all other things, we agree this didn't happen; right?  Other things

might have happened, but he wasn't on the phone with Griffin, he didn't abduct him getting off the Foster bus around this time.  This didn't happen?

MR. NATHAN:  Objection.  Asked and answered.

BY MR. LOEVY:

Q.  Do we agree?

MR. NATHAN:  Compound.  And it's also vague.

THE COURT:  Sustained.

BY MR. LOEVY:

Q.  All right.  The confession time got changed, didn't it?

MR. NATHAN:  Objection. Form.  Foundation.

THE COURT:  Overruled.

THE WITNESS:  What do you mean the time got changed?

BY MR. LOEVY:

Q.  Was there ever any discussion with which you were a part of where the detective says, "We got a problem.  We took a confession that he got abducted off a bus in the evening hours, there's -- he's on video, there's no bus, we got to move the time of the abduction"?  Was there ever any kind of conversation like that with anybody?

A.  No, absolutely not.

Q.  To your knowledge, the confession stayed right here, he confessed to doing it at 9:30 to 10:30?

A.  Whatever he said.

Q.  Yeah.

A.   That's what he said, that's what's there.

Q.   How about this business that maybe he went to the hospital, snuck out of the hospital, killed him, snuck back to the hospital?  That was never -- you weren't part of that discussion?

A.   I wasn't part of that, no.

Q.   How about this business that maybe when he got back from the hospital, he snuck out, rounded up the gang?  You weren't part of that either?

A.   That wasn't part -- I wasn't part of that part, no.

Q.   Who was -- who was part of changing the time to after midnight?

        MR. NATHAN:  Object to the form.

BY MR. LOEVY:

Q.   Were you?  If --

        THE COURT:  Sustained.  Okay.  Were you part...

        THE WITNESS:  What was that again now?

BY MR. LOEVY:

Q.   Were you ever part of any discussions at all where there was some brainstorming, said, "You know what, why don't we say the crime happened after midnight?"  Were you ever part of any discussions like that?

A.   No.

Q.   Did you ever talk to ASA Rubinstein?

A.   I can't remember if I talked to them or someone else did.

Zalatoris - direct

1473

Q.   Do you remember talking to Rubinstein about making the theory that, "You know what, we got this hospital video problem.  Let's say he went to the hospital, snuck out of the hospital, rounded up the guys, abducted them, found him, killed him, got back to the hospital in time to pick up Yolanda"? Were you part of that discussion?

A.   I've never heard a discussion like that.

        MR. LOEVY:  All right.  We'd like to move into evidence Plaintiffs' Exhibit 58, Your Honor, Rubinstein's memo.

        MR. NATHAN:  In evidence.

        THE COURT:  All right.

BY MR. LOEVY:

Q.   All right.  Showing your attention here.  This is a memo you didn't create, dated March the 24th -- 21st, regarding an oral statement of John Fulton; right?  And showing you the paragraph I want to draw your attention to.  Fulton drove Yolanda to the hospital that day because she was sick.  He got there around 8:45 or 9.  They waited.  He left, went back to the old neighborhood, saw Riff and Stick hanging out.  Stick was getting ready to play baseball, looks like.  Fulton pulled up to Riff and Stick, asked if they wanted to go beat Chris's ass.

        MR. NATHAN:  Object to the commentary.  Objection. Foundation.

        THE COURT:  Yes.  Read it accurately or --

Zalatoris - direct

1474

BY MR. LOEVY:

Q.   It doesn't say they were going to get ready to play baseball, does it?  It doesn't say they were getting ready to play baseball?

A.   Pardon me?

Q.   What it says on this super cold night, Riff and Stick were hanging out on the corner and one of them had a baseball bat. That's what it says?

A.   That's what the state's attorney is saying.

Q.   And then they pick --

A.   Had nothing to do with this, so.

Q.   That's what I'm establishing now.  You had nothing to do with this?

A.   You're asking me about something I didn't write.

Q.   Fulton didn't tell you anything like this?

A.   You're asking me about something I didn't write.  Okay? And I don't know what was written on that.  First time ever seeing this.

Q.   All right.  And then there's the story, they hit him real bad.  They get some tape, same story.  But then Fulton drove Stick back somewhere around 79th.  He then went to the hospital and picked Yolanda up.  You didn't say that happened.  That was never any story that you heard; right?

A.   Again, I don't know.  I didn't see that.

Q.   And you don't -- I already asked, you weren't part of the

hospital video problem?

A.   No, I had nothing to do with it.

MR. NATHAN:  Object to the characterization.

BY MR. LOEVY:

Q.   Who did, if you know?

A.   I told you Winstead and Rolston did.

Q.   Now Rolston's dead; right?

A.   Yes.

Q.   So he's a convenient person to blame, isn't he?

MR. NATHAN:  Objection.  Argumentative.

THE COURT:  Sustained.

THE WITNESS:  I'm telling you the truth.  I can't help that he's dead.

BY MR. LOEVY:

Q.   And Mr. Winstead unfortunately has dementia apparently; correct?

A.   Oh, I don't know about that.

Q.   Have you talked to him?

A.   Yeah, maybe about three, four months ago.

Q.   Was he fine?

A.   I mean, he was elderly.

Q.   But he's -- he can testify in court; right?

MR. NATHAN:  Objection.  Foundation.  Calls for speculation.

(Interruption by court reporter.)

MR. NATHAN: Objection. Calls for speculation. If you have something to argue about with Judge Lefkow, I'd ask to do it at a sidebar.

MR. LOEVY: Your Honor, it has been told to us by them that he has dementia.

MR. NATHAN: Excuse me. We can introduce it into evidence if that's necessary.

MR. LOEVY: Let's just go with Mr. Zalatoris.

MR. NATHAN: This is something that should be discussed and it's not appropriate for this forum.

MR. LOEVY: Can I ask this witness his observations of Mr. Winstead?

THE COURT: Yes.

BY MR. LOEVY:

Q. Three, four months ago, he seemed elderly but okay, huh?

A. Three, four months ago, I talked to him for 30 seconds at his son's funeral, at his son's wake. I haven't seen him since then. I don't know what's going on with Winstead.

Q. All right. But you didn't notice any problems when you did talk to him?

A. I mean, he's older and slow, yeah.

Q. Are you blaming him?

A. Not blaming him. I'm just saying, that was his part of the investigation. Not blaming anybody.

Q. Let's talk about Mr. Bartik. And not too much more here.

Zalatoris - direct

1477

But you were present at John and Anthony's criminal trial; correct?

A.   Yes.

Q.   And you interacted with the prosecutor Nancy Nazarian?

A.   I believe she was a state's attorney that was trying the case.

Q.   And then there did come a point after the trial started where it was discovered that Mr. Bartik was going to be a witness; right?

A.   I imagine so.

Q.   What do you remember about that?

A.   That he's part of the trial, I guess.

Q.   Okay.  But the trial had already started and then everybody realized, wait a minute, Bob Bartik took a confession from Fulton.  That's what happened; right?

            MR. NATHAN:  Objection.  Assumes facts not in evidence.

            THE WITNESS:  I don't know when that came in.  I don't know.

            THE COURT:  Wait.  Don't answer before I rule.

            THE WITNESS:  I'm sorry.

            THE COURT:  Those are facts that are to be established; correct?

            MR. LOEVY:  Yes.

            THE COURT:  All right.  Overruled.

Zalatoris - direct

1478

BY MR. LOEVY:

Q.   All right.  Let's talk about your involvement with Mr. Bartik.  Back on March 18th, all the way back to the first day of the investigation, you took Fulton -- while you were on the drive-along to see the locations for him to show you the locations, you took him to see a polygrapher; right?

A.   No.

Q.   What part of that was wrong?

A.   Basically when you said we took him there.  That was all wrong.

Q.   I thought I corrected it.  He wanted to show you the location?

A.   Yeah, and you're wrong.

Q.   All right.  You guys left the station together; right?

A.   We left the station.

Q.   And by the way, there's no documents, no report, no GPR, no memo, nowhere documenting that you left the station with Mr. Fulton; right?

        MR. NATHAN:  Objection to the extent it mischaracterizes the testimony -- the evidence.

BY MR. LOEVY:

Q.   You're not aware of any, are you, sir?

        THE WITNESS:  Is there a ruling, Judge?

        THE COURT:  Overruled.

        THE WITNESS:  What was that again?  What's the

question?

BY MR. LOEVY:

Q.  You didn't write in your GPRs, your reports, your notes, your memos, nowhere, that you took him out for a ride to go see the scene; right?  You didn't write that down?

A.  I think we did document it on the GPR that he showed us these areas.

Q.  All right.  All right.  I'm going to show you --

MR. LOEVY:  Can I get a copy of the long GPR?

BY MR. LOEVY:

Q.  Show us where it says you took him to the scene and showed you the area.

A.  Let me see.

Q.  Because you probably should have documented that if it happened; right?

A.  I'm going to have to read through this and see.

Q.  Take your time.

MR. NATHAN:  What did you show him?  The seven-page?

MR. LOEVY:  The seven-page.

BY MR. LOEVY:

Q.  Tell you what, sir.  Since counsel's going to get a chance to examine you, if he thinks it's in there, he'll probably show it to you.

A.  I'll do it.  Give me a second.  Let me finish up here.

Q.  Okay.

A.   Well, this has his confession, yes.

Q.   Okay.  So nowhere in there did you indicate for a state's attorney or somebody subsequently reading it that you and him were in a car, drove to the scene, looked at where the abduction supposedly happened, looked at where -- the alley where he got taped up, showed him -- or he showed you where the body was.  You didn't note in any report or any notes that he'd actually been taken to the scene?

A.   You know, it could be in the closing.  Again, it's -- it's documented somewhere.

Q.   It should be documented somewhere.

A.   Well, I'm saying, we did it, you know, so.

Q.   We'll get to the "we did."  But it should have been documented; right?

A.   Well, it's -- if it's not in the GPRs, it might be in the sup.

Q.   Not the question.

A.   Well, I'm asking.  If it is, you can tell me.  It's in the sup.

Q.   Still not the question.  It should have been documented if you took this kid to the scene; right?  This young man.

A.   Well, again, I would think maybe.

Q.   All right.  Back to Mr. Bartik.  While you were out on the drive, you gave him an opportunity to take a polygraph; right?

A.   Yes.

Zalatoris - direct

1481

Q.   He wanted -- he said "I'll prove it.  I'll take a polygraph."  He wanted to do that?

A.   We asked him if he'd take it.

Q.   And he wanted to do it?

A.   He says "Okay."

Q.   He wanted to do it; right?

A.   He said "Okay."

Q.   All right.  And you got there.  The polygraph was where, Homan Square?

A.   Yes.

Q.   It's a building.  What do you guys call that?

A.   It's Homan Square as we call it.

Q.   You took him and he met with Robert Bartik; right?

A.   Well, first thing we did is we called and make an appointment.

Q.   Okay.  And he was able to see you?

A.   And they give you a time that you can come down.

Q.   All right.  And you briefed Bartik on the facts of the case?

A.   When we got there.  Brief synopsis.

Q.   Brief synopsis.  And Bartik and John went into the room to do the polygraph?

A.   Yes.

Q.   Right?  And then they came out of the room; right?

A.   Yes.

Q. And typically when somebody came out of the polygraph room, it's because they took a polygraph; right? Typically?

A. You don't know.

Q. But typically --

A. You don't know, sir.

Q. Typically --

A. You don't know.

MR. NATHAN: Objection. Asked and answered. Argumentative.

BY MR. LOEVY:

Q. Okay. In this case, John did not get his polygraph exam; right?

A. That's what we were informed.

Q. And you can't recall a single other instance in your career where that's happened; correct?

A. I can't recall out of the hundreds of people down there now. No.

Q. But you can't remember any?

A. I can't recall any right now.

Q. Okay.

A. But that's not uncommon. It does happen.

Q. Well, I asked if you could ever remember it happening and you couldn't. Actually Russell asked you.

A. I said it does happen.

Q. All right. What was Bartik's explanation for why -- you

Zalatoris - direct

1483

don't recall Bartik's explanation for why the polygraph wasn't performed?  You don't recall; correct?

A.   No, I don't recall --

Q.   All right.  That's good.

A.   -- why he didn't take it.

Q.   And you certainly didn't document why he didn't take it; right?

A.   Well, not documented.  That was an oversight on my part.

Q.   When you say "oversight," there's no documentation at all that you took him to see Bartik; right?

A.   Again, it was over seven hours.  Plus he didn't take it, so.

Q.   Just starting with my question --

A.   I did.  I answered it.

Q.   Not with the why.  I said, there is no documentation at all that he saw Mr. Bartik; correct?

A.   Well, the polygraph unit does some kind of paperwork.

Q.   And that's the paperwork that showed up after the trial started; right?

          MR. NATHAN:  Objection.  Foundation.

          THE COURT:  Are you going to --

          MR. LOEVY:  I can prove it up, Your Honor.

          THE COURT:  All right.  Overruled.

          THE WITNESS:  I don't know.  I'm not in the polygraph unit, but I know they do paperwork.

Zalatoris - direct

1484

BY MR. LOEVY:

Q.   Let's focus on your paperwork.  You didn't create any paperwork that he had gone to see this polygrapher; correct?

A.   Again, an oversight.  And he didn't take it.

Q.   Again -- I'll ask you to answer why you didn't create paperwork in a second.  Can we just go in order?  You didn't create any paperwork; right?

A.   We didn't put it on the reports, no.

Q.   All right.  Now it's your turn to say why you didn't write it in your reports.

A.   Again, it was an oversight.  And he didn't take the polygraph.

Q.   All right.  Now after you met with Bartik, you took him back to Area One; right?

A.   Yes.

Q.   And you got his -- you got his statement, his confession; right?

A.   Yes, he confessed.

Q.   What time was that?

A.   I couldn't give you an exact time.

Q.   Would it help if you saw your report?

A.   If it's on there.  Is it on there?

Q.   Actually you got your report in front of you.  It's got the Miranda time at the top.

A.   Okay.  So it's on here, sir?

Zalatoris - direct

1485

Q. What time approximately did you get his confession?

A. Again, if it's on here, sir, I have to look for it.

Q. Right at the top, very first page, it says "Miranda 2130"?

A. It says 2130 on the Miranda; right. Sometime after that time then.

Q. And haven't you testified at least four times that you got the confession at 9:30 on March 18th?

A. Again, yes. Those are all approximate times, though.

Q. All right. So 9:30 at Area One. Did it seem to you that he had -- that you were the first one to get his confession?

MR. NATHAN: Object to the form.

THE WITNESS: So far as I knew.

MR. LOEVY: All right.

THE COURT: Overruled.

BY MR. LOEVY:

Q. Yeah. So it is true, is it not, that Mr. Fulton never made any incriminating statements at the polygraph office in front of you and Mr. Bartik? That's true; right?

A. Not in front of us.

Q. Not in front of you?

A. Not in front of us.

Q. He did not repeat a confession to a murder in your presence?

A. Not in our presence.

Q. And you're certain of that; right?

Zalatoris - direct

1486

A.   Certain as I can be 22 years later.

Q.   I mean, because that's kind of the thing you'd remember; right?  If you --

A.   Well, yeah, as certain as I can be 22 years later.

Q.   That's the kind of thing you would remember if you took him to see a polygrapher and he confessed; correct?

MR. NATHAN:  Objection.  Asked and answered.

THE COURT:  Sustained.

MR. LOEVY:  All right.  We'd move into evidence Plaintiffs' Exhibit 51, the polygraph report, Your Honor.

MR. NATHAN:  I think it's in evidence.

BY MR. LOEVY:

Q.   All right.  This is the undated report.  And I'm saying undated because if you think there's a date, I'd --

MR. NATHAN:  I'd just object to if he's calling it a certain thing.  It's part of five different pages.  So all of them should be together.

MR. LOEVY:  All right.  I will call it nothing.  And I've broken the ELMO.  It's frozen here.  All right.  Thank you.

BY MR. LOEVY:

Q.   All right.  It looks like on this thing, it's got a report there and it says the subject stated -- it's a polygraph examination.  Subject stated he was on the phone with Precious, et cetera.  We've got the whole Riff thing.  Let's go kill him.

Sunday, March 10th, in the evening hours, he saw the guy get off the bus, struck him, duct tape, bowling bag, refrigerator box, gasoline, guilty, guilty, guilty. And then the second page of this report, this is his -- where his trunk, in case he runs out of gas -- subject repeated his -- I'm sorry, I'm not calling it a report. Second page of this thing, "Subject repeated his admission in front of Gang Specialist Breen and Zalatoris of Area One crime." You see that on the paper?

A. What am I looking at, sir?

MR. NATHAN: One second. Objection. Vague. Saying "this thing," when we have a record that we need to keep. It's part of an exhibit. It's a multipage document. He's using one specific page of it. Let's keep it a clear record.

MR. LOEVY: All right. Let's go slowly then.

THE COURT: Identify what this is.

BY MR. LOEVY:

Q. This is -- let's look at all the -- the whole thing. This is the Chicago Police Department Forensic Unit. You see that? Are you familiar with that?

A. Yes.

Q. All right. And it looks like the report of -- requested by Zalatoris, it's Bartik's report of John Fulton; right?

A. It's -- it's not a report we did.

Q. All right.

A. That's the report done by the polygraph unit.

Zalatoris - direct

1488

Q.   And then here's some notes here.  No examination, see attachment.  And here we go.  So this is the confession.  Prior to the polygraph, after signing the consent form -- so in other words, he's ready to do the polygraph, he signs the consent form.  And he says, "Subject," that's Fulton, "stated on March 8th he was on the phone with Precious" and just read the whole confession; right?

A.   Somebody typed --

Q.   Somebody wrote that?

A.   It wasn't us.

Q.   It was Bartik; right?

A.   Well, it wasn't us.  Okay?  It's not a report you're asking me about.

Q.   And you had never -- this report didn't show up for the first two years?

     MR. NATHAN:  Objection.

BY MR. LOEVY:

Q.   To your knowledge, you never saw it for years; right?

A.   I didn't see it until now.

Q.   All right.  So 2003, you didn't know about it?

A.   We could go through every year until 2025.

Q.   I'm just going to go to the criminal trial.  2003, 2004, 2005, you never knew about this report?

A.   I never saw it because I don't know what kind of reports they do at the forensic -- the polygraph unit.  We're not part

of that unit.

Q. All right. Gasoline was in his can from his trunk. Subject stated -- so you don't know when this was created, you don't know if it was created after or before or when; right?

A. I don't know anything about --

MR. NATHAN: Objection. Calls for speculation.

MR. LOEVY: He answered. He doesn't know anything about when it was created.

