**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN FULTON, | ) | |
| | ) | |
| Plaintiff, | ) | 20-cv-3118 |
| | ) | |
| v. | ) | Judge Lefkow |
| | ) | |
| ROBERT BARTIK, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ANTHONY MITCHELL, | ) | |
| | ) | 20-cv-3119 |
| Plaintiff, | ) | |
| | ) | Judge Lefkow |
| v. | ) | |
| | ) | |
| ROBERT BARTIK, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY IN FURTHER SUPPORT
OF THEIR RULE 59(A) MOTION FOR NEW TRIAL**

*/s/ Shneur Nathan*
Special Assistant Corporation Counsel
Shneur Nathan, Avi Kamionski,
Natalie Adeeyo, Breana Brill, & John Cerney
Nathan & Kamionski LLP
206 S. Jefferson Street
Chicago, IL 60661
snathan@nklawllp.com

*Attorneys for Individual City Defendants*

*/s/ James P. Fieweger*
Special Assistant Corporation Counsel
James P. Fieweger
Michael Best & Friedrich LLP
444 W Lake St Ste 3200,
Chicago, IL 60606
jpfieweger@michaelbest.com

*Attorney for City of Chicago*

## <u>TABLE OF CONTENTS</u>

ARGUMENT .................................................................................................................. 1

I.  THE EXCLUSION OF THE VIDEOTAPED CONFESSION WAS PREJUDICIAL ERROR WHICH WAS
    COMPOUNDED BY PLAINTIFFS' OWN CONDUCT............................................................... 1
    A.  The Crux of The Case Was What The Videotaped Confession Showed......................... *1*

    B.  Fox v. Hayes Is Inapposite...................................................................................... *5*

    C.  Refusing To Agree To Plaintiffs' "Compromise" Did Not Forfeit Any Argument. ....... *6*

    D.  The Court's Instruction Regarding The Video Unfairly Penalized Defendants............. *7*

II.  AS IN COBIGE, THE EXCLUSION OF CRITICAL REBUTTAL DAMAGES EVIDENCE WAS UNFAIR
     AND REQUIRES A NEW TRIAL. ..................................................................................... 8
III. THE EXCLUSION OF DR. GOLDSTEIN'S ADMISSIBLE REBUTTAL TESTIMONY DEPRIVED
     DEFENDANTS OF A FAIR TRIAL. ................................................................................. 11
IV.  EXCLUSION OF EVIDENCE FROM THE CRIMINAL TRIALS RESULTED IN PREJUDICIAL ERROR.
     ................................................................................................................................. 13
V.   EXCLUSION OF EVIDENCE INTRODUCED AT THE GRAND JURY WAS UNFAIR. ................... 15
VI.  THE COURT'S GANG-RELATED EVIDENTIARY RULINGS CREATED A FUNDAMENTALLY
     UNFAIR, ONE-SIDED PRESENTATION. ......................................................................... 16
VII. FORBIDDING REFERENCE TO CRIMINAL SUPPRESSION HEARINGS WAS ERRONEOUS AND
     UNFAIR. ................................................................................................................... 18
VIII.THE ERRONEOUS ADMISSION OF HEARSAY EVIDENCE WAS UNFAIR. ............................ 19
IX.  THE ERRONEOUS ADMISSION OF RULE 404(B) EVIDENCE AGAINST BARTIK WAS UNFAIR.
     ................................................................................................................................. 21
     A.  Plaintiffs' Efforts to Characterize the 111 Cases as "Impeachment" Is Pretextual and
         Did Not Justify Admission of Inadmissible Evidence.................................................. *21*

     B.  Plaintiffs Fail to Explain How This Evidence Is Probative of Untruthfulness Under
         Rule 608(b). .......................................................................................................... *22*

     C.  Plaintiffs' Use of the 111 Confessions Violated the Court's Prior 404(b) Ruling. ....... *23*

     D.  Plaintiffs Fail to Meaningfully Address Rule 403 Prejudice......................................... *24*

     E.  Admission of the 111 Confessions Made to Bartik Prejudiced Defendants Breen and
         Zalatoris ............................................................................................................... *24*

X.   IMPROPER CONDUCT BY PLAINTIFFS' COUNSEL RESULTED IN AN UNFAIR TRIAL. ............ 25
     A.  Repeated Violations of the Court's Orders In Limine.................................................. *25*

         i.   Violation of Court's order in limine barring use of the term "kids." ........................ 25
         ii.  Violation of the Court's order in limine barring reference to any violation of the 48-
              hour rule being "unconstitutional." .................................................................... 27
         iii. Violation of the Court's reserved ruling regarding Collazo's gang membership. .... 28
         iv.  Violation of the Court's order barring testimony regarding Defendant Bartik's
              history.............................................................................................................. 29

B.  Plaintiffs' Counsel's Repeated Inflammatory Comments in Front of the Jury Including Baseless Accusations Against Defense Counsel............................................................ *29*

C.  Plaintiffs' Counsel's Improper and Argumentative Questioning During Witness Cross Examinations Prejudiced the Defendants. ..................................................................... *32*

D.  Inappropriate Emotional Outbursts from Plaintiffs and at Plaintiffs' Counsel's Table. *35*

E.  The Court's Lack of Intervention During Plaintiffs' Counsel's Misbehavior............... *36*

XI.  PROCEDURAL IRREGULARITIES RESULTED IN AN UNFAIR TRIAL ....................................... 37

A.  The Court's Fluctuating Rulings About the Basis for the Dismissal of the Criminal Charges Unfairly Prejudiced Defendants........................................................................ *38*

B.  Failure to Rule on Defense Objections and Asking the Jury for Its Input in Ruling on Whether Defendants Could Present Evidence was Unfair. ............................................ *41*

C.  The Court's Instruction That It Was "Unreasonable" for Plaintiffs To Be Held for More Than 48 Hours was Unfair............................................................................................. *42*

D.  The Jury Was Not Properly Instructed on Taxes In Response to Its Question.............. *42*

E.  Defendants Were Unfairly Prevented from Presenting Relevant Evidence Under The Guise of "Cumulativeness."........................................................................................... *45*

XII.  INCONSISTENT VERDICTS NECESSITATE A NEW TRIAL. .................................................... 46

XIII. THE CUMULATIVE EFFECT OF ERRONEOUS AND UNFAIR EVIDENTIARY RULINGS, PLAINTIFFS' COUNSEL'S MISCONDUCT, AND UNFAIR PROCEDURE REQUIRES A NEW TRIAL. ....................................................................................................................................... 47

CONCLUSION........................................................................................................................ 47

## TABLE OF AUTHORITIES

**Supreme Courts**
*Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)...................................................... 34
*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 598 n. 22 (1980)...................................... 4

**Appellate Courts**
*Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).................................... 39
*Burton v. City of Zion*, 901 F.3d 772, 778 (7th Cir. 2018) ................................... 12
*Christmas v. City of Chicago*, 682 F.3d 632, 642 (7th Cir. 2012) .......................................... 32
*Cobige v. City of Chicago*, 651 F.3d 780, 784 (7th Cir. 2011).............................................. 11
*Collins v. Kibort*, 143 F.3d 331, 338 (7th Cir. 1998) .......................................... 20
*Collins v. Lochard*, 2015 WL 4127039, at *2 (7th Cir. July 9, 2015) ................................. 34
*Cont'l Vineyard, LLC v. Vinifera Wine Co., LLC*, 973 F.3d 747, 754 (7th Cir. 2020) .............. 46
*Davis v. FMC Corp., Food Processing Mach. Div.*, 771 F.2d 224, 234 (7th Cir. 1985)............ 31
*Durant v. Sur. Homes Corp.*, 582 F.2d 1081, 1089 (7th Cir. 1978) ........................................ 33
*Evans v. Katalinic*, 445 F.3d 953 (7th Cir. 2006) ............................................................. 18
*Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010) ....................................................................... 5, 6
*Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir. 1993) ........................ 3, 16
*Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) .......................................................... 12
*Gilbert v. Merchant*, 488 F.3d 780, 792 (7th Cir. 2007).......................................................... 4
*Hill v. City of Harvey*, 732 F. Supp. 3d 862, 887 (N.D. Ill. 2024), *appeal dismissed*, No. 24-1940, 2024 WL 4921652 (7th Cir. Oct. 30, 2024) ............................................................. 44
*Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007) ............................................................... 7
*In re Air Crash Disaster Near Chicago, Ill., On May 25, 1979*, 803 F.2d 304, 313 (7th Cir. 1986) .................................................................................................................................. 43
*Jimenez v. City of Chicago*, 732 F.3d 710, 718 (7th Cir. 2013) ........................................... 14
*Joseph v. Brierton*, 739 F.2d 1244, 1247–48 (7th Cir. 1984) .............................................. 26
*Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1042 (7th Cir.1999).......................... 39
*Parish v. City of Elkhart, Ind.*, 702 F.3d 997, 1000 (7th Cir. 2012)........................................ 2
*U.S. v. Bahena-Navarro*, 678 F.3d 492, 495 (7th Cir. 2012) .................................................... 4
*United States v. Beck*, 625 F.3d 410, 418 (7th Cir. 2010) ..................................................... 30
*United States v. Hatchett*, 245 F.3d 625, 644 (7th Cir. 2001) ......................................... 19, 20
*United States v. Lynch*, 699 F.2 839, 845 (7th Cir. 1982) ..................................................... 22
*United States v. Robbins*, 197 F.3d 829, 848 (7th Cir. 1999)................................................ 37
*United States v. Villegas*, 655 F.3d 662, 672 (7th Cir. 2011).................................................. 9
*United States v. Wilson*, 962 F.2d 621 (7th Cir. 1992) ........................................................ 41
*United States v. Wolf*, 787 F.2d 1094, 1098 (7th Cir. 1986) ........................................... 33, 34
*United States v. Wormick,* 709 F.2d 454, 459 (7th Cir.1983) ............................................... 33
*Walsh v. Mellas*, 837 F.2d 789, 801 (7th Cir. 1988) ............................................................ 18
*Whiting v. Westray*, 294 F.3d 943, 944 (7th Cir. 2002) ......................................................... 32
*Willis v. Lepine*, 2011 WL 1630896, at *1 (N.D. Ill. Apr. 29, 2011) (Lefkow, J.), *aff'd*, 687 F.3d 826 (7th Cir. 2012)............................................................................................................ 28

**District Courts**

*Boyd v. Vill. of Carol Stream*, No. 99 C 6514, 2001 WL 641301, at *4 (N.D. Ill. June 1, 2001) 34

*Cunningham Charter Corp. v. Learjet Inc.*, No. 07-233-DRH, 2012 WL 2830351, at *2 (S.D. Ill. July 10, 2012)...................................................................................................................... 31

*Harris v. City of Chicago*, 2018 WL 2183992, at *16 (N.D. Ill. May 11, 2018) ........................ 24

*In re Fedex Ground Package System, Inc. Employment Practices Litigation*, 2010 WL 1838400, at *1 (N.D. Ind. May 4, 2010)................................................................................................... 44

*Klawer v. Szadkowski*, No. 1:22-CV-01171, 2024 WL 1587015, at *1 (C.D. Ill. Apr. 11, 2024) 30

*Ross v. City of Chicago*, No. 13 C 751, 2014 WL 1344279, at *4 (N.D. Ill. Apr. 3, 2014)......... 27

*Tucker v. Lally*, No. 17 C 2331, 2020 WL 5909070, at *3 (N.D. Ill. Oct. 6, 2020)..................... 26

**Statutes**

26 U.S.C. § 139F(a) .................................................................................................................... 44

**Rules**

Fed. R. Civ. P. 46........................................................................................................................ 41

Fed. R. Evid. 1002 ........................................................................................................................ 5

Fed. R. Evid. 608(b)................................................................................................................... 23

## ARGUMENT

Defendants' motion for a new trial identifies a series of prejudicial errors—including the unfair exclusion of dispositive video evidence, a prejudicial instruction that compounded the error, and repeated violations of *in limine* rulings—that individually and cumulatively denied them a fair opportunity to present their case. Plaintiffs' response fails to meaningfully engage with these concerns, dismissing them as routine trial events, but this was not a typical trial. As demonstrated below, it was one marked by evidentiary errors and cumulative procedural irregularities that undermined the integrity of the verdict. Accordingly, Defendants respectfully request a new trial.