BY MR. LOEVY:

Q. All right. Case is now -- "Subject repeated his admission in front of Gang Specialist Breen and Zalatoris." If I understand your testimony, and I don't think you're going to change it, did that happen?

A. No.

Q. All right. Just a few more areas, sir. You got the confession of Fulton, Mitchell, and Shaw; right? The statements?

A. What was that now?

Q. You and Breen were the ones responsible for getting the statements that led to the conviction; right?

A. Yes.

Q. And there really was no other evidence developed other than the statements; right?

A. Well, you know, no. Statements and them taking us for the rides and showing us these things, yeah.

Zalatoris - direct

1490

Q.   All right.   So you would agree then, you were -- you and Breen were primarily responsible for the evidence that put these men in prison; right?

A.   We were one of the -- two of the detectives responsible, yes.

Q.   All right.   But you were the ones who got the only evidence; right?

A.   One of the detectives responsible for this, closing this case, yes.

Q.   By the time you were done with the Forest View Police Department, you were burned out on being a police officer, fair to say?

        MR. NATHAN:   Objection.   Form.

        THE WITNESS:   I was done with it, yeah.

BY MR. LOEVY:

Q.   It was not a passion thing for you, you were done with it? Did you have tunnel vision in this investigation?

A.   No.

Q.   Did you prejudge when John and Anthony were in the room? Did you prejudge them as guilty when they walked in?

A.   No, of course not.

Q.   Remember we said yesterday -- you said he told you what the truth was, and you said, "That's not the truth, keep going until you tell me the truth."   So you did prejudge their guilt; right?

A.   We didn't prejudge them.  We asked them and they said no.
We weren't involved.

Q.   All right.  At the point that you got Precious's statement,
it really was a point of no return for you, wasn't it, sir?

        MR. NATHAN:  Object to the form.

        THE COURT:  Sustained.

        THE WITNESS:  What was the question again?

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Point of no return.  I'll think of a less argumentative way
of saying that.  But you couldn't turn back once you got
statements from Mitchell and Fulton saying they did it; right?

A.   No.

Q.   In other words, once the hospital video shows up and the
phone records show up, you were not in a position where you
could say, "Let's start over, let's reinvestigate this."  That
was not an option for you; correct?

        MR. NATHAN:  Object to the form of the question.

        THE COURT:  I think the form is all right.

        THE WITNESS:  Okay.

        THE COURT:  Go ahead.

        THE WITNESS:  What was the question again?

BY MR. LOEVY:

Q.   Once you got these statements and the evidence shows up
from the hospital and the phone records and such, you were no

longer in a position where you could start all over the investigation and go looking for other people; right?

A.   Oh, you could.

Q.   But if you did that, you'd have to explain to your supervisors and the state's attorney's office how you managed to get three confessions that were false?  You would have had to do that; right?

A.   We'd present this to the state's attorney's office and they were the ones that would make the determination, yes.

Q.   No, but the point is, sir, like your boss -- who is your boss?

A.   Who, the superintendent of police?

Q.   Did you have a supervisor that --

A.   I don't remember 22 years ago who the bosses were.

Q.   Whoever your boss was, if you would have started over and, say, looked into a gang angle or something, you would have had to explain, "How did you get Fulton and Mitchell to confess if it was somebody else?"  That would have been hard for you, do we agree?  Hard to explain?

A.   Well, I don't understand what we would find out after they confessed and told us they did it.

Q.   Yeah.  Let's say they confessed and they told you they did it.

A.   Right.

Q.   And then you found other information that suggested

Zalatoris - direct

1493

somebody else did it.  You would have got in trouble; right?

A.   No, we wouldn't have got in trouble, no.

Q.   Nobody would have cared you got confessions --

A.   I wouldn't say "wouldn't have cared."  Wouldn't be in trouble.

Q.   Are you sure you wouldn't have been in trouble?

         MR. NATHAN:  Objection.  Argumentative.

         THE COURT:  Sustained.

BY MR. LOEVY:

Q.   Would it have caused you professional embarrassment?

A.   No.

Q.   If you got the wrong people to confess?

A.   Not at all.

Q.   If you had to do this all over again, would you do the exact same steps, sir?

A.   Yes.

Q.   You've now had some point in time to reflect.  Would you change a thing?

A.   I just did my job the best I could.

Q.   Would you change a thing?

A.   I just did my job the best I could, sir.

Q.   All right.  Did you do your job the best you could?

A.   I did.

Q.   Let me ask you a different question.  Would you do anything different than what you did?

Zalatoris - cross

1494

A.   If I was investigating this back in 2003?

Q.   For example, maybe checked out the hospital, gone a little slower, would you have done anything different?

A.   No.

Q.   Do you have any remorse for your actions, sir?

A.   No, sir, just doing our jobs.

MR. LOEVY:   I don't have any other questions, Your Honor.

THE COURT:   Would you like a break?

THE WITNESS:   In a while, maybe.  Okay.

THE COURT:   Okay.  Mr. Nathan, you can...

MR. NATHAN:   Your Honor, just for planning purposes, how long are we going to be going now?

THE COURT:   We'll take a -- let's see.  We started at 2 o'clock or 1 o'clock?  I usually go an hour and a half, so that would put us at 2:30.  If you want, we can --

MR. NATHAN:   We have about a half an hour now?

THE COURT:   Pardon me?

MR. NATHAN:   We have about a half an hour now?

THE COURT:   Think we can do that; right?  Yes?  Okay. So we'll go to 2:45, take a recess.

CROSS-EXAMINATION

BY MR. NATHAN:

Q.   Good afternoon, Mr. Zalatoris.

MR. NATHAN:   May I have just -- I'm going to be using

a document that's in evidence, if I could publish to the jury. It's just the 12-pager.

BY MR. NATHAN:

Q. Before we get into kind of the meat of your examination here, Mr. Loevy asked you some questions about whether or not you documented in that seven-page general progress report anything about how you took Mr. Fulton on a drive and he showed you the various things that he was talking about. Do you remember those questions?

A. Yes.

Q. And you noted that it wasn't in your general progress report?

A. Yes.

Q. Okay. Showing you page 8 -- first of all, showing you Defendants' Exhibit 6. This is a 12-page report, which is typed up by who? Do you see who the reporting officer is in this report?

A. Yes. Detective Rolston.

Q. Did you type up this report?

A. No.

Q. Did you do your best to communicate the actions that you took in the investigation to Detective Rolston?

A. Well, yes.

Q. Showing you page 8 of this report. Do you see here where it says Fulton went with R/Ds and showed R/Ds the route that

was taken to Foster Avenue?  Do you see that?

A.  Yes.

Q.  What's documented over there?

A.   It's documented that he came with us, he showed us the route they took up there, he showed us where the victim had been abducted from, the alley that he believed was the one where they removed the victim from the trunk and taped him up, and he showed the route that they took back to get to where they burned the body.

Q.  Showing you page 10 of this report.  What's documented over here?

A.  What's documented here is when Mitchell went with us and showed us all the areas, how they got there, and where the kid was grabbed, gas station, things like that.

Q.  And that's where he showed you exactly what he was talking about when he gave you a statement?

A.  Yeah.

Q.  So just backing up, how long were you a Chicago police officer?

A.  28 years.

Q.  And how long of that was -- were you a detective?

A.  18.

Q.  When did you become a detective?

A.  January of '95.

Q.  And when did you retire?

A.   September of 2013.

Q.   Are you married?

A.   Yes.

Q.   Do you have children?

A.   Yes.

Q.   How many children do you have?

A.   Two.

Q.   Is your wife retired as well?

A.   She is.

Q.   What did she do for a living?

A.   She worked for Jewel for like 46 years.

Q.   Are you presently living off of your pension?

A.   Yes.

            MR. LOEVY:  Objection, Your Honor.  That opens the door.

            THE COURT:  Is there an objection --

            MR. LOEVY:  Objection to testimony about his personal finances.

            THE COURT:  All right.  Sustained.

BY MR. NATHAN:

Q.   Now turning your attention to the investigation of the murder -- into the murder of Christopher Collazo, I remember yesterday you were asked questions about things that may have happened at the scene of the murder.  Do you remember those questions?

A.   I remember being asked questions about that, yes.

Q.   Were you at the scene of the murder?

A.   No.

Q.   And were you at the scene where -- specifically where the body was located, burning?

A.   No.

Q.   You know, just going back to Defendants' Exhibit 6 --

MR. NATHAN:  May I have the...

BY MR. NATHAN:

Q.   Do you see here on the front of the report, it says Primary Detective Assigned?

A.   Yes.

Q.   What does that mean?

A.   That's the person whose case this is.

Q.   And what does that mean relative to the scene?  Do you know if he was at the scene?

A.   That -- yeah.  That's how you end up getting it assigned to you, by getting the scene on it.

Q.   Now you mentioned that Detective Rolston is -- he's now deceased?

A.   Yes.

Q.   During the time period between when Fulton, Mitchell, and Shaw were arrested and the trial, do you know if Mr. Rolston got sick?

A.   Could you ask me that again?

Zalatoris - cross

1499

Q.   Sure.   And if you don't know, it's okay.   But do you know
if Mr. Rolston got sick at any point in time prior to the 2006
trial?

A.   I don't know.

Q.   Does the fact that somebody's a primary detective mean that
they initially will be responsible for the paperwork?

A.   Yes, they are.

Q.   Now just to orient us a little bit -- well, what was your
first involvement in this case?

A.   First involvement we had was when we were coming into work
on -- I guess it was the 10th.   We were told to do -- start
doing a followup on it and identify this kid, see if we can get
him identified at the morgue.

Q.   And were you able to do that?

A.   Yes.

Q.   How did you do that?

A.   We had the crime lab come and print him and they ran the
prints.

Q.   And that's how you were able to learn the person who had
died was Christopher Collazo?

A.   Yes.

Q.   And then what did you do next?

A.   Next thing we did, we went to the address we had for him to
notify his family.

Q.   And that's where you met with who?

Zalatoris - cross

1500

A.   That's where we -- the mother, the brothers.

Q.   You were asked questions about -- yesterday about how the brothers initially left the house and they were upset. Remember that?

A.   Yes.

Q.   Did they eventually come back?

A.   Yes.

Q.   What were you thinking when they left the house and they were upset?

A.   I didn't know if -- you know, again, I didn't know if they were just kind of distraught and just wanted out of there for a minute or two, you know, or what.

Q.   Like they needed fresh air, or?

A.   Yeah, like that, for instance.  Yeah.

Q.   Did they come back, though?

A.   They did come back.

Q.   And did you interview them?

A.   Yes, we talked to them.

Q.   And did you talk to the mother?

A.   Yes, we talked to the mother.

Q.   And what did you end up learning?

A.   Well, we learned that he was with a kid named Stix.  That was the nickname they had.  And they couldn't tell us who the kid was, but they said there's a guy that lives a couple -- about a block and a half away named Wood.  I think that's

Rosas, if I'm not mistaken, and said he knows who this kid is. So we went to that house next.

Q. And showing you what's been marked as Defendants' Exhibit 52, and this is a general progress report that is in evidence. First of all, before we get into the substance here, I think it would be helpful if you could explain what a "watch" is.

A. Well, in a 24-hour period, it's divided into three watches. And midnights will be first watch. That could be anywhere from like 10 to 6 in the morning, 11 to 7 in the morning, or midnight until 8 in the morning. And then you have second watch, which is primarily days. And you have third watch, which is like going into like, say, late afternoon, early evening, to the midnight shift.

Q. And what was your typical watch?

A. We were third watch.

Q. And what was that shift?

A. That would be 4:30 until midnight, 1 o'clock in the morning.

Q. Now maybe I chose a bad example because this is showing a different watch. Is this -- who authored this general progress report?

A. Myself and my partner.

Q. And actually, do you recognize more than one handwriting on this report?

A.   Yeah.

Q.   And some of this is yours and some is your partner Breen?

A.   Right.

Q.   And just, you know, we're going to see their handwriting later, but up here is whose handwriting?

A.   That looks like Jim's, my partner's.

Q.   And yours is where?

A.   Down here.

Q.   Here?

A.   Yeah, the stuff that's hard to read.

Q.   Okay.  Now up at the top where it says the date of the original case report, what does that mean?

A.   That's the date that it happened, you know, that the general offense case report was done.

Q.   Just showing you Defendants' Exhibit Number 1.  You saw this on your -- Mr. Loevy's questioning.  Is this what you're referring to about the general offense case report?

A.   Yes.

Q.   And this -- who writes the general offense case report?

A.   Usually it would be beat officers that respond to the call.

Q.   What does that mean, the beat officers?

A.   The guys in the blue and white, patrolmen.

Q.   So those are the initial officers who respond to a 911 call?

A.   Yes.

Q.   Okay.   And then that person fills out their preliminary investigation report?

A.   Yes.

Q.   And that's called a general offense case report?

A.   Yes.

Q.   For this document, what does it say for date of occurrence?

A.   It's 10 March '03, 0305 hours, which would be 3:05 in the morning.

Q.   Okay.   So now moving back to your general offense case report, date of original case report, is that referring to Exhibit Number 1?

A.   The date on that, yes.

Q.   Now where it says date of this report at the top right corner, what does that mean?

A.   That's the --

MR. LOEVY:   Objection.   Asked and answered, Your Honor.   We covered that.

MR. NATHAN:   We covered the watch.   I'm just trying to put it in context in a little bit clearer way.

THE COURT:   All right.   Go ahead.

THE WITNESS:   That's the date that we did the -- did this GPR here.

BY MR. NATHAN:

Q.   You're saying that's when you wrote this GPR?

A.   When we wrote this GPR.

Q.   And then the watch, doesn't give you an exact time, but it gives you a time period; is that fair?

A.   Right.

Q.   And explain why that gives you a time period.

A.   It means we did it between -- well, first watch, you know, approximately midnight to 8 o'clock in the morning, in that time.

Q.   Now this is a general progress report, and that is an official report, which you signed; right?

A.   Yes.

Q.   But is it also -- it's another way of saying it's your notes; right?

A.   Yes.

Q.   And sometimes some detectives could be better note-takers than other detectives?

A.   Each one's different.

Q.   So looking here, what is this general progress report documenting to you?

A.   Well, it's talking about Michael Rosas, who's the guy that the family told us about, so we talked to him.  The top part, that's his like identifiers.  And then he talks about where he was, at the victim's house on Sunday night, saw the victim and Stix in the house.  And he actually told us about Stix.  I forgot exactly if he gave us a first name.  And he said he's an Italian kid from Elmwood Park, and that's how we identified

Zalatoris - cross

1505

Marinelli.

Q. Now you didn't interview Marcus Marinelli; right?

A. No.

Q. But do you understand that as a result of your interview with Rosas, other detectives learned about that and then followed up and interviewed Marinelli?

A. Yes.

Q. And what do you believe that your investigation learned from the interview with Marinelli?

A. Well, that the victim and him were going to do a gun deal with Fulton and that was all set up by a girl that knows both of them, Precious, and it turned into where the victim and Marinelli ripped off the -- ripped off Fulton in a hallway.

Q. That was the lead that -- about the gun deal?

A. Right.

Q. And ultimately you learned that Detective Winstead had interviewed Johnitta Griffin, AKA Precious; right?

A. Yes.

Q. Why is it you went to go reinterview her?

A. You know, Winstead told us that, you know, "You ought to reinterview her again." And I can't remember exactly if he even said to us that there was something that he wanted to ask her. But we wanted to ask something because from what we could see, that was the only tie from where the victim lived on the northwest side and where he got grabbed on the far north side.

Well, we didn't know he got grabbed there at the time, but where he ended up being burnt in a box on the south side.

Q. So you wanted more information?

A. Yeah, we did, yes.

Q. Showing you what is Plaintiffs' Exhibit 11, Bates Number 8671-38673. Now what are we looking at right now?

A. This is an interview of Precious.

Q. And whose general progress report is this?

A. It's myself and my partner's.

Q. And do you recognize the handwriting on this report?

A. Yeah, it's mine.

Q. Now according to this report, again, this relates to a general -- original case report from an incident dated 10 March 2003; right?

A. Right.

Q. And then what does it indicate, the date and time, in terms of when you were writing this report?

A. 14 March '03. And into midnights.

Q. And does that show you, again, there's a --

A. First watch.

Q. Shows watch?

A. Yes.

Q. That's the approximate time period you're talking to her?

A. Right.

Q. When you interviewed her, what did she tell you about

what -- she told you about, you know -- we covered already that she told you about the gun deal; right?

A.   Right.

Q.   And then after the gun deal, what did she tell you about what John said relating to Collazo?

A.   Well, she said "You or your boy got it coming to you" and "Either you or him."  And wanting the money back.

Q.   And was John asking about getting his $300 back from Griffin?

A.   Yeah.  He did want it back.  I think he made a comment, something like he's going to take it out on her or something.

Q.   What else did John say -- excuse me.  What else, according to Ms. Griffin, did John say about getting money back or about Collazo?

A.   She says "Make sure you know you or your boy got it coming."

Q.   And you have that in quotes; right?

A.   Yes.

Q.   Why do you have that in quotes?

A.   She told us that's what he said.

Q.   Not everything in your general progress report or your notes is in quotation marks; right?

A.   No.

Q.   Is that because you're doing the best that you can to summarize what happened?

Zalatoris - cross

1508

A.   Exactly.  But when there's a quote that somebody said, we try to do that if we can, like if -- like she said what he said.  Yeah, we put that in quotes.

Q.   Now showing you the second page of your notes from that interview with Ms. Griffin.  What did she tell you about how -- how she called Collazo before the murder?  I mean, I highlighted it here.

A.   Oh, I'm sorry.  It says Precious tries to call him from a pay phone at Armitage and Kimball.

Q.   And actually, do you remember that yesterday she testified that she actually called Collazo from a pay phone?

A.   I tend to --

          MR. LOEVY:  Objection to the date and foundation, Your Honor.

BY MR. NATHAN:

Q.   Sure.  Do you remember yesterday, when we heard the videotape deposition testimony of Ms. Griffin, she mentioned that same fact?

A.   Yes.

          MR. LOEVY:  On what day and time?  But.

BY MR. NATHAN:

Q.   You were asked questions about how after you interviewed Ms. Griffin, then a state's attorney interviewed her; right?

A.   Right.

Q.   And were you present for that interview?

A.   Yeah, I believe so.

Q.   Let me show you that.  I know that Mr. Loevy showed you this, but let me just -- this is Defendants' Exhibit 11.  This is a formal handwritten statement of Ms. Griffin.  Who does it say was present?