**I.     The Exclusion of the Videotaped Confession was Prejudicial Error Which Was Compounded by Plaintiffs' Own Conduct.**

Excluding Mitchell's videotaped confession, in a case centered on the coercion and fabrication of that very statement was erroneous and severely prejudiced Defendants. Plaintiffs' response does nothing to refute that.

### A.  The Crux of The Case Was What The Videotaped Confession Showed.

The trial centered on whether Defendants fabricated or coerced confessions from Plaintiffs. (Fulton[1] Dkt. 485 at 33). Yet, the Court excluded a videotape that would have shown Mitchell confessing to a prosecutor for approximately 30 minutes where he was alert, calm, and cooperative conveying no signs that he was acting under duress or fear. His non-verbal behavior—such as maintaining eye contact, using hand gestures to demonstrate actions, and speaking without visible hesitation—belies the claim of coercion. (Dkt. 513 at 5, 8) (summarizing ASA Rubinstein's testimony as to what is depicted in the videotape). The exclusion of this pivotal evidence constituted prejudicial error that deprived the Defendants of a fair trial.

---

[1] Defendants cite exclusively to Fulton Docket numbers herein.

Plaintiffs' argument that this case was not about the confession, but what happened before, ignores the fact that here, unlike *Fox*, there was a coerced confession claim and a claim that the videotaped confession itself was fabricated evidence used against Mitchell at his criminal trial. The jury never got to see the evidence that was the basis of that claim. *See* Criminal Tr., Aug. 25, 2006, CITY_FULTON_MITCHELL_ 004098-004099, attached as Exhibit 1 (Prosecutor: "I'm asking to publish the video…". The Court: "It will be received."). Plaintiffs improperly used the transcript of the videotaped confession to argue that the confession had the hallmarks of a coerced or fabricated confession. Fulton did not have a transcribed confession. Yet, Plaintiffs used the transcript of Mitchell's confession as some sort of proof that Fulton's inculpatory statements were also fabricated. To then argue that the video of Mitchell's confession itself is irrelevant to Plaintiffs' claims is preposterous.

Moreover, Plaintiffs' damages are affected by their claims of innocence. *See Parish v. City of Elkhart, Ind.*, 702 F.3d 997, 1000 (7th Cir. 2012) (finding evidence of plaintiff's guilt or innocence was critical to a fair trial). Indeed, it was the video of Mitchell's confession that convinced the Cook County Circuit Court judge to deny Plaintiffs' petitions for COIs. *See* Def. Trial Ex. 77 at 6:4–13, attached as Exhibit 2 ("I am unconvinced the Movants are able to satisfy the element of actual innocence. In large part, that rests upon my belief that Mr. Mitchell gave a credible statement. I looked at the —I looked at the statement….")

Plaintiffs' assertion that both sides said the exact same thing about Mitchell's demeanor in the video is also misleading. (Dkt. 518 at 4). To state broadly that the parties agree as to Mitchell's demeanor fails to recognize a multitude of different observed behaviors that can demonstrate the truthful and voluntary nature of Mitchell's confession, which is **the central dispute** between the

parties. This dispute should have been left to the jury to decide by viewing Mitchell's videotaped confession.

Plaintiffs claim Mitchell's demeanor was calm because he thought he was going home and was simply submitting to the story that Defendants fed him. (Tr. 1695:16–1696:11). But Mitchell also testified he was "anxious" and "agitated" in the video. (Tr. 1807-1808). Yes, Defendants agree the video shows Mitchell was calm, but in a way that showed he was not in distress or under duress or parroting a story—the opposite of what Plaintiff claims. Mitchell was forthright, and clearly articulating how the crime occurred; he was not someone succumbing to pressure to regurgitate a story. That is a crucial dispute and one that required the jury to view the video to determine whose characterization was more accurate. Otherwise, Plaintiffs were allowed to, as they do here, use the broad description of "calm" to mislead the jury into their version of events.

Plaintiffs, for example, characterized the taped confession as scripted and coached. *Id.* Mitchell even claimed that he spent days in police custody with nothing to eat or drink other than perhaps a Pepsi. (Tr. 1664:9–20). Mitchell's clarity, forthright attitude, calm demeanor, hand gestures, and confidence as projected in the video casts serious doubt on that testimony. Without the video, the jury was left with a one-sided, abstract description of the circumstances under which he confessed. Plaintiffs' description of the video portrayed the scene as if Mitchell were a political hostage, reciting a scripted story under threat by kidnappers who promised if he did so he could go home. But the video did not show a hostage regurgitating a script; it showed someone voluntarily confessing and giving a full account in a way someone earnestly answering questions would. The transcript would read exactly the same in each of those scenarios, with the video demonstrating which one is the truth. The exclusion of the video unfairly slanted the evidence in favor of Plaintiffs. *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir. 1993)

(verdict must be set aside where jury presented with "a skewed picture" based on evidentiary rulings). Plaintiffs' counsel and witnesses repeatedly characterized the confession as coached and rehearsed, (Dkt. 513 at 7–8), while Defendants were barred from presenting the clearest evidence that it was not—the video itself.

Plaintiffs make the erroneous accusation that during the trial, Defendants never articulated why the video was the best evidence. (Dkt. 518 at 9). Plaintiffs contend that Defendants did not give specifics at any time during the trial about what the video would show that a transcript could not. *Id.* That is demonstrably false. Defendants filed Renewed Objections to Plaintiffs' MIL Barring the Videotaped Confession on February 18, 2025, during trial, explaining in detail why "[t]he transcript is no substitute for the video." (Dkt. 433 at 7). In fact, some of the exact phrases that Plaintiffs quote from Defendants Rule 59(a) motion and argue Defendants never made before are in Defendants Renewed Objections motion. (*Compare* Dkt. 518 at 9, *with* Dkt. 433 at 7).[2]

Plaintiffs assert that the videotaped recording of Mitchell's confession is merely cumulative of the transcript. It was not. Unlike a transcript, the video would have allowed the jury to observe Mitchell's tone, demeanor, and physical conduct, including his composure, responsiveness, body language, and gestural affirmations.. *See, e.g.*, *U.S. v. Bahena-Navarro*, 678 F.3d 492, 495 (7th Cir. 2012) (acknowledging that transcript does not convey witness demeanor); *Richmond Newspapers*, *Inc. v. Virginia*, 448 U.S. 555, 598 n. 22 (1980) (noting transcript or cold record is no substitute for presence in the courtroom). These visual and auditory details are key to the voluntariness inquiry. *See Gilbert v. Merchant*, 488 F.3d 780, 792 (7th Cir. 2007) (affirming voluntariness finding as to confession based on factual details comprising totality of

---

[2] "The video shows that Mitchell was alert, closely paying attention, intently listening, nodding along, and other facial expressions indicating he understood and agreed with what was being said when those questions were being asked. Mitchell makes gestures throughout as he is explaining what occurred to illustrate what he is saying." (Dkt. 433 at 7).

circumstances). This is why Rule 1002 of the Federal Rules of Evidence requires that an original recording be presented when its content is at issue. Fed. R. Evid. 1002.

### B. *Fox v. Hayes* **Is Inapposite**

Plaintiffs continue to lean heavily on *Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010), but the differences between *Fox v. Hayes* and this one are stark and dispositive. (Dkt. 513 at 2–7). A key difference in *Fox*, was that the officers had the entire interrogation on video feed but did not video record anything but the confession. Plaintiffs here disingenuously claim that there is "no dispute" that Defendants "*could have* recorded" the full interrogation. Dkt. 518 at 6 & n. 4. But the proof here shows the opposite. Unlike in *Fox*, Defendants in this case lacked any in-room video or audio recording equipment at the time of the interrogation. Unrebutted trial testimony of Zalatoris, ASA Rubinstein, and ASA Varga established that the temporary Area One headquarters where Plaintiffs were interviewed had no surveillance infrastructure capable of recording interrogations. (Dkt. 513 at 6–7). Videotaping Mitchell's confession required the State's Attorney's Office to affirmatively dispatch a videographer, and the recording only occurred after Mitchell consented, in compliance with Illinois law then requiring such consent. *Id.* The absence of earlier video was thus a function of technological and legal limitation, not selective omission. This fundamental difference eliminates the concern present in Fox and underscores why the full recording of Mitchell's statement—already used in his criminal trial—was not only appropriate for the jury's consideration here, but essential to evaluating the core allegations of coercion and fabrication. Defendants did not have the equipment on hand, nor did they even control the videographer—the CCSAO did.

*Fox* also litigated entirely different claims. Plaintiffs agree that the key claims in *Fox* were a malicious prosecution claim and an IIED claim. (Dkt. 518 at 2). They ignore, however, that in *Fox*, the parties agreed that there was probable cause without the confession. *Fox*, 600 F.3d at 832.

Unlike here, in *Fox* there was no trial and there was no claim that the confession was evidence used against the plaintiff at trial and rendered his trial unfair.

What is more, Plaintiffs' response fails to address the fact that, unlike in *Fox*, Plaintiffs' counsel here repeatedly opened the door to the videotape by claiming that Fulton should have been videotaped and mischaracterizing the events captured on Mitchell's confession video. (*Id*. at 7–8.) They further opened the door by claiming that the videotaped confession was the product of rehearsal and by claiming there was no evidence of guilt. *Id.* (citing numerous examples of door opening including Plaintiffs' opening statement, Plaintiffs' trial testimony, and their cross-examination of the Defendants). For all these reasons, Plaintiffs' reliance on *Fox* is misplaced. That case cannot be stretched to bar an otherwise complete, probative, and material video confession that directly contradicts the very core of the coercion and fabrication claims in this case.

### C. Refusing To Agree To Plaintiffs' "Compromise" Did Not Forfeit Any Argument.

Plaintiffs also suggest that Defendants waived any objection to the prohibition on the video because Plaintiffs offered that both sides could play a short clip of the video, limited to a single transcript page, and they both had to stipulate that those short clips were representative of Mitchell's demeanor. That was not a legitimate solution. First, Plaintiffs cannot offer a "compromise" to argue Defendants waived any objection, which was the exact purpose of the "compromise" here – as part of that solution, Defendants had to waive their objection entirely by stipulating the video were representative. (Dkt. 518 at 8.) Selecting a snippet from a 30-minute confession strips it of context and neuters its evidentiary force. No snippet of video can adequately demonstrate Mitchell's composure and volition throughout. The jury needed to see the entirety of what the criminal jury saw: the entire videotaped confession. (Ex. 1). Nor do Plaintiffs cite any authority for the notion that it was waiver to reject Plaintiffs' absurd proposal. Plaintiffs cite a case

6

where a defendant lost an evidentiary challenge on the grounds of prejudice because he rejected a limiting instruction which would have lessened the prejudice, but here, Plaintiffs required Defendants to withdraw the objection entirely and stipulate Plaintiffs solution cured the prejudice. (Dkt. 518 at 8.) Had Defendants done so, Plaintiffs would be arguing, by accepting the "compromise," Defendants waived any objection to the prohibition of the entire video.

### D. The Court's Instruction Regarding The Video Unfairly Penalized Defendants.

The Court's instruction to the jury about the video only exacerbated the error and prejudice which Defendants faced because it implied Defendants did something improper by not recording the full interrogations. The Court instructed the jury that it excluded the videotape "because only the last 34 minutes of the entire time that Mr. Mitchell was in custody was recorded." Dkt. 513 at 11 (citing Court's instruction at Tr. 851:7–14). This was misleading to the jury as there was no rule requiring Defendants to record the full interrogation, there was no means to do so, and they were not responsible for the limited time of recording. A new trial is warranted where instructions mislead the jury and prejudice the objecting litigant. *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007). Simply such an instruction was unfair and unnecessary.

Plaintiffs blame defense counsel for the need for this instruction, arguing that defense counsel had asked a question of Plaintiffs' expert in which he admitted he watched the video in coming to his opinion. (Dkt. 518 at 16). But the Court never barred reference to the existence of the videotape. This was thoroughly established in Defendants' Rule 59(a) and mistrial motions, (Dkt. 513 at 11; Dkt. 432) and culminated with the Court's acknowledgement that "the plaintiffs never moved to bar mention of the video, …only the videotape itself." The instruction came instead because the Court commented that it "learned that the jury was asking about the video," and then the Court said, "let's not talk about the video anymore" and gave the instruction (Tr. 1358:20–

1359:21). There is nothing in the record however to indicate that the jury ever inquired about the video before the instruction was given, so it is unclear why this Court was under that impression.