A.   Yeah, during the formal statement, Rolston, yeah.

Q.   So Mr. Rolston was present when Mr. ASA Rubinstein interviewed her?

A.   Yes.

Q.   Okay.  Now just generally about the procedure, a witness like Ms. Griffin or any of the -- Mr. Fulton or Mr. Mitchell, a witness gives a detective an account of what happened, then you want to formalize that in a written statement.  How do you go about getting a prosecutor to come to the station?

A.   Well, you would call the felony review unit from the state's attorney office.  Again, depending if they have anybody free right then and there.  They say, "We'll give you the next guy that's up," or whatever, that's available.  So you might wait for a while for that.  And then if you happen to make the mistake of calling anywhere near one of their shift changes, you could expect a couple hours before you see a state's attorney.

Q.   Do you control when they show up?

A.   No, not at all.

Q.   And if I understand you correctly, you're saying the

Zalatoris - cross

1510

Q. prosecutor's office is not in your building; right?

A. Nowhere near it.

Q. Your building was located where again?

A. That was at 39th and Wood. And again, they're out at 26th and California, but they're all over the place. I mean, they might get that call to go to Area One to somebody that's way up on the far northwest side.

Q. In any event, when would your shift have ended on March 14th, 2003?

A. That day, about 1 o'clock in the morning.

Q. So by the time Ms. Griffin gives a statement to Mr. Rubinstein at 9:45 a.m., are you even on shift?

A. No.

Q. That's because you were on third watch; right?

A. Right.

Q. You remember there was a question -- you were asked questions by Mr. Loevy about Ms. Griffin going to the grand jury?

A. Yeah.

Q. Do you -- were you even there --

A. No.

Q. -- at that time?

A. No.

Q. Do you know if she went to the grand jury?

A. I don't remember if you showed me grand jury -- no, you

Zalatoris - cross

1511

know what, I don't know, to tell you the truth.

Q. Well, she did testify yesterday at the -- we saw her giving videotaped deposition testimony and she talked about grand jury testimony?

A. Yes.

Q. Remember that?

A. Yes.

Q. But were you there?

A. No, I wasn't there.

Q. Okay. So let's -- let's move on to March 18th, 2003. Do you remember you were shown by Mr. Loevy, you were shown the arrest report of John Fulton? Do you remember that?

A. Yes.

Q. Showing you Defendants' Exhibit 11, which is in evidence. What is this?

A. That's an arrest report, Chicago Police arrest report.

Q. And whose arrest report is this?

A. That's John Fulton's.

Q. Now in a Chicago Police Department arrest report in 2003 -- I'm showing you the bottom of it -- is there a space on the bottom for arresting officer and second arresting officer?

A. Yes.

Q. And what is that space for?

A. That's for the -- two officers -- well, two people that are involved in the arrest that went there and made the arrest.

Zalatoris - cross

1512

Q.   You were asked questions yesterday about why you were listed as an arresting detective over here on the narrative section.   And why is that that you're listed there?

A.   Well, on a case like this, everybody that's involved in this case would be on the arrest report.   They all participated actually in this.

Q.   Did you fill out this arrest report?

A.   No, I didn't.

Q.   Were you present at the arrest of John Fulton?

A.   No.

Q.   And according to this report, do you see here, Box 29, it says date of arrest?

A.   Yes.

Q.   And what is that date?

A.   18 March of -- well, 18 March of '21.

Q.   Is that a typo?

A.   It's got to be a typo.

Q.   Okay.   And what time is located -- is indicated --

A.   0530 in the morning.

Q.   Okay.   Were you on shift at that time on March 18th?

A.   No.

Q.   And, again, when did your shift start?

A.   Ours started at like 4:30 in the afternoon.

Q.   P.m.?

A.   Right.

Zalatoris - cross

1513

Q.   And that was third watch?

A.   Yes.

Q.   Do you remember -- I don't remember if it was yesterday or today, but Mr. Loevy showed you that seven-page general progress report, which documented the confession that Mr. Fulton gave you.  Do you remember that?

A.   Yes.

Q.   And do you remember this whole line of questioning about, where is it documented about, that initially when you first talked to Fulton, he denied killing Collazo?  Do you remember that line of questioning?

A.   Yes.

Q.   Showing you Defendants' Exhibit 6.  This is a report we looked at before earlier today; right?

A.   Yes.

Q.   Showing you page 7 of this report.  What does it say in that first paragraph of the report?

A.   18 March '03, that part?

Q.   Yes.

A.   Yeah.  "R/Ds Breen and Zalatoris were advised that John Fulton was in custody by Detectives Rolston and Girardi.  R/Ds Breen and Zalatoris again advised Fulton of his constitutional rights from the current FOP handbook.  He replied that he understood these rights and agreed to talk to R/Ds.  Fulton initially related that he had been robbed by the victim in

February during a gun sale transaction between him and the victim. He denied having anything to do with the murder of the victim."

Q. Okay. So first, can you just explain to the ladies and gentlemen of the jury, what is an FOP handbook and like how -- what are you reading from?

A. The FOP handbook, it's basically calendars for every police period, like every month. And you can write in your court dates and stuff like that. But it also has like all the streets in the city of Chicago and what hundreds they are. It also has -- it's got -- like I said, like he was saying, it's got the Miranda warnings in there that you can give. Again, I haven't looked at one in years now, but I'm trying to think of what else might be in there.

Q. Is that something that almost every police officer keeps with them? It's like a handheld little --

A. Yeah, because you record your court dates and stuff like that in there. So guys always had that in their pockets.

Q. It's like a pocket calendar almost?

A. Kind of like that.

Q. And in there, it says the Miranda warnings?

A. Yes, it does.

Q. So what did you do to read Mr. Fulton the Miranda warnings?

A. I took out my FOP book and opened it. And, you know, I couldn't tell you exact page, but -- because sometimes it

changes when they do different books.  But it's up around the page 130 I remember on there.  And I went to it and I read him the Miranda warnings that were in there.

Q.  Okay.  And was the facts that Fulton initially denied having anything to do with the murder of Collazo documented in this report, Defendants' Exhibit Number 6?

A.  It is documented in this report.

THE COURT:  All right.  It's time for a recess.

(Recess at 2:49 p.m., until 3:06 p.m.)

THE COURT:  Would you take your place on the witness stand.

(Jury in at 3:06 p.m.)

THE COURT:  Be seated.

BY MR. NATHAN:

Q.  So I was trying to go in chronological order to make it less confusing, but I've got to rewind for a second.  Sorry. Going back to that time, you know, that dramatic moment where you have to notify the mother, Mr. Collazo's mother, that her son just passed away, so going -- that was on March 10th, right?

A.  Yes.

Q.  Okay.  So showing you part of Plaintiffs' Exhibit 11, this GPR.  Whose GPR is this?

A.  Well, that's mine and Jim's.

Q.  Okay.  And is this -- where is this information coming from

really on this GPR?

A.   I think it's one of the brothers.

Q.   Okay.  And at the top it says "LaRaza."  Do you see that?

A.   Right.  I don't know exactly what is on there or what it means to tell you the truth.

Q.   And that's what I was going to ask you about.  It's been a long time.  And it says "LaRaza."  Do you know, you know, why exactly you put down "LaRaza"?

A.   I don't.

Q.   But that's information that came from the brothers?

A.   Yes.

Q.   And if, if that had given you sufficient information to go do any kind of investigation, would you have done that?

A.   Yes.

Q.   Okay.  And any reason not to do investigation if you have actionable information?

A.   No.

Q.   Does the mere fact that somebody says, Oh, Collazo is in a gang, does that give you any further ability to investigate?

A.   Not really.

Q.   I mean, you hear that he's in a gang.  What are you supposed to do with that?  Like, tell me what you could do with that information.

A.   I mean, I don't know.  I mean, you know, he's in a gang.  I mean, there is gang factions.  There is all kind of stuff.  I

Zalatoris - cross

1517

mean, it could be anybody.

Q. Was there any information that you learned that allowed you to go follow-up on a lead about a possible gang hit or anything like that?

A. No.

Q. In fact, earlier today we heard about that 911 call. Do you remember that?

A. Yes.

Q. And a dispatch tape?

A. Yes.

Q. I know you said you didn't hear, you didn't hear it at the time. But right now you heard that the description that was over police dispatch was for two black males, right?

A. Yes.

Q. Is the LaRaza gang a black or Hispanic gang?

A. Hispanic.

Q. And is that dispatch like consistent or inconsistent with any theory about a LaRaza gang?

A. No.

Q. Now, this business about LaRaza gang, is that just complete rank speculation?

A. I believe that's what it is.

Q. But you did learn, and, you know, now I can go fast-forward back to the 18th, you did learn from Precious that there was information that Collazo had been involved in a gun, a gun

Zalatoris - cross

1518

transaction that went bad, right?

A.   Right.

Q.   And you followed up on that lead?

A.   Yes.

Q.   And why did you do that?

A.   Because it's important.  I mean, there was a gun deal that turned bad.  And there was, according to Precious, you know, there is calls made back and forth, like that kind of stuff.

Q.   If you had some other lead, would you have followed it?

A.   Yes.

Q.   But this was the lead that you had, right?

A.   Right.

Q.   So now fast-forward back to the 18th.  We covered that Mr. Fulton was, he was arrested by Rolston, right?

A.   Right.

Q.   And you weren't there, but you show up on third watch, which is in the afternoon sometime after 4:30, right?

A.   Yes.

Q.   Initially he gives you a denial.  It's documented in the supp report, right?

A.   Yes.

Q.   That's not your supp report.  It's Rolston's supp report, right?

     Now, speaking of that supp report, I think you were testifying earlier that you acknowledge that the fact that the

next thing that happened was that you brought Mr. Fulton to a polygraph. That's not in the supp report, right?

A. No.

Q. And why is that?

A. Well, he didn't take the polygraph.

Q. And you said that was an oversight?

A. That was an oversight, yes.

Q. Now, if you were writing this report today, would you put that in the report?

A. We put down we took him there, yes.

Q. Were you intentionally trying to hide the fact that he went to a polygraph?

A. No.

Q. In fact, we saw the polygraph records that document Mr. Fulton went to a polygraph, right?

A. Yes. It is documented, but not by us.

Q. And that's not disputed Mr. Fulton went to the polygraph, right?

A. Yes.

Q. Now, a lot of what you do, you go through, you rely on your reports in order to refresh your memory, right?

A. Yes.

Q. And is that what you were talking about at times to the jury, you were saying: Can I have my report?

A. Right, or GPRs, yeah.

Zalatoris - cross

1520

Q.   Why is that?

A.   Well, this is 22 years ago, and I'm being asked detailed things.  And you investigate a lot of cases over the years, and, you know, you just can't remember everything.

Q.   So, I mean, not to be hard on you or anything, but like it would have been -- if you had, if you had a GPR about the polygraph unit, it would help refresh your memory, right?

A.   Oh, yeah, it would.

Q.   But, unfortunately, you had an oversight there and you didn't do that?

A.   Right.

Q.   Do you have a perfect memory of what exactly happened at the polygraph?

A.   I don't have a perfect memory of it, no.

Q.   Now, somebody -- and we saw that Mr. Bartik did have a report, it's a full page and a little bit report about what Fulton said at the polygraph, right?

A.   Yes.

Q.   And you don't have a report, so you don't have as good a memory?

A.   I mean, no.  I never saw that report until, I don't know, whenever.

Q.   Okay.

A.   I'm not part of that unit.

Q.   So are you saying that Bartik is wrong or are you saying

Zalatoris - cross

1521

you just don't remember?

A.   I don't remember it.

Q.   So after the polygraph unit, the next thing in the investigation is you go back to the area, right?

A.   Yes.

Q.   Now, there was no polygraph exam.  Why wasn't there a polygraph exam given?

A.   I don't know.

Q.   Because you don't remember?

A.   Right.

Q.   Okay.  But you know from your general progress report that at some point on March 18th, during third watch, you spoke to Fulton, right?

A.   Yes.

Q.   And this, just to be clear, this is not your handwriting. It's your partner Breen's handwriting?

A.   Yes.

Q.   But you also signed the bottom because this is -- you're there, too?

A.   Right.

Q.   Okay.  Now, for now I'll zoom out.  I can't get the whole page on for some reason, so I apologize.

         But you've seen this document before, right?

A.   Yes.

Q.   And this document is actually seven pages, correct?

Zalatoris - cross

1522

A.   Right.

Q.   And the entire seven pages is documenting what?

A.   What was told to us.

Q.   What was that?

A.   What was told to us by Fulton.

Q.   Now, Mr. Loevy asked you several questions about whether you gave him any information, Mr. Fulton the information or whether he was giving you information.

Which one was it?

A.   He was giving us information.

Q.   Did you guys just like have a creative writing session and just write whatever you want down in these seven pages?

A.   No.

Q.   What is it that you are writing down here?

A.   Well, there is questions being asked, and we're writing down what the answers are to those questions.

Q.   And do you have a perfect memory as to every question that you asked and every exact answer he gave you?

A.   No.

Q.   At some point in time he was talking to you and he gave you this account.  He gave you the information about the gun deal, right?

A.   Right.

Q.   And that's in your general progress report?

A.   Yes.

Q.   And he talked about how he ended up abducting Mr. Collazo, beating him and burning him, right?

A.   Yes.

Q.   Mr. Loevy pointed out that there was an address in the supplementary report that Fulton actually -- you were saying Fulton gave an address?  Or I might be misstating that.  Fulton gave you an address about where this alley was.  Do you remember that?

A.   Where the body was found?

Q.   Yeah.

A.   He didn't give us an address.

Q.   Okay.  How did you get that address?

A.   He showed us where it was at.

Q.   Okay.  So explain, explain to the ladies and gentlemen of the jury how that process went.

A.   While we were out driving, he showed us where they drove down the Dan Ryan, where they got off at Garfield.  We drove around these streets up and down.  And then the alley was pointed out to us.  We turned in this alley.  So we went in that alley, and he showed us where they burned him in a box.

Afterwards we went around the front, made sure we had the address for the houses on the other side.  It was a vacant lot the whole way up if I'm not mistaken, and we wrote down that address.

Q.   Now, showing you page 4 of your general progress report,

the one that Breen wrote, Defendants' Exhibit 61.

You were asked questions earlier about what Mr. Fulton said relating to the bus. Do you remember that?

A. Yes.

Q. What does it say here about the bus?

A. It says, "Bus pulls up and then drives away. Notice Chris walking on Foster."

Q. Okay. Does it say here that Mr. Fulton said he saw Mr. Collazo or Chris get off the bus?

A. No.

Q. What is it saying?

A. It says he sees a bus pull up and drive away, and he sees the kid walking there.

Q. And then here, what does it say here, "Riff and Stick"?

A. Right at the what is yellow there or above it?

Q. Just before it.

A. "Riff and Stick beat Chris."

Q. And what does it say next?

A. It says, "Riff pulled out, pulled or" I believe it's "bat or what appeared to be a little metal or wooden baseball bat."

Q. Okay. And why did Breen write that down? And why did you sign the bottom of that GPR about that?

A. Because that's what he told us.

Q. Turning to page 6 of the exhibit.

Tell us what Mr. Fulton told you starting from here,

"John and Riff"?

A. "John, Riff and Stick kicked the box over to the side out of the middle of the alley. John entered the driver's seat, Stick in the passenger seat, Riff in the back seat with gas can. Drove Riff and Stick home."

Wait. "Drove Riff and Stick home. They drove, they drove home."

Q. Does that say "Next day" here?

A. Well, "Next day," oh, yeah. "Next day put gas can in grandparents' garage. Used the garage door opener."

And then "Car vacuumed out/cleaned at Pete's Car Wash, South Chicago and King Drive. Bowling bag, cardboard cover for spare tire and toolbox all had blood. Washed with soap."

Q. Now, did you actually go and try to see -- well, let me back up. So Mr. Fulton is telling you this information, right?

A. Yes.

Q. And before he told you that, had you ever heard of Pete's Car Wash before?

A. No.

Q. How did you learn that information?

A. Well, from him.

Q. Is that because he told you that on March 18th?

A. Yes.

Q. And did you actually go to the garage to try to investigate whether this was true?

Zalatoris - cross

1526

A.   For the gas can?

Q.   Yes.

A.   Yes, we did.

Q.   I'm showing you Defendants' Exhibit 124.

What is this?

A.   It's the gas can.

Q.   Now, you were describing before that you didn't have a camera.  But explain to the ladies and gentlemen of the jury how does this picture come into existence?

A.   When we recover something like gasoline, fireworks, gun powder, things like that, you have to call the bomb and arson unit.  And they're all equipped with cameras.  I guess they're trained as ETs also.  So that's where that picture came from, the bomb and arson detective that recovered it.

Q.   So the bomb and arson unit of the Chicago Police Department came out to the --

A.   Recover.

Q.   -- to the garage to take the picture and recover it?

A.   Yes.

Q.   Now, we saw earlier a general progress report that talked about this trip that you took to Mr. Lucas's garage, correct?

A.   Yes.

Q.   And I think if I remember that correctly, it didn't describe exactly what Mr. Lucas said at the time.  Do you remember that?

A. Right.

Q. Showing you page 10 of Defendants' Exhibit 6. One second.

What does it say here?

A. "R/Ds went to the residence of Adolphus Lucas."

Q. Slow down. Just read that a little slower.

A. Okay.

Q. "R/Ds," reporting detectives, "went to the residence." Continue.

A. Okay. Can you blow it up a little bit?

Q. Sorry.

A. That's okay.

"Went to the residence of Adolphus Lucas, Fulton's grandfather, at 8055 South Crandon. R/Ds explained to Lucas that they were looking for a gas can that had been left in his garage by Fulton. Lucas gave his consent to look for the can and accompanied R/Ds into the garage. R/Ds found a new red plastic" --

Q. One second. Let me just stop you there.

A. Okay.

Q. Do you actually remember Mr. Lucas?

A. Yeah.

Q. What do you remember about him?

A. Old-timer, I believe he had white hair, balding, nice guy.

Q. You remember him being nice?

A. I remember him being a nice guy, yeah.

Zalatoris - cross

1528

Q.   Okay.  Keep going.

A.   Because we were there in the middle of night, and he was pretty decent.

Okay.  "R/Ds found a new red plastic gas container in the rear of the garage on the west wall.  This container resembled the same type as those that were sold at the gas station located at Lincoln and Foster.  Lucas, upon seeing the gas container found by the R/Ds, related it was not his gas can, and he had never seen it in his garage before.  Container was recovered by Detective Winston, bomb and arson unit, under" an inventory number.