## II. As in *Cobige*, the Exclusion of Critical Rebuttal Damages Evidence was Unfair and Requires a New Trial.

Plaintiffs attempt to downplay the unfair exclusion of Fulton's recorded prison call— during which he vividly described luring another inmate into his cell to "stomp his brains out"— by characterizing it as isolated and irrelevant to whether Fulton killed Collazo. In Plaintiffs' view, this was an isolated incident, Fulton was merely fearful and acting in self-defense, and the call did nothing to rebut the good-character evidence offered by Plaintiffs. (Dkt. 518 at 19). This position fails to address Defendants' argument that the prison call should have been admitted to rebut Fulton's positive character evidence and damages. This matter of fact—whether Fulton was a violent person—was for the jury to evaluate; both sides could argue about what the phone call showed.

Fulton's own statements as recorded on his prison phone were highly probative to rebut a central theme in Plaintiffs' case: that Fulton was a "gentle soul," youthful, incapable of violence, and that the brutal murder of Christopher Collazo could not have been a "first time crime" committed by someone like him. (Dkt. 513 at 13). Plaintiffs repeatedly advanced this theory during trial, not only through direct testimony but also during closing argument. Their narrative was designed to evoke sympathy and to bolster their innocence claim by implying that Fulton was fundamentally non-violent. The call directly rebutted that narrative.

Plaintiffs argue that the exclusion of the call was no big deal because it was only one call from his entire prison experience. This does not rebut Plaintiffs' witnesses who asserted that Fulton was "not a street person," was not "hanging in the streets," "wouldn't throw a brick at an abandoned building," and "was doing exactly what a teenager was supposed to be doing." (Dkt.

513 at 13) (citing trial testimony of Yolanda Henderson, Laverne Henderson, Antonio Shaw, Jerome Greenlaw, and Mitchell). Plaintiff's counsel also argued in closing that Collazo's killing could not have been the work of a first-time offender like Fulton, and that Fulton was especially vulnerable in prison because he was seen as a "weak victim and [someone who was] seen as prey." (Tr. 4190:19). That characterization of Fulton's peaceful and passive disposition was shattered by his unfiltered words in the recorded prison call. The call revealed Fulton as a man capable not only of violence, but also of calculated premeditation and boastful reflection about it, describing in detail how he tricked another inmate into his cell and attacked him with an elbow so forceful it dropped the man instantly.

This was not generic character impeachment as Plaintiffs suggest. It went directly to the heart of damages and liability: refuting Fulton's portrayal as someone inherently incapable of committing a violent act, and therefore, by implication, incapable of having committed the crime for which he was convicted. Courts routinely allow rebuttal evidence to correct misleading impressions created by a party's testimony. *See*, *e.g.*, *United States v. Villegas*, 655 F.3d 662, 672 (7th Cir. 2011) (discussing the "open door" doctrine and its soundness). Once Fulton put his character and alleged non-violence in issue—voluntarily and repeatedly—Defendants were entitled to respond with probative rebuttal evidence, especially when that evidence came from Fulton's own recorded words, not third-party hearsay. *Id.*

The Court's exclusion of the call under Rule 403 ignored this context. While the language in the call was evocative, it was no more prejudicial than the emotional testimony Plaintiffs themselves elicited. Moreover, Rule 403 does not bar strong evidence merely because it is damaging; it only excludes evidence where unfair prejudice substantially outweighs probative value. Here, the probative value was overwhelming—it directly contradicted Plaintiffs' core theory

of damages—and there was no unfairness in allowing the jury to hear Fulton speak in his own words about an act of violence he described in detail. For these reasons, exclusion of Fulton's prison call deprived the jury of critical context and undermined the fairness of the trial. The Court's ruling unfairly insulated Plaintiffs from the consequences of having presented a distorted picture of Fulton's post-conviction conduct, and Defendants respectfully submit that a new trial is warranted on this basis alone.

Additionally, the Court erred in excluding Anthony Mitchell's criminal history, including three arrests in 2003 for criminal trespass, battery, and robbery, and his 2021 and 2022 post-release charges for possession of cannabis, possession of a weapon in a vehicle, and possession of an illegal scanner. Plaintiffs introduced a highly curated and emotional narrative through the testimony of Mitchell and his daughter, Archerie Mitchell, portraying Mitchell as a devoted father who immediately stepped into a nurturing parental role after his release. Ms. Mitchell described her father as a man of warmth and integrity: the first to buy her flowers, the person she looked up to most, and someone who changed her life upon his return. That testimony was accompanied by visible emotional displays and tears from the witness and Mitchell who was in physical proximity to the jury box. Having opened the door so dramatically to Mitchell's post-release character and rehabilitation, Plaintiffs cannot simultaneously exclude evidence that rebuts this portrayal.

The same logic applies to the unfair exclusion of Mitchell's 2021 and 2022 charges, as well as the 2003 arrests, which rebutted Mitchell's portrayal that he had a character for lawfulness and stability that Plaintiffs placed at issue. The arrests occurred at key moments: the 2003 charges close in time to the Collazo investigation, directly contradicting the notion that Mitchell had no history of violence or criminality; and the 2021 and 2022 charges were shortly after his release. This timing undermines evidence Plaintiffs introduced that Mitchell was a devoted father who

dedicated most of his days to driving Archerie long distances to and from school. The notion that incidents of criminal trespass, battery, robbery and gun possession are too minor or irrelevant ignores their cumulative weight in undermining the pristine image of Mitchell that Plaintiffs presented. Courts have long held that when a party introduces good character or reputation, the opposing side must be permitted to rebut that testimony with contrary evidence, including specific acts where relevant. *Cobige v. City of Chicago*, 651 F.3d 780, 784 (7th Cir. 2011). Defendants were deprived of presenting that evidence here.

Plaintiffs dismiss *Cobige* as "unhelpful"—but *Cobige* expressly required a new trial under strikingly similar circumstances where the exclusion of critical damages evidence compromised the fairness of the proceedings. Plaintiffs argue that *Cobige* is distinguishable from Fulton's call because *Cobige* involved a different type of evidence, an arrest history as opposed to a phone call. First, this underscores that Mitchell's arrest and conviction history should have been admitted under *Cobige* to rebut his claimed positive character and damages. Second, the prison phone recording capturing Fulton's own words is not materially distinguishable from the arrest record evidence *Cobige*—both are reliable rebuttal evidence—so the same result should follow here. In the end, the exclusion of Fulton's recorded call regarding his violence and Mitchell's criminal history gave the jury an unbalanced picture of Plaintiffs' respective characters and bolstered an inflated damages narrative without any opportunity for rebuttal. The Court's rulings in this regard were therefore seriously prejudicial and deprived Defendants of a fair trial.

### III. The Exclusion of Dr. Goldstein's Admissible Rebuttal Testimony Deprived Defendants of a Fair Trial.

With the benefit of the now fully developed trial record, it is evident that the exclusion of Dr. Diane Goldstein's expert testimony caused significant and prejudicial harm to Defendants. Plaintiffs rest on their previous briefing on this issue and thus do not respond to Defendants'

arguments on this point. As we explain in our motion, this evidence would have directly rebutted key aspects of Dr. Leo's opinions regarding the psychology of custodial interrogations and the social science research underpinning claims of false confessions. Defendants' inability to introduce expert rebuttal testimony allowed Plaintiffs to present a lopsided view of the confessions and statements at the heart of this case. Had the Court allowed Dr. Goldstein's expert testimony on the subject of coerced confessions, the outcome of the trial could have been different. *Burton v. City of Zion*, 901 F.3d 772, 778 (7th Cir. 2018).

The Court's inquiry is limited to "whether the expert's 'qualifications provide a foundation . . . to answer a specific question' asked." *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010)). Here, the specific question is whether the body of research around coerced confessions is reliable. Dr. Goldstein is a licensed and board-certified clinical neuropsychologist, with a Ph.D. and 20 years of clinical experience, making her more than qualified to review a body of confessions research. She regularly conducts forensic evaluations—including in cases involving custodial statements. (Dkt. 513 at 17). And her work consistently requires her to conduct, use, and extrapolate social science studies and statistics and draw conclusions based on those studies. That is precisely what she did here. Her experience and background amply qualified her to review the body of research upon which Dr. Leo relied.

This testimony went to the heart of Plaintiffs' theory of liability. The absence of counter-expert testimony allowed Plaintiffs to overstate the reliability and conclusions of the literature cited by Dr. Leo and to portray as scientific fact what Dr. Goldstein would have shown to be contested, limited, or unsupported. (Dkt. 513 at 16). Thus, the Court's exclusion of Dr. Goldstein's testimony deprived Defendants of the ability to present critical evidence and that resulted in a substantial miscarriage of justice. Accordingly, Defendants should receive a new trial.

## IV.    Exclusion of Evidence from the Criminal Trials Resulted in Prejudicial Error.

Defendants were also unfairly prevented from introducing evidence of what occurred at Plaintiffs' criminal trials, while Plaintiffs were permitted to present a one-sided picture tailored to their theory of the case. Plaintiffs mischaracterize Defendants' inability to introduce evidence from the criminal proceedings as merely a matter of "flow of evidence." On the contrary, the materiality of the allegedly fabricated evidence was an essential element of that claim. Precluding the jury from hearing evidence that was introduced at the criminal trial, which no doubt would have impacted the jury's assessment of materiality, resulted in significant prejudice to Defendants.

As Plaintiffs note, ASA Nancy Nazarian's testimony covers nearly 400 pages of trial transcript—specifically, 374 pages (Tr. 3336–3710). On direct and redirect, Plaintiffs occupied 247 of those pages (Tr. 3336–3502; 3629–3710), while Defendants were limited to only 127 pages on cross (Tr. 3502–3629)—20 of which consisted of colloquy with the Court regarding what topics the defense would be permitted to explore. But plaintiffs ignore that Defendants were given only about half as much time as plaintiffs to question Nazarian, only for Plaintiffs to then object that any further questioning by Defendants was cumulative.

By the time it was the City's turn to question Nazarian, the Court expressed fatigue (Tr. 3539:11–13), but that exhaustion should not have curtailed Defendants' ability to present critical evidence. Plaintiffs should not be allowed to call a key witness, frame the evidence unilaterally, and then preclude the defense from rebutting or clarifying it under the guise of "cumulativeness." As the Court rightly asked: "[i]s there evidence that's relevant to the fundamental questions in this case?" (Tr. 3541:16–18). Yet, the Court denied further examination with the blanket conclusion: "This would just be a reiteration. No." (Tr. 3549:9–16). That premature judgment precluded the jury from hearing relevant, non-cumulative evidence.

Compounding the prejudice, the Court also excluded the criminal trial transcripts—leaving the jury with no independent means of evaluating whether the allegedly fabricated evidence was material to the original convictions. Plaintiffs rely on *Jimenez v. City of Chicago*, 732 F.3d 710, 718 (7th Cir. 2013), but mischaracterize its holding. (Dkt. 518 at 19). *Jimenez* does not support the exclusion of trial transcripts where, as here, the defense is otherwise blocked from developing the materiality record. In fact, the Seventh Circuit held that while the criminal transcripts were not necessary in that case, they were "relevant," and could be necessary if the plaintiff could not meet his burden of establishing what occurred at the criminal trial "by other means." *Id*. at 719. That reasoning confirms the transcripts were admissible here, particularly given the Court's limits on other proof.

Moreover, the Court's refusal to allow a summary of criminal trial evidence through ASA Nazarian deprived Defendants of a fair opportunity to respond. The Court excluded key testimony as cumulative or irrelevant, including:

1. That Marcus Marinelli described a taunting phone call between Collazo and Fulton, which was not captured on any phone record, calling into question whether the phone records available in 2025 fully captured all conversations between the participants;
2. That Griffin recanted at trial only a narrow portion of her prior statement, the same statement that Plaintiffs alleged was fabricated by Defendants;
3. That Plaintiffs made threatening calls to Griffin, which was a motive for Griffin to recant her statement;
4. That forensic analyst Bob Beris found no fingerprints in Fulton's car, which is consistent with someone cleaning the car after the murder;
5. That the criminal jury knew the Foster bus was not running at the time Plaintiffs claimed they were using it—a detail Plaintiffs relied upon to support their fabrication claim;
6. That Fulton's disputed confession to Bartik was raised before trial and was known to the jury.