Q.   Now, when Mr. Lucas told you he had never seen this gas can before in his garage, what did you think?

A.   Well, this is the gas can they used.

Q.   Meaning it was the gas can that what?

A.   The gas can they used to burn that box.

Q.   And what did that make you think about whether or not the statement that Mr. Fulton was giving you about putting a gas can in the garage, in the grandparents' garage was accurate?

A.   Well, that's the only way we would have known it's there.

Q.   So going back to this idea where -- now, how do you go about and get a Felony Review attorney to interview Mr. Fulton?

A.   Well, you have to call Felony Review.  And, again, do they have somebody free?  Do they don't, if they do, then they're going to send them down.  You don't know where they're coming

Zalatoris - cross

1529

from.  You don't know how long they're going to get there.

Q.   At some point ASA McRay Judge did show up to Area 1?

A.   Yes.

Q.   And you have a recollection of Mr. Judge, right?

A.   Right.

Q.   Do you have a perfect memory of everything that he said?

A.   No.

Q.   Questions, answers?

A.   No.

Q.   But who was asking the questions during that time period?

A.   He was.

Q.   Do you remember there was testimony about where Mr. Judge asked you to step outside and he had a moment with Mr. Fulton?

A.   Yes.

Q.   Is that something that's routine that happens every time a state's attorney interviews a suspect?

A.   Yes.

Q.   And was there anything out of the ordinary about the fact that Mr. Judge asked you to step outside?

A.   No.

Q.   Did that get you upset in any way?

A.   No.

Q.   Would that get you upset?

A.   I don't know why.

Q.   Tell us why it wouldn't get you upset.

Zalatoris - cross

1530

A.   Because that's something that's done every time by the state's attorneys.

Q.   Actually, we covered that ASA Judge, I think he said he was at the station at 3:00 a.m. and then he took a statement, he started the statement at 4:55 a.m. or 5:00 a.m.  Do you remember that?

A.   Something like that.

Q.   Where does that fit in in terms of your shift, your third watch?  You start at, you started at 4:30 p.m. on the 18th, and now we're on the 19th of March.

When does your watch end?

A.   It would have been 1:00 a.m.  So we're like 4 hours into overtime on this.

Q.   Okay.  So what would you have done next?

A.   After he talks to him?

Q.   Yeah.

A.   Well, after he talks to him, then it would be like a handwritten or a video.

Q.   Now, you don't know if that happened next or not because what did you do?

A.   Well, again, we're out of the room.  You know, he tells us, you know, leave the room.  We do.  And then he comes out.  And, again, I don't really remember talking to him, you know.

Q.   But you remember that your shift is over?

A.   Well, yeah, it's been over.  And so we're going home at

this point.

Q. And you know what your shift is because why?

A. Because we worked 'til 1:00 o'clock in the morning.

Q. Is that what you would do all the time?

A. Yeah.

Q. Now, you came back on duty.

Showing you the arrest report of Mr. Mitchell, Defendants' Exhibit 8.

Do you see here (indicating) the date?

A. Yes.

Q. And is your name on this arrest report?

A. Yes.

Q. Okay. And did you arrest Mr. Mitchell?

A. Myself and my partner did.

Q. And why was Mr. Mitchell arrested?

A. For murder.

Q. And that's because Mr. Fulton said that he was involved?

A. He was implicated by Fulton, yes.

Q. And was he also implicated by Ms. Griffin?

A. And Griffin, too.

Q. I think we might have had -- Mr. Loevy's timeline that he was writing might have been off by a bit.

But what is the time of the arrest?

A. It says 2330.

Q. That's 11:30?

A.   Yes.

Q.   It's not 11:00, right?

A.   No.

Q.   Now, showing you Defendants' Exhibit 6, page 9.

Do you see here where it talks about "You're advised that" -- Mitchell was advised of his Constitutional rights?

A.   Yes.

Q.   What does it say there about that?

A.   It says, "He's advised of his Constitutional rights by Detective Zalatoris from the current FOP book."

Q.   Is that the same FOP book you talked about before?

A.   Yes.

Q.   And what happened next?

A.   "Then he replied he understood his rights and agreed to talk to us R/Ds.  Mitchell initially related to R/Ds he did not know anything about the murder of the victim."

Q.   Is it actually -- it is documented that the first statement Mr. Mitchell gave was a denial?

A.   Yes.

Q.   Now, showing you Defendants' Exhibit 58.

What is this?

A.   It's a GPR from Anthony Mitchell.

Q.   Does this also have a date of original case report?

A.   Right.

Q.   And that's not the date of your writing this general

Zalatoris - cross

1533

progress report, right?

A.   No.

Q.   Right, meaning March 10th is the date that --

A.   That's the date of the incident.

Q.   Okay.  And date of this report being what?

A.   20 March '03.

Q.   And what watch?

A.   Third watch.

Q.   And that tells you what?

A.   That's when this is being written.

Q.   Okay.  And is this your handwriting?

A.   Yes.

Q.   Now, I'm just going to quickly go through this.

        This is your handwriting on the first page?

A.   Yes.

Q.   Second page?

A.   Yes.

Q.   Third page?

A.   Yes.

Q.   Fourth page?

A.   Yes.

Q.   And why did you write down these things on these four pages of general progress reports documented at Defendants' Exhibit 58?

A.   Because that's what he told us.

Zalatoris - cross

1534

Q.   Again, were you doing creative writing?

A.   No.

Q.   Were you just simply doing your job and writing down what he told you?

A.   Yes.

Q.   You know, you testified a little bit about this earlier, but after you had talked with Mitchell, you also had him show you the different locations, right?

A.   Yes.

Q.   Were you telling him where to go or he was telling you?

A.   No.   He was showing us.

Q.   Explain.

A.   Well, we got in a car.

          Where did you go?

          We went over here.

          Okay.   Which way did you go?

          We turned here.   We turned there.   We went this way. We went that way.

          That's what he did.   We're not showing him where to go.

Q.   And why did you feel the need to do that?

A.   We wanted to verify what he told us.

Q.   Now, do you remember, you started talking about this when Mr. Loevy was asking you questions, but I just want you to elaborate.   You were describing how Mr. Mitchell was telling

you a specific alley to go down. Can you elaborate?

A.   Yes.   We were driving around, and we're asking him:   Is it this alley?   Is it that alley?   Is it this alley?

He made the comment, he goes:   No.   There was like a brown garage door across it.

So we're driving around, driving around.   Went down an alley and I saw a brown garage door at the other end of the alley.   I says:   How does this look?

He goes:   Yeah, it's down here.

And he told me about the car, told me and Jimmy about the car, that there was an old blue car on a garage apron halfway down the alley, which you could not see from the mouth of the alley, you know.

Q.   What do you mean by that?

A.   What's that?

Q.   That you couldn't see from the mouth of the alley?

A.   Well, you couldn't see it from the mouth of the alley looking down that alley.   You had to drive like almost up to it to see because it was on a garage pad in back a little bit.

Q.   So you're at the mouth of an alley, and Mr. Mitchell tells you what?

A.   He says, you know -- I said:   How does this look?

He goes:   Yeah, that's the alley.   And there is an old blue car parked down there.

Q.   Stop for a second.

A.   Okay.

Q.   And he said:  There is an old blue car parked where?

A.   Down that alley on the side by a garage, you know.

Q.   And then what do you do?

A.   We went --

Q.   Stop.  At that moment in time, you look down the alley.  Do you see something?

A.   You don't see the blue car.  You don't see it until you drive down the alley.

Q.   Okay.  And did you drive down the alley?

A.   Yeah, we did.

Q.   Okay.  What happened once you drove down the alley?

A.   There was a blue '40s, I want to say a Plymouth, like a '40 something Plymouth four-door, painted like bright blue, like somebody painted it with a brush, on a garage pad where a garage would be.

Q.   And what did that make you think?

A.   That's a detail that we wouldn't know.

Q.   Showing you Defendants' Exhibit 6, which is again Rolston's report.  It's the closing report.

     Do you see that there (indicating)?

A.   Yes.

Q.   What does that say?

A.   Where do you want me to go from?

Q.   In the circled area here.

Zalatoris - cross

1537

A.   Oh, the whole thing?   "Mitchell showed R/Ds the gas station that Fulton purchased the gasoline was purchased from.   This gas station is on the northeast corner of Lincoln and Foster.   R/Ds found that this gas station also sells red plastic gas containers.   Mitchell also showed R/Ds the alley where the victim was taken to be duct taped after being abducted.   This occurred in the alley at the rear of 1626 West Winona.   Before turning into the alley, Mitchell said there was a brown garage in the T intersection of the alley."

          THE COURT:   You are going awfully fast for our court reporter.

          THE WITNESS:   Oh, I'm sorry.

BY MR. NATHAN:

Q.   "There was a brown garage in the T intersection of the alley"?

A.   "In the T intersection of the alley and then that old blue car parked farther done.   There was in fact a brown garage at the intersection of the east end of the alley in the rear of Ashland Avenue.   There was also a blue 1940s era vehicle parked on a concrete garage pad at approximately 1648 Winona."

Q.   Did you participate in the arrest of Antonio Shaw?

A.   Yes.

Q.   Showing you Defendants' Exhibit 9.   Does this help refresh your memory about the time of that arrest and date?

A.   Yes.

Zalatoris - cross

1538

Q.   When was that?

A.   It was 21 March '03 at 0400 hours, 4:00 o'clock in the morning.

Q.   Okay.  And why did you arrest Mr. Shaw?

A.   For murder.

Q.   And who had implicated him in the murder at this point?

A.   Well, from what I remember, it was Fulton and Mitchell.

Q.   Now, showing you what's been marked as Defendants' Exhibit 49.  What is this?

A.   GPR.

Q.   And what is the date of the report of the GPR?

A.   21 March '03.

Q.   Is that the same time period of the arrest?

A.   Well, I don't know.

Q.   The arrest was March 21st, right?

A.   Right.

Q.   And what is this documenting?

A.   Well, this has Shaw's name, his identifiers.  It's got he lives with his aunt.  We have, we had I believe that's the aunt's name right there.  We've got the grandmother's name on there.

Q.   What did the aunt, Ms. Daniels, who Shaw was staying with, what did she say to you?

A.   Well, she said she wasn't coming down.  I remember that part.

Zalatoris - cross

1539

Q.   And what is documented here?

A.   "I have to work.  I'm tired and I'm not coming down."  And then she did call, I think it's the grandmother was in New Orleans, she called her.  She said, "Well, she's not coming back."

Q.   Do you remember the testimony about a youth officer being present?

A.   Yes.

Q.   Why is a youth officer present for an interview of Mr. Shaw?

A.   Well, if you can't get a guardian or responsible adult from the family with a juvenile, the youth officer, by state law, he has to be there to guard that juvenile's rights.

Q.   And do you understand that -- first of all, have you ever been a youth officer?

A.   No.

Q.   Do you know exactly what the statute under Illinois law is about youth officers?

A.   I don't know offhand, no.

Q.   But your understanding, you are saying, is that if a guardian for a juvenile is not present, you need a youth officer?

A.   Yes.

Q.   At least at that time?

A.   Yes.

Q. Was there anything out of the ordinary about interviewing a juvenile in a murder case as long as there is a youth officer present?

A. No.

Q. Now showing you Defendants' Exhibit 51.

MR. NATHAN: There is no objection to this. This is in evidence also.

BY MR. NATHAN:

Q. Is that your signature at the bottom?

A. Yes.

Q. And is this -- what is this?

A. Well, it's a GPR of what Anthony Shaw told us -- Antonio Shaw told us.

Q. And is this three pages of what Mr. Shaw was saying to you?

A. Yes.

Q. Also, why did you, why did you write this down?

A. Because that's what he told us.

Q. Were you telling him what to say or he was giving you what he wanted to say?

A. No, he's telling us.

Q. Mr. Loevy -- well, first of all, just what does this say here, "J and S"?

A. John and, John and Shaw.

Q. What is that, "John and Shaw get out"?

A. Yes.

Q.   What does this say?

A.   "Shaw punches the victim four to five times in the body, and then Riff hits victim.  John pops trunk, comes out with bat or pipe, with pipe.

"John hits victim six times around legs.  Victim goes down.  Shaw gets back in car."

Q.   Okay.  Now, was this entire three-page document written at the same time?

A.   Yeah, it was.

Q.   Did you have -- did you go back and like edit the document?

A.   No.

Q.   Do you have a way to edit handwritten notes?

A.   No.

Q.   Now, going to the third, going to the third page here, what does this say?

A.   It says, "Riff and Shaw discuss murder and asks what Riff -- asks Riff what he's going to do when the police come looking for him.  And Riff says 'I don't give a fuck.'"

Q.   And who is Riff?

A.   That's Mitchell.

Q.   Now, did you follow the same procedure with Mr. Shaw where, after he gives you a statement, you call the Felony Review, you call the State's Attorney's office to have the Felony Review attorney come?

A.   Yes.

Q. And were you present at the statement of Antonio Shaw?

A. You know, I can't remember now offhand if it was me or Rolston.

Q. Would showing you a copy of that statement refresh your memory?

A. Yes.

Q. Showing you Defendants' Exhibit 43, which I think is in evidence.

MR. NATHAN: If it's not in evidence, we'd seek to --

MR. LOEVY: No objection, Your Honor.

MR. NATHAN: -- publish and admit it.

MR. LOEVY: No objection.

THE COURT: All right.

(Plaintiffs' Exhibit No. 43 was received in evidence.)

BY MR. NATHAN:

Q. Does that refresh your memory that you were present at the statement of Antonio Shaw?

A. Yes.

Q. And who is ASA Andrew Varga?

A. Yes.

Q. Is that a state's attorney?

A. Yes.

Q. Okay. And who else is present there?

A. The uncle.

Q. Who is that, Ron Smith?

Zalatoris - cross

1543

A.   Ron Smith, that's Shaw's uncle.

Q.   Showing you -- one second.

   (Off the record.)

BY MR. NATHAN:

Q.   Showing you page 4 of the statement.  What does it say here?

A.   "Antonio says John was in the building for like 10 minutes, and that when he came out, John said he was robbed."

Q.   Okay.  This is talking about the gun robbery?

A.   The gun robbery, right.

Q.   And then Antonio says that what?

A.   "Riff grabbed a pipe and chased after Chris and another guy."

Q.   Okay.  Now, this, this part about the pipe wasn't even about the murder of Collazo.  This is about the gun robbery?

A.   Right.

Q.   So he's saying after Fulton comes out from being robbed, he's going to the car where Mitchell is, and Mitchell runs after Collazo.  And it turned out to be Marinelli with a pipe?

A.   Yes.

Q.   Okay.  Showing you page 7.  What did Mr. Shaw say here (indicating) he wanted to -- "John said" what?

A.   "John said he wanted to beat Chris."

Q.   And continue.

A.   "Antonio says that John said, 'There he goes right there.'

And he saw Chris walking on the street."

Q. Does it say here that Chris got out of a bus?

A. No.

Q. In your experience, by the way, if you have multiple people giving the same account of an incident, is it surprising to you if there are certain details that are different?

A. If there is things that are different, no, not at all.

Q. Why not?

A. Well, first off, even when people are telling you this, they're going to lie somewhat, and they're all trying to minimize their involvement in the crime.

Q. Now, what does it say after that, "Anthony and Antonio"?

A. "Anthony and Antonio chased Chris and that John pulled them in a car or followed them in a car. Antonio says that Anthony hit Chris with the pipe, and that by the time he got to Chris, Chris was already down."

Q. Now, and what does it say next?

A. "Antonio says that he punched Chris four or five times while Chris was down on the ground."

Q. Now, do you remember those questions where Mr. Loevy was saying, implying that Antonio's statement was that he didn't do anything, he was saying you were telling him, you know, it was just Fulton and Mitchell?

A. Right.

Q. Did Mr. Shaw actually implicate himself as well?

A.   He did.

Q.   And what did he -- he said that he punched Chris, too?

A.   Yes.

Q.   What does he say next?

A.   "Antonio said that John got a baseball bat out of the trunk.  And John hit Chris about six times with the bat."

Q.   Okay.  According to Shaw, it's actually more than one object that's being used to hit Chris?

A.   Yes.

Q.   What are those objects?

A.   Well, there is a pipe and there is a bat.

Q.   And what does Mr. Shaw say in his statement about how he was treated, Antonio says that he has been treated?

A.   "Antonio says he was treated fine by the police and by ASA Varga.  Antonio says that he has fed, given pop and water, and was allowed to sleep and go to the bathroom.  Antonio says that he is not giving this statement because of any threats or promises."

Q.   Okay.

A.   Okay.

Q.   And is that Mr. Shaw's signature?

A.   Yes.

Q.   Assistant State's attorney Varga's signature?

A.   Yes.

Q.   And is this your signature here?

Zalatoris - cross

1546

A.   The uncle's and then mine at the bottom.

Q.   And here, this is Ronald Smith's signature?

A.   Yes.

Q.   Now, you weren't present at Mr. Mitchell's videotaped statement to Assistant State's Attorney Nick D'Angelo, is that right?

A.   No.

Q.   But you understood that that did happen?

A.   Yes.

Q.   Talking about charging, is it your decision as a detective to charge someone with murder?

A.   No.   That decision is made by the State's Attorney's office.

Q.   And how does that work?

A.   Well, they review the facts of the case.   They interview people.   And then they usually end up calling their supervisors back and forth four or five times.

Q.   Pause for a second.   They, were talking about the Felony Review unit?

A.   Felony Review, yes.

Q.   Okay.   Those are the prosecutors?

A.   Right.

Q.   All right.   Go on.

A.   And they'll call their supervisors, and sometimes they make a bunch of phone calls back and forth.   It goes over the course

of a certain time.

MR. LOEVY: Objection, Your Honor, to the vouching by the Cook County State's Attorney's office issue.

THE COURT: Wait.

MR. LOEVY: He's implying that they blessed it.

THE COURT: All right.

MR. NATHAN: I'm eliciting the fact that it's their decision to charge.

MR. LOEVY: Well, he went considerably past that, Your Honor.

THE COURT: All right. So I'll sustain. Let's see, what was the question of -- go back to the question.

MR. NATHAN: I'll rephrase.

THE COURT: Okay.

BY MR. NATHAN:

Q. Are you able to charge somebody without the State's Attorney's office approving charges?

A. On a murder, no.

Q. If you present evidence to the Felony Review unit or the prosecutors at the Cook County State's Attorney's office, and they want additional investigation, can they, can they do that? Can they say: We're not charging?

A. Yes. It's called CIing it, continuing investigation.

Q. CI, means, stands for continued investigation?

A. Yes.

Zalatoris - cross

1548

Q. Or continuing investigation?

A. Right.

Q. And that's something that the State's Attorney's office can do if you present them, let's say statements, and they want you to look into something else?