(See Offer of Proof as to ASA Nazarian's Testimony, Dkt. 474 at 3).

The exclusion of this evidence, particularly when Plaintiffs were allowed to elicit their own selective version of the criminal trial through ASA Nazarian's testimony, denied Defendants a full

and fair opportunity to rebut or contextualize Plaintiffs' narrative regarding the criminal trial evidence. Accordingly, Defendants respectfully request a new trial in which they are permitted to introduce this material evidence and meaningfully cross-examine the key witnesses.

## V.  Exclusion of Evidence Introduced at the Grand Jury was Unfair.

Plaintiffs fail to engage with the core of Defendants' argument, resorting instead to *ad hominem* attacks and misdirection. They assert that ASA Sandra Navarro's proposed testimony regarding Johnitta Griffin's grand jury appearance was inadmissible hearsay, (Dkt. 518 at 20), but that mischaracterization ignores both the content and the purpose of the proposed testimony. Navarro was not being offered to testify about the truth of Griffin's statements, but rather to establish the consistency and circumstances under which those statements were made. These are facts directly relevant to the claim that Defendants fabricated Griffin's statement.

As noted, the evidence at issue is ASA Navarro's testimony that she would have testified that she met with Griffin prior to Griffin testifying before the grand jury, to find out what she knew about the Collazo case while reviewing Griffin's handwritten statement previously provided to the police, and that would be the basis for Griffin's grand jury testimony. (Tr. 4061:16–4062:15). This testimony was critical to assessing whether Griffin's statement was fabricated, as it was offered not for its truth (and is thus not hearsay), but rather to show the changing nature of her statement. As Plaintiffs note, Griffin recanted some of the inculpatory statements she made to the grand jury; however, she also knew and maintained details suggesting personal knowledge of the crime that could have supported a different inference, namely that Griffin recanted certain details only out of fear of Plaintiffs. That would have undermined Plaintiffs' claim that Griffin's handwritten statement and her grand jury testimony were fabricated. (Dkt. 485 at 33.)

ASA Navarro was uniquely positioned to testify to Griffin's demeanor, the process by which she was questioned, and the consistency of her statements. Preventing the jury from hearing

that evidence stripped the Defense of its ability to challenge Plaintiffs' narrative. The jury needed to hear the fact that ASA Navarro independently interviewed Griffin before her grand jury testimony and that Griffin gave an account substantially similar to her grand jury testimony and the handwritten statement she gave to Defendants Breen and Zalatoris in order to assess the credibility of Plaintiffs' claim that Griffin's statement to police was fabricated. As such, the Court's limitation on defense counsel's questioning of Navarro deprived Defendants Breen and Zalatoris of a fair trial.

## VI. The Court's Gang-Related Evidentiary Rulings Created a Fundamentally Unfair, One-Sided Presentation.

The trial was rendered fundamentally unfair by the Court's rulings that permitted Plaintiffs to suggest Collazo's murder was gang-related while simultaneously barring Defendants from introducing probative evidence of Plaintiffs' own gang affiliations. *Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir. 1993) (verdict must be set aside where jury presented with "a skewed picture" based on evidentiary rulings). Initially, the Court properly recognized that Plaintiffs lacked a foundation to introduce either Collazo's alleged gang membership or any alternative suspect theory involving rival gangs, reserving judgment on Plaintiffs' motions *in limine* 34 and 45 (Dkts. 297, 309). Yet, once Plaintiffs began eliciting testimony on these points, the Court allowed it—without requiring any further foundational showing. (Dkt. 513 at 23) (citing Tr. 102:14-17, 103:8-9).

That ruling was not applied evenly. When Defendants sought to respond with credible evidence of Plaintiffs' own gang affiliations, the Court excluded the evidence outright. As Plaintiffs' own brief concedes, they were allowed to argue that some unknown gang member committed the murder due to Collazo's ties to the Maniac Latin Disciples. (Dkt. 518 at 22).

Plaintiffs argue there was "no actual evidence" of Plaintiffs' gang membership, when in fact there was plenty, including:

- Johnitta Griffin testified before the grand jury that she dated Fulton and knew that Plaintiffs were Gangster Disciples;

- Griffin made similar statements to police during the original investigation;

- And Griffin reaffirmed those statements during an interview with John Fulton's then-criminal defense attorney, Elliott Zinger.

(Dkt. 513 at 24) (citing Tr. 2928:18–23). This evidence should have been admitted, at a minimum, to rebut Fulton's repeated testimony that he was not a gang member. (*Id*. at 23–24) (citing three examples where Fulton claimed he was not a gang member). Additionally, once Plaintiffs introduced unredacted general progress reports that referenced gang affiliation, and once Mr. Fulton affirmatively denied gang involvement during trial (see, *e.g.*, Tr. 120:15–19; 219:14–19; 238:13–20), any barrier to admissibility was removed. The issue was not only relevant, but Plaintiffs also placed the issue squarely in dispute by themselves.

Plaintiffs argue that Defendants "elected to stay away" from the issue (Dkt. 518 at 23). Not so. Defendants repeatedly and contemporaneously objected to the one-sided introduction of gang evidence and moved to admit countervailing evidence (Dkt. 298), only to be rebuffed by the Court's exclusionary ruling (Dkt. 400; Tr. 254:14–256:24). It was the Court—not Defendants—that prevented the jury from hearing about Plaintiffs' gang affiliation. *Id.* To make matters worse, Plaintiffs were allowed to argue that some unknown gang member committed the murder due to Collazo's ties to the Maniac Latin Disciples. (Dkt. 518 at 22). Plaintiffs were permitted to cast the murder as a gangland execution carried out by shadowy third parties, while jurors were kept in the dark about Plaintiffs' own gang ties. The imbalance was extremely prejudicial. For this reason, a new trial is warranted.

## VII.   Forbidding Reference to Criminal Suppression Hearings Was Erroneous and Unfair.

Defendants were denied a fair trial when the Court excluded all evidence that Plaintiffs each had suppression hearings during their criminal proceedings—hearings in which courts denied their motions to suppress their confessions. This evidence was not offered for its preclusive effect as suggested in Plaintiffs response, but rather to provide necessary context for the jury to assess the state of mind and good faith of the investigating officers. The state of mind of the officers was particularly important because the jury was considering punitive damages. *Walsh v. Mellas*, 837 F.2d 789, 801 (7th Cir. 1988) (noting punitive damages requires a determination that the defendants acted with deliberate indifference or reckless disregard). At the time of the interviews, Defendants knew their conduct and the admissibility of any resulting confessions would be scrutinized by a criminal court, which occurred contemporaneously with the events at issue. That scrutiny ultimately resulted in judicial findings that the confessions were admissible and served as objective, contemporaneous validations of the officers' conduct. Excluding that evidence unfairly invited the jury to evaluate the officers' actions solely through the lens of modern norms and sensibilities—more than 20 years removed—without the benefit of knowing that a court, applying the standards in place at the time, found the officers' conduct within legal bounds.

Plaintiffs' response brief misrepresents Defendants' position by relying on *Evans v. Katalinic*, 445 F.3d 953 (7th Cir. 2006), a case addressing the inapplicability of preclusion doctrines based on suppression rulings. (Dkt. 518 at 24). Defendants are not arguing that the prior suppression rulings should have been given preclusive effect or that they foreclosed liability as a matter of law. Rather, the argument is that those rulings—particularly the mere fact that they occurred—were probative and admissible to demonstrate that Defendants Bartik, Breen, and Zalatoris should not have been assessed punitive damages because they did not act with reckless

or malicious intent. A fair assessment of the officers' intent and reasonableness must include the fact that they operated within a legal system that contemporaneously reviewed and upheld their methods, including the length of time Plaintiffs were in custody before being presented before a judge. Stripping that context from the trial permitted Plaintiffs to severely distort the record and deprived Defendants Bartik, Breen, and Zalatoris of a meaningful opportunity to rebut allegations of intentional misconduct. This resulted in an unfair judgment of punitive damages against these Defendants.

### VIII.   The Erroneous Admission of Hearsay Evidence was Unfair.

The Court's admission of hearsay evidence—including a bus schedule offered without a live witness and the wholesale admission of the entire police investigative file—was emblematic of a broader lack of control over the evidentiary process which resulted in an unfair trial. These rulings disregarded basic evidentiary safeguards guaranteed under the Federal Rules of Evidence and allowed Plaintiffs to introduce key exhibits without proper foundation, undermining Defendants' ability to fairly contest the allegations.

Plaintiffs attempt to justify the admission of a hearsay CTA bus schedule because they claim it was "authentic". (Dkt. 518 at 31). But authenticity does not, by itself, justify its admission without a sponsoring witness capable of establishing its reliability, relevance, and the context in which it was created. *United States v. Hatchett*, 245 F.3d 625, 644 (7th Cir. 2001) (affirming district court's refusal to admit a lab report under Rule 803(8) where the defendant failed to produce "a witness who could identify and authenticate the report."). Plaintiffs leveraged this unsworn document to argue that Mitchell and Fulton's confessions were fabricated—specifically, by asserting that a "false fact" was fed to them because no Foster Avenue bus was running after midnight. But no witness confirmed that no bus could have plausibly been operating in the area at that hour. In fact, testimony from Detective Breen established that there was a CTA bus terminal—

referred to as a "bus barn" or North Park Garage—on Foster Avenue, and that it was not unreasonable for a bus to be present in the area during the early morning hours. (Tr. 2559–60). By admitting the document without live testimony, the Court allowed Plaintiffs to make an inflammatory argument unsupported by competent evidence and denied Defendants the opportunity to challenge the document's interpretation through cross-examination. Defendants were entitled to a trial governed by the rules of evidence—not by documents floated into the record without scrutiny.

Second, Plaintiffs offer no real defense of the Court's even more problematic decision to admit the entire investigative file—comprised of police reports, notes, summaries, and third-party statements—en masse over Defendants' foundational objection. This file contained layers of hearsay, some of which were authored by individuals who did not testify, and all of which were admitted without distinguishing between proper and improper evidentiary use. Relatedly, Plaintiffs were routinely permitted to cross-examine officers about documents that they did not create— something that was facilitated through the blanket admission of the entire investigative file into evidence. Plaintiffs now argue that Defendants waived any hearsay objection by objecting to the file's "foundation" rather than using the word "hearsay." (Dkt. 518 at 27). This is meritless. A foundation objection inherently encompasses hearsay concerns where, as here, the objection targets documents whose admissibility depends on the declarant's credibility and firsthand knowledge. Foundation challenges are precisely the procedural vehicle used to enforce the hearsay rules when documents are offered without authenticating witnesses. *Collins v. Kibort*, 143 F.3d 331, 338 (7th Cir. 1998) (finding abuse of discretion where court admitted medical bill without proper foundational witness); *Hatchett*, 245 F.3d at 644. The Court's ruling effectively excused

Plaintiffs from proving the admissibility of these documents and allowed the jury to consider unfiltered, unsworn allegations and summaries as substantive evidence.

Taken together, these rulings permitted Plaintiffs to bypass core evidentiary safeguards. They are not harmless errors—they go to the heart of the reliability and fairness of the trial record. Defendants respectfully submit that these rulings, individually and collectively, justify a new trial.

### IX.     The Erroneous Admission of Rule 404(b) Evidence Against Bartik Was Unfair.

Plaintiffs attempt to justify the admission of Defendant Bartik's 111 prior pre-test confessions under Rule 608(b), but their arguments fail both legally and factually. Their response confirms what the Court had earlier recognized: that this evidence invites an impermissible propensity inference in violation of Rule 404(b) and is unduly prejudicial under Rule 403. (Dkt. 401 at 5). Plaintiffs' careful avoidance of any Rule 404(b) analysis underscores that this evidence was admitted for improper propensity purposes even after the Court ruled that such evidence would be unfairly prejudicial.

#### A.  Plaintiffs' Efforts to Characterize the 111 Cases as "Impeachment" Is Pretextual and Did Not Justify Admission of Inadmissible Evidence.