A. Right.

Q. And do you know if that did happen during the course of this case?

A. You know, I don't know to tell you the truth if it was or not.

Q. Okay.

A. Or I don't recall at least.

MR. NATHAN: One moment.

(Off the record.)

BY MR. NATHAN:

Q. Do you remember those allegations that Mr. Fulton made that you hit him?

A. Yes.

Q. Did that happen?

A. No, not at all.

Q. Did you hit him in the head?

A. No.

Q. Did you ever do any -- kick him?

A. No, not at all.

MR. NATHAN: Your Honor, I did have an offer of proof

relating to his financial condition.  I don't know if you would like me to do it now or --

THE COURT:  I would prefer you go ahead with this witness and we can take it --

MR. NATHAN:  I'm wrapping up.  That's what I wanted to do.

THE COURT:  Okay.

MR. LOEVY:  Should we talk briefly?

THE COURT:  Are you finished with the witness?

MR. NATHAN:  One moment.

May I have a sidebar?

THE COURT:  Yes.

(Proceedings heard at sidebar:)

THE COURT:  What is your offer of proof?

MR. NATHAN:  Your Honor, I just got my headphones on. I missed whatever was said.  What was said?

THE COURT:  I didn't realize you weren't ready.  Go ahead.

MR. NATHAN:  Your Honor, if permitted, I was going to ask Mr. Zalatoris if his income is from his pension.  I was going to establish that his checking account balance is approximately $1,000, savings account approximately $39,000, and that's it.

MR. LOEVY:  Well, we have several objections to that, Your Honor.  First of all, it's undisclosed.  They were very

hard on us on disclosure. There is no documents to corroborate that. No discovery was done on it. And it's not an issue that's been pled or, you know, that we had any notice of or did any discovery on.

MR. NATHAN: I think Mr. Loevy is perhaps recalling a different case. We did do a supplemental interrogatory in this case making this disclosure that I'm proffering.

MR. LOEVY: Well, then I --

THE COURT: Are you actually opening the door to indemnification?

MR. NATHAN: I don't believe it is. Your Honor may rule that --

MR. LOEVY: That was going to be my second point, if they choose to say that this man can't pay it, the law is quite clear in this circuit and elsewhere that Your Honor has to instruct that that only goes to the punitive damages and that it is indemnified for the compensatory; otherwise they would think it has to be a $1,000 verdict, or it's going to break this guy.

MR. NATHAN: That wasn't -- Judge Chang didn't deal with it in that way. His approach is we could introduce limited evidence of inability to pay without opening a door wide open to the fact that there is an indemnification by the City.

MR. LOEVY: We dispute that.

MR. NATHAN: Let me --

MR. LOEVY: Sorry. Sorry, Nathan. It's your turn. I didn't mean to interrupt. I apologize.

MR. NATHAN: All good.

It's very limited, and it's going to be focused on any punitive damages.

MR. LOEVY: Your Honor, *Lawson v. Trowbridge*, a Seventh Circuit case, if you plead poverty, the jury needs to understand the door is open. You held that. My colleague is handing me the motion in limine ruling.

THE COURT: I'm well aware of the law on that. In fact, I cited it I think in this case.

MR. NATHAN: You did.

THE COURT: So on what basis did Judge Chang decide that didn't open the door?

MR. NATHAN: I believe his reasoning is that it's just unnecessary to -- putting in evidence that the City is paying compensatory damages is inviting a jury to award damages that are not tethered to the injuries in the case, so seeking a deep pocket.

We are still going to be barred from arguing that the City taxpayers have to fund this. So we're both somewhat limited. I recognize that. And I'm seeking to introduce very limited information about his inability to pay a huge financial, huge punitive damages verdict. But I don't think

Zalatoris - cross

1552

that opens the door wide open.

MR. AINSWORTH: Keep your voice down.

MR. NATHAN: I apologize. I didn't know it was loud.

I don't know that opens the door or I don't think that opens the door to the fact that the City pays.

THE COURT: All right. Well, I'll tell you that I am 95 percent sure that I would say it opens the door. I'm not going to bar you from eliciting the testimony.

MR. LOEVY: Your Honor, you did rule that. I mean, you've already decided that. It's docket 404, the last motion. You said, "If, however, the officers raise the issue in their testimony, plaintiffs may introduce evidence of indemnification and inquire further," and you cited cases.

So, you know, they're adverse to each other, the City and the defendants, but Mr. Nathan --

MR. NATHAN: I represent this officer.

MR. LOEVY: Yeah, he has a job to do. But that does open the door.

THE COURT: It's up to you.

MR. NATHAN: Thank you.

(Proceedings heard in open court:)

BY MR. NATHAN:

Q.  Mr. Zalatoris, I'm almost done.

Just briefly, we talked about how you are retired from the Chicago Police Department, right?

A.   Yes.

Q.   And your wife is retired from Jewel?

A.   Yes.

Q.   Do you both live off your pension?

A.   Yes.

Q.   And is your checking account balance still approximately $1,000?

A.   My checking account, yeah, somewhere in there.

Q.   And do you have a savings account balance approximately $39,000?

A.   About that.

Q.   And is that all you have to live on for your retirement?

A.   That's our retirement money, yeah.

            MR. NATHAN:  That's all I have.

                    REDIRECT EXAMINATION

BY MR. LOEVY:

Q.   Sir, in eliciting that testimony, you're asking, are you not, a jury to have mercy on your -- when they decide the punitive damages against you?  That's why you are talking about your money, right?

            MR. NATHAN:  Objection, work product, argumentative.

            MR. LOEVY:  What else is it relevant to, Your Honor?

            MR. NATHAN:  Objection.  He's arguing a motion to the jury.  It's not proper.

            MR. LOEVY:  It is a proper question, Your Honor.

Zalatoris - redirect

1554

THE COURT: I think it's proper to ask.

BY THE WITNESS:

A. What was the question again?

BY MR. LOEVY:

Q. Are you talking about how much money you have because you're asking the jury to have mercy when they decide punitive damages?

A. I don't know.

MR. NATHAN: Objection, foundation.

BY MR. LOEVY:

Q. When the jury decides punitive damages, do you have any apology, any apology to these men for what happened?

A. Again, we were just doing our job the best we could.

Q. Yes or no. Do you have any apology for them?

A. Again --

MR. NATHAN: Objection, asked and answered.

MR. LOEVY: He didn't answer it.

THE COURT: He did not answer it.

BY THE WITNESS:

A. We were just doing our jobs the best we could.

BY MR. LOEVY:

Q. And you'd do it all over again the same way?

A. We would.

Q. All right. Let's back up a little bit. Mr. Nathan asked you about who makes the charging decision. The state's

Zalatoris - redirect

1555

attorney ultimately has to approve it, right?

A.   They do.   They make the decision, yes.

Q.   Of course, the Chicago police officers have to pick up the phone, call Felony Review and invite them to the station, right?

A.   Well, we don't invite them.   We call them and say:   We need you do down here.

Q.   Who made the decision to call the state's attorney to prosecute Fulton and Mitchell?

A.   Who made the decision to charge them?

Q.   No.   In this case who made the decision to pick up the telephone --

A.   The State's Attorney's office make a decision to charge them.

Q.   I don't think you -- listen to my question.   Maybe if you let me finish it -- to pick up the telephone and call the state's attorney?

A.   Well, one of us did.

Q.   And if you hadn't made the decision to pick up the telephone and call the state's attorney to prosecute these men, then the state's attorneys would have never heard of them, right?

A.   I'm assuming.   I don't know.

Q.   And you asked the state's attorneys to rely on your credibility, your good faith, and your representation that this

was legit.  You asked them to believe you that it was legit, right?

MR. NATHAN:  Objection, form, foundation.

MR. LOEVY:  Should I simplify it?

THE COURT:  Break it down, yes.

BY MR. LOEVY:

Q.  Did you put your credibility behind it when you told the state's attorneys they should prosecute these men?

A.  Among other things.

Q.  All right.  Let's back up all the way.  Mr. Nathan asked you, Hey, this is the lead you had.  Do you remember that question?

A.  What are we talking about?

Q.  He said:  Look, you know, Marinelli says there is a robbery.  And he said, you know, you had a lead.  And, you know, this is the lead you had.  That was his exact question. Do you remember that?

A.  I don't understand what lead you're talking about.

Q.  The lead that led you to Mr. Fulton and Mr. Mitchell.  When Marinelli said, "We robbed these kids about four or five weeks ago," that was a lead, right?

A.  That was, yes.

Q.  All right.  It was a good lead, right, worth investigating?

A.  Yes.

Q.  All right.  Would have probably been negligent not to run

it down, right?

A.   Well, it's the lead we followed, yes.

Q.   All right.  But there was a whole bunch of other leads you could have run down, too, right?

A.   No.

Q.   Well, you could have developed more than this single lead, right?

A.   We followed what we had.

Q.   And you had one and a grand total of one leads during the entire investigation?

A.   We had one lead and we followed it, yes.

Q.   All right.  Let's talk about the LaRaza lead.  This is a street gang, LaRaza, that is not the Maniac Latin Disciples street gang, right?

A.   LaRaza is not Maniac Latin Disciples.

Q.   So Collazo is in a different gang than LaRaza, right?

        MR. NATHAN:  Objection.  This is asked and answered.

        MR. LOEVY:  Your Honor --

        THE COURT:  Overruled.

BY THE WITNESS:

A.   You know what, I don't know if they're on the same side or not.

BY MR. LOEVY:

Q.   All right.  And the reason we don't know anything about this potential lead is because the only thing you wrote down

are these words.  That's the only thing you chose to write down, right?

A.  Well, the Maniac Latin Disciples and LaRaza might actually be allies.

Q.  That might be.  That might have been your next question to Collazo, right, to the Collazo brothers?  But whatever they said, you didn't write it down, right?

A.  I don't know what "LaRaza" meant on there to tell you the truth, okay.

Q.  Just focusing on my questions.

A.  All right.

Q.  The reason you don't know anything about what "LaRaza" meant was because whatever they told you, you made no record of it, right?

A.  There is no record other than what we have on there.

Q.  Let's talk about Precious Griffin.  Mr. Nathan asked you, Hey, you know, you have exact quotes about the things she said. Those are her words to you, right?

A.  Let me take a look here.

Q.  This is her -- this is your GPR for Precious.

A.  Okay.

Q.  And my question to you, sir:  Isn't it true that nowhere in your notes do you reflect anywhere where she said, "I have nothing to do with this.  I don't know what you're talking about."  You never wrote that down, right?

Zalatoris - redirect

1559

A.   We wrote down what she told us, sir.

Q.   So I'll break it down to two questions.  You never wrote down anything to the effect of "I don't know who killed Chris Collazo.  I'm innocent"?  You never wrote that down, right?

A.   If she had told us that, it would be written down.

Q.   All right.  So if she -- you're claiming that she never said anything about being innocent between 10:00 o'clock, when she got picked up, and 10:00 o'clock, 10:00 o'clock the next morning, she never said anything about "I don't know what you're talking about" or you would have written it down?

A.   Well, you're talking -- I don't know what the question is here, okay.  You kind of are kind of jumbling up things here.

Q.   Now, the threat here, Mr. Nathan asked you, "You and your boy got it coming."  Do you remember that threat?  Remember the quotes?

A.   Let's see it.

Q.   Well, do you remember the question that he was asking you about?

A.   Is that what we were just looking at, sir?

Q.   Different.  Do you remember him asking you questions?  I mean, your memory is very much at issue.

        Do you remember Mr. Nathan asking you a question about an hour ago, half hour ago about "They got it coming"?

A.   I believe it was on a GPR.  If I could take a look and refresh my memory again, sure.

Zalatoris - redirect

1560

Q.   Sure.  The threat actually was, "You and your boy got it coming.  You'll hear from my lawyer."  That was the threat, right?  "You'll hear from my lawyer."

     John Fulton was going to -- "If you didn't get my money back, you are going to hear from my lawyer."  It wasn't "I'm going to come kill you."  It's "You are going to hear from my lawyer."

A.   Well, you're not looking farther down.  You are covering it with your finger here.

Q.   Well, I'm talking about the quotes, which you said --

A.   Well, there is a quote right here, too, sir, that says what you just said, "You and your boy got it coming to you," okay.

Q.   "You'll hear from lawyer"?

A.   He says it right there.  He says it two times, sir.

Q.   All right.  I'm asking about the first one.

     THE COURT:  Don't interrupt each other.

BY MR. LOEVY:

Q.   I'm asking about the first one.  "You'll hear from lawyer. You and your boy got it coming to you," right?

A.   That's the first time she said it -- he said it, yeah.

Q.   So that really struck fear in her heart, that John's lawyer was going to come sue her?

     MR. NATHAN:  Objection, argumentative.

     THE COURT:  Sustained.

BY MR. LOEVY:

Zalatoris - redirect

1561

Q.   All right.  The timing, you are not implying that you weren't involved when Precious Griffin went from saying she was innocent to when he was guilty?  You were involved in that part of the discussion, right?

A.   I was there when she was there, yes.

Q.   And Mr. Nathan asked you if you went home at 1:00 a.m. that night.  But you didn't go home at 1:00 a.m. that night, right?

A.   That night?

Q.   Yeah.  She didn't give her statement until 9:45 in the morning.  You stayed that night, right?

A.   I didn't go home.

Q.   What's that?

A.   Then I didn't go home, right?

Q.   You worked plenty of overtime in this investigation, right?

A.   I worked overtime, yes.

Q.   Time and a half for overtime, right?

A.   Yes.

Q.   And you were there when Shaw got arrested at 4:00 a.m., right?

A.   Yes.

Q.   You were there when Rubinstein -- you had a conversation with Rubinstein at 7:00 a.m. on 3/14, correct?

A.   It's on there, yes.

Q.   And you were there with McRay Judge at 4:00 a.m., right?

A.   If it says so, yes.

Q. So you didn't mean to imply that you had gone home at 1:00 a.m. on the night Precious was arrested, did you?

A. Well, if you have I didn't go home, then I didn't go home.

Q. All right. Did you -- you were asked some questions about prejudging. And Mr. Nathan showed you the arrest report.

The arrest report is dated, here it is, March 18th, right? This is when it starts, when he's arrested at 5:30 in the morning?

A. Yes.

Q. And is that when the arrest report is created?

A. I don't when it's created. It might have it on the bottom. I don't know. I didn't do this report, so.

Q. Because the thing is it's already got the baseball bat as being the weapon, right?

A. Again, I didn't, I didn't do this arrest report, so.

Q. All right. When John was arrested, had the baseball bat been decided to be the weapon?

A. I don't recall exactly at that time.

Q. Let's talk about Pete's Car Wash. You told Mr. Nathan you never heard of it, right?

A. Well, I mean, I heard of it in this courtroom.

Q. Yeah. But back at the time you never heard of it?

A. Well, when he told us about it, I didn't know where it was.

Q. All right. So you have no way or you don't dispute, what he told you was it's a car wash where I get my car, they wash

your car out. You can't dispute that, right?

A. He says that's where he takes his car, and that's where he got it cleaned out, yes.

Q. And you can't -- you have no idea what the hours were, nothing like that?

A. I don't know if it's even there anymore.

Q. Let's talk about the Shaw interview. You did say that the relatives said they were tired. They didn't want to come, come down with him, right?

A. Yes.

Q. And having been asked those questions by Mr. Nathan, are you sure you didn't give the impression that this was routine, he'll be back in the morning, just a few questions?

MR. NATHAN: Objection, asked and answered.

THE COURT: Sustained.

BY THE WITNESS:

A. I told you no before.

BY MR. LOEVY:

Q. All right. You haven't yet seen this report. This is another GPR in the file. It's another Winstead interview. This is Plaintiffs' Exhibit 11, page 8.

MR. NATHAN: Objection, beyond the scope.

MR. LOEVY: This relates to Mr. Shaw, Your Honor.

MR. NATHAN: Anything relating to --

THE COURT: What in the testimony was?

MR. LOEVY:  He said he seemed fine, that Mr. Shaw did not appear that there was any problem.  So I would like to just elicit what is right here.

THE COURT:  I would have to --

MR. NATHAN:  This was asked about in direct.  So it's asked and answered.

MR. LOEVY:  This has not been --

MR. NATHAN:  I didn't cover this.

MR. LOEVY:  Sorry.  This has not been asked.  I'm moving pretty quickly through this, Your Honor.

THE COURT:  I know.

MR. NATHAN:  Just because he speaks quickly doesn't mean we should do the same thing over again.

THE COURT:  Can somebody do a word search?  I don't recall his talking about --

MR. LOEVY:  I don't think this has been on the screen. I don't think this --

THE COURT:  No.  In Mr. Nathan's direct, did he talk about Shaw?

MR. LOEVY:  Yes.

MR. NATHAN:  The witness?

THE COURT:  Can we find that testimony?

MR. LOEVY:  Do we know how to do that?

I'll tell you what, we can do this with Mr. Breen. We'll move forward, keep moving, okay.

THE COURT: Okay.

BY MR. LOEVY:

Q. Now, you were asked by Mr. Nathan if this is just a creative writing project or are you just writing down what they tell you, right?

A. Yes.

Q. But we have established at this point that in all of these notes it starts with the guilty story, right? That is John pulls up. You know, he gets Riff. John drives up. They get in the car to go do the murder.

The story in all three of the notes begins with "Let me tell you how I committed the murder." That's agreed, right?

MR. NATHAN: Objection, asked and answered.

BY THE WITNESS:

A. What they tell us.

BY MR. LOEVY:

Q. Right. What they tell you?

A. What they tell us.

Q. And Mr. Nathan asked you: Hey, but you did write down that he's innocent.

And I'm showing you the report Mr. Nathan showed you. Mr. Nathan put this on the screen. "Breen and Zalatoris were advised that Fulton was in the station. He denied having anything to do with the murder."

And then someone confronted him, you confronted him

with Griffin's statement about the time and the travel.  Do you see that?

MR. NATHAN:  Objection, asked and answered.

MR. LOEVY:  He did this on his direct, Your Honor.

THE COURT:  Yes.  Overruled.

BY MR. LOEVY:

Q.  Now, he denied having anything to do with the murder of the victim.  You're putting a lot of weight on that sentence, right?

A.  Well, again, I didn't type this report.

Q.  Exactly.  Your notes say nothing about him denying it. Your seven-page notes say nothing about him denying it, right?

A.  If they're not in there, they're not in there.

Q.  And Rolston writes this one sentence.  But there is no record of, for example, if he had an alibi, who he was with, the hospital, no record of that other than this one sentence, right?

MR. NATHAN:  Objection, mischaracterizes the testimony.