Plaintiffs claim they introduced the 111 prior confessions solely to impeach Bartik's explanation that he typed Mr. Fulton's confession due to its length and his poor handwriting. But Bartik never denied typing the report. Whether he typically typed or handwrote confessions is irrelevant to the central question raised at trial: whether Bartik typed a confession after Fulton told it to him or whether he fabricated it more than a year later. Introducing evidence from over 100 other cases to rebut a minor point about formatting was grossly disproportionate and was a blatant pretext for seeking the admission of inadmissible evidence.

Bartik acknowledged that there were times he would write notes in the room with a suspect, but he never testified that he consistently memorialized confessions in writing during pre-test

interviews. As he testified: Q: All right. Well, sir, isn't it true that if you got a confession during a pretest interview, you would handwrite the confession? A: There are times when I would, yes. (Tr. 1990: 24 – 1991: 2). Bartik further explained "[i]t's been my experience, counselor, that a lot of times when people are talking to you, if you start writing stuff down, they stop talking. So, by listening to them, they actually continue to talk. If you all of a sudden start writing things down, they're, like, well, why are you writing that down? So, by having a conversation with a person, they continue—they continue to talk." (Tr. 2043:1–8). Thus, whether Bartik typed or handwrote Fulton's confession does not establish that the method of documentation was indicative of fabrication. The true function of this evidence was to suggest that Bartik had fabricated many prior confessions, thereby bolstering Plaintiffs' theory that he fabricated Fulton's confession—a classic Rule 404(b) impermissible inference, which this Court had already disallowed. (Dkt. 401 at 5).[3]

### B. Plaintiffs Fail to Explain How This Evidence Is Probative of Untruthfulness Under Rule 608(b).

Plaintiffs argue that the 111 examples demonstrate "untruthfulness" because they contradict Bartik's stated reason for typing Fulton's confession. But this logic is flawed. First, Bartik did not deny obtaining the 111 confessions, nor did he deny handwriting (as opposed to typing) many of them. Thus, there was no false statement to impeach. Second, even if the jury found Bartik's explanation for typing the confession unconvincing, that does not convert his 111 prior interviews into acts of deceit, fraud, or falsehood, which are the relevant standards under Rule 608(b). Third, Plaintiffs' cited case, *United States v. Lynch*, 699 F.2 839, 845 (7th Cir. 1982),

---

[3] Plaintiffs wrongly assert in a footnote that Defendants waived any objection to the extrinsic exhibit shown to the jury. In fact, Defendants expressly challenged the entire line of questioning about the 111 prior pre-test confessions—including the exhibit—under Rules 608(b), 404(b), and 403. Their Rule 59(a) motion specifically objected to the exhibit's admission, noting: "The Court then allowed extrinsic evidence of one example of the handwriting for the jury." (Dkt. 515 at 29). This clearly encompassed the exhibit's use to support an inadmissible propensity inference. The argument was preserved, and Plaintiffs' waiver claim is meritless.

is inapposite. There, a tax return was admitted where the defendant falsely represented her employment status as housewife rather than a full-time secretary—which was a clear act of deception. *Id.* In contrast, Bartik testified truthfully about his professional role as a polygraph examiner and nothing about the fact that he obtained other pre-test confessions in his job as a police polygrapher has any bearing on his truthfulness under Fed. R. Evid. 608(b). Ultimately, Plaintiffs never explain how obtaining confessions during interviews, whether frequent or rare, constitutes evidence of untruthfulness. Their argument is circular: they suggest that Bartik's prior conduct is suspicious, therefore he is untruthful, and therefore the conduct is admissible to show untruthfulness. That is classic impermissible propensity reasoning, and the evidence should have remained excluded from trial.

### C. Plaintiffs' Use of the 111 Confessions Violated the Court's Prior 404(b) Ruling.

This Court explicitly held that Plaintiffs could not offer Mr. Sosnowski's opinion regarding the frequency of Bartik's confessions because it would invite an impermissible propensity inference—*i.e.*, that Bartik fabricated Fulton's confession because he had fabricated others. (Dkt. 401). Plaintiffs circumvented that ruling by introducing the same inference through cross-examination and demonstrative exhibits, referencing 111 prior cases and telling the jury during opening statements that "[Bartik] has a little habit of this." (Tr. 37:13–14). That language—and Plaintiffs' assertion in their response that "Bartik had lied repeatedly about obtaining confessions during non-confrontational pre-test interviews"—demonstrates exactly why this evidence should have remained excluded. This was not a passing remark about handwriting; it was a deliberate strategy to portray Bartik as a serial fabricator. The Court rightly barred this evidence before trial when it prohibited Plaintiffs from eliciting the same inference through their expert, Mr. Sosnowski. (Dkt. 401 at 4) (citing *Harris v. City of Chicago*, 2018 WL 2183992, at *16 (N.D. Ill. May 11,

2018)). There, the Court previously found such a theory impermissible against the same Defendant Bartik. The same reasoning should have applied here, as this Court initially recognized, regardless of the Plaintiffs' method of introducing this improper propensity evidence.

### D. Plaintiffs Fail to Meaningfully Address Rule 403 Prejudice.

Plaintiffs dismiss the Rule 403 argument as waived and argue that any prejudice was "ordinary." But this misrepresents the record. Defendants raised Rule 403 both before, during and after trial in their opening brief, and the prejudice is evident from Plaintiffs' framing and from the disproportionate scope of the evidence admitted. (Dkt. 513 at 30; Dkt. 431 at 6). The jury was invited to draw a sweeping conclusion about Bartik's integrity based on 111 unrelated cases that had no connection to Mr. Fulton's interview. The introduction of extrinsic exhibits, a sample confession, and the repeated insinuation of fabrication in other cases ensured that the jury would judge Bartik (and by extension Breen and Zalatoris) not on the facts of this case but on supposed, unsubstantiated, speculative insinuation against Bartik from other cases. That is the very definition of unfair prejudice.

### E. Admission of the 111 Confessions Made to Bartik Prejudiced Defendants Breen and Zalatoris

Plaintiffs argue that the 111 confessions should come in to impeach Bartik, but do not address the fact that this caused severe prejudice to Detectives Breen and Zalatoris. The implication that Bartik fabricated dozens of confessions allowed Plaintiffs to paint Breen and Zalatoris as guilty by association. On this, Plaintiffs are silent and have no response and therefore they concede the evidence introduced against Bartik is also unfairly prejudicial to the other defendants. The admission of the 111 prior pre-test confessions served no legitimate impeachment purpose under Rule 608(b), violated the Court's earlier ruling under Rule 404(b), and carried extreme prejudicial weight in the context of a high stakes reversed conviction trial. Plaintiffs' response confirms – not cures – the fundamental unfairness that resulted. A new trial is warranted.

24

X.     **Improper Conduct By Plaintiffs' Counsel Resulted in an Unfair Trial.**

    A.  **Repeated Violations of the Court's Orders In Limine.**

Throughout trial, Plaintiffs violated the Court's orders *in limine* and in the process prejudiced the jury against Defendants such that they received an unfair trial. Specifically, Plaintiffs violated the Court's on Defendants' motions *in limine*.

    i.  **Violation of Court's order in limine barring use of the term "kids."**

Prior to trial, the Court ordered Plaintiffs to refrain from making any reference to John Fulton, Anthony Mitchell, Antonio Shaw, or Johnnitta Griffin as "children," "kids," "minors," "teenagers" or similar terms noting such terms would "only serve to 'garner emotional sympathy[.]'" (*See* Dkt. 400 at 11). Given Plaintiffs' numerous violations of this order throughout the entire trial, even after acknowledging doing so, they cannot seriously claim such transgressions were inadvertent "unintentional, arguable missteps." It was deliberate gamesmanship designed to garner sympathy in favor of Plaintiffs and prejudice the Defendants. (Dkt. 513 at 31–34). Adding insult to injury, Defendants' attempts to enforce the ruling was mocked by Plaintiffs, sowing distrust in Defendants among the jurors.

Plaintiffs bizarrely argue that Defendants should have ignored Plaintiffs' repeated violations of the Court's order so as to minimize the prejudice to Defendants. Such a burden would be unworkable and makes a mockery of Plaintiffs' deliberate violations of the *in limine* ruling. It is absurd to argue that the Plaintiffs' regular violations of an order *in limine* is the fault of Defendants.

Equally unpersuasive is Plaintiffs' argument that they had no other choice but to violate the order and contend it was Defendants' burden to determine an acceptable alternative way to refer to "the boys to make the necessary age-related points." (Dkt. 518 at 40). But this argument is a nonstarter because the Court permitted "Plaintiffs [to] use terms such as 'young men' and

'young women.'" (Dkt. 400 at 10). Referring to Plaintiffs as "a 17-year-old" or "18-year-old" would have similarly sufficed. Far from impossible, such terms are simple and reasonable alternatives which are consistent with the Court's ruling. Viewed fairly, Plaintiffs consistently violated an order and only now argue they had no other choice.

As Plaintiffs note, the district judge is free to alter a previous *in limine* ruling. (Dkt. 518 at 38). Instead of arguing for clarification of the ruling, however, Plaintiffs acknowledge they violated the ruling repeatedly and consistently because they claim they were in "an impossible position." (Dkt. 518 at 40). Plaintiffs' counsel calls these 40-plus violations of the Court's ruling *in limine* "inadvertent," "justified," and "insignificant," and pejoratively describes Defendants objections to his violations as "a boy who cried wolf." (*Id.* at 42 n. 21). In his view, orders *in limine* are mere suggestions and it is Defendants' own fault for objecting to violations of those "suggestions." That decidedly is not the standard. Purposefully violating a ruling *in limine* constitutes prejudicial error necessitating a new trial where the jury easily could have relied on them in reaching their verdict. *See*, *e.g.*, *Tucker v. Lally*, No. 17 C 2331, 2020 WL 5909070, at *3 (N.D. Ill. Oct. 6, 2020) (J. Kendall) (citing *Joseph v. Brierton*, 739 F.2d 1244, 1247–48 (7th Cir. 1984) (counsel violated an *in limine* ruling during closing argument, and despite instructions from the court telling the jury to ignore counsel's comments, the comments were highly prejudicial and a new trial was necessary). The Court already ruled that using such diminutive terms was prejudicial. No doubt the jury relied on Counsel's comments in finding sympathy for Plaintiffs. Moreover, these were not one-off violations during closing arguments. They infected the entire trial from beginning to end, and thus the Court could not have corrected the improper emotional sympathy they evoked. These repeated violations warrant a new trial.

26

Plaintiffs also argue part of the problem was semantics, claiming they understood "the purpose of the order was to avoid use of 'diminutive terms' that 'would *only* serve to garner emotional sympathy.'" Dkt 518 at 33–34 (citing dkt. 400 at 11). This argument is disingenuous as it distorts what the Court ordered, which was as follows:

> Plaintiffs may not, however, use other diminutive terms such as "children," "kids," "minors," and "juveniles," as such terms are unduly prejudicial and have no relevance. As plaintiffs concede, whether Plaintiffs and Shaw were investigated as juveniles or adults has nothing to do with this case. Accordingly, such terms would only serve to garner emotional sympathy, which is an improper basis for the presentation of evidence or arguments at trial.

(Dkt. 400 at 11) (cleaned up). The Court could not have been clearer, and if Plaintiffs did not understand the "semantics" they should have sought clarification before they violated the order 40-plus times. Plaintiffs' contention that they did not intend the "use of a diminutive term to gin up sympathy" cannot be squared with the sheer number of times that Plaintiffs violated the Court's order. Plaintiffs' counsel used the prohibited terms repeatedly in a manner that is "an improper basis for the presentation of evidence or arguments at trial." *Id.* (citing *Ross v. City of Chicago*, No. 13 C 751, 2014 WL 1344279, at *4 (N.D. Ill. Apr. 3, 2014)). These persistent and reckless violations, as well as Plaintiffs' counsel's mockery of Defendants objecting to those violations, resulted in an inherently unfair trial for Defendants and requires a new trial.

### ii. Violation of the Court's order in limine barring reference to any violation of the 48-hour rule being "unconstitutional."