MR. LOEVY:  It's a question, Your Honor.  It's not a characterization at all.

THE COURT:  I think it's a fair question.

MR. NATHAN:  Objection, form, as to "no record." There has been testimony from Mr. Judge.

THE COURT:  Okay.  There is no record of, for example,

if he had an alibi, who he was with, the hospital.

BY THE WITNESS:

A.   What's the question again?

BY MR. LOEVY:

Q.   He denied having anything to do with the murder victim is the sum total of whatever he told you about where he was, who he was with, him not doing it, I'm innocent, I'm innocent. That's all gone for time, right, lost to time?

A.   No.   I mean, once they did part of the investigation, he did this whole thing with the video.   I'm not real up on exactly what went on with that or the things on that.

Q.   All right.

A.   But there were other people involved in the investigation.

Q.   You're just staying with it just for -- not to belabor it, but if he had an alibi, "I was here, I was with that person," you absolutely would have written that down so you could poke holes in it later, right?

A.   And I believe Winstead did investigate that.

Q.   I'm talking about you, sir.

A.   I'm talking about Winstead.

Q.   I'm talking about you.

A.   That wasn't part of the investigation for me.   That was Winstead's part.

Q.   The innocence part wasn't part.   You were the guilt part?

MR. NATHAN:   Objection, argumentative.

THE COURT: Sustained.

BY MR. LOEVY:

Q. All right. Let's talk about the gas can. Just so we're clear on the facts then, I understood Mr. Nathan showed you on the report it said the gas can, right, Rolston's report? Do you remember him showing you that?

A. Okay.

Q. Now, your notes we've already gone through, I'm not going to do it again, don't say anything about the grandfather saying "I haven't seen the gas can," right?

A. No.

Q. And then Rolston writes a report. What's the date on Rolston's report?

A. Okay, 19 August.

Q. And in that report, there is a description about how you supposedly asked the grandfather and he said, "I've never seen that gas can," right?

A. Evidently Rolston was apprised of it one way or another by us and he put it in the report.

Q. All right. Because you're the one claiming that his grandfather said "I didn't see it," right?

A. My partner or myself, yes.

Q. Okay. And Adolphus was dead by the time of trial, right? He couldn't rebut it?

A. I don't know when he died.

Q.   And isn't it true that all that happened was you said to Mr. Fulton, "Hey, do you have access to a gas can?"  He said, "Yeah, it's in the garage."  That's all that happened?

A.   No, it's not.

Q.   All right.  The gas can was described as a -- actually you got the gas can here, right.  It's got -- what color is the cap?

A.   It's a black cap on it.

Q.   I'm going to show you Anthony Mitchell's description of the gas can.  What does he describe it as?

A.   He says it has a yellow top.

Q.   All right.  This one doesn't have a yellow top, right?

A.   Well, not necessarily.

Q.   How about that doesn't have a yellow top?

A.   How about not necessarily.

Q.   Okay.

A.   Because you could take the spout out, and the spout could be yellow that goes down into that can.

Q.   That's right.  It could be.

A.   Exactly.

Q.   All right.  The alley with Mr. Mitchell.  Mr. Mitchell says, "All right, I'm guilty."  And then we've already established a bunch of time went by before the statement.  And in between you took him on a drive, right?

A.   We took him -- he showed us where he went, yes.

Q.   All right.  And that also is not documented in your notes anywhere, you took him for a drive, right?

A.   What's the question?

Q.   That's not documented anywhere in your notes that you took him for a drive to see the scene?

A.   The GPRs, I believe we have where he said they went.

Q.   No.  You have the address.  But it doesn't say, "We took him there and he had an opportunity to see it."  It doesn't say that you took him there?

A.   We didn't take him there.  He directed us there, sir.

Q.   All right.

A.   You keep trying to say that, you know.

MR. NATHAN:  Objection to this line.  It's asked and answered, cumulative.

MR. LOEVY:  He went through it, Your Honor.

MR. NATHAN:  I went through it.  He went through it.  We all went through it.

MR. LOEVY:  Let me ask a follow-up question.

THE COURT:  All right.

BY MR. LOEVY:

Q.   You didn't need to see it because you had already seen it with John?

A.   But we're verifying what Mitchell told us.

Q.   All right.  This business about the car, the blue car that Mr. Nathan asked you about, that's an example of a provable

Zalatoris - redirect

1571

fact, right?

A.   Okay.

Q.   In other words, if you really had proof that he said "I can tell you about the alley.  It's got a blue car."  And you drove to the alley, although you picked the alley, I guess, and you said, "Is this it?"  And he said, "That's it."

A.   I didn't pick it.

          MR. NATHAN:  Objection, argumentative.

BY MR. LOEVY:

Q.   Well, let me back up.

A.   I explained how we came across the alley.  I didn't pick it.

Q.   But I thought you'd said you're looking for a brown garage, and you said, "Is that it?"  And he said, "Yeah, that's it"?

A.   That's not what I said.

Q.   You didn't say that to me and Mr. Nathan?

A.   I didn't say that to you.  What I said is, "How about this down here?"  And he looked and he said, "Yeah, that's the alley."  So we turned in there.

Q.   All right.  So let me slow you down here.

A.   Okay.

Q.   So you said, "How about this?"  And he said, "Yes."

          And now your claim is that he predicted there was going to be a blue car, right?

A.   He didn't predict it.  He told us.

Q.   Right.

A.   Yeah.

Q.   And so that's an example of a provable fact, right?

A.   And it's documented in the case report.

Q.   Okay.  But the problem with that provable fact is there is no proof that he actually said that before you saw the blue car, other than you're telling us that's what happened, correct?

        MR. NATHAN:  Objection, argumentative.

        MR. LOEVY:  I'm cross-examining, Your Honor.

        MR. NATHAN:  You're arguing.

BY MR. LOEVY:

Q.   Correct?

A.   What was the question again here?

Q.   There is no proof that he said "Blue car" and then you saw a blue car, other than your memory that that's what happened, right?

A.   Other than what he told us, yes.

Q.   Okay.  So it's not in your notes, right?

        MR. NATHAN:  Objection, argumentative, asked and answered.

        MR. LOEVY:  No, it's not argumentative.

BY MR. LOEVY:

Q.   The blue car part is not in your notes.  That's a new question.

Zalatoris - redirect

1573

A.   It's documented in the case report.

Q.   The blue car part is not in your contemporaneous notes, right?

A.   It's documented in the case report, sir.

Q.   I'm going to keep asking you until you answer me.

A.   Well, you can ask me.

Q.   The blue --

A.   It's not in a general progress report.  It's in a cleared, closed supplemental report.

Q.   The blue car story is not in your contemporaneous notes, correct?

A.   It's not in a general progress report, no.

Q.   All right.  It is in the report that Rolston wrote in August, right?

A.   It's on the one that's in the cleared, closed report, yes.

Q.   All right.  And the only thing we have to know that that happened, that he said blue car, you saw blue car, is your memory?

A.   Yes, and the report.

Q.   By the way, your memory seems a little selective, would you agree?

        MR. NATHAN:  Objection, argumentative.

        THE COURT:  Sustained.

BY MR. LOEVY:

Q.   You remembered Mr. Fulton's grandfather is a real nice guy.

Zalatoris - redirect

1574

You remembered gray hair I think you said, elderly guy. You remember him, right?

A. I don't know if --

MR. NATHAN: Objection, cumulative, asked and answered.

MR. LOEVY: I'm trying to wrap up my cross-examination, Your Honor. This is not cumulative. I'd like a little leeway here.

THE COURT: All right. Go ahead. Wrap it up.

BY MR. LOEVY:

Q. All right. Mr. Fulton -- speaking of memory, when Mr. McRay came out of that room after John had given a confession and then now he's saying it's not true, you can't remember him telling you that the confession is not true? You don't remember that at all, right?

A. So you're asking why you remember certain things and don't remember certain things?

Q. That's what I'm asking.

A. I don't know why people do that.

Q. All right. You remember the grandfather and the blue car. But you don't remember what McRay Judge said to you when he came out of that room, had to explain why the kid wasn't, why the young man wasn't going to confess. You don't remember that fact?

A. I don't remember that part, no.

Q.   How about the polygrapher?  You don't remember the fact that John Fulton confessed to the polygrapher in your presence.  That slipped your mind.

A.   Slipped my mind?

Q.   You just don't remember it, right?

A.   I don't remember that happening.

Q.   All right.

         MR. LOEVY:  I have no more questions.

         THE COURT:  All right.  Then you are excused.  It's been a long day.

         THE WITNESS:  Yeah, it was.

   (Witness excused.)

         THE COURT:  Do you have another witness on hand?

         MR. LOEVY:  We do, Your Honor.

         THE COURT:  Okay.

         MR. AINSWORTH:  At this time plaintiffs call Mr. Mitchell.

         When would you like to break, Your Honor?

         THE COURT:  How are you all feeling?  If we go to 5:00, is that all right?  Do you want to stand up and take a stretch?

         A JUROR:  Is it okay?

         THE COURT:  Let's just take a minute.

         Good afternoon.  I need you to stand and raise your right hand to be sworn.

Mitchell - direct

1576

(Witness sworn.)

THE WITNESS:  Yes.

ANTHONY CHARLES MITCHELL, A PLAINTIFF HEREIN, DULY SWORN,

DIRECT EXAMINATION

BY MR. AINSWORTH:

Q.  Please have a seat.

Good afternoon, Mr. Mitchell.

A.  How are you doing?

Q.  Would you please state and spell your name for the record.

A.  Anthony Charles Mitchell.

Q.  How old are you, Mr. Mitchell?

A.  39.

Q.  Mr. Mitchell, have you wanted to prepare for your testimony for this case?

A.  No.

Q.  How many times have we planned to meet to prepare and you've canceled?

A.  I lost count.

Q.  Why don't you want to prepare for your testimony in this case?

A.  It's been 22 years, and I want it out of my life.  I want nothing to do with it.

Q.  How do you feel --

THE COURT:  Can everyone understand him?

A JUROR:  I can't hear him very well.

Mitchell - direct

1577

THE COURT:  You better stand closer to the mic.

BY MR. AINSWORTH:

Q.  Get closer and then move the microphone up a little.  And then the microphone works great when you speak up.

A.  Okay.

Q.  And it will carry it.  You don't have to speak into it. Just speak up and it will do great.

A.  Okay.

Q.  Can you tell us, sir, why don't you -- what is your experience being in this courtroom?

A.  It's traumatizing.  It's been bad news after bad news for 22 years.

Q.  Why do you say that, sir?  Why do you say it's been bad news after bad news?

A.  That's exactly what it's been for me.

Q.  Have you been reliving experiences?

A.  I'm reliving it right now.

Q.  And how does that make you feel, sir, to relive this?

A.  I honestly don't want to be up here.

Q.  Well, sir, do you run a business?

A.  Yes.

Q.  Tell the jury what business you run.

A.  I run a tire shop/mechanics shop.

Q.  What's the name?

A.  It's called Rite Price.

Q.   Where did you grow up, Mr. Mitchell?

A.   I grew up on what I call the southeast side of Chicago, some might say south side of Chicago.

Q.   Who raised you?

A.   My family.

Q.   And who do you consider to be your family?

A.   My mom, my dad, my sister, my grandmother, my uncles, aunts.

THE COURT:  My brother what?

THE WITNESS:  My brother, my dad, my sister, aunties, uncles, my family.  Excuse me.

BY MR. AINSWORTH:

Q.   So growing up, Mr. Mitchell, who was your hero?

A.   My hero was my dad.

Q.   Why was he your hero?

A.   Because he taught me how to be a provider, and he taught me how to have a work ethic.

Q.   And so what did your dad teach you to do?

A.   My dad taught me mechanics, how to cut grass, and how to be a provider.

Q.   All right.  When you say he taught you mechanics, what do you mean?

A.   He taught me basic things you need to learn when you're dealing with cars.

Q.   So he taught you like car maintenance.  What kind of car

maintenance?

A. Car maintenance, like he taught me how to change oil, that was number one, brakes and mainly minor things with cars like fluids and stuff like that.

Q. Would you accompany your dad on work when he did work?

A. Yes. I was always with my dad. That's how he spent time with me, working.

Q. What kind of work did your dad do?

A. My dad did snow removal. He did landscaping. He did construction.

Q. And where did he do snow removal?

A. He did snow removal at O'Hare Airport.

Q. At O'Hare?

A. Yeah.

Q. Would you accompany him when he would do snow removal at O'Hare.

A. Sometimes.

Q. And would you help?

A. Yes.

Q. And what would you do?

A. I was young at that time. And I don't know, I don't really know how to describe it. But it comes on two wheels, it has like a circle, you put the salt in, you roll it, and the salt comes out at the bottom and spreads it out.

Q. Like the spreader?

Mitchell - direct

1580

A.   Yeah.

Q.   Do you still like working on cars?

A.   Yes.

Q.   You said your dad did construction.  What did he do for construction?

A.   I don't know exactly what he did for construction.  I couldn't tell you exactly what his job title was.

Q.   Where did he work, do construction?

A.   I know he helped build the Harold Washington Library just as well as the new McCormick Place.

Q.   Do you have a nickname?

A.   Yes.

Q.   What is your nickname?

A.   Riff.

Q.   And where did you get that nickname from?

A.   From my dad.

Q.   And where did your dad come up with that name?

A.   My dad came up with the name, I don't remember the cartoon, but it was a cartoon character named Riff-Raff.

Q.   And it stuck?

A.   Yeah.

Q.   What has your mom done for work?

A.   My mom, she has worked at Wrigley Field, the Cubs stadium.  She's worked at Church's Chicken, and she's also worked at the Post Office.

Q. At Wrigley, what did she do there?

A. She actually work in a concession stand.

Q. Would you get to go?

A. Yeah.

Q. And so you would get to go to the game --

A. Yeah.

Q. -- while she was working?

A. Yes.

Q. And she also worked for the Post Office, is that right?

A. Yes, sir.

Q. Does your mom have a big family?

A. What do you call big?

Q. Well, how many brothers and sisters does your mom have?

A. I know it's nine of them in all. I can't tell you how many aunts and uncles. I could name them all if you want me to. Then you could decide.

Q. I call that big. Do you agree?

A. Yes.

Q. Do you have siblings?

A. Yes.

Q. Who are your siblings?

A. Want me to name them?

Q. Yes.

A. Nevada, Mitchell Garcia, and Stanton Jones.

Q. All right. What is the age difference between you and

Mitchell - direct

1582

Nevada?

A. Like six years, six-year difference between me and my sister.

Q. Who is older and who is younger?

A. She's older.

Q. So she was your big sister?

A. Absolutely.

Q. What does she do now?

A. She's in the medical field. I can't tell you exactly what it is.

Q. And what was your relationship like with Nevada when you were growing up?

A. We had an up and down brother relationship. I was the irritating little brother.

Q. You were the irritating little brother?

A. Absolutely.

Q. All right. And what about your brother, what is the age difference between --

A. Nine years.

Q. -- you and Stanton?

A. Nine years.

Q. Who is older?

A. Me.

Q. All right. So it goes Nevada is the oldest, then you, then Stanton?

Mitchell - direct

1583

A.   Yes.

Q.   And do you guys have the same parents?

A.   Yes.

Q.   But did your parents get married along the way?

A.   My parents got married in 1994, before Stanton was born.

Q.   All right.

A.   Early months.

Q.   So he has a different last name, but you have the same parents?

A.   Yeah.  My brother has my dad's last name.

Q.   And what was your relationship like with Stanton when you were growing up?

A.   He turned into the irritating little brother.

Q.   And how old was he when you were arrested?

A.   I'm doing math, 8.

Q.   And so when you went away, he was still your kid brother?

A.   Absolutely.  He still is right now even.

Q.   As a kid, did you study martial arts?

A.   Yes.

Q.   How did you -- how did that happen?  What got you into that?

A.   My dad wanted me to know how to defend myself.

Q.   And do you know what your dad's thinking was on that?

A.   Do I know what his thinking was?

Q.   Yeah.  Why he wanted you to defend yourself?

Mitchell - direct

1584

A.   He wanted me to be able to defend myself for whatever reason.

Q.   All right.  Did you grow up in a rough neighborhood?

A.   What do you consider rough?

Q.   Well, I'm asking you.

A.   No.

Q.   All right.  But were there gangs around?

A.   Yes.

Q.   And what kind of martial arts did you study?

A.   Taekwondo.

Q.   And was part of that to help keep you out of gangs?

A.   Yes.

Q.   And did you compete in events and stuff?

A.   Yes.

Q.   Did you get trophies?

A.   Yes.

Q.   Were you proud of that?

A.   Yes.

Q.   Did you like playing sports when you were growing up?

A.   I grew to like sports.

Q.   Did you play in school?

A.   Yes.

Q.   What did you play in school?

A.   I played basketball and softball in school.

Q.   All right.  What position do you play in softball?

Mitchell - direct

1585

A.   I played right field in softball.

Q.   And what about in basketball, what position do you play?

A.   I was a forward.

Q.   When you were a kid and there were holidays, was there a place where you guys would gather?

A.   Could you repeat that?

Q.   When you were a kid and there was a holiday, was there a place where your family would gather?

A.   It depends on, it depends on the occasion, honestly.

Q.   All right.  And so how does the occasion affect where you guys would gather?

A.   It depends on what holiday it was, if it was the 4th of July, Easter, Christmas, Thanksgiving.  It varied.

Q.   All right.  And, well, where would you go for Christmas?

A.   Christmas, I would be at home with my mom and my dad.

Q.   All right.  What about Thanksgiving?

A.   Thanksgiving, I probably would go to my grandmother's house.

Q.   All right.  Tell us about your grandmother.

A.   What do you want to know?

Q.   Is that a hard topic?

A.   Yeah.

Q.   Well, what was her role in the family?

A.   Glue, that's the word.

Q.   She was the glue?

Mitchell - direct

1586

A.   Yeah.

Q.   Why do you say that your grandmother was the glue in the family?

A.   She kept us in line and together.

Q.   She has since passed, is that right?

A.   Yeah.

Q.   What do you remember about gathering at your grandmother's house for Thanksgiving when you were a kid before you were incarcerated?

A.   Family.

Q.   And what do you mean by "family"?

A.   My people, my family, my loved ones.  I don't know what you're asking.

Q.   So describe the scene.  Would you have, you know, for Thanksgiving when your family would gather, would you have a table for the big people and a table for the kids?  What would it be like in your house, in your gathering?

A.   Honestly, we were told to get out of the room when grown folks were congregating and talking or whatever.  So kids had their own area.  We ate together.