Defendants moved to exclude evidence of a class action settlement related to alleged violations of their constitutional rights through which Plaintiffs had already been compensated. (Dkt. 400 at 20). The Court allowed Plaintiffs to argue that their detention was unreasonably long and a factor in their confessions but otherwise granted the motion as unopposed. *Id.* The scope of the order was confirmed at the pretrial conference, in particular Defendants argued:

> MR. NATHAN: You can say how long they were in custody without saying it was a constitutional violation to say that they were in custody…. But to say that it was a constitutional violation is unfairly prejudicial when they were acting pursuant to a policy that is—was admittedly wrong. And that's why they settled the lawsuit relating to that.

(FPTC Tr. 63:6–8; 14–17). After some discussion the Court ordered as follows "It's relevant. The issue of whether you call it unconstitutional to the witness, I think, is—you know, maybe you shouldn't do that. But it's certainly relevant. So let's do that." *Id.* at 66:7–11. Perhaps the ruling could have been more clear, but regardless, Plaintiffs' counsel blew through the ruling on the first trial day stating that Fulton "was in there for more time than the Constitution allows," (Tr. 17:23–18:3) and continued to do so despite the Court clarifying that Plaintiffs were barred from referring to the 48-hour issue as a "constitutional" issue (Tr. 107:1–4). These references to the detention being unconstitutional violated the Court's ruling and left Defendants with an unfair trial.

That the Court did not definitively rule that such reference was prejudicial until after opening statements is inconsequential. Regardless of when it happened," the misconduct of counsel ... justifies a new trial where that misconduct prejudiced the adverse party." *Willis v. Lepine*, 2011 WL 1630896, at *1 (N.D. Ill. Apr. 29, 2011) (Lefkow, J.), *aff'd*, 687 F.3d 826 (7th Cir. 2012) (citations omitted). The Court ruled as much. When Plaintiffs called the 48-hour violation a "constitutional" violation, the jury was told Plaintiffs had their constitutional rights violated, severely prejudicing their determination of whether the Defendants were responsible for the alleged violations here. By presenting the case in this way, Plaintiffs intentionally violated an order *in limine* thereby denying Defendants a fair trial.

### iii. Violation of the Court's reserved ruling regarding Collazo's gang membership.

As discussed above, the Court excluded reference to Collazo being in a gang unless a foundation had been laid. Defendants moved *in limine* to bar evidence of any gang references

relating to Collazo. (Dkt. 297, 309). Yet, Plaintiffs proceeded to directly Collazo's gang affiliation violation of the Courts order *in limine* No. 45. (*See* Tr. 1094:18–23, "Q: And when you were investigating who might have wanted to do this, one of the first things you had to look at was this kid's gang affiliation; right?"). Despite no foundation being laid, however, the Court overruled Defendants' objection. (Tr. 1095:1). Plaintiffs attempt to excuse the introduction of this foundation free and prejudicial evidence by noting that Zalatoris later testified that he wrote the word "La Raza" (which is the name of a gang) in his notes. (Dkt. 518 at 45; Tr. 1100:6–9). This was unfair in that the jury had no legitimate basis to believe Collazo was in a gang.

### iv. Violation of the Court's order barring testimony regarding Defendant Bartik's history.

This was yet another instance of Plaintiff's Counsel flouting the Court's order such that Defendants would receive an unfair trial. As discussed above, Plaintiffs introduced barred Rule 404(b) evidence against Bartik under a pretext that it was mere impeachment or evidence of untruthfulness. This was unfair and is yet another basis for a new trial.

### B. Plaintiffs' Counsel's Repeated Inflammatory Comments in Front of the Jury Including Baseless Accusations Against Defense Counsel

Plaintiffs' counsel injected unduly prejudicial and inflammatory commentary throughout the trial including baseless accusations that defense counsel colluded with Marinelli and faked Defendant Winstead's unavailability. Plaintiffs' counsel made an inappropriate and baseless accusation against Defendants' counsel in front of the jury; specifically, suggesting that the defense was engaging in a *quid pro quo* with the witness Marcus Marinelli. As this Court recalls, Marinelli testified from jail via a videoconference that was coordinated by the Court. Marinelli on video in court but outside the presence of the jury said that he was visited by Plaintiffs' attorneys, (Tr. 3720), and that he thought that counsel for the City "should have the courtesy to come speak with me before all these proceedings." (Tr. 3720). The Court then told Marinelli that there could

be consequences if he failed to testify and Marinelli proceeded to testify. (Tr. 3723). Even after Defendants argued it was error for Plaintiffs to suggest before the jury that defense counsel engaged improperly solicited Marinelli's testimony, the only justification Plaintiffs came up with was that Marinelli's request to speak with defense counsel "was clearly pretext." (Dkt. 518 at 41). This empty *post hoc* attempt to justify Plaintiffs' counsel's behavior is not a substitute for a good faith basis to ask such a prejudicial question. The Court twice sustained defense objections when Plaintiffs attempted to make these accusations, but the damage was done. (Tr. 3803:19–3804:2).

While an attorney does not need definitive proof to have a good-faith basis to engage in a line of questions, he does need "[a] well-reasoned suspicion that a circumstance is true." *United States v. Beck*, 625 F.3d 410, 418 (7th Cir. 2010). But there is no well-reasoned suspicion that the witness was seeking some sort of deal or that Defense Counsel had even spoken with the witness. Plaintiffs' counsel asking the question in front of the jury was not intended to elicit evidence of bias but was designed to unfairly cast aspersions on the credibility of Defendants' counsel, hindering their ability to defend the case. Trial counsel's credibility with a jury is of the utmost importance, so baseless accusations against counsel deprive that party of a fair trial. *See, e.g.*, *Klawer v. Szadkowski*, No. 1:22-CV-01171, 2024 WL 1587015, at *1 (C.D. Ill. Apr. 11, 2024) (J. Chang) (cleaned up) (Dismissal may be appropriate when a litigant abuses the judicial process by leveling "vitriol and frivolous accusations" against opposing counsel or the court, refusing to obey court orders, or making threats.)

Plaintiffs' counsel pulled a similar maneuver in his commentary to the jury about Winstead's medical condition suggesting Defendants' counsel of misrepresenting the medical condition of another Defendant. (Tr. 1475:15–1476:10) ("Your Honor, it has been told to us by then that he has dementia"). Defendants established in their motion that it was improper for

Plaintiffs to litigate the issue of Winstead's unavailability before the jury where the parties had exchanged medical records and the Court was going to make a ruling—and did eventually rule—that Winstead was medically unavailable. (Dkt. 513 at 37). Plaintiffs have no legitimate response to this prejudicial conduct and cynically argue that Defendants were "playing games with the issue of Winstead's medical (un)availability." (Dkt. 518 at 42). This argument was already rejected by the Court, which found that Winstead was indeed unavailable. (Dkt. 465). The misconduct of counsel justifies a new trial where that misconduct prejudiced the adverse party. *Davis v. FMC Corp., Food Processing Mach. Div.*, 771 F.2d 224, 234 (7th Cir. 1985). Plaintiffs' commentary about Winstead's medical condition was again designed to suggest nefarious acts by Defendants' counsel rather than to elicit relevant evidence.

Plaintiffs' counsel's inappropriate and prejudicial comments that "I'm going to show you the March 21st memo of Rubinstein, *which might or might not have been taken*—written on March 21st" was unacceptable testimony by counsel. (Tr. 3266:17–19); *see, e.g., Cunningham Charter Corp. v. Learjet Inc.*, No. 07-233-DRH, 2012 WL 2830351, at *2 (S.D. Ill. July 10, 2012) (finding there is "everything wrong, however, with defense counsel testifying" and forbidding counsel from testifying, supplying his own evidence, providing expert testimony, or doing anything that causes the jury to believe that he is in a better position to know the facts than the witnesses themselves). Plaintiffs' counsel's theories as the creation of the Rubinstein memo are appropriate for closing argument, not as commentary during his questioning of witnesses. Plaintiffs' counsel made similar pejorative commentary during ASA Nazarian's testimony while an objection was pending, claiming "She's telling stories." (Tr. 3469:22–3470:1). In essence, Plaintiffs' counsel was testifying that he believed the witness to be a liar. He later mocked ASA Nazarian in order to get an emotional rise out of the jurors (Tr. 3933:20 ("MR. LOEVY: Didn't ask her. She just kept

talking."); Tr. 3934:1–23 (Defense explaining at sidebar jurors laughing throughout trial to Mr. Loevy's comments like this which are meant to taint the jury); Tr. 3935:4–10 ("MR. LOEVY: … And I did respond to the objection that he made in front of the jury by saying I -- he said you asked her that, and I didn't ask her that. She -- she just volunteered it….I can't help it if the juror apparently agreed with me.). Reasonable latitude in cross-examination does not include *ad hominem* attacks on a witness, regardless of their sophistication or perceived hostility, especially when counsel is not even examining the witness. It similarly does not include testimony from the questioning attorney about the credibility of the witness. This behavior taken together irreparably prejudiced Defendants and denied them a fair trial.

### C. Plaintiffs' Counsel's Improper and Argumentative Questioning During Witness Cross Examinations Prejudiced the Defendants.

Defendants are entitled to a new trial because Plaintiffs' attorney's cross-examination was improper and it prejudiced Defendants' case. *Christmas v. City of Chicago,* 682 F.3d 632, 642 (7th Cir. 2012) (citing *Whiting v. Westray*, 294 F.3d 943, 944 (7th Cir. 2002)). Defendants have identified at least nineteen instances of improper and argumentative questioning by Plaintiffs' counsel during the cross-examination of Defendant Zalatoris alone, and an additional nine during the examination of ASA Nancy Nazarian. This is not an exhaustive list, but a representative sample of a broader pattern of misconduct—one in which counsel repeatedly argued with witnesses, mischaracterized evidence, speculated without basis, and inserted their own testimony under the guise of questions. This conduct far exceeded the boundaries of permissible cross-examination and cumulatively deprived Defendants of a fair trial.

This is not, as Plaintiffs suggest, an attempt to manufacture appellate issues. (Dkt. 518 at 48). Rather, it reflects serious, sustained improper cross-examination and badgering of witnesses. Counsel's tactic of embedding arguments and innuendo in their questions, mocking witness

responses, and treating the stand as a platform for narrative spinning, improperly skewed the jury's perception of the evidence and the witnesses. *See*, *e.g.*, *Durant v. Sur. Homes Corp.*, 582 F.2d 1081, 1089 (7th Cir. 1978) (finding improper questioning regarding conversation of which there was no evidence in the record and that counsel was not prepared to prove existed).

By way of example, there was no evidence, nor could Plaintiffs prove that Shaw was offered a deal (Tr. 1348:9–14); phone records were missing (Tr. 1400:24–1401:7); signatures were added to reports post-creation (Tr. 1409:13–15); and/or the (non-) existence of a "murder weapon" (Tr. 1461:9–14). Furthermore, questioning which is designed, not to elicit facts, but to demean the witness is similarly improper. *See*, *e.g.*, *United States v. Wolf*, 787 F.2d 1094, 1098 (7th Cir. 1986) (finding improper cross examination with innuendo that Defendant had a venereal disease because it "was calculated to demean him in the eyes of the jury—and there is little doubt that that was the purpose for which it was planted"). *Wolf* also found the purpose of questioning with no basis in the record was to diminish the defendant in the eyes of the jury and therefore was improper. *Id.* (citing *United States v. Wormick,* 709 F.2d 454, 459 (7th Cir.1983) ("The entire line of cross-examination was improper; the prosecutor was insinuating Wolf's guilt of another crime, which the government should have been but was not prepared to prove by clear and convincing evidence if it wanted to inject it into the case.")).

Plaintiffs' questioning was often deliberately demeaning. *See*, *e.g.*, (Tr. 1456:25–1457:3) (Q: You're just making that up, though; right?); (Tr. 1475:9–11) (Q: So he's a convenient person to blame, isn't he?); (Tr. 1553:17–1554:1) (Q: … you're asking, are you not, a jury to have mercy on your – when they decide the punitive damages against you? That's why you are talking about your money, right?"); (Tr. 1573:20–23) (Q: By the way, your memory seems a little selective, would you agree?); (Tr. 3426:24–25) (Q: The reason you are having trouble here is because the

whole theory of the case was revenge, revenge, revenge, correct?). Counsel's unfounded personal opinions on the credibility of witnesses he was examining in the guise of cross examination were beyond the scope of proper questioning and undoubtedly prejudicial. *See*, *e.g.*, *Boyd v. Vill. of Carol Stream*, No. 99 C 6514, 2001 WL 641301, at \*4 (N.D. Ill. June 1, 2001) (J. Darrah) (noting judgment of the credibility of witnesses' testimony "is best left to the finder of fact."); *Wolf*, 787 F.2d at 1099 (improper questioning is a basis for a new trial where it was prejudicial).