Q.   Do you have cousins?

A.   Absolutely.

Q.   All right.  And so was it time for all the cousins to get together and do cousins stuff?

A.   Yeah.  I looked forward.  I knew those occasions I would

Mitchell - direct

1587

get to see my family just as well as my cousins.

Q.   Grandmother a good cook?

A.   Absolutely.

Q.   All right.  Do you like her food?

A.   Yeah.

Q.   And so where did your grandmother live in relation to your parents' house growing up?

A.   She lived -- what are you asking me?  Are you asking me if she lived in the same neighborhood?

Q.   Well, like how many blocks away?

A.   Walking distance.

Q.   All right.  And did you have other family within walking distance?

A.   Yes.

Q.   And so you guys had, you had close relationships with your aunts and uncles?

A.   Yeah, I got to see my family and my cousins a little bit more often.  So I waited until the occasions --

Q.   All right.  We're going to ask you to --

A.   Yeah, I'll speak up.

Q.   And maybe I'll move here so that you're speaking towards the mic.

A.   You don't have to.  I'll speak up.

Q.   Yeah, that's all right.

         Who taught you how to fish?

Mitchell - direct

1588

A.   My Uncle Legs.

Q.   Legs?

A.   Legs, L-E-G-S, Legs, bow legs.

Q.   All right.  That's what you called him?

A.   Absolutely.

Q.   All right.  And you liked fishing with him?

A.   I won't say necessarily say I liked it.  But it was an experience for him teaching me.

Q.   So you would go while he would fish?

A.   No.  He taught me how to fish.

Q.   All right.

A.   I said I didn't necessarily like it.

Q.   Teach a man to fish and you pass some time.  All right.

       But, you know, did there come a time that you learned that your dad was using narcotics?  You have to answer out loud.  I'm sorry.

A.   Yes.

Q.   How did that affect you when you found that out?

A.   See what it's doing to me now?

Q.   Well, we need to know from you.  We can observe, you know, how your demeanor is.  But we need you to tell us how it affected you as a kid.

A.   As bad as this may sound, it made me not respect him.

Q.   And so when you're losing respect for your dad, how did you react as a child?

Mitchell - direct

1589

A.   Honestly, and this includes my mother, it may sound bad, could nobody tell me anything.  I didn't want to listen to nobody.

Q.   So you didn't want to listen to anyone?

A.   No one.

Q.   And did you rebel?

A.   Yes.

Q.   About how old were you at this time?

A.   13, 14 years old.

Q.   All right.  And so did you act out?

A.   I might not define it acting out, Russell.

Q.   Well, let me ask it this way.  Were you trying to get your dad's attention?

A.   No.

Q.   All right.  And what would you do, you know, what did you start to do when you found out you lost respect for your dad?

A.   I didn't want to be around.

Q.   And so what did you do?

A.   I found a way to somewhat live on my own.

Q.   All right.  And what did that entail?

A.   Can you repeat that?

Q.   Yeah.  What did you do to, you know, live on your own?

A.   It was a process.  My mom played a part of it.

Q.   All right.  And so tell us what happened.

A.   I dropped out of school.  And my mom told me that when she

Mitchell - direct

1590

went to work, I had to be out of the house. I couldn't stay there. So I had to figure it out.

Q. All right. And how old were you at this time?

A. Probably 14, 15.

Q. Are you sure?

A. Maybe even 13. I don't know.

Q. And when your mom said you couldn't just hang around the house, what did you do?

A. I started hanging with one of my other cousins who graduated high school. He no longer -- he had the choice to finish going to school or not go to school anymore. He had graduated high school. So it was an outlet for me to hang out and not go to school.

Q. So did you move out of your parents' house?

A. Yes.

Q. And where did you move to?

A. I moved to my aunt's house.

Q. All right. And which aunt was that?

A. Technically it's my grandmother's sister's house, my Aunt Dorothy's. But I always call it her daughter's house, my Aunt Jackie's house, because my Aunt Dorothy was deceased then.

Q. All right. So you would stay at Jackie's house?

A. Yes.

Q. And how far away from that -- how far was Jackie's house from your parents' house?

Mitchell - direct

1591

A.   Walking distance.

Q.   And were your parents okay with you staying at Jackie's house?

A.   Honestly, no.

Q.   All right.  It caused some tension?

A.   Yes.

Q.   All right.  And during that time, did you work odd jobs?

A.   No.  What you mean "odd jobs"?

Q.   Did you do any like cutting grass?

A.   Oh, okay.  I thought you meant like did I have a working job.

Q.   All right.  Well, just tell us like what you did.

A.   What I did to make money?

Q.   Yeah.

A.   I cut grass.  I shoveled the snow.  I helped my dad fix cars.

Q.   Would your dad fix cars after work?

A.   Yeah.  That was his hobby.  He always worked.  He's always working.

Q.   And where would you go to work on cars?

A.   In the back of my grandmother's house.

Q.   That was kind of like a place where people would come if they needed help on their car?

A.   Yes.

Q.   All right.  And so, you know, did you always like cars and

Mitchell - direct

1592

working on them?

A.   Me?

Q.   Yeah.

A.   Yes.

Q.   And do you still do that to this day?

A.   Yes.

Q.   Did you have aspiration, did you have plans for yourself regarding like working on cars as a teenager?

A.   Honestly, no.

Q.   And was there ever a time when you thought about maybe getting -- going to a tech school or something to like learn how to work on cars for real?

A.   I don't think I probably wanted to go that far, as far as school.  But it was a thought that I probably would want to do that for a living.

Q.   What do you mean that it was a thought that you wanted to do that for a living?

A.   I told you my dad was a mechanic.  He went to school for it.  So I somewhat knew what it took to be a professional mechanic.  I didn't want to be a professional mechanic.  I wanted to do that as side work.

Q.   All right.

A.   I didn't want to, I didn't want to work on cars for the rest of my life, no.

Q.   Did you know somebody named Antonio Shaw?

Mitchell - direct

1593

A.   Yes.

Q.   How did you know Antonio Shaw?

A.   I knew Antonio Shaw from the neighborhood.

Q.   All right.  And so where did he live in relation to Jackie's house?

A.   Jackie lived 7739 Luella, and Antonio Shaw lived 7753 Luella.  You can literally walk out of the back of Aunt Jackie's house and walk across the alley to Antonio Shaw's house.

Q.   All right.  And did Antonio Shaw have a nickname?

A.   Yes.

Q.   All right.  This case -- and what was his nickname?

A.   Stick.

Q.   Okay.  So this case, we've got a guy named Wood, a guy named Stick, and then a guy named Styx.  Are you aware of that?

A.   Absolutely.

Q.   Okay.  So Marcus Marinelli, he's Styx, right?

A.   Mm-hmm.

Q.   Like S-T-Y-X?

A.   You're telling me or asking me?

Q.   Well, I'm asking you.

A.   I don't know.

Q.   All right.  You don't know how to spell Styx.  But that's Styx plural, right?

A.   Okay.

Q. And then Shaw, he's Stick singular, is that right?

A. That sounds accurate.

Q. Okay. Or that's what you would call Stick?

A. Yeah.

Q. All right. How would you describe Shaw's mental abilities when, you know, he was 14, 15 years old?

A. That's my buddy. Me personally, he just got a 5-second tic. He just catch things slower than everybody else. Ain't nothing wrong with him.

Q. And so what do you mean he catches things slower than everyone else?

A. He has a 5-second tic. It might take him 5 seconds more to pick it up than me.

Q. All right. And how do you know that?

A. Because of repetition. He's one of my best friends.

Q. All right. And so you spent time with him?

A. Absolutely.

Q. And was that something that you experienced each time you interacted with him?

A. Yes.

Q. How old was Shaw in relation to you?

A. I don't know.

Q. All right. Was he younger?

A. Sure.

Q. But you don't know by how much?

A.   No.

Q.   How did you know John Fulton?

A.   How did I know John Fulton, or how did I meet John Fulton?

Q.   Well, let's take a stab in the dark.  How did you meet John Fulton?

A.   Okay.  Thank you.  I met John Fulton in the same neighborhood through my family member, my cousin Darnell Smith.

Q.   All right.  So you had a cousin Darnell?

A.   Yes.

Q.   And then Darnell knew John Fulton?

A.   Yes.

Q.   And that was like the connection between you guys?

A.   Yes.

Q.   How did it come about that you and John Fulton started hanging out more?

A.   Well, like I just told you, I met him through Darnell Smith.  But I didn't start hanging around him through Darnell Smith.  I have another mutual cousin as well that knew John Fulton.  That's how I started into interacting with John.

Q.   And who was the mutual -- who was the other cousin who also knew John Fulton?

A.   Rashawn Hobbs.

Q.   All right.  And who is Rashawn Hobbs?

A.   That's my cousin.

Q.   And who was his mom?

Mitchell - direct

1596

A.   Jackie Butler.

Q.   Okay.  So Aunt Jackie was Rashawn Hobbs' mom?

A.   Yeah, she is Rashawn Hobbs' mom.

Q.   And she also was his mom then, right?

A.   No.  She is his mom.

Q.   Okay, both.  All right.  Fair.

     So because -- and so tell us how John Fulton knowing Rashawn Hobbs led to you hanging out with John Fulton more?

A.   John and Rashawn used to hang out.  And of course I lived there, so.

Q.   And so how old were you when you first started hanging out more with John Fulton?

A.   I can guess if you want, but I don't --

Q.   You don't know for sure?

A.   No.

Q.   All right.  At some point did you end up living with John Fulton?

A.   Yes, sir.

Q.   When did you start living with John Fulton?

A.   I don't really remember, but I would say -- can I guess?

Q.   Well, what is your best estimate?

A.   November, October 2002.

Q.   All right.  And so in November 2002, you had just turned 17, is that right?

A.   Yes, sir.

Q. All right. Why were you living with John Fulton?

A. I honestly don't know.

Q. Well, how did it come about that you started living with him?

A. John Fulton asked me to live with him.

Q. All right. And did you say yes?

A. Yeah.

Q. Did you enjoy it?

A. I wouldn't say I enjoyed it, but.

Q. Well, what would you say?

A. I mean, I wouldn't say I enjoyed it. It was, it was cool. You see the result. So no, I didn't enjoy it.

Q. All right. Well, you know, up until, you know, say up until February, would you hang out with Mr. Fulton?

A. I don't know about hang out. We hung out.

Q. Okay.

A. But yeah, yes.

Q. So you hung out?

A. Yes, yes.

Q. When you were living with Mr. Fulton, was Antonio Shaw staying there sometimes, too?

A. Sometimes, yeah.

Q. What did you like about Mr. Fulton during that time period?

A. I liked the fact that he went to school. I liked the fact that he was kind of a mystery.

Mitchell - direct

1598

Q.   What do you mean by that?

A.   He wasn't the average teenager like myself.

Q.   In what way was he different from the average teenager?

A.   From the outside looking in, being kind of ignorant to the situation at the time, he somewhat what I would say he had, he had his self together.  He took care of his self very well to be a teenager.

Q.   When you were living with Mr. Fulton, were you doing any babysitting?

A.   Yes.

Q.   Tell us how that -- tell us who you were babysitting and how that came up.

A.   I don't know exactly how it came to.  But I knew I grew into watching Cam'ron.  I enjoyed it.  I liked it.  And he had to go to school.  He was doing something positive.  I didn't mind.

Q.   All right.  So when John would go to -- so John had a son, Cam'ron?

A.   Yes.

Q.   And when John would go to school, you would stay and babysit?

A.   Yes.

Q.   And you didn't mind doing that?

A.   Not at all.

Q.   Who is Dynasty Wheaton?

Mitchell - direct

1599

A.   Dynasty Wheaton is my oldest daughter's mom.

Q.   All right.  And so back in 2002, 2003, you had a casual relationship with her, or how would you describe it?

A.   Casual will be, will be probably appropriate.

Q.   You guys were not intending to --

A.   No.

Q.   -- be together for a long time?

A.   No.

Q.   But she was pregnant, is that right?

A.   Yes.

Q.   And so what's your oldest daughter's name?

A.   Her name is Archerie Mitchell.

Q.   All right.  And when was she born?

A.   She was born November 3, 2003.

Q.   All right.  So let's talk about that for a little bit.  If she was born on November 3, 2003, where were you living at the time that she was born?

A.   I was living in Division 10, Cook County jail, 2003 when my child was born.

Q.   How did you learn that you were a father?

A.   A telephone call home to my mom.

Q.   All right.  And so how were you able to call your mom?  Or tell us how it worked that you were able to call your mom.

A.   Of course you, you have to have some money on the phone first or you have to call collect.

Mitchell - direct

1600

Q.   All right.   And so did you know when your child was going to be born?

A.   I didn't necessarily know when.   Of course, she had a due date, an estimate.   I knew that.   I didn't know she was going to be born November 3rd, if that's what you are asking.

Q.   And so were you calling to try and find out what was going on with Dynasty?

A.   Honestly, no.

Q.   All right.   And then you called your mom and you found out that --

A.   Yeah.

Q.   -- she had given birth?

     Did Dynasty bring Archerie to visit you at Cook County jail?

A.   Yeah, sometimes.

Q.   And tell the jury what it was like to -- what the visiting room at Division 10 was like back in the period of 2003 to 2006 when you were there.

A.   Okay.   Can you reask the question?   Are you asking me what was it like or what did it feel like?

Q.   Let's first start with what it was like, what the --

A.   Describe it?

Q.   Yeah.

A.   I don't know the size of the room, but I know it's two sides to the room.   This side, you've got that side, and glass.

Mitchell - direct

1601

You've got holes in the glass on both sides so you can communicate back and forth with your loved one.  That's about the only thing I can describe about the visiting room to you.

Q.   And at this time, you were an inmate in the Cook County jail, is that right?

A.   Yes, sir.

Q.   And what were you being charged for?

A.   I was being charged with first degree murder, aggravated kidnapping, and concealment of a homicide.

Q.   And that was for the Christopher Collazo homicide, is that right?

A.   Yes, sir.

Q.   Did you kill Christopher Collazo?

A.   No, I did not kill Christopher Collazo.

Q.   Did you have anything to do with Christopher Collazo's death?

A.   No.

Q.   Did you know about Christopher Collazo's death?

A.   No.

Q.   Did you help plan it?

A.   No.

Q.   Were you in any way aware that Christopher Collazo was being killed on March 9th or 10th of 2003?

A.   No.

Q.   All right.  And so when you had visitors in Division 10,

Mitchell - direct

1602

how long were the visits?

A.  I would say 30 minutes.

Q.  And you said there was glass between you and the person visiting you, is that right?

A.  In between, yeah, separating.

Q.  Could you physically touch your visitors?

A.  No.

Q.  Was there a period at the beginning or the end of the visit where you could have physical contact with the visitors?

A.  No.

Q.  And you had to speak through a speaker?

A.  Yes.

Q.  And so where were you when you first met Archerie?

A.  Division 10, Cook County jail.

Q.  Were you able to hold your daughter?

A.  No.

Q.  And how would you try and -- was there any -- would you touch the glass to communicate with visitors?

A.  No.

Q.  Why not?

A.  I never did that.

Q.  All right.  Did you ever fist-bump?

A.  No.

Q.  Why not?

A.  I would just say "Bye.  I'll see you later."

Mitchell - direct

1603

Q. Why?

A. Because what am I reaching for?

Q. How did it make you feel when you knew that somebody was coming to visit you when you're in Division 10?

A. How did it make me feel?

Q. Yeah.

A. Majority of the times, I wasn't expecting or even thought I was going to get a visit, so I didn't have any way to feel.

Q. All right. But when they told you that you had a visit, was that a good thing or an unpleasant thing?

A. It wasn't a good thing, it wasn't a bad thing, because I didn't know who it was. I probably didn't want to go visit with whoever it was, so I can't really say, Russ.

Q. Why? Why wasn't that a good thing to have a visitor when you are in jail?

A. Because I never really looked forward to anybody coming to see me anyway. I had grew content with my situation. I didn't care.

Q. Were you embarrassed about where you were?

A. I wasn't embarrassed about where I were. I was embarrassed by the situation I was in.

Q. And tell us, why were you embarrassed, sir?

A. Can you ask that question again?

Q. Why were you embarrassed about the situation that you were in?

Mitchell - direct

1604

A.   I was embarrassed about the situation because I somewhat created it myself.

Q.   In your mind you believed that you created somewhat the situation that you were?

A.   I didn't believe.  I did.

Q.   All right.  Well, tell us, what did you do?

A.   I was tricked and manipulated into thinking that my friends killed somebody and that my consequences would be lessened if I agreed with that.

Q.   And so do you blame yourself for giving a statement, you know, repeating what the detectives told you?

A.   100 percent.

Q.   Why do you blame yourself?

A.   Because I let another human being manipulate me to doing something that was false and I knew it was false.

Q.   When did you start blaming yourself?

A.   Immediately.

Q.   When did you stop blaming yourself?

A.   I haven't.

Q.   Did you ever think that, you know, as a 17-year-old against two, you know, 40 something detectives with experience, that there might have been a mismatch there?

A.   No.

Q.   Why?  Why are you so hard on yourself?

A.   I'm not hard on myself.

Mitchell - direct

1605

Q.   Well, why do you blame yourself in this situation?

A.   Because I don't look at nobody else when I look in the mirror but myself.

Q.   Does it make it easier for you to be in control of, you know, what happened?

A.   Repeat that.

Q.   Does it make it easier for you to be in control of what happened by blaming yourself?

A.   I don't necessarily understand what you mean by that.

Q.   Well, that's fair.

When you were in Division 10 awaiting trial, did you get sad?

A.   I'm sad now, yes.

Q.   Did you need a hug?

A.   No.

Q.   Why not?

A.   What is a hug going to do?

Q.   What is that?

A.   What is a hug going to do, Russ?

Q.   Did you get a hug in the entire time that you were in Cook County jail?

A.   I don't remember.  I probably hugged an attorney or something.  I don't know.

Q.   Were you able to touch your mom at any point between the time that you were arrested on March 19, 2003 until the time

Mitchell - direct

1606

that you left Cook County jail in November of 2006?

A.  No.

Q.  Were you able to hug any of your family in that time period?

A.  No.

Q.  So I want to talk about --

THE COURT:  All right.  This is probably a good time to break.

MR. AINSWORTH:  Okay.

THE COURT:  Thank you all.

You step down first.

(Witness steps down.)

THE CLERK:  All rise.

THE COURT:  Thank you all for your attention today. It's been a long day.  I'll see you tomorrow, same time.

(Jury out at 4:57 p.m.)

MR. NATHAN:  Your Honor, we do have something before you leave the bench.

THE COURT:  All right.