Plaintiffs' defense of this conduct as "effective cross-examination" demonstrates their cavalier attitude and is a tacit admission that this style of improper questioning was so commonplace that it infected the entire proceeding. The Supreme Court has made clear that the Confrontation Clause guarantees only the opportunity for effective cross-examination—not a license for unfettered rhetorical theatrics. *See Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) ("Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."). That principle applies here.

Defendants were forced to lodge repeated objections to curb Plaintiff's improper tactics. These objections that were often sustained, but this created additional prejudice by suggesting to the jury that the defense was trying to "hide" something or obstruct the flow of testimony. Worse, the Court issued no curative instruction to mitigate this recurring behavior in the face of Defense objections. This stands in contrast to cases like *Collins v. Lochard*, 2015 WL 4127039, at \*2 (7th Cir. July 9, 2015), where the issuance of prompt curative instructions was key to neutralizing any risk of prejudice. No such remedial action was taken here.

In the aggregate, Plaintiffs' counsel's improper questioning strategy functioned as unchecked closing argument masquerading as cross-examination. The cumulative effect of that

misconduct—combined with the Court's failure to correct it—prejudiced the jury against Defendants. Accordingly, a new trial is warranted to remedy the substantial unfairness that permeated these proceedings.

### D.  Inappropriate Emotional Outbursts from Plaintiffs and at Plaintiffs' Counsel's Table.

Plaintiff Fulton's wife's audible outburst—shouting "wow" from the gallery in direct response to Breen's testimony—was an improper and prejudicial intrusion into the proceedings. (Tr. 2418). This emotional display was intended to signal disbelief and disagreement with the testimony being offered and was plainly designed to influence the jury by appealing to their sympathies. Plaintiffs do not dispute the inappropriateness of this conduct, conceding it "shouldn't have happened." (Dkt. 518 at 49). Yet the Court took no immediate corrective action: there was no admonishment of the gallery, no curative instruction issued to the jury, and no meaningful effort to neutralize the prejudicial effect of what was an emotionally charged and inappropriate interjection.

Furthermore, this incident was not an isolated lapse, as Plaintiffs contend. Another such lapse was laughing from counsel's table—that demeaned Defendants and undermined the integrity of the proceedings. (Tr. 3195:1-14) ("We've had laughing at Plaintiffs' table, outbursts from counsel, as well as Plaintiffs. And now this is at a minimum a third instance on a third day."). Another highly prejudicial moment followed when Plaintiff's uncle, Jerome Greenlaw, stepped off the witness stand where he was testifying as a damages witness and embraced Mr. Fulton directly in front of the jury. (Tr. 3194:16: "Witness hugs Mr. Fulton."). This overt display of familial affection in the presence of the jury again served only one purpose: to generate emotional sympathy for Plaintiff Fulton, portraying him as a victim deserving of compassion rather than subjecting his claims to dispassionate scrutiny. Once more, the Court denied a mistrial motion and

issued no curative instruction. (Tr. 3194:17–22). These repeated emotional outbursts and displays of high courtroom drama deprived Defendants of a fair trial.

### E. The Court's Lack of Intervention During Plaintiffs' Counsel's Misbehavior.

Plaintiffs offer no additional argument as to Defendants' arguments regarding the Court's lack of admonishment of Plaintiffs' counsel's misbehavior. Plaintiffs contend Defendants have not identified anything worthy of admonishment but see the plethora of examples noted above including the repeated violations of the Court's orders, intentionally inflammatory commentary, and improper and argumentative questioning. Throughout trial, Plaintiffs violated the Court's orders *in limine* and in the process prejudiced the jury against Defendants such that they received an unfair trial. Prompt intervention through instructions or admonishment perhaps could have reduced the prejudice to Defendants created by Plaintiffs' behavior, but there was no such admonishment. (*See*, *e.g.*, Tr. 2327:1–11; 3197:7–3198:23) As a result, Defendants received an unfair trial and should receive a new one.

Moreover, the Court did not enforce its own rulings at times, particularly regarding the 48-hour ruling. (Dkt. 400 at 20). Plaintiffs were barred from arguing that the length of Fulton's and Mitchell's custody beyond 48 hours without a probable cause hearing was a constitutional violation. Yet during opening statements, Plaintiffs' counsel violated this ruling arguing, "John…was in there for more time than the Constitution allows." (Tr. 17:19–24). The Court addressed this violation regarding the 48-hour rule explaining "I think it is confusing to the jury to talk about that detention beyond the 48 hours as unconstitutional, so I want to stay away from that. But there are, you know, the officers had a standard that they were to apply, and you can inquire into that." (Tr. 107:2–4). The Court reiterated that Plaintiffs' counsel "can't argue that this was independently a constitutional violation when he's arguing his case to the jury. (Tr. 109:13–16). Plaintiff flouted this ruling as described above.

36

The Court's impartiality, both actual and perceived, is paramount for a fair trial. Defendants are particularly concerned by the Court's acknowledgment that it made facial gestures expressing disapproval in response to their objections. (Tr. 3208:7–8). While perhaps unintentional, these gestures conveyed to the jury a sense of judicial disfavor toward Defendants, which compromised the appearance of a fair trial. As recognized by the Seventh Circuit, a trial judge's conduct may render a trial unfair when it reflects "such a high degree of favoritism or antagonism as to make fair judgment impossible." *United States v. Robbins*, 197 F.3d 829, 848 (7th Cir. 1999). Additional comments from the Court—such as stating that "this is Mr. Loevy's trial, and he has to defend it on appeal" (Tr. 1357)—further bolstered the perception that Plaintiffs were entitled to deference not enjoyed by Defendants.

The cumulative effect of Plaintiffs' counsel's behavior, compounded by the Court's failure to enforce its own rulings or issue timely curative instructions, rendered the trial fundamentally unfair. Defendants do not raise these concerns lightly but do so out of necessity to preserve the integrity of the judicial process. Respectfully, the interests of justice require that the Court grant Defendants a new trial.

## XI.     Procedural Irregularities Resulted in an Unfair Trial

Defendants are entitled to a new trial because the cumulative effect of the Court's procedural missteps deprived them of a fair and impartial proceeding. First, the Court's inconsistent and fluctuating rulings concerning how to characterize the vacatur of Plaintiffs' underlying criminal convictions severely prejudiced Defendants. Despite Plaintiffs' failure to address this argument substantively, the record is clear that Defendants were prevented from explaining to the jury that the convictions were overturned on procedural grounds, not due to a finding of innocence. The jury was repeatedly and improperly led to believe that Plaintiffs were "wrongfully convicted," as if that was something a prior court previously concluded. Second, the

Court failed to rule on numerous defense objections and, in one instance, improperly polled the jury on whether it wished to hear certain evidence—an abdication of the Court's gatekeeping role that signaled partiality and undermined the adversarial process. Third, the Court's instruction that it was "unreasonable" for Plaintiffs to be held for more than 48 hours effectively decided the involuntary confession claim for the jury, denying Defendants a fair opportunity to contest that essential element. Fourth, in response to a jury question concerning the taxability of compensatory damages, the Court erroneously declined to issue a clarifying instruction, despite Defendants' timely request to do so. The failure to provide this instruction permitted the jury to speculate— resulting in an inflated damages award based on a mistaken belief that taxes would apply. Lastly, the Court unfairly sustained Plaintiffs' cumulative objections while affording Plaintiffs broad leeway to introduce repetitive testimony, further constraining Defendants' ability to present their case. Whether viewed individually or cumulatively, these errors constitute a miscarriage of justice and compel the granting of a new trial.

### A. The Court's Fluctuating Rulings About the Basis for the Dismissal of the Criminal Charges Unfairly Prejudiced Defendants.

Plaintiffs procured the dismissal of their criminal charges by submitting an affidavit from Fulton's former criminal defense attorney, Elliott Zinger, which created the misleading and false impression that Zinger failed to check for the existence of a backdoor camera at Fulton's apartment which would purportedly have proved Plaintiffs' alibi. (Dkt. 290-2 at 5–6; FPTC Tr. 33:11–15). In reality, Zinger testified that he had personally investigated the area and confirmed that no such camera existed. (*See*, *e.g*., Tr. 3924:13–14: "Q. Did you see a camera by the rear doors of the building? A. No."). Thus, the implication left by Plaintiffs in the post-conviction process was

materially misleading.[4] Despite this deception, Defendants were barred from introducing evidence at trial that Plaintiffs' convictions were vacated not because of any misconduct by Defendants, but due to misrepresentations made by Plaintiffs themselves. Nevertheless, the Court restricted Defendants to stating only that the convictions were vacated for "procedural error, not a determination of innocence." (Dkt. 400 at 24 (emphasis added)).

Taking advantage of the Court's ruling, Plaintiffs repeatedly suggested to the jury that their convictions were overturned because they were factually innocent. In opening statements and throughout the trial, they used the loaded phrase "wrongfully convicted" to imply that Plaintiffs' convictions were reversed based on innocence. (See Tr. 4:8–9, 4:19–20, 6:10, 87:14–22). Although the Court initially ruled that if Plaintiffs opened the door to the basis for their post-conviction relief that Defendants could respond with relevant evidence, (Dkt. 399 at 3), the Court ultimately changed its ruling. The Court did not allow Defendants to explain the actual grounds for vacating the convictions. Instead, the Court enforced its prior limitation and confined Defendants to explaining the basis for the dismissal of charges as a "procedural error."

Compounding the prejudice, the Court reversed itself at the close of evidence and omitted the "procedural error" language from the dismissal instruction completely. (Dkt. 485 at 36). This revision changed the framing of the entire trial without giving Defendants the chance to respond. As a result, the only narrative the jury heard—unopposed—was the misleading one Plaintiffs advanced from the outset: that they were "wrongfully convicted." This one-sided portrayal deeply prejudiced Defendants. When the Court changed its ruling at the end of the trial, the evidentiary

---

[4] Plaintiffs have not presented an alternative explanation for the dismissal of their criminal charges. Failure to respond to an argument—as Plaintiffs have done here—results in waiver. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *see also Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1042 (7th Cir.1999) ("If [judges] are given plausible reasons for [deciding a motion], they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning. An unresponsive response is no response.")

record had closed. Defendants were left defenseless on a central issue—the reason Plaintiffs' convictions were vacated.

Plaintiffs' only answer is to note that Defendants argued during opening statements that Plaintiffs were never declared innocent. (Dkt. 518 at 56). But defense counsel's opening statement is no substitute for evidence and the Court's ruling during the evidence phase of the trial was that the dismissal was to be described as based on a "procedural error." Plaintiffs claim the trial then proceeded smoothly (Dkt. 518 at 57) but ignore the numerous areas of the evidentiary imbalance created by Plaintiffs' behavior and the Court's rulings described in Defendants' motion. The prejudice to Defendants was fully baked when the Court ultimately changed the framing of the basis for the dismissal of Plaintiffs' charges in the jury instructions provided after the close of evidence.

Plaintiffs attempt to reframe this issue as "Defendants did it too," claiming that Defendants made their own statements regarding the lack of a judicial finding of innocence. (Dkt. 518 at 56-57). But this misses the point. It was not merely that the parties disagreed. It was that the Court's rulings—first barring the full explanation, then changing course at the close of trial—ultimately prevented Defendants from presenting the truth about why Plaintiffs' convictions were vacated. The record makes clear that Plaintiffs "opened the door" within the meaning of the Court's earlier ruling by repeatedly calling Plaintiffs wrongfully convicted and referencing that their convictions were "overturned." (Tr. 5:5–10, 294:22–23, 962:6–8; 3339:1–6). Defendants should have been allowed to walk through their evidence that Plaintiffs' convictions were vacated based on misrepresentations, not actual innocence. Accordingly, the Court's failure to permit that response deprived Defendants of a fair trial.

### B. Failure to Rule on Defense Objections and Asking the Jury for Its Input in Ruling on Whether Defendants Could Present Evidence was Unfair.