MR. NATHAN:  Your Honor, during Mr. Loevy's cross-examination of Mr. Winstead --

MR. LOEVY:  Probably not Winstead, right?

MR. NATHAN:  Mr. Zalatoris.  I apologize.

THE COURT:  It's late in the day.

MR. NATHAN:  He implied that I or an attorney for

1607

Mr. Zalatoris was lying or concealing Mr. Winstead.

I've been in discussions with Mr. Loevy about Mr. Winstead's medical condition. At the pretrial conference we raised, we raised the first we had heard about it that he was in a rehab facility. We were trying to figure out what his medical status was.

Ms. Brill has more details exactly about that because she's the person who she actually went to the facility, and we can go through the medical situation that he's in.

We've disclosed a medical record from this facility that Mr. Winstead was in. He was discharged I believe it's on the 9th of February, but I'll look at the chart for that exact date.

I don't know if this -- I'm going to talk about his medical situation, so I'd ask that this be confidential.

THE COURT: Do you want to go off the record?

MR. NATHAN: No. This has to be on the record I think.

We disclosed that there is a diagnosis of Cognitive Communication Deficit.

When Ms. Brill saw him at the facility, he didn't know why he was there. It turned out he had been in the hospital for COVID and other complications and went to this facility. He didn't know what day it was. And he just seemed confused. Ms. Brill could probably shed more light because I wasn't

1608

there.

We've been communicating with the plaintiff about it. As I said, we disclosed the medical record about it. It was -- if they have an objection to the medical record, we need to figure out whether Mr. Winstead is unavailable for trial, that's an issue that we need to discuss with the Court.

We've been working to try to resolve it by agreement with Mr. Loevy, and I thought we would be able to. And I understood that if we can't, we would obviously bring this issue to the Court just like I raised it at the pretrial conference.

Mr. Loevy decided to start attacking me during Mr. Zalatoris's cross-examination talking about, saying that the attorneys were making up that Mr. Winstead has dementia. It's totally inappropriate.

And, first of all, we're seeking for yet another reason that we should have a mistrial. So we are on that basis, we are moving for a mistrial again.

THE COURT: All right. Can we review exactly, I remember that this came up, but I don't remember precisely what the question and answer was.

MR. LOEVY: If I could give our side when you are ready, Your Honor, because we have a very different view of this issue.

THE COURT: Okay.

1609

MR. NATHAN:  Yeah, there is two issues.  One is his actual medical condition, which that's an issue that we should discuss and we should discuss it today and figure this out.

THE COURT:  Right, right.

MR. NATHAN:  There is a separate issue about raising it in front of the jury about a dispute and impugning me.

MR. LOEVY:  Well, here is our side of it, Your Honor?

THE COURT:  All right.  Yes, go ahead.

MR. LOEVY:  Thank you, Your Honor.  This is a very disturbing issue.  You know, Mr. Winstead, they want to be able to read his deposition as I understand it.  And they sort of hinted at before trial, you know, he might or might not be available.  They wouldn't answer.

And at the pretrial conference, my memory, they were sort of ambiguous.  So we started writing them emails.  And apparently the rehab facility as we understood it was a physical rehab.  He had a physical problem, not a mental problem.  And he had COVID.  And they wouldn't pin down, and since this is obviously going to be a mistrial issue, we are going to lay the written record, they wouldn't pin down on what was wrong with him.

So I started asking trying to get clarity and not getting clarity back.  I bet we've written 10 emails on this. Trying to get clarity, not getting clarity back.  Are you saying he has a cognitive issue?  It took us a while to get to

1610

are you saying he has a cognitive issue?  Finally they dribbled out, yeah.  We aren't saying it's physical.  Because at first they were like:  He can't come to court.  He has to testify remotely.

Fine.  Are you saying it's a cognitive issue?  It shouldn't have been such a struggle.

Then where it got objectionable, because I started writing emails saying, Listen, are you saying -- it's sort of like cross-examination -- are you saying he's cognitively unavailable?  Declare that.

And they waffled and they wouldn't answer it.  And they said -- they're basically making it like they wanted -- I said it's too late.  Our position is if you have a medical record you've given us after trial started, then we can't do any discovery into this.  We're going to ask Judge Lefkow to say you are too late to prove he's unavailable.  You can't read his deposition.

So, in other words, we're saying we're going to argue to the Court it's too late to prove it.  Are you saying he's unavailable?  And that's where they got waffley.  They wanted to have it both ways.

What he said in writing was, Well, you know, if it's too late to prove he's unavailable, then we might call him.  So that's objectionable, because if he's unavailable, then he's unavailable.

1611

And fortunately we have this all in writing so Your Honor will be able to review it at your convenience.

What I was just told by Mr. Nathan and you were just told is he doesn't know why he was there. He was confused. These are new facts not shared with us, further supporting my hypothesis that what is going on here is they're holding their cards back until they decide which way they're going to play it.

When I asked that witness today: Is there anything wrong with Mr. Winstead?

He said: No. I talked to him three months ago. He's fine.

And then I said: Are you sure he doesn't have dementia?

Maybe I lost my temper a little bit. But this is not how it should go. We should not be told he has dementia, only to have a witness say he's fine. And then when he understood the significance, he walked it back.

But then he's like: I talked to him, he's fine. Three months ago, he's fine, fine.

Yet, now they're going to tell you we want to read his deposition. So there is just too much strategic going on, and that's where we're coming from.

MR. NATHAN: I'm not willing to diagnose somebody with dementia without seeing a medical record. I can't make up a

1612

diagnosis. When Mr. Loevy asks me "Does he have dementia?" I told him I'm trying to get a medical record.

As soon as I got the medical record, I gave it to him.

THE COURT: When was that?

MR. NATHAN: I got this medical record --

MR. LOEVY: We got it during trial.

MR. NATHAN: I can tell you exactly the date. I think it was this weekend.

MR. AINSWORTH: Thursday.

MR. LOEVY: We got the record during trial.

MR. NATHAN: So we got two --

THE COURT: Now why would you not --

MR. NATHAN: One second, Your Honor. Hold on, hold on. You're shaking your head. I'm not sure why. Your Honor, it's the discharge record --

THE COURT: Okay.

MR. NATHAN: -- is on February 9th. So this is developing as this is happening.

THE COURT: Okay.

MR. NATHAN: So you know what, it's sometimes difficult to get in touch and communicate with a facility to get the records.

THE COURT: I understand.

MR. NATHAN: We got the records in short order considering his discharge was on February 9th. And as soon as

we got them, we gave them to Mr. Loevy.

I'm happy to give Your Honor a copy of this admission record, which has a list of his diagnoses. And then I'm handing that up to Your Honor.

MR. LOEVY: Your Honor, if I could propose something unorthodox. And you can tell me no, you're the judge. But could the Court ask Mr. Nathan if he is or is not unavailable, without telling him which way you are going to rule on the timeliness, because they won't tell me.

MR. NATHAN: He is unavailable. He cannot testify with that diagnosis and based on what Ms. Brill is saying.

MR. LOEVY: So they told me he might testify. He might not testify. They told me if he's not found -- if this is found untimely, he might testify. It's really been very strategic feeling.

THE COURT: Okay. Hold on. I would just like to review what Mr. Nathan gave me.

MR. NATHAN: The diagnosis, Your Honor, is on page 2.

THE COURT: Okay. We have terms that I don't necessarily understand.

MR. NATHAN: The diagnosis on page 2, on diagnosis information, the third thing down there says Cognitive Communication Deficit.

THE COURT: Well, he does not appear to be well from all of this. What is the first, what is that?

1614

MR. NATHAN: I don't know what that is.

THE COURT: We can look it up.

MR. LOEVY: It's not clear to us if this a physical, that he was taken in for physical or mental.

THE COURT: Right.

MR. NATHAN: It seems to us that he's taken in for a physical problem, which is COVID, and that they diagnosed him with this while he was there.

MR. LOEVY: Well, so what might have happened was he went in for COVID, and they said, Hey, we need some proof to read his deposition, can you give him a diagnosis?

MR. NATHAN: I'm sure we didn't diagnose him with a cognitive disorder. And that's the kind of thing that he said to the jury.

MR. LOEVY: We don't know -- the problem with not doing things with discovery is we have no idea how this record was created when. It's not nefarious to say to a doctor: Would you give us a diagnosis.

MR. NATHAN: I'm sorry, it's kind of ridiculous for him to claim that we put him into a facility.

MR. LOEVY: I'm not saying that.

MR. NATHAN: He's got no basis to make these ridiculous accusations that we put Mr. Winstead into a facility --

MR. LOEVY: I'm not saying that.

1615

MR. NATHAN:  -- and got him to get a Cognitive Communication Disorder.  It's bizarre.

THE COURT:  I don't think he did that.

MR. LOEVY:  I'm not saying that, Your Honor.  He went in for COVID.

THE COURT:  I don't know whether you called them or tried to get it.

MR. NATHAN:  We did not ask them to make a diagnosis, absolutely not.

MR. LOEVY:  And I accept that.  I accept it.  He went in for COVID.  We weren't getting a straight answer from them.  And all of a sudden they're like he's got a diagnosis for COVID and he has a communication --

THE COURT:  This says this rhabdomyolysis is a potentially life-threatening condition that occurs when damaged muscle tissue breaks down and releases myoglobin into the bloodstream.  Too much myoglobin in the blood can lead to kidney damage or kidney failure, et cetera.

So that's apparently his primary diagnosis then.  But, you know, dysphagia's meaning, isn't that like foggy thinking or something?

MR. LOEVY:  Well, it's associated with a physical condition.  Maybe that's why Ms. Brill saw him and he was a little bit out of it.  That doesn't mean dementia, if he's having a physical issue.

1616

MR. NATHAN: Like I said before, I am not in the business of diagnosing people without knowing. So that's why when Mr. Loevy asks me a question, I say: This is what we know. I'm getting a record. And I gave him the record. Simple. It says on the bottom of the record, second page, left-hand corner, date of discharge, 2/9/25.

THE COURT: All right.

MR. LOEVY: And our position is it is too late for them to try to read Winstead's deposition, because if they were going to take the position he was unavailable for trial, they had to do it in an orderly way so we could get more information. That's not our position. They haven't proved unavailability.

THE COURT: Did anybody submit the deposition excerpts? Do I have that?

MR. NATHAN: We're working on that.

THE COURT: Okay.

MR. LOEVY: Are they saying it's a recent onset or he's had this cognitive issue for months or years?

MR. NATHAN: I was hopeful that Mr. Loevy and I would be able to work out whether we can decide together based on the medical record that he's unavailable, based on Ms. Brill's representation that she interviewed him, didn't know why he was in the hospital. And he apparently was in the hospital for days. He didn't know when his wife died. That's another fact

1617

that came up. And he didn't know what day it was.

So based on that, I was confident that Mr. Loevy would be professional and we'd be able to work out the fact that he's unavailable, because under Rule 804 he is unavailable. Now --

THE COURT: Let me hear from Ms. Brill. When did you talk to --

MR. LOEVY: That's it.

THE COURT: When did you talk to him?

MS. BRILL: So I have been trying to get in contact with Mr. Winstead for about two weeks. And his son gained access to his phone, because I left him a voicemail. And his son called me back and told me he was in a rehabilitation center. And prior to that, he had been hospitalized for about a month.

So I visited him on February 4th. I had met Mr. Winstead on at least three prior occasions. And when I walked in the room, he didn't recognize me.

I asked him why he had been hospitalized for a month, and he didn't know. And I asked him about his wife, because she was deceased. And he first told me that she died in 1974. And then he told me she died in 2020. And she actually died in 2006. It was clear to me that he was confused and just unaware of what was going on.

THE COURT: And when was he released from this?

MS. BRILL: February 9th.

1618

THE COURT: Five days later.

MR. LOEVY: So it might be true that when he had this condition that you looked up on your phone that he was disoriented. It sounds like that would be expected.

But they have not shown -- and by the way, if this interview happened on February 4th, it's disappointing that from then until now in court this is the first we're getting this information.

And Mr. Nathan, the stuff he told you earlier about Ms. Brill, that absolutely is not in writing or orally, never been communicated to us. We think there is something going -- there is a game being played here. And they have not shown that he is unavailable. And if he was unavailable two months ago, they would have known that. They would have said, you know -- we could have asked this doctor, you know, is it temporary.

None of us has any answers. I will credit Mr. Nathan none of us has any answers. If this is something that should have been brought up before trial if they wanted to prove he is unavailable so we could do discovery and find some answers. It's not fair to say in the middle of trial nobody has any information, but we want to read his deposition.

MR. NATHAN: It's not nobody has any information. We just presented the information. We've been telling Mr. Loevy about the cognitive communication problem as soon as we heard

1619

about it. I told him that there is a problem. I raised it at the pretrial conference.

But I like to be exact when I'm telling somebody, when I'm declaring somebody has dementia. I'm not just going to say that about somebody. And I can't make it up. I need to have a record that says that.

MR. LOEVY: Well, Your Honor, the issue to be called on to rule on I guess is we argue that they have not shown that he is unavailable in the terms of the rule. We're happy to, you know, file something because there is steps you've got to take. This wouldn't be fair to read his deposition under these circumstances.

Should we file a motion? Or how do you want to handle the issue?

THE COURT: Okay. It would be your motion to bar him from testifying via deposition.

MR. LOEVY: All right.

THE COURT: You have a video deposition of him, is that it? When was it taken?

MS. BRILL: I think it was in 2022. I'd have to check the date.

THE COURT: Okay. I mean, he's a defendant in the case. It seems like he ought to be able to testify.

MR. LOEVY: Well, that's Mr. Nathan's position. As I understand it, it wouldn't be fair. But we think that the

rules of hearsay, you have to prove unavailability. And we don't accept what -- if this had been six months that he's had this condition, then they could have told us at the pretrial conference. We could have found out what these diagnoses are. We could have found out is it temporary disorientation or is it permanent.

None of us has any idea. And I was -- the reason I got mad on the stand is like Zalatoris is like, "He's fine, he's fine. What are you talking about?" And then he tried to walk it back and say, "Well, I only talked to him for a brief period of time." But he's like, "I talked to him relatively recently. I didn't notice anything."

You told me in writing he is cognitively unavailable, you know, so it's just getting very confusing.

MR. NATHAN: I think Mr. Loevy is playing fast and loose with the facts. I'm trying to be particular when I talk about the man's mental health and diagnosis. It's not fair. I brought it up as soon as I knew about it. We investigated it and shared it.

Now, what I think is happening here is two things. Mr. Loevy was maybe hoping to exclude the testimony and laying in the weeds and not coming to an agreement, even though I've been upfront about it. Every time I try to answer his questions via email, he just asks the same question again. And I don't understand what that is all about. And now, after he

1621

did something which I think is outrageous, accusing me in the middle of Zalatoris's cross that I'm concealing information, now instead of just apologizing, he's accusing me of I don't even know what.

MR. LOEVY: Well, I can clarify.

THE COURT: Well, it's like the blind man and the elephant, right. You both have different perspectives on what was going on.

I will assume the good faith of both of you. I would say, I mean, yes, you can file a motion. Both of you file it. And it's of course going to turn out to be discretionary. So I'm inclined to -- it sounds like he's not now in a position to testify.

MR. LOEVY: We don't know that. That's what they're saying. You know, we don't accept anything about this. If he was disoriented when he saw Ms. Brill because he had a kidney condition, maybe he will revert to Mr. Zalatoris's recollection of him.

THE COURT: Okay.

MR. LOEVY: I just don't think there is a record. That's our position. We have no idea if he's competent or not.

THE COURT: All right. Well, yeah. Is there any way to get more information? You have a team over there.

MR. NATHAN: What information would Your Honor like?

THE COURT: From the doctor.

1622

MR. NATHAN: We can do that.

MR. LOEVY: Or maybe even voir dire the witness outside the presence of the jury.

THE COURT: That's a thought, too.

MR. NATHAN: And we could probably do that too via video.

THE COURT: All right. I like that idea. So we'll find a time.

MR. NATHAN: To do the voir dire?

THE COURT: Yes.

MR. NATHAN: Okay. The problem is it's hard to -- I really don't have a problem with it. We could do that. But I just want to be cognizant of the fact that it's hard to know if somebody knows what they're talking about or not. So just I would ask time, place. I would ask --

THE COURT: Well, Ms. Brill has been able to -- she thinks that he's not capable, right?

MR. NATHAN: Right. So those similar types of questions.

THE COURT: Yeah. I mean, and I urge you not to prepare him in advance for this.

MR. NATHAN: I assume Your Honor is going to ask him the questions and not --

THE COURT: Me?

MR. NATHAN: For voir dire.

THE COURT: If you give me the questions to ask.

MR. NATHAN: Okay.

MR. LOEVY: Right. We may ask the Court for follow-up, but I'll see what happens next.

THE COURT: All right. We could possibly do it over -- well, probably it would be after the regular court day or --

MR. LOEVY: We probably should --

THE COURT: Let's find out when he's available.

MR. LOEVY: We probably should ask his family when he's at his best. If he's elderly, some people are better in the morning, for example.

THE COURT: Okay. That's true. See what you can find out.

MR. NATHAN: Okay.

MR. LOEVY: Thank you, Judge.

MR. NATHAN: I just do want to say I have moved for a mistrial on that basis.

THE COURT: Okay. Your motion is denied. We're not going to start over on this case.

(Adjourned at 5:19 p.m. until 9:30 a.m., 2/20/25.)

                    *    *    *    *    *

1624

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*/s/Kathleen M. Fennell*                    *February 19, 2025*
Kathleen M. Fennell                  Date
Official Court Reporter


*/s/Judith Walsh*                           *February 19, 2025*
Judith Walsh                         Date
Official Court Reporter


*/s/Hannah Jagler*                          *February 19, 2025*
Hannah Jagler                        Date
Official Court Reporter

/s/Jennifer Costales                 *February 19, 2025*
Jennifer Costales                    Date
Official Court Reporter

1625

I N D E X

WITNESSES                                                    PAGE

JOHN ZALATORIS

Direct Examination (Resumed) By Mr. Loevy          1268
Cross-Examination By Mr. Nathan                    1494
Redirect Examination By Mr. Loevy                  1553

ANTHONY CHARLES MITCHELL

Direct Examination By Mr. Ainsworth                1576


PLAINTIFFS' EXHIBIT                              RECEIVED

No. 1, pages 28-37                                 1313
No. 34, page 2                                     1445
No. 42                                             1273
No. 43                                             1542
No. 44                                             1311
No. 102                                            1347


DEFENDANTS' EXHIBIT                              RECEIVED

No. 121                                            1410
No. 106, page 1                                    1448
No. 145, pages 2 and 4                             1448