Plaintiffs attempt to downplay the Court's failure to rule on numerous defense objections by labeling the cited examples as "silly," suggesting that the objections lacked merit or were simply too frequent to warrant rulings. (Dkt. 518 at 53). But regardless of their substance or frequency, each objection placed a legal issue before the Court that required resolution. Plaintiffs argue that Defendants were obligated to "insist" on rulings, relying on *United States v. Wilson*, 962 F.2d 621 (7th Cir. 1992). Yet, Plaintiffs omit the critical context: the waiver in *Wilson* occurred where counsel failed both to raise the issue and to object at all—not merely to follow up on a pending objection. *Id*. at 625. In contrast, Defendants here did exactly what Rule 46 of the Federal Rules of Civil Procedure requires: they clearly stated their objections and the grounds for them, thereby preserving those issues for resolution. Fed. R. Civ. P. 46 ("When the ruling or order is requested or made, a party need only state the action that it wants the court to take or objects to, along with the grounds for the request or objection."). Plaintiffs would have the Court impose a heightened and asymmetric standard on Defendants. That is not only inconsistent with the rules but fundamentally unfair.

These irregularities were further highlighted when the Court solicited the jury's input on whether it wanted to hear additional evidence, rather than deciding the admissibility question as required. This unusual procedure risked implying to the jury that its preferences could override evidentiary rules and fostered the appearance of partiality. Plaintiffs dismiss this concern as "silly" and suggest the Court's conduct was merely being "courteous and considerate" to the jury. (Dkt. 518 at 54). But this response only reinforces the point: that the process favored Plaintiffs in a way that compromised neutrality. Defendants respectfully submit that these procedural irregularities, particularly the Court's failure to rule on key objections and delegation of admissibility decisions

to the jury, cumulatively undermined the fairness of the trial. A new trial is warranted to restore the integrity of these proceedings.

### C. The Court's Instruction That It Was "Unreasonable" for Plaintiffs To Be Held for More Than 48 Hours was Unfair.

The Court's instruction that Defendants' conduct in holding Fulton and Mitchell for more than 48 hours was itself "unreasonable" was unfair as it made it impossible for Defendants to prevail on the involuntary confession claim. By its instruction, the Court was making a conclusion for the jury as to that claim. Plaintiffs do not meaningfully address this argument, contending only that the Court's instruction was a complete and accurate statement of the law. This left the jury with the false impression that it was required to find for the Plaintiffs and resulted in an unfair trial.

### D. The Jury Was Not Properly Instructed on Taxes In Response to Its Question.

Plaintiffs contend that Defendants failed to propose a jury instruction regarding the taxation of compensatory damages prior to the jury instruction conference. Consequently, Plaintiffs argue, Defendants are now precluded from asserting that a tax instruction should have been provided in response to the jury's question on that issue. *See* Dkt. 518 at 58–59. This argument is misplaced. Defendants are not objecting to the pattern compensatory damages instruction initially given to the jury. Rather, Defendants contend that, once the jury submitted a question to the Court regarding the taxability of compensatory damages, the Court should have responded by instructing the jury that such damages are not subject to taxation. Therefore, the Court erred in rejecting Defendants' proposed instruction addressing the jury's tax question. Plaintiffs' response fails to engage with this argument.

First, Defendants could not have anticipated that the jury would inquire about the taxability of damages during deliberations. Accordingly, they could not have proposed a tax-related jury instruction at the jury instruction conference for a question they had no way of foreseeing. Second,

and more significantly, once the jury submitted its question, the Court should have informed the jury that compensatory damages are not taxable. *See In re Air Crash Disaster Near Chicago, Ill., On May 25, 1979*, 803 F.2d 304, 313 (7th Cir. 1986) (Reversing jury verdict and holding that, in light of the risk of overcompensating the plaintiff, the jury should be instructed that damages are not taxable to prevent inflated awards).

During the discussion of the jury's question, defense counsel proposed the following instruction: "We are not tax advisers, but compensatory damages are generally not taxed, and you would have to report it on your income." (Tr. 4356:14–16). Defense counsel also pointed out that simply referring the jury back to the compensatory damages instruction would not adequately address their question. (Tr. 4356:11–13). Nonetheless, the Court responded to the jury as follows, contrary to defense counsel's recommendation: "I cannot give you any advice on tax consequences of a judgment. You must rely on instructions on damages." (Tr. 4357:8–10). Plaintiffs incorrectly assert that defense counsel agreed to this response; however, the record reflects no such agreement. (*See* Tr. 4356–4357) (MR. KAMIONSKI: So it's our position that compensatory damages, especially in this type of case, is generally not taxable. We're not tax advisors. But that would be our position. Referring them back to the instructions doesn't answer the question.)

Despite their experience in securing compensatory damages awards for clients, Plaintiffs' counsel professes complete ignorance as to whether any such awards have ever been subject to taxation. Rather than providing evidence from their own practice, Plaintiffs instead submit a declaration from tax attorney Robert Wood, who opines that the law surrounding the taxability of compensatory damages is unclear. However, Mr. Wood's declaration notably omits any mention of experience advising plaintiffs on the tax reporting requirements for compensatory damages awarded following reversed convictions—a likely omission given that his primary area of

expertise appears to be advising businesses on tax issues related to independent contractor classifications. *See In re Fedex Ground Package System, Inc. Employment Practices Litigation*, 2010 WL 1838400, at *1 (N.D. Ind. May 4, 2010). Nevertheless, Mr. Wood ultimately affirms what defense counsel has consistently maintained: that damages recovered in cases such as this one are, in all likelihood, not taxable. (*See* Dkt. 518-6, Ex. F at ¶ 16 ("Section 139F creates a tax exclusion for plaintiffs specifically for amounts received as part of certain wrongful incarceration recoveries. [...] I believe it is likely that the compensatory damages awarded to Mr. Fulton and Mr. Mitchell could so qualify…"). Accordingly, Plaintiffs' own expert acknowledges that the type of compensatory damages awarded in this case is likely nontaxable. The Court, therefore, should have issued the instruction proposed by Defendants.

Plaintiffs rely on *Hill v. City of Harvey*, 732 F. Supp. 3d 862, 887 (N.D. Ill. 2024), *appeal dismissed*, No. 24-1940, 2024 WL 4921652 (7th Cir. Oct. 30, 2024), to support their claim that compensatory damages are taxable, based on the jury instruction provided by Judge Maldonado in that case. However, both Plaintiffs and Mr. Wood acknowledge that 26 U.S.C. § 139F provides a tax exclusion for monetary awards received in cases like this one. Specifically, the statute states: "In the case of any wrongfully incarcerated individual, gross income shall not include any civil damages, restitution, or other monetary award (including compensatory or statutory damages and restitution imposed in a criminal matter) relating to the incarceration of such individual for the covered offense for which such individual was convicted." 26 U.S.C. § 139F(a). Therefore, Plaintiffs' contention that their compensatory damages award would be subject to taxation was incorrect, and the Court should have given the instruction proposed by defense counsel.

Referring the jury to the compensatory damages instruction failed to address the jury's specific question regarding taxation. This omission had a concrete impact. As revealed by a juror

who later posted on Reddit, the jury "didn't know if that money would be taxed, so we gave extra just in case…I'm not good with math. lol I think we assumed they would be taxed about 30% (if it is taxed at all)." (See Dkt 515, n. 9). This candid comment illustrates that the jury, left without guidance, speculated about tax implications and consequently increased the damages award to offset a presumed tax liability that does not, in fact, apply. By failing to clearly instruct the jury that compensatory damages in this context are not taxable, the Court allowed the jury to base its award, in part, on a mistaken assumption. The Court therefore erred in declining to adopt defense counsel's proposed instruction, which would have clarified the non-taxable nature of such damages and prevented the unjustified inflation of the award.

### E. Defendants Were Unfairly Prevented from Presenting Relevant Evidence Under The Guise of "Cumulativeness."

Plaintiffs dodge the substance with derision rather than addressing the core issue. While trial time is indeed limited, that is exactly why Defendants requested equal time for both sides. (Dkt. 285 at 10). As anticipated, Plaintiffs consumed the lion's share of time for their case-in-chief, then argued that Defendants' efforts to respond were "cumulative." That is not efficiency—it is prejudice.

Respectfully, the exclusion of rebuttal evidence merely because Plaintiffs first broached the topic cannot be discounted as case management. It resulted in one-sided trial control in favor of Plaintiffs. Take ASA Nazarian's testimony: Plaintiffs called her for the express purpose of "establish[ing] generally what happened at the trial to show the materiality point[.]" (Tr. 3530). When Defendants tried to elicit the actual content of that testimony to rebut Plaintiffs' selective narrative, the Court barred it as cumulative. (Tr. 3541, 3549). Yet, when Plaintiffs sought to rehash evidence through Nazarian—*e.g.*, about Detective Rolston—even after objections, the Court allowed it. (Tr. 3349–51; 3660–61).

This asymmetric enforcement of the cumulative evidence doctrine hamstrung Defendants. Worse, in a trial where credibility was pivotal, excluding prior testimony simply because it was referenced elsewhere defies logic. Evidence bearing on witness credibility is not cumulative in any meaningful sense—it is essential. The fact that similar evidence was introduced previously does not diminish its value when offered to test a witness's truthfulness or challenge Plaintiffs' version of events. For example, Plaintiffs were freely permitted to call several damages witnesses even though the topics of their testimony—damages—were previously covered by Plaintiffs and other damages witnesses. The selective exclusion of defense evidence under the guise of "cumulativeness" unfairly tilted the trial. A new trial is warranted to restore due process.

## XII. Inconsistent Verdicts Necessitate a New Trial.

The jury rendered inconsistent verdicts on Plaintiffs' involuntary confession claims and conspiracy claims that no rational jury could have reached that verdict having heard the same evidence. Plaintiffs argue Defendants forfeited this argument by not making a contemporaneous objection citing *Cont'l Vineyard, LLC v. Vinifera Wine Co., LLC*, 973 F.3d 747, 754 (7th Cir. 2020) ("Without such an objection, the court's option to fix the problem by resubmission to the jury as contemplated by Rule 49(b)(3)(B), vanishes.") But *Vineyard* addressed the question of what to do when a litigant fails to object to an apparently inconsistent general verdict *with written questions* before the jury disbands. *Id.* (emphasis added). There were no written questions here and so Rule 49(b) is inapplicable. Despite the lack of any evidence (or even an allegation) that Bartik ever interacted with Mitchell, the jury found in favor of Mitchell and against Bartik. (*See* Dkt. No. 487). Therefore, a new trial is warranted.

### XIII. The Cumulative Effect of Erroneous and Unfair Evidentiary Rulings, Plaintiffs' Counsel's Misconduct, and Unfair Procedure Requires a New Trial.

Each of the errors discussed above justifies a new trial. Plaintiff does not meaningfully address this argument stating that the unfairness described herein was simply "non-existent errors." (Dkt. 518 at 64). However, even if any one of these irregularities standing alone does not justify a new trial, cumulatively these errors, in the context of the entire trial, were so severe as to have rendered the trial fundamentally unfair to Defendants, and therefore they are entitled to a new one.

### CONCLUSION

Defendants did not receive a fair trial due to erroneous evidentiary rulings, conduct of Plaintiffs' counsel, and erroneous procedure. As such, Defendants respectfully request the Court grant them a new trial, and for any other relief this Court deems just and proper.

Dated: June 25, 2025                         Respectfully submitted,

*/s/ Shneur Nathan*                          */s/ James P. Fieweger*
Special Assistant Corporation Counsel        Special Assistant Corporation Counsel
Shneur Nathan, Avi Kamionski,                James P. Fieweger
Natalie Adeeyo, Breana Brill, & John Cerney  Michael Best & Friedrich LLP
Nathan & Kamionski LLP                       444 W Lake St Ste 3200,
206 S. Jefferson Street                      Chicago, IL 60606
Chicago, IL 60661                            jpfieweger@michaelbest.com

*Attorneys for Individual City Defendants*   *Attorney for City of Chicago*

### CERTIFICATE OF SERVICE

I, Shneur Nathan, hereby certify that I have caused true and correct copies of the above and foregoing motion to be served on all counsel of record via CM/ECF on June 25, 2025.

*/s/ Shneur Nathan